IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel*. CHARLES R. SHEPHERD and DANNY V. RUDE, | ) ) ) | |
| | ) | CA No.: 6:13-cv-02428-TMC |
| Plaintiffs/Relators, | ) | |
| | ) | |
| v. | ) | Filed Under Seal and In Camera |
| | ) | |
| FLUOR CORPORATION, INC., | ) | |
| FLUOR INTERCONTINENTAL, INC., | ) | Jury Trial Demanded |
| KELLOGG, BROWN & ROOT, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT

Now comes the United States of America, on the relation of Charles R. Shepherd and Danny V. Rude, directly as a plaintiff, and complains of Defendants Fluor Corporation, Inc., Fluor Intercontinental, Inc., (together, "Fluor"), and Kellogg, Brown, and Root, Inc., as follows:

Introduction

1.      This action seeks damages and civil penalties arising from violations of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

2.      Co-relators Charles R. Shepherd and Danny V. Rude are both former military officers who served their country with distinction.  They are former employees of Fluor Corporation, Inc., which holds a contract to perform work on forward operating bases in support of the U.S. Army's Joint Task Force-Afghanistan and Provincial Reconstruction Teams (LOGCAP IV, Task Order 05 Contract).

3.      As described in more detail below, Fluor defrauded the U.S. government out of hundreds of millions of dollars for its work under Task Order 05.  Fluor profited greatly from its

fraud, from the very beginning of its involvement in the LOGCAP and throughout, by billing the government for work Fluor did not perform, by billing the government for work Fluor was not authorized to perform (*i.e.*, not on Fluor's Master Scope of Work), by routinely inflating contract performance and compliance figures to obtain massive award fees it did not earn, by deploying thousands of excess personnel that it knew were not necessary, and by engaging in extensive frauds related to the acquisition and management of government property and materials. This last category includes misconduct in the acquisition and use of government property and materials, a failure to track and control inventory, and the maintenance of a deficient and non-compliant property management system.

4.      In addition to the above, in order to cover up for all of the misconduct above, Fluor engaged in additional forms of fraud to conceal hundreds of millions of dollars in lost government property.

5.      All of these actions resulted in the submission of false claims to the U.S. government.  When Shepherd and Rude complained about misconduct to their supervisors at Fluor, Fluor greeted their whistleblowing with hostility, threats, the denial of well deserved promotions, and constructive demotions.

<u>Parties</u>

6.      Relator Charles R. Shepherd, is a former U.S. Army officer and graduate of the U.S. Army Ranger School, and served in the United States Army for 17 years, retiring from active duty in 1990 at the rank of Captain.  During this time, Shepherd served as a Rifle Platoon Leader and Company Commander in the 82nd Airborne Division, as well as an Operations Officer for the Southern European Task Force (Airborne).  Shepherd completed his active duty in the Army as a Public Affairs Officer for the Airborne Battalion Combat Team stationed in

Vincenza, Italy.

7.      As a Rifle Platoon Leader, Shepherd commanded a 120-man Airborne Rifle Company.  In his role as Operations Officer, Shepherd served as second in command for a battalion task force of several hundred soldiers.  This battalion was the only "quick reaction" Airborne Infantry Battalion stationed in Europe.

8.      Relator Shepherd began working for Fluor in 2009 in the role of Operations Manager, Project Manager, and Senior Logistics Manager.  As a Senior Logistics Manager, Shepherd was tasked with supporting the Service Desk and Work Control mission across 70 Forward Operating Bases ("FOBs") in northern Afghanistan as part of Task Order 05.  Shepherd currently serves in the position of Country MAXIMO Manager.  In this position, he is responsible for managing the Fluor System of Record (IBM MAXIMO Enterprise Management System v7.1) which tracks all maintenance and work for over 70 Forward Operating Bases in Northern Afghanistan. Shepherd was fired, in retaliation for his complaints about Fluor's fraudulent conduct, in July 2015.

9.      Relator Danny V. Rude, a U.S. Army First Sergeant (retired), spent twenty years on active duty in the United States Army.  During this period, Rude served as a Non-Commissioned Officer in U.S. Airborne, Artillery and Air Defense Units, including several tours of duty overseas.  As a First Sergeant, Rude commanded a 125-man Company and was responsible for the training of over 600 personnel in proper weapons maintenance techniques. For his exemplary service, Rude was awarded several Good Conduct, National Defense, and Army Accommodation Medals.

10.     Relator Rude also began working for Fluor in 2009.  He worked as the Operations and Maintenance Manager for the largest remote Forward Operating Base in Afghanistan, and as

a Transition Manager, and then as the Deputy Country MAXIMO Manager. In this position, Rude directly supervised the MAXIMO Technical and Reporting Teams, which included monitoring Fluor's performance against compliance standards. Rude was fired, in retaliation for his complaints about Fluor's fraudulent conduct, in July 2014.

11.     Defendant Fluor Corporation, Inc., is a Texas-based corporation with its principal place of business in Irving, Texas. Fluor is one of the world's largest publicly traded engineering, procurement, construction, and maintenance ("EPCM") companies. Under the Logistics Civil Augmentation IV Program ("LOGCAP IV"), Fluor provides EPCM services, as well as site management, facility operations and maintenance, and base camp construction and services support to the U.S. Army's Joint Task Force-Afghanistan and Provincial Reconstruction Teams. Fluor currently provides these services at 70 FOBs in northern Afghanistan as part of the 7 billion dollar Task Order 05 contract (W52P1J-07-D-0008).

12.     Defendant Fluor Intercontinental, Inc., a wholly owned subsidiary of Fluor Corporation, Inc., is a South Carolina corporation with its principal place of business in Greenville, South Carolina.

13.     Defendant Kellogg, Brown & Root, Inc., ("KBR") is a Delaware corporation with its principal place of business in Houston, Texas. KBR is the largest non-union construction and engineering firm in the United States. Under the LOGCAP III Program, KBR provided logistics support services, base camp services, life support services, as well as EPCM services to U.S. and allied forces in Afghanistan, including establishing base camps at Kandahar and Bagram Air Base. The total value of the LOGCAP III contract to KBR as it related to Afghanistan was approximately 217 million dollars.

14.     Relators Shepherd and Rude are original sources for the allegations in this

Complaint. Prior to filing this Complaint, Relators voluntarily disclosed to the government the information upon which this action is based. In addition, they have personally witnessed Fluor's fraudulent activity, including but not limited to billing the government for work not on its Master Scope of Work; billing the government for work that it did not perform; routinely reporting to the government false and grossly inflated contract performance and compliance figures related to performance of Life, Health and Safety issues, inventory tracking and control, etc.; circumventing the Maximo property system and failing to maintain Maximo as an accurate and adequate property management system; and engaging in various fraudulent schemes to conceal inventory shortages and property loss.

<u>Jurisdiction and Venue</u>

15.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under a federal statute, 31 U.S.C. § 3729, *et seq*. There has been no public disclosure of the fraud alleged herein. Moreover, Shepherd and Rude are original sources because 1) prior to any public disclosure they voluntarily disclosed to the government the information on which the allegations in this suit are based; and 2) because they have knowledge that is independent of, and materially adds to, any publicly disclosed information, and voluntarily provided the information to the government before filing this suit.

16.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 31 U.S.C § 3732(a) because at least one of the Defendants conducts business in this judicial district and at least one of the claims giving rise to this Complaint occurred in this judicial district.

<u>Facts</u>

**I.     LOGCAP History and Background**

17.     LOGCAP was designed and implemented by the United States Department of the

Army as a means of outsourcing the provision of service-based logistical military support to civilian contractors during wartime. By arranging for routine and contingency support services to be performed by contractors, LOGCAP is designed to help the Army release military units to perform other functions; LOGCAP serves a "force multiplying" function.

18.    The Army defines the "Base Life Support" functions that comprise the bulk of the duties undertaken by LOGCAP contractors as encompassing the following: facilities management; hazardous materiel storage; vector and pest management services; laundry service; food service; morale, welfare, and recreation; power generation; water production; billeting; waste and sewage management; material handling equipment (MHE) operations; maintenance transportation motor pool; shuttle bus service; Class III retail operations; firefighting services and fire protection; and government support services.

19.    The Department of Defense, the Government Accountability Office, and other agencies have recognized that military logistics contracts like LOGCAP bear an inherent risk, which has increased as these contracts have grown in scope and complexity while the number of qualified Government contracting personnel has actually decreased. As a result of these factors, it is increasingly difficult for the United States to effectively oversee the activities of logistics contractors and ensure that contracts are being executed in the best interests of taxpayers. As detailed in this Complaint, Fluor exploited this situation to its own benefit and to the detriment of the United States.

20.    Although it was first implemented in 1985, LOGCAP's profile – in terms of both funds committed and public notoriety – drastically increased in 2001 when, following the events of September 11 of that year, Kellogg, Brown & Root Inc. (KBR, a subsidiary of Halliburton Company) was awarded the LOGCAP III contract (contract number DAAA09-02-D-0007), an

indefinite delivery, indefinite quantity contract with an unlimited dollar amount. KBR's duties under the contract primarily involved the provision of an array of support services – of the type identified in the preceding paragraphs – to the military units deployed to the Middle East and elsewhere in the wake of the attacks on September 11.

21.     Although LOGCAP III was competitively bid by the Department of the Army and won by KBR, the arrangement began to come under increased scrutiny as the mission in Iraq wore on and the expenditures mounted. It was reported in August 2011 – near the end of the contract period, which had consisted of a base year and nine option years – that payments under LOGCAP III to KBR and its many subcontractors had reached a staggering $37 billion. Thus, while the initial LOGCAP III bid may have been competitive, the contract terms essentially allowed KBR to decide what work needed to be done, determine the cost, and bill it to the Government, without any competition with regard to the ultimate cost of performance. This state of affairs eventually drew widespread criticism from the media, as well as Congress. KBR's performance under LOGCAP III was heavily criticized by the Defense Contract Audit Agency, an auditing organ of the Department of Defense.

22.     Under intense criticism from the Government auditing agencies, the media, various legislators, and the public, the Department of the Army announced that ongoing logistics work in Afghanistan and Iraq would be re-bid in a new competition for a contract to be known as LOGCAP IV. In April 2008, the Army selected KBR, DynCorp International LLC (DynCorp), and Fluor to serve as performance contractors.

23.     According to the U.S. Army, "what [KBR, DynCorp, and Fluor] won [was] the potential" to compete for task orders under LOGCAP IV.11 In July 2009, the primary logistics support work under LOGCAP IV was awarded to DynCorp and Fluor. Under contract number

W52P1J-07-D-0008, Fluor was awarded Task Order 0005, primarily consisting of the provision of BLS services at 74 bases in North Afghanistan. The contract consisted of one base year and – initially – four option years. Fluor announced that the potential value of the contract could reach $7 billion. DynCorp was awarded a similar LOGCAP task order for South Afghanistan.

## II.    Background on LOGCAP IV

24.    The principle objective of LOGCAP is to provide Combat Support and Combat Service Support to Combatant Commanders and Army Service Component Commanders during contingency operations.  Support is to be provided by LOGCAP contractors through the full range of military operations and other operations as designated by the Department of the Army.

25.    The U.S. Army Material Command ("AMC") is the executive agent for LOGCAP Program Management.  The principal staff agency for the day-to-day management and operation of the LOGCAP program is the Army Sustainment Command ("ASC").  AMC is responsible for all facets of the program, from the identification and inclusion of contract requirements through the execution of the contract itself.  ASC Rock Island is the contracting agency for the AMC LOGCAP Contract.  As the Contracting Agency for this contract, ASC Rock Island has the authority, through a duly appointed Procuring Contracting Officer ("PCO"), to enter into, administer, and/or terminate this contract, as well as to make determinations and findings regarding contract performance.  The PCO delegated authority to the Defense Contract Management Agency ("DCMA") to perform contract administration functions based on individual Task Order delegation.

26.    LOGCAP IV is the fourth generation of contracts under the Army's Logistics Civil Augmentation Program.  LOGCAP IV is an umbrella contract for an indefinite delivery of an indefinite quantity of services, known as an IDIQ contract.  IDIQ contracts operate through

task orders, each of which prescribes a specific scope of work.

27.    Funding for all military operations and projects must be appropriated from the U.S. Treasury by Congress. In making appropriations, Congress has the authority to define the purpose for which the funds are committed. With regard to the Department of the Army, Congress uses different appropriation vehicles to fund, respectively, military construction (MILCON), operations and maintenance (OMA), and other types of activities (OPA).

28.    The United States Department of Defense (DoD) Office of General Counsel has expressed that "contracts for obtaining logistics and support services under LOGCAP are not subject to special treatment under the law: they must be formed, funded, and executed in accordance with the laws and regulations governing government contracts generally." Because

> an agency's operating appropriations are legally available for the acquisition of services and supplies that are necessary to carry out its day-to-day operations, and for which funds are not otherwise provided . . . the Operations and Maintenance, Army appropriation is the proper source of funding for task orders under the LOGCAP contracts.[1]

29.    Accordingly, Fluor's LOGCAP IV contract is funded by OMA appropriations. These are funds that are Congressionally appropriated annually for the purpose of covering expenses related to the Army's day-to-day operations for one fiscal year. In contrast, military construction projects are funded through MILCON appropriations, which must be specifically authorized by Congress, with certain exceptions. See 10 U.S.C. § 2802. One exception is that OMA funds may be used for minor military construction projects costing $1,000,000.00 or less. This provision was amended on December 19, 2014, raising the threshold from $750,000.00 – where it stood for much of the subject period relevant to this case – to $1,000,000.00.

---

[1] See Memorandum for Office of the Legal Counsel to the Joint Chiefs of Staff, Logistics Civil Augmentation Program (LOGCAP) Funding, DoD Office of General Counsel, March 7, 2006, available at http://ogc.hqda.pentagon.mil/EandF/Fiscal_Documentation/LOGCAP%20Contract %20Funding%20(Final).pdf (last visited June 29, 2016).

30.     Fluor's proposal to the Army regarding the execution of Task Order 0005 was centered in large part on workload "drivers." In essence, Fluor compiled a list of every task that would need to be performed to accomplish the scope of work under the Task Order, the frequency of each task, and amount of time that task would take on each occasion of its performance. Fluor then aggregated all of these estimates and, based on that sum, Fluor's proposal produced the number of "Full-Time Equivalents" (FTEs) – in other words, full-time employees – that would be needed to perform the work. In simplistic terms, one employee performing a forty-hour work week, or 2080 hours per year, equals one FTE.

31.     Fluor's proposal also included projections for the cost of the materials and supplies associated with the provision of BLS services, as well as the freight forwarding costs attendant on the shipment of those materials to Afghanistan. Fluor's contract with the Government required Fluor to use the Federal Supply Schedule (FSS) program – a much more cost effective means of acquiring material than through commercial channels – to the greatest extent possible. However, the Government accepted that not all items required for contract performance were available through the FSS and that at times the lead time for FSS procurement did not support the contract requirements, and in these circumstances,  Fluor was allowed to purchase items through the commercial market and ship these items into the Afghanistan theater.

32.     Not included in Fluor's proposals were minor construction projects falling under the $750,000.00 threshold exception. When minor construction projects were necessary to support U.S. military operations in conjunction with Fluor's logistics services contract, those projects necessitated a "change order" to the original funding amount – and an increase in the potential value of the contract to Fluor. When projects of this kind were contemplated, the supported military units, the LSO, and the Defense Contract Management Agency (DCMA

Administrative Contracting Officer developed a Statement of Work and issued Fluor a Project Planning Request. In turn, Fluor submitted a Project Planning Estimate (PPE) for the work. A Technical Evaluation (TE) was performed by military representatives, the LOGCAP Program Office (the LSO and/or the LOGCAP Program support contractor), the DCMA, and Fluor. If the TE was accepted and the PPE subsequently funded through the military command / J8 funding process, then the DCMA issued Fluor a change order to the contract. These change orders incurred additional costs to the contract, including the potential hiring and deployment of new personnel and acquisition of material to complete the project. Fluor was not authorized to incur these costs until it was issued a change order by the United States. Once the change 21 order was issued, Fluor submitted Material Requisition Forms (MRFs) for the acquisition of the material identified in the Bill of Material included in the Project Planning Estimate.

*Cost-Plus Award-Fee and Cost-Plus Fixed Fee Contract*

33.     All costs incurred by Fluor in performing LOGCAP IV Task Order 0005 were passed along to the United States – including line items for Fluor's overhead, management, and administrative costs. Additionally, Fluor earned a bonus on top of its cost reimbursement.

34.     LOGCAP IV was initially a Cost-Plus Award-Fee contract.  This means that it contains both a base fee provision (a fixed profit percentage applied to actual costs to complete the work), as well as an award fee provision (a variable and discretionary profit percentage tied to various performance and compliance measures).  Under Task Order 05, the government pays Fluor for its actual cost of providing services under the task order, plus a 3% base fee (cost plus 3%).

35.     Additionally, award fees are granted bi-annually and are based on Fluor's performance as evaluated by the LOGCAP Award Fee Evaluation Board ("AFEB"). The award

fees are optional, and entirely discretionary; the government was under no obligation to grant them.

36.     In order to receive an award fee, a contractor must submit to the government a written assessment of its performance under the contract.  The AFEB scores the contractor on various performance indicators, and then, based on the overall score, evaluates the contractor's performance as "Excellent," "Very Good," "Good," or "Average," each of which corresponds to a numerical scoring range.  A contractor must be evaluated "Good" (i.e., score of greater than 70 out of 100) to be eligible for any award fee.

37.     As described in more detail below, Fluor consistently took advantage of the Cost-Plus Award-Fee contract structure, among other things, by working on facilities not on its Master Scope of Work (and not only charging the government for this work but growing its base contract in the process so that the 3% base fee increases proportionally), by both deliberately overcharging the government for work performed and deliberately charging the government for work that it did not do or was not authorized to do, by knowingly misrepresenting its performance and compliance numbers to grow its bi-annual award fee, by deploying thousands of personnel more than it needed to perform the contract, and by losing millions of dollars of property and inventory and engaging in excess re-ordering to make up for the losses, among other things.

38.     Later in the life of the contract, it transitioned to a "cost plus fixed fee" contract, under which Fluor was automatically entitled to a certain percentage of its overall billings – all of which further incentivized Fluor to boost the overall costs it passed along to the United States.

*Applicable Contract Clauses, Regulations and Other Requirements*

39.     Like all Government contracts for goods and services, LOGCAP IV (and the task

orders executed thereunder) is governed by the Federal Acquisition Regulations ("FAR"), codified in Chapter 48 of the Code of Federal Regulations. FAR sets forth the requirements binding the executive agencies of the United States and all contractors that provide goods and services to those agencies. 48 C.F.R. § 1.101 et seq.

40.     Because the LOGCAP IV prime contract specifically involves defense contracting, it is also subject to the Defense Federal Acquisition Regulation Supplement ("DFARS"), promulgated by the Department of Defense ("DoD"). 41 U.S.C. § 421(c)(2); see also 48 C.F.R. § 201.301(a) (DoD implements and supplements the FAR through the DFARS).

41.     As explained below, under the FAR and DFARS provisions incorporated into the LOGCAP IV prime contract, Fluor was required to establish and maintain a system to control, protect, preserve, and maintain all Government property in inventory, and to provide a complete and auditable record of any shortage, loss, damage, or destruction of that inventory.

42.     FAR 52.245-1, entitled "Government Property," incorporated into the Contract in Clause I-326, provides in pertinent part:

> (b) Property management. . . . The Contractor shall have a system to manage (control, use, preserve, protect, repair and maintain) Government property in its possession. The system shall be adequate to satisfy the requirements of this clause. In doing so, the Contractor shall initiate and maintain the processes, systems, procedures, records, and methodologies necessary for effective control of Government property, consistent with voluntary consensus standards and/or industry-leading practices and standards for Government property management . . . .
>                          *     *     *     *
> (f)(iii) Records of Government property. The Contractor shall create and maintain records of all Government property accountable to the contract . . . . (A) Property records shall enable a complete, current, auditable record of all transactions . . . .
>
> (f)(iv) Physical Inventory. The Contractor shall periodically perform, record, and disclose physical inventory results. . . .
> (f)(vi) Reports. The Contractor shall have a process to create and provide reports of discrepancies; loss, damage, destruction, or theft; physical inventory results; audits and self-assessments; corrective actions; and other property-related reports as directed by the Contracting Officer.

> (A)    Loss, damage, destruction, or theft. Unless otherwise directed by
> the Property Administrator, the Contractor shall investigate and
> promptly furnish a written narrative of all incidents of loss,
> damage, destruction, or theft to the property administrator as soon
> as the facts become known . . . .

Contract § I-326; 48 C.F.R. § 52.245-1.

43.    Clause I-257 of the Contract incorporates DFARS 252.242-7004, 48 C.F.R. §

252.242-7004, which requires the contractor to maintain a Material Management and Accounting

System ("MMAS"). That section of DFARS requires the following:

> (d) System Criteria. The MMAS shall have adequate internal controls to ensure
> system and data integrity, and shall—
>
> (1) Have an adequate system description including policies, procedures, and
> operating instructions that comply with the FAR and Defense FAR Supplement;
> . . . .
> (3) Provide a mechanism to identify, report, and resolve system control
> weaknesses . . . ;
>
> (4) Provide audit trails and maintain records (manual and those in machine
> readable form) necessary to evaluate system logic and to verify through transaction
> testing that the system is operating as desired;
>
> (5) Establish and maintain adequate levels of record accuracy, and include
> reconciliation of recorded inventory quantities to physical inventory by part number on a
> periodic basis. A 95 percent accuracy level is desirable.

DFARS 252.242-7004(d).

44.    In order to comply with the Contract and applicable Government regulations, the

Fluor Government Group ("FGG") issued written policies and procedures governing inventory

management.

45.    FGG's "Desk Top Guide" governing "Inventory Procedures" for Materials

provides in pertinent part:

**11.1 Conducting Inventories**

11.1.1 Inventory management should be conducted weekly at a minimum. In order to maintain current inventory records, periodic and physical inventories shall be performed. These include but are not limited to daily random spots checks, monthly site inventories or 10% monthly cycle counts that are performed throughout the year.

11.1.1.1 Random spot checks consist of randomly picking bin locations and notating the item description, location, quantity and verifying the information against Maximo.

11.1.1.2 Monthly Site or 10% inventories means that 10% of the entire warehouse is selected for inventory. This is a monthly requirement at the minimum and must be
completed in order to accomplish our 100% physical yearly inventory.

FGG Materials, Desk Top Guide (DTG), Inventory Procedures, Chapter 11, Revision 2 (revised January 12, 2011) (hereafter, "Desk Top Guide").

46.     The reference to "Maximo" in the above guidance is to Fluor's IBM-developed property management system called "Maximo." Maximo is basically a massive database, with a front-end user interface that could be accessed by Fluor property staff in Afghanistan and elsewhere, used to keep track of all government property managed by Fluor, from beginning (*e.g.*, receipt in Afghanistan) to end (*e.g.*, used up or consumed). Every item in inventory is recorded in Maximo, and all additions, subtractions, or other transactions involving inventory are recorded in Maximo. Maximo is intended to be the system of record for real time and historic information about inventory.

47.     Fluor's Desk Top Guide governing Inventory Procedures further provides that if a discrepancy is discovered between the Maximo records and a physical inspection of inventory during a random check or monthly 10% inventory, the discrepancy must be researched and a determination made as to the reason for the discrepancy. The Desk Top Guide states in pertinent part:

**11.2 Adjusting Inventory Records**

15

> **11.2.1** If the comparison of the physical counts against Maximo records discovers a discrepancy, then research and determination of needing an adjustment is accomplished.

*Id.*

48.     When a physical inspection reveals fewer items in inventory than are recorded in Maximo, a "Negative Adjustment" of the Maximo records is required. A Negative Adjustment is an adjustment to the inventory records within Maximo that reflects a decline in the inventory balance.

49.     Negative Adjustments are of two types. The first type is an "Administrative Adjustment." An Administrative Adjustment occurs when the discrepancy between physical inventory and Maximo records can be accounted for due to a technical or administrative error, such as typos or miscoded items, Unit of Measurement mistakes (item vs. case), placement of items in the wrong bin, items from two bins being mistakenly combined, etc. Fluor's Desktop Guide for Inventory Procedures, process steps 11.2.1.1 and 11.2.1.2, define certain actions to be taken in conducting research to determine if the adjustment is due to an administrative error:

> 11.2.1.1 Review all issues, returns and any IPR's [Internal Purchase Requisitions] that have taken place against the item code to eliminate any administrative errors.

> 11.2.1.2 Review all open PO's [Purchase Orders] and IPO's [Internal Purchase Orders] for delinquent MRRs [Material Receiving Reports] and MRR interface errors involving item codes.

> *Id.*

50.     The second type of Negative Adjustment is a "Loss, Theft, Destruction or Damage" (LTDD) adjustment. Any shortage in inventory that cannot be determined to be Administrative Adjustments is considered an LTDD event. When an Administrative Adjustment cannot be documented, the Contract as well as Fluor internal procedures require that an LTDD report be created and provided to the Government Property Administrator. See Contract Clause §

16

I-326 and 48 C.F.R. § 52.245-1. In relevant part, FAR 52.245-1, entitled "Government

Property," incorporated into the Contract in Clause I-326, provides:

> Loss, damage, destruction, or theft. Unless otherwise directed by the Property
> Administrator, the Contractor shall investigate and promptly furnish a written narrative of
> all incidents of loss, damage, destruction, or theft to the property administrator as soon as
> the facts become known . . . .

Contract § I-326; 48 C.F.R. § 52.245-1.

51.      Fluor's Desk Top Guide for Inventory Procedures further provides that the LTDD

report to the Government Property Administrator must be made no later than the Saturday after

discovery of the shortage:

> 11.2.6 Any shortages will be reported to Property NLT [no later than] the following
> Saturday in which the shortage was found and be processed as an LTDD.

*Id.*

52.      The LTDD report provides a variety of information, including a description of the

loss, the cost of the loss, the reason for the loss, and the Corrective Actions that will be taken to

mitigate future losses. Contract § I-326(f)(vi); 48 C.F.R. § 52.245-1(f)(vi).

53.      The LTDD report serves multiple purposes. First, it apprises the Government of

the missing items and the reason therefor. Second, it permits the Government to oversee

corrective action so that similar losses do not continue to occur. Third, it provides a procedure

for either assessing the cost of the loss to the contractor or, alternatively, relieving the contractor

of responsibility for the missing items.

54.      Upon review of the LTDD, if the Government Property Administrator determines

that the contractor should not be held financially liable for the missing items, the Property

Administrator issues a "Relief of Responsibility" (ROR) report, which, as its name implies,

relieves the contractor of any further responsibility for the missing items. Contract clause I-

326(f)(vii). That clause of the Contract states:

(vii) Relief of stewardship responsibility. Unless the contract provides otherwise, the Contractor shall be relieved of stewardship responsibility for Government property when such property is

(A) Consumed or expended, reasonably and properly, or otherwise accounted for, in the performance of the contract, including reasonable inventory adjustments of material as determined by the Property Administrator; or a Property Administrator granted relief of responsibility for loss, damage, destruction or theft of Government property . . . .

Contract clause I-326(f)(vii); 48 C.F.R. § 52.245-1(f)(vii) (same).

55.     Fluor's internal Practice Guide entitled, "FGG Government Property Control System," Practice 620.490.0133, in the section on "Physical Verification Inventories," states in pertinent part:

Physical Verification Inventories. . . . Results of physical inventories including all adjustments and LTDD-related reports identified are reported in writing to the GPA [Government Property Administrator] within 30 days of the inventory completion. Where applicable, documentation providing relief of responsibility from the GPA regarding any LTDD-related reports is filed with the official property records.

56.     In addition to the random spot checks and the monthly 10% cyclic inventory, Fluor is obligated by the Contract to conduct an end of year audit. Results of this audit must be reported to the Government including completed LTDD reports:

- In order to maintain current inventory records, periodic and physical inventories shall be performed. Periodic inventories include, but are not limited to, daily random spot checks, monthly, quarterly, or ten percent cyclic counts that are performed throughout the year. Physical inventories shall be scheduled and conducted at fiscal year end, where all counts and adjustments to the fiscal inventory is completed no later than 30 September of each fiscal year. . . . .
- Results of the physical inventory shall be reported and forwarded to the assigned Fluor Government Property Representative. These results shall include completed LTDD reports for each documented shortage.

"FGG Material Management Plan," Revision 4, § 4.6.6 (entitled "Government Property Physical Property").

57.     Further guidance on inventory management is found in the FGG Material

Management Group Internal Policy Memorandum, IPM-0005, which provides:

> Section 2
> If the comparison of the physical count against the Maximo records reflects a discrepancy, then the research and determination of the need for adjusting the records is accomplished IAW [in accordance with] the MMP [Material Management Plan].

. . . .

> Section 3(b)(i)
> Discrepancies will be researched with due diligence in order to record the Physical Count results within 72 hour of the 2nd count and reconciliation.

58.     Additional internal guidance is found in the FGG Material Management Bulletin, MMB-0013, Sections III and IV:

> III. Shortages identified during inventories
> A. 2
> i. The person conducting the inventory will check all of the surrounding bin locations to ensure items were not misplaced.
> ii. Subsequent inventory counts may need to be conducted to validate the discrepancy. If a third count is required, a foreman, supervisor or manager should be onsite to validate the count.
> iii. If the item cannot be located, the item will be inventoried and the loss immediately recorded in Maximo.
> iv. The recorded loss will produce a Maximo generated Inventory Adjustment Report (IAR). The Maximo generated IAR along with the causative research documenting the loss, and any additional documents or reports will be submitted with the LTDD as part of the IAR and LTDD audit trail.
>
> IV. Supporting Document File
> i. All supporting documents to justify any and all discrepancies will be retained in the materials inventory document control file for audit purposes.

59.     As alleged below, Fluor did not comply with its contractual and regulatory obligations and its internal procedures, all of which required Fluor to document inventory Negative Adjustments and to report missing items to the Government.

60.     As a consequence of Fluor's mismanagement of inventory, hundreds of millions of dollars of Government-owned materials were lost and are unaccounted for in Afghanistan.

61.     Fluor concealed the extent of the problem from the Government in reports that

Fluor submitted to the AFEB, thereby depriving the Government of the ability to take prompt corrective action and fraudulently earning a higher performance award fee than it was entitled to receive.

## III.    Background: The Controlling Plans

62.    Fluor was required to submit its Government Property Control System ("GPCS") and Material Management Plan ("MMP") to Department of Defense contract management personnel for approval. These documents provide the Government with the policies and procedures that will be implemented to receive, secure, and maintain Government property. The GPCS is the overarching master plan, and the MMP implements the policies and procedures set forth in the GPCS at a more local level, including within the Material Department. Once the government has approved these processes, amendment or modification is permitted only upon further approval by the United States.

*The Government Property Control System ("GPCS")*

63.    The GPCS is based on relevant government regulations and acknowledges that Fluor was tasked with the oversight and maintenance of Government property. It states:

> This practice defines the methodology and process used by [FGG] to manage and control both client- and FGG-owned property in the possession of FGG during the performance period of awarded contracts. This practice is derived from [FARs and DFARs], Industry Leading Practices, and Voluntary Consensus Standards that include the International Standardization Organization [] and the American Society for Testing and Materials [] Standards International… As stewards of client-owned property, the goal of this practice is to employ sound business judgment and provide best value to the FGG client providing life cycle management of equipment and materials entrusted to FGG for contract performance.

GPCS 620.490.0133 (effective date 9/01/2011) at p. 1.

64.    The GPCS states (on page 6) that "[t]he written policies and procedures that provide for effective property control of each type of [Government]-owned item of property in

FGG's possession are contained in this practice. The intent of this practice is to comply with the requirements of FAR 52.245-1."

65.     The GPCS also sets forth policy on physical inventories (discussed further below) and losses of Government property.

66.     Page 9 of the GPCS indicates that when Government property cannot be accounted for, Security takes the lead in preparing the incident report to be used in LTDD reports. These incident reports are dispositioned internally, and final reports are provided to the Property Administrator.

67.     The GPCS references (on Page 12) that "[a]ll reports required by the FAR property clause 52.245-1 in the contract are prepared, reviewed for accuracy and completeness, and submitted to the [Property Administrator] to meet due dates." The GPCS goes on to identify the specific requirements and elements of a LTDD report and discusses other Fluor reports that are submitted to the Property Administrator (i.e., physical verification inventory reports, audits, self-assessments, and correction actions).

*The Material Management Plan ("MMP")*

68.     The MMP is a reference and guide for policies and procedures set out in the GPCS concerning LTDD reports and inventories. For example, Section 4.5.12.6.1 the MMP sets forth the policies and procedures for conducting inventories.

69.     The MMP outlines requirements for daily random spot checks, monthly site inventories, 10% monthly inventories of all property, 100% monthly inventories of sensitive items, and 100% physical yearly inventories.

70.     The MMP sets out procedures for transferring items to a Defense Reutilization Marketing Office ("DRMO") Storeroom and documenting any inventory shortages.

71.    In addition, the MMP requires that detailed corrective action reports ("CARs") be submitted in support of a LTDD report. A CAR identifies serious or systemic noncompliance and suggests a plan to correct that noncompliance. A Corrective Action Plan ("CAP") is then submitted to DMCA in response by the contractor, and the contractor must implement the CAP as approved by DCMA. In practice, CARs are infrequent and result only when informal methods have failed to remedy problems.

72.    Section 4.6 of the MMP, "Government Property Administration," acknowledges Fluor's obligations with regard to the maintenance and security of Government property:

> FGG has a contractual obligation to adhere to [Government] regulations and the applicable contract clauses as they relate to stewardship and management of Government property in the possession of contractors. FGG is directly accountable for all Government property in its possession, acquired or furnished under [Government] contracts to include property in the possession of affiliate companies and subcontractors. FGG will provide qualified personnel with the property management skills and experience necessary to maintain a contract compliant property control system.

### The Task Order Execution Plans

73.    Fluor also created Task Order Execution Plans ("TOEPs"). For example, on June 15, 2009, Fluor issued a draft document titled "US Army Sustainment Command (ASC), Logistics Civil Augmentation Program (LOGCAP IV), Afghanistan Area of Operations (AOR) Expansion North, W52P1J-07-D-0008/0005, TASK ORDER EXECUTION PLAN" (hereinafter referred to as the "Expansion North TOEP").

74.    The Expansion North TOEP established the "execution philosophy, describe[d] the project scope of work, and define[d] the organization, work processes, and systems necessary for management of the project." This TOEP also indicated that the plan was developed per the requirements of the prime contract and the MMP, and that work under the task order was based on the requirements within Contract No.W52P1J-07-D-0008.

75.     Task Order 005 described the planned transition to Fluor of responsibility for 62 northern Afghanistan FOBs, and included additional requirements involving transitions of other FOBs that were managed under Task Orders 002 and 004 (to include transitioning responsibility for eight FOBs). The Expansion North TOEP included a discussion of Government Property transfer and material control that was relevant to Task Order 005. Section 12.0 of the Expansion North TOEP covered the material management aspects of the plan and referenced Fluor's LOGCAP IV Material Management Plan, Rev. 2 (June 30, 2009) for further detail.

76.     The Expansion North TOEP (at Section 12.3.1) also specifically stated that the LOGCAP IV program would utilize Fluor's proprietary procurement management software— i.e., Material Manager (also referred to as "MatMan") and Maximo—to record and control Government property.

77.     Furthermore, Section 12.7 of the TOEP, titled "Government Property Administration," tracks above-referenced language in the MMP when it states that FGG "has a contractual obligation to adhere to [Government] regulations and the applicable contract clauses as they relate to stewardship and management of Government property in the possession of contractors. FGG is directly accountable for all Government property in its possession, acquired or furnished under [Government] contracts to include property in the possession of affiliate companies and subcontractors."

## IV.    Fluor and KBR's Misconduct

### A.  Transition Period Misconduct

78.     In the transition from LOGCAP III to LOGCAP IV, KBR and Fluor were required to perform joint inspections of facilities and inventory to ensure that work performed (and paid for) under LOGCAP III was complete before being transferred from KBR to Fluor, and

that KBR's final inventory lists were complete and accurate.  Fluor and KBR did not perform these joint inspections, but certified to the government that they did.  Fluor also certified that it inspected KBR's inventory when it had not.  As a result, Fluor ended up billing the government for work that KBR had been paid to complete under LOGCAP III – work that the joint inspections would have revealed.  Fluor also fraudulently represented to the government that it had taken possession of the amount of government property KBR listed in inventory, when in fact Fluor had not taken steps to account for and receive such inventory.

79.     As mentioned above, under Task Order 05 of LOGCAP IV, Fluor provides various operations, management, and support services to facilities located at 70 Forward Operating Bases in northern Afghanistan.  However, prior to assuming the Task Order 05 contract, these same services were provided to many of the same facilities by contractor KBR under the earlier LOGCAP III Program.  In order to transition these facilities from Incumbent Contractor KBR to the Incoming Performance Contractor Fluor, the U.S. Army Material Command and the Defense Contract Management Agency ("DCMA") developed comprehensive Transition Plans that set out the policies and procedures to be followed by KBR and Fluor during the transition phase.

80.     For example, Fluor and KBR were obligated to conduct Joint Technical Inspections ("JTIs") of all facilities covered under Task Order 05 in order to flag all Life, Health, and Safety ("LHS") issues at these facilities.  LHS issues are defined in the Performance Work Statement as "situations that affect life, health, and safety" and "present immediate danger to [the] occupants" of a facility.  The goal of the JTIs was to not only identify LHS issues so that they could be mitigated until more remedial action could be taken, but to identify them for the government so that the government – which had already paid incumbent contractor KBR to

remedy any LHS issues during the Phase-Out or transition period under the LOGCAP III

contract – could get the full benefit of its contract with KBR.

81.     Fluor and KBR never conducted these JTIs.  Instead, they falsely certified to the

government by signing multiple LOGCAP IV Transition Acknowledgment documents that the

JTIs had been conducted and that "no major deficiencies" had been "discovered."  This was a

knowing violation by KBR and Fluor of the Transition Plan.  It was also a knowing violation by

KBR of its contract with the government, which stated explicitly that "the incumbent contractor

shall not defer needed work for the purpose of transferring responsibility to the successor

contractor."  Again, the government had already paid KBR to complete this work as part of its

base contract under LOGCAP III.

82.     Had KBR and Fluor conducted these JTIs as they were contractually obligated,

they would have discovered thousands of LHS issues across all seventy FOBs that fell under

Task Order 05.  Instead, Fluor had to independently identify and repair these LHS issues after the

transition period.  More important, without reporting its joint failure to conduct the

aforementioned JTIs, Fluor charged the government the tens of millions of dollars in labor and

materials necessary to remedy these LHS issues.  The result is that the government, in

unknowingly paying Fluor for work that KBR was contracted for and paid to complete, was

deceived into paying twice for work that it should only have paid for one time.

83.     In addition, under the Transition Plan, KBR was also obligated to "initiate-

conduct-conclude a 100% physical inventory of all property/assets…currently in [its]

possession."  As part of this inventory, KBR was to: 1) identify and report any/all pending,

current and/or discovered Lost, Damaged or Destroyed property to either the Property

Administrator or the Administrative Contracting Officer so that these issues could be resolved

prior to the contract being transitioned to Fluor; and 2) identify any/all property not previously or currently identified on the contractor's records so as to reflect an accurate accounting of all property that is currently in the contractor's possession. The latter report was to be provided to the government for inventory/records validation.

84.     For its part, when it came time to accept this inventory from KBR, Fluor was to inspect all inventory and materials to be turned over by KBR to make sure that it matched up with KBR's inventory records. Not only did KBR never conduct the required inventories, but Fluor certified KBR's inventory records as accurate without ever inspecting KBR's inventory and materials.

85.     Unfortunately, Fluor later determined that there was tens of millions of dollars of inventory that KBR (and Fluor) could not physically account for to the government (i.e., KBR included it on the inventory list but it could not be found). The result is that: 1) KBR was able to collect a 1% uplift on the cost of these materials per the cost-plus portion of its contract without being able to prove that these materials had ever been used to complete contracted work; 2) KBR avoided having to use the proper government disposition process for lost, stolen or destroyed inventory, meaning they avoided having to reimburse the government for the cost plus 1% of materials that they could not properly account for; 3) without admitting to the government that it never carried out the proper inventory inspections, Fluor then bought more of the materials it had certified were "handed off" from KBR, charging the government for the cost of those materials plus 3%. Put simply, Fluor defrauded the government into letting KBR off the hook for, at minimum, tens of millions of dollars of inventory it could not account for and then Fluor billed the government for much of this same material when it eventually determined that KBR's inventory list was grossly inaccurate.

### B.  Life, Health, and Safety Response and Mitigation Times

86.    A central component of Fluor's LOGCAP IV contract is to manage and operate a customer service desk at each of the more than 70 Forward Operating Bases included in Task Order 05.  These service desks are contracted to initiate necessary services/repairs for all facilities located on these bases.  Service orders that are called in to the Fluor service desk are separated into 3 categories: 1) Priority 1 Emergency Service Orders (for situations that pose an immediate danger to life, health, or safety); 2) Priority 2 Urgent Service Orders (for situation that are urgent but non-life threatening; and 3) Priority 3 Routine Service Orders.  Each service order type has very specific response and repair times attached to it.

87.    In terms of Emergency Service Orders, Fluor has two hours to respond from the time that the order is called into the Fluor service desk.  This response time is absolute, meaning that Fluor must respond within two hours 100% of the time.  Fluor was supposed to send a Fluor technician to examine the danger, determine if it could be immediately remedied, and if not, mitigate it so that it no longer posed a serious risk of injury to personnel located at that facility (*e.g.*, a risk of electrical shock).  Once the issue was mitigated in this way, Fluor was allowed a longer period of time in which to repair the issue.

88.    By comparison, for Urgent Service Orders, Fluor must respond within 24 hours 100% of the time, and must complete repairs within 72 hours 75% of the time.

89.    For Routine Service Orders, Fluor must respond within 72 hours 100% of the time and repairs must be completed within 14 days 75% of the time.

90.    Fluor consistently reported to the government 100% compliance with the two hour response time requirement for Emergency Service Orders.  In reality, Fluor rarely responded within two hours to these Emergency Service Orders and instead represented to the

27

government that it was in compliance when in fact it knew it was not.

91.     Fluor knowingly and fraudulently misreported its response and repair times to the government, and concealed evidence of its non-compliance through various schemes. Among them:

a.      In blatant and callous disregard for the safety of U.S. military personnel, Fluor routinely recorded the time of its response immediately when the emergency was called in; even though at that point no Fluor technician had even laid eyes on the problem. By doing so, Fluor falsely claimed 100% compliance with the two hour response time requirement. Even more egregious is that Fluor would leave the life, health, and safety issue unmitigated until it could schedule a technician to repair it, which was almost always far longer than the two hour response time requirement. The result is that these life, health, and safety issues went unmitigated for days, and often weeks, before Fluor even examined the problem, let alone actually repaired it.

b.      Because of the lack of inventory control discussed below, Fluor routinely did not have the materials it needed to conduct repairs within the required completion times for Urgent Service Orders (72 hours) and Routine Service Orders (14 days). To conceal the resulting non-compliance, staff would close the Service Orders and then re-open them later when the materials arrived, so that they would not be out of compliance. A Fluor employee contemporaneously documented this conduct in a 2011 email, describing the scheme communicated to her as follows: the individual "indicated that nothing is left in WMATL [Waiting Materials status] that will take longer than the allotted completion time so nothing is out of compliance. The ticket is simply completed and then requires a 'new' ticket to order materials."

       c.      For the same reason, Fluor lowered the classifications of non-compliant Service Orders so that they would come into compliance. So, for example, if the response times on an Emergency Service Order were not met, it re-classified the Service Order as an Urgent or Routine Service Order if doing so would create the impression that the response time was compliant. Likewise, if the 72 hour completion time for an Urgent Service Order was not met, Fluor would re-classify it as a Routine Service Order if that would create the impression that the completion time was compliant.

       d.      Where it could not achieve compliance by manipulating the Service Order classifications, Fluor re-classified Service Orders into a new "Priority 4" classification that was "off-the-books" and unapproved by the government. In other words, Service Orders placed in a Priority 4 status, for all intents and purposes, did not exist; they were not included in Fluor's reports to the government on response and completion times.

      92.     Again, in its monthly compliance reports to the government, Fluor knowingly and falsely reported to the government a 100 percent compliance rate with the two-hour response time requirement for Emergency Service Orders.  The reality is that for Emergency Service Orders, Fluor was rarely in compliance.  Indeed, Fluor misrepresented its repair completion rates as well.  Across all three types of service orders, Fluor had a repair completion rate of around 27% yet routinely reported to the government that it completed repairs within the allotted time periods 77% percent of the time.

      93.     Despite placing U.S. military personnel at risk of serious injury, Fluor collected millions of dollars in bi-annual award fees as a result of these fraudulent compliance numbers. For example, Fluor was awarded millions of dollars in award fees for the first half of 2012 based in part on the government's belief that "emergency response continued to be an area of strength

for Fluor."  Similarly, during the first half of 2011, Fluor earned multi-million dollar award fees in part because "Fluor exceed[ed] its repair contractual requirements for urgent service orders by 21.15% and for routine service orders by 21.80%."  Notably, technical performance – a category that includes a contractor's ability to meet compliance targets – forms 40% of the Award Fee Evaluation Board's criteria for determining a contractor's bi-annual award fee.

94.     In total, Fluor earned base and award fees over one hundred million dollars, just for the period from mid-2009 through mid-2012, despite its woeful rates of compliance on Life, Health and Safety Service Orders. Accurate reporting of its compliance rates would have caused Fluor to fall below the overall score of 70 necessary to be eligible for an award fee.

### C. Performing Work Not On the Master Scope of Work

95.     As mentioned above, LOGCAP IV is an indefinite delivery, indefinite quantity or IDIQ service contract that operates through a task order system, with each individual task order providing its own separate scope of work and period of performance.  Each task order has a separate Performance Work Statement ("PWS"), which includes both the scope of the facilities to be worked on and the scope of services to be provided.  The Master Statement of Work ("MSOW") for a given task order is based on the PWS for that task order.

96.     Fluor provides base camp support services and operations and management services for Forward Operating Bases in northern Afghanistan under Task Order 05.  More important, under Fluor's Task Order 05 contract it is not to conduct any work not on the MSOW without first obtaining direction to do so from the government in the form of a Task Order Change Order.  In short, with only a few minor exceptions, work is only to be done if it is in the base contract for that particular task order or it is added to the base contract by the government through written direction (Change Order).

97.    The reason for this is that Fluor is regularly the highest-cost provider, as compared to the numerous other contractors, subcontractors and local companies providing services to the United States military in northern Afghanistan.

98.    Under the Cost-Plus Award-Fee contract, Fluor is paid 3% above all labor and materials costs; so, the more work that Fluor engages in, the more money it makes.  Similarly, because the award fee is paid as a percentage of the value of the base contract, the more the base contract is worth, the greater the award fee.  The incentive is to grow the base contract by adding facilities and work that is not on the original MSOW.

99.    Fluor took full advantage of this fee structure to fraudulently charge the government tens of millions of dollars for the labor and materials necessary to complete work that it did not have direction to do, including work on facilities that were not included in its MSOW, effectively adding these facilities to its base contract and thereby driving up the value of its bi-annual award fees.  For example, at Camp Eggers, a base near Kabul, Fluor's Government Contracts Manager and its Deputy Project Manager routinely directed Fluor employees to perform work not on the MSOW.

100.    One way that Fluor added facilities to its base contract without written direction was through the fraudulent use of Work Orders. Work Orders are the mechanism by which the use and consumption of property and materials are tracked. So, for example, a group of tradesmen may open a Work Order to build or repair something, and then any materials they need to perform the job are issued to that Work Order. Property like reusable equipment is then returned to inventory after the Work Order is completed, while materials that are "consumed" (*e.g.*, plates, nails, light bulbs, etc.) are simply decremented from inventory.

101.    Work Orders allow a contractor to work on a facility not on its MSOW when such

work will cost $5,000 or less to complete. In such a case, the contractor need only seek approval from the Administrative Contracting Officer ("ACO") to take on the work rather than seek a more involved Change Order. Fluor took advantage of the Work Order Process in a number of ways.

102. First, it used Work Orders to perform work on facilities not on its MSOW that it knew would cost much more than $5,000, and then certified to the ACO that it would cost less than the $5,000 Work Order threshold. Once Fluor opened a Work Order on a facility not on its MSOW, that facility would be added to its MSOW, allowing Fluor to bill the government for the operations and management costs for that facility going forward. This means that Fluor not only fraudulently charged the government for labor and materials for work on a facility that Fluor should have needed a Change Order to undertake, but it then charged the government for the cost of operating and maintaining that same facility.

103. Second, Fluor routinely opened Work Orders for facilities both on and off its MSOW (both in cases where the cost of the work was above and below the $5,000 Work Order threshold) without seeking authority from the ACO whatsoever. Here too, Fluor charged the government both for the labor and materials to complete the work, but also for the operations and maintenance costs for those facilities.

104. Fluor used the Work Order process in such blatant disregard for its contractual obligations that even after the government expressed concern that many of Fluor's completed Work Orders resulted in costs well above $5,000, and warned Fluor not to use Work Orders for work not on its MSOW it knew would cost more than $5,000, Fluor represented to the government that it had placed safeguards in place to prevent such cost overruns, but continued to use Work Orders in the same manner as before.

### D.  General Health and Safety Fraud

105.    Fluor is required to report all "recordable" safety violations and accidents to the

government.  These "recordable" incidents are factored into what is called the Total Case

Incident Report ("TCIR"), an important factor considered by the Award Fee Evaluation Board

when determining a contractor's bi-annual award fee.  Fluor consistently fraudulently and

grossly underreported the number of "recordable" incidents to the government, allowing it to

collect award fees that it did not deserve.

106.    For example, from January 1, 2012 through June 30, 2012, Fluor claimed a TCIR

of 0.19%.  More important, citing the crucial importance of safety to the LOGCAP program, the

AFEB cited to Fluor's TCIR, a rate they noted was 25 times better than the industry standard, as

partial justification for awarding Fluor an award fee for that same six month period of

performance.

107.    The reality is that Fluor did not have a TCIR anywhere near the 0.19% that it

reported to the government.  Instead, this TCIR rate was fraudulently achieved only by directing

Fluor's Health, Safety, and Environment group to not disclose all "recordable" incidents.  This

underreporting was achieved in a couple of ways: 1) from September, 2008 to just a few months

ago, Fluor did not report any work place injury that occurred outside of a given shift on any

particular day despite the fact that the reporting requirement is continuous and incidents are to be

recorded 24 hours per day; and 2) in many areas Fluor simply failed to report injuries to sub-

contractors despite the fact that, per their contract, "recordable" incidents includes accidents to

all Fluor employees and to the employees of any sub-contractor hired by Fluor.

108.    Fluor misrepresented its TCIR since 2008, inducing the government to pay Fluor

millions of dollars in award fees that it was not eligible to collect.  Beyond this, Fluor's

fraudulent TCIR also impacted the insurance rate that Fluor had to pay per employee to the government under the Defense Base Act.  Finally, the government also considers a contractor's TCIR when determining the eligibility of a contractor to bid on a contract, and as part of that contractor's task order bid, meaning that Fluor may have been able to bid on and win contracts that it otherwise should not have been able to.

### E.  Deploying Unnecessary Personnel

109.    Over the course of its LOGCAP IV contract performance, Fluor systematically inflated its billings to the United States by hundreds of millions of dollars through the deployment of unnecessary and redundant personnel.

110.    As described above, in submitting its proposals to the Army for LOGCAP task orders – and yearly extensions of those contracts – Fluor submitted estimates of the manpower that Fluor projected might be necessary to perform the contract requirements.

111.    Once Fluor began its performance of the contract and was required to deploy personnel to the Afghanistan theater, it submitted statements of justification to the Army with regard to each employee, demonstrating the need for his or her deployment and his or her role in performance of the contract. The Army approved Fluor's justifications through Letters of Authorization. These requests and approvals are processed via the "Synchronized Pre-Deployment and Operational Tracker" system (SPOT).

112.    Fluor fraudulently deployed thousands of redundant, unnecessary personnel, at enormous, unnecessary cost to U.S. taxpayers.

113.    Scott Dillard, a West Point graduate who served as a U.S. Army officer in Iraq and Afghanistan, served as Deputy Director of Fluor's Material Management Group from 2012 to 2016. On December 30, 2015, Dillard participated in a conversation with several of Fluor's

senior managers in Afghanistan, Paul Gentry (Gentry) and James Davis (Davis), which Dillard

recorded. At the time of this conversation, Gentry was Fluor's Deputy Project Manager for Site

Management and Construction, and Davis was a Fluor Operations Manager. During this

conversation, Gentry discussed his previous experience as Fluor's Manager for the Bagram Area

of Operation. Gentry detailed the superfluous personnel knowingly sent to Afghanistan by Fluor

corporate management and the company's motive:

> GENTRY: Back in 2012 I added fucking 800 motherfuckers here with no missions. Eight
> hundred just because they [Fluor management] realized that, hey, according to our work
> drivers, we could have had more people. I don't fucking need 100 people laying the fuck
> around doing nothing already. Get them in here. And that was after the year before I'd
> added almost 2,000 the year before.

> DAVIS: Yeah.

> GENTRY: For no fucking reason. The same number of buildings on the density list, the
> same meals served, the same mission, the same this, same, same, same, same. An extra
> 1,800 people. The next year, extra 800 fucking people. What the fuck were they for?

> DILLARD: Who's pushing that, [Fluor management in] Greenville?

> GENTRY: Yeah. Just maximize billing, maximize billing. That's all.

> DAVIS: Yeah.

> GENTRY: As soon as they [DoD] rubber-stamped that bullshit we turned in, they [Fluor
> management] went back and checked it. "Oh, fuck, we ain't got enough people here to
> spend all this money." Really?

> DILLARD: Even if you don't need them?

> GENTRY: Yeah, that was irrelevant.

> * * *

> ***

> GENTRY: I got here [Bagram, Afghanistan] the beginning of 2011.

> DAVIS: Uh-huh.

GENTRY: And by the end of that year, I done picked up 1,800 motherfuckers.

DAVIS: Yeah.

GENTRY: That's why I'm saying what the fuck for. The next year 800 fucking more. I just saying fucking – fucking stop, you motherfuckers, man. I can't take it. I can't fucking take it. I've already started – we've already cut shit away here and what the fuck is the justifications? It was all bullshit. The justification was maximize billing. It's like putting pigs in front of a trough full of feed. They are just going to – more pigs show the fuck up until the fucking feed runs out. That's why the trough is fucking empty now. All the little piggies are running around, fucking grunting wanting some more.

DAVIS: They're like, if we are going to house all these people in these individual little white tents, and they're like "Rack them and stack them."

DILLARD: Who said that? Greenville?

DAVIS: Yeah. Ian [Dolan, Fluor Project Director].

DILLARD: Ian.

DAVIS: Hell, rack them and stack them, you can use the white tents.

114.    In other words, at a time when troops were being drawn down in Afghanistan, Fluor was sending at least 2,600 additional people to the Bagram, Afghanistan area alone, who, according to the Fluor officer in charge, had no mission and were utterly superfluous, other than to perpetrate Fluor's fraud. Gentry, Fluor's current Deputy Project Manager in the Afghan Theater for Site Management and Construction, was told to "rack and stack" these unnecessary personnel in tents – feed them, house them, and pay them – for the sole purpose of fraudulently boosting and maximizing Fluor's billing to the United States.

115.    In late 2011, Dillard and his supervisor, Jarrold Reeves, Director of Fluor's Materials Management Group (MMG), were instructed by their superiors to implement a reduction in force, because the Materials Management Group was on track to spend $120 million against a budget of $86 million. Based on his knowledge and experience with Fluor's operation and with Government supervisory policy, Dillard believes that the MMG group was a target of

36

particular scrutiny because its costs were improperly categorized by Fluor as part of its PWS

08.03 Management and Administration costs instead of PWS 08.02 Procurement and Supply

Management.

116.    Dillard and Director Reeves duly planned a reduction in force for the MMG. As

personnel began to be recalled from deployment, however, Reeves was ordered by Fluor Country

Manager George Rabb to halt the reduction. Rabb told Reeves that Fluor Government Group

CFO Eric Best (Best) and Vice President of LOGCAP Operations Rick Reuter (Reuter) had

overruled the reduction in force because it was impacting the company's revenue and profit. This

decision was made by Best and Reuter purely to continue profitable billing levels for the

company; it was not based on any considerations with regard to Fluor's mission of supporting

the military – and indeed was nonsensical given the drawdown of troops during that time period,

with U.S. troop levels reaching their peak in August, 2010. The employees that were retained

were unnecessary to the mission and served solely to falsely pad Fluor's bills to the United

States.

117.    Fluor employees were bounced back and forth at the whims of some management

and the frustration of others when the employees had no apparent duties or roles other than to be

billeted and fed for the purposes of fraudulently billing the United States. For example, Carla

Greene was serving as a "buyer" for Fluor's procurement operations at Camp Phoenix,

Afghanistan, when the 2011 - 2012 reduction in force was implemented. In early April 2012, Ms.

Greene was set to board a plane home because she had no purpose in the theater, only to be

yanked back on the orders of senior management, to the consternation of her supervisor who had

nothing for her to do. With the reduction in force underway, Ms. Greene traveled from Camp

Phoenix to Bagram Airfield for out-processing and stayed the night, prepared to fly out of the

theater the following day. As she was literally preparing to board the plane, Fluor management,
through George Rabb, cancelled the reduction in force and ordered Ms. Greene to return to her
imaginary "duties." The next day, Theater Procurement Manager Keith Whelan called Dillard for
an explanation: "Why did you send Ms. Greene back? I don't want her, I don't need her."
Nevertheless, Ms. Greene – and many others – remained, and the United States bore the cost of
their unnecessary deployment.

118.    In mid-2015, Dillard and his direct supervisor, Jarrold Reeves, were tasked by
Preston Howard (Howard), the Country Chief of Staff (#2 position on project) and Scott Roesler
(Roesler), Fluor Project Controls Theater Manager, to begin planning a reduction in force for the
Materials Management Group. At this time, the LOGCAP IV contract was coming to a close,
and the company anticipated that there would be a new competitive bidding process in 2016.
Howard, Roesler, and others were concerned that, if Fluor continued to bill at the "fat" levels it
had maintained over the course of its performance of Task Order 0005, it would be difficult for
Fluor to submit a competitive bid for the next major logistics contract. But if Fluor did submit a
competitive bid in the next competition, that would only highlight how unreasonable and
unnecessary Fluor's billings had been under Task Order 0005.[2]

119.    With this understanding and broader competitive situational awareness in mind,
Dillard prepared plans for a two-phased reduction in force beginning in mid-2015. The Country
Manager, Mark O'Neill, quashed the plans with a clearly contrived concern that the company
might be "releasing talent for [its] competitors to hire." The reduction in force was eventually
implemented in late-2015, but only after Fluor enjoyed fraudulently increased revenue for
several more months.

---

[2] As detailed elsewhere, this was not an issue when Fluor submitted its original proposal for Task
Order 05, in part because Fluor knew that KBR was out of the running.

120.    Put simply, Fluor's personnel decisions were made with the perverse goal of boosting Fluor's profits in contradiction to the goal of efficiently performing its mission in support of the U.S. military. At the highest levels, Fluor's management knowingly deployed and retained in theater employees who clearly had no mission and represented nothing but a stream of income for Fluor at the expense of U.S. taxpayers.

121.    The damage to the United States caused by Fluor's duplicity is enormous. Gentry estimated that at least 2,600 unnecessary employees deployed by Fluor to the Bagram Area of Operations alone from 2011 to 2012. The cost billed to the United States for just this small sample of Fluor's unnecessary employees is enormous. Based on Dillard's review of Fluor's employment records in his capacity as Deputy Director, he has determined that the median pay grade for Fluor employees in Afghanistan during this time period was "GG4." Dillard estimates that the cost borne by the United States for a 12-month deployment of one of these employees – not including the costs of recruitment, mobilization, an initial medical screening, life support (food, water, housing, etc.), and similar expenses[3] – is around $170,000. Based on these estimates, the 2,600 unnecessary and redundant employees identified by Gentry cost the United States at least $442 million.

122.    There is ample additional evidence corroborating Fluor's deliberate overstaffing. Each year, Fluor prepared internal Basis of Estimate (BOE) spreadsheets detailing all of the tasks Fluor personnel were to perform on the contract, and providing to-the-decimal estimates of the

---

[3] These additional expenses, excluded from the estimate above, are themselves significant, and were further incentive for Fluor to maximize the personnel it sent to Afghanistan. Indeed, in addition to covering salaries, overhead, etc., for each employee Fluor gets approval to send to Afghanistan it charges the government an approximately $50,000 mobilization/recruitment fee, in addition to base life support costs (housing, food and water, etc.) of approximately $100 per day per employee. These figures add up to tens of millions of dollars in additional charges annually for just even a few hundred employees.

amount of time it would take to perform each task at each Forward Operating Base. These internal BOEs were then converted into external BOEs that were presented to the government to provide justification for Fluor's staffing levels. Based on the total hours necessary to perform the work, the number of personnel needed to perform the work could be determined.

123.    These BOEs, however, were simply one stage in a multi-step fraud to inflate personnel requirements on the contract.

124.    First, Fluor's BOEs contained falsely inflated estimates of the hours necessary to complete tasks, and in many cases estimated hours for work that Fluor knew it was not performing and had no intention of performing. By way of example, as discussed below, Fluor consistently and for years failed to perform contractually required monthly counts of 10% of the inventory at each FOB, which were intended to ensure accurate inventory control and tracking. Yet, each year Fluor fraudulently estimated it would spend hundreds of thousands of hours performing so-called 10% inventories, and thus needed hundreds of employees it knew would not be doing such work.

125.    Second, in translating the BOE's estimated number of hours to complete Fluor's tasks to the number of personnel needed to perform the tasks, Fluor assumed 180 hours per month for each employee, or six hours per day, 7 days a week (personnel were expected to work seven days a week while in Afghanistan, and then took elective "rest and recuperative time," or R&R, usually for a few weeks at a time and several times a year). But in reality, Fluor employees consistently billed 84 hours per week every week they were in theater, that is, 12 hour days every day. By using the six hour per day estimate, Fluor was able to justify sending many more personnel, and then billed the government 12 hours per day for all of those excess personnel.

126.    Third, upon information and belief, the "external" BOEs shared with the

government were inflated to include more hours and more personnel needs than the internal versions created by Fluor's managers internally.

127.    Yet additional evidence of Fluor's gross overstaffing is that Fluor had dramatic fluctuations in the amount of personnel in Afghanistan without commensurate fluctuations in work being accomplished. On average, 21% of Fluor personnel assigned to the project were on leave and not working (primarily on R&R). But this number fluctuated, such that at a high point Fluor had almost 30% of personnel on leave, and at a low point it had approximately 11% of personnel on leave. Yet, various indicators of workload—for example, the amount of material being issued to work orders and the number of work orders being completed—contain no evidence of commensurate fluctuations in work being accomplished. Perhaps most revealing, when Fluor had 30% of personnel on leave, no less work was being accomplished. In other words, Fluor could have reduced the number of personnel by 9-10%, and still have performed the same work, such that the government got no benefit from the hundreds of millions of dollars it spent on all those additional people.

### F.    Annual "Fit for Duty" Exams

128.    Fluor also boosted its own profits and passed massive costs along to the United States by requiring that every employee deployed overseas undergo an annual "fit for duty" physical exam in Dubai, United Arab Emirates in direct violation of its material contractual obligations and certifications to the United States. Despite Department of Defense regulations making clear that employees of civilian contractors should undergo "an annual in-theater rescreening," rather than a comprehensive physical exam outside of the theater – a material regulation about which Fluor corporate management had knowledge – Fluor continued to subcontract with a medical clinic in Dubai and route every employee through the city annually,

housing them at a hotel and subjecting them to full, comprehensive physical exams, all at false

costs to the United States.

129.    Prior to December 2013, Army regulations stated that "DOD Contractor

Personnel, who deploy for multiple tours of more than 12 months total, must be reevaluated for

fitness to stay deployed. Periodic health surveillance requirements and prescriptions needs

assessments should be recent enough so as to remain current through the deployment period. An

examination with all medical issues and requirements addressed will remain valid for 15 months

from the date of the physical."[4]

130.    In December 2013, the Army issued Modification 12 to that regulation, inserting

the following language: "Annual in-theater rescreening may be focused on health changes,

vaccination currency, and monitoring of existing conditions, but should continue to meet all

medical guidance prescribed in Mod 12. If individuals are unable to adequately complete their

medical screening evaluation in the AOR (Area of Responsibility), they should be redeployed to

accomplish this yearly requirement.[5]

131.    When Fluor began performance of its work under Task Order 0005 for its

LOGCAP IV contract, it instituted its annual "fit-for-duty" program as described above, which

included, at its peak, approximately 30,000 annual physical exams conducted in its medical

clinic at Dubai and employment of an entire medical records staff in Greenville, South Carolina.

This practice was instituted under the previous iterations of the US CENTCOM policy and

maintained under Mod 11 and Mod 12.

132.    Fluor knew that annual, comprehensive physical exams performed out of

---

[4] US CENTCOM 021922Z DEC 11 MOD ELEVEN TO USCENTCOM INDIVIDUAL
PROTECTION AND INDIVIDUAL UNIT DEPLOYMENT POLICY (Mod 11).

[5] US CENTCOM 021502Z DEC 13 MOD ELEVEN TO USCENTCOM INDIVIDUAL
PROTECTION AND INDIVIDUAL UNIT DEPLOYMENT POLICY (Mod 12).

Afghanistan were not – and had never been – required or authorized by DoD regulations and that the Army and U.S. Central Command (CENTCOM) did not intend to fund that practice when it issued CENTCOM medical requirements – in short, comprehensive physical exams performed outside of the theater were not required by the Army and clearly not payable. As proof of this, none of Fluor's competitors (KBR, DynCorp) interpreted DoD policy to authorize Fluor's practice, and only Fluor instituted annual physicals outside of the theater. Mod 12 makes very clear that DoD / CENTCOM policy is for civilian contractor personnel to undergo in-theater health screenings, not out-of-theater comprehensive yearly physicals. Yet, despite the concerns and recommendations of high-level management, including the Afghanistan Country Manager Mark O'Neill (O'Neill), Fluor corporate management ordered that the fit-for-duty policy would remain in place into 2016.

133.     In January 2015, Fluor Executive Jeff Uribe (Uribe) told Dillard that Fluor management was considering transitioning from the fit-for-duty program in Dubai to in-country health assessments – as described in Mod 12.Uribe indicated that one reason Fluor was hesitant to take this step was out of concern that, once the policy was changed, DoD would scrutinize the program from its inception and demand repayment of the millions of fraudulent dollars Fluor had billed and received for annual physicals up to that point.

134.     In late 2015, Dillard traveled with Fluor Country Manager O'Neill to LOGCAP-supported Forward Operating Base Dahlke, Afghanistan, where O'Neill held a "Town Hall" meeting for Fluor employees. When Electrician Christopher O'Connor asked O'Neill about potential changes to the fit-for-duty policy, O'Neill responded candidly that he had recommended to Fluor leadership in Greenville, South Carolina that the program was unnecessary and should be canceled, but that he had been overruled. In subsequent Town Hall

meetings, O'Neill addressed the question more obliquely, but did acknowledge that DoD regulations appeared to require a health assessment based on existing conditions, rather than an annual, comprehensive physical.

135.    Dillard also discussed the fit-for-duty policy with Country Health, Safety, and Environmental (HSE) Manager Peter Provost (Provost), who confirmed what Uribe had told Dillard previously: that leadership in Greenville insisted on continuing the practice – even though it was clearly unnecessary, unauthorized, and not billable – in part because it was afraid to tell the Army that it had been performing and billing for comprehensive fit-for-duty exams all along. The following are excerpts from that recorded conversation:

DILLARD: So what's the deal with the fit for duty?

PROVOST: We're still doing them.

DILLARD: Okay, because it keeps getting asked every time.

PROVOST: Yeah.

DILLARD: Uribe told me like a year ago we're going away from it or going –

PROVOST: Right. But what Greenville said is "'no, we're going to continue it.' Because they don't have good PR people because they're saying, 'We can't explain why we did it before if we stop it now.'"

* * *

DILLARD: So basically they're . . . they're afraid of the sins of the ` past?

PROVOST: Yeah, they're afraid of the sins of the past and it's a way to keep people employed in Greenville.

* * *

***

PROVOST: There's a whole host of people that keep medical records that we don't need.

* * *

44

***

PROVOST: We thought it was a done deal that it was stopped. It made all the sense in the world. All you got to have is good PR people to explain to the military why we stopped it.

DILLARD: Right.

PROVOST: But they know it should never have been started.

DILLARD: Right.

PROVOST: Never should have done the first in-theater [Dubai] physical. So, and you know what? If you ask me, I think Auditor 101 is going to catch us but we're going to pay – we'll put all this money into it that we'll have to pay back.

* * *

PROVOST: No one else does it, just us. And that's what they [the Army] can say, "Hey, no one else did it." Everyone else interpreted it correctly except Fluor.

136.    Provost also confirmed that O'Neill had informed Fluor leadership that the fit-for-duty policy was unnecessary, problematic, and unauthorized (and un-reimbursable) by the Army, but that he was overruled by Fluor at the corporate level:

PROVOST: Because his [O'Neill's] decision was – he said, "I cannot convince the military – I can't justify that to the military." And that should have been enough. But in truth he doesn't run the project.

DILLARD: Okay.

PROVOST: Ian [Dolan] runs the project.

DILLARD: Oh, got it.

PROVOST: Greenville runs the project, not the Country Manager. They pat him on the back and say, "It's all yours. Profit and loss is yours. You know, you run the project, your decisions." They didn't tell him, "If we agree with you, you run it. If we don't agree with you, our – we rule the project."

DILLARD: Okay.

PROVOST: So, and that's what happened here. Ian put it in a drawer, his [O'Neill's] appeal to stop it [fit-for-duty]. He didn't even look at it. Didn't talk to the people there.

DILLARD: Wow.

PROVOST: He says, "That's my decision and we're going to do it."

137.    Provost went on to describe the enormous waste associated with Fluor's maintenance of support personnel in Dubai whose duties were associated with administration of fit-for-duty exams.

138.    With knowledge that its fit-for-duty program was deemed unnecessary by the Army, Fluor continued to pass huge superfluous false expenses on to the United States, in no small part to avoid other overpayments that it knew should be refunded. The unbillable costs associated with the Fluor fit-for-duty program and borne by the United States included: (a) the actual costs of performing the annual physicals in Dubai; (b) one-night Dubai hotel stay related to each employee's examination; (c) a per diem payment for each employee on the date of his or her physical; and (d) regular eight-hour day's pay for each employee on the day of his or her exam. Based upon information available to him regarding the number of exams performed by Fluor over the life of Task Order 0005 of its LOGCAP IV contract and the above costs associated with each exam, Dillard estimates that Fluor has falsely billed, and the United States has paid, approximately $91.1 million for unnecessary, annual, comprehensive physical exams performed in Dubai.

### G.  Fraudulently Inflating Vehicle and Equipment Usage Rates

139.    Fluor committed gross fraud by falsely inflating vehicle and equipment usage rates, fraudulently justifying the maintenance of a larger fleet of vehicles and higher billings to the United States. Fluor senior management knew that its employees were under instructions from lower-level management to run the engines of material handling equipment (MHE) while

not in use for this purpose.

140.    In April 2015, U.S. Forces-Afghanistan (USFOR-A) implemented a Vehicle Management Review Board process, through which all Non-Tactical Vehicles (NTVs) and MHE underwent a semi-annual review. DoD's stated intent was to reduce the numbers of NTVs and MHE and associated costs. As part of this process, Fluor was required to issue a Letter of Justification for each piece of MHE/NTV, stating whether the asset was mission-critical, mission-essential, or mission-enhancing and to provide a written narrative supporting the classification. In addition to the justification, the review board analyzed the usage rates for each piece of equipment (miles or kilometers driven for NTVs, and engine hours for MHE).

141.    Dillard and his colleagues became aware that Fluor personnel were running MHE in the Fluor materials yard while not in use. In July 2015, Dillard visited the yard and personally observed two Rough Terrain Container Handlers (RTCH) and four or five forklifts cranked and idling in place with no one in sight and nothing occurring other than the burning of fuel, emission of exhaust, and the meter running up engine hours. Although Dillard reported this incident informally to Fluor's compliance personnel, the issue persisted for several months, at minimum. In late-September, Dillard visited the yard with the new Director of the Materials Management Group, Gregg Gross (Gross), and observed an RTCH with its engine running for half an hour, with no movement, and no one in the cab. Eventually an employee killed the engine, without the RTCH moving from that spot. In October 2015, Fluor Compliance Officer Justin Jones made a very similar observation. Dillard discussed this with Gross and reminded him of the prior visit, which Gross acknowledged. Finally, in January 2016, Dillard visited the yard once more and again witnessed, and recorded by video, an empty, unused RTCH with engine running for nearly half an hour.

142.     In direct, intentional frustration of DoD's effort to decrease spending on MHE, Fluor fraudulently padded the engine hours of its equipment by starting the engines and letting them run idle in place for no purpose other than to create the false appearance that the equipment was actually being used to support the military. Fluor made false statements to DoD regarding the requirement for the MHE in its possession, knowing that, in fact, the equipment was just idling and burning fuel in the yard. Fluor's fraud is even more reprehensible and damaging in light of the fact that running vehicles while not in operation also cost gallons of fuel shipped into the war theater at great expense to the United States and at great personal danger to the soldiers and civilians on the associated logistics convoys.

### H.  Fraudulent Schemes Related to Fluor's Systemic and Pervasive Failure to Manage and Track Inventory

143.     Under its prime contract with the government, Fluor is responsible for managing the government's inventory of property and materials in Afghanistan.

144.     This was not only a massive undertaking—one for which Fluor was paid hundreds of millions of dollars—it was also a massive responsibility—one for which Fluor was subject to stringent rules and regular reporting and disclosure requirements. Losses were required to be reported immediately, and in each case of loss an investigation was to be conducted to determine the reason for the loss and corrective actions to be taken to prevent future loss.

145.     Ensuring accurate inventory and preventing loss was no idle concern. Tracking inventory matters to ensuring that taxpayer-purchased goods actually go to a government benefit, and keeping track of what materials are available at each Forward Operating Base is crucial to completing repairs and construction projects promptly in order to adequately support the troops (e.g., promptly fixing Life, Health and Safety issues, as discussed above).

146.     In addition, Northern Afghanistan was a war zone, and one with thriving black

markets that craved the sorts of American-made goods that Fluor was supposed to manage. Add to that the fact that American military installations throughout Afghanistan had a steady flow of local Afghanis and third country nationals from Central and Southern Asia coming on and off base on a daily basis. For these reasons, and many others, theft was a constant problem, and the failure to track inventory exposed the government to inordinate loss. Indeed, there are numerous well-documented examples of rampant theft of government property, which in some cases resulted in criminal indictments. Examples span from pervasive fuel theft across Afghanistan to specific examples of theft, large and small, from Fluor's own material yards, including everything from fuel injectors and other power generation equipment, to a fire truck and an armored pickup truck.

147.     Perhaps most importantly, inventory control was important to troop safety. Many of the materials Fluor was responsible for were valuable to insurgents. Copper wire and timing devices in common appliances, for example, could be used in improvised explosives; and items as innocuous as nails, nuts, and bolts could also be used as shrapnel.

### a. Fluor Did Not Maintain a System of Record that Could Accurately or Adequately Track Inventory

148.     Fluor was required to maintain a government-approved property management system to track and control the purchase, storage and consumption of government property and materials. Fluor fraudulently represented to the government that it maintained an adequate property management system, called Maximo, when in fact Fluor knew that its Maximo system never contained an accurate representation of actual inventory and consumption, and further knew that it was consistently circumventing Maximo, such that the inventory figures in Maximo were highly inaccurate, and that the data in Maximo was routinely manipulated to conceal Fluor's failure to track and control current inventory and consumption.

149.    Maximo is an IBM Enterprise Management System used by Fluor to track all costs for assets, labor, and materials under Task Order 05.  All property must be accounted for in Maximo, beginning with the input of new property into Afghanistan, and continuing through the transfer of material from location-to-location, and the use of material on specific "Work Orders" (e.g., plates used on a cafeteria work order, PVC pipes used on a plumbing work order, copper wire used on a work order to fix an electrical issue, etc.).

150.    Because Fluor failed to conduct joint technical inspections during the transition period in which inventory was handed off from KBR to Fluor, as discussed above, inventories in Maximo were not accurate from the start. Moreover, starting inventories from KBR, however inaccurate, were not promptly input into Maximo, sometimes for years, at which point they were outdated and useless. Because of these problems, Fluor's property personnel at each Forward Operating Base maintained their own *ad hoc* systems to try to keep track of the inventory at their own bases. All of this was non-compliant with government requirement that Fluor use Maximo as theater-wide property management system.

151.    The problem continued unabated throughout the life of contract, because in addition to inaccurate initial counts, Fluor failed to properly receive newly purchased government property into Maximo. It often failed to track which Forward Operating Base the material was sent to, or what Work Order it was used on. Thus, Fluor lost track of newly purchased government property as soon as it was received in Afghanistan.

152.    By way of example, in a May 2015 conversation with Fluor's Theater Property Manager, Ed Nukic, Fluor's Deputy Theater Property Manager, stated that when new property was routinely input into a general "bin" in Maximo rather than the actual location to which it went, and so "unless someone really quickly moved it to a correct BIN, where the item really

50

was, the information on the item was lost, and it hovered in the Maximo, having the balance that could not be matched, or would be very hard to match to a particular receiving action or issue, or anything for that matter, becoming a Ghost." He attributed the problem to "poor training," "bad receiving procedure," "no Supervisory oversight." He opined that "[t]he real problem was that Materials waited for too long to do something about it, so stuff just piled up and it got worse," and that the problem "continues to date, when receiving is not being done correctly."

153.    Compounding matters, Fluor consistently failed to conduct monthly cyclic checks of 10% of all inventory at each FOB, referred to as 10% inventories. For years it also failed to comply with the requirement that it conduct 100% annual inventories at every FOB. Fluor knew the results of such inventories would be abysmal, and would require a reckoning with its rampant lack of inventory control, and commensurate need to report that it had lost millions of dollars in government property.

154.    Fluor's own internal audits and reports revealed that for years monthly 10% inventories were not being performed, without any legitimate justification. Fluor senior management was made aware of these problems a number of times, including through internal assessments and nonconformance reports, but the problem continued unabated for years. Other internal records revealed that in a number of cases where documentation of 10% inventories was found, the inventories were "pencil-whipped," *i.e.*, falsified.

155.    Consistent with this, internal documentation indicated not only that Fluor consistently failed to perform required monthly 10% inventories, but also that the inventory counts that were done revealed extreme inaccuracies.

156.    Examples of internal documentation of the issues above include the following:

        a.    A January 2011 internal presentation reviewed nine Forward Operating Bases and

found that at eight of the nine FOBs the 10% inventory requirement was not met. Only one site had completed 10% inventories, and another had counted just 3% of inventory; for those two sites, inventory accuracy was found to be 44% and 61%, respectively. In the same presentation, Fluor acknowledged that the inventory accuracy standard it was required to meet was 97%.

      b.   A late 2012 management self-assessment report looked at inventory accuracy at several major Forward Operating Bases, Bagram, Sharana, Marmal, Spann and Phoenix, and found that "Ten percent monthly inventories are not being performed consistently throughout the project."

      c.   A February 2013 email from Jarrold Reeves, Director of Fluor's Materials Management Group (MMG), admitted, "[W]e are not executing 10% [inventories] to standard. Sites are pencil whipping the inventory, not reconciling the 10% in Maximo, and not reflecting the reason for the adjustment in Maximo."

      d.   A January 2014 report regarding lost material explained that the loss was "a direct result from past Management which didn't follow the MMP guidelines," and a result of "failing to conduct required 100% and 10% inventory in order to maintain accurate inventory records in MAXIMO." The report further stated that going back to 2012 the Regional Distribution Center Manager at Marmal knew that "the inventory department did not perform required 10% monthly inventory," and further stated, "No effort or emphasis was ever placed on completing required inventories resulting in loss of accountability of materials."

157.    Further compounding matters, Maximo contained grossly inaccurate Unit of Measure and pricing data, meaning that Fluor could not provide the government with accurate estimates of the cost of labor and materials.  In fact, at a Maximo materials meeting on January 25, 2012, it was revealed that an internal audit by Fluor had discovered that 17,000 lines of

materials in Maximo were priced incorrectly.  Relators Shepherd and Rude had been reporting this accuracy problem with Maximo to Fluor senior management since at least 2010.

158.    Despite the fact that Fluor was well aware of the problems above, Fluor consistently represented to the government that it maintained an accurate and adequate property management system, and certified to the government that its cost and billing data were accurate. In reality, when Fluor submitted required periodic reports to the government about inventory levels, inventory accuracy, inventory loss, etc., Fluor reported knowingly false information. It knew, for example, that it could not provide accurate information, because it lacked accurate data from which to actually report to the government. Rather than admit this, Fluor hid these facts from the government, and falsely represented that its inventory accuracy, for example, exceeded 99%.

159.    For these reasons, and based on all of the fraudulent schemes discussed below, Fluor's Maximo system was never an accurate or adequate property management system, and as further discussed below, Fluor engaged in numerous schemes to conceal the extent of its lack of inventory control from the government.

    b.  **Fluor's Lack of Inventory Control Resulted in Massive Losses of Government Property, Which It Concealed Through Various Schemes**

160.    Not surprisingly, based on the foregoing, Fluor lost millions of dollars of government property, depriving the government of its benefit. Fluor was required to report the shortages to the government, by reporting the instances of loss, theft, damage or destruction ("LTDD"). Fluor could seek relief of responsibility for losses reported on LTDDs.

161.    However, the full extent of the shortages and unaccounted for inventory based on the conduct discussed above was massive. Fluor knew that the government would not relieve it of responsibility for such large losses, so it concealed them.

*i.  Negative Adjustment Transactions in Maximo*

162.    Jeff Nix was a Fluor Compliance Manager in Afghanistan from December 2012 to April 2014, and is a retired United States Army officer who served for 23 years. In 2013, Nix discovered Fluor's mismanagement of inventory in Afghanistan when Fluor's Compliance Department performed a Compliance Review of the process and procedures used by Fluor for making Negative Adjustments to inventory and for reporting instances of loss, theft, damage, and destruction ("LTDD") to the Government. The purpose of the Compliance Review was to determine whether Fluor's handling of Negative Adjustments complied with contractual and regulatory requirements and internal procedures.

163.    The Negative Adjustments Compliance Review grew out of an earlier Compliance Review performed by Justin Jones, a Compliance Manager within Fluor's Compliance Department. Among other areas of inquiry, Mr. Jones' Compliance Review examined a sample of 25 Negative Adjustments to inventory during the review period of January 1 to July 31, 2012. Jones found that only 2 of the 25 Negative Adjustments had the necessary LTDD documentation associated with them, another 4 were annotated as "Administrative Adjustments," and the remaining 19 had no supporting documentation whatsoever. Jones' Compliance Review concluded that "[s]hortages found during physical inventory are not consistently being reported to Property [the Government Property Administrator] for LTDD" and that "[t]his lack of reporting demonstrates a lack of control and oversight" over government property.

164.    Based on Jones' report, the Compliance Department decided to conduct a Compliance Review specifically examining Fluor's handling of Negative Adjustments to inventory, in particular whether Fluor was documenting the reason for each Negative Adjustment to inventory and whether Fluor was properly reporting LTDD events to the Government.

165.    As explained more fully below, the Negative Adjustments Compliance Review found that Fluor personnel were routinely making Negative Adjustments in Maximo (*i.e.*, reducing the inventory count in Maximo) without any documentation whatsoever – neither documentation supporting an Administrative Adjustment nor an LTDD report notifying the Government of loss, theft, damage or destruction of Government property. Handling inventory shortages in this manner is a violation of the Contract, federal regulations, Fluor's internal procedures and policies, and sound inventory management practices, and results in a complete lack of accountability for missing items in inventory.

166.    Fluor managers that were made aware of the results of the Compliance Review include Country Manager Steve Whitcomb, now-retired Country Audit Response and Compliance Manager Joseph Kerr, FGG Compliance Director Dave Methot, Deputy Theater Property Manager Ed Nukic, Country Director of Material Management Jarrold Reeves, and Theater Materials Manager Michael "Shane" Ramirez.

167.    The universe from which the sample was drawn consisted of all Negative Adjustments to the materials inventory in Afghanistan during the period January 1, 2010 to February 1, 2013.

168.    In total there were 168,868 transactions involving Negative Adjustments in the universe of transactions during the selected period, *i.e.*, 168,868 transactions in which Maximo records had been adjusted downward to reflect shortages in inventory. These 168,868 transactions totaled approximately $386 million dollar worth of Government-owned materials.

169.    Standard sampling methodology was used to select a statistically significant sample size for the audit, which was determined to be 59 samples from each of four periods between January 1, 2010 and February 1, 2013, or a total of 236 samples (0.139% of the universe

of transactions). EZ-Quant random number generator to select the samples randomly.

170.    Nix examined the 236 Negative Adjustment transactions to determine whether the transactions complied with the Contract, federal regulatory requirements, and Fluor's internal policies and procedures. Nix examined all documentation in Maximo (the system of record) and all back up materials provided by the Regional Supply Centers in response to a request for these materials from the Compliance Department. In addition, Nix reviewed the Fluor Material Management Group's LTDD database (maintained by the Fluor Government Property Department), which is the repository of all LTDD reports.

171.    The Compliance Review audit found gaping holes in Fluor's management and oversight of the materials inventory in Afghanistan. These findings are explained below.

172.    The Compliance Department's audit found that in 190 of the 236 Negative Adjustments audited, there was no documentation whatsoever of the Negative Adjustment. Of the remaining 46 Negative Adjustments, 37 were instances in which an Administrative Adjustment was documented, and nine were transactions in which an LTDD was prepared.

173.    In sum, the audit showed that in 80.5% of the Negative Adjustments (190 of 236 cases), Maximo records had been adjusted downward with no back-up documentation, no explanation, and no audit trail. This meant that in the vast majority of instances when a shortage was discovered in inventory, Fluor personnel simply papered over the shortage by adjusting the Maximo records downward. If Fluor had followed required procedures, it would have prepared an LTDD report notifying the Government of the loss since there was no evidence of an Administrative Adjustment.

174.    Fluor's practice of making Negative Adjustments to inventory without documenting an Administrative Adjustment or creating an LTDD report violated the Contract,

federal regulations, and Fluor's internal procedures.

175.    Fluor's failure to account for the missing inventory concealed from the Government the extent of Fluor's mismanagement of inventory and deprived the Government of the ability to direct Fluor to correct the problem in a timely manner.

176.    As noted above, the 168,000 Negative Adjustments during the three year period under review totaled approximately $386 million in value. Given that 80.5% of the Negative Adjustments had no audit trail and no reporting of an LTDD, this represents $310 million in missing and unaccounted-for Government materials for which Fluor is responsible.

177.    David Payne worked for Fluor from December 2011 through December 2016 in its Security department, where he performed numerous LTDD investigations and supervised nearly all LTDDs that were prepared by other Fluor employees. Through his investigations, Payne quickly discovered that Fluor's material management system was out of control. He, too, learned that Fluor was using improper Inventory Adjustment Transactions ("IATs"), including Negative Adjustments in particular, to conceal shortages.

178.    Through various reviews of Maximo, Payne discovered multiple instances of information being manipulated, omitted, or falsely reported in the database. Payne, like Nix, discovered that Inventory Adjustment Transactions were entered into Maximo without the required justification or memorandum to explain the adjustment.

179.    Payne also discovered that materials personnel repeatedly adjusted inventories in the Maximo database system without performing the necessary causative research to validate identified overages and shortages. Furthermore, the Materials department personnel failed to inform Fluor Security of the adjustments and often could not provide the necessary documentation to substantiate them.

### ii. Falsified Records

180.     Another ruse took place at the level of Fluor's eight Regional Distribution Centers ("RDCs") (basically, larger bases that acted as "hubs") in Afghanistan. In February and March 2013, as part of the Compliance Review of Negative Adjustments, Fluor's Compliance Department requested any records reflecting Administrative Adjustments, LTDDs, or other explanation for the Negative Adjustments in the audit. Managers Ramirez and Reeves directed that the eight RDCs provide back-up documentation for the 236 Negative Adjustments to inventory in the sample population.

181.     In response to this request, the Compliance Department received no response whatsoever from six of the eight RDCs, even though each of these six had a sizeable number of Negative Adjustments in the sample population. The two RDC's that did respond – Salerno and Fenty – each provided a number of backdated documents that suggested an attempt to cover-up failings in their inventory management.

182.     Fenty RDC submitted 53 Memoranda that purported to document the reason for 53 Negative Adjustments to inventory at the Fenty RDC (53 was the number of Fenty Negative Adjustments in the sample of 236 Negative Adjustments). A close examination of these Memoranda revealed that all of them were backdated to look like they were created contemporaneous with the Negative Adjustment, whereas in truth they were created in response to the much later request of the Compliance Department.

183.     Nix discovered the backdating of the Fenty Memoranda by (1) examining the metadata of the documents (submitted in electronic format) which showed that the document had been created contemporaneous with the request of the Compliance Department, and also (2) by examining the date the author of the document was assigned to the Fenty RDC, which showed that the author was not assigned to Fenty until after the purported date the document was created.

184.    Moreover, the backdated Memoranda provided by the Fenty RDC did not even accomplish the purpose for which they were intended, which was to justify the Negative Adjustment. The Fenty Memoranda simply stated, "The below item code was adjusted because it was not located during inventory on [the date of the physical inspection]." This was merely a restatement of the problem – that the items were missing from inventory – and offered no explanation for why the items were missing.

185.    The Salerno RDC submitted eight Memoranda (the number of Salerno Negative Adjustments in the sample population) in response to the Compliance Department's request. Nix's examination of these Memoranda revealed that four of them were backdated to look like they were created contemporaneous with the Negative Adjustment, whereas in truth they were created only in response to the much later request of the Compliance Department. Nix discovered the backdating of the Salerno in the same manner he detected the Fenty backdating.

186.    As noted above, the other six RDCs did not even make an attempt to provide back-up documentation for the Negative Adjustments in their region, effectively conceding that there was no back-up documentation and thus no known reason for the Negative Adjustments in their region. The non-responsiveness of six RDCs and the inadequate response of the other two RDCs supported the conclusion of the Compliance Review that Fluor's system for managing inventory is fundamentally inadequate and that Fluor handled recklessly its responsibility to maintain oversight over Negative Adjustments to inventory and account for Government property.

187.    David Payne, the Senior Supervisor in Security, also found evidence that Fluor personnel were falsifying records. Payne found that fraudulent Memorandum for Records documents ("MFRs") were prepared in an attempt to justify Maximo record changes and/or

failures to comply with required Materials Management Plan policies and procedures. There were instances where these MFRs were created in 2013, but backdated to support transactions allegedly performed in 2011 or 2012.

### iii.  Virtual (or "ghost") DRMO[6] Storeroom Losses

188.     In September or October of 2012, Payne learned that Fluor property-management personnel used entries in the Maximo system to sequester missing property in fictional "storerooms," rather than reporting them on LTDDs.

189.     In November or December of 2012, Payne was evaluating the extent of Government property that Fluor had lost but not submitted on an LTDD or otherwise dispositioned. Over the next six months, Payne found that Fluor property personnel had placed approximately $30 million worth of Government property in virtual DRMO storerooms, or "bins." Simply put, he found that, according to the Maximo database, $30 million worth of unaccounted-for Government property was in physical locations that did not exist. These nonexistent "bins" were also called "ghost bins."

190.     The "contents" of the ghost bins consisted in substantial part of material that could not be accounted for on Fluor's required, monthly, 10% Inventories.

191.     Payne told Wilson (his supervisor) about his findings, and then he reported it up the corporate chain. As a result, in mid-2013, Fluor's Corporate Investigations operation took over the inquiry.

192.     Wilson also told Payne that MMD management was concerned that these and other breakdowns would cast doubt on the reliability and accuracy of previous Fluor end of year

---

[6] Defense Reutilization Marketing Office ("DRMO") is a term that was used for locations that accept and manage surplus/excess military property. DRMOs fell under the purview of the Defense Logistics Agency ("DLA")/Defense Reutilization Marketing Service, which is now known as DLA Disposition Services.

inventory reports submitted to the Government.

193.    In approximately March 2013, Ernest Ridley, a high-level Materials Management Group manager, and Reed Wilson, a MMG Specialist, traveled to Bagram from Greenville, S.C. Payne knew that Ridley would be travelling to Afghanistan, as he (Payne) had emailed Ridley and others a series of questions on March 28, 2013, concerning material shortage issues, including some aspects of the DRMO storerooms. Ridley provided a written response to Payne's emailed questions on or about March 29, 2013. One of Payne's questions pertained to what RDC managers had been told regarding inventory losses, and whether the data that was disseminated to RDC Managers included DRMO storerooms. Ridley responded, "Transactions that are currently in the DRMO storeroom were not included because an inventory adjustment has not been completed on these. All transactions in the DRMO storeroom will be inventoried and a subsequent LTDD [report] may be initiated."

194.    Payne, Ridley, Reed Wilson, Bryan Wilson, and Robert Fiorille met on multiple occasions at Bagram, so Payne knew that Ridley and Reed Wilson were traveling to various Fluor Forward Operating Bases on their trip. Payne was told by Ridley, in the presence of Bryan Wilson and Fiorelle, that the Greenville team actually determined that the potential missing property (dating back to 2010) in the virtual storerooms/ghost bins was valued at $48 million.

195.    About a month after Ridley left Bagram AF, he told Payne that the $48 million in unaccounted-for Government property had been reduced to $26.9 million. Payne was advised that Tony Montalvo (Deputy Project Manager for Materials Management Group), Ridley, and Reed Wilson, as well as unidentified Fluor personnel in Afghanistan, went through thousands of line items of Government property transactions to determine the new loss value.

196.    Greenville personnel told Payne that the approximately $27 million in lost

Government property would be submitted on a LTDD report.

197.    To the best of his knowledge, over the course of his tenure with Fluor, Payne saw virtually all LTDD reports covering loss in excess of $3,000 that were submitted to the Government, but he did not see any LTDD reports concerning the ghost DRMO inventory.

*iv.  Placing Lost Materials on Work Orders*

198.    Another method by which Fluor concealed inventory losses was to simply "issue" lost inventory to current or completed Work Orders, as though the materials were used on the Work Orders. In this way, the material was removed from inventory and deemed consumed.

199.    In some cases, lost government property was added to Work Orders that had been completed long ago. In fact, Fluor added more than $60 million in lost materials to Work Orders that had already been completed.

200.    Payne, too, upon information and belief, suspected that Work Orders were repeatedly initiated so that it would appear in Maximo that unaccounted-for Government property was being utilized in a project. By doing this, the unaccounted-for government property could be decremented out of Maximo as material associated with a Work Order, and thus not be reported through the LTDD process to the government.

201.    Payne also suspected that, upon information and belief, Fluor was allowing employees to access Maximo at elevated user access levels and with elevated privileges. These employees were performing various critical functions (*e.g.*, creating or deleting work orders) that were typically performed by supervisors or managers.

*v.  Shifting Losses When Closing Bases*

202.    When Forward Operating Bases closed, as they did from time to time and in particular during the drawdown in troops, Fluor was required to conduct a 100% inventory, account for any inventory losses, and send property and materials that were still usable back to

Regional Distribution Centers (RDCs). In other words, base closings were a potential moment of reckoning regarding lost inventory.

203.     However, RDC managers intentionally did not report losses promptly, to avoid scrutiny of their practices. For example, sites that had been closed for more than one year failed to submit any site closure LTDD reports and often reported near-perfect records of accountability for 10% or 100% Inventories. However, when remaining material was brought back to RDCs from FOBs or other locations under their management, considerable losses (some of which were referred to as "in-transit losses") were reported. Since there was no evidence of tampering or pilferage during transit, Security personnel determined the losses were the result of poor inventory control.

204.     It was also determined that in the final days before a site closed, materials were being issued to existing, but unrelated, Work Orders for the sole purpose of trying to quickly balance the inventory. Essentially, RDC Managers would try to allocate lost materials to a project on paper, so that it would appear as if the material was actually accounted-for and not "lost" as a result of poor inventory practices prior to a site's closure.

### c. Schemes Above Were Also Used to Deceive Government Auditors In Order To Conceal Fluor's Inventory Frauds and Retain the Ability to Obtain Relief of Responsibility for Lost Inventory

205.     The government performed periodic audits of Fluor's inventory system, called Property Management System Analysis audits, or PMSA audits, in which auditors conducted on-site visits of a particular Forward Operating Base to assess compliance with Fluor's contractual and regulatory obligations. As part of the PMSA audits, the government would check Fluor's documentation, and perform sampling of inventory to determine if the Maximo inventory matched physical inventories. Fluor had advance notice before the government conducted PMSA audits at each Forward Operating Base.

206.    In late 2010, Fluor failed three successive PMSA audits at three different sites. In response, the government issued a Letter of Concern to Fluor identifying systemic problems with Fluor's inventory control, and threatening, "The Contracting Officer may revoke the Government's assumption of risk for loss, theft, damage or destruction (LTDD). In that event, the Contractor would be held liable for any L TDD costs as a result of the failure to maintain adequate property management practices in accordance with the clause at FAR 52.245-1." Tony Montalvo, Fluor's Deputy Project Manager for the Materials Management Group, confirmed the stakes if Fluor failed further PMSA audits: "If DCMA deems that sufficient improvement is not being made then liability for LTDDs will be transferred to Fluor."

207.    From that point forward, in advance of PMSA audits, Fluor sent its own "pre-audit" team to each Forward Operating Base about to be audited, with the intention of concealing evidence of Fluor's inventory control failures and ensuring Fluor passed the audit. Among other things, the pre-audit teams would compare Fluor's inventory, as tracked in Maximo, with actual physical inventories. When they found discrepancies, they used the various schemes above to adjust the Maximo inventory to match what they had on hand, all without acknowledging the losses to the government. So, for example, when shortages of a given material were found, the pre-audit teams reduced the Maximo inventory to match the physical inventory by falsely "issuing" materials to Work Orders, transferring it to DRMO storerooms where they would not be seen by auditors, and just simply making Negative Adjustments to inventory.

208.    Indeed, analysis of Fluor's Maximo system reveals that, over and over, in the period immediately before a PMSA audit at a particular Forward Operating Base, there was a spike at the soon-to-be audited site in materials being issued to Work Orders, and/or a spike in inventory adjustments.

209.    All of these actions were designed to conceal that, despite charging the government hundreds of millions of dollars to manage property and materials, Fluor failed to meet its contractual and regulatory obligations with regard to inventory tracking, and to ensure that regardless Fluor could continue to obtain relief of responsibility from the government for lost property.

### d.  Illegal Acquisition and Use of Government Material

210.    Fluor illegally spent government money to acquire property without authority; consistently and knowingly acquired material redundant to material already acquired on behalf of the United States and in Fluor's possession; illicitly created a de facto "authorized stockage list" of construction materials without permission; utterly failed to properly account for Government property and seek direction regarding the disposition of that property; and worked to conceal this state of affairs from the United States' contracting representative. As a result, the United States paid tens of millions of dollars in unnecessary shipping and procurement costs. Moreover, by these schemes Fluor was able to illegally obtain construction work under its logistics contract without statutorily-mandated review and appropriation by Congress, depriving the United States of the opportunity to competitively bid this work at a lower cost. In addition, even with respect to construction change orders not approaching the military construction (or MILCON) threshold, Fluor was able to artificially and falsely deflate the costs of its proposals through the illicit use of Government owned material that was not properly requisitioned for the change order and was in fact acquired for other purposes. This deceit fraudulently enticed the United States to award more work to Fluor at the higher costs associated with the cost-plus LOGCAP contract, rather than utilizing other, more economical channels such as fixed price construction contractors or locally-based companies.

211.    As outlined in this Complaint, Fluor's LOGCAP IV, Task Order 0005, was a logistics services contract, funded with U.S. Army Operations and Maintenance (OMA) funds – the funds appropriated by Congress to the Army to fund its day-to-day operations. Inherent in the scope of Fluor's contractual duties, however, was the construction of certain basic facilities required to perform its "Base Life Support" functions. Congress recognized this practical reality when it allowed for certain construction projects to be paid for under logistics contracts, up to a value of $750,000.00 – now $1 million.

212.    Scott Dillard served as Deputy Director of Fluor's Materials Management Group. In this capacity – in addition to his prior experience as a LOGCAP Program representative – Dillard was intimately familiar both with the federal regulations dealing with management of Government property by defense contractors and the systems Fluor employed in this regard.

213.    With regard to the material Fluor required to perform its Base Life Support functions, Fluor was authorized by the Army to maintain an Authorized Stockage List (ASL). In effect, this means that, the Army having approved its proposal for the cost of performing Task Order 05, Fluor was able to maintain a stock of the supplies and material it needed to perform those functions. Items like light bulbs, which Fluor could project that it would need with a known frequency, could be maintained as part of Fluor's ASL and replenished when supplies reached a certain point.

214.    With regard to construction materials, Fluor was not permitted to maintain an ASL. As outlined above, construction change orders represented a further commitment of funds by the United States in addition to the original logistics contract. Accordingly, materials for change orders could not be purchased until the change order was issued. Fluor's acquisition of material on behalf of the United States, prior to the decision of the United States' contracting

representative to authorize that acquisition, would plainly be *ultra vires* and in violation of the Anti-Deficiency Act. For that reason, Fluor's request to the DCMA for permission to maintain a construction ASL was not granted and Fluor was not permitted to maintain a stock of construction supplies.

215.    Under the Federal Acquisition Regulations and its LOGCAP contract, Fluor was charged with acquiring material on behalf of the United States – as authorized – and with properly storing and inventorying that material. Fluor employed an IBM system known as Maximo to track – theoretically – every item of U.S. property entrusted to its care. This material should have included items in the Operations and Maintenance ASL (*i.e.*, the stock of material Fluor would use to perform its Base Life Support duties); material specifically identified in Bills of Material for specified construction change order projects, as approved by DoD representatives; property found to have been in excess of requirements on prior construction change order projects; property received for specific change orders that were subject to a "stop work" order; and other categories of material properly acquired by Fluor on behalf of the United States in order to complete its duties under the LOGCAP task order.

216.    In reality, Fluor thwarted the proper procedures in numerous ways, all of which were designed to allow Fluor to use the United States' property in a manner that benefited Fluor, without regard to the cost to the government. Fluor shuffled government material through its system in whatever manner was expedient to Fluor at the time, failing to properly account for material, maintaining "off the books" caches of government property, defying its own procedures, and procuring redundant material at government expense – which in turn became additional fodder for Fluor's fraud and abuse.

*i.  Construction Excess Storerooms (COXS)*

217.    A 2012 compliance report authored by Fluor's Training and Assessment Team (the TAT Report) offers a glimpse of many of these issues (and serves to demonstrate that they were well-known by Fluor's management). The TAT Report surveyed Fluor's acquisition and utilization practices and reported several major deficiencies.

218.    In fact, as the TAT Report notes, Fluor did effectively create a *de facto* construction ASL – despite knowing it had not been granted authority to do so – in the form of construction excess (COXS) material store rooms. Although Fluor was required to report excess construction materials and to await instructions from DoD regarding their disposition, the TAT Report reveals that these construction excess storerooms were enormous, at that time encompassing 6,400 line-items of material valued at $13.2 million. Moreover, the TAT Report shows that Fluor was not even utilizing this vast collection of Government property to the Government's benefit. When Fluor needed material for a new construction project, it simply ordered it again, without referencing these massive storerooms to determine if the material was already on hand and could be used, which would have saved the United States the expense of acquiring new material and shipping it into the Afghan war theater.

219.    For example, the TAT Report highlights one purchase order generated by Fluor for change order "CB3-7083 Alaska Tents Structures." All told, Fluor requisitioned over $400,000 worth of material for the construction of these tents. The TAT Report reveals that all of this material was already in Fluor's COXS storerooms. Specifically, the TAT Report shows that Fluor requisitioned two Alaska tent power distribution systems at a unit cost of over $45,606. It already had ten. It also requisitioned ten small Alaska tent structures at a unit cost of $15,550. Again, ten of these tents were already owned by the United States and residing in Fluor's storerooms.

220.    The Alaska tent episode demonstrates two major issues with Fluor's practices. First, it is difficult to imagine how Fluor innocently stockpiled in its COXS storerooms ten power distribution systems worth $45,000 dollars each. Material of that kind and value should not have ended up as excess to another construction project (particularly one falling under the $750,000 O&M exception), given that each approved project should include a Bill of Material encompassing everything required to complete the project. An extra spool of wire may be understandable, but half a million dollars' worth of power distribution equipment is not. Secondly, of course, Fluor still did not inform DoD that this material was on hand and could be used to fulfill the new requirements. Instead, it ordered more. Put simply, Fluor ended up with a huge store of government-owned property by willfully over-ordering material on the Government dime.

221.    The existence and use of COXS Storerooms is merely one snapshot of Fluor's consistent daily practice of routing Government-owned property to its own ends without regard to Federal Acquisition Regulations or its obligations to the taxpayers. Fluor's construction personnel constantly raided materials that were part of the O&M ASL or were specifically earmarked for a different construction change order project. Consistently this was done without properly documenting the transaction, as a result of which the United States was misled as to where the material paid for by the United States had gone. A 2011 email from Fluor's Construction Superintendent Kenneth Conner (Conner) demonstrates how dire this problem was. Conner wrote to Fluor's construction and materials personnel to inform them that materials requisitioned for a certain change order construction project were beginning to arrive in-country. Because the project was on hold temporarily, Conner was very concerned that the materials earmarked for this project would simply disappear, being cannibalized by Fluor for whatever

other purposes suited Fluor personnel as was Fluor's typical modus operandi. He outlined the situation as follows:

> The situation we are faced with is, material is coming in for a high visibility CO, which has unofficially been put on hold pending a redesign, that has not officially been put in place . . . My point is, we have to secure these materials, because the customer & client, are well aware of the materials [sic] existence and at some point will be asking for its accountability . . . . Everybody and their mother knows about this job and if we cannot account for all the material, Fluor will definitely be put on the hot seat. We need a plan in place to secure the material and not let it get away from us . . . I don't think it will be to our advantage to scatter it all over the Kabul AO.

222.    The plain implication of Conner's email is that, in the normal course of business – when the United States' representatives are not precisely aware of what material Fluor is acquiring and where it is going – there is no "plan in place" to "secure the material" that the United States has acquired through Fluor for a given project – rather, when it is not under extra-scrutiny, Fluor typically uses materials to its own advantage. As a matter of routine, Conner's email makes clear, when U.S. Government-owned material arrives at Fluor's facilities, it is free game and liable to be scattered around the Area of Operations without accountability. It is a special occasion when the Government is aware of material that is coming into Afghanistan and Fluor is required to actually use it as contractually required.

223.    Email correspondence shows that Fluor "senior management in Greenville" approved the creation of the construction excess storerooms in 2011. In reality, there was no contractual or regulatory basis for the creation of what amounted to an illicit construction ASL that ballooned into a massive cache of material – all material legitimately excess to a change order project should have been catalogued, reported, and stored until Fluor received instruction regarding its disposition. The change order to Fluor's contract, which had included additional outlay by the United States for the material listed in the Bill submitted by Fluor, should have

been amended to show that some of the material had been found to be excess and returned. None of this was done and instead Fluor covertly stockpiled huge amounts of Government property for its own use and falsely retained the full amount paid by the United States under the change order.

224.    Eventually, in April 2014, long after Fluor's compliance personnel had determined that the COXS storerooms were "non-compliant," and once construction work in the theater was winding down, Dillard's supervisor Reeves was able to convince Fluor management to close the storerooms. Reeves' memorandum notes that "[t]he goal [of closing the storerooms] is to restore compliance while maintaining accountability." Even at this time, the COXS storerooms contained some 2,600 line items of material. Eventually, as part of a "War on Excess" mounted by Reeves as the contract was winding down, a physical inspection of the Fluor construction yard was performed in early 2015 and found 27 containers of material that were not catalogued in Fluor's Maximo system at all, along with enormous amounts of material that was not tied to any change order or work order.

225.    Fluor correspondence shows that DoD's representatives in Afghanistan were at points suspicious that Fluor was illicitly acquiring and stockpiling material, but that Fluor evaded detection, in part by using falsified inventory reports and whitewashing its own compliance documents. For example, in July 2013, Fluor's Office of the Chief Compliance Officer published a report entitled "Change Order Acquisition and Utilization, LOGCAP-IV Afghanistan, Project Compliance Review" (the Final Report). The Final Report itself touches on many of the issues outlined in this complaint, including: (1) (unauthorized) requisitioning of material not referenced to any specific change order or work order; (2) utilizing O&M material for change orders without properly accounting for the requisitioning of that material, potentially resulting in over-ordering of O&M stock; and (3) non-compliance of the COXS storeroom – which the report

advises closing – specifically, "[n]o evidence of promptly disclosing and reporting to the Government property in [Fluor's] possession that is excess to contract performance relating to construction materials." Dillard was informed, however, that the original report was much more explicit than the Final Report, and that Compliance Officer Justin Jones, who conducted the review, was ordered by senior compliance personnel to "tone down" the language of the report and obscure the findings, in order to evade DoD scrutiny.

226.    Fluor's willful evasion of the requirements for acquiring, using, and storing Government property – and its misrepresentations to the United States in that regard – were not harmless. As a result of Fluor's fraudulent practices, the United States was charged with millions of dollars in unnecessary material costs, including material that was not associated with any change order and thus not authorized for acquisition, material that was double ordered by Fluor, and material that was double ordered to replace O&M stock even if the material, once received, was retained by construction without proper accounting, and so on. Moreover, all of the material acquired by Fluor on behalf of the United States was shipped into the Afghan war theater at huge expense, much of which was known to be unnecessary, and Fluor, when asked, deliberately obfuscated from Government contracting representatives in Rock Island its means and modes of transport in order to help justify its exorbitant freight forwarding / shipping costs from the United States.

227.    Finally, Fluor's illegal construction ASL served as a means for Fluor to suppress its estimates for construction change order projects. By using material owned by the United States, Fluor could keep its estimates below the O&M construction project threshold, thereby avoiding competition for those jobs through the MILCON competition process. Because Fluor had illegally acquired property without authorization and improperly stockpiled it without proper

disclosure to and instruction from DoD, Fluor was able to create a virtual monopoly on small construction projects in Afghanistan, and the United States was deprived of the opportunity to competitively bid that work for potentially lower prices from more scrupulous contractors.

*ii. Aluminum "AM-2" Matting*

228.    A specific episode from December 2015 involving aluminum AM-2 matting (aluminum plates covered in a nonskid material) further illustrates the way Fluor has conducted its performance under LOGCAP-IV Task Order 0005. At this time, Fluor was preparing a Project Planning Estimate for DoD regarding the relocation of Fluor's Theater Distribution Center (TDC). On December 21, 2015, Roesler sent notice of a meeting titled "TDC Relocation – Internal Review of PPE Draft" with the Description: "Initial PPE has total costs exceeding MILCON. Need to review and look for ways to decrease costs if possible." Dillard attended the meeting.

229.    The primary point of discussion for lowering costs to win the TDC relocation project dealt with the possible surfaces, specifically eliminating or reducing rebar-reinforced concrete for Large Area Maintenance Shelter (LAMS) aprons (the outdoor area(s) not covered by the LAMS) and associated dumpster pads. The initial PPE called for rebar-reinforced concrete aprons and dumpster pads. Gravel pads, in lieu of concrete, were discussed as a feasible option to reduce costs.

230.    At that point, Theater Distribution Center Manager Juan Jones (Jones) suggested that the PPE could be fraudulently lowered under the military construction threshold by preparing the PPE to use AM-2 matting. This high-strength aluminum matting was designed for the rapid construction of aircraft runways. As the discussion continued, it became clear that Jones was already in possession of a significant quantity of AM-2 matting that he had secured

illicitly and converted to his own purposes. But rather than inform the government that Fluor had AM-2 matting on hand and could perform the work using AM-2 matting the government had already purchased, Fluor concealed this fact from the government.

231.    One of the non-BLS duties included in Fluor's LOGCAP functions was the operation of a Retro-sort Yard. This involved the receipt of truckloads of undocumented or mostly undocumented military equipment and material, which Fluor was tasked with cataloguing, storing, and reporting to the Government, with National Stock Number (NSN) items (such as AM-2 matting) reported through the Standard Army Retail Supply System (SARSS), for instructions for disposition. Jones' comments at the December 2015 TDC relocation meeting – together with Dillard's knowledge of Fluor's practices and Jones's in particular – strongly indicated that Jones had effectively stolen truckloads of AM-2 matting from the Retro-sort Yard, which he stored or put to use in his own materials yard or distributed to whomever he deemed fit in an ad hoc and undocumented manner.

232.    Jones indicated his belief that, once the project was won, the military would accede to Fluor's request that it supply AM-2 matting for the TDC relocation – but he also assured Roesler and the others that, should the request be denied, he already had the necessary matting on hand. Jones and Gentry explicitly discussed that the best strategy was to request that the military supply the matting for the relocation, and then "whatever else we have, we have it." In that event, Jones assured Gentry, Jones could simply store the "excess" matting: "it is easy to stack like Legos . . . I can store as much as I need to, Sir."

233.    Plainly, Jones, with the complicity of Fluor senior manager Gentry and others, seized upon this gambit as a means of both concealing and potentially adding to an illicit cache of very valuable aluminum matting – even if the military denied Fluor's request for 37,000

square feet of AM-2 matting for the TDC relocation, Fluor already had in its illicit possession more than sufficient quantities of matting for the relocation of the TDC. Following the TDC Relocation meeting, Dillard toured Juan Jones's TDC yard and found at least 1,777 panels of AM-2 matting, comprising 42,648 square feet and valued at $1,236,792.

234.    Fluor, thus, had illicitly acquired $1.24 million worth of U.S. Government property that the military urgently needed in Iraq and other expeditionary operating environments. Instead of informing the Government, Fluor made an attempt to secure yet more AM-2 matting. This acquisition was itself unnecessary, given that concrete aprons and dumpster pads were called for in the initial PPE, gravel was an acceptable substitute, and AM-2 matting was proposed solely for the purpose of bringing Fluor's estimate under the minor construction threshold while simultaneously boosting its already large supply of AM-2 matting for use as Fluor deemed fit and not the Government.

235.    Dillard reported this fraud to Fluor's corporate investigations and compliance departments. Dillard understands that Fluor senior management intends to further conceal this fraud by belatedly reporting that the AM-2 matting in its possession was "found on installation" (FOI). The FOI process continues to disallow the military use of this valuable equipment by not inputting the items into the "Global Combat Support System – Army" (the late 2015 SARSS replacement) for worldwide visibility and appropriate Government direction for disposition / redistribution to Iraq or wherever the Government deems needed.

### e.  Fluor Falsely Minimized Property Losses In Reports to The Government, Allowing it To Earn Massive Award Fees

236.    FAR provides regulations for managing and overseeing the award fee process for Cost Plus Award Fee contracts.

237.    FAR 16.405-2, "Cost-Plus-Award-Fee Contracts," states that the amount of the

award fee to be paid is determined by the Government's evaluation of the contractor's

performance in terms of the criteria stated in the contract.

238.    The Contract in this case provides that: "The payment of any award fee is

contingent upon earning a performance rating of good, very good or excellent." Contract, § H-

35.f. The amount of the fee rises with each higher rating. See id.

239.    The AFEB evaluates the contractor's performance semiannually by reviewing the

contractor's written self-assessment as well as the assessment of Government representatives.

Contract, § H-35.d. Contract Clause H.36.d(6) provides:

> The LOGCAP Award Fee Evaluation Board (AFEB) will evaluate Contractor
> performance on each CPAF [Cost Plus Award Fee] task order not less than semi-annually
> by:
> (a) Reviewing Contractor performance as measured against the LOGCAP award
> fee evaluation criteria.
> (b) Reviewing the Contractors written assessment describing its performance
> during the evaluation period.

240.    Under the Contract, Fluor's written self-assessment is due within five working

days prior to the end of the evaluation period. Contract, § H.36.d(7). "This written assessment of

the Contractors performance throughout the evaluation period should contain any information

that may be reasonably expected to assist the AFEB in evaluating the Contractors performance."

Id.

241.    Based on its evaluation of Fluor's performance, AFEB recommends an award to

the Award Fee Determining Official ("AFDO"), who makes the final decision about the amount

of the award fee. Contract, § H.36.e.

242.    Jeff Nix, while working in Compliance, discovered that in Fluor's biannual self-

assessment reports to the AFEB, Fluor misrepresented the number of LTDD events that had

occurred during the reporting period. Fluor misrepresented the number in two different ways.

243.    First, as explained above, Fluor did not prepare LTDD reports in the large majority of instances where an LTDD was required, *i.e.*, inventory shortages that could not be documented as Administrative Adjustments.

244.    Secondly, Fluor counted only a subset of its LTDD reports (already artificially low due to the practice noted immediately above) when it prepared its self-assessment reports for the AFEB. This can be seen by comparing (1) Fluor's LTDD database maintained by the Property Department, with (2) Fluor's self-assessment reports submitted to the AFEB (including Fluor's back-up information for the reports).

245.    Fluor's LTDD database consists of every LTDD report prepared by Fluor. Fluor's self-assessment reports to the AFEB state the number of LTDD events during the reporting period as a percentage. The percentage is the ratio of the value of all LTDD reports in the reporting period divided by the total value of all property in inventory.

246.    In order to receive a rating of good, very good, or excellent for the performance category of "Materials and Property Management," Fluor tries to keep the percentage of LTDD events as low as possible. The industry standard for LTDDs is 2% of all inventory. In order to qualify for the highest possible performance evaluation, Fluor sought to keep its LTDD rate below 2%. The smaller the percentage, the higher Fluor's performance evaluation and corresponding award.

247.    Nix compared Fluor's LTDD database with Fluor's reports to the AFEB. He discovered that the number of LTDD reports in the former was much greater than the number relied upon by Fluor in the latter.

248.    Following is a chart showing the discrepancy between (i) the number of LTDD reports in Fluor's LTDD database (which itself only contained a fraction of the actual LTDD

events) and (ii) the number of LTDD events that Fluor reported to the AFEB. This chart is for the period January 2011 through June 2012 (the period for which Relator had access to complete records). After June 2012, the Contract became a fixed price contract and reports to the AFEB were no longer required (because there was no longer an award fee).

| LTDD Comparison TableNumber of LTDD Reports 2011 | LTDD Database | AFEB Backup |
|---|---|---|
| Jan | 491,446.06 | 286,979.63 |
| Feb | 496,571.41 | 312,597.22 |
| Mar | 2,748,400.98 | 340,512.74 |
| Apr | 3,058,765.31 | 188,857.67 |
| May | 1,968,137.30 | 157,588.97 |
| Jun | 1,340,012.99 | 126,401.01 |
| Jul | 584,348.35 | 2,584,263.78 |
| Aug | 605,095.22 | 751,244.86 |
| Sep | 410,941.42 | 516,688.58 |
| Oct | 2,128,901.67 | 15,453.64 |
| Nov | 437,308.43 | 47,553.96 |
| Dec | 3,829,434.97 | 130,533.90 |
| **Total** | **18,099,364.11** | **5,458,675.96** |

249.    Fluor presented a series of slides biannually to the AFEB on its performance on different aspects of the Contract, including management of property and materials in inventory. In each biannual slide presentation, Fluor reported that its LTDD ratio was below 2%; however, it could only make this claim by not counting all of its LTDD events.

250.    Fluor's January 1 – June 30, 2011 AFEB Report under Task Order 5 states, inter alia, that "LTDDs total only 0.23% of the property book dollar value," exceeding the LTDD industry standard of 2% and showing "good stewardship of Government . . . property." [Emphasis in original.]

251.    Fluor's July 1, 2011-December 31, 2011 AFEB report states that Fluor had

"achieved 0.05% LTDD rate, 40 times better than industry standard of 2%." [Emphasis in original.]

252.    Fluor's January 1, 2012 – June 30, 2012 AFEB Report states that total LTDDs "averaged 0.05% of the property book dollar value" and "demonstrated good stewardship" of Government property. [Emphasis in original.]

253.    Nix informed Ramirez, Reeves, and Nukic, among others, of discrepancies between the LTDD database and LTDDs as reported to the AFEB.

254.    In April 2013, Fluor's Government Property Supervisor, Theater Property Book, Amir Jetishi. Jetishi confirmed that, until 2012, only LTDDs with ROR were reported to the AFEB but that the Government directed that all LTDDs, without regard to ROR status, be included in reports to the AFEB.

255.    In an email on April 4, 2013, Deputy Theater Property Manager Nukic also confirmed that LTDD data in Fluor's database should match the numbers for all LTDDs in monthly backup reports utilized for AFEB reporting or "otherwise someone was taking some liberty with data and I know it wasn't us."

256.    Fluor's misrepresentation of the number of LTDD events in its reports to the AFEB, along with the false reporting of response and compliance times for Life. Health and Safety issues, of performance of monthly 10% inventories and impeccable inventory accuracy, of cost conscious personnel decisions and materials ordering, and many other practices alleged in this Complaint, caused the Government to pay award fees to Fluor to which Fluor was not entitled.

*i. Additional Evidence of LTDD Mis-Reporting*

257.    Rickey Mackey was Fluor's Theater Property Manager from 2012-2014. He has 42 years of Property and Materials Management experience. He served in the United States

Army for approximately 17 years, as a Supply Sergeant.

258.    In February 2012, Mackey began to express concern to his superiors over Fluor's property loss reporting. Mackey informed the Materials Directors, Tony Montalvo, and Jarrold Reeves, that there were clear deviations from well-established federal regulations and Fluor's own protocol.

259.    Mackey discovered that the Bagram Materials Department was not reporting lost property as required. Mackey was particularly concerned that although all of Material Management Group's warehouses throughout the entire Theater were claiming to carry out monthly 10% inventories (they were not, as discussed above), but no significant instances of lost government materials or even damaged materials were being reported from over seventy sites. The pattern of failing to report losses became such a problem that it ultimately culminated in millions of dollars of lost Government property that Fluor could not and would not explain.

260.    Some of the losses purportedly occurred when property was shipped from one Fluor materials warehouse to another. But strangely, according to Fluor security investigators as well as Fluor transportation and materials personnel, most shipments showed no evidence of being tampered with.

261.    In March of 2013, Mackey reported to his management that property lost during shipment from one site to another was likely not being sent in the first place, and inventory accounting tricks were being used to hide the losses. Rather than investigate the potentially fraudulent activity though, Montalvo instructed Mackey to call him to discuss. During the call, Mackey was threatened and told he could be the subject of a civil action for slander. This threat was made in order to intimidate Mackey into backing down.

262.    Mackey also discovered that in the instances when monthly inventories were

actually performed, property found missing was not being listed on LTDDs, as required by Government regulations.

263.     On October 30, 2012, Reeves sent Fluor's official End of Year report, to the Government falsely stating that the Materials Department had no losses to report. But, in reality, there were over nine-hundred line items of materials valued at $791,426 that had not been accounted for. Mackey communicated his concerns to Fluor Materials Leadership including Jarrold Reeves and Tony Montalvo that the report of no losses was false because there were specific losses that were not included, *as well as* the $791,426 worth of materials that were missing and not available in inventory.

264.     In a November 11, 2012 email, Joshua Waggy ("Waggy"), the Fluor Government Property Supervisor, confirmed Mackey's concern. Waggy responded, "what was reported to the DCMA is beyond wrong, all they have to do is simple [sic] read some of the LTDDs to prove that and Fluor will not be sitting good for falsify [sic] their Inventory Reports to the USG."

265.     During an April 2013 Sensitive Items Inventory, it was discovered that Minka Hill (a Fluor auditor who worked with Manager Juan Jones) had lost a cellular telephone—a serious breach which would trigger the filing of an LTDD. In the course of investigating the incident, Mackey discovered that Hill had falsified documents to make it appear that the phone had been present during all of her inventories and also fabricated a document showing the phone had been issued to someone else.

266.     In June of 2013 Mackey's LTDD Senior Specialist, Amir Jetshi, informed him that sixteen LTDD reports that they sent to Reeves' office had not been returned and were missing. When Mackey asked Reeves about the reports, Reeves handed the unsigned LTDDs back to Mackey and informed him that the reports would not be endorsed and that Fluor would

roll the LTDDs into an eventual larger LTDD report later. When Mackey questioned Reeves about the propriety of this plan, Reeves became visibly angry. Reeves directed Mackey to follow up with Ernest Ridley ("Ridley"), Fluor's LOGCAP Material Manager in Greenville. Ridley flatly denied Reeves' claim and confirmed Mackey's sentiment that the LTDDs should be processed and reported to the Government

267.    The unreported losses continued to pile up and by July 2013 there were over 400 open LTDDs that should have been reported to the Government, but were not, comprising property worth tens of millions of taxpayer dollars. Mackey continued to complain and raise his concerns, including all the way up to Steve Whitcomb, Fluor's Country Program Manager, but Fluor's leadership continued to ignore the systemic problems.

**V.    Retaliation Against Relators Shepherd and Rude**

268.    Both Shepherd and Rude have been retaliated against for repeatedly bringing the fraudulent behavior and misconduct described above to the attention of their supervisors at Fluor.

269.    This has included the denial of deserved promotions despite the fact that both of their performance evaluations consistently indicate that they "exceed expectations" in all categories.  For example, in or around mid-2013 Rude was denied a promotion by the Deputy Project Manager Michael D'Archangelo despite the fact that the promotion had already been approved by both Human Resources and Project Controls.

270.    In February, 2011, Shepherd approached Kassandra Combs, Fluor's Risk Manager for Task Order 05, and told her that Fluor was performing work on facilities that were not on the MSOW as well as other work that had never been directed by the government.  This was in strict violation of Fluor's contract which makes it clear that no unfunded and/or optional work was to be performed without seeking direction from the government.  Combs asked

82

Shepherd for additional information on these problems.  Taking information directly from

MAXIMO, Shepherd and Rude prepared a spreadsheet that demonstrated that Fluor was

providing full O&M services to 1700 facilities at Bagram alone that were not on the MSOW.

Once Director of O&M Norm McCollum discovered that Shepherd had provided this

information to Combs, he ordered Shepherd to his office and informed him that his behavior was

unacceptable and that he was not a "team player."

271.    In May, 2011Shepherd was "dressed down" for providing this information to

Combs by LOGCAP Country Manager George Rabb who threatened that Shepherd "was running

a union shop but was not playing ball."  From that point forward, senior officials at Fluor like

McCollum and Rabb started to exclude Shepherd and Rude from many of the weekly group

meetings.

272.    In a November, 2011 meeting of Fluor group leaders, Shepherd attempted to raise

the issue of Fluor certifying to the government inaccurate compliance and performance numbers,

as well as the various accuracy problems with Fluor's electronic systems of record.  Shepherd

was ordered to stop his presentation by Country Manager Rabb.

273.    In February, 2012 Fluor Area Managers began telling Shepherd that they were

told at a recent Area Managers meeting that Shepherd would be replaced by Johnny Warner, an

associate of McCollum.  In March, in what can only be described as an effort to cut Shepherd

and Rude out of the loop, and to undermine their positions as MAXIMO Country Manager and

Deputy Country Manager, McCollum appointed Warner to the MAXIMO group and directed

Area Managers to report to Warner and not Shepherd despite the fact that Shepherd was the

Director of the group.

274.    In March, 2012, in an attempt to silence Shepherd, McCollum informed Shepherd

that Warner would represent the MAXIMO group in all future meetings with the government. On information and belief, McCollum did this solely to prevent Shepherd from reporting Fluor's misconduct to government officials.

275.    Finally, in July 2015, Relator Shepherd was fired in retaliation for his complaints about, and refusal to approve and participate in, fraudulent behavior and misconduct, including many of the frauds described above. He was in Dubai after R&R, scheduled to return to northern Afghanistan, but then the morning of his flight he was not permitted to board the flight to Afghanistan and then several hours later he was told he was being fired. He requested to speak to the Country Manager to discuss the fraudulent schemes underlying his retaliatory firing. Although it was routine for senior managers to have an exit interview with the Country Manager, Relator Shepherd was denied permission to do so. When he later tried to call the employee tip line, Fluor security terminated the call and forcibly removed him from Fluor's offices.

276.    In the year before his firing, Relator Shepherd raised a number of concerns about fraudulent conduct to senior Fluor officials, and refused to participate in such schemes. Examples include the following:

a.    He was asked to participate in a scheme to re-open old Work Orders to remove inventory shortages and he refused to permit it despite repeated requests to do so, and reported the misconduct to senior officials.

b.    He also complained to senior Fluor officials in Afghanistan and Fluor's headquarters in Greenville, South Carolina that they did not have documentation supporting Work Orders removing materials shortages from Maximo.

c.    And he complained about instances in which Fluor personnel changed Emergency (Priority 1) Service Orders, some of which were for electrical issues posing serious safety issues

for troops, to off-the-books Priority 4 Service Orders that would not be captured in Fluor's reporting of response and repair compliance times (discussed above).

277.     In July 2014, Relator Rude's employment was also terminated. In the wake of his complaints, and Fluor's retaliatory efforts to isolate him and deny him promotions, Fluor ultimately terminated Relator Rude's employment.

278.     The treatment of Relators Rude and Shepherd was not isolated conduct. Fluor had a culture of retaliating against employees who blew the whistle on misconduct. Scott Dillard, Deputy Director of Fluor's Material Management Group; Rickey Mackey, Fluor's Theater Property Manager; Jeff Nix, a Fluor Compliance Manager; and David Payne, a Senior Supervisor in Fluor's Security department, were all victims of retaliatory terminations of their employment.

279.     All of the examples of retaliatory conduct above further demonstrate that Fluor's fraudulent actions were deliberate and performed knowingly.  Rather than address the fraudulent conduct Relators raised, Fluor disregarded their concerns and marginalized them.

## False Claims

### Count I – False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A), (B), (C) and (G)

280.     Relators incorporate each paragraph of this Complaint as if fully set forth herein.

281.     As described above, Fluor and/or KBR knowingly presented, or caused to be presented, to an officer or employee of the United States or a member of the Armed Forces, false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

282.     As described above, Fluor and/or KBR knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approved by the Government, in violation of 31 U.S.C. § 3729(a)(1)(B).

283.    As described above, Fluor and/or KBR knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States; and knowingly concealed, avoided, or decreased an obligation to pay or transmit money or property to the United States, in violation of 31 U.S.C. § 3729(a)(1)(G).

284.    As described above, by violating their record keeping obligations and undertakings such that the government would not discover Fluor and/or KBR's violations, Fluor and/or KBR concealed from the government the fact that the government was entitled to refunds and/or accommodations on its contracts.

285.    Fluor, its various corporate entities, and KBR, and its various corporate entities, conspired to defraud the Government by getting false or fraudulent claims allowed or paid, and/or conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A), (B) or (G), in violation of 31 U.S.C. § 3729(a)(1)(C).

286.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

287.    By reason of Defendants' acts, the United States has been damaged, and continues be damaged, in substantial amount to be determined at trial.

**Count II – False Claims Act, 31 U.S.C. § 3730(h)**

288.    Relators incorporate each paragraph of this Complaint as if fully set forth herein.

289.    Relators engaged in lawful acts in furtherance of his efforts to stop conduct in violation of 31 U.S.C. § 3729. Defendant Fluor, by and through its officers, agents, supervisors, and employees, was on notice of Relators' objections to Fluor's conduct described above. As a

direct result of Relators' efforts to stop Defendant Fluor's misconduct, Fluor retaliated against Relators, including by denying them promotions and ultimately terminating their employment, adversely altering the terms and conditions of his employment.

290.    As a direct and proximate result of the actions of Defendant Fluor, by and through their officers, agents, supervisors, and employees, Relators lost the benefits and privileges of employment and have suffered continuing damage to their otherwise successful careers.

291.    Relators are entitled to all relief necessary to make them whole, including two times the amount of back pay, interest on the back pay, and compensation for special damages sustained as a result of the retaliation, including litigation costs and reasonable attorneys' fees.

### Count III – Contract Disputes Act, 41 U.S.C. § 7103(c)(2)

292.    Relators incorporate each paragraph of this Complaint as if fully set forth herein.

293.    Fluor and/or KBR submitted certified false claims to the ACO that were false and unsupported due to a misrepresentation of fact or fraud, in violation of 41 U.S.C. § 7103(c)(2).

294.    As a result of these false claims to the ACO, Fluor and/or KBR caused the United States to sustain damages in an amount to be determined at trial.

295.    The United States government, unaware of the falsity of the claims and/or statements made by Defendants Fluor and/or KBR, and in reliance on the accuracy of these claims and/or statements, paid and/or continues to pay Fluor and/or KBR hundreds of millions of dollars Fluor and KBR were/are not entitled to collect.

296.    For each of the false claims described above, Fluor and/or KBR are liable in this action for treble the amounts of money it claimed and/or concealed from the United States, together with the appropriate statutory penalties.

### Jury Trial Demanded

The United States of America, on the relation of Charles R. Shepherd and Danny V. Rude, hereby demand trial by jury on all issues so triable.

WHEREFORE, Charles R. Shepherd and Danny V. Rude respectfully requests that the Court enter judgment in their favor and in favor of the United States of America against Defendants, as follows:

1. That Defendants cease and desist from violating 31 U.S.C. § 3729, et seq.;

2. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus interest and a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3. That Relator be awarded 30% of the United States' recovery;

4. That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5. That Relator recover such other relief as the Court deems just and proper.

[signature on next page]

Respectfully submitted,

/s/ Richard Harpootlian
Richard A. Harpootlian (Fed. ID No. 1730)
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street
Post Office Box 1090
Columbia, SC 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810
rah@harpootlianlaw.com

Mike Kanovitz
Anand Swaminathan
LOEVY & LOVEY
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
Phone: (312) 243-5900
anand@loevy.com
mike@loevy.com

*Attorneys for Relators Charles R. Shepherd and Danny V. Rude*

October 1, 2018
Columbia, South Carolina.