IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel*. CHARLES R. SHEPHERD, DANNY V. RUDE, ROBERT SCOTT DILLARD, and RICKEY MACKEY | ) ) ) ) | CA No.: 6:13-cv-02428-TMC |
| | ) | |
| Plaintiffs/Relators, | ) | |
| | ) | |
| v. | ) | |
| | ) | Jury Trial Demanded |
| FLUOR CORPORATION, INC., FLUOR INTERCONTINENTAL, INC., | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## SECOND AMENDED COMPLAINT

Now comes the United States of America, on the relation of Charles R. Shepherd, Danny V. Rude, Robert Scott Dillard, and Rickey Mackey, and complains of Defendants Fluor Corporation, Inc., Fluor Intercontinental, Inc., (together, "Fluor"), as follows:

Introduction

1.      This action seeks damages and civil penalties arising from violations of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*.

2.      Relators Charles Shepherd, Danny Rude, Scott Dillard and Rickey Mackey are all former military officers who served their country with distinction. They all worked for Fluor on a massive contract to support United States military personnel on forward operating bases in Afghanistan through the United States Government's Logistics Civil Augmentation Program contract known as LOGCAP IV. And, despite working in different groups and different locations, with different areas of knowledge and expertise, they all observed pervasive and systemic fraud in Fluor's performance on the LOGCAP IV contract.

3.     LOGCAP IV is a program of the United States Army to hire civilian contractors to provide in-theater logistical support to military personnel in wartime and other operations in the Middle East and elsewhere. Fluor supports military personnel deployment and operations by providing civilian personnel to perform "Base Life Support" services such as laundry, food service, sanitation, facilities management, morale welfare and recreation, information management, transportation, engineering and construction services, and power generation and distribution. More than 100,000 civilian personnel and their subcontractors have worked overseas in support of task orders under LOGCAP IV.

4.     As described in more detail below, Kellogg, Brown & Root, Inc., ("KBR") held the third-generation LOGCAP III contract for almost a decade beginning in 2001, collecting for itself and its subcontractors approximately $37 billion from the United States. Based on growing concerns among the military, media and Congress about KBR's fraud, mismanagement, and poor performance under LOGCAP III, the fourth-generation LOGCAP IV contract was competitively bid and awarded to Fluor, and a period of transition was therefore necessary to ensure continuity of services from the outgoing contractor KBR to the incoming contractor Fluor.

5.     When Fluor took over the LOGCAP IV contract, it too defrauded the U.S. government for work under LOGCAP IV. Fluor billed the government for work not performed, inflated contract performance and compliance figures to boost award fees it had not earned, overstated its personnel needs in order to inflate labor costs, and misdirected the acquisition and management of government property and materials. This last category includes misconduct in the acquisition, use and accounting of government property and materials, fraudulent concealment of its failure to track and control inventory, and the maintenance of a deficient and non-compliant property management system.

2

6.     By all of these actions, Fluor submitted false claims to the United States government.

7.     When Shepherd and Rude complained about misconduct to their supervisors at Fluor, Fluor greeted their whistleblowing with hostility, threats, the denial of well deserved promotions, and constructive demotions.[1]

Parties

8.     Relator Charles R. Shepherd, is a former U.S. Army officer and graduate of the U.S. Army Ranger School, and served in the United States Army for 17 years, retiring from active duty in 1990 at the rank of Captain.  During this time, Shepherd served as a Rifle Platoon Leader and Company Commander in the 82nd Airborne Division, as well as an Operations Officer for the Southern European Task Force (Airborne).  Shepherd completed his active duty in the Army as a Public Affairs Officer for the Airborne Battalion Combat Team stationed in Vincenza, Italy.

9.     As a Rifle Platoon Leader, Shepherd commanded a 120-man Airborne Rifle Company.  In his role as Operations Officer, Shepherd served as second in command for a battalion task force of several hundred soldiers.  This battalion was the only "quick reaction" Airborne Infantry Battalion stationed in Europe.

10.     Relator Shepherd worked for KBR from 2004 through 2008, as a Director of Logistics, Project Lead, and Senior Operations Manager. In connection with the transition, many KBR employees were hired by Fluor, often to continue in the same roles. Shepherd began working for Fluor in 2009 in the role of Operations Manager, Project Manager, and Senior Logistics Manager. As a Senior Logistics Manager, Shepherd was tasked with supporting the

---

[1]  Relators Dillard and Mackey were also fired in retaliation for their whistleblowing. Those personal claims are not brought as part of this Complaint.

3

Service Desk and Work Control mission across 70 Forward Operating Bases ("FOBs") in northern Afghanistan as part of Task Order 05. Shepherd next served in the position of Country Maximo Manager. In that position, he was responsible for managing the Fluor System of Record (IBM Maximo Enterprise Management System v7.1), which tracks all maintenance and work for over 70 Forward Operating Bases in Northern Afghanistan. Shepherd was fired, in retaliation for his complaints about Fluor's fraudulent conduct, in July 2015.

11.    Relator Danny V. Rude, a U.S. Army First Sergeant (retired), spent twenty years on active duty in the United States Army. During this period, Rude served as a Non-Commissioned Officer in U.S. Airborne, Artillery and Air Defense Units, including several tours of duty overseas. As a First Sergeant, Rude commanded a 125-man Company and was responsible for the training of over 600 personnel in proper weapons maintenance techniques. For his exemplary service, Rude was awarded several Good Conduct, National Defense, and Army Accommodation Medals.

12.    Relator Rude worked for KBR on LOGCAP III from 2005 through 2009, when he joined Fluor. For KBR, he started as a mechanic, and then worked as an Operations Specialist, as a Senior Logistics Manager, and ultimately as a Site Manager. He held these positions at forward operating bases Phoenix, Gadrez/Lightning, and Eggers, all sites that were transitioned from KBR to Fluor. For Fluor, Relator Rude worked as the Operations and Maintenance Manager for the largest remote Forward Operating Base in Afghanistan, Leatherneck, as a Transition Manager, and then as the Deputy Country Maximo Manager. In this position, Rude directly supervised the Maximo Technical and Reporting Teams, which included monitoring Fluor's performance against compliance standards. Rude was fired, in retaliation for his complaints about Fluor's fraudulent conduct, in July 2014.

13.    Relator Scott Dillard was employed by Fluor from 2010 to 2016. A West Point graduate who served as U.S. Army officer in Iraq and Afghanistan, Dillard has extensive experience with and expertise in the LOGCAP. Prior to his employment with Fluor, Dillard served as a LOGCAP Support Officer (LSO) in the U.S. Army Reserves. In this capacity, Mr. Dillard served as a forward deployed representative of the Army Sustainment Command's LOGCAP Program Office – the federal agency responsible for determining LOGCAP program requirements – on-site at multiple military installations in Afghanistan. As such, Dillard was responsible for coordinating project management between the military and the contractor, educating military units on LOGCAP capabilities, policies, and procedures, and facilitating unit requests for access to LOGCAP services. Dillard served as the LSO for the construction of Camp Leatherneck, designed to support a majority of the 2009 surge of 26,000 troops, and later served as the LSO for the U.S. Army 5th Brigade, 2nd Infantry Division. Having thus acquired knowledge of the LOGCAP program from the perspective of the U.S. Department of Defense, Dillard was hired in January 2010 by Fluor as a Project Specialist I (Tier I - GG18). In March 2010 Fluor deployed Dillard as an Operations and Maintenance Manager, and subsequently served in positions of increasing responsibility as a Regional Distribution Center Manager for Fluor's Kabul (Afghanistan) Area of Operations (AO) and, from 2012 to 2016, as a Deputy Director of Fluor's Material Management Group.

14.    Relator, Rickey A. Mackey, began working for Fluor in May of 2009 in Afghanistan. Prior to that, he served in the military as a Supply Sergeant in the United States Army, responsible for maintaining hand receipts, conducting inventories and reporting loss, damage, and or destruction of materials. He has nearly forty years of property management experience. He has worked for Lockheed Martin, EPS Corporation ("EPS"), Technical and

Management Services Corporation ("TAMSCO"), and KBR. Mackey has performed his duties managing property throughout the world. In the course of his career, Mackey has achieved numerous certifications, including: Certified Professional Property Specialist ("CPPS"); Certified Professional Property Administrator ("CPPA"); and Certified Professional Property Manager ("CPPM").

15.     Defendant Fluor Corporation, Inc., is a Texas-based corporation with its principal place of business in Irving, Texas.  Fluor is one of the world's largest publicly traded engineering, procurement, construction, and maintenance companies.

16.     Under LOGCAP IV, Fluor provides engineering, procurement, construction, and maintenance services to the U.S. Army's Joint Task Force-Afghanistan and Provincial Reconstruction Teams.  Fluor provided these services, at one point during the relevant timeframe, to 70 FOBs in northern Afghanistan, and has billed well over $10 billion on its LOGCAP IV contract (W52P1J-07-D-0008).

17.     Defendant Fluor Intercontinental, Inc., a wholly owned subsidiary of Fluor Corporation, Inc., is a South Carolina corporation with its principal place of business in Greenville, South Carolina.

Jurisdiction and Venue

18.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under a federal statute, 31 U.S.C. § 3729, *et seq*.

19.     There has been no public disclosure of the fraud alleged herein.  Moreover, Shepherd and Rude are original sources because 1) prior to any public disclosure they voluntarily disclosed to the government the information on which the allegations in this suit are based; and 2) because they have knowledge that is independent of, and materially adds to, any publicly

disclosed information, and voluntarily provided the information to the government before filing this suit.

20.    Relators all worked for Fluor, and have personal knowledge of the fraudulent conduct set forth below. This includes billing the government for work that Fluor did not perform; routinely reporting to the government false and grossly inflated contract performance and compliance figures related to performance of Life, Health and Safety issues, inventory tracking and control, etc.; circumventing the Maximo property system and failing to maintain Maximo as an accurate and adequate property management system; engaging in various fraudulent schemes to conceal inventory shortages and property loss, overcharging the government for labor for unnecessary personnel, and misappropriating government property for improper uses.

21.    Venue is proper in this district under 28 U.S.C. § 1391(b) and 31 U.S.C § 3732(a) because at least one of the Defendants conducts business in this judicial district and at least one of the claims giving rise to this Complaint occurred in this judicial district.

Facts

## I.    LOGCAP History and Background

22.    LOGCAP was designed and implemented by the United States Department of the Army as a means of outsourcing the provision of service-based logistical military support to civilian contractors during wartime. By arranging for routine and contingency support services to be performed by contractors, LOGCAP is designed to help the Army release military units to perform other functions; LOGCAP serves a "force multiplying" function.

23.    The Army defines the "Base Life Support" functions that comprise the bulk of the duties undertaken by LOGCAP contractors as encompassing the following: facilities

7

management; hazardous material storage; vector and pest management services; laundry service; food service; morale, welfare, and recreation; power generation; water production; billeting; waste and sewage management; material handling equipment (MHE) operations; maintenance transportation motor pool; shuttle bus service; retail operations; firefighting services and fire protection; and government support services.

24.     The Department of Defense, the Government Accountability Office, and other agencies have recognized that military logistics contracts like LOGCAP bear an inherent risk, which has increased as these contracts have grown in scope and complexity while the number of qualified government contracting personnel has actually decreased. As a result of these factors, it is increasingly difficult for the United States to effectively oversee the activities of logistics contractors and ensure that contracts are being executed in the best interests of taxpayers. As detailed in this Complaint, Fluor exploited this situation to its own benefit and to the detriment of the United States.

25.     Although it was first implemented in 1985, LOGCAP's profile – in terms of both funds committed and public notoriety – drastically increased in 2001 when, following the events of September 11 of that year, KBR was awarded the LOGCAP III contract (contract number DAAA09-02-D-0007), an indefinite delivery, indefinite quantity contract with an unlimited dollar amount. KBR worked on LOGCAP III for a base year plus nine option years.

26.     In 2010, KBR was notified by the Army that, based on the Army's evaluation of KBR's contract performance on LOGCAP III, it would not receive any award fees for the period January 1, 2008 through April 30, 2008.

27.     Ultimately, in the face of intense criticism from the government auditing agencies over the contract and the continuing revelations about KBR's malfeasances, the media, various

legislators, and the public, the Department of the Army announced that ongoing logistics work in Afghanistan and Iraq would be re-bid in a new competition for a contract to be known as LOGCAP IV.

28.     In or around 2008, the Department of the Army announced that ongoing logistics work in Afghanistan and Iraq would be re-bid in a new competition for a contract to be known as LOGCAP IV.

29.     In July 2009, the primary logistics support work under LOGCAP IV was taken from KBR and awarded to DynCorp and Fluor. Under contract number W52P1J-07-D-0008, Fluor was awarded Task Order 0005, primarily consisting of the provision of Base Life Services at 74 bases in Northern Afghanistan. The contract consisted of one base year and – initially – four option years. Fluor announced that the potential value of Task Order 05 of the LOGCAP IV contract could reach $7 billion (it proved to be much higher). DynCorp was awarded a similar LOGCAP IV task order for South Afghanistan.

## II.     Background on LOGCAP IV

30.     The U.S. Army Material Command ("AMC") is the executive agent for LOGCAP Program Management.  The principal staff agency for the day-to-day management and operation of the LOGCAP program is the Army Sustainment Command ("ASC").  AMC is responsible for all facets of the program, from the identification and inclusion of contract requirements through the execution of the contract itself.  ASC Rock Island is the contracting agency for the LOGCAP contract.  As the Contracting Agency for this contract, ASC Rock Island has the authority, through a duly appointed Procuring Contracting Officer ("PCO"), to enter into, administer, and/or terminate this contract, as well as to make determinations and findings regarding contract performance.  The PCO delegated authority to the Defense Contract Management Agency

("DCMA") to perform contract administration functions on individual task orders.

31.    LOGCAP IV is the fourth generation of contracts under the Army's Logistics Civil Augmentation Program.  It is an umbrella contracts for an indefinite delivery of an indefinite quantity of services, known as an IDIQ contract.  The LOGCAP IDIQ contracts operate through the task orders, each of which prescribes a specific scope of work.

32.    Funding for all military operations and projects must be appropriated from the U.S. Treasury by Congress. In making appropriations, Congress has the authority to define the purpose for which the funds are committed. With regard to the Department of the Army, Congress uses different appropriation vehicles to fund, respectively, military construction ("MILCON"), operations and maintenance (OMA), and other types of activities.

33.    The United States Department of Defense ("DoD") Office of General Counsel has expressed that "contracts for obtaining logistics and support services under LOGCAP are not subject to special treatment under the law: they must be formed, funded, and executed in accordance with the laws and regulations governing government contracts generally." Because

> an agency's operating appropriations are legally available for the acquisition of services and supplies that are necessary to carry out its day-to-day operations, and for which funds are not otherwise provided . . . the Operations and Maintenance, Army appropriation is the proper source of funding for task orders under the LOGCAP contracts.

34.    Accordingly, Fluor's work on LOGCAP IV is funded by OMA appropriations. These are funds that are Congressionally appropriated annually for the purpose of covering expenses related to the Army's day-to-day operations for one fiscal year.

35.    With regard to Fluor's proposals to the Army regarding the execution of its work under LOGCAP IV, Fluor prepared analyses identifying every task to be performed under the contract, how many times each task was to be performed, how long it would take to perform each task at each base, and so on. Along exactly these lines, Relators were in management

10

positions at Fluor; in those positions, they were required to prepare detailed assessments for the work performed by their teams. These analyses formed the basis for justifying the number of full-time employees that the government authorized Fluor to send to Afghanistan to perform work on LOGCAP IV, and in turn formed the basis for the primary source of reimbursements requests to the government: labor costs.

36.     So, Fluor's analyses were centered in large part on workload "drivers." In essence, Fluor compiled a list of every task that would need to be performed to accomplish the scope of work under the Task Order, the frequency of each task, and amount of time that task would take on each occasion of its performance. Fluor then aggregated all of these estimates and, based on that sum, Fluor produced the number of "Full-Time Equivalents" (FTEs) – in other words, full-time employees – that would be needed to perform the work. In simplistic terms, one employee performing a forty-hour work week, or 2080 hours per year, equals one FTE. These analyses formed the basis for justifying the number of full-time employees that the government authorized Fluor to send to Afghanistan to perform work on LOGCAP IV, and in turn formed the basis for the primary source of reimbursements requests to the government: labor costs.

37.     Fluor's proposal also included projections for the cost of the materials and supplies associated with the provision of Base Life Support services, as well as the freight forwarding costs attendant on the shipment of those materials to Afghanistan.

III.   **LOGCAP IV's Cost-Plus Award-Fee and Cost-Plus Fixed Fee Payments**

38.     LOGCAP IV was initially a Cost-Plus Award-Fee contract. This means that all costs Fluor incurred in performing work under LOGCAP IV were passed along to the United States – including the cost of purchased materials, and labor costs for personnel performing work on the contract and additional overhead, management, and administrative costs–and that

11

additionally paid a base fee (a fixed profit percentage applied to actual costs to complete the work), as well as an additional award fee (a variable and discretionary profit percentage tied to various performance and compliance measures).

39.    Under LOGCAP IV Task Order 05, the government paid Fluor for its actual cost of providing services under the contract, plus a 1% base fee (cost plus 1%).

40.    Additionally, award fees were granted bi-annually based on Fluor's performance as evaluated by the LOGCAP Award Fee Evaluation Board ("AFEB"). The award fees are optional, and entirely discretionary; the government was under no obligation to grant them.

41.    The award fee was paid out of the Award Fee Pool. That Pool was 6% of the total costs Fluor incurred under the Contract, plus a 1% base fee amounting to 1% of the incurred costs. In other words, in addition to reimbursement of all incurred costs, Fluor could earn up to an additional 7% of incurred costs (1% as a guaranteed base fee; the other 6% making up the Award Fee Pool).

42.    In order to receive an award fee, for each six-month award fee period Fluor submitted a written "self-assessment" and additional briefing, in the form of a PowerPoint presentation, to the AFEB detailing its performance under the contracts.  The AFEB relied on the information Fluor submitted in scoring Flour on various performance indicators, and then, based on the overall score, gave Fluor a performance rating of "Excellent," "Very Good," "Good," or "Average," each of which corresponded to a numerical scoring range.  Fluor had to be evaluated "Good" (*i.e.*, score of greater than 70 out of 100) to be eligible for any award fee.

43.    As described in greata detail below, Fluor took advantage of the Cost-Plus Award-Fee contract structure by deliberately charging the government for work that it did not do, by knowingly misrepresenting its performance and compliance numbers to grow its

12

semiannual award fee, by deploying thousands of personnel more than it needed to perform the contract, and by losing millions of dollars of property and inventory and engaging in excess re-ordering to make up for the losses, among other things.

44.     The Task Order 05 contract eventually converted from a Cost Plus Award Fee contract to a Cost Plus Fixed Fee contract. Modification 60 to the Task Order 05 contract indicates that this change was made retroactive to July 1, 2012, the beginning of Option Year 2 (*i.e.*, after one year of transition and two years of full performance). The Fixed Fee completely replaced both the Base Fee and the Task Order Award Fee described above. Based on its false representations to the government, discussed below, Fluor negotiated a Fixed Fee payment of 5.87% of overall billings. The negotiated figure was determined in part based on the size of the previous, fraudulently obtained, award fees.

45.     The Fixed Fee is not automatic, but rather is only paid once certain performance objectives are met. Furthermore, the nature of the Fixed Fee is that it is binary, meaning that Fluor either earned the entire Fixed Fee by meeting those performance objectives, or else it failed to meet performance objectives and was not paid any fee at all.

46.     Again, as described in great detail below, Fluor took advantage of the Cost-Plus Fixed-Fee contract structure by deliberately charging the government for work that it did not do, by knowingly misrepresenting its performance and compliance numbers, by deploying thousands of personnel more than it needed to perform the contract, and by losing millions of dollars of property and inventory and engaging in excess re-ordering to make up for the losses, among other things. In doing so, Fluor falsely represented that it had met its performance objectives and was entitled to a Fixed Fee, when in fact it was not.

*Definitization Process*

47.     For each six-month performance period (except the Transition performance period, which was one year), Fluor estimated the cost of completing that particular performance period and sought government approval for that estimation. Once approved, the government funded a certain portion of the estimated cost of executing that performance period, meaning that Fluor received payment for a portion of its estimated costs.

48.     The estimated cost of executing any given performance period were routinely renegotiated. Any costs for that performance period above the government approved estimated cost of execution were considered undefinitized. Fluor eventually sought definitization of those costs, meaning that after a particular performance period ended, Fluor provided the government with invoices and documentation supporting the additional costs in order to get those costs approved and, ultimately, paid. As the government approved the additional costs Fluor submitted, that new total amount became the definitized amount that the government paid for that particular performance period.

*Total Payments to Fluor Under LOGCAP IV Task Order 05*

49.     For transition and each subsequent performance period through June 2017, the total definitized costs Fluor submitted for reimbursement and that the government approved and paid are as follows:

| Performance Period | Dates | Definitized Costs as of 3/16/2017* | Undefinitized Costs as of 3/16/2017* |
|---|---|---|---|
| Transition | 7 July 2009 to 30 June 2010 | $755,552,888 | $0 |
| Full Performance | 1 July 2010 to 30 June 2011 | $1,704,855,592 | $0 |
| Option Year 1 | 1 July 2011 to 30 June 2012 | $1,742,148,329 | $0 |
| Option Year 2 | 1 July 2012 to 30 June 2013 | $1,781,369,015 | $50,689,528 |
| Option Year 3 | 1 July 2013 to 30 June 2014 | $1,187,654,727 | $10,072,326 |
| Option Year 4 | 1 July 2014 to 30 June 2015 | $800,156,663 | $36,237,688 |
| Extension 1 | 1 July 2015 to 30 June 2016 | $625,994,815 | $10,522,457 |
| Extension 2 | 1 July 2016 to 30 June 2017 | $574,993,703 | $42,629,728 |

*Based on Contract Modification BM signed March 16, 2017

14

50.     Fluor's award fee payments during the Cost-Plus Award Fee period of the Contract are as follows:

| Performance Period | Definitized Costs | Total Earned Fee (Base + Award) | Base Fee 1% | Award Fee |
|---|---|---|---|---|
| Transition/IOC | $755,552,888 | $35,544,525 | $7,555,528 | $27,988,997 |
| Full Performance | $1,704,855,592 | $69,635,624 | $17,048,555 | $52,587,069 |
| Option Year 1 | $1,742,148,329 | $75,368,821 | $17,421,483 | $57,947,338 |
| **Totals** | **$4,202,556,809** | **$180,548,970** | **$42,025,566** | **$138,523,404** |

51.     Fluor's fixed fee payments during the Cost-Plus Fixed Fee period of the Contract are as follows:

| Performance Period | Definitized Costs | Total Fixed Fee |
|---|---|---|
| Option Year 2 | $1,781,369,015 | $101,431,338 |
| Option Year 3 | $1,187,654,727 | $66,947,287 |
| Option Year 4 | $800,156,663 | $44,508,782 |
| Extension 1 | $625,994,815 | $29,295,987 |
| Extension 2 | $574,993,703 | $30,578,680 |
| **Totals** | **$4,970,168,923** | **$272,762,074** |

52.     In sum, for the Cost Plus Award Fee period of the Contract, Fluor submitted invoices and requests for payment that the government approved and paid in amounts totaling $4.2 billion for incurred costs. The government paid Fluor an additional $42 million in base fees, as well as $138.5 million in award fees based on Fluor's representations about its contract performance to the government, including the Award Fee Evaluation Boards. For the Cost Plus Fixed Fee period of the Contract, Fluor submitted invoices and requests for payment that the government approved and paid in amounts totaling $5 billion for incurred costs. The government paid Fluor an additional $272 million in fixed fees based on Fluor's representations about its contract performance to the government, including DCMA, DCAA and the Army Sustainment Command.

## IV.     Applicable Contract Clauses, Regulations and Other Requirements

53.     Under Task Order 0005 (contract number W52P1J-07-D-0008), Fluor had numerous obligations and responsibilities, all of which were to support American military forces

15

in the war effort. Accordingly, many of the functions Fluor was performing-everything from feeding the troops, to conducting repairs on military facilities, to ensuring adequate supplies of water, fuel and power-were considered mission critical, and impacted the military's operational readiness.

54.     Indeed, the LOGCAP IV contract itself states as follows: "The requirements to be executed under this LOGCAP contract are often mission-critical services for the United States military. It is therefore of the utmost importance that performance be both effective and efficient. Poor execution, management, or cost control can negatively impact the U.S. military's ability to execute its national defense objectives. Such critical performance by the contractor necessarily requires a significant confidence, faith, and trust that the contractor will protect the interests of the U.S. military in the performance of this contract, as well as protecting its own interests. The contractor's responsibilities under this contract should be viewed in this vein."

55.     For this reason, the contract placed obligations on Fluor not only through the contract terms, but also Federal Acquisition Regulation (FAR) clauses incorporated therein, a Performance Work Statement, and additional task order execution plans that Fluor was required to develop and submit for government approval. These Fluor-developed, government-approved plans served the express purpose of ensuring that Fluor had the processes and personnel in place to meet its mission critical obligations. The basic contractual and regulatory framework, as applicable, is as follows.

**A.  The Contract and Applicable Regulations**

56.     The LOGCAP IV Contract incorporates a government created Performance Work Statement ("PWS"). The PWS "describes the technical, functional and performance characteristics of the work to be performed" and "identifies essential functions and provides

standards that shall be evaluated in terms of quality and/or timeliness of output." In other words, the PWS identifies the scope of work to be performed.

57.     In addition to the PWS, like all government service contracts, LOGCAP IV is governed by the Federal Acquisition Regulations ("FAR"), codified in Chapter 48 of the Code of Federal Regulations, as well as the Defense Federal Acquisition Regulation Supplement ("DFARS").

58.     Under the PWS and FAR/DFARS provisions incorporated into the LOGCAP IV contract, all property held by Fluor belonged to the United States. 48 C.F.R. § 52.245-1(e). Fluor was required to establish and maintain a system to control, protect, preserve, and maintain government property; to acquire, receive, distribute, inventory and otherwise manage that property; and to provide a complete and auditable record of any shortage, loss, damage, or destruction of that inventory.

59.     More specifically, the LOGCAP IV contract incorporated FAR 52.245-1, entitled "Government Property," in Clause I-326, which provides in pertinent part:

> (b) Property management. . . . The Contractor shall have a system to manage (control, use, preserve, protect, repair and maintain) Government property in its possession. The system shall be adequate to satisfy the requirements of this clause. In doing so, the Contractor shall initiate and maintain the processes, systems, procedures, records, and methodologies necessary for effective control of Government property, consistent with voluntary consensus standards and/or industry-leading practices and standards for Government property management . . . .
>
> *     *     *     *
> (f)(iii) Records of Government property. The Contractor shall create and maintain records of all Government property accountable to the contract . . . . (A) Property records shall enable a complete, current, auditable record of all transactions . . . .
>
> (f)(iv) Physical Inventory. The Contractor shall periodically perform, record, and disclose physical inventory results. . . .
>
> (f)(vi) Reports. The Contractor shall have a process to create and provide reports of discrepancies; loss, damage, destruction, or theft; physical inventory results; audits and

self-assessments; corrective actions; and other property-related reports as directed by the Contracting Officer.

> (A)    Loss, damage, destruction, or theft. Unless otherwise directed by the Property Administrator, the Contractor shall investigate and promptly furnish a written narrative of all incidents of loss, damage, destruction, or theft to the property administrator as soon as the facts become known . . . .

Contract § I-326; 48 C.F.R. § 52.245-1.

60.    Clause I-257 of the LOGCAP IV Contract incorporates DFARS 252.242-7004, 48

C.F.R. § 252.242-7004, which requires the contractor to maintain a Material Management and

Accounting System ("MMAS"). That section of DFARS requires the following:

> (d) System Criteria. The MMAS shall have adequate internal controls to ensure system and data integrity, and shall—

> (1) Have an adequate system description including policies, procedures, and operating instructions that comply with the FAR and Defense FAR Supplement;
> . . . .
> (3) Provide a mechanism to identify, report, and resolve system control weaknesses . . . ;

> (4) Provide audit trails and maintain records (manual and those in machine readable form) necessary to evaluate system logic and to verify through transaction testing that the system is operating as desired;

> (5) Establish and maintain adequate levels of record accuracy, and include reconciliation of recorded inventory quantities to physical inventory by part number on a periodic basis. A 95 percent accuracy level is desirable.

DFARS 252.242-7004(d).

61.    Pursuant to 48 C.F.R. § 52.232-16(c), the Contracting Officer "may reduce or

suspend progress payments" for the Contractor's "failure to comply with any material

requirement of [the] contract." Maintaining inventory control is a material requirement of the

LOGCAP IV Contract.

62.    Moreover, the Contract also permits withholding of payments from the prime

contractor where there is a "significant deficiency" in the Contractor's Material Management and Accounting System. DFARS 252.242-7004, incorporated into Clause I-257 of the Contract, defines "significant deficiency" as follows: "Significant deficiency" means a shortcoming in the system that materially affects the ability of officials of the Department of Defense to rely upon information produced by the system that is needed for management purposes."

## B. The Government Approved Controlling Plans

63.    In order to comply with the LOGCAP IV contract and applicable government regulations, Fluor Government Group ("FGG") developed written policies and procedures called the Government Property Control System ("GPCS") and Material Management Plan ("MMP"). Fluor submitted the GPCS and MMP to Department of Defense contract management personnel for approval. These documents represented to the government the policies and procedures that Fluor would implement to receive, secure, and maintain government property. The GPCS is the overarching master plan, and the MMP implements the policies and procedures set forth in the GPCS at the project level, including within the Material Department. Once the government has approved these processes, amendment or modification is permitted only upon further approval by the United States.

### *The Government Property Control System ("GPCS")*

64.    The GPCS is based on relevant government regulations and acknowledges that Fluor was tasked with the oversight and maintenance of government property. It states:

> This practice defines the methodology and process used by [FGG] to manage and control both client- and FGG-owned property in the possession of FGG during the performance period of awarded contracts. This practice is derived from [FARs and DFARs], Industry Leading Practices, and Voluntary Consensus Standards that include the International Standardization Organization [] and the American Society for Testing and Materials [] Standards International… As stewards of client-owned property, the goal of this practice is to employ sound business judgment and provide best value to the FGG client providing

19

life cycle management of equipment and materials entrusted to FGG for contract performance.

GPCS 620.490.0133 (effective date 9/01/2011) at p. 1.

65.     The GPCS states (on page 6) that "[t]he written policies and procedures that provide for effective property control of each type of [Government]-owned item of property in FGG's possession are contained in this practice. The intent of this practice is to comply with the requirements of FAR 52.245-1."

66.     The GPCS also sets forth policy on physical inventories and losses of government property.

67.     For example, page 9 of the GPCS indicates that when government property cannot be accounted for, a report must be submitted identifying and explaining the loss, theft, damage or destruction, referred to as an LTDD report. These LTDD reports are dispositioned internally, and final reports are provided to the Government Property Administrator.

68.     The GPCS states that "[a]ll reports required by the FAR property clause 52.245-1 in the contract are prepared, reviewed for accuracy and completeness, and submitted to the [Property Administrator] to meet due dates." The GPCS goes on to identify the specific requirements and elements of a LTDD report and discusses other Fluor reports that are submitted to the Property Administrator (*i.e.*, physical verification inventory reports, audits, self-assessments, and correction actions).

*The Material Management Plan ("MMP")*

69.     The MMP is a reference and guide for policies and procedures set out in the GPCS concerning LTDD reports and inventories.

70.     For example, Section 4.5.12.6.1 the MMP sets forth the policies and procedures for conducting inventories and for documenting any inventory shortages, among many other

20

things.

71.    Section 4.6 of the MMP, "Government Property Administration," acknowledges

Fluor's obligations with regard to the maintenance and security of Government property:

> FGG has a contractual obligation to adhere to [Government] regulations and the applicable contract clauses as they relate to stewardship and management of Government property in the possession of contractors. FGG is directly accountable for all Government property in its possession, acquired or furnished under [Government] contracts to include property in the possession of affiliate companies and subcontractors. FGG will provide qualified personnel with the property management skills and experience necessary to maintain a contract compliant property control system.

*The Task Order Execution Plans*

72.    Fluor also created Task Order Execution Plans ("TOEPs").

73.    The TOEPs established the "execution philosophy, describe[d] the project scope

of work, and define[d] the organization, work processes, and systems necessary for management

of the project." This TOEP also indicated that the plan was developed per the requirements of the

prime contract and the MMP, and that work under the task order was based on the requirements

within Contract No.W52P1J-07-D-0008.

74.    Fluor's TOEP included a discussion of government property transfer and material

control that was relevant to Task Order 05, and referenced Fluor's LOGCAP IV Material

Management Plan, Rev. 2 (June 30, 2009) for further detail.

75.    Furthermore, Section 12.7 of the TOEP, titled "Government Property

Administration," tracks above-referenced language in the MMP when it states that FGG "has a

contractual obligation to adhere to [government] regulations and the applicable contract clauses

as they relate to stewardship and management of government property in the possession of

contractors. FGG is directly accountable for all government property in its possession, acquired

or furnished under [government] contracts to include property in the possession of affiliate

21

companies and subcontractors."

76.     In addition to the above, Fluor Government Group created various guides and manuals to satisfy the various contractual requirements and to implement Fluor's GPCS, MMP and TOEP, including for example a  "Desk Top Guide" governing "Inventory Procedures."

### C. Conducting Inventories and Loss Reporting Under the Applicable Plans

77.     Under its Material Management Plan, Fluor was required to conduct daily random spot checks, monthly site inventories, 10% monthly inventories of all property, 100% monthly inventories of sensitive items, and 100% physical yearly inventories.

78.     Fluor's Desktop Guide detailed the requirement as follows:

**11.1 Conducting Inventories**
11.1.1 Inventory management should be conducted weekly at a minimum. In order to maintain current inventory records, periodic and physical inventories shall be performed. These include but are not limited to daily random spots checks, monthly site inventories or 10% monthly cycle counts that are performed throughout the year.

> 11.1.1.1 Random spot checks consist of randomly picking bin locations and notating the item description, location, quantity and verifying the information against Maximo.
>
> 11.1.1.2 Monthly Site or 10% inventories means that 10% of the entire warehouse is selected for inventory. This is a monthly requirement at the minimum and must be
> completed in order to accomplish our 100% physical yearly inventory.

FGG Materials, Desk Top Guide (DTG), Inventory Procedures, Chapter 11, Revision 2 (revised January 12, 2011) (hereafter, "Desk Top Guide").

79.     The reference to "Maximo" in the above guidance is to Fluor's IBM-developed property management system called "Maximo." Maximo is basically a massive database, with a front-end user interface that could be accessed by property staff in Afghanistan and elsewhere, used to keep track of all government property managed by Fluor, from beginning (*e.g.*, receipt in Afghanistan) to end (*e.g.*, used up or consumed). Every item in inventory is recorded in Maximo,

and all additions, subtractions, or other transactions involving inventory are recorded in Maximo.

Maximo is intended to be the system of record for real time and historic information about

inventory. Fluor represented to the government that in order to satisfy the regulatory clause

requiring Fluor to maintain a government approved Material Management and Accounting

System, Fluor would utilize Maximo.

80.     In addition to the random spot checks and the monthly 10% cyclic inventory,

Section 4.6.6 of the MMP requires Fluor to conduct an end of year audit. Results of this audit,

referred to as an End of Year Inventory Summary, had to be submitted to DCMA:

- In order to maintain current inventory records, periodic and physical inventories shall be performed. Periodic inventories include, but are not limited to, daily random spot checks, monthly, quarterly, or ten percent cyclic counts that are performed throughout the year. Physical inventories shall be scheduled and conducted at fiscal year end, where all counts and adjustments to the fiscal inventory is completed no later than 30 September of each fiscal year. . . . .
- Results of the physical inventory shall be reported and forwarded to the assigned Fluor Government Property Representative. These results shall include completed LTDD reports for each documented shortage**.**

81.     Under the controlling plans, if a discrepancy is discovered between the Maximo

records and a physical inspection of inventory, the discrepancy must be researched and a

determination made as to the reason for the discrepancy. The Desk Top Guide states in pertinent

part:

**11.2 Adjusting Inventory Records**
> **11.2.1** If the comparison of the physical counts against Maximo records discovers a discrepancy, then research and determination of needing an adjustment is accomplished.

82.     When a physical inspection reveals fewer items in inventory than are recorded in

Maximo, a "Negative Adjustment" of the Maximo records is required. A Negative Adjustment is

an adjustment to the inventory records within Maximo that reflects a decline in the inventory

balance.

83.     Negative Adjustments are of two types. The first type is an "Administrative Adjustment." An Administrative Adjustment occurs when the discrepancy between physical inventory and Maximo records can be accounted for due to a technical or administrative error, such as typos or miscoded items, unit of measurement mistakes (item vs. case), etc. Fluor's Desktop Guide for Inventory Procedures, process steps 11.2.1.1 and 11.2.1.2, define certain actions to be taken in conducting research to determine if the adjustment is due to an administrative error:

> 11.2.1.1 Review all issues, returns and any IPR's [Internal Purchase Requisitions] that have taken place against the item code to eliminate any administrative errors.

> 11.2.1.2 Review all open PO's [Purchase Orders] and IPO's [Internal Purchase Orders] for delinquent MRRs [Material Receiving Reports] and MRR interface errors involving item codes.

84.     The second type of Negative Adjustment is a "Loss, Theft, Destruction or Damage" (LTDD) adjustment. Any shortage in inventory that cannot be determined to be Administrative Adjustments is considered an LTDD event. When an Administrative Adjustment cannot be documented, the Contract as well as Fluor internal procedures require that an LTDD report be created and provided to the Government Property Administrator. See Contract Clause § I-326 and 48 C.F.R. § 52.245-1. In relevant part, FAR 52.245-1, entitled "Government Property," incorporated into the Contract in Clause I-326, provides:

> Loss, damage, destruction, or theft. Unless otherwise directed by the Property Administrator, the Contractor shall investigate and promptly furnish a written narrative of all incidents of loss, damage, destruction, or theft to the property administrator as soon as the facts become known . . . .

Contract § I-326; 48 C.F.R. § 52.245-1.

85.     Section 4.5.12.6.2 (titled "Adjusting Inventory Records") of the MMP sets forth the process for adjusting inventory records when shortages are discovered. It requires that "[a]ny

shortages [] be reported to Property [no later than] the following Saturday in which the shortage was found and be processed as an LTDD." And further confirming that the government viewed inventory control as a material obligation of the Contract and took losses very seriously, "[a]ll LTDD submittals will require a detailed Corrective Action Report to be submitted in support of the LTDD." DCMA, in turn, would approve a Corrective Action Plan ("CAP") intended to prevent future losses, and Fluor would be required to implement the CAP as approved by DCMA.

86.    The LTDD report provides a variety of information, including a description of the loss, the cost of the loss, the reason for the loss, and the corrective actions that will be taken to mitigate future losses.

87.    The LTDD report serves multiple purposes. First, it apprises the government of the missing items and the reason therefor. Second, it permits the government to oversee corrective action so that similar losses do not continue to occur. Third, it provides a procedure for either assessing the cost of the loss to the contractor or, alternatively, relieving the contractor of responsibility for the missing items.

88.    Fluor submits its LTDD reports to the United States through DCMA. If DCMA determines that Fluor is financially responsible, Fluor must pay the United States for the value of the lost, stolen, damaged or destroyed property. If DCMA determines that Fluor is not liable, it will issue Fluor a "Relief of Responsibility" letter. The letter is issued based, at least in part, on the information provided by Fluor to DCMA about its compliance with policies and procedures concerning the receipt, maintenance, storage, and security of government property.

89.     Cases submitted by LTDD reporting are closed only when there is a determination that the contractor is not liable for the lost, stolen, damaged, or destroyed property,

or when the contractor has paid the total assessed liability amount.

90.     Under the contract, Fluor can be held liable to the United States for the full value of missing government property if the contractor has failed to maintain an acceptable Property Control/Management System. FAR 52.245(h)(1), (4).

91.     Additional internal guidance is found in the FGG Material Management Bulletin, MMB-0013, Sections III and IV:

> III. Shortages identified during inventories
> A. 2
> i. The person conducting the inventory will check all of the surrounding bin locations to ensure items were not misplaced.
> ii. Subsequent inventory counts may need to be conducted to validate the discrepancy. If a third count is required, a foreman, supervisor or manager should be onsite to validate the count.
> iii. If the item cannot be located, the item will be inventoried and the loss immediately recorded in Maximo.
> iv. The recorded loss will produce a Maximo generated Inventory Adjustment Report (IAR). The Maximo generated IAR along with the causative research documenting the loss, and any additional documents or reports will be submitted with the LTDD as part of the IAR and LTDD audit trail.
>
> IV. Supporting Document File
> i. All supporting documents to justify any and all discrepancies will be retained in the materials inventory document control file for audit purposes.

92.     As set forth in detail below, Fluor did not comply with these contractual and regulatory obligations and its internal procedures. As a consequence of Fluor's mismanagement of inventory, hundreds of millions of dollars of government-owned materials were lost and are unaccounted for in Afghanistan.

93.     Fluor concealed the extent of the problem from the government, in reports that Fluor submitted to DCMA, the Government Property Administration, and the Award Fee Evaluation Board, thereby depriving the government of the benefit of its property, preventing the government from recovering from Fluor for the loss, and fraudulently earning a higher

26

performance award fee than it was entitled to receive.

## V.     Fluor's Transition Period Fraudulent Conduct

94.     In the transition from LOGCAP III to LOGCAP IV, KBR and Fluor were required to perform joint technical inspections of facilities to ensure that work performed (and paid for) under LOGCAP III was complete before being transferred from KBR to Fluor, and Fluor was required to confirm, through a 100% joint inventory, that KBR's final inventory lists were complete and accurate.

95.     The government relies on the list as accurate. Among other things it is used to establish the inventories transferred to Fluor, and for KBR to obtain relief of financial responsibility for property it received from the government or bought on the government's behalf.

96.     Fluor certified that it had conducted joint inventories to ensure that KBR's inventories were accurate, when in fact it had not.

97.     By these false certifications, KBR obtained relief from financial responsibility to the government for the property.

98.     As mentioned above, under Task Order 05 of LOGCAP IV, Fluor provides various operations, management, and support services to facilities located at 70 Forward Operating Bases in northern Afghanistan.  However, prior to assuming such duties, these same services were provided to many of the same facilities by contractor KBR under the earlier LOGCAP III contract.  In order to transition these facilities from Incumbent Contractor KBR to the Incoming Performance Contractor Fluor, the U.S. Army Materiel Command and the Defense Contract Management Agency ("DCMA") developed comprehensive a Transition Plan that set out the policies and procedures KBR and Fluor had to follow during the transition phase.

27

99.     The Transition Plan consists of "phase-in" and "phase-out" provisions designed by the Army to allow the seamless transition between the LOGCAP III contractor KBR and the LOGCAP IV contractor Fluor. As expressly stated in the Transition Plan, the intent was to "execute a seamless transition of newly awarded task orders from LOGCAP III to LOGCAP IV in a collaborative and deliberate timeline that is fully coordinated and synchronized" and "to ensure a successful end state with no interruptions to services being provided."

100.     This uninterrupted support was a requirement not only in the Transition Plan, but also in the LOGCAP contracts as well. It was contained in a provision of the LOGCAP IV contract that required Fluor to "allow seamless transition between contracts and allow for the cooperative transfer of task execution between contractors as needed."

*Joint Inventories*

101.     To meet the Army's transition mission, under the Transition Plan, KBR was obligated to "initiate-conduct-conclude a 100% physical inventory of all property/assets…currently in [its] possession."  As part of this inventory, KBR was to: 1) identify and report any/all pending, current and/or discovered Lost, Damaged or Destroyed property to the DCMA Property Administrator so that any issues, including financial responsibility, could be resolved prior to the contract being transitioned to Fluor; and 2) identify any or all property not previously or currently identified on KBR's records so as to reflect an accurate accounting of all property currently in KBR's possession.  The latter report was to be provided to the government for inventory/records validation.

102.     KBR, as the incumbent contractor, was then to provide a "validated" property listing to the DCMA Procuring Contracting Officer and Administrative Contracting Officer for review and inclusion in the LOGCAP IV Task Order. This then became the Government

28

Furnished Property listed in the Property Exhibit of the Fluor contract and represented the government-owned property that would serve as the starting inventory for Fluor and was to be used for the military's benefit during contract performance. Demonstrating the critical nature of this property listing, "any changes" to the listing could only occur via contract modification, in order to ensure that an accurate listing of property in the custody of the contractor was maintained throughout the life of the contract.

103.    In order to accomplish this transfer of property, Fluor was required to participate in joint, 100% physical inventories for each individual base location, using the "floor to records inventory method." KBR was to provide Fluor with a copy of the validated property listing for use during these joint physical inventories. KBR was also to provide Fluor with Inventory Work/Count Sheets for each individual base/location containing, among other things: description of the property; quantity on hand; property serial numbers; and the physical location of the property. These worksheets formed the basis of the joint inventories, and all discrepancies encountered were to be reported to the DCMA Property Team Leader.

104.    Further, a DA-3161 (Property Transfer Document) or a DD-1149 (Work/Count Sheets) was generated, by specific base and location, documenting completion of the joint inventories, the actual inventories, and any and all discrepancies. This formed the basis of the final transfer of property to Fluor. The DA-3161 or the DD-1149 documents were then signed by a DMA representative based on the signatures of the "Authorized Management" representative for each contractor certifying the occurrence and accuracy of all inventory documents. Copies of these signed certifications were provided to the DCMA Property Transition Team Leader. These signed documents were also submitted to Army Materiel Command and Army Contracting Command, the DCMA Transition Project Leader, and the DCMA Prime Administrative

Contracting Officer.

105.    DCMA relied on these submissions. DCMA had limited resources and could not conduct, or even oversee, 100% inventory counts at every forward operating base during transition. So, the government paid Fluor during transition to serve as a check on KBR, and DCMA made itself available to adjudicate any disputes. In this way, the commanding officer's requirement of a seamless transition could be met, despite limited DCMA resources.

106.    In reality, Fluor did not insist upon, or ultimately conduct, 100% joint inventories to ensure that KBR's inventories were accurate. Instead, Fluor falsely certified in the "Transition Packets" for each FOB that the inventories had been done and were accurate. Each of the bases where KBR and Fluor were required to perform the 100% joint inventories are listed below.

107.    A separate Transition Packet was submitted for each forward operating base that was transferred over. Each Transition Packet included (a) a "flat file," which was basically an electronic copy of the inventory purportedly being transferred from KBR to Fluor, (b) property and service transfer documents signed off on by KBR and Fluor reflecting the completion of all required transition tasks including joint inventories and technical inspections, and ultimately (c) DCMA sign-off on the flat files, forms and accompanying documents signed off on by Fluor and KBR, along with the DA-3161 and DD-1149 forms. Once DCMA sign-off was obtained, the transfer was complete and Fluor was responsible for the property going forward.

108.    The Transition Packets, after submission and sign off by DCMA, were then submitted to and retained by the Army's Procuring Contracting Officer.

109.    There is ample evidence corroborating Relators' claim that Fluor falsely certified that it had conducted the 100% joint inventories ensuring that KBR's property transfer documents were accurate, including the following:

30

a.     In September 2009, Relator Shepherd was told by a manager in Fluor's Project Controls that across bases transitioned to Fluor inventory loaded from KBR's flat files was missing and had not been counted during joint inventories.

b.     In November 2009, Relator Shepherd was told by Fluor's Deputy of Public Works that joint inventories were not being conducted, and that he was being told by senior managers to nevertheless upload the KBR inventories as soon as he could.

c.      In August 2010, while at FOB Shank, a Materials Manager who came directly from KBR told Relators Shepherd and Rude that the material in the property yard had not been inventoried at transition or since.

d.     In November and December 2010, after Fluor failed multiple government audits, investigation found that working papers associated with joint inventories could not be found and that in fact KBR and Fluor had not conducted the joint inventories.

e.     In May 2012, a Fluor Security Manager and former KBR Security Manager informed Relator Shepherd that Fluor had not conducted inventories at Transition.

110.    Ample evidence supports the conclusion that the property transfer documents reflecting KBR's starting inventories were not accurate.

111.    First, the inventory KBR validated and submitted in flat files as an accurate inventory count were taken from KBR's government-approved property management system, Maximo. However, it was well-known within KBR that the inventory counts from the Maximo system were inaccurate.

112.    Second, KBR property and materials personnel did not use the approved property management systems on a consistent basis, and instead kept their own unofficial and unauthorized spreadsheets and inventory lists to track inventory.

31

113.    Third, KBR's practice was to treat materials as "consumed," and remove them from its official inventory when the material left larger bases and went to smaller, remote bases. This resulted in inaccurate counts throughout the bases KBR supported.

114.    Further evidence that the inventories that Fluor signed off on were false includes the following:

115.    In November 2009, a manager in Fluor Project Controls stated that all of the bases KBR transitioned to Flour were missing materials that should have been in inventory, and it seemed likely that inventory had not been counted.

116.    In April 2010, immediately after the transition of the Bagram base was completed on March 31, 2010, a Fluor internal assessment found that the inventories were already way off, and a "floor to record" audit like the one that was supposed to be done jointly found that only 3 out of 18 audited records from the KBR transition inventories were accurate.

117.    In May 2010, Relator Shepherd was told by two individuals on his team, both of whom ran KBR's government-approved property management systems, that the inventory lists Fluor was loading into Maximo from KBR's transition inventories included lots of missing material, and were not accurate. These former KBR employees stated that KBR did not track property using Maximo (as it was contractually required to do), and instead tracked property using ad hoc spreadsheets maintained at individual bases.

118.    In September 2010, Relator Shepherd traveled to the Bagram base, the largest base in Northern Afghanistan, as part of his property management duties. He traveled with the Fluor Director of Public Works, formerly in the same role for KBR. Upon arrival, they checked for material, property and records against the inventory counts in Maximo—based on the uploaded flat files from KBR at transition—and found that all of the property was missing. When

32

Shepherd was amazed at how so much material could be entered in Maximo but not physically there, the Director of Public Works stated that the material had been missing at Transition and was not caught because of the failure to do the joint inventories.

119.    Also in September 2010, a former KBR property manager who joined Fluor in the same role told Relator Shepherd that KBR's transition inventories were not accurate, such that it shifted all lost or missing inventory to Fluor during the transition.

120.    In May 2013, a Fluor Security Manager investigating the cause of Fluor's inventory problems informed Relator Shepherd that Fluor was finding that material KBR purportedly transferred at transition in fact was never there.

121.    Although the government put in place a required process by which KBR and Fluor would police each other through joint inventories, in reality KBR and Fluor had incentives to look the other way regarding inventory problems at transition.

122.    For KBR, the transition inventories would have revealed the magnitude of their lack of inventory control, which would have reduced its award fees. It also allowed KBR to obtain relief of responsibility for missing material for which it would otherwise have been financially liable.

123.    Fluor, meanwhile, was disinterested in engaging in the lengthy physical inventory process. It was anxious to move out of the transition phase and assume control of bases as quickly as possible so it could enter into the more lucrative performance phase of the LOGCAP IV contract. Indeed, in November 2013, a Fluor Information Technology manager told Relator Shepherd that Ian Dolan, Fluor's Project Director and a senior Fluor official overseeing the transition, had directed Fluor personnel to complete transition as quickly as possible, even if it meant not conducting or completing the required joint inventories.

124.    As a practical matter, there was ample opportunity for KBR and Fluor to skip the joint inventories and simply certify they were done. As indicated above, Fluor simply hired many KBR employees, who often kept the exact same roles. In many cases, a KBR property manager or employee took off a KBR hat one day, and put on a Fluor hat the next. In this way, any problems they found in their capacity at Fluor would reflect back on them in their capacity at KBR. It was easier to simply kick the can down the road.

125.    Fluor was also obligated to conduct joint technical inspections of all facilities covered under Task Order 05 in order to flag all Life, Health, and Safety ("LHS") issues at the facilities and to ensure that the facilities were ready for transfer and for Fluor to assume responsibility. LHS issues are defined in the Performance Work Statement as "situations that affect life, health, and safety" and "present immediate danger to [the] occupants" of a facility. The goal of using JTIs was to identify LHS issues so that they could be mitigated until more remedial action could be taken, and also to identify them so that the government – which had already paid incumbent contractor KBR to remedy any LHS issues during the Phase-Out or transition period under the LOGCAP III contract – could get the full benefit of its contract with KBR.

126.    Fluor and KBR never conducted these inspections.  Instead, Fluor falsely represented in the Transition Packet sign-offs that it had participated in the inspections and that the facilities were ready for transfer without major problems or deficiencies.  This was a knowing violation by Fluor of the Transition Plan.

127.    Fluor communications in mid-May 2010 document that joint technical inspections were not conducted at FOB Sharana.

128.    In October 2010 a Maximo Supervisor from base Ghazni informed Relator

Shepherd that KBR and Fluor had not done joint technical inspections during transition.

129.    Following transition, Fluor personnel discovered thousands of LHS issues that would have been revealed had the technical inspections been conducted as Fluor claimed. Fluor charged the government tens of millions of dollars in labor and materials necessary to remedy these LHS issues, which would have been KBR's financial responsibility had Fluor not falsely certified that technical inspections had been completed and the facilities were ready to be handed off. The result is that the government, in unknowingly paying Fluor for work that KBR was contracted and paid to complete, paid twice for work that it should only have paid for one time.

130.    The result of the Fluor misconduct above includes the following: 1) KBR was released from financial liability to the government for property that it lost; 2) Fluor was able to charge the government for purchasing more of the materials it had certified were "handed off" from KBR, while also growing the overall LOGCAP IV contract costs and thereby its base fees and award fees; 3) Fluor increased its award fee payments by falsely representing that its performance during the transition phase of the contract was far better than it actually was; and 4) Fluor billed the government for the cost of personnel to conduct joint inventories when in fact no such work was performed.

*False Claims Associated with Transition Fraud*

131.    Through the actions above, Fluor defrauded the government in violation of the False Claims Act.

132.    First, for each base Fluor submitted Transition Packets, consisting of DD-1149 forms, Transfer of Service Documents, Property Transfer Documents, and a Transfer of Authority Checklist, along with flat files of property and other accompanying documents. Fluor made false representations in the Transition Packets that it had conducted joint inventories and

35

that the inventory it signed off on was accurate, and that it was ready to take over work at the site.

133.    For the most part, the Transition Packets were submitted during the period from June 2009 through June 2010.

134.    So, for example, at FOB Ghazni, DCMA issued a Letter of Release dated April 5, 2010, stating that the site had been successfully transitioned from KBR to Fluor on March 31, 2010, and that all property was transferred on March 29, 2010. The property transfer was based on Fluor's sign-off on the Property Transfer Documents. On March 29, 2010, Fluor's Albert Colon, signed the Transfer of Authority Checklist certifying that, among other things, 100% joint inventories had been completed, that all of the tasks listed on the Checklist had been completed and that Fluor was "prepared to begin performance of this service." On March 30, 2010, Fluor's Chris Hartnett signed off on the spreadsheet containing all property purportedly being handed off to Fluor from KBR. KBR's representative also signed the Checklist and the property spreadsheet, and a DCMA representative then signed off on the Property Transfer Documents as well.

135.    The specific details of the remaining fraudulent Transition Packet submissions are as follows:

| Site | Letter of Release Date | Transition Date | Property Transfer/Sign-Off Date |
|---|---|---|---|
| Airborne | 10/9/2009 | 10/9/2009 | 9/30/2009 |
| Alamo | 5/29/2010 | 5/23/2010 | 5/22/2010 |
| Altimur | 10/18/2009 | 10/18/2009 | 10/14/2009 |
| Asadabad | 11/27/2009 | 11/27/2009 | 11/22/2009 |
| Bagram | 12/3/2009, 12/8/2009, 12/12/2009, 1/1/2010, 1/27/2010, 2/2/2010 | 12/1/2009, 12/9/2009, 12/10/2009, 12/18/2009, 1/1/2010, 1/21/2010, 1/25/2010 | 11/29/2009, 12/3/2009, 12/7/2009, 12/17/2009, 1/19/2010, 1/24/2010 |
| Bandar | 4/24/2010 | 4/19/2010 | 4/18/2010 |

36

| Bermel | 4/26/2010 | 4/12/2010 | 4/7/2010 |
|---|---|---|---|
| Blackhorse | 5/21/2010 | 5/12/2010 | 5/11/2010 |
| Blessing | 12/24/2009 | 12/16/2009 | 12/15/2009 |
| Bostick | 11/13/2009 | 11/13/2009 | 11/10/2009 |
| Chamkani | 2/9/2010 | 2/3/2010 | 2/1/2010 |
| Chapman | 3/27/2010 | 3/21/2010 | 3/19/2010 |
| Clark | 2/9/2010 | 2/2/2010 | 1/31/2010 |
| Dubbs | 6/2/2010 | 5/31/2010 | 5/30/2010 |
| Eggers | 3/26/2010 | 3/19/2010 | 3/18/2010 |
| Fortress | 11/20/2009 | 11/20/2010 | 11/15/2010 |
| Four Corners | 3/30/2010 | 3/26/2010 | 3/19/2010 |
| Gardez | 3/17/2010 | 3/12/2010 | 3/15/2010 |
| Ghazni | 4/5/2010 | 3/31/2010 | 3/29/2010 |
| Giro | 3/31/2010 | 3/28/2010 | 3/28/2010 |
| Goshta | 12/18/2009 | 12/13/2009 | 12/10/2009 |
| Herrera | 2/20/2010 | 2/16/2010 | 2/13/2010 |
| Honaker Miracle | 1/26/2010 | 1/21/2010 | 1/24/2010 |
| Hughie | 1/19/2010 | 1/13/2010 | 1/13/2010 |
| Jalalabad | 2/1/2010 | 1/24/2010 | 1/4/10, 1/10/10, 1/15/10, 1/24/10 |
| Julien | 6/2/2010 | 5/3/2010 | 5/30/2010 |
| Kalagush | 12/4/2009 | 11/27/2009 | 11/25/2009 |
| Khogyani | 12/9/2009 | 12/9/2009 | 12/3/2009 |
| Kiwi Bamian | 5/20/2010 | 5/15/2010 | 5/14/2010 |
| Korengal | 12/25/2009 | 12/4/2009 | 11/29/2009 |
| Kushamond | 3/6/2010 | 3/1/2010 | 2/28/2010 |
| Kutschbach | 5/7/2010 | 4/28/2010 | 4/28/2010 |
| Lighting | 4/1/2010 | 3/29/2010 | 3/29/2010 |
| Lilley | 5/19/2010 | 5/12/2010 | 5/12/2010 |
| Lion | 5/30/2010 | 5/23/2010 | 5/22/2010 |
| Mazur e Sharafi | 2/24/2010 | 2/14/2010 | 2/13/2010 |
| Mehtar Lam | 12/14/2009 | 12/4/2009 | 12/3/2009 |
| Monti | 11/18/2009 | 11/18/2009 | 11/14/2009 |
| Morales Frazier | 5/9/2010 | 5/7/2010 | 5/6/2010 |
| Morehead | 6/5/2010 | 5/30/2010 | 5/29/2010 |
| Orgun E | 4/25/2010 | 4/16/2010 | 4/15/2010 |
| Phoenix | 6/25/2010 | 6/7/2010, 6/11/2010, 6/15/2010 | 6/14/2010 |
| Pol e Charki | 5/9/2010 | 5/9/2010 | 5/7/2010 |
| Rushmore | 5/28/2010 | 5/22/2010 | 5/21/2010 |
| Salerno | 3/11/2010 | 2/20/2010 | 2/19/2010 |
| Shank | 10/29/2009 | 10/29/2009 | 10/23/2009 |

| | | 4/25/2010, 4/28/2010, 5/2/2010 | |
|---|---|---|---|
| Sharana | 5/16/2010 | | 4/26/2010 |
| Spann | 2/13/2010 | 2/4/2010 | 2/1/2010 |
| Tillman | 4/25/2010 | 4/17/2010 | 4/17/2010 |
| Torkham | 1/24/2010 | 1/16/2010 | 1/20/2010 |
| Warrior | 4/19/2010 | 4/8/2010 | 4/8/2010 |
| Waza Khwa | 3/22/2010 | 3/19/2010 | 3/19/2010 |
| Wilderness | 3/6/2010 | 2/23/2010 | 2/22/2010 |
| Zerok | 4/7/2010 | 4/4/2010 | 4/3/2010 |
| Zormat | 3/9/2010 | 3/9/2010 | 3/2/2010 |

136.    Second, Fluor billed the government for the cost of labor associated with performing joint inventories and technical inspections that they did not perform. As set forth in Section VIII below, Fluor had to justify each person they deployed to Afghanistan to work on the LOGCAP contract, in part because the cost of each person sent over easily approached $200,000 annually per person, on average.

137.    Fluor created false Basis of Estimates and related documents, in which it included joint inventories, to justify the need for additional personnel to the government. Once justified, the Fluor personnel filled out time sheets each week in which they always billed for a full work week, and assigned those hours to a cost code for transition. Those labor hours under the transition cost code were then submitted to the government for reimbursement under the category of labor costs, including for the falsely certified joint inventories, and ultimately paid upon completion of the cost definitization process. In this way, Fluor billed the government and was reimbursed for work that was not done.

138.    Third, through the submission of the false Transition Packets, Fluor allowed KBR to avoid obligations to repay the government. In the case of Transition Packets for joint inventories, the submission of the false records concealed material losses from the government, which in turn allowed KBR to in effect obtain unofficial relief of responsibility for missing

property.

139.    Fourth, as discussed in greater detail above and below, Fluor made false submissions to the government in order to receive additional award fee incentive payments for its work during the transition period.

140.    These submissions were false in that Fluor falsely represented that it had performed  joint inventories and technical inspections. By the actions above, Fluor made false representations about inventory accuracy and control, material losses, prompt resolution of Life, Health and Safety issues, and about overall contract performance. As a result, it received award fee payments it should not have received. Ultimately, for the transition period, Fluor received award fees of approximately $28 million.

141.    In total, for the two years during which transition work was being performed, Fluor received $755.5 million in definitized payments, plus $35 million in additional base fees and award fees. The vast majority of the payments from the government to Fluor were reimbursements of purported labor costs for personnel perform contractually required work, as well as property and material purchases.

## VI.    Fraudulent Schemes Related to Fluor's Systemic and Pervasive Failure to Manage, Track and Store Government Property

142.    Under its prime contract with the government, Fluor is responsible for managing the government's inventory of property and materials in Afghanistan.

143.    This was not only a massive undertaking—one for which Fluor was paid hundreds of millions of dollars—it was also a massive responsibility—one for which Fluor was subject to stringent rules and regular reporting and disclosure requirements. Losses were required to be reported immediately, and in each case of loss an investigation was to be conducted to determine the reason for the loss and corrective actions to be taken to prevent future loss.

144. Ensuring accurate inventory and preventing loss was no idle concern. Tracking inventory matters to ensuring that taxpayer-purchased goods actually go to a government benefit, and keeping track of what materials are available at each Forward Operating Base is crucial to completing repairs and construction projects promptly in order to adequately support the troops (*e.g.*, promptly fixing Life, Health and Safety issues, as discussed above).

145. In addition, Northern Afghanistan was a war zone, and one with thriving black markets that craved the sorts of American-made goods that Fluor was supposed to manage. Add to that the fact that American military installations throughout Afghanistan had a steady flow of local Afghanis and third country nationals from Central and Southern Asia coming on and off base on a daily basis. For these reasons, and many others, theft was a constant problem, and the failure to track inventory exposed the government to inordinate loss. Indeed, there are numerous well-documented examples of rampant theft of government property, which in some cases resulted in criminal indictments. Examples span from pervasive fuel theft across Afghanistan to specific examples of theft, large and small, from Fluor's own material yards, including everything from fuel injectors and other power generation equipment, to a fire truck and an armored pickup truck.

146. Perhaps most importantly, inventory control was important to troop safety. Many of the materials Fluor was responsible for were valuable to insurgents. Copper wire and timing devices in common appliances, for example, could be used in improvised explosives; and items as innocuous as nails, nuts, and bolts could also be used as shrapnel.

### A. Fluor Did Not Maintain a System of Record that Could Accurately or Adequately Track Inventory

147. Fluor was required to maintain a government-approved property management system to track and control the purchase, storage and consumption of government property and

40

materials. Fluor fraudulently represented to the government that it maintained an adequate property management system, called Maximo, when in fact Fluor knew that its Maximo system never contained an accurate representation of actual inventory and consumption, and further knew that it was consistently circumventing Maximo, such that the inventory figures in Maximo were highly inaccurate, and that the data in Maximo was routinely manipulated to conceal Fluor's failure to track and control current inventory and consumption.

148.    Maximo is an IBM Enterprise Management System used by Fluor to track all costs for assets, labor, and materials under Task Order 05.  All property must be accounted for in Maximo, beginning with the input of new property into Afghanistan, and continuing through the transfer of material from location-to-location, and the use of material on specific "Work Orders" (*e.g.*, plates used on a cafeteria work order, PVC pipes used on a plumbing work order, copper wire used on a work order to fix an electrical issue, etc.).

149.    Because Fluor failed to conduct joint technical inspections during the transition period in which inventory was handed off from KBR to Fluor, as discussed above, inventories in Maximo were not accurate from the start. Moreover, starting inventories from KBR, however inaccurate, were not promptly input into Maximo, sometimes for years, at which point they were outdated and useless. Because of these problems, Fluor's property personnel at each Forward Operating Base maintained their own *ad hoc* systems to try to keep track of the inventory at their own bases. All of this was non-compliant with government requirement that Fluor use Maximo as theater-wide property management system.

150.    By way of example, in May 2012, Fluor's Security Department became aware of three incidents of lost or stolen fuel injectors and pumps (with a combined value of approximately $118,724.73) at Bagram Air Base. The fuel injectors and pumps were

41

unaccounted for because Bagram Materials Management personnel were not properly tracking the items. Rather than using Maximo, as required by the Materials Management Plan, the employees decided they would instead track the items locally using an Excel spreadsheet. Not surprisingly, this led to inconsistent inventory practices and inaccurate inventory counts, which resulted in many fuel injector pumps being lost or stolen

151. The problem continued unabated throughout the life of contract, because in addition to inaccurate initial counts, Fluor failed to properly receive newly purchased government property into Maximo. It often failed to track which Forward Operating Base the material was sent to, or what Work Order it was used on. Thus, Fluor lost track of newly purchased government property as soon as it was received in Afghanistan.

152. Compounding matters, Fluor consistently failed to conduct monthly cyclic checks of 10% of all inventory at each FOB, referred to as 10% inventories. For years it also failed to comply with the requirement that it conduct 100% annual inventories at every FOB. Fluor knew the results of such inventories would be abysmal, and would require a reckoning with its rampant lack of inventory control, and commensurate need to report that it had lost millions of dollars in government property.

153. Fluor's own internal audits and reports revealed that for years monthly 10% inventories were not being performed consistently, and when it was the monthly inventories were not properly completed or documented. Fluor senior management was made aware of these problems a number of times, including through internal assessments and nonconformance reports, but the problem continued unabated for years. Other internal records revealed that in a number of cases where documentation of 10% inventories was found, the inventories were "pencil-whipped," *i.e.*, falsified.

154. Consistent with this, internal documentation indicated not only that Fluor consistently failed to perform required monthly 10% inventories, but also that the inventory counts that were done revealed extreme inaccuracies.

155. Examples of internal documentation of the issues above include the following:

a. A January 2011 internal presentation reviewed nine Forward Operating Bases and found that at eight of the nine FOBs the 10% inventory requirement was not met. Only one site had completed 10% inventories, and another had counted just 3% of inventory; for those two sites, inventory accuracy was found to be 44% and 61%, respectively. In the same presentation, Fluor acknowledged that the inventory accuracy standard it was required to meet was 97%.

b. A late 2012 management self-assessment report looked at inventory accuracy at several major Forward Operating Bases, Bagram, Sharana, Marmal, Spann and Phoenix, and found that "Ten percent monthly inventories are not being performed consistently throughout the project."

c. A February 2013 email from Jarrold Reeves, Director of Fluor's Materials Management Group (MMG), admitted, "[W]e are not executing 10% [inventories] to standard. Sites are pencil whipping the inventory, not reconciling the 10% in Maximo, and not reflecting the reason for the adjustment in Maximo."

d. A January 2014 report regarding lost material explained that the loss was "a direct result from past Management which didn't follow the MMP guidelines," and a result of "failing to conduct required 100% and 10% inventory in order to maintain accurate inventory records in MAXIMO." The report further stated that going back to 2012 the Regional Distribution Center Manager at Marmal knew that "the inventory department did not perform

43

required 10% monthly inventory," and further stated, "No effort or emphasis was ever placed on completing required inventories resulting in loss of accountability of materials."

156. Likewise, Relators' analysis and investigation has confirmed that the failure to conduct inventories was a rampant and persistent problem. To provide some examples, Fluor's Internal Assessments, Nonconformance Reports and other internal documentation demonstrate that monthly 10% inventories either were not conducted at numerous sites, including at FOB Marmal, from July 2010 (when Fluor finished transition and entered the performance period of the contract) through July 2013, and that in the period from January through July 2013, Fluor appears to have falsified records indicating that 10% inventories were conducted. In addition, an October 2012 internal assessment found that there had been no cyclic inventories at all for the period from January through September 2012, and that no End of Year Inventory Summary Report was submitted from that site.

157. A separate January 2014 internal report found that no 10% inventories were conducted at all in 2012 at FOB Marmal, with the knowledge of the Site Manager; the report further found that "[n]o effort or emphasis was ever placed on completing required inventories resulting in loss of accountability of materials."

158. At FOB Bagram, an internal assessment indicated that 10% inventories were not conducted consistently in the period from July 2010 through October 2012, and that documentation of 10% inventories in the ensuing six months appears to have been falsified. Indeed, an internal inventory tracking report for the first half of 2011 indicates that 10% inventories were not completed at Bagram in January, April and May of 2011, and that for the two months in between inventory accuracy was an abysmal 70.61% for February and 80.29% for March. The document itself indicates that the accuracy target was 95% (and as discussed in this

44

Complaint, the loss rate was expected to be less than 2%).

159.    The same is true at smaller sites. Examples of internal documentation expressly conceding that 10% inventories were not conducted as these sites includes the following:

a.    At FOB Spann, internal reports from April and June 2012 expressly state that Fluor had not complied with its monthly 10% requirement for August 2011, and from October 2011 through May 2012. The June 2012 report explained why the inventories had not been conducted: "Lack of management oversight. Staying compliant with guidelines and procedures is systemic issue."

b.    At FOB Alamo, an April 2012 assessment indicated that no monthly 10% inventories had been conducted at all, because "Site Personnel unaware of requirement" and "Materials Management did not follow up."

c.    At FOB Blackhorse, a February 2012 internal report found that no monthly 10% inventories were conducted for November and December 2011.

d.    At FOB Eggers, a November 2012 internal assessment found no evidence that monthly 10% inventories had been conducted for July through September 2012.

e.    At FOB Deh Dadi, an internal assessor found actual documentation of monthly 10% inventories for November 2011 through January 2012; however, those inventories all reported perfect results with zero discrepancies, but a floor to records sampling of inventory yielded highly inaccurate results.

f.    At FOB Deh Yak, an internal assessment in April 2012 found that the new Site Materials Lead had not arrived yet, and that the previous Lead had left no evidence indicating that 10% inventories had ever been conducted.

g.    In other instances, Fluor's internal documentation indicates that

documentation of 10% inventories simply could not be found, that a Site Materials Lead had been on vacation for a particular month and simply never turned in any documentation suggesting that 10% inventories had been completed, etc. There are instances of this at FOB Bostic/Narray, FOB Hughie, FOB Shinwar, FOB Tillman, FOB Bermal, FOB Shkin/Lilley, FOB Bandar, FOB Deh Yak, FOB Bande Sardeh,

160.    Internal Fluor documentation further reveals that Fluor was consistently failing to conduct even highly critical sensitive item inventories, with meaningful consequences. By way of example, an August 2011 internal audit at Sharana known as a Functional Assessment Report found no documentation that sensitive items inventories had occurred. In addition, a subsequent 2012 internal audit in advance of a DCMA property system audit at Sharana found that 100% sensitive items inventory records "cannot be found, and no documentation available to verify inventory was conducted." It further noted that "in one case, Security was not notified of a lost sensitive item (shipment did not arrive)."

161.    Additional internal documentation of the failure to conduct sensitive item inventories includes the following:

a.    A February 2013 internal audit finding at FOB Bagram that the Property Department failed to conduct 10% sensitive item inventories in a number of departments, and that a number of other departments did not produce any evidence that the sensitive item inventories had been done. The finding was for the period from February 2012 through January 2013.

b.    A March 2013 internal audit finding that the Property Department had not conducted 10% sensitive item inventories, based in part on the lack of guidance from management, for the period from mid-2011 through February 2013 at FOBs Bamian/Kiwi,

Panjshir, Morales Frasier, Kutzbach, Kalagush, Gamberi, and DFIP.

162. Further compounding matters, Maximo contained grossly inaccurate Unit of Measure and pricing data, meaning that Fluor could not provide the government with accurate estimates of the cost of labor and materials. In fact, at a meeting of Maximo Materials Management staff on January 25, 2012, it was revealed that an internal audit by Fluor had discovered that 17,000 lines of materials in Maximo were priced incorrectly. Relators Shepherd and Rude had been reporting this accuracy problem with Maximo to Fluor senior management since at least 2010.

163. A February 23, 2011 internal audit report regarding Bagram, Fenty, and Sharana is emblematic of Fluor's lax controls and vulnerability to theft of government property. The internal audit found that "Physical security of the storage yards was inadequate at both the Sharana and Fenty locations," and that "both yard entrances were unguarded after regular work hours, and it appeared that many of the connex containers in the Sharana yard remained unlocked during the night." At these same sites, the report found, *inter alia*: "Physical inventory counts of materials and supplies (*e.g.*, auto parts, office supplies, electrical parts) were not being performed or documented, as required by the Material Management Plan and Federal Acquisition Regulations"; "no evidence was provided to document that [monthly 10%] cycle counts had been performed at any of the nine sites sampled"; "Materials were not well controlled"; "inventory errors, including test count discrepancies and a backlog in material receipts, were identified"; "Maximo inventory records at the three sites were inadequate and numerous errors were identified in our test counts, including the inability to physically locate materials reflected as on-hand inventory in Maximo and the inability to find Maximo inventory records for materials physically located"; and "Asset records maintained in Maximo were frequently outdated and, in

47

some instances, assets could not be located during attempted test counts at the three sites."

164.    Another example, concerning power generator fuel injector pumps at FOB Bagram, demonstrates the relationship between the failure to perform 10% inventories and the loss of government property. Fluor prepared three LTDDs dated June 10 and 11, 2012, for the apparent theft of approximately 400 power generator fuel injector pumps at the Bagram materials yard. First was a March 24, 2011 notification that 19 fuel injector pumps were missing from their storage container; the second was an April 24, 2012 report that eight more pumps were missing, and so an internal request for them could not be fulfilled; and third was a May 2, 2012 report of the "apparent theft" of 377 fuel injector pumps. The total value of the fuel injector pumps exceeded $100,000. Fluor Security's investigation revealed that an examination of eight consecutive monthly 10% inventories from August 2011 through March 2012, for the Non-Tactical Vehicle (NTV) and Power Generation (PGEN) store rooms . . .revealed that documentation could only be provided for November 2011, which is contrary to statements provided by previous site Materials Management." The report of the May incident concluded as follows: "Several line items had not been inventoried for almost a year and storage bin locations throughout the NTV [Non-Tactical Vehicles] and PGEN [Power Generation] storerooms . . . were very inaccurate."

165.    Despite the fact that Fluor was well aware of the problems above, Fluor consistently represented to the government that it maintained an accurate and adequate property management system, and certified to the government that its cost and billing data were accurate. In reality, when Fluor submitted required periodic reports to the government about inventory levels, inventory accuracy, inventory loss, etc., Fluor reported knowingly false information. It knew, for example, that it could not provide accurate information, because it lacked accurate data

from which to actually report to the government. Rather than admit this, Fluor hid these facts from the government, and falsely represented that its inventory accuracy exceeded 99% and its loss rate was near zero.

166.    In reality, Fluor's property management system was a mess, and Fluor's management did not work to resolve the problems, and instead focused its efforts on concealing the problems from the government (as discussed below). Meanwhile, brazen efforts to circumvent the property management system were tolerated. For example, in March 2011 a Fluor Materials Management employee reported that a particular senior Materials Management Supervisor repeatedly requested bundles of plywood "off the books, out the back door" so he could "help out some guys" from another company, Mantech. Human Resources recommended the employee's firing, but Michael D'Arcangelo, an executive management team employee and Deputy Project Manager over Construction, refused to permit the firing; no justification or explanation of the brazen misconduct was provided.

167.    For these reasons, and based on all of the fraudulent schemes discussed below, Fluor's Maximo system was never an accurate or adequate property management system, and as further discussed below, Fluor engaged in numerous schemes to conceal the extent of its lack of inventory control from the government.

## B.  Fluor's Lack of Inventory Control Resulted in Massive Losses of Government Property, Which It Concealed Through Various Schemes

168.    Not surprisingly, based on the foregoing, Fluor lost millions of dollars of government property, depriving the government of its benefit. Fluor was required to report the shortages to the government, by reporting the instances of loss, theft, damage or destruction ("LTDD"). Fluor could seek relief of responsibility for losses reported on LTDDs.

169.    However, the full extent of the shortages and unaccounted for inventory based on

the conduct discussed above was massive. Fluor knew that the government would not relieve it of responsibility for such large losses, so it concealed them.

### 1. Negative Adjustment Transactions in Maximo

170.     Jeff Nix was a Fluor Compliance Manager in Afghanistan from December 2012 to April 2014, and is a retired United States Army officer who served for 23 years. In 2013, Nix discovered Fluor's mismanagement of inventory in Afghanistan when Fluor's Compliance Department performed a Compliance Review of the process and procedures used by Fluor for making Negative Adjustments to inventory and for reporting instances of loss, theft, damage, and destruction ("LTDD") to the government. The purpose of the Compliance Review was to determine whether Fluor's handling of Negative Adjustments complied with contractual and regulatory requirements and internal procedures.

171.     The Negative Adjustments Compliance Review grew out of an earlier Compliance Review performed by Justin Jones, a Compliance Manager within Fluor's Compliance Department. Among other areas of inquiry, Mr. Jones' Compliance Review examined a sample of 25 Negative Adjustments to inventory during the review period of January 1 to July 31, 2012. Jones found that only 2 of the 25 Negative Adjustments had the necessary LTDD documentation associated with them, another 4 were annotated as "Administrative Adjustments," and the remaining 19 had no supporting documentation whatsoever. Jones' Compliance Review concluded that "[s]hortages found during physical inventory are not consistently being reported to Property [the Government Property Administrator] for LTDD" and that "[t]his lack of reporting demonstrates a lack of control and oversight" over government property.

172.     Based on Jones' report, the Compliance Department decided to conduct a Compliance Review specifically examining Fluor's handling of Negative Adjustments to

inventory, in particular whether Fluor was documenting the reason for each Negative Adjustment to inventory and whether Fluor was properly reporting LTDD events to the government.

173.    As explained more fully below, the Negative Adjustments Compliance Review found that Fluor personnel were routinely making Negative Adjustments in Maximo (*i.e.*, reducing the inventory count in Maximo) without any documentation whatsoever – neither documentation supporting an Administrative Adjustment nor an LTDD report notifying the government of loss, theft, damage or destruction of government property. Handling inventory shortages in this manner is a violation of the Contract, federal regulations, Fluor's internal procedures and policies, and sound inventory management practices, and results in a complete lack of accountability for missing items in inventory.

174.    Fluor managers that were made aware of the results of the Compliance Review include Country Manager Steve Whitcomb, now-retired Country Audit Response and Compliance Manager Joseph Kerr, FGG Compliance Director Dave Methot, Deputy Theater Property Manager Ed Nukic, Country Director of Material Management Jarrold Reeves, and Theater Materials Manager Michael "Shane" Ramirez.

175.    The universe from which the sample was drawn for the Negative Adjustments Compliance Review consisted of all Negative Adjustments to the materials inventory in Afghanistan during the period January 1, 2010 to February 1, 2013.

176.    In total there were 168,868 transactions involving Negative Adjustments in the universe of transactions during the selected period, *i.e.*, 168,868 transactions in which Maximo records had been adjusted downward to reflect shortages in inventory. These 168,868 transactions totaled approximately $386 million dollar worth of government-owned materials.

177.    Standard sampling methodology was used to select a statistically significant

51

sample size for the audit, which was determined to be 59 samples from each of four periods between January 1, 2010 and February 1, 2013, or a total of 236 samples (0.139% of the universe of transactions). EZ-Quant random number generator was used to select the samples randomly.

178.     Nix examined the 236 Negative Adjustment transactions to determine whether the transactions complied with the Contract, federal regulatory requirements, and Fluor's internal policies and procedures. Nix examined all documentation in Maximo (the system of record) and all back up materials provided by the Regional Supply Centers in response to a request for these materials from the Compliance Department. In addition, Nix reviewed the Fluor Material Management Group's LTDD database (maintained by the Fluor Government Property Department), which is the repository of all LTDD reports.

179.     The Compliance Review audit found gaping holes in Fluor's management and oversight of the materials inventory in Afghanistan. These findings are explained below.

180.     The Compliance Department's audit found that in 190 of the 236 Negative Adjustments audited, there was no documentation whatsoever of the Negative Adjustment. Of the remaining 46 Negative Adjustments, 37 were instances in which an Administrative Adjustment was documented, and nine were transactions in which an LTDD was prepared.

181.     In sum, the audit showed that in 80.5% of the Negative Adjustments (190 of 236 cases), Maximo records had been adjusted downward with no back-up documentation, no explanation, and no audit trail. This meant that in the vast majority of instances when a shortage was discovered in inventory, Fluor personnel simply papered over the shortage by adjusting the Maximo records downward. If Fluor had followed required procedures, it would have prepared an LTDD report notifying the government of the loss since there was no evidence of an Administrative Adjustment.

182. Fluor's practice of making Negative Adjustments to inventory without documenting an Administrative Adjustment or creating an LTDD report violated the Contract, federal regulations, and Fluor's internal procedures.

183. Fluor's failure to account for the missing inventory concealed from the government the extent of Fluor's mismanagement of inventory and deprived the government of the ability to direct Fluor to correct the problem in a timely manner.

184. As noted above, the 168,000 Negative Adjustments during the three year period under review totaled approximately $386 million in value. Given that 80.5% of the Negative Adjustments had no audit trail and no reporting of an LTDD, this represents $310 million in missing and unaccounted-for government materials for which Fluor is responsible.

185. David Payne worked for Fluor from December 2011 through December 2016 in its Security department, where he performed numerous LTDD investigations and supervised nearly all LTDDs that were prepared by other Fluor employees. Through his investigations, Payne quickly discovered that Fluor's material management system was out of control. He, too, learned that Fluor was using improper Inventory Adjustment Transactions ("IATs"), including Negative Adjustments in particular, to conceal shortages.

186. Through various reviews of Maximo, Payne discovered multiple instances of information being manipulated, omitted, or falsely reported in the database. Payne, like Nix, discovered that Inventory Adjustment Transactions were entered into Maximo without the required justification or memorandum to explain the adjustment.

187. Payne also discovered that materials personnel repeatedly adjusted inventories in the Maximo database system without performing the necessary causative research to validate identified overages and shortages. Furthermore, the Materials department personnel failed to

53

inform Fluor Security of the adjustments and often could not provide the necessary documentation to substantiate them.

2. *Falsified Records*

188.    Another ruse took place at the level of Fluor's eight Regional Distribution Centers ("RDCs") (basically, larger bases that acted as "hubs") in Afghanistan. In February and March 2013, as part of the Compliance Review of Negative Adjustments, Fluor's Compliance Department requested any records reflecting Administrative Adjustments, LTDDs, or other explanation for the Negative Adjustments in the audit. Managers Ramirez and Reeves directed that the eight RDCs provide back-up documentation for the 236 Negative Adjustments to inventory in the sample population.

189.    In response to this request, the Compliance Department received no response whatsoever from six of the eight RDCs, even though each of these six had a sizeable number of Negative Adjustments in the sample population. The two RDC's that did respond – Salerno and Fenty – each provided a number of backdated documents that suggested an attempt to cover-up failings in their inventory management.

190.    Fenty RDC submitted 53 Memoranda that purported to document the reason for 53 Negative Adjustments to inventory at the Fenty RDC (53 was the number of Fenty Negative Adjustments in the sample of 236 Negative Adjustments). A close examination of these Memoranda revealed that all of them were backdated to look like they were created contemporaneous with the Negative Adjustment, whereas in truth they were created in response to the much later request of the Compliance Department.

191.    Nix discovered the backdating of the Fenty Memoranda by (1) examining the metadata of the documents (submitted in electronic format) which showed that the document had been created contemporaneous with the request of the Compliance Department, and also (2) by

54

examining the date the author of the document was assigned to the Fenty RDC, which showed that the author was not assigned to Fenty until after the purported date the document was created.

192.    Moreover, the backdated Memoranda provided by the Fenty RDC did not even accomplish the purpose for which they were intended, which was to justify the Negative Adjustment. The Fenty Memoranda simply stated, "The below item code was adjusted because it was not located during inventory on [the date of the physical inspection]." This was merely a restatement of the problem – that the items were missing from inventory – and offered no explanation for why the items were missing.

193.    The Salerno RDC submitted eight Memoranda (the number of Salerno Negative Adjustments in the sample population) in response to the Compliance Department's request. Nix's examination of these Memoranda revealed that four of them were backdated to look like they were created contemporaneous with the Negative Adjustment, whereas in truth they were created only in response to the much later request of the Compliance Department. Nix discovered the backdating of the Salerno Memoranda in the same manner he detected the Fenty backdating.

194.    As noted above, the other six RDCs did not even make an attempt to provide back-up documentation for the Negative Adjustments in their region, effectively conceding that there was no back-up documentation and thus no known reason for the Negative Adjustments in their region. The non-responsiveness of six RDCs and the inadequate response of the other two RDCs supported the conclusion of the Compliance Review that Fluor's system for managing inventory is fundamentally inadequate and that Fluor handled recklessly its responsibility to maintain oversight over Negative Adjustments to inventory and account for government property.

195.   David Payne, the Senior Supervisor in Security, also found evidence that Fluor personnel were falsifying records. Payne found that fraudulent Memorandum for Records documents ("MFRs") were prepared in an attempt to justify Maximo record changes and/or failures to comply with required Materials Management Plan policies and procedures. There were instances where these MFRs were created in 2013, but backdated to support transactions allegedly performed in 2011 or 2012.

*3.   Virtual (or "ghost") DRMO2 Storeroom Losses*

196.   In September or October of 2012, Payne learned that Fluor property-management personnel used entries in the Maximo system to sequester missing property in fictional "storerooms," rather than reporting them on LTDDs.

197.   In November or December of 2012, Payne was evaluating the extent of government property that Fluor had lost but not submitted on an LTDD or otherwise dispositioned. Over the next six months, Payne found that Fluor property personnel had placed approximately $30 million worth of government property in virtual DRMO storerooms, or "bins." Simply put, he found that, according to the Maximo database, $30 million worth of unaccounted-for government property was in physical locations that did not exist. These nonexistent "bins" were also called "ghost bins."

198.   The "contents" of the ghost bins consisted in substantial part of material that could not be accounted for on Fluor's required, monthly, 10% Inventories.

199.   Payne told Wilson (his supervisor) about his findings, and then he reported it up the corporate chain. As a result, in mid-2013, Fluor's Corporate Investigations operation took

---

[2] Defense Reutilization Marketing Office ("DRMO") is a term that was used for locations that accept and manage surplus/excess military property. DRMOs fell under the purview of the Defense Logistics Agency ("DLA")/Defense Reutilization Marketing Service, which is now known as DLA Disposition Services.

over the inquiry.

200.    Wilson also told Payne that MMD management was concerned that these and other breakdowns would cast doubt on the reliability and accuracy of previous Fluor end of year inventory reports submitted to the government.

201.    In approximately March 2013, Ernest Ridley, a high-level Materials Management Group manager, and Reed Wilson, a MMG Specialist, traveled to Bagram from Greenville, S.C. Payne knew that Ridley would be travelling to Afghanistan, as he (Payne) had emailed Ridley and others a series of questions on March 28, 2013, concerning material shortage issues, including some aspects of the DRMO storerooms. Ridley provided a written response to Payne's emailed questions on or about March 29, 2013. One of Payne's questions pertained to what RDC managers had been told regarding inventory losses, and whether the data that was disseminated to RDC Managers included DRMO storerooms. Ridley responded, "Transactions that are currently in the DRMO storeroom were not included because an inventory adjustment has not been completed on these. All transactions in the DRMO storeroom will be inventoried and a subsequent LTDD [report] may be initiated."

202.    Payne, Ridley, Reed Wilson, Bryan Wilson, and Robert Fiorille met on multiple occasions at Bagram, so Payne knew that Ridley and Reed Wilson were traveling to various Fluor Forward Operating Bases on their trip. Payne was told by Ridley, in the presence of Bryan Wilson and Fiorelle, that the Greenville team actually determined that the potential missing property (dating back to 2010) in the virtual storerooms/ghost bins was valued at $48 million.

203.    About a month after Ridley left Bagram AF, he told Payne that the $48 million in unaccounted-for government property had been reduced to $26.9 million. Payne was advised that Tony Montalvo (Deputy Project Manager for Materials Management Group), Ridley, and Reed

57

Wilson, as well as unidentified Fluor personnel in Afghanistan, went through thousands of line items of government property transactions to determine the new loss value.

204.    Greenville personnel told Payne that the approximately $27 million in lost government property would be submitted on a LTDD report.

205.    To the best of his knowledge, this was not done. Over the course of his tenure with Fluor, Payne saw virtually all LTDD reports covering loss in excess of $3,000 that were submitted to the government, but he did not see any LTDD reports concerning the ghost DRMO inventory.

### 4.  *Placing Lost Materials on Work Orders*

206.    Another method by which Fluor concealed inventory losses was to simply "issue" lost inventory to current or completed Work Orders, as though the materials were used on the Work Orders. In this way, the material was removed from inventory and deemed consumed.

207.    In some cases, lost government property was added to Work Orders that had been completed long ago. In fact, Relators' independent analysis has found that Fluor added more than $60 million in lost materials to Work Orders that had already been completed.

208.    Payne, too, upon information and belief, suspected that Work Orders were initiated so that it would appear in Maximo that unaccounted-for government property was being utilized in a project. By doing this, the unaccounted-for government property could be decremented out of Maximo as material associated with a Work Order, and thus not be reported through the LTDD process to the government.

209.    Payne also suspected that, upon information and belief, Fluor was allowing employees to access Maximo at elevated user access levels and with elevated privileges. These employees were performing various critical functions (*e.g.*, creating or deleting work orders) that were typically performed by supervisors or managers.

58

210. As an example of this scheme taken from Fluor's own Maximo records, Fluor opened a Work Order on November 30, 2010 for the performance of work in the Power Generation Department at FOB Sharana. Property valued at approximately $167,000 was added to the work Order, and then it was completed on January 9, 2011. Two weeks later, $1.6 million in additional property was added to the Work Order. Approximately $1.4 million of the added material was radiator engine coolant, unrelated to the original materials on the Work Order. The fraudulent post-completion material was added by a different Maximo user, and there was no documentation attached to the Work Order in Maximo to justify the post-completion addition of such a large amount of property. Finally, the $1.6 million in post-completion materials were added right after Fluor failed a DCMA audit of its property system and inventory control at FOB Sharana, with the knowledge that DCMA would be returning shortly to conduct a re-audit at FOB Sharana.

*5. Shifting Losses When Closing Bases*

211. When Forward Operating Bases closed, as they did from time to time and in particular during the drawdown in troops, Fluor was required to conduct a 100% inventory, account for any inventory losses, and send property and materials that were still usable back to Regional Distribution Centers (RDCs). In other words, base closings were a potential moment of reckoning regarding lost inventory.

212. However, RDC managers intentionally did not report losses promptly, to avoid scrutiny of their practices. For example, sites that had been closed for more than one year failed to submit any site closure LTDD reports and often reported near-perfect records of accountability for 10% or 100% Inventories. However, when remaining material was brought back to RDCs from FOBs or other locations under their management, considerable losses (some of which were referred to as "in-transit losses") were reported. Since there was no evidence of

59

tampering or pilferage during transit, Security personnel determined the losses were the result of poor inventory control.

213.   It was also determined that in the final days before a site closed, materials were being issued to existing, but unrelated, Work Orders for the sole purpose of trying to quickly balance the inventory. Essentially, RDC Managers would try to allocate lost materials to a project on paper, so that it would appear as if the material was actually accounted-for and not "lost" as a result of poor inventory practices prior to a site's closure.

214.   As an example of this practice, in January and February 2013, many containers of items from site closures around FOB Fenty began to arrive at Bagram Air Base. Upon receipt of the containers, it was clear that proper procedures had not been followed by the Material Management personnel at FOB Fenty, or the respective closing sites. For example, no shipping or inventory paperwork accompanied the containers. The items in the containers were also improperly stored for shipment—many of the containers were not blocked and braced, hazardous material was comingled with consumable items, and sensitive items were mixed with non-sensitive items. The failure of FOB Fenty MMD personnel to follow proper protocol at the front end of the transfer created issues with taking an accurate inventory when the containers arrived at Bagram Air Base.

215.   The government was not notified of these inventory issues or lack of positive control and accountability, which was contrary to the proper management of government property required by the GPCS and MMP.

**C.  Schemes Above Were Also Used to Deceive Government Auditors In Order To Conceal Fluor's Inventory Frauds and Retain the Ability to Obtain Relief of Responsibility for Lost Inventory**

216.   The government through DCMA performed periodic audits of Fluor's inventory system, called Property Management System Analysis audits, or PMSA audits, in which auditors

conducted on-site visits of a particular Forward Operating Base to assess compliance with Fluor's contractual and regulatory obligations. As part of the PMSA audits, DCMA would check Fluor's documentation, and perform sampling of inventory to determine if the Maximo inventory matched physical inventories. Fluor had advance notice before the PMSA audits at each Forward Operating Base.

217.    In late 2010, Fluor failed three successive PMSA audits at three different sites. In response, the government issued a Letter of Concern to Fluor identifying systemic problems with Fluor's inventory control, and threatening, "The Contracting Officer may revoke the Government's assumption of risk for loss, theft, damage or destruction (LTDD). In that event, the Contractor would be held liable for any L TDD costs as a result of the failure to maintain adequate property management practices in accordance with the clause at FAR 52.245-1." Tony Montalvo, Fluor's Deputy Project Manager for the Materials Management Group, confirmed the stakes if Fluor failed further PMSA audits: "If DCMA deems that sufficient improvement is not being made then liability for LTDDs will be transferred to Fluor."

218.    From that point forward, in advance of PMSA audits, Fluor sent its own "pre-audit" team to each Forward Operating Base about to be audited, with the intention of concealing evidence of Fluor's inventory control failures and ensuring Fluor passed the audit. Among other things, the pre-audit teams would compare Fluor's inventory, as tracked in Maximo, with actual physical inventories. When they found discrepancies, they used the various schemes above to adjust the Maximo inventory to match what they had on hand, all without acknowledging the losses to the government.

219.    Indeed, Relators' independent analysis of Fluor's Maximo system reveals that, over and over, in the period immediately before a PMSA audit at a particular Forward Operating

Base, there was a spike in material being issued to Work Orders, including closed Work Orders.

220.    As an example, at FOB Eggers, just before the PMSA audits in October 2011 and December 2012, there was a spike in property being added to Work Orders that had been closed for at least 60 days. The same is true just before the PMSA audits at FOB Fenty in June 2011 and late June 2012.

221.    All of these actions were designed to conceal that, despite charging the government hundreds of millions of dollars to manage property and materials, Fluor failed to meet its contractual and regulatory obligations with regard to inventory tracking, and to ensure that regardless Fluor could continue to obtain relief of responsibility from the government for lost property.

### D. False Submissions to the Government Associated with the Material Losses and Concealment

222.    Through the actions above, Fluor submitted numerous false statements and claims to the government.

*Inventory Summary Reports*

223.    Fluor, through its Country Operations-Afghanistan group, submitted monthly Inventory Summary Reports and End of Year Inventory Summary Reports to the Government Property Administrator and DCMA falsely representing that 10% and 100% inventories were being done consistently across theater, that inventory accuracy was nearly perfect, and that inventory losses were minimal. As set forth above, none of these things were true.

224.    The monthly Inventory Summary Reports and End of Year Inventory Summary Reports also purported to provide information to the government about Inventory Adjustment Transactions—that is, Administrative and Negative Adjustments. These submissions were also false. As set forth above, Relators found numerous examples of improper and undocumented

Negative Adjustments that were not included on the Inventory Summary Reports submitted to the government, and Fluor did not reveal to the government that many of the Inventory Adjustment Transactions on those reports did not have the requisite supporting documentation to justify the adjustment to inventory (without the need to take a loss). The Reports were therefore false and contained material omissions by which Fluor avoided liability for lost property and materials.

225.    As one example of the false Inventory Summary Reports, on approximately October 30, 2012 Fluor's Materials Management senior leadership submitted an End of Year Inventory Summary Report for fiscal year 2012 to DCMA and the Government Property Administrator, covering the period from October 1, 2011 through September 30, 2012. That Report falsely reported that the Materials department had no losses to report. It contained additional falsehoods and material omissions, concealing that 10% and 100% inventories were not being conducted consistently; and that losses were disappeared by placing them in ghost bins, shifting them to unrelated or completed work orders, or simply deleting them. Evidence disputing the representations in the End of Year Inventory Summary Report include the following:

a.    On October 31, 2012, Rickey Mackey, Country Property Manager for Fluor,19 sent an email to Michael "Shane" Ramirez, Fluor's Theatre Material Manager, and Reeves, and copying a number of other Materials Management supervisors including Tony Montalvo, about the Fiscal Year 2012 Inventory Summary Report. Mackey communicated his concerns to Fluor Materials Leadership that the report of no losses was false because there were specific losses that were not included, as well as over 900 line items of materials, worth $791,426, that were missing and not available in inventory. He warned that "there are numbers

63

for losses that drastically contradict those quoted in the [End Of Year Inventory Summary Report]…These numbers do not add up so I'm asking to be sure what's being said here."

b.      In a November 11, 2012 email, Joshua Waggy ("Waggy"), the Fluor Government Property Supervisor, confirmed Mackey's concern. Waggy responded, "what was reported to the DCMA is beyond wrong, all they have to do is simple [sic] read some of the LTDDs to prove that and Fluor will not be sitting good for falsify [sic] their Inventory Reports to the USG."

c.      Indeed, an internal report on inventory adjustments for that period lists line items that add up to almost $19 million in losses just at Bagram Air Base, and over $121 million in losses throughout Fluor's area of operation in Northern Afghanistan. Over the same period of time, the internal inventory report lists 17,296 adjustments at Bagram, and 48,677 adjustments overall. None of those figures were included in the Inventory Summary Report provided to the government.

d.      As discussed above, numerous sites were not conducting 10% inventories and 100% inventories consistently, ¶¶147-167. Further to this point, in February to March 2012, Security's David Payne initiated multiple investigations into the loss of government property and discovered that numerous Fluor departments were not consistently completing the 100% Inventories and reporting them back to the MMD, which were reported to Material Management supervisors. In August or September 2012, a Level II CAR was issued to Fluor personnel at FOB Fenty for not properly conducting 100% Inventories. Likewise, Fluor's Materials Control Specialist at FOB Sharana from January through September 2012, Daniel Ristikj, found that when he arrived at the FOB there was no Materials Lead on site, tools and materials had been taken without accountability, and the materials yard was "wide open until August 2012," and that

64

when he attempted to perform a 100% Inventory, 722 line items were short, 315 lines were "overage," and only 57 lines were accurate. According to Ristikj, the total value of lost government property items from that inventory amounted to $185,669.89. None of this was reported in the End of Year Inventory Summary Report, which instead gives the exact opposite impression.

226.    As another example, Fluor's Security group discovered that in Fiscal Year 2012, six perfect inventories (five of which were consecutive) were reported by the Materials Management supervisors at FOB Salerno. Security reviewed the corresponding original physical inventory count sheets compared to the same line items in Maximo and found that the data in Maximo showed an entirely different outcome: a significant number of the items had shortages, while some had overages. In short, the identified discrepancies clearly showed that the inventories were not perfect at all. Moreover, physical count sheets at FOB Salerno were also found to be incomplete or altered. In one case, there were two sets of count sheets for each month: the original documents that showed discrepancies were sent to Fluor's Country Document Data Management group (responsible for archiving documents for the work on Task Order 05), while the second set of documents were altered to show no discrepancies and remained at FOB Salerno for DCMA audit purposes.

*LTDD Reports*

227.    Fluor's LTDD Reports, submitted on a monthly basis by the Country Operations-Afghanistan group, and supporting records, were also false and contained material omissions. Through the fraud discussed above, Fluor submitted LTDD reports representing that losses were minimal, and well within the 2% industry standard rate of loss (and therefore supportive of larger award fees). But Fluor knew that its losses were much bigger, and that the LTDD Reports it

65

submitted should have contained millions of dollars in additional losses that were concealed in, *inter alia*, fraudulent and unauthorized Negative Adjustments, DRMO/"ghost" bins, previously completed and unrelated Work Orders, and purported transfers to other bases.

228.    An example of false LTDD Reporting, in January 2012 Fluor Security was notified by Material Controls Supervisor Michael Brooks that lumber was missing at FOB Deh Dadi II. The resulting investigation revealed that the missing lumber line items had been deleted from Maximo. Moreover, the Fluor employee who made the deletion put a note in Maximo stating that he was instructed by Fluor RDC Manager Mark Cotharn to make the deletions. Under Cotharn's management, monthly inventories were not being conducted consistently or accurately. No LTDD report was promptly initiated concerning the missing and improperly deleted lumber, which was valued at $127,047.36. The Security team prepared a report concerning the missing Deh Dadi II lumber, but Materials Management supervisors refused to submit the report to the Government Property Administrator (over Security's objections), and did not provide evidence to refute the findings made in Security's report. The LTDD Reports Fluor submitted for January 2012, amounting to $286,979.63, did not include the lost lumber, nor did the subsequent LTDD reports through December totaling $5,458,675.96.

229.    As another example, in the instances when monthly 10% inventories actually were conducted, Fluor did not promptly report the losses as required, and instead concealed them through the means discussed above. At FOB Salerno, an April 2012 internal assessment found that there were 109 shortages found during the October 2011 10% monthly inventory and 51 shortages found during the November 201110% monthly inventory, but that none of those shortages were included in an LTDD Report. These omissions are also further evidence of the false representations and omissions in Fluor's November 2012 End of Year Inventory Summary

Report, discussed above.

230.    As another example, at FOB Salerno a $1.25 million shortage was found, but no corresponding LTDD report was ever initiated. In approximately January or February 2013, Security's David Payne found that some of those line item losses had been adjusted out of Maximo, so that the losses effectively disappeared.

231.    In June of 2013 Mackey's LTDD Senior Specialist, Amir Jetshi, informed him that sixteen LTDD reports that they sent to Reeves' office had not been approved and returned for submission to DCMA and the Government Property Administrator. When Mackey asked Reeves about the reports, Reeves informed him that the reports would not be endorsed and that, contrary to the regulations and Government-approved Controlling Plans, Fluor would roll the LTDDs into an eventual larger LTDD report later. When Mackey questioned Reeves about the propriety of this plan, Reeves became visibly angry. When Mackey followed up with Ernest Ridley ("Ridley"), Fluor's LOGCAP Material Manager in Greenville, Ridley confirmed that the LTDDs should be processed and reported to the government. However, the unreported losses continued to pile up, and by July 2013 there were over 400 open LTDDs that should have been reported to the government, but were not, comprising property worth tens of millions of taxpayer dollars. Mackey continued to complain and raise his concerns, including all the way up to Steve Whitcomb, Fluor's Country Program Manager, but Fluor's leadership continued to ignore the systemic problems.

232.    Consistent with all of the above, on or about December 8, 2012, Security's David Payne interviewed David Erp, the RDC Manager overseeing FOB Sharana. Erp was trying to close out FOB Sharana's books as he was scheduled to soon demobilize from the LOGCAP project. Erp stated that the majority of the loss adjustments were not reported through the

required LTDD reporting process. He also stated that the reasons for loss of government property included, amongst other things, failure to follow proper procedures, a lack of qualified personnel onsite, and a lack of management in ensuring compliance with policies and procedures.

*Corrective Action Reports and Corrective Action Plans*

233.    Fluor's Corrective Action Reports, and responses to government-approved Corrective Action Plans, were also a sham. These provided a mechanism by which Fluor was to honestly report its failures, fixes were supposed to be implemented to prevent future losses, and Fluor was to confirm that the issues had been resolved. In reality, Fluor's Corrective Action Reports concealed the vast majority of losses, and in turn concealed the true reasons for the losses and the true steps needed to correct the problem. In addition, Fluor falsely represented that even the modest fixes it committed to make (to misreported problems) had been done.

*False Billing for Labor*

234.    In addition to all of the above, Fluor submitted false cost reports and invoices seeking payment for work associated with inventory management and control that was not performed, including in particular 10% and 100% inventories.

235.    By way of background, for each year of the Task Order 05 contract starting with transition, Fluor calculated the total hours necessary to complete the work required on Task Order 05. It did this by creating Bases of Estimates, or BOEs, which contain a detailed breakdown of all of the tasks to be performed on the contract, and the amount of time needed to complete each task at each Forward Operating Base (FOB) and Material Management Group (MMG) Regional Distribution Center (RDC). Those hours were then used to determine the amount of personnel needed to complete the work, including their tiers and levels (which dictate their salary and benefit costs).

68

236. The BOEs translate directly to damages because the primary function of the BOEs is to determine, and justify, the total personnel Fluor could hire to perform the work required under Task Order 05. Once personnel were hired, Fluor billed at 12 hours per day, every day (excluding R&R leave). They billed to broad categories called charge codes; Materials Management personnel billed to charge code D270. These charges were then rolled up into Fluor's invoices to the government, one category of which was reimbursement for labor costs. In sum, the BOE justified the total personnel sent to work on Task Order 0005, including their tiers and levels (*i.e.*, their seniority and therefore their pay); and the total personnel dictated the total labor charges to the government, because every person billed the government for a full day, every day.

237. As a result, every hour estimated in the BOEs for 10% inventories and other inventory tasks justified additional inventory personnel, and resulted in charges to the government for each of those additional inventory personnel.

238. In its Materials Management BOE for the period from July 1, 2011 through June 30, 2012, Fluor estimated it would take 450,360.24 hours to perform 10% inventories across all sites, requiring 209 inventory personnel just to perform that task. Based on Relators' knowledge of the full salary burden to the government of each category of employee Fluor justified through the BOE, Fluor's total labor cost to the government for 10% inventories was $11,125,724 for that one year. Including the additional mobilization/recruiting costs, base life supports costs, and other costs for each employee that Fluor passed on to the government adds an additional $4,321,600 approximately for that one year. And adding the one-time mobilization/recruitment fee Fluor charges the government for each Task Order 05 employee adds another $3,606,108. In total, the cost to the government of the Fluor personnel hired to conduct 10% inventories was

approximately $15,447,324 per year.

239. Fluor's internal assessments provide additional evidence of the improper billing for labor associated with 10% inventories.

a. As an example, as discussed above, a late 2012 management self-assessment report looked at inventory accuracy at FOBs Bagram, Sharana, Marmal, Spann and Phoenix, and found that "Ten percent monthly inventories are not being performed consistently throughout the project." *See* ¶ 155. Likewise, Fluor's internal reports documenting the failure to conduct 10% inventories at numerous sites, including at FOB Marmal throughout the period from July 2010 through April 2013. Yet, for the period from July 1, 2011 through June 30, 2012, Fluor's BOE was used to justify 9,973.40 monthly hours to perform 10% inventories at FOB Bagram, requiring 55.41 people for that site; and to justify 1,212.80 monthly hours to perform 10% inventories at FOB Marmal, requiring 6.74 Materials personnel just for that site. Each of those Materials personnel then bill 12 hours per day to the Materials charge code, which in turn is rolled up as part of Fluor's claims for reimbursement of labor costs.

b. The same was true at the smaller FOBs. Fluor's internal assessments found a number of months in which 10% inventories were not conducted at FOBs Alamo, Dubs, ISAF, Morehead, and Pol e Sharki. The reasons given were that "Site personnel were unaware of requirement" or that there was no permanent Materials staff at the site and that "Neither site management, nor Materials management arranged for any personnel to conduct inventory." Yet, Fluor justified the need for more than 10 employees by representing that it would be conducting 10% inventories at those sites. At Alamo, it justified 8.4 Materials personnel and 3.49 people specifically for 10% inventory functions; at Dubs, it justified 6.77 Materials personnel and 3.08 people specifically for 10% inventory functions; at Morehead, it justified 7.88 Materials

personnel and 3.22 people specifically for 10% inventory functions; at ISAF, it justified 1.56

Materials personnel and 0.88 people specifically for 10% inventory functions; and at Pol e

Sharki, it justified 0.92 Materials personnel and .54 people specifically for 10% inventory

functions.

240.    Through the actions above, Fluor submitted bi-weekly cost reports to the

government through its Government Contract Management group, as well as invoices and related

claims for payment through the definitization process that were false.

## VII.    Fluor Falsely Reports Its Contract Performance To The Government, Allowing it To Earn Massive Award Fees

241.    As discussed above, award fees and fixed fees are a special incentive, for above-

average to exceptional performance across a number of established metrics.

242.    Based on all of the fraudulent conduct discussed above, Fluor's actual

performance on those metrics was poor. Fluor knew that, and much of the fraudulent

concealment discussed above was for the very purpose of preserving Fluor's ability to earn these

incentive fees worth hundreds of millions of dollars.

243.    To that end, Fluor made false representations and material omissions in its

submissions to the Award Fee Evaluation Boards responsible for determining if and how much

to award Fluor in incentive fees.

*Regulations Related to Award Fee Payments*

244.    The Federal Acquisition Regulations provide for managing and overseeing the

award fee process for Cost Plus Award Fee contracts.

245.    FAR 16.405-2, "Cost-Plus-Award-Fee Contracts," states that the amount of the

award fee to be paid is determined by the Government's evaluation of the contractor's

performance in terms of the criteria stated in the contract.

71

246. The Contract in this case provides that: "The payment of any award fee is contingent upon earning a performance rating of good, very good or excellent." Contract, § H-35.f. The amount of the fee rises with each higher rating.

247. The Award Fee Evaluation Board evaluates the contractor's performance semiannually by reviewing the contractor's written self-assessment as well as the assessment of government representatives. Contract, § H-35.d. Contract Clause H.36.d(6) provides:

> The LOGCAP Award Fee Evaluation Board (AFEB) will evaluate Contractor performance on each CPAF [Cost Plus Award Fee] task order not less than semi-annually by:
> (a) Reviewing Contractor performance as measured against the LOGCAP award fee evaluation criteria.
> (b) Reviewing the Contractors written assessment describing its performance during the evaluation period.

248. Under the Contract, Fluor's written self-assessment is due within five working days prior to the end of the evaluation period. Contract, § H.36.d(7). "This written assessment of the Contractors performance throughout the evaluation period should contain any information that may be reasonably expected to assist the AFEB in evaluating the Contractors performance."

249. Based on its evaluation of the contractor's performance, AFEB recommends an award to the Award Fee Determining Official, who makes the final decision about the amount of the award fee. Contract, § H.36.e.

*Award Fee Process*

250. During the Cost-Plus Award Fee period from July 2009 through June 2012, the award fee was paid out of the Award Fee Pool. That Pool was 6% of the total costs Fluor incurred under the Contract (in addition to the 1% base fee).

251. While the base fee was paid "for minimal performance" of Contract requirements, the award fee is defined as "a fee amount that is earned by the contractor for performance above

72

that minimally required by the contract/task order." The "award fee is not presumed, but is a fee earned via demonstration of performance in accordance with . . . established award fee factors, criteria, and weights."

252.    Indeed, as the Task Order 05 Contract indicates, "contractors should not receive an award fee (above the base fee) for simply meeting contract requirements." Instead, Fluor began "each evaluation period with 0% of the available award fee and work[ed] up to the evaluated fee for each evaluation period." The U.S. Army Contracting Command made clear that the award fee was to be 0% for "acceptable performance" and an award fee of 100% was only to be given upon demonstrating "exceptional performance."

253.    Reflective of the fact that government award fees are not assumed, for the period from January through April 2008, the Army granted no award fee to KBR based on dissatisfaction with KBR's contract performance on LOGCAP III.

254.    The government had total discretion to grant or deny an award fee, and to set the amount. Pursuant to the Task Order 05 Contract, "amount of the award fee to be paid" was to be "determined by the Government's subjective evaluation of the contractor's performance" based on specific "criteria stated in the contract", and the "determination and…methodology for determining the award fee [we]re unilateral decisions made solely at the discretion of the Government."

255.    This discretion was exercised through a semi-annual evaluation of Fluor's performance by members of the Award Fee Evaluation Board, as well as by other government technical representatives.

256.    As part of this evaluation, Fluor was to submit to the Prime Contracting Officer a written Award Fee Self-Assessment, and conducted a self-assessment Briefing (a slide

73

presentation) directly to the AFEB, where it made representations about its performance on the specific performance criteria in order to justify a higher fee.

257.    In addition to Fluor's written Self-Assessments and Briefing to the AFEBs directly (each of which is discussed specifically below), the AFEB members also relied on information provided to them by government agencies such as the Defense Contract Management Agency, Defense Contract Auditing Agency, and Army Sustainment Command about how well Fluor performed its contractual obligations under the Performance Work Statement. Those agencies, in turn, reported to the AFEBs based on the routine reports and documentation Fluor submitted to them, along with their own periodic audits. One of the ways in which Fluor communicated information to the agencies, which in turn shared it with the AFEBs, was through Functional Area Assessments; the information communicated to the agencies through FAA Reports became part of the "Government Brief" submitted to the AFEBs.

258.    The Government Briefs routinely contained detailed information and metrics regarding Fluor's performance in the area of inventory management and government property control. That information was provided by Fluor, which submitted such information in, among other fora, its presentations to the Government Property Issues Council ("GPIC"). The GPIC included representatives from Army Sustainment Command and DCMA. The GPIC data would in turn be presented to AFEBs in the "Cost / Schedule" portion of Fluor's AFEB presentations as part of Management Cost & Control, and additionally to the AFEBs through the Government Brief that included information from agency representatives on the GPIC.

259.    DCMA and DCAA also prepared formal slide presentations to the AFEB during each award fee period, in which they relied on Fluor's ongoing representations to provide their summary assessment of Fluor's performance.

74

*Award Fee Criteria*

260.    The award fee criteria consist of a detailed formula. Overall, there are two components to the Award Fee: 1) Indefinite Delivery Indefinite Quantity ("IDIQ") Award Fee, and 2) Task Order Award Fee. The IDIQ Award Fee component was based on Fluor's overall corporate performance. The Task Order Award Fee component was based on Fluor's performance in the field (i.e., Northern Afghanistan).

261.    The IDIQ Award Fee (15%) was based on the following three areas of performance:

| Area of Performance | Award Fee Weight |
|---|---|
| Corporate Management | 40% |
| Corporate Business Systems | 40% |
| Subcontracting | 20% |

262.    Average Contractor performance in these areas would be insufficient to qualify a Contractor for an award fee. An Average rating in the Corporate Management Area of Performance would be given if, in relevant part, the Contractor "responds to Government requirements, but has some difficulty performing in a timely manner," provides the contracting officers with "briefing on program status" and informs them "of potential problems," and takes corrective actions "before most issues become a problem." In the Corporate Business Systems Area of Performance, an Average rating insufficient for an award fee would be given if "[l]ittle interest is shown in improvement of the business systems," "Contractor has difficulty maintaining approval of the business system," "additional cost or delay in schedule for operations as a result of problems with business system," and "[f]requent prodding or constant surveillance required by the Government to ensure proper progress is maintained."

263.    The Task Order Award Fee criteria fall into four general areas of performance:

| Area of Performance | Award Fee Weight |
| --- | --- |
| Technical Performance | 40% |
| Project Management | 20% |
| Cost/Schedule Management | 20% |
| Cost Control | 20% |

264.    Expectations are broken down further within each category:

Technical Performance (40%): Schedule adherence; **Timeliness, Responsiveness, and Communications; Quality of work**; Government direction required; Surge requirements.
Project Management (20%): **Communication**; **Problem resolution;** Government direction required; **Quality.**
Cost/Schedule Management (20%): Schedule adherence; Timeliness; **Quality**; **Responsiveness**; Government direction required.
Cost Control (20%): **Accurate and detailed reports**; **Optimum use of resources**; **Provide recommendations/solutions to controlling costs**; **Early communications with Government.**

265.    And more specifically, Average Contractor performance in these areas would be insufficient to qualify a Contractor for an award fee. An Average rating in the Technical Performance Area of Performance would be given if, in relevant part, "[m]ost contractor-controlled schedules are met," "caliber of work is good," and "Government direction is required." In the Project Management Area of Performance, an Average rating would be given if "Contractor has some difficulty with communication with the Government," the Government contracting official "is briefed on only the basic program status and is not informed of potential problems in advance." "[p]roblem resolutions often require Government assistance," "[c]orrective actions are not always taken before issues become a problem," "Contractor demonstrates accounting practices that identify and implement very few cost reduction strategies," and "Contractor has some difficulty managing personnel and deployment issues." In the Cost/Schedule Management Area of Performance, an Average rating would be given if the Contractor fails to "take[] measures to avoid cost/schedule growth," and to "provide[] accurate cost and schedule estimates for tasks." In the Cost Control Area of Performance, "[w]henever

76

there is a significant cost overrun that was within its control, a contractor will be given a score of zero."

266.    Performance consistent with the descriptions above would be *insufficient*; performance *better* than the descriptions above was necessary to receive a score high enough to receive an award fee. As detailed in this Complaint, Fluor's performance on the IDIQ Areas of Performance and Task Order Areas of Performance was at or below an Average rating.

267.    The AFEB evaluated Fluor's performance using a scoring system from 0 to 100, where specific scores were associated with a particular adjectival "Performance Standard" ranging from Average to Excellent, and each Performance Standard dictated what percentage of the Award Fee Pool Fluor could earn during that performance period (see TO 05 Contract at 177):

| Performance Standard | Performance Standard Defined | Numerical Rating (Score) | Percent of Award Fee To Be Earned |
|---|---|---|---|
| Average | Contractor's performance is the minimum required level to meet needs. Areas of good performance are offset by deficiencies and problems, which reduces performance to a level that is minimally acceptable under the contract. | 0-70 | 0% |
| Good | Contractor exceeds some contract requirements in a manner demonstrating commitment to the program. Work completed is much better than minimum required performance. Areas of deficiency and minor problems are more than off-set by areas of good performance. | 71<br>72<br>73<br>74<br>75<br>76<br>77<br>78<br>79<br>80 | 4%<br>8%<br>12%<br>16%<br>20%<br>24%<br>28%<br>32%<br>36%<br>40% |
| Very Good | Performance is of high quality and approaching the best that could be performed by a Contractor. Work completed greatly exceeds an average performance level. A few minor problems are | 81<br>82<br>83<br>84<br>85<br>86<br>87 | 44%<br>48%<br>52%<br>56%<br>60%<br>64%<br>68% |

| | experienced during the evaluation period without impacting the overall level of performance. | 88 89 90 | 72% 76% 80% |
| Excellent | Performance is of the highest quality that could be achieved by a contractor under the contract. There are no areas of material deficiencies or performance problems encountered during the evaluation period. | 91 92 93 94 95 96 97 98 99 100 | 82% 84% 86% 88% 90% 92% 94% 96% 98% 100% |

268.    So, earning any award fee at all was contingent on Fluor receiving a performance score above 70. A performance score of 70 or below meant that no award fee would be paid for that performance period at all. Furthermore, the percentage of the award fee to be paid for any score above 70 was set out in concrete and non-discretionary terms with each score from 71 through 100 corresponding to a specific percentage amount.

269.    As discussed in detail in this Complaint, Fluor engaged in knowingly fraudulent conduct and failed to meet its contractual obligations (let alone exceed them); it engaged in fraudulent schemes to conceal its poor performance from the Government; and it additionally submitted self-assessments and briefings to the AFEBs that were knowingly false.

270.    As set forth below, if Fluor had not vastly misrepresented its failure to meet its contractual requirements, and concealed its non-compliance from the AFEBs through fraudulent schemes, it would not have received a score of 70 in any of the first three years of the contract, and therefore would not have received any award fees at all, let alone the $138.5 million in incentive fees the government paid it.

271.    In the alternative, truthful representations would have certainly resulted in a lower score, and hence a smaller award fee. Indeed, pursuant to the scoring system above, even a 10 point drop in Fluor's score, from 88 (the highest score it ever received) to 78, would have

78

reduced its award fee by more than half, from 72% to 32% of the Award Fee Pool of 6% of incurred costs.

272.    Through the frauds discussed above and below, independently and in the aggregate, Fluor increased its AFEB scores, and in turn obtained award fees it had not earned and to which it was not entitled.

**A. Fluor's Government Property Fraud Resulted in False Award Fee Submissions and Fraudulently Obtained Award Fees**

273.    Fluor represented to Award Fee Evaluation Boards and government agencies participating in the AFEBs including DCMA and DCAA that its Maximo data was accurate and reliable, and that it was using Maximo as its government-approved Materials Management Accounting System; that it was consistently conducting monthly 10% inventories and annual 100% inventories in accordance with the Materials Management Plan, and that its inventory accuracy consistently exceeded its 95% goal; and that its inventory losses were extremely low— and in fact were routinely orders of magnitude less than the industry standards of 2%.

274.    For all of the reasons discussed in Section VI above, which is references and incorporated herein, those representations were false.

275.    For example, Fluor's reporting of property losses—that is, its LTDD reporting— was knowingly false.

276.    Jeff Nix, a Fluor Compliance Manager, discovered that Fluor misrepresented the number of LTDD events that had occurred in each of Fluor's biannual self-assessment reports to the AFEB. Fluor misrepresented the number in two different ways.

277.    First, as explained above, Fluor simply deleted property losses out of Maximo as undocumented Negative Adjustments, hid lost material on completed or unrelated work orders, and engaged in various additional fraudulent schemes to conceal property losses. In this way, it

hid losses in the large majority of instances where an LTDD report was required, ensuring that whatever LTDDs it did report would be vastly understated.

278.    Second, Fluor counted only a subset of its LTDD reports (already artificially low due to the practice noted immediately above) when it prepared its self-assessment reports for the AFEB. This can be seen by comparing (1) Fluor's LTDD database maintained by the Property Department, with (2) Fluor's self-assessment reports submitted to the AFEB (including Fluor's back-up information for the reports).

279.    Fluor's LTDD database consists of every LTDD report prepared by Fluor. Fluor's self-assessment reports to the AFEB state the number of LTDD events during the reporting period as a percentage. The percentage is the ratio of the value of all LTDD reports in the reporting period divided by the total value of all property in inventory.

280.    In order to receive a rating of good, very good, or excellent for the performance category of "Materials and Property Management," Fluor tries to keep the percentage of LTDD events as low as possible. The industry standard for LTDDs is 2% of all inventory. In order to qualify for the highest possible performance evaluation, Fluor sought to keep its LTDD rate below 2%. The smaller the percentage, the higher Fluor's performance evaluation, and corresponding award.

281.    Nix compared Fluor's LTDD database with Fluor's reports to the AFEB. He discovered that the number of LTDD reports in the former was much greater than the number relied upon by Fluor in the latter.

**282.**    Following is a chart showing the discrepancy between (i) the number of LTDD reports in Fluor's LTDD database (again, which itself only contained a fraction of the actual LTDD events given the fraudulent schemes Fluor used to hide property losses) and (ii) the

80

number of LTDD events that Fluor reported to the AFEB. This chart is for the period January

2011 through June 2012 (the period for which Nix had access to complete records at the time of

his audit). After June 2012, the Contract became a fixed price contract and reports to the AFEB

were no longer required (because there was no longer an award fee).

**LTDD Comparison Table**

| Number of LTDD Reports 2011 | LTDD Database | AFEB Backup |
|---|---|---|
| Jan | 491,446.06 | 286,979.63 |
| Feb | 496,571.41 | 312,597.22 |
| Mar | 2,748,400.98 | 340,512.74 |
| Apr | 3,058,765.31 | 188,857.67 |
| May | 1,968,137.30 | 157,588.97 |
| Jun | 1,340,012.99 | 126,401.01 |
| Jul | 584,348.35 | 2,584,263.78 |
| Aug | 605,095.22 | 751,244.86 |
| Sep | 410,941.42 | 516,688.58 |
| Oct | 2,128,901.67 | 15,453.64 |
| Nov | 437,308.43 | 47,553.96 |
| Dec | 3,829,434.97 | 130,533.90 |
| **Total** | **18,099,364.11** | **5,458,675.96** |

| Number of LTDD Reports 2012 | LTDD Database | AFEB Backup |
|---|---|---|
| Jan | 1,418,486.53 | 218,868.73 |
| Feb | 630,903.16 | 2,472,593.33 |
| Mar | 2,838,477.20 | 745,908.18 |
| Apr | 1,233,775.59 | 2,412,457.12 |
| May | 2,756,517.20 | 32,990.73 |
| Jun | 1,539,423.08 | 23,998.52 |
| **Total** | **10,417,582.76** | **5,906,806.61** |

283.    Fluor presented a series of slides biannually to the AFEB on its performance on

different aspects of the Contract, including management of property and materials in inventory.

In each biannual slide presentation, Fluor falsely reported that its LTDD ratio was below 2% by

deliberately excluding many of its LTDD events.

284.    Fluor's January 1 – June 30, 2011 AFEB Report under Task Order 5 states, *inter alia*, that "LTDDs total only **0.23%** of the property book dollar value," exceeding the LTDD industry standard of 2% and showing "good stewardship of Government . . . property." [Emphasis in original.]

285.    Fluor's July 1, 2011-December 31, 2011 AFEB report states that Fluor had "achieved **0.05%** LTDD rate, **40** times better than industry standard of 2%." [Emphasis in original.]

286.    Fluor's January 1, 2012 – June 30, 2012 AFEB Report states that total LTDDs "averaged **0.05%** of the property book dollar value" and "demonstrated good stewardship" of Government property. [Emphasis in original.]

287.    Nix informed Fluor senior managers Shane Ramirez, Jerrold Reeves, and Ed Nukic, among others, of discrepancies between the LTDD database and LTDDs as reported to the AFEB.

288.    In April 2013, Fluor's Government Property Supervisor, Theater Property Book, Amir Jetishi, confirmed that only LTDDs where Fluor received "relief of responsibility" were reported to the AFEB. He conceded that the government directed that *all* LTDDs, without regard to whether Fluor had already been given "relief of responsibility," be included in reports to the AFEB.

289.    In an email on April 4, 2013, Deputy Theater Property Manager Nukic also confirmed that LTDD data in Fluor's database should match the numbers for all LTDDs in monthly backup reports utilized for AFEB reporting or "otherwise someone was taking some liberty with data." He further indicated that such liberties were not being taken by him or his

82

team, suggesting the actions were being dictated by higher-ups.

290.    In addition to the above, additional evidence that Fluor's loss rates reported to the AFEBs were wholly fabricated is discussed at Paragraphs 227-232.

291.    There are additional indicators that Fluor grossly misrepresented its losses in its reports to the government. A November 2013 internal presentation within Fluor discussed that Fluor actually maintained three separate systems for tracking property loss: Maximo, Memo and E- Tools. Maximo was supposed to be Fluor's government-approved system of record/MMAS, including for LTDDs, but contained "incomplete LTDD data." Memo was a Fluor-developed MS Access database that it used in lieu of Maximo, and that Fluor considered the "baseline" for LTDD management. And E-Tools was the government's system for tracking LTDDs, which Fluor used to submit LTDDs for relief of responsibility. The value of loss Fluor reported in each system was vastly different. Fluor submitted LTDDs to the government through E-Tools reflecting a loss of approximately $26.3 million from 2009 through 2013. But its internal tracking reveals that its losses over that period were much larger. Maximo indicated that Fluor's actual loss over that period was closer to $62 million, and Fluor's internal tracking of LTDDs through Memo indicated that Fluor's actual loss over that period was approximately $67.5 million.

292.    This is just one category of misrepresentations to the AFEBs related to Fluor's mismanagement of government property and inventory losses discussed in Section VI above. Fluor also made knowing misrepresentations to the AFEBs about its performance of monthly 10% inventories, its use of Maximo as a system of record, and its inventory accuracy.

293.    These were material misrepresentations. Indeed, the AFEBs, in their written decisions explaining their scoring and the award fee percentage, routinely cited Fluor's false

83

representations about its loss rates and its overall stewardship of government property.

**B. Fluor Falsely Represented That It Mitigated and Repaired Life, Health and Safety Issues Within Strict Compliance Times Set Forth in Contract And Fraudulently Obtained Award Fees**

294.    A central component of Fluor's LOGCAP IV contract is to manage and operate a customer service desk at each of the more than 70 Forward Operating Bases included in Task Order 05.  These service desks are contracted to initiate necessary services and repairs for facilities located on these bases within Fluor's stewardship. Service orders that are called in to the Fluor service desk are separated into three categories: 1) Priority 1 Emergency Service Orders (for situations that pose an immediate danger to life, health, or safety); 2) Priority 2 Urgent Service Orders (for situation that are urgent but non-life threatening; and 3) Priority 3 Routine Service Orders.

295.    Each service order type has very specific response and repair times, per the Performance Work Statement and Materials Management Plan.

296.    In terms of Emergency Service Orders, Fluor has two hours to respond from the time that the order is called into the Fluor service desk.  This response time is absolute, meaning that Fluor must respond within two hours 100% of the time. Fluor was supposed to send a Fluor technician to examine the danger, determine if it could be immediately remedied, and if not, mitigate it so that it no longer posed a serious risk of injury to personnel located at that facility (*e.g.*, a risk of electrical shock). Once the issue was mitigated in this way, Fluor was allowed a longer period of time in which to repair the issue.

297.    By comparison, for Urgent Service Orders, Fluor must respond within 24 hours 100% of the time, and must complete repairs within 72 hours 75% of the time.

298.    For Routine Service Orders, Fluor must respond within 72 hours 100% of the time and repairs must be completed within 14 days 75% of the time.

84

299.    Fluor consistently reported to the government that it was in compliance with these response and repair times. For example, it reported near-perfect compliance with the two-hour response time requirement for Priority 1 Emergency Service Orders. In reality, Fluor rarely responded within two hours to these Emergency Service Orders and instead represented to the government that it was in compliance when in fact it knew it was not.

300.    Fluor knowingly and fraudulently misreported its response and repair times to the government, and concealed evidence of its non-compliance through various schemes. Among them:

a.    In blatant disregard for the safety of U.S. military personnel, Fluor routinely recorded the time of its response immediately when the emergency was called in; even though at that point no Fluor technician had even laid eyes on the problem. By doing so, Fluor falsely claimed near perfect compliance with the two hour response time requirement for Priority 1 Emergency Service Orders. Moreover, Fluor would routinely leave the life, health, and safety issue unmitigated until it could schedule a technician to repair it, which was almost always far longer than the two hour response time requirement. The result is that these life, health, and safety issues went unmitigated for days, and often weeks, before Fluor even examined the problem, let alone actually repaired it.

b.    Because of the lack of inventory control discussed below, Fluor routinely did not have the materials it needed to conduct repairs within the required completion times for Priority 2 Urgent Service Orders (72 hours) and Priority 3 Routine Service Orders (14 days). To conceal the resulting non-compliance, staff would close the Service Orders and then re-open them later when the materials arrived, so that they would not be out of compliance. A Fluor employee contemporaneously documented this conduct in a 2011 email, describing the scheme

85

communicated to her as follows: the individual indicated that "nothing is left in WMATL [Waiting Materials status] that will take longer than the allotted completion time so nothing is out of compliance. The ticket is simply completed and then requires a 'new' ticket to order materials." In this way, Fluor made it appear that it was in compliance with repair times for Priority 2 and Priority 3 Service Orders, when in fact the opposite was true.

c.      Similarly, Fluor lowered the classifications of non-compliant Service Orders so that they would come into compliance. So, for example, if the response time on a Priority 1 Emergency Service Order was not met, it re-classified the Service Order as an Urgent or Routine Service Order if doing so would make the response time appear to be compliant. Likewise, if the 72 hour completion time for a Priority 3 Urgent Service Order was not met, Fluor would re-classify it as a Routine Service Order if that would create the impression that the completion time was compliant.

d.      Fluor also manipulated the Service Order classifications by reclassifying some Service Orders into a new "Priority 4" classification that was "off-the-books" and unapproved by the government. In other words, Service Orders placed in a Priority 4 status, for all intents and purposes, did not exist; they were not included in Fluor's reports to the government on response and completion times. By reclassifying non-compliant Service Orders as Priority 4, Fluor was able to make its rate of compliance on Priority 1, 2 and 3 Service Orders falsely appear much higher.

301.    In its monthly compliance reports to the government, and in its AFEB submissions, Fluor reported to the government perfect or near-perfect compliance rates with the two-hour response time requirement for Emergency Service Orders, and reported that it met the repair and response times for Urgent and Routine Service Orders. It knew these representations

86

were false.

302.     Fluor's July 7, 2009 – June 30, 2010 AFEB Report under Task Order 5 states, *inter alia*, that Fluor's response times were nearly perfect, and that it repaired or mitigated Priority 1 Emergency Service Orders in less than the required two hours 98.2% of the time, that it repaired Priority 2 Urgent Service Orders in less than the required 72 hours 98.2% of the time, and that it repaired Priority 3 Routine Service Orders in less than the required 14 days 97.8% of the time.

303.     Fluor's July 1, 2010 – December 31, 2010 AFEB Report under Task Order 5 states, *inter alia*, that Fluor's response times were nearly perfect, and that it repaired Priority 2 Urgent Service Orders in less than the required 72 hours 97.3% of the time, and that it repaired Priority 3 Routine Service Orders in less than the required 14 days 96.5% of the time.

304.     Fluor's January 1, 2011 – June 30, 2011 AFEB Report under Task Order 5 states, *inter alia*, that Fluor's response times were nearly perfect, and that it repaired Priority 2 Urgent Service Orders in less than the required 72 hours 96.15% of the time, and that it repaired Priority 3 Routine Service Orders in less than the required 14 days 96.8% of the time.

305.     Fluor's July 1, 2011 – December 31, 2011 AFEB Report under Task Order 5 states, *inter alia*, that Fluor's response times were nearly perfect, and that it repaired Priority 2 Urgent Service Orders in less than the required 72 hours 97.11% of the time, and that it repaired Priority 3 Routine Service Orders in less than the required 14 days 95.88% of the time.

306.     Fluor's January 1, 2012 – June 30, 2012 AFEB Report under Task Order 5 states, *inter alia*, that Fluor's response times were perfect, and that it repaired Priority 2 Urgent Service Orders in less than the required 72 hours 97.22% of the time, and that it repaired Priority 3 Routine Service Orders in less than the required 14 days 96.87% of the time.

307. The reality is that Fluor was rarely in compliance. As set forth above, its response times were a sham, in that its response time was often logged as the time the call came in. And across all three types of Service Orders, Fluor had a repair completion rate of around 27%, yet routinely reported to the government that it completed repairs within the allotted time periods 77% percent of the time.

308. Fluor's internal communications contain examples of the practices used by Fluor personnel to boost their life, health and safety compliance figures. Examples include the following:

a. In an October 2011 email, a Fluor employee documented a conversation with a tradesperson at FOB Bagram responsible for performing repairs, in which the tradesperson made clear that his team "completed service orders when there were no materials available so they would not be out of compliance." The tradesperson also expressly requested that a Priority 2 Service Order be changed to a Priority 3 so that he would have more time to respond.

b. Analysis of Fluor's Maximo system reveals 6,638,843 different Service Orders with an "off-the-books" Priority 4 classification (excluding preventive maintenance Work Orders, which are not part of Service Order reporting); of those, 47,450 Service Orders specifically designated as tracking repairs on facilities had for some period of time been given a Priority 4 classification; of the Priority 4 Service Orders currently designated as such in Maximo, approximately 2/3 of them had previously been a Priority 1, 2, or 3 in Maximo,

309. Put simply, Fluor's compliance times were nowhere near the 96-100% compliance with Priority 1, 2, and 3 response times and repair times.

310. These were material misrepresentations. Indeed, the AFEBs, in their written

decisions explaining their scoring and the award fee percentage, routinely cited Fluor's false representations about its Life, Health and Safety compliance times. For example, during the first half of 2011, the AFEB relied on Fluor's false representations about its compliance times, taking figures directly from Fluor's presentation and reciting them in its award fee determination, stating that "Fluor exceed[ed] its repair contractual requirements for urgent service orders by 21.15% and for routine service orders by 21.80%." And for the first half of 2012, the AFEB relied on Fluor's false representations about its compliance times, stating in its award fee determination that "emergency response continued to be an area of strength for Fluor."

## C. Fluor Made False Representations About Its General Health And Safety Record And Fraudulently Obtained Award Fees

311.    Fluor is required to report all "recordable" safety violations and accidents to the government.  These "recordable" incidents are factored into what is called the Total Case Incident Rate ("TCIR"), an important factor considered by the Award Fee Evaluation Board when determining a contractor's bi-annual award fee. Fluor consistently fraudulently and grossly underreported the number of "recordable" incidents to the government, allowing it to collect award fees that it did not deserve.

312.    In Fluor's July 7, 2009 – June 30, 2010 AFEB Report under Task Order 5, *inter alia*, Fluor claimed a TCIR of less than 0.26 in every month, below the industry standard of 6.2.

313.    In Fluor's July 1, 2010 – December 31, 2010 AFEB Report under Task Order 5, *inter alia*, Fluor claimed a TCIR of less than 0.20 in every month, which it characterized as 23 times below the industry standard.

314.    In Fluor's January 1, 2011 – June 30, 2011 AFEB Report under Task Order 5, *inter alia*, Fluor claimed a TCIR of 0.19, which it characterized as 23 times below the industry standard.

89

315.    In Fluor's July 1, 2011 – December 31, 2011 AFEB Report under Task Order 5, *inter alia*, Fluor again claimed a TCIR of 0.19, which it characterized as 25 times below the industry standard.

316.    In Fluor's January 1, 2012 – June 30, 2012 AFEB Report under Task Order 5, *inter alia*, Fluor again claimed a TCIR of 0.19, which it characterized as 25 times below the industry standard.

317.    The reality is that Fluor did not have a TCIR anywhere near the figures that it reported to the government. Instead, this TCIR rate was fraudulently achieved only by directing Fluor's Health, Safety, and Environment group to not disclose all "recordable" incidents. This underreporting was achieved in a couple of ways: 1) from Transition through at least 2013, Fluor did not report any work place injury that occurred outside of a given shift on any particular day, despite the fact that the reporting requirement is continuous and incidents are to be recorded 24 hours per day; and 2) in many areas Fluor simply failed to report injuries to sub-contractors despite the fact that, per their contract, "recordable" incidents includes accidents to all Fluor employees and to the employees of any sub-contractor hired by Fluor.

318.    These were material misrepresentations. Indeed, the AFEBs, in their written decisions explaining their scoring and the award fee percentage, routinely cited Fluor's false representations about its Life, Health and Safety compliance times. For example, for the January 1, 2012 through June 30, 2012 performance period, the AFEB's determination recited Fluor's representations about its TCIR, a rate the AFEB noted was 25 times better than the industry standard.

### D. Fluor Made False Representations About Its Cost Control Efforts And Fraudulently Obtained Award Fees

319.    The Award Fee Evaluation Boards were keenly aware of the cost-plus nature of

the LOGCAP Contract, and so efforts to reduce costs played a prominent role in the criteria by which Fluor's contract performance was assessed. To that end, Fluor dedicated a number of slides in its AFEB briefings to the subject of cost control efforts and cost savings, and DCAA consistently presented to the AFEBs about Fluor's cost control efforts as well.

320.    For example, Fluor routinely touted its "CAM" program, or Cost Avoidance Measures, in its AFEB presentations. For example, in its AFEB presentation for the July 1, 2010 – Dec 31, 2010 performance period, Fluor sought credit for $16.7 million of *proposed* cost avoidance measures.  Likewise, in its AFEB presentation for the January 1, 2012 – June 30, 2012 performance period, Fluor sought credit for 46.9 million in *proposed* cost avoidance measures.

321.    Meanwhile, as discussed at length below, Fluor was *actually* charging the government hundreds of millions of dollars for personnel that it knew it did not need, and that it kept in Afghanistan for one purpose only: in the words of Fluor's Deputy Project Manager for Site Management and Construction, Paul Gentry (below), to "maximize billing."

322.    In addition, as discussed in Section IX below, Fluor fraudulently overcharged the government for annual "fit for duty" exams in Dubai that it knew should have been done in Afghanistan, at much lower costs. Nevertheless, Fluor continued the practice for years, in part to avoid bringing the misconduct to the government's attention, and instead passing the improper charges on to the government. If Fluor had been forthcoming with the AFEBs about these practices, its scores for cost control would have been dramatically reduced.

323.    Finally, as discussed in Section X below, Fluor amassed government property that had been earmarked for other purposes, and kept such property "off-the-books" and for its own use, rather than return the excess to the government so that the government could decide how best to use it. In doing so, Fluor deprived the government of the opportunity to seek the most

91

effective use of such excess, while Fluor retained the ability to purchase more of the same material. In this way, the government was deprived of an opportunity for cost savings. If Fluor had been forthcoming with the AFEBs about these practices, its scores for cost control would have been dramatically reduced.

### E. Fluor's Fraudulent Submissions to the AFEBs

324.    The exact amount of Fluor's fraudulently obtained award fees in each performance period is set forth in Paragraphs 50-51 above. Relators provide the following additional  particularity regarding each of the award fee periods in which Fluor defrauded the government.

| Period | Award Fee Evaluation Period | Fluor Self-Assessment Date | Fluor AFEB Presentation Date | Award Date | Score | Fluor Participants | AFEB Members |
|---|---|---|---|---|---|---|---|
| Transition | 7/1/09-6/30/10 | 8/20/2010 | 8/25/2010 | 12/29/2010 | 76/100 | Helen Tirone, George Rabb, Kassandra Combs, Rick Reuter, Ian Dolan, Karen Jack | BG Feldman (Army Sustainment Command), Col. Randy LeCompte (ASC), Col Kenneth Copeland (DCMA), Lt. Col. Kirk Whitson (CITF J4), Col. Robert Gingras (TF Wolverine), Col. Marcia Smith (USFOR-A), Capt. Thomas O'Keefe (RC-N), plus non-voting members Lou Aldini, John Cooper, Gregg Johnson, Storme Guiraldi, Bill Faanes |
| Full Perf. | 7/1/10-12/31/10 | 1/31/2011 | 2/10/2011 | 4/12/2011 | 84/100 | Bruce Stanski, Rick Reuter, George Rabb, Mike D'Arcangelo, Mike Cepek, Kassandra Combs | Tommy L. Marks (LOGCAP Exec. Dir.), Eddie D. Nagel (Army Sustainment Command), Cameron G. Holt (DCMA), Clarence Lee (USFOR-A), David Hall (USFOR-A), Michael Peterman (USFOR-A), Marcia Smith (USFOR-A), plus advisory members Amy Hayden, Bridget Stengel, Storme Guiraldi, Tom Petkunas, Gary Carter |
| Full Perf. | 1/1/11-6/30/11 | 8/10/2011 | 8/25/2011 | 10/12/2011 | 82/100 | Ronald Riley, George Rabb, Joseph Poniatowski, Michael D'Arcangelo, Norman McCollum, Jeff DeYoung | Tommy Marks (LOGCAP Exec. Dir.), Mark Calabrese (Army Sustainment Command), Richard Nalwasky (DCMA), Walter Anderson (USFOR-A), Roberto Mercado (USFOR-A), William Galbraith (USFOR-A), Mark Raschke (USFOR-A), plus advisory members Pete Tuttle, Storme Guaraldi, Gregg Johnson, Tyler Wentler, Jack Vinyard |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| OY 1 | 7/1/11-12/31/11 | 2/6/2012 | 2/20/2012 | 6/12/2012 | 88/100 | George Rabb, Norman McCollum, Mike D'Arcangelo, Mark Cofer, Mike Cepek, Jospeh Poniatowski, Tony Montalvo, Ronald Riley, Kassandra Combs, Patrick Macleod | Tommy L. Marks (Army Sustainment Command), James Allen (ASC), James Richardson (USFOR-A), Robert Myles (DCMA), Ron Jobo (USFOR-A), Michael Burns (USFOR-A), Robert Hubble (USFOR-A), plus advisory members Gary Rangel, Sandra Bermann, Mary Sheridan, Emily Graham, Lindsay foley, Clarita Jones, Jack Vinyard, Mildred Guitierrez, Mark Schuck |
| OY 1 | 1/1/12-6/30/12 | undated | 8/3/2012 | 10/12/2012 | 81/100 | Patrick Macleod, Joseph Poniatowski, others unknown | Tommy L. Marks (ASC), James Allen (ASC), Col. John Jones (DCMA), BG Felix Gedney (USFOR-A), Lt. Col. Dennis Caron (USFOR-A), Col. Kurt Ryan (USFOR-A), Lt. Col. Daniel Townsend (USFOR-A) |

## VIII.   Deploying Unnecessary Personnel

325.   Over the course of its LOGCAP IV contract performance, Fluor systematically inflated its billings to the United States by hundreds of millions of dollars through the deployment of unnecessary and redundant personnel.

326.   As described above, in submitting its proposals to the Army for LOGCAP task orders – and yearly extensions of those contracts – Fluor submitted estimates of the manpower that Fluor projected might be necessary to perform the contract requirements.

327.   Once Fluor began its performance of the contract and was required to deploy personnel to the Afghanistan theater, it submitted statements of justification to the Army with regard to each employee, demonstrating the need for his or her deployment and his or her role in performance of the contract. The Army approved Fluor's justifications through Letters of Authorization. These requests and approvals are processed via the "Synchronized Pre-Deployment and Operational Tracker" system (SPOT).

328.   Fluor fraudulently deployed thousands of redundant, unnecessary personnel, at enormous, unnecessary cost to U.S. taxpayers.

93

329.    Relator Scott Dillard, a West Point graduate who served as a U.S. Army officer in Iraq and Afghanistan, served as Deputy Director of Fluor's Material Management Group from 2012 to 2016. On December 30, 2015, Dillard participated in a conversation with several of Fluor's senior managers in Afghanistan, Paul Gentry (Gentry) and James Davis (Davis), which Dillard recorded. At the time of this conversation, Gentry was Fluor's Deputy Project Manager for Site Management and Construction, and Davis was a Fluor Operations Manager. During this conversation, Gentry discussed his previous experience as Fluor's Manager for the Bagram Area of Operation. Gentry detailed the superfluous personnel knowingly sent to Afghanistan by Fluor corporate management and the company's motive:

> GENTRY: Back in 2012 I added fucking 800 motherfuckers here with no missions. Eight hundred just because they [Fluor management] realized that, hey, according to our work drivers, we could have had more people. I don't fucking need 100 people laying the fuck around doing nothing already. Get them in here. And that was after the year before I'd added almost 2,000 the year before.

> DAVIS: Yeah.

> GENTRY: For no fucking reason. The same number of buildings on the density list, the same meals served, the same mission, the same this, same, same, same, same. An extra 1,800 people. The next year, extra 800 fucking people. What the fuck were they for?

> DILLARD: Who's pushing that, [Fluor management in] Greenville?

> GENTRY: Yeah. Just maximize billing, maximize billing. That's all.

> DAVIS: Yeah.

> GENTRY: As soon as they [DoD] rubber-stamped that bullshit we turned in, they [Fluor management] went back and checked it. "Oh, fuck, we ain't got enough people here to spend all this money." Really?

> DILLARD: Even if you don't need them?

> GENTRY: Yeah, that was irrelevant.

> * * *

94

***

GENTRY: I got here [Bagram, Afghanistan] the beginning of 2011.

DAVIS: Uh-huh.

GENTRY: And by the end of that year, I done picked up 1,800 motherfuckers.

DAVIS: Yeah.

GENTRY: That's why I'm saying what the fuck for. The next year 800 fucking more. I just saying fucking – fucking stop, you motherfuckers, man. I can't take it. I can't fucking take it. I've already started – we've already cut shit away here and what the fuck isthe justifications? It was all bullshit. The justification was maximize billing. It's like putting pigs in front of a trough full of feed. They are just going to – more pigs show the fuck up until the fucking feed runs out. That's why the trough is fucking empty now. All the little piggies are running around, fucking grunting wanting some more.

DAVIS: They're like, if we are going to house all these people in these individual little white tents, and they're like "Rack them and stack them."

DILLARD: Who said that? Greenville?

DAVIS: Yeah. Ian [Dolan, Fluor Project Director].

DILLARD: Ian.

DAVIS: Hell, rack them and stack them, you can use the white tents.

330. In other words, at a time when troops were being drawn down in Afghanistan, Fluor was sending at least 2,600 additional people to the Bagram, Afghanistan area alone, who, according to the Fluor officer in charge, had no mission and were utterly superfluous, other than to perpetrate Fluor's fraud. Gentry, Fluor's current Deputy Project Manager in the Afghan Theater for Site Management and Construction, was told to "rack and stack" these unnecessary personnel in tents – feed them, house them, and pay them – for the sole purpose of fraudulently boosting and maximizing Fluor's billing to the United States.

331. In late 2011, Dillard and his supervisor, Jarrold Reeves, Director of Fluor's Materials Management Group (MMG), were instructed by their superiors to implement a

95

reduction in force, because the Materials Management Group was on track to spend $120 million against a budget of $86 million. Based on his knowledge and experience with Fluor's operation and with government supervisory policy, Dillard believes that the MMG group was a target of particular scrutiny because its costs were improperly categorized by Fluor as part of its PWS 08.03 Management and Administration costs instead of PWS 08.02 Procurement and Supply Management.

332.    Dillard and Director Reeves duly planned a reduction in force for the MMG. As personnel began to be recalled from deployment, however, Reeves was ordered by Fluor Country Manager George Rabb to halt the reduction. Rabb told Reeves that Fluor Government Group CFO Eric Best (Best) and Vice President of LOGCAP Operations Rick Reuter (Reuter) had overruled the reduction in force because it was impacting the company's revenue and profit. This decision was made by Best and Reuter purely to continue profitable billing levels for the company; it was not based on any considerations with regard to Fluor's mission of supporting the military – and indeed was nonsensical given the drawdown of troops during that time period, with U.S. troop levels reaching their peak in August, 2010. The employees that were retained were unnecessary to the mission and served solely to falsely pad Fluor's bills to the United States.

333.    Fluor employees were bounced back and forth at the whims of some management and the frustration of others when the employees had no apparent duties or roles other than to be billeted and fed for the purposes of fraudulently billing the United States. For example, Carla Greene was serving as a "buyer" for Fluor's procurement operations at Camp Phoenix, Afghanistan, when the 2011 - 2012 reduction in force was implemented. In early April 2012, Ms. Greene was set to board a plane home because she had no purpose in the theater, only to be

yanked back on the orders of senior management, to the consternation of her supervisor who had nothing for her to do. With the reduction in force underway, Ms. Greene traveled from Camp Phoenix to Bagram Airfield for out-processing and stayed the night, prepared to fly out of the theater the following day. As she was literally preparing to board the plane, Fluor management, through George Rabb, cancelled the reduction in force and ordered Ms. Greene to return to her imaginary "duties." The next day, Theater Procurement Manager Keith Whelan called Dillard for an explanation: "Why did you send Ms. Greene back? I don't want her, I don't need her." Nevertheless, Ms. Greene – and many others – remained, and the United States bore the cost of their unnecessary deployment.

334.    In mid-2015, Dillard and his direct supervisor, Jarrold Reeves, were tasked by Preston Howard (Howard), the Country Chief of Staff (#2 position on project) and Scott Roesler (Roesler), Fluor Project Controls Theater Manager, to begin planning a reduction in force for the Materials Management Group. At this time, the LOGCAP IV contract was coming to a close, and the company anticipated that there would be a new competitive bidding process in 2016. Howard, Roesler, and others were concerned that, if Fluor continued to bill at the "fat" levels it had maintained over the course of its performance of Task Order 0005, it would be difficult for Fluor to submit a competitive bid for the next major logistics contract. But if Fluor did submit a competitive bid in the next competition, that would only highlight how unreasonable and unnecessary Fluor's billings had been under Task Order 0005.[3]

335.    With this understanding and broader competitive situational awareness in mind, Dillard prepared plans for a two-phased reduction in force beginning in mid-2015. The Country Manager, Mark O'Neill, quashed the plans with a clearly contrived concern that the company

---

[3] As detailed elsewhere, this was not an issue when Fluor submitted its original proposal for Task Order 05, in part because Fluor knew that KBR was out of the running.

might be "releasing talent for [its] competitors to hire." The reduction in force was eventually implemented in late-2015, but only after Fluor enjoyed fraudulently increased revenue for several more months.

336.    Put simply, Fluor's personnel decisions were made with the perverse goal of boosting Fluor's profits in contradiction to the goal of efficiently performing its mission in support of the U.S. military. At the highest levels, Fluor's management knowingly deployed and retained in theater employees who clearly had no mission and represented nothing but a stream of income for Fluor at the expense of U.S. taxpayers.

337.    The damage to the United States caused by Fluor's duplicity is enormous. Gentry estimated that at least 2,600 unnecessary employees deployed by Fluor to the Bagram Area of Operations alone from 2011 to 2012. The cost billed to the United States for just this small sample of Fluor's unnecessary employees is enormous. Based on Dillard's review of Fluor's employment records in his capacity as Deputy Director, he has determined that the median pay grade for Fluor employees in Afghanistan during this time period was "GG4." Dillard estimates that the cost borne by the United States for a 12-month deployment of one of these employees – not including the costs of recruitment, mobilization, an initial medical screening, life support (food, water, housing, etc.), and similar expenses[4] – is around $170,000. Based on these estimates, the 2,600 unnecessary and redundant employees identified by Gentry cost the United States at least $442 million.

---

[4] These additional expenses, excluded from the estimate above, are themselves significant, and were further incentive for Fluor to maximize the personnel it sent to Afghanistan. Indeed, in addition to covering salaries, overhead, etc., for each employee Fluor gets approval to send to Afghanistan it charges the government an approximately $50,000 mobilization/recruitment fee, in addition to base life support costs (housing, food and water, etc.) of approximately $100 per day per employee. These figures add up to tens of millions of dollars in additional charges annually for just even a few hundred employees.

338.    There is ample additional evidence corroborating Fluor's deliberate overstaffing. Each year, Fluor prepared internal Basis of Estimate (BOE) spreadsheets detailing all of the tasks Fluor personnel were to perform on the contract, and providing to-the-decimal estimates of the amount of time it would take to perform each task at each Forward Operating Base. These internal BOEs were then converted into external BOEs that were presented to the government to provide justification for Fluor's staffing levels. Based on the total hours necessary to perform the work, the number of personnel needed to perform the work could be determined.

339.    These BOEs, however, were simply one stage in a multi-step fraud to inflate personnel requirements on the contract.

340.    First, Fluor's BOEs contained falsely inflated estimates of the hours necessary to complete tasks, and in many cases estimated hours for work that Fluor knew it was not performing and had no intention of performing. By way of example, as discussed below, Fluor consistently and for years failed to perform contractually required monthly counts of 10% of the inventory at each FOB, which were intended to ensure accurate inventory control and tracking. Yet, each year Fluor fraudulently estimated it would spend hundreds of thousands of hours performing so-called 10% inventories, and thus needed hundreds of employees it knew would not be doing such work.

341.    Second, in translating the BOE's estimated number of hours to complete Fluor's tasks to the number of personnel needed to perform the tasks, Fluor assumed 180 hours per month for each employee, or six hours per day, 7 days a week (personnel were expected to work seven days a week while in Afghanistan, and then took elective "rest and recuperative time," or R&R, usually for a few weeks at a time and several times a year). But in reality, Fluor employees consistently billed 84 hours per week every week they were in theater, that is, 12 hour days every

99

day. By using the six hour per day estimate, Fluor was able to justify sending many more personnel, and then billed the government 12 hours per day for all of those excess personnel.

342. Third, upon information and belief, the "external" BOEs shared with the government were inflated to include more hours and more personnel needs than the internal versions created by Fluor's managers internally.

343. Yet additional evidence of Fluor's gross overstaffing is that Fluor had dramatic fluctuations in the amount of personnel in Afghanistan without commensurate fluctuations in work being accomplished. On average, 21% of Fluor personnel assigned to the project were on leave and not working (primarily on R&R). But this number fluctuated, such that at a high point Fluor had almost 30% of personnel on leave, and at a low point it had approximately 11% of personnel on leave. Yet, various indicators of workload—for example, the amount of material being issued to work orders and the number of work orders being completed—contain no evidence of commensurate fluctuations in work being accomplished. Perhaps most revealing, when Fluor had 30% of personnel on leave, no less work was being accomplished. In other words, Fluor could have reduced the number of personnel by 9-10%, and still have performed the same work, such that the government got no benefit from the hundreds of millions of dollars it spent on all those additional people.

## IX. Annual "Fit for Duty" Exams

344. Fluor also boosted its own profits and passed massive costs along to the United States by requiring that every employee deployed overseas undergo an annual "fit for duty" physical exam in Dubai, United Arab Emirates in direct violation of its material contractual obligations and certifications to the United States. Despite Department of Defense regulations making clear that employees of civilian contractors should undergo "an annual in-theater

rescreening," rather than a comprehensive physical exam outside of the theater – a material regulation about which Fluor corporate management had knowledge – Fluor continued to subcontract with a medical clinic in Dubai and route every employee through the city annually, housing them at a hotel and subjecting them to full, comprehensive physical exams, all at false costs to the United States.

345.     Prior to December 2013, Army regulations stated that "DOD Contractor Personnel, who deploy for multiple tours of more than 12 months total, must be reevaluated for fitness to stay deployed. Periodic health surveillance requirements and prescriptions needs assessments should be recent enough so as to remain current through the deployment period. An examination with all medical issues and requirements addressed will remain valid for 15 months from the date of the physical."[5]

346.     In December 2013, the Army issued Modification 12 to that regulation, inserting the following language: "Annual in-theater rescreening may be focused on health changes, vaccination currency, and monitoring of existing conditions, but should continue to meet all medical guidance prescribed in Mod 12. If individuals are unable to adequately complete their medical screening evaluation in the AOR (Area of Responsibility), they should be redeployed to accomplish this yearly requirement.[6]

347.     When Fluor began performance of its work under Task Order 0005 for its LOGCAP IV contract, it instituted its annual "fit-for-duty" program as described above, which included, at its peak, approximately 30,000 annual physical exams conducted in its medical

---

[5] US CENTCOM 021922Z DEC 11 MOD ELEVEN TO USCENTCOM INDIVIDUAL PROTECTION AND INDIVIDUAL UNIT DEPLOYMENT POLICY (Mod 11).

[6] US CENTCOM 021502Z DEC 13 MOD ELEVEN TO USCENTCOM INDIVIDUAL PROTECTION AND INDIVIDUAL UNIT DEPLOYMENT POLICY (Mod 12).

clinic at Dubai and employment of an entire medical records staff in Greenville, South Carolina. This practice was instituted under the previous iterations of the US CENTCOM policy and maintained under Mod 11 and Mod 12.

348.    Fluor knew that annual, comprehensive physical exams performed out of Afghanistan were not – and had never been – required or authorized by DoD regulations and that the Army and U.S. Central Command (CENTCOM) did not intend to fund that practice when it issued CENTCOM medical requirements – in short, comprehensive physical exams performed outside of the theater were not required by the Army and clearly not payable. As proof of this, none of Fluor's competitors (KBR, DynCorp) interpreted DoD policy to authorize Fluor's practice, and only Fluor instituted annual physicals outside of the theater. Mod 12 makes very clear that DoD / CENTCOM policy is for civilian contractor personnel to undergo in-theater health screenings, not out-of-theater comprehensive yearly physicals. Yet, despite the concerns and recommendations of high-level management, including the Afghanistan Country Manager Mark O'Neill (O'Neill), Fluor corporate management ordered that the fit-for-duty policy would remain in place into 2016.

349.    In January 2015, Fluor Executive Jeff Uribe (Uribe) told Dillard that Fluor management was considering transitioning from the fit-for-duty program in Dubai to in-country health assessments – as described in Mod 12.Uribe indicated that one reason Fluor was hesitant to take this step was out of concern that, once the policy was changed, DoD would scrutinize the program from its inception and demand repayment of the millions of fraudulent dollars Fluor had billed and received for annual physicals up to that point.

350.    In late 2015, Dillard traveled with Fluor Country Manager O'Neill to LOGCAP-supported Forward Operating Base Dahlke, Afghanistan, where O'Neill held a "Town Hall"

meeting for Fluor employees. When Electrician Christopher O'Connor asked O'Neill about potential changes to the fit-for-duty policy, O'Neill responded candidly that he had recommended to Fluor leadership in Greenville, South Carolina that the program was unnecessary and should be canceled, but that he had been overruled. In subsequent Town Hall meetings, O'Neill addressed the question more obliquely, but did acknowledge that DoD regulations appeared to require a health assessment based on existing conditions, rather than an annual, comprehensive physical.

351.    Dillard also discussed the fit-for-duty policy with Country Health, Safety, and Environmental (HSE) Manager Peter Provost (Provost), who confirmed what Uribe had told Dillard previously: that leadership in Greenville insisted on continuing the practice – even though it was clearly unnecessary, unauthorized, and not billable – in part because it was afraid to tell the Army that it had been performing and billing for comprehensive fit-for-duty exams all along. The following are excerpts from that recorded conversation:

DILLARD: So what's the deal with the fit for duty?

PROVOST: We're still doing them.

DILLARD: Okay, because it keeps getting asked every time.

PROVOST: Yeah.

DILLARD: Uribe told me like a year ago we're going away from it or going –

PROVOST: Right. But what Greenville said is "'no, we're going to continue it.' Because they don't have good PR people because they're saying, 'We can't explain why we did it before if we stop it now.'"

* * *

DILLARD: So basically they're . . . they're afraid of the sins of the ` past?

PROVOST: Yeah, they're afraid of the sins of the past and it's a way to keep people employed in Greenville.

103

* * *

***

PROVOST: There's a whole host of people that keep medical records that we don't need.

* * *

***

PROVOST: We thought it was a done deal that it was stopped. It made all the sense in the world. All you got to have is good PR people to explain to the military why we stopped it.

DILLARD: Right.

PROVOST: But they know it should never have been started.

DILLARD: Right.

PROVOST: Never should have done the first in-theater [Dubai] physical. So, and you know what? If you ask me, I think Auditor 101 is going to catch us but we're going to pay – we'll put all this money into it that we'll have to pay back.

* * *

PROVOST: No one else does it, just us. And that's what they [the Army] can say, "Hey, no one else did it." Everyone else interpreted it correctly except Fluor.

352.    Provost also confirmed that O'Neill had informed Fluor leadership that the fit-for-duty policy was unnecessary, problematic, and unauthorized (and un-reimbursable) by the Army, but that he was overruled by Fluor at the corporate level:

PROVOST: Because his [O'Neill's] decision was – he said, "I cannot convince the military – I can't justify that to the military." And that should have been enough. But in truth he doesn't run the project.

DILLARD: Okay.

PROVOST: Ian [Dolan] runs the project.

DILLARD: Oh, got it.

104

PROVOST: Greenville runs the project, not the Country Manager. They pat him on the back and say, "It's all yours. Profit and loss is yours. You know, you run the project, your decisions." They didn't tell him, "If we agree with you, you run it. If we don't agree with you, our – we rule the project."

DILLARD: Okay.

PROVOST: So, and that's what happened here. Ian put it in a drawer, his [O'Neill's] appeal to stop it [fit-for-duty]. He didn't even look at it. Didn't talk to the people there.

DILLARD: Wow.

PROVOST: He says, "That's my decision and we're going to do it."

353.    Provost went on to describe the enormous waste associated with Fluor's maintenance of support personnel in Dubai whose duties were associated with administration of fit-for-duty exams.

354.    With knowledge that its fit-for-duty program was deemed unnecessary by the Army, Fluor continued to pass huge superfluous false expenses on to the United States, in no small part to avoid other overpayments that it knew should be refunded. The unbillable costs associated with the Fluor fit-for-duty program and borne by the United States included: (a) the actual costs of performing the annual physicals in Dubai; (b) one-night Dubai hotel stay related to each employee's examination; (c) a per diem payment for each employee on the date of his or her physical; and (d) regular eight-hour day's pay for each employee on the day of his or her exam. Based upon information available to him regarding the number of exams performed by Fluor over the life of Task Order 0005 of its LOGCAP IV contract and the above costs associated with each exam, Dillard estimates that Fluor has falsely billed, and the United States has paid, approximately $91.1 million for unnecessary, annual, comprehensive physical exams performed in Dubai.

## X.    Illegal Acquisition and Use of Government Material

355.    Fluor illegally spent government money to acquire property without authority; consistently and knowingly acquired material redundant to material already acquired on behalf of the United States and in Fluor's possession; illicitly created a de facto "authorized stockage list" of construction materials without permission; utterly failed to properly account for government property and seek direction regarding the disposition of that property; and worked to conceal this state of affairs from the United States' contracting representative. As a result, the United States paid tens of millions of dollars in unnecessary shipping and procurement costs. Moreover, by these schemes Fluor was able to illegally obtain construction work under its logistics contract without statutorily-mandated review and appropriation by Congress, depriving the United States of the opportunity to competitively bid this work at a lower cost. In addition, even with respect to construction change orders not approaching the military construction (or MILCON) threshold, Fluor was able to artificially and falsely deflate the costs of its proposals through the illicit use of government owned material that was not properly requisitioned for the change order and was in fact acquired for other purposes. This deceit fraudulently enticed the United States to award more work to Fluor at the higher costs associated with the cost-plus LOGCAP contract, rather than utilizing other, more economical channels such as fixed price construction contractors or locally-based companies.

356.    As outlined in this Complaint, Fluor's LOGCAP IV, Task Order 0005, was a logistics services contract, funded with U.S. Army Operations and Maintenance (OMA) funds – the funds appropriated by Congress to the Army to fund its day-to-day operations. Inherent in the scope of Fluor's contractual duties, however, was the construction of certain basic facilities required to perform its "Base Life Support" functions. Congress recognized this practical reality

106

when it allowed for certain construction projects to be paid for under logistics contracts, up to a value of $750,000.00 – now $1 million.

357.    Relator Scott Dillard served as Deputy Director of Fluor's Materials Management Group. In this capacity – in addition to his prior experience as a LOGCAP Program representative – Dillard was intimately familiar both with the federal regulations dealing with management of government property by defense contractors and the systems Fluor employed in this regard.

358.    With regard to the material Fluor required to perform its Base Life Support functions, Fluor was authorized by the Army to maintain an Authorized Stockage List (ASL). In effect, this means that, the Army having approved its proposal for the cost of performing Task Order 05, Fluor was able to maintain a stock of the supplies and material it needed to perform those functions. Items like light bulbs, which Fluor could project that it would need with a known frequency, could be maintained as part of Fluor's ASL and replenished when supplies reached a certain point.

359.    With regard to construction materials, Fluor was not permitted to maintain an ASL. As outlined above, construction change orders represented a further commitment of funds by the United States in addition to the original logistics contract. Accordingly, materials for change orders could not be purchased until the change order was issued. Fluor's acquisition of material on behalf of the United States, prior to the decision of the United States' contracting representative to authorize that acquisition, would plainly be *ultra vires* and in violation of the Anti-Deficiency Act. For that reason, Fluor's request to the DCMA for permission to maintain a construction ASL was not granted and Fluor was not permitted to maintain a stock of construction supplies.

360.    Under the Federal Acquisition Regulations and its LOGCAP contract, Fluor was charged with acquiring material on behalf of the United States – as authorized – and with properly storing and inventorying that material. Fluor employed an IBM system known as Maximo to track – theoretically – every item of U.S. property entrusted to its care. This material should have included items in the Operations and Maintenance ASL (*i.e.*, the stock of material Fluor would use to perform its Base Life Support duties); material specifically identified in Bills of Material for specified construction change order projects, as approved by DoD representatives; property found to have been in excess of requirements on prior construction change order projects; property received for specific change orders that were subject to a "stop work" order; and other categories of material properly acquired by Fluor on behalf of the United States in order to complete its duties under the LOGCAP task order.

361.    In reality, Fluor thwarted the proper procedures in numerous ways, all of which were designed to allow Fluor to use the United States' property in a manner that benefited Fluor, without regard to the cost to the government. Fluor shuffled government material through its system in whatever manner was expedient to Fluor at the time, failing to properly account for material, maintaining "off the books" caches of government property, defying its own procedures, and procuring redundant material at government expense – which in turn became additional fodder for Fluor's fraud and abuse.

## A.  Construction Excess Storerooms (COXS)

362.    A 2012 compliance report authored by Fluor's Training and Assessment Team (the TAT Report) offers a glimpse of many of these issues (and serves to demonstrate that they were well-known by Fluor's management). The TAT Report surveyed Fluor's acquisition and utilization practices and reported several major deficiencies.

363.    In fact, as the TAT Report notes, Fluor did effectively create a *de facto* construction ASL – despite knowing it had not been granted authority to do so – in the form of construction excess (COXS) material store rooms. Although Fluor was required to report excess construction materials and to await instructions from DoD regarding their disposition, the TAT Report reveals that these construction excess storerooms were enormous, at that time encompassing 6,400 line-items of material valued at $13.2 million. Moreover, the TAT Report shows that Fluor was not even utilizing this vast collection of government property to the government's benefit. When Fluor needed material for a new construction project, it simply ordered it again, without referencing these massive storerooms to determine if the material was already on hand and could be used, which would have saved the United States the expense of acquiring new material and shipping it into the Afghan war theater.

364.    For example, the TAT Report highlights one purchase order generated by Fluor for change order "CB3-7083 Alaska Tents Structures." All told, Fluor requisitioned over $400,000 worth of material for the construction of these tents. The TAT Report reveals that all of this material was already in Fluor's COXS storerooms. Specifically, the TAT Report shows that Fluor requisitioned two Alaska tent power distribution systems at a unit cost of over $45,606. It already had ten. It also requisitioned ten small Alaska tent structures at a unit cost of $15,550. Again, ten of these tents were already owned by the United States and residing in Fluor's storerooms.

365.    The Alaska tent episode demonstrates two major issues with Fluor's practices. First, it is difficult to imagine how Fluor innocently stockpiled in its COXS storerooms ten power distribution systems worth $45,000 dollars each. Material of that kind and value should not have ended up as excess to another construction project (particularly one falling under the

$750,000 O&M exception), given that each approved project should include a Bill of Material encompassing everything required to complete the project. An extra spool of wire may be understandable, but half a million dollars' worth of power distribution equipment is not. Secondly, of course, Fluor still did not inform DoD that this material was on hand and could be used to fulfill the new requirements. Instead, it ordered more. Put simply, Fluor ended up with a huge store of government-owned property by willfully over-ordering material on the government dime.

366. The existence and use of COXS Storerooms is merely one snapshot of Fluor's consistent daily practice of routing government-owned property to its own ends without regard to Federal Acquisition Regulations or its obligations to the taxpayers. Fluor's construction personnel constantly raided materials that were part of the O&M ASL or were specifically earmarked for a different construction change order project. Consistently this was done without properly documenting the transaction, as a result of which the United States was misled as to where the material paid for by the United States had gone. A 2011 email from Fluor's Construction Superintendent Kenneth Conner (Conner) demonstrates how dire this problem was. Conner wrote to Fluor's construction and materials personnel to inform them that materials requisitioned for a certain change order construction project were beginning to arrive in-country. Because the project was on hold temporarily, Conner was very concerned that the materials earmarked for this project would simply disappear, being cannibalized by Fluor for whatever other purposes suited Fluor personnel as was Fluor's typical modus operandi. He outlined the situation as follows:

> The situation we are faced with is, material is coming in for a high visibility CO, which has unofficially been put on hold pending a redesign, that has not officially been put in place . . . My point is, we have to secure these materials, because the customer & client, are well aware of the materials [sic] existence and at some

point will be asking for its accountability . . . . Everybody and their mother knows about this job and if we cannot account for all the material, Fluor will definitely be put on the hot seat. We need a plan in place to secure the material and not let it get away from us . . . I don't think it will be to our advantage to scatter it all over the Kabul AO.

367.    The plain implication of Conner's email is that, in the normal course of business – when the United States' representatives are not precisely aware of what material Fluor is acquiring and where it is going – there is no "plan in place" to "secure the material" that the United States has acquired through Fluor for a given project – rather, when it is not under extra-scrutiny, Fluor typically uses materials to its own advantage. As a matter of routine, Conner's email makes clear, when U.S. government-owned material arrives at Fluor's facilities, it is free game and liable to be scattered around the Area of Operations without accountability. It is a special occasion when the government is aware of material that is coming into Afghanistan and Fluor is required to actually use it as contractually required.

368.    Email correspondence shows that Fluor "senior management in Greenville" approved the creation of the construction excess storerooms in 2011. In reality, there was no contractual or regulatory basis for the creation of what amounted to an illicit construction ASL that ballooned into a massive cache of material – all material legitimately excess to a change order project should have been catalogued, reported, and stored until Fluor received instruction regarding its disposition. The change order to Fluor's contract, which had included additional outlay by the United States for the material listed in the Bill submitted by Fluor, should have been amended to show that some of the material had been found to be excess and returned. None of this was done and instead Fluor covertly stockpiled huge amounts of government property for its own use and falsely retained the full amount paid by the United States under the change order.

369.    Eventually, in April 2014, long after Fluor's compliance personnel had

111

determined that the COXS storerooms were "non-compliant," and once construction work in the theater was winding down, Dillard's supervisor Reeves was able to convince Fluor management to close the storerooms. Reeves' memorandum notes that "[t]he goal [of closing the storerooms] is to restore compliance while maintaining accountability." Even at this time, the COXS storerooms contained some 2,600 line items of material. Eventually, as part of a "War on Excess" mounted by Reeves as the contract was winding down, a physical inspection of the Fluor construction yard was performed in early 2015 and found 27 containers of material that were not catalogued in Fluor's Maximo system at all, along with enormous amounts of material that was not tied to any change order or work order.

370. Fluor correspondence shows that DoD's representatives in Afghanistan were at points suspicious that Fluor was illicitly acquiring and stockpiling material, but that Fluor evaded detection, in part by using falsified inventory reports and whitewashing its own compliance documents. For example, in July 2013, Fluor's Office of the Chief Compliance Officer published a report entitled "Change Order Acquisition and Utilization, LOGCAP-IV Afghanistan, Project Compliance Review" (the Final Report). The Final Report itself touches on many of the issues outlined in this complaint, including: (1) (unauthorized) requisitioning of material not referenced to any specific change order or work order; (2) utilizing O&M material for change orders without properly accounting for the requisitioning of that material, potentially resulting in over-ordering of O&M stock; and (3) non-compliance of the COXS storeroom – which the report advises closing – specifically, "[n]o evidence of promptly disclosing and reporting to the Government property in [Fluor's] possession that is excess to contract performance relating to construction materials." Dillard was informed, however, that the original report was much more explicit than the Final Report, and that Compliance Officer Justin Jones, who conducted the

112

review, was ordered by senior compliance personnel to "tone down" the language of the report and obscure the findings, in order to evade DoD scrutiny.

371.    Fluor's willful evasion of the requirements for acquiring, using, and storing government property – and its misrepresentations to the United States in that regard – were not harmless. As a result of Fluor's fraudulent practices, the United States was charged with millions of dollars in unnecessary material costs, including material that was not associated with any change order and thus not authorized for acquisition, material that was double ordered by Fluor, and material that was double ordered to replace O&M stock even if the material, once received, was retained by construction without proper accounting, and so on. Moreover, all of the material acquired by Fluor on behalf of the United States was shipped into the Afghan war theater at huge expense, much of which was known to be unnecessary, and Fluor, when asked, deliberately obfuscated from government contracting representatives in Rock Island its means and modes of transport in order to help justify its exorbitant freight forwarding / shipping costs from the United States.

372.    Finally, Fluor's illegal construction ASL served as a means for Fluor to suppress its estimates for construction change order projects. By using material owned by the United States, Fluor could keep its estimates below the O&M construction project threshold, thereby avoiding competition for those jobs through the MILCON competition process. Because Fluor had illegally acquired property without authorization and improperly stockpiled it without proper disclosure to and instruction from DoD, Fluor was able to create a virtual monopoly on small construction projects in Afghanistan, and the United States was deprived of the opportunity to competitively bid that work for potentially lower prices from more scrupulous contractors.

### B. Aluminum "AM-2" Matting

373.    A specific episode from December 2015 involving aluminum AM-2 matting (aluminum plates covered in a nonskid material) further illustrates the way Fluor has conducted its performance under LOGCAP-IV Task Order 0005. At this time, Fluor was preparing a Project Planning Estimate for DoD regarding the relocation of Fluor's Theater Distribution Center (TDC). On December 21, 2015, Roesler sent notice of a meeting titled "TDC Relocation – Internal Review of PPE Draft" with the Description: "Initial PPE has total costs exceeding MILCON. Need to review and look for ways to decrease costs if possible." Dillard attended the meeting.

374.    The primary point of discussion for lowering costs to win the TDC relocation project dealt with the possible surfaces, specifically eliminating or reducing rebar-reinforced concrete for Large Area Maintenance Shelter (LAMS) aprons (the outdoor area(s) not covered by the LAMS) and associated dumpster pads. The initial PPE called for rebar-reinforced concrete aprons and dumpster pads. Gravel pads, in lieu of concrete, were discussed as a feasible option to reduce costs.

375.    At that point, Theater Distribution Center Manager Juan Jones (Jones) suggested that the PPE could be fraudulently lowered under the military construction threshold by preparing the PPE to use AM-2 matting. This high-strength aluminum matting was designed for the rapid construction of aircraft runways. As the discussion continued, it became clear that Jones was already in possession of a significant quantity of AM-2 matting that he had secured illicitly and converted to his own purposes. But rather than inform the government that Fluor had AM-2 matting on hand and could perform the work using AM-2 matting the government had already purchased, Fluor concealed this fact from the government.

114

376.    One of the non-BLS duties included in Fluor's LOGCAP functions was the operation of a Retro-sort Yard. This involved the receipt of truckloads of undocumented or mostly undocumented military equipment and material, which Fluor was tasked with cataloguing, storing, and reporting to the government, with National Stock Number (NSN) items (such as AM-2 matting) reported through the Standard Army Retail Supply System (SARSS), for instructions for disposition. Jones' comments at the December 2015 TDC relocation meeting – together with Dillard's knowledge of Fluor's practices and Jones's in particular – strongly indicated that Jones had effectively stolen truckloads of AM-2 matting from the Retro-sort Yard, which he stored or put to use in his own materials yard or distributed to whomever he deemed fit in an ad hoc and undocumented manner.

377.    Jones indicated his belief that, once the project was won, the military would accede to Fluor's request that it supply AM-2 matting for the TDC relocation – but he also assured Roesler and the others that, should the request be denied, he already had the necessary matting on hand. Jones and Gentry explicitly discussed that the best strategy was to request that the military supply the matting for the relocation, and then "whatever else we have, we have it." In that event, Jones assured Gentry, Jones could simply store the "excess" matting: "it is easy to stack like Legos . . . I can store as much as I need to, Sir."

378.    Plainly, Jones, with the complicity of Fluor senior manager Gentry and others, seized upon this gambit as a means of both concealing and potentially adding to an illicit cache of very valuable aluminum matting – even if the military denied Fluor's request for 37,000 square feet of AM-2 matting for the TDC relocation, Fluor already had in its illicit possession more than sufficient quantities of matting for the relocation of the TDC. Following the TDC Relocation meeting, Dillard toured Juan Jones's TDC yard and found at least 1,777 panels of

115

AM-2 matting, comprising 42,648 square feet and valued at $1,236,792.

379. Fluor, thus, had illicitly acquired $1.24 million worth of U.S. government property that the military urgently needed in Iraq and other expeditionary operating environments. Instead of informing the government, Fluor made an attempt to secure yet more AM-2 matting. This acquisition was itself unnecessary, given that concrete aprons and dumpster pads were called for in the initial PPE, gravel was an acceptable substitute, and AM-2 matting was proposed solely for the purpose of bringing Fluor's estimate under the minor construction threshold while simultaneously boosting its already large supply of AM-2 matting for use as Fluor deemed fit and not the government.

380. Dillard reported this fraud to Fluor's corporate investigations and compliance departments. Dillard understands that Fluor senior management intends to further conceal this fraud by belatedly reporting that the AM-2 matting in its possession was "found on installation" (FOI). The FOI process continues to disallow the military use of this valuable equipment by not inputting the items into the "Global Combat Support System – Army" (the late 2015 SARSS replacement) for worldwide visibility and appropriate government direction for disposition / redistribution to Iraq or wherever the government deems needed.

## XI.    Retaliation Against Relators Shepherd and Rude

381. Both Shepherd and Rude have been retaliated against for repeatedly bringing the fraudulent behavior and misconduct described above to the attention of their supervisors at Fluor.

382. In addition to their retaliatory firings, this included the denial of deserved promotions and raises, despite the fact that both of their performance evaluations consistently indicated that they "exceed expectations" in all categories.

383. In both of their cases, they were specifically denied promotions and raises that

would have resulted in dramatic increases in their pay and benefits, despite the fact that the promotions had been recommended and approved by their supervisors, and approved by Human Resources. These actions were taken by Fluor senior leadership, including Deputy Project Manager Michael D'Arcangelo, and Director of Operations & Management Norm McCollum.

384.    In February 2011, Shepherd approached Kassandra Combs, Fluor's Risk Manager for Task Order 05, and told her that Fluor was performing work on facilities that were not on the MSOW as well as other work that had never been directed by the government. This was in strict violation of the LOGCAP Contract and the Controlling Plans, which made it clear that no unfunded and/or optional work was to be performed without seeking direction from the government, and subjected Fluor to potential False Claims Act liability for billing the government for unauthorized or unnecessary work, at Fluor's higher LOGCAP rates. Combs asked for additional information on these problems.

385.    Taking information directly from Maximo, Shepherd and Rude prepared a spreadsheet that demonstrated that Fluor was providing full O&M services to more than a thousand facilities at Bagram alone that were not on Fluor's Master Scope of Work.

386.    When Director of O&M Norm McCollum discovered that Shepherd and Rude had provided this information to Combs, he immediately ordered Shepherd to his office and informed him that his behavior was unacceptable and that he was not a "team player." McCollum told Shepherd that the unauthorized work would continue. Shepherd responded that he believed Fluor was not following the government approval process, and that Fluor could be perceived as submitting "false claims" by billing for work it was not directed to do.

387.    In or around May 2011, Shepherd was "dressed down" for providing this information to Combs by LOGCAP Country Manager George Rabb who threatened that

117

Shepherd "was running a union shop" and "was not playing ball. He was told that, as a result of his complaints about Fluor billing the government for work it was not authorized to do, Fluor's senior managers did not want to work with him. Rabb further stated that Shepherd's complaints were a problem for Fluor, and that they would not be good for Shepherd's career.

388.    From that point forward, senior officials at Fluor like McCollum and Rabb started to exclude Shepherd and Rude from many of the weekly group meetings they had previously attended.

389.    In a November 2011 meeting of Fluor group leaders, Shepherd attempted to raise the issue of Fluor certifying to the government false compliance and performance numbers, as well as the various accuracy problems with Fluor's electronic system of record, Maximo. As discussed above, these misrepresentations presented an obvious risk of False Claims Act liability. Shepherd was ordered to stop his presentation by Country Manager Rabb.

390.     In February, 2012 Fluor Area Managers began telling Shepherd that they were told at a recent Area Managers meeting that Shepherd would be replaced by Johnny Warner, an associate of McCollum.

391.    In March 2012, in an effort to cut Shepherd and Rude out of the loop, and to undermine their positions as Maximo Country Manager and Deputy Country Manager, McCollum appointed Warner to the Maximo group and directed Area Managers to report to Warner and not Shepherd despite the fact that Shepherd was the Director of the group.

392.    In March 2012, McCollum informed Shepherd that Warner would represent the Maximo group in all future meetings with the government.  On information and belief, McCollum did this solely to prevent Shepherd from reporting Fluor's fraudulent conduct to government officials.

393.    In or around June and July 2012, both Rude and Shepherd were denied promotions that they had earned, despite stellar performance evaluations and the approvals of their supervisors and Human Resources.

394.    In August 2012, Shepherd briefed Country Manager Steve Whitcomb about problems with Fluor's Maximo system, and many of the areas of noncompliance discussed above, including Fluor charging the government for unauthorized work, failing to keep accurate inventories in Maximo, false reporting to the government related to inventory tracking and losses, and the failure to use Maximo as the government-approved system of record.

395.    The same month, Shepherd was denied a transfer to a Project Management position, despite the recommendation and approval of his supervisors.

396.    In or around early 2013, Rude informed the manager of Fluor's Government Contract Management group that he believed Fluor was not disclosing to the government its noncompliance with LOGCAP requirements and Fluor's Materials Management Plan and Desktop Guide, including inaccurate Maximo inventories, Fluor's failure to properly track and manage government property, and its overall failure to use Maximo as its government-approved system of record. Rude stated that he believed this conduct constituted fraud against the government.

397.    In or around the same time, Rude provided the same information to Justin Jones, a Fluor Compliance manager.

398.    By mid-2013, it was clear to Shepherd and Rude that they were being isolated, and that Fluor management was looking for an opportunity to remove them. As an example, in or around September 2013 Shepherd was told by personnel in the Industrial Security department that there were active efforts to come up with an excuse to have them fired.

399.    In the wake of his complaints to Fluor management, and his refusal to participate in, and actions to stop, the conduct discussed above, Fluor ultimately terminated Rude's employment in July 2014. From the time of Rude's first complaints in early 2011 to the time of his firing, he was not only denied promotions, he was not given a single raise despite his strong performance reviews.

400.    In the period between mid-2014 and mid-2015, Shepherd raised a number of concerns about fraudulent conduct to senior Fluor officials, and refused to participate in such schemes. Examples include the following:

a.    He was asked to participate in a scheme to re-open old Work Orders to remove inventory shortages and he refused to permit it despite repeated requests to do so, and reported the misconduct to senior officials.

b.    He also complained to senior Fluor officials in Afghanistan and Fluor's headquarters in Greenville, South Carolina that they did not have documentation supporting Work Orders removing materials shortages from Maximo.

c.    He complained about instances in which Fluor personnel changed Emergency (Priority 1) Service Orders, some of which were for electrical issues posing serious safety issues for troops, to off-the-books Priority 4 Service Orders that would not be captured in Fluor's reporting of response and repair compliance times.

401.    In the wake of his complaints to Fluor management, and his refusal to participate in, and actions to stop, the conduct discussed above, Fluor ultimately terminated Shepherd's employment in July 2015. From the time of Shepherd's first complaints in early 2011 to the time of his firing, he was not only denied promotions, he was not given a single raise despite his strong performance reviews.

120

402.    Shepherd was in Dubai after R&R, scheduled to return to Northern Afghanistan, but then the morning of his flight he was not permitted to board the flight to Afghanistan and then several hours later he was told he was being fired.

403.    He requested to speak to the Country Manager to discuss his retaliatory firing and the fraudulent conduct on which it was based. Although it was routine for senior managers to have an exit interview with the Country Manager, Relator Shepherd was denied permission to do so. When he later tried to call the employee tip line, Fluor security terminated the call and forcibly removed him from Fluor's offices.

404.    Shepherd and Rude made the notifications to their supervisors discussed above; and refused to participate in, and took actions to stop, the conduct discussed above, because they believed Fluor was defrauding the government, and at all times since February 2011 because they believed Fluor's actions violated the False Claims Act.

405.    The treatment of Relators Rude and Shepherd was not isolated conduct. Fluor had a culture of retaliating against employees who blew the whistle on misconduct. Scott Dillard, Deputy Director of Fluor's Material Management Group; Rickey Mackey, Fluor's Theater Property Manager; Jeff Nix, a Fluor Compliance Manager; and David Payne, a Senior Supervisor in Fluor's Security department, were all victims of retaliatory terminations of their employment.

406.    All of the examples of retaliatory conduct above further demonstrate that Fluor's fraudulent actions were deliberate and performed knowingly.  Rather than address the fraudulent conduct Relators raised, Fluor disregarded their concerns and marginalized them.

## False Claims

### Count I – False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A), (B), (C) and (G)

407.    Relators incorporate each paragraph of this Complaint as if fully set forth herein.

408.    As described above, Fluor knowingly presented, or caused to be presented, to an officer or employee of the United States or a member of the Armed Forces, false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

409.    As described above, Fluor KBR knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approved by the government, in violation of 31 U.S.C. § 3729(a)(1)(B).

410.    As described above, Fluor knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States; and knowingly concealed, avoided, or decreased an obligation to pay or transmit money or property to the United States, in violation of 31 U.S.C. § 3729(a)(1)(G).

411.    As described above, by violating their record keeping obligations and undertakings such that the government would not discover Fluor's violations, Fluor concealed from the government the fact that the government was entitled to refunds and/or accommodations on its contracts.

412.    Fluor, its various corporate entities, its subcontractors, and their various corporate entities, and others conspired to defraud the government by getting false or fraudulent claims allowed or paid, and/or conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A), (B) or (G), in violation of 31 U.S.C. § 3729(a)(1)(C).

413.    The government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid and continues to pay the claims that would

122

not be paid but for Defendants' unlawful conduct.

414.    By reason of Defendants' acts, the United States has been damaged, and continues be damaged, in substantial amount to be determined at trial.

## Count II – False Claims Act, 31 U.S.C. § 3730(h) - Retaliation

415.    Relators Shepherd and Rude incorporate each paragraph of this Complaint as if fully set forth herein.

416.    Relators Shepherd and Rude reasonably believed that Fluor's efforts to bill for work not on its Master Scope of Work and that it was not authorized to perform, that Fluor's failure to consistently conduct 10% monthly and 100% annual inventories, that its failure use Maximo as its government-approved system of record and to accurately track and manage inventory in Maximo, and that Fluor's false representations about its property losses, Life, Health and Safety compliance times, and General Health and Safety record, all defrauded the government out of money and constituted violations of the False Claims Act.

417.    This misconduct was in fact a violation of the False Claims Act.

418.    Relators Shepherd and Rude engaged in lawful acts "in furtherance of an action" by investigating the misconduct above, notifying their supervisors and senior Fluor officials of the misconduct, and by communicating to those individuals that they refused to participate in the misconduct. Through the actions discussed herein, Relators Shepherd and Rude also took efforts to stop the False Claims Act violations discussed herein.

419.    Defendant Fluor, by and through its officers, agents, supervisors, and employees, knew of Relators' acts in furtherance of an action, and was on notice of Shepherd and Rude's objections to Fluor's conduct described above.

420.    As a direct result of Shepherd and Rude's efforts to stop Defendant Fluor's

misconduct, Fluor retaliated against them, including by denying them promotions and raises, and ultimately terminating their employment.

421. As a direct and proximate result of the actions of Defendant Fluor, by and through their officers, agents, supervisors, and employees, Relators were denied pay raises and promotions, and lost the benefits and privileges of employment and have suffered continuing damage to their otherwise successful careers.

### Count III – Contract Disputes Act, 41 U.S.C. § 7103(c)(2)

422. Relators incorporate each paragraph of this Complaint as if fully set forth herein.

423. Fluor submitted certified false claims to the ACO that were false and unsupported due to a misrepresentation of fact or fraud, in violation of 41 U.S.C. § 7103(c)(2).

424. As a result of these false claims to the ACO, Fluor caused the United States to sustain damages in an amount to be determined at trial.

425. The United States government, unaware of the falsity of the claims and/or statements made by Defendants Fluor, and in reliance on the accuracy of these claims and/or statements, paid and/or continues to pay Fluor hundreds of millions of dollars Fluor was not entitled to collect.

426. For each of the false claims described above, Fluor is liable in this action for treble the amounts of money it claimed and/or concealed from the United States, together with the appropriate statutory penalties.

### Jury Trial Demanded

The United States of America, on the relation of Charles Shepherd, Danny Rude, Scott Dillard and Rickey Mackey, hereby demand trial by jury on all issues so triable.

<u>Prayers for Relief</u>

WHEREFORE, on behalf of the United States, Relators Charles Shepherd, Danny Rude, Scott Dillard and Rickey Mackey respectfully request that the Court enter judgment in their favor and in favor of the United States of America against Defendants, as follows:

1. That Defendants cease and desist from violating 31 U.S.C. § 3729, et seq.;

2. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus interest and a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3. That Relators be awarded 30% of the United States' recovery;

4. That Relators be awarded all costs of this action, including attorneys' fees and expenses; and

5. That Relators recover such other relief as the Court deems just and proper.

WHEREFORE, on their retaliation claims, Relators Shepherd and Rude respectfully request all relief necessary to make them whole, including reinstatement, two times the amount of back pay, interest on the back pay, and compensation for all special damages sustained as a result of the retaliation, including litigation costs and reasonable attorneys' fees.

Respectfully submitted,

<u>/s/ Christopher P. Kenney</u>

Mike Kanovitz
Anand Swaminathan
LOEVY & LOEVY
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
Phone: (312) 243-5900
Fax: (312) 243-5902
mike@loevy.com
anand@loevy.com

*Attorneys for Relators Charles Shepherd and Danny Rude*

Richard A. Harpootlian (Fed. ID No. 1730)
Christopher P. Kenney (Fed. ID No. 11314)
RICHARD A. HARPOOTLIAN P.A.
1410 Laurel Street
Post Office Box 1090
Columbia, South Carolina 29202
Phone (803) 252-4848
Facsimile (803) 252-4810
rah@harpootlianlaw.com
cpk@harpootlianlaw.com

Mark Correro
LAW OFFICES OF MARK CARRERO, P.C.
2909 Hillcroft Avenue, Suite 560
Houston, Texas 77057
Office: 713.955.3323
Fax: 832.240.5353
Email:  Mark@CorreroLeisure.com
*Attorneys for Relator Rickey Mackey*

William N. Nettles
LAW OFFICES OF BILL NETTLES
2008 Lincoln Street
Columbia, SC 29205
Office:  803.814.2826
Bill@BillNettlesLaw.com

James Barger
J. Elliot Walthall
FROHSIN BARGER & WALTHALL
100 Main Street
Saint Simons Island, Georgia 31522
Phone: 205.933.4006
Of Counsel
*Attorneys for Relator Scott Dillard*

Frank L. Eppes, Fed. ID 1003
EPPES & PLUMBLEE. PA
PO Box 10066
Greenville, S.C. 29603
Phone: 864-235-2600
(f) 864-235-4600
feppes@eppesandplumblee.com

126