# Exhibit C

(Nix Complaint)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>ex rel</u>. [UNDER SEAL], | Civil Action No. 6:13-cv-01528-BHH |
| Plaintiff, | **AMENDED COMPLAINT** |
| v. | |
| [UNDER SEAL], | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| Defendants. | |

**DO NOT ENTER IN PACER**

**DOCUMENT TO BE KEPT UNDER SEAL**

**ROE CASSIDY COATES & PRICE, P.A.**

William A. Coates, Fed. ID No. 183
Joseph O. Smith, Fed. ID 10551
P.O. Box 10529
(1052 North Church Street, 29601)
Greenville, SC 29603
864-349-2600 – Telephone
864-349-0303 – Facsimile
wac@roecassidy.com – E-mail
jsmith@roecassidy.com – E-Mail

**HORTON LAW FIRM, P.A.**

W. Andrew Arnold, Fed. ID No. 5947
307 Pettigru Street
Greenville, South Carolina 29601
Telephone: (864) 233-4351
E-Mail: aarnorld@hortonlawfirm.net

**OF COUNSEL:**
Colette G. Matzzie
PHILLIPS & COHEN LLP
2000 Massachusetts Ave., NW
Washington, DC. 20036
Telephone: (202) 833-4567
Fax: (202) 833-1815
cmatzzie@phillipsandcohen.com

Larry P. Zoglin
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Telephone:  (415) 836-9000
Fax:  (415) 836-9001
Lpz@pcsf.com

*Attorneys for Plaintiff-Relator Jeffrey Nix*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>ex rel</u>.<br>JEFFREY NIX, | Civil Action No. 6:13-cv-01528-BHH |
| Plaintiff, | **AMENDED COMPLAINT FOR<br>VIOLATION OF FALSE CLAIMS ACT,<br>31 U.S.C. § 3729,<br>*ET SEQ.*** |
| v. | |
| FLUOR CORPORATION, FLUOR<br>INTERCONTINENTAL, INC., AND<br>FLUOR ENTERPRISES, INC., | **FILED IN CAMERA AND UNDER SEAL** |
| Defendants. | **JURY TRIAL DEMANDED** |

**FILED IN CAMERA AND UNDER SEAL**

**PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**DO NOT ENTER IN PACER**

Plaintiff Jeffrey Nix, through his attorneys, on behalf of the United States of America, for his Complaint against defendants Fluor Corporation, Fluor Intercontinental, Inc., and Fluor Enterprises, Inc. (collectively, "Defendants" or "Fluor") would respectfully show unto the Court:

## I.     INTRODUCTION

1.     This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements and claims made, used, presented, and caused to be made, used or presented by Defendants and/or their agents, employees and co-conspirators, in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq. ("the FCA").

2.     As described in more detail below, Fluor entered into a prime contract with the United States Government (the "Government") to provide logistical support for the United States military deployment in Afghanistan (the "Contract").  During the majority of the relevant time frame, the Contract provided that the United States would pay Fluor for allowable costs incurred in performing the Contract, plus an "award fee" based upon quality of performance.

3.     Pursuant to the Contract, Fluor provides the Government with a wide range of support services in Afghanistan, including supply operations, field operations, engineering and construction services, communication services, transportation and cargo services, and facilities maintenance and repair.

4.     The Contract requires that Fluor manage billions of dollars of Government property in inventory and provide a complete and auditable record of any shortage, loss, theft, damage or destruction of the property in that inventory.

5.     Effective and reliable management of property in inventory in Afghanistan is critically important to the United States Government to avoid repetition of prior losses that have

1

been well-publicized including the loss of $3.5 billion in property by other contractors in Iraq.

6.      As set forth in this Complaint, Fluor has defrauded the Government by charging the Government for inventory management services that Fluor contractually agreed to but did not provide.  Fluor was paid to keep track of the Government's property in Afghanistan, yet Fluor treated this obligation with reckless disregard and lost effective control over the inventory.

7.      As a result of Fluor's reckless disregard for its contractual duties, hundreds of millions of dollars of Government-owned property for which Fluor is responsible are missing and unaccounted for in Afghanistan.

8.      Fluor knowingly concealed its mismanagement of the Government property inventory system in reports Fluor submitted to the Government's Award Fee Evaluation Board (AFEB), the body that recommends the amount of award fees the contractor is entitled to under the Contract.

9.      Fluor's concealment of its profound mismanagement of inventory knowingly misled the Government and deprived the Government of the opportunity to direct Fluor to correct the significant flaws in Fluor's inventory management system in a timely manner or to refund payments for inventory management under the Contract.

10.     Fluor's knowing misstatements about property management defrauded the Government by causing the Government to award Fluor higher award fees based on exceeding performance benchmarks than if Fluor had submitted accurate information.

11.     Every invoice that Fluor submitted to the Government for defective and substandard inventory management services, and every claim for an award fee that Fluor submitted to the Government based upon false and misleading information, constitutes a violation of the False Claims Act.

2

12. Fluor's failure to disclose its misstatements about its defective and substandard inventory management services also constitutes a violation of the False Claims Act.

13. The FCA was originally enacted during the Civil War and was substantially amended in 1986, and again in 2009 and 2010. Congress amended the statute in 1986 to enhance the federal Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive, and that the statute, which Congress characterized as the primary tool for combating Government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the United States to disclose that information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

14. The FCA prohibits knowingly presenting (or causing to be presented) to the federal Government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). Additionally, the FCA prohibits knowingly making, using, or causing to be made or used, a false or fraudulent record or statement material to a false claim. 31 U.S.C. §§ 3729(a)(1)(B). Furthermore, the FCA prohibits knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government. 31 U.S.C. §§ 3729(a)(1)(G). Moreover, the FCA makes it unlawful for an employer to terminate or otherwise discriminate against an employee because that employee engaged in protected activity under the FCA, 31 U.S.C. § 3730(h). Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a)(1).

15. The FCA allows any person having information about an FCA violation to bring

an action on behalf of the United States and to share in any recovery. The complaint must be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit. Based on these provisions, *qui tam* plaintiff and relator Jeffrey Nix seeks to recover all available damages, civil penalties, and other relief for the violations alleged herein.

## II.    PARTIES

16.    The United States, the real party in interest herein, entered into the Army Logistics Civil Augmentation Program (LOGCAP IV) prime contract (the Contract) and various task orders thereunder with Fluor Intercontinental, Inc., headquartered in Greenville, South Carolina. The United States Army Sustainment Command ("ASC"), located in Rock Island, Illinois, awarded and issued the Contract. ASC bears responsibility for defining the Government's needs under the Contract, and issuing task orders pursuant to the Contract.

17.    Jeffrey Nix, the *qui tam* Plaintiff/Relator in this action (hereafter, "Relator"), is a resident of Simpsonville, South Carolina and was an employee working for Fluor in Afghanistan. Relator joined Fluor as an Operations Coordinator in Afghanistan in August 2011. In December 2012 he was promoted to Compliance Manager and remained in that position as of the date of filing this Complaint was terminated in May 2014. As a Compliance Manager, Relator was responsible for the administration and management of compliance reviews of activities performed by Fluor under the Contract. Relator reported to managers in Afghanistan and in Greenville, South Carolina. Prior to joining Fluor, Relator had extensive auditing, finance, business, and management experience in the private sector between 1996 and 2011. Relator is a highly decorated retired officer of the U.S. Army, having served in the Army for 23 years, including tours of duty in Iraq and Afghanistan.

18.     Defendant Fluor Corporation is a Delaware corporation with headquarters in Irving, Texas.  It is a holding company that owns the stock of a number of subsidiaries.  Acting through these subsidiaries, it provides engineering, procurement, construction, maintenance, and project management services on a global basis.  The company's business is aligned into five principal segments.  The segment involved in this case is the Government Segment, which is headquartered in Greenville, South Carolina.  The Government Segment's largest long-term contract is the LOGCAP IV prime contract.  Fluor has assigned responsibilities for that prime contract to Fluor Intercontinental, Inc.

19.     Defendant Fluor Intercontinental, Inc. ("Fluor Intercontinental") is a California corporation with its principal place of business in Greenville, South Carolina.  It is a wholly-owned subsidiary of Fluor Enterprises, Inc., which in turn is a wholly-owned subsidiary of Fluor Corporation.  Fluor Intercontinental is the prime contractor on the LOPCAP IV Contract.

20.     Defendant Fluor Enterprises, Inc. is a California corporation with its principal place of business in Greenville, South Carolina.  It is a wholly-owned subsidiary of Fluor Corporation and is the immediate parent of Fluor Intercontinental.

21.     Defendants will be referred to collectively in this Complaint as "Fluor" or "Defendants."

## III.    JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3729 and 3730.  Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.  Moreover, even if such a public disclosure had occurred, this Court would retain

jurisdiction over this matter because Relator is the original source of the facts and information hereinafter set forth.

23.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States.  Moreover, Defendants can be found, transact, or have transacted business in this District.

24.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and transact or have transacted business in this District. Defendants conduct substantial business in this District, including overseeing and managing the execution of the LOGCAP IV prime contract that is the subject of this Complaint.

## IV.    LOGCAP BACKGROUND

25.     The Logistics Civil Augmentation Program, or "LOGCAP," was established in 1985 to enable and coordinate civilian contractor logistical support for United States military forces deployed overseas, principally in countries with which the United States does not have treaties or agreements that would enable the host country to provide such services.  The program has grown exponentially in recent years as the Government has relied increasingly on private contractors to support military missions in Iraq, Afghanistan and elsewhere.

26.     Under the LOGCAP program at all times relevant to this Complaint, a prime contract was awarded to provide a wide range of logistical services.  Each LOGCAP prime contract contains a Statement of Work describing generally the types of services to be provided by the LOGCAP prime contractor.

27.     The services provided under the LOGCAP program include supply operations (such as the delivery of food, water, fuel, spare parts, and other items), field operations (such as

dining and laundry facilities, housing, sanitation, waste management, postal services, and

morale, welfare and recreation services), engineering and construction services, support to

communication networks, transportation and cargo services, and facilities maintenance and

repair. These operations require use of large amounts of materials and property, which are

typically maintained in storage facilities and warehouses throughout Afghanistan. The property

and materials in inventory are owned by the United States Government.

28.    As defined in the Contract and as used in this Complaint, the terms "property"

and "material" have the following meanings:

> Property means all tangible property, both real and personal.
> .        .        .        .
> Material means property that may be consumed or expended during the performance of a
> contract, component parts of a higher assembly, or
> items that lose their individual identity through incorporation into an end item. Material
> does not include equipment, special tooling, or special test equipment.

Contract, § I-326(a).

29.    Keeping track of and managing United States Government property in inventory

in Afghanistan is the contractual responsibility of the prime contractor, Fluor.

30.    LOGCAP prime contracts are awarded periodically. The United States awarded

the fourth such prime contract, LOGCAP IV, to Fluor in 2007 (Contract No W52P1J-07-D-

0008). The effective date of the Contract was June 27, 2007. The Contract was awarded by the

United States Army Sustainment Command ("ASC"), headquartered at Rock Island, Illinois.

31.    The LOGCAP IV prime contract had a one-year base period (June 27, 2007 to

June 26, 2008) and nine one-year renewal options. The Government has renewed the Contract

each year since the base year, continuing through the present date.

32.    Because it is impossible to specify the military's precise needs at the outset of

each LOGCAP prime contract, as military needs arise the Government and the prime contractor

execute "task orders" detailing particular operations or services that the contractor must furnish.

33.     Pursuant to the Contract, the Government has awarded Fluor several task order contracts for the LOGCAP IV services in Afghanistan.  References in this Complaint to the LOGCAP IV "Contract" include the task orders issued thereunder.

34.     Up until July 2012, the LOGCAP IV Contract was a "Cost Plus Award Fee" contract.  This meant that Fluor was reimbursed for allowable costs it incurred under the Contract and in addition it received a profit, consisting of a "base fee" and an "award fee," above those costs.

35.     Under the Cost Plus Award Fee contract, Fluor received a "base fee" of up to 3% of costs as the work was performed, and an additional discretionary "award fee" based on performance.  The maximum allowed under the Contract was 10% for combined base and award fees.  Contract, § H-35.

36.     Effective July 1, 2012, the LOGCAP IV Contract was renegotiated as a fixed price contract.

37.      Under the Cost Plus Award Fee Contract, the precise amount of the award fee was based upon the Government's evaluation of Fluor's performance, taking into account technical performance, cost performance, and management.  Id., § H35(d).  The evaluation is performed by the LOGCAP Award Fee Evaluation Board (AFEB).  *See* ¶¶ 82-84 below.

## V.     LOGCAP IV CONTRACT LANGUAGE AND LEGAL FRAMEWORK

38.     Like all Government contracts for goods and services, LOGCAP IV (and the task orders executed thereunder) is governed by the Federal Acquisition Regulations ("FAR"), codified in Chapter 48 of the Code of Federal Regulations.  FAR sets forth the requirements binding the executive agencies of the United States and all contractors that provide goods and

services to those agencies. 48 C.F.R. § 1.101 et seq.

39.    Because the LOGCAP IV prime contract specifically involves defense
contracting, it is also subject to the Defense Federal Acquisition Regulation Supplement
("DFARS"), promulgated by the Department of Defense ("DoD").  41 U.S.C. § 421(c)(2); see
also 48 C.F.R. § 201.301(a) (DoD implements and supplements the FAR through the DFARS).

40.    As explained below, under the FAR and DFARS provisions incorporated into the
LOGCAP IV prime Contract, Fluor was required to establish and maintain a system to control,
protect, preserve, and maintain all Government property in inventory, and to provide a complete
and auditable record of any shortage, loss, damage, or destruction of that inventory.

41.    FAR 52.245-1, entitled "Government Property," incorporated into the Contract in
Clause I-326, provides in pertinent part:

> (b) Property management. . . . The Contractor shall have a system to manage
> (control, use, preserve, protect, repair and maintain) Government property in its
> possession.  The system shall be adequate to satisfy the requirements of this clause.  In
> doing so, the Contractor shall initiate and maintain the processes, systems, procedures,
> records, and methodologies necessary for effective control of Government property,
> consistent with voluntary consensus standards and/or industry-leading practices and
> standards for Government property management . . . .
>
> \*        \*        \*        \*
>
> (f)(iii) Records of Government property.  The Contractor shall create and
> maintain records of all Government property accountable to the contract . . . .  (A)
> Property records shall enable a complete, current, auditable record of all transactions . . . .
>
> (f)(iv) Physical Inventory.  The Contractor shall periodically perform, record, and
> disclose physical inventory results. . . .
>
> (f)(vi) Reports.  The Contractor shall have a process to create and provide reports
> of discrepancies; loss, damage, destruction, or theft; physical inventory results; audits and
> self-assessments; corrective actions; and other property-related reports as directed by the
> Contracting Officer.
>
> (A)  Loss, damage, destruction, or theft.  Unless otherwise directed by the
> Property Administrator, the Contractor shall investigate and promptly furnish a written
> narrative of all incidents of loss, damage, destruction, or theft to the property
> administrator as soon as the facts become known . . . .

9

Contract § I-326; 48 C.F.R. § 52.245-1.

42.     Clause I-257 of the Contract incorporates DFARS 252.242-7004, 48 C.F.R. § 252.242-7004, which requires the contractor to maintain a Material Management and Accounting System ("MMAS").  That section of DFARS requires the following:

> (d) System Criteria.  The MMAS shall have adequate internal controls to ensure system and data integrity, and shall—
>
>  (1) Have an adequate system description including policies, procedures, and operating instructions that comply with the FAR and Defense FAR Supplement;
> . . . .
> (3) Provide a mechanism to identify, report, and resolve system control weaknesses . . . ;
> (4) Provide audit trails and maintain records (manual and those in machine readable form) necessary to evaluate system logic and to verify through transaction testing that the system is operating as desired;
> (5) Establish and maintain adequate levels of record accuracy, and include reconciliation of recorded inventory quantities to physical inventory by part number on a periodic basis. A 95 percent accuracy level is desirable.

DFARS 252.242-7004(d).

43.     In order to comply with the Contract and applicable Government regulations, the Fluor Government Group ("FGG") issued written policies and procedures governing inventory management.

44.     FGG's "Desk Top Guide" governing "Inventory Procedures" for Materials provides in pertinent part:

> **11.1 Conducting Inventories**
> 11.1.1  Inventory management should be conducted weekly at a minimum.  In order to maintain current inventory records, periodic and physical inventories shall be performed. These include but are not limited to daily random spots checks, monthly site inventories or 10% monthly cycle counts that are performed throughout the year.
>
> > 11.1.1.1     Random spot checks consist of randomly picking bin locations and notating the item description, location, quantity and verifying the information against Maximo.

> 11.1.1.2     Monthly Site or 10% inventories means that 10% of the entire warehouse is selected for inventory. This is a monthly requirement at the minimum and must be completed in order to accomplish our 100% physical yearly inventor

FGG Materials, Desk Top Guide (DTG), Inventory Procedures, Chapter 11, Revision 2 (revised January 12, 2011) (hereafter, "Desk Top Guide").

45.     The reference to "Maximo" in the above guidance is to Fluor's inventory record keeping system called "Maximo." Every item in inventory is recorded in Maximo, and all additions, subtractions, or other transactions involving inventory are recorded in Maximo. Maximo is intended to be the system of record for real time information about inventory.

46.     Fluor's Desk Top Guide governing Inventory Procedures further provides that if a discrepancy is discovered between the Maximo records and a physical inspection of inventory during a random check or monthly audit, the discrepancy must be researched and a determination made as to the reason for the discrepancy. The Desk Top Guide states in pertinent part:

**11.2 Adjusting Inventory Records**
> **11.2.1** If the comparison of the physical counts against Maximo records discovers a discrepancy, then research and determination of needing an adjustment is accomplished.

*Id.*

47.     When a physical inspection reveals fewer items in inventory than are recorded in Maximo, a "Negative Adjustment" of the Maximo records is required. A Negative Adjustment is an adjustment to the inventory records within Maximo that reflects a decline in the inventory balance.

48.     Negative Adjustments are of two types. The first type is an "Administrative Adjustment." An Administrative Adjustment occurs when the discrepancy between physical inventory and Maximo records can be accounted for due to a technical or administrative error,

11

such as miscoding items, Unit of Measurement mistake (item vs. case), placement of items in the wrong bin, items from two bins being mistakenly combined, etc.  Fluor's Desktop Guide for Inventory Procedures, process steps 11.2.1.1 and 11.2.1.2, define certain actions to be taken in conducting research to determine if the adjustment is due to an administrative error:

> 11.2.1.1 Review all issues, returns and any IPR's [Internal Purchase Requisitions] that have taken place against the item code to eliminate any administrative errors.

> 11.2.1.2 Review all open PO's [Purchase Orders] and IPO's [Internal Purchase Orders] for delinquent MRRs [Material Receiving Reports] and MRR interface errors involving item codes.

*Id.*

49.     The second type of Negative Adjustment is a "Loss, Theft, Destruction or Damage" (LTDD) adjustment.  Any shortage in inventory that cannot be determined to be Administrative Adjustments is considered an LTDD event.  When an Administrative Adjustment cannot be documented, the Contract as well Fluor internal procedures require that an LTDD report be created and provided to the Government Property Administrator.  *See* ¶ 41, *supra* (quoting Contract § I-326 and 48 C.F.R. § 52.245-1).  In relevant part,  FAR 52.245-1, entitled "Government Property," incorporated into the Contract in Clause I-326, provides:

> Loss, damage, destruction, or theft.  Unless otherwise directed by the Property Administrator, the Contractor shall investigate and promptly furnish a written narrative of all incidents of loss, damage, destruction, or theft to the property administrator as soon as the facts become known . . . .

Contract § I-326; 48 C.F.R. § 52.245-1.

50.     Fluor's Desk Top Guide for Inventory Procedures further provides that the LTDD report to the Government Property Administrator must be made no later than the Saturday after discovery of the shortage:

> 11.2.6  Any shortages will be reported to Property NLT [no later than] the following Saturday in which the shortage was found and be processed as an LTDD.

*Id.*

51.     The LTDD report provides a variety of information, including a description of the loss, the cost of the loss, the reason for the loss, and the Corrective Actions that will be taken to mitigate future losses.  Contract § I-326(f)(vi); 48 C.F.R. § 52.245-1(f)(vi).

52.     The LTDD report serves multiple purposes.  First, it apprises the Government of the missing items and the reason therefor.  Second, it permits the Government to oversee corrective action so that similar losses do not continue to occur.  Third, it provides a procedure for either assessing the cost of the loss to the contractor or, alternatively, relieving the contractor of responsibility for the missing items.

53.     Upon review of the LTDD, if the Government Property Administrator determines that the contractor should not be held financially liable for the missing items, the Property Administrator issues a "Relief of Responsibility" (ROR) report, which, as its name implies, relieves the contractor of any further responsibility for the missing items.  Contract clause I-326(f)(vii).  That clause of the Contract states:

> (vii) Relief of stewardship responsibility. Unless the contract provides otherwise, the Contractor shall be relieved of stewardship responsibility for Government property when such property is
>
>     (A) Consumed or expended, reasonably and properly, or otherwise accounted for, in the performance of the contract, including reasonable inventory adjustments of material as determined by the Property Administrator; or a Property Administrator granted relief of responsibility for loss, damage, destruction or theft of Government property . . . .

Contract clause I-326(f)(vii); 48 C.F.R. § 52.245-1(f)(vii) (same).

54.     Fluor's internal Practice Guide entitled, "FGG Government Property Control System," Practice 620.490.0133, in the section on "Physical Verification Inventories," states in pertinent part:

13

Physical Verification Inventories. . . .  Results of physical inventories including all adjustments and LTDD-related reports identified are reported in writing to the GPA [Government Property Administrator] within 30 days of the inventory completion. Where applicable, documentation providing relief of responsibility from the GPA regarding any LTDD-related reports is filed with the official property records.

55.      In addition to the random spot checks and the monthly 10% cyclic inventory,

Fluor is obligated by the Contract to conduct an end of year audit.  Results of this audit must be

reported to the Government including completed LTDD reports:

- In order to maintain current inventory records, periodic and physical inventories shall be performed.  Periodic inventories include, but are not limited to daily random spot checks, monthly, quarterly, or ten percent cyclic counts that are performed throughout the year.  Physical inventories shall be scheduled and conducted at fiscal year-end, where all counts and adjustments to the fiscal inventory is completed no later than 30 September of each fiscal year.
. . . .
- Results of the physical inventory shall be reported and forwarded to the assigned Fluor Government Property Representative. These results shall include completed LTDD reports for each documented shortage**.**

"FGG Material Management Plan," Revision 4, § 4.6.6 (entitled "Government Property Physical

Property").

56.      Further guidance on inventory management is found in the FGG Material

Management Group Internal Policy Memorandum, IPM-0005, which provides:

Section 2
If the comparison of the physical count against the Maximo records reflects a discrepancy, then the research and determination of the need for adjusting the records is accomplished IAW [in accordance with] the MMP [Material Management Plan].
.       .       .       .       .

Section 3(b)(i)
Discrepancies will be researched with due diligence in order to record the Physical Count results within 72 hour of the 2nd count and reconciliation.

57.      Additional internal guidance is found in the FGG Material Management Bulletin,

MMB-0013, Sections III and IV:

III. Shortages identified during inventories
    A. 2
        i.    The person conducting the inventory will check all of the surrounding bin locations to ensure items were not misplaced.
        ii.  Subsequent inventory counts may need to be conducted to validate the discrepancy.  If a third count is required, a foreman, supervisor or manager should be onsite to validate the count.
        iii. If the item cannot be located, the item will be inventoried and the loss immediately recorded in Maximo.
        iv. The recorded loss will produce a Maximo generated Inventory Adjustment Report (IAR). The Maximo generated IAR along with the causative research documenting the loss, and any additional documents or reports will be submitted with the LTDD as part of the IAR and LTDD audit trail.

IV. Supporting Document File
        i.  All supporting documents to justify any and all discrepancies will be retained in the materials inventory document control file for audit purposes.

58.    As alleged below, Fluor did not comply with its contractual and regulatory obligations and its internal procedures, all of which required Fluor to document inventory Negative Adjustments and to report missing items to the Government.

59.    As a consequence of Fluor's mismanagement of inventory, hundreds of millions of dollars of Government-owned materials are missing and unaccounted for in Afghanistan.

60.    Fluor concealed the extent of the problem from the Government in reports that Fluor submitted to the AFEB, thereby depriving the Government of the ability to take prompt corrective action and fraudulently earning a higher performance award fee than it was entitled to receive.

**ALLEGATIONS**

**VI.   FLUOR DEFRAUDED THE GOVERNMENT BY PROVIDING DEFECTIVE AND INADEQUATE INVENTORY MANAGEMENT SERVICES**

61.    Under its prime Contract with the Government, Fluor is responsible for managing the Government's inventory of materials and other property in Afghanistan.

62.     In 2013, Relator discovered Fluor's mismanagement of inventory in Afghanistan when Fluor's Compliance Department, of which Relator is a member, performed a Compliance Review of the process and procedures used by Fluor for making Negative Adjustments to inventory and for reporting instances of loss, theft, damage, and destruction (LTDD) to the Government.  The purpose of the Compliance Review was to determine whether Fluor's handling of Negative Adjustments complied with contractual and regulatory requirements and internal procedures.

63.     The Negative Adjustments Compliance Review grew out of an earlier Compliance Review performed by Relator's colleague Justin Jones, who, like Relator, is a Compliance Manager within Fluor's Compliance Department.  Among other areas of inquiry, Mr. Jones' Compliance Review examined a sample of 25 Negative Adjustments to inventory during the review period of January 1 to July 31, 2012.  He found that only 2 of the 25 Negative Adjustments had LTDD's associated with them, another 4 were annotated as Administrative Adjustments, and the remaining 19 had no supporting documentation whatsoever.  Mr. Jones' Compliance Review concluded that "[s]hortages found during physical inventory are not consistently being reported to Property [the Government Property Administrator] for LTDD" and that "[t]his lack of reporting demonstrates a lack of control and oversight" over the inventory.

64.     Based on Mr. Jones' report, the Compliance Department decided to conduct a Compliance Review specifically examining Fluor's handling of Negative Adjustments to inventory, in particular whether Fluor was documenting the reason for each Negative Adjustment to inventory and whether Fluor was properly reporting LTDD events to the Government.  Relator was placed in charge of this review and it led to the discovery by the Compliance Group of the practices alleged in this Complaint.

65.     As explained more fully below, the Negative Adjustments Compliance Review found that Fluor personnel were routinely making Negative Adjustments in Maximo (i.e., reducing the inventory count in Maximo) without any documentation whatsoever -- neither documentation supporting an Administrative Adjustment nor an LTDD report notifying the Government of loss, theft, damage or destruction of Government property.  Handling inventory shortages in this manner is a violation of the Contract, federal regulations, Fluor's internal procedures and policies, and sound inventory management practices, and results in a complete lack of accountability for missing items in inventory.

### A.     Details of the Compliance Review

66.     Relator was the lead reviewer for the Compliance Department's Review of Fluor's Negative Adjustments to inventory.

67.     Fluor managers that have been made aware of the results of the Compliance Review include Country Manager Steve Whitcomb, now-retired Country Audit Response and Compliance Manager Joseph Kerr, FGG Compliance Director Dave Methot, Theatre Property Manager Rickey Mackey, Deputy Theater Property Manager Ed Nukic, Country Director of Material Management Jarrold Reeves, Deputy Director of Materials Management-Afghanistan Scott Dillard, and Theater Materials Manager Michael "Shane" Ramirez.

68.     To conduct the audit of Negative Adjustments, Relator used standard sampling methodology.  The universe from which the sample was drawn consisted of all Negative Adjustments to the materials inventory in Afghanistan during the period January 1, 2010 to February 1, 2013.

69.     In total, there were 168,868 transactions involving Negative Adjustments in the universe of transactions during the selected period, i.e., 168,868 transactions in which Maximo

records had been adjusted downward to reflect shortages in inventory.  These 168,868

transactions totaled approximately $386 million dollar worth of Government-owned materials.

72.    Relator utilized standard sampling methodology to select a statistically

significant sample size for the audit, which was determined to be 59 samples from each of four

periods between January 1, 2010 and February 1, 2013, or a total of 236 samples (0.139% of the

universe of transactions).   Relator utilized EZ-Quant random number generator to select the

samples randomly.

71.    Relator reviewed the 236 Negative Adjustment transactions to determine whether

the transactions complied with the Contract, federal regulatory requirements, and Fluor's internal

policies and procedures.  For purposes of the audit, Relator examined all documentation in

Maximo (the system of record) and all back up materials provided by the Regional Supply

Centers in response to a request for these materials from the Compliance Department.  In

addition, Relator reviewed the Fluor Material Management Group's LTDD database (maintained

by the Fluor Government Property Department), which is the repository of all LTDD reports.

72.    The Compliance Review audit found gaping holes in Fluor's management and

oversight of the materials inventory in Afghanistan. These findings are explained below.

**1.    Hundreds of Millions of Dollars of Materials In Inventory in
Afghanistan Are Missing and Unaccounted-For**

73.    The Compliance Department's audit found that in 190 of the 236 Negative

Adjustments audited, there was no documentation whatsoever of the Negative Adjustment.  Of

the remaining 46 Negative Adjustments, 37 were instances in which an Administrative

Adjustment was documented, and nine were transactions in which an LTDD was prepared.

74.    In sum, the audit showed that in 80.5% of the Negative Adjustments (190 of 236

cases), Maximo records had been adjusted downward with no back-up documentation, no

18

explanation, and no audit trail.  This meant that in the vast majority of instances when a shortage

was discovered in inventory, Fluor personnel simply papered over the shortage by adjusting the

Maximo records downward.  If Fluor had followed required procedures, it would have prepared

an LTDD report notifying the Government of the loss since there was no evidence of an

Administrative Adjustment.

75.    Fluor's practice of making Negative Adjustments to inventory without

documenting an Administrative Adjustment or creating an LTDD report violated the Contract,

federal regulations, and Fluor's internal procedures.

76.    Fluor's failure to account for the missing inventory concealed from the

Government the extent of Fluor's mismanagement of inventory and deprived the Government of

the ability to direct Fluor to correct the problem in a timely manner.

77.    As noted above, the 168,000 Negative Adjustments during the three year period

under review totaled approximately $386 Million in value.  Given that 80.5% of the Negative

Adjustments had no audit trail and no reporting of an LTDD, this represents $360 million in

missing and unaccounted-for Government materials for which Fluor is responsible.

78.    Extrapolated over the entire term of Fluor's Logcap IV contract, and all property

in inventory, the estimated amount of missing Government property for which Fluor is

responsible under the Contract, is over a billion dollars.

## 2.    Fluor Misrepresented the Number of LTDD Events In Reports to the AFEB.

79.    FAR provides regulations for managing and overseeing the award fee process for

Cost Plus Award Fee contracts.

80.    FAR 16.405-2, "Cost-Plus-Award-Fee Contracts," states that the amount of the

award fee to be paid is determined by the Government's evaluation of the contractor's

performance in terms of the criteria stated in the contract.

81.     The Contract in this case provides that: "The payment of any award fee is contingent upon earning a performance rating of good, very good or excellent."  Contract, § H-35.f.  The amount of the fee rises with each higher rating.  *See id.*

82.     The AFEB evaluates the contractor's performance semiannually by reviewing the contractor's written self-assessment as well as the assessment of Government representatives.  Contract, § H-35.d.  Contract Clause H.36.d(6) provides:

> The LOGCAP Award Fee Evaluation Board (AFEB) will evaluate Contractor performance on each CPAF [Cost Plus Award Fee] task order not less than semi-annually by:
> (a) Reviewing Contractor performance as measured against the LOGCAP award fee evaluation criteria.
> (b) Reviewing the Contractors written assessment describing its performance during the evaluation period.

83.     Under the Contract, Fluor's written self-assessment is due within five working days prior to the end of the evaluation period.  Contract, § H.36.d(7).  "This written assessment of the Contractors performance throughout the evaluation period should contain any information that may be reasonably expected to assist the AFEB in evaluating the Contractors performance."  *Id.*

84.     Based on its evaluation of Fluor's performance, AFEB recommends an award to the Award Fee Determining Official ("AFDO"), who makes the final decision about the amount of the award fee.  Contract, § H.36.e.

85.     During the Compliance Review, Relator discovered that in Fluor's biannual self-assessment reports to the AFEB, Fluor misrepresented the number of LTDD events that had occurred during the reporting period.  Fluor misrepresented the number in two different ways.

86.     First, as explained above, Fluor did not prepare LTDD reports in the large

majority of instances where an LTDD was required, i.e., inventory shortages that could not be documented as Administrative Adjustments. *See* ¶¶ 73-74 above. Since Fluor did not report these shortages as LTDDs, even though it should have done so, Fluor's internal records and Fluor's self-assessment reports to the AFEB based upon its internal records underreported the number of LTDD events.

87. Secondly, Fluor counted only a <u>subset</u> of its LTDD reports (already artificially low due to the practice noted immediately above) when it prepared its self-assessment reports for the AFEB. Relator discovered this latter practice during the Negative Adjustments Compliance Review when Relator compared (1) Fluor's LTDD database maintained by the Property Department with (2) Fluor's self-assessment reports submitted to the AFEB (including Fluor's back-up information for the reports).

88. Fluor's LTDD database consists of every LTDD report prepared by Fluor. Fluor's self-assessment reports to the AFEB state the number of LTDD events during the reporting period as a percentage. The percentage is the ratio of the value of all LTDD reports in the reporting period divided by the total value of all property in inventory.

89. In order to receive a rating of good, very good, or excellent for the performance category of "Materials and Property Management," Fluor tries to keep the percentage of LTDD events as low as possible. The industry standard for LTDDs is 2% of all inventory. In order to qualify for the highest possible performance evaluation, Fluor sought to keep its LTDD rate below 2%. The smaller the percentage, the higher Fluor's performance evaluation and corresponding award.

90. When Relator compared Fluor's LTDD database with Fluor's reports to the AFEB, he discovered that the number of LTDD reports in the former was much greater than the

number relied upon by Fluor in the latter.

91.     Following is a chart showing the discrepancy between (i) the number of LTDD

reports in Fluor's LTDD database (which itself only contained a fraction of the actual LTDD

events) and (ii) the number of LTDD events that Fluor reported to the AFEB.  This chart is for

the period January 2011 through June 2012 (the period for which Relator had access to complete

records).  After June 2012, the Contract became a fixed price contract and reports to the AFEB

were no longer required (because there was no longer an award fee).

### LTDD Comparison Table

Number of LTDD Reports

| 2011 | LTDD Database | AFEB Backup[1] |
|------|--------------:|---------------:|
| Jan | 491,446.06 | 286,979.63 |
| Feb | 496,571.41 | 312,597.22 |
| Mar | 2,748,400.98 | 340,512.74 |
| Apr | 3,058,765.31 | 188,857.67 |
| May | 1,968,137.30 | 157,588.97 |
| Jun | 1,340,012.99 | 126,401.01 |
| Jul | 584,348.35 | 2,584,263.78 |
| Aug | 605,095.22 | 751,244.86 |
| Sep | 410,941.42 | 516,688.58 |
| Oct | 2,128,901.67 | 15,453.64 |
| Nov | 437,308.43 | 47,553.96 |
| Dec | 3,829,434.97 | 130,533.90 |
| **Total** | **18,099,364.11** | **5,458,675.96** |

| 2012 | LTDD Database | AFEB Backup |
|------|--------------:|------------:|
| Jan | 1,418,486.53 | 218,868.73 |
| Feb | 630,903.16 | 2,472,593.33 |
| Mar | 2,838,477.20 | 745,908.18 |
| Apr | 1,233,775.59 | 2,412,457.12 |
| May | 2,756,517.20 | 32,990.73 |

---

[1] As noted in ¶88 above, Fluor's self-assessment reports to the AFEB express the number of LTDDs as a percentage.  The back-up information for the self-assessment reports show the number of LTDD reports that Fluor used to calculate this percentage.

| Jun | 1,539,423.08 | 23,988.52 |
|------|---------------|-------------|
| **Total** | **10,417,582.76** | **5,906,806.61** |

92.    Fluor presented a series of slides biannually to the AFEB on its performance on different aspects of the Contract, including management of property and materials in inventory. In each biannual slide presentation, Fluor reported that its LTDD ratio was below 2%; however, it could only make this claim by not counting all of its LTDD events.

93.    Fluor's January 1 – June 30, 2011 AFEB Report under Task Order 5 states, *inter alia*, that "LTDDs total only *0.23%* of the property book dollar value," exceeding the LTDD industry standard of 2% and showing "good stewardship of Government . . . property." [Emphasis in original.]

94.    Fluor's July 1, 2011-December 31, 2011 AFEB report states that Fluor had "achieved *0.05%* LTDD rate, *40* times better than industry standard of 2%."   [Emphasis in original.]

95.    Fluor's January 1, 2012 – June 30, 2012 AFEB Report states that total LTDDs "averaged *0.05%* of the property book dollar value" and "demonstrated good stewardship" of Government property.  [Emphasis in original.]

96.    While conducting the Compliance Review, Relator informed Ramirez, Reeves, Mackey, Nukic, and Dillard, among others, of discrepancies between the LTDD database and LTDDs as reported to the AFEB.

97.    On April 3, 2013, Theater Property Manager Rickey Mackey directed questions on the AFEB reports to Fluor's Government Property Supervisor, Theater Property Book, Amir Jetishi.  Jetishi confirmed that, until 2012, only LTDDs with ROR were reported to the AFEB but that the Government directed that *all* LTDDs, without regard to ROR status, be included in

reports to the AFEB.

98.     In an email on April 4, 2013, Deputy Theater Property Manager Nukic also confirmed that LTDD data in Fluor's database should match the numbers for all LTDDs in monthly backup reports utilized for AFEB reporting or "otherwise someone was taking some liberty with data and I know it wasn't us."

99.     Fluor's misrepresentation of the number of LTDD events in its reports to the AFEB, along with all of the other practices alleged in this Complaint, caused the Government to pay award fees to Fluor to which Fluor was not entitled.

**B.     Fluor Used Various Deceptive Practices to Cover Up the Extent of Missing Materials in Inventory**

100.     Fluor used various deceptive practices to conceal from the Government Fluor's failure to maintain control over the inventory.  The examples provided below are intended to be representative and not exhaustive of all of the schemes used by Fluor to conceal the failings of its inventory management system.

101.     Fluor's engages in the practice of "balancing" inventory shortages at one warehouse against inventory surplus at another warehouse, and canceling the two out in the Maximo system.  This practice effectively treats the shortage and surplus as if they never existed. This is not an accepted practice in inventory management.  It turns a blind eye to the underlying cause of the shortage or the surplus, and thus eliminates the possibility of correcting the problem in the future

102.     Another ruse that Relator encountered took place at the level of Fluor's eight Regional Distribution Centers in Afghanistan.  In February and March 2013, as part of the Compliance Review of Negative Adjustments, Fluor's Compliance Department requested any records reflecting either Administrative Adjustments, LTDDs, or other explanation for the

Negative Adjustments in the audit.  Managers Ramirez and Reeves directed that the eight RDCs provide back-up documentation for the 236 Negative Adjustments to inventory in the sample population.

103.    In response to this request, the Compliance Department received no response whatsoever from six of the eight RDCs, even though each of these six had a sizeable number of Negative Adjustments in the sample population.  The two RDC's that did respond – Salerno and Fenty – each provided a number of backdated documents that suggested an attempt to cover-up failings in their inventory management.

104.    The Fenty RDC submitted 53 Memoranda that purported to document the reason for 53 Negative Adjustments to inventory at the Fenty RDC (53 was the number of Fenty Negative Adjustments in the sample of 236 Negative Adjustments).  A close examination by Relator of these Memoranda revealed that all of them were backdated to look like they were created contemporaneous with the Negative Adjustment, whereas in truth they were created in response to the much later request of the Compliance Department.

105.    Relator detected the backdating of the Fenty Memoranda by (1) examining the metadata of the documents (submitted in electronic format) which showed that the document had been created contemporaneous with the request of the Compliance Department, and also (2) by examining the date the author of the document was assigned to the Fenty RDC, which showed that the author was not assigned to Fenty until after the purported date the document was created.

106.    Moreover, the backdated Memoranda provided by the Fenty RDC did not even accomplish the purpose for which they were intended, which was to justify the Negative Adjustment.  The Fenty Memoranda simply stated, "The below item code was adjusted because it was not located during inventory on [the date of the physical inspection]."  This was merely a

restatement of the problem – that the items were missing from inventory – and offered no explanation for *why* the items were missing.

107.    The Salerno RDC submitted eight Memoranda (the number of Salerno Negative Adjustments in the sample population) in response to the Compliance Department's request. Relator's examination of these Memoranda revealed that four of them were backdated to look like they were created contemporaneous with the Negative Adjustment, whereas in truth they were created only in response to the much later request of the Compliance Department. Relator detected the backdating of the Salerno in the same manner he detected the Fenty backdating. *See* ¶ 105 above.

108.    As noted above, the other six RDCs did not even make an attempt to provide back-up documentation for the Negative Adjustments in their region, effectively conceding that there was no back-up documentation and thus no known reason for the Negative Adjustments in their region. The non-responsiveness of six RDCs and the inadequate response of the other two RDCs supported the conclusion of the Compliance Review that Fluor's system for managing inventory is fundamentally inadequate and that Fluor handled recklessly its responsibility to maintain oversight over Negative Adjustments to inventory and account for Government property.

**C.    Similar Practices Concerning Durable Property Inventory**

109.    This Complaint largely focuses on Fluor's management of materials inventory. Materials are consumable items. However, Relator is informed and believes that Fluor's management of durable property inventory is subject to the same deficiencies.

110.    Relator's Compliance Review found that the deficiencies in Fluor's handling of Negative Adjustments to materials inventory were systemic, affecting all regions and inventory

management personnel at all levels. Thus it is reasonable to conclude, and on that basis Relator alleges, that this practice affected durable property inventory as well as materials inventory.

111.    Further support for this allegation is found in Corrective Action Reports ("CAR") issued by the Defense Contract Management Agency (DCMA) in Afghanistan. For example, on April 27, 2013, DCMA issued a CAR to the Bagram RDC. This CAR cited several deficiencies in Bagram's management of durable property inventory due to inadequate processes and controls. These deficiencies included the failure to maintain an accurate physical location of property within Maximo, failure to turn in equipment to the Government after representing that it had done so, and failure to record the physical location and custodian of property in the system of record.

112.    Another CAR was recently issued to an RDC for losing 300,000 gallons of fuel, valued at approximately $4,000,000. This CAR is of such sensitivity that it is being tightly controlled and not widely disseminated

113.    The deficiencies cited in these CARs provide further evidence of faulty control and process affecting Fluor's management of inventory of all types.

**D.    Fluor's Liability For Mismanaging The Government's Inventory in Afghanistan**

114.    As set forth above, Fluor failed to manage the Government's inventory of property in Afghanistan in the manner required by the Contract and federal regulations.

115.    Each voucher or invoice that Fluor submitted to the United States claiming costs associated with inventory management, and claiming entitlement to an award for performance ranked good or better, was an affirmative statement that such costs and award fee were payable pursuant to the terms of the prime Contract and task orders thereunder, and the FAR provisions referenced therein, and each such statement therefore was material to a false claim for payment.

27

116.    Fluor submitted these false and fraudulent claims with the knowledge and intention that such claims would be presented to officers and employees of the United States Government for payment or approval.  Fluor did so with actual knowledge of the falsity of each claim, reckless disregard for the truth and falsity of each claim, or deliberate indifference to the truth or falsity of each claim.

117.     As a result of Fluor's false and fraudulent claims and statements, the United States paid substantially in excess of the amounts it owed under the Contract and task orders thereunder.

118.    Pursuant to FAR 52.245-1, incorporated into the Contract at clause I-326, Fluor was responsible for the loss of any Government property in its possession that resulted from "willful misconduct or lack of good faith."

119.    The actions of Fluor in knowingly disregarding obligations under the Contract and federal regulations, and in making false statements to the Government for the purpose of increasing its award fee under its Cost Plus Award Fee contract, establish lack of good faith and willful misconduct.  Accordingly, Fluor is liable for the full amount of the materials missing and unaccounted-for in inventory, amounting to several hundreds of millions of dollars.

120.    The Contract also permits withholding of payments from the prime contractor in certain circumstances.  DFARS 252.242-7004, incorporated into Clause I-257 of the Contract, defines "significant deficiency" in the contractor's Material Management and Accounting System (MMAS) as follows:

> *"Significant deficiency"* means a shortcoming in the system that materially affects the ability of officials of the Department of Defense to rely upon information produced by the system that is needed for management purposes."

DFARS 252.242-7004(a)(5).

121.    If the Contracting Officer determines that there are significant deficiencies in the contractor's MMAS, the contractor has 45 days to correct the deficiencies or submit an acceptable corrective action plan to correct the deficiencies.  Id. § (f).

122.    DFARS 252.242-7005, incorporated into clause I-258 of the Contract, provides for the withholding of up to 5% of payments for significant deficiencies.  Moreover, pursuant to 48 C.F.R. § 52.232-16(c), the Contracting Officer "may reduce or suspend progress payments" for the Contractor's "failure to comply with any material requirement of [the] contract").  Maintaining proper inventory control is a material requirement of the LOGCAP IV prime Contract.

123.    By concealing from the Government, the lack of effective inventory control, Fluor avoided the withholding, reduction or suspension of progress payments.

124.    Clause HA70022 of the Contract governs Contractor Demobilization, and provides in subsection (a)(4):

> (4) Government Furnished Equipment/Materials: . . .  Prime contractors who are not in compliance with the FAR, Defense Federal Acquisition Regulation Supplement, Department of Defense Directives and Instructions, United States Forces-Afghanistan (USFOR-A) FRAGOs, policies, or procedures will be responsible and liable for damages to the government property. The prime contractor may apply for a "relief of responsibility" from the Contracting Officer anytime during the contract performance period. . . .  The prime contractor shall report lost, damaged or destroyed property immediately to the Contracting Officer, but no later than the joint inventory at the end of the contract period. <u>If the prime contractor fails to report lost, damaged or destroyed equipment or materials during the contract performance period, the prime contractor shall be responsible for the replacement and/or repair of the equipment or materials.</u>

Emphasis added.

125.    Because Fluor failed to report to the Contracting Officer lost, damaged or destroyed materials in a timely manner, Fluor was not eligible for a "relief of responsibility" for the loss, damage or destruction of these materials.  Consequently, Fluor is fully responsible and

liable for the value of the missing property, amounting to hundreds of millions of dollars.

## STATEMENT OF CLAIMS
### Count I
### (Against All Defendants)
### False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A), (B), (G)

126.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 125 of this Complaint.

127.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

128.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the United States government for payment or approval.

129.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

130.     By virtue of the acts described above, Defendants knowingly and improperly avoided or decreased an obligation to transmit money or property to the United States Government.

131.     Relator cannot at this time identify all of the false and fraudulent claims that were caused by Defendants' conduct.  Documentation of such claims is in the possession of the Government and the Defendants, and Relator has no access to such records.

132.     The Government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

133.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

134.    Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## PRAYER

WHEREFORE, Relator prays for judgment against Defendants on Count I as follows:

a.    That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

b.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus interest and a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c.    That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

d.    That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

e.    That Relator recover such other relief as the Court deems just and proper.

### COUNT II
### (Against All Defendants)
### False Claims Act
### 31 U.S.C § 3730(h)

135.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 134 of this Amended Complaint.

136.    Relator was employed by Fluor beginning August 2011 as an Operations Coordinator and accepted a position as Compliance Manager in December 2012.

137.    In 2013, Relator discovered the discrepancies between the inventory records and the Maximo records, as well as the mismanagement of inventory in Afghanistan.  Further,

Relator discovered that the handling and accounting of the inventory shortages were being done in a fraudulent manner and in violation of federal law.

138.    In 2013 and 2014, Relator engaged in protected activity under the FCA in reporting these discoveries to his superiors in Afghanistan and in Greenville, South Carolina. Relator on numerous occasions requested that his superiors take corrective actions in connection with the false inventory reports.

139.    Moreover, Relator engaged in protected activity under the FCA when he refused to acquiesce in Fluor's scheme to cover-up Fluor's systematic practice of mishandling of Government property and fraudulent accounting for such lost property.

140.    Relator engaged in protected activity under the FCA when he filed this action as a Relator in 2013.

141.    At all times, Relator performed his duties as Compliance Manager satisfactorily and without complaint or objection by his superiors.

142.    In or about May 2014, Relator and Justin Jones were summoned to meet with Gary Harber, Chief of Staff and second in command for Fluor's Afghanistan operations. Upon arriving at such meeting, Fluor informed Relator and Jones that their positions had been eliminated. They were further informed that their compliance functions were being transferred to Greenville, South Carolina.

143.    Relator was thereby terminated.

144.    However, Justin Jones was simultaneously offered another position, and later returned to Afghanistan in a compliance role. The position offered to Jones was not posted on the job posting board, thereby denying Relator the opportunity to remain employed with Fluor.

145.    Fluor knew Relator had engaged in protected activity under the FCA.

146.    Fluor terminated Relator in retaliation for his protected activity under the FCA in violation of 31 U.S.C. § 3730(h).  Moreover, Fluor discriminated against Relator by refusing to allow him an opportunity to apply for a vacant position for which he was the best qualified candidate.

147.    Relator's protected activity under the FCA was a motivating factor in Fluor's termination of him as well as Fluor's subsequent actions to conceal the job opportunity made available to Jones.

148.    Fluor's actions have caused and will continue to cause Relator economic loss, including lost salary, benefits, and favorable tax treatment of wages earned in Afghanistan. Moreover, such actions have damaged his professional reputation and future earning potential.

**PRAYER**

WHEREFORE, Relator prays for judgment against Defendants on Count II as follows:

a.    Award Relator back pay, two (2) times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees under 31 U.S.C. § 3730(h);

b.    Award reinstatement with the same seniority status Relator would have had but for the discrimination, or in the alternative, front pay; and

c.    That Relator recover such other relief as the Court deems just and proper to make Relator whole.

**(SIGNATURE ON FOLLOWING PAGE.)**

Respectfully submitted,

By:   /s/ William A. Coates
        William A. Coates, Fed. ID No. 183
        Joseph O. Smith, Fed. ID No. 10551
        ROE CASSIDY COATES & PRICE, P.A.
        P.O. Box 10529
        (1052 North Church Street, 29601)
        Greenville, SC 29603
        864-349-2600 – Telephone
        864-349-0303 – Facsimile
        wac@roecassidy.com – E-mail
        jsmith@roecassidy.com – E-mail

        W. Andrew Arnold, Fed. ID No. 5947
        HORTON LAW FIRM, P.A.
        307 Pettigru Street
        Greenville, South Carolina 29601
        Telephone: (864) 233-4351
        E-Mail: aarnorld@hortonlawfirm.net

**OF COUNSEL:**
Colette G. Matzzie
PHILLIPS & COHEN LLP
2000 Massachusetts Ave., NW
Washington, DC. 20036
Telephone: (202) 833-4567
Fax: (202) 833-1815
cmatzzie@phillipsandcohen.com

Larry P. Zoglin
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Telephone:  (415) 836-9000
Fax:  (415) 836-9001
Lpz@pcsf.com

        ***Attorneys for Plaintiff-Relator Jeffrey Nix***


        Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

        By:   /s/ William A. Coates
            William A. Coates, Fed. ID No. 183

Greenville, South Carolina
April 7, 2017