**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

UNITED STATES OF AMERICA *ex rel.*
CHARLES R. SHEPHERD, DANNY V.
RUDE; ROBERT SCOTT DILLARD; AND
RICKEY MACKEY,
              Plaintiffs,

    v.

FLUOR CORPORATION, FLUOR
INTERCONTINENTAL, INC.,
           Defendants.

Civil Action No. 6:13-cv-02428-JD

## (REDACTED) MEMORANDUM IN SUPPORT OF MOTION TO COMPEL AND FOR PARTIAL STAY OF DISCOVERY

Mark C. Moore (Fed. ID No. 4956)
Konstantine P. Diamaduros (Fed. ID 12368)
Nexsen Pruet LLP
1230 Main St.
Ste. 700
Columbia, SC 29201
Columbia, SC
Telephone: (803) 540-2146
Facsimile: (803) 727-1458
MMoore@nexsenpruet.com
KDiamaduros@nexsenpruet.com

Craig D. Margolis (admitted *pro hac vice*)
Tirzah S. Lollar (admitted *pro hac vice*)
Christian D. Sheehan (admitted *pro hac vice*)
Emily Reeder-Ricchetti (admitted *pro hac vice*)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, D.C. 20001-3743
Telephone: (202) 942-6127
Facsimile: (202) 942-5999
craig.margolis@arnoldporter.com
tirzah.lollar@arnoldporter.com
christian.sheehan@arnoldporter.com
emily.reeder-ricchetti@arnoldporter.com

*Counsel for Defendants Fluor Corporation &
Fluor Intercontinental, Inc.*

September 12, 2022

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

**FACTUAL BACKGROUND** ........................................................................................... 3

I.    Fluor Counsel-Directed Internal Investigations ...................................................... 3

II.   The Counsel-Directed Materials Management Investigation .................................. 5

III.  Distribution and Use of Fluor's Privileged Materials ........................................... 11

IV.   Post-Declination Procedural History .................................................................... 15

**ARGUMENT** ................................................................................................................ 19

I.    Fluor's Internal Investigation, Including the Work Performed by Nix and Payne, is Protected by the Attorney-Client Privilege and the Attorney Work Product Doctrine ........................ 19

      A.   The Materials Management Investigation is Subject to the Attorney-Client Privilege and Attorney Work Product Protection ..................................................... 20

      B.   The Disputed Documents Are Privileged and/or Work Product .............................. 22

II.   Fluor Is Entitled to Discovery Regarding the Distribution and Use of Its Privileged Documents in This Litigation .................................................................................. 24

      A.   The Discovery Fluor Seeks is Relevant & Proportional ........................................... 24

      B.   Relator's Privilege Objections Are Meritless ......................................................... 27

III.  This Court Should Partially Stay Discovery ........................................................ 33

**CONCLUSION** ............................................................................................................ 35

i

## **TABLE OF AUTHORITIES**

**Cases**                                                                                            **Page(s)**

*Abbott Labs. v. H&H Wholesale Servs., Inc.*,
    2018 WL 2459271 (E.D.N.Y. Mar. 9, 2018) ..........................................................................32

*AVX Corp. v. Horry Land Co.*, 2010 WL 4884903 (D.S.C. Nov. 24, 2010) ...............................28

*Brown-Thomas v. Hynie*, 2019 WL 1043724 (D.S.C. Mar. 5, 2019) ...........................................33

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) ...........................................................................24

*Charleston Med. Therapeutics, Inc. v. AstraZenaca Pharms. LP*,
    2015 WL 12805685 (D.S.C. Mar. 4, 2015) ......................................................................20

*Cooper v. Richland Cty Recreation Comm.*,
    2018 WL 4594944 (D.S.C. Sept. 25, 2018) ......................................................................21

*Equal Rights Ctr. v. Equity Residential*,
    2008 WL 11363366 (D. Md. June 6, 2008) ......................................................................22

*Gates Corp. v. CRP Indus., Inc.*, 2019 WL 2183408 (D. Colo. May 21, 2019) ..........................31

*Haigh v. Matsushita Elec. Corp. of Am.*, 676 F. Supp. 1332 (E.D. Va. 1987) .............................32

*Harleysville Ins. Co. v. Holding Funeral Home, Inc.*,
    2017 WL 4368617 (W.D. Va. Oct. 2, 2017) ...............................................................27, 34

*Harris Davis Rebar, LLC v. Structural Iron Workers*
    *Local Union No. 1, Pension Trust Fund*, 2019 WL 447622 (Feb. 5, 2019) ...........................34

*Herring v. Lapolla Indus., Inc.*, 2013 WL 12148769 (D.S.C Aug. 30, 2013) ..............................33

*In re Allen*, 106 F.3d 582 (4th Cir. 1997) ...............................................................................20, 22

*In re County of Erie*, 473 F.3d 413 (2d Cir. 2007) .......................................................................25

*In re Fluor Intercontinental, Inc.*, 803 F. App'x 697 (4th Cir. 2020)........................................3, 21

*In re Fresh & Process Potatoes Antitrust Litig.*,
    2015 WL 1222278 (D. Idaho Mar. 17, 2015) ...................................................................21

*In re Grand Jury Proceedings*, 102 F.3d 748 (4th Cir. 1996) ................................................29, 31

*In re Grand Jury Proceedings #5 Empanelled Jan. 28, 2004*,
    401 F.3d 247 (4th Cir. 2005) ........................................................................................30, 31

*In re Grand Jury Subpoena*, 204 F.3d 516 (4th Cir. 2000) ........................................................28

*In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129*,
    902 F.2d 244 (4th Cir. 1990) .............................................................................................32

*In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*,
    318 F.3d 379 (2d Cir. 2003).................................................................................................2

*In re Int'l Payment Grp.*, 2011 WL 4738321 (D.S.C. Oct. 6, 2011) ...........................................22

*In re KBR, Inc.*, 756 F.3d 754 (D.C. Cir. 2014).............................................................20, 21, 23

*In re KBR, Inc.*, 796 F.3d 137 (D.C. Cir. 2015).......................................................................20

*In re Kunstler*, 914 F.2d 505 (4th Cir. 1990)............................................................................24

*In re Sealed Case*, 146 F.3d 881 (D.C. Cir. 1998)....................................................................20

*In re Sealed Case*, 676 F.2d 793 (D.C. Cir. 1982)....................................................................29

*In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019) .....................20, 25, 29

*In re Smith & Nephew Birmingham Hip Resurfacing
    Hip Implant Prod. Liab. Litig.*, 2019 WL 2330863 (D. Md. May 31, 2019)..........................22

*In re Uehling*, 2013 WL 3283212 (E.D. Cal. June 27, 2013) ......................................................31

*Int'l Med. Grp., Inc. v. Walker*, 2011 WL 1752101 (S.D. Ind. May 9, 2011) ..............................32

*Knox Energy, LLC v. Gasco Drilling, Inc.*,
    2014 WL 4052806 (W.D. Va. Aug. 14, 2014) .......................................................................28

*Lashley v. Spartanburg Methodist Col.*,
    2020 WL 12787706 (D.S.C. Aug. 6, 2020)...........................................................................28

*Madanes v. Madanes*, 199 F.R.D. 135 (S.D.N.Y. 2001) ...........................................................31

*Moody v. IRS*, 654 F.2d 795 (D.C. Cir. 1981) ..........................................................................30

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Murray Sheet Metal Co.*,
    967 F.2d 980 (4th Cir. 1992) .........................................................................................2, 21

*Parrott v. Wilson*, 707 F.2d 1262 (11th Cir. 1983)...............................................................30, 31

*Popov ex rel. Delgado v. QBE Ins. Corp.*,
    2021 WL 2328035 (D.S.C. June 8, 2021)...............................................................................3

*Projects Mgmt. Co. v. Dyncorp Int'l*, 734 F.3d 366 (4th Cir. 2013) ..........................................24

*Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 280 (E.D. Va. 2004) ...................................30, 32

*Richards v. Jain*, 168 F. Supp. 2d 1195 (W.D. Wash. 2001)...................................................25, 27

*Schaefer v. Fam. Med. Ctrs. of S.C., LLC*,
2019 WL 5893478 (D.S.C. July 26, 2019) .........................................................................31, 32

*Shaffer v. Nw. Mut. Life Ins. Co.*, 2006 WL 2432110 (N.D.W. Va. Aug. 21, 2006)....................28

*St. John Haney v. Kavoukijian*, 2020 WL 12762509 (D.S.C. Aug. 3, 2020) ...............................23

*TJF Servs., Inc. v. Transp. Media, Inc.*,
2019 WL 7599942 (E.D.N.C. Jan. 22, 2019) ...........................................................................28

*United States ex rel. Bumbury v. Med-Care Diabetic & Med. Supplies, Inc.*,
101 F. Supp. 3d 1268 (S.D. Fla. Mar. 9, 2015)........................................................................26

*United States ex rel. Doe v. X Corp.*, 862 F. Supp. 1502 (E.D. Va. 1994)...................................27

*United States ex rel. Frazier v. IASIS Healthcare Corp.*,
2012 WL 130332 (D. Ariz. Jan. 10, 2012) .........................................................................25, 26

*United States ex rel. Hartpence v. Kinetic Concepts, Inc.*,
2013 WL 2278122 (C.D. Ca. Apr. 8, 2013) ........................................................................25, 27

*United States v. Nobles*, 422 U.S. 225 (1975) .......................................................................20, 21

*United States v. Quest Diagnostics*, 734 F.3d 154 (2nd Cir. 2013)........................................25, 26

*United States v. Schaffer Equip. Co.*, 11 F.3d 450 (4th Cir. 1993)...............................................24

*United States v. (Under Seal)*, 748 F.2d 871 (4th Cir. 1984) ........................................................2

*United States v. Zolin*, 491 U.S. 554 (1989) .................................................................................29

*Ulrich v. Hearst Corp.*, 809 F. Supp. 229 (S.D.N.Y. 1992) .........................................................26

*Upjohn v. United States*, 449 U.S. 383 (1981)....................................................................*passim*

*Walker v. GEICO Indem. Co.*, 2017 WL 1174234 (M.D. Fla. Mar. 30, 2017) .......................25, 27

*Washington v. Follin*, 2016 WL 1614166 (D.S.C. Apr. 22, 2016)................................................29

*Wellin v. Wellin*, 211 F. Supp. 3d 793 (D.S.C. 2016) ..................................................................32

Defendants Fluor Corporation[1] and Fluor Intercontinental, Inc. (collectively, "Fluor") file this memorandum of law in support of Fluor's Motion to Compel Discovery and for Partial Stay of Non-Document Discovery.[2]

## INTRODUCTION

Upon receiving a government subpoena relating to its material management practices in Afghanistan in March 2013, Fluor began a comprehensive internal investigation directed by counsel and with the participation of subject matter experts, including compliance personnel. At the same time, the government conducted its own extensive investigation and ultimately declined to intervene in this False Claims Act ("FCA") case. In the course of that investigation, Fluor learned that two of its former employees who participated in Fluor's internal investigation, Jeffrey Nix and David Payne, had stolen information and documents protected by the attorney-client privilege and work product doctrine. Fluor also learned that these protected materials were provided to government counsel and counsel for the other relators,[3] as evidenced by the fact that

---

[1] "Fluor Corporation, Inc." does not exist. As noted in Fluor's Local Rule 26.01 Responses, Dkt. 125, this entity should properly be referred to as Fluor Corporation.

[2] This Motion and a related Motion to Seal were originally filed on June 15, 2022. See Dkt. 273 & 274. Fluor voluntarily withdrew both Motions on August 17, 2022, Dkt. 290, consistent with the Court's directive during the August 8, 2022 telephonic status conference and the parties' subsequent discussions, and now re-files it pursuant to the parties' agreed schedule. Dkt. 292 at n. 2 (noting that Fluor will file motions on September 12, 2022, and that the parties have agreed that Relators' opposition briefing is due October 7, and Fluor must file its reply by October 26).

[3] After Fluor received copies of the documents Nix and Payne provided to the government, Fluor identified 29 privileged documents provided by Nix (identified herein as "Nix Priv. Log" documents) and 16 privileged documents provided by Payne (identified herein as "Payne Priv. Log" documents). Relators have disputed the privilege assertions for all 45 documents ("Disputed Documents"). This memorandum also incorporates privileged communications and work product that is closely related to one or more of the disputed documents (identified herein as "Ex Parte Ex."), as well as relevant non-privileged documents (identified herein as "Ex.").

several of them were displayed at a meeting hosted by the Department of Justice (DOJ) in which relators' counsel participated.[4]

Despite Fluor's repeated requests, the government and Relators' counsel refused to provide any information about the theft and dissemination of Fluor's privileged information, including the circumstances under which they were stolen, the individuals with whom Fluor's privileged materials were shared, or an explanation of how those materials were used by the government or the Relators. Fluor attempted to raise this issue with the Court at its first opportunity, asking for limited expedited discovery at the same time that it filed its motion to dismiss. That motion was denied, and after the case proceeded to discovery, Fluor served requests about the theft and use of its privileged material; however, Relators have refused to comply.

This dispute is now ripe, as the parties have completed the written deposition process ordered by the Court. *See* Dkt. 247 & Dkt. 272. For the reasons discussed below, the Court should enter an order compelling Relators to respond to Fluor's discovery requests regarding the distribution and use of Fluor's privileged materials. The Court should also stay all further non-document discovery until this privilege dispute is resolved for the simple reason that a variety of sanctions could be warranted, including potential disqualification of Relators' counsel in this case.[5]

---

[4] The plaintiffs/relators in this case are Charles Shepherd, Danny Rude, Rick Mackey, and Scott Dillard. Fluor uses the capitalized term "Relators" in this motion to refer to those four individuals. As discussed below, Nix and Payne dismissed their *qui tam* complaints against Fluor, though Relators continue to pursue their allegations.

[5] The Court granted Fluor leave to file the original Motion to Compel Discovery on June 13, 2022. Pursuant to Local Civ. Rule 7.02, Fluor conferred with Relators regarding the proposed stay prior to filing Fluor's Motion. Relators did not have a position as to the partial stay at that time.

# FACTUAL BACKGROUND

## I.      Fluor Counsel-Directed Internal Investigations[6]

At all times relevant to this litigation, Fluor Government Group ("FGG") has maintained a corporate Compliance & Business Ethics Program designed to prevent, detect, and respond to potential misconduct. Ex. G, Hughes Decl. ¶ 7 (hereinafter "Hughes Decl."). FGG adopted its own Compliance and Business Ethics Program, which included policies and procedures for conducting investigations under the supervision of the Fluor Law Department. *Id.* ¶ 8. The Law Department also provided legal advice to senior management about Fluor's potential legal exposure, and, if necessary, the need to make a mandatory disclosure under the Federal Acquisition Regulation ("FAR"). *Id.* ¶ 13. The Fourth Circuit recently held that Fluor investigations conducted under the supervision of the Law Department are protected by attorney-client privilege and the attorney work product doctrine. *In re Fluor Intercontinental, Inc.*, 803 F. App'x 697 (4th Cir. 2020) (granting mandamus petition and reversing order requiring disclosure of Fluor's investigative materials).

For investigations initiated by or referred to the Law Department,[7] the Law Department frequently enlisted other investigative departments and subject matter experts to assist in the

---

[6] To date, Fluor has substantiated its privilege assertions through non-privileged declarations, testimony, and discovery responses, but Relators continue to dispute whether Fluor has established that the investigation, including the Nix and Payne's work, was privileged. Fluor therefore is including certain materials for *in camera* consideration. *In camera* review is "a practice both long-standing and routine in cases involving claims of privilege." *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d 379, 386 (2d Cir. 2003) (citation omitted). A party asserting privilege often explains "the significance or meaning" of documents "through ex parte submissions if necessary to maintain confidentiality" *United States v. (Under Seal)*, 748 F.2d 871, 876 (4th Cir. 1984); *see also Nat'l Union Fire Ins. Co. of Pittsburgh v. Murray Sheet Metal Co.*, 967 F.2d 980, 985 (4th Cir. 1992) (district court must determine, "from an examination of the documents or their circumstances," whether documents are work product); *Popov ex rel. Delgado v. QBE Ins. Corp.*, 2021 WL 2328035 (D.S.C. June 8, 2021) (reviewing documents *in camera* to determine if they were protected by attorney-client privilege or work product doctrine).

[7] Investigating departments were required to immediately refer certain types of matters to the Law Department. Hughes Decl. ¶¶ 11-12.

investigation, including personnel from Fluor's Compliance, Corporate Security, and Corporate Investigations Departments. Hughes Decl. ¶ 14. Individuals working in Fluor's investigative departments were trained on attorney-client privilege and attorney work product protection, and received written guidance on the treatment of materials generated in privileged investigations. *Id.* at ¶¶ 15-16; *see also* Ex. A, Jones Decl. (May 30, 2019) (hereinafter "Jones Decl.") at ¶¶ 59-60, 62-65. Justin Jones, former Fluor Compliance Manager and current Fluor Mission Solutions Chief Compliance Officer, testified that investigators were instructed that if "work product was created at the request or direction of counsel it was considered privilege[d]." Ex. C, Jones Dep. (hereinafter "Jones Dep.") at Q&A 43. Investigators were further instructed that "[t]he transmission of non-privileged work to the law department is considered privileged" and the communication to the Law Department of "any [non-privileged] work that had been previously conducted [and] further analysis" was also privileged. *Id.*[8]

From 2013 through May 2014, Nix served as an in-theater Compliance Manager, where he worked closely with Jones. Jones Decl. ¶¶ 14, 28, 58; Jones Dep. at Q&A 1, 2, 6. Broadly speaking, the Compliance Department's role was to monitor and ensure compliance with FAR 52.203-13, Contractor Code of Business Ethics and Conduct. Jones Decl. ¶ 28. Payne worked as an Investigator in the Corporate Security Department, which managed the physical security of Fluor-managed assets and personnel. *Id.* ¶¶ 24, 61.

---

[8] To be clear, although previously performed non-privileged work did not become privileged by virtue of its subsequent transmission to the Law Department, the *communication* to the Law Department is privileged, as is any subsequent work performed at counsel's direction. *Upjohn v. United States*, 449 U.S. 383 (1981); *see also* Hughes Decl. ¶ 13.

## II.    The Counsel-Directed Materials Management Investigation

In March 2013, Fluor received a civil investigative demand (CID), a type of subpoena authorized under the FCA, issued by DOJ requesting records from Fluor's MAXIMO database, the computer program used to track property and materials in Afghanistan under LOGCAP IV, Task Order 5. Dkt. 127-2.[9] On March 6, 2013, attorney Bob Stamps, Fluor Special Counsel for Afghanistan, transmitted the CID to several individuals, including Joseph Kurr, Fluor Afghanistan Country Audit Response & Compliance Manager. In turn, Kurr forwarded the CID to others in the Compliance Department, including Jones and Nix. Ex. H (Mar. 6, 2013). Soon after receiving the CID, and without the knowledge or authorization of Fluor, Nix began sending confidential Fluor documents, including the CID itself, to his personal Gmail account. *See, e.g.*, Ex. I (Mar. 20, 2013).

In light of the CID, Fluor reasonably anticipated litigation and initiated an internal investigation under the direction of the Law Department for the purpose of providing legal advice to FGG, headed by then-FGG General Counsel James "Ty" Hughes, a former senior lawyer at the Defense Department. Ex. B, Yenovkian Decl. (May 30, 2019) (hereinafter "Yenovkian Decl.") at ¶ 4; Hughes Decl. ¶¶ 20-23. Several other attorneys within the Fluor Law Department assisted in directing and supervising the investigation: Brad Smith (Fluor Assistant General Counsel); Stamps; and Don Yenovkian (then-FGG Senior Counsel). Hughes Decl. ¶ 23; *see also* Jones Decl. ¶ 61; Yenovkian Decl. ¶ 2. On May 24, 2013, Fluor's Corporate Investigations Department formally opened a case in "Ethics Point," Fluor's system of record for complaints and investigations, Jones Decl. ¶ 58, although the investigation was already under way by that time.

---

[9] Fluor was one of the awardees of the Logistics Civil Augmentation Program ("LOGCAP") IV contract under which contractors provided support services to the military. Fluor provided logistical support in Northern Afghanistan under Task Order 5 of that contract.

Personnel from various functions within Fluor assisted in this counsel-led internal investigation, including Nix and Jones from the Compliance Department, Payne from the Corporate Security Department, Joseph Kolakowski and Martial Robichaud from the Corporate Investigations Department, Internal Audit Department personnel, and subject matter experts from the Materials Management, Information Technology, and Maximo departments. Jones Dep. at Q&A 26(i); Hughes Decl. ¶¶ 25-26. Jones began assisting the Law Department with the investigation soon after receipt of the CID and continued to work on the investigation for its duration. Jones Decl. ¶¶ 57-59; Jones Dep. at Q&A 11; Ex. D, J. Jones Written Cross-Examination (hereinafter "Jones CX") at Q&A 5.

Consistent with Fluor's standard practice described above, investigators acted as extensions of the Law Department when performing tasks related to the counsel-directed investigation. Fluor attorneys instructed non-attorney personnel assisting in the investigation that they should treat their work as privileged and confidential. Jones Dep. at Q&A 34; *see also* Hughes Decl. ¶¶ 15, 29; Jones Decl. ¶¶ 59-60 ("Starting with my conversations in Spring 2013, I understood that the Law Department's review of material management in Afghanistan was to be subject to Fluor's attorney-client privilege and work product protection . . . Mr. Nix also understood the need to keep information and documents pertaining to the Materials Management Investigation confidential."); Ex. V (Nov. 19, 2013). Documents relating to the investigation were saved in Ethics Point and on the Compliance Share Drive, access to which was limited to select personnel with a need to know the information. Jones Decl. ¶¶ 50-53; Yenovkian Decl. ¶¶ 8-9.

A.    **Nix's Work on the Counsel-Directed Materials Management Investigation and Theft of Privileged Materials**

Nix left Afghanistan for "rest and relaxation" ("R&R") leave in mid-June 2013, and returned on or about June 29.[10] While Nix was on R&R, work on the Materials Management Investigation was well underway. *See, e.g.*, Ex Parte Ex. 1 (email thread containing Jones' counsel-directed analysis of a specific work order,[11] and counsel's request for a meeting to discuss the reports generated). Upon Nix's return, he joined the privileged investigation and, at the direction of counsel, began working with Jones to analyze data related to certain aspects of Fluor's materials management practices. Jones Decl. ¶ 58; Yenovkian Decl. ¶ 5. Nix was instructed that his work was privileged. Jones Decl. ¶ 60; Yenovkian Decl. ¶ 5; Hughes Decl. ¶ 29; Jones Dep. at Q&A 33, 35(c), 38(c); Jones CX at Q&A 45 ("[I]t was a routine discussion topic to ensure confidentiality and maintaining privilege [on the Materials Management Investigation]."). Jones and Nix "continually reminded each other to ensure that documents were properly marked" as privileged consistent with the instructions from the Law Department. Jones Dep. at Q&A 162(i). In addition, Nix privately expressed to Jones his concerns about proposed plans to share office space with other employees, stating "everything we are working on is 'Privileged' . . . [we] can't have people listening in to our discussions, calls, conference calls, etc." Ex. T (Jul. 26, 2013).

Beginning in or about early July 2013, Nix regularly communicated with the Law Department and other members of the investigative team about his counsel-directed analysis. *See, e.g.*, Ex Parte Ex. 4 (July 5, 2013 email from Fluor counsel referencing a discussion with Nix and Jones regarding counsel-directed analysis and counsel's recommended follow-up actions). Nix's

---

[10] On June 5, 2013, Nix filed a sealed *qui tam* complaint against Fluor. Dkt. 1, Compl., *United States ex rel. Nix v. Fluor Corp.*, No. 6:13-cv-01528-TMC (June 5, 2013).

[11] The Work Order at issue in this exhibit is also the subject of Nix Privilege Log documents 7, 19, and 22, which Nix falsely claims reflect self-directed, non-privileged analysis. *See* Dkt. 134 at 18. Nix received Jones' counsel-directed analysis upon his return to theater, *see* Ex Parte Ex. 3, and Jones and Nix subsequently created Nix Privilege Log documents 7, 19, and 22.

communications reflected his creation of protected work product—in particular, the data that he and Jones analyzed and the methodologies they used to identify and analyze the data—and contain or reference discussions with counsel about his conclusions and investigation strategy. *See, e.g.*, Jones Decl. ¶ 68; Jones Dep. at Q&A 156, 158, 160, 163(b), 164. For example, throughout July and August 2013, Nix authored numerous communications to Fluor Corporate Investigator Joseph Kolakowski and Fluor counsel Stamps summarizing the investigation's preliminary analysis of specific Maximo Work Order data. *See, e.g.*, Ex Parte Ex. 8[12] (Nix email to Kolakowski and Fluor counsel Stamps summarizing his analysis of a specific work order); Ex Parte Ex. 14[13] (Nix email to Kolakowski and Stamps summarizing his analysis of a specific work order). Many of these documents bear conspicuous privilege markings. *See, e.g.*, Ex Parte Ex. 7 & Nix Priv. Log 1; Ex Parte Ex.11 & Nix Priv. Log 3; Ex Parte Ex. 13 & Nix Priv Log. 9; Ex Parte Ex. 30.[14]

On or about July 8, 2013, the Law Department asked Jones and Nix to prepare a briefing "to update management on the status of a privileged internal investigation." Jones Decl. ¶ 68; Jones Dep. at Q&A 67-70, 73-75. Jones and Nix, who were simultaneously working closely with counsel on the preparation of other written materials for the Materials Management Investigation, *see e.g.*, Ex Parte Ex. 6, asked counsel to review the draft presentation. *See* Jones Dep. at Q&A 72; Ex Parte Ex. 5. The following day, Jones led part of a privileged closed-session briefing for Rick Reuter, Vice President of Afghanistan Operations, with Nix and other members of the investigation team—including Fluor counsel Stamps and Hughes—in attendance. *See* Jones Dep. at Q&A 75,

---

[12] This work order is also the subject of Nix Privilege Log documents 6, 16, and 17, which Nix has falsely claimed reflect self-directed, non-privileged analysis. *See* Dkt. 134 at 18.

[13] This work order is also the subject of Nix Privilege Log 4, 10, 11, and 12, which Nix has also falsely claimed reflect self-directed, non-privileged analysis. *See* Dkt. 134 at 18.

[14] Nix's privilege-marked email to counsel has two attachments, the first of which is Nix Privilege Log 23. The second is an Excel spreadsheet the tabs of which largely consist of—with minor non-substantive changes—the spreadsheets at Nix Privilege Log 24-28. *See* Ex Parte Ex. 31.

80-82; Jones CX at Q&A 19; Jones Decl. ¶ 68(1). The presentation was circulated to members of the investigation team with clear privilege markings in the subject line and body of the transmission email. *See* Jones Decl. ¶ 68(1); Jones Dep. at Q&A 76; Ex Parte Ex. 7. Portions of this presentation were later provided by Nix to DOJ and utilized in the government's investigation.

As the Materials Management Investigation expanded in August 2013, Nix and Jones continued to provide counsel regular updates on their progress, both via email and in teleconferences. *See, e.g.*, Ex Parte Ex. 13 (briefing on the investigation's progress, which includes prominent red privilege markings on the memorandum cover page); Ex Parte Ex. 16 (email requesting ███████████████████████████████████████████████████ Ex Parte Ex. 23 (email regarding Jones and Nix's analysis of Maximo data to members of the investigation team, including Stamps and Robichaud). At the same time, unknown to Fluor, Nix was forwarding privileged Fluor documents to his personal Gmail account. *Compare* Nix Priv. Log 2 *with* Ex Parte Ex. 10 and Ex. U (Nix email providing Excel spreadsheet of information requested by attorneys and attorney-agents for counsel-directed investigation, and Nix email forwarding that spreadsheet to his Gmail account); *see also* Nix Priv Log 3 and Ex Parte Ex. 11 (Excel spreadsheet attached to email sent by Jones to investigation team members, including Nix and Hughes, on July 29, 2013; the metadata for an identical document provided by Nix to the government states that it was last revised July 29, 2013). The government later confirmed that it received materials from Nix beginning in September 2013, including many of the documents on the Nix Privilege Log. Dkt. 127-11.[15] In addition, Fluor later determined through forensic analysis that in or around May 2014—around the time Nix was released from Fluor as part of a reduction

---

[15] The emails Nix sent from his Fluor email address to his personal Gmail account include other privileged communications and data sets that are not on the Nix Privilege Log. Fluor does not know whether Nix shared these documents with anyone.

in force—Nix downloaded a significant number of documents, including materials relating to the privileged investigation, from Fluor's restricted-access Compliance Share Drive. Dkt. 127-9 (Aug. 23, 2016 letter); *see also* Jones Decl. ¶ 66; Yenovkian Decl. ¶¶ 9, 24.

**B.    Payne's Work on the Counsel-Directed Materials Management Investigation and His Theft of Privileged Materials**

Like Nix, Payne began work on the investigation in mid-2013. He participated in meetings and teleconferences where he received direction from counsel regarding the investigation. *See, e.g.*, Ex. S (September 17, 2013 meeting with investigation team members including Jones, Nix, and Payne with Fluor counsel regarding materials management investigation); Ex Parte Ex. 31 (email reiterating request made during a teleconference regarding assistance with investigation); Ex Parte Ex. 34 (request for assistance with Materials Management Investigation analysis regarding specific categories of inventories); *see also* Jones Dep. at Q&A 176-77; Jones Decl. ¶ 61. Payne drafted summaries of his counsel-directed analysis, which he provided to counsel and those working at the direction of counsel. *See* Payne Priv. Log 2, 4 through 10, 13-16 & Ex Parte Exs. 20, 34, 37-39. Investigation team members also regularly solicited Payne's input on key investigation issues, and Payne provided lengthy summaries of his analysis. *See, e.g.*, Ex Parte Exs. 20, 24, 36 & Payne Priv. Log 3, 5, 11-12. Fluor later learned that Payne had provided numerous privileged communications to the Department of Defense Office for the Special Inspector General for Afghanistan Reconstruction ("SIGAR"), which were then incorporated into a SIGAR report issued on May 12, 2014. *See* Payne Priv. Log 1 (SIGAR report attaching as exhibits privileged Fluor documents). Fluor also identified numerous privileged documents provided by Payne to DOJ, including some of those produced to SIGAR as well as additional privileged documents. These documents reflected detailed summaries of investigation issues that were drafted either jointly with Fluor counsel or at their direction (or the direction of an established

attorney agent). *See, e.g.*, Payne Priv. Log 7 (draft summary of investigation team conclusions and recommendations, reflecting attorney comments and edits).

## III.    Distribution and Use of Fluor's Privileged Materials in Pursuit of This FCA Lawsuit

At the same time it was conducting the Materials Management Investigation, Fluor was cooperating with the government investigation that had prompted the Law Department's work, including by producing millions of documents. *See* Dkt. 127-5; Yenovkian Decl. ¶¶ 3, 12. On February 25, 2015, the government issued a Department of Defense Inspector General ("DOD-IG") subpoena seeking additional documents, including on topics related directly to Nix's and Payne's privileged work on Fluor's internal investigation. Yenovkian Decl. ¶1.[16]

In or around August 2015, the government informed Fluor that there were *qui tam* actions under seal but did not disclose the relators' identities. Yenovkian Decl. ¶ 18. The government also advised Fluor that it had obtained Fluor documents from unidentified third parties. Dkt. 127-9. Although Fluor did not know that those documents contained privileged materials, Fluor expressed concern about the prospect of third parties (including relators) gaining access to and sharing Fluor's confidential data. Despite Fluor's concerns, the government did not inform Fluor that it was sharing with Relators both the documents produced by Fluor and the documents received from third parties. Yenovkian Decl. ¶¶ 15-16.

In early 2016, Fluor learned from Andrew Johnson, a former Security Department employee who had participated in the Materials Management Investigation, that the government

---

[16] *Compare* Ex. K at ███████████ *with* Payne Priv Log 1, 4, 5, 9, 15 ████████████ ; *compare* Ex. K at ████ *with* Nix Priv. Log 1, 4, 22 (privileged documents regarding █████████ ) and Payne Priv. Log 1, 7, 22 (same); *compare* Ex. K at ████████ 2 *with* Payne Priv. Log at 1, 6, 13, 14, 15 ████████████ .

had requested to interview him. *Id.* ¶¶ 19-21; Jones Decl. ¶ 61; Jones Dep. Q& 26(i). Fluor promptly informed the government about its privileged internal investigation and explained that the government's practice of contacting Fluor employees directly raised serious concerns that privileged information might be revealed. Fluor repeatedly offered to work with the government to establish a process that would allow them to interview Fluor employees while safeguarding Fluor's privilege, but the government refused. Yenovkian Decl. ¶¶ 22-23. Instead, at the government's request, Fluor provided a list of "key individuals" (including Nix) who participated in the internal investigation. Fluor cautioned, however, that the list was not exhaustive and that "other individuals were interviewed or were involved in electronic communications relating to this review." Dkt. 127-7 (May 20, 2016 letter). Fluor also cautioned the government that, if they were receiving Fluor documents from former employees, the privileged status of documents may not always be immediately apparent to those unfamiliar with Fluor's privileged investigation. *Id.* Soon after, Fluor notified the government that someone had downloaded large amounts of data from Fluor's Compliance Share Drive, including privileged documents, and that Fluor suspected (but could not then confirm) that Nix was responsible. *Id.* Fluor asked the government to provide copies of documents it had received from third parties so that Fluor could identify any privileged documents, but the government again refused. Yenovkian Decl. ¶ 24.

Fluor's suspicions about disclosure of its privileged information were confirmed during an April 25, 2017 meeting, in which the government and Relators jointly presented evidence gathered in the course of the government investigation to Fluor. Yenovkian Decl. ¶ 29; Dkt. 127-11 (letter from DOJ thanking Fluor for attending "the United States' and relators' presentation"). Immediately prior to the meeting, the government admitted to Fluor that in a meeting with Relators' counsel earlier that month, a "potentially privileged" document was displayed on a

screen, but removed when the government "recognized the [privilege] markings." Dkt. 127-11. Then, as part of the presentation itself, the government and Relators prominently featured two documents reflecting counsel-directed analysis from Fluor's internal investigation. *Compare* Nix Priv. Log 1 *with* Ex Parte Ex. 5; *compare* Nix Priv. Log 23 *and* Ex Parte Ex. 30. Fluor immediately recognized the documents as privileged and alerted the government. Yenovkian Decl. ¶ 31.

Shortly after the meeting, the government informed Fluor that it had received the materials at issue from Nix in 2013. Dkt. 127-11. The government argued that the documents that it had received and reviewed—including those in the presentation—were not privileged, citing "multiple assurances" from Nix's counsel. The government also confirmed in writing that a (still unidentified) privileged document had been displayed during a meeting with Relators' counsel, but did not explain why it had not immediately notified Fluor of the disclosure or sought Court guidance regarding Relators' possession of privileged documents. Dkt. 127-11. Nor did the government identify who had displayed the privileged document, or if the government had taken steps to ensure that they did not have any other privileged documents in their possession. *Id.*

Meanwhile, after extensive correspondence, Nix's counsel, Colette Matzzie of Phillips & Cohen, provided Fluor with what she described as a "full set" of the documents her firm had received from Nix. Dkt. 127-13. She argued that "[n]othing about [the] document" included in the April 25, 2017 joint presentation "indicates it could be subject to a privilege claim" and asserted that none of the documents Nix provided were privileged. *Id.* Several months later, Nix's counsel notified Fluor that in fact she had "discovered some additional documents" Nix provided to the government. Dkt. 127-21. Nix's counsel declined to provide a list of everyone with whom Nix shared the documents, but advised Fluor the documents had been shared with the "Government's investigative team," which included other Relators' counsel. Dkt. 127-22.

Fluor reviewed the documents provided by Nix's counsel and conservatively identified 29 documents as privileged, including those used in the joint presentation. Fluor prepared and provided to the government and Nix's counsel a privilege log for those 29 documents ("Nix Privilege Log"). Fluor demanded that the government, Nix's counsel, and any third parties with whom the documents were shared immediately destroy the documents identified on the log. Dkt. 127-18 & Dkt. 127-19. In the course of preparing its privilege log, Fluor discovered evidence that at least one document had been manipulated to disguise its privileged status. An August 12, 2013 memorandum summarizing preliminary findings of the Materials Management Investigation bore prominent privilege markings when Nix circulated it by email to Fluor counsel and other members of the investigative team. Ex Parte Ex. 13; Jones Dep. at Q&A 120. Yet, when Nix provided it to the government (and presumably to Relators' counsel), Nix Priv. Log 9, it no longer contained privilege markings. Jones Decl. ¶ 68; Yenovkian Decl. ¶¶ 33, 37. Even more troubling, the document metadata indicates it was last modified on September 13, 2013 by an individual then employed by Nix's counsel. Ex. Q; *see also* Jones Dep. at Q&A 122; Jones Decl. ¶ 68(9).

Around the same time in July 2017, Fluor learned that the theft and disclosure of its privileged documents had not been limited to Nix. On July 19, the government provided Fluor with five CDs containing documents the government had received from third parties other than Nix. Although the government did not disclose the source at the time, Fluor has since confirmed that the documents were provided by Payne. Dkt. 127-17 & Yenovkian Decl. ¶ 35. The government assured Fluor that it had not reviewed and would not review the Payne documents and indicated that those documents had not been shared with third parties. Dkt. 127-25.

Fluor carefully reviewed the documents on the five CDs provided by the government and conservatively identified 16 documents as privileged. Fluor prepared and provided a log to the

government for those 16 documents and advised that they appeared to have been stolen by Payne ("Payne Privilege Log").[17] These documents included documents with attorney-client privilege markings and drafts clearly intended for counsel, *see, e.g.*, Payne Priv. Log 2 & 7, as well as other documents that appeared to have been manipulated to omit a privilege marking present on the original. *Compare* Payne Priv. Log 8 *with* Ex. Parte Ex. 38 (substantively identical email transmitted by Payne to Fluor counsel and others with privilege marker); *compare* Payne Priv Log 4 *with* Ex. Parte Ex. 38 (Payne email to Fluor counsel and attorney-agents, marked as privileged and containing Payne Priv. Log 4; Ex Parte Ex. 38's attachments include Payne Priv. Log 5 and 6). After Fluor provided this log, the government revealed that it had reviewed the privileged Payne documents after unilaterally determining that they "were not subject to any privilege or legal protection." The government did not disclose whether the Payne documents were shared with Relators' counsel.

In or about May 2018, the government attempted to use its CID authority to depose Jones and probe Fluor's privilege claims. Similar to the procedure directed by this Court, Fluor and the government instead agreed to present Jones' testimony in writing. Jones provided a declaration on July 16, 2018. Shortly thereafter, in October 2018, the government declined to intervene in the sealed *qui tam* cases. Dkt. 77.

IV.    **Post-Declination Procedural History**

Apparently on notice of the government's intention to decline, Relators Shepherd and Rude filed their First Amended Complaint immediately before the seal was lifted, copying and pasting entire sections from the other *qui tam* complaints. As particularly relevant here, the First Amended Complaint incorporated Nix's allegations related to periodic inventories, alleged delinquent and

___

[17] Fluor subsequently provided the Nix Privilege Log and the Payne Privilege Log (discussed further below) to Relators in discovery.

insufficient reporting of Negative Adjustments, and under-reporting of Lost, Theft, Damaged, Destroyed reports. *Compare* Dkt. 76, First Am. Compl. (Oct. 1, 2018) ¶¶ 39-61; 162-176, 180-86; 236-256 *with* Dkt. 53, First Am. Compl., *United States ex rel. Nix v. Fluor Corp.*, No. 6:13-cv-01528-TMC (Apr. 7, 2017). It also adopted Payne's allegations about Fluor's Government Property Control System (GPCS), task order execution, policies for periodic inventories and loss reporting ████████████████████████████████████████████████████████████ ████████████████████████████████████ and virtual storerooms. *Compare* FAC ¶¶ 62-77, 178-79, 188-97, 200-01, 203-04 *with* Dkt. 1, Compl., *United States ex rel. Payne v. Fluor*, 6:18-cv-01000 (D.S.C. Apr. 12, 2018). In addition to its incorporation of previously pled allegations, the First Amended Complaint also expanded on Payne's and Nix's prior allegations concerning monthly inventories, FAC ¶¶ 153-59, and Payne's previously threadbare allegation related to LTDD work orders, *id.* ¶¶ 198-200.[18] The First Amended Complaint also pled wholly new allegations; most notably, it contained detailed allegations that Fluor had systematically made improper inventory adjustments prior to Defense Contract Management Agency (DCMA) audits.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ .

---

[18] The First Amended Complaint also incorporated allegations from previously-filed *qui tams* by Relators Scott Dillard and Richard Mackey, who were newly-named as relators in this action. *See* First Am. Compl. ¶¶ 17-23, 27-33, 38, 109-121, 128-142; 210-235; (pleadings based upon Dillard's prior *qui tam*); *id.* ¶¶ 258-67 (pleadings based upon Mackey's prior *qui tam*).

The First Amended Complaint named Shepherd, Rude, Mackey, and Dillard as plaintiffs.[19]

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████[20]

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████.

Nix and Payne were not named as plaintiffs despite the Amended Complaint's heavy reliance on their allegations. Nix, however, remains part of a "sharing agreement" under which he will share in the recovery of any judgment against Fluor in this action. Ex. R, (Mar. 2, 2021 email). In effect, he remains a party in all but name—he stands to gain should Relators prevail.

Relators' Second Amended Complaint filed on April 15, 2019 retained the allegations from the First Amended Complaint, including those derived from the Nix and Payne complaints and the allegations that appear to be based on Relators' access to the stolen privileged documents. *See* Dkt. 121, Second Am. Compl. (Apr. 15, 2019). Fluor moved to dismiss the Second Amended Complaint on May 30, 2017. Dkt. 126. At the same time, Fluor filed a motion seeking limited expedited discovery regarding the theft and dissemination of privileged material from its internal investigation. Dkt. 127. The Court denied Fluor's motion as premature, noting that Fluor could pursue these issues in "the normal course of discovery." Dkt. 173. Accordingly, once discovery began following the Court's denial of Fluor's motion to dismiss, Fluor promptly issued document

---

[19] Dillard maintained his FCA retaliation claim in a separate action. The Court granted Fluor summary judgment on his retaliation claim, Dkt. 154, Op & Order, *United States ex rel. Dillard v. Fluor Corp.*, No. 6:16-cv-2948 (D.S.C. Apr. 1, 2022), which Dillard is appealing. Dkt. 157, Notice of Appeal, *United States ex rel. Dillard v. Fluor Corp.*, No. 6:16-cv-2948 (D.S.C. Apr. 25, 2022).
[20] *See* Dkt. 1, Compl., *United States ex rel. Dillard v. Fluor Corp.*, No. 6:16-cv-2948 (D.S.C. Apr. 1, 2022); Dkt. 1, Compl., *United States ex rel. Mackey v. Fluor Int. Inc.*, 6:16-cv-01521-TMC (D.S.C. May 10, 2016).

requests and interrogatories seeking information regarding Relators' receipt and reliance on Fluor's privileged information. In particular:

- Request for Production ("RFP") 30 requested documents provided to or received from the government, including "all documents [Relators] received from the government that were produced to the government by any Relator, Jeffrey Nix, [or] David Payne."

- RFP 32 requested the production of "[d]ocuments [Relators] obtained from Jeffrey Nix or David Payne."

- RFP 33 requested "[c]ommunications with anyone, including but not limited to any of the Relators, Jeffrey Nix, or David Payne regarding the acquisition or review of any documents obtained from Fluor by . . . Nix . . . or . . . Payne."

- RFP 34 requested "[c]ommunications with anyone, including but not limited to any of the Relators, Jeffrey Nix, or David Payne regarding whether and to what extent to rely, for the purpose of developing Relators' allegations, on documents obtained from Fluor by . . . Nix . . . or Payne."

- Interrogatory 5 asked Relators to describe "communications with . . . co-relators, Jeffrey Nix, and David Payne related to . . . [Relators'] receipt and/or use of documents obtained from Fluor" by "Relators, Jeffrey Nix, David Payne, or any third party."

Fluor also issued a subpoena to Nix that requested similar information.

Relators refused to provide most of the requested information, asserting that it was protected by *their* attorney-client privilege, as well as the work product doctrine, joint litigation privilege, and common interest privilege. Ex. M, Rels.' Resp. to Fluor RFP (Aug 21, 2020).[21] Nix objected to the subpoena on similar grounds. Ex. P (Sept. 15, 2020 letter). During subsequent meet and confer conferences, Relators asserted that any motion to compel by Fluor would be premature because they were entitled to take discovery on the "threshold question" of whether Fluor's investigation, and in particular the work of Nix and Payne, was privileged. *See, e.g.*, Dkt. 247.

---

[21] *See also* Ex. N, Dillard Resp. to Fluor First ROGs (Aug. 21, 2020); Rude Resp. to Fluor First ROGs (Aug. 21, 2020); Shepherd Resp. to Fluor First ROGs (Aug. 21, 2020); and Mackey Resp. to Fluor First ROGs (Aug. 21, 2020).

In early 2021, the Court directed the parties to develop a procedure that would allow Relators to take limited discovery regarding Fluor's privilege assertions, while preserving Fluor's privilege. *Id.* Relators and Fluor negotiated a written deposition question procedure, which was approved by the Court in July 2021. *Id.* Relators subsequently served written deposition questions on Justin Jones, who provided non-privileged testimony regarding the Materials Management Investigation and the documents on the Nix and Payne privilege logs. *See* Exs. C-F. With Jones' deposition now complete, Fluor has fully complied with the Court's March 2021 order and the privilege dispute is ripe for adjudication.[22]

## **ARGUMENT**

**I.    Fluor's Internal Investigation, Including the Work Performed by Nix and Payne, is Protected by the Attorney-Client Privilege and the Attorney Work Product Doctrine**

Although Relators have made much of the need to resolve the threshold question of whether Fluor's investigation was privileged, it is not a close call. Fluor's investigation is protected by the attorney-client privilege and the attorney work product doctrine under the Supreme Court's landmark decision in *Upjohn v. United States*, 449 U.S. 383 (1981) and established Fourth Circuit precedent. Because Nix's and Payne's work on the investigation was performed at the direction of

---

[22] Relators have suggested, without authority, that Fluor was required to identify any individuals on which it would rely to support its privilege claims and previously asked this Court for relief. The Court denied Relators' request as premature; however, Fluor believes there would be no grounds for additional depositions conducted by Relator related to the privilege issue. Fluor fully complied with its obligations under the Federal Rules, identifying persons who participated in the privileged investigation in its initial disclosures and privilege logs, and Relators have also received considerable information through Jones' CID Declaration (Ex. A), Fluor's Motion for Limited Expedited Discovery (Dkt. 127-1), and Mr. Jones' written deposition (Exs. C through F). Relators did not ask to depose anyone other than Jones through the stipulated procedure. As noted *supra*, courts routinely rely on *ex parte* or *in camera* submissions to adjudicate privilege claims. Otherwise, by challenging the underlying privilege claims and seeking discovery as to their basis, an adversary could force a waiver of the privilege by the party seeking to uphold it.

counsel, those protections extend to their communications and work product, including each of the documents on the Nix Privilege Log and the Payne Privilege Log.

A.    **The Materials Management Investigation is Subject to the Attorney-Client Privilege and Attorney Work Product Protection**

The Supreme Court held in *Upjohn* that the attorney-client privilege applies to communications made in furtherance of an attorney-supervised internal investigation conducted "to ensure [a company's] compliance with the law." 449 U.S. at 392. The privilege attaches not only to the communications between employees and corporate counsel, but also to communications with investigators acting at the direction and under the supervision of counsel. *Id.* at 394. Further, the privilege attaches to the communication of information from a client's employees to its investigators and attorneys given that "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts." *Id.* at 390. Courts have repeatedly reaffirmed these bedrock principles in holding that communications made in furtherance of a counsel-led internal investigation are protected by the attorney-client privilege. *See, e.g.*, In re Allen, 106 F.3d 582, 602 (4th Cir. 1997) (citing *Upjohn* to hold attorney-led investigation was subject to attorney-client privilege), *cert. denied*, 522 U.S. 1047 (1998); *In re KBR, Inc.*, 756 F.3d 754, 757 (D.C. Cir. 2014) ("*KBR I*") (same), *cert. denied*, 574 U.S. 1122 (2015); *Charleston Med. Therapeutics, Inc. v. AstraZeneca Pharms. LP*, 2015 WL 12805685, at *2 (D.S.C. Mar. 4, 2015) (same).

"[T]he work product doctrine is distinct from and broader than the attorney-client privilege," *United States v. Nobles*, 422 U.S. 225, 238 n.14 (1975), and it "is no less important." *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 173 (4th Cir. 2019). The doctrine recognizes that "attorneys often must rely on the assistance of investigators and other agents" and thus also "protect[s] material prepared by agents for the attorney. . . ." *Nobles*, 422 U.S. at 238 &

n.11. Work product protection applies to attorney-led investigations when the materials at issue were created in anticipation of litigation. *Upjohn*, 449 U.S. at 397-402; *In re Allen*, 106 F.3d at 607; *In re KBR, Inc.*, 796 F.3d 137, 149-50 (D.C. Cir. 2015) ("*KBR II*"). Courts have held that a party that receives a request for documents as part of a government investigation reasonably anticipates litigation, such that work product protection attaches to investigative efforts to respond. *See, e.g.*, *Upjohn*, 449 U.S. at 398 (work product protection applies to materials generated in an internal investigation initiated in response to an IRS summons); *KBR II*, 796 F.3d at 149-50 (work product protection applies to materials developed during internal investigation of alleged fraud); *In re Sealed Case*, 146 F.3d 881, 885-86 (D.C. Cir. 1998) (documents created "in anticipation of litigation" where lawyer was "aware" agency "had the authority to conduct investigations and initiate civil actions" and company had a "significant concern" of future litigation); *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992) (work product protection attaches following "series of events that reasonably could result in litigation").[23]

Fluor's internal investigation here was protected by the attorney-client privilege and the attorney work product doctrine. As the D.C. Circuit recently held, a LOGCAP contractor's internal investigation conducted to meet its contractual and regulatory obligations is "materially indistinguishable" from *Upjohn* and its progeny. *See KBR I*, 756 F.3d at 757. Here, the Materials Management Investigation was initiated by counsel "to gather facts and ensure compliance with the law" after receiving a CID. *Id.* "And as in *Upjohn*," Fluor's "investigation was conducted under

---

[23] *See also Cooper v. Richland Cty Recreation Comm.*, 2018 WL 4594944, at *7-*8 (D.S.C. Sept. 25, 2018) (analysis generated by counsel during a corporate investigation was protected work product because "the totality of the circumstances" supported that they were created "in anticipation of litigation."); *In re Fresh & Process Potatoes Antitrust Litig.*, 2015 WL 1222278, at *3-4 (D. Idaho Mar. 17, 2015) (materials created after receiving CID were protected work product because they related to "actual, threatened legal action from the DOJ").

the auspices of [its] in-house legal department, acting in its legal capacity." *Id.* The Law Department was assisted by personnel from Fluor's Compliance, Corporate Investigations, and Corporate Security departments, including Nix (Compliance) and Payne (Security), just as counsel in *Upjohn* relied on non-attorneys to assist with fact investigation. Accordingly, the "same considerations that led the Court in *Upjohn* to uphold the corporation's privilege claims apply here." *Id*. Indeed, the privileged status of Fluor's counsel-led internal investigations is so clear that the Fourth Circuit recently granted a writ of mandamus to prevent the disclosure of information from such an investigation. *In re Fluor*, 803 F. App'x at 698, 701-02.

### B.    The Disputed Documents Are Privileged and/or Work Product

At a minimum, the 29 documents on the Nix Privilege Log and the 16 documents on the Payne Privilege Log were created as part of the Materials Management Investigation.[24] As described in greater detail in the Appendix, each document reflects information and analysis "compiled in order to assist [counsel] in the provision of legal advice" and "inform[] the legal strategy," *In re Smith & Nephew Birmingham Hip Resurfacing Hip Implant Prod. Liab. Litig.*, 2019 WL 2330863, at *3 (D. Md. May 31, 2019), thus "reveal[ing] [the] thought processes and theories" of Fluor counsel and investigators. *In re Allen*, 106 F.3d at 608 (citation omitted). These documents are quintessential opinion work product. *See, e.g.*, *In re Int'l Payment Grp., Inc.*, 2011 WL 4738321, at *2 (D.S.C. Oct. 6, 2011) (finding that numerous Excel spreadsheets, emails, and written materials drafted by an agent working at the direction of counsel were protected opinion

---

[24] To be clear, at this point without aid of the discovery Relators are attempting to prevent, Fluor may substantiate its claims of privilege invasion based only on documents on the Nix and Payne privilege logs. However, Fluor has every expectation that additional documents may have been stolen that have not been disclosed to Fluor or, more likely, that Nix and Payne *orally* relayed privileged communications and protected work product that was then shared among Relators. Fluor's claims are therefore not limited to the documents it identifies above.

work product); *Equal Rights Ctr. v. Equity Residential*, 2008 WL 11363366, at *5 (D. Md. June 6, 2008) (selection of survey data and drafting of survey were protected work product).

Relators have previously taken particular issue with documents on the Nix Privilege Log that reflect compilations and arrangements of data; however, this too is work product under settled Fourth Circuit precedent. Communications and documents reflecting information that is identified and collected from a larger set of materials is protected opinion work product where, as here, the selection of particular items "reveals [counsel's] thought processes and theories" about what issues may be significant risks or defenses in future litigation. *In re Allen*, 106 F.3d at 608 (citing cases and noting that "choice and arrangement" of information "reveal" counsel's thought processes and theories); *see also St. John Haney v. Kavoukijian*, 2020 WL 12762509, at *3 (D.S.C. Aug. 3, 2020) ("The Fourth Circuit has recognized that the choice and arrangement or 'selection and compilation' of documents and evidence in anticipation of litigation constitutes work product"). This includes documents relating to certain work order data that was selected for review—using counsel-directed methodologies—from the tens of thousands of work orders generated on LOGCAP IV, and which "would not have been access[ed]" absent "the privileged investigation and direction from counsel . . . ." Jones Dep. at Q&A 102; Ex Parte Exs. 1-4, 8, 14, 23, 27. Similarly, other documents on the Nix Privilege Log, such as documents 24 through 28, reflect selections of data requested by counsel in July 2013, Jones Dep. at Q&A 32-33; 37-38; Ex Parte Exs. 30-31, and which informed the Law Department's further investigation on this issue. *See* Ex Parte Exs. 18, 30.

Further, although each Disputed Document is protected work product, many are also protected by the attorney-client privilege. In particular, Nix Privilege Log documents 1, 3, 9 and 23, and Payne Privilege Log documents 2, 4, and 8, are all documents or drafts of documents that were transmitted by Jones, Nix, or Payne *directly to counsel* in response to counsel's requests.

23

These documents summarize investigative findings and identify data that reflects Fluor counsel's thought process and theories regarding the investigation. Documents to other non-attorneys working at the direction of counsel on the Materials Management Investigation—such as Martial Robichaud (Director of Corporate Investigations), Andrew Johnson (Senior Manager, Corporate Investigations), and Bryan Wilson (Corporate Security)— are also protected by both the attorney-client privilege and the attorney work product doctrine. *KBR I*, 756 F.3d at 758 ("[C]ommunications made by and to non-attorneys serving as agents of attorneys in internal investigations are routinely protected by the attorney-client privilege.").

## II. Fluor Is Entitled to Discovery Regarding the Distribution and Use of Its Privileged Documents in This Litigation

### A. The Discovery Fluor Seeks is Relevant & Proportional

While there is clear and compelling evidence that the stolen Fluor documents are privileged, critical facts remain unknown regarding who received the documents or other protected information, when they were received, and how they have been used by Relators in this case. Targeted discovery regarding these issues is necessary to determine the appropriate remedy for the violation of Fluor's privilege. If the evidence shows that Relators and their counsel were aware that they possessed Fluor's privileged materials and failed to take appropriate action, or worse, affirmatively relied on those materials, Fluor would be entitled to a range of sanctions, including the fees and costs incurred in related discovery disputes, evidentiary sanctions, disqualification of counsel, and dismissal of any allegations based upon privileged information. Fluor recognizes it is premature to fully brief the question of sanctions, but previews here the remedies that may be available to illustrate why this privilege dispute is so important and why it must be resolved now.

Federal Rule of Civil Procedure 11 serves the dual purposes of "deter[ring] future litigation abuse" and "punishing present litigation abuse, streamlining court dockets, and facilitating court

management." *In re Kunstler*, 914 F.2d 505, 522 (4th Cir. 1990) (citation omitted)*, cert denied*, 499 U.S. 969 (1991). This Court also has the inherent power to impose "appropriate sanctions" for conduct that "abuses the judicial process," including "outright dismissal of a lawsuit," *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44-45 (1991) (citation omitted); *see also Projects Mgmt. Co. v. Dyncorp Int'l*, 734 F.3d 366, 375 (4th Cir. 2013) (affirming dismissal of suit for plaintiff's abuse of the discovery process); *United States v. Schaffer Equip. Co.*, 11 F.3d 450, 456-58 (4th Cir. 1993) (affirming dismissal of suit based on the government's failure to disclose a witness's misrepresentations as to his professional qualifications and attempts to obstruct defendants' discovery of the same), and disqualification of counsel. *United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 2013 WL 2278122, at *2 (C.D. Ca. Apr. 8, 2013) (disqualification where counsel "should have known" documents were privileged and transferred them to the United States attorneys and "repeatedly used them in the pleadings"); *United States ex rel. Frazier v. IASIS Healthcare Corp.,* 2012 WL 130332, at *4, *15 (D. Ariz. Jan. 10, 2012) (disqualification of relators' counsel for failure to disclose privileged documents, despite counsel declaration that she had instructed client not to send privileged documents, and "never read or relied on" documents she believed might be privileged); *Richards v. Jain,* 168 F. Supp. 2d 1195, 1200-01 (W.D. Wash. 2001) (plaintiffs' access to privileged documents for 11 months and failure to notify defense warranted disqualification, even where counsel's review and knowledge of the documents was not extensive) (citing ABA Comm. on Ethics & Prof. Responsibility, Formal Op. 94-382 (1994)); *Walker v. GEICO Indem. Co.*, 2017 WL 1174234, at *12 (M.D. Fla. Mar. 30, 2017) (disqualifying lawyers who received protected documents, reviewed them, and discussed them with their clients).

Courts impose sanctions where counsel has been exposed to privileged materials because the bell cannot be un-rung and the disclosure of privileged information irreparably taints the case

and the lawyers involved. *C.f. In re Search Warrant*, 942 F.3d at 175 (citing cases and admonishing the court for "fail[ing] to recognize that an adverse party's review of privileged materials seriously injures the privilege holder" and that harm was "plainly irreparable" because the "review of those privileged materials cannot be undone.").[25] Indeed, courts will disqualify counsel even where the misconduct is less egregious than is indicated here. For example, in *United States ex rel. Frazier v. IASIS Healthcare Corp.*, the relator stole privileged documents from the defendant, and relator's counsel became aware of the privileged documents while preparing the relator's disclosure statement to the government (and again encountered the issue while the action was under seal). 2012 WL 130332 at *4-5. Counsel—*which included Nix's counsel, Phillips & Cohen attorney Collette Matzzie*—failed to seek guidance from the court about the documents and instead "set those documents aside and did not read them," and "reviewed only those documents from which [she] was confident" were not privileged. *Id.* at *5. When the complaint was unsealed years later, relator's counsel "feigned ignorance" when the corporate defendant expressed concerns that the relator had misappropriated privileged materials. *Id.* at *15. After the defendant alerted the court to the relator's conduct, the court determined that although dismissal was unwarranted based upon relator's counsel's segregation and limited review of the privileged documents, counsel had nonetheless engaged in significant misconduct when they failed to seek the court's guidance

---

[25] *See also United States v. Quest Diagnostics*, 734 F.3d 154, 166-68 (2nd Cir. 2013) (affirming the district court's disqualification of counsel in a FCA action because counsel was "in a position to use [defendants' confidential information] to give present or subsequent clients an unfair, and unethical, advantage."); *In re County of Erie*, 473 F.3d 413, 417-18 (2d Cir. 2007) (reversing the district court's order that documents were non-privileged, and noting that because the documents had already been ordered produced, the privilege must be "vindicated by preventing the use of the documents during further discovery . . ."); *Ulrich v. Hearst Corp.*, 809 F. Supp. 229, 236 (S.D.N.Y. 1992) ("Adverse use of confidential information is not limited to disclosure. It includes knowing what to ask for in discovery, which witnesses to seek to depose, what questions to ask them, what lines of attack to abandon and what lines to pursue . . . and innumerable other uses.").

regarding the potentially privileged materials and did not notify the defendant before serving the unsealed complaint. *Id.* Citing its inherent powers to impose sanctions for discovery abuses, the court disqualified counsel and awarded attorneys' fees and costs for defendant's efforts to retrieve its privileged materials. *Id.* Other courts have similarly imposed sanctions on relators for abuse of a defendant's privilege in FCA actions.[26] In fact, given the unique nature of *qui tam* actions, which afford defendants few judicial remedies during the seal period, "courts expect greater care and candor from [relators'] counsel" with respect to ethical concerns. *Hartpence*, 2013 WL 2278122, at *2 (citation omitted). The targeted discovery Fluor seeks will allow the Court to determine whether sanctions should be imposed, and if so, which ones.

### B.    Relator's Privilege Objections Are Meritless

After disregarding Fluor's privilege for years, it is ironic that Relators now refuse to provide any discovery on this topic on the basis that Fluor's requests would invade *Relators*' privilege. As discussed below, Relators' privilege objections fail because the information sought

---

[26] *See, e.g.*, *Quest Diagnostics*, 734 F.3d at 166-67; *United States ex rel. Bumbury v. Med-Care Diabetic & Med. Supplies, Inc.*, 101 F. Supp. 3d 1268, 1277-80 (S.D. Fla. 2015) (disqualifying law firm where attorney "actually obtained client confidences," even though attorney did not remember the calls in which he improperly obtained protected information), *aff'd*, 101 F. Supp. 3d 1280 (S.D. Fla. 2015); *Hartpence*, 2013 WL 2278122, at *2 (disqualification where counsel "should have known" documents were privileged and alerted the court, but instead transferred them to the United States attorneys and "repeatedly used them in the pleadings"); *United States ex rel. Doe v. X Corp.*, 862 F. Supp. 1502, 1509 (E.D. Va. 1994) (finding that plaintiff could not serve as a relator and dismissing the action because "[i]t was only through confidential communications with [other corporate] employees and by review of some confidential documents that Doe learned all of the alleged 'facts' supporting his allegations"); *Harleysville Ins. Co. v. Holding Funeral Home, Inc.*, 2017 WL 4368617, at *14 (W.D. Va. Oct. 2, 2017) (disqualifying counsel that reviewed privileged materials for which they believed that privilege had been waived, and did not alert the court); *Walker*, 2017 WL 1174234, at *12 (disqualifying counsel where "highly impactful" privileged information had been "extensively reviewed, copied, discussed, and disseminated," noting that "what is required for disqualification is a showing that there is a 'possibility' that an unfair informational advantage was obtained"); *Richards*, F. Supp. 2d at 1201 (disqualifying firm where paralegal reviewed the privileged material because his access to privileged materials irreparably tainted the proceedings).

is either not privileged, or it is discoverable under the crime-fraud exception to the attorney-client privilege and attorney work product doctrine.

### 1. Nix's and Payne's Underlying Theft of Fluor's Privileged Materials Does Not Implicate Relators' Privilege

Nix's and Payne's theft of Fluor's privileged information does not implicate privilege *unless* they did so at the direction of their counsel. Relators' counsel have expressly denied providing any such direction, meaning Fluor should be able to inquire freely on these topics without fear of encroaching on privilege.

### 2. The Identities of Individuals Who Received Fluor's Privileged Documents Are Not Privileged

The attorney-client privilege protects substantive communications; it does not protect facts. *Upjohn*, 449 U.S. at 395-96. The privilege therefore ordinarily does not protect information such as client or witness identities, the date of transmission, or the identities of individuals who received privileged materials. Rather, this is precisely the type of information that ordinarily would appear on a privilege log. *See, e.g.*, Fed. R. Civ. P. 26(b)(5)(A)(ii) (requiring parties to provide an index "describ[ing] the nature of the documents" to establish privilege); *Lashley v. Spartanburg Methodist Col.*, 2020 WL 12787706, at *4 (D.S.C. Aug. 6, 2020) (rejecting plaintiff's claim that facts such as the date, name, general subject, and participants in a communication were privileged). Relators' sweeping claims of privilege over basic facts—including whether communications regarding the privileged documents even occurred and who participated in those communications —have no basis in the law. *Id.*; *see also In re Grand Jury Subpoena*, 204 F.3d 516 (4th Cir. 2000) (compelled disclosure of documents revealing client's identity would not violate attorney-client privilege); *TJF Servs., Inc. v. Transp. Media, Inc.*, 2019 WL 7599942, at *6-7 (E.D.N.C. Jan. 22, 2019) (identification of individuals who provided specific pieces of information alleged in the complaint was not privileged or work product); *Knox Energy, LLC v. Gasco Drilling, Inc.*, 2014

28

WL 4052806, at *3 (W.D. Va. Aug. 14, 2014) (questions regarding whether litigant had consulted with counsel on an issue did not violate privilege); *AVX Corp. v. Horry Land Co.*, 2010 WL 4884903, at *3 (D.S.C. Nov. 24, 2010) (noting that party asserting the privilege must provide sufficient information to demonstrate attorney-client privilege, including general subject matter, date, and place of the communication); *Shaffer v. Nw. Mut. Life Ins. Co.*, 2006 WL 2432110, at *2 (N.D. W.Va. Aug. 21, 2006) (noting that "transmittal records that [neither] include legal advice nor disclose [the client's] privileged matters are not subject to the attorney-client privilege."). Therefore, Relators must at minimum identify who received each document on the Nix and Payne privilege logs and when each document was received.

### 3.   Otherwise Privileged Communications Regarding Use of Privileged Materials Are Discoverable Under the Crime-Fraud Exception

Some of the discovery Fluor seeks, such as communications among Relators and their counsel regarding the information on which they relied to craft their allegations against Fluor, ordinarily would be privileged. Under the unique circumstances here, however, Fluor is entitled to targeted discovery regarding the privileged materials under the crime-fraud exception to the attorney-client privilege and the attorney work product doctrine.

The crime-fraud exception provides that "attorney-client and work-product privileges are lost" when a communication is made "for the purpose of committing or further a crime or fraud." *In re Grand Jury Proceedings*, 102 F.3d 748, 750-51 (4th Cir. 1996); *c.f. In re Search Warrant*, 942 F.3d at 175 n.15 (providing that otherwise privileged communications made "for the purpose of committing or furthering a crime or fraud" are not protected). "The term 'crime/fraud exception' . . . is a bit of a misnomer, as many courts have applied the exception to situations falling well outside of the definitions of crime or fraud" to include wrongful conduct such as discovery abuse such as spoilation of evidence. *Washington v. Follin*, 2016 WL 1614166, at *14 n. 37 (D.S.C. Apr.

22, 2016) (quoting *Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 280, 288 (E.D. Va. 2004)). Although the Fourth Circuit has not set forth a precise test for determining the exception's scope, other circuits have applied it to any conduct "fundamentally inconsistent with the basic premises of the adversary system." *In re Sealed Case*, 676 F.2d 793, 812 (D.C. Cir. 1982); *cf. United States v. Zolin*, 491 U.S. 554, 562 (1989) (noting that the purpose of attorney-client privilege is to "promote broader public interests in the observance of law and the administration of justice."); *Parrott v. Wilson*, 707 F.2d 1262, 1271-72 (11th Cir. 1983) (stating that work product arising from lawyer's "unprofessional conduct" was properly ordered disclosed because its disclosure did not "traumatize[] the adversary process more than the underlying legal misbehavior"), *cert. denied*, 464 U.S. 936 (1983); *Moody v. IRS*, 654 F.2d 795 (D.C. Cir. 1981) (stressing that work product protection's purpose was "not to protect any interest of the attorney . . . but to protect the adversary trial process itself.") (citation omitted). District courts in the Fourth Circuit have applied the exception where "a client's interest in confidential communications and work product" is "outweigh[ed] [by] the societal need to assure the integrity of the process by which litigation is conducted[.]" *Rambus*, 222 F.R.D. at 288; *see also id.* at 289-90 (applying exception to permit discovery into spoliation of evidence because communications in furtherance of spoliation are inconsistent with the purposes of the privilege, namely "observance of law" and "administration of justice") (citation omitted). A party's invasion of another party's privilege by theft of protected information and documents falls comfortably within the exception.

A party asserting the crime-fraud exception "must make a prima facie showing that the privileged communications fall within the exception." *In re Grand Jury Proceedings #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 251 (4th Cir. 2005) (citation omitted). A party is not required to provide "proof" of the fraud by a preponderance of the evidence or beyond a reasonable

doubt. *Id.* (citing *Union Camp Corp. v. Lewis*, 385 F.2d 143, 145 (4th Cir. 1967)). It need only make a prima facie showing that (1) the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel; and (2) the documents containing the privileged materials bear a close relationship to the client's existing or future scheme. *Id.* That standard is plainly met here. Nix and Payne stole privileged documents and shared them with the government and Relators' counsel, presumably for the purpose of developing their allegations against Fluor. Further, although there is certainly circumstantial evidence that Relators' counsel, Nix's counsel, and the government were aware of the privileged nature of at least some of the documents at the time they received them, the crime-fraud exception does not require actual knowledge *by the lawyers*. *Id.* at 254-56. "[I]t is enough that the communication furthered, or was intended by the client to further," the client's misconduct. *In re Grand Jury Proceedings*, 102 F.3d at 751 (citing *In re Grand Jury Proceedings*, 87 F.3d 377 (9th Cir. 1996)). Thus, "[a]ttorney communications may be in furtherance of a fraud even if the attorney is unaware of the client's fraudulent intent." *Schaefer v. Fam. Med. Ctrs. of S.C., LLC*, 2019 WL 5893478, at *2 (D.S.C. July 26, 2019); *see also In re Grand Jury Proceedings*, 102 F.3d at 751 (finding that the government had established a *prima facie* case for the crime-fraud exception in showing that attorneys had unknowingly incorporated fraudulent documents into their pleadings).

Federal courts have applied the crime-fraud exception under circumstances strikingly similar to those here. *See, e.g.*, *Madanes v. Madanes*, 199 F.R.D. 135, 142-43, 149 (S.D.N.Y. 2001) (holding that crime-fraud exception could apply where defendants alleged that plaintiff and her counsel misappropriated privileged information); *Gates Corp. v. CRP Indus., Inc.*, 2019 WL 2183408, at *2-4 (D. Colo. May 21, 2019) (applying crime-fraud exception to permit discovery regarding conduct of party and its attorneys after being informed about theft and use of proprietary

information);[27] *In re Uehling*, 2013 WL 3283212, at *7-8 (E.D. Cal. June 27, 2013) (permitting, under crime-fraud exception, deposition questions of former employee regarding whether attorneys instructed him to retain and copy employer's confidential information), *reconsideration denied*, 2013 WL 3803942 (E.D. Cal. July 19, 2013).[28]

Finally, Relators cannot claim a "common interest" or joint prosecution privilege over their communications with Nix and Payne because the crime-fraud exception vitiated any underlying privilege that may have existed.[29] The common interest doctrine does not create a privilege in the first instance and only serves to avoid waiver of otherwise privileged information shared among parties. *See In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129*, 902 F.2d 244 (4th Cir. 1990) (common interest privilege "presupposes the existence of an otherwise valid privilege"); *Wellin v. Wellin*, 211 F. Supp. 3d 793, 806 (D.S.C. 2016) (common interest privilege is not an "independent privilege" and is an "exception[] to the waiver of privilege, and therefore require[s]

---

[27] Relevant here, the report and recommendation in *Gates Corp.* reasoned that discovery and *in camera* review was justified because the requests were "precisely limited" to the alleged misconduct, "relevant to a hotly disputed case issue," the information was "not obtainable by any other means" and the discovery requests sought "information that is facially privileged but where . . . the privilege may not inhere [due to the crime-fraud exception], depending on closer review." 2018 WL 4697327, at *18 (D. Colo. Aug. 10, 2018); *see also Parrott*, 707 F.2d at 1271 n.20.

[28] *See also Rambus*, 222 F.R.D. at 288-90 (citing cases and ordering production of otherwise privileged documents related to document retention program amid party's spoilation of evidence); *Haigh v. Matsushita Elec. Corp. of Am.*, 676 F. Supp. 1332, 1356-59 (E.D. Va. 1987) (work product privilege vitiated for "misconduct" where plaintiff clandestinely recorded telephone conversations and provided them to counsel, who used them to prepare complaint and discovery requests); *Schaefer*, 2019 WL 5893478, at *1 (compelling discovery of otherwise privileged communications because they bore a "close relationship" to misrepresentations made by the client); *Abbott Labs. v. H&H Wholesale Servs., Inc.*, 2018 WL 2459271, at *6 (E.D.N.Y. Mar. 9, 2018) (applying crime-fraud exception for a party's "discovery fraud" because the court could not "countenance the use of attorneys as 'front men' in a scheme to subvert the judicial process itself."); *Int'l Med. Grp., Inc. v. Walker*, 2011 WL 1752101, at *3 (S.D. Ind. May 9, 2011) (ordering privileged documents produced where parties had "competing versions of what occurred" but there was sufficient prima facie evidence of discovery fraud).

[29] To be clear, Fluor does not concede that there is a common interest privilege among Relators and reserves the right to brief that issue should the Court decline to apply crime-fraud exception.

the parties to possess an underlying privilege"). Because communications regarding the distribution and use of Fluor's privileged materials were either not privileged in the first place or fall under the crime-fraud exception, there is no valid claim of common interest privilege for communications relating to Relators' knowledge of the privileged documents.

## III.    This Court Should Partially Stay Discovery

The Court should order a partial stay of fact discovery pending resolution of this privilege dispute. Fluor requests that the parties be permitted to complete document productions and conduct any privilege-related discovery that the Court determines is appropriate, but that all other fact discovery (including depositions) be stayed. Fluor's proposed stay serves judicial economy because the resolution of this dispute may affect which substantive allegations in this case proceed to further discovery and result in the disqualification of some or all of Relators' counsel.

Courts are authorized under Rule 26(c) to stay discovery, and have a "broad inherent power" to do so, particularly where "preliminary issues can be settled which may be dispositive of some important aspect of the case." *Brown-Thomas v. Hynie*, 2019 WL 1043724, at *4 (D.S.C. Mar. 5, 2019) (citation omitted), *denying review* 2019 WL 24423446 (D. S. C. Jun. 12, 2019). In deciding whether a stay is appropriate, courts in this district weigh three factors: (1) the potential prejudice to the non-moving party; (2) the hardship and inequity to the moving party if the action is not stayed; and (3) the judicial resources that would be saved by avoiding duplicative litigation if the case is in fact stayed. *Id.* at *3. Ultimately, whether to grant a stay "calls for an exercise of the district court's judgment 'to balance the various factors relevant to the expeditious and comprehensive disposition of the causes of action on the court's docket.'" *Herring v. Lapolla Indus., Inc.*, 2013 WL 12148769, at *2 (D. S. C Aug. 30, 2013) (quoting *Md. V. Univ. Elections, Inc.*, 729 F.3d 370, 379-80 (4th Cir. 2013)).

Here, all factors favor the proposed stay, which is narrowly crafted to maximize judicial economy and minimize delay. The parties would continue to receive and produce document discovery. This case does not involve allegations where time is of the essence (indeed, both parties have requested numerous extensions of document discovery), and any potential inconvenience is outweighed by the likelihood that resolution of the privilege dispute will streamline the case and minimize discovery disputes. Accordingly, the proposed stay would not prejudice Relators.

In contrast, if the targeted discovery Fluor seeks through this motion reveals that Relators' counsel were aware of and relied upon Fluor's privileged materials, the invasion of Fluor's privilege is an ongoing harm which threatens to taint every aspect of this litigation. It is thus critical that the privilege dispute be resolved before the parties begin depositions. Courts in similar cases, including in the Fourth Circuit, have crafted sanctions that bar use not only of the privileged materials, but also information "derived from such material[] to seek additional information in discovery." *See, e.g.*, *Harleysville*, 2017 WL 4368617, at *17-*18; *Harris Davis Rebar, LLC v. Structural Iron Workers Local Union No. 1, Pension Trust Fund*, 2019 WL 447622, at *7 (N.D. Ill. Feb. 5, 2019) (ordering Defendants to "destroy any and all copies of documents . . . as well as any records, notes, or other documents that reference or were derived from them."). Without clarity as to Relators' invasion of privilege, continued fact discovery presents a minefield as to appropriate lines of inquiry and what steps Fluor must take to continue to protect its privilege.

Finally, if discovery reveals, as Fluor suspects, that at least some of Relators' counsel were aware of the privileged materials and failed to take appropriate action, Fluor intends to move for all available sanctions, up to and including disqualification of counsel. It is thus clearly in all parties' interest, and to the benefit of the Court, to resolve this question sooner rather than later. It would be manifestly unjust to Fluor for Relators later to cry foul and prejudice due to

34

disqualification of their counsel or other commensurate sanctions because discovery has continued

forward. A stay now would mitigate any such future claim of prejudice.

## **CONCLUSION**

For all of these reasons, Fluor respectfully requests that the Court grant Fluor's motion to

compel and stay further fact discovery not directly related to the privilege dispute, with the

exception of the parties' completion of document production and related privilege logs.

*/s/ Mark. C. Moore*
Mark C. Moore (Fed. ID No. 4956)
Konstantine P. Diamaduros (Fed. ID No. 12368)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 540-2146
Facsimile: (803) 727-1458
MMoore@nexsenpruet.com
KDiamaduros@nexsenpruet.com

Craig D. Margolis (admitted *pro hac vice*)
Tirzah S. Lollar (admitted *pro hac vice*)
Christian D. Sheehan (admitted *pro hac vice*)
Emily Reeder-Ricchetti (admitted *pro hac vice*)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, D.C. 20001-3743
Telephone: (202) 942-6127
Facsimile: (202) 942-5999
craig.margolis@arnoldporter.com
tirzah.lollar@arnoldporter.com
christian.sheehan@arnoldporter.com
emily.reeder-ricchetti@arnoldporter.com

*Counsel for Defendants Fluor Corporation and
Fluor Intercontinental, Inc.*

Dated: September 12, 2022
Columbia, South Carolina

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a copy of the foregoing Memorandum in Support of Fluor Defendants' Motion to Compel and for Partial Stay of Discovery has been served upon all counsel of record in this case on this, the 12th day of September, 2022, via the Court's electronic filing system.


*/s Mark. C. Moore*
Mark C. Moore