IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| United States of America, *ex rel.* Charles R. Shepherd; Danny V. Rude; Robert Scott Dillard; Rickey Mackey,<br><br>    Plaintiff-Relators,<br><br>    v.<br><br>Fluor Corporation, Inc.; Fluor Intercontinental, Inc.,<br><br>    Defendants. | C/A No. 6:13-cv-02428-JD |

**UNITED STATES' STATEMENT OF INTEREST REGARDING DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS**

The False Claims Act—a statute that has been the United States' primary fraud-fighting tool for 160 years—does not violate the Appointments Clause and Take Care Clause of the Constitution. As every other federal circuit to consider these arguments has done, this Court should find the statute is consistent with those Clauses and deny Defendants' Motion for Judgment on the Pleadings.

**I.     Introduction**

Congress has carefully crafted the False Claims Act to create a public-private partnership for the common good to discover and redress fraud against the government, while leaving the government in ultimate control. This public-private partnership is supported by sound policy. In fiscal year 2022, federal spending topped $7.4 trillion.[1] Since 2020, federal funds obligated to

---

[1] U.S. Dep't of Treasury, Financial Report of the United States: Fiscal Year 2022 (Feb. 16, 2023), https://www.fiscal.treasury.gov/files/reports-statements/financial-report/2022/02-16-2023-FR-(Final).pdf.

1

programs addressing the covid-19 pandemic reach nearly $4.6 trillion.[2] Though it is difficult to estimate the percentage of funds lost each year to fraud, even the lowest of estimates produces staggering numbers. It is as necessary now to incentivize the public to report fraud as it was in 1863 when the False Claims Act, 31 U.S.C. §§ 3729–3733 (FCA), was enacted. While the infrastructure of the United States agencies is more robust today than in 1863, so too is the federal budget. Indeed, the challenges of rooting out fraud in the modern era are more complex; and the FCA is made potent through its *qui tam* provisions.

Of course, policy considerations alone cannot sustain a law, and they need not here. Courts of appeal have unanimously found the government's control over *qui tam* cases to be constitutionally sufficient. This Court should do the same.

**II.    Background**

This *qui tam* case involves allegations of fraud in a war zone. Relators, all former employees of Defendants Fluor Corporation, Inc. or Fluor Intercontinental, Inc., filed this action on September 9, 2013. ECF No. 1-2. They allege that Defendants defrauded the federal government out of hundreds of millions of dollars in connection with a contract to track, maintain, and repair government property in Afghanistan. ECF No. 121. The United States investigated Relators' allegations but declined to intervene. ECF No. 77. In its Notice of Election to Decline Intervention, the United States requested that the Court solicit the written consent of the United States before granting approval of any settlement or dismissal; requested that it receive all pleadings in the action; reserved its right to order deposition transcripts; and noted that it may move to intervene in the action at a later date for good cause. *Id.* at 1–2. Following the

---

[2] The Federal Response to COVID-19, https://www.usaspending.gov/disaster/covid-19 (last visited Jan. 26, 2024).

government's declination, Relators elected to proceed with the action as permitted by 31 U.S.C. § 3730(b)(4)(B). On December 6, 2023, Defendants moved for judgment on the pleadings, arguing that the FCA's *qui tam* provisions violate the U.S. Constitution's Appointments Clause and Take Care Clause. ECF No. 396-1.

Although the United States has not intervened in this action, it remains a real party in interest. *See* 31 U.S.C. § 3730(d); *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 934–35 (2009). And, because the FCA is the United States' primary civil tool for prosecuting fraud against the government, the United States has a substantial interest in the development of the law in this area. For this reason, and pursuant to 28 U.S.C. § 517, the United States respectfully submits this Statement of Interest addressing Defendants' Motion for Judgment on the Pleadings. *See* ECF No. 396-1.

**III.     History of *Qui Tam* Provisions and Statutory Framework**

The essence of the *qui tam* mechanism is that a private party may bring suit because of a wrong done to the sovereign and is entitled to a share of the recovery if the action is successful. This mechanism has deep historical roots in English and American law. The Supreme Court has observed, for example, that "[s]tatutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our Government." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.4 (1943) (quoting *Marvin v. Trout*, 199 U.S. 212, 225 (1905)). The Court has since reiterated the "long tradition of *qui tam* actions in England and the American Colonies," as well as the "considerable number" of such statutes that the First Congress itself enacted. *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774, 776–77 (2000).

3

*Qui tam* suits were thus far from novel when Congress enacted the FCA in 1863. *See* Act of March 2, 1863, ch. 67, 12 Stat. 696 (1863). The FCA was originally designed to "stop[] the massive frauds perpetrated by large contractors during the Civil War." *United States v. Bornstein*, 423 U.S. 303, 309 (1976). It authorized *qui tam* suits to "be brought and carried on by any person, as well for himself as for the United States," and provided that the action "shall be at the sole cost and charge of such person, and shall be in the name of the United States." Act of March 2, 1863, § 4, 12 Stat. at 698 (1863).

The contemporary version of the FCA retains the basic structure of the *qui tam* mechanism. Under the current statute, the Attorney General may bring a civil action to recover treble damages and civil penalties for a violation of the FCA. *See* 31 U.S.C. § 3730(a). Alternatively, a private person known as a "relator" may bring suit "for the person and for the United States Government." *Id.* § 3730(b)(1). The relator's complaint must be filed under seal and served upon the United States. *Id.* § 3730(b)(2). The government then has 60 days, subject to extension, to decide whether to intervene and take over the suit. *Id.* § 3730(b)(2), (3).

If the United States intervenes, "the action shall be conducted by the Government." *Id.* § 3730(b)(4)(A). In that circumstance, the government "shall have the primary responsibility for prosecuting the action." *Id.* § 3730(c)(1). The government may intervene either initially or "at a later date upon a showing of good cause," *id.* § 3730(c)(3), and, upon doing so, may file its own complaint or amend the relator's complaint to add or clarify claims, *id.* § 3731(c).

If the United States declines to intervene, "the person bringing the action shall have the right to conduct the action." *Id.* § 3730(b)(4)(B). The relator, however, is neither the government nor its legal representative. The relator does not appear on behalf of the United States, nor are his legal and factual representations those of the United States. He is a "private part[y]" seeking to

4

vindicate his independent interest, which arises by virtue of the statute's "partial assignment of the Government's damages claim" to him. *Stevens*, 529 U.S. at 773, 786 n.17; *see also* 31 U.S.C. § 3730(d) (entitling a relator to a share of the award if his action results in a financial recovery). The government is not liable for any expenses the relator incurs in bringing suit. 31 U.S.C. § 3730(f).

Under the current version of the FCA, the government retains considerable control over *qui tam* suits in which the Attorney General has declined to intervene. For example, the government can veto a relator's proposed dismissal or settlement of an action or, conversely, dismiss or settle the action over the relator's objection. *Id.* § 3730(b)(1), (c)(2)(A), (B); *see United States ex rel. Polansky v. Exec. Health Res., Inc.*, 143 S. Ct. 1720 (2023) (finding United States has power to dismiss *qui tam* actions over the relator's objection after intervention); *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330 (4th Cir. 2017) (finding United States Attorney General possesses an absolute veto power over voluntary settlements in FCA *qui tam* actions); *see also* U.S. Dep't of Just., Just. Manual § 4-4.111 (2021) (noting that the government's ability to dismiss *qui tam* actions "provide[s] an important tool to advance the government's interests, preserve limited resources, and avoid adverse precedent"). The government is also entitled to copies of all pleadings and deposition transcripts, can limit discovery to avoid interference with a government investigation or prosecution, and can pursue alternate remedies against the defendant. 31 U.S.C. § 3730(c)(3)–(5). Thus, the statute gives the ultimate control to the United States and shields it from being vulnerable to the whims of a relator.

## IV.     The FCA's *Qui Tam* Provisions Are Constitutional.

Defendants, in their Motion for Judgment on the Pleadings, ask this Court to hold that the FCA's *qui tam* provisions are unconstitutional. At bottom, Defendants' contention is that these provisions interfere with the Executive's power to appoint federal officers, as set forth in the

5

Appointments Clause, and the Executive's responsibility to take care that federal law is faithfully executed, as found in the Take Care Clause. *See* ECF. No. 396-1 at 5. But every federal circuit to consider these arguments has rejected them, recognizing that the FCA's *qui tam* provisions are consistent with Article II of the Constitution. *See United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993); *see also United States ex rel. Wallace v. Exactech, Inc.*, No. 7:18-CV-01010-LSC, 2023 WL 8027309, at *4 (N.D. Ala. Nov. 20, 2023). For the reasons that follow, this Court should also hold that the *qui tam* provisions are constitutional.

    A.    **The FCA's *Qui Tam* Provisions Do Not Violate the Appointments Clause.**

The Appointments Clause specifies the permissible means of appointing "Officers of the United States" to public offices "established by Law." U.S. Const. art. II, § 2, cl. 2. Defendants contend that *qui tam* actions violate the Appointments Clause by authorizing unappointed relators to vindicate public rights on the government's behalf. *See* ECF No. 396-1 at 8. The Court should reject that argument because: (1) it conflicts with Supreme Court precedent regarding the nature of *qui tam* suits and their deep historical roots, *see Stevens*, 529 U.S. at 765, and (2) relators are not "Officers of the United States" whose selection would be governed by the Appointments Clause, *see, e.g., Riley*, 252 F.3d at 757–58.

    1.    **Defendants' Argument Is Contrary to *Stevens*.**

In *Stevens*, the Supreme Court held that *qui tam* relators have Article III standing to pursue actions under the FCA. 529 U.S. at 771–78. Although the Court did not decide whether the Act's *qui tam* provisions comport with the Appointments Clause, the Court's analysis undercuts

6

Defendants' position in at least two ways. First, in holding that the FCA's *qui tam* provisions are consistent with Article III, the Court expressly declined to rely on a theory that a private relator sues as an "agent of the United States." *Id.* at 772. Instead, the Court observed that the relator's statutory entitlement to a share of any ultimate recovery gives him a "concrete private interest in the outcome of the suit." *Id.* at 772–73. The FCA, the Court explained, can "reasonably be regarded as effecting a partial assignment of the Government's damages claim," thus conferring standing on the relator. *Id.* at 773. After addressing standing, the Court held that the FCA does not authorize relators to pursue *qui tam* actions against States because, among other things, actions pursued by relators are "private suit[s]" brought by "private parties." *Id.* at 780–81 n.9, 786 n.17. Defendants do not seriously grapple with the *Stevens* Court's emphasis on the relator's personal, private stake in the litigation, or its rejection of the notion that relators are "agents" of the government.

Second, *Stevens* emphasized the deep historical roots of *qui tam* provisions. *See id.* at 774–77. Specifically, the Court observed that "immediately after the framing, the First Congress enacted a considerable number of informer statutes," some of which (like the FCA) "provided both a bounty and an express cause of action." *Id.* at 776–77. This historical evidence, the Court found, was "well nigh conclusive" in establishing that *qui tam* suits are consistent with Article III of the Constitution. *Id.* The prevalence of *qui tam* provisions at the founding also severely undercuts any argument that such provisions run afoul of Article II. *See Riley*, 252 F.3d at 752 (finding it "logically inescapable that the same history that was conclusive on the Article III question in *Stevens* with respect to *qui tam* lawsuits initiated under the FCA is similarly conclusive with respect to the Article II question concerning this statute"); *see also Marsh v. Chambers*, 463 U.S. 783, 790 (1983) (legislation "passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, is contemporaneous and weighty

evidence of its true meaning") (quoting *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888)) (ellipsis omitted); *Bowsher v. Synar*, 478 U.S. 714, 723–24 (1986) (same); *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (explaining that "'traditional ways of conducting government give meaning' to the Constitution") (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)) (ellipsis omitted); *NLRB v. Noel Canning*, 573 U.S. 513, 524–25 (2014).

Despite the ancient pedigree of *qui tam* actions, Defendants argue that "[h]istorical practice is relevant only where a statute's constitutionality is debatable," and that *qui tam* actions "obvious[ly]" violate Article II. *See* ECF No. 396-1 at 22.[3] Yet the position that Defendants claim is "obvious" and "[un]debatable," *see id.*, has been consistently and repeatedly rejected as meritless. *See, e.g.*, *Stone*, 282 F.3d at 805 (collecting cases from federal circuit courts and rejecting Appointments Clause challenge to the FCA's *qui tam* provisions). Underscoring the point, a district court recently rejected constitutional challenges to the FCA's *qui tam* provisions and subsequently denied the defendant's motion to certify interlocutory appeal, finding "no substantial ground for difference of opinion on the issue." *Wallace*, No. 7:18-CV-01010-LSC, ECF No. 259 at 1–3.

Nor can Defendants discount the historical evidence by arguing that times have changed since the FCA's enactment. *See* ECF No. 396-1 at 24–25. Citing a dissenting opinion, Defendants

---

[3] In making this point—and elsewhere in their filing—Defendants cite to a 1989 memorandum from the Department of Justice Office of Legal Counsel (OLC). The 1989 OLC memorandum was an internal recommendation to the Attorney General, rather than a formal OLC opinion, and it has never reflected the Department of Justice's official position. *See* Constitutionality of the Qui Tam Provisions of the False Claims Act, 13 Op. O.L.C. 207, 207 (1989) (stating that "[t]his memorandum was not intended to present the official position of the Department of Justice at the time of its writing" and that "[t]he views on the Appointments Clause expressed in the memorandum have been superseded by a subsequent Office of Legal Counsel memorandum").

argue that the Executive Branch is now staffed more robustly than in the Civil War era, when it struggled to "'monitor and prosecute fraud by defense contractors occurring in a war-torn country in which military requisitions had multiplied enormously.'" *See id.* at 25 (quoting *Riley*, 252 F.3d at 775 n.38 (Smith, J., dissenting)). Yet, the Senate Judiciary Committee's report on the 1986 amendments to the FCA explained that "perhaps the most serious problem plaguing effective enforcement [of the FCA] is a lack of resources on the part of Federal enforcement agencies." S. Rep. 99-345, at 7 (1986). While the federal budget and executive branch have grown since 1863, our society has not yet solved the endemic press of greed. There were scammers in the 1800s and there are scammers now; albeit the scams are more expensive for taxpayers and possibly more challenging to detect. To that end, the FCA's *qui tam* provisions have continued to serve "as a critical supplement to government enforcement." *United States ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 84 (D.C. Cir. 2014). Indeed, this very case involves allegations of fraud by defense contractors in a war-torn country, exemplifying the vital role *qui tam* actions continue to play in combatting fraud on the government. *See* ECF No. 121. There is thus no basis for ignoring the strong historical support for *qui tam* provisions, as recognized by the Court in *Stevens*.

### 2.     *Qui Tam* Relators Lack the Indicia of Federal Officers.

Courts rejecting Appointments Clause challenges to the FCA have also recognized that relators are not "Officers of the United States" and thus need not be appointed in accordance with the Appointments Clause. *See, e.g.*, *Stone*, 282 F.3d at 804–05. The concept of an "office," the Supreme Court has held, "embraces the ideas of tenure, duration, emolument, and duties." *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1868); *see Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890) (merchant appraiser did not hold an office where his position was "without tenure, duration, continuing emolument, or continuous duties, and he act[ed] only occasionally and temporarily");

9

*United States v. Germaine*, 99 U.S. 508, 511–12 (1878) (surgeon did not hold an office where he was "only to act when called on by the Commissioner of Pensions in some special case"). To that end, an officer must have duties that are "permanent, not occasional or temporary." *Germaine*, 99 U.S. at 511–12; *see also Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) ("[A]n individual must occupy a 'continuing' position established by law to qualify as an officer.").

The relator's role, by contrast, is limited in time and scope, confined to a particular case, and fundamentally personal in nature, stemming from his capacity as a plaintiff pursuing what is, in essence, a partially assigned claim. The relator is not subject to the benefits or requirements of officeholders, such as drawing a federal salary or establishing fitness for public employment. *See Stone*, 282 F.3d at 805; *Riley*, 252 F.3d at 757–58. And the task of representing the United States in FCA litigation is entrusted to attorneys within the Department of Justice, who can and do contest legal and factual representations made by relators in *qui tam* actions. Moreover, although a statutory designation is not dispositive of the constitutional question, *cf. Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392–93 (1995); *Mistretta*, 488 U.S. at 393, it is notable that the FCA does not purport to "establish[] by Law" an "Office[]" of informer or relator, U.S. Const. art. II, § 2, cl. 2. Nor does the Act otherwise express an intent that relators should be treated as federal officers. To the contrary, the FCA provision that authorizes *qui tam* suits is entitled "ACTIONS BY PRIVATE PERSONS." 31 U.S.C. § 3730(b). For these reasons, courts have long held that *qui tam* relators are not Officers of the United States, as defined by the Supreme Court in *Auffmordt* and *Germaine*, and thus they need not be appointed in accordance with the Appointments Clause.

Defendants do not seriously engage with these precedents.[4] Instead, Defendants concede that relators are not officers but argue that the FCA impermissibly delegates to relators executive authority—namely, "'the administration and enforcement of public law.'" See ECF No. 396-1 at 10 (quoting *Buckley v. Valeo*, 424 U.S. 1, 139 (1976)). Defendants rely heavily on *Buckley*, where the Supreme Court found that the function of Federal Elections Commission (FEC) members in conducting civil litigation "may be discharged only by persons who are 'Officers of the United States' within the language of [the Appointments Clause]." 424 U.S. at 140. If these FEC members ran afoul of the Appointments Clause, Defendants argue, then so do relators. *See* ECF No. 396-1 at 9.

That argument fails, however, because *Buckley* in no way modified the long-settled principle that "Officers" are those who actually fill federal offices. To the contrary, *Buckley* cites both *Germaine* and *Auffmordt* with approval. *Buckley*, 424 U.S. at 125–26 & n.162. Moreover, in defining "Officers," the Supreme Court in *Buckley*, sometimes citing *Germaine* explicitly, explained that the term applies to "appointees" or "appointed officials" who exercise significant authority under federal law. *See, e.g.*, *Buckley*, 424 U.S. at 131 (finding "Officers" are "all appointed officials exercising responsibility under the public laws"); *see also Wallace*, No. 7:18-CV-01010-LSC, 2023 WL 8027309, at *4 (N.D. Ala. Nov. 20, 2023) ("[I]n *Buckley* the Supreme Court expressly relied on both *Auffmordt* and *Germaine* and was clear that its holdings should be

---

[4] In a footnote, Defendants suggest that a straightforward application of *Germaine* conflicts with the Court's decision in *Morrison v. Olson*, 487 U.S. 654 (1988). *See* ECF No. 396-1 at 10 n.5. But *Morrison* presented a different Appointments Clause question than the one posed here. There, the Court held that an independent counsel was an inferior officer (rather than a principal officer) for purposes of the Appointments Clause. Unlike in *Morrison*, the issue here is not whether an Officer of the United States is inferior or principal, but rather whether a *qui tam* relator is subject to the Appointments Clause at all. The Court in *Morrison* did not—and had no need to—reach that question because, unlike a *qui tam* relator, the independent counsel was appointed in a manner provided for by the Appointments Clause. *See id.* at 673–74.

11

read in conformity with those prior decisions."). Accordingly, the FEC members—who served in offices and conducted executive functions—had to be appointed pursuant to the Appointments Clause. That is quite a different proposition than requiring that private persons, who sue for themselves and simultaneously provide a benefit for the United States, must also be Officers of the United States under the Appointments Clause.

The contrast between *qui tam* relators and the FEC positions at issue in *Buckley* is stark. Importantly, the FEC positions were not personal, were not limited to a single case, and were endowed with "primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights." *Buckley*, 424 U.S. at 140. The Court emphasized the FEC's "extensive rulemaking and adjudicative powers." *Id.* at 110. In particular, the Commission could bring civil enforcement actions without any "concurrence of or participation by the Attorney General," and "the decision not to seek judicial relief . . . appear[ed] to rest solely with the Commission." *Id.* at 111. *Qui tam* relators, by contrast, are merely "private parties" pursuing civil litigation in their own personal interest. *Stevens*, 529 U.S. at 786 n.17; *see Taxpayers Against Fraud*, 41 F.3d at 1041 ("Although a relator may sue in the government's name, the relator is not vested with governmental power."). They do not "administ[er] and enforce[ ] public law" in the constitutional sense, *Buckley*, 424 U.S. at 141, any more than does a plaintiff asserting a private right of action under a federal statute, such as the Americans with Disabilities Act or the Sherman Act. As with plaintiffs who sue under other federal statutes, *qui tam* relators may furnish practical assistance in the enforcement of federal law, but that does not transform them into "Officers of the United States" whose selection is governed by the Appointments Clause.

Contrary to Defendants' assertion, this conclusion is no "loophole." *See* ECF No. 396-1 at 10. Rather, consistent with longstanding historical practice, *qui tam* relators lack the indicia of federal officers and thus need not be appointed pursuant to the Appointments Clause.

**B.    The FCA's *Qui Tam* Provisions Are Consistent with Article II's Take Care Clause.**

Defendants' contention that *qui tam* actions violate the Take Care Clause of Article II is equally meritless. Under the Take Care Clause, the President "shall take Care that the laws be faithfully executed." U.S. Const. art. II, § 3. In assessing whether legislation "disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977). Defendants' primary contention is that the FCA interferes with the President's constitutionally assigned functions by diffusing executive authority and limiting executive oversight. ECF No. 396-1 at 11–18. As courts have long agreed, however, *qui tam* litigation does no such thing. *See Stone*, 282 F.3d at 805–07; *Riley*, 252 F.3d at 752–57; *Taxpayers Against Fraud*, 41 F.3d at 1041; *Kelly*, 9 F.3d at 749–57; *see also United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1154–55 (2d Cir. 1993).

As discussed above, the Supreme Court has made clear that relators are private litigants. *See Stevens*, 529 U.S. at 772 (expressly declining to adopt a theory that a private relator sues as an "agent of the United States"). Although it is the United States whose injury gives rise to an FCA suit, the relator has Article III standing because of his independent stake: he has a "concrete *private* interest in the outcome of the suit" that arises from Congress's "partial assignment of the Government's damages claim" to him. *Id.* at 772–73 (emphasis added); *see also United States ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1167 (10th Cir. 2009) (holding that a would-be relator had validly released potential future *qui tam* claims she could personally bring because

13

"the relator has an interest in some part of the civil action apart from the Government"). As with the Appointments Clause, the fact that a relator's suit may also vindicate a federal interest in remedying and deterring fraud on the United States does not change the analysis. Indeed, as the en banc Fifth Circuit explained when it rejected a separation-of-powers challenge to the FCA's *qui tam* provisions, the Take Care Clause "does not require Congress to prescribe litigation by the Executive as the *exclusive* means of enforcing federal law." *Riley*, 252 F.3d at 753; *see also Kelly*, 9 F.3d at 751; *Wallace*, 2023 WL 8027309, at *5. Instead, as the Sixth Circuit noted, "[o]ur current statutory framework includes many laws that authorize individuals to act as 'private attorneys-general,' bringing causes of action for the common weal." *Taxpayers Against Fraud*, 41 F.3d at 1041.

Moreover, the same historical evidence that informs the Appointments Clause analysis bears heavily on this question. *See, e.g.*, *Riley*, 252 F.3d at 752–53. Private parties' pursuit of *qui tam* litigation is consistent with longstanding historical practice, which suggests strongly that the Framers did not view *qui tam* relators as usurping the Executive's constitutionally assigned functions.

Further, as courts have recognized, the FCA includes several control mechanisms to ensure that the Executive Branch's prerogatives are not impinged by *qui tam* suits. *See id.* at 753–57; *Taxpayers Against Fraud*, 41 F.3d at 1041; *Kelly*, 9 F.3d at 753–55; *Kreindler & Kreindler*, 985 F.2d at 1155. From the outset, every *qui tam* complaint must be filed under seal and served on the government precisely to ensure that the United States can investigate the matter and determine whether it wishes to "intervene and proceed with the action" or potentially move to dismiss it. 31 U.S.C. §§ 3730(b)(2); (c)(2)(a). If the government chooses to intervene, "the relator loses control" and the action is "'conducted by the Government.'" *Polansky*, 143 S. Ct. at 1728 (quoting 31

U.S.C. § 3730(b)(4)(A)). In that circumstance, the government "shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the" relator. 31 U.S.C. § 3730(c)(1); *Polansky*, 143 S. Ct. at 1728. The government can also "elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty," rather than litigating the FCA suit. 31 U.S.C. § 3730(c)(5).

And if the government initially declines to intervene, it may still intervene at a later time for good cause and move to dismiss the relator's claims. *See Polansky*, 143 S. Ct. at 1732, 1734. Such motions are subject to highly deferential review under Federal Rule of Civil Procedure 41(a); indeed, the Supreme Court emphasized that district courts must grant dismissal "in all but the most exceptional cases"—"even if the relator presents a credible assessment to the contrary," *Polansky*, 143 S. Ct. at 1734. And even where the government does not intervene, it retains a great deal of control over a *qui tam* suit. The government can settle a pending suit, *see* 31 U.S.C. § 3730(c)(2)(B), and it can veto a relator's proposed settlement or voluntary dismissal of his action, *see id.* § 3730(b)(1). For example, in *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330 (4th Cir. 2017), a declined *qui tam* arising out of this District, the United States objected to a proposed settlement between the relators and the defendant. *Id.* at 335. On appeal, the Fourth Circuit found the "Attorney General possesses an absolute veto power over voluntary settlements in FCA qui tam actions." *Id.* at 340. Further, after declining to intervene, the United States is entitled to receive copies of all pleadings and transcripts, *id.* § 3730(c)(3), and to stay any discovery by the relator that "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts," *id.* § 3730(c)(4).

These control mechanisms have been fully available here. Specifically, the United States has closely monitored the docket in this case, received filings, entered several of its own filings, *see* ECF Nos. 295, 296, 299 300, 365, 366, attended status hearings, *see e.g.*, ECF No. 173, and could, upon a showing of good cause, move to intervene, settle, or dismiss this case if it chose to do so.

Nevertheless, Defendants insist that the FCA's safeguards insufficiently protect Executive Branch prerogatives. They argue, for example, that the government cannot determine when and where a relator files suit in the first place. *See* ECF No. 396-1 at 13. But Article II does not require that Executive Branch officials be able to prevent private litigants from suing to vindicate their "private interest[s]," *Stevens*, 529 U.S. at 772, even if those private interests overlap with public ones. Tellingly, Defendants do not contend that the Constitution would require the Executive Branch to approve private suits under Title VII or the Sherman Act, for example, before they are filed—even though plaintiffs bringing such actions may vindicate public rights. Defendants also suggest that *qui tam* actions can infringe executive interests by, for example, saddling the government with the obligation to reimburse defense costs, or by resulting in judgments with res judicata or collateral estoppel effect. *See* ECF No. 396-1 at 17 & n.8. The Executive, however, is well-positioned to weigh the potential benefits of a *qui tam* suit against any potential risks. And, again, the FCA empowers the Executive to take measures, up to and including intervention and dismissal of the case, that it deems appropriate. *Polansky*, 143 S. Ct. at 1732, 1734. For these reasons, the FCA's *qui tam* provisions are consistent with the Take Care Clause.

Further, the relevant case law does not support Defendants' position. Defendants rely heavily on *Morrison v. Olson*, 487 U.S. 654 (1988), to argue that the FCA exceeds the outer limit of permissible congressional restrictions on executive power. In *Morrison*, the Court upheld

restrictions on the President's ability to remove an independent counsel who possessed "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice." *Id.* at 662. As a threshold matter, *Morrison* is inapposite. *Kelly*, 9 F.3d at 752–53; *Riley*, 252 F.3d at 754–55. There, the prosecutor was assigned to represent the United States itself and to bring criminal prosecutions—a "function [that] cuts . . . to the heart of the Executive's constitutional duty to take care that the laws are faithfully executed." *Riley*, 252 F.3d at 755. Therefore, Congress could not—at least not without raising the most serious separation of powers questions—have assigned that responsibility to a private party outside the Executive and not subject to Executive control. *Qui tam* relators, however, are simply civil litigants; they are not government officials and they do not represent the United States. *See id.*; *Wallace*, 2023 WL 8027309, at *5. In any event, as discussed, a relator's case is subject to substantial control by the Executive Branch, thus ensuring it does not infringe the constitutional limitations set by *Morrison*. *See, e.g.*, *Kelly*, 9 F.3d at 752–53.

Equally unavailing is Defendants' reliance on *Seila Law v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020). There, the Court held that a for-cause restriction on the President's power to remove the Consumer Financial Protection Bureau's (CFPB) single Director violated constitutional separation of powers. *Id.* at 2201. The CFPB's leadership structure, the Court held, "lacks a foundation in historical practice and clashes with constitutional structure by concentrating power in a unilateral actor insulated from Presidential control." *Id.* at 2192. By contrast, the *qui tam* mechanism is firmly grounded in historical practice; and the role of the *qui tam* relator bears no resemblance to that of the CFPB director, who was shielded from executive control while "wield[ing] vast rulemaking, enforcement, and adjudicatory authority over a significant portion of the U.S. economy." *Id.* at 2191.

Finally, Defendants contend that the FCA impermissibly constrains the Executive's ability to terminate declined *qui tam* actions and to "remove" relators. ECF No. 396-1 at 18–21. That contention is unpersuasive. As to the government's ability to terminate declined FCA actions, the Third Circuit's *Polansky* decision, which the Supreme Court affirmed "across the board," 143 S.Ct. at 1730, underscored that the "uniquely flexible and capacious" good-cause standard for intervention "provid[es] an adequate forum to vindicate the prerogatives of the Executive Branch," thus allaying any separation-of-powers concerns. *See Polansky v. Exec. Health Res. Inc.*, 17 F.4th 376, 387 (3d Cir. 2021), *cert. granted sub nom. United States ex rel. Polansky v. Exec. Health Res., Inc.*, 142 S. Ct. 2834 (2022), and *aff'd sub nom. Polansky*, 143 S. Ct. 1720. And as to the argument that the Executive is unable to remove relators, Defendants' contention is fundamentally misplaced. As the Ninth Circuit explained, the "concept of removal does not make sense in the *qui tam* context, where there is no 'office' from which to remove the relator and subsequently fill with someone else." *See Kelly*, 9 F.3d at 755. The Court should reject Defendants' removal argument for that reason alone. In any event, the Executive's power to intervene and dismiss *qui tam* actions—thus displacing the relator's authority to litigate a case—sufficiently protects Executive Branch prerogatives. The Constitution does not require that the Executive Branch have any additional power to preclude a private party whose suit would vindicate public rights from litigating a case.

## V.     Conclusion

For these reasons, the FCA's *qui tam* provisions are consistent with the Constitution's Appointments Clause and Take Care Clause. Accordingly, the Court should reject Defendants' arguments—as every federal Circuit Court to decide the issue has done—and deny Defendants' Motion for Judgment on the Pleadings.

January 26, 2024                                             Respectfully submitted,

                                                                ADAIR F. BOROUGHS
                                                                United States Attorney District of South Carolina

                       By:     s/ BETH C. WARREN
                                BETH C. WARREN (#11360)
                                STAN RAGSDALE (#3197)
                                Assistant United States Attorneys
                                1441 Main Street, Suite 500
                                Columbia, S.C. 29201
                                Telephone: (803) 929-3037

                                JAMIE ANN YAVELBERG
                                ROBERT McAULIFFE
                                ART J. COULTER
                                JAMES P. NEALON
                                Attorneys, Civil Division
                                Commercial Litigation Branch
                                Post Office Box 261
                                Ben Franklin Station
                                Washington, D.C. 20044
                                Telephone: (202) 307-0237

                                *Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing has been served upon all counsel of record in this case on this, the 26th day of January 2024, via the Court's electronic filing system.

/s/ Beth C. Warren
Beth C. Warren