**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CHARLES R. SHEPHERD; DANNY V. RUDE; ROBERT SCOTT DILLARD; and RICKEY MACKEY, <br><br> Plaintiff-Relators, <br><br> v. <br><br> FLUOR CORPORATION; FLUOR INTERCONTINENTAL, INC., <br><br> Defendants. | Civil Action No. 6:13-cv-02428-JD |

**FLUOR'S MOTION IN LIMINE NO. 1 TO EXCLUDE
ALL EVIDENCE AND TESTIMONY RELATED TO
THE NOVEMBER 12, 2016 SUICIDE BOMBING AT BAGRAM AIRFIELD**

Mark C. Moore (Fed. ID No. 4956)
Michael A. Parente (Fed. ID No. 13358)
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 540-2146
Facsimile: (803) 727-1458
MMoore@maynardnexsen.com

Konstantine P. Diamaduros (Fed. ID No. 12368)
MAYNARD NEXSEN PC
104 South Main Street, Suite 900 (29601)
Post Office Drawer 10648
Greenville, SC 29603-0648
Telephone: (864) 370-2211
Facsimile: (864) 282-1177

Craig D. Margolis (admitted *pro hac vice*)
Tirzah S. Lollar (admitted *pro hac vice*)
Christian D. Sheehan (admitted *pro hac vice*)
Elizabeth A. Carney (admitted *pro hac vice*)
Katelyn M. Deibler (admitted *pro hac vice*)
Elliot S. Rosenwald (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, Northwest
Washington, DC 20001-3743
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
craig.margolis@arnoldporter.com

Rachel K. Higgins (admitted *pro hac vice*)
Sahrula Kubie (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Counsel for Defendants Fluor Corporation and Fluor Intercontinental, Inc.*

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ....................................................................................................1

II.    BACKGROUND ....................................................................................................2

    A.    Relators' Property Management Allegations. ............................................3

    B.    LOGCAP IV & The Afghan First Program ..............................................3

    C.    The Army's Security Failures ...................................................................4

    D.    The AR 15-6 Report..................................................................................5

    E.    Related Litigation......................................................................................7

III.    LEGAL STANDARD ...........................................................................................7

IV.    ARGUMENT.........................................................................................................8

    A.    Evidence Concerning the Bombing is Irrelevant and, Therefore,
        Inadmissible. .............................................................................................9

        1.    The Bombing is irrelevant to Relators' property management
            allegations. ....................................................................................9

        2.    Relators mischaracterize the findings in the redacted Report....................10

    B.    The Bombing Is Unduly Prejudicial. ......................................................13

        1.    The evidence has minimal probative value.................................13

        2.    The risk of unfair prejudice is substantial and unavoidable. .....................14

        3.    Any reference to the Bombing will inevitably result in wasted
            time and juror confusion. ............................................................19

    C.    Were the Court to Allow Relators to Introduce Evidence of the Bombing,
        It Must Also Allow Fluor to Mount a Defense. .....................................20

V.    CONCLUSION....................................................................................................21

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*El-Masri v. United States*,
    479 F.3d 296 (4th Cir. 2007) ...................................................................................21

*Farnsworth Cannon, Inc. v. Grimes*,
    635 F.2d 268 (4th Cir. 1980) ...................................................................................21

*Hencely v. Fluor Corp.*,
    120 F.4th 412 (4th Cir. 2024) ........................................................................ *passim*

*Hencely v. Fluor Corp.*,
    554 F. Supp. 3d 770 (D.S.C. 2021) ......................................................................7, 21

*Hencely v. Fluor Corp.*,
    No. 24-924 (Nov. 3, 2025) ...............................................................................6, 7, 9

*In re Air Crash at Charlotte, N.C. on July 2, 1994*,
    982 F. Supp. 1060 (D.S.C. 1996) ...........................................................................18

*In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair Sys. Prods. Liab. Litig.*,
    810 F.3d 913 (4th Cir. 2016) ...................................................................................19

*Martin v. Cavalier Hotel Corp.*,
    48 F.3d 1343 (4th Cir. 1995) ...................................................................................18

*Mullins v. Mayor & City Council of Balt.*,
    No. TJS-14-2698, 2017 WL 784120 (D. Md. Mar. 1, 2017) ..................................18

*Parker v. Transp. Leasing/Contr., Inc.*,
    No. 4:22-cv-00138-JD, 2025 WL 2528652 (D.S.C. Sept. 3, 2025) ....................7, 20

*Sterling v. Tenet*,
    416 F.3d 338 (4th Cir. 2005) ...................................................................................21

*Tangen v. Fluor Intercontinental, Inc.*,
    No. 6:21-cv-335-JD (D.S.C.) ...............................................................................2, 7

*United States ex rel. Davis v. U.S. Training Ctr. Inc.*,
    498 F. App'x 308 (4th Cir. 2012) .......................................................................15, 16

*United States ex rel. Wheeler v. Acadia Healthcare Co., Inc.*,
    127 F.4th 472 (4th Cir. 2025) ....................................................................................9

*United States v. Aramony*,
  88 F.3d 1369 (4th Cir. 1996) ........................................................................................8

*United States v. Bainbridge Mgmt., L.P.*,
  Nos. 01 CR 469-1 & 01 CR 469-6, 2002 WL 31006135 (N.D. Ill. Sept. 5,
  2002) ....................................................................................................................16, 17, 19

*United States v. Cadden*,
  No. 14-10363-RGS, 2018 WL 2108243 (D. Mass. May 7, 2018)..........................................16

*United States v. Elsheikh*,
  103 F.4th 1006 (4th Cir. 2024) .......................................................................................8

*United States v. Fitzsimons*,
  605 F. Supp. 3d 92 (D.D.C. 2022) ...................................................................................17

*United States v. Fulmer*,
  108 F.3d 1486 (1st Cir. 1997).........................................................................................17

*United States v. Khatallah*,
  313 F. Supp. 3d 176 (D.D.C. 2018) .................................................................................17

*United States v. Smith*,
  452 F.3d 323 (4th Cir. 2006) ...........................................................................................7

*United States v. Verges*,
  No. 1:13-cr-222-JCC, 2014 WL 559573 (E.D. Va. Feb. 12, 2014)....................................7, 20

*Yates v. Ford Motor Co.*,
  No. 5:12-CV-752-FL, 2015 WL 2189774 (E.D.N.C. May 11, 2015) ..............................18, 19

iii

Defendants Fluor Corporation and Fluor Intercontinental, Inc. (collectively, "Fluor"), by and through undersigned counsel and pursuant to Federal Rules of Evidence 401, 402, and 403, hereby file this motion *in limine* ("Motion")[1] requesting that the Court exclude all evidence and testimony related to the suicide bombing that occurred at Bagram Airfield on November 12, 2016 (the "Bombing").

## I.    INTRODUCTION

In the early morning hours of November 12, 2016, some 200 military and civilian personnel gathered at the starting line for a Veterans Day 5k race at the Bagram Airfield in Afghanistan. Afghan national Ahmad Nayeb ("Nayeb") (who had been hired by a Fluor subcontractor in compliance with the Army's "Afghan First" program) approached the group from a distance. When confronted, he detonated an explosive vest, killing himself and five others and severely wounding seventeen more. The Taliban took credit for this tragic terrorist attack.

For the reasons set forth below, Fluor urges the Court to preserve the integrity of the upcoming trial by prohibiting Relators from exploiting this tragedy. Relators seek to introduce evidence blaming Fluor for the Bombing as "proof" that Fluor failed in its mission to manage government property. This is no more than a thinly veiled attempt to inflame the jury. For the reasons discussed below, Fluor seeks to exclude all evidence of, and reference to, the Bombing under Federal Rules of Evidence 401, 402, and 403.

*First*, the Bombing is irrelevant to a False Claims Act ("FCA") case, and the alleged facts Relators would elicit bear no relationship to their property management allegations. *Second*, even

---

[1]    Pursuant to Local Civil Rule 7.04 (D.S.C.), Fluor is not filing a supporting memorandum because a full explanation of this Motion as set forth in Local Civil Rule 7.05 (D.S.C.) is contained herein, and a supporting memorandum would serve no useful purpose.

if Relators could show that the Bombing is somehow marginally relevant (which they cannot), the evidence should be excluded as unduly prejudicial because the risk of causing jurors to ignore other evidence and render an improper verdict is substantial and unavoidable. *Third*, the facts surrounding the Bombing are hotly disputed in many pending lawsuits, the vast majority of which are assigned to this Court and stayed pending the Supreme Court's decision in *Hencely*.[2] Fluor also notes that if Relators are allowed to introduce evidence or testimony about the Bombing, Fluor would be entitled to respond with evidence and testimony of its own, which could include the need to take additional discovery.[3] This might not only delay trial; it would inevitably result in an unnecessary sideshow. This "trial within a trial" about an irrelevant but emotion-stirring suicide bombing could easily take weeks, wasting time and running the substantial risk of completely sidetracking jurors' focus in what is already an extremely convoluted series of theories by Relators.

## II.     BACKGROUND

The full details surrounding the Bombing could fill volumes. Accordingly, Fluor limits the following factual discussion to that which is necessary for the Court to adjudicate the present Motion.

---

[2]     *See Hencely v. Fluor Corp.*, 120 F.4th 412 (4th Cir. 2024), *cert. granted*, 145 S. Ct. 2748 (2025); *Tangen v. Fluor Intercontinental, Inc.*, No. 6:21-cv-335-JD (D.S.C.) (13 consolidated cases pending before the Honorable Joseph Dawson, III, which are currently stayed pending resolution of *Hencely*). As the Court is aware, discovery has not been completed in *Hencely*—nor has it truly begun in any of the related cases assigned to this Court.

[3]     It would appear that Relators would seek primarily here to introduce and reference the Army's 70-page heavily redacted investigative report at trial. As discussed in Section IV.C, *infra*, the vast majority of the Army's investigative materials, including substantial portions of the final report, remain classified. Should Relators be permitted to use the report, Fluor could not effectively rebut it with large portions redacted and classified. At a minimum, should the present Motion not be granted, Fluor will have no choice but to issue a trial subpoena to the Army to obtain the unredacted Report, which in turn would result in further motions practice.

### A.     Relators' Property Management Allegations.

Fluor does not believe there is any relevance between the Bombing and any of Relators' allegations. However, for purposes of this Motion, the only aspect of this case which could conceivably implicate the Bombing is Relators' allegation that Fluor mismanaged materials and concealed this fact from the government. Relators assert Fluor's "inventory records . . . were wildly inaccurate and reflected a lack of inventory control that resulted in material shortages and overages." Dkt. 512 at 1. According to Relators, these alleged failures resulted in "over-ordering and use of expensive air freight to cover shortages," as well as "shortages that prevented timely repairs." *Id.* They claim "Fluor was well aware that it was failing in these areas" and "engaged in various schemes to conceal its failures" from the government. *Id.* at 1, 3.

For the reasons explained below, the Bombing does nothing to advance these claims.

### B.     LOGCAP IV & The Afghan First Program

The bomber, Nayeb, was employed by a Fluor labor subcontractor. *See Hencely*, 120 F.4th at 418. At the time of the Bombing, he worked as a HAZMAT employee, responsible for managing hazardous materials in the HAZMAT section of the Non-Tactical Vehicle ("NTV") Yard—not in the materials management group. *See id.*; Dkt. 539-2 at 9, 11.[4] Indeed, Nayeb's position in the NTV Yard had absolutely nothing to do with Fluor's management of materials under the LOGCAP IV contract.

Nayeb was hired pursuant to the Army's Afghan First Program, which, as part of the United States' broader counterinsurgency strategy, sought to develop the Afghan economy with the end goal of fostering a "moderate, stable, and representative Afghanistan capable of controlling and

---

[4]     Non-tactical vehicles are, for the most part, commercially available civilian vehicles such as trucks, vans, and the like that were maintained and repaired by Fluor.

governing its territory." 120 F.4th at 418. To this end, the Program involved training and employing Afghans ("Local Nationals") for "jobs being performed by contracted personnel, [Department of Defense] civilians, and even U.S. military personnel." *Id.*

Critically, in furtherance of the Afghan First program, the LOGCAP IV Task Order 5 Performance Work Statement obligated Fluor to "hire [Local National] personnel and Subcontractors to the maximum extent possible in performance of this contract." *Id.* at 419. The military was at all times responsible for establishing and enforcing force protection and base security policies. *Id.*

### C.     The Army's Security Failures

In 2011, the Army interviewed, vetted, and approved Nayeb for employment. *See id.* at 418, 420–21. Unbeknownst to Fluor—but not to the Army—Nayeb was a "former" Taliban member. *See id.* at 420–21. The Army conducted additional counterintelligence screening interviews with Nayeb over his five years of employment at the base. *Id.* at 421. In one such interview, only months before the Bombing, interviewers noted that Nayeb's answers to counterintelligence questions seemed "trained and coached." *Id.* Notwithstanding this potential threat indicator, the Army took no action and failed to inform Fluor of Nayeb's suspicious interview responses or Taliban ties. *See id.*

When Fluor proposed providing additional escort supervision of Local Nationals like Nayeb, the Army rejected the proposal, explaining that "the price tag was going to be excessive." *Id.* at 420. Finally, the night before the Bombing, while military intelligence indicated that an attack was imminent, the military failed to inform Fluor of any active threat or to otherwise take action. *See id.* at 421.

4

D.     **The AR 15-6 Report**

Following the Bombing, the Army conducted a three-week investigation under Army Regulation 15-6 ("AR 15-6"), issuing a final report in December 2016 (the "Report"). *Id.* at 420. Although the publicly available version details investigators' conclusions regarding Fluor's conduct allegedly contributing to the security failures—unsupported and unproven conclusions which Fluor vigorously disputes—all details surrounding relevant potential failures of others (including but not limited to the Army) have been redacted. *See generally* Dkt. 539-2. As a result, most of the Report's "eight major findings," including *the Army's* role in contributing to the Bombing, remain classified. Without the full version of the Report, it is impossible to know the manner and extent to which the Army's own negligence caused the Bombing.[5]

That said, the unredacted portions of the Report state that Nayeb manufactured an improvised explosive device with materials that either were smuggled past Army security (as Nayeb lived outside the base) or which Nayeb stole on the base. *See* Dkt. 539-2 at 49.[6] The Report does not specify exactly where Nayeb obtained the materials (including the loose hardware that was included in the device as shrapnel). *See id.* Accordingly, it is not clear whether Nayeb stole these materials from the NTV Yard where he worked or acquired them from some other location (including outside the base). *See generally id.* (containing swaths of redactions).

---

[5]     For a comprehensive discussion of the redactions in the Report and Fluor's position with respect to the same, see Memorandum of Law in Support of Defendants' Motion for Judgment on the Pleadings, *Hencely v. Fluor Corp.*, 6:19-cv-00489-BHH (D.S.C.), Dkt. No. 101. *See also infra* Section IV.C.

[6]     The redacted Report discusses "components" used in the explosive vest to include string that matched string found at Nayeb's worksite, nuts and bolts that were "similar" to those found at the NTV Yard, and a switch "similar" to switches found at the NTV Yard including in the trash. *See* Dkt. 539-2 at 12, 49. Yet, it does not conclude whether Nayeb obtained these "similar" items from the NTV Yard or whether he smuggled them in from outside (as he allegedly did with the explosives used in the device).

If he stole them from the Yard, it is not clear exactly where he got them. He worked with hazardous materials, not with screws, bolts, and string. This distinction is important because the NTV Yard was where mechanics worked on vehicles and where common hardware would therefore be found. Most critically for this Motion, there is no suggestion in the redacted Report that Nayeb obtained the "components" from a materials storeroom under the control of Fluor's Materials Management Group.

The Report nonetheless criticizes Fluor for allegedly allowing Nayeb to access tools that his job did not require, failing to adequately supervise and escort him while on base, and retaining him after reported instances of sleeping on the job and unauthorized absences. *Hencely*, 120 F.4th at 421. Despite purporting to deem Fluor's conduct "the primary contributing factor" to the Bombing,[7] the Army declined to terminate its LOGCAP IV contract. *See id.* In fact, in a case that turns on whether Fluor's Property Management System ("PMS") ought to have been disapproved, the government continued to approve Fluor's PMS following the Bombing. Fluor was also one of the awardees of LOGCAP V, and while it did not win a task order to continue work in Afghanistan, it is currently supporting the military in Africa under that contract.[8]

---

[7]    As Justice Alito aptly acknowledged during the recent oral argument in *Hencely*, "[w]hen something goes wrong like the [B]ombing on the Bagram base, the military has an interest in trying to exonerate itself." Transcript of Oral Argument at 67:2–5, *Hencely v. Fluor Corp.*, No. 24-924 (Nov. 3, 2025).

[8]    In 2021, Fluor transitioned to the LOGCAP V contract. Fluor Corp., *Fluor Awarded U.S. Army's LOGCAP V Contract for U.S. Africa Command* (Apr. 15, 2019), https://newsroom.fluor.com/news-releases/news-details/2019/Fluor-Awarded-US-Armys-LOGCAP-V-Contract-for-US-Africa-Command/default.aspx. Fluor notes the above only to show the irrelevance of the Bombing to this case. Fluor separately has filed a motion *in limine* to exclude evidence relating to the award of LOGCAP V. At trial, Fluor will not reference its LOGCAP V work should the Court grant these motions.

### E.    Related Litigation

As stated, Fluor vehemently disputes the redacted Report's conclusion that Fluor was responsible to any extent for the security failures that culminated in the Bombing. Fluor has consistently denied responsibility for the tragic incident.

U.S. Army Specialist Winston Tyler Hencely was among those injured. In February 2019, he sued Fluor in this District, alleging Fluor's supervision, entrustment, and retention of Nayeb was negligent. *See generally Hencely v. Fluor Corp.*, 554 F. Supp. 3d 770 (D.S.C. 2021).[9] United States District Judge Bruce H. Hendricks granted summary judgment for Fluor, *id.*, and the Fourth Circuit affirmed. *Hencely*, 120 F.4th at 433. Mr. Hencely's case was recently argued before the Supreme Court. *See* Transcript of Oral Argument, *Hencely v. Fluor Corp.*, No. 24-924 (Nov. 3, 2025). An additional thirteen cases involving the Bombing have been consolidated before this Court, which remain stayed pending the resolution of Mr. Hencely's case. *Tangen v. Fluor Intercontinental, Inc.*, No. 6:21-cv-335-JD (D.S.C.).

## III.    LEGAL STANDARD

"Questions of trial management are quintessentially the province of the district courts." *Parker v. Transp. Leasing/Contr., Inc.*, No. 4:22-cv-00138-JD, 2025 WL 2528652, at *1 (D.S.C. Sept. 3, 2025) (quoting *United States v. Smith*, 452 F.3d 323, 332 (4th Cir. 2006)). "The purpose of a motion in limine is to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the jury will consider." *Id.* (quoting *United States v. Verges*, No. 1:13-cr-222-JCC, 2014 WL 559573, at *2 (E.D. Va. Feb. 12, 2014)) (emphasis omitted). "When ruling on a motion in limine, a federal district court

---

[9]    Importantly, Mr. Hencely makes no allegations relating to property management.

exercises 'wide discretion.'" *Id.* (quoting *United States v. Aramony*, 88 F.3d 1369, 1377 (4th Cir. 1996)).

"Irrelevant evidence is not admissible." Fed. R. Evid. 402. The federal rules set a "fairly low bar" for relevance. *United States v. Elsheikh*, 103 F.4th 1006, 1026 (4th Cir. 2024). Still, to be admissible, evidence *must* have a tendency to make a fact of consequence more or less probable than it would be without the evidence. *Id.;* Fed. R. Evid. 401.

Finally, even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Evidence is "unfairly prejudicial" if "there is a genuine risk that the emotions of a jury will be excited to irrational behavior and this risk is disproportionate to the probative value of the offered evidence." *Elsheikh*, 103 F.4th at 1026 (citation modified); *see also* Fed. R. Evid. 403 advisory committee's note ("Exclusion for risk of unfair prejudice, confusion of issues, misleading the jury, or waste of time, all find ample support in the authorities. 'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.").

## IV.     ARGUMENT

There are at least three independently sufficient grounds for excluding all evidence of and reference to the Bombing: (1) the incident and the circumstances surrounding it are irrelevant and inadmissible; (2) even if marginally relevant, their probative value is slight and substantially outweighed by (a) the danger of unfair prejudice and (b) the risk of distracting the jury and wasting time; and (3) allowing evidence of the Bombing would require Fluor to mount a vigorous defense, which, at the minimum, would mean subpoenaing documents and witnesses from the Army,

8

triggering a whole new round of motions practice under the state secrets doctrine among other issues.[10]

### A.     Evidence Concerning the Bombing is Irrelevant and, Therefore, Inadmissible.

#### 1.     *The Bombing is irrelevant to Relators' property management allegations.*

As stated, Relators purport to advance multiple theories of liability based on their allegation that "Fluor operated a failing property management system that lost control of Government property, and . . . actively concealed these failures from the Government." Dkt. 537 at 26. Each theory fails for the reasons set forth in Fluor's Motion for Summary Judgment. *See generally* Dkt. 507-1. Fluor does not rehash those arguments here but instead provides a summary of Relators' claims to demonstrate why, regardless of their merits, the Bombing is wholly irrelevant to the issues in this case.

*First*, Relators contend Fluor "fraudulently induced" the government to enter into and extend contracts, to approve its PMS, and to approve its Loss, Theft, Damaged and Destroyed requests ("LTDDs"). Dkt. 537 at 29–32. *Second*, distinct from their fraudulent inducement theory, Relators allege "Fluor made false express and implied certifications in its LTDDs" by submitting LTDDs when "management was fully aware of systemic and recurring failures in its property system." *Id.* at 32–33. *Third*, based on their improper reading of *Wheeler*,[11] Relators argue Fluor's alleged property management failures are actionable under a "reverse false claims theory." *Id.* at 33–36. *Fourth*, they claim "Fluor's systemic and recurring property management failures resulted in . . . award fee submissions full of falsehoods." *Id.* at 37. *Fifth*, Relators argue that "Fluor's

---

[10]     At oral argument in *Hencely*, Justice Barrett acknowledged the United States' position that "it could assert the state secrets privilege and reserve[s] the right to do so, although it had not yet in this case." Transcript of Oral Argument at 37:6-10, *Hencely v. Fluor Corp.*, No. 24-924 (Nov. 3, 2025).

[11]     *United States ex rel. Wheeler v. Acadia Healthcare Co., Inc.*, 127 F.4th 472 (4th Cir. 2025).

routine failure to conduct monthly inventories . . . resulted in Fluor billing the Government for work that it was not performing, and had no intention of performing," and that its "lack of inventory control was *one of* the ways in which Fluor knowingly failed to follow" its property management obligations. *Id.* [12]

Relators do *not* allege inadequate physical security relating to materials storage areas generally or the NTV Yard specifically. They do *not* allege that, among their litany of criticisms of Fluor's PMS, that tradespeople and laborers outside of the Materials Management Group (such as Nayeb) had inappropriate access to materials maintained by that Group. And, while they do allege that Fluor's Materials Management Group did not conduct inventories as frequently or with the rigor that Relators believe was necessary, they do not claim that "properly conducted" inventories would have included materials outside of the Group's control (for example, materials issued by the Materials Management Group to the various departments for conducting daily work).

### 2. *Relators mischaracterize the findings in the redacted Report.*

Relators brazenly misrepresent the findings in the redacted Report by falsely suggesting that investigators considered Fluor's alleged property mismanagement a contributing factor to the Bombing: "Tragically, the impact also included the death of two Fluor employees and three U.S. soldiers killed by an improvised explosive device detonated on base using property and equipment,

---

[12] To prevail on any of these theories, Relators must prove their allegation that Fluor's PMS was inadequate. Of course, Relators must also prove that Fluor's management knew the PMS was inadequate and concealed that fact from the government. But Relators do not (and cannot) suggest that the Bombing is probative of these points. Fluor fully cooperated with the Army's investigation, and the redacted Report mentions no dishonesty or failure to disclose on Fluor's part.

Presumably, Relators also will attempt to prove that Fluor's seniormost management caused the loss of property through willful misconduct or lack of good faith. *See* FAR 52.245-1(h)(1)(ii). However, this allegation is even further removed from the Bombing as nothing in the redacted Report even remotely suggests that Fluor's senior managers caused lost property. Accordingly, Fluor does not further discuss that ground for liability here but reserves the right to discuss it in its reply should Relators rely upon it in opposing this Motion.

10

which a Government investigation found attributable to lax procedures in Fluor's property yards . . . ." Dkt. 537 at 37. Such a description is highly misleading.

Relators state the explosive device was "detonated on base using property and equipment." *Id.* That much is an accurate reflection of the redacted Report. But, by following that statement with a clause about "lax procedures in Fluor's property yards," *id.*, Relators imply a conclusion found nowhere in the redacted Report—that the "property and equipment" at issue were taken from Fluor's Materials Management Group. *That is a baseless insinuation.* While the redacted Report explains that certain of the bomb's components were the same or "similar" to materials found at Nayeb's work facility, it *does not* explain where, how, or when Nayeb acquired them. *See* Dkt. 539-2 at 49. There is no reference to "lax procedures in property yards" or to property management practices period. Nayeb did not work for the Materials Management Group or in a materials storeroom. He worked with hazardous materials at the NTV Yard where vehicles were maintained and repaired. Dkt. 539-2 at 9, 11. The Report does not say that Nayeb obtained the "components" from a materials storeroom.

Another misleading implication arises from Relators preceding their statement about "lax procedures in Fluor's property yards" with a clause about Nayeb using "property and equipment" to detonate the bomb. By doing so, they suggest the "lax procedures" at issue were Fluor's *property management* procedures. *That is similarly baseless.* As stated, the redacted Report criticizes Fluor not for property mismanagement, but for insufficient oversight of its employees and "fail[ing] to supervise use of tools by employees." *See* Dkt. 539-2 at 11–15.[13]

---

[13]    Since this case focuses on Fluor's management of materials, it is worth noting that the "tools" referenced in the redacted Report, Dkt. 539-2 at 12–13, are considered property—not materials. *See* Montalvo Dep. 11:24–12:5, 13:8–13, Dkt. 507-36 (explaining "materials" are low-dollar-value items consumed in use). This is evident from the fact that Nayeb, as stated in the

To the extent that Relators argue Fluor's alleged failure "to supervise use of tools" is probative of their allegations regarding Fluor's PMS, they again misconstrue the redacted Report's conclusions. The purpose of the Army's investigation, as stated in the redacted Report, was "to weigh considerations pertinent to force protection, intelligence, contracting, and combat operations," not to assess the adequacy of Fluor's PMS. *See* Dkt. 539-2 at 1. Indeed, any honest reading of the redacted Report confirms that investigators were concerned primarily with safety—not contractors' recordkeeping or inventory practices. *See*, *e.g.*, *id.* at 2 ("[T]his investigation seeks to provide value to the ongoing efforts in Afghanistan, with hopes that it can contribute to the understanding required to keep Service member[s] and civilians as safe as possible."). Investigators deemed Fluor's tool check-out practices problematic because of the perceived security risks posed by a lack of defined protocols and/or failure to consistently enforce them. *See id.* at 12–13. Thus, the concern reflected in the redacted Report was not that Fluor was mismanaging property (and certainly not in the manner Relators allege) but that individuals such as Nayeb could gain access to tools and use them for nefarious purposes.

Tellingly, despite proposing a litany of corrective actions, the redacted Report recommends no changes to Fluor's PMS and makes no mention of Fluor's inventory practices. In fact, the word "inventory" appears nowhere in the document. The redacted Report never discusses Fluor's management of materials, and it certainly does not conclude that Fluor's mismanagement of materials contributed to the Bombing or that superior inventory practices could have prevented the tragedy. Relators' assertion to the contrary is disingenuous, self-serving, and a blatant mischaracterization of the redacted Report's conclusions.

---

redacted Report, was required to "check out" the tools. *See* Dkt. 539-2 at 12–13. Materials are not "checked out" but treated as consumed when issued to the tradespeople.

***

Despite the liberties Relators take in describing the redacted Report, the Bombing simply has no bearing on any of the facts at issue in this litigation. Accordingly, the Court should exclude any reference to the Bombing as irrelevant under Rule 401 and inadmissible under Rule 402. However, as explained in the next section, even if the Bombing were somehow tangentially relevant, there are nonetheless ample additional reasons for excluding any evidence related to it.

**B.      The Bombing Is Unduly Prejudicial.**

The foregoing speculative inference Relators will ask a jury to draw, multiple times removed from the actual evidence and allegations in this case developed after years of discovery, demonstrates why the Bombing must be excluded under Rule 403. The probative value of such evidence is marginal at best. On the other hand, there is an extremely high risk of inflaming jurors' emotions, confusing the issues, and wasting time.

*1.        The evidence has minimal probative value.*

As noted, the Report itself does not draw the conclusions Relators would have a jury draw from it. It does not "blame" a lack of inventories or flawed government inspections or inadequate disclosures for the tragedy. Rather, it states that a single employee out of thousands on a single base out of dozens was insufficiently supervised and had access to tools he should not have. This single extreme example does virtually nothing to prove the sort of large-scale materials mismanagement alleged by Relators, much less that Fluor intentionally concealed its alleged materials mismanagement from the government.[14] At most, the investigation of the Bombing

---

14      There is no way of knowing whether, had Fluor done additional inventories, it would have noticed missing tools (or materials) and, even if it had noticed them, that it would have learned that Nayeb had stolen them. At the time of the Bombing, at government direction, Fluor did not file LTDD reports for negative adjustments. *See* Dkt. 536 at 15–18. There is no reason to believe

revealed that the Army vetted and required Fluor to hire a "former" Taliban member without informing Fluor that he was a "former" terrorist, that the Army approved his access to the Bagram Airfield, that the "former" Taliban member borrowed tools under false pretenses and may (or may not) have stolen a negligible amount of common hardware, and that he may (or may not) have used the tools and stolen materials to assist with carrying out a suicide bombing he plotted in secrecy with the assistance of a terrorist organization.

### 2.     *The risk of unfair prejudice is substantial and unavoidable.*

The risk of unfair prejudice here cannot be overstated. Any description of the Bombing will almost certainly arouse juror's sense of patriotism, anti-terrorism sentiment, sympathy for the victims, and animus toward Fluor. This is especially true given that the redacted Report is heavily one-sided and purports to assign the lion's share of blame to Fluor, without discussing the Army's own potential failures, which Fluor contends are the primary contributing cause of this tragedy. Not only do Relators appreciate the Bombing's tendency to prejudice a jury against Fluor—they reference it for precisely that reason.

Relators purport to have evidence of large-scale materials mismanagement costing the government hundreds of millions of dollars. Why, then, would they seek to introduce evidence of a single instance where a single individual stole a small quantity of materials to carry out a bombing? There is but one plausible answer: to capitalize on jurors' emotional response to an incident in which active members of the United States military (alongside Fluor employees) were killed and injured by a terrorist.

---

Fluor would have treated the missing tools or materials as anything more than routine negative adjustments that would not be reported to the government.

Courts in the Fourth Circuit and elsewhere have barred the introduction of even relevant evidence involving death or injury due to the risk of unfair prejudice, including in FCA cases. For example, in *United States ex rel. Davis v. U.S. Training Ctr. Inc.*, 498 F. App'x 308 (4th Cir. 2012), the relators brought an FCA suit against a security training company ("USTC"). The relators alleged USTC overbilled the government and committed other fraudulent acts in connection with two contracts the company entered with the Department of Homeland Security and the Department of State. *Id.* at 310–11. The district court granted partial summary judgment in favor of USTC but allowed two claims to proceed to trial. *Id.* at 311. The surviving claims concerned a "State Department contract, under which USTC provided security services in Iraq and Afghanistan in connection with the United States' military presence in those areas." *Id.* The jury rendered a verdict for USTC on all claims, and the relators appealed. *Id.*

On appeal, the relators argued the district court erred by excluding certain categories of evidence at trial. *Id.* Specifically, the relators sought to introduce testimony and exhibits relating to the State Department's review of USTC's operations in Iraq. *Id.* at 317. They claimed the evidence "suggested that the reviewers found that USTC was altering billing records and that a USTC employee issued a 'death threat' to one of the reviewers," and was therefore relevant "to show USTC's intent to defraud and 'hide its bad acts through intimidation.'" *Id.* The district court found the evidence was highly prejudicial and lacked significant probative value. *Id.*

The Fourth Circuit affirmed, explaining that "evidence concerning the alleged 'death threat' was inherently sensational, and was only marginally, if at all, relevant to Relators' claims." *Id.* The court also found that the "evidence concerning the alteration of billing records lacked probative value . . . because there is no evidence that the records alleged to have been altered were related to USTC's billing or submission of claims to the government at issue in this case." *Id.*

15

If a "death threat" is "inherently sensational," a terrorist attack on a United States military base causing death and injury is multiples more so. Further, the "death threat" incident in *Davis* lacked probative value because there was nothing to establish "the records alleged to have been altered were related to USTC's billing or submission of claims to the government at issue in [that] case." *Id.* Here, there is no evidence establishing that the *allegedly* stolen materials that were *allegedly* used in the Bombing were related to Fluor's *alleged* concealment of property management failures at issue in *this* case.

While not an FCA case, *United States v. Bainbridge Mgmt., L.P.*, Nos. 01 CR 469-1 & 01 CR 469-6, 2002 WL 31006135, at *2 (N.D. Ill. Sept. 5, 2002), is particularly instructive. In that prosecution for federal health care fraud offenses, the defendants moved to bar references to the deaths of two patients who were allegedly subjected to unnecessary medical procedures. *Id.* The court granted the defendants' motion, explaining that "[t]he crux of the indictment involves a kickback and bribery scheme" and the "alleged result of two particular unnecessary tests—the death of two patients—is not a fact central to the scheme." *Id.* Further, the court found that "[e]vidence about the death of two patients is inflammatory and likely to prejudice the jury against the corporate defendants who are not charged with causing the patient's deaths." *Id.* Finally, the court recognized allowing the evidence "would also raise collateral causation issues" and "unduly lengthen an already protracted trial." *Id.*; *see also United States v. Cadden*, No. 14-10363-RGS, 2018 WL 2108243, at *5 (D. Mass. May 7, 2018) (citing *Bainbridge* with approval; excluding evidence of patients' deaths and injuries due to risk of unfair prejudice).

This case is on all fours with the above. Like prosecutors' attempts to inflame and distract a jury with evidence of patient deaths in health care fraud cases, here Relators attempt to inflame and distract with a terrorist attack in an FCA case. This is not *Hencely*; Fluor is not on trial for

allegedly causing a terrorist attack. As noted in *Bainbridge*, the direct victims in the case were not the two deceased patients, but "the Medicare and Medicaid funds, and the private insurers who paid for unnecessary medical procedures." 2002 WL 31006135, at *2. Here, similarly, the alleged victim is the Army (and the monies it should have allegedly received for lost property). Introducing the Bombing into this case would turn it into something it is not.

Furthermore, courts have recognized the subjects of terrorism and bombings as emotionally charged and particularly likely to arouse passion and prejudice in the jury. In *United States v. Fulmer*, 108 F.3d 1486 (1st Cir. 1997), the defendant was convicted of threatening a federal agent in violation of 18 U.S.C. § 115(a)(1)(B). At trial, the district court allowed the federal agent to testify that the then-recent Oklahoma City bombing contributed to his interpretation of the defendant's message as a threat. *Id.* at 1496–97. Specifically, the district court found the evidence was "relevant to the agent's state of mind at the time he received the communication and to why he might have considered it threatening." *Id.* at 1497.

On appeal, the First Circuit reversed, finding the evidence created a "tremendous" risk of unfair prejudice and that its probative value was "slight" at best. *Id.* at 1497–98. "Undue focus on evidence of the Oklahoma City bombing and resulting deaths, as well as subsequent bomb threats and evacuations, serves only to evoke an improper emotional response from the jury, distracting the jury from careful consideration of the relevant issues before it and thereby prejudicing [the defendant]." *Id.* at 1498; *see also United States v. Khatallah*, 313 F. Supp. 3d 176, 194–95 (D.D.C. 2018) (A prosecutor's reference to the defendant as a "stone cold terrorist" "was not, as the government suggests, a reference to the terrorism-related charges that the defendant faced, but rather an appeal to the 'passion and prejudice' associated with the 'terrorist' label."); *cf. United States v. Fitzsimons*, 605 F. Supp. 3d 92, 99–100 (D.D.C. 2022) (in "January 6" prosecution,

17

excluding records of calls made by defendant to congressional staffers referencing the "deep state" because evidence "risk[ed] suggesting to the jury that he [was] an unhinged political extremist.").

Of course, the Bombing of which Relators attempt to take advantage poses the very same risks.

Introducing the heavily redacted Report into evidence carries the additional risk that the jury could "place undue weight" on the Army's findings. *See, e.g.*, *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1357–58 (4th Cir. 1995) (affirming exclusion of state agency report "because of the prejudicial effect such an official report might have on the jury"); *Yates v. Ford Motor Co.*, No. 5:12-CV-752-FL, 2015 WL 2189774, at *16 (E.D.N.C. May 11, 2015) ("The impact of such unfair prejudice would further be enhanced because the [EPA video] report bears the imprimatur of the federal government, leading the jury to grant these statements undue weight."); *In re Air Crash at Charlotte, N.C. on July 2, 1994*, 982 F. Supp. 1060, 1066 (D.S.C. 1996) (recognizing "a jury might place undue weight on statements of an official governmental agency"); *Mullins v. Mayor & City Council of Balt.*, No. TJS-14-2698, 2017 WL 784120, at *6 (D. Md. Mar. 1, 2017) (excluding EEOC determination because "imprimatur of government approval" created "substantial risk that it would be given undue weight"). The redacted Report here is both *one-sided* and *stamped with the mark of government approval.* If Relators are allowed to use it at trial, severe prejudice is unavoidable.

***

In summary, it is difficult to imagine evidence more likely to inflame jurors' emotions than a suicide bombing carried out by a terrorist organization that killed and injured American servicemen and civilians on an American military base. Such evidence has no place in this FCA case. To allow Relators to exploit the jury's inevitable emotional response will prevent the jury

18

from considering the merits of this already convoluted case. Accordingly, all evidence of or references to the Bombing must be excluded under Rule 403, for the risk of unfair prejudice substantially outweighs whatever speculative probative value they may have.

### 3. *Any reference to the Bombing will inevitably result in wasted time and juror confusion.*

The risks of wasting time and distracting the jury provide an independently sufficient ground for excluding the Bombing. The trial in this case will no doubt span many weeks, dozens of witnesses, and potentially thousands of exhibits.[15] Jurors will be tasked with evaluating complex legal claims and keeping track of myriad evidence and testimony. And that is *without* any reference to the Bombing.

Again, many key facts surrounding the Bombing remain hotly disputed, and Fluor's alleged role in contributing to the incident is the subject of active litigation where no fact discovery has occurred. Fluor has consistently denied responsibility for the Bombing and takes issue with several of the redacted Report's conclusions. If Relators are permitted to introduce evidence or testimony about the Bombing, Fluor is entitled to respond with evidence and testimony of its own. Once that Pandora's box is opened, no one knows how long it could take to close.

Indeed, courts are reluctant to allow even relevant evidence when it is likely to sidetrack a complex trial. *See, e.g.*, *In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair Sys. Prods. Liab. Litig.*, 810 F.3d 913, 922 (4th Cir. 2016) (subjecting jury to days of complex testimony on question not central to action is misleading); *Yates*, 2015 WL 2189774, at *16 ("[I]ntroduction of this evidence seems likely to protract trial by raising collateral issues . . . ."); *Bainbridge*, 2002 WL

---

[15]     In their pre-trial disclosures, Relators identified 78 potential witnesses and over 1,750 exhibits including subparts. Dkt. 586-1 & 586-3.

31006135, at *2 ("[T]he challenged evidence would also raise collateral causation issues . . . . This would unduly lengthen an already protracted trial.").

"The purpose of a motion in limine is to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the jury will consider." *Parker v. Transp. Leasing/Contr., Inc.*, No. 4:22-cv-00138-JD, 2025 WL 2528652, at *1 (D.S.C. Sept. 3, 2025) (quoting *United States v. Verges*, No. 1:13-cr-222-JCC, 2014 WL 559573, at *2 (E.D. Va. Feb. 12, 2014)) (emphasis omitted). Fluor urges the Court to exercise its wide discretion over trial management and prevent Relators from creating a sideshow by injecting evidence about the Bombing. The jury has plenty to consider without piling on days of additional evidence and testimony related to inflammatory, collateral issues not central to the present action.

### C.     Were the Court to Allow Relators to Introduce Evidence of the Bombing, It Must Also Allow Fluor to Mount a Defense.

What is good for the goose is good for the gander. If Relators are allowed to introduce evidence of the Bombing, Fluor must be allowed to mount a full and fair defense. If introduced, the evidence would mark the first time any evidence of the Bombing has been introduced in a trial. Fluor, at a minimum, will subpoena a fully unredacted copy of the Report from the Army (and call as witnesses the investigator or investigators who authored it). Fluor fully expects that, when and if the full facts are aired about the Bombing, the Army will have an oversized share of the liability for this tragic incident.

But Fluor also expects the Army to resist any such attempt to obtain classified information, requiring the Court to then adjudicate Fluor's entitlement to it. Such a dispute would almost certainly implicate the state secrets doctrine under which a court must dismiss an action where the unavailable classified information either prevents the plaintiff from establishing a prima facie case

20

or prevents the defendant from mounting a viable defense. *See*, *e.g.*, *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268, 281 (4th Cir. 1980) (en banc); *El-Masri v. United States*, 479 F.3d 296, 313 (4th Cir. 2007); *see also Sterling v. Tenet*, 416 F.3d 338, 348 (4th Cir. 2005). This quagmire should be avoided because the Bombing is not relevant to the claims in this case.

In *Hencely*, Fluor moved for judgment on the pleadings on the ground that sensitive military secrets are so central to the subject matter of the litigation that any attempt to proceed would threaten the disclosure of privileged matters. *See* 554 F. Supp. 3d at 776 n.8. The motion was rendered moot when Judge Hendricks granted summary judgment for Fluor on other grounds. *See id.* Nevertheless, should the Supreme Court permit the plaintiff to proceed in its case against Fluor, the state secrets issue will be decided. *See id.* ("[S]uffice it to say that, were this case to continue in the absence of preemption, the withholding of classified information central to material questions of causation would present a major hurdle, if not a prohibitive event, to the resolution of this matter on the merits.").

Simply put, if Relators are permitted to inject the Bombing into this case, Fluor is entitled to address it. Yet Fluor cannot do so without access to the full, unredacted Report. Unless the Army agrees to de-classify the Report in its entirety (a highly unlikely event given that it has repeatedly signaled its unwillingness to do so), basic fairness requires its exclusion and the exclusion of all evidence relating to the Bombing.

## V.     CONCLUSION

Relators should be barred from introducing evidence of or referencing the Bombing because it is irrelevant to the issues in this case. Even if evidence concerning the Bombing had some minimal probative value (it does not), its probative value is substantially outweighed by the risk of unfair prejudice, confusing the jury, and wasting time at trial. And, were Relators to be permitted to inject the Bombing into this case, Fluor must be permitted to mount a full defense,

including by issuing subpoenas to the Army for documents and testimony, which the Army will almost certainly refuse.

Accordingly, the Court should grant Fluor's Motion and exclude all reference to, and evidence and testimony related to, the suicide bombing that occurred at Bagram Airfield on November 12, 2016.

Fluor certifies that, in compliance with Local Civ. Rule 7.02 (D.S.C.), it has consulted with opposing counsel concerning the issues raised in this Motion and opposing counsel does not consent to the relief sought herein.

*[Signature Page Follows]*

22

Respectfully Submitted,

*/s/ Mark. C. Moore*
Mark C. Moore (Fed. ID No. 4956)
Michael A. Parente (Fed. ID No. 13358)
Maynard Nexsen PC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 540-2146
Facsimile: (803) 727-1458
MMoore@maynardnexsen.com

Konstantine P. Diamaduros (Fed. ID No. 12368)
Maynard Nexsen PC
104 South Main Street, Suite 900 (29601)
Post Office Drawer 10648
Greenville, SC 29603-0648
Telephone: (864) 370-2211
Facsimile: (864) 282-1177

Craig D. Margolis (admitted *pro hac vice*)
Tirzah S. Lollar (admitted *pro hac vice*)
Christian D. Sheehan (admitted *pro hac vice*)
Elizabeth A. Carney (admitted *pro hac vice*)
Katelyn M. Deibler (admitted *pro hac vice*)
Elliot S. Rosenwald (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, Northwest
Washington, DC 20001-3743
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
craig.margolis@arnoldporter.com

Rachel K. Higgins (admitted *pro hac vice*)
Sahrula Kubie (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

January 8, 2026
Columbia, South Carolina

*Counsel for Defendants Fluor Corporation and Fluor Intercontinental, Inc.*

23