## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## GREENVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* CHARLES R. SHEPHERD and DANNY V. RUDE; ROBERT SCOTT DILLARD; and RICKEY MACKEY, )<br><br>Plaintiff-Relators, )<br><br>v. )<br><br>FLUOR CORPORATION, INC., FLUOR INTERCONTINENTAL, INC., )<br><br>Defendants. ) | CASE NO.: 6:13-cv-02428-JD<br><br><br>**MEMORANDUM OPINION AND ORDER** |

This is a False Claims Act ("FCA") action arising out of Fluor's performance of logistics and life-support services for the United States military at forward operating bases in Afghanistan under the Logistics Civil Augmentation Program ("LOGCAP") IV contract and, more specifically, Task Order 0005 ("TO5"). Relators allege, among other things, that Fluor submitted false claims and false statements, failed to comply with required property-management obligations, engaged in labor overbilling and overstaffing, and retaliated against employees who raised concerns regarding those practices.

Before the Court is the Motion for Summary Judgment filed by Defendants Fluor Corporation, Inc., and Fluor Intercontinental, Inc. (collectively, "Fluor"). (DE 507.) Relators Charles R. Shepherd, Danny V. Rude, Robert S. Dillard, and Rickey Mackey ("Relators") filed a Response in Opposition (DE 537), and Fluor filed a Reply (DE 551). Also before the Court is Relators' Motion for Partial Summary Judgment.

(DE 512.) Fluor filed a Response in Opposition (DE 536), and Relators filed a Reply

(DE 552). The motions are fully briefed and ripe for adjudication.

For the reasons set forth below, both motions for summary judgment are

denied.

## I.     BACKGROUND[1]

### A.     Factual Background[2]

#### 1.     Contractors in Afghanistan

This case begins in the Middle East. As the Fourth Circuit explained, "[s]ince

the United States began its military operations in Afghanistan and Iraq in 2001 and

2003, respectively, the U.S. military [ ] depended heavily on contractors to support

its mission." *Hencely v. Fluor Corp.*, 120 F.4th 412, 418 (4th Cir. 2024), *cert. granted*,

145 S. Ct. 2748 (2025). This case primarily is about one such contractor: Fluor.

#### 2.     LOGCAP IV and TO5

To serve as a contractor for operations in Iraq and Afghanistan, Fluor bid to

provide services to the United States Government ("the Government"). Those services

---

[1]     Certain facts discussed in this Order are drawn from briefs or exhibits that were filed in redacted form or under seal pursuant to the Confidentiality Order (DE 211) and the Court's Text Order granting Relators' motions to seal (DE 554). Those sealing determinations were procedural and uncontested, and were based on the parties' compliance with Local Civil Rule 5.03 rather than a merits determination that continued sealing was required. To the extent this Order summarizes, characterizes, or relies upon factual material contained in sealed or redacted filings, the Court finds that such discussion is necessary to explain its rulings and does not disclose information warranting continued sealing. Nothing in this Order otherwise disturbs the sealing of the underlying exhibits or filings.

[2]     Because this is a motion for summary judgment, all facts reproduced are the undisputed facts. Where disputed facts are relevant, the parties' differing views of such facts (and the reasonable inferences therefrom) are indicated in-text. Similarly, where the Court's discussion addresses facts "in the light most favorable to the nonmoving party," *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018), this will be noted.

include engineering, procurement, construction, and maintenance. (Am. Compl. 2d ¶ 16, DE 121 at 6; Am. Answer 2d ¶ 16, DE 493 at 5.)

In 2007, Fluor was selected as one of several performing contractors under LOGCAP IV, an indefinite-delivery, indefinite-quantity ("IDIQ") contract to provide combat support and combat service support logistics services—including base and life-support functions—in support of U.S. military contingency operations. (*See* LOGCAP IV § C.1.2, DE 507-2 at 15.) The scale of LOGCAP IV was substantial, with the Government authorized to order an open-ended quantity of services through discrete task orders, each of which defined a specific scope of work to be performed by the contractor. (Am. Compl. 2d ¶ 31, DE 121 at 10; Am. Answer 2d ¶ 31, DE 493 at 8; *see* LOGCAP IV § A-5, DE 507-2 at 6.)

In 2009, Fluor was awarded Task Order 0005 ("TO5") under LOGCAP IV. (*See* TO5 ¶ 1, DE 507-4 at 3; LOGCAP IV § A-5, DE 507-2 at 15.) TO5 obligated Fluor to provide comprehensive base life-support and related logistics services to U.S. and coalition forces operating at forward-operating bases ("FOBs") throughout Northern Afghanistan. (*See* TO5 Performance Work Statement ("PWS") § 01.00, DE 507-5 at 4.) These services were continuous, mission-critical, and population-driven, supporting daily military operations in a dynamic contingency environment, and encompassed the infrastructure and sustainment functions necessary to maintain functioning bases in an active theater of operations. (*See id*. §§ 01.00, 05.00, DE 507-5 at 4, 10.)

### 3. Award Fee Evaluation Boards

TO5 was structured as a cost-plus-award-fee ("CPAF") contract.[3] (*See* TO5 § H-3(a), DE 507-4 at 10; *see also* LOGCAP IV § H-35.a, d(6), DE 507-2 at 36–38.) This means that Fluor could recover its costs, as well as a "base fee" of one percent for minimal performance of its obligations.[4] (*Id.* § H-35.c(1), DE 507-2 at 36; Mar. 2013 Pre/Post Negotiation Mem. at 10.[5]) Importantly, Fluor also could recover an additional six percent "award fee" that, unlike the base fee, was determined by an evaluation of Fluor's performance above the minimum contractual requirements. (*Id.* § H-35.c(2), DE 507-2 at 36; Nov. 2010 Mem. AFDO Welker at 1.[6])

Whether Fluor received an award fee under each contract—and what the amount of that fee would be—was determined by a hierarchy of decisionmakers beginning with a multi-member Award Fee Evaluation Board ("AFEB"). (*See generally, e.g.*, Feb. 2011 Mem. AFDO Welker (explaining the AFEB process during the period of July–December 2010).[7]) Importantly, for each AFEB, Fluor was required

---

[3]    A cost-plus-award-fee contract is a form of "cost-reimbursement contract" providing for "a fee consisting of [ ] a base amount," if any, "fixed at contract inception," and an additional "award amount that the contractor may earn", in whole or in part, based on an evaluation of performance. *See* 48 C.F.R. § 16.405-2 (2026). Under such contracts, the base fee compensates minimal acceptable performance, while the award fee is intended to incentivize excellence in cost control, schedule, and technical performance. *See id.*

[4]    The amounts of these payments were fixed *ex ante* based on projected costs and negotiation. (LOGCAP IV § H-35.c, DE 507-2 at 36.)

[5]    Ex. 42 to Relators' Mot. for Partial Summ. J. (DE 512).

[6]    Ex. 90 to Relators' Mot. for Partial Summ. J. (DE 512).

[7]    Ex. 91 to Relators' Mot. for Partial Summ. J. (DE 512).

to submit a written evaluation and a presentation (collectively, the "AFEB Submission"). (LOGCAP IV § H-35.d, e, f; DE 507-2 at 36–38.)

The AFEB Submissions were to contain "any information that may be reasonably expected to assist the AFEB in evaluating [Fluor's] performance." (TO5 § H-3.d.(7), DE 507-4 at 12.) While Fluor had limited space to present its self-assessment (*id.*), the criteria to be employed by the AFEB in its award-fee decision were set forth in the contracts and an "award fee plan." (LOGCAP IV § H-35.d(2), DE 507-2 at 36–37; *see generally* Award Fee Plan for Logistics Civil Augmentation Program Contract Performance (discussing this), DE 507-10.)

Fluor's self-assessments were not the only basis for the AFEB's decision, however. Other sources, including the Defense Contract Management Agency ("the DCMA") itself, also made submissions to the AFEB. (Marks Dep. 196:8–13, DE 507-3 at 13.)

After receiving all the relevant data, the AFEB would deliberate and issue a performance rating of 0–100 for Fluor. (LOGCAP IV § H-35.d(5), DE 507-2 at 37; TO5 § H-3(d)(4), DE 507-4 at 11.) Performance below 70 would result in no award fee. (LOGCAP IV § H-35.d(5), DE 507-2 at 37; TO5, § H-3.d(5), DE 507-4 at 11.)

This process was recurring. After an initial evaluation encompassing Fluor's first twelve months of performance, every six months the AFEBs evaluated Fluor's performance for determination of whether an award fee was justified under each contract. (LOGCAP IV § H-35.b(1), (2), DE 507-2 at 35–36; TO 5 § H-3.a., DE 507-4 at 10.) Ultimately, Fluor received award fees in all five periods that TO5 remained a

5

CPAF contract.[8] (Army Pre/Post Negotiation Mem. ("Army PNM") at 17, DE 507-34 at 18.)

### 4. Property-Management Obligations

#### (a) In General

As part of performing TO5, Fluor was tasked with managing property and materials that belonged to the United States. (Montalvo Dep. 9:24–10:24, DE 507-36 at 3.) Naturally, federal regulations apply to Fluor's management of such property. Those regulations are incorporated into TO5 (see, e.g., TO5 Performance Work Statement § 1, DE 512-1), and for example, required Fluor to "have a system of internal controls to manage . . . Government property in its possession." FAR § 52.245-1.

To meet these requirements, Fluor employed a Property Management System ("PMS") called Maximo. (*See* Am. Compl. 2d ¶ 148, DE 121 at 41; Am. Answer 2d ¶ 148, DE 493 at 31.) Fluor had recurring reporting obligations in Maximo regarding its management of Government property. (Am. Compl. 2d ¶¶ 81–82, DE 121 at 23–24; Am. Answ. 2d ¶¶ 81–82, DE 493 at 17–18.)

As with the AFEBs' ongoing review of Fluor's performance, Fluor's PMS system likewise was subject to ongoing compliance requirements. (*See, e.g.*, Nov. 4, 2014, DCMA Approval at 1, DE 507-41 at 2.)

---

[8]     In 2013, TO5 was converted from a CPAF contract to a cost-plus-fixed-fee contract. (*See* TO5 Mod. 60 § A.2, DE 507-35 at 4.) Among other impacts this so-called "Modification 60" had, it removed the AFEB process. (*Id.*)

In addition, Fluor was obligated to create and submit to the DMCA a set of procedures Fluor would follow to control the government property in its possession: a Government Property Control System ("GPCS").[9] Fluor was then subject to audit by DMCA for its compliance with the GPCS—an audit called a Property Management System Analysis, or "PMSA". These audits were completed at the FOBs and at Fluor's headquarters.

Before each PMSA, the DCMA issued Fluor a request for information. (Relators' Mot. for Partial Summ. J. 6–7, DE 512 at 10–11.) Fluor was obligated to provide the DCMA, among other things, "internal 'Self Audits,' the dates these audits were perform [sic] and by whom these internal audits were performed." (Jan. 27, 2011, RFI from Barbara Griffin at 1.[10])

The upshot is this: if Fluor failed to maintain an adequate, Government-approved PMS—as evidenced, for example, by failing PMSA audits—it could be held financially liable for the loss of Government property entrusted to it under TO5. (*See* Mod. P00003 at 9 (incorporating 48 C.F.R. § 52.245-1(h)(1)(iii) (2019)).[11] Conversely, where Fluor maintained an adequate PMS and no willful misconduct or lack of good faith by its managerial personnel was shown, the risk of loss for Government property in Fluor's possession or control remained with the Government.

---

[9]     Ex. 4 to Relators' Mot. for Partial Summ. J. (DE 512). Note this is the 2011 version.

[10]     Ex. 40 to Relators' Mot. for Partial Summ. J. (DE 512).

[11]     Ex. 5 to Relators' Mot. for Partial Summ. J. (DE 512).

### (b)    Audit Failures

In 2010, Fluor first was audited at three FOBs. It failed these audits—at Bagram Airfield (Nov. 16, 2010, PMSA[12]), Shank (Dec. 2, 2010, PMSA[13]), and Sharana (Dec. 29, 2010, PMSA[14]). The DCMA issued a letter of concern to Fluor about some of these failures. (Dec. 17, 2010, Guaraldi Ltr. at 1, DE 507-49 at 2.) This letter contained a demand for a corrective action plan ("CAP") and a timeline to comply.

Fluor responded with such a plan. (*See generally* Dec. 13, 2010, PMSA CAP (setting forth plan).[15]) And, following Fluor's creation of the CAP, the DCMA conducted more PMSAs, all of which Fluor ultimately passed.

### 5.    Staffing

To perform its contractual obligations, Fluor needed personnel. Under TO5, for Fluor to deploy individuals to any FOBs, it was required to obtain government approval through an authorization process. (Fluor 30(b)(6) 651:22–653:8, DE 507-16 at 26–28.) Once an individual was deployed, Fluor billed the labor costs to the United States Government, along with overhead. (*Id.* 222:5–17, DE 507-16 at 4; *see generally* Labor Invoices[16] (itemizing labor and billing for it).)

---

[12]    Ex. 48 to Relators' Mot. for Partial Summ. J. (DE 512).

[13]    Ex. 49 to Relators' Mot. for Partial Summ. J. (DE 512).

[14]    Ex. 50 to Relators' Mot. for Partial Summ. J. (DE 512).

[15]    Ex. 142 to Relators' Mot. for Partial Summ. J. (DE 512).

[16]    Ex. 53 to Relators' Resp. in Opp'n (DE 537).

### 6.    Relators Shepherd and Rude's Relationship with Fluor

#### (a)    Relator Charles R. Shepherd

Charles R. Shepherd ("Shepherd") was first employed by Fluor in 2009 and later became Fluor's Country Maximo Manager. (Am. Compl. 2d. ¶ 10, DE 121 at 3–4; Am. Ans., 2d ¶ 10, DE 493 at 3.)  In 2013, Shepherd was one of the original Relators who initiated this action. (*See generally* Compl., DE 1-2 at 1.)

In July 2015, Shepherd was in Dubai awaiting transportation to Afghanistan. (Shepherd Dep. 349:10–20, DE 507-53 at 3.) The evening of his flight, he had two drinks of Scotch in his hotel room. (*Id.* 350:3–11, DE 507-53 at 4.) While checking in for the flight, Shepherd became involved in an altercation involving other Fluor employees. (*Id.* 354:8–355:4, DE 507-53 at 8–9.) Fluor fired him, justifying its decision by pointing to Shepherd's misconduct, and for being unfit to fly due to his intoxication. (*See generally* Sean Decollibus Email and Attachments (describing events and providing witness statements), DE 507-54.)

#### (b)    Relator Danny V. Rude

Another of Fluor's employees was Danny V. Rude ("Rude"). Rude was first employed by Fluor in 2009 and worked at various times as the Operations and Maintenance Manager and Transition Manager. (Am. Compl. 2d ¶ 12, DE 121 at 3; Am. Ans. 2d ¶ 12, DE 493 at 4.) Rude's last position with Fluor was as Deputy Country Maximo Manager. (*Id.*) Like Shepherd, Rude became involved as a relator in this case in 2013. (*See generally* Compl., DE 1-2 at 1.) In 2014, Fluor released Rude, justifying its decision as part of a broad reduction in force that resulted from a

drawdown of United States military involvement in Afghanistan. (July 2014 RIF at 1.[17]) Rude was hired several months later for a different project.

## B.    Procedural Background[18]

On April 19, 2019, Relators filed a Second Amended Complaint. (DE 121.) Relators employ the qui tam provisions of the FCA in their three-count, Second Amended Complaint. Only two counts remain. (*See generally* Order of February 28, 2020, DE 176 (dismissing Count III under Rule 12(b)(6), Fed. R. Civ. P.)). As to Count I, Relators assert that Flour is liable under the FCA's presentment and false-statement provisions in three particulars:

- Fluor knowingly submitted materially false information to, and omitted material information from, the AFEB for five award periods, resulting in payments to which it was not entitled ("the AFEB Claims");

- Fluor knowingly submitted materially false information to, and omitted material information from, the Government with respect to its property-management practices  ("the Property-Management Claims"); and

- Fluor knowingly overstaffed the FOBs ("the Overstaffing Claims").

As to Count II, Relators contend essentially that Fluor retaliated against Shepherd and Rude through denial of promotions and termination, in violation of the FCA's anti-retaliation provision.

---

[17]    Ex. 203 to Relators' Resp. in Opp'n (DE 537).

[18]    For a more fulsome examination of the early procedural history of the case, the reader is directed to the Court's Order of February 28, 2020, at 3–6, DE 176 at 3–6.)

Fluor purports to seek summary judgment on all claims in the Second Amended Complaint, albeit, with a caveat.[19] Relators seek partial summary judgment only on certain of the AFEB Claims and Property-Management Claims.

The parties' motions are now ripe for review and adjudication.

## II.    LEGAL STANDARD

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* at 322. "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a

---

[19]    Although Fluor's motion is styled as seeking summary judgment on all claims, Fluor acknowledges that its arguments are directed to particular FCA theories that were developed in discovery and addressed by the parties' expert reports. (*See* Fluor's Mot. Summ. J. 1 n.1, DE 507-1 at 9.) Relators, in turn, contend that Fluor's failure to move for summary judgment on other allegations constitutes forfeiture and requires those theories to proceed to trial. (Relators' Resp. in Opp'n 5–11, DE 537 at 11–17.) The Court accepts neither position.

Allegations are not necessarily deemed preserved, forfeited, or legally sufficient in this Court simply because they were not the subject of a summary judgment motion. Accordingly, this Order resolves only the claims and theories actually presented and briefed. To the extent any other allegations remain in the case, their viability will depend on the evidence adduced at trial and on any appropriate motions made at later stages of the proceedings.

reasonable jury might return a verdict for the non-movant." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (citation omitted). If the burden of proof at trial would be on the nonmoving party "a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Celotex Corp.*, 477 U.S. at 324. "[T]he burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. "If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied[] . . . ." *Id.* at 332 (Brennan, J., dissenting).

Accordingly, once the movant has made this threshold demonstration, to survive the motion for summary judgment, under Rule 56(e), the nonmoving party must "go beyond the pleadings and by h[is] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (citation omitted). Under this standard, "the mere existence of a scintilla of evidence" in favor of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion." *Wai Man Tom*, 980 F.3d at 1037.

"Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin.*

*Office of the Cts*, 780 F.3d 562, 568 (4th Cir. 2015) (quoting another source). "The court may grant summary judgment only if it concludes that the evidence could not permit a reasonable jury to return a favorable verdict." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). "Therefore, courts must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted and alterations adopted). A court improperly weighs the evidence if it fails to credit evidence that contradicts its factual conclusions or fails to draw reasonable inferences in the light most favorable to the nonmoving party. *See id*. at 659–60.

## III.    DISCUSSION

### A.    Summary Judgment Is Inappropriate as to Fluor's Affirmative Defense that the Qui Tam Provisions Violate Article II of the U.S. Constitution

Fluor argues that this action cannot proceed because the FCA's qui tam provisions violate Article II of the Constitution. (Fluor's Mot. Summ. J. 50, DE 507-1 at 57 (citing *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d 1293 (M.D. Fla. 2024), *appeal docketed*, No. 24-13581 (11th Cir.).) Fluor incorporates by reference its prior briefing raising the same challenge. (*See* DE 396; DE 414.) Relators respond that this Court has already rejected that argument, and that intervening authority does not warrant a different result. (*See generally* Relators' Resp. in Opp'n, DE 537 (incorporating DE 408).)

The Court agrees with Relators. As explained below, Fluor is not entitled to summary judgment on its Article II affirmative defense.

### 1.     Historical Background of the Qui Tam Provisions

The FCA "is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). Since its original enactment in 1863, the FCA has included a qui tam mechanism reflecting Congress's judgment that private relators may supplement public enforcement in combating fraud on the Treasury. *See Am. C.L. Union v. Holder*, 673 F.3d 245, 247 (4th Cir. 2011).

Consistent with that history, courts of appeals have repeatedly rejected facial Article II challenges to the FCA's qui tam provisions. (*See* DE 461 at 6–9 (collecting authority)). While individual Justices of the Supreme Court have recently acknowledged that such challenges raise "substantial arguments," *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 442 (2023) (Kavanaugh, J., concurring, joined by Barrett, J.); *id.* at 449 (Thomas, J., dissenting), those writings are not holdings and do not displace binding appellate precedent upholding the statute.

### 2.     The Take Care Clause

Fluor contends that the qui tam scheme violates the Take Care Clause[20] by permitting private relators to prosecute FCA actions without sufficient Executive

---

[20]     The "Take Care" Clause provides that the President of the United States "shall take Care that the Laws be faithfully executed . . . ." U.S. Const. Art. II, § 3.

Branch control. (*See* DE 507-1 at 57 (incorporating prior briefing).) This Court previously rejected that contention when denying Fluor's Rule 12(c) motion, explaining that "under the present state of the law," the FCA's qui tam provisions do not facially infringe the Executive's duty to ensure faithful execution of the laws. (DE 461 at 4.)

Nothing in the current summary-judgment record alters that conclusion. To the contrary, *Polansky* underscores the extent of Executive control retained under the FCA. The Supreme Court held that the Government may intervene at any stage of a qui tam action and may thereafter seek dismissal over the relator's objection, with district courts applying ordinary voluntary-dismissal principles that afford substantial weight to the Government's judgment. 599 U.S. at 428–39. That continuing authority to intervene and dismiss is a significant structural safeguard relevant to any Take Care Clause analysis and undermines Fluor's claim that relators operate beyond Executive supervision.

### 3.     The Appointments Clause

Fluor argues that qui tam relators exercise significant authority pursuant to federal law and therefore qualify as Officers of the United States who must be appointed in conformity with the Appointments Clause.[21] In support, Fluor relies on general Appointments Clause principles articulated by the Supreme Court and

---

[21]     The Appointments Clause provides that the President of the United States "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law[] . . . ." U.S. Const. Art. II, § 2, cl. 2.

invokes *United States ex rel. Zafirov v. Florida Medical Associates, LLC*, an out-of-circuit district court decision concluding that FCA relators occupy a "continuing position established by law" and dismissing a qui tam action on Appointments Clause grounds. 751 F. Supp. 3d at 1307–15.

The Court has carefully considered *Zafirov* but is not persuaded by its reasoning and declines to follow it.

First, *Zafirov* is a lone district court decision, currently on appeal, and does not alter the governing appellate landscape. This Court previously recognized that lower courts should not invalidate an Act of Congress on constitutional grounds absent controlling authority requiring such a result. (DE 461 at 9–10.) Second, *Zafirov* is in tension with the substantial body of circuit precedent rejecting Article II challenges to the FCA's qui tam provisions—authority this Court relied upon in denying Fluor's earlier motion. (*Id.* at 6–9.) Third, even courts acknowledging *Zafirov* have declined to adopt its reasoning in light of contrary precedent. *See, e.g.*, *United States ex rel. Publix Litig. P'ship, LLP v. Publix Super Markets, Inc.*, 2025 WL 2468832, at *3 (M.D. Fla. Aug. 27, 2025); *Proctor v. Wound Care Mgmt., LLC*, 2025 WL 2444133, at *2 (E.D. La. Aug. 25, 2025).

Accordingly, *Zafirov* does not provide a basis for granting summary judgment on Fluor's Appointments Clause challenge.

### 4.    Summary Judgment Is Improper

Finally, the Court reiterates the principle—previously applied in this case—that federal courts should avoid passing on the constitutionality of an Act of Congress

unless such adjudication is unavoidable. (DE 461 at 9 (citing *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 7 (1993)).) Fluor's Article II challenge remains foreclosed by the prevailing appellate authority recognized in this Court's prior order, and the emergence of a single contrary district court decision does not render a constitutional ruling unavoidable, particularly where the Supreme Court has emphasized the Executive's retained control over qui tam litigation. *See Polansky*, 599 U.S. at 428–39.

Accordingly, Fluor is not entitled to judgment as a matter of law on its affirmative defense that the FCA's qui tam provisions violate Article II, and summary judgment on that ground is denied.

## B. Summary Judgment for Fluor and Relators Is Inappropriate as to Liability for Count I

### 1. Cross-Motions on AFEB Claims Liability

Relators contend that Fluor submitted false claims and made false statements in order to win award fees from the Government in representing their performance under LOGCAP IV and TO5. (Relators' Mot. for Partial Summ. J. 31, DE 512 at 35.) There are five AFEB submission periods in issue:

- July 7, 2009, to June 30, 2010 (AFEB held August 25, 2010) ("Period 1");

- July 1, 2010, to December 31, 2010 (AFEB held February 10, 2011) ("Period 2");

- January 1, 2011, to June 30, 2011 (AFEB held August 25, 2011) ("Period 3");

- July 1, 2011, to December 31, 2011 (AFEB held February 20, 2012) ("Period 4"); and

- January 1, 2012, to June 30, 2012 (AFEB held August 3, 2012) ("Period 5") (collectively, "the AFEB Periods").

As to Fluor's AFEB Submissions for each of the AFEB Periods,[22] Relators assert Fluor has failed to create any genuine disputes of material fact, and they are entitled to summary judgment.

Fluor also moves for summary judgment on all of Relators' AFEB Claims. It positions *all* Relators' AFEB Claims as proceeding under a fraudulent-inducement theory of FCA liability.[23] Fluor then contends that because under that theory Relators have not satisfied but-for causation, their claim fails. (Fluor's Mot. Summ. J. 24–33, DE 507-1 at 32–41.)

> **(a)    Fluor's Motion as to Count II Must be Denied Because, as a Matter of Law, Fraudulent Inducement Is Not the Only Correct Framework for Relators' AFEB Claims**

The Court begins with Fluor's arguments about the applicable legal framework. Fluor's contention boils down to its view that, as a matter of law, Relators' AFEB Submissions were not "claims" within the meaning of the FCA. (Fluor's Reply at 3, DE 551 at 8.) In other words, Fluor asks the Court to conclude that its pre-voucher AFEB Submissions subject Fluor only to the "common law gloss" of

---

[22]    The materials sometimes refer to Period 1 as a "transition phase," since Fluor was taking over performance from another contractor. The remaining periods were "performance phases."

[23]    Relators characterize their AFEB claims as ordinary presentment and false statement claims under § 3729(a)(1)(A) and (B). (Relators' Mot. for Partial Summ. J. 31–32, DE 512 at 35–36.) Also, they assert an implied-certification theory under *Universal Health Service, Inc. v. United States*, 579 U.S. 176 (2016). (*Id.* at 32, DE 512 at 36.)

fraudulent-inducement FCA liability. *United States ex rel. Cimino v. Int'l Bus. Machines Corp. ("Cimino")*, 3 F.4th 412, 417 (D.C. Cir. 2021).

To advance this theory, Fluor relies on LOGCAP IV's language.[24] The contract provides that "[t]he payment of any award fee is *contingent* upon earning a [certain] performance rating . . . " and "[t]he award fee will be provided to the contract through *contract modifications* . . . ." (LOGCAP IV § H-35(f)(1), (2), DE 507-2 at 38 (emphasis added).) Fluor emphasizes that its written "self-assessments"—the "claims" Relators assert were knowingly false and material—were only "modifications" of the contract. (*Id.* § H-35(d)(7), DE 507-1 at 37–38.)

Notably, Fluor concedes it makes "claims" (Fluor's Reply at 3, DE 551 at 80), but only *after* its AFEB Submissions. Namely, when it "submit[s] vouchers for the award fee to which [Fluor] [is] entitled immediately upon written notification" of an award fee. (LOGCAP IV § H-35(f)(2), DE 507-2 at 38.) This—and this only, according to Fluor—"result[s] in a 'call upon the government fisc,'" *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 196 (4th Cir. 2018) (quoting *Harrison*, 176 F.3d at 785–86), satisfying the FCA.

The statutory definition of "claim," last substantively amended in 2009, is expansive. *See* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(a)(2), 123 Stat. 1617, 1623 (codified at 31 U.S.C. § 3729(b)(2)(A)). Neither the statutory text nor controlling authority construing it supports Fluor's contention that, although vouchers submitted under a preexisting contractual arrangement may

---

[24]    Fluor also points to the Code of Federal Regulations.

constitute "claims," the AFEB Submissions required by that same arrangement categorically cannot. If mere "[e]stimates [for progress payments] are not exempt from FCA scrutiny," *U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 732 (4th Cir. 2010), it is difficult to see why the AFEB Submissions would be. Consistent with this understanding, pre-2009 precedent—left undisturbed by the 2009 amendments—makes clear that "[t]he False Claims Act is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government," and that courts should reject a "rigid, restrictive reading" of the statute. *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968) (quoting another source).

Fluor's secondary authorities are readily distinguishable. No party disputes that AFEB Submissions are intended to assist the Government in determining whether to award additional compensation for above-average performance within an existing contractual framework. That function, however, bears no resemblance to a contract renewal, *see Cimino*, 3 F.4th at 416; an allegedly false insurance application, *see United States ex rel. Kraemer v. United Dairies, L.L.P.*, 82 F.4th 595, 603 (8th Cir. 2023), reh'g denied, No. 22-3306, 2023 WL 7015733 (8th Cir. Oct. 25, 2023); or a requisition form submitted to obtain payment, *see United States ex rel. Gordon v. Shiel Medical Laboratory*, No. 16-CV-1090 (NGG) (TAM), 2025 WL 949432, at *15–16 (E.D.N.Y. Mar. 29, 2025). Nor does this case involve alleged misrepresentations made to induce modifications to a pricing schedule to include software licenses the

Government might later purchase. *See U.S. ex rel. Frascella v. Oracle Corp.*, 751 F. Supp. 2d 842, 855 (E.D. Va. 2010).

In fact, cases involving AFEB Submissions *have* proceeded under presentment and false-statement rubrics. *See United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1030 (D.C. Cir. 2017). And regarding the term "claim," courts have short-circuited similar arguments to Fluor's—for example, by concluding that pre-claim progress reports are "claims." *U.S. ex rel. Schwedt v. Plan. Rsch. Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995) (explaining that "[a] submission need not be an actual invoice to be a 'claim' or 'statement' under the [FCA]"). Of course, Fluor does not contend that Relators' AFEB Submissions are "unconnected" to its acknowledged claims. *See U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*, 858 F. Supp. 2d 79, 82 (D.D.C. 2012) (allegedly fraudulent posting of products for sale to government not a "claim" since "unconnected to" any government purchase), *aff'd*, 764 F.3d 19 (D.C. Cir. 2014), and *aff'd*, 764 F.3d 19 (D.C. Cir. 2014).

It would make little sense to expand what Fluor's own authorities acknowledge is a "gloss" on the FCA's text—albeit a well-recognized one—in this context. This is particularly true where Fluor does not dispute that it submitted a "claim" by presenting a voucher pursuant to the pre-existing contractual relationship between it and the Government. As the court of appeals has explained in a claims-counting case, "[i]t is conduct of the [defendant], not the disposition of the claims . . . , that creates FCA liability." *United States v. Krizek*, 111 F.3d 934, 940 (D.C. Cir. 1997).

Accordingly, although Relators might also have pursued a fraudulent-inducement theory, it would be unsound to pigeonhole their claims as a matter of law. Because Fluor's motion for summary judgment on Count II does not meaningfully address presentment or false certification, that portion of the motion is denied.

> **(b)** **Relators' Motion for Summary Judgment Must Be Denied Because There Are Genuine Disputes of Material Fact as to Their Presentment and False Statement Theories**

Relators assert that Fluor "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval," *United States ex rel. Wheeler v. Acadia Healthcare Co., Inc. ("Wheeler")*, 127 F.4th 472, 486 (4th Cir. 2025) (quoting 31 U.S.C. § 3729(a)(1)(A)), when it made its AFEB Submissions for each of the AFEB Periods. (Relators' Mot. for Partial Summ. J. 31, DE 512-1 at 35.)

Relatedly, Relators characterize some of Fluor's AFEB Submissions as running afoul of § 3729(a)(1)(B), which prohibits "false record[s] or statement[s] material to a false or fraudulent claim[.]" This theory asserts that Fluor "implicitly certified that it complied with relevant statutes, regulations, or contract requirements when it knew that it was not complying." *Wheeler*, 127 F.4th at 487.

The bottom line is that under both theories, there are genuine disputes of material fact. To begin with, it is disputed as a factual matter whether the AFEB Submissions actually *were* claims. (*See* Fluor's Resp. in Opp'n 21–23, DE 536 at 26–28.) While this alone is enough to dispose of Relators' motion, a preview of the remaining requirements—specifically, the knowing falsity of the components of the AFEB Submissions and their materiality—confirms the inappropriateness of summary judgment.

In the FCA, "Congress did not define what makes a claim 'false' or 'fraudulent.'" *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 200 (4th Cir. 2022) (quoting another source). However, the Fourth Circuit has held that "false statement" means

> any "words or conduct" that "amount[ ] to an assertion not in accordance with the truth," including a "representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying information," . . .

*Id.* at 200–01 (first quoting Restatement (Second) of Torts § 525 cmt. b (1977), then quoting *id.* § 529).

Relators point to the following statements and certifications in the AFEB Submissions over various AFEB Periods as either "factually or legally false":

- Fluor's "success in implementing" the Corrective Action Plan;

- Fluor's "low loss rate";

- Fluor's "remarkably high response and repair compliance times";

- Fluor's "[q]uality and corrective action processes"

- Fluor's "claims about its millions of dollars in cost savings for the Government[.]"

(Relators' Mot. for Partial Summ. J. 33–34, DE 512 at 37–38.)

Fluor responds that, at minimum, there are facts in dispute. (Fluor Resp. in Opp'n 36, DE 536 at 41.) Fluor also presses that falsity cannot be shown because Relators' assertions rest on "hopelessly ambiguous and subjective" language in LOGCAP IV.[25] (*Id.* at 2–3, at DE 536 a 7–8.)

---

[25]     The Court believes that this contention is better resolved under the scienter element. Scienter "refers to respondents' knowledge and subjective beliefs—not to what an objectively

It has long been settled that "[t]he character of the claim—that is to say, whether true, genuine, and honest, or false, fictitious, and fraudulent—must be determined in view of all of the facts and circumstances attending it." *Dimmick v. United States*, 116 F. 825, 828 (9th Cir. 1902). And even assuming, for purposes of this motion, that all statements Relators identify as factually or legally false are undisputed as such, it remains well established that "the issue of fraudulent *intention* is generally not amenable to resolution on summary judgment." *United States ex rel. Bunk v. Gov't Logistics N.V.*, 842 F.3d 261, 276 (4th Cir. 2016) (emphasis added). This case is no exception. Viewing the record as a whole, and drawing all reasonable inferences in Fluor's favor, the evidence readily supports competing inferences as to intent.

These elements are not the only ones in dispute. On the "materiality" element, too, competing inferences exist. One example of this is TO5's March 2013 adjustment from CPAF "to a cost-plus-fixed-fee structure" in which "as part of that agreement" Fluor was paid "additional award fees." (Relators' Reply at 22, DE 552 at 25.) Notably, this occurred *after* Relators' initial complaint in this matter. Under *Universal Health Servs., Inc. v. Escobar*, 579 U.S. 176 (2016), this at least raises a disputed fact question about materiality.

---

reasonable person may have known or believed." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023).

Because genuine disputes about these threshold elements exist, the Court need go no further. Accordingly, Relators' motion for summary judgment on Fluor's AFEB Submissions is denied.

### 2.    Cross-Motions on Property-Management Liability

#### (a)    Fluor's Motion Must be Denied

Fluor next argues that Relators' Property-Management Claims fail as a matter of law because allegations that Fluor did not conduct inventories properly amount, at most, to non-actionable poor management or inefficiency. (*See* Fluor's Mot. Summ. J. 42–43, DE 507-1 at 50–51.) This argument mischaracterizes both the record and Relators' theory of liability.

Relators do not contend that Fluor is liable under the FCA merely because its inventory practices were inefficient or resulted in unnecessary costs. Rather, Relators identify evidence suggesting Fluor knowingly billed the Government for work it was required to perform but did not and knowingly made false statements and certifications regarding its compliance with its Government-approved PMS for its own benefit. Properly understood, Fluor's argument fails under settled Fourth Circuit precedent.

> #### i.    Relators' Reverse-False Claim Theories Contain A Legally Sufficient Obligation but Are Genuinely Disputed

While "[d]irect false claims cause the United States to remit money directly to claimants, . . . reverse false claims facilitate the improper withholding of money or property to which the United States is legally entitled," *United States ex rel. Wheeler v. Acadia Healthcare Co.*, 127 F.4th 472, 495 (4th Cir. 2025); *see also United States*

*ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 255 (D.D.C. 2016) ("Direct and reverse false claims are mirror images of one another—both result in a loss to the Government.").

The reverse–false–claims provision of the FCA imposes liability on any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(G). The statute defines "obligation" broadly as:

> an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.

31 U.S.C. § 3729(b)(3).

### (1)     Governing Legal Framework

In *Wheeler*, the Fourth Circuit articulated a two-step inquiry for evaluating reverse false claims. First, courts examine the relevant contractual or regulatory provisions to determine whether the alleged conduct, if proven, would constitute a violation of those provisions.[26] *Wheeler*, 127 F.4th at 495. Second, courts determine whether such violations would give rise to an "obligation" owed to the Government

---

[26]     Importantly, the Fourth Circuit engaged with this issue on a de novo review of dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. So, this Court does not simply accept as true Relators' allegations about what the terms of the GPCS *required*—instead, the Court finds the allegations undisputed. Fluor only emphasizes that the GPCS was "immaterial" and argues its "discretion" under the Code of Federal Regulations in what to disclose. (Fluor's Resp. in Opp'n 7–8 & n.5, DE 536 at 7–8 & n.5.)

within the meaning of § 3729(b)(3). *Id.* at 496. This framework governs the Court's analysis here.

(2)     Fluor's Contractual and Regulatory Duties

Fluor does not dispute that TO5 required it to establish and maintain a Government Property Control System ("GPCS"). (PWS § 1.08, DE 507-5 at 5; *see* also Fluor's Mot. Opp'n 7, DE 536 at 12 (acknowledging TO5 requirement).) Nor does Fluor dispute that 48 C.F.R. § 52.245-1 governed its responsibility for Government property in its possession, including the circumstances under which Fluor would bear financial responsibility for lost, damaged, destroyed, or stolen property. (*See* Mod. P00003 at 9 (quoting 48 C.F.R. § 52.245-1(h)(1)(iii) (2026));[27] Fluor's Mot. Summ. J. 35–36, DE 507-1 at 43–44.)

Relators identify specific provisions of Fluor's GPCS requiring that:

- "Quality Department reviews audits, self-assessments, and correction actions" be "forwarded to the [General Contract Manager] for submittal to the [Government Property Administrator]," and

- "[r]esults of physical inventories including all adjustments and [loss, theft, damage, and destruction]–related reports identified are reported in writing to the [Government Property Administrator] within 30 days."

(GPCS at 10–11;[28] *see* Relators' Mot. for Partial Summ. J. 9–11, DE 512 at 13–15.)

Fluor does not meaningfully dispute that these provisions exist or that they impose mandatory reporting duties. Instead, Fluor reframes Relators' theory as turning entirely on whether the Government ultimately disapproved Fluor's Property

---

[27]     Ex. 5 to Relators' Mot. for Partial Summ. J. (DE 512).

[28]     Ex. 4 to Relators' Partial Mot. Summ. J. (DE 512).

Management System ("PMS") or denied relief of responsibility. (Fluor's Mot. Summ. J. 38–39, DE 507-1 at 46–47.) That framing is incorrect.

        (3)     These Duties Constitute an "Obligation" Under the FCA

The Court has little difficulty concluding that, as a matter of law, Fluor's contractual and regulatory duties constitute an "obligation" within the meaning of § 3729(b)(3).

First, the statutory definition expressly includes "an established duty, whether or not fixed," and expressly encompasses duties arising from contracts and regulations. 31 U.S.C. § 3729(b)(3). Fluor's obligations to conduct inventories, to report lost, theft, damage, and destruction ("LTDD") events accurately, and to disclose audit deficiencies were mandatory conditions of its authority to manage Government property under TO5. (*See* Relators' Resp. in Opp'n 34–36, DE 537 at 38–40.)

Second, *Wheeler* forecloses Fluor's argument that an obligation does not exist unless and until the Government affirmatively exercises enforcement discretion. In *Wheeler*, the Fourth Circuit rejected the contention that stipulated penalties were not obligations because the Government retained discretion whether to enforce them, explaining that "[a] contracting party's discretion to enforce an obligation does not eliminate the existence of that obligation." 127 F.4th at 496–97. The Court emphasized that Congress, through the 2009 amendments, deliberately expanded the definition of "obligation" to include contingent and non-fixed duties. *Id.* at 495.

28

That reasoning applies here. The fact that the Government retained discretion whether to disapprove Fluor's PMS or deny relief of responsibility does not negate the underlying duty to comply with 48 C.F.R. § 52.245-1 and Fluor's GPCS, nor does it negate the financial obligation that would arise upon noncompliance. (*See* Relators' Resp. in Opp'n 35–37, DE 537 at 39–41.)

Third, persuasive authority reinforces this conclusion. In *Landis*, the court rejected the argument that a breach-created obligation was too contingent to support reverse false claims liability merely because the Government had not yet sought repayment. 160 F. Supp. 3d 253. Accepting such an argument, the court explained, would improperly permit contractors to conceal noncompliance "unless and until the government files a lawsuit." *Id.* at 259. The FCA does not permit a defendant to avoid liability simply because its concealment was successful. (*See also* Relators' Resp. in Opp'n 36, DE 537 at 40 (relying on *Landis*).)

>(4)     Fluor's Attempt to Distinguish *Wheeler* Is Unavailing

Fluor contends that *Wheeler* is limited to contracts containing "automatic" liquidated damages provisions. (Fluor's Mot. Summ. J. 36–37, DE 507-1 at 44–45.) The Court disagrees.

Although the corporate integrity agreement in *Wheeler* contained stipulated penalties, the Fourth Circuit's analysis did not turn on the mechanical accrual of damages. Rather, it rested on the statutory text of § 3729(b)(3) and Congress's express inclusion of contingent obligations. *Wheeler*, 127 F.4th at 495–97. Nothing in *Wheeler* suggests its reasoning is confined to liquidated damages clauses. To the contrary, its

logic applies broadly to contractual and regulatory duties such as those at issue here. (*See* Relators' Resp. in Opp'n 34–35, DE 537 at 38–39.)

Fluor's reliance on *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497 (3d Cir. 2017), and *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033 (5th Cir. 2016), is similarly misplaced. In *Petras*, the alleged obligation to pay dividends depended entirely on "future discretionary" corporate acts— declaration of dividends or liquidation—that had not occurred and might never occur, and thus no duty to pay existed at the time of the alleged concealment. *Petras*, 857 F.3d at 505–06. In contrast, Fluor's duties to conduct inventories, report losses, and disclose audit deficiencies existed independently of any later Government enforcement decision.

Likewise, *Simoneaux* involved unassessed regulatory penalties arising from a purely statutory "duty to obey the law," 843 F.3d at 1039–1040, not from a contractual or property-management relationship. The Fifth Circuit emphasized that the government had initiated no process to assess penalties. *Id.* at 1039. Here, Relators allege the concealment of existing contractual and regulatory violations designed to prevent the Government from exercising rights it already possessed under TO5 and 48 C.F.R. § 52.245-1. Accordingly, neither *Petras* nor *Simoneaux* undermines the conclusion that Fluor's duties constitute an "obligation" under § 3729(b)(3).

(5)    Summary Judgment Is Improper

Finally, even if Fluor's framing of Relators' legal theory were viable—which it is not—summary judgment would still be inappropriate. Relators have adduced evidence that Fluor failed to conduct required inventories, failed to disclose audit deficiencies, and submitted misleading information during multiple PMSAs between 2011 and 2014. (*See* Relators' Mot. for Partial Summ. J. 9–14, DE 512 at 13–18; Relators' Resp. in Opp'n 37–41, DE 537 at 41–45.) Whether those failures resulted from willful misconduct or bad faith, whether Fluor was therefore ineligible for relief of responsibility under 48 C.F.R. § 52.245-1(h)(1), and whether Fluor knowingly concealed those facts to avoid financial liability are all disputed questions of material fact. (*See* Relators' Resp. in Opp'n 35–36, DE 537 at 39–40; Fluor's Reply 15–17, DE 551 at 20–22.)

At summary judgment, the Court may not resolve those disputes or weigh competing evidence. Viewing the record in the light most favorable to Relators, a reasonable jury could conclude that Fluor knowingly concealed information material to an established obligation to pay or transmit money or property to the Government.

Accordingly, Fluor's motion for summary judgment is denied insofar as it seeks dismissal of Relators' reverse-false-claims property-management theory.

ii.    *Relators' Remaining Fraudulent Inducement and Presentment Theories*

The FCA does not impose liability for mere inefficiency or negligent contract performance. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 789–90 (4th Cir. 1999). It does, however, reach situations in which a contractor knowingly

31

makes false statements to the Government to obtain approval or payment, where such approval or payment would not have been granted absent the misrepresentation. *See id.* at 788–89 (explaining that FCA liability may attach where false information is used to induce the Government to agree to something it otherwise would not have agreed to).[29]

Relators' Property-Management Claims fall within this latter category. The summary-judgment record contains evidence that Fluor was contractually required to conduct monthly inventories at least under TO5. Though the parties dispute whether Fluor's Government-approved Material Management Plan ("MMP") was a compliance requirement (*see* Fluor's Resp. in Opp'n 7 n.5, DE 536 at 12 n.5), compliance with TO5 *was* a component of the Government's ongoing approval of Fluor's PMS. (*See* Relators' Mot. for Partial Summ. J. 9–14, 18–19, DE 512 at 13–18, 22–23 (citing MMP and PMSA materials).[30]) Relators further cite evidence that Fluor

---

[29]     The Court does not hold—and Relators do not contend—that a contractor's inefficient performance, poor inventory practices, or increased costs, standing alone, give rise to liability under the FCA. *See Harrison*, 176 F.3d at 789–90. Nor does the Court endorse an independent theory that Fluor is liable merely because inventory deficiencies may have led to unnecessary purchases or higher operating costs (a theory Relators expressly disavow (*see* Relators' Resp. in Opp'n 36–37, DE 537 at 42–43)). Instead, the Court's ruling is limited to inventory-related conduct to the extent it is offered as evidence that Fluor knowingly billed for work it did not perform or knowingly made false statements or certifications regarding compliance with required inventory and property-management procedures in order to obtain Government payment or approval.

[30]     TO5 was amended multiple times during the period at issue, including revisions to the Performance Work Statement in 2010, 2012, and 2013. (*See, e.g.*, PWS, DE 507-5; *see also, e.g.*, 2010 PWS, Ex. 9 to Relators' Mot. for Partial Summ. J. (DE 512); 2012 PWS, Ex. 10 to Relators' Mot. for Partial Summ. J. (DE 512); 2013 PWS, Ex. 11 to Relators' Mot. for Partial Summ. J. (DE 512).) Although the scope of services and operational requirements evolved over time, each version of the PWS retained express requirements concerning property control, accountability for Government-furnished property, and compliance with approved procedures. None of the amendments eliminated or excused Fluor's obligation to maintain inventory controls or to accurately report compliance with its approved PMS. For

routinely failed to conduct the required inventories, internally acknowledged that inventories were being "pencil whipped," and nevertheless represented to the Government that inventory controls were in place and functioning. (*Id.* 21–31, 36–50, DE 512 at 25–35, 40–54.)

In addition, Relators identify record evidence that Fluor billed the Government for labor devoted to inventory activities during periods when inventories were not performed as required. (*See id.* 36–37, DE 537 at 42–43; *see also* Relators' Mot. for Partial Summ. J. 27–28, 30, 34 (citing internal Fluor documents and testimony), DE 512 at 31–32, 34, 38.) A reasonable jury could conclude that such billing constituted claims for payment predicated on work Fluor was obligated to perform, but did not.

Relators rely on this evidence as the factual basis for presentment and fraudulent-inducement theories given Government approvals and payments. The record reflects that Fluor's representations concerning inventory control and loss rates were incorporated into its AFEB Submissions and PMSA representations that the Government considered in evaluating Fluor's performance and eligibility for continued approval. (*See* Relators' Mot. for Partial Summ. J. 12, 27–28, 30, 39–40, DE 512 at 16, 31–32, 34, 43–44.)

Under *Harrison*, such evidence is sufficient to defeat summary judgment.[31] If Fluor knowingly misrepresented its compliance with required inventory procedures,

---

purposes of this motion, the Court therefore treats the inventory and property-control obligations relied upon by Relators as materially consistent across the relevant amendments.

[31]     In denying summary judgment, the Court does not adopt Fluor's proposed requirement from *Cimino* that Relators prove but-for causation at this stage. Fourth Circuit precedent permits FCA liability where false statements or certifications are used to obtain or maintain Government approval or payment, without requiring proof at summary judgment

and those misrepresentations were capable of influencing the Government's decisions to approve Fluor's PMS or pay claims for inventory-related labor, FCA liability may attach. 176 F.3d at 788–90. This is a fact question. "Materiality" is, too—the Fourth Circuit has described it as "partak[ing] of the character of a mixed question of fact and law." *Harrison*, 176 F.3d at 792 (quoting another source). At minimum, the record presents genuine disputes of material fact as to falsity, scienter, materiality, and causation.

Accordingly, Fluor is not entitled to summary judgment on Relators' Property-Management Claims to the extent those theories are predicated on presentment or fraudulent inducement rather than mere allegations of poor management or inefficiency.

### (b)    Relators' Motion Must Likewise Be Denied

Relators seek summary judgment in their favor on their Property-Management Claims. To the extent Relators assert that summary judgment in their favor is warranted on their reverse-false-claim theories, the Court concludes that, taken in the light most favorable to Fluor, genuine disputes of material fact exist for the reasons adduced above. Summary judgment is, therefore, denied.

---

that a particular dollar payment would not have occurred absent the misrepresentation. *See Harrison*, 176 F.3d at 788–90.

Nor does the Court accept that, as a matter of law, Fluor's submissions in connection with PMS reviews or PMSAs are "claims" for payment under a presentment theory. Rather, the factfinder must determine this, as well as whether Fluor's PMSA submissions were "material to" the Government's decisions concerning approval of Fluor's PMS, continued self-insurance, and Fluor's eligibility for payment or award fees. Thus, Relators' various theories of liability in the Property-Management Claims may proceed only to the extent they satisfy the statutory text of the FCA and applicable precedent.

As to Relators' various presentment and false-statement claims: Relators press that Fluor "submitted false statements in order to receive relief of responsibility from the Government," contending that "[e]ach" false statement made in connection with a PMSA is independently actionable under the FCA. (*See* Relators' Mot. for Partial Summ. J. 45–50, DE 512 at 49–54.)

The Court declines to adopt this categorical factual premise. *See supra* text accompanying note 31. Rather, PMSA-related statements may give rise to FCA liability to the extent they constitute knowingly false statements that were "material" to a Government decision to approve Fluor's PMS—and thus, the Government's continued self-insurance—and such approval, in turn, was material to payment to, or relief of responsibility of, Fluor. But substantial fact disputes exist about nearly every element of these theories. It is the same with LTDDs, each of which Relators aver creates liability under one or more presentment or false statement theories— including whether Fluor's statements were "material" to the LTDD "claims," as well as whether the same were "claims" at all. (*Id.* at 46, DE 512 at 50.)

Turning to Relators' fraudulent inducement Property-Management Claims, even assuming the legal viability of these claims,[32] the record reflects genuine disputes of material fact as to falsity, scienter, materiality, and causation with respect to Fluor's PMSA-related statements. *Cf. Harrison*, 176 F.3d at 788–90 (explaining these requirements). Fluor disputes what information it was required to disclose, what it knew at the time of particular PMSAs, whether alleged omissions

---

[32]    Especially given that they were first articulated as such in a responsive brief.

rendered its submissions misleading, and whether any misstatements were material to the Government's decisions regarding system approval or relief of responsibility. (*See generally* Fluor's Resp. in Opp'n, DE 536.)

Summary judgment is, therefore, inappropriate. While the evidence may ultimately warrant narrowing of Relators' theories or claims at a later stage, the Court declines to undertake that pruning on the present record. Accordingly, this portion of Relators' motion for summary judgment is denied.

### 3.     Fluor's Motion on Overstaffing Liability

Fluor next seeks summary judgment on Relators' overstaffing theory, arguing that it fails for two independent reasons. First, Fluor contends that Relators cannot establish falsity because the challenged invoices reflect permissible estimating practices rather than hours actually worked. Second, Fluor argues that Relators have not produced evidence tying any alleged overstaffing to specific labor hours that were not worked, amounting to a "basic failure of proof" requiring summary judgment. (*See* Fluor's Mot. Summ. J. 44–46, DE 507-1 at 52–54.)

Relators respond that Fluor's twelve-hour-per-day labor invoices were knowingly false because Fluor knew that its employees routinely spent a substantial portion of each day—approximately three hours—on "admin time" rather than productive labor, yet nevertheless invoiced the Government for twelve hours of work per day. (*See* Relators' Resp. in Opp'n 40, DE 537 at 46.) Framed this way, Relators' overstaffing theory sounds in false billing, not merely inefficient staffing or suboptimal workforce management.

36

The summary-judgment record reveals genuine disputes of material fact that preclude judgment as a matter of law. The parties sharply dispute whether the asserted three-hour "admin time" figure reflects actual labor hours not worked, or instead derives from a planning or estimating tool used for staffing and scheduling purposes. Fluor maintains that this figure was an appropriate estimating factor and that billing based on twelve-hour days was contractually permissible. (*See* Fluor's Reply at 19–21, DE 551 at 24–26.) Relators, by contrast, contend that Fluor knew at the time of invoicing that employees were not working the hours billed and nevertheless submitted invoices reflecting full twelve-hour workdays. These disputes bear directly on the issues of falsity and scienter.

Fluor's argument that Relators have failed to tie their evidence to specific invoices does not warrant summary judgment at this stage. Relators have produced testimony and documentary evidence from which a reasonable jury could infer systematic overbilling of labor hours. Whether that evidence ultimately establishes that particular invoices were false, and whether Fluor acted with the requisite knowledge, are questions that turn on credibility determinations and the weighing of competing inferences—tasks reserved for the factfinder.

Accordingly, because genuine disputes of material fact exist as to whether Fluor knowingly billed the Government for labor hours not actually worked, Fluor is not entitled to summary judgment on Relators' overstaffing theory. This portion of Fluor's motion for summary judgment is, therefore, denied.

### C.    Summary Judgment for Fluor Is Inappropriate as to Liability for Relators' Retaliation Claim (Count II)

Fluor also moves for summary judgment on Relators' retaliation claims under 31 U.S.C. § 3730(h),[33] arguing that Shepherd and Rude cannot establish that any adverse employment action was taken because of protected activity. (*See* Fluor's Mot. Summ. J. 46–49, DE 507-1 at 54–57.) Viewing the record in the light most favorable to Relators, the Court disagrees.

To establish a prima facie claim of retaliation under the FCA, a relator must show that (1) he engaged in protected activity, (2) his employer knew of that activity, and (3) the employer took adverse action because of the protected activity. *See United States ex rel. Bachert v. Triple Canopy, Inc.*, 321 F. Supp. 3d 613, 629 (E.D. Va. 2018); *see also Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013). Where, as here, there is no direct evidence of retaliatory animus, courts apply the familiar *McDonnell Douglas* burden-shifting framework. *Cody v. ManTech Int'l Corp.*, 746 F. App'x 166, 175–76 (4th Cir. 2018).

As an initial matter, Fluor does not address Relators' claims that Shepherd and Rude were subjected to retaliatory denials of promotion. (Relators' Resp. in Opp'n 45–46, DE 537 at 51–52.) A "fail[ure] to promote" may constitute an adverse employment action if it is "a significant change in employment status . . . ." *See Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011). Fluor has not challenged this

---

[33]    31 U.S.C. § 3730(h) provides a remedy for "[a]ny employee, contractor, or agent" who has experienced "discharge[], demot[ion], suspen[sion], threat[s], harass[ment], or . . . [who has otherwise been] discriminated against in the terms and conditions of employment" because of actions taken "in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."

theory of retaliation against Shepherd and Rude in its summary judgment motion,[34] and the Court, therefore, does not consider it.

With respect to termination, Fluor does not meaningfully dispute that Shepherd and Rude have adduced prima facie evidence of retaliation, creating "a presumption of illegal discrimination" that Fluor must rebut. *Hoyle*, 650 F.3d at 336. Here, both Shepherd and Rude engaged in protected activity by repeatedly raising concerns about conduct they reasonably believed to be fraudulent and by refusing to participate in that conduct. (*See, e.g.*, Nov. 9, 2011, Email from Shepherd;[35] Nov. 2011 Email Exchange.[36]) Both have produced evidence that Fluor management was aware of those concerns. (*See, e.g.*, Sept. 28, 2011, Shepherd Email to James "Pete" Coogle.[37]) And both were subjected to adverse employment actions, including termination. Fluor instead argues that summary judgment is warranted because Relators cannot rebut Fluor's proffered legitimate, non-retaliatory reasons for their terminations. That argument fails at this stage.

Relators have produced evidence from which a reasonable jury could conclude that Fluor's explanations were pretextual and that the adverse actions were part of an escalating pattern of retaliation. The record reflects that Shepherd and Rude initially received strong performance evaluations and were affirmatively

---

[34]     Fluor mentions only Rude's claim in passing, choosing to lump it in with Rude's hostile-work-environment claim. (Fluor's Mot. Summ. J. 49, DE 507-1 at 57.)

[35]     Ex. 184 to Relators' Resp. in Opp'n (DE 537).

[36]     Ex. 178 to Relators' Resp. in Opp'n (DE 537).

[37]     Ex. 186 to Relators' Resp. in Opp'n (DE 537).

recommended for promotion. (*See* Judith Hiatt-Robb 2011 Assessment of Shepherd at 3[38] (explaining that Shepherd "sets the model for what we want our Managers to represent" and that he "was a trusted and valued member of my Management 'inner circle'"); May 2010 Field Performance Assessment of Rude.[39]) After they raised concerns regarding alleged fraud and inaccurate Government reporting, they were criticized for not being "team players," excluded from meetings, stripped of responsibilities, and denied promotions that had been previously approved or verified as available. (*See* Relators' Resp. in Opp'n 47–48, DE 537 at 53–54 (marshalling evidence).) A reasonable jury could view these actions as probative of retaliatory motive and as contextual evidence bearing on later terminations. *See Cody*, 746 F. App'x at 179–80 (evidence of earlier adverse actions may support inference of retaliatory intent).

As to Shepherd, Fluor asserts that his termination was based on misconduct during a deployment-related incident. Shepherd, however, disputes the factual basis for that justification, including whether his conduct violated any policy and whether Fluor's account of the incident is accurate. Resolving those disputes would require credibility determinations that are inappropriate on summary judgment. *See Glynn*, 710 F.3d at 217 (summary judgment improper where employer's justification is factually contested and retaliatory motive could be inferred).

---

[38]    Ex. 172 to Relators' Resp. in Opp'n (DE 537).

[39]    Ex. 175 to Relators' Resp. in Opp'n (DE 537).

40

As to Rude, Fluor contends that his termination resulted from a project-wide reduction in force. (*See* Fluor's Mot. Summ. J. 48–49, DE 507-1 at 56–57.) Relators have produced evidence, however, from which a jury could conclude that the decision-makers involved in the reduction in force were aware of Rude's protected activity and that the proffered explanation was not the true reason for his termination. (*See, e.g.*, Sept. 28, 2011, Shepherd Email to James "Pete" Coogle;[40] Fluor Mem. for Record (apparently signed by Pete Coogle).[41]) Unlike cases in which a reduction in force is undisputed and unconnected to protected activity, the record here presents genuine disputes concerning who made the relevant decisions, what criteria were applied, and whether Rude was selected for termination because of his whistleblowing. *See Cody*, 746 F. App'x at 178–79.

In short, viewing the evidence in the light most favorable to Relators, the record permits a reasonable jury to return a verdict in their favor on the retaliation claim. *See Glynn*, 710 F.3d at 213. Genuine disputes of material fact exist as to pretext and causation for both Shepherd and Rude. Summary judgment is therefore inappropriate.[42]

---

[40]     Ex. 186 to Relators' Resp. in Opp'n (DE 537).

[41]     Ex. 203 to Relators' Resp. in Opp'n (DE 537).

[42]     Fluor relies heavily on *United States ex rel. Dillard v. Fluor Corp.*, 2022 WL 993667 (D.S.C. Mar. 31, 2022), *aff'd*, 2023 WL 8618545 (4th Cir. Dec. 13, 2023), a case decided by this Court, to argue that summary judgment is warranted on Relators' retaliation claims. *Dillard* is distinguishable. There, the record established that the decisionmaker responsible for the reduction in force lacked knowledge of the plaintiff's protected activity and that the plaintiff's position was eliminated as part of an undisputed, cost-driven reorganization. *Id.* at *4. Here, by contrast, Relators have adduced evidence from which a reasonable jury could conclude that relevant decisionmakers were aware of Shepherd's and Rude's protected

Accordingly, Fluor's motion for summary judgment on Relators' retaliation claim (Count II) is denied.

## IV.    CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (DE 507) is **DENIED**, and Relators' Motion for Partial Summary Judgment (DE 508, DE 512) is **DENIED**.

This action shall proceed to trial on the remaining claims consistent with this Order. Nothing in this Order alters the sealing of filings previously ordered under DE 554, except as expressly clarified herein.

**IT IS SO ORDERED.**

Joseph Dawson, III
United States District Judge

Florence, South Carolina
January 14, 2026

---

activity and that the proffered justifications for adverse actions, including termination, were pretextual. Accordingly, *Dillard* does not compel summary judgment on the present record.

42