**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* CHARLES R. SHEPHERD and DANNY V. RUDE; ROBERT SCOTT DILLARD; and RICKEY MACKEY,<br><br>Plaintiff-Relators,<br><br>v.<br><br>FLUOR CORPORATION, INC., FLUOR INTERCONTINENTAL, INC.,<br><br>Defendants. | CASE NO.: 6:13-cv-02428-JD<br><br><br>**Memorandum Opinion and Order on Defendants' Motion to Exclude Rudolph** |

Before the Court is Defendants Fluor Corporation, Inc., and Fluor Intercontinental, Inc.'s Motion to Exclude the Testimony of Relators' Expert Michael Rudolph pursuant to Federal Rules of Evidence 702 and 403 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (DE 544.) Relators have filed a Response in Opposition (DE 565), supported by the expert reports of Michael Rudolph and Brigadier General (Ret.) Mike Hoskin (DE 575; DE 576), and Fluor has filed a Reply (DE 583).

The motion challenges the admissibility and scope of Mr. Rudolph's proposed expert testimony concerning inventory management, property accountability, and related issues arising from Fluor's performance under the LOGCAP IV contract and Task Order 0005 in Afghanistan. Specifically, Fluor contends that Mr. Rudolph is not qualified to offer several of his proffered opinions, his methodology is unreliable, and

portions of his testimony are irrelevant, impermissibly speculative, or unfairly prejudicial.

For the reasons below, the Court grants the motion (DE 544) in part and denies it in part.

## I.    BACKGROUND[1]

### A.    Factual Background

This action arises under the False Claims Act and concerns Defendants Fluor Corporation, Inc., and Fluor Intercontinental, Inc.'s ("Fluor") performance of logistics and life-support services for the United States military in Afghanistan under the Logistics Civil Augmentation Program IV ("LOGCAP IV") contract and Task Order 0005 ("TO5"). Relators allege, among other things, that Fluor knowingly submitted false claims and false statements to the Government in connection with award-fee determinations and property-management obligations, and that Fluor retaliated against employees who raised concerns regarding those practices. (*See generally* Am. Compl. 2d, DE 121.)

Under LOGCAP IV, Fluor was awarded an indefinite-delivery, indefinite-quantity contract to provide life-support and logistics services to U.S. military operations overseas. (LOGCAP IV Contract, DE 507-2.) Fluor performed under

---

[1]    For ease of reference, the Court uses the following acronyms throughout this Order: "LOGCAP IV" refers to the Logistics Civil Augmentation Program IV contract; "TO5" refers to Task Order 5 issued under LOGCAP IV; "FAR" refers to the Federal Acquisition Regulation; "DFARS" refers to the Defense Federal Acquisition Regulation Supplement; "DCMA" refers to the Defense Contract Management Agency; "PMS" refers to a contractor's Property Management System; "PMSA" refers to a Property Management System Analysis conducted by DCMA; and "LTDD" refers to Loss, Theft, Damage, and Destruction reports submitted by a contractor concerning Government property.

2

discrete task orders that defined the scope of work at particular locations. (*Id.*) In 2009, Fluor was awarded TO5, which required Fluor to provide base life-support services at forward operating bases throughout Northern Afghanistan. (TO5, DE 507-4; Performance Work Statement.)

TO5 was structured as a cost-plus-award-fee contract. Under that structure, Fluor could recover allowable costs and earn a base fee for minimal performance, as well as an additional award fee determined by the Government based on periodic evaluations of Fluor's performance. (LOGCAP IV § H-35, DE 507-2 at 36–38.) Among the areas evaluated were Fluor's compliance with property-management requirements and its effectiveness in managing Government-furnished and contractor-acquired property. (*See, e.g.*, Property Management System Analysis ("PMSA") materials discussed in DE 565 at 10-11.)

In support of their claims, Relators designated Michael Rudolph as an expert witness. Mr. Rudolph is a retired Marine Corps officer with decades of experience in logistics, supply chain management, and inventory control, including service in combat and contingency environments. (Rudolph Rep. at 5–6, DE 575.) According to his report, Mr. Rudolph reviewed Fluor's inventory management practices, property management systems, audit findings, and related records, and offers opinions regarding the adequacy of those practices and the operational significance of recurring deficiencies identified during Fluor's performance of TO5. (DE 575-1 at 47–50, DE 575-2 at 1–17.)

### B.     The Parties' Positions

Fluor moves to exclude Mr. Rudolph's testimony in whole or in part pursuant to Federal Rules of Evidence 702 and 403. (DE 544.) Fluor contends that Mr. Rudolph lacks the qualifications to opine on contractual and regulatory requirements, Government decision-making, and alleged consequences, such as award-fee determinations, loss of relief of responsibility, or suspension and debarment. (DE 544-1 at 7–8.) Fluor further argues that Mr. Rudolph employs no reliable methodology to support several of his opinions and that portions of his proposed testimony consist of impermissible legal conclusions, speculation regarding intent or state of mind, or narrative argument rather than expert analysis. (*Id.* at 21–30.)

Relators oppose the motion, asserting that Mr. Rudolph's extensive experience in military logistics and inventory management qualifies him to offer the challenged opinions, that his testimony is grounded in a reliable review of the record and accepted logistics principles, and that his opinions will assist the jury in understanding operational issues relevant to Fluor's performance and representations to the Government. (DE 565.)

Fluor replies that Relators recast Mr. Rudolph's opinions and argues that the proffer remains inadmissible because the opinions are irrelevant or outside his expertise, unsupported by reliable methodology, or unfairly prejudicial. (DE 583.)

## II.     LEGAL STANDARD

District courts "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm. Inc.*, 509

4

U.S. 579, 589 (1993). Rule 702 of the Federal Rules of Evidence was amended in response to *Daubert* and its progeny to provide:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of an expert witness's testimony bears the burden of proving that such testimony meets the requirements of Rule 702 by a preponderance of evidence. *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n. 10). As the text of the rule suggests, district courts have a "special obligation" as gatekeepers. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). This means that regardless of the content of the expert testimony, "a district court must ensure that the expert is qualified and that the expert's testimony is both relevant and reliable." *United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019).

Beginning with qualifications, "[t]he test is whether, under the totality of the circumstances, the witness can be said to be qualified as an expert in a particular field through any one or more of the five bases enumerated in Rule 702—knowledge,

skill, experience, training, or education." *Santos v. Posadas De Puerto Rico Assocs.*, Inc., 452 F.3d 59, 64 (1st Cir. 2006).

Turning to methodology, the court must consider "whether the reasoning or methodology underlying the testimony" is reliable. *Daubert*, 509 U.S at 592–93. Certain nonexclusive factors address the reliability of a particular theory or technique, namely, whether the theory or technique:

(1)     can be and has been tested;

(2)     has been subjected to peer review and publication;

(3)     has a known or potential rate of error; and

(4)     has attained general acceptance in the pertinent scientific community.

*See id.* at 593–94. Of course, given the district court's role regarding all expert testimony, "some of *Daubert*'s questions can help to evaluate the reliability even of experience-based testimony." *Kumho Tire Co.*, 526 U.S. at 151. But in any given case, which of these factors are applicable "depends upon the particular circumstances of the particular case at issue." *Id.* at 150. And importantly, the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

Finally, relevance is determined by ascertaining whether the testimony is sufficiently tied to the facts of the case such that it will aid the jury in resolving a factual dispute. *See id.* at 593; *see also* Rule 402, Fed. R. Evid.

However, "the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." *In re Lipitor (Atorvastatin Calcium)*

6

*Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 631 (4th Cir. 2018) (alteration omitted) (quoting another source).

## III. DISCUSSION

Fluor's motion is styled as seeking exclusion of Mr. Rudolph's testimony; that said, Fluor does not seek to exclude Mr. Rudolph in his entirety. The Court's task under Rule 702 is not to determine whether the expert's conclusions are correct, but whether the proponent has shown, by a preponderance of the evidence, that the expert is qualified to offer the opinions at issue and that those opinions are reliable and will assist the trier of fact. *See Daubert*, 509 U.S. at 592–95; *Kumho Tire*, 526 U.S. at 147. Consistent with this gatekeeping obligation, the Court must examine the admissibility of Mr. Rudolph's opinions individually, rather than accepting or rejecting his testimony wholesale. *See Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281–82 (4th Cir. 2021); *Frankenberry v. Sig Sauer, Inc.*, 2022 WL 22887079, at *3–4 (D.S.C. Feb. 4, 2022).

Fluor challenges discrete categories of opinions because Mr. Rudolph lacks the qualifications to offer them, they are not the product of reliable principles and methods, or they are irrelevant, speculative, or unfairly prejudicial. The Court addresses these arguments in turn.

## A. Qualifications

Rule 702 requires that an expert be qualified "by knowledge, skill, experience, training, or education" to offer the specific opinions proffered. Fed. R. Evid. 702. Expertise in one field does not automatically qualify a witness to testify about others, and courts must evaluate an expert's qualifications with respect to the opinions the

witness seeks to give. *See United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019); *Nease v. Ford Motor Co.*, 848 F.3d 219, 229–30 (4th Cir. 2017); *Mincey v. Se. Farm Equip. Co.*, 2025 WL 2450913, at \*6 (D.S.C. Aug. 25, 2025).

### 1. Opinions Within Mr. Rudolph's Logistics and Inventory Expertise

Mr. Rudolph's career reflects decades of experience overseeing logistics operations, materials accountability, and supply systems in complex environments, including combat zones. (DE 575 at 5–6 (Rudolph Rep.).) Experience-based expertise of this nature may satisfy Rule 702 where the opinions offered fall within the witness's demonstrated professional domain. *See Kumho Tire*, 526 U.S. at 150–51; *Mincey*, 2025 WL 2450913, at \*6.

Accordingly, the Court finds that Mr. Rudolph is qualified to offer opinions explaining logistics and inventory-management concepts, identifying practices commonly viewed as effective or deficient in such operations, and describing the operational significance of recurring inventory discrepancies or control weaknesses reflected in the record. To the extent that Mr. Rudolph's testimony is limited to these subjects, his qualifications are sufficient under Rule 702.

### 2. Opinions Beyond Mr. Rudolph's Qualifications

The Court reaches a different conclusion as to certain opinions in Mr. Rudolph's report that extend beyond the application of logistics and inventory-management principles.

### a. The parties' dispute begins with how to characterize the proffer.

Fluor argues that Mr. Rudolph repeatedly goes beyond supply-chain operations and instead offers opinions on (1) what LOGCAP IV/TO5 and FAR/DFARS required, and (2) how DCMA/the Government would have acted—i.e., counterfactual "consequences" (failed PMSAs, PMS disapproval, loss of relief of responsibility, award-fee impacts, and even suspension/debarment). (DE 544-1 at 9–21.) Relators respond that Fluor is attacking opinions "he does not offer," and represent that he does not intend to testify about the processes or factors governing suspension/debarment or award fees and is not offering legal interpretations; they characterize his testimony as operational—industry standards, what the records show about execution, and whether Fluor's disclosures and representations are consistent with the contemporaneous evidence he reviewed. (DE 565 at 19–24.) Fluor's reply maintains that Relators are "recast[ing]" his opinions, but that Relators' own framing still depends on a counterfactual reconstruction of DCMA's regulatory decision-making under FAR/DFARS, which Rudolph is not qualified to provide. (DE 583 at 6–7.)

### b. Operational opinions within the expert's field remain admissible in principle.

As Relators describe the proffer, Mr. Rudolph applies supply-chain and property-control experience to evaluate Fluor's written property procedures and identify practices he considers deficient from an operational perspective, including the operational significance of those deficiencies. (DE 565 at 20–23; *see also* Rudolph Rep.)

### c. However, to the extent Mr. Rudolph's opinions cross from "operational significance" into Government-process determinations, they exceed his demonstrated qualifications.

Fluor identifies multiple categories of opinion where, in its view, Rudolph purports to opine that deficiencies failed audit standards, rose to "significant" systemwide failures, required disclosure or immediate corrective action, and would have produced particular Government outcomes (e.g., failed PMSAs; PMS disapproval; loss of relief of responsibility; adverse award-fee consequences; suspension/debarment). (DE 544-1 at 11–21.) Relators deny that Rudolph will testify about certain Government "consequences" (notably suspension/debarment and award fees) and emphasize that he is not opining on "the process" of DCMA decision-making. (DE 565 at 19–21.)

But Relators simultaneously contend that Rudolph may state that Fluor "would have lost approval" of its property system and "in turn, lost relief of responsibility" as "natural consequences," based on his "straightforward interpretation" of materials he reviewed. (DE 565 at 21.) That type of opinion—what DCMA would have done, whether disapproval would follow, and what legal/contractual consequences would attach—necessarily depends on the interpretation and application of FAR/DFARS and DCMA's regulatory processes, and thus implicates fields beyond inventory-management expertise. (*See* DE 544-1 at 11–18 (arguing Rudolph lacks experience with PMSAs, system disapproval, relief of responsibility, mandatory disclosure standards, etc.); DE 583 at 8, 10–11 (reply

arguing Relators' theory turns on FAR/DFARS/DCMA counterfactual decision-making)).

Rule 702 requires an expert to be qualified to offer the specific opinions proffered, not merely knowledgeable in a related field. *Smith*, 919 F.3d at 835; *Nease*, 848 F.3d at 229–30. Expertise in logistics and inventory management, standing alone, does not qualify a witness to opine on how the Government interprets FAR/DFARS/contract requirements, evaluates audit adequacy and business-system approval/disapproval, determines whether disclosures satisfy Government standards, or exercises discretion regarding relief of responsibility or other contractual consequences. (*See* DE 544-1 at 14–20 (qualifications challenge focused on FAR/DFARS/PA/CO processes)).

Nor may an expert substitute his judgment for that of contracting officers, DCMA property administrators, or other agency decision-makers by testifying— expressly or in substance—that particular deficiencies required specific determinations or actions by the Government. Such testimony exceeds the scope of permissible expert assistance and risks presenting legal conclusions or administrative judgments to the jury. *See Smith*, 919 F.3d at 835; *McIver*, 470 F.3d at 562–63.

### 3. Summary of Qualification Rulings

#### a. Permitted operational testimony.

Mr. Rudolph may testify regarding logistics and inventory-management principles; identify practices he considers deficient from an operational perspective; and explain the operational significance of those practices (including how such

deficiencies typically manifest operationally), subject to the reliability and relevance limitations discussed below.

### b. Excluded testimony regarding Government determinations, contract/regulatory meaning, and counterfactual consequences.

To the extent Mr. Rudolph's report or testimony can be read to offer opinions regarding:

- o the interpretation of LOGCAP IV/TO5 contractual requirements or FAR/DFARS obligations as such (including what those authorities required as a matter of contract/regulation), *see* DE 544-1 at 9–10;

- o whether Fluor satisfied or failed audit standards or Government business-system standards as a Government determination (including whether Fluor should have failed PMSAs), *see* DE 544-1 at 17;

- o whether particular deficiencies required disclosure, corrective action, or other specific Government responses, *see* DE 544-1 at 21–24 (disclosures) and 16–17 (PMSA/system consequences);

- o how DCMA or other Government decisionmakers would or should have exercised discretion with respect to PMS approval/disapproval, relief of responsibility, award fees, suspension/debarment, or other contractual consequences, *see* DE 544-1 at 11–21; DE 565 at 19–21 (discussing what Rudolph will/won't offer); DE 583 at 11–12.

Those opinions are excluded on qualification and scope grounds.

### c. Relators' narrowing representations.

Relators represent that Mr. Rudolph does not intend to testify at trial about the processes for suspension/debarment or award-fee determinations and is not offering an analysis that Fluor would have been suspended/debarred or deprived of award fees. (DE 565 at 19–20.) To the extent any portion of his report could be construed to offer such opinions, those opinions are excluded consistent with this Order. (*See* DE 583 at 11 (reply addressing whether such opinions were abandoned)).

## B.    Reliability and Methodology

The parties dispute reliability on several grounds. Fluor argues Mr. Rudolph employed no reliable methodology because (1) he describes his "methodology" primarily as reviewing and summarizing a large volume of documents, using sticky notes, and "looking for trends," rather than applying a professional method capable of judicial scrutiny; (2) he bridges from operational observations to conclusions about Government processes and "consequences" through *ipse dixit* and untested "logical assumptions"; and (3) he adopts other experts' analyses without sufficient independent application and offers a $63–$70 million Loss, Theft, Damage, Destroyed ("LTDD") compilation in a manner Fluor contends is speculative and misleading. (DE 544-1 at 27; *see also* DE 544-2 at 38–39, Ex. 1 (Rudolph Rep); DE 544-3 at 94–95, Ex, 2, (Rudolph Dep) 93:5–94:20; DE 544-1 at 28–29; DE 544-1 at 30.)

Relators respond that Fluor misstates the basis for Mr. Rudolph's opinions: they contend he relies not only on experience but also on industry standards (including SCOR and ASTM) and Fluor's own written procedures; experiential methods are admissible when adequately explained; and experts may rely on other experts' analyses so long as they apply their own specialized knowledge to reach independent conclusions. (DE 565 at 19, 26.)

Even where an expert is qualified to testify on a general subject, Rule 702 requires the proponent to demonstrate that the expert's opinions are based on sufficient facts or data, are the product of reliable principles and methods, and reflect a reliable application of those principles and methods to the facts of the case. Rule

702(b)–(d), Fed. R. Evid. The Court's focus is on the expert's reasoning process, not on whether the Court agrees with the conclusions reached. *Daubert*, 509 U.S. at 595. At the same time, the Court must exclude testimony where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

### 1.     Experience-Based Testimony

Mr. Rudolph's opinions are mainly experience-based. Such testimony is not inherently unreliable, but when an expert relies primarily on experience, the expert must explain how that experience leads to the conclusions reached, why it provides a sufficient basis for those conclusions, and how it is reliably applied to the facts of the case. *Kumho Tire*, 526 U.S. at 150–52.

Where Mr. Rudolph applies logistics and inventory-management principles to describe operational practices reflected in the record—such as identifying recurring inventory discrepancies or weaknesses in control processes documented in property-management reviews—his reasoning is sufficiently transparent to permit evaluation by the Court and testing through cross-examination. For example, Mr. Rudolph relies on generally accepted supply-chain and inventory-management principles and industry standards to frame his assessment of inventory-control practices, and he then points to recurring deficiencies and discrepancies documented across multiple internal audits, assessments, and compliance reviews as indicative of systemic weaknesses in inventory-control processes rather than isolated errors. (DE 575 at 37–39, 47–50 (Rudolph Rep.)) To that extent, the Court finds that such opinions reflect a

discernible application of professional experience to the facts of the case and are not excluded on reliability grounds.

The Court agrees, however, that an expert may not simply "summarize the evidence of record" without specialized analysis. To the extent Mr. Rudolph's report offers narrative characterizations of emails, audits, or testimony untethered to an explained application of logistics or inventory-management principles, such material is not admissible as expert testimony. The parties may, of course, present the underlying documents and fact testimony directly, but Mr. Rudolph may not function as a conduit for record summaries cloaked in expert authority.

Relators contend Mr. Rudolph's operational reasoning is supported not only by experience but by his asserted application of SCOR and ASTM standards and Fluor's own written procedures. (DE 565 at 26.) To the extent that those standards inform operational assessments of inventory-control practices, they may contribute to the reliability of experience-based opinions by providing an identifiable framework against which operational practices can be evaluated. But even accepting Relators' characterization of his reliance on those standards, they do not provide a reliable analytical foundation for opinions that turn on the FAR/DFARS framework governing PMSA determinations—such as "adequacy" and "significant deficiency"—or for predicting the outcome of multi-step, discretionary Government decision-making under those authorities. These limitations are consistent with the Court's qualification rulings above and, independently, with Rule 702's reliability requirements; even where logistics standards inform operational analysis, they do

not qualify Mr. Rudolph to opine on Government determinations or supply a reliable method for predicting discretionary regulatory outcomes.

Further, to the extent Mr. Rudolph relies on other experts' analyses, he must apply his own specialized knowledge to reach his own opinions and may not merely repeat another expert's conclusion without independent reasoning. *Cf. Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 144 (M.D. Pa. 2015).

Relators argue Mr. Rudolph permissibly relies on Dr. Gaukler's quantitative review of Maximo data and contributes an independent opinion based on his own contingency-environment supply-chain experience. Fluor responds that Mr. Rudolph did not understand or test the underlying analysis and therefore risked "parrot[ing]" another expert's work. (DE 583 at 14.) The Court agrees with the governing principle both sides acknowledge: Mr. Rudolph may assume and consider another expert's analysis as a factual predicate where experts in his field would reasonably do so, but any opinion he offers must reflect an articulated application of his own specialized knowledge to those outputs. He may not merely adopt or repeat Dr. Gaukler's conclusions wholesale without explaining the reasoning by which his own expertise supports the inference he draws from that analysis.

### 2.    Analytical Gaps and Speculative Causation

Other opinions offered by Mr. Rudolph do not satisfy Rule 702's reliability requirements. In several instances, Mr. Rudolph identifies inventory or property-management deficiencies and then opines that those deficiencies rose to the level of significant systemwide failures that would have failed audit standards, required

disclosure and immediate corrective action, and carried recognized ramifications for contract performance and Government evaluation. (*See* DE 575 at 17–25; DE 575-1 at 7–11, 20–27 (Rudolph Rep.).) In doing so, Mr. Rudolph implicitly links operational deficiencies to discretionary Government actions or consequences without articulating a reliable methodology for predicting how or whether the Government would respond as he describes.

The record does not reflect a discernible methodology bridging that inferential gap. Mr. Rudolph does not identify standards governing how contracting officers or DCMA would evaluate deficiencies in contingency environments under the governing FAR/DFARS business-system framework, explain how competing performance factors are weighed, or articulate criteria by which the operational deficiencies he identifies reliably predict the Government outcomes he asserts. Instead, the opinions move from identification of operational issues to conclusions about discretionary Government decisions without explaining the analytical steps connecting the two.

Rule 702 does not permit an expert to substitute speculation for analysis. Where an opinion rests on assumptions about discretionary decision-making without an articulated and reliable basis for predicting those decisions, it exceeds the bounds of admissible expert testimony. *Joiner*, 522 U.S. at 146. The Court's gatekeeping obligation cannot be satisfied by relegating such deficiencies to cross-examination, as reliability is a threshold admissibility determination, not a question of weight. *See* Rule 702, Fed. R. Evid.; *Daubert*, 509 U.S. at 589.

### a.   LTDD compilation and monetary framing.

Fluor separately challenges Mr. Rudolph's compilation of LTDD amounts and his associated implication that Fluor should have been "on the hook" for approximately $63–$70 million, arguing that the opinion assumes (without analysis) that all LTDDs reflect compensable "losses" and further assumes a particular financial-liability consequence of any loss of relief of responsibility—an assumption Mr. Rudolph acknowledged he could not confirm. (DE 544-1 at 30–31.) Relators respond that this is a factual disagreement over characterization and weight. (DE 565 at 30–31.)

The Court agrees with Fluor that, to the extent Mr. Rudolph offers a monetary "consequence" opinion—i.e., that Fluor would necessarily have been financially liable for that total amount—the opinion lacks a reliable foundation and risks misleading the jury by presenting a delusive impression of precision untethered to a reliable analytic method. The underlying compilation may be referenced, if at all, only as a descriptive summary of amounts reflected in the LTDD submissions themselves, without expert inference regarding what portion constitutes "true loss" versus inventory adjustment and without any opinion that those amounts represent damages or inevitable Government financial recoupment.

Accordingly, opinions that extrapolate from identified deficiencies to predict Government decision-making or contractual consequences, without a reliable analytical foundation, are excluded.

### 3. Consideration of Alternative Explanations and Contextual Variables

18

The reliability concerns are most pronounced where Mr. Rudolph acknowledges competing explanations yet offers definitive "impossibility" or consequence conclusions without articulating a basis for excluding reasonable alternatives. This issue arises, for example, where Mr. Rudolph relies on another expert's data analysis to conclude that reported service-order response and repair times were "all but impossible," while conceding at deposition that other explanations were "theoretically possible" and that he did not understand or independently evaluate or distinguish among the underlying reasons reflected in the data. (DE 575-1 at 10 –11 (Rudolph Rep.); DE 575-4 at 22, 24 (Rudolph Dep.) 278:5–281:21, 287:3–288:7.)

Similarly, where conclusions depend on how operations functioned in a contingency environment, the reliability of experience-based reasoning may turn on whether the expert accounts for contextual variables that bear on the inference, including operational constraints, data-quality limitations, and explanations consistent with the record advanced by the opposing party. The failure to engage such variables can leave the Court unable to distinguish applied professional judgment from subjective belief. *See Daubert*, 509 U.S. at 593–94.

### 4. Summary of Reliability Rulings

In sum, Mr. Rudolph's opinions are reliable to the extent they apply logistics and inventory-management principles (and, where appropriately explained, relevant industry standards) to describe operational practices and deficiencies reflected in the record. Opinions that amount to narrative summarization untethered to specialized analysis, that merely adopt other experts' conclusions without independent application of expertise, that assert monetary "consequence" liability based on speculative assumptions, or that extrapolate from operational deficiencies to predict discretionary Government decision-making or contractual consequences without a discernible method are excluded under Rule 702.

## C. Relevance and Rule 403

The parties dispute whether, even if otherwise admissible under Rule 702, portions of Mr. Rudolph's testimony should be excluded as unhelpful or unfairly prejudicial. Fluor argues that significant portions of the report amount to narrative summaries and "plain meaning" document interpretations that add no specialized analysis; that Mr. Rudolph improperly opines on Fluor's state of mind and corporate ethics or "culture"; and that his discussion of a suicide bombing incident is irrelevant, highly inflammatory, and would mislead the jury and invite a mini-trial. (DE 544-1 at 32–33, 36–38.)

Relators respond that Mr. Rudolph's testimony will assist the jury in understanding specialized property-management concepts; that he is not offering mindreading testimony and instead relies on documentary admissions and evidence of notice; that he will not offer prejudicial "broken culture" rhetoric; and that the

20

bombing evidence is probative to rebut anticipated defenses, though they contend the issue is better suited for motions in limine. (DE 565 at 31–37.)

Even otherwise admissible expert testimony may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or wasting time. Fed. R. Evid. 403. Rule 403 reflects a balancing judgment entrusted to the Court's discretion, and it "includes expert testimony" as well as other forms of evidence. *See United States v. Sellers*, 566 F.2d 884, 886 (4th Cir. 1977).

### 1.    Relevance and Helpfulness

Expert testimony is relevant under Rule 702 only if it will assist the trier of fact to understand the evidence or determine a fact in issue. *Daubert*, 509 U.S. at 593. As discussed above, Mr. Rudolph's testimony explaining logistics and inventory-management concepts, industry terminology, and the operational significance of inventory-control practices reflected in the record may assist the jury in evaluating matters beyond common experience—particularly where those concepts provide context for the operational import of recurring discrepancies, control weaknesses, and documented deficiencies.

Fluor argues, however, that substantial portions of Mr. Rudolph's report are presented as a "high-level summary" of the record—emails, audits, and deposition testimony—without specialized analysis, and that such narrative recitations are not helpful to the jury when they merely "filter" record evidence through the authoritative lens of an expert. (DE 544-1 at 35.) The Court agrees with that

principle. Where Mr. Rudolph does not apply identifiable logistics or inventory-management principles and instead offers narrative characterizations of documents or argument-like summaries, that testimony does not satisfy Rule 702(a)'s helpfulness requirement and is excluded.

Similarly, to the extent Mr. Rudolph offers "plain reading" interpretations of contract or regulatory text on the ground that he "understand[s] the English language," such testimony does not assist the jury and risks invading the Court's role in instructing on the law. (DE 575-4 at 4 (Rudolph Dep.) 206:10–207:7.) The jury does not require expert assistance to be told what documents *mean* where the proffered interpretation is simply a lay reading divorced from specialized knowledge. *See Lightfoot v. Georgia-Pacific Wood Prods., LLC*, 5 F.4th 484, 494 (4th Cir. 2021) (affirming exclusion of expert testimony where documents "spoke for themselves" and expert offered only interpretive gloss without specialized methodology). Consistent with Fluor's argument (DE 544-1 at 26–28, 32–33), and with the scope limitations set forth above, Mr. Rudolph may not testify to interpret the FAR/DFARS or to supply purportedly "plain meaning" contract/regulatory readings.

Finally, Fluor argues that Mr. Rudolph's "common sense" extrapolations and "logical assumptions" about what would follow from certain facts—for example, that failure to follow a corrective action plan could lead to disapproval of a property management system—are unhelpful because jurors are equally capable of drawing such inferences. (DE 575-4 at 43 (Rudolph Dep.) 364:11–365:9; DE 544-1 at 27–29.) The Court agrees that expert testimony may not be used to present inferences that

do not require specialized knowledge. *See Koenig v. Johnson*, 2020 WL 2308305, at 6 (D.S.C. May 8, 2020) (excluding expert testimony consisting of "common-sense extrapolations" that the jury was equally capable of drawing). To the extent Mr. Rudolph's proffer consists of "common sense" assumptions or logical extrapolations about discretionary Government actions or other consequences—as opposed to operational explanations grounded in logistics or inventory-management expertise— such testimony is excluded as unhelpful and, in any event, falls outside the permissible scope identified above.

### 2.    State of Mind, Intent, and Corporate Ethics or "Culture"

Fluor separately argues that Mr. Rudolph's report includes improper opinions regarding Fluor's knowledge, intent, and state of mind, as well as broad characterizations of Fluor's corporate ethics or "culture." (DE 544-1 at 33–36.) Relators respond that Mr. Rudolph does not intend to "read a witness's mind" (DE 565 at 32), and that the passages Fluor identifies are either (1) straightforward discussions of admissions in documents and testimony or (2) permissible testimony bearing on notice—i.e., whether certain information was distributed to or discussed by managers.

The Court agrees that an expert may not opine on a party's intent, motive, or state of mind, nor may an expert offer ethical condemnations or corporate "culture" verdicts that amount to advocacy rather than specialized analysis. *See In re Smith & Nephew Birmingham Hip Resurfacing*, 2023 WL 6794318, at *8 (D. Md. Oct. 12, 2023). To that extent, Mr. Rudolph may not testify that Fluor "understood," "knew,"

23

"intended," "encouraged," or "deceived" in the sense of offering conclusions about subjective mental state or corporate intent, nor may he characterize Fluor's conduct as reflecting an embedded corporate culture of "do whatever is necessary to get paid," deceit, or willful defiance. (*See* DE 575-1 at 6, 21 (Rudolph Rep.); DE 574-4 at 38 (Rudolph Dep.) 342:3–9.)

At the same time, the Court does not read this limitation to bar all testimony that bears on notice or the operational significance of management oversight. If Mr. Rudolph relies on specific documents showing distribution, escalation, or discussion of identified operational deficiencies within a chain of command, he may testify to those record facts and to the operational significance of effective leadership and supervision in inventory control, consistent with Relators' representation that he will not offer bombastic "broken culture" rhetoric. (DE 565 at 34.) The line is that he may describe what the record shows was communicated and why, operationally, leadership/supervision matters in the field—but he may not translate those facts into conclusions about subjective intent, ethics, or corporate character. Accordingly, Mr. Rudolph may not use intent-laden verbs (e.g., 'intended,' 'deceived,' 'encouraged') to characterize Fluor's mental state; he may instead describe what information was communicated to whom and, based on his logistics expertise, explain the operational significance of effective oversight.

### 3.     Testimony Regarding the Suicide Bombing Incident

Fluor moves to exclude, under Rule 403, Mr. Rudolph's opinions attributing "tragic consequences" to alleged inventory-management failures, including his reference to a suicide bombing incident and his suggestion that lax controls allowed a bomb vest to be built using Fluor-managed tools and materials. (DE 544-1 at 36–37; DE 575-1 at 9, 31 (Rudolph Rep.) at 58, 80.) Fluor argues that the cited Army investigative report does not draw the causal link Mr. Rudolph asserts; that the subject is highly inflammatory and risks misleading the jury; and that litigating the issue would invite a distracting mini-trial over responsibility and causation. (DE 544-1 at 36–37.) Relators respond that the evidence is probative to rebut defenses they expect Fluor to press, including arguments concerning "mission failure" and FCA materiality or the absence of consequences, and contend that the issue should be addressed, if at all, through motions in limine rather than at the Daubert stage. (DE 565 at 31–34.)

Whatever the ultimate evidentiary ruling on the incident at trial, the Court concludes that Mr. Rudolph may not offer expert opinions tying the bombing to Fluor's inventory-management deficiencies. As Fluor points out, the proffered linkage rests on a contested interpretation of a heavily redacted investigative report that does not attribute the attack to inventory-management failures, and Mr. Rudolph's own testimony reflects uncertainty regarding the report's contents. (*See* DE 544-1 at 37; see also; DE 575-4 at 49–50 (Rudolph Dep.) 389:16–391:10.) Presenting such opinions through an expert witness raises substantial risks of unfair prejudice, confusion of

the issues, and misleading the jury—risks heightened by the powerful emotional impact of the event and the potential for satellite litigation over responsibility and causation. Evidence is unfairly prejudicial when it has "an undue tendency of evidence to influence a jury to make a decision for reasons unrelated to the probative value of the evidence." *Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 719 (4th Cir. 2014).

The probative value of presenting these matters through Mr. Rudolph's expert testimony is, at best, marginal relative to these risks, particularly where his opinions move beyond operational analysis and into attribution of catastrophic causation. Accordingly, Mr. Rudolph is excluded from offering expert testimony or opinions concerning the suicide bombing incident, including any opinion that inventory-management deficiencies caused or enabled the attack or that Fluor-managed tools or materials were used to construct the device.

This ruling is limited to Mr. Rudolph's expert testimony. The Court does not foreclose the parties from addressing, through appropriate motions in limine and on a developed trial record, whether any non-expert evidence concerning the incident is admissible for any purpose and, if so, under what limitations.

### 4.    Balancing and Scope of Limitation

Consistent with Rule 403's preference for admitting probative evidence with appropriate limits where feasible, the Court finds that the proper remedy here is limitation rather than wholesale exclusion. Mr. Rudolph may testify regarding logistics and inventory management principles and the operational significance of

practices reflected in the record, to the extent those opinions are grounded in his specialized knowledge and reliable methodology as discussed above. He may not (1) present narrative advocacy summaries of documents without specialized analysis, (2) offer contract/regulatory "plain meaning" interpretations, (3) opine on state of mind, intent, ethics, or corporate "culture" in argumentative terms, (4) predict discretionary Government actions or legal consequences, or (5) offer expert opinions concerning the suicide bombing incident.

## IV.    CONCLUSION

For the reasons above, Defendants Fluor Corporation, Inc., and Fluor Intercontinental, Inc.'s Motion to Exclude the Testimony of Michael Rudolph (DE 544) is GRANTED IN PART AND DENIED IN PART.

Mr. Rudolph may testify regarding logistics, inventory management, and property-control principles and may offer opinions applying those principles to explain operational practices and the operational significance of practices and deficiencies reflected in the record, to the extent such opinions are grounded in his specialized experience and a reliable application of that experience to the facts of this case.

Mr. Rudolph may **not** offer expert opinions that:

- interpret or opine on the meaning of contractual or regulatory requirements, including FAR/DFARS or LOGCAP IV/TO5 obligations;

- predict, characterize, or assess how the Government would or should have exercised discretion, including with respect to audits, business-system determinations, disclosures, relief of responsibility, award-fee determinations, suspension or debarment, or other contractual or enforcement consequences;

- present narrative summaries or argumentative characterizations of documents or testimony without the application of specialized logistics or inventory-management analysis;

- rely on common-sense assumptions or logical extrapolations that do not require specialized knowledge and therefore do not assist the jury;

- opine on Fluor's intent, knowledge, state of mind, ethics, or corporate "culture" in a manner that substitutes expert judgment for the jury's role;

- offer speculative monetary or liability conclusions, including opinions that LTDD amounts necessarily reflect compensable losses or inevitable Government financial recoupment; or

- offer expert testimony or opinions concerning the suicide bombing incident, which are excluded under Rule 403 due to the substantial risk of unfair prejudice, confusion of the issues, and misleading the jury.

To the extent any disputed testimony arises at trial that implicates the boundaries set forth in this Order, the Court will address such matters in the context of the evidence presented.

**IT IS SO ORDERED**.

Joseph Dawson, III
United States District Judge

Florence, South Carolina
January 14, 2026