## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## GREENVILLE DIVISION

UNITED STATES OF AMERICA, *ex*)
*rel.* CHARLES R. SHEPHERD and)
DANNY V. RUDE; ROBERT SCOTT)
DILLARD; and RICKEY MACKEY,   )
                                )
      Plaintiff-Relators,   )
                                )
      v.   )
                                )
FLUOR    CORPORATION,    INC.,)
FLUOR INTERCONTINENTAL, INC.,)
                                )
      Defendants.   )
                                )

CASE NO.: 6:13-cv-02428-JD

**Memorandum Opinion and Order on Relators' Motion to Exclude in part Various Experts**

Before the Court is Relators' Daubert Motion to Exclude Testimony of Defendants' Experts pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (DE 547.) The challenged experts are Mike Hoskin, J. Bradford Rice, Renee Richardson, David Robbins, Thomas Ruckdaschel, and Bill Walter. Defendants Fluor Corporation, Inc., and Fluor Intercontinental, Inc., have filed a response in opposition (DE 559), and Relators have filed a reply (DE 578).

For the reasons below, the motion is granted in part and denied in part.

## I.     BACKGROUND

This action arises under the False Claims Act and concerns Fluor's performance under the United States Army's Logistics Civil Augmentation Program IV ("LOGCAP IV"), an indefinite delivery/indefinite quantity contract under which Fluor provided logistics, base operations, and related support services in contingency

environments, including Afghanistan. Relevant to the issues raised in the present motion, LOGCAP IV included cost-reimbursable task orders with award-fee provisions tied to the Government's evaluation of Fluor's performance in specified functional areas, including property and materials management.

As part of its performance, Fluor implemented internal systems and procedures governing supply chain operations, inventory control, and government property administration. These procedures were memorialized, among other documents, in Fluor's Material Management Plan and related internal guidance governing the use of inventory systems such as Maximo and the associated reporting mechanisms. (*See*, e.g., DE 559-10.) Fluor's performance in these areas was subject to periodic review by the Defense Contract Management Agency ("DCMA"), including Property Management System Analyses ("PMSAs"), as well as internal audits and assessments.

In support of its defenses, Fluor has designated multiple expert witnesses with experience in government contracting, logistics, property management, and data analysis. The experts challenged in the present motion include former senior government officials and industry professionals who reviewed contract documents, internal Fluor records, audit materials, deposition testimony, and data extracted from Fluor's inventory systems. Several experts offer opinions concerning the structure and operation of award-fee processes, the Government's oversight mechanisms, the application and administration of property-management

requirements, and analyses of inventory and physical count data derived from Fluor's systems. (*See*, e.g., DE 559-2; DE 559-3; DE 559-4; DE 559-8.)

The record reflects that Fluor's experts relied on a combination of documentary evidence and testimony, including internal Fluor audits, correspondence, PMSA materials, and deposition testimony of Fluor and Government personnel (see, e.g., DE 559-1; DE 559-5; DE 559-6; DE 559-7; DE 559-9). Certain experts also performed data-driven analyses using structured queries of inventory records to assess the timing and frequency of physical counts and related metrics. (DE 559-8.)

Relators move to exclude portions of this testimony, contending that several opinions exceed the experts' qualifications, rest on unreliable or undisclosed methodologies, improperly interpret contract or regulatory language, rely on impermissible credibility assessments or undisclosed communications, or otherwise fail to satisfy Rule 702's requirements. (DE 547-1.) Fluor disputes these characterizations and maintains that its experts' opinions are grounded in their experience, supported by the evidentiary record, and will assist the jury in understanding complex contractual, operational, and technical issues central to the case. (DE 559.)

## II.    LEGAL STANDARD

District courts "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 589 (1993). Rule 702 of the Federal Rules of Evidence was amended in response to *Daubert* and its progeny to provide:

3

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of an expert witness's testimony bears the burden of proving that such testimony meets the requirements of Rule 702 by a preponderance of evidence. *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n. 10). As the text of the rule suggests, district courts have a "special obligation" as gatekeepers. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Regardless of the content of the expert testimony, "a district court must ensure that the expert is qualified and that the expert's testimony is both relevant and reliable." *United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019).

Beginning with qualifications, "[t]he test is whether, under the totality of the circumstances, the witness can be said to be qualified as an expert in a particular field through any one or more of the five bases enumerated in Rule 702—knowledge, skill, experience, training, or education." *Santos v. Posadas De Puerto Rico Assocs., Inc.*, 452 F.3d 59, 64 (1st Cir. 2006).

Turning to methodology, the court must consider "whether the reasoning or methodology underlying the testimony" is reliable. *Daubert*, 509 U.S at 592–93. Certain nonexclusive factors address the reliability of a particular theory or technique, namely, whether the theory or technique:

(1)      can be and has been tested;

(2)      has been subjected to peer review and publication;

(3)      has a known or potential rate of error; and

(4)      has attained general acceptance in the pertinent scientific community.

*See id.* at 593–94. Of course, given the district court's role regarding all expert testimony, "some of *Daubert*'s questions can help to evaluate the reliability even of experience-based testimony." *Kumho Tire Co.*, 526 U.S. at 151. But in any given case, which of these factors are applicable "depends upon the particular circumstances of the particular case at issue." *Id.* at 150. And importantly, the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

Finally, relevance is determined by ascertaining whether the testimony is sufficiently tied to the facts of the case such that it will aid the jury in resolving a factual dispute. *See id.* at 593; *see also* Rule 402, Fed. R. Evid.

However, "the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 631 (4th Cir. 2018) (alteration omitted) (quoting another source).

5

## III.    DISCUSSION

### A.    David Robbins

Relators seek to exclude portions of the testimony of Defendants' expert David Robbins, contending that several of his opinions exceed his qualifications, rest on unreliable reasoning, improperly interpret contract and regulatory language, or speculate regarding Government decision-making. (DE 547-1 at 5–11.) The Court addresses each category of challenged opinions in turn.

#### 1.    Qualifications.

David Robbins is offered by Fluor as an expert in government contracting and procurement-fraud oversight. Mr. Robbins is a partner and co-chair of the Government Contracts Practice at Jenner & Block and has extensive experience advising government contractors on False Claims Act matters, compliance, internal investigations, and enforcement proceedings. His background includes service as a senior attorney in the Office of the General Counsel of the United States Air Force, where he led the Air Force's Procurement Fraud Remedies Office and served as Acting Suspending and Debarring Official and Deputy General Counsel (Contractor Responsibility). In those roles, Mr. Robbins advised senior Department of Defense leadership on contractor responsibility, procurement fraud, and administrative remedies, including suspension and debarment. (DE 547-3 at 15–22.)

The Court finds that Mr. Robbins is qualified under Rule 702 because of his education and extensive professional experience to offer expert testimony concerning the structure and operation of federal procurement-fraud oversight mechanisms, including suspension and debarment processes, contractor-responsibility

determinations, and related monitoring and referral frameworks within the Department of Defense.

Mr. Robbins is not, however, qualified to interpret contract or regulatory provisions as a matter of law, opine on whether particular conduct satisfied statutory or contractual requirements, or offer conclusions regarding how the Government would have exercised discretionary enforcement authority in this case under hypothetical circumstances.

### 2. Opinions Concerning Mission Failure, Suspension, or Debarment

To the extent Mr. Robbins's testimony that he found no evidence of "mission failure" (DE 547-3 at 5) is offered as expert opinion, it fails to satisfy Rule 702's reliability requirements. Mr. Robbins does not identify any specialized principles, criteria, or analytical framework governing how "mission failure" should be assessed in this context, nor does he explain how his review of the materials was sufficient to support such a conclusion. Instead, his opinion amounts to a narrative summary of selected documents and invites the jury to substitute his characterization of the record for its own evaluation of the evidence.

The insufficiency of the factual basis for these opinions underscores their unreliability. Mr. Robbins reviewed only eight documents—all Contractor Performance Assessment Reporting System ("CPARS") evaluations—out of the extensive evidentiary record developed in this case. (Ex. 3, Robbins Dep. 226:13–17; Ex. 4 (30(b)(6) Dep.) at 326:12–20, DE 547-3 at 82, 212.) He articulated no methodology for determining that this limited subset of documents was

representative of Fluor's performance as a whole, nor any basis for concluding that CPARS assessments alone could resolve whether a mission failure occurred. On this record, the opinions are not "based on sufficient facts or data," nor are they "the product of reliable principles and methods." Fed. R. Evid. 702(b)–(c).

Relators, by contrast, have adduced evidence that Fluor failed to disclose significant performance deficiencies to the Government, including internal audit findings acknowledging noncompliance with property-management requirements and practices designed to obscure those deficiencies from auditors. (*See* DE 512 at 9–14; DE 537 at 8–9.) Mr. Robbins did not account for this evidence or explain why it was excluded from his analysis. Such unexplained selectivity further widens the analytical gap between the materials considered and the conclusions offered. *See Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017).

Mr. Robbins's opinions that Fluor would not have been suspended or debarred are independently inadmissible. Suspension and debarment decisions involve discretionary judgments by government officials based on the totality of information available to them at the relevant time. Mr. Robbins identifies no reliable methodology for predicting how those officials would have exercised that discretion under hypothetical conditions, nor does he articulate any decision criteria that would permit such extrapolation. Absent such a method, these opinions rest on speculation and present an impermissible analytical gap between the limited facts reviewed and the conclusions reached. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 290–91 (4th Cir. 2021).

8

Accordingly, Mr. Robbins may not testify that there was no mission failure, that Fluor would not have been suspended or debarred, or that such enforcement actions were unlikely or unwarranted, whether framed as background facts, expert opinions, or ultimate conclusions.

### 3.   Opinions Regarding Government Consideration or Rejection of Enforcement Actions

Relators also challenge testimony suggesting that the Government was aware of certain issues, considered suspension or debarment, and affirmatively decided not to pursue those actions. (DE 547-1 at 10–13.)

Mr. Robbins may testify, at a general level, regarding the structure of suspension and debarment processes, including the roles of Suspension and Debarment Officials, the distinction between monitoring and adjudicative functions, and the manner in which allegations may be tracked while related litigation is pending. Such testimony may assist the jury in understanding an unfamiliar regulatory framework.

Mr. Robbins may not, however, testify that suspension or debarment consideration in fact occurred in this case, that Government officials evaluated the merits of the allegations and declined to act, or that enforcement options were affirmatively rejected. Mr. Robbins did not review the Suspension and Debarment Official's files, internal referral memoranda, or other materials that would reliably establish whether such consideration occurred, and portions of his own testimony reflect assumptions rather than documented factual determinations.

9

Opinions asserting what Government officials actually considered, decided, or intended therefore lack a sufficient factual basis and improperly speculate about Government decision-making. *See Moore v. Equitrans, L.P.*, 36 F.4th 240, 255–56 (4th Cir. 2022). Such testimony is excluded.

### 4.     Scope of Admissible Testimony

Consistent with the foregoing, Mr. Robbins may testify regarding:

- The general structure and operation of suspension and debarment and contractor-responsibility processes;

- The roles of Government officials and agencies involved in procurement-fraud oversight; and

- Factual descriptions of oversight mechanisms reflected in the record, without speculation as to unrecorded Government decisions.

Mr. Robbins **may not testify** regarding:

- Whether Fluor's conduct constituted fraud or noncompliance as a matter of law;

- Whether suspension or debarment would or should have occurred;

- Whether Government officials considered and rejected enforcement actions in this case; or

- Speculative conclusions regarding Government intent, motivation, or hypothetical decision-making.

### 5.     Ruling as to Mr. Robbins

Relators' motion is granted in part and denied in part as to David Robbins. The motion is granted to the extent set forth above and denied insofar as Mr. Robbins offers testimony consistent with Rule 702 and the limitations described herein.

## B.     Bill Walter

Relators seek to exclude portions of the testimony of Defendants' expert Bill Walter, contending that his opinions regarding inventory "counts" and related analyses are not based on a reliable methodology, rely on undisclosed assumptions, and improperly draw conclusions about Fluor's compliance with contractual or regulatory requirements. (DE 547-1 at 15.) The Court addresses these arguments below.

### 1. Qualifications

Fluor offers Bill Walter as an expert in government contracting, accounting, and data analysis. Mr. Walter is a Certified Public Accountant with more than forty years of experience in the accounting profession as it relates to entities performing under federal contracts and subcontracts. His professional background includes service as an auditor with the Defense Contract Audit Agency, where he conducted cost analyses and compliance reviews of Department of Defense contractors, as well as subsequent work in private practice advising contractors on compliance with the Federal Acquisition Regulation, the Defense FAR Supplement, and the Cost Accounting Standards. Mr. Walter also served in senior leadership roles at KBR, including as Senior Vice President for Government Compliance and Senior Vice President for Finance, and has extensive experience with cost-reimbursement contracts, including LOGCAP task orders. (DE 547-3 at 904–05.)

The Court finds that Mr. Walter is qualified under Rule 702 because of his education, licensure, and extensive professional experience to offer expert testimony concerning government-contract accounting practices, cost-reimbursement

structures, and the analysis of contractor financial and inventory data, including the mechanics of inventory-management databases and structured data queries.

In this case, Mr. Walter reviewed and analyzed inventory data extracted from Fluor's systems using SQL queries designed to identify transaction activity associated with inventory items during specified periods. (DE 559-8.) Mr. Walter is, therefore, qualified to testify regarding the structure of the underlying data, the design and execution of his queries, and the results those queries produced. Mr. Walter's analyses in this case were performed using data extracts, spreadsheets, and query code generated by a Fluor employee, and Mr. Walter's opinions are admissible only to the extent he can explain the bases for the data inputs and the assumptions embedded in the extraction and categorization of transactions reflected in his materials.

Mr. Walter is not, however, qualified to interpret contractual or regulatory requirements as a matter of law, to opine on whether Fluor's conduct satisfied contractual, regulatory, or statutory standards, or to draw legal conclusions regarding the compliance or materiality of inventory practices.

### 2.      Reliability of Inventory "Count" Methodology

Relators primarily challenge the reliability of Mr. Walter's opinions characterizing inventory items as having been "counted" within particular time periods, arguing that his analysis conflates database entries with physical inventory counts and rests on unsupported assumptions regarding compliance with inventory

requirements (DE 547-1 at 15–22).[1] Mr. Walter's analysis relies on SQL queries and spreadsheet outputs generated from Fluor's Maximo data that identify inventory lines associated with certain transaction fields or dates within specified fiscal years. (DE 559-8.) As Relators emphasize, however, the challenged opinions turn not on the mechanics of querying and summarizing data, but on how the underlying transactions were categorized as "counts" and the inferences drawn from those categorizations. (DE 547-1 at 15–22.)

The Court finds that the data-extraction methodology itself is sufficiently reliable for purposes of Rule 702. Mr. Walter explains the logic of his queries, the source tables reviewed, and the assumptions applied in extracting and summarizing the data (*id.*). To that extent, the methodology is transparent, reproducible, and capable of evaluation through cross-examination.

The Court also agrees with Relators that the record raises substantial concerns regarding whether Mr. Walter's report adequately discloses and explains the transaction categories treated as inventory "counts." Mr. Walter acknowledges that physical inventory counts in Maximo are typically reflected through Physical Count Adjustment ("PCOUNTADJ") transactions. (DE 547-1 at 15–18.) Yet his reported "count" totals incorporate additional entries described in the spreadsheets as

---

[1]     Dr. Gary Gaukler was offered by Relators as a rebuttal expert, and his rebuttal report was stricken in its entirety by prior order of the Court. (DE 541.) To the extent Relators' arguments concerning Mr. Walter reference or rely upon Dr. Gaukler's rebuttal opinions, the Court does not consider those opinions in resolving this motion. The Court's conclusions regarding the reliability and scope of Mr. Walter's testimony are based on the methodology reflected in Mr. Walter's own report and testimony and the arguments properly before the Court.

"creation of inventory balance record" or similar "inventory creation" activity—labels that function as catch-all categories rather than Maximo transaction types, and that may include receipts, transfers, automated system activity, or other inventory adjustments not necessarily associated with the performance of a physical count. (*Id*. at 15–20.) The materials attached to Mr. Walter's report do not consistently identify the underlying transaction types included within those catch-all categories, and Mr. Walter's report does not clearly break out what portion of the "count" totals is attributable to PCOUNTADJ transactions as opposed to these other entries. (*Id*.) These disclosure and categorization issues bear directly on whether the opinion that inventory was "counted" is reliably supported by the data and methodology described.

That said, the Court agrees with Relators that the conclusions Mr. Walter seeks to draw from that data exceed what the methodology can reliably support. The queries identify the presence of certain transactions or system entries; they do not establish whether physical inventory counts were performed in accordance with contractual or regulatory requirements. As Relators note, the challenged "inventory creation" categories may include system-generated activity and records associated with non-physical or virtual locations within the database, which—on their face—do not demonstrate that an on-the-ground physical count occurred. (DE 547-1 at 19–21.) Treating such data points as proof that inventory was "counted" in a substantive or compliant sense creates an impermissible analytical gap between the data reviewed and the conclusions offered. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 290–92 (4th Cir. 2021). Relators

14

correctly emphasize that contractual and operational inventory "counts" are process-driven events requiring physical verification and documentation, not merely the existence of transactional entries or system activity within an inventory database. (DE 547-1 at 16–18.)

Fluor responds that Mr. Walter's analysis reflects Maximo "business logic," under which the physical count date may be set either by a user-entered physical count adjustment or when an inventory balance record is created (including in connection with bin creation), and that Mr. Walter's categorization therefore captures instances in which a physical count occurred without a corresponding PCOUNTADJ entry. (DE 559 at 19–26; DE 559-8.) Whatever the operation of Maximo's data fields in the abstract, the issue under Rule 702 is whether the record and the disclosed methodology reliably support the inference that the non-PCOUNTADJ entries included in Mr. Walter's "count" totals correspond to the performance of physical inventories in practice. Mr. Walter does not identify supporting policies, procedures, or contemporaneous documentation establishing that each category of non-PCOUNTADJ activity included in his analysis reliably reflects a physical inventory count. (DE 547-1 at 18–22.)

Accordingly, Mr. Walter may testify regarding what the data reflects, including the existence and timing of certain transactions or entries, but he may not equate those data points with the performance, adequacy, or compliance of physical inventory counts.

### 3. Opinions Regarding Compliance or Significance of Inventory Practices

Relators also seek to exclude opinions suggesting that Mr. Walter's analysis demonstrates that Fluor complied with inventory-count requirements or that alleged deficiencies were immaterial or insignificant (DE 547-1 at 15–22). The Court agrees that such opinions are inadmissible.

Whether Fluor's inventory practices complied with contractual or regulatory obligations requires interpretation of governing requirements and assessment of operational practices beyond Mr. Walter's data analysis. Mr. Walter's methodology does not purport to test compliance, adequacy, or materiality, nor does it provide a reliable basis for such conclusions. Allowing these opinions would improperly transform technical data analysis into legal or normative conclusions reserved for the Court and jury. *See United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006).

Mr. Walter, therefore, may not testify that the results of his analysis demonstrate compliance with inventory requirements, the absence of significant deficiencies, or the legal insignificance of alleged inventory issues, notwithstanding Fluor's contention that such opinions go merely to weight (DE 559 at 20—26).

### 4. Scope of Admissible Testimony

Consistent with the foregoing, Mr. Walter **may testify** regarding:

- The structure and operation of Fluor's inventory databases, including Maximo;

- The design and execution of the SQL queries he performed;

- The data fields reviewed and the results generated by those queries; and

- The limitations and assumptions in the analysis.

16

Mr. Walter **may not testify** regarding:

- Whether inventory items were properly or adequately counted;

- Whether Fluor complied with contractual or regulatory inventory requirements;

- The materiality or significance of alleged inventory deficiencies; or

- Legal conclusions regarding Fluor's obligations or performance.

### 5.    Ruling as to Mr. Walter

Relators' motion is granted in part and denied in part as to Bill Walter. The motion is granted to the extent set forth above and denied insofar as Mr. Walter offers testimony limited to the technical data analysis and results described herein.

## C.    Mike Hoskin

Relators seek to exclude limited portions of the testimony of Defendants' expert Mike Hoskin. (DE 547-1 at 28.) Specifically, Relators argue that Mr. Hoskin should be barred from (1) offering testimony concerning the effect of Fluor's costs or staffing on award-fee determinations where he admits he did not consider those matters, and (2) opining that Relators' award-fee expert cannot possibly form a reliable opinion regarding how different or additional information might have affected award-fee outcomes. (DE 547-1 at 29.) The Court addresses these arguments below.

### 1.    Qualifications

Fluor offers Mike Hoskin as an expert in government contracting, logistics operations, and performance oversight in contingency environments. Mr. Hoskin served as an active-duty United States Army officer for thirty-three years, including around twenty-five years as a contracting officer and acquisition professional. His

17

career included senior leadership roles within the Defense Contract Management Agency and the Department of the Army, command of multiple contracting organizations, and extensive overseas deployments in support of contingency operations. (DE 547-3 at 1295–98.)

Mr. Hoskin's experience includes direct, hands-on responsibility for LOGCAP contracts across multiple program iterations. He served as a forward-deployed DCMA Commander and Administrative Contracting Officer for LOGCAP III in Iraq, where he managed contract performance, issued corrective actions, and hosted award-fee evaluation boards. He later held senior Pentagon-level positions overseeing contracting missions in Iraq and Afghanistan, authored and implemented operational contracting doctrine, and ultimately served as the Commanding General of the Expeditionary Contracting Command, with responsibility for all Army contingency contracting worldwide, including LOGCAP operations. He later served as the senior contracting official for the Army and as Director of Contracting for the U.S. Army Corps of Engineers. (*Id*.)

Relators do not meaningfully dispute Mr. Hoskin's general qualifications. The Court finds that Mr. Hoskin is qualified under Rule 702 to testify regarding the structure and operation of LOGCAP contracts, award-fee processes, and contracting practices in contingency environments. The admissibility of particular opinions therefore turns on the scope of those opinions and the bases on which they are offered.

## 2.   Testimony Concerning Costs and Staffing Not Considered or Disclosed

Relators contend that Mr. Hoskin should be barred from testifying about the effect of Fluor's costs or staffing levels on award-fee determinations because he admitted at his deposition that he did not consider those matters in forming his opinions. (Ex. 24, Hoskin Dep. at 109:9-13, 113:4-9, DE 547-3 at 1418; DE 547-1 at 29.)

Fluor responds that Mr. Hoskin does not offer any opinion about how individual performance factors—such as costs or staffing—would have affected Fluor's award fee, and instead expressly declined to speculate on that issue. (DE 559 at 31-32.)

The Court agrees with Fluor that Mr. Hoskin does not purport to offer a counterfactual opinion concerning how specific performance factors would have altered award-fee outcomes. To the extent Mr. Hoskin has disclaimed such opinions, he may not offer them at trial. An expert may not testify about opinions or subject matters that were not considered, formed, or disclosed in the expert report. *See* Fed. R. Civ. P. 26(a)(2); Fed. R. Civ. P. 37(c)(1).

Accordingly, Mr. Hoskin may not testify regarding how Fluor's costs or staffing levels affected, or would have affected, award-fee determinations, insofar as he admits he did not analyze or form opinions on those subjects. Such testimony is also unhelpful under Rule 702(a), as it does not apply specialized knowledge to assist the jury but instead instructs the jury on how competing expert opinions should be

resolved. This limitation reflects the scope of Mr. Hoskin's disclosed opinions and does not otherwise restrict his testimony concerning award-fee processes.

### 3.     Opinions That No Expert Can Determine Award-Fee Impact

Relators also seek to exclude Mr. Hoskin's opinion that "it is … impossible for anyone to determine whether Fluor would have received a different award fee" had different information been presented to the Award Fee Evaluation Board. (DE 547-3 at 1309.)

Fluor argues that this testimony does not address admissibility and instead constitutes permissible rebuttal, explaining—based on Mr. Hoskin's experience— that award-fee decisions are subjective, multifactorial, and difficult to reconstruct years later. (DE 559 at 32.) Fluor further contends that experts may critique the factual bases of opposing experts' opinions without offering alternative calculations. (*Id*. at 32.)

The Court agrees in part. Mr. Hoskin may testify, based on his experience, regarding the structure of award-fee processes, the discretionary and subjective nature of award-fee evaluations, and the practical difficulty of reconstructing how award-fee officials would have weighed particular information. Such testimony may assist the jury in evaluating competing expert opinions.

However, Mr. Hoskin may not testify that no expert can possibly form a reliable opinion on the issue. A categorical assertion of impossibility extends beyond critique of assumptions or methodology and risks encroaching on the Court's role as gatekeeper under Rule 702 by effectively instructing the jury that an entire category

of expert testimony is invalid as a matter of principle. Expert witnesses may explain why they disagree with another expert's premises or conclusions, but they may not opine on what expert testimony is legally or practically permissible in the abstract. *See United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006).

Accordingly, Mr. Hoskin may challenge the factual assumptions underlying Relators' award-fee expert's analysis and explain why, in his experience, award-fee decisions are difficult to reconstruct. He may not testify that it is impossible for any expert to form such an opinion.

### 4.    Scope of Admissible Testimony

Consistent with the foregoing, Mr. Hoskin **may testify** regarding:

- The structure and operation of LOGCAP award-fee processes;
- The discretionary and multifactorial nature of award-fee evaluations;
- General contracting and operational practices in contingency environments; and
- Experience-based explanations tied to the facts of this case and his disclosed opinions.

Mr. Hoskin **may not testify** regarding:

- The effect of Fluor's costs or staffing on award-fee determinations where he did not analyze or disclose opinions on those subjects; or
- Categorical assertions that no expert can form a reliable opinion regarding award-fee impacts.

### 5.    Ruling as to Mr. Hoskin

Relators' motion is granted in part and denied in part as to Mike Hoskin, consistent with the limitations set forth above.

**D.    J. Bradford Rice**

Relators seek to exclude discrete portions of the testimony of Defendants' expert J. Bradford Rice on the ground that certain opinions rest on undisclosed, off-the-record communications with Fluor's litigation consultant and corporate designee, Justin Jones, rather than on record evidence or a disclosed and reliable methodology. (DE 547-1 at 22–23.) Relators contend that, in forming these opinions, Dr. Rice merely adopts factual narratives supplied during those conversations without independently applying his economic or data-analytic expertise, thereby rendering the challenged opinions unreliable and unfairly insulated from meaningful cross-examination. The Court addresses these arguments below.

**1.    Qualifications**

Fluor offers J. Bradford Rice as an expert in economics, statistics, and quantitative data analysis. Dr. Rice is a Managing Principal at Analysis Group, Inc. and an adjunct professor of economics at Harvard University. He holds a Ph.D. in economics and has extensive academic and professional experience conducting empirical research, applying econometric and statistical methods, and analyzing large datasets. His work has been published in peer-reviewed journals, and he has taught courses in statistics, econometrics, and related fields. (DE 547-3 at 1190–91.)

Dr. Rice also has substantial experience providing expert consulting services in government investigations and litigation, including numerous matters arising under the False Claims Act. In that capacity, his work commonly involves extracting, validating, and analyzing data from enterprise systems and applying structured,

quantitative workflows—using tools such as SQL—to evaluate patterns, trends, and transaction activity within large datasets. (*Id.*)

Relators do not challenge Dr. Rice's general qualifications to testify as an expert in economics, statistics, or quantitative data analysis. The Court finds that, based on his education and professional experience, Dr. Rice is qualified under Rule 702 to offer expert testimony within those subject areas, including testimony concerning data extraction and quantitative analysis of enterprise system records.

The admissibility of particular opinions offered by Dr. Rice, therefore, turns not on his qualifications but on whether those opinions are based on sufficient facts or data and reflect a reliable application of his expertise, as discussed below.

## 2. Opinions Based on Undisclosed Communications with Fluor Personnel

Relators challenge discrete opinions offered by Dr. Rice on the ground that they are based in material part on undisclosed, off-the-record conversations with Fluor's litigation consultant and corporate designee, Justin Jones, rather than on record evidence or a disclosed and reliable methodology. Specifically, Relators contend that Dr. Rice relied on factual explanations supplied during those conversations— including explanations for unusually rapid response times and spikes in inventory transactions within Fluor's Maximo system—to support his conclusions, without independently verifying those explanations through documents, testimony, or quantitative analysis. (DE 547-1 at 22–25.)

Fluor responds that experts are permitted to rely on information provided by knowledgeable fact witnesses and that Dr. Rice's reliance on information from Mr.

23

Jones reflects a routine and acceptable practice in expert analysis. (DE 559 at 26.) Fluor further argues that any disputes regarding the accuracy of those factual explanations go to weight rather than admissibility. (DE 559 at 30.)

The Court agrees with Relators in part. Rule 702 permits an expert to rely on information supplied by others, including fact witnesses, but it requires that the expert's opinion be grounded in sufficient facts or data and reflect a reliable application of the expert's own specialized knowledge. An expert may not simply adopt and repeat factual narratives supplied by counsel or a party representative without demonstrating how those narratives were tested, verified, or analyzed using the expert's expertise.

Here, the record reflects that Dr. Rice relied on Mr. Jones's off-the-record explanations for critical factual predicates underlying certain opinions, including explanations offered to account for anomalous data patterns observed in Fluor's systems. Those conversations were not recorded, summarized, or otherwise disclosed in a manner that would permit meaningful evaluation of their content, and Dr. Rice acknowledged at deposition that he did not recall all of the details discussed and that only selected portions of those discussions were reflected in his report. (Ex. 20, Rice Dep. 136:17-23, 137:18-138:9, 62:24-64:6, 65:7-15, 66:6-11, DE 547-3 at 1225, 1242; DE 547-1 at 24.)

More importantly, Dr. Rice does not explain how he independently applied his economic, statistical, or data-analytic expertise to assess the accuracy of the explanations supplied by Mr. Jones. The challenged opinions do not reflect any

testing of alternative hypotheses, validation against contemporaneous records, or quantitative analysis demonstrating that the asserted explanations account for the observed data patterns. Instead, those opinions largely mirror the explanations provided during the undisclosed conversations, without an articulated methodological bridge between the underlying data and the conclusions reached.

Under these circumstances, the Court finds that the challenged opinions rest on an impermissible analytical gap between the facts considered and the conclusions offered. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281–82 (4th Cir. 2021). Where an expert merely adopts or repeats unverified factual assertions supplied by a party representative, without independently testing or applying specialized expertise to those assertions, the testimony lacks a reliable factual foundation and presents an impermissible analytical gap, rendering it inadmissible under Rule 702. *See TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 731–32 (10th Cir. 1993); *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142–43 (4th Cir. 1994).

Accordingly, Dr. Rice may not offer opinions that depend on undisclosed communications with Mr. Jones as the factual basis for explaining observed data patterns, where those explanations are not independently supported by record evidence or a disclosed and reliable application of Dr. Rice's quantitative expertise. Dr. Rice may, however, testify regarding analyses that are grounded in the data itself and that transparently apply reliable statistical or quantitative methods to that data,

25

without reliance on untested factual narratives supplied through off-the-record communications.

### 3.      Scope of Admissible Testimony and Ruling as to Dr. Rice

Consistent with the foregoing, Dr. Rice **may testify** regarding economic, statistical, and quantitative methodologies; the structure of Fluor's enterprise data systems; and the extraction, validation, and analysis of data from those systems, including the results of analyses that are transparently tied to the data reviewed and methods employed.

Dr. Rice **may not** offer opinions that merely repeat or adopt factual narratives supplied through undisclosed or off-the-record communications, nor may he present conclusions that are not the product of an independent and reliable application of his specialized expertise to record evidence. Testimony that functions as advocacy or that cannot be meaningfully tested through cross-examination is excluded under Rule 702.

Accordingly, Relators' motion is granted in part and denied in part as to J. Bradford Rice. The motion is granted to the extent Dr. Rice seeks to offer opinions that rest on undisclosed communications or unverified factual narratives supplied by Fluor personnel, and denied insofar as Dr. Rice offers testimony that reflects a reliable application of his economic and quantitative expertise to record evidence in accordance with Rule 702 and the limitations described herein.

### E.      Renee Richardson

Relators seek to exclude discrete portions of the testimony of Defendants' expert Renee Richardson on the ground that certain opinions rest on no discernible methodology and amount to little more than her personal interpretation of contract

language. (DE 547-1 at 12–13.) Specifically, Relators contend that Ms. Richardson offers opinions regarding the meaning and application of particular FAR and contract provisions despite conceding that she has no prior experience interpreting those provisions and did not consult any governing guidance, standards, or other sources typically relied upon in government contracting practice. (*Id*.) Relators further challenge limited opinions to the extent they rely on undisclosed, off-the-record communications with Fluor's corporate designee, rather than on record evidence or a disclosed analytical framework. (*Id*. at 22.) The Court addresses these arguments below.

### 1.    Qualifications

Fluor offers Renee Richardson as an expert in government contracting, contract administration, and oversight of large, complex federal contracts, including cost-plus-award-fee contracts in contingency environments. Ms. Richardson is a graduate of the United States Air Force Academy and served as a commissioned officer in the United States Air Force for more than twenty-nine years, retiring with the rank of Colonel. Following her military retirement, she served in the Senior Executive Service for the Air Force and has since worked as a senior acquisition subject-matter expert in industry. (DE 547-3 at 594–97.)

During her military and civilian service, Ms. Richardson held numerous senior leadership and contracting roles, including serving as a contracting officer with an unlimited warrant, commanding large contracting organizations, and overseeing billions of dollars in federal contracts worldwide. Her experience includes extensive

27

overseas deployments in support of contingency and combat operations, senior leadership positions within the Defense Contract Management Agency, and responsibility for administering and overseeing LOGCAP and LOGCAP-related contracts. She also participated in, organized, and chaired multiple award-fee boards, including for LOGCAP IV, and served in senior acquisition roles responsible for reviewing and approving major contract actions. (*Id.*)

Relators do not challenge Ms. Richardson's general qualifications to testify regarding government contracting practices, contract administration, and oversight mechanisms for large federal contracts. Based on her education and extensive professional experience, the Court finds that Ms. Richardson is qualified under Rule 702 to offer expert testimony within those subject areas.

The admissibility of particular opinions offered by Ms. Richardson therefore turns not on her qualifications, but on whether the challenged opinions reflect a reliable application of her expertise to the facts of the case and are grounded in a disclosed and reliable methodology, as addressed below.

## 2. Opinions Interpreting Contract Language Without a Reliable Methodology

Relators principally challenge Ms. Richardson's opinions interpreting specific FAR and contract provisions, including the meaning of "Contractor's managerial personnel" under FAR 52.245-1, on the ground that those opinions rest on no discernible methodology and amount to little more than her personal say-so. (DE 547-1 at 12–15.)

The record confirms that, in offering these opinions, Ms. Richardson conceded that she had no prior experience interpreting the provision at issue and did not consult any Department of Defense guidance, policies, interpretive materials, or other sources commonly relied upon in government contracting practice. (DE 547-3 at 627–28, (Richardson Rep) at 34–35.) Nor did she identify any principles of contract interpretation, comparators, or analytical framework applied to reach her conclusions. Instead, her analysis consisted solely of reviewing the text of the clause and offering a subjective assessment of how it should be understood. Ms. Richardson further acknowledged that she was "not sure" of her conclusions and framed them in expressly tentative terms. (DE 547-3 at 523, 556, Ex. 9 (Ruckdaschel Rep) at 10, 43; DE 547-3 at 638; Ex. 10 at 35 (Richardson Rep); DE 547-1 at 13.)

Rule 702 requires more than an expert's assurance that her conclusions are correct. Where an expert offers an interpretation of contractual language without applying any reliable principles or methods, and without grounding that interpretation in experience, guidance, or an articulated analytical framework, the opinion constitutes impermissible *ipse dixit* and is not admissible. *See Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142–43 (4th Cir. 1994).

Accordingly, Ms. Richardson may not offer opinions interpreting the meaning or application of contract or FAR provisions where those opinions are unsupported by any reliable methodology or articulated basis beyond her own subjective judgment.

### 3. Limited Reliance on Undisclosed Communications with Fluor Personnel

Relators also seek to exclude discrete opinions to the extent Ms. Richardson relied on off-the-record statements by Fluor's corporate designee, Justin Jones, regarding staffing challenges and deployment timelines, which she then used to opine that Fluor's staffing was reasonable. (DE 547-1 at 22.)

Rule 703 permits experts to rely on information of a type reasonably relied upon by experts in the field, but it does not permit an expert to introduce new factual narratives through undisclosed communications or to serve as a conduit for a party's version of disputed facts. *See United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009); *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195–98 (4th Cir. 2017).

To the extent Ms. Richardson's opinions are grounded in identified documents, deposition testimony, or other materials in the record, they are not excluded on this basis. However, opinions that depend materially on undisclosed, off-the-record communications with Fluor personnel, and that cannot be traced to record evidence or independently analyzed through her expertise, are not admissible under Rule 702 and Rule 703.

### 4. Scope of Admissible Testimony

Consistent with the foregoing, Ms. Richardson **may testify** regarding:

- General government contracting practices and acquisition principles;

- Contract administration and oversight processes for large federal contracts;

- The structure and operation of award-fee boards at a general level;

- The types of documentation and communications typically generated during contract performance; and

- Descriptive discussion of record evidence within her area of expertise.

Ms. Richardson **may not testify** regarding:

- Interpretations of contract or FAR provisions offered as expert conclusions where those interpretations are unsupported by a reliable methodology;

- Opinions that merely reflect her personal judgment or speculation as to the meaning of contractual language;

- Factual narratives derived from undisclosed communications with Fluor personnel; or

- Opinions that depend on assumptions not grounded in record evidence or independently analyzed through her expertise.

While Ms. Richardson may describe general government-contracting practices and how contracting officials typically approach oversight and administration, she may not instruct the jury on the legal meaning of specific contract or regulatory terms or supply an interpretation untethered to a disclosed methodology or interpretive framework.

### 5. Ruling as to Ms. Richardson

Relators' motion is granted in part and denied in part as to Renee Richardson. The motion is granted to the extent Ms. Richardson seeks to offer opinions interpreting contract or FAR provisions without a reliable methodological basis, or opinions materially dependent on undisclosed communications with Fluor personnel. The motion is denied insofar as Ms. Richardson offers testimony grounded in her experience and expertise concerning general government contracting practices and contract administration, and that reflects a reliable application of her expertise to record evidence consistent with Rule 702.

### F.     Thomas Ruckdaschel

Relators seek to exclude discrete portions of the testimony of Defendants' expert Thomas Ruckdaschel on the ground that certain opinions (1) offer unsupported interpretations of contract and regulatory language based on little more than his own say-so, (2) rely on undisclosed, off-the-record communications with Fluor personnel and counsel to supply critical factual predicates, and (3) improperly rest on credibility assessments that invade the province of the jury. (DE 547-1 at 12–15, 27.) The Court addresses these arguments below.

### 1.     Qualifications

Fluor offers Thomas Ruckdaschel as an expert in government property management and the policies and oversight mechanisms governing Government-furnished property and contractor property-management systems. Mr. Ruckdaschel has extensive experience in federal acquisition and Department of Defense contracting policy with a sustained focus on Government property management. (DE 547-3 at 514–17.)

His professional background includes service as the primary author of FAR Part 45 and the FAR 52.245-1 Government Property clause, as well as subsequent revisions. He also served as Deputy Director of Contract Policy at the Defense Contract Management Agency and authored DCMA instructions and guidebooks governing Property Management System Analyses. (*Id.*)

Relators do not meaningfully dispute Mr. Ruckdaschel's general qualifications to testify regarding the structure and administration of Government property policy and DCMA oversight practices. The Court finds that Mr. Ruckdaschel is qualified

under Rule 702 to offer expert testimony within those subject areas. The admissibility of particular opinions, however, depends on whether the challenged opinions are grounded in sufficient facts or data and reflect a reliable application of expertise, as discussed below.

### 2. Opinions Interpreting Contract or Regulatory Language Without a Reliable Methodology

Relators challenge Mr. Ruckdaschel's opinions interpreting the meaning and application of certain contract and regulatory terms, including the scope of "Contractor's managerial personnel" under FAR 52.245-1 and the meaning of "significant deficiency" under DFARS 252.245-7003(a), contending that these opinions are based on nothing more than his own subjective reading of the text. (DE 547-1 at 12–15.)

The record reflects that Mr. Ruckdaschel conceded he had not previously needed to interpret at least some of the contested language and did not identify any guidance, instructions, standards, or other interpretive materials consulted in reaching his opinions. He also expressed his conclusions in tentative terms, including that he was "not sure" who would qualify as "Contractor's managerial personnel" in the circumstances discussed. (DE 547-3 at 523, 556, Ex. 9 (Ruckdaschel Rep) at 10, 43.)

Rule 702 requires more than an expert's assurance that a particular interpretation is correct. Where an expert offers an interpretation of contractual or regulatory language without articulating any reliable principles or methods—such as reference to established guidance, interpretive practices in the field, or a discernible

analytical framework—and instead supplies a conclusory gloss untethered to an identifiable basis, the opinion constitutes impermissible *ipse dixit* and is inadmissible. *See Small v. WellDyne*, Inc., 927 F.3d 169, 177 (4th Cir. 2019); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The same is true where the opinion is expressly speculative or presented without reasonable certainty. *See Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142–43 (4th Cir. 1994).

Accordingly, Mr. Ruckdaschel may not offer opinions interpreting the meaning or application of FAR or DFARS provisions where those opinions are unsupported by a reliable methodology or articulated basis beyond his own subjective judgment, including opinions that are not anchored in any cited interpretive source, practice, or guidance and thus amount to a conclusory gloss on the text.

### 3. Opinions Based on Undisclosed Communications and Improper Credibility Assessments

Relators also seek to exclude opinions to the extent Mr. Ruckdaschel relied on undisclosed, off-the-record conversations with Fluor's corporate designee and litigation consultant, Justin Jones, and with a Fluor Audit Compliance team member, Minka Hill, and then used those communications to support factual narratives offered to the jury—including opinions regarding the operation and timing of Fluor's audit efforts and whether Fluor could have concealed information from DCMA auditors. (DE 547-1 at 22–27.)

Rule 703 permits experts to rely on information of a type reasonably relied upon by experts in the field, but it does not allow an expert to serve as a conduit for undisclosed hearsay or to introduce new factual narratives through private

34

communications that cannot be meaningfully tested. *See United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009). Where an expert's opinion depends materially on such communications to supply critical factual predicates, and the expert does not independently verify or analyze those predicates using a reliable method, the testimony is unreliable under Rule 702. *See Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281–82 (4th Cir. 2021); *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 731–32 (10th Cir. 1993).

In addition, Relators identify deposition testimony indicating that Mr. Ruckdaschel accepted the off-the-record statements of Jones and Hill as true and formed opinions based, at least in part, on his assessment that those individuals were credible. (DE 547-1 at 26–27.) Expert testimony that constitutes an evaluation of witness credibility is not admissible because it invades the province of the jury and risks substituting the expert's credibility assessment for the jury's own. *See United States v. Allen*, 716 F.3d 98, 106 (4th Cir. 2013).

Accordingly, Mr. Ruckdaschel may not offer opinions that (1) materially depend on undisclosed, off-the-record communications with Fluor personnel or counsel to establish disputed facts, where those facts are not otherwise supported by record evidence or reliably analyzed, or (2) expressly or implicitly rest on credibility determinations regarding fact witnesses.

### 4.     Scope of Admissible Testimony

Consistent with the foregoing, Mr. Ruckdaschel **may testify** regarding:

- The structure, purpose, and general operation of Government property management policy and DCMA oversight;

35

- How PMSAs are generally planned, conducted, and documented;

- The roles and responsibilities typically associated with property administrators, contracting officers, and related oversight functions; and

- General context concerning Government property accountability practices, so long as such testimony does not purport to resolve disputed facts or apply legal standards to those facts.

Mr. Ruckdaschel **may not testify** regarding:

- Interpretations of FAR, DFARS, or contract language offered as expert conclusions where the interpretation is unsupported by a reliable methodology and amounts to ipse dixit;

- Speculative or tentative interpretations presented without a reliable basis;

- Factual narratives derived from undisclosed, off-the-record communications with Fluor personnel or counsel; or

- Opinions that expressly or implicitly assess the credibility of fact witnesses.

**5.     Ruling as to Mr. Ruckdaschel**

Relators' motion is granted in part and denied in part as to Thomas Ruckdaschel. The motion is granted to the extent Mr. Ruckdaschel seeks to offer (1) contract or regulatory interpretations unsupported by a reliable methodological basis and presented as his personal gloss on the text, and (2) opinions materially dependent on undisclosed communications or on credibility assessments of fact witnesses. The motion is denied insofar as Mr. Ruckdaschel offers testimony grounded in his experience concerning Government property management policy and DCMA oversight practices and that reflects a reliable application of his expertise to record evidence consistent with Rule 702 and the limitations described herein.

## IV.    CONCLUSION

For the foregoing reasons, Relators' Daubert Motion to Exclude Defendants' Experts (DE 547) is **GRANTED IN PART and DENIED IN PART**.

In exercising its gatekeeping responsibility under Federal Rule of Evidence 702, the Court does not weigh competing expert conclusions or resolve factual disputes. Rather, it ensures that expert testimony presented to the jury is grounded in sufficient facts or data, reflects a reliable application of specialized knowledge, and does not intrude upon the roles reserved to the Court or the jury.

Consistent with the analysis above, the motion is **GRANTED** to the extent that Defendants' experts seek to offer testimony that:

- Interprets contractual, regulatory, or statutory provisions as a matter of law;

- Opines on whether Fluor's conduct complied with contractual, regulatory, or statutory requirements;

- Assesses the legal materiality or legal significance of alleged deficiencies;

- Speculates regarding Government intent, motivation, discretionary decision-making, or hypothetical enforcement outcomes, including suspension or debarment;

- Offers counterfactual opinions untethered to record evidence or unsupported by a disclosed and reliable analytical framework;

- Resolves disputed factual issues through express or implicit credibility assessments of witnesses; or

- Critiques the admissibility, legal sufficiency, or credibility of other expert witnesses, rather than addressing the factual bases or assumptions underlying their opinions.

The motion is **DENIED** to the extent Defendants' experts offer testimony that falls within their respective qualifications and reflects a reliable application of

37

experience, technical knowledge, or quantitative methodology, including testimony concerning:

- General government contracting, oversight, and contract-administration practices, where relevant to the expert's designated subject matter;

- Award-fee processes and evaluation structures at a general level, as offered by experts qualified and permitted to address those topics;

- Government property management frameworks and oversight mechanisms, including PMSAs, as background context;

- Quantitative and data-analytic methodologies and the results those methodologies generate, subject to the limitations described in this Order; and

- Experience-based explanations of industry or operational practices, when expressly tethered to record evidence and within the scope of disclosed opinions.

Each expert's testimony shall be limited as set forth in the Discussion above.

Nothing in this Order precludes the parties from raising appropriate objections at trial based on foundation, relevance, scope, or the manner in which testimony is presented.

**IT IS SO ORDERED**.

Joseph Dawson, III
United States District Judge

Florence, South Carolina
January 14, 2026