**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| United States of America, *ex rel.* Charles R. Shepherd, Danny V. Rude, Robert Scott Dillard, And Rickey Mackey<br><br>Plaintiff-Relators,<br><br>v.<br><br>Fluor Corporation, Inc., and Fluor Intercontinental, Inc.,<br><br>Defendants. | Case Number: 6:13-02428-JD<br><br>Honorable Joseph Dawson, III<br><br>JURY TRIAL DEMANDED |

**RELATORS' MOTION BRIEF REGARDING UNDISCLOSED CONTRACTS
WITH WITNESSES**

Unlike Relators' counsel (who admittedly freaked out upon learning at the very end of a two-day examination that the witness was being paid), the Court very wisely and appropriately made clear that it was not going to jump to any conclusions or make any decisions until it fully understood all of the facts. Things were moving fast, but with the benefit of more hindsight and deliberation, Relators' counsel now acknowledges that the Court was absolutely correct about the most appropriate way to proceed, and apologizes to the Court for essentially urging the Court to make rulings before the full facts were known.

Unfortunately, however, this Court still does not have all of the facts. Fluor is presently attempting to keep much of this information secret. What is already known, however, is beyond disturbing. Relief is warranted, including at a minimum an order compelling Fluor to stop stonewalling.

**BACKGROUND**

One week into trial, Relators' counsel asked Tony Montalvo, a key (and purportedly neutral) fact witness, why he had spent so much time preparing with Fluor for trial if he was not getting paid. To Relators' surprise, Mr. Montalvo looked over at Fluor's counsel—not the Court—and asked for permission to answer. After Fluor's counsel granted him permission, Mr. Montalvo revealed that Fluor was in fact compensating him for his time spent on the case. Trial Tr. Vol. V at 271:1–9 (attached as Exhibit A).

Fluor had never previously disclosed to Relators or the Court any agreement to compensate Mr. Montalvo. Indeed, just minutes earlier, Fluor's counsel had asked Mr. Montalvo if he "work[ed] for Fluor," and Mr. Montalvo answered unequivocally, "I do not work for Fluor." *Id.* at 159:7–9.

It is beyond troubling that Mr. Montalvo, a sophisticated witness, was unsure whether testifying truthfully under oath would breach his agreement with Fluor. It is even more concerning that, had Relators' counsel not asked, Fluor would have left the Court and the jury with the distinct impression that Mr. Montalvo had no financial relationship with Fluor.

It turns out, Mr. Montalvo had entered into an independent contractor agreement with Fluor covering his testimony in this case. Montalvo Contract (attached as Exhibit B). After Montalvo left the stand, Fluor revealed that it had entered a written agreement to compensate Montalvo for his time. In response to Relators' requests to provide the contract, Fluor at first took the position that it was under no obligation to do so because Relators supposedly never previously asked for the contract. Email Exchange at 4 (attached as Exhibit C). The next morning, before Relators raised the matter with the Court, Fluor reconsidered and produced three such contracts to compensate fact witnesses scheduled to testify that week: Mr. Montalvo, David Methot, and Bradley Hamm, the latter of whom also expressed a head-scratching commitment to Fluor's case, even to the point of disavowing his own very clear emails—all while professing his supposed neutrality.

These contracts are no ordinary "witness agreements." They are independent contractor consulting agreements, limiting total witness-compensation to 1,000 hours (at $250/hour) per year in connection with the trial. They affirmatively obligate the witness to make himself available at Fluor's beck and call to review whatever documents Fluor wants him to review, on demand.

Most objectionable of all, the purported witness agreements include a nondisclosure clause that by its plain terms prevents these fact witnesses from disclosing to anyone (including the Court and jurors) any facts that Fluor has not authorized them to disclose. The only consideration provided in exchange for this nondisclosure term governing participation in this jury trial is cash.

And that is only what Relators have discovered so far. It appears that these three contracts are just the tip of the iceberg, and Fluor refuses to let Relators and the Court look underwater. Apparently, an unknown number of other fact witnesses in this case were also hired as independent contractors for Fluor in connection with their testimony. Based on the three "consulting" agreements Fluor has shared to date, at least two of these witnesses testified falsely at their depositions that they do not work for Fluor. Nor were they corrected at those depositions by Fluor's counsel, who knew at the time that they did.[1]

Remarkably, Fluor has now communicated that it is unwilling to even identify every fact witness at this trial whom Fluor has locked up with non-disclosure agreements covering his testimony. Fluor has not even disclosed all of the "witness agreements" it entered into with these three witnesses, as Relators learned when Mr. Hamm referenced yet another one on the witness

---

[1] At his deposition, Mr. Methot testified that he stopped working for Fluor in 2019, had never held another position at Fluor after that, and had completely retired. *See* Methot Dep. Tr. at 21:18–25 (attached as Exhibit D). Likewise, Mr. Hamm testified that at the time of his deposition, he worked for a company called Leidos and had not worked for Fluor since late 2022. Hamm Dep. Tr. at 10:16–17, 15:11–16:14 (attached as Exhibit E). As stated, when they gave that false testimony, Fluor's counsel did not attempt to correct or clarify either of their representations in real time or anytime afterwards—yet later told the Court that Relators supposedly never asked.

stand. And though Fluor does claim to be working on disclosing the amounts paid, Fluor inappropriately refuses to produce as single document "relating to requests for payment or [sic] such as invoices" setting forth whatever services these fact witnesses billed and were paid for. Ex. C at 1.

These are enormously significant developments in an enormously significant case, a case which itself involves allegations of undisclosed fraud and corruption. Not only does this jeopardize Relators' ability to get a fair trial, but it implicates the very integrity of the judicial system. Relief is warranted.

**ARGUMENT**

## I.     The NonDisclosure Independent Contractor Agreements In This Case Are Not The Normal Types Of Agreements To Reimburse Fact Witnesses For Their Time

What Fluor refers to as "witness agreements" are formal consulting agreements with nondisclosure provisions. The only consideration for the witnesses' silence is payment for preparation, consulting, and testimony time.[2]

The contracts obligate the fact witnesses to perform services for Fluor in order to receive the money. The witness is affirmatively obligated to make himself "reasonably available for assistance . . . related to the litigation, as may be requested by the Company." Ex. B at 1. That time is compensable as "consulting compensation." *Id.* at 2. Should the witness decline to meet with Fluor and review the documents Fluor chooses to put in front of him, the witness is in breach of the terms and does not get paid.

### A.     The Payments At Issue Are Unusual And Extraordinary

---

[2] They do not qualify as "reimbursement" agreements, because witnesses are "reimbursed" for out-of-pocket expenses, such as travel. Nor are these witnesses being reimbursed for lost wages, because two of the three whose agreements have been disclosed to date are unemployed and the third (Mr. Montalvo) is already on a salary for another employer. These witnesses are being "compensated" for the value of their time, just like Rule 26 experts.

Because Fluor has refused Relators' requests for information such as invoices, the Court cannot yet know exactly what the witnesses are being compensated for, or for how many hours. The cases upon which Fluor relies contemplate a reasonable number of hours spent meeting with counsel to prepare and then testify. These witnesses, by contrast, may well be billing 24/7 for indeterminate time periods, including any time spent thinking about the case. It is all troublingly unclear.

What is clear, though, is that these are not just payments for a few hours of time at a reasonable rate. The contracts provide a 1,000-hour cap on the number of hours that can be billed annually, limited to 125 hours per month. One thousand (1,000) hours. It is difficult to see that as anything other than a deliberate and gratuitous carrot to encourage generous billing. In the case of Mr. Hamm, for example, he would not commit in front of the jury to an upper limit on how many hours he was going to claim. If Fluor wins, there is nothing stopping him from sending an invoice for hundreds of hours.

We are thus apparently talking about witnesses like Mr. Montalvo receiving as much as ten or twenty thousand dollars, or more, for nothing other than services associated with testimony. If other witnesses were paid similarly, the collective amounts could well be without precedent in the history of the American judicial system (bribery cases excluded).

To its considerable credit, this Court has consistently assumed the best about everyone's intentions. But sometimes (particularly in a case involving allegations of massive corporate fraud) people can take advantage. That appears to be the case, for example, with Mr. Montalvo. Fluor belatedly revealed to Relators that he had been in town for a week, despite being the one witness who actually testified on the day he was originally scheduled to be called. That means either (a) that

he spent a lot more time preparing with Fluor's counsel than he revealed; or (b) he was billing Fluor at $250/hour for a lot of his time, possibly at 24 hours a day. The jury did not have the full story.

### B. Contrary To The Model Rules Upon Which Fluor Purports To Have Adapted These Contracts, Payment Under These Contracts Is Improperly Conditional

The contracts contain several other objectionable provisions. For one thing, Fluor compensates witnesses only if they provide testimony that is somehow both "truthful" and "approved" by Fluor. Ex. B at 1–2. Fluor's counsel claimed these agreements were drafted carefully to mirror the ABA rules, but neither the ABA rule nor South Carolina's analogue endorses compensating witnesses for "approved" or "truthful" testimony. ABA Formal Op. 96402 at 1–3 (Aug. 2, 1996); *see Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters NonMarine Ass'n*, 865 F. Supp. 1516, 1524–25 (S.D. Fla. 1994) (finding that an agreement to pay witness for "truthful" testimony violated analogous professional responsibility rule in light of the common law), *aff'd in part*, 117 F.3d 1328 (11th Cir. 1997).

While this qualifier sounds innocent enough, it is easy to see why it perverts justice in a civil case. Fluor obviously liked Montalvo's sworn deposition testimony, and effectively paid him to stick to it. Thus, for example, when Montalvo checked the wrong box on adverse examination about whether Fluor was required to follow the MMP, Fluor was able to get him to revert to his prior sworn testimony, lest he be accused of being "untruthful" (the original testimony, after all, was sworn) and thereby forfeit his right to be paid. *See* Ex. B at 1. That is why requirements for "truthful" testimony are not appropriate in civil cases. *See Golden Door*, 865 F. Supp. at 1524–25; *In re Kien*, 372 N.E.2d 376, 379 (Ill. 1977) ("It is realistic to assume that defense lawyers will not pay policemen for 'truth' which does not favor their clients."); *New York v. Solvent Chem. Co.*, 166 F.R.D. 284, 289 (W.D.N.Y. 1996) (collecting cases).

As one court put it, paying "a witness to 'tell the truth' is as clearly subversive of the proper administration of justice as to pay him to testify to what is not true." *Solvent Chem. Co.*, 166 F.R.D. at 289 (citation omitted). And in a case that the Fourth Circuit has never overruled, it held that "[a]ny agreement to pay" witnesses more than "the fees provided by law" is "void as lacking in consideration and also as contrary to public policy." *Alexander v. Watson*, 128 F.2d 627, 630 (4th Cir. 1942). Fluor's contract with its hired fact witnesses goes much further than these cases and the professional rules contemplate. *See Goldstein v. Exxon Rsch. & Eng'g Co.*, No. No. Civ. 952410, 1997 WL 580599, at *1–2 (D.N.J. Feb. 28, 1997) ("commentators agree" that "any contract to pay a fee for testimony" beyond reasonable compensation for time spent "is unenforceable as against public policy and for lack of consideration"); *accord Consol. Rail Corp. v. CSX Transp., Inc.*, No. 09cv10179, 2012 WL 511572, at *8 (E.D. Mich. Feb. 16, 2012).[3]

### C.     These Contracts Improperly Prohibit Fact Witnesses From Disclosing Facts Not Approved By Fluor

Most extraordinary of all, the contract places limits on what witnesses can disclose to people outside of Fluor, including the Court and jurors. Fluor is going to try to insist that is not what these consulting agreements say. But the uncomfortable reality is that they do. Granted, they were created by a highly respected law firm, lending a presumptive imprimatur of legitimacy. And they have clearly been drafted with the utmost precision and care. But the plain reading of these Compensation Agreements is just as described above. Here is the sentence at issue (with one clause of irrelevant legalese deleted):

---

[3] As a general matter, it is not clear why the ABA rules or South Carolina's professional responsibility rules should trump *Alexander* and the common law. Those professional responsibility rules all state that paying fact witnesses is proper only if it is "consistent with the law of the jurisdiction." See ABA Formal Op. 96402 at 1–3 (Aug. 2, 1996); *see also* S.C. Ethics Advisory Op. 9742 at 2. If anything, then, *Alexander* and the commonlaw rule against paying witnesses for "truthful" testimony carry the day.

> The Witness agrees that any information which he or she obtains in connection with this Agreement concerning the business operations of the Company . . . shall be used only to perform such services **and** shall not be disclosed to **anyone** [i.e., including jurors or the Court] outside the Company, except with the prior written authorization of the Company.

See Ex. B at 2 (bracketed alteration added).[4] The next sentence extends the prohibition against disclosing even further, covering all written documents provided by Fluor to the witnesses. *Id.*

The next paragraph is even more damning. To cover itself, Fluor carves out whistleblower activity. In other words, Fluor knows exactly what it is doing, and both wants to (a) lock employees into silence; and (b) not ever be accused of silencing whistleblowers. The problem is that while the carve-out exempts whistleblowing activity and complaints to government agencies, *it does not carve out witness testimony at trial before jurors.* Trial testimony remains covered by the non-disclosure language set forth above.

The plain reading of this provision is that a witness breaches his contract with Fluor if, at trial, he discloses "any information" Fluor provided him about its "business operations" during preparation, the disclosure of which Fluor does not authorize in writing. *Id.*

Even if Fluor were correct that the language does not mean what it says (which Fluor is not), witnesses certainly could reasonably read the contract that way and believe that in order to receive promised compensation, they cannot reveal on the witness stand certain potentially incriminating information provided to them by Fluor, notwithstanding their oath to tell the truth. That the provision means just what it says is further confirmed by the witnesses' failure to disclose at their

---

[4] The full text of the sentence provides: "Confidential Information. The Witness agrees that any information which he or she obtains in connection with this Agreement concerning the business operations of the Company, its affiliates or third parties with whom the Company does business (including, but not as a limitation, technical information) shall be used only to perform such services **and** shall not be disclosed to anyone outside the Company, except with the prior written authorization of the Company." *Id.* (emphasis still added).

depositions (and Fluor's counsels' failure to correct them) that they had contracts with Fluor despite questions to which this would have been responsive.

The language says what it says. Fluor attempts to soften it with the recitals about how the "Company is not seeking to influence the Witnesses' testimony" and payment is "not contingent" on the substance or outcome, and must be "truthful." *Id.* at 1. Fluor's insistence notwithstanding, none of those recitals or disclaimers contradict or override the contract's non-disclosure provision. They are not inconsistent. Payments can both be "not contingent on substance or outcome" *and* only paid if the witness does not violate the term forbidding disclosure of company secrets.

Fluor insists that Relators' reading of the contract is implausible. But once again, this is not a hypothetical scenario. In court, Mr. Montalvo, an experienced professional, appeared genuinely confused by whether Fluor would allow him to testify truthfully under oath on the stand. That is why he asked for Fluor's approval to talk about the existence of the contract. These contracts are on Fluor letterhead and filled with legalese, and witnesses like Mr. Montalvo are not lawyers.

As Fluor correctly notes, the ABA's rule states that lawyers may pay fact witnesses "for time spent attending a deposition or trial or in meeting with the lawyer preparatory to such testimony" in certain circumstances. ABA Formal Op. 96402 at 1–3 (Aug. 2, 1996). Likewise, South Carolina's rules of professional responsibility allow payments to witnesses "made solely for the purpose of compensating the witness for the time the witness has lost in order to give testimony in litigation." S.C. Ethics Advisory Op. 9742 at 2. Neither these rules nor any case Fluor cites allows an agreement that compensates witnesses (a) only for testimony that is somehow both "truthful" and "specifically approved," (b) only for testimony that does not reveal company secrets without Fluor's authorization; and (c) conditions payment on the witness being willing to serve as

an ondemand case consultant to review any documents Fluor wants to show him for as long as Fluor wants to meet with him.

The consequences here are very real. Had Relators known that Mr. Montalvo worked as a paid consultant for Fluor subject to a nondisclosure agreement, they may not have even chosen to call Mr. Montalvo as one of their first fact witnesses. Having done so, they certainly would have elicited the truth about his allegiance and testimonial constraints before the jury heard two days of testimony.

As another example of how this development is infecting these proceedings, Fluor's counsel took seven (7) different off-the-record breaks during Mr. Methot's deposition to discuss documents immediately before Mr. Methot testified about them, and then instructed him not to answer what was discussed. Ex. D at 53:12–54:9, 149:10–22, 165:24–167:8, 182:9–22, 187:23–188:11, 209:12–24, 221:24–222:12. Fluor's counsel did so despite not representing Methot. *Id.* at 53:23–54:6. In light of the newly disclosed Compensation Agreement, this is all incredibly troubling. Fluor could very well have been telling Methot he was not authorized to reveal something pursuant to the term of his agreement. Meanwhile, Mr. Methot repeatedly answered that he could not remember certain events, even while admitting he spent two full days preparing for his deposition and reviewed as many as 50 documents. The fact that Mr. Methot was actually working incognito for Fluor as an independent contractor bound by a nondisclosure agreement calls into question the legitimacy of the entire process.

The risk of corruption of the judicial process associated with payments to witnesses for silence cannot be understated. Jury trials are one of the greatest features of our democracy. They should not be permitted to become auctions to see which side would pay witnesses more. *See United States v. Donathan*, 65 F.3d 537, 539–40 (6th Cir. 1995).

No one, including Fluor, would even attempt to defend the proposition that a party can simply offer to pay a witness $20,000 to support their side. That is patently offensive. Actually, it is a crime. If Relators had offered $20,000 payments for any witness willing to sign a "truthful" declaration, they would likely be sent to prison. Fluor insists that is not what is going on here. But, as discussed below, Relators and the Court do not yet know how much money is involved, how far back this goes, and how many trial witnesses have been compromised (and lied about it).

## II.    Fluor Is Presently Taking The Position That It Will Not Provide Invoices Or Other Documents Relating To Any Trial Witnesses, And Will Only Provide Contracts For Some

As the Court made clear, if there was ever a question about whether Relators were interested in knowing the facts about witnesses' compensation agreements, there is no longer any ambiguity. After the Court suggested it, Trial Tr. Vol. VI at 235:19–237:17 (attached as Exhibit F), Relators promptly asked in writing for all agreements with any witness in the case, the amounts of the payments, and all documents and invoices related to the payments. Fluor responded, in writing, that it was working on providing the amounts, but would not produce much of the other requested information. Ex. C at 1.

### A.    Fluor's Continued Nondisclosure

The "scare quotes" around "secret payment agreements" and "secret payments" now need to come off. Fluor has in fact entered into secret payment agreements, and has made secret payments. That is the present state of the record, as Fluor continues refusing to disclose which witnesses it has paid, how much it has paid them, and for what services.

The Court is thus presently conducting a jury trial where (now two weeks in) one party is refusing to provide to the other side (a) all of the agreements it has entered into to compensate fact witnesses; (b) the identities of all possible trial witnesses with whom it has reached such agreements

(so Relators can decide who they want to call or not call); and (c) documents and invoices relating to the witness payments, including for two whom the jury has already heard testify—and who told improbably proFluor stories.

It is also now clear that Fluor has not been forthcoming even about the witnesses who already testified. After Mr. Montalvo made his revelation, Fluor disclosed three contracts with witnesses, including one that it represented was for Mr. Hamm, the witness who disavowed his prior written statements about rampant fraud in Afghanistan. See PX 44 (email from Juan Jones to Tony Montalvo regarding Brad Hamm's statements about Fluor's fraud) (attached as Exhibit G). Based on this disclosure, Relators could hardly have been faulted for believing that Fluor was providing all of the relevant agreements for these witnesses.

It turned out, however, that Fluor was still hiding the ball. After Mr. Hamm was almost done testifying, he was forced to admit in response to questioning that there was actually another such contract that had still not been disclosed for his deposition time. Fluor has not produced that second agreement, and has opposed Relators' request for all invoices and past payments made to Hamm.[5]

Fluor undoubtedly heard the Court say that if there was previously a doubt, the information has now been unambiguously requested. Having heard that, Fluor is nonetheless refusing to provide some very critical information. There is something very serious going on here. This is a highstakes trial. Witnesses are getting paid by the Defendant under terms that may affect their neutrality and testimony, and one side is presently refusing to reveal information about it. And most important of all, the jury evaluating the witnesses' testimony does not have the facts.

---

[5] Mr. Hamm's belatedly provided contract is dated December 1, 2025. Oddly, Mr. Methot's is not effective until March 1, 2026, which has not yet even arrived, suggesting Fluor has not provided the current agreement. Mr. Montalvo's became effective on November 1, 2025. These agreements are all set to oneyear terms, which begs the question whether there were additional contracts with these witnesses for years past.

**B.      Fluor's Continuing Refusal To Reveal These Agreements And These Payments To The Court Is Corrupting This Jury Trial**

What has happened here is aggravated by the fact that Fluor attempted to conceal all this from the Court and Relators' counsel, and was only caught when the Relators fortuitously discovered it. If Fluor thought this was legitimate, it surely would have put it on the table long ago.

There were multiple opportunities where Fluor could and should have done so. The very first discovery requests sought anything relating to the claims and defenses in the case. See Relators' First Request For Production 37 (attached as Exhibit H). That plainly covered Fluor's consulting contracts with witnesses it contemplated may testify against Relators. Parties to litigation are under a continuing obligation to supplement responses to RFPs, *see* Fed. R. Civ. P. 26(e), but Fluor never divulged the existence of such agreements in the first place, *see United States v. Cinergy*, No. 1:99CV1693LJMJMS, 2008 WL 7679914, at *14 (S.D. Ind. Dec. 18, 2008). Rule 26 of course requires disclosure of all information about payments, and while the Rule is obviously limited to experts, that is only because there is no such thing as secret fact-witness payments. When designing the Federal Rules, Congress did not provide for any such thing.

But perhaps more obviously, Fluor should have disclosed these agreements every time it heard a fact witness state falsely under oath during depositions that he did not work for Fluor, including Mr. Montalvo, Mr. Hamm, and Mr. Methot. *See* Montalvo Dep. Tr. at 148:3–5 (attached as Exhibit I); Ex. D at 21:18–25 (Mr. Methot); Ex. E at 10:16–17, 15:11–16:14 (Mr. Hamm). Fluor's counsel did not attempt to correct or clarify the record in any of these depositions, despite knowing that all three had consulting contracts, and despite knowing that Relators' counsel did not know that. Indeed, Fluor's counsel asked Mr. Montalvo at trial if he worked for Fluor, and did not correct the record when Mr. Montalvo said he did not. Ex. A at 159:7–9.

13

The extent of the nondisclosure—and accordingly, the prejudice to Relators—may well be much greater than is currently known. At least eight other fact witnesses testified at depositions that they no longer work for Fluor, and Fluor has indicated that it has enough contracts with potential witnesses that locating them all will take considerable time.[6]

Fluor also could and should have disclosed this information during briefing on the motions *in limine*. For instance, Relators filed a motion to set ground rules for how the parties were going to handle the payment of travel arrangements, all of which were mutually disclosed. Dkt. 596 at 35 (Relators' MIL No. 19). That certainly would have been a good place for Fluor to note that, by the way, we have made what are likely tens of thousands of dollars in compensation for the same witnesses' time preparing, testifying, and consulting.

Fluor also brought an unusual motion *in limine* seeking permission to lead witnesses, prompting a debate about which witnesses were neutral and which were aligned with Fluor. Dkt. 591 (Fluor's MIL No. 4). On this occasion and others, Fluor has repeatedly made the point that the witnesses in question are "former" Fluor employees whom Fluor's counsel does not represent. The

---

[6] At least eight other potential fact witnesses in this case testified that they do not work for Fluor while Fluor's counsel stood by silently. It seems now that some or all of these witnesses may also be working as independent contractors for Fluor under similar terms as those of Mr. Montalvo, Mr. Hamm, and Mr. Methot. *See, e.g.,* Ramirez Dep. Tr. at 16:20–25, 18:5–8 (attached as Exhibit J) (testifying that he is currently employed by another company, and that he worked as a contractor for Fluor only from 2009 to 2017); Whitcomb Dep. Tr. at 9:17–10:4 (attached as Exhibit K) (testifying that he is "currently unemployed" but his "last employment" was with Fluor, ending in 2018); Rabb Dep. Tr. at 34:18–35:3 (attached as Exhibit L) (testifying that he was "now retired from Fluor," after he "stop[ped] working for Fluor" in "[a]round 2015"); Gross Dep. Tr. at 95:23–96:4 (attached as Exhibit M) (testifying that his "last position" with Fluor was in 2020, that he has "not worked for Fluor" since 2020, and that now, he does "some consulting work"); Ridley Dep. Tr. at 10:18–11:7 (attached as Exhibit N) (testifying that he "separated from Fluor" in 2020, has not been employed since then, and cannot "recall" whether he has "ever signed a confidentiality agreement with Fluor"); Roesler Dep. Tr. at 12:24–25 (attached as Exhibit O) (testifying that he is not "currently with Fluor"); DeYoung Dep. Tr. at 18:7–13 (attached as Exhibit P) (testifying that he "was done with Fluor," and "since working for Fluor," had been working in "landscape management"); D'Arcangelo Dep. Tr. at 285:11–18 (attached as Exhibit Q) (testifying that he "retired from Fluor" and "can't speak for Fluor as a company").

duty of candor to the Court required Fluor to mention that the witnesses it sought to lead whom Fluor "did not represent" were actually on their payroll. Without knowing the full picture, the Court denied Relators' request to bar Fluor from leading its former employees, even on cross. Dkt. 650 at 10 (Court's ruling); Dkt. 624 at 3 (Relators citing cases holding that such ground-rules can be appropriate under certain circumstances). The result was the Montalvo two-day "yes, sir" litany. If the Court had been fully apprised that Montalvo had entered into a nondisclosure contract and been paid five figures in connection with this testimony, it might have made a different decision about Relators' motion to bar Fluor from leading a witness it hired.

Even setting aside whether Fluor was obligated to share the information with Relators, there should be no dispute that it was obligated to share it with the Court at a jury trial. These witnesses are all effectively operating under a "nondisclosure" agreement, although a unique one. The terms of this nondisclosure agreement broadly cover not just legitimate trade secrets, but quite possibly anything harmful to Fluor's case that Fluor does not expressly authorize the witness to disclose. At the very least, the Court is entitled to know about the existence—and the metes and bounds—of Fluor's contractual relationships with fact witnesses. Even in actual trade secrets cases, parties are obligated to show the court proprietary information so the court can properly adjudicate. *See Pratt & Whitney Canada Inc. v. United States*, 14 Cl. Ct. 268, 275 (1988).

When Relators' counsel asked witnesses questions calling for harmful information that Fluor may have shared with them, the Court undoubtedly expected the witnesses to answer truthfully, whereas Fluor and the witnesses understood that the witness was supposed to only reveal information that Fluor expressly authorized them to reveal. Fluor was 100% aware when these witnesses took the stand and swore to tell the truth that this Court did not know about this restriction. The witnesses and the Court were thus operating under different assumptions. Hence the

fiasco that arose when Relators' counsel stumbled on to the issue. Counsel asked Mr. Montalvo (who purported to be neutral) why he spent so much time getting ready with Fluor if he was not getting paid. The record will reflect that Montalvo looked over at Fluor's counsel (not to your Honor) for permission to answer the question. To state the obvious, the Court is supposed to be in charge of what witnesses are allowed to say or not say at a jury trial, not Fluor's counsel. But that would have required Fluor to have been forthcoming about the existence of these agreements.

No one wants to unfairly accuse anyone of anything. The full facts about Mr. Montalvo's agreements and payments are still unknown, as are those about other fact witnesses. Albeit, they are still unknown only because Fluor is inappropriately refusing to share them. But it may yet turn out that Mr. Montalvo and counsel declined to mention during Mr. Montalvo's testimony that he had *already been paid* in connection with consulting with Fluor on this case pursuant to this or some other contract. If so, that is another big problem.[7]

### C.    This Evidence Is Extremely Probative To Scienter

When the Court indicated that Relators' counsel was requesting this information, Fluor's counsel indicated he had to "consult with [his] client." Ex. F at 12:16–18. In other words, with Fluor itself. Counsel suggested at the time that it was going to be a significant undertaking to even try to figure out how many former Fluor employees had contracted with Fluor about the allegations in this case or received payments.

---

[7] When counsel for Fluor asked the Court at a sidebar for permission to recross on this point, Relators' counsel objected that it was unfair to permit it while only Relators (and not Fluor) were in the dark about the true state of affairs. Relators did not even yet know, for example, that there was a formal written agreement. Over Relators' objections, the Court permitted the recross, and overruled a leading objection, leaving Fluor in full control to put the facts on the table. What Fluor elicited gave the jurors the impression that the only agreement for payments was in connection with preparing for trial (which was just a day and a half, according to Montalvo). That may or may not turn out to be accurate. In a case that may well turn on Montalvo's credibility, these are not collateral points.

What sense does that make? Trial counsel should be able to say immediately which potential trial witnesses have been paid cash to prepare their testimony, simply by forwarding emails. The clear implication is that Fluor itself is the one who reached these agreements to pay these employees, not trial counsel. That inference is supported by the fact that the contracts are between the compensated witnesses and a whollyowned Fluor entity called FDEE Consulting, Inc.

This is essentially a trial about fraud and concealment of material facts. To sustain their burden of proof, Relators are required to prove that Fluor executed a plot to defraud the government, no matter how offputting the allegation. The number, scope, and duration of Fluor's NDA contracts with potential witnesses are highly probative as to Relators' claims. Consider the question of when Fluor began executing these agreements—a question Fluor has heretofore resisted answering. If Fluor's independent contractor agreements with current and former employees date as far back as the 2010s, a jury could reasonably conclude that after Fluor received the CID request for documents from the Department of Justice, Fluor set out to buy the silence of former employees with knowledge of the facts.

Corporations cannot talk or be deposed, but it would be difficult to imagine more probative circumstantial evidence in a fraud case. If it turns out that Relators are right about this, then Fluor responded to the DoJ inquiry prompted by this *qui tam* by attempting to buy the silence of all of the employees with knowledge about where the bodies are buried. These agreements put former employees back on the payroll (even if they have new jobs), pay them for asyet unknown services, and obligate them to keep company secrets (albeit expressly carving out their right to exercise whistleblower rights in order to maintain at least an illusion of propriety).

Without full information, it is too early to determine whether that is what is really going on here. But if Fluor started signing these contracts in the time period of the DoJ investigation, then a

reasonable jury could infer it was not simply compensating witnesses for a few hours of deposition

prep time, as Fluor has suggested and this Court undoubtedly properly assumed. If Fluor was

instead buying silence, or if a reasonable jury could conclude that it was doing so, then this is

extremely important evidence of scienter. And to quote the last witness, Heather O'Connell, if there

is nothing to hide, then why was it hidden? *See, e.g., Constr. Laborers Pension Tr. for S. Cal. v.*

*CBS Corp.*, 433 F. Supp. 3d 515, 548–49 (S.D.N.Y. 2020) (corporate agent's efforts to "buy silence

from potential accusers" was "circumstantial evidence of [corporation's] scienter").

## III.    Relief Sought

Given the foregoing, the relief sought by the Relators includes but is not limited to the

following:

### A.    Bar Fluor From Calling Any Witness For Whom They Have Not Already Provided Contracts

The Court helped make clear to Fluor that Relators were requesting this information. Fluor

has made equally clear it is not willing to produce it. The Court does not need to save Fluor from

itself and its own choices. It should require Fluor to disclose the identities of every witness with

whom it has any asyet undisclosed agreement and/or to whom it has paid undisclosed money

postemployment, and then bar Fluor from calling any such witness.

### B.    Order Fluor To Provide All Of The Requested Information Immediately

Relators request that the Court overrule Fluor's objections and require Fluor to immediately

produce:

> 1.    ANY AND ALL AGREEMENTS WITH ANY WITNESS ASSOCIATED WITH THE CASE, INCLUDING EVERY PERSON WHO EITHER PARTY DISCLOSED PURSUANT TO RULE 26 AND/OR INCLUDED ON TRIAL WITNESS LISTS.

It is important that Relators understand the full picture of who is under contract with Fluor or has received payments from it. Relators cannot make informed decisions about which witnesses to call and which not to call without knowing who Fluor has paid. For example, maybe they would not call Minka Hill if they believed Juan Jones was not on Fluor's trial witness payroll. Relators might also be especially interested in witnesses who resisted Fluor's offer. The trial is entering its third week. Fluor finally should put all the facts on the table regarding all witness payments for all witnesses in the case.

> 2.      ALL PAYMENTS TO ANY WITNESS ASSOCIATED WITH THE CASE, INCLUDING EVERY PERSON WHO EITHER PARTY DISCLOSED UNDER RULE 26, IN DISCOVERY, AND/OR INCLUDED ON TRIAL WITNESS LISTS.

This should have been an easy request. It is crazy to have to write a sentence saying that the Court should order the Defendant to immediately tell the other party which trial witnesses they have paid, and how much. Under the circumstances, the fact that Fluor has not yet done so is inexplicable.

> 3.      ALL INVOICES SUBMITTED BY OR ASSOCIATED WITH ANY WITNESS ASSOCIATED WITH THE CASE, INCLUDING EVERY PERSON WHO EITHER PARTY DISCLOSED UNDER RULE 26, IN DISCOVERY, AND/OR INCLUDED ON TRIAL WITNESS LISTS.

Fluor's refusal on this is indefensible. The contracts provide that invoices must be submitted monthly, detailing the time spent and a description of the associated activities, subject to Company approval by a man named James Pike. This is extremely probative information. The compensated witness must be crossexamined as to why they are getting paid: what they are doing for the money, what they reviewed, what work they did, etc. After all that has happened, Fluor's refusal to produce things like trial witness payment invoices is entering Epstein-file territory, and only begs the question of how bad the information must be.

4.    ALL COMMUNICATIONS (E.G., EMAILS) REGARDING ALL INVOICES OR PAYMENTS INVOLVING ANY WITNESS ASSOCIATED WITH THE CASE, INCLUDING EVERY PERSON WHO EITHER PARTY DISCLOSED UNDER RULE 26, IN DISCOVERY, AND/OR INCLUDED ON TRIAL WITNESS LISTS.

If there are communications about witness payments, they should be produced. If Fluor wants to try to assert a privilege, they should be logged, with the Court, not Fluor, to adjudicate what must be disclosed.

5.    PERMIT VOIR DIRE OF MONTALVO, HAMM, AND METHOT ABOUT THEIR CONTRACTS AND PAYMENTS.

To the extent the first two witnesses are now gone, if the Court is inclined to allow it, Relators' counsel is prepared to re-call them by video to accommodate their geographic unavailability.

6.    PERMIT A FRCP 30(b)(6) DEPOSITION ON THIS TOPIC, AS WELL AS THE DEPOSITION OF JAMES PIKE.[8]

It is late in the day for discovery, but the fact that these issues should have been aired long ago during discovery should not inure to Relators' detriment. Having withheld this information, Fluor cannot legitimately object to efforts to get all of the information on the record while the record is still open. The alternative is that Relators continue to learn new important facts after trial, which would, should Relators lose, undoubtedly prompt motions for a new trial. The preferred course is to get all of the facts on the table now.[9]

**C.    The Court Should Allow Relators Counsel To Put All Of The Facts Before The Jury As Relevant To Witness Credibility, And Permit Vigorous CrossExamination**

---

[8] Mr. Pike is identified in the contract as the person liaising with the compensated witness about payment. *See* Ex. B at 1.

[9] In substantially similar circumstances, other courts have required parties to produce documents and submit for additional depositions as requested here. *See, e.g.*, *Solvent Chem. Co.*, 166 F.R.D. at 290–92.

Like most jury trials, this one very much turns on what weight the jury puts on the testimony of important witnesses like Mr. Montalvo, Mr. Hamm, and Mr. Methot, not to mention the asyet unknown witnesses upon whom Fluor intends to rely. These witnesses may also be highly compensated pursuant to agreements that restrict their ability to tell the truth.

1.     Vigorous CrossExamination

Relators urge the Court to keep in mind that there are not ordinarily guard rails around crossexamination concerning cash payments to witnesses. The only normal example is experts, who are vigorously crossexamined about their compensation. In fact, the only principled reason for allowing paid witnesses at jury trials is precisely that the adversary has the opportunity to expose bias through vigorous cross examination. *See State v. Kelly*, 770 A.2d 908, 930 (Conn. 2001).[10] It is actually difficult to find any cases imposing limits on the vigor of crossexamination about financial bias. There is absolutely no reason why the same guidelines would not apply to fact witnesses. If anything, compensated fact witnesses should be crossexamined more vigorously.

This issue arises most often in the criminal context, where the government may pay informants and coconspirators to testify against a criminal defendant. But when that happens, "[i]n recognition of the substantial risk that financial incentives can corrupt," the Fourth Circuit requires courts to impose rigorous safeguards. *United States v. Levenite*, 277 F.3d 454, 462–63 (4th Cir. 2002). Those include that the criminal defendant can vigorously crossexamine the informant, including on how much they are being paid, and that the court must instruct the jury "about the heightened scrutiny to be given testimony provided under a fee payment arrangement." *Id.*

---

[10] Relators rely on a case from a state supreme court precisely because this is not even issue that ever comes up.

Courts across the country have also routinely held in civil cases that payments to witnesses are probative as to the witness's bias and credibility, and are thus subject to vigorous crossexamination. *See Kelly*, 770 A.2d at 930 (collecting cases); *Jamaica Time Petroleum, Inc. v. Fed. Ins. Co.*, 366 F.2d 156, 158 (10th Cir. 1966); *Ennen v. Pub. Serv. Mut. Ins. Co.*, 774 F.2d 321, 328 (8th Cir. 1985); *Funds of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F. Supp. 1314, 1370 (S.D.N.Y. 1982); *Murray v. Just in Case Bus. Lighthouse, LLC*, 374 P.3d 443, 452 (Colo. 2016).[11]

Relators previously proffered the kinds of questions they wish to ask, which are exactly the kind that would be appropriate for a paid opinion witness. Proposed questions included, for example, how the rate was arrived at, whether there was a negotiation, who first brought up the idea of compensation, and whether the fact witness would have spent all that time preparing without having been paid. Under any fair analysis, these are all fair game. Were it otherwise, the jury would not have anything close to the full picture.

### 2.    The Agreements Should Be Admitted Into Evidence

The contracts are relevant evidence. As Fluor has made clear, it believes Relators are misreading, misconstruing, and distorting the terms. Relators are doing nothing of the sort. The point of course is that this is why there are jury trials. Fluor is perfectly capable (in closing argument or sooner) of showing the jury that it drafted these Agreements very carefully to be not conditioned on testimony or the outcome. If Fluor is right about the way to read these agreements, the jury will be persuaded. But Relators are equally entitled to present their own interpretation of the relevant

---

[11] Fluor contends that *Levenite* is applicable only to criminal cases. Dkt. 671 at 5 n.5. That may be true of the requirement in criminal cases that the prosecution disclose agreements to the defense prior to trial. But as noted above, Fluor was obligated to disclose contracts with witnesses to Relators for entirely different reasons than those described in *Levenite*. And the other procedural safeguards in *Levenite* are not unique to the criminal context, as demonstrated by the abundance of cases cited above.

evidence. Again, that is what juries are for, and jurors should decide. Anything less than that unfairly deprives the jury of critical evidence very much bearing on critical witnesses. And as noted above, depending on the agreements Fluor produces, those agreements may themselves be substantive evidence of scienter. *CBS Corp.*, 433 F. Supp. 3d at 548–49.

Nor do Fluor's Rule 403 arguments make any sense. Rule 403 prohibits unfair prejudice. Fluor's position is that there is absolutely nothing wrong with these agreements. According to Fluor, they are quite proper, right on their face. So where is the risk of unfair prejudice? Even if there were, the Court has already instructed the jury that agreements to compensate witnesses for their time are proper. The Court's "limiting instruction cured any potential prejudice," and the Court should "presume that jurors understand and are able to follow the trial court's instructions." *McCollum v. McDaniel*, 32 F. App'x 49, 53 (4th Cir. 2002).

Fluor's one and only argument about a risk of unfair prejudice is that perhaps a juror would misunderstand the agreements. But the ambiguity is precisely Relators' point. To the extent Fluor highlights a risk that a juror might (mis)interpret this agreement as being conditioned on keeping Fluor's secrets, so might Mr. Montalvo, Mr. Hamm, Mr. Methot, or any other paid witness![12] It is those witnesses' subjective understandings of the agreements that matter most, which is what Relators' counsel was trying to persuade the Court to allow him to elicit from Mr. Hamm.

Fluor cannot, in other words, articulate any genuine prejudice—except to the extent the jurors might think this bears on the witness's bias. But that is exactly (and to the exact extent) why the evidence is probative, so there is no risk of any prejudice that is genuinely unfair.

Rule 403 also turns on witness confusion. Allowing the exact terms of the witnesses' agreements with Fluor reduces, not increases the risk of confusion. Our system entrusts juries to

---

[12] Relators' counsel only allows himself one exclamation point per year in briefs. He has now used it, and it is only February.

view the actual evidence of bias, rather than characterizations by counsel, and draw their own conclusions.

Nor is there any risk of the proverbial minitrial. This evidence would prolong the trial by minutes. And if the Court had any such concerns, it could allow Relators to introduce the evidence, and then let both sides make their arguments about what they mean during closing arguments.

3.     The Court Should Instruct The Jury In A Manner To Be Determined About The Complete Circumstances Of The Montalvo and Hamm Contracts

As stated, neither the Court nor Relators yet know how much Mr. Montalvo or Mr. Hamm has been paid, how much they have invoiced, how many contracts they have with Fluor, and what the asyet undisclosed agreements provide. As discussed on Friday in court, the bell cannot be unrung on the testimony of Mr. Montalvo or Mr. Hamm, but the Court can ameliorate some of the prejudice by providing the jury the full and accurate picture of their potential motivations and bias. Anything short of that would risk a jury verdict based on juror credibility determinations relying on incomplete information. The jury must be instructed to apply heightened scrutiny to the testimony of paid witnesses.

4.     The Court Should Enter Default Judgment

In response to Relators' objections upon learning that Fluor was paying witnesses, Fluor's counsel accused Relators of "histrionics." Relators disagree.

Relators' counsel understands and appreciates that they are not from here, and that local norms feature more politeness and niceness than some other jurisdictions. In that regard, practicing here has been a wonderful experience. This is a far more pleasant way to conduct business than the unnecessary vitriol and squabbling that sometimes plagues the practice of law. But the problem is, there is no polite or nice way to say that what is going on here may be very corrupt. This is a case concerning massive fraud on the Government by a powerful corporation, where the underlying

24

allegations concern fraud and lies by omissions. Now it turns out that an unknown number of critical trial witnesses who are coming off the paper to tell Fluor's story have been secretly paid an unknown amount of money in consideration for nondisclosure agreements, perhaps for years.

Relators' counsel acknowledge they have reacted strongly. It has been very upsetting to have learned fortuitously in the middle of trial for which they have spent so long preparing that the case is all really just a game in which fact witnesses are being secretly paid despite representing that they do not work for Fluor. Counsel have invested more than a decade of their time into this case. Far more importantly, their clients (the Relators) have taken enormous personal risks to stick their necks out for the Government and go up against such a powerful company, effectively blackballing themselves in their professional field. The Government, too, has an enormous stake in the outcome of this trial. If Relators and their counsel had understood that Fluor was going to be allowed to defend the case by hiring all the fact witnesses (without telling the Court) conditioned on keeping Fluor's secrets, they might have made other decisions about each phase of litigation. It should not be lost on anyone that if the Court had granted summary judgment based on the compromised testimony, none of this would have ever come out.

Given what has happened here, including Fluor's refusal to respond to the requests to finally divulge this information, default judgement is appropriate. *See Cinergy,* 2008 WL 7679914, at *14–15 (ordering new trial for a defendant's failure to disclose materially identical information in similar circumstances).

## CONCLUSION

These are extraordinary developments. In Relators' view, Fluor's actions have put at risk the public trust in the judicial system, all the more problematic in a case involving corrupt practices against the Government. At an absolute minimum, even if the Court decides to do nothing else, the

jurors deciding this case are entitled to consider all of the relevant evidence concerning the financial

motivations of the trial witnesses in this case upon whose testimony Fluor asks them to rely. That

includes their contracts and the nondisclosure terms therein. The jury should decide what to make of

them. If Fluor is right, they are unobjectionable, so there is nil prejudice that could possibly

outweigh the enormous probative value.


Respectfully submitted,


                                            /s/ Jon Loevy
                                            Jon Loevy

                                            Richard Harpootlian (Fed. ID No. 1730)
                                            Andrew Hand (Fed. ID No. 12176)
                                            RICHARD A. HARPOOTLIAN P.A.
                                            1410 Laurel Street
                                            Post Office Box 1090
                                            Columbia, SC 29202
                                            Telephone: (803) 252-4848
                                            Facsimile: (803) 252-4810
                                            rah@harpootlianlaw.com

                                            Jonathan Loevy
                                            Michael Kanovitz
                                            Daniel Twetten
                                            Anand Swaminathan
                                            Frank Newell
                                            Anna Dover
                                            Gwen Parker
                                            Heather Sticht
                                            Dominique Gilbert
                                            Alexandra Wolfson
                                            Aadi Tolappa
                                            **LOEVY & LOEVY**
                                            311 N. Aberdeen St., Third Floor
                                            Chicago, IL 60607
                                            Telephone: (312) 243-5900
                                            Facsimile: (312) 243-5902
                                            anand@loevy.com
                                            *Attorneys for Relators*

*Charles R. Shepherd*
*and Danny V. Rude*

Frank L. Eppes (Fed. ID No. 1003)
EPPES & PLUMBLEE, PA
PO Box 10066
Greenville, SC 29603
Telephone: (864) 235-2600
Facsimile: (864) 235-4600
feppes@eppesandplumblee.com

*Attorney for Relator Robert Scott*
*Dillard*

Judah N. VanSyckel
SALUDA LAW, LLC
137 E. Butler Street
Lexington, SC 29072
Telephone: (803) 939-6927
Facsimile: (803) 902-8004
judah@saludalaw.com

*Attorney for Relator Rickey Mackey*