IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CHARLES R. SHEPHERD; DANNY V. RUDE; ROBERT SCOTT DILLARD; and RICKEY MACKEY,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>FLUOR CORPORATION; FLUOR INTERCONTINENTAL, INC.,<br><br>　　　　　　Defendants. | Civil Action No. 6:13-cv-02428-JD<br>Hon. Joseph Dawson, III |

**FLUOR'S OMNIBUS RESPONSE TO**
**RELATORS' FILINGS REGARDING WITNESS AGREEMENTS**

Relators' conspiracy theories continue. Although Fluor has now produced the witness agreements, clearly explained their legal basis, and provided the requested payment information, Relators' deluge of filings persists. Fluor has already extensively briefed this issue (*see* Dkts. 671 and 678) and will repeat itself here.[1] Fluor will, however, respond to Relators' latest accusations and attempt to provide greater clarity to the witness agreement process. To avoid further accusations about "unsworn" representations, Fluor is also submitting with this brief sworn declarations from the individuals involved in the collection and production of witness agreements and payment information: Elliot Rosenwald (a member of Fluor's legal team); Lindsey Guthke (a

---

[1] Relators puzzlingly assert that "Fluor has filed the second of its two pleadings *without denying virtually any of the allegations therein*." Dkt. 684 at 1. Fluor believes it has made its position quite clear. But for the avoidance of doubt, Fluor denies any accusation that it did anything improper in entering into these witness agreements, which are expressly permitted by the American Bar Association, the South Carolina Bar, and applicable federal law.

1

Fluor legal assistant); and Parry Wilson (a Fluor Project Controls employee).  Fluor respectfully submits that the record is more than sufficient for the Court to resolve this issue.

## ADDITIONAL BACKGROUND

In light of Relators' many representations about the witness agreements,[2] Fluor will first briefly describe the witness agreement process.  Fluor formed the entity FDEE Consulting, Inc.—which stands for "Fluor Daniel Ex Employee"—for the purpose of entering into consulting and other agreements with former employees on matters related to their former employment with Fluor.  Because this case relates to matters that occurred more than a decade ago, many of the relevant witnesses are former employees.  The witness agreements at issue arose in one of two ways.  In some instances, the witness asked to be compensated for lost time in connection with work preparing for a deposition or trial or drafting a declaration.  In other instances, Fluor offered to compensate the witnesses for their lost time and if the witness requested such compensation, Fluor would execute an agreement.[3]  Each of the agreements is for a one-year period.

As Fluor discussed at length in its prior briefing, Fluor did not produce the witness agreements in fact discovery because it had no affirmative obligation to disclose that information, and it was not responsive to a discovery request from Relators.  Dkt. 671 at 7–9.; Dkt. 678 at 4–5.  But, contrary to Relators' assertions, Fluor did nothing to hide the agreements.  Had witnesses been asked at deposition whether they were being compensated for the time they spent preparing

---

[2] Relators have at various points referred to the agreements as "witness agreements," "nondisclosure agreements," "nondisclosure contracts," and "independent contractor agreements." Dkt. 684 at 3, 5, 6.

[3] Not every former employee requested compensation.  For example, Scott Roesler did not request to be compensated for deposition preparation and testimony when the deposition was held close to his home in Florida.  Now that he has to travel from Iraq and take a week off from work, however, he inquired about compensation for lost time and Fluor entered into a witness agreement.

or testifying, the witnesses would have truthfully answered those questions.[4] Relators, however, did not ask. When Relators asked the first trial witness under such an agreement (Mr. Montalvo), he answered truthfully and completely. *See* Ex. 1, Trial Tr. 1658:6–14.[5]

Relators raised concerns, requested production of the agreements, as well as payment and other information. Fluor believes that it clearly described what it intended to produce and Fluor has since followed through on that commitment. On February 5, 2026, Fluor stated:

> [Fluor was] in the process of attempting to locate and obtain copies of witness agreements for each person on Relators' witness list that were in effect at the time testimony was or will be given – either at deposition or at the trial. We do not agree nor do we think it relevant to provide agreements outside of these. As to the payments themselves, we do not agree to provide all documents relating to requests for payment or such as invoices. We will, however, agree to provide the amount by witness of any payments made under the relevant agreements relating to this matter.

Dkt. 676-3 at 2.

Subsequently, a Fluor legal assistant took steps to identify whether individuals on either party's pre-trial disclosures had entered into witness agreements with Fluor. Ex. 2, Guthke Decl. ¶ 3–5; Ex. 3, Rosenwald Decl. ¶¶ 3–4. After Fluor's counsel confirmed which former Fluor employees had witness agreements related to this litigation, a member of Fluor's Project Controls team conducted a search for invoices reflecting payments made under the relevant witness agreements for time the witnesses spent related to "preparing a declaration; testifying at a deposition or trial; preparing to testify at a deposition or trial; traveling to or from a deposition or

---

[4] Relators' assertion that former employees were untruthful at deposition when they testified they did not "work" for Fluor is unavailing. Under any reasonable construction of the term "work," the witnesses understood that they were being asked whether they were employed by Fluor. That is very different than *Solvent Chemical*, in which witnesses were broadly asked whether they had any "business relationship" with the party. *See New York v. Solvent Chem. Co., Inc.*, 166 F.R.D. 284, 290 (W.D.N.Y. 1996).

[5] Contrary to Relators' repeated assertions, Mr. Montalvo did not ask Fluor counsel whether he could disclose whether he was paid. He asked whether he could disclose the amount. Fluor counsel responded that he could. *Id.* at 1658:15–19.

3

trial; or reviewing a deposition transcript." Ex. 4, Wilson Decl. ¶ 3–5; Ex. 3, Rosenwald Decl. ¶¶ 3–6, 8. Fluor's counsel then reviewed all relevant invoices and calculated all payments made to each individual for the identified activities. Ex. 3, Rosenwald Decl. ¶¶ 6–7. These agreements were produced to Relators on February 10, 2026. Dkt. 684-1 at 3.[6] A chart reflecting payment information was produced on February 10, 2026. Dkt. 684-5 at 2.

As Fluor advised Relators and the Court on February 10, 2026, Fluor was in the processing of finalizing agreements with two additional trial witnesses (Ernest Ridley and Scott Roesler). Fluor finalized those agreements on February 12 and promptly produced them to Relators.[7] Ex. 3, Rosenwald Decl. ¶ 8.

## DISCUSSION

Relators' additional complaints lack merit for the reasons discussed below.

***First,*** Relators continue to demand *any* agreement with *any* individual who was on either party's Rule 26 disclosures. But the only reason these agreements are relevant at all is that they are arguably probative of witness bias, which of course is not at issue for any individual that *will not testify at trial*. Nonetheless, in an abundance of caution, Fluor conducted a search for witness agreements related to this case that had been executed by anyone on the parties' Rule 26

---

[6] Relators take issue with Fluor's designation of these witness agreements as "Confidential Information." Dkt. 684 at 1. But as Fluor informed Relators, this designation only applies to "the witnesses' addresses (page 1 of each agreement)." Dkt. 684-1 at 3. This designation was only made to protect the dissemination of these individual's home addresses, consistent with the protective order in this case.

[7] Relators claim to be "baffl[ed]" by "[t]he situation with Mr. Ridley and Mr. Roesler," two witnesses whom Relators only recently told Fluor they plan to call. *See* Dkt. 690 at 7–8. As Fluor has informed Relators numerous times, it would promptly produce any new witness agreement signed by any person listed on either party's pretrial disclosures. Messrs. Ridley and Roesler each executed a witness agreement on February 12, and Fluor produced each agreement within hours of it being signed. Relators' Reply nonetheless devotes an entire paragraph to convoluted musings about what such agreements *might* say—despite those agreements already being in Relators' possession. Ex. 3, Rosenwald Decl. ¶ 8.

disclosures, but not on their witness lists. Fluor identified one person: Mike Cepek. Fluor is not producing his agreement because he has not been identified as a witness and the agreement therefore is not relevant.

*Second,* Relators also seek "all payments to any witness associated with the case" and "all invoices submitted by or associated with, and all communications relating to the same, for any witness associated with the case." Dkt. 684 at 7. Fluor has provided exactly the same information for the individuals under witness agreements that the parties provided for expert witnesses—the rates, total hours billed, and total amount billed. Relators have not made any coherent argument for why they need more. They assert that invoices are necessary "particularly if the time is not in fact related to deposition or trial preparation as has been represented to the Court." Dkt. 584 at 5. As reflected in the declaration of Mr. Rosenwald, however, Fluor counsel has reviewed the invoices and prepared a chart that reflects time that falls into the above categories. Ex. 3, Rosenwald Decl. ¶ 3.e, 6. Relators' counsel has offered no basis to question the veracity of representations made by Fluor's counsel.

Moreover, some of the invoices include information protected by the attorney-client privileged and/or entries related to other matters, such as internal investigations and separate litigation, like Scott Dillard's retaliation case. Fluor would therefore have to produce the invoices in redacted form, which no doubt would prompt a flurry of additional unfounded accusations by Relators. Fluor would of course be happy to provide the invoices to the Court to review *in camera* if necessary, but Fluor hopes the representations of its counsel are sufficient.

*Third,* Relators continue to make unfounded accusations. Perhaps most absurd is Relators' claim that Mr. Montalvo must not have invoiced Fluor because "his number will be so high that it cannot be paid until trial is over[,] [o]r that Fluor was holding out on paying him until he

5

delivered." *Id.* at 5 n.5. Once again, there is a far more obvious, less nefarious, answer: Mr. Montalvo decided not to bother invoicing Fluor for the time spent at his deposition. If his decision not to send Fluor an invoice is probative at all, it goes to show *lack* of bias—that is, that he spent time preparing for and testifying at deposition without any compensation at all.

**Fourth,** Relators asserted in Court on February 12, 2026 that David Erp's witness agreement should be considered a "bribery" payment. Again, these inflammatory accusations have no factual basis. Relators executed a declaration with Mr. Erp on February 6, 2023 and produced it on February 22, 2023. As it did with all of the individuals who provided declarations, Fluor subsequently contacted Mr. Erp to see whether he would be willing to speak with Fluor counsel. He had an initial conversation about his declaration and recollection of relevant events. Subsequently, in September 2023, Mr. Erp asked to be compensated for lost time, and Fluor executed a witness agreement with him. Eight months later, he signed a declaration clarifying the prior declaration that he had provided to Relators.[8]

Relators have indicated that they will call Mr. Erp to testify at trial. To the extent Relators intend to call him for the sole purpose of asking about his execution of a witness agreement, his testimony would present serious Rule 403 concerns. Fluor has good reason to believe this is Relators' plan, as they previously advised Fluor they would call another individual who provided a counter-declaration (Robert Bunyea), only to quickly backtrack when they learned he did not have a witness agreement.[9]

---

[8] Relators falsely assert that Mr. Erp's agreements were "undisclosed until yesterday," *i.e.*, Wednesday, February 11. Dkt. 690 at 4. In fact, Fluor produced these agreements to Relators on the morning of Tuesday, February 10. *See* Ex. 3, Rosenwald Decl. ¶ 5.

[9] Relators fault Fluor for not producing witness agreements with the other individuals who provided counter-declarations. None of those witnesses have witness agreements.

*Fifth,* Relators raise a variety of arguments about what they perceive to be inconsistencies between the amount of time for which a witness invoiced Fluor and what they recalled at deposition. For example, Mr. Methot testified at deposition that he spent between 12 to 14 hours preparing but invoiced Fluor for 31.5 hours. Dkt. 684 at 4–5 n.4. Mr. Methot's deposition lasted over 10 and a half hours, Ex. 5, Methot Dep. at 2, 257, which does not include any travel time for the deposition and each day of preparation. Mr. Methot was then asked to review his deposition transcript and complete any necessary corrections through an errata. When considering all of this work and other communications with Fluor's counsel regarding this matter, 31.5 hours is entirely reasonable.[10] Perhaps even more important, Relators' speculative assertions that Mr. Methot's statements about his reported time *must be indicative of something nefarious* demonstrates why the questioning of witnesses relating to this issue must be carefully policed. Fluor respectfully submits that the Court should continue to ensure that this trial remains focused on the merits, not sideshows like witness agreements and untimely attempts to invade Fluor's attorney-client privilege.

*Sixth,* Relators now ask for the Court to allow them to take two depositions: a Rule 30(b)(6) deposition of Fluor and a deposition of James Pike, Fluor's Senior Vice President, Law. Dkt. 684 at 7–8. Fluor is not aware of any precedent that would support such a drastic remedy at this stage. Nor does Fluor understand how Relators even anticipate completing these depositions in the middle of trial without upending the schedule. Moreover, these depositions would only reiterate

---

[10] Relators' also suggest that Mr. Methot's invoiced time is indicative of something nefarious because he had a poor recollection of events at his deposition. As the Court is aware, Mr. Methot is 72 years old and has not been shy about his failing memory. It is attacks like these on Mr. Methot that prompted Fluor to file a motion on a similar issue. *See* Dkt. 665.

what Fluor has already told Relators and the Court and provide no additional information relevant to the jury's consideration of the case.

***Seventh,*** despite the Court reiterating again yesterday that it will not revise the guardrails on questioning related to witness agreements until it finally resolves this issue, Relators asserted in a filing made last night at nearly 11:00 p.m. that they "are certainly expecting an opportunity to cross-examine Mr. Ridley about what is going on," apparently far outside those guardrails. *See* Dkt. 690 at 8. As the Fourth Circuit held in the sole precedential case cited in Relators' 11-page Reply, "a trial court necessarily possesses wide latitude to impose reasonable limits on cross-examination, premised on such concerns as prejudice, confusion, repetition, and relevance." *United States v. Smith*, 451 F.3d 209, 221 (4th Cir. 2006) (cited at Dkt. 690 at 2); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (citing *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam )); *United States v. Lingenfelter*, 473 F App's 303, 304 (4th Cir. 2012) (same).[11] This Court has done exactly that. Relators' assertion that "[i]f the agreements are perfectly proper . . . then the jury will agree with

---

[11] Relators misleadingly cite *Smith* for the proposition that "[w]itnesses' financial bias is always extremely relevant to credibility. It is always extremely probative." Dkt. 690 at 2. In *Smith*, the Fourth Circuit held that the district court had erroneously curtailed cross-examination of police officers about their destruction of the alleged drugs in a prosecution for drug distribution. *See* 451 F.3d at 215-16, 221. That holding has nothing to do with witness bias, let alone financially motivated witness bias.

Fluor," and '[i]f they . . . place Fluor and [a] witness in a bad light, then that is precisely why they are probative" turns Rule 403 on its head. That rule exists to ensure that jury decisions are based on reasonable and appropriate grounds, not unfair and improper inferences or confusion. *See Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 720 (4th Cir. 2014) (finding that impeachment evidence with "little to no probative value" should have been excluded under Rule 403).

As to Relators' attempt to equate former employees under witness agreements with Mr. Nix, the Court aptly noted that the situations are entirely different. Though he is nominally a non-party, he has exactly the kind of financial motivation a party has: His payout is contingent on his side winning and would be directly proportional to the size of any judgment. Fluor's witness agreements, on the other hand, explicitly *preclude* these bias-inducing arrangements.

## CONCLUSION

It is important to put Relators' request into this case's current context. Fluor's witness agreements are lawful and appropriate. Relators did not request this information in discovery and have identified no legal authority that Fluor was required to affirmatively provide it. Relators have been able to ask every witness with an agreement a detailed set of questions approved by the Court designed to explore potential bias. There is simply nothing more to be done with this issue.[12]

---

[12] Fluor also requests that should Relators request any jury instruction related to witness payments in this case that Fluor be given an opportunity to respond. In Relators' original briefing on witness agreements, they referenced *United States v. Levenite* for support that the jury is entitled to an instruction on this issue. Subsequent Fourth Circuit precedent highlighted that *Levenite*'s ruling should not be broadly construed. In *Luck*, the Fourth Circuit noted that other circuits had found that an "informant instruction is necessary when the informant's testimony is *uncorroborated by other evidence*" but did not issue a blanket ruling for this Circuit. *See United States v. Luck*, 611 F.3d 183, 187–88 (4th Cir. 2010). Instead, the court found that the instruction should have been given in *Luck* because there "was *little corroborating evidence* beyond the informant's testimony." *Id.* at 188 (emphasis added). The witnesses in that case included "three main witnesses," two of which were paid informants. *Id.* at 184. The Fourth Circuit noted that "[t]here was *literally no*

Respectfully submitted,

*/s/ Mark C. Moore*
Mark C. Moore (Fed. ID No. 4956)
Michael A. Parente (Fed. ID No. 13358)
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 540-2146
Facsimile: (803) 727-1458
MMoore@maynardnexsen.com

Konstantine P. Diamaduros (Fed. ID No. 12368)
MAYNARD NEXSEN PC
104 South Main Street, Suite 900 (29601)
Post Office Drawer 10648
Greenville, SC 29603-0648
Telephone: (864) 370-2211
Facsimile: (864) 282-1177
KDiamaduros@maynardnexsen.com

Craig D. Margolis (admitted *pro hac vice*)
Tirzah S. Lollar (admitted *pro hac vice*)
Christian D. Sheehan (admitted *pro hac vice*)
Elizabeth A. Carney (admitted *pro hac vice*)
Katelyn M. Deibler (admitted *pro hac vice*)
Elliot S. Rosenwald (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, Northwest Washington, DC 20001-3743
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
craig.margolis@arnoldporter.com

Rachel K. Higgins (admitted *pro hac vice*)
Sahrula Kubie (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street

---

*corroborating evidence* for [an informant's] claim that he was buying cocaine base from Luck several times a day for a year," and it was only because of this lack of corroborating evidence that the Court determined there was ineffective assistance of counsel to not request an informant instruction because "the uncorroborated testimony of paid informants could have been 'manufactured . . . out of whole cloth' for the benefit of the informant alone." *Id.* at 188 (emphasis added). This is entirely different from a case that involves potentially dozens of witnesses and hundreds of documents.

New York, NY 10019-9710  
Telephone: (212) 836-8000  
Facsimile: (212) 836-8689

February 13, 2026  
Greenville, South Carolina

*Counsel for Defendants Fluor Corporation and Fluor Intercontinental, Inc.*

11