IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| United States of America, *ex rel.* Charles R. Shepherd, Danny V. Rude, Robert Scott Dillard, And Rickey Mackey<br><br>Plaintiff-Relators,<br><br>v.<br><br>Fluor Corporation, Inc., and Fluor Intercontinental, Inc.,<br><br>Defendants. | Case Number: 6:13-02428-JD<br><br>Honorable Joseph Dawson, III<br><br>JURY TRIAL DEMANDED |

### **RELATORS' PROFFER OF DAVID METHOT TESTIMONY**

Now come the Relators, by their counsel, and respectfully proffer the proposed testimony from David Methot.

### INTRODUCTION

Mr. Methot is an important witness. He was head of Fluor's compliance department, overseeing Jeff Nix and Justin Jones. In June of 2014, he signed Fluor's self-reported "mandatory disclosure" to the Government pursuant to FAR 3.1003 that Fluor was not performing the 10% inventories required by the contract, or was doing them improperly. This disclosure is a Fluor trial exhibit, and is in evidence. See Exhibit A (DX 591).

Relators original schedule had Mr. Methot testifying on the second day of trial. Given delays related to weather, the length of witness exams, and constraints OF other witnesses, his testimony was repeatedly postponed. When Relators attempted to call him during the [second] week of trial, the Court directed Relators to hold off so the Court could review motions relating to witness payments

and Fluor's motion relating to privilege. Trial Transcript 2/4/26 at 1700:3-6; 2/12/2026 at 3310:6-7; 3311:22-3313:5. During the fourth week of trial, on February 17, 2026, Fluor informed Relators and the Court that Mr. Methot was experiencing vertigo and therefore could not drive to court. Trial Transcript 2/17/26 at 3:12-17. Fluor later reported that he was feeling better and expected to be able to testify soon, but since then Fluor has repeatedly reported that he is not yet able to testify.[1]

Relators should not be forced to close their case without calling Mr. Methot. His testimony is relevant to their claims, and Fluor has raised no valid reason to bar him.

## RELATORS' PROFFER

Relators would call Mr. Methot to offer the following testimony:

1. Methot was Fluor's Chief Compliance Officer, overseeing Mr. Nix and Mr. Jones. During the relevant time period, he had regular interactions with Mr. Nix and Mr. Jones, with whom he had weekly meetings. *See* Ex. B, Deposition of David Methot (Methot Dep.) at 32:9-20.

2. As head of the Compliance Department, Mr. Methot oversaw the inventory adjustment review undertaken by Mr. Nix and Mr. Jones that resulted in the finding that 80% of the adjustments had no memo line. *See* Ex. C, PX 1560 (Justin Jones listing compliance reviews, including the Jones/Nix review of inventory adjustments (05-GOVP-2013-1-006) as requiring Mr. Methot's approval). He regularly reviewed the internal audit reports. Ex. B, Methot Dep. at 122:1-4.

3. There is nothing unusual about Mr. Methot's memory. He does not claim to have any disability or any memory problem.

4. Mr. Methot has billed, and Fluor has paid him, a total of 337 hours consulting for Fluor on the subjects at issue in this trial.

---

[1] Per the so-called witness agreements, Mr. Methot is contractually obligated to appear at trial upon request by Fluor's counsel, who have committed to Relators' counsel to make him available at trial.

2

5.  Mr. Methot recalls and can explain many of the relevant subjects discussed at trial. Ex. B, Methot Dep. at 24:24-26:1; 28:10-29:17; 33:15-34:13; 35:4-36:1. Relators do not intend to elicit all or even most of the foregoing at trial, but merely proffer that Methot was able to remember plenty of facts, including:

- The various "types of reviews" required by Fluor's "policies and procedures," including internal assessments by functional areas, independent reviews by the quality team, and independent reviews by the compliance team. Ex. B, Methot Dep. at 25:2-27:14, 28:10-29:17.
- How to conduct a "compliance review." This included the process of subject matter experts forwarding findings to Mr. Methot, who would review and decide whether to approve. *Id*. at 33:15-34:13; 34:23-36:1.
- He would not double check information from functional leads before doing a disclosure, and would "rely totally" on the information they provided him. Id. at 102:24-103:11.
- Mr. Methot remembers how DOD IG would process and follow-up on disclosures. *Id*. at 142:13-143:21.
- Mr. Methot would have quarterly meetings with functional leads to review their internal assessments. *Id*. at 123:5-18.
- In his own words, Mr. Methot had "active involvement" in the disclosure process, having his team do "follow-ups on things that were identified in theater." *Id*. at 126:10-23.
- His recollection that "Fluor Corporation has investigative controls," and in different parts of the organization, different people had investigative authority and responsibility. *Id*. at 130:6-17.
- His recollection of Fluor's "compliance management plan" and "compliance and ethics procedure" (which Methot wrote). *Id*. at 131:5-132:7.
- Knowledge of FAR 52.203-13 and its history/background. *Id*. at 14:14-15:9.
- The history of Fluor creating a compliance team for LOGCAP IV. *Id*. at 23:3-24:15.
- Working with Justin Jones and Jeff Nix in compliance. *Id*. at 24:2-23.
- Fluor's "culture of compliance." *Id*. at 27:15-28:9.
- The government's process of approving Fluor's policies and procedures, including Fluor's internal trainings and assessments. *Id*. at 37:21-38:14.
- FAR's requirements of when to disclose information to the DOD IG. *Id*. at 45:20-47:3.
- Fluor's process of initiating and conducting preliminary investigations related to possible FAR 52.203-13 disclosure issues. *Id*. at 47:8-48:17.
- If Fluor was required "to perform periodic maintenance inspections or preventative maintenance inspections," and employees signed documents saying they had done so but

3

    did not, that would constitute both "pencil whipping" and "fraud" that would likely require disclosure. *Id*. at 66:7-20, 67:12-68:11.
- Fluor was obligated to correct the record if it told the government it was performing better than it actually was. *Id*. at 79:1-16.
- The entities that Fluor was required to disclose to on Task Order 5. *Id*. at 82:14-83:6.
- How complaints progressed from the ethics hotline to functional teams. *Id*. at 110:11-112:4.

### Mr. Methot's Relationship with Fluor and Memory

6. Mr. Methot testified at his deposition that he retired from Fluor in 2019. Dep. 21:21-25. According to Mr. Methot, "my life is my own." Ex. B, Methot Dep. at 22:1-6. This is contradicted by the three contracts he signed with Fluor that obligate him to make himself available to Fluor on demand to review whatever documents they request that he reviews. *See* Ex. D at Section 1, "Scope of Services" (Methot Witness Agreements).

7. Mr. Methot testified that prior to his deposition, he spent two full days and about 14 hours with Fluor's counsel getting ready. Ex. B, Methot Dep. at 8:21-9:5. He reviewed a number of documents about his role in the case, and was unable to say if it was more or less than 50 documents. Ex. B, Methot Dep. at 9:14-24.

8. In total, Mr. Methot has billed 337 hours preparing to testify in this case.[2]

### The 2014 Disclosure

9. In June of 2014, Mr. Methot sent the Government the 2014 Disclosure upon which Fluor has relied during opening statement and throughout trial (and presumably post-trial) to

---

[2] Fluor claims that some of these hours relate to other matters, but Fluor has to date chosen not to substantiate that claim. The one other matter referenced by Fluor's counsel terminated years before these witness agreements were signed for this case in 2023. *See* <u>Anderson v. Fluor Intercontinental, Inc.,</u> No. 1:19-CV-0289, Dkt. 225-27 (Methot deposed on September 18, 2019); Dkt. 265 (stipulation of dismissal signed on February 23, 2021).

support its defense that it was open and forthright in self-disclosing problems to the Government. Ex. A, DX 591.

10. Mr. Methot's 2014 Disclosure and accompanying email states it was the result of a "comprehensive year-long review of its material management procedures." *Id.* The disclosure was made pursuant to FAR 3.1003, which requires credible evidence of at least a "potential" False Claims Act violation, the failure of which to disclose could result in serious consequences to Fluor. Ex. E, DX 1109 [FAR 3.1003]. On that basis, Relators intend to ask Mr. Methot whether this was one of the more important (and thus memorable) issues in his portfolio at the time.

11. Relators will next ask Mr. Methot his understanding of why he signed this disclosure, and whether he reviewed evidence that supported it. In response, Mr. Methot will testify that he cannot identify any steps he took to verify the information in the 2014 Disclosure. Ex. B, Methot Dep. at 214:16-23; 215:7-12.

12. Relators will also ask Mr. Methot his basis for including the language that the problems were "isolated," "minimal," and "not systemic." At his deposition, he testified that he does not know how he went about making that determination. Ex. B, Methot Dep. at 178:2-6.

13. As Fluor's Chief Compliance Officer, Mr. Methot also testified under oath that he has no understanding of the meaning of the word "anecdotal" that he also used in his disclosure to describe the problems. Ex. B, Methot Dep. at 197:22-199:13.

14. In response to leading questions from Fluor's counsel, and at other points in the deposition, Mr. Methot disavows all memory of this disclosure document. Ex. B, Methot Dep. at 230:11-23. This is true even after spending 14 hours with Fluor's counsel reviewing approximately 50 documents to prepare for the deposition. Ex. B, Methot Dep. at 9-10.

5

15. Relators will establish that Mr. Methot was, however, able to recall: (a) what mandatory disclosures are, and when they are required. Ex. B, Methot Dep. at 45:20-47:3; (b) that Fluor always erred on the side of disclosing problems. Ex. B, Methot Dep. at 205:20-206:2; 67:7-8; 88:13-24; (c) the steps he would take before making disclosures, including meeting people, discussing concerns, etc. Ex. B, Methot Dep. at 110:11-25; and (d) his team would regularly keep him abreast of all developments. Ex. B, Methot Dep. at 125:24-126:9.

16. Mr. Methot also specifically recalls that he did not have access to Mr. Reeves' infamous "pencil whipping" email. See Ex. B, Methot Dep. at 210:12-16. This is not an "I don't recall." Mr. Methot recalls specifically that he never saw this document. *Id.*

17. After establishing the following, Relators will move on. They have no intention of belaboring it an inappropriate manner. In closing argument, Relators will ask the jury to disbelieve his lack of recollection, and to hold it against his credibility.

**Liability of Fluor Corporation as a Defendant**

18. Relators will also ask Mr. Methot questions about Fluor Corporation's role in the matters at issue in this case.

19. As this Court is aware: there are two defendants in this case: Fluor Corporation and Fluor Intercontinental, Inc and Fluor has requested that the jury consider the evidence against each defendant separately. See Ex. F, Fluor's Requested Jury Instruction No.11 (emailed to the Court).

20. To the extent that Fluor plans to make distinctions between the two corporate defendants to avoid having to repay money that would be returned to the United States, Mr. Methot's testimony about Fluor Corporation's role in this case is particularly probative.

21. As head of compliance at Fluor Government Group, Mr. Methot responded to corporate business audits along with Fluor Corporation executives. One example of these audits

related to the role of Fluor Corporation's Board of Directors or Audit Committee in management oversight/decisions relating to Government contracts. *See, e.g*, Ex. G, DCAA-SR0000624097 (not a trial exhibit); Ex. H, DCAA-SR0000624081 (related to DCAA-SR0000624097); Ex. I, DCAA-SR0000623996 (related to DCAA-SR0000624097 and -624081).

## Fluor Cannot Justify Barring Mr. Methot

22. Where a witness claims not to specifically recall a sensitive and incriminating subject, that is not some "get out of jail free card" that automatically prevents the opponent from calling him at trial. That proposition is almost so obvious as to defy citation. Were it otherwise, everyone would simply say "I don't recall" and no one would ever testify. *See, e.g., Johnson v. Cook Inc.*, 327 F. App'x 661, 664 (7th Cir. 2009) ("Johnson confuses lack of memory with lack of involvement. The witness *did* evaluate Johnson's application, along with thousands of others; he was certain that he looked at Johnson's application because his name appears on the rejection letter. He thus had personal knowledge of the events leading to Johnson's elimination from consideration, even if he did not later recall what he knew."); *United States v. Collins*, 478 F.2d 837, 839 (5th Cir. 1973) ("It is the belief of this Court that the statements made in prior sworn testimony are admissible not only to impeach his claim of lack of memory, but also as an implied affirmation of the truth. The trial court's hands should not be tied where a witness does not deny making the statements nor the truth thereof, but merely falsifies a lack of memory."); *Brown v. Haddon Twp.*, No. 118CV15122NLHAMD, 2021 WL 2821199, at *6 (D.N.J. July 7, 2021) ("A jury must assess the credibility of Plaintiff's statement that he has no memory of what occurred between the time he started to run after the crash and when he was on the ground saying he had been shot . . . ."); *Hartford Fire Ins. Co. v. Taylor*, 903 F. Supp. 2d 623, 644–45 (N.D. Ill. 2012) ("In this case, the issue of Taylor's credibility must go to a jury. It would be a mistake to confuse his purported lack of memory with a

lack of involvement in the incident. Taylor participated in the incident and the surrounding circumstances giving rise to the accident, and his recollections must be judged by a jury—the adequacy of his testimony is not a question of competency for the Court to decide." (citation omitted)).

23. In addition to the effect his purported lack of recollection has on his credibility, Relators are entitled to introduce evidence of his habit and practice to fill in the gap of how he would have handled this. Fed. R. Evid. 406. *E.g., Babcock v. Gen. Motors Corp.*, 299 F.3d 60, 66 (1st Cir. 2002) (under Fed. R. Evid. 406, a witness unable to recall a party's conduct at a specific moment can testify as to the actor's routine practice in order to establish that the conduct in question was in keeping with that practice).

24. As for habit and practice evidence, Mr. Methot testified both ways on that subject at his deposition. Relators likely intend to elicit both versions.

25. In response to Relators' questioning, Mr. Methot claimed that he, as the Chief Compliance Officer of Fluor, did not independently verify the information presented to the Government. Ex. B, Methot Dep at 178:3-11. He testified that he would have signed it, even without confirming its accuracy. *Id*. at 202:10-204:11.

26. However, Fluor's counsel elicited from Mr. Methot that he believes he would have had all of the relevant information before signing the 2014 Disclosure. *Id*. at 244:13-22. He would have relied on his team, including Justin Jones. Ex. B, Methot Dep at 249:16-24. He would not have submitted it if he believed at the time it was unsubstantiated. *Id*. at 255:15-21.

### Fluor Has Identified No Valid Reason To Prevent Relators From Calling Mr. Methot

26. Fluor is obviously concerned that the jury is not going to find Mr. Methot's purported lack of recollection credible. But that is exactly why it is probative, particularly in light of how important the subject was, plus all the time he has spent reviewing the file. If he implausibly

claims no memory, the jury must hear his testimony. That is the law, and there is no real argument why this situation is in any way somehow unique.

27. That has also been the consistent ground rule for this trial. Both sides, including Fluor, has been permitted to show every witness copies of email or other documents bearing their name to ask questions about it. Some witnesses remember those documents, some do not. The relevant questions are asked, and the questioning moves on. That is all Relators are asking for here.[3]

28. Relators have no intention of protracting the subject matter or abusing the situation. But they are entitled to put the relevant facts on the table, including all of the reasons why Methot should remember this subject. There is no genuine argument to the contrary.

29. In fact, Fluor's motion does not even ask to bar Mr. Methot from testifying because of lack of memory on this subject. That is not really a thing. The other side cannot be barred from asking questions about incriminating things just because a witness intends to say he does not recall. Instead, Fluor has contrived a rather absurd privilege argument. It has no merit.

**Fluor's Privilege Argument Is Frivolous**

30. Fluor never asserted any privileges on this subject at the deposition. Mr. Methot was permitted to testify freely because Fluor intended to use, and has used, the 2014 Disclosure as a sword for its defense. Fluor did not invoke privilege a single time on the subject at the deposition. Instead, Mr. Methot answered everything substantively, and just did not recall. Fluor thus cannot invoke privilege now. It is far too late for that.

---

[3] It also bears noting that Fluor has been given enormous latitude to ask its own witnesses leading questions about things the witnesses do not always recall. This includes, for example, Ms. McNamera, Mr. Montalvo, and most recently, Mr. Ridley. Sometimes it felt as if Fluor's counsel was testifying even after the witness said he did not recall, e.g., the line of questioning Mr. Ridley to admit it was "possible" that things happened the way Fluor's counsel postulated.

31. That may leave the Court wondering why there is any privilege issue at all. There is not. Instead of suggesting that questioning would invade a privilege, Fluor seems to be arguing that if Relators ask Mr. Methot about the 2014 Disclosure, that could put Fluor in a tricky situation because it would have to refresh Mr. Methot's memory with privileged documents. This argument is profoundly unpersuasive for several reasons.

32. First, there is nothing requiring Fluor to assert a privilege. Fluor only has to try to assert a privilege if it wants to try to assert a privilege. No one is forcing Fluor to do anything. If anything, Relators are arguing there is no valid privilege.

33. More importantly, however, as stated, it is too late to be asserting any privilege. Fluor did not assert a privilege at the deposition. Mr. Methot answered every question about the 2014 Disclosure. He claimed not to remember anything. Fluor cannot now assert a privilege at trial.

34. Out of moves, Fluor is falling back on an extremely strange argument, namely, that the situation is supposedly unfair. According to Fluor, it wants to try to refresh Mr. Methot's recollection, but cannot -- apparently because it would have to show him privileged documents.

35. This is a bizarre argument. If Fluor wanted to show Mr. Methot any privileged documents to refresh his recollection, it undoubtedly could have done so before his deposition. Indeed, Fluor already has. Mr. Methot admits to spending two full days preparing with Fluor for his deposition, during which time he was shown plus/minus 50 documents (and billed 337 total hours on witness time). Having spent all of that time, Mr. Methot's still memory was not refreshed. Ex. B, Methot Dep.9-10. Fluor was hardly prevented from refreshing it.[4]

---

[4] The argument also illustrates the problem with Fluor's privilege position. It continues to want to rely on the self-disclosures as a sword, yet will not give Relators the supposedly privileged documents that surround it. Nothing about Fluor's objection makes any sense.

**Conclusion**

Fluor has identified no basis to prevent Mr. Methot from being treated like any other witness at trial. Fluor intends to move for a directed verdict and cannot prevent Relators from calling an important witness in the case. Fluor has identified no basis to bar him, nor to restrict his testimony in any unusual way.

Respectfully submitted,

/s/ Andrew Hand
Richard Harpootlian

Richard Harpootlian (Fed. ID No. 1730)
Andrew Hand (Fed. ID No. 12176)
RICHARD A. HARPOOTLIAN P.A.
1410 Laurel Street
Post Office Box 1090
Columbia, SC 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810
rah@harpootlianlaw.com

Jonathan Loevy
Michael Kanovitz
Daniel Twetten
Anand Swaminathan
Frank Newell
Anna Dover
Gwen Parker
Heather Sticht
Dominique Gilbert
Alexandra Wolfson
Aadi Tolappa
**LOEVY & LOEVY**
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
Telephone: (312) 243-5900
Facsimile: (312) 243-5902
anand@loevy.com
*Attorneys for Relators*
*Charles R. Shepherd*
*and Danny V. Rude*

Frank L. Eppes (Fed. ID No. 1003)
EPPES & PLUMBLEE, PA
PO Box 10066
Greenville, SC 29603
Telephone: (864) 235-2600
Facsimile: (864) 235-4600
feppes@eppesandplumblee.com

*Attorney for Relator Robert Scott Dillard*