**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CHARLES R. SHEPHERD; DANNY V. RUDE; ROBERT SCOTT DILLARD; and RICKEY MACKEY, <br><br> Plaintiffs, <br><br> v. <br><br> FLUOR CORPORATION; FLUOR INTERCONTINENTAL, INC., <br><br> Defendants. | Civil Action No. 6:13-cv-02428-JD <br> Hon. Joseph Dawson, III |

**FLUOR'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW**

Mark C. Moore (Fed. ID No. 4956)
Michael A. Parente (Fed. ID No. 13358)
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 540-2146
Facsimile: (803) 727-1458
MMoore@maynardnexsen.com

Konstantine P. Diamaduros (Fed. ID No. 12368)
MAYNARD NEXSEN PC
104 South Main Street, Suite 900 (29601)
Post Office Drawer 10648
Greenville, SC 29603-0648
Telephone: (864) 370-2211
Facsimile: (864) 282-1177
KDiamaduros@maynardnexsen.com

Craig D. Margolis (admitted *pro hac vice*)
Tirzah S. Lollar (admitted *pro hac vice*)
Christian D. Sheehan (admitted *pro hac vice*)
Elizabeth A. Carney (admitted *pro hac vice*)
Katelyn M. Deibler (admitted *pro hac vice*)
Elliot S. Rosenwald (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, Northwest
Washington, DC 20001-3743
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
craig.margolis@arnoldporter.com

Rachel K. Higgins (admitted *pro hac vice*)
Sahrula Kubie (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Counsel for Defendants Fluor Corporation and Fluor Intercontinental, Inc.*

February 24, 2026

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

LEGAL STANDARD ........................................................................................................... 1

DISCUSSION ....................................................................................................................... 2

    I.    Fluor Is Entitled to JMOL on Relators' Award Fee Theory ...................................... 2

        A.    Fluor's AFEB Presentations Were Not "Claims" Under the FCA ......................... 2

        B.    Relators Have Not Presented Evidence of But-For Causation ................................ 4

        C.    Relators Have Not Shown Any Objectively False Statement .................................. 9

        D.    Relators Have Not Introduced Evidence of Scienter ............................................. 12

    II.    Fluor Is Entitled to JMOL on Relators' Staffing Theory ...................................... 13

        A.    Relators Should Be Judicially Estopped from Pursuing Their Abandoned Overestimating Theory ............................................................................................. 13

        B.    Fluor Is Entitled to JMOL on Relators' Overestimating Theory ......................... 16

        C.    Fluor Is Entitled to JMOL on Relators' Overbilling Theory ................................ 18

    III.    Fluor Is Entitled to JMOL on Relators' Property Management Theory .............. 22

        A.    Relators Have Not Introduced Sufficient Evidence to Support a Reverse FCA Theory Based on Revocation of Fluor's Property Management System ...................... 24

        B.    Relators Have Not Introduced Evidence That Fluor Would Have Lost the LOGCAP IV Contract ................................................................................................ 27

        C.    Relators Have Not Introduced Evidence That Fluor's Managerial Personnel Engaged in Willful Misconduct or Lack of Good Faith ................................................. 28

    III.    Fluor Is Entitled to JMOL on Both Retaliation Claims ........................................ 30

        A.    Relator Shepherd's Retaliation Claim .................................................................. 30

        B.    Relator Rude's Retaliation Claim .......................................................................... 31

    IV.    The FCA Qui Tam Device Violates Article II of the Constitution ......................... 35

CONCLUSION .................................................................................................................... 35

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Aviles v. Alutiq Secs. & Tech.*,
No. 10-cv-2589, 2012 WL 12905874 (S.D. Cal. June 15, 2012) ..............................................34

*Awards Depot, LLC v. Trophy Depot, Inc.*,
No. CV H-18-1838, 2020 WL 10817485 (S.D. Tex. Dec. 21, 2020)......................................30

*Barnhill v. Bondi*,
138 F.4th 123 (4th Cir. 2025) ..............................................................................................31

*Brown v. CSX Transp., Inc.*,
18 F.3d 245 (4th Cir. 1994) ...................................................................................................1

*Buckley v. Deloitte & Touche USA LLP*,
888 F. Supp. 2d 404 (S.D.N.Y. 2012), aff'd, 541 F. App'x 62 (2d Cir. 2013)......................7, 8

*Burrage v. United States*,
571 U.S. 204 (2014).................................................................................................................5

*Carmack v. Virginia*,
No. 1:18-cv-31, 2019 WL 4120410 (W.D. Va. Aug. 29, 2019), *aff'd*, 837 F.
App'x 178 (4th Cir. 2020) ....................................................................................................34

*Chapins v. Northwestern Cmty. Servs. Bd.*,
243 F. Supp. 3d 739 (W.D. Va. 2017) ...................................................................................34

*Clark Cnty. Sch. Dist. v. Breeden*,
532 U.S. 268 (2001)...............................................................................................................32

*Clark v. Reeder*,
158 U.S. 505 (1895)................................................................................................................4

*D'Agostino v. ev3, Inc.*,
845 F.3d 1 (1st Cir. 2016).......................................................................................................4

*Dookeran v. Mercy Hosp. of Pittsburgh*,
281 F.3d 105 (3d Cir. 2002)....................................................................................................3

*Dotson v. Pfizer, Inc.*,
558 F.3d 284 (4th Cir. 2009) .................................................................................................30

*Dowe v. Total Action Against Poverty in Roanoke Valley*,
145 F.3d 653 (4th Cir. 1998) .................................................................................................33

ii

*Dupree v. Younger*,
  598 U.S. 729 (2023)............................................................................................2

*Fairchild Hiller Corp.*,
  ASBCA No. 14387, 1971 WL 1284 (Nov. 30, 1971)......................................28, 29

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)..........................................................................................11

*Feldman v. L. Enf't Assocs. Corp.*,
  752 F.3d 339 (4th Cir. 2014) ..........................................................................32, 33

*Fields v. Verizon Servs. Corp.*,
  493 F. App'x 371 (4th Cir. 2012) .........................................................................34

*Foster v. Univ. of Md.-E. Shore*,
  787 F.3d 243 (4th Cir. 2015) ...............................................................................34

*Gordon v. Shiel Med. Lab'y*,
  No. 16-cv-1090, 2025 WL 949432 (E.D.N.Y. Mar. 29, 2025).........................2, 3, 4

*Harrison v. Westinghouse Savannah River Co.*,
  176 F.3d 776 (4th Cir. 1999) ................................................................ *passim*

*In re Williams*,
  455 B.R. 485 (Bankr. E.D. Va. 2011).....................................................................30

*Jett v. Zink*,
  474 F.2d 149 (5th Cir. 1973) ...............................................................................15

*John S. Clark Co. v. Faggart & Frieden, P.C.*,
  65 F.3d 26 (4th Cir. 1995) ...................................................................................14

*Johnson v. United Parcel Serv., Inc.*,
  839 F. App'x 781 (4th Cir. 2021) .........................................................................31

*King v. Herbert J. Thomas Mem'l Hosp.*,
  159 F.3d 192 (4th Cir. 1998) ...............................................................................14

*Lamonds v. Gen. Motors Corp.*,
  34 F. Supp. 2d 391 (W.D. Va. 1999) ...............................................................14, 15

*Leicester Piano Co. v. Front Royal & Riverton Improvement Co.*,
  55 F. 190 (4th Cir. 1893) .......................................................................................4

*Logsdon v. Baker*,
  517 F.2d 174 (D.C. Cir. 1975)..............................................................................21

*Lowery v. Stovall*,
    92 F.3d 219 (4th Cir. 1996) ..................................................................................14

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)....................................................................................8

*Miller v. U.S. ex rel. Miller*,
    110 F.4th 533 (2d Cir. 2024) ................................................................................25

*Newman v. Hy-Way Heat Sys., Inc.*,
    789 F.2d 269 (4th Cir. 1986) ................................................................................21

*Nifong v. SOC, LLC*,
    234 F. Supp. 3d 739 (E.D. Va. 2017) ...................................................................32

*Pac. Architects & Eng'rs, Inc.*,
    ASBCA No. 19513, 1978 WL 2445 (Oct. 24, 1978)..............................................28

*Pascual v. Lowe's Home Ctrs., Inc.*,
    193 F. App'x 229 (4th Cir. 2006) .........................................................................32

*Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*,
    834 F.2d 208 (1st Cir. 1987)..................................................................................15

*Perry v. Kappos*,
    489 F. App'x 637 (4th Cir. 2012) .........................................................................32

*Propst v. HWS Co., Inc.*,
    148 F. Supp. 3d 506 (W.D.N.C. 2015) .................................................................34

*Remy Holdings Int'l, LLC v. Fisher Auto Parts, Inc.*,
    No. 5:19-cv-00021, 2022 WL 571527 (W.D. Va. Feb. 25, 2022).........................15

*Roberts v. Glenn Indus. Grp., Inc.*,
    998 F.3d 111 (4th Cir. 2021) ................................................................................31

*Singer v. Dungan*,
    45 F.3d 823 (4th Cir. 1995) ....................................................................................2

*Swann v. US Foods, Inc.*,
    No. 1:14-cv-1409, 2015 WL 3793739 (E.D. Va. June 17, 2015)...........................32

*Thiokol Corp.*,
    ASBCA No. 32629, 1989 WL 77301 (June 2, 1989).............................................28

*U.S. ex rel. Cimino v. Int'l Bus. Machs. Corp.*,
    3 F.4th 412 (D.C. Cir. 2017).................................................................................4, 5

*U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*,
    562 F.3d 295 (4th Cir. 2009) ...................................................................................17, 18

*U.S. ex rel. Fuchs v. Johns Hopkins Univ.*,
    No. 20-cv-3242, 2025 WL 958222 (D.D.C. Mar. 31, 2025) ......................................10

*U.S. ex rel. Kraemer v. United Daires, L.L.P.*,
    82 F.4th 595 (8th Cir. 2023) .........................................................................................3

*U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*,
    491 F.3d 254 (5th Cir. 2007) ......................................................................................18

*U.S. ex rel. Marcus v. Hess*,
    317 U.S. 537 (1943) .................................................................................................4, 5

*U.S. ex rel. McBride v. Halliburton Co.*,
    848 F.3d 1027 (D.C. Cir. 2017) ...............................................................................8, 19

*U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*,
    612 F.3d 724 (4th Cir. 2010) .............................................................................1, 16, 27

*U.S. ex rel. Petras v. Simparel, Inc.*,
    857 F.3d 497 (3d Cir. 2017)........................................................................................25

*U.S. ex rel. Polansky v. Exec. Health Res., Inc.*,
    599 U.S. 419 (2023) (Kavanaugh, J., joined by Barrett, J., concurring) ..................35

*U.S. ex rel. Schnupp v. Blair Pharm.*,
    No. ELH-17-2335, 2025 WL 2306250 (D. Md. Aug. 11, 2025) .............................16

*U.S. ex rel. Schutte v. SuperValu Inc.*,
    598 U.S. 739 (2023)....................................................................................................12

*U.S. ex rel. Taylor v. Gabelli*,
    345 F. Supp. 2d 313 (S.D.N.Y. 2004).........................................................................3

*U.S. ex rel. Wheeler v. Acadia Healthcare Co., Inc.*,
    127 F.4th 472 (4th Cir. 2025) .........................................................................22, 23, 26

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
    525 F.3d 370 (4th Cir. 2008) ...............................................................................9, 10, 18

*U.S. ex rel. Zafirov v. Fla. Med. Assocs.*,
    751 F. Supp. 3d 1293 ..................................................................................................35

*United States ex rel. Cody v. ManTech Int'l, Corp.*,
    746 F. App'x 166 (4th Cir. 2018) ...........................................................................29, 33

v

*United States v. McNinch*,
　356 U.S. 595 (1958)......................................................................................................3

*United States v. Southland Mgmt. Corp.*,
　326 F.3d 669 (5th Cir. 2003) ......................................................................................10

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
　579 U.S. 176 (2016)............................................................................................ *passim*

*Wheatley v. Wicomico County*,
　390 F.3d 328 (4th Cir. 2006) ........................................................................................2

*Wis. Bell, Inc. v. U.S. ex rel. Heath*,
　604 U.S. 140 (2025)......................................................................................................2

*Zobrest v. Catalina Foothills Sch. Dist.*,
　509 U.S. 1 (1993)........................................................................................................35

**INTRODUCTION**

Relators have spent weeks assailing Fluor's management of property and materials under Task Order 5 ("TO5") in Afghanistan.  As the Court has heard, Fluor indeed had challenges in that respect.  But the False Claims Act ("FCA) is not "a vehicle for punishing garden-variety breaches of contract or regulatory violations," *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 194 (2016), nor is it a vehicle for challenging "poor and inefficient management of contractual duties," *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 789 (4th Cir. 1999).  "Congress crafted the FCA to deal with fraud, not ordinary contractual disputes."  *U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 726 (4th Cir. 2010).  Even then, "the [FCA] was not designed to punish every type of fraud committed upon the government." *Harrison*, 176 F.3d at 785.  "The statute attaches liability, not to the underlying fraudulent activity . . . but to the claim for payment." *Id.*

Because the FCA has a specific focus, it also has specific elements.  Relators have failed to meet them.  On award fee, Relators have not shown that award fee submissions are claims for payment, and they cannot prove the elements of a fraudulent inducement theory.  On staffing, Relators' ever-changing theory fails for a host of reasons.  As to property management, Relators have not presented sufficient evidence that Fluor had an obligation to repay the government for lost property.  And finally, on retaliation, there is a complete absence of proof on essential elements. The Court should grant Fluor judgment as a matter of law ("JMOL") on all counts.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 50(a)(1), JMOL may be granted after "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1)(B); *see Brown v. CSX Transp., Inc.*, 18 F.3d 245, 248 (4th Cir. 1994).  "To grant the motion

1

the district court must examine the evidence in the light most favorable to the non-moving party and determine whether a reasonable trier of fact could draw only one conclusion from the evidence." *Id*. (internal quotation marks omitted). "This standard largely 'mirrors' the summary-judgment standard, the difference being that district courts evaluate Rule 50(a) motions in light of the trial record rather than the discovery record." *Dupree v. Younger*, 598 U.S. 729, 731–73 (2023). JMOL is properly granted "if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof." *Wheatley v. Wicomico County*, 390 F.3d 328, 332 (4th Cir. 2006) (citing *Singer v. Dungan*, 45 F.3d 823, 826–27 (4th Cir. 1995)).

## DISCUSSION

### I.     Fluor Is Entitled to JMOL on Relators' Award Fee Theory

Fluor is entitled to JMOL on four independent bases as to Relators' AFEB theory: (i) Fluor's presentations at AFEBs were not "claims"; (ii) Relators have not shown causation; (iii) Relators have not shown an objectively false statement; and (iv) Relators have not established scienter as the FCA requires.

### A.     Fluor's AFEB Presentations Were Not "Claims" Under the FCA

Whether something is a claim under the FCA is a question of law. *See Wis. Bell, Inc. v. U.S. ex rel. Heath*, 604 U.S. 140, 148 (2025) ("resolv[ing] the circuit split over whether [certain] reimbursement requests are FCA 'claims'"). The FCA defines a "claim" as a "request or demand, whether under a contract or otherwise, for money or property." 31 U.S.C. § 3729(b)(2)(A). This requires "a call upon the government fisc." *Harrison*, 176 F.3d at 785. "Where a party submits documentation one step removed from a request or demand for money . . . such documentation does not constitute a claim within the meaning of the [FCA]." *Gordon v. Shiel Med. Lab'y*, No.

2

16-cv-1090, 2025 WL 949432, at *15 (E.D.N.Y. Mar. 29, 2025) (internal quotation marks omitted) (quoting *U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 335 (S.D.N.Y. 2004)).[1]

As the evidence introduced at trial confirms, Fluor's self-assessments and AFEB presentations are not claims under the FCA because they make no "call upon the government fisc." *See Harrison*, 176 F.3d at 785. Fluor submits a written self-assessment to the AFEB and then presents a slideshow to the AFEB. Dkt. 711 at 4255:13–25. The AFEB receives information from Fluor, DCMA, DCAA, the Army, and then deliberates and sends a recommendation to the Award Fee Determining Official ("AFDO"). *Id.* at 4257:7–11, 4296:4–8. The AFDO then makes a unilateral decision about whether, and how much, of an award fee should be granted, which must be approved by an even higher official, the Army Head of Contracting Activity ("HCA"). *See, e.g.*, Defs.' Ex. 816. Once the fee is determined, the AFDO notifies Fluor of it. Dkt. 711 at 4282:1–4. The Army then proposes a contract modification under which Fluor is permitted to bill for the award fee. *Id.* at 4282:5–9. Only after all these steps does Fluor submit an invoice for the amount of the chosen award fee. *Id.* at 4257:13–23. In short, Fluor's AFEB presentation and self-

---

[1] In *Gordon*, customers of medical laboratories allegedly sent requisitions to the laboratories requesting certain tests be run, which would be subsequently billed to government payors. The court held that the requisitions themselves were not claims for payment, even if they could ultimately result in such claims. *See id.* at *2, 16. Similarly, in *Taylor*, telephone companies allegedly falsely certified to the FCC that they were small businesses entitled to have a portion of their bid refunded if they won an auction for spectrum licenses. 345 F. Supp. 2d at 319. Because the companies would not receive the rebates until the FCC first declared them the winners, these certifications too were not claims. *Id.* at 335–36; *see also United States v. McNinch*, 356 U.S. 595, 598–99 (1958) (holding in prosecution under criminal FCA that defendant's application for credit insurance was not a "claim" because "[i]n agreeing to insure a home improvement loan, the [government] disburses no funds"); *U.S. ex rel. Kraemer v. United Daires, L.L.P.*, 82 F.4th 595, 603 (8th Cir. 2023) ("An insurance application is not a claim for payment. The claim for payment occurs when the insured applies for crop insurance benefits[.]"); *Dookeran v. Mercy Hosp. of Pittsburgh*, 281 F.3d 105, 109 (3d Cir. 2002) (no claim where defendant made "a request that [it] be designated a clinical trial center," which "ultimately might have led . . . to the authorization of the payment of federal funds").

assessment is an information-gathering tool far more than "one step removed from a request . . . for money," and therefore, does not constitute a claim as a matter of law.  *See Gordon*, 2025 WL 949432, at *15.

### B.     Relators Have Not Presented Evidence of But-For Causation

Because the award fee statements are not "claims" under the FCA, the only way Relators can establish FCA liability is if they can show that Fluor fraudulently induced the government into giving Fluor an award fee.  *See Harrison*, 176 F.3d at 788; *U.S. ex rel. Cimino v. Int'l Bus. Machs. Corp.*, 3 F.4th 412, 417 (D.C. Cir. 2017) (citation modified) (citing, inter alia, *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537 (1943)).[2]

Although the Fourth Circuit has not explicitly ruled on which causation standard should apply in FCA fraudulent inducement claims, the Supreme Court requires this Court to look to the common law when construing the FCA.  *See Universal Health Servs. v. Escobar*, 579 U.S. 176, 193 (2016).  Centuries of common-law jurisprudence hold that but-for causation is the standard that applies to fraudulent inducement cases.  *E.g.*, *Clark v. Reeder*, 158 U.S. 505, 523–24 (1895); *Leicester Piano Co. v. Front Royal & Riverton Improvement Co.*, 55 F. 190, 193–94 (4th Cir. 1893). Courts faced with this same issue in the FCA context have likewise required but-for causation. *Cimino*, 3 F.4th at 420; *see D'Agostino v. ev3, Inc.*, 845 F.3d 1, 8–9 (1st Cir. 2016).  These cases are consistent with *Marcus*, in which the Supreme Court analyzed that the defendants "caused the government to pay claims . . . under contracts found to have been executed as the result of the fraudulent bidding," making the initial fraudulent representations "the basic cause for payment of

---

[2] At the summary judgment stage, the Court declined to pigeonhole Relators' award fee theory into only a fraudulent inducement framework. Dkt. 600 at 22.  Relators have now had their opportunity to demonstrate how the award fee process worked.  As described above, all trial evidence points to the conclusion that Fluor's AFEB submissions were not claims for payment.

every dollar paid." 317 U.S. at 543 (emphases added). Language like "resulting from" reflects a but-for causation requirement. *Burrage v. United States*, 571 U.S. 204, 214 (2014).[3]  Moreover, the Department of Justice agrees that but-for causation is the appropriate framework.  *See* U.S. Br. at 1, *Cimino*, No. 19-7139, 2020 WL 1429726 (D.C. Cir. filed Mar. 18, 2020) ("U.S. *Cimino* Br.").

Relators have not introduced sufficient evidence at trial to show that Fluor's AFEB presentations and self-assessments were a but-for cause for the decision to give Fluor an award fee.  Each of the AFEB's award fee recommendations were subjective.  *See* Defs.' Ex. 32 § H-3(c)(2) ("award fee . . . determined by the government's subjective evaluation . . . [and] are unilateral decisions made solely at the discretion of the government).  And they were subjective on multiple levels—they consisted of several subsidiary subjective decisions made by each individual board member on each board.  Dkt. 711 at 4206:17–21 (AFEB chairman Tommy Marks testifying "there's subjectivity[] [b]ecause each member of the award fee board, based on the criteria, we're reading that and then we make our assessment based on the evaluation criteria").

In light of this subjectivity, Relators have not introduced evidence from which a reasonable jury could find that Fluor's award fees would have been lower, let alone by how much.  Instead,

---

[3] In *Burrage*, the Supreme Court considered causation in the context of a 20-year mandatory minimum sentence imposed if "death . . . resulted from the use of [a controlled] substance." 571 U.S. at 207. There, a habitual drug user died after ingesting multiple drugs, one of which was heroin the defendant sold.  *Id.* at 206–07. The Court held that, in such cases, the government must prove "actual causality," that is, "that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct."  *Id.* at 211 (internal quotation marks omitted).  Rejecting an appeal to "multiple causation" analysis, the Court noted this lower causation requirement applies only if "multiple sufficient causes independently, but concurrently, produce a result."  *Id.* at 214. In other words, the conduct at issue must be an "independently sufficient cause" of the harm. Id. at 215 (noting absence of evidence that death would have been caused by heroin alone). The Court expressly declined to adopt a test under which "an act or omission is considered a cause-in-fact if it was a 'substantial' or 'contributing' factor in producing a given result."  *Id.* at 214–16; *accord* Restatement (Third) of Torts: Economic Harm § 11 cmt. a (cause must be "necessary contribution to the plaintiff's loss"; in multiple-cause cases, "each . . . [must] have been sufficient to cause the resulting loss").

the record reflects the following:

- Each of the five AFEBs had 7 or 8 members, Dkt. 711 at 4273:16–20, and Relators have only offered the testimony of *one*, Tommy Marks.

- Relators did not ask Mr. Marks whether he personally would have changed the scores he gave to Fluor if he had known the supposed truth about Fluor's performance.

- AFEBs look at Fluor's "overall performance" under the contract, *id.* at 4254:14–16, in four areas: technical performance (40%), project management (20%), cost schedule management (20%), and cost control (20%). *Id.* at 4236:15–21. Fluor's AFEB scores were a result of Fluor's *overall contract performance*, including but not limited to, water production, dining facility services, laundry, MWR, power generation, firefighting, sewage and waste management. *Id.* at 4252:2–19, 4263:9–4264:25. Property management is only *one* part of Fluor's contract performance.

- The AFEB did not rubber stamp Fluor's representations. *Id.* at 4200:17–23. Mr. Marks personally observed Fluor's performance when he traveled to Afghanistan for approximately two weeks for each AFEB meeting, at which time he also spoke to the military personnel who directly received services from Fluor. *Id.* at 4293:20–4294:11, 4306:19-23. Mr. Marks viewed DCMA as his "eyes and ears" because they were living on the same bases that Fluor provided services for and also provided Mr. Marks information about Fluor's performance. *Id.* at 4294:13–21, 4201:24–4202:6, 4203:13–20.

- The recommendation made by the AFEB to the AFDO is not just a board member's individual recommendation, "[i]t's based on the entire board." *Id.* at 4256:5–14. Despite receiving the same presentations from each participating entity, each AFEB member might vote differently, and scores were "all over the map." *Id.* at 4288:15–20.

- The AFDO has the authority to unilaterally reject the AFEB's recommendation and pick a different score. *Id.* at 4257:1–11. Relators have not offered any AFDO's testimony about how they reach this decision, nor any evidence that any AFDO in this case would have reached a different decision had they been provided with different information.

- The record reflects that the AFDO did reach different award fee decisions than those presented by the AFEB. *Compare* Defs.' Ex. 382 (Brigadier General Felix Gedney awarding Fluor 50% in "techn[ical] performance" where the rest of the AFEB gave "85 percent to 92 percent" and similar variations for cost control), *with* Defs.' Ex. 421 (AFDO excluding BG Gedney's scores when awarding higher award fee than AFEB originally recommended). Relators have not offered any evidence to indicate what

factors or circumstances would cause an AFDO to select a score lower than an AFEB's recommendation.

- An award fee is granted for "above average" contract performance. Dkt. 711 at 4198:8–9. Average is defined by TO5 as just meeting the minimum contractual requirements. *Id.* at 4299:19–4300:1. Relators' expert John Lyle testified that it is impossible to define what it means for a contractor to exceed contract requirements.[4]

- Mr. Marks testified that evidence of mission failure might change an AFEB's decision, *id.* at 4238:9–14, but he is not aware of any such evidence as it relates to Fluor. *Id.* at 4295:16–4296:8; 4296:18–4297:3.

- Mr. Marks is not aware of any LOGAP contractor going through an award fee process and not receiving an award fee. Dkt. 711 at 4300:3–7.

- Multiple different entities—DCMA, DCAA, the Army, and Fluor—presented at each AFEB, and there is no evidence suggesting that a statement made by Fluor alone could have altered the award-fee decision-making process.

Relators' award fee theory is premised on the idea that Fluor's alleged property management failures were not disclosed (which is independently not supported by the record) and that property management alone would be *dispositive* in the AFEBs' score. But they have simply not introduced evidence to establish that this is true. Even when Relators posed various questions about how certain hypothetical information *might have* changed the award fee, Mr. Marks repeatedly answered in some form that the board would have to consider the information as *a factor* in the determination. Dkt. 711 at 4237:5–16, 4239:18–25.

*Buckley v. Deloitte & Touche USA LLP*, 888 F. Supp. 2d 404 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 62 (2d Cir. 2013), is instructive. There, a bankruptcy trustee sued the company's auditor, alleging the company's directors would have acted differently to avert bankruptcy had the auditor presented "accurate" information to the board. *Id.* at 409, 416. As here, the *Buckley* plaintiff was required to show but-for causation. *Id.* at 417. The court went on to grant summary judgment for

---

[4] Because Fluor has filed this motion on the same day as Mr. Lyle's testimony, Fluor does not yet have a transcript for this testimony.

the auditor because there was no evidence from which a reasonable jury could conclude "that the Board would have agreed to" any different plan of action were it presented with different information. *Id.* at 417. The court reasoned that the plaintiff "ha[d] but conjecture to present to the jury," which is not enough to raise a genuine dispute of material fact. *Id.* at 417, 419. "Put another way, the jury ha[d] no evidence from which to conclude that, but for [the auditor's] conduct," different decisions would have been made; "assertions . . . based on speculation are not enough to survive summary judgment." *Id.* at 419 (quoting *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008)). The Second Circuit affirmed, agreeing there was "insufficient evidence in the record to permit a reasonable juror to find" that the board would have acted differently, let alone that it would have taken the specific actions the plaintiff alleged. 541 F. App'x at 64.

If anything, Relators' but-for causation case is weaker than in *Buckley*. There, the plaintiff's case turned on the auditor's alleged failure to provide information on a single issue—the company's loan loss rates. Here, Relators accuse Fluor of making misrepresentations about a small minority of performance areas in AFEB submissions covering the whole range of services. Moreover, Fluor was but one voice of many, as DCMA, DCAA, and supported military customers provided their own take on Fluor's performance, often differing from Fluor's. Relators essentially want a "do-over" of Fluor's AFEBs, not to ask the jury to sit as evaluators themselves but, worse, to ask them to guess how the *actual evaluators would have voted*, all without evidence as to why the evaluators voted as they did.[5]

---

[5] Relators' expert confirmed that all the information an AFEB receives goes into the blender, and the result is an award fee score. Relators have presented only one piece of a blender with more than thirty components. That is far too little for a reasonable jury to determine causation.

These same facts are also fatal to Relators' ability to show materiality. Mr. Marks's repeated testimony that certain hypothetical facts would have simply required him to deliberate with his colleagues on the board—rather than that they would have definitely resulted in any specific outcome—dooms any argument that "the Government consistently refuses to pay claims in the mine run of [allegedly similar] cases." *See Escobar*, 579 U.S. at 195; *see also U.S. ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1033–34 (D.C. Cir. 2017) (granting summary judgment because "an Administrative Contracting Officer's (ACO) statement in a declaration that he 'might' have investigated further had he known false headcounts were being maintained, and that such an investigation 'might' have resulted in some charged costs being disallowed . . . [were a] far-too-attenuated supposition that the Government *might* have had the 'option to decline to pay'"). To the contrary, the numerous references in AFEB materials to Fluor's alleged performance deficiencies[6] show that this was a situation where "the Government pa[id] a particular claim in full despite its actual knowledge that certain requirements were violated," which "is very strong evidence that those requirements are not material." *Escobar*, 579 U.S. at 195.

### C.     Relators Have Not Shown Any Objectively False Statement

The question of whether there is an objective falsehood under the FCA is question of law. *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008). A "statement or conduct" is not false under the FCA unless it is "an objective falsehood." *Id.* at 376. "As a result, mere . . . imprecise statements or differences in interpretation growing out of a disputed

---

[6] Dkt. 151 at 25 (Fluor's AFEB presentation explaining that it is "Addressing PMSA Deficiencies"); Dkt. 81 at 11 (Fluor's Self-Assessment noting that it received 16 Level I CARs and 37 Level II CARs); Dkt. 225 at 3 (Fluor's Self-Assessment identifying that Fluor's response compliance time fell short for service orders); Dkt. 383 at 3 (Fluor's self-assessment identifying the same issue related to service orders).

legal question" cannot support FCA liability.  *Id.* at 377 (citation modified).  Nor can liability be based on a "subjective interpretation of [a contractor's] contractual duties" arising from "imprecise," "general" provisions that fail to make it "exactly clear what" the contractor was required to do.  *Id.*  Relators must prove an "objective falsehood, . . . rather [than] [their own] subjective interpretation of [Fluor's] contractual duties."  *Id.* at 377.

Relators contend that Fluor's AFEB submissions were false, in part, because Fluor omitted negative information Relators claim Fluor was required to provide.  But the contract contains to requirement to provide negative information, let alone a specific quantity or type of negative information.  Rather, it requires Fluor to provide "any information that may be *reasonably expected* to assist the AFEB in evaluating [Fluor's] performance."  Defs.' Ex. 32 at 11 (emphasis added).

In *Wilson*, the Fourth Circuit held that requirements to "ensure the safety and health of personnel, equipment and supplies" and that all "vehicles shall meet required vehicle requirements" were too subjective to give rise to an actionable falsehood. 525 F.3d at 374, 376– 77. Here, the contractual language is even less clear, requiring Fluor to exercise subjective judgment as to what information "may" "reasonably" "assist" AFEB members in making their own subjective determinations about Fluor's performance. And the sole guidance the government provided came in a short letter from PCO Cooper and Johnson, who instructed Fluor to "identify your performance above the minimum performance standards of the contract."  Defs.' Ex. 802. That letter said nothing about identifying performance "below" such minimum standards.  *Id.* at 23.

Therefore, Relators' contention that Fluor should have included different, negative information in its AFEB submissions reflects, at most, a "difference[] in interpretation" about the meaning of vague contractual language. *See Wilson*, 525 F.3d at 377 (citation omitted); *see also*

10

*U.S. ex rel. Fuchs v. Johns Hopkins Univ.*, No. 20-cv-3242, 2025 WL 958222, at \*7 (D.D.C. Mar. 31, 2025) (citing, inter alia, *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 675 (5th Cir. 2003)) (statements based on "imprecise adjective[s]," such as describing a patient's response to medical treatment as "dramatic," cannot be false under the FCA). The FCA does not punish "guesses." To hold otherwise and impose FCA liability—complete with treble damages and per claim penalties—based on the contractual language here would run afoul of the "fundamental principle" that the government "must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

Moreover, the contract imposed limitations on the amount of information Fluor could submit during the AFEB process, and because of this, Mr. Marks explained that Fluor's self-assessment and briefing slides were only an "executive summary." Dkt. 711 at 4255:13–19. Fluor had to exercise its judgment about what information to provide to the AFEB, which, as Mr. Marks confirmed, Fluor exercised in favor of informing the board of both strengths and weaknesses. *Id.* at 4290:6–9, 4291:2–5. This is a far cry from showing an objectively false statement.

Relators have elicited allegations of affirmative false statements to AFEBs in only two areas: property loss rates and service order response times. But there is no evidence from which a reasonable jury could conclude that what Fluor said to the AFEBs was false.

Start with service orders. Neither the LOGCAP IV nor TO5 contract, nor the associated performance work statement, define "response" and "repair" times for service orders. Dkt. 679 at 2479:6-9 (testimony of Relator Rude); *see* Defs.' Ex. 12, Defs.' Ex. 27, Defs.' Ex. 32. Fluor developed policies for response and repair times for itself and laid them out in its internal procedures—they were not mandated by the government. Dkt. 679 at 2479:10–12. The same is true of Fluor's property loss rate. Relators have made much of the fact that Fluor presented a 4.7%

11

loss rate to DCMA as part of its 2013 disclosure, and that this is higher than the rates of LTDDs presented in the AFEBs. *Compare* Pls.' Ex. 765, *with* Pls.' Ex. 190. But this is an apples-to-oranges comparison. Fluor was clear in its AFEB presentations that it was giving the board the numbers of actual LTDDs submitted and closed; not all losses for which a cause had not yet been established. Relators have presented no evidence that the numbers Fluor presented were false, nor that any particular metric was the right one to present. To the contrary, the jury has seen ample evidence that determining exactly what to put in a presentation was left to the contractor's discretion. *See supra* at 9–10.

### D.     Relators Have Not Introduced Evidence of Scienter

Liability under the FCA also requires that the false statement was knowingly false or made in "deliberate ignorance" or "reckless disregard" of its truth or falsity. 31 U.S.C. §§ 3729(a)(1)(A), (b)(1)(A). The Supreme Court has made clear that this scienter requirement is "rigorous" and should be "strict[ly] enforce[d]." *Escobar*, 579 U.S. at 192. It requires a relator to demonstrate a defendant's "knowledge and subjective beliefs" and is assessed based on "what the defendant thought when submitting the [allegedly] false claim." *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749, 752 (2023).

No reasonable jury could find that Fluor had such scienter. Relators have presented the testimony of only one individual who was involved in preparing AFEB presentations for Fluor: Scott Roesler. Mr. Roesler testified that his goal was to present data to the AFEBs that was accurate and complete. Dkt. 716 at 4874:12–15. He did not try to hide information from them. *Id.* 4874:20–22. There is absolutely no testimony from any other witness, nor any documentary

12

evidence, to the contrary.[7]  Mr. Roesler's testimony is corroborated by a slide deck he developed to train Fluor personnel on the award fee process.  Pls.' Ex. 64.  The slide deck is clear about Fluor's approach to award fee presentations: Managers were to "[r]eview and validate [data] in advance."  *Id.* at 6.  And they were expected to "[p]rovide backup documentation with data" for each of their assertions," and "[b]e critical" before putting something in a presentation for the government.  *Id.* at 8.  Relators cannot point to any evidence undermining the plain inference of this document: Fluor's goal was to present an accurate, honest picture in its AFEB presentations, and took seriously the task of educating its managers on how to do so.  That is not disregard for the truth.

## II.    Fluor Is Entitled to JMOL on Relators' Staffing Theory

### A.    Relators Should Be Judicially Estopped from Pursuing Their Abandoned Overestimating Theory

For six years, Relators' staffing theory was that by including three daily hours of "admin time" in estimates it submitted to the government, Fluor duped the government into letting it hire more personnel than it needed (the "Overestimating Theory").  *See* Dkt. 546-1 at 4–8 (laying out the evolution of Relators' staffing theories).  When Fluor moved for summary judgment on the Overestimating Theory, however, Relators specifically disclaimed it.  Dkt. 601 at 2–3.  In its place, Relators substituted a new staffing theory—one that was supposedly "not about the *estimates* that Fluor submitted to the Government *before* each reporting period," but "about the actual *timesheets*

---

[7] Mr. Roesler's 2011 email reflecting back on why Fluor had omitted a small amount of 2009 data from its August 2010 AFEB presentation is of no help to Relators.  *See* Pls.' Ex. 1212.  As Mr. Roesler testified, he omitted the data precisely because it was "not accurate," such that there was "no way to present it in any way that would explain what was happening on the ground accurately."  Dkt. 716 at 4874:3–10.  He did not know whether the data was favorable to Fluor or not.  *Id.* at 4874:16–19.  Relators have not come close to showing that Mr. Roesler recklessly disregarded the truth by omitting 2009 data that the government itself largely omitted from its presentations to that AFEB.  *See* Pls.' Ex. 134.

13

Fluor submitted *during* each reporting period (containing 3 hours of administrative time)" (the "Overbilling Theory"). Dkt. 537 at 11. This Court accepted Relators' abandonment of their Overestimating Theory in denying Fluor's motion for summary judgment, Dkt. 600 at 36, and in excluding James Sherman's testimony. Dkt. 601 at 2–3. But at trial, Relators reverted to the abandoned Overestimating Theory.[8] Relators are estopped from asking the jury to find Fluor liable based on this abandoned theory.

"Judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation." *Lamonds v. Gen. Motors Corp.*, 34 F. Supp. 2d 391, 394 (W.D. Va. 1999) (citing *John S. Clark Co. v. Faggart & Frieden, P.C.*, 65 F.3d 26, 28–29 (4th Cir. 1995)). The doctrine involves three basic elements:

> (1) The party to be estopped must be asserting a position that is factually inconsistent with a position taken in a prior judicial or administrative proceedings;
> (2) the prior inconsistent position must have been accepted by the tribunal; and
> (3) the party to be estopped must have taken inconsistent positions intentionally for the purpose of gaining unfair advantage.

*King v. Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192, 196 (4th Cir. 1998); *see also Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996). It is "invoked to prevent a party from playing fast and loose with the courts, from blowing hot and cold as the occasion demands, or from attempting to mislead the courts to gain unfair advantage." *King*, 159 F.3d at 196 (citations omitted). "As an equitable doctrine, judicial estoppel is invoked in the discretion of the district court and with the

---

[8] *See, e.g.*, Dkt. 714 at 4698 ("And if some folks can work more hours or less hours, that's going to impact the number of people you need, right?"); *id.* at 4698 ("If we assume people could only work five hours per day, if this is per day, then you need 200 people; right?"); *id.* at 4702 ("[U]ltimately this will drive management decisions on staffing levels; correct?"); *id.* at 4702 ("So this BOE is going to be used to identify for management how many people do we need to do the job; right?"); *id.* at 4728 (""And the reason you'd expect that is because that can have a huge impact on the number of people that you ultimately are going to say you need to do the job; right?"); *id.* at 4728 ("This could have as much as a 25 percent impact on the number of people you need if you remove those three hours of admin time, for example.").

14

recognition that each application must be decided upon its own specific facts and circumstances." *Id*. at 196, 198.

Relators' Overestimating Theory is inconsistent with the position they asserted in their summary judgment and *Daubert* briefing. To prevail at summary judgment, Relators emphasized that their claims turned on actual bills, not on the submission of estimates. Dkt. 601 at 2–3. The Court accepted Relators' representations and denied Fluor's motion for summary judgment on that basis. Dkt. 600 at 36 (denying Fluor's motion for summary judgment because Relators' response was "framed" in a way that "sounds in false billing"). Having won their point at summary judgment, Relators cannot now revert to their old, disavowed theory that Fluor's submission of estimates led to overstaffing of M&A personnel. *See Lamonds*, 34. F. Supp. 2d at 394 (where counsel  expressly stated that they were relying on one legal theory and the parties and court relied on this representation, the doctrine of judicial admission prohibits later inconsistent representations).[9]

Relators' change in theory was not a mistake. "Establishing that [a party] has taken [a] new position 'intentionally' does not require some sort of smoking gun type proof of intent"; rather, "[t]he inquiry for this third element focuses on whether the party is truly attempting to persuade the court to accept two inconsistent positions so as to gain unfair advantage." *Lamonds*, 34 F. Supp. 2d at 395. In *Lamonds*, a plaintiff advanced one theory of causation at summary judgment and prevailed as a result. But "having received the benefit of the court's prior denial of

---

[9] *See also Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*, 834 F.2d 208 (1st Cir. 1987) (party could not contradict its previously stated intention to not pursue a count regardless of the outcome of its appeal); *Jett v. Zink*, 474 F.2d 149, 155 (5th Cir. 1973) ("Sterling Oil has argued one position before this court and now, after obtaining the benefit of that position, has advanced an admittedly inconsistent position in hopes of prevailing again. We hold that it is precluded from utilizing such a tactic.")

summary judgment, the plaintiff wishes to proceed to trial by advancing a new, inconsistent set of facts as the basis for her theory of causation." The court precluded the new theory, because "[t]his sequence of events convinces the court that adoption of the new set of facts underlying the [new theory] was intentional and not inadvertent or a mistake." *Id.* The same result should be imposed here.

Even if the Court does not find that judicial estoppel warrants relief, Relators' express abandonment of this theory provides an independent basis to hold Relators to their previous representations. *Cf. Remy Holdings Int'l, LLC v. Fisher Auto Parts, Inc.*, No. 5:19-cv-00021, 2022 WL 571527, at *4 (W.D. Va. Feb. 25, 2022) ("Remy is now trying to change legal theories once again to avoid the entry of summary judgment. . . . Remy cannot evade summary judgment by contesting facts it previously conceded as true and conveniently switching theories when it suits them."); *U.S. ex rel. Schnupp v. Blair Pharm.*, No. ELH-17-2335, 2025 WL 2306250, at *18 (D. Md. Aug. 11, 2025) (failure to raise claim in summary judgment briefing constitutes abandonment and refusing to permit plaintiff to get "a second bite at the apple, by resurrecting a claim that he abandoned").

**B. Fluor Is Entitled to JMOL on Relators' Overestimating Theory**

Even if Relators had not abandoned their Overestimating Theory, they have failed to introduce sufficient evidence to permit a reasonable juror to find in their favor on it. To prove their case about Fluor's process for estimating labor, the only evidence Relators have introduced are internal estimating worksheets for field management and administration ("M&A") personnel. These worksheets referred to a three-hour "general admin time" assumption. *E.g.*, Dkt. 714 at 4699:6–11. This evidence is insufficient for a jury to find an FCA violation based on Relators' Overestimating Theory for three independent reasons: (i) the estimating worksheets were not used

16

to generate the estimates ultimately submitted to the government, (ii) Fluor does not submit bills based on estimates; and (iii) there is nothing wrong with a three-hour "admin time" assumption.

*First*, Relators have offered no evidence that these estimating worksheets were used in Fluor's actual contract proposals to the government. Indeed Mr. Roesler specifically testified to the contrary. Dkt. 714 at 4702:11–20 ("the actual formulation of the actual BOE that would go to the government was actually done by a separate thing. So I was gathering information and providing it to our senior management for decision making processes. But they had a group in Greenville that actually did the full proposal for the government."). Relators have not presented any evidence about what information was actually submitted to the government as it relates to Fluor's labor estimates, let alone shown that those submissions included an assumption of three hours of "general admin" time. Without any evidence that Fluor communicated these internal estimates to the government, an estimating-based FCA claim fails. *U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*, 562 F.3d 295, 308–09 (4th Cir. 2009) (affirming summary judgment for defendant where evidence included mere "estimate of [defendant's] costs" that "did not become a part of any commitment").

*Second*, Mr. Roesler and Mr. Howard testified consistently and repeatedly that the worksheets at issue were models and estimates that do not reflect actual or historical costs. *E.g.*, Dkt. 714 at 4716:14–16; Dkt. 716 at 4957:6–24. Mr. Roesler further testified that Fluor does not bill based on estimates, but instead based on actual labor costs incurred (*i.e.*, hours actually recorded by employees on their timesheets). Dkt. 716 at 4850:13–24. Relators have provided the jury no evidence from which it can draw any conclusions from *estimating worksheets* about Fluor's *actual* labor billing to the government. *Id.* at 4857:3–6. The *sine qua non* of a FCA violation is a

17

false claim for payment. *Harrison*, 176 F.3d at 785. Without any link between internal worksheets and a claim for payment, Relators' Overestimating Theory fails.

*Third*, Relators have not presented evidence that there is anything wrong with a three hour "general admin time" estimating assumption. Witnesses have consistently testified that Fluor used the term "admin time" in internal worksheets as a way to capture tasks that could not be planned or quantified with precision—such as responding to an unanticipated government request, attending a safety briefing, or taking shelter in a bunker during an enemy attack—but needed to be included in an estimate to ensure sufficient staffing to perform the work required by the contract. *See* Dkt. 716 at 4957:10–24.[10] There is no contrary evidence. Relators' counsel has suggested in questions that "admin time" included non-productive time that should not be included in an estimate, but no witness has said anything like that. The only witnesses with any personal involvement in estimating (Mr. Roesler and Mr. Howard) fully stood behind the reasonableness of an "admin time" assumption. Nor has any witness said that three hours is an inappropriate amount of "admin time" to include in an estimate.

### C. Fluor Is Entitled to JMOL on Relators' Overbilling Theory

Relators also have not introduced sufficient evidence to permit a reasonable jury to find for them on their Overbilling Theory. The FCA attaches liability to a false or fraudulent claim for

---

[10] Even as to estimates that were ultimately included in proposals Fluor submitted to the government, the government then vigorously negotiated with Fluor. Dkt. 716 at 4916:23–49:17:1; Dkt. 716 at 4955:1–15 (Howard testifying that the government goes "line item by line item" and "question[s] every single line item" during negotiations). Mr. Howard testified that during these negotiations, he informed the government about the concept of admin time. Dkt. 716 at 4960:24– 4961:7. Fluor had numerous discussions with government contracting officials about how to account for those sorts of tasks to develop appropriate staffing levels. *Id.* at 4962:16–22 ("Q. Do you have any reason to believe that a three-hour general admin time assumption was used in a proposal to the government? A: No. Q: But no doubt in your mind, right, that the concept of admin time was discussed, right? A: Yes.").

payment. *Harrison*, 176 F.3d at 785. But Relators have not introduced a single claim for payment into evidence. There is therefore no evidence showing what amount Fluor billed the government for labor, much less for M&A labor, much less for M&A labor reflecting "admin time." That alone prevents Relators from proving this theory under the FCA. *DRC, Inc.*, 562 F.3d at 308–09; *U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 491 F.3d 254, 262 (5th Cir. 2007) (same, because "negligent[,] . . . [u]nreasonable or incorrect cost projections" were not "actionable false claims").[11]

Of course, even if Relators had proven what claims Fluor submitted to the government, they would also need to prove that they were false. *See Wilson*, 525 F.3d at 374, 376–77. Relators' counsel have suggested that it would be inappropriate for Fluor to bill the government for amounts paid to employees who were not actively engaged in a task. In other words, Relators contend that although employees should have been paid by Fluor for the time they spent "on the clock," Fluor should not have charged that time to the government. But they have presented no *evidence* that periods of "down time" throughout the day were improperly charged to the government. Under a cost-reimbursable contract like LOGCAP, Fluor is entitled to be reimbursed for the amounts it paid employees. Fluor paid its employees for all the time they spent at their workstations either actively working or prepared to work, and Fluor was entitled to be reimbursed for those costs. Dkt. 716 at 4851:4–6; *id*. at 4950:19–4960:6. Relators offer no evidence to the contrary. And as discussed, "admin time" was an estimating assumption that accounted not only for "administrative" type tasks, but also productive work which simply could not be predicted in advance. *See id.* at 4704:14–4705:23 ("roughly about maybe 25 percent of your day, a three-hour

---

[11] The lone Fluor invoice introduced into evidence includes only two line items for award fee billings. *See* Pls.' Ex. 780-90.

portion of your day, would be unscheduled things, something that comes up"). A claim for labor costs can be false only if it included time that the employee was not actually at work.

Moreover, Relators cannot base a FCA case on speculation. The FAR permits "reasonable" costs, which is based on "if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business." 48 C.F.R. § 31.201–2(a)(1). Relators must have adduced evidence of specific costs that Fluor incurred that it should not have *because* of its overstaffing, such as specific time billed to the government that Fluor either actually knew the costs were unnecessary or was at least reckless as to that fact. *See* 31 U.S.C. § 3729(a)(1)(A)–(B); *see also United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1032–34 (D.C. Cir. 2017) (rejecting FCA claim based on allegations of inflated headcounts to justify excess staffing because there was no evidence to support accurate headcount data "was relevant to determining the reasonableness of costs" under the FAR). Relators have proffered no evidence to show that Fluor's labor costs, let alone its M&A costs or its "administrative time" costs, were unreasonable. As a result, the jury has no benchmark with which to gauge the reasonableness of those costs. *See* 48 C.F.R. § 31.201-3(b) (cost reasonable requires considering whether "it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance."). And there is substantial evidence showing that Fluor was *not* reckless in determining its labor costs, given the substantial government oversight over Fluor's costs and its participation in negotiating Fluor's estimates. *See* Dkt. 716 at 4942:18–4943:3 (agreeing that the government "negotiate[d hard]" and that they did not "pull any punches in negotiations").

Finally, anecdotal evidence about employees "milling around," *see* Dkt. 687 at 2963:6–24, or "excessive" personnel cannot save Relators' staffing claims. Starting with the recording of Paul

20

Gentry, there is no evidence that the employees Mr. Gentry was discussing in that tape were M&A employees. Mr. Howard testified that Mr. Gentry was primarily responsible for the trades (which are not M&A) and that when Mr. Gentry complained to him, he was complaining about the trades. Dkt. 716 at 4966:25–4967:9. Although Mr. Dillard suggested (incorrectly in Fluor's view) that Mr. Gentry had some oversight of the trades, Mr. Dillard was unable to identify which personnel Mr. Gentry was discussing on the recording. Therefore, even if Mr. Gentry had some oversight of M&A personnel, there is no evidence that is who he was talking about. The same is true for the other anecdotal testimony about employees sitting around smoke pits or otherwise not actively engaged in a task. Ex. 1 at 5192:15–5193:11 (Mr. Dillard discussing "a large number of people in general" who were "not necessarily being productive"). Not a single witness has said that they observed M&A personnel "on the clock" who were not at their workstations working or ready to work.

Finally, Relators cannot rely on the testimony from Dr. Gaukler to imply that timesheets must have been falsified because the number of work orders being completed during the year was "fairly steady" and there was only a "tiny dent" in the number work orders around the winter holidays. Dkt. 683 at 2775:21–2777:7. As an initial matter, this opinion looks at functions performed by *trade* labor and assumes they would be correlated with overstaffing of *M&A* labor. Worse still for Relators, there is no evidentiary basis for the jury to find that any Fluor employee, let alone 25–30% of the workforce, left Afghanistan during the winter holiday system. "It is fixed law that 'an expert can give his opinion on the basis of hypothetical facts, but those facts must be established by independent evidence properly introduced.'" *Newman v. Hy-Way Heat Sys., Inc.*, 789 F.2d 269, 270 (4th Cir. 1986) (citing *Logsdon v. Baker*, 517 F.2d 174 (D.C. Cir. 1975)). Where an expert's opinion "speculate[s] in fashions unsupported by" the evidence of the case, the

21

testimony should be stricken. *See id.* This is precisely the case here. The jury should be told to disregard this testimony entirely, and the Court should not consider this testimony when evaluating Fluor's JMOL motion.[12]

### III. Fluor Is Entitled to JMOL on Relators' Property Management Theory

Fluor is also entitled to JMOL on Relators' property management theory because Relators have not proven a reverse false claim on any of their three theories.[13] In their opening statements, Relators conceded that under LOGCAP IV, there were but "two possible consequences" when "Fluor . . . would lose stuff." Dkt. 658 at 46:15–17. First, "if [Fluor] couldn't satisfy the government that [it] had a [property management] system that worked, then Fluor [would] be responsible for all these [alleged] losses," which otherwise "the government would be responsible for." *Id.* at 46:16–21.[14] "The second thing, of course, is . . . they could lose the contract." *Id.* at 46:24–25. The third way that Fluor could be liable for losses (which Relators neglected to mention in opening statements but they appear to be trying to prove) is that Fluor could be liable for "[l]oss

---

[12] Moreover, Relators told the jury about this evidence during Opening Statements, drawing an objection by Fluor. Dkt. 658 at 65:7–17. Fluor informed the Court that the basis for Relators' statement rests on Mr. Sherman's stricken expert report. *Id.* at 65:21–66:13. Relators urged the Court to permit their opening statement to continue, citing "the data's going to show that every November and December everybody would go home, and the same work got done" and indicated that "Fluor witnesses, record keepers" would offer this testimony. *Id.* at 66:15–67:6. Relators did not offer this evidence. The jury should be reminded that statements of counsel are not to be taken as evidence.

[13] At summary judgment, Relators argued that Fluor received reimbursement from the government for LTDDs. Dkt. 537 at 33. Relators have not introduced any evidence of this affirmative FCA theory as the evidentiary record reflects that Fluor is not reimbursed after submitting an LTDD, they just receive relief of responsibility. *See* Dkt. 707 at 1998:19–1999:4.

[14] This statement is legally incorrect. *See* Def. Ex 274 (FAR 52.245-1(h)(iii) confirming Fluor not liable for loss of property even if PMS is disapproved if it can show "by clear and convincing evidence that the loss of Government property occurred while the Contractor had adequate property management practices or the loss did not result from the Contractor's failure to maintain adequate property management practices[.]").

of Government property that is the result of willful misconduct or lack of good faith on the part of the Contractor's managerial personnel." FAR 52.245-1(h)(ii).

To prove that Fluor was liable under any of these three theories, Relators must have introduced sufficient factual evidence from which a reasonable juror could find that Fluor "knowingly conceal[ed] or knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the Government." *See* 31 U.S.C. § 3729(a)(1)(G); *see also U.S. ex rel. Wheeler v. Acadia Healthcare Co., Inc.*, 127 F.4th 472, 495–96 (4th Cir. 2025). An obligation under the reverse false claims provision must be "an established duty, whether or not fixed," to "pay or transmit money or property to the Government." *Id.* §§ 3729(b)(3), (a)(1)(G).[15] Such an obligation may arise "from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *Id.* §§ 3729(b)(3). *Wheeler* demonstrates the distinction between obligations that are established and those that are not: when a putative obligation is "contingent and may not ultimately materialize," it is not established; when "[t]he only remaining step is for the government to collect," the obligation is sufficiently established to trigger the reverse false claims provision. 127 F.4th at 496.

---

[15] To the extent the Court indicated in its summary judgment ruling that Fluor's property management duties could suffice as "obligations" within the meaning of the FCA's reverse false claims provision, Fluor respectfully requests that the Court reconsider that decision. *See* Dkt. 600 at 28. As *Wheeler* makes clear, an obligation under the reverse false claims provision must be "an *obligation to pay* or transmit money or property to the Government." 127 F.4th at 495 (quoting 31 U.S.C. § 3729(b)(3)) (emphasis in *Wheeler*). Violation of a preexisting contractual or regulatory provision is insufficient—the question is "whether these alleged violations *would create* an 'obligation' owed by [the defendant] to the government." *Id.* at 496 (emphasis added).

23

The evidentiary record currently before the jury reflects that Fluor had no existing obligation to pay the government for any of the losses as set forth in greater detail below.[16] Accordingly, there is no legally or factually sufficient basis to find that Fluor is liable of a reverse false claim violation related to property management.

### A. Relators Have Not Introduced Sufficient Evidence to Support a Reverse FCA Theory Based on Revocation of Fluor's Property Management System

Relators' first property management theory is that if the government knew the "truth," it would have revoked approval of Fluor's property management system ("PMS"), thereby causing Fluor to become liable for lost property. As a matter of law, to establish this theory, Relators must have introduced evidence to show that all the government had to do was ask for the money and "collect." *See Wheeler*, 127 F.4th at 496. But Relators have not come close.

As established by DCMA Prime Property Administrator Maria McNamara's testimony, "the Government bears the risk of loss" on LOGCAP IV unless "[Fluor] has a disapproved system." Dkt. 708 at 2226:11–14; *see also* Def. Ex. 274. This disapproval process requires the Contracting Officer to revoke the PMS approval "in writing" after "the Contract failed to take timely corrective action." Def. Ex. 274 (FAR 52-245-1(h)(iii)). The opportunity to take corrective action would require a Contracting Officer to prepare a Level III or IV CAR that is issued to the contractor. Dkt. 691 at 3252:4–7. Even if the contractor did not take appropriate corrective action and DCMA decided to revoke the PMS, Fluor would not be liable for losses if it could show "by clear and convincing evidence that the loss of Government property occurred while the Contractor had adequate property management practices or the loss did not result from the Contractor's failure to maintain adequate property management practices[.]" Def. Ex. 274 (FAR 52-245-1(h)(iii). It

---

[16] Fluor maintains that Relators cannot prove of any actual physical loss of property but reserves filing a motion on this issue until the evidentiary record develops further.

would only be after *each of these steps* that government would have an "obligation" to pay the government for lost property.

The evidentiary record confirms that there was not yet an existing obligation for Fluor to pay the government for allegedly "lost" materials:

- As set forth above, FAR 52-245-1(h) lays out a process in which the government would follow when revoking relief of responsibility. There is no evidence in the record that any government official took any of these steps against Fluor.

- Relators have only offered *one* government witness related to their property management claim: Maria McNamara. Ms. McNamara did not have the authority to revoke Fluor's PMS, as this lies within the authority of a Contracting Officer. Dkt. 708 at 2225:19–22. Ms. McNamara did ever recommend that the Contracting Officer disapprove Fluor's PMS. Dkt. 708 at 2225:19–25.

- Ms. McNamara *approved* Fluor's PMS each year. Dkt. 708 at 2226:21–2227:3. As Ms. McNamara explained, any decision for the government to shift responsibility for losses onto Fluor would "go hand-in-hand" with a decision to revoke approval of Fluor's property system. Dkt. 707 at 2000:1–19.

- Relators point to Storme Guaraldi's December 10, 2010 Letter of Concern, claiming that the government warned Fluor that it could revoke relief of responsibility for losses if Fluor did not implement corrective actions. *See* Pl's Ex. 1 (Guaraldi Letter of Concern). However, a letter of concern does not start the PMS disapproval process, and Relators would need to show that the government issued a Level III or Level IV CAR. *See* Dkt. 691 at 3251:12–17. There is no evidence of this in the evidentiary record. Moreover, PMS disapproval happens at a higher rank than Ms. Guaraldi. *Cf.* Dkt. 687 at 3077:14–3079:24.

- Relators did not offer testimony or other evidence about any Contracting Officer or other senior DCMA official who had the authority to revoke Fluor's PMS and what information they would consider when weighing whether to disapprove a contractor's PMS.

- The government rarely revokes a contractor's PMS. *See* Dkt. 707 at 2000:20–23 (Ms. McNamara only taking part in one PMS disapproval); *cf.* Dkt. 708 at 2229:3–13 (Ms. McNamara oversaw "many more" than 50 different contractors in her career).

In sum, Relators have not introduced any evidence that Fluor had an obligation to pay the government for any losses because the government did not revoke Fluor's PMS, let alone take any steps to do so.

25

The law is clear that "a duty is not established when it 'is dependent on a future discretionary act'" by government officials. *Miller v. U.S. ex rel. Miller*, 110 F.4th 533, 544 (2d Cir. 2024) (citing *U.S. ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 505 (3d Cir. 2017)); *see also id.* at 545 n.5 (collecting cases from three other courts of appeals).[17]  For example, in *Petras*, a company allegedly "hid[] [its] deteriorating financial condition from the SBA . . . to prevent the SBA from placing [it] into involuntary liquidation," which would have required the company to pay dividends to the government. 857 F.3d at 500–01.  The court held such facts could not support a reverse false claims theory because "events that would trigger an actual obligation to pay dividends . . . had not yet materialized," and it was possible that they never would.  *Id.* at 506. Since the alleged obligation was contingent on future events, the relator's reverse false claim theory failed.  *See id.* at 506–07.

Employing this principle, the Fourth Circuit in *Wheeler* recently held that reverse false claims liability could be imposed where a contractual liquidated damages clause provided for "stipulated monetary penalties" to "automatically accrue" in the event of a specified breach. 127 F.4th at 496. These stipulated penalties were self-executing such that "[t]he only remaining step [wa]s for the government to collect on that penalty."  *Id.*  The only "discretion" was for the government to decide when to collect or whether to waive collection of the automatically imposed obligation.  *Id.* at 496–97.[18]

---

[17] The paradigmatic circumstance is where a party's "obligation" is predicated on "a statute [that] gives an agency the ability to decide whether ir. 2016).  In other words, "potential or contingent" exposure cannot trigger reverse false claims liability. *Id.* at 1035.

[18] Notably, the Fourth Circuit construed its holding as "narrow," applying it to the provisions of that particular contract and not to liquidated damage provisions generally. Id. at 497. Relators here do not rely on any liquidated damages clause in LOGCAP or TO5—because there is none. The LOGCAP contract incorporates a FAR provision that contemplates that a task order under LOGCAP could be written to include a liquidated damages provision. Def. Ex. 12 § F-12 (incorporating FAR 52.211-11). But TO5 has no such provision. Accordingly, *Wheeler* does not

Here, because the evidence in the record reflects that the government did not disapprove Fluor's PMS, no reverse false claims liability could lie on the facts currently in evidence. Moreover,  even if Relators' claim could proceed despite the government not taking any steps to revoke Fluor's PMS, there is no evidence to indicate that the government would have done so. When Relators asked the sole government property witness what she would have done if she had known about a select number of internal Fluor documents, Ms. McNamara indicated that she would need to speak with someone at a higher authority level than her.  E.g., Dkt. 691 at 3278:7– 3279:9.  Relators also never asked her whether she would have recommended Fluor's PMS be disapproved.  Accordingly, Fluor is entitled to JMOL on this theory.

## B. Relators Have Not Introduced Evidence That Fluor Would Have Lost the LOGCAP IV Contract

Relators' second property management theory is easily dispensed with.  Relators have presented no evidence whatsoever about how a decision for Fluor to "lose the contract" would have been made, nor the process for doing so (if one even existed), let alone any evidence showing that such a thing would have happened had the government known more or different information about Fluor's management of government property.   Indeed, when asked about potential consequences for poor property management, DCMA GPA Maria McNamara listed only one: revocation of the government's assumption of risk for lost property.  Dkt. 707 at 2000:11–14 ("Q: And so once this [corrective action plan] was in place, if Fluor failed the next PMSA, the subsequent PMSAs, what was the potential consequence for Fluor? A: It could be the revocation of the LTDD.").  Nor have Relators pointed to any applicable provision of the LOGCAP IV contract, or of Task Order 5, under which contract termination could have resulted from poor

---

support Relator's claims; precisely the opposite. The alleged liability at issue, as described below, does not automatically arise as a matter of contract but requires predicate governmental action.

27

property management.  That is because there is none.  *See* Defs.' Ex. 12; Defs.' Ex. 32.  Moreover, there is simply no evidence that the government took any steps to cancel the LOGCAP IV contract after learning of Relators' claims.  Because Relators have put on no evidence in support of this theory, Fluor is entitled to JMOL on it.

### C. Relators Have Not Introduced Evidence That Fluor's Managerial Personnel Engaged in Willful Misconduct or Lack of Good Faith

The final way that Fluor could have an obligation to pay for losses is if Relators show a "[l]oss of Government property that is the result of willful misconduct or lack of good faith on the part of the Contractor's managerial personnel."  FAR 52.245-1(h)(ii).  The FAR defines "contractor's managerial personnel" as "[Fluor's] directors, officers, managers, superintendents, or equivalent representatives who have supervision or direction of (1) All or substantially all of the Contractor's business; (2) All or substantially all of the Contractor's operation at any one plant or separate location; or (3) A separate and complete major industrial operation."  FAR 52-245-1(a).  Relators have failed to present sufficient evidence to reach a jury on this theory.

*First*, Relators have not introduced any evidence about who would qualify as contractor's managerial personnel, let alone demonstrate that the key players discussed at trial would satisfy that definition.  On the first prong, none of the Fluor employees who were discussed at trial had "supervision or direction of [] [a] or substantially all of [Fluor's] business."  *See* FAR 52-245-1(a).  As for the second prong (related to "supervision or direction of . . . [a]ll or substantially all of [Fluor's] operation at any one plant or separate location"), this would cover, at most, Country Managers (or higher), such as Country Managers Steve Whitcomb, George O'Neill, and George Rabb.[19]

---

[19] For example, Relators have spent a lot of time discussing Mr. Montalvo's actions as the Director of Materials Management, but Mr. Montalvo does not have "supervision or direction of . . . [a]ll

*Second*, Relators have not presented evidence to show "willful misconduct or lack of good faith" and link those actions to the loss of specific government property. *See* FAR 52.245-1(h)(ii). "Mere indifference" or "proof of negligence" are "not enough." *Fairchild Hiller Corp.*, ASBCA No. 14387, 1971 WL 1284 (Nov. 30, 1971).[20]  Rather, "willful misconduct" requires proof that a qualifying individual was "recreant," or "refuse[d] deliberately to perform a plain, well-understood contractual or statutory obligation without just cause or excuse," or "conscious[ly] fail[ed] to use the necessary means to avoid peril and [was] indifferen[t] to its consequences." *Fairchild Hiller Corp.*, 1971 WL 1284 (citations omitted).[21]  There is simply nothing in the record to support that any of these individuals engaged in "willful misconduct" when overseeing property management issues.

*Third,* Relators have not introduced any specific loss of government property that can be tied to these Country Managers.

The possibility that the government *might* identify a loss potentially subject to the exception and *might* decide to take any of the steps outlined above is far too speculative to impose an obligation on Fluor to pay.  Accordingly, Relators' claim that Fluor should have been liable for lost property because its managerial personnel engaged in willful misconduct or lack of good faith fails as a matter of law.

---

or substantially all of [Fluor's] operation" in Afghanistan.  Therefore, he cannot properly be categorized as contractor managerial personnel pursuant to the FAR.

[20] *Cf. Pac. Architects & Eng'rs, Inc.*, ASBCA No. 19513, 1978 WL 2445 (Oct. 24, 1978) (overruling government's attempt to invoke this provision as to items stolen from contractor-operated commissary because of lack of evidence of requisite mental state, even though contractor "failed to comply with" theft-prevention procedures despite awareness of employee thefts).

[21] "[B]ad faith [is] never presumed," and "[t]he Government has much to show before a finding of bad faith or willful misconduct can be made." *Thiokol Corp.*, ASBCA No. 32629, 1989 WL 77301 (June 2, 1989).

### III.    Fluor Is Entitled to JMOL on Both Retaliation Claims

To establish a prima facie case of retaliation under the False Claims Act ("FCA"), a plaintiff must prove the following: "(1) that he engaged in 'protected activity' by acting in furtherance of a *qui tam* suit; (2) that his employer knew of these acts; and (3) that a causal link exists—that his employer took adverse action against him *as a result* of these acts." *United States ex rel. Cody v. ManTech Int'l, Corp.*, 746 F. App'x 166, 176 (4th Cir. 2018) (quotations omitted). If a plaintiff establishes a *prima facie* case of retaliation, "the burden then shifts to the employer to show that it had a legitimate non-retaliatory basis for its actions," and "[i]f the employer makes this showing . . . the burden then shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for [retaliation]." *Id.* (quotations omitted). "Stated differently, the plaintiff must show the articulated reason is false *and* that retaliation was the real reason for the challenged conduct." *Id.* at 178 (quotations omitted). Fluor is entitled to JMOL on Relator Shepherd's and Relator Rude's retaliation claims as discussed below.

### A.    Relator Shepherd's Retaliation Claim

Relator Shepherd has abandoned his retaliation claim by not presenting any evidence at trial. *See In re Williams*, 455 B.R. 485, 489 n.7 (Bankr. E.D. Va. 2011) ("[Plaintiff] appears to have abandoned this claim for relief, as no evidence was included at trial to support the claim[.]").[22] Therefore, there is no "legally sufficient evidentiary basis to find for the non-moving party," *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 292 (4th Cir. 2009) (quotations omitted), and Fluor is entitled to JMOL.

---

[22] *See also Awards Depot, LLC v. Trophy Depot, Inc.*, No. CV H-18-1838, 2020 WL 10817485, at *1 n.2 (S.D. Tex. Dec. 21, 2020) ("The parties did not present evidence or testimony at trial on the other claims, which are waived or abandoned.").

B.     **Relator Rude's Retaliation Claim**

Relator Rude has alleged that Fluor engaged in retaliation against him by (i) including him in a Reduction in Force ("RIF")[23] in July 2014; (ii) denying him a Task Order 5 ("TO5") promotion in mid-July 2012; and (iii) denying him a promotion to Tier I status in early July 2012.  Relator Rude has failed to present sufficient evidence to establish any of these theories.

     i.  **Relator Rude Has Not Proven That Decisionmakers Had Knowledge of His Protected Activity**

Relator Rude's retaliation claim for the RIF and Tier I promotion fail because he has not introduced *any* evidence "that a relevant decisionmaker was actually aware of the protected activity before making their decision." *See Barnhill v. Bondi*, 138 F.4th 123, 132 (4th Cir. 2025) (emphasis added).  At trial:

- When asked "do you know who made the decision to RIF you[,]" Relator Rude testified, "No, I can't give you an opinion on that. *I don't know who made the decision*." Dkt. 679 at 2517:5–7 (emphasis added).[24]

- When asked "You don't know who made a decision not to promote you to Tier 1; right[,]" Relator Rude responded: "*No, I do not*." Dkt. 679 at 2512:1–3 (emphasis added).

These admissions alone are dispositive because Relator Rude cannot show *who* the decisionmakers were, and therefore, he cannot show that they had knowledge about his protected activity.  *See*

---

[23] Fluor's reason for terminating Relator Rude appears on the face of the document he signed in July 2014: "[Y]our position with Fluor's LOGCAP IV Afghanistan project has been eliminated as the result of the United States Government operational requirements and mandated reductions of mission requirements in Afghanistan." Defs.' Ex. 599.

[24] Despite admitting that his supervisors, Relator Sheperd and James Coogle, would have had to sign off on the RIF, Relator Rude refused to lay blame at their feet and believed the decision was made "at a higher level." *See id.* at 2458:2–2459:4, 2516:10–2517:7.  As a matter of law, Relator Shepherd and Mr. Coogle cannot now be decisionmakers to support Relator Rude's claim.  *See Barnhill*, 138 F. 4th at 135 (failure to assert decisionmaker possessed discriminatory animus was dispositive).

*Barnhill*, 138 F. 4th at 132; *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021); *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 784 (4th Cir. 2021).

As for Relator Rude's claim that he was improperly denied a TO5 promotion, he testified that he believed Michael D'Arcangelo was the decisionmaker. But the only evidence submitted to support that belief (PX 1683) states that Mr. D'Arcangelo asked the Compensation Team to place the "[a]ction on HOLD pending further clarification," after which Mr. D'Arcangelo posed a series of questions, including about the remaining Maximo budget. *See* Pls.' Ex. 1683 at 2. Relator Rude admits that he has no knowledge about how large the Maximo budget was; how much was remaining; and whether that was sufficient to accommodate his promotion. *See* Dkt. 683 at 2599:11–2600:24. Furthermore, this exhibit shows only that the *Compensation Team* did not take any further action on the promotion, *id.* at 2—it does not show *D'Arcangelo* was the final decisionmaker or that the promotion was ever actually denied. Given the lack of other evidence on this issue offered by Relator Rude, his claim here fails as well.

### ii. Relator Rude Cannot Show a Causal Nexus Between Protected Activity and the Adverse Employment Actions

Relator's Rude's three retaliation theories also fail because he cannot show that there is a causal connection between the protected activity and the alleged adverse employment actions. "Temporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation, and the causal connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event." *Feldman v. L. Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014) (citation modified). The Fourth Circuit requires the temporal proximity to be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S.

268, 273–74 (2001); *see also Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012) (holding that "a three-month lapse is too long to establish causation, without more").[25]

At trial, Relator Rude identified only two instances of protected activity:

- At an undisclosed time, Relator Rude expressed concerns to John Cray and Ron Riley that Fluor should not document the time that Fluor receives a service order as the response time. Dkt. 679 at 2411:18-2414:25.
- At an undisclosed time, Relator Rude raised this same concern in country manager meetings. *Id.* at 2419:11. This would have only occurred when Relator Shepherd was on R&R. *Id.* at 2420:9-10.

Because Relator Rude did not offer any testimony about *when* he reported these concerns, he necessarily cannot show that such reporting was *causally connected* to the employment actions he now complains of. He only generally stated that he reported his concerns for "[t]hree and a half, four years" before his RIF. Dkt. 679 at 2451:19. This means that Relator Rude engaged in protected activity for approximately *1.5 years* before allegedly being denied both promotions in July 2012, *see* Pls.' Ex. 1683 & 1684; and *approximately 3.5 years* before the RIF, *see* Defs.' Ex. 599.

"A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action, as was the case here, negates any inference that a causal connection exists between the two." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (Title VII retaliation). Because Relator Rude's concerns were raised

---

[25] *Nifong v. SOC, LLC*, 234 F. Supp. 3d 739, 757 (E.D. Va. 2017) ("It is axiomatic in this circuit that a gap of three months . . . between a protected activity and adverse action is too long to infer a causal nexus."); *Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012) (holding that "a three-month lapse is too long to establish causation, without more"); *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) ("[T]hree to four months separat[ing] the [adverse action] and the claimed protected activities . . . is too long to establish a causal connection by temporal proximity alone."); *Swann v. US Foods, Inc.*, No. 1:14-cv-1409, 2015 WL 3793739, at *6 (E.D. Va. June 17, 2015) ("[C]ourts have consistently held that a period of three or four months between protected activity and adverse employment action is insufficient to establish a causal link between the two.").

*years* before any alleged improper employment action—far in excess of the three-month temporal proximity the Fourth Circuit demands—Fluor is entitled to JMOL.

Furthermore, the *government's* reduction of forces in Afghanistan constitutes a "legitimate intervening event" sufficient to sever any causal connection. *See Feldman*, 752 F.3d at 348. In *Cody*, the Fourth Circuit reversed the district court's *denial* of JMOL under Rule 50(b). *United States ex rel. Cody v. ManTech Int'l, Corp.*, 746 F. App'x 166, 183 (4th Cir. 2018). Even though one relator in that case was fired after filing a *qui tam*, "there [was not] any evidence that Muge would have been retained by ManTech even after the Army had eliminated her job, particularly given the economic straits in which ManTech found itself at the time." *Id.* at 182. The Fourth Circuit concluded "that no reasonable finder of fact could conclude that 'the harm would not have occurred in the absence of—that is, but for—the defendant's conduct.'" *Id.* at 182–83 (quoting *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015)).[26]

Here, Relator Rude admits that in 2014, the military was closing sites across Afghanistan, and "[w]hen the military draws down, Fluor has to draw down." Dkt. 683 at 2603:21–22, 2604:3–5. Given the lack of temporal proximity between Relator Rude's alleged protected activity and the July 2014 RIF, combined with the ongoing drawdown (decided by the *government*, not Fluor), Relator Rude has not introduced evidence of a causal nexus to support his retaliation claim.

### iii. Relator Rude Has Not Offered Evidence That Fluor's Articulated Reasons Were False and Retaliation Was the Real Reason

Moreover, Relator Rude has not presented sufficient evidence for any reasonable juror to find that Fluor's non-retaliatory bases were not the true reason for all three employment actions.

---

[26] *See also Chapins v. Northwestern Cmty. Servs. Bd.*, 243 F. Supp. 3d 739, 749 (W.D. Va. 2017) (granting summary judgment in FCA retaliation case where closure of defendant's program "led Northwestern to terminate thirty-three other employees—most or all of whom, presumably did not engage in protected activity under the False Claims Act.").

The Fourth Circuit frequently recognizes RIFs and budgetary restraints as legitimate, non-retaliatory justifications. *See Carmack v. Virginia*, No. 1:18-cv-31, 2019 WL 4120410, at *18 (W.D. Va. Aug. 29, 2019) (collecting cases), *aff'd*, 837 F. App'x 178 (4th Cir. 2020); *Fields v. Verizon Servs. Corp.*, 493 F. App'x 371, 376 (4th Cir. 2012) (consideration of "the present and future needs of the company is a legitimate, nondiscriminatory reason"); *Propst v. HWS Co., Inc.*, 148 F. Supp. 3d 506, 525–26 (W.D.N.C. 2015) (collecting cases). Moreover, the fact that Relator Rude was rehired *only four months* after he was included in a RIF is irreconcilable with Relators' assertion that he was terminated as a punishment for speaking up. *See Aviles v. Alutiq Secs. & Tech.*, No. 10-cv-2589, 2012 WL 12905874, at *4–5 (S.D. Cal. June 15, 2012) (subsequent rehiring indicates termination was nondiscriminatory).

Based on the above, Fluor is entitled to JMOL on Relator Rude's retaliation claim as well.

## IV.    The FCA Qui Tam Device Violates Article II of the Constitution

In addition to all the above, this case cannot proceed because the *qui tam* device violates Article II of the Constitution.[27] *See U.S. ex rel. Zafirov v. Fla. Med. Assocs.*, 751 F. Supp. 3d 1293 (M.D. Fla. 2024), *appeal docketed*, No. 24-13581 (11th Cir.). Because the parties have extensively briefed the merits of this question, Fluor incorporates by reference its prior briefing as to why it is entitled to judgment on this ground, *see* Dkts. 396, 414, which the Court need not reach if it grants motion on other grounds. *See Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 7 (1993).

### CONCLUSION

For these reasons, and others stated on the record, the Court should grant Fluor judgment as a matter of law on all counts.

---

[27] Fluor understands that evidence of the FCA's constitutionality has not been presented at trial but includes this argument to preserve the issue.

Respectfully Submitted,

/s/ Mark C. Moore
Mark C. Moore (Fed. ID No. 4956)
Michael A. Parente (Fed. ID No. 13358)
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 540-2146
Facsimile: (803) 727-1458
MMoore@maynardnexsen.com

Konstantine P. Diamaduros (Fed. ID No. 12368)
MAYNARD NEXSEN PC
104 South Main Street, Suite 900 (29601)
Post Office Drawer 10648
Greenville, SC 29603-0648
Telephone: (864) 370-2211
Facsimile: (864) 282-1177

Craig D. Margolis (admitted *pro hac vice*)
Tirzah S. Lollar (admitted *pro hac vice*)
Christian D. Sheehan (admitted *pro hac vice*)
Elizabeth A. Carney (admitted *pro hac vice*)
Katelyn M. Deibler (admitted *pro hac vice*)
Elliot S. Rosenwald (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, Northwest
Washington, DC 20001-3743
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
craig.margolis@arnoldporter.com

Rachel K. Higgins (admitted *pro hac vice*)
Sahrula Kubie (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

February 24, 2026                    *Counsel for Defendants Fluor Corporation and*
Greenville, South Carolina           *Fluor Intercontinental, Inc.*

36