**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CHARLES R. SHEPHERD; DANNY V. RUDE; ROBERT SCOTT DILLARD; and RICKEY MACKEY, <br><br> Plaintiff-Relators, <br><br> v. <br><br> FLUOR CORPORATION; FLUOR INTERCONTINENTAL, INC., <br><br> Defendants. | Civil Action No. 6:13-cv-02428-JD |

**FLUOR'S MEMORANDUM OF LAW IN SUPPORT OF
<u>SECOND MOTION FOR JUDGMENT AS A MATTER OF LAW</u>**

Mark C. Moore (Fed. ID No. 4956)
Michael A. Parente (Fed. ID No. 13358)
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 540-2146
Facsimile: (803) 727-1458
MMoore@maynardnexsen.com

Konstantine P. Diamaduros (Fed. ID No. 12368)
MAYNARD NEXSEN PC
104 South Main Street, Suite 900 (29601)
Post Office Drawer 10648
Greenville, SC 29603-0648
Telephone: (864) 370-2211
Facsimile: (864) 282-1177
KDiamaduros@maynardnexsen.com

Craig D. Margolis (admitted *pro hac vice*)
Tirzah S. Lollar (admitted *pro hac vice*)
Christian D. Sheehan (admitted *pro hac vice*)
Elizabeth A. Carney (admitted *pro hac vice*)
Katelyn M. Deibler (admitted *pro hac vice*)
Elliot S. Rosenwald (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, Northwest
Washington, DC 20001-3743
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
craig.margolis@arnoldporter.com

Rachel K. Higgins (admitted *pro hac vice*)
Sahrula Kubie (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Counsel for Defendants Fluor Corporation and Fluor Intercontinental, Inc.*

March 6, 2026

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

STANDARD OF REVIEW ......................................................................................................... 1

DISCUSSION ............................................................................................................................. 2

    I.    Fluor is Entitled to JMOL on Relators' Award Fee Claim ................................................ 2

        a.    Relators Have Not Introduced Sufficient Evidence to Permit a Jury to Find Scienter on Their Award Fee Claim ........................................................................................................ 2

        b.    Relators Have Not Introduced Sufficient Evidence to Permit a Jury to Find Falsity on Their Award Fee Claim ........................................................................................................ 7

        c.    Fraudulent Inducement Is The Only Proper Legal Framework for Relators' Award Fee Claim and Relators Have Not Presented Sufficient Evidence of Causation ........................... 8

    II.    Fluor is Entitled to JMOL on Relators' Theory Relating to Cost Plus Fixed fee ......... 11

    III.    Fluor is Entitled to JMOL on Relators' Staffing Theory ............................................. 12

    IV.    Fluor is Entitled to JMOL on Relators' Property Management Claim ......................... 17

    V.    Fluor is Entitled to JMOL on Relator Rude's Retaliation Claim ..................................... 20

    VI.    Fluor Corporation is Entitled to JMOL on All Claims ................................................. 24

CONCLUSION ........................................................................................................................... 26

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Antonio v. Sygma Network, Inc.*,
   458 F.3d 1177 (10th Cir. 2006) ...............................................................................22

*Azar v. Benson Motor Co. of San Antonio, Inc.*,
   No. SA-14-CA-563, 2015 WL 12533100 (W.D. Tex. Mar. 19, 2015)....................................23

*Bradley v. Harcourt, Brace and Co.*,
   104 F.3d 267 (9th Cir. 1996) ..................................................................................22

*Brown v. CSX Transp., Inc.*,
   18 F.3d 245 (4th Cir. 1994) .....................................................................................1

*Coghlan v. Am. Seafoods Co. LLC*,
   413 F.3d 1090 (9th Cir. 2005) .................................................................................23

*Curry v. S.C. State Elec. Comm'n*,
   No. 3:22-cv-0911-JFA-TER, 2024 WL 862239 (D.S.C. Feb. 29, 2024)................................22

*Dewberry Grp., Inc. v. Dewberry Eng'g Inc.*,
   604 U.S. 321 (2025)..............................................................................................24

*Drake v. Living Spaces Furniture LLC*,
   No. CV-22-01384-PHX-DWL, 2024 WL 4444315 (D. Ariz. Oct. 8, 2024) ..........................23

*Dupree v. Younger*,
   598 U.S. 729 (2023)................................................................................................1

*Fairchild Hiller Corp.*,
   ASBCA No. 14387, 1971 WL 1284 (Nov. 30, 1971)...................................................19

*Harrison v. Westinghouse Savannah River Co.*,
   176 F.3d 776 (4th Cir. 1999) (*Harrison I*)...................................................9, 10, 12

*Hartsel v. Keys*,
   87 F.3d 795 (6th Cir. 1996) ....................................................................................23

*Howard v. United Parcel Service, Inc.*,
   Civ. A. No. 3:09-CV-207, 2011 WL 195682 (N.D. Tex. Jan. 18, 2011) ..............................23

*Johnson v. United Parcel Serv., Inc.*,
   839 F. App'x 781 (4th Cir. 2021) ............................................................................20

*Kellogg Brown & Root Servs., Inc. v. United States*,
   728 F.3d 1348 (Fed. Cir. 2013)................................................................................15

*Logsdon v. Baker*,
    517 F.2d 174 (D.C. Cir. 1975) ...................................................................................16

*Lovelace v. Sherwin-Williams Co.*,
    681 F.2d 230 (4th Cir. 1982) ....................................................................................16

*Lowe v. J.B. Hunt Transp., Inc.*,
    963 F.2d 173 (8th Cir. 1992) ....................................................................................22

*Newman v. Hy-Way Heat Sys., Inc.*,
    789 F.2d 269 (4th Cir. 1986) ....................................................................................16

*Oby v. Baton Rouge Marriott*,
    329 F. Supp. 2d 772 (M.D. La. 2004).......................................................................23

*Pascual v. Lowe's Home Ctrs., Inc.*,
    193 F. App'x 229 (4th Cir. 2006) .............................................................................21

*Perry v. Kappos*,
    489 F. App'x 637 (4th Cir. 2012) .............................................................................21

*Proud v. Stone*,
    945 F.2d 796 (4th Cir. 1991) ...............................................................................22, 24

*Roberts v. Glenn Indus. Grp., Inc.*,
    998 F.3d 111 (4th Cir. 2021) ....................................................................................20

*Roberts v. Separators, Inc.*,
    172 F.3d 448 (7th Cir. 1999) ....................................................................................22

*Rosenow v. CareCore Nat., LLC*,
    No. 9:10–cv–1592–RMG, 2012 WL 1802456 (D.S.C. May 17, 2012)...................22

*Singer v. Dungan*,
    45 F.3d 823 (4th Cir. 1995) ........................................................................................2

*Smith v. Integrated Community Oncology Network*,
    No. 3:08–cv–1196–J–25 MCR, 2010 WL 3895571 (M.D. Fla. June 18, 2010).....22

*Sturkie v. Sifly*,
    280 S.C. 453 (1984).................................................................................................25

*Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*,
    31 F.3d 209 (4th Cir. 1994) ......................................................................................22

*U.S. ex rel. Becker v. Westinghouse Savannah River Co.*,
    305 F.3d 284 (4th Cir. 2002) ....................................................................................14

*U.S. ex rel. Behnke v. CVS Caremark Corp.*,
   No. 14-cv-824, 2025 WL 1758623 (E.D. Pa. June 25, 2025)...................................................3

*U.S. ex rel. Garzione v. PAE Gov't Servs., Inc.*,
   164 F. Supp. 3d 906 (E.D. Va. 2016) ...................................................................................15

*U.S. ex rel. Grant v. United Airlines*,
   912 F.3d 190 (4th Cir. 2018) ...............................................................................................8, 9

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*,
   352 F.3d 908 (4th Cir.2003) ................................................................................................3, 5

*U.S. ex rel. Howard v. Caddell Construction Co., Inc.*,
   No. 7:11-CV-270-FL, 2021 WL 1206584 (E.D.N.C. Mar. 30, 2021)..................................8, 9

*U.S. ex rel. Maritno-Fleming v. S. Bay Mental Health Ctrs.*,
   540 F. Supp. 3d 103 (D. Mass. 2021) .....................................................................................25

*U.S. ex rel. Martin v. Life Care Ctrs. of Am., Inc.*,
   114 F. Supp. 3d 549 (E.D. Tenn. Sept. 29, 2014)....................................................................3

*U.S. ex rel. Schutte v. SuperValu Inc.*,
   598 U.S. 739 (2023)..............................................................................................................2, 6

*U.S. ex rel. Taylor v. Boyko*,
   39 F.4th 177 (4th Cir. 2022) ...............................................................................................9, 24

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
   525 F.3d 370 (4th Cir. 2008) ........................................................................................7, 8, 15

*United States ex rel. Bassan v. Omnicare, Inc.*,
   No. 15 CIV.4179 (CM), 2025 WL 1591609 (S.D.N.Y. June 5, 2025)..............................25, 26

*United States ex rel. Cody v. ManTech Int'l, Corp.*,
   746 F. App'x 166 (4th Cir. 2018) ..........................................................................................20

*United States ex rel. McBride v. Halliburton Co.*,
   848 F.3d 1027 (D.C. Cir. 2017).............................................................................................15

*United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*,
   612 F.3d 724 (4th Cir. 2010) ....................................................................................................2

*United States v. Bestfoods*,
   524 U.S. 51 (1998)..............................................................................................................24, 26

*United States v. Fadul*,
   No. DKC 11–0385, 2013 WL 781614 (D. Md. Feb. 28, 2013)..............................................3

*United States v. Regeneron Pharms., Inc.*,
  No. 20-cv-11217, 2023 WL 6296393 (D. Mass. Sept. 27, 2023)................................................3

*United States v. Sci. Apps. Int'l Corp.*,
  626 F.3d 1257 (D.C. Cir. 2010) ..............................................................................................3

*Univ. Med. Assocs. of Med. Univ. of S.C. v. UnumProvident Corp.*,
  335 F. Supp. 2d 702 (D.S.C. 2004).........................................................................................25

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
  579 U.S. 176 (2016).......................................................................................................2, 9, 12

*Wakefield-Brace v. Greenwood Sch. Dist. 50*,
  No. 8:16-02750-MGL, 2017 WL 2569846 (D.S.C. June 14, 2017) .......................................22

*Wheatley v. Wicomico County*,
  390 F.3d 328 (4th Cir. 2006) .....................................................................................................2

Pursuant to Federal Rule of Civil Procedure 50(a), Fluor Corporation and Fluor Intercontinental, Inc. (collectively "Fluor"), by and through undersigned counsel, hereby submit this memorandum of law in support of their Second Motion for Judgment as a Matter of Law ("JMOL").

## INTRODUCTION

The purpose of this motion is twofold.  First, for any arguments raised in Fluor's first Rule 50(a) motion, Dkt. 725, that the Court has taken under advisement, Fluor simply supplements those arguments with additional factual and legal support based on the recent developments in the trial record.  Second, Fluor again moves for JMOL as it relates to Relator Rude's failure-to-promote retaliation claim and on Relators' overbilling theory as the record does not contain sufficient evidence which would permit a jury to find for Relators on those claims.  For the reasons set forth on the record, in Fluor's First Rule 50 motion and those set forth below, Fluor respectfully asks the Court to grant Fluor's JMOL on all of Relators' claims.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 50(a)(1), JMOL may be granted after "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1)(B); *see Brown v. CSX Transp., Inc.*, 18 F.3d 245, 248 (4th Cir. 1994).  "To grant the motion the district court must examine the evidence in the light most favorable to the non-moving party and determine whether a reasonable trier of fact could draw only one conclusion from the evidence." *Id*. (internal quotation marks omitted).  "This standard largely 'mirrors' the summary-judgment standard, the difference being that district courts evaluate Rule 50(a) motions in light of the trial record rather than the discovery record." *Dupree v. Younger*, 598 U.S. 729, 731–73 (2023).  JMOL is properly granted "if the nonmoving party failed to make a showing on an

1

essential element of his case with respect to which he had the burden of proof." *Wheatley v. Wicomico County*, 390 F.3d 328, 332 (4th Cir. 2006) (citing *Singer v. Dungan*, 45 F.3d 823, 826–27 (4th Cir. 1995)).

**DISCUSSION**

**I.     Fluor is Entitled to JMOL on Relators' Award Fee Claim**

As discussed during argument on Fluor's first Rule 50 motion, one of the reasons Fluor is entitled to JMOL on Relators' award fee claim is that Relators have not set forth sufficient evidence to permit a jury to find that Fluor acted with the requisite scienter.  Fluor supplements its prior briefing on that issue here.  Fluor also provides supplemental briefing as to why Relators cannot proceed under a presentment or implied certification theory and why Relators have failed to present sufficient evidence from which a reasonable jury could find causation on a fraudulent inducement theory.

**a.   Relators Have Not Introduced Sufficient Evidence to Permit a Jury to Find Scienter on Their Award Fee Claim**

The Supreme Court has cautioned that the FCA's scienter requirement is "rigorous" and should be "strict[ly] enforce[d]."  *See Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 192 (2016).  Scienter can be shown in three ways: actual knowledge; deliberate ignorance of the truth or falsity; or acts taken in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b); *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023).  "Congress, however, has made plain its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence." *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 728 (4th Cir. 2010) (internal quotation marks omitted).

Relators cannot prove scienter by pointing to Fluor employees' "collective knowledge" or "piecing together scraps of 'innocent knowledge held by various corporate officials, even if those officials never had contact with each other or knew what others were doing in connection with a claim seeking government funds." *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 918 n.9 (4th Cir. 2003) (*Harrison II*).[1]  Instead, for their award fee claim, Relators must adduce sufficient evidence, for each of the five award fee periods, that a single individual involved in preparing and/or presenting information to the boards, either knew (or deliberately ignored or was recklessly indifferent) "that [Fluor] was submitting a[n] [AFEB presentation] seeking government funds [or the modification of a government contract] and that this [presentation] was tainted by" false information.  *Harrison II*, 352 F.3d at 919.  Relators have fallen far short.

Only five trial witnesses have testified to having any involvement in either collecting data for AFEBs or representing Fluor during the AFEB meetings.  Fatal to Relators' claim, they simply cannot show that any of these individuals acted with actual knowledge, deliberate ignorance, or reckless disregard of the falsity of any information presented to any AFEB:

- **Tony Montalvo**: Mr. Montalvo testified that he had a minor role in the award fee presentations and reviewed some, but not all of the slide decks before they

---

[1] In the leading case on this issue, the D.C. Circuit observed that it "kn[e]w of no circuit that has applied the 'collective knowledge' theory to the FCA." *United States v. Sci. Apps. Int'l Corp.*, 626 F.3d 1257, 1275 (D.C. Cir. 2010); *see, e.g.*, *United States v. Regeneron Pharms., Inc.*, No. 20-cv-11217, 2023 WL 6296393, at *13 n.19 (D. Mass. Sept. 27, 2023) ("For purposes of establishing scienter under the FCA, however, the "collective knowledge" doctrine does not apply.") *aff'd on other grounds*, 128 F.4th 324 (1st Cir. 2025); *United States v. Fadul*, No. DKC 11–0385, 2013 WL 781614, at *9 (D. Md. Feb. 28, 2013) (citing *Harrison II*, 352 F.3d at 918 n.9) ("When the Government seeks to hold an entity liable under the False Claims Act, it cannot rely on the collective knowledge of the entity's agents to establish scienter."); *U.S. ex rel. Martin v. Life Care Ctrs. of Am., Inc.*, 114 F. Supp. 3d 549, 567 (E.D. Tenn. Sept. 29, 2014) ("As a general matter, federal courts have not permitted a "collective knowledge" theory to be applied in an FCA case."); *U.S. ex rel. Behnke v. CVS Caremark Corp.*, No. 14-cv-824, 2025 WL 1758623, at *33 (E.D. Pa. June 25, 2025) (collecting cases).

were presented.  Dkt. 706 at 1421:15–24.  Mr. Montalvo was unable to recall having any role in reviewing the AFEB slides or attending an award fee presentation where Fluor represented a 0.12% LTDD rate.  *Id.* at 1426:2–13.  Moreover, Relators did not show that Mr. Montalvo ever put *any* information— let alone *false* information—on any award fee slides.

- **Scott Roesler**: In his role leading the Country Analysis Group, Mr. Roesler was responsible for gathering information for the AFEBs which included going through a quality control process for the data that was submitted.  Dkt. 716 at 4847:14–4859:9.  Mr. Roesler shared that his personal goal was to present accurate and complete information to the AFEB, *id.* at 4874:12–15, and he did not try to hide information from the AFEB. *Id.* at 4874:20–22.[2]  Mr. Roesler testified that he never personally put information in an AFEB deck that he knew was wrong was always told to "evaluate [the slide deck] to make sure it was accurate." *Id.* at 4870:11–20.  Moreover, his team developed training for how managers should submit information and reminded them that the submitted data must be accurate.  *Id.* at 4859:10–22; *see also id.* at 4859:23–4863:22 (discussing Defendant's Exhibit 64, which stressed the importance of functional groups submitting accurate data to AFEBs).

- **Joe Poniatowski**: Mr. Poniatowski reviewed Fluor's award fee submissions for the final AFEB before they were submitted.  Ex. 1 at 6838:1–6.    However, he did not write the documents presented to the AFEB because was "not the subject matter expert" and he only reviewed "to ensure that it met the requirements of the contractor and that of which the Government asked [Fluor] for." *Id.* at 6945:6–15.  Mr. Poniatowski was involved only in the final AFEB.  Ex. 1 at 6838:1–3.

- **Falk Schoner**: Mr. Schoner was responsible for downloading data that was sent to Greenville, but he was not sure whether any of this information was actually included in AFEBs.  Dkt. 739 at 6615:16–6616:14.  He never participated in the AFEB meetings.  *Id.* at 6615:4–5.  There is no evidence in the record that ties Mr. Schoner's reports to actual data that was presented on the AFEBs, let

---

[2] Mr. Roesler's 2011 email reflecting back on why Fluor had omitted a small amount of 2009 data from its August 2010 AFEB presentation is of no help to Relators. *See* PX 1212. As Mr. Roesler testified, he omitted the data precisely because it was "not accurate," such that there was "no way to present it in any way that would explain what was happening on the ground accurately." Dkt. 716 at 4874:3–10. He did not know whether the data was favorable to Fluor or not. *Id.* at 4874:16–19.  As reflected in the government's slide deck, the government itself also largely excluded 2009 data. *See* PX 134. Fluor expert Brad Rice confirmed from his review of Maximo data that the 2009 data was, in fact, incomplete and sporadic and therefore insufficient to draw any conclusions about Fluor's performance.  Dkt. 739 at 6638:14–23.  Relators' expert Dr. Gaukler likewise excluded 2009 data from his analysis.  Dkt. 683 at 2673:19–22, 2795:13–25.  Relators have not come close to presenting evidence from which a reasonable jury could conclude that Mr. Roesler recklessly disregarded the truth.

alone testimony that shows Mr. Schoner knew the data he exported in this report was incorrect.

- **Sandy Combs**: Ms. Combs was Fluor's spokesperson at AFEB meetings.  Ex. 2 at 7383:18–20. She testified that Fluor was candid and truthful in the information that it presented to the AFEBs, and she took steps to educate herself on both the "good stuff and the bad stuff" before each AFEB.  *Id.* at 7382:9–14, 7383:21–25.  Moreover, Ms. Combs' testimony confirms that Fluor was directed to include "good news stories" in its AFEB presentations at the direction of the government.  *Id.* at 7293:3–7294:18; *see also id.* at 7296:11–15 ("our responsibility is to report those things, the good news stories, challenges if we were having them, how we overcome those challenges. Again, ill-defined contractually, our responsibility, as Fluor, how we would report to our own internal management.").

Documentary evidence confirms that Fluor had a process in place to ensure the accuracy of data presented to the AFEBs.  Defendants' Exhibit 64 shows that Fluor's managers were instructed to "[r]eview and validate [data] in advance." DX 64 at 7. And they were expected to "[p]rovide backup documentation with data" for each of their assertions," and "[b]e critical" before putting something in a presentation for the government. *Id.* at 8.  Ms. Combs testified that when she presented at each AFEB, she and her team would bring binders full of such data to be shared with the board.  Ex. 2 at 7302:2–7.  Relators cannot point to any evidence undermining the plain inference of this document: Fluor's goal was to present an accurate, honest picture in its AFEB presentations, and took seriously the task of educating its managers on how to do so.  No reasonable jury could conclude that is disregard for the truth.

Essentially, Relators' claim is that there are *other* internal Fluor documents involving *different* employees that reflect different facts or data than presented to the AFEBs.  But this is exactly the type of collective knowledge pooling that is insufficient to show scienter under the FCA.  *See Harrison II*, 352 F.3d at 918 n.9 (rejecting theory that would hold defendant liable "if the plaintiff could also prove that some other Westinghouse official, who knew nothing about the [concealed information], knew that [a defendant] was submitting a bid and yet another employee,

5

who knew nothing about the [concealed information], knew only that Westinghouse was submitting a [false] certification"); *Sci. Apps. Int'l Corp.*, 626 F.3d at 1273–1275 (reversing jury verdict due to instruction that corporate defendant acted knowingly if "at least one individual employee of SAIC had actual knowledge of an organizational conflict of interest that contradicted SAIC's statements and claims that were made and presented to the NRC").

Relators' scienter arguments also disregard the Supreme Court's recent holding that FCA scienter must be based on "what the defendant thought when submitting the false claim—not what the defendant may have thought *after* submitting it." *Schutte*, 598 U.S. at 752. In attempting to cobble together scienter evidence, Relators rely heavily on evidence about analyses conducted well after the final AFEB met, which purportedly showed higher "loss" rates than those presented to the boards. But, as *Schutte* teaches, a person cannot know a statement is false if the information contradicting it does not yet exist. Afghanistan was a complex environment where it often took a time to get the right information. *See* Dkt. 738 at 6247:5–24, 6357:4–7 (testimony of country manager Steve Whitcomb). Even if a single individual later learned information that was inconsistent with a representation made to an AFEB years earlier (a point that Fluor does not concede), that cannot suffice to prove scienter under the FCA.

In short, Relators must show, for each of the five AFEBs, either (i) that one of the individuals that prepared data, presentations, or the self-assessment knew that the information was false at the time it was presented or (ii) that any Fluor employee presenting the information knew that it was false at the time it was presented. Because Relators have failed to introduce any such evidence, Fluor is entitled to JMOL.

**b. Relators Have Not Introduced Sufficient Evidence to Permit a Jury to Find Falsity on Their Award Fee Claim**

Relators have also failed to adduce sufficient evidence that Fluor made any false statements in any submission or presentation to any of the AFEBs. To be "false" within the meaning of the FCA, "the statement or conduct alleged must represent an objective falsehood," not merely a dispute about "imprecise statements or differences in interpretation." *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376–77 (4th Cir. 2008) (internal quotation marks omitted). Relators have pressed only two theories of which categories of Fluor's AFEB statements might have been false. Neither meets this demanding standard.

First, Relators assert that Fluor underreported its LTDD rates by reporting only the number of closed LTDDs, rather than a combination of both open and closed. But the lone witness who has testified about LTDD reporting to AFEBs testified unequivocally that there is nothing wrong with reporting LTDDs this way. Ex. 3 at 7518:11–17 (testimony of Ms. Richardson). Moreover, "the Government had the unilateral right to make any . . . changes" to how Fluor presented its data. *Id.* at 7518:18–7519:13. And there is evidence in the record of the government doing exactly that as to other metrics, but not as to LTDDs. *Id.* at 7550:15–22 (discussing PX 159 at 7). Without a violation of an "objective" standard of reporting, this can be nothing more than a question about interpretive differences about how best to present LTDD rates, the kind of dispute that *Wilson* squarely holds cannot give rise to FCA liability. Nor have Relators shown that Fluor misrepresented any data under the metric that it used.

As to Relators' other theory, that Fluor presented unduly positive statistics about its response to service orders, the evidence is even weaker. Relators have introduced no evidence of any alternative metric of service order reporting that they think would have been more accurate, let alone that would have rendered Fluor's reporting of service orders objectively false. They

7

simply resort to supposition that Fluor's response times were too good to be true.  But Fluor's contract requirement was to meet these metrics 100% of the time.  PX 743 at 49–50.  So Fluor's reports that it had compliance times in the 99% range (*e.g.*, PX 191 at 12) are not too good to be true—they are in fact just below what the government and Fluor had agreed upon.  Moreover, as with Relators' theory of false AFEB statements about LTDDs, Relators have introduced no evidence that Fluor failed to adhere to an objectively correct way of computing the timing metrics, as would be required to permit a finding against Fluor under *Wilson*.  Indeed, the only testimony on this point is that there was no established definition of these metrics.  Dkt. 739 at 6539:15–20 (testimony of Mr. Schoner). In any event, the revised definition about which Relators complain was not introduced until late 2012, after Fluor had made its last AFEB submission in August 2012. *Id.* at 6543:19–6545:6 (citing DX 424, dated November 2012).

### c.  Fraudulent Inducement Is The Only Proper Legal Framework for Relators' Award Fee Claim and Relators Have Not Presented Sufficient Evidence of Causation

In Fluor's first Rule 50 motion, Fluor extensively discussed why Fluor's award fee presentations and self-assessments are not claims for payment.  *See* Dkt. 725-1 at 2–4.  Every witness to testify since has reiterated that Fluor's AFEB submissions do not request money.  Fluor therefore does not repeat itself here but provides the Court with additional briefing to explain why Relators' alternative frameworks are not legally cognizable.

First, to proceed on a presentment theory, Relators must prove that Fluor "knowingly present[ed], or cause[d] to be presented, to an officer or employee of the United States Government . . . a false or fraudulent *claim for payment or approval*." 31 U.S.C. § 3729(a)(1) (emphasis added). By definition, this framework only applies where the claim for payment—that is, the request or demand for money—*is itself false*.  In *U.S. ex rel. Howard v. Caddell Construction Co., Inc.*, No. 7:11-CV-270-FL, 2021 WL 1206584 (E.D.N.C. Mar. 30, 2021), the court found that

8

subcontracting reports were not actionable claims under the FCA even though they were "'related' to claims for payment made in the monthly progress payment requests." *Id.* at \*15. Instead, the court clarified that "[t]he standard, however, is not whether statements made to the government are related to a claim for payment or related to the same contract upon which payment is sought, but rather whether the statements are 'made as part of a false or fraudulent claim.'" *Id.* (citing *U.S. ex rel. Grant v. United Airlines*, 912 F.3d 190, 196 (4th Cir. 2018)). Like the reports submitted in *Howard*, Fluor's representations to the AFEB are not statements "made as part of a false or fraudulent claim" and therefore cannot give rise a presentment claim. *See Grant*, 912 F.3d at 196.

Nor can Relators' award fee theory proceed under an implied-certification theory. In *Escobar*, the Supreme Court clearly delineated that an implied-certification theory may be utilized where "*the claim does not merely request payment*, but also makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." *See Escobar*, 579 U.S. at 190 (emphasis added).[3] Again, this framework simply does not fit Relators' award fee claims because any "misrepresentations" that Relators complain of were allegedly made in the self-assessment and award fee presentations, which occurred months before the contract was modified and Fluor sent an invoice to the government for any awarded fee. Fluor's invoices for award fees do not contain any representations about Fluor's performance—they simply request payment of the fee amount specifically permitted via contract modification. *E.g.,* PX 780-90.

During the hearing on Fluor's first Rule 50(a) motion, Relators also argued that even if the award fee presentations and the self-assessments are not claims, they can appropriately be deemed

---

[3] *See also U.S. ex rel. Taylor v. Boyko*, 39 F.4th 177, 190 (4th Cir. 2022) (submission of claims for payment to Medicare after defendant did not disclose that the defendant did not have the requisite authorization to bill under Medicare properly analyzed under implied-certification theory)

9

"a false record or statement material to a false or fraudulent claim." *See* 31 U.S.C. § 3729(a)(1)(B). But that argument fails for the same reasons discussed above: "for a false statement to be actionable under either subsection of the FCA, it must be made *as part of a false or fraudulent claim*." *Grant*, 912 F.3d at 196 (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 786 (4th Cir. 1999) (*Harrison I*)) (emphasis added). Because Relators simply have not set forth any evidence that Fluor's award fee presentations are part of a claim, this argument also fails as a matter of law.

For all of these reasons, the only cognizable framework for Relators' award fee theory is fraudulent inducement. As the Court knows, that theory is premised on the idea that the defendant induced the government into awarding it a contract, or here, a contract modification, by allegedly making misrepresentations *before* a claim is made in order to induce the government to enter a contract under which such claims will *later* be made. Here, it is not until Fluor makes a request for money to the government after that contract modification that a claim is made. *See* Dkt. 725-1 at 2–4; *see also* Ex. 1 at 6847:8–6848:1 (Mr. Poniatowski testifying that self-evaluations and presentations for the AFEBs were not invoices or requests for money); Ex. 3 at 7553:1–7 (same testimony from Ms. Richardson); Ex. 2 at 7302:17–22 (same testimony from Ms. Combs). Therefore, the only cognizable FCA theory is that Fluor fraudulently induced the government into modifying the contract to permit Fluor to bill for award fees. *Cf. Harrison I*, 176 F.3d at 787.

To get to a jury on a fraudulent inducement theory, Relators must present sufficient evidence of but-for causation. *See* Dkt. 725-1 at 4–9. They have not done so. In addition to the evidence set forth in Fluor's first Rule 50 motion, the evidentiary record now even more strongly demonstrates that no *reasonable* jury could conclude that Fluor's award fee score would have changed had Fluor presented different information about its LTDD rate and service orders (the only alleged misrepresentations Relators have identified):

10

- Though more than 30 government officials received Fluor's AFEB submissions and participated in award fee determinations over the course of the five award fee periods, only Tommy Marks has testified. *See* PX 145, Dx 174, PX 187, PX 208, DX 406 (identifying voting members and Award Fee Determining Officials for each AFEB). Mr. Marks did not testify that he personally would have done anything differently if he had received different information from Fluor, let alone that any of the other officials involved would have done so.

- Ms. Richardson confirmed that the award fee boards look at some objective factors, such as the number of DFAC meals served, but "the majority of what goes into it is very subjective, and if it was all objective." Ex. 3 at 7554:20–7555:7. Because the process is subjective "you never know what each individual's factoring in," and because of that, there was variance in board members' scores. *Id.* at 7555:25–7556:9; *see also id.* at 7559:2–11 (comparing award fee scoring to figure skating "[b]ecause everybody is watching the same evidence and the judges sometimes come up with very, very different scores even though they are watching the same evidence"). Additionally, in this process, award fees tend to focus on customer-facing services because the board members "trying to give more weight to the things that are important to the war fighters and in this instance those tended to be things like the DFAC." *Id.* at 7565:4–7.

- Ms. Combs confirmed that award fee determinations evaluated Fluor's entire performance under the contract, including work on approximately 70 different FOBs and thousands of services. Ex. 2 at 7290:3–13. Because the AFEB was evaluating all of Fluor's services, Fluor had to "boil down thousands of missions into here's what happened in the theater over a six-month period of time" which required Fluor to "summarize and prioritize" what it put in its self-assessment and award fees. *Id.* at 7296:7–10. When Fluor presented information to the board, it was "extremely interactive" and was "a conversation about performance," meaning that even Relators cannot know what exactly was discussed at the AFEBs. *Id.* at 7301:19–25; *see also id.* at 7304:10–7305:5 (discussing that a general was very upset at an award fee board about not having his Sunday waffle).

Accordingly, Fluor is entitled to JMOL on Relators' award fee claim.

## II.     Fluor is Entitled to JMOL on Relators' Theory Relating to Cost Plus Fixed Fee

Relators have also entirely failed to prove several FCA elements with respect to the conversion of Task Order 5 to a cost-plus-fixed-fee ("CPFF") contract. By all accounts, the change to CPFF was the result of hard-fought negotiations between Fluor and the government over a period of nearly two years. Dkt. 739 at 6750:16–6751:25; Ex. 1 at 6853:5–6858:2 (Testimony of Mr. Poniatowski). Relators

11

have introduced into evidence the government's Pre/Post-Negotiation Memorandum, which exhaustively catalogues the information on which the government relied during the negotiations. *See* PX 250. But they have not pointed to a single piece of information in that document that reflects a false statement by Fluor. Nor have they introduced any other evidence that what Fluor said during these negotiations was objectively false, let alone that any such false statement was the but-for cause of any decision the government made during the negotiations. *See supra* page 7–10 (discussing fraudulent-inducement framework).

Relators also cannot establish scienter related to anything Fluor said during these negotiations. Both of Fluor's lead negotiators have testified extensively about these negotiations. Their unrebutted testimony indicates that Fluor approached the negotiations in good faith and shared copious information with the government. *See* Ex. 2 at 7337:2–7339:2 (Testimony of Ms. Combs). No person involved in the negotiations has given any contrary view, nor has there been documentary evidence of any reckless or knowing falsehoods with respect to these negotiations. Given this utter lack of proof, the Court should not permit the jury to speculate that Fluor obtained hundreds of millions of dollars of bargained-for fees through a vague fraudulent scheme the supported only by Relators' innuendo.

## III.    Fluor is Entitled to JMOL on Relators' Staffing Theory

As the Supreme Court and Fourth Circuit have cautioned, the FCA "is not an all-purpose antifraud statute," nor is it a vehicle for challenging "poor and inefficient management of contractual duties." *Escobar*, 579 U.S. at 194 (citation modified); *Harrison I*, 176 F.3d at 789. This distinction is important because Relators' overbilling theory essentially boils down to, at most, a disagreement about reasonable labor billing that cannot serve as the basis for FCA liability.

Because the Court determined that Relators may not pursue an overestimating theory, a bulk of the "staffing" evidence in this case is simply irrelevant. For example, Mr. Roesler testified extensively about how he created internal estimating worksheets, but made clear that they had no relationship to the labor costs for which Fluor actually billed the government. Dkt. 714 at

12

4716:14–16; Dkt. 716 at 4957:6–24.  Likewise, the "admin time" assumption in these estimating worksheets is an estimating concept and is not reflected on timesheets or invoices to the government.  It is simply irrelevant to Relators' current claim.

Instead, to prove actual overbilling, Relators would need to introduce actual evidence of unreasonable overbilling under the contract.  Relators' evidence on this point is easily summarized:

- There is no evidence in the record to demonstrate that the sole timesheet in the record (DX 808) is for an M&A employee.  Additionally, Relators have not introduced any evidence that this employee billed for time than they spent working.  Indeed, the invoice shows that employee did not automatically bill for 12.0 hours each day. *See* DX 808 (12.7 hour billing for one day).

- Although Relators introduced invoices for Fluor's labor costs, *e.g.*, PX 780-2, there is no evidence in the record that shows that these invoices contain any overbilling, let alone how much of the invoice would be overbilling by M&A personnel—the category of employees to which Relators expressly confined their claims.

- Witnesses testified that Fluor employees generally bill 12 hours per day even on "less busy" days.  Critically, however, no witness has said that  on "less busy" days, the employees were not at their work station either ready to work or working on other projects.

- As Fluor's expert Bill Walter testified, under Task Order 5, Fluor was entitled to reimbursement from the government for the amounts paid to its employees for time these employees were at work. A contractor does not need to review labor hours on timesheets and discern more or less productive time.  Relators have not produced any evidence to the contrary.

The remaining evidence is vague, anecdotal testimony that some unnamed employees took smoke breaks and were "milling around."  But this testimony cannot be causally tied to any claim that was submitted to the government without evidence that the employees were M&A employees and billed for this time.[4]

---

[4] For the recording of Paul Gentry, there is no evidence that the employees Mr. Gentry was discussing in that tape were M&A employees.  Mr. Howard testified that Mr. Gentry was primarily responsible for the trades (which are not M&A) and that when Mr. Gentry complained to him, he was complaining about the trades.  Dkt. 716 at 4966:25–4967:9.  Although Mr. Dillard suggested (incorrectly in Fluor's view) that Mr. Gentry had some oversight beyond the trades, Mr. Dillard

Moreover, even assuming that there were record evidence of these facts, Relators must prove that Fluor's costs were not allowable, including that they were not reasonable. The FAR provides that a cost is reasonable "it does not exceed that which would be incurred by a prudent person in the conduct of competitive business." 48 C.F.R. § 31.201–3(A). Four factors are considered:

> (1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;

> (2) Generally accepted sound business practices, arm's length bargaining, and Federal and State laws and regulations;

> (3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and

> (4) Any significant deviations from the contractor's established practices.

*Id.* at 31.203–3(b).

Relators have offered no evidence about these factors, let alone testimony about how the government determines reasonable staffing levels in a contingency environment. Labor is the "most closely scrutinized cost type," Dkt. 716 at 4954:20–22, and the government approved Fluor's labor budget after extensive negotiations, *id.* at 4942:18–4943:3; approved each Fluor employee that traveled into theater, *id.* at at 4952:3–6; and had GPAs who were living at FOBs with Fluor personnel, Dkt. 737 at 5942:1–3. Moreover, the government required Fluor to use its business judgment to ensure that there was sufficient staff to respond to any changes needed by the military. *Id.* at 7701:16–7702:5; *see id.* at 7699:10–11 (reviewing DX 32 and discussing that the contract "recognize[d] that there may be an increase or a decrease at any of the FOBs of plus or minus 25 percent.").

---

was unable to identify which personnel Mr. Gentry was discussing on the recording. Therefore, even if Mr. Gentry had some oversight of M&A personnel, there is no evidence that is who he was talking about.

14

The government's knowledge and ongoing approval of Fluor's staffing level is fatal to Relators' claim that they were unreasonable. *See U.S. ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002) (granting summary judgment because "DOE's full knowledge of the material facts underlying any representations implicit in Westinghouse's conduct negates any knowledge that Westinghouse had regarding the truth or falsity of those representations").

Further, this cost reasonableness analysis does not "represent an objective falsehood" that can create FCA liability. *See Wilson*, 525 F.3d at 376. Cost reasonableness is a "fact-intensive" inquiry that considers several different "context-specific" factors." *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1360 (Fed. Cir. 2013). Applying *Wilson*'s objective falsity rule, courts have held that a FCA theory premises on alleged cost unreasonableness is not viable. *See, e.g.*, *U.S. ex rel. Garzione v. PAE Gov't Servs., Inc.*, 164 F. Supp. 3d 906, 813 (E.D. Va. 2016) (dismissing FCA claim for lack of falsity because "[t]he regulations applicable to . . . what constitutes a 'reasonable' price are general and by their terms confer a great deal of discretion and judgment on the selecting contractor"). At its core, Relators' overbilling claim is based on "Relators' subjective interpretation of [Fluor's] contractual duties" and "[g]iven the imprecise nature of the [cost reasonableness standard] here, it is not exactly clear what would qualify as [reasonable or unreasonable] under Task Order [5]." *Id.* at 377; *see also United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1032–34 (D.C. Cir. 2017) (granting summary judgment based on "imprecise theories about unreasonable costs" for allegedly inflated headcounts which were tied to a claim of excessive staffing).

Entering judgment for Fluor on Relators' overbilling theory is especially warranted here as Relators have also not offered any witness or other evidence to even opine on *how many* M&A

15

employees were allegedly unnecessary. Indeed, the trial record reflects that the government changed Fluor's staffing levels at various points of the contract. Ex. 2 at 7230:4–7231:19; Dkt. 683 at 2603:21–22, 2604:3–5. Relators have not presented any evidence that would permit a reasonable jury to find that Fluor's M&A staffing was unreasonable, let alone by how much. Where no such facts are offered, "it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982).

Finally, Relators cannot rely on the testimony from Dr. Gaukler to imply that timesheets must have been falsified because the number of work orders being completed during the year was "fairly steady" and there was only a "tiny dent" in the number work orders around the winter holidays. Dkt. 683 at 2775:21–2777:7. As an initial matter, this opinion looks at functions performed by *trade* labor and assumes they would be correlated with overstaffing of *M&A* labor. Worse still for Relators, there is no evidentiary basis for the jury to find that any Fluor employee, let alone 25–30% of the workforce, left Afghanistan during the winter holiday system. "It is fixed law that 'an expert can give his opinion on the basis of hypothetical facts, but those facts must be established by independent evidence properly introduced.'" *Newman v. Hy-Way Heat Sys., Inc.*, 789 F.2d 269, 270 (4th Cir. 1986) (citing *Logsdon v. Baker*, 517 F.2d 174 (D.C. Cir. 1975)). Where an expert's opinion "speculate[s] in fashions unsupported by" the evidence of the case, the testimony should be stricken. *See id.* This is precisely the case here. The jury should be told to disregard this testimony entirely, and the Court should not consider this testimony when evaluating Fluor's JMOL motion.[5]

---

[5] Moreover, Relators told the jury about this evidence during Opening Statements, drawing an objection by Fluor. Dkt. 658 at 65:7–17. Fluor informed the Court that the basis for Relators' statement rests on Mr. Sherman's stricken expert report. *Id.* at 65:21–66:13. Relators urged the

16

## IV.     Fluor is Entitled to JMOL on Relators' Property Management Claim

As set forth in Fluor's first Rule 50 motion, Relators have not presented sufficient evidence for a reasonable jury to conclude that Fluor had an established duty to pay or transmit money to the government for any "lost" property.  *See* Dkt. 725-1 at 22–29.  Similarly, there is no evidence whatsoever to support any FCA theory related to property management other than a reverse false claim theory.  It is undisputed that Fluor does not request payment for lost property; the only question is whether it has to repay the government.  Fluor does not repeat those arguments here in light of the Court's ongoing consideration of that motion and given that the trial record has introduced facts only consistent with Fluor's first Rule 50 motion.  However, Fluor files this motion to address additional fact and arguments that support Fluor's entitlement to JMOL on Relators' contractor managerial personnel theory.

Only after Fluor highlighted in its Rule 50 briefing the complete absence of evidence to support a reverse false claims theory related to the FAR's contractor managerial personnel provision did Relators begin to attempt to develop such a theory.  This, at minimum, confirms Fluor's arguments from its first JMOL motion that Relators did not introduce any of this evidence in their own case.  On that basis alone, the Court should grant Fluor's first JMOL motion.  *See* Dkt. 725 (currently under advisement).

Even setting that side, there remains insufficient evidence for Relators to get to a jury on a contractor's managerial personnel theory.  The only individuals responsible for "all or substantially all of the Contractor's business" would be Bruce Stanski (FGG President) and Rick Reuter (Vice

---

Court to permit their opening statement to continue, citing "the data's going to show that every November and December everybody would go home, and the same work got done" and indicated that "Fluor witnesses, record keepers" would offer this testimony. *Id.* at 66:15–67:6. Relators did not offer this evidence.

President for Afghanistan Operations).  Neither individual testified.  Relators have introduced no evidence related to Mr. Stanski at all.  With respect to Mr. Reuter, the evidence shows, at most, awareness of property management challenges during Fluor's implementation of the corrective action plan.  That is insufficient to constitute willful misconduct or lack of good faith.  Dkt. 725-1 at 28–29.  As for the provision related to "Contractor's operation at any one plant or separate location" the "Contractor" is Fluor Intercontinental, Inc., which has projects throughout the world.  Therefore, properly construed, this provision should be interpreted to mean Fluor Intercontinental, Inc.'s operation under Task Order 5 in Afghanistan.  The only individual with authority over all of Fluor's operation in Afghanistan was the Country Manager (discussed further below).  Finally, the provision related to "[a] separate and complete major industrial operation" simply does not apply here.  The term "industrial" means "[o]f, relating to, or resulting from the manufacturing industry."     *Industrial*,     American     Heritage     Dictionary     (2022), https://www.ahdictionary.com/word/search.html?q=industrial.  Plainly, none of Fluor's work in LOGCAP fits that definition.  Moreover, to the extent Relators argue that property management fits this definition, the fall short for another reason:  property management is not "separate" from Fluor's other work under LOGCAP.  Instead, witnesses have testified that it is a support function that enables the provision of direct services.  Ex. 3 at 7565:21–25 ("Property Management [i]s an enabling function . . . [to] the direct support services").

There were three country managers during the events giving rise to this lawsuit: George Rabb, Steve Whitcomb, and Mark O'Neill (in that order, chronologically).  Mr. O'Neill and Mr. Rabb did not testify and Relators have not introduced any evidence they were responsible for the loss of any specific government property, let alone that they "refuse[d] deliberately to perform a plain, well-understood contractual or statutory obligation without just cause or excuse," or

18

"conscious[ly] fail[ed] to use the necessary means to avoid peril and [was] indifferen[t] to its consequences" during their time as Country Manager. *Fairchild Hiller Corp.*, ASBCA No. 14387, 1971 WL 1284 (Nov. 30, 1971) (citations omitted); *see also id.* ("Mere indifference" or "proof of negligence" insufficient).

The only former Country Manager to testify at trial was Mr. Whitcomb. Relators adduced no evidence that Mr. Whitcomb was "recreant" in his duties. *See id.* To the contrary, Mr. Whitcomb testified that he took his role overseeing Fluor's performance on LOGCAP IV, Task Order 5 with the utmost care:

- **"Q** Did you ever direct Fluor personnel to cheat to pass a PMSA? **A** No. **Q** If you had learned that any of your subordinates at Fluor had given such a direction, what would you have done? **A** There would have been serious repercussions. We were an ethical business and I had -- you can't sell your reputation or your integrity. And that's how I've operated all my life. And that's how I operated as country manager." Dkt. 738 at 6252:8–16

- **A:** "I go back and restate again: I had integrity, and I expected my folks to have integrity. And I repeatedly said we're not going to do anything illegal or immoral in our operations. Whatever the facts were, we would face the facts, and we would make adjustments." Dkt. 738 at 6231:17–21.

- **Q:** "During your entire employment with Fluor, have you ever given a direction to anyone at Fluor to cheat for any purpose? **A** No." Dkt. 738 at 6253:7–9.

- **A:** "Believe it or not, despite being a business, we were trying to be good stewards of the government's resources also and we had any number of efforts to try and reduce government cost." Dkt. 738 at 6306:20–23.

- **Q:** "This disclosure says: 'No financial impact to the government.' Do you see that? **A** Yes, sir. **Q** That's certainly something you wouldn't have let go of unless you had been told it was true; right? **A** Unless I -- unless I believed it was true." Dkt. 738 at 6411:5–10.

Relators have not presented any evidence at trial to show that any of Fluor's contractor managerial personnel engaged in "willful misconduct or lack of good faith" let alone tied those actions to a single physical loss of government property. *See* FAR 52.245-1(h)(ii). Accordingly, Fluor is entitled to JMOL on this theory.

19

**V.     Fluor is Entitled to JMOL on Relator Rude's Retaliation Claim**

To establish a prima facie case of retaliation under the False Claims Act ("FCA"), a plaintiff must prove the following: "(1) that he engaged in 'protected activity' by acting in furtherance of a *qui tam* suit; (2) that his employer knew of these acts; and (3) that a causal link exists—that his employer took adverse action against him *as a result* of these acts." *United States ex rel. Cody v. ManTech Int'l, Corp.*, 746 F. App'x 166, 176 (4th Cir. 2018) (quotations omitted). If a plaintiff establishes a *prima facie* case of retaliation, "the burden then shifts to the employer to show that it had a legitimate non-retaliatory basis for its actions," and "[i]f the employer makes this showing . . . the burden then shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for [retaliation]." *Id.* (quotations omitted). "Stated differently, the plaintiff must show the articulated reason is false *and* that retaliation was the real reason for the challenged conduct." *Id.* at 178 (quotations omitted).

Relator Rude alleges that he was retaliated against Fluor based on the alleged denial of two promotions: (i) the Tier I status promotion and (ii) the Task Order 5 ("TO5") promotion. The Tier I promotion fails as a matter of law because when Relator Rude was asked "You don't know who made a decision not to promote you to Tier 1; right[,]" he responded: "*No, I do not*." Dkt. 679 at 2512:1–3 (emphasis added). No other evidence was adduced at trial which proved or even created an inference about who made this decision. Because Relator Rude cannot show *who* the decisionmaker is, he cannot show that they had knowledge about his protected activity. *See*

*Barnhill*, 138 F. 4th at 132; *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021); *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 784 (4th Cir. 2021).[6]

As for Relator Rude's TO5 promotion, he testified that he believed Michael D'Arcangelo was the decisionmaker.[7] The only evidence submitted to support that belief (PX 1683) states that Mr. D'Arcangelo asked the Compensation Team to place the "[a]ction on HOLD pending further clarification," and then asked a series of questions to be answered by Relator Shepherd. *See* PX 1683 at 2; Ex. 2 at 7195:24–7196:1. Mr. D'Arcangelo's email was not a rejection of the promotion packet. Ex. 2 at 7194:20–7195:9. Relator Rude did not introduce any evidence showing that Relator Shepherd responded to Mr. D'Arcangelo, a necessary step to show that Mr. D'Arcangelo made any decision on the packet. Because it was *Mr. Shepherd* who did not respond to Mr. D'Arcangelo's request for additional information, there is insufficient evidence in the record for the jury to find that Mr. D'Arcangelo made any decision not to promote Relator Rude.

Even if Relator Rude had presented sufficient information to show the decisionmaker, he did not present any evidence about *when* he reported the concerns that supposedly resulted in the promotion denial. Indeed, Relator Rude testified that he started engaging in protected activity approximately 1.5 years *before* the TO5 promotion denial. *See* Dkt. 679 at 2451:19; PX 1684. There is no evidence that Relator Rude raised any of his alleged concerns in close proximity to the

---

[6] The Court previously granted Fluor's first Rule 50(a) motion on Relator Rude's "retaliatory RIF" claim on this same basis. Dkt. 737 at 5980:18–23 ("Fluor's Rule 50 motion identifies trial testimony in which Rude admitted he did not know who made the decision to RIF him. The absence of evidence identifying the relevant decision makers coupled with the lack of evidence tying those decision makers to retaliatory knowledge or motive is fatal to this theory on the present record."). At the time that the Court issued this ruling, it did not specifically address Relator Rude's Tier I promotion. Accordingly, Fluor renews its motion here.

[7] Fluor does not concede that Mr. D'Arcangelo has any knowledge about Relator Rude's protected activity based on his testimony, but Fluor understands that the Court may not make credibility determinations at this stage.

21

alleged non-promotion. This is fatal to his claim. *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) ("[T]hree to four months separat[ing] the [adverse action] and the claimed protected activities . . . is too long to establish a causal connection by temporal proximity alone."); *Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012) (same).

Moreover, even assuming the Court finds that Relator Rude has presented sufficient evidence of a prima facie case of retaliation, any inference of discrimination is severed by Mr. D'Arcangelo's testimony that he recommended Relator Rude for a *different* promotion in October 2011—only nine months *before* the allegedly retaliatory promotion denial and *closer* in proximity to the allegedly protected conduct. *See* PX 1095 (D'Arcangelo approving Relator Rude promotion in October 2011); Ex. 2 at 7197:6–8 ("Q. Had you previously approved a promotion for him about nine months earlier? A. Yes, sir.").

Mr. D'Arcangelo's approval of Relator Rude's promotion in October 2011 gives rise to the same-actor inference. The inference generally arises in the discrimination context where "the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991). The Fourth Circuit recognizes that if the inference applies, there may be "egregious facts from which a discharge in this context could still be proven to have been discriminatory" but due to "the compelling nature of the inference arising from facts such as these [it] will make cases involving this situation amenable to resolution at an early stage." *Id.* at 798.

22

Even a gap of 18–months between the two employment actions is sufficiently close to permit the inference. *See Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 215 (4th Cir. 1994).[8]

The inference also applies to retaliation claims. *See Oby v. Baton Rouge Marriott*, 329 F. Supp. 2d 772, 784 (M.D. La. 2004) (granting motion for summary judgment, in part because, "[u]nder the same actor inference, if the same actor takes a positive employment action towards an employee after that employee engages in protected activity, any inference of retaliation dissipates.").[9]

Additionally, the Fourth Circuit has expanded the inference to non-promotion claims. In *Taylor v. Virginia Union University*, the Fourth Circuit affirmed the district court's decision to enter judgment as a matter of law based on the same-actor inference:

> Chief Wells was instrumental in hiring Taylor in August 1992, and evaluated her just eight months later in April 1993. While Taylor was not fired at the time of her evaluation, the same hirer-same firer inference applies here by analogy. It strains credulity to believe that Chief Wells would have falsely rated Taylor as marginal in one category in her performance evaluation only eight months after he recommended that she be hired, so that he could prevent her from being promoted

---

[8] *Curry v. S.C. State Elec. Comm'n*, No. 3:22-cv-0911-JFA-TER, 2024 WL 862239, at *5 (D.S.C. Feb. 29, 2024); *Rosenow v. CareCore Nat., LLC*, No. 9:10–cv–1592–RMG, 2012 WL 1802456, at *18 (D.S.C. May 17, 2012) (seventeen months); *Wakefield-Brace v. Greenwood Sch. Dist. 50*, No. 8:16-02750-MGL, 2017 WL 2569846, at *2 (D.S.C. June 14, 2017) (adverse actions that occurred between five and eight months after hiring were sufficient to invoke Proud's same-actor inference); *Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 269 (9th Cir. 1996) (one year); *Roberts v. Separators, Inc.*, 172 F.3d 448, 452 (7th Cir. 1999) (one year); *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173, 175 (8th Cir. 1992) (two years); *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) (ten–months); *Smith v. Integrated Community Oncology Network*, No. 3:08–cv–1196–J–25 MCR, 2010 WL 3895571, at *5 n.12 (M.D. Fla. June 18, 2010) (nine months).

[9] *Azar v. Benson Motor Co. of San Antonio, Inc.*, No. SA-14-CA-563, 2015 WL 12533100, at *4 n.3 (W.D. Tex. Mar. 19, 2015); *Howard v. United Parcel Service, Inc.*, Civ. A. No. 3:09-CV-207, 2011 WL 195682, at *9 (N.D. Tex. Jan. 18, 2011); *cf. Drake v. Living Spaces Furniture LLC*, No. CV-22-01384-PHX-DWL, 2024 WL 4444315, at *19 (D. Ariz. Oct. 8, 2024) (discussing that the same-actor inference may apply to a retaliation claim if a defendant can show that "an individual agent became aware that the plaintiff had engaged in protected activity, that the agent then provided a positive employment benefit to the plaintiff, and that the agent then imposed an adverse action.").

to the rank of corporal because she was a woman. . . . Significantly, Taylor offered no evidence even remotely suggesting that either of these individuals held any discriminatory animus toward women. Even in the face of Chief Wells' comment that he would never send a woman to the Police Academy, these factors compel the conclusion that a reasonable jury could not find Taylor's performance evaluation to be anything other than an accurate assessment of her job performance.

193 F.3d 219, 231–32 (4th Cir. 1999).[10]

Here, like *Taylor*, it strains credulity to believe that Mr. D'Arcangelo would have promoted Relator Rude months after Relator Rude alleges that he began engaging in protected activity only to then not to promote him nine months later because of retaliation. Because Mr. D'Arcangelo promoted Relator Rude in October 2011, months *after* Relator Rude testified that he began raising concerns, this raises a "powerful inference" that Relator Rude's July 2012 non-promotion was not retaliatory. *See Proud*, 945 F.2d at 797. This inference can be rebutted if Relators had "egregious facts" that show that Relator Rude's non-promotion was actually because of retaliation. *See id.* at 798. But they have set forth no such evidence and accordingly, Fluor is entitled to JMOL on Relator Rude's retaliation claim.

## VI.     Fluor Corporation is Entitled to JMOL on All Claims

Fluor Corporation is the ultimate parent company of Fluor Intercontinental, Inc. Although Relators filed their claims against these two Fluor entities, "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks omitted). "Th[is] is so even if the entities are affiliated—as they are here by virtue

---

[10] *See also Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1096 (9th Cir. 2005) (permitting same-actor inference in case of allegedly discriminatory failure-to-promote claim); *Hartsel v. Keys*, 87 F.3d 795, 804 & n.9 (6th Cir. 1996).

of having a common owner." *Dewberry Grp., Inc. v. Dewberry Eng'g Inc.*, 604 U.S. 321, 687 (2025).

Fluor Corporation is not a party to the LOGCAP IV contract, the task order 5 contract, and has not submitted any of the invoices which created allegedly false "claims for payment." *See* DX 12 (LOGCAP IV contract); DX 32 (Task Order 5); *e.g.*, PX 780–38 (Fluor Intercontinental invoice). Only Fluor Intercontinental Inc. bears any potential liability for Relators' claims, and therefore, Fluor Corporation is entitled to JMOL on each of Relators' claims.[11]

Relators have submitted a series of proposed jury instructions which conflate liability of Fluor Intercontinental, Inc. and Fluor Corporation in violation of this very basic principle. *See* Relators Proposed Jury Instruction 14-1 ("An agent of the corporation need not be an employee of the corporation. An agent may be another corporation, including a subsidiary corporation."). But even the cases cited by the Relators do not support this instruction. *Maritno-Flemming* clarifies that "[a] parent may be liable for the submission of false claims by a subsidiary *where the parent*

---

[11] A parent company can be held liable for the actions of its subsidiary if a plaintiff pierce the corporate veil. The doctrine "is not to be applied without substantial reflection" and only applies where the parent "entity is used to protect fraud, justify wrong, or defeat public policy." *Sturkie v. Sifly*, 280 S.C. 453, 457 (1984). To pierce the corporate veil in South Carolina, South Carolina requires courts to apply a two-part test from *Sturkie*:

> The first prong is an eight-factor test designed to analyze the corporation's adherence to the corporate form, and it includes questioning (1) whether the corporation was grossly undercapitalized; (2) its failure to observe corporate formalities; (3) non-payment of dividends; (4) insolvency of the debtor corporation at the time; (5) siphoning of funds of the corporation by the dominant stockholder; (6) non-functioning of other officers or directors; (7) absence of corporate records; and, (8) whether the corporation was merely a facade for the operations of the dominant stockholder. The second prong of the Sturkie test mandates that 'there be an element of injustice or fundamental unfairness if the acts of the corporation be not regarded as the acts of the [shareholders]."

*Univ. Med. Assocs. of Med. Univ. of S.C. v. UnumProvident Corp.*, 335 F. Supp. 2d 702, 707 (D.S.C. 2004) (quoting *Sturkie v. Sifly*, 280 S.C. 453, 457 (1984)). Relators have made no showing of any of these factors, and therefore, this is not applicable here.

25

had direct involvement in the claims process." *U.S. ex rel. Maritno-Fleming v. S. Bay Mental Health Ctrs.*, 540 F. Supp. 3d 103, 118 (D. Mass. 2021) (emphasis added). Likewise, *Bassan* confirms that "[i]f the only evidence in the case were that [the parent company] owned [a subsidiary company], it would not be enough to hold [the parent company] liable under the False Claims Act." *United States ex rel. Bassan v. Omnicare, Inc.*, No. 15 CIV.4179 (CM), 2025 WL 1591609, at *2 (S.D.N.Y. June 5, 2025) (citing *Bestfoods*, 524 U.S. at 61).

Similarly, Relators' Jury Instruction No. 14-2 requests an instruction that "[a] corporation is also responsible for the acts of its employee, agent, or subsidiary if it ratifies those acts with full knowledge of all material facts." Once again, Relators cite *Bassan* and *Maritno-Flemming* as support despite their clear holdings. Because none of the witnesses in this case ever worked for Fluor Corporation, it is not liable for any of their actions.

Because Relators have not pierced the corporate veil, Fluor Corporation respectfully asks or the Court to enter Judgment as a Matter of Law on all claims against it.

## CONCLUSION

For the reasons set forth above, Fluor respectfully requests that the Court grant JMOL on all of Relators' remaining claims.

*[signature page follows]*

26

Respectfully Submitted,

/s/ Mark C. Moore
Mark C. Moore (Fed. ID No. 4956)
Michael A. Parente (Fed. ID No. 13358)
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 540-2146
Facsimile: (803) 727-1458
MMoore@maynardnexsen.com

Konstantine P. Diamaduros (Fed. ID No. 12368)
MAYNARD NEXSEN PC
104 South Main Street, Suite 900 (29601)
Post Office Drawer 10648
Greenville, SC 29603-0648
Telephone: (864) 370-2211
Facsimile: (864) 282-1177

Craig D. Margolis (admitted *pro hac vice*)
Tirzah S. Lollar (admitted *pro hac vice*)
Christian D. Sheehan (admitted *pro hac vice*)
Elizabeth A. Carney (admitted *pro hac vice*)
Katelyn M. Deibler (admitted *pro hac vice*)
Elliot S. Rosenwald (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, Northwest
Washington, DC 20001-3743
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
craig.margolis@arnoldporter.com

Rachel K. Higgins (admitted *pro hac vice*)
Sahrula Kubie (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

March 6, 2026                         *Counsel for Defendants Fluor Corporation and*
Greenville, South Carolina            *Fluor Intercontinental, Inc.*

27