**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CHARLES R. SHEPHERD; DANNY V. RUDE; ROBERT SCOTT DILLARD; and RICKEY MACKEY, <br><br> Plaintiff-Relators, <br><br> v. <br><br> FLUOR CORPORATION; FLUOR INTERCONTINENTAL, INC., <br><br> Defendants. | Civil Action No. 6:13-cv-02428-JD <br> Hon. Joseph Dawson, III |

**FLUOR'S MEMORANDUM OF LAW IN SUPPORT OF
<u>RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW</u>**

Mark C. Moore (Fed. ID No. 4956)
Michael A. Parente (Fed. ID No. 13358)
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 540-2146
Facsimile: (803) 727-1458
MMoore@maynardnexsen.com

Konstantine P. Diamaduros (Fed. ID No. 12368)
MAYNARD NEXSEN PC
104 South Main Street, Suite 900 (29601)
Post Office Drawer 10648
Greenville, SC 29603-0648
Telephone: (864) 370-2211
Facsimile: (864) 282-1177
KDiamaduros@maynardnexsen.com

Craig D. Margolis (admitted *pro hac vice*)
Tirzah S. Lollar (admitted *pro hac vice*)
Christian D. Sheehan (admitted *pro hac vice*)
Elizabeth A. Carney (admitted *pro hac vice*)
Katelyn M. Deibler (admitted *pro hac vice*)
Elliot S. Rosenwald (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, Northwest
Washington, DC 20001-3743
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
craig.margolis@arnoldporter.com

Rachel K. Higgins (admitted *pro hac vice*)
Sahrula Kubie (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Counsel for Defendants Fluor Corporation and Fluor Intercontinental, Inc.*

April 10, 2026

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

LEGAL STANDARD............................................................................................................ 2

DISCUSSION ....................................................................................................................... 3

I.     There is Insufficient Evidence to Support Reverse False Claims Liability Under
       Relators' Property Management Theory............................................................................ 3

       A.     Legal Framework ................................................................................................. 3

       B.     Relators Did Not Introduce Sufficient Evidence That Fluor Had an
              Obligation to Pay the Government .......................................................................... 4

              1.     The Term "Contractor's Managerial Personnel" Covers a Narrow
                     Class of Individuals.................................................................................... 5

              2.     Relators Did Not Present Sufficient Evidence of Willful
                     Misconduct or Lack of Good Faith by Managerial Personnel.................. 11

              3.     Relators Did Not Present Sufficient Evidence That the Conduct of
                     Fluor's Managerial Personnel Caused the Loss of Government
                     Property..................................................................................................... 17

       C.     Even Under Relators' Theory, the Evidence Was Not Sufficient to
              Demonstrate That Fluor's Potential Liability Was Established............................ 20

       D.     Relators Introduced No Evidence that Fluor Knowingly Concealed or
              Knowingly and Improperly Avoided An Obligation ........................................... 21

II.    Relators Introduced Insufficient Evidence to Support Fluor Corporation's
       Liability............................................................................................................................. 23

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alvarez Rondquillo v. Bondi*,
 151 F.4th 522 (4th Cir. 2025) ...........................................................................................9

*Am. Mfg. Assocs., Inc. v. N.L.R.B.*,
 594 F.2d 30 (4th Cir. 1979) .............................................................................................16

*Biedermann Techs. GmbH & Co. KG v. K2M, Inc.*,
 678 F. Supp. 3d 716 (E.D. Va. 2023) ................................................................................3

*Bond v. United States*,
 572 U.S. 844 (2014)..........................................................................................................11

*Bresler v. Wilmington Tr. Co.*,
 855 F.3d 178 (4th Cir. 2017) ..........................................................................................2, 3

*Burrage v. United States*,
 571 U.S. 204 (2014)......................................................................................................17, 18

*Fairchild Hiller Corp.*,
 ASBCA No. 14387, 1971 WL 1284 (Nov. 30, 1971)....................................................12, 17

*Fuller v. County of Charleston*,
 444 F. Supp. 2d 494 (D.S.C. 2006).....................................................................................18

*Green v. Brennan*,
 578 U.S. 547 (2016)...............................................................................................................9

*Herlihy v. DBMP, LLC*,
 167 F.4th 142 (4th Cir. 2026) ............................................................................................12

*Jimenez v. DaimlerChrysler Corp.*,
 269 F.3d 439 (4th Cir. 2001) ...............................................................................................1

*M&G Polymers USA, LLC v. Tackett*,
 574 U.S. 427 (2015)...............................................................................................................9

*Maersk Line, Ltd. v. United States*,
 513 F.3d 418 (4th Cir. 2008) .............................................................................................11

*Myers v. Ozmint*,
 No. 9:07-1131-HMH-GCK, 2007 WL 2978662 (D.S.C. Oct. 10, 2007) ................................18

*Navient Sols., LLC v. Lohman*,
   136 F.4th 518 (4th Cir. 2025) ......................................................................3, 23

*Newbrough v. Piedmont Reg'l Jail Auth.*,
   No. 10-cv-867, 2012 WL 12931710 (E.D. Va. Jan. 12, 2012) ..................................24

*Niz-Chavez v. Garland*,
   593 U.S. 155 (2021)..................................................................................9

*Pac. Architects & Eng'rs, Inc.*,
   ASBCA No. 19513, 1978 WL 2445 (Oct. 24, 1978)..........................................13, 17

*Paroline v. United States*,
   572 U.S. 434 (2014)..............................................................................17, 18

*Price v. City of Charlotte*,
   93 F.3d 1241 (4th Cir. 1996) .........................................................................3

*Pulsifer v. United States*,
   601 U.S. 124 (2024)................................................................................6, 10

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000)..................................................................................3

*Renauer v. Discovery Creek Children's Museum of Wash., Inc.*,
   No. 09-cv-140, 2011 WL 826806 (D. Md. Mar. 7, 2011) ........................................16

*United States v. Goines*,
   357 F.3d 469 (4th Cir. 2004) .........................................................................7

*United States v. Hasson*,
   26 F.4th 610 (4th Cir. 2022) ........................................................................16

*United States v. Miller*,
   604 U.S. 518 (2025).................................................................................5

*U.S. ex rel. Byers v. Amedisys SC LLC*,
   No. 7:21-cv-03109-DCC, 2022 WL 4237076 (D.S.C. Sept. 14, 2022)...........................21

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*,
   352 F.3d 908 (4th Cir. 2003) ........................................................................22

*U.S. ex rel. Landis v. Tailwind Sports Corp.*,
   160 F. Supp. 3d 253 (D.D.C. 2016) ................................................................22

*U.S. ex rel. Wheeler v. Acadia Healthcare Co.*,
   127 F.4th 472 (4th Cir. 2025) ................................................................ *passim*

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,
    529 U.S. 765 (2000)............................................................................................11

**Statutes**

31 U.S.C.
    § 3729(a)(1)(G)........................................................................................4, 22, 23
    § 3729(b)(1)(B)...................................................................................................12
    § 3729(b)(3) ........................................................................................4, 20, 23

41 U.S.C.
    § 7103(a)(3) ......................................................................................................21
    § 7103(e) ............................................................................................................21
    § 7104(a) ............................................................................................................21
    § 7105(a)(2) ........................................................................................................12

**Other Authorities**

48 C.F.R. Ch. 2, App. A, ¶ 1..................................................................................12

FAR 52.233-1 .........................................................................................................21

FAR 52.245-1 ................................................................................................ *passim*

FAR 52.246-6 ............................................................................................................6

FAR 52.288-7 ............................................................................................................6

FAR 288.370-1 .........................................................................................................6

Fed. R. Civ. P.
    50(a) ...................................................................................................................8
    50(b).................................................................................................................1, 2

*Bad Faith,* Black's Law Dictionary (12th ed. 2024) ..........................................12

*Industrial*, American Heritage Dictionary (5th ed. 2022),
    https://www.ahdictionary.com/word/search.html?q=industrial.................................9

*Restatement (Third) of Agency* § 1.01...................................................................24

*Willful*, American Heritage Dictionary (5th ed. 2022),
    https://www.ahdictionary.com/word/search.html?q=Willful ..................................11

*Willful*, Black's Law Dictionary (12th ed. 2024)..................................................11

Fluor Corporation and Fluor Intercontinental, Inc. (collectively, "Fluor") submit this memorandum of law in support of their Renewed Motion for Judgment as a Matter of Law.

## INTRODUCTION

The jury's verdict cannot be supported based on the evidence adduced at trial and should be set aside under Federal Rule of Civil Procedure 50(b).  Finding for Fluor on three of Relators' four theories, the jury returned what was admittedly a "compromise" verdict, Dkt. 779 at 8961:23, finding that both Fluor entities "had an obligation to pay or transmit money or property to the Government" arising from the loss of $15,000,000 worth of government property, which both entities "knowingly concealed, avoided, or improperly decreased."  Dkt. 775 at 15–17.

As Relators argued to the jury in summation, the default rule under Task Order 5 was that "if Fluor loses stuff, the government pays for it," and even "[i]f Fluor loses more stuff, the government pays for it."  Dkt. 777 at 8618:16–18; *accord* FAR 52.245-1(h)(1) (Defs.' Ex. 274). Under the Federal Acquisition Regulation ("FAR"), there are three limited exceptions to that rule, which, if invoked by the government, can result in the contractor bearing financial responsibility for lost property.  The Court instructed the jury on only one: that Fluor could have an obligation to pay the government for lost property if the loss occurred as a result of the willful misconduct or lack of good faith of Fluor's "managerial personnel."[1]  Very few Fluor employees constitute

---

[1] The other two exceptions are if (1) the government issues a written disapproval of Fluor's property management system ("PMS"), or (2) an insurer reimburses the contractor for the lost property.  FAR 52.245-1(h)(1).  Relators did not contend Fluor was insured for the loss, which left government disapproval of Fluor's PMS as the only other alternative path to find Fluor liable. However, the Court did not instruct the jury on this theory, and Relators did not object to the absence of such an instruction.  *See* Dkt. 761 at 7 (raising only unrelated objections to the relevant instruction); Dkt. 777 at 8581:21–8582:5 (not raising any further objections).  Therefore, the jury is presumed not to have based its verdict on it.  *See Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 448 (4th Cir. 2001).  The Court "cannot at this stage consider an argument about what the jury could have or would have done had [a non-instructed] issue been presented to it."  *Id.* Accordingly, Fluor confines its argument here to the managerial personnel theory.

"managerial personnel" under the FAR's narrow definition of that term, which reaches only the seniormost managers of Fluor. Relators introduced scant evidence that any such personnel did anything wrong, let alone engaged in "willful misconduct or lack of good faith." Nor did Relators present evidence from which a reasonable jury could find that such individuals' conduct was the but-for and proximate cause of *any* "loss" of government property as that term is defined in the FAR, much less a $15,000,000 loss. For these reasons, Relators failed to present sufficient evidence that Fluor had an obligation to pay or transmit money to the government.

Moreover, the crux of a reverse false claims case is not the existence of an obligation to the government—which would be subject to contractual remedies—but the "*improper withholding*" of what the government is due. *U.S. ex rel. Wheeler v. Acadia Healthcare Co.*, 127 F.4th 472, 495 (4th Cir. 2025) (emphasis added). Relators therefore were required to also prove that Fluor had knowledge of an obligation—that is, of specific property loss caused by managerial personnel's misconduct or lack of good faith—and then either knowingly concealed or knowingly and improperly avoided it. This requires proof of separate and distinct conduct. *See id.* at 497. It also requires proof that at least one individual had all of the requisite knowledge; Relators were not permitted to piece together the knowledge of different employees to establish corporate scienter. Relators did not even argue to the jury that Fluor concealed or avoided a repayment obligation, let alone present sufficient evidence to support a verdict on that element.

Accordingly, the Court should grant Fluor judgment as a matter of law on the single theory for which the jury found in Relators' favor.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 50(b), judgment as a matter of law is proper when "the evidence is legally insufficient to support the jury's verdict," *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 196 (4th Cir. 2017), such that "the only conclusion a reasonable jury could have

reached is one in favor of the moving party. This occurs, for example, when the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof," *Navient Sols., LLC v. Lohman*, 136 F.4th 518, 522–23 (4th Cir. 2025) (citations and internal quotation marks omitted). In making this evaluation, the Court "draw[s] all reasonable inferences in the plaintiffs' favor," *Bresler*, 855 F.3d at 196 (alteration adopted) (citation and internal quotation marks omitted), but "should give credence to . . . evidence supporting the [defendant] that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (internal quotation marks omitted). Especially in cases "involving difficult factual and legal concepts foreign to many lay jurors," the Court is "not a rubber stamp convened merely to endorse the conclusions of the jury, but rather ha[s] a duty to reverse the jury verdict[] if the evidence cannot support it." *Biedermann Techs. GmbH & Co. KG v. K2M, Inc.*, 678 F. Supp. 3d 716, 729 (E.D. Va. 2023) (quoting *Price v. City of Charlotte*, 93 F.3d 1241, 1250 (4th Cir. 1996)), *appeal dismissed per stipulation*, Nos. 2023-2168, 2023-2232, 2023 WL 8923383 (Fed. Cir. Dec. 27, 2023).

## DISCUSSION

### I.    There is Insufficient Evidence to Support Reverse False Claims Liability Under Relators' Property Management Theory

#### A.    Legal Framework

As the Court's jury charge and verdict form recognized, the only viable False Claims Act ("FCA") framework for Relators' property management allegations is a reverse false claims theory. *See* Dkt. 770 at 25 (instructing the jury that Relators' property management theory is "that Defendants knowingly concealed or improperly avoided an obligation to pay or transmit money or property to the United States aris[ing] from the loss of Government property"); Dkt. 775 at 15–

17 (verdict form posing similarly worded questions).  The FCA's reverse false claim provision imposes liability when a defendant "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).  An obligation, in turn, is defined as "an established duty, whether or not fixed." *Id.* § 3729(b)(3).  By focusing on money that a contractor allegedly owed to the government (rather than money a contractor allegedly received from the government), a reverse false claims theory "flips the typical claim under the [FCA]." *Wheeler*, 127 F.4th at 495.

Under these principles, Relators were required first to prove that Fluor had an obligation to pay the government based on the physical loss of government property resulting from the willful misconduct or lack of good faith of Fluor's "managerial personnel" (as defined in the FAR).  Then, Relators were required further to prove that Fluor knew it had this obligation to pay but knowingly concealed or knowingly and improperly avoided that liability.  Relators failed to present sufficient evidence as to any of these essential elements.

**B.      Relators Did Not Introduce Sufficient Evidence That Fluor Had an Obligation to Pay the Government**

FAR 52.245-1 states that a contractor may be liable for "[l]oss of Government property that is the result of willful misconduct or lack of good faith on the part of the Contractor's managerial personnel." FAR 52.245-1(h)(1)(ii) (Defs.' Ex. 274); *see* Dkt. 777 at 8708:4–8709:9 (Relators' discussion of this concept during closing argument).  The Court instructed the jury that to find a FCA violation based on this clause, they "must . . . find that[] Defendant's managerial personnel engaged in willful misconduct and/or lack of good faith; [a] loss of government property occurred; and [t]he willful misconduct and/or lack of good faith caused the loss to the government." Dkt. 770 at 23 (list formatting omitted).  Relators did not introduce sufficient

– 4 –

evidence of improper conduct by managerial personnel or resulting property loss to support the jury's verdict.

### 1. The Term "Contractor's Managerial Personnel" Covers a Narrow Class of Individuals

To properly assess the evidence, the Court must first construe the FAR's definition of "Contractor's managerial personnel," which reaches only "the Contractor's directors, officers, managers, superintendents, or equivalent representatives who have supervision or direction of[:] (1) All or substantially all of the Contractor's business; (2) All or substantially all of the Contractor's operation at any one plant or separate location; or (3) A separate and complete major industrial operation." FAR 52.245-1(a). Only a handful of Fluor employees could meet this definition.

*First*, the "Contractor" is Fluor Intercontinental, Inc ("FII"), as it is undisputed that only that entity executed the LOGCAP IV and Task Order 5 contracts at issue in this case. Defs.' Ex. 12 at 1; Defs.' Ex. 32 at 1. Therefore, the only individuals responsible for "[a]ll or substantially all of [Fluor's] business" would be FII's seniormost executives (i.e., its Chief Executive Officer or President).[2] No such individual was identified at trial.[3]

*Second*, in construing the phrase "[a]ll or substantially all of the Contractor's operation at . . . one plant or separate location," the Court should consider the context in which it appears and its place in the larger regulatory scheme. *See United States v. Miller*, 604 U.S. 518, 533 (2025)

---

[2] As discussed *infra* at 23–24, Relators did not present sufficient evidence to impose liability on Fluor Corporation. Fluor's argument here, however, does not depend on a distinction between the two entities.

[3] The parties stipulated before trial that Bruce Stanski was the president of *Fluor Government Group* during the relevant period. Dkt. 653 at 4. There was no evidence as to whether he was the Chief Executive of FII or was otherwise responsible for all or substantially all of its business. In any event, the stipulation regarding Mr. Stanski was not introduced at trial and no other evidence was presented as to his role at FII or in LOGCAP more generally.

(it is "a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" (citation omitted) (cleaned up)); *Pulsifer v. United States*, 601 U.S. 124, 133 (2024) (a "choice between [] two [competing interpretations] . . . can sensibly be made only by . . . reviewing text in context"). This language appears several times in other sections of the FAR, always in defining the seniormost company officials whose conduct can create an exception to a generally applicable rule. *E.g.*, FAR 52.246-6 (relating to inspections of contractors' work); FAR 52.288-7 (relating to circumstances under which government will reimburse contractor for insurance expenses); FAR 288.370-1 (relating to liability for damage to government aircraft). Where the same term is used in different sections of a statute or regulation, courts should presume, absent clear indication to the contrary, that the term carries the same meaning. *See Pulsifer*, 601 U.S. at 149 (it is an "interpretive principle" that "[i]n a given statute, the same term usually has the same meaning" throughout). Here, in each FAR provision, the clear intent was to depart from a default rule only where misconduct was committed by the senior officials chiefly responsible for the contractor's operations as a whole.

Applying those principles here, the only individual with supervision or direction over "[a]ll or substantially all of the Contractor's operation at . . . one . . . separate location" was Vice President of Afghanistan Operations Rick Reuter. FAR 52.245-1's reference to a "plant" and later an "industrial operation" reflect that the provision related to "Contractor's managerial personnel" was designed for a more traditional manufacturing contract. It is an awkward fit for a services contract like LOGCAP. Nonetheless, analogizing LOGCAP to a manufacturing contract, Mr. Reuter was the functional equivalent of the plant manager for a manufacturing or industrial site because he was the only individual principally responsible for all of Fluor's work in Afghanistan.

– 6 –

He is therefore the only Fluor employee who qualifies as managerial personnel under the second prong of the definition.

To the extent that prong could be stretched to include any of Mr. Reuter's subordinates, the only individuals who could even arguably qualify would be those who served as Afghanistan Country Manager in the relevant period (George Rabb, succeeded by Steve Whitcomb, succeeded by Mark O'Neill). The sole evidence presented on this issue at trial came from Joe Poniatowski and Steve Whitcomb. Mr. Poniatowski, Fluor's former Director of Prime Contracts, testified that in Fluor's perspective, only "one individual" stationed in Afghanistan could satisfy this definition: "the Country Manager." Dkt. 753 at 6836:24–6837:5. And as Mr. Whitcomb testified, one person (the Country Manager) managed Fluor's entire Northern Afghanistan operation from Fluor's Afghanistan headquarters located at Bagram Airfield. *See* Dkt. 738 at 6192:6–6193:19. Relators presented no contrary evidence.

Given that the purpose of the "Contractor's managerial personnel" provision is to create an exception where misconduct is committed by a company's seniormost employees, personnel beneath the Country Manager cannot qualify. It would make little sense for the general rule that Fluor was not liable for lost property to give way based on the conduct of a manager at one of the dozens of individual forward operating bases ("FOBs") scattered across Afghanistan. *See United States v. Goines*, 357 F.3d 469, 475 (4th Cir. 2004) (construing a statute in the way that "better effectuates the congressional intent"). Nonetheless, were the term "separate location" to be construed to mean each individual FOB, the only individual who supervised all or substantially all

– 7 –

of the operations at each was the site manager.   Dkt. 738 at 6383:15–21.  Relators presented no evidence about site managers' conduct.[4]

Instead, Relators argued primarily that various regional distribution center ("RDC") managers met this definition.  *See* Dkt. 759 at 8497:9–13 (Rule 50(a) argument); Dkt. 777 at 8708:24–8709:9 (closing argument).  Nevertheless, as Mr. Whitcomb testified, RDC managers were not responsible for "anything at the RDCs other than materials and property."  Dkt. 738 at 6433:25–6434:23; *see also id*. at 6383:15–21, 6386:11–23.  This is entirely consistent with Relators' own testimony.  Relator Rickey Mackey testified that RDC managers are "the people who had authority over . . . RDC property offices and material offices."  Dkt. 696 at 3644:9–11.  Relator Scott Dillard testified that, as the Phoenix RDC manager, he was "responsible for the material control, property," and related functions for the Phoenix AO.  Dkt. 716 at 4993:4–13; *see also id.* at 4994:24–4995:7 (Relator Dillard did not "feel prepared" to be RDC manager because he "did not have a lot of specific materials and property control experience to that point"); Dkt. 658 at 142:2–6 (Relators' leadoff witness and former relator, David Payne, defining RDC managers as "the primary lead for the entire materials and property section on that site").  Fluor's "operation" at each separate location consisted of much more than managing property and materials.  *See, e.g.*, Pls.' Ex. 743 (Performance Work Statement ("PWS") for Task Order 5 detailing dozens of services Fluor was responsible for providing); *see also* Dkt. 738 at 6434:9–23 (Mr. Whitcomb testifying that RDC Managers were not responsible for security, serving meals, or "anything at the RDCs other than materials and property").  Accordingly, the evidence cannot

---

[4] The area of operations ("AO") manager for each AO had oversight of the sites in that AO, Dkt. 729 at 5365:6–9; however, Relators also presented no evidence about AO managers' conduct.

reasonably be construed as proving that RDC managers (or any property managers for that matter) had charge of "[a]ll or substantially all of [Fluor's] operations" at *any* location.

*Third*, property and materials management does not qualify as "[a] separate and complete major industrial operation" such that property managers like Tony Montalvo or Jarrold Reeves could meet the definition of "Contractor's managerial personnel." Regulatory and contract interpretation must begin with the plain text. *See Green v. Brennan*, 578 U.S. 547, 553 (2016); *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015). In ascertaining a phrase's plain meaning, courts routinely consult dictionary definitions. *See Niz-Chavez v. Garland*, 593 U.S. 155, 169 (2021); *Alvarez Rondquillo v. Bondi*, 151 F.4th 522, 527–28 (4th Cir. 2025). Here, FAR 52.245-1 refers to a "separate and complete major *industrial* operation." (emphasis added). The term "industrial" means "[o]f, relating to, or resulting from the manufacturing industry." *Industrial*, American Heritage Dictionary (5th ed. 2022), https://www.ahdictionary.com/word/search.html?q=industrial. Management of property and materials on a life support services contract in Afghanistan does not fit that definition, which instead would cover an individual who manages a large manufacturing plant.

Moreover, property management functions were not "separate" from the rest of the project, nor are they "complete." Property management was a management and administrative function that supported Fluor's provision of life support services under its PWS. For example, Fluor managed lumber and common hardware so that it could be used in construction or facility maintenance. Similarly, Fluor managed dining facility supplies so that they could be used for serving meals. Property management is therefore a means to an end, not an end in itself, and cannot constitute a "separate and complete" operation, let alone an industrial one. Witnesses consistently testified accordingly. *E.g.*, Dkt. 707 at 2004:10–2005:15 (Maria McNamara testifying

that "all" government property is used "in [] support of the contract"); Dkt. 708 at 2284:13–21 (Ms. McNamara testifying that property and materials management "is important to the mission because you have to [have] the right amount of material for whatever the project, and process, and construction that is going on"); Dkt. 711 at 4207:2–3 (Tommy Marks testifying that property management affects the entire mission); Dkt. 755 at 7565:21–25; 7567:20–23 (Renee Richardson testifying that property management is an "enabling function" of direct support services).  The only witness who Relators questioned directly about their interpretation—Mr. Poniatowski— testified that he believed Relators' view was wrong.  Dkt. 753 at 6923:21–6924:10; *see also id.* at 6837:6–15 (Mr. Poniatowski explaining that, in Fluor's perspective, no property personnel at any level would qualify under any prong of the definition).  Here again, there was no contrary testimony.[5]

In addition, had the FAR Council (that is, the FAR's drafters) intended the definition in FAR 52.245-1 to reach property managers, it would have said so explicitly.  The term "property" appears well over 200 times in FAR 52.245-1, which is, after all, the *Government Property* Clause. The repeated use of the term "property" demonstrates the drafters knew when to employ it, and it makes no sense for the Council to have used "separate and complete industrial operation" if it simply meant "property management."  Indeed, the fact the drafters did not do so is proof that they did not intend this term to apply to property managers.  *See Pulsifer*, 601 U.S. at 149 ("In a given statute . . . different terms usually have different meanings.").  A contrary interpretation would be

---

[5] Relators' counsel suggested to Mr. Whitcomb that property and materials management constitutes an "industrial operation" and asked him who had "supervision or direction of the operation [being asked] about—materials and property."  Dkt. 738 at 6384:3–5, 6387:4–5.  Mr. Whitcomb responded that it primarily would have been Mr. Reeves, and his boss Mr. Montalvo. *Id.* at 6387:4–22.  But Mr. Whitcomb never endorsed the idea that the property and materials "operation" is an *industrial* operation of any kind, let alone one that is both *separate* and *complete*. *See id.*

counterintuitive and require some clear indication that the FAR Council intended it. *See Bond v. United States*, 572 U.S. 844, 860 (2014) (before adopting a "curious" interpretation, courts "can insist on a clear indication" that the drafters intended it).

* * *

To the extent there is any remaining ambiguity about the definition of "Contractor's managerial personnel," since the definition appears in a contract clause drafted *by* the government, the Court must construe it *against* the government. *See Maersk Line, Ltd. v. United States*, 513 F.3d 418, 423 (4th Cir. 2008) (where "there is ambiguity" in a contract drafted by the United States, "we are compelled to construe the words against the United States"). Here, the Relators stand in the government's shoes, *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000), and the contract provision must therefore be construed against them. Resolving the ambiguity in Fluor's favor would limit the definition to Mr. Reuter, or at the very most, also Messrs. Rabb and Whitcomb.[6] But Relators failed to present sufficient evidence that any of these individuals engaged in willful misconduct or lack of good faith, much less that such conduct caused the loss of $15,000,000 in government property.

### 2. Relators Did Not Present Sufficient Evidence of Willful Misconduct or Lack of Good Faith by Managerial Personnel

The FAR does not define the term "willful misconduct or lack of good faith." The ordinary meaning of "willful" refers to something "[d]one wittingly or on purpose, as opposed to accidentally or casually," and it "is stronger that *voluntary* or *intentional*; it is traditionally the equivalent of *malicious*, *evil*, or *corrupt*." *Willful*, Black's Law Dictionary (12th ed. 2024); *see also Willful*, American Heritage Dictionary (5th ed. 2022),

---

[6] Relators introduced no evidence about the third country manager in the relevant period, Mr. O'Neill. Fluor therefore limits its discussion to Messrs. Rabb, Reuter, and Whitcomb.

– 11 –

https://www.ahdictionary.com/word/search.html?q=Willful ("Said or done on purpose; deliberate"). The term "lack of good faith" has a similar meaning: it is equivalent to "bad faith." *See Herlihy v. DBMP, LLC*, 167 F.4th 142, 151 (4th Cir. 2026) (holding, under a different provision of federal law, that "the lack-of-good-faith requirement . . . requires the movant to show . . . subjective bad faith"). "Bad faith" requires showing "[d]ishonesty of belief, purpose, or motive." *Bad Faith,* Black's Law Dictionary (12th ed. 2024).[7]

These definitions of "willful" and "lack of good faith" are consistent with the few authorities that have interpreted FAR 52.245-1(h)(1)(ii). The Armed Services Board of Contract Appeals ("ASBCA")[8] has held that bad faith requires more than "mere indifference"; it requires a showing that the contractor's managerial personnel were "recreant to [their] duty," "refuse[d] [to] deliberately [] perform a plain, well-understood contractual or statutory obligation without just cause or excuse," or "conscious[ly] fail[ed] to use the necessary means to avoid peril and indifference to its consequences." *Fairchild Hiller Corp.*, ASBCA No. 14387, 1971 WL 1284 (Nov. 30, 1971).[9] "[N]egligen[ce] for failure to follow . . . procedures . . . *is not the standard*."

---

[7] The FCA's scienter element does not require proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1)(B). However, because Relators allege that Fluor's "obligation" arose under a separate provision of law (FAR 52.245-1), the jury had to first assess whether the requirements of that provision were met. FAR 52.245-1(h)(1)(ii) includes an independent scienter requirement that, by its plain terms, is more stringent than the FCA. Therefore, Relators were required to prove first that managerial personnel purposefully, corruptly, or dishonestly caused losses of government property. Only if Relators made such a showing would the FCA's lower scienter standard (which includes recklessness and deliberate ignorance) come into play.

[8] The ASBCA is "the authorized representative of the Secretary of Defense . . . in hearing, considering and determining appeals by contractors from decisions of contracting officers." 48 C.F.R. Ch. 2, App. A, ¶ 1. In addition to meeting the other requirements for administrative law judges, ASBCA members must be experienced in public contract law. 41 U.S.C. § 7105(a)(2).

[9] *Fairchild Hiller* was decided before the FAR added the now-operative definition of "contractor's managerial personnel." Therefore, while this decision's construction of "willful misconduct" and "lack of good faith"—which remain undefined in the FAR—continues to apply, its construction of "contractor's managerial personnel" may be broader than the current FAR provision.

*Pac. Architects & Eng'rs, Inc.*, ASBCA No. 19513, 1978 WL 2445 (Oct. 24, 1978) (emphasis added) (overruling government's attempt to invoke this provision as to items stolen from contractor-operated commissary because of lack of evidence of requisite mental state, even though contractor "failed to comply with" theft-prevention procedures despite awareness of employee thefts).

Therefore, Relators had to present evidence from which a reasonable jury could find that Mr. Rabb, Mr. Reuter, or Mr. Whitcomb purposefully, corruptly, or dishonestly caused losses of government property. They failed to do so. Instead, Relators argued that these individuals "knew" about Fluor's alleged problems with property management and that it was their "job to fix it." Dkt. 730 at 5817:11–22; Dkt. 759 at 8499:10–12 ("[country managers were] well in the know"). Even assuming the jury accepted this characterization of the evidence, the most it shows is insufficient management. That is not enough. *See Pac. Architects*, 1978 WL 2445 ("Nor is negligence on the part of [a contractor's] management personnel the standard.").

Beginning with Mr. Rabb, Relators' evidence is almost nonexistent. He did not testify at trial. Relators rely exclusively on the fact that he signed the December 2010 corrective action plan ("CAP") and received a letter of concern four days later regarding ostensible shortcomings regarding property management. These documents show, at most, that Mr. Rabb was aware of issues and that corrective action was needed. *See* Dkt. 759 at 8499:20–8500:9. When Mr. Montalvo reported concerns about property management at the Phoenix site in January 2011 to senior leadership—including Mr. Rabb—they did not ignore him; instead, they deployed personnel to help the site prepare for and pass the property management system analysis ("PMSA"). *See* Pls.' Ex. 234 (Mr. Montalvo reporting that there was "[a] lot of work being done across the theater by all of the employees"); Dkt. 706 at 1437:4–21. Relators presented no evidence suggesting that

– 13 –

Mr. Rabb was aware of allegations of "cheating" on the Phoenix PMSA. There is no evidence either that Mr. Rabb instructed any employee to engage in misconduct or to fail to manage property appropriately. On this record, no reasonable jury could infer bad faith or willful misconduct.

Relators similarly fail to meet this standard as to Mr. Whitcomb, a retired general officer and former Army Inspector General. *See* Dkt. 738 at 6171:1–21, 6176:13–6178:22. They assert that because he was a "hands-on manager" who visited sites regularly and stayed "up-to-date," he must have known of the alleged property management and inventory issues and supposed misconduct related to PMSAs. Dkt. 759 at 8498:15–8499:12. But the only PMSA Relators questioned him about—the 2011 Phoenix PMSA—occurred nearly a year and a half *before* Mr. Whitcomb joined Fluor. And his uncontradicted testimony was that he trusted his staff, had no reason to believe anyone would falsify audit outcomes, and had never directed or tolerated such conduct. Dkt. 738 at 6429:12–6430:7, 6252:5–6253:7–9. As with Mr. Rabb, Relators presented no evidence that Mr. Whitcomb was aware of supposed "cheating" or "cooking the books" with respect to PMSAs—assertions Relator Dillard does not claim to have made to anyone until he testified in this case. Dkt. 729 at 5337:11–19.[10]

In contrast to the complete absence of evidence that Mr. Whitcomb engaged in willful misconduct or acted with bad faith, there is substantial evidence that he was diligent and transparent with the government. When compliance manager (and future relator) Jeffrey Nix raised concerns about LTDD reporting, Mr. Whitcomb assigned his chief of staff "to coordinate ongoing efforts" among several departments to understand what was going on. *See* Pls.' Ex. 805.

---

[10] Relators also mischaracterized one of Mr. Whitcomb's emails as instructing staff to "get [their] story in sync." Dkt. 738 at 6398:23–24 (discussing Pls.' Ex. 494). Mr. Whitcomb directly refuted this reading, explaining the email concerned ensuring consistency between field operations and briefings to the Government Property Administrator—nothing nefarious. Dkt. 738 at 6398:6–6399:16 (discussing Pls.' Ex. 494). Relators offered nothing to contradict this explanation. *Id.*

– 14 –

And he ordered a 100% inventory of materials in theater "to make sure that we knew where we were in terms of materials . . . [a]nd if we had missing materials, equipment, whatever it was, that we took the appropriate actions to either locate it or bring it to record."  Dkt. 738 at 6268:7–25. Mr. Whitcomb testified that "you can't sell your reputation or your integrity" and that these principles guided his work as country manager.  *Id.* at 6252:8–16, 6253:7–9.  He also testified that he consistently communicated with the Army, maintained transparency with DCMA, and conducted himself with integrity.  *Id.* at 6236:14–6241:13.  His testimony that he never instructed anyone to cheat, and that if such conduct had been brought to his attention "[t]here would have been serious repercussions," stands unrebutted.  *Id.* at 6252:11–16.

Finally, turning to Mr. Reuter, Relators' evidence is similarly insufficient.  Like Mr. Rabb, Mr. Reuter too did not testify at trial.  Instead, Relators relied heavily, if not exclusively, on Plaintiffs' Exhibit 4 (the "smoke and mirrors" email) to argue that Mr. Reuter dismissed concerns about the Phoenix site's readiness for the 2011 PMSA and ignored supposed "lies" to auditors. Dkt. 705 at 1135:17–25, 1150:4–17.  This narrative collapses under the testimony of Mr. Montalvo, who explained unequivocally that his message to Mr. Reuter was not about misrepresentation to DCMA auditors, but rather about information that site personnel communicated internally to "the boss"—Mr. Reuter.  *Id*. at 1150:11–20 ("Q. Was [Mr. Reuter] saying, well, what did you mean by 'we pass through lies and omission'? . . . What did we lie to the auditors about?  A. It is not that we necessarily lied, we didn't share everything.  It wasn't about the auditors, it was about what he said to the boss.  What Bill [Newhouse] wrote to the boss. Q. All right.  A. There was a lot more work that needed to be done than what was in [Mr. Newhouse's] email [to Mr. Reuter].").  Mr. Montalvo also explicitly rejected the idea that Mr. Reuter's attitude was that Fluor could "fool the auditors" and then see if they passed the audit.  *Id*.

– 15 –

at 1135:13–1136:14.  Instead, Mr. Montalvo explained that Mr. Reuter was not being dismissive, but reasonably suggesting they wait for the audit result rather than overreact prematurely.  Dkt. 706 at 1645:17–21.[11]  In the same email, Mr. Reuter told Mr. Montalvo that his plan was to "ask the right questions in front of the world" (i.e., during a scheduled briefing three days later) "and solve the problem right there."  Pls.' Ex. 4 at 1.

Critically, however, *even if the jury did not find Mr. Montalvo's explanation of the email credible*, Relators presented no evidence about Mr. Reuter's *own* contemporaneous understanding.  Relators did not call him to testify.  They did not present any evidence of follow-up communications in which Mr. Reuter expressed concern that Fluor was concealing information from the government.  Relators simply asked the jury to speculate based on a single email that Mr. Reuter engaged in purposeful, corrupt, or dishonest conduct resulting in lost property.  A verdict dependent on state of mind evidence that is based purely on speculation cannot stand.  *See United States v. Hasson*, 26 F.4th 610, 626–27 (4th Cir. 2022) (a factfinder may disregard uncontradicted testimony only where there is "evidence in the record [that] undermines or discredits that testimony"); *Am. Mfg. Assocs., Inc. v. N.L.R.B.*, 594 F.2d 30, 33–34 (4th Cir. 1979) (trier of fact improperly disregarded uncontradicted testimony and engaged in "mere surmise or speculation, without any circumstantial evidence" to do so); *Renauer v. Discovery Creek Children's Museum of Wash., Inc.*, No. 09-cv-140, 2011 WL 826806, at *6 (D. Md. Mar. 7, 2011) (where one witness testifies in support of defendant's theory, and "no evidence" is introduced for plaintiff's theory, "[e]ven if [the] jury finds [the witness]'s testimony unreliable," it is nonetheless not permitted to "base its decision on pure speculation" that the plaintiff's theory is correct).

---

[11] Mr. Montalvo also confirmed that Mr. Reuter never instructed him to cheat, mislead auditors, or act dishonestly in connection with the Phoenix 2011 PMSA.  Dkt. 706 at 1634:7–14.

Relators rely on another email where, in response to an internal audit in December 2010, Mr. Reuter wrote that the "procurement, property and material piece is just broken." Pls.' Ex. 1583 at 1. But Relators conveniently ignore that in the same email Mr. Reuter stated that the newly created CAP addressed the issues identified in the audit and that he was meeting with senior leadership and traveling to Afghanistan to address them. *See id.* This is direct evidence of corrective action—not a bad-faith failure to address issues. And it certainly does not establish Mr. Reuter was "recreant to [his] duty," or "refuse[d] [to] deliberately [] perform a plain, well-understood contractual or statutory obligation without just cause or excuse." *Fairchild Hiller Corp.*, 1971 WL 1284 (internal quotation omitted). There is simply no evidence that Mr. Reuter turned a blind eye to property management concerns.

### 3. Relators Did Not Present Sufficient Evidence That the Conduct of Fluor's Managerial Personnel Caused the Loss of Government Property

Even if Relators had presented sufficient evidence of willful misconduct or lack of good faith, they would still have needed to prove that this conduct *caused* loss of government property. *See Pac. Architects & Eng'rs, Inc.*, 1978 WL 2445 ("The Government must establish that this loss was caused by the 'willful misconduct or lack of good faith[.]'"). The FAR clause shifts liability to the contractor only when the "[l]oss of Government property . . . is *the result of* willful misconduct or lack of good faith on the part of the Contractor's managerial personnel." FAR 52.245-1(h)(1)(ii) (emphasis added). As the Court's jury charge recognized, Dkt. 770 at 23, "[t]he words 'as a result of' plainly suggest causation." *Paroline v. United States*, 572 U.S. 434, 445 (2014). In particular, "'[r]esults from' imposes . . . a requirement of actual causality," meaning "a requirement of but-for causation." *Burrage v. United States*, 571 U.S. 204, 211, 214 (2014). And there is good reason to apply the "more restrictive" requirement of proximate cause as well, because it too plays a "traditional role in causation analysis." *Paroline*, 572 U.S. at 446 (collecting

– 17 –

cases). Thus, Relators were required to introduce sufficient evidence for the jury to find both "that the [loss] would not have occurred in the absence of—that is, but for—the" willful misconduct or lack of good faith *and* that there was "some direct relation between the [loss] and the . . . conduct." *See Burrage*, 571 U.S. at 211 (internal quotation marks omitted); *Paroline*, 572 U.S. at 444 (internal quotation marks omitted). They did not do so. They did not question any witnesses about any specific misconduct by Fluor's managerial personnel, and certainly did nothing to demonstrate that but for any such misconduct, a certain property loss would not have occurred.

Nor did Relators prove *any* "loss" of government property. The FAR defines loss as: "unintended, unforeseen or accidental loss, damage or destruction to Government property that *reduces the Government's expected economic benefits of the property*." FAR 52.245-1(a) (emphasis added); *accord* Dkt. 770 at 20 (jury instructions). That necessarily means property that was physically lost and never used, as opposed to property of which Fluor lost track but was otherwise consumed on the contract—because the latter would still provide the government with its expected economic benefits. As Relators' counsel acknowledged over and over again at trial, there is no way to know which of these buckets any supposed "losses" they claim fell into. Dkt. 777 at 8814:8–19; Dkt. 714 at 4680:25–4682:6. But it was Relators' burden to identify specific items for which the government did not receive its expected economic benefits; it was not Fluor's burden to disprove Relators' supposition. *See Myers v. Ozmint*, No. 9:07-1131-HMH-GCK, 2007 WL 2978662, at *13 (D.S.C. Oct. 10, 2007) (granting summary judgment on the basis that "[d]efendants are under no obligation to present evidence disproving any elements of [p]laintiff's claim" because the "[p]laintiff must come forward with an affirmative showing more significant than conclusory and self-serving allegations"); *Fuller v. County of Charleston*, 444 F. Supp. 2d

– 18 –

494, 500 (D.S.C. 2006) ("Defendants are under no obligation to present evidence *disproving* any elements of Plaintiff's claim."). By their own admissions, Relators failed to meet that burden.

Indeed, there are only four "loss" Lost-Theft-Damage-Destroyed reports ("LTDDs") in evidence, and each seeks relief of responsibility for inventory adjustments or consumption. Defs.' Ex. 362 ($914.09 of inventory adjustments); Defs.' Ex. 369 ($866.25 of inventory adjustments); Defs.' Ex. 906 ($1,678,032.30 of undocumented consumption); Defs.' Ex. 1101 ($895.44 of inventory adjustments). FAR 52.245-1 clearly states that inventory adjustments are treated as consumption, not loss. FAR 52.245-1(f)(vii)(C)(1); *see also* Defs.' Ex. 546 at 17–20; Dkt. 691 at 3192:19–3193:10 (Maria McNamara testifying the same). Accordingly, the LTDDs in evidence do not represent "losses" as defined by the FAR, and no reasonable jury could have relied on these LTDDs to find Relators proved loss that "reduce[d] the Government's expected economic benefits of the property" as the FAR requires. *See* Dkt. 708 at 2083:23–24 (Ms. McNamara testifying that DCMA "didn't want inventory adjustments submitted as LTDDs"). Similarly, should Relators point to the $31 million of "actual loss" listed in the December 2013 CAP briefing (Pls.' Ex. 765 at 4), this too would fail because Fluor contemporaneously and repeatedly defined "actual loss" as including undocumented consumption. *See* Pls.' Exs. 483–490 (Dec. 13, 2013, Letters to Ms. McNamara).[12] Fluor witnesses Messrs. Montalvo and Ernest Ridley confirmed this interpretation, and no witness testified otherwise. Simply put, there is nothing in the record from which a reasonable jury could have concluded that the government was deprived of the expected economic benefits of $15 million in government property.

---

[12] On page 2 of each letter, Fluor informed Ms. McNamara that "actual losses" included "items for which Fluor was not able to demonstrate the cause of the loss or gain," including "items [that] were received, issued, or turned in without the supporting document trail." *E.g.*, Pls.' Ex. 483 at 2.

– 19 –

\* \* \*

Relators were required to present sufficient evidence to support each facet of an alleged obligation arising under the "willful misconduct/lack of good faith" clause—an executive who satisfies the FAR criteria, sufficiently culpable conduct, and actual loss caused by that conduct. Relators' evidence was insufficient as to each of these elements. Relators identified few managerial personnel; introduced very little evidence about their specific conduct, none of which represented intentional or even reckless wrongdoing; and showed no connection to any physical loss of property. Because Relators lacked sufficient evidence that an obligation existed, this theory must fail and Fluor is entitled to judgment as a matter of law.

### C. Even Under Relators' Theory, the Evidence Was Not Sufficient to Demonstrate That Fluor's Potential Liability Was Established

Even if Relators could overcome all of the legal and factual hurdles discussed above, their reverse false claim theory based on the conduct of managerial personnel would still fail. To constitute an obligation under the FCA, the liability must be "an established duty." 31 U.S.C. 3729(b)(3); *see also* Dkt. 770 at 18 (jury instructions reflecting the same). A liability is "established" for this purpose if it is "automatic[]," such that "[t]he only remaining step is for the government to collect on [it]." *Wheeler*, 127 F.4th at 496. For example, in *Wheeler*, the Fourth Circuit held that an obligation was established because the contract at issue "imposed a stipulated monetary penalty for each day [the defendant] failed to implement or comply with [specified requirements]," which "was to automatically accrue on the day after the date the obligation became due." *Id.* (emphasis deleted) (internal quotation marks omitted). But the court was quick to caution that its holding was "narrow[ly]" confined to that specific contract, because even "a different liquidated damages remedy" may not be sufficiently established to constitute an obligation under the FCA. *Id.* at 497.

– 20 –

Relators introduced no evidence showing that the FAR clause regarding managerial personnel imposes anything like the automatic requirement that *Wheeler* had. To the contrary, the evidence demonstrates that the two are nothing alike. Here, the LOGCAP IV contract incorporated the FAR Disputes Clause, FAR 52.233-1. Defs.' Ex. 12 at 41. Under that provision, the contracting officer would have first had to make a written determination of liability, followed by a formal written claim for repayment, which Fluor could then dispute through administrative and judicial processes. FAR 52.233-1(d)(1); *see also* 41 U.S.C. § 7103(a)(3). By statute, a contracting officer's decision "shall state the reasons for the decision reached and shall inform the contractor of the contractor's rights as provided in this chapter," 41 U.S.C. § 7103(e), which includes the right to appeal, 41 U.S.C. § 7104(a). Because the undisputed evidence shows that any liability for lost property would have been contingent upon a preceding claim by a contracting officer accompanied by a written decision, Fluor had no obligation to pay.

**D.     Relators Introduced No Evidence that Fluor Knowingly Concealed or Knowingly and Improperly Avoided An Obligation**

Even if Relators had introduced sufficient evidence to show that Fluor had an obligation to pay the government, that alone would not suffice to prove FCA liability under a reverse false claims theory. Rather, as the Court instructed the jury, Relators must *also* prove Fluor "knowingly concealed [that] obligation . . . or knowingly and improperly avoided or decreased [it]." Dkt. 770 at 22. This is because the existence of an obligation is only the first step to the imposition of reverse false claims liability. *See, e.g.*, *Wheeler*, 127 F.4th at 495–96; *U.S. ex rel. Byers v. Amedisys SC LLC*, No. 7:21-cv-03109-DCC, 2022 WL 4237076, at *4 (D.S.C. Sept. 14, 2022) (dismissing complaint for failure to allege "a separate obligation for repayment as required to establish a reverse false claim"). The crux of a reverse false claims case is not the existence of liability to the government, but the "*improper* withholding" of what the government is due.

– 21 –

*Wheeler*, 127 F.4th at 495 (emphasis added) (quoting *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 255 (D.D.C. 2016)).  It thus requires proof of separate and distinct conduct—both "that the [payment obligations] accrued *and* [that they] were knowingly and improperly avoided." *Id.* at 497 (emphasis added).  The knowledge component requires proof that a single individual had the requisite knowledge that any nonpayment was being concealed or improperly avoided or decreased.  *See U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 918 n.9 (4th Cir. 2003) (rejecting "collective knowledge" doctrine).

In *Wheeler*, it was not enough that the defendant's alleged conduct "constitute[d] a violation" of its contract with the government, nor was it enough that the contract's liquidated damages provision provided for monetary liability that "accrued the day following each violation, thereby creating an obligation to pay a stipulated monetary penalty."  127 F.4th at 495–96.  In keeping with the FCA's text, the Fourth Circuit demanded more, holding that a reverse false claims theory requires that a relator *also* "establish that [the defendant] knowingly concealed or knowingly and improperly avoided the . . . obligation." *Id.* at 497.  The court in *Wheeler* thus sided with the relator only after finding that she had properly alleged that the defendant "kn[ew] of a breach *and* fail[ed] to provide notice" despite a requirement that it do so. *Id.* (emphasis added).

Relators introduced no evidence from which a reasonable jury could find these additional essential elements.  There was no testimony or document indicating that any Fluor employee knew, deliberately ignored, or recklessly disregarded that property loss had resulted from managerial personnel's lack of good faith and thereby given rise to an established obligation, let alone that anyone with such awareness then did something "improper[]" to avoid or decrease that obligation. *See* 31 U.S.C. § 3729(a)(1)(G).  To the contrary, there is ample evidence that Fluor disclosed to the government the property management challenges of which it was aware. *E.g.*, Defs.' Ex. 256

at 7 (PMSA report reflecting that Fluor had disclosed "multiple issues within the material management functional areas during the previous fiscal year"); Dkt. 730 at 5672:18-21 (Minka Hill testifying that "[Pre-PMSA] site assessments" were "[a]lways provided to DCMA"); Dkt. 737 at 6070:1-12, 6070:7-12 (Minka Hill testifying that all pre-PMSAs were provided to the government, even "brutal assessments"); Defs.' Ex. 551 (January 2014 corrective action plan); Pls.' Ex. 2 (December 2010 corrective action plan).  Under the plain language of the FCA, the mere existence of an unfulfilled "obligation" is insufficient for liability; the defendant must also "knowingly conceal[] or knowingly and improperly avoid[] or decrease[]" that obligation.  31 U.S.C. § 3729(a)(1)(G).  But Relators have not even introduced evidence to support the barest outlines of such a scheme—leaving Fluor's evidence of ample disclosure unrebutted.  Because Relators "failed to make a showing on [this] essential element of [their] case with respect to which [they] had the burden of proof," Fluor is entitled to judgment as a matter of law.  *Navient Sols., LLC*, 136 F.4th at 523 (citation and internal quotations omitted).

## II.    Relators Introduced Insufficient Evidence to Support Fluor Corporation's Liability

Defendant Fluor Corporation is additionally entitled to judgment as a matter of law because the evidence was insufficient to support the jury's verdict against it.  Under the reverse false claims provision, any obligation must arise from "an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).  There is no dispute that FII is the only entity that was contracted to perform under Task Order 5—not Fluor Corporation. *See, e.g.*, Defs.' Ex. 12; Defs.' Ex. 32.  And Relators introduced no evidence that Fluor Corporation had any of the other kinds of relationships with the government that can give rise to an obligation

under the FCA. Any attempt to impose liability on Fluor Corporation for violating an obligation must therefore fail.[13]

And Relators' attempt to impose liability on Fluor Corporation fails for another reason. They introduced no evidence that any relevant individual whose conduct was at issue at trial was acting as an agent of Fluor Corporation. As the Court instructed the jury, when it comes to determining whether a given employee's "conduct [is] attributable to [a] particular defendant," "[w]hat matters is whether the individual was acting on behalf of the particular corporation at the time of the conduct at issue." Dkt. 770 at 13. Relators introduced no evidence that anyone who was engaged in improper avoidance of an obligation was "at the time" "acting on behalf of" Fluor Corporation. At most, Relators got a handful of witnesses to testify that, in hindsight, they believe (erroneously) that they were employed by Fluor Corporation.[14] Even if that thin evidence could support a finding that those individuals were agents of Fluor Corporation at some point, it would still fall short of giving the jury any basis to find that any of these individuals was acting in that capacity when they became aware of an obligation to the government and wrongfully avoided it.[15]

---

[13] As demonstrated by the verdict form, the jury found Fluor Corporation liable directly, not based on any theory of indirect liability or theory of having caused another entity's violation of the reverse false claims provision. The jury found that Fluor Corporation had its own obligation to pay the government; engaged in its own avoidance, concealment, or decreasing of that obligation; and had its own knowledge of this purported violation. Dkt. 775 at 15, 17.

[14] Some of these witnesses later corrected themselves. Dkt. 716 at 4971:1–15 (Preston Howard); Dkt. 714 at 4590:2–13 (Ernest Ridley).

[15] Any argument with respect to Fluor Government Group likewise fails. Relators do not dispute that Fluor Government Group is not a legal entity. As a matter of law, it therefore cannot be an agent of any entity. *See Newbrough v. Piedmont Reg'l Jail Auth.*, No. 10-cv-867, 2012 WL 12931710, at *3 (E.D. Va. Jan. 12, 2012) ("non-existent entity" cannot be party to agency relationship); *see also Restatement (Third) of Agency* § 1.01 (agency relationship must be between "one person" and "another person"). Moreover, even if Fluor Government Group were an entity, because it is not a party to this case, any purported relationship between it and either of the parties is beside the point.

## CONCLUSION

For the reasons set forth above, Fluor respectfully requests that the Court grant judgment as a matter of law on Relators' property management theory.

*[signature page follows]*

Respectfully Submitted,

/s/ Mark C. Moore

Mark C. Moore (Fed. ID No. 4956)
Michael A. Parente (Fed. ID No. 13358)
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 540-2146
Facsimile: (803) 727-1458
MMoore@maynardnexsen.com

Konstantine P. Diamaduros (Fed. ID No. 12368)
MAYNARD NEXSEN PC
104 South Main Street, Suite 900 (29601)
Post Office Drawer 10648
Greenville, SC 29603-0648
Telephone: (864) 370-2211
Facsimile: (864) 282-1177

Craig D. Margolis (admitted *pro hac vice*)
Tirzah S. Lollar (admitted *pro hac vice*)
Christian D. Sheehan (admitted *pro hac vice*)
Elizabeth A. Carney (admitted *pro hac vice*)
Katelyn M. Deibler (admitted *pro hac vice*)
Elliot S. Rosenwald (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, Northwest
Washington, DC 20001-3743
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
craig.margolis@arnoldporter.com

Rachel K. Higgins (admitted *pro hac vice*)
Sahrula Kubie (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Counsel for Defendants Fluor Corporation and
Fluor Intercontinental, Inc.*

April 10, 2026

– 26 –