**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

|  |  |
|---|---|
| United States of America, *ex rel.* Charles R. Shepherd, Danny V. Rude, Robert Scott Dillard, And Rickey Mackey<br><br>Plaintiff-Relators,<br><br>v.<br><br>Fluor Corporation, Inc., and Fluor Intercontinental, Inc.,<br><br>Defendants. | Case Number: 6:13-02428-JD<br><br>Honorable Joseph Dawson, III<br><br>JURY TRIAL DEMANDED |

**MEMORANDUM IN SUPPORT OF**
**RELATORS' MOTION FOR A NEW TRIAL,**
**OR, IN THE ALTERNATIVE, TO AMEND JUDGMENT**

**CONTENTS**

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARD....................................................................................................... 2

ARGUMENT ................................................................................................................... 3

I.     THE COURT ERRED BY EXCLUDING EVIDENCE OF THE SUICIDE BOMBING EVEN AFTER FLUOR REPEATEDLY OPENED THE DOOR. .................................... 3

II.    THE COURT ERRED BY PREVENTING RELATORS FROM PRESENTING EVIDENCE RELATED TO FLUOR'S "MATERIALS MANAGEMENT INVESTIGATION" ....................................................................................................... 9

III.   THE COURT ERRED BY LIMITING TESTIMONY OF DAVE METHOT ................ 12

IV.   THE COURT ERRED BY REFUSING TO ALLOW RELATORS TO CROSS FLUOR'S EXPERTS ON MATERIAL THEY DID NOT REVIEW TO REACH THEIR OPINIONS ...................................................................................................... 14

V.   THE COURT ERRED BY PREVENTING RELATORS FROM REBUTTING NEW DEFENSE EVIDENCE ...................................................................................... 17

VI.   THE COURT ERRED BY BARRING TESTIMONY OF JIM SHERMAN AND DISMISSING THE ESTIMATING THEORY HIS OPINIONS EXPLAINED.............. 19

VII.  THE COURT ERRED BY PREVENTING RELATORS FROM PRESENTING EVIDENCE RELATED TO FLUOR'S PAYMENTS TO FACT WITNESSES ............ 20

VIII. A NEW TRIAL ON DAMAGES AND PENALTIES SHOULD BE GRANTED AS TO THE PROPERTY FRAUD CLAIM .................................................................. 26

IX.   IN THE ALTERNATIVE, IF NO NEW TRIAL ON LIABILITY OR DAMAGES IS GRANTED, FLUOR REMAINS LIABLE FOR $164,129,000 ................................... 31

      A.    Fluor is Liable to the United States for Treble Damages..................................... 31

      B.    The Court Should Award an Additional $74,129,000 in Civil Penalties.............. 32

CONCLUSION................................................................................................................ 35

# TABLE OF AUTHORITIES

## CASES

*ACLU  v. Holder*, 673 F.3d 245, (4th Cir. 2011) .................................................................... 27, 32

*Allen v. Prince George's Cnty.* 737 F.2d 1299 (4th Cir. 1984) ..................................................... 17

*Am. Customer Satisfaction Index, LLC v. ForeSee Results, Inc.*,

No. 18-CV-13319, 2023 WL 145000 (E.D. Mich. Jan. 10, 2023) ............................................... 20

*Bahr v. NCL (Bahamas) Ltd.*, No. 19-CV-22973,

2021 WL 4845789 (S.D. Fla. Oct. 18, 2021) ................................................................................ 15

*Benedict v. Hankook Tire Co. Ltd.*,

No. 3:17-CV-109, 2018 WL 3352952 (E.D. Va. July 9, 2018) ..................................................... 17

*Boshea v. Compass Mktg., Inc.*,

No. CV ELH-21-309, 2024 WL 4732773 (D. Md. Nov. 8, 2024) ............................................... 27

*City of Huntington v. AmerisourceBergen Drug Corp.*,

No. CV 3:17-01362, 2021 WL 1711381 (S.D.W. Va. Apr. 29, 2021) ......................................... 15

*City of Myrtle Beach v. United Nat. Ins. Co.*,

No. CIV.A. 4:08-1183, 2010 WL 3420044 (D.S.C. Aug. 27, 2010) ........................................... 11

*Cook Cnty. v. U.S. ex rel. Chandler*, 538 U.S. 119 (2003) ........................................................... 31

*Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*,

No. CIV. WDQ-08-2764, 2011 WL 862729 (D. Md. Mar. 10, 2011) ......................................... 16

*Dorman v. Annapolis OB-GYN Assocs., P.A.*, 781 F. App'x 136 (4th Cir. 2019) .................. 23, 24

*Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*,

412 F.3d 745 (7th Cir.2005 ......................................................................................................... 16

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,

No. 12 CIV. 7372 (AT), 2020 WL 4251229 (S.D.N.Y. Feb. 19, 2020) ....................................... 20

*Graham v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,

No. 0:16-CV-01153-MBS, 2017 WL 116798 (D.S.C. Jan. 12, 2017)......................................... 12

*Hege v. Aegon USA, LLC*,

No. 1:10-CV-1635-GRA, 2011 WL 1791883 (D.S.C. May 10, 2011)......................................... 11

*Hernandez v. Results Staffing, Inc.*, 907 F.3d 354 (5th Cir. 2018) ...................................... 3

*Hicks v. Ferreyra*, 64 F.4th 156, 171 (4th Cir. 2023) ................................................... 2

*Hollins v. Powell*, 773 F.2d 191 (8th Cir. 1985)............................................................ 13

*Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 691 (S.D. W. Va. 2014).................................... 15

*In re Aqueous Film-Forming Foams Products Liability Litigation*,

No. 2:18-CV-3487, 2023 WL 3517923 (D.S.C. May 2, 2023) ..................................... 15

*In re Sims*, 534 F.3d 117 (2d Cir. 2008) ..................................................................... 11

*Kemp v. United States*, 142 S. Ct. 1856 (2022)............................................................... 3

*Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,

No. 11 Civ. 681, 2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015).................................... 20

*Mach. Sols., Inc. v. Doosan Infracore Am. Corp.*, 323 F.R.D. 522 (D.S.C. 2018)....................... 12

*May v. Stahl*, 91 F.3d 131 (4th Cir. 1996) .................................................................. 20

*Momeni-Kuric v. Metro. Prop. & Cas. Ins. Co.*,

No. 3:18-CV-00197-RGJ, 2019 WL 3416677 (W.D. Ky. July 29, 2019)................................... 17

*Moore v. BPS Direct, LLC*,

No. 2:17-CV-3228-RMG, 2019 WL 2913306 (D.S.C. July 8, 2019).......................................... 15

*Nationwide Mut. Fire Ins. Co. v. Kelt*, Inc.,

No. 6:14-cv-749-Orl-41TBS, 2015 WL 1470971 (M.D. Fla. Mar. 31, 2015)............................. 12

*Nix v. Chemours Co. FC, LLC*, 805 F. Supp. 3d 626 (E.D.N.C. 2025)........................................ 19

*Olson v. Fairview Health Servs. of Minnesota*, 831 F.3d 1063 (8th Cir. 2016) ........................... 29

*Poynter by Poynter v. Ratcliff*, 874 F.2d 219 (4th Cir. 1989)........................................... 2

*Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448 (4th Cir. 2010)............................................. 17

*Rice v. Community Health Association,* 203 F.3d 283 (4th Cir.2000)............................................ 2

*Russell v. Wright*, No. 3:11 CV 00075, 2013 WL 596062 (W.D. Va. Feb. 15, 2013) ................. 20

*S.E.C. v. Lipson*, 129 F. Supp. 2d 1148 (N.D. Ill. 2001) ............................................................. 34

*Schaefer v. Fam. Med. Ctrs. of S.C., LLC,*

No. 3:18-CV-02775-MBS, 2019 WL 5901493 (D.S.C. Apr. 22, 2019)..................................... 8, 9

*Seely v. Archuleta*, No. 08-CV-02293, 2011 WL 3625073 (D. Colo. Aug. 17, 2011) ................. 15

*Shell Disposal & Recycling. v. City of Lancaster*, 504 F. App'x 194 (3d Cir. 2012) ................... 13

*Silicon Knights, Inc. v. Epic Games, Inc.*,

No. 5:07-CV-275-D, 2011 WL 6748518 (E.D.N.C. Dec. 22, 2011)............................................ 20

*Stanko v. Stirling*, No. 1:19-CV-03257, 2022 WL 22887110 (D.S.C. May 23, 2022)................. 11

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ........................................ 28, 33

*State v. Kelly*, 770 A.2d 908  (Conn. 2001)................................................................................... 23

*Synergetics, Inc. v. Hurst*, 477 F.3d 949 (8th Cir. 2007) .............................................................. 15

*U.S. Equal Emp. Opportunity Comm'n v. Consol. Energy, Inc.*, 860 F.3d 131 (4th Cir. 2017)..... 2

*U.S. ex rel. Bunk v. Birkart Globistics GmbH & Co.*,

No. 1:02CV1168 AJT/TRJ, 2011 WL 5005313 (E.D. Va. Oct. 19, 2011).................................. 30

*U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364 (4th Cir. 2015) ........................................ passim

*U.S. ex rel. Int'l Bhd. of Elec. Workers No. 98 v. Farfield Co.*, 5 F.4th 315 (3d Cir. 2021) ........ 32

*U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 501 F. Supp. 2d 51 (D.D.C. 2007)........ 33, 34

*U.S. ex rel. Morsell v. Gen Dig., Inc.*, 712 F. Supp. 3d 14 (D.D.C. 2024) .............................. 34, 35

*U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719 (N.D. Ill. 2007) ........... 30, 35

*U.S. v. Dynamics Visions, Inc.*, 2022 WL 612709 (D.D.C. Mar. 2, 2022). ............................ 34, 35

*U.S. v. Speqtrum, Inc.*, 2016 WL 5349196 (D.D.C. Sept. 23, 2016)............................................ 35

*United States ex rel. Miller v. Bill Harbert Intern. Const., Inc.*,

No. 95-1231, 2007 WL 851868 (D.D.C. 2007)........................................................................... 27

*United States ex rel. Streck v. Takeda PharAm., Inc.*,

No. 14 C 9412, 2023 WL 3320281 (N.D. Ill. May 9, 2023) ........................................ 33

United States ex rel. Wheeler v. Acadia Healthcare Co., Inc., 127 F.4th 472 (4th Cir. 2025)..... 28

*United States v. A&S Council Oil Co.*, 947 F.2d 1128 (4th Cir. 1991) .................................. 15, 16

*United States v. Anty*, 203 F.3d 305 (4th Cir. 2000) ......................................................... 23

*United States v. Birchette*, 908 F.3d 50 (4th Cir. 2018).................................................... 8

*United States v. BlueWave Healthcare Consultants, Inc.*,

No. 9:11-CV-1593-RMG, 2017 WL 11621328 (D.S.C. Nov. 20, 2017) ..................................... 27

*United States v. Boyd*, No. 4:24-cr-00935-JD, 2025 WL 4664208, (D.S.C. Oct. 14, 2025) .......... 5

*United States v. Byers*, 649 F.3d 197 (4th Cir. 2011) ...................................................... 17

*United States v. Caudle*, 606 F.2d 451 (4th Cir. 1979)..................................................... 24

*United States v. Duke Energy Corp.,* 208 F.R.D. 553 (M.D.N.C. 2002)..................................... 11

*United States v. Greenwood*, 796 F.2d 49 (4th Cir. 1986)................................................. 23

*United States v. Grimmond*, 137 F.3d 823 (4th Cir. 1998)................................................. 7, 8

*United States v. Harvey*, 547 F.2d 720 (2nd Cir. 1976).................................................... 23

*United States v. Hawkins*, No. 23-4130, 2024 WL 3083418 (4th Cir. June 21, 2024)................. 23

*United States v. Hopkins*, 197 F. App'x 235 (4th Cir. 2006)............................................... 23

*United States v. Hunt*, 749 F.2d 1078 (4th Cir. 1984) ..................................................... 19

*United States v. Levenite*, 277 F.3d 454 (4th Cir. 2002)................................................... 22

*United States v. Miller*, 61 F.4th 426 (4th Cir. 2023) ...................................................... 5

United States v. Moore, No. 2:11CR00004, 2012 WL 4404082,

(W.D. Va. Sept. 25, 2012), *aff'd,* 532 F. App'x 336 (4th Cir. 2013).......................................... 17

*United States v. Portsmouth Paving Corp.*, 694 F.2d 312 (4th Cir. 1982)................................. 20

*United States v. Siegel*, 536 F.3d 306 (4th Cir. 2008) ...................................................... 7, 8

*United States v. White*, 944 F. Supp. 2d 454 (D.S.C. 2013) ............................................... 11

v

*United States v. Williams*, 445 F.3d 724 (4th Cir. 2006) ................................................................ 7

*Universal Health Servs., Inc. ex rel. Escobar v. United States*, 579 U.S. 176 (2016) .................. 35

*Yates v. Pinellas Hematology & Oncology*, 21 F.4th 1288 (11th Cir. 2021) .................... 31, 32, 35

*Yoo v. BMW Mfg. Co., LLC*,

No. CV 7:17-3499-AMQ-SVH, 2018 WL 11485095 (D.S.C. Aug. 6, 2018) ............................... 21

## STATUTES

31 U.S.C. § 3729 ............................................................................................................. 27, 28, 31

## OTHER AUTHORITIES

ABA Formal Op (Aug 2, 1996) ............................................................................................. 22

S.C. Ethics Advisory Op ....................................................................................................... 22

## RULES

28 C.F.R. § 85.3 ..................................................................................................................... 33

Fed. R. Evid. 403 .................................................................................................................... 5

Fed. R. Evid. 611 .................................................................................................................. 17

Fed.R.Civ.P. 60 ................................................................................................................... 2, 3

Rule 403 ................................................................................................................................. 3

Rule 705 ............................................................................................................................... 15

Pursuant to Federal Rules of Civil Procedure 59 and 60, Relators respectfully request that this Court grant a new trial against Defendants Fluor Corporation, Inc., and Fluor Intercontinental, Inc. (hereinafter collectively "Fluor") on liability as to their award fees and excess labor fraud claims, and on damages as to their property fraud claims. Relators move, in the alternative, for a new trial on damages on the property fraud claims; and in the alternative to that, to amend judgment to account for treble damages and penalties in the total amount of $164,129,000.

**INTRODUCTION**

On March 12, 2026, after a 27-day trial, the jury found Defendants liable for violating the False Claims Act regarding its government property obligations. *See* Dkt. 775 at 15–17. The jury found Fluor Corporation liable for $15 million in damages, *id.* at 16, and Fluor Intercontinental liable for $15 million in damages, *id.* at 16–17. The jury did not find Defendants liable for the claims Relators brought relating to award fees and labor, nor did it find Fluor liable for retaliation under 31 U.S.C. § 3730. *See* Dkt. 775.

The jury's verdict was tainted by error, and a new trial is warranted. First, the Court prohibited Relators from presenting essential facts to the jury. Specifically, Relators were not allowed to present facts and argument regarding Defendants' payments to fact witnesses. The Court also barred Relators from presenting evidence that Fluor was responsible for a suicide bombing in Afghanistan, even after Fluor argued relentlessly that it always met its contractual obligations and avoided mission failure. The Court also improperly prohibited Relators from presenting evidence related to Fluor's "materials management investigation," even though it used the results that investigation offensively at trial to defend its property management system and disclosures to the Government. The Court went so far as to prevent Relators from even asking Dave Methot (who signed the 2014 disclosure to the Department of Defense) what the basis was for the conclusions in the disclosure. Lastly, the Court barred Relators from cross-examining Fluor's witnesses regarding

1

evidence those experts refused to consider in reaching their opinions. Each of these evidentiary rulings alone would warrant a new trial; collectively, they prevented Relators from receiving a fair trial.

In addition to the evidentiary errors, the Court erred by refusing to include a line on the verdict form asking the jury to determine the number of false claims or statements related to Defendants' management of Government property.

Finally, the Court should amend the judgment to account for the automatic trebling of damages to $45 million against Fluor Corporation and $45 million against Fluor Intercontinental, Inc., and to account for penalties of $164,129,000, before application of post-judgment interest and the awarding of attorney fees and costs.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 59(a), the Court may grant a new trial "on all or part of the issues," Fed.R.Civ.P. 59(a), if the verdict: "(1) is against the clear weight of the evidence; (2) is based upon false evidence; or (3) will result in a miscarriage of justice," *Hicks v. Ferreyra*, 64 F.4th 156, 171 (4th Cir. 2023) (citation omitted). A district court's evidentiary error constitutes a miscarriage of justice warranting a new trial if it rendered the entire trial unfair. *U.S. Equal Emp. Opportunity Comm'n v. Consol. Energy, Inc.*, 860 F.3d 131, 145 (4th Cir. 2017). "A motion for a new trial is governed by a different standard from a directed verdict motion," as Rule 59 allows a trial judge to "weigh the evidence and consider the credibility of witnesses" and ultimately to "set aside the verdict, even if supported by substantial evidence[.]" *Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989). "[A] new trial can be limited to any separable matter." *Rice v. Community Health Association,* 203 F.3d 283, 290 (4th Cir.2000).

Additionally, Rule 60 authorizes relief from judgment for "mistake, inadvertence, surprise, [ ] excusable neglect" Fed.R.Civ.P. 60(b)(1), or "fraud (whether previously called intrinsic or

2

extrinsic), misrepresentation, or misconduct by an opposing party[,]" Fed.R.Civ.P. 60(b)(3).[1] Rule

60 can be invoked to grant a new trial in event of the conduct the rule contemplates. *See Hernandez*

*v. Results Staffing, Inc.*, 907 F.3d 354, 359 (5th Cir. 2018).

## ARGUMENT

**I.     THE COURT ERRED BY EXCLUDING EVIDENCE OF THE SUICIDE BOMBING EVEN AFTER FLUOR REPEATEDLY OPENED THE DOOR.**

One of Fluor's main defenses at trial was that its shortcomings in executing Task Order 5

("TO5") never caused mission failure or concern from the Army. Fluor emphasized this point during

both opening and closing arguments and had numerous witnesses testify about it. Relators sought

to rebut Fluor's narrative by introducing evidence of a key mission failure that eventually cost Fluor

the contract: the Army's finding that Fluor allowed someone to build and detonate a suicide bomb

at Bagram Airfield using Fluor's materials, tools, and facilities. But the Court repeatedly denied

Relators' requests under Federal Rule of Evidence 403.

That was reversible error. The Army's documents concerning the suicide bombing were

admissible under Rule 403. Even if they were not, Fluor opened the door by touting that there was

no evidence of mission failure, safety issues, or Army dissatisfaction with Fluor's performance. In

the end, the Court left the jury with a one-sided, grossly inaccurate picture of Fluor's materials

management and dedication to safety.

On November 12, 2016, a suicide bomber attacked Fluor-controlled Bagram Airfield,

killing himself and five other people. Ex. 1 **(**PX1038) at 3. The Army investigated and concluded

that the bomber was a Fluor subcontractor who "freely acquire[d] most of the components

necessary for the construction of the suicide vest" from Fluor facilities. *Id.* at 14, 46. Many

---

[1] The term "mistake" in Rule 60(b)(1) includes all errors of law made by a judge, including "misapplying controlling law to record facts." *Kemp v. United States*, 142 S. Ct. 1856, 1862 & n.2 (2022).

components of the bomb came from his worksite. *Id.* at 46. The Army also found that the subcontractor had been allowed to check out "multiple tools" wholly unrelated to his job numerous times. *Id.* Fluor personnel either did not notice, or did not act. *Id.* at 15.

The Army informed Fluor that it was "considering terminating" TO5 and ordered Fluor to show cause. Ex. 2 (PX1036) at 3. Ultimately, the Army did not terminate the contract: Though it stressed that Fluor "indisputabl[y] ... did not comply" with "key contractual requirements of TO 0005," the Army decided that "terminating [TO5] for default" was "not currently in the Government's best interest." Ex. 3 (PX1037) at 2.

When Fluor later submitted a proposal in response to the Army's RFP for LOGCAP V task orders, however, the suicide bombing featured prominently in the Army's evaluation of Fluor's past performance. Army evaluators weighed Fluor's unsatisfactory CPAR ratings for regulatory compliance and management of key personnel and a CPQ rating of marginal for compliance with security requirements—all of which stemmed primarily from the suicide bombing incident. Ex. 4 (PX 831) at 27. The evaluators further considered the Army's own investigatory finding that the primary contributing factor to the attack was Fluor's "complacency and its lack of reasonable supervision of its personnel." *Id.* In part because of this evaluation, Fluor was not awarded a LOGCAP V contract. In response to Fluor's protest of this outcome, the Government Accountability Office (GAO) upheld the Army's evaluation of the tragic incident. *Id.* at 29.

Fluor moved *in limine* to exclude "all evidence" of the suicide bombings. Dkt. 588 at 5. Relators opposed, arguing that the Army's documents concerning the bombing satisfied Rule 403, and even if not, Fluor would open the door to this evidence by suggesting that Relators lacked evidence of mission failure or the Army being dissatisfied with Fluor's performance. Dkt. 622 at 2–3. The Court denied Fluor's motion without prejudice and invited Fluor to renew its objection at

trial if Relators sought to introduce evidence of the bombing. Dkt. 650 at 7.

At trial, Fluor hammered Relators for supposedly lacking evidence of mission failure or Army dissatisfaction. Fluor developed this theme in both its opening and closing arguments. Trial Transcript Volume ("V") 1 at 97:16–21; 27 at 8691:7-11. Fluor also elicited testimony from several witnesses that it had never failed to perform critical services and prioritized safety. *See, e.g.*, V.3 at 900:3–22; V. 5 at 1527:17–1530:9; V.8 at 2486:11–2496:8; V.16 at 4971:16–497; V.20 at 6196:6–6203:16; V.22 at 7026:24–7027:8, 7088:1–15; V.24 at 7567:24–7568:16.

Every time Relators tried to introduce the Army's report or asked the Court to rule that Fluor's questions about safety, mission success, and the Army's satisfaction had opened the door, the Court declined. *See* V.7 at 2240:5–2243:10 (Relators barred from asking witness whether poor property management could lead to the enemy acquiring materials for weapons); V.8 at 2486:11–2496:8; V.16 at 4971:16–4973:4 (Fluor asking Howard over objection whether "[s]afety is a core value of Fluor's"); V.20 at 6196:6–6203:16 (Fluor asking Whitcomb over objection if he would "say anything to the Fluor employees with respect to safety," and Whitcomb responding that "[s]afety was one of [his] primary focuses" in part because Fluor "lost 27 employees, killed by the enemy"); V.24 at 7567:24–7568:16.

### 1. The Army's Documents Concerning the Suicide Bombing Were Admissible Under Rule 403

Rule 403 allows a district court to exclude relevant evidence only when its unfair prejudicial effect substantially outweighs its probative value. Fed. R. Evid. 403. Courts recognize a presumption in favor of admitting relevant evidence. *United States v. Miller*, 61 F.4th 426, 429 (4th Cir. 2023). So exclusion under Rule 403 is an "extraordinary remedy to be applied sparingly." *United States v. Boyd*, 2025 WL 4664208, at *3 (D.S.C. Oct. 14, 2025).

The Army's findings on the suicide bombing were highly probative. Its report and decision

plainly supported Relators' allegation that Fluor failed to account for the Government's property and materials. Ex. 1 at 14–15, 46; Ex. 2 at 3; Ex. 3 at 2–3. The Army concluded that the Fluor subcontractor who created the bomb "freely acquire[d] most of the components necessary for the construction of the suicide vest" from Fluor facilities. Ex. 1 at 14, 46. Many components of the bomb apparently came from his Fluor worksite. *Id.* at 46. Others apparently matched items "readily available and unaccounted for in a trash container" nearby. *Id.* Ultimately, the Army concluded that Fluor "did not comply with the key contractual requirements," which "contributed to" the bombing. Ex. 1 at 2–3. The Army's findings dovetailed with trial testimony. Witnesses testified that Fluor would conceal excess inventory by throwing it away, *see, e.g.*, V.6 at 1825:25–1826:4, 1851:2–10. Given the rest of the evidence, the jury could reasonably have inferred from the Army's findings that Fluor did not account for its materials as required, because if it had, a subcontractor would not have been able to construct a weapon of mass destruction on the job.

Fluor did not meaningfully refute that the Army's documents were relevant in its motion *in limine.* Dkt. 588 at 6, 14. Nor could it have. Indeed, Fluor confirmed the relevance of the Army's findings when it prompted several witnesses to testify that Fluor prioritized safety and that the Government never cited Fluor for maintaining dangerous conditions on bases. V.8 at 2486:11– 2496:8; V.16 at 4971:16–497; V.20 at 6196:6–6203:16. Admittedly, the Army's report focused on Fluor's deficiencies in supervising its personnel, not on Fluor's deficiencies in accounting for its materials. *See* Ex. 1 at 4. That does not negate the report's secondary findings regarding materials management, which were undoubtedly relevant to Relators' claims *Id.* at 14, 46.

The Army's findings on the suicide bombing would not have unfairly prejudiced Fluor. Fluor suggested in its motion *in limine* that discussing the bombing would rouse "sympathy for the victims." *Id.* at 14. But it is entirely unclear how that would have prejudiced Fluor given that two

6

of the bomber's five victims worked for Fluor. Ex. 1 at 3. More broadly, the concept that Fluor's personnel died on the job was entirely uncontroversial during trial. Fluor itself emphasized the dangers of operating in a warzone in both its opening and closing arguments and prompted various witnesses to testify about the constant threats to their lives. *See* V.1 at 91:17–24, 95:9–24, 117:14–21 (opening); V.5 at 1517:1–1521:3 (Montalvo testifying, among other things, that "[y]ou can die" in an attack); V.16 at 4841:13–4842:2, *id.* at 4958:9–22 (Howard testifying that personnel would hide in bunkers "frequent[ly]"); V.23 at 7233:6–7236:3 (testifying about frequently taking "incoming fire"); V.27 at 8691:23-8692:1; 8694:20-8695:3. Fluor even had its former country manager testify that 27 Fluor employees had been "killed by the enemy." V.20 at 6196:6–6203:16.

What made the Army's report so different? The answer, of course, is that the Army blamed Fluor—not just enemy combatants—for some of the dangers its personnel faced. Ex. 1 at 14, 46. The Army's findings were, by definition, "prejudicial": They undermined key aspects of Fluor's defense, including that it never failed in its mission, that it properly accounted for materials, and that the Army never complained. Indeed, "[e]vidence that is highly probative invariably will be prejudicial to the defense." *United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998); *see United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006).

But "[t]hat kind of general prejudice" does not "warrant exclusion of otherwise relevant, admissible evidence." *United States v. Siegel*, 536 F.3d 306, 319 (4th Cir. 2008). Rather, even prejudicial evidence is fair—and thus, admissible—if it speaks directly to an element of the claim at issue. *Miller*, 61 F.4th at 429. Thus, the Fourth Circuit has frequently upheld the admission of dramatic and inflammatory evidence under Rule 403 where the prejudice was fair, or where any unfair prejudice did not substantially outweigh probative value. *See, e.g.*, *Williams*, 445 F.3d at 727 (collecting cases and allowing evidence that defendant committed an uncharged murder in his

felon-in-possession trial); *Grimmond*, 137 F.3d at 833 (allowing evidence that defendant committed two prior shootings, one fatal, in his drug and weapons possession trial). Here, the Army's findings spoke directly to Fluor's deficiencies in property management and what the government would have done had it discovered those deficiencies sooner.

At bottom, the Army's findings regarding the suicide bombing were not *unfairly* prejudicial, and did not substantially outweigh the findings' probative value to Relators' property claims. The Court erred by excluding this body of evidence. *Siegel*, 536 F.3d at 319.

### 2.     Fluor Opened the Door to Evidence of the Suicide Bombing

Regardless whether the Army's findings were admissible under Rule 403, Fluor opened the door to their admission, and the Court erred by continuing to exclude them. Even if a piece of evidence is inadmissible on its own, "courts may admit such evidence after the opposing party has 'opened the door to its admission.'" *United States v. Birchette*, 908 F.3d 50, 61 (4th Cir. 2018) (citation omitted). The purpose of this "door-opening" doctrine is "fairness and completeness of the information" for the factfinder. *See Schaefer v. Fam. Med. Ctrs. of S.C., LLC*, No. 3:18-CV-02775-MBS, 2019 WL 5901493, at *6 (D.S.C. Apr. 22, 2019). Fluor opened the door to the Army's findings on the suicide bombing by eliciting testimony that Fluor cared about safety because it had lost personnel to war, did not have safety issues, never experienced mission failure, and never heard the Army complain about its services. V.8 at 2486:11–2496:8; V.16 at 4971:16–4973:4; V.20 at 6196:6–6203:16; V.24 at 7567:24–7568:16. Yet each time Relators asked the Court to rule that Fluor had opened the door to introducing the Army's findings on the suicide bombing, the Court declined. Even when Relators asked the Court whether a witness could testify that enemies could access unaccounted-for materials to make weapons, the Court said no. V.7 at 2240:5–2243:10.

After Fluor presented so much evidence of mission success, principles of "fairness and completeness" required allowing Relators to introduce evidence of mission failure along the same

8

axes. *Schaefer*, 2019 WL 5901493, at *6. Instead, the Court allowed Fluor to have it both ways, telling the jury it fulfilled its duties while excluding evidence showing otherwise.

### 3. The Court's Exclusion Rendered Trial Fundamentally Unfair

Because of the Court's evidentiary ruling, the jury saw a one-sided and fundamentally inaccurate picture of the facts. Fluor was allowed to argue that it never reached mission failure, that it prioritized safety above all else, that the Army was wholly satisfied with its property management system, and that the Army would not have terminated TO5 for property-related deficiencies. Without the Army's findings, the jury could not understand the full extent of Fluor's property deficiencies, which likely influenced their decision to reject the award fee claims and award a fraction of the property fraud damages Relators requested. Moreover, had the jury known that the Army nearly terminated TO5 after discovering the extent of Fluor's property-related deficiencies, the jury may well have determined that the Army would have done the same had it discovered those deficiencies earlier. Thus, the jury may well have found for Relators on their award-fee theory, on which materiality was a hotly contested issue. In sum, the Court's evidentiary rulings on the Army's report cast serious doubts on the fairness of the trial and created a miscarriage of justice. The Court should grant Relators a new trial on this ground.

## II. THE COURT ERRED BY PREVENTING RELATORS FROM PRESENTING EVIDENCE RELATED TO FLUOR'S "MATERIALS MANAGEMENT INVESTIGATION"

The court erred when it found Fluor had not waived its privilege as to its Materials Management Investigation ("MMI"). In 2013, Fluor understood that it was failing to comply with its property management system, including by failing to report known losses to the Government. Ex. 5 (PX1622) at 1; Ex. 6 (PX365) at 1-2; Ex. 7 (PX796) at 1-2, 7-9; Ex. 8 (PX1525) at 2, 6-7; Ex. 9 (PX1620) at 5-8. Fluor undertook an investigation into the problems. Eventually, in December 2013, that investigation resulted in a disclosure to the Government. Ex. 10 (PX765).

9

That disclosure concluded that Fluor had only really lost about $1.4 million of Government property. Ex. 10 at 4. Such was the case in the trial. During their examination of Tony Montalvo, Fluor elicited testimony that it had disclosed to the Government losses that it found through an inventory adjustment investigation. *See* V.5 at 1557:7–60:5. And Montalvo testified that if the Government did not like the number, it could have figured it out the issue on its own. *See* V.5 at 1494:10–95:10. Likewise, from Ernest Ridley, Fluor elicited testimony that Fluor conducted an investigation that it then disclosed to the Government. *See* V.15 at 4634:9–36:18. *See, e.g.*, *id.* at 4636:15–18. And, again, this investigation came to exactly the same conclusions as the so-called privileged investigation: a $31.3 million unexplained negative adjustment and a $1.4 million loss. *See id.* at 4636:10–14; Dkt. 695.

In fact, the investigation that Montalvo and Ridley referred to *was also known as the MMI*. The same personnel and data used in the Ridley/Montalvo investigation were used in the MMI. Fluor admits the inventory adjustment problem was not privileged, but has characterized dozens of documents about that non-privileged problem as being part of a privileged MMI. For example, Montalvo appears on 324 entries in Fluor's privilege log, and Ridley appears on more than 20 such entries. The same is true of Jeffrey Nix and Justin Jones—the Fluor employees who conducted key compliance reviews relating to the inventory adjustment problem (*see* Exs. 8 and 9), who each appear on hundreds of log entries. Moreover, the admittedly non-privileged inventory adjustment review and the purportedly privileged MMI arrived at the exact same concluding figures. *See* Dkt. 688-2 at 31; Dkt. 695. Fluor just gave them two different names.

On February 12, Relators moved the Court to find that Defendants had waived their privilege over the MMI. *See* Dkt. 688 at 5. Relators made the argument above and explained that Defendants had made the investigation the centerpiece of their defense. *See id.* at 1, 4. In their

10

motion, Relators asked the Court to review ten documents in camera to allow the Court to better evaluate Relators' argument. *See id.* at 9; *see also* V.9 at 2567:12–13.

Two days later, on February 14, Relators issued a subpoena to Fluor for an unredacted copy of a document regarding the internal investigation related to Ridey, the next witness at trial. *See* Dkt. 698-1 at 1, Dkt. 698-6 at 7. Fluor moved to quash. *See* Dkt. No. 698.

On February 17, the Court denied Relators' motion to find privilege waiver. *See* V.13 at 139:4–41:1. On February 18, the Court quashed Relators' subpoena for the investigation document but ordered Fluor to file it under seal. *See* V.14 at 4406:12–25. On February 24 and February 27, Relators asked the Court to address the sealed document. The Court again did not rule and still has not. *See* V.18 at 5737:22–38:4, V.21 at 6628:7–10.

Whatever else was true during discovery, with the benefit of the entire trial record, it is now indisputable that Fluor waived privilege as to its MMI by putting the investigation at issue in its trial defense. It is black letter law that "a party may not use an allegedly privileged document as a 'shield and a sword.'" *Stanko v. Stirling*, No. 1:19-CV-03257, 2022 WL 22887110, at *2 (D.S.C. May 23, 2022) (quoting *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008)); *United States v. Duke Energy Corp.,* 208 F.R.D. 553, 558 (M.D.N.C. 2002) ("A party may not use a privilege (or work product) as a shield during discovery and then hammer it into a sword for use at the trial."). As a result, "if a defendant voluntarily injects an issue in the case, whether legal or factual, the insurer voluntary waives, explicitly or impliedly, the attorney-client privilege." *City of Myrtle Beach v. United Nat. Ins. Co.*, 2010 WL 3420044, at *5 (D.S.C. Aug. 27, 2010); *see also Hege v. Aegon USA, LLC*, 2011 WL 1791883, at *4 (D.S.C. May 10, 2011). When parties so waive their privilege, courts require disclosures as a basic matter of "fairness." *United States v. White*, 944 F. Supp. 2d 454, 460 (D.S.C. 2013); *Graham v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 2017 WL

11

116798, at *4 (D.S.C. Jan. 12, 2017). And Relators' request that the Court examine the so-called privileged documents in camera was appropriate. *See, e.g.*, *Mach. Sols., Inc. v. Doosan Infracore Am. Corp.*, 323 F.R.D. 522, 538 (D.S.C. 2018) (a court may conduct an in-camera review to adjudicate a privilege dispute (citing *Nationwide Mut. Fire Ins. Co. v. Kelt, Inc.*, 2015 WL 1470971, at *9 (M.D. Fla. Mar. 31, 2015)). The Court's denial of Relators' requests prejudiced their ability to counter Fluor's defense and maintain their case. A new trial should be granted on this basis.

## III.     THE COURT ERRED BY LIMITING TESTIMONY OF DAVE METHOT

In 2014, Fluor made a formal disclosure to the Department of Defense Office of Inspector General ("DODIG") that Fluor had found "credible evidence" of a potential False Claims Act violation but that the impact on the Government was minimal because the problems were "isolated, minimal, non-systemic, or anecdotal." Ex. 4 at 1. Further, the 2014 DODIG disclosure, signed by Methot, asserted that the problems only caused $1.4 million in previously unreported losses—which is the same figure both touted by Montalvo in his 2013 DODIG disclosure and determined by the MMI.

The 2014 DODIG disclosure was a crucial event for the jury to understand. On one hand, Fluor argued at trial and in the 2014 disclosure that any problems really weren't so bad and in any event the cost to the Government was only $1.4 million. On the other hand, Relators presented evidence that the problems were much broader in scope and the cost to the Government was much higher. It was therefore essential that jury be able to assess the credibility of Methot, the person who signed the 2014 DODIG disclosure.

Instead, the Court severely limited Relators' cross-examination of Methot. Relators sought to establish that Methot had taken no steps to actually verify the assertions he made in the 2014 DODIG disclosure. The Court refused to allow these questions. V.17 at 5407:21–10:8.

12

Fluor argued that it would be unfair to allow those questions because Methot claimed to not remember and in order to refresh his recollection Fluor would have to use the purportedly-privileged MMI. *Id.* at 5374:24–12, 5375:22–76–13, 5377:25–78:17, 5408:10–13. The Court agreed and barred such questions. *Id.* at 5378:20–81:17, 5408:25–10:6. This was incorrect for several reasons. First, the MMI is not, in fact, privileged. *See supra* § III. Second, the question of whether there was recollection to "refresh" was a red herring, because Methot did not actually take any steps to justify or verify the claims he made in the DODIG disclosure. Dkt. 717 at 3 (citing instances from Methot's deposition that show Methot did not verify the claims he made in the disclosure). Third, the assertions made in the 2014 DODIG disclosure mirror those made by Montalvo in his 2013 disclosure. Methot's recollection could have been refreshed using those documents.

And fourth, any concerns that Fluor had regarding this issue were waived. Fluor produced the 2014 DODIG disclosure in discovery, and then made it a centerpiece of its defense, including at trial. And at Methot's deposition, Fluor let him answer numerous questions about the disclosure without asserting privilege objections. *See generally* Dkt. 665-1 at 167:9–188:11.

So, Fluor waived any privilege over the underlying investigation and conduct leading to the 2014 DODIG disclosure. For starters, a party waives its attorney-client privilege by failing to timely object to relevant questions. *See Hollins v. Powell*, 773 F.2d 191, 197 (8th Cir. 1985); *Shell Disposal & Recycling. v. City of Lancaster*, 504 F. App'x 194, 196 n.4 (3d Cir. 2012). At Methot's deposition, Fluor did not object based on privilege even once in response to questions about the 2014 disclosure investigation. Additionally, a party waives privilege over a subject matter where it selectively discloses information related to that subject matter. *See supra* § III.

The Court's severe restrictions on Relators' ability to cross-examine Methot prevented

13

Relators from receiving a fair trial and a new trial should be granted on this ground.

### IV.     THE COURT ERRED BY REFUSING TO ALLOW RELATORS TO CROSS FLUOR'S EXPERTS ON MATERIAL THEY DID NOT REVIEW TO REACH THEIR OPINIONS

The district court also erred in improperly cabining the scope of Relators' cross examination of Fluor's expert witnesses.

First, Relators' counsel attempted to question Fluor's expert Renee Richardson about whether she considered the deposition testimony of two individuals who worked for Fluor when she formed her opinion. *See* V.24 at 7604:7-9. Fluor objected, and the Court precluded this line of questioning. *See id.* at 7604:10–11, 7606:14–16. It occurred a second time when Relators' counsel attempted to ask Richardson if she had considered the deposition testimony of Storme Guaraldi, a government contracting officer who oversaw Fluor at the relevant time. *See id.* at 7694:16–17. Fluor again objected, and the Court sustained the objection on the basis of Rule 403 concerns. *See id.* at 7694:18, 7696:12–13.

Third, Relators' counsel attempted to introduce two documents regarding the accuracy of Fluor's inventory into evidence during his cross examination of Fluor's expert Thomas Ruckdaschel. *See* V.26 at 8292:19–93:7; Dkt. 656 at 4–5. Ruckdaschel had listed these documents in his report. *See* V.26 at 8294:1–8. After Fluor objected, the Court instructed Relators' counsel to establish whether Ruckdaschel relied on those documents, and Relators' counsel agreed to move on. *See id.* at 8293:17, 8294:4–8, 16–18.

Fourth, Relators' counsel asked Fluor's expert Bradford Rice what he had considered in order to assign a causative rationale as to the spikes that he observed in Maximo before audits. *See* V.21 at 6691:10–14. Fluor objected, and the Court sustained the objection. *See id.* at 6691:15, 6691:25–92:2.

Each of these instances prevented Relators from fulsomely examining the bases of Fluor's

14

experts' opinions. Courts grant parties "broad latitude on cross-examination" to examine the bases of experts' opinions. *City of Huntington v. AmerisourceBergen Drug Corp.*, No. 3:17-cv-01362, 2021 WL 1711381, at *5 (S.D.W. Va. Apr. 29, 2021); *see also Moore v. BPS Direct, LLC*, No. 2:17-CV-3228-RMG, 2019 WL 2913306, at *5 (D.S.C. July 8, 2019) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." (quoting *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 955 (8th Cir. 2007)). Indeed, "[f]ull examination of the underpinnings of an expert's opinion is permitted because the expert, like all witnesses, puts his credibility in issue by taking the stand." *United States v. A&S Council Oil Co.*, 947 F.2d 1128, 1135 (4th Cir. 1991). Rule 705, which requires experts to reveal the bases underlying their opinions, "is the cross-examiner's sword, and, within very broad limits, he may wield it as he likes." *Id.*

A cross-examiner may wield his sword to inquire as to sources that the expert *failed* to consider, as well as those the expert did. *See Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 691, 735 (S.D. W. Va. 2014). This formed the basis of the court's ruling in *In re Aqueous Film-Forming Foams Products Liability Litigation*, No. 2:18-cv-3487, 2023 WL 3517923, at *5 (D.S.C. May 2, 2023), where the court admitted plaintiff's expert, despite the fact that he "'cherry-picked' data" and "wholly failed to consider alternative sources of PFAS," precisely because the expert's failure to consider other sources of data was "most properly addressed through cross-examination." *See also Bahr v. NCL (Bahamas) Ltd.*, No. 19-cv-22973, 2021 WL 4845789, at *10 (S.D. Fla. Oct. 18, 2021) (admitting an expert opinion because the plaintiff could inquire into whether the expert failed to "consider all of the relevant medical records" on cross examination); *Seely v. Archuleta*, No. 08-CV-02293, 2011 WL 3625073, at *11 (D. Colo. Aug. 17, 2011)

15

(same).

The Court similarly erred in disallowing Relators from pursuing this line of questioning. Relators asked Richardson about Rabb and Reuter to determine whether Richardson "failed to consider alternative sources" of data that might have undermined her opinion. *Bahr*, 2021 WL 4845789, at *10; *see also* V.24 at 7604:7-9. That Rabb and Reuter did not testify is no barrier; parties may cross examine experts "to reveal otherwise-inadmissible underlying information before the jury," in order to reveal the basis of the expert opinion. *See A&S Council*, 947 F.2d at 1134.

The same analysis holds where Relators asked Richardson whether she considered Storme Guaraldi's deposition. *See* V.24 at 7694:16–17. Relators were questioning Richardson about her opinion as to how the Government treats contractors who do not abide by contractual terms. *See id.* at 7694:2–10. Whether she considered the deposition of the government contracting officer who said that Fluor risked losing its property management system bears on the reliability of her opinion. *See id.* at 7694:11–17. This line of questioning raised no Rule 403 concerns. *See id.* at 7696:12–13. Inquiring as to whether Richardson considered a relevant source is "straightforward and unlikely to be misunderstood by the jury." *Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, No. CIV. WDQ-08-2764, 2011 WL 862729, at *7 (D. Md. Mar. 10, 2011). These questions were therefore appropriate and important.

For similar reasons, Relators should have been allowed to introduce documents that Ruckdaschel reviewed but did not rely on. Parties may cross examine an expert on materials that he reviewed, "even if in the end he does not rely on them in formulating his expert opinion." *Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.,* 412 F.3d 745, 751 (7th Cir.2005); *see also Momeni-Kuric v. Metro. Prop. & Cas. Ins. Co.*, No. 3:18-CV-00197, 2019 WL 3416677,

16

at \*10 (W.D. Ky. July 29, 2019). Finally, Relators should have had a full opportunity to cross

Rice as to what she considered, for the reasons explained above. Failure to do so prejudiced

Relators in their attempt to undermine the basis of Rice's opinion.

## V.     THE COURT ERRED BY PREVENTING RELATORS FROM REBUTTING NEW DEFENSE EVIDENCE

The Court erred when it denied Relators request for leave to introduce evidence to rebut

two new facts that Defendants elicited during their case-in-chief: (1) that Fluor never ran out of

critical items; and (2) that audit results demonstrate the strength of Fluor's quality management

system. A Court may allow a plaintiff to present rebuttal evidence after the defense closes its case

at trial. Fed. R. Evid. 611(a); *Allen v. Prince George's Cnty.* 737 F.2d 1299, 1305 (4th Cir. 1984).

Rebuttal evidence "explain[s], repel[s], counteract[s], or disprove[s]" the opposing party's

evidence. *United States v. Byers*, 649 F.3d 197, 213 (4th Cir. 2011). Parties may offer such

evidence to "refute or explain facts implied by the opposing party's evidence as well as those

directly stated." *United States v. Moore*, 2012 WL 4404082, at \*1 (W.D. Va. Sept. 25, 2012).

Generally, courts allow rebuttal testimony when the defendant presents "new facts" in its case-in-

chief. *Allen*, 737 F.2d at 1305. And courts are under no obligation to limit rebuttal testimony to

evidence that comes as a "surprise" to plaintiffs. *See Pugh v. Louisville Ladder, Inc.*, 361 F.

App'x 448, 458–59 (4th Cir. 2010); *see also Benedict v. Hankook Tire Co. Ltd.*, 2018 WL

3352952 (E.D. Va. July 9, 2018) (the court did not consider whether the new evidence was a

surprise (it was not); what mattered was that it presented a new perspective on the familiar topic).

William Snyder testified that Fluor never ran out of critical materials between 2011 and

2016. V.12 at 7027:2-8, 7033:4-16. The topic was not "new;" other witnesses had discussed

knowledge of Fluor's shortages of critical materials. V.2 at 900:3-22 (Rudolph); V.5 at 1527:17-25

(Montalvo). But Snyder was the first witness (in either party's case) with direct first-hand

17

knowledge of Fluor's critical material shortages: he led Fluor's "stock control department," V.22 at 7015:24-25, where he was responsible for ensuring that FOBs had adequate inventory of critical items, *id.* at 7019:6-11, 7020:22-25, and monitoring the "authorized stockage lists" ("ASLs"), which tracked each FOB's utilization and consumption, *id.* at 7015:18-7016:25. No other witnesses testified to seeing Fluor's ASLs, let alone analyzing whether those ASLs ever showed that Fluor had never experienced a critical material shortage. Thus, Snyder's testimony introduced a new fact into this case: Someone personally responsible for ensuring Fluor never ran out of critical supplies testified that it never did so, based on his first-hand knowledge of Fluor's tracking system. Relators intended to introduce five exhibits that directly contradict Snyder's assertion that there were never critical material shortages: Ex. 11(PX 351); Ex. 12 (PX 353); Ex. 13 (PX 658); Ex. 14 (PX 443); and Ex. 15 (PX 890). The Court should have allowed Relators to present this evidence to rebut Snyder's testimony.

### 1.     External Audits Revealing Fluor Failed to Maintain a Quality Management System

Defendants also introduced a theory that numerous government audits over the award fee period demonstrate the strength of its quality management system. They supported this theory through their expert witness Renee Richardson with the introduction of DX 801, a numerical summary of government audits completed during the award fee period that Richardson attested provided evidence of Fluor's robust quality control system during the award fee evaluation period. Richardson thereby introduced new evidence into the record concerning the strength of Fluor's quality system, backed up by evidence of audits. To rebut this purported evidence, Relators sought to introduce, through the testimony of David Vaughn, Fluor's Quality Director, Ex. 16 (PX 1542), which is a series of slides showing the results of a third-party audit organization that performed a review of Fluor's quality systems during the second AFEB period.

Ex. 16 at 1. The review found serious problems with Fluor's quality control system, including "an isolated approach to quality," "[s]ystem quality problems [that] add unnecessary and avoid costs," a "noncompliant" quality management system with "many high risk areas," *id.* at 10. This contradicts the new evidence Fluor introduced regarding the strength of its quality control system. Now that Richardson has "opened the door" to this dispute, Relators were "entitled to rebuttal to refute [Fluor's] theory." *United States v. Hunt*, 749 F.2d 1078, 1084 (4th Cir. 1984).

## VI.     THE COURT ERRED BY BARRING TESTIMONY OF JIM SHERMAN AND DISMISSING THE ESTIMATING THEORY HIS OPINIONS EXPLAINED

For the reasons stated on the record, the Court erred in prohibiting testimony from the very Relators expert upon whom Defendants' expert opinions all revolved. *See* V.26 at 8196:14–8120:4; *see also* Dkt. 561. The Court also erred in dismissing Relators' labor estimating fraud theory, which Sherman's opinions corroborated with evidence in the record. *See* Dkt. 546-2. The Court further erred by then permitting Fluor to offer testimony from its experts on the labor fraud theory, that were subject to the same methodological and reliability concerns upon which the Court barred Sherman. The Court barred Sherman because it determined that he did not analyze Fluor's underlying billing submissions or records. But neither Sherman nor Fluor's experts Richardson and Walter ever analyzed "the claims submitted, labor hours billed, or work actually performed." *Id.* at 17; Ex. 17 at 39–42; Ex. 18 at 23–30. Instead, Richardson opined that Fluor maintained appropriate staffing levels because it needed enough staff to support population fluctuations and because the government employed "substantial" scrutiny of personnel levels. *See* Ex. 17 at 39–42. Likewise, Walter concluded that Fluor's staffing was appropriate because the Government monitored costs, and there was no evidence the Government relied on Fluor's BOEs. *See* Ex. 18 at 23–30. Both opinions failed to apply a reliable methodology to the operative issue, and the Court should have excluded both. *See Nix v. Chemours Co. FC, LLC*, 805 F. Supp. 3d 626, 656 (E.D.N.C. 2025);

19

*Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-CV-275-D, 2011 WL 6748518, at *15 (E.D.N.C. Dec. 22, 2011).

Furthermore, after the Court barred Sherman, Richardson's and Walter's opinions did not assist the jury. Both Richardson's and Walter's opinions served only to rebut Sherman's, *see* Ex. 17 at 4, 40–41 (framing her opinions in opposition to Shermans), Ex. 18 at 22–30 (same), and with Sherman barred, there was no basis for their opinions. *See Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-cv-681, 2015 WL 5459662, at *9 (S.D.N.Y. Sept. 16, 2015) ("As the Court has precluded [plaintiff's expert], there is no longer any reason for [defendants' experts] to testify."); *Am. Customer Satisfaction Index, LLC v. ForeSee Results, Inc.*, No. 18-cv-13319, 2023 WL 145000, at *3 (E.D. Mich. Jan. 10, 2023) (same); *See also Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, No. 12-cv-7372 (AT), 2020 WL 4251229, at *9 (S.D.N.Y. Feb. 19, 2020) (same).

Finally, it was improper to allow both Walter and Richardson to testify, after excluding Sherman entirely. Courts exclude expert testimony that results in "needless presentation of cumulative evidence" under Rule 403. *See May v. Stahl*, 91 F.3d 131 (4th Cir. 1996). *See also United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 324 (4th Cir. 1982); *Russell v. Wright*, No. 3:11-cv-00075, 2013 WL 596062, at *4 (W.D. Va. Feb. 15, 2013). Walter and Richardson both denied that Fluor marked up its labor costs and contended that Government oversight would have prevented such chicanery. *Compare* Ex. 17 at 39, 40 *with* Ex. 18 at 25, 26. The Court should not have allowed two experts, neither of whom applied reliable methodology to the facts at issue, to say the same thing.

## VII.    THE COURT ERRED BY PREVENTING RELATORS FROM PRESENTING EVIDENCE RELATED TO FLUOR'S PAYMENTS TO FACT WITNESSES

During the trial testimony of the third witness (Tony Montalvo), Relators learned for the first

20

time that Fluor paid its fact witnesses.[2] This was a shocking revelation. Relators immediately requested information related to these payments. It turned out that Fluor had written agreements with multiple fact witnesses that designated them contractors for Fluor and provided that these witnesses could only disclose facts *as approved by Fluor*. These agreements authorized the witnesses to bill Fluor for up to $300,000 each.

Relators immediately and repeatedly asked the Court for relief, including permission to present these facts to the jury. *See, e.g.,* Dkt. 676; V.7 at 2059:6-2066:10; V.14 at 4149:20- 4151:8; 4151:23-4152:9; V.17 at 5391:18- 5394:2. The Court rejected Relators' requests in virtually all material respects, instead limiting Relators to only asking on cross-examination about the amounts billed by each witness. *See* Dkt. 703. Relator also asked the Court to permit a deposition of James Pike and of a Fluor corporate representative on the topic, Dkt. 676 at 20; Dkt. 684 at 8, and the Court denied these requests as well, Dkt. 703 at 22. In addition to unfairly limiting the evidence that Relators presented to the jury related to the payments, the Court issued an instruction that blessed the payments and agreements as proper. V.6 at 1943:18–24. The Court went even further, permitting the parties to ask *only* a series of questions about the contractual terms that told only Fluor's side of the story (*e.g.*, the payments are not contingent on the substance of the testimony). *See, e.g.,* V.14 at 4143:18–21.

In reality, the payments and the agreements were not proper. Congress enacted an anti-

---

[2] During discovery, at least ten witnesses testified at their depositions in one way or another that they no longer worked for Fluor, including a number of witnesses who testified at trial. *See, e.g.*, Dkt. 676-4 at 21:18–25, 147:3–5; Dkt 676-5. at 10:16–17, 15:11–16:14; Ex. 32 (Hill Dep.) at 20:3–13; Ex. 33 (Whitcomb Dep.) at 9:17–20, 10:12–11:7, 65:15–16 ; Dkt. 676-15 at 12:24–25. At no point did Fluor correct or clarify any of this testimony. *See Yoo v. BMW Mfg. Co., LLC*, No. CV 7:17-3499-AMQ-SVH, 2018 WL 11485095, at *3 n.1 (D.S.C. Aug. 6, 2018) (attorney has an ethical obligation to bring the truth to the court's attention). But in fact, the witness agreements require former employees to "render advisory and consultation services to the Company as and when the Company may from time-to-time request" and "make [themselves] reasonably available for assistance to litigation or disputes involving the Company, its subsidiaries, parents, related entitles, or joint ventures as may be requested by the Company." Ex. 19. Had they admitted they had signed agreements that paid them for their time assisting Fluor—*i.e.*, what is commonly known as *working for a company*—thorough discovery would have ensued.

bribery statute criminalizing offering a thing of value that could influence testimony, 18 U.S.C.A. § 201 (c)(2). The point is not to claim or accuse Defendants of criminal conduct; it is to emphasize the importance of preventing undue influence of witnesses to a functioning legal system and a just society. To the extent payments to fact witnesses are permitted at all, it is only in limited circumstances, and they are scrutinized thoroughly to ensure that they do not serve an illicit purpose and to permit the factfinder to thoroughly assess the credibility of the paid witness "[i]n recognition of the substantial risk that financial incentives can corrupt." *United States v. Levenite*, 277 F.3d 454, 462–63 (4th Cir. 2002).

The witness agreements, however, went far beyond what the professional rules allow under the auspices of "reasonable" compensation of time, as set forth below. *See* S.C. Ethics Advisory Op. 97-42 at 2 (payments to witnesses do not violate ABA Model Rules of Professional Conduct if "made solely for the purpose of compensating the witness for the time the witness has lost in order to give testimony in litigation"); ABA Formal Op. 96-402 at 3 (Aug. 2, 1996). No discovery or probing was permitted into whether the compensation rates for each Fluor paid witness were reasonable, and in multiple cases the paid witnesses were being compensated at extremely high rates for their time despite being unemployed or retired. Moreover, far beyond what the professional rules contemplate, the agreements provide that Fluor will compensate witnesses "for preparing to testify, attending proceedings, and providing testimony *as specifically approved by the Company* during the term of this Agreement ... ." Ex. 19. They further provide that witnesses cannot disclose facts "to anyone outside the Company, except with the prior written authorization of the Company." *Id.* A witness contracted by Fluor could easily have the impression that he will not be paid if he offers testimony that Fluor has not "approved" or "authorized." When counsel for Relators asked Montalvo if he had been paid for his testimony, he asked Fluor's counsel if he could answer the

question, obviously uncertain whether he could be forthright without Fluor's approval. V.5 at 1658:6–19.

Thorough cross-examination on all aspects of the agreements and every facet of the witnesses' understanding of the agreements was therefore especially crucial here. *See United States v. Hopkins*, 197 F. App'x 235, 238 (4th Cir. 2006) ("[T]he Government may introduce a witness' plea agreement 'so that the jury may assess the credibility of the witnesses the government asks them to believe.'"); *United States v. Anty*, 203 F.3d 305, 311–12 (4th Cir. 2000) (defendant had the "right to be apprised of the [ ] compensation arrangement with the witness and to inquire about it on cross-examination" because "[t]he adversary process must be allowed to probe for possible corruption of testimony"); *Anty*, 203 F.3d at 311–12; *United States v. Greenwood*, 796 F.2d 49, 54 (4th Cir. 1986) ("The point of a bias inquiry is to expose to the jury the witness's 'special motive to lie,' by revealing facts such as pecuniary interest in the trial ... ." (quoting *United States v. Harvey*, 547 F.2d 720, 722 (2nd Cir. 1976)); *see also United States v. Hawkins*, 2024 WL 3083418, at *1 (4th Cir. June 21, 2024) ("[A] defendant may ask a cooperating witness whether he hopes to receive some benefit in exchange for his testimony ... ."); *Dorman*, 781 F. App'x at 144 (same); *State v. Kelly*, 770 A.2d 908, 930 (Conn. 2001) (collecting cases showing that payments to witnesses are probative of bias and credibility, and thus subject to vigorous cross-examination).

In the end, the Court's rulings left the jury with a wildly inaccurate understanding of these payments and their significance. For example, Fluor was permitted to ask Erp about some of the terms of the "witness agreement," including that the agreement specifically requires that he testify truthfully. V.14 at 4143:18–21. But the Court prohibited Relators from cross-examining Erp on the related terms of the same witness agreement, including the provision requiring that the supposedly non-contingent testimony could not include anything that Fluor had not expressly authorized in writing. V.14 at

4146:25–47:9. [3] By preventing this questioning, the Court prevented Relators from performing one of the most basic functions of cross-examination: to probe the motivations and biases that may impact the jury's assessment of the witnesses' credibility. *See Dorman*, 781 F. App'x at 144 (quoting *United States v. Caudle*, 606 F.2d 451, 457 n.3 (4th Cir. 1979). How Erp, and every other Fluor witness with a payment agreement, interpreted and understood the terms of the agreements—and what limitations or restrictions it placed on their testimony if they wanted to remain in compliance so they could be paid—was crucial cross-examination as to credibility.

In addition, at the conclusion of two days of testimony, Relators counsel happened to ask Montalvo why he spent so much time with Fluor getting ready for deposition and trial if he was not getting paid. To nearly everyone's surprise, Montalvo asked Fluor's counsel for permission to answer the question. After Fluor's counsel granted him this permission, Montalvo testified that Fluor was paying him $250 per hour. V.V at 1658:6–19. Thereafter, Relators counsel asked Fluor to share any agreements governing payments to witnesses. Fluor took the position that it did not have to, and would not. V.6 at 1751:21–24; Ex. 21 (2/5/26 Email from C. Sheehan). Fluor subsequently reversed itself and produced "the agreements," i.e., three contracts, one for each of Montalvo, Hamm, and Methot, covering testimony at trial. Ex. 21.

The Court said it would wait for Fluor to disclose all the facts before making any decisions and issued guard-rails around cross-examination around the topic of compensation. V.6 at 1773:21–74:12, 1785:4–87:3. After Relators argued that Fluor has misleadingly implied that there were only three agreements, Fluor produced another twenty agreements governing many of the important witnesses at

---

[3] It is worth noting that Erp authored and signed an affidavit for Relators describing Fluor's fraudulent practices in Afghanistan. Ex. 20 (PX 63); see V.13 at 242:9-244:6; V.14 at 4136:22-4137:16. On September 20, 2023, Fluor signed Erp to one of these witness agreements. *See* V.13at 245:8-16; *see* Ex. 19 at 1. On May 16, 2024, Erp signed a "counter-declaration" for Fluor, disavowing and walking back his original affidavit. *See* V.13 at 250:12-20. Thus it appears he was paid to sign a new declaration to counter the one he authored for Relators for free.

24

the trial. *See* Ex. 22 (2/10/26 Email from T. Lollar). Several witnesses had more than one.

Fluor also responded with the following payments (Ex. 22):

| Name | Rate | Hours | Total |
|---|---|---|---|
| Erp, David | $ 75 | 6 | $ 450.00 |
| Gross, Gregg | $ 160 | 44 | $ 7,040.00 |
| Hamm, Bradley | $ 85 | 44.5 | $ 3,782.50 |
| Hill, Minevere (Minka) | $ 80 | 45.5 | $ 3,640.00 |
| Methot, David | $ 200 | 33.5 | $ 6,700.00 |
| Rabb, George | $200 | 22.52 | $ 4,504.00 |
| Ramirez, Michael (Shane) | $ 75 | 40 | $ 3,000.00 |
| Whitcomb, Roy (Steven) | $ 200 | 30.5 | $ 6,100.00 |

These representations turned out to be extremely inaccurate. For example, although Fluor had previously claimed it had paid Erp for only six hours, Erp testified on the stand that he billed "18 to 16 hours." On further cross-examination, Erp claimed to have checked his records before testifying, and there were actually 32 hours. V.14 at 4162:5–7.

Erp's five-fold disparity pales in comparison to the ten-fold disparity of former Chief Compliance Officer David Methot. Fluor originally disclosed that Methot had charged 33.5 hours to Fluor. Ex. 22.[4] After Relators' counsel questioned that total, Fluor eventually revealed that Fluor actually paid Methot for 334.5 hours and counting. Ex. 23 (2/20/26 Decl. of E. Rosenwald) at 4.

With the shifting answers and explanations from Fluor, Relators asked the Court to order Fluor to produce *all* invoices for these paid witnesses and for any other witness or, at a minimum, to review them in camera for itself. *See* Dkt. 676. The Court refused. *See* Dkt. 703. The Court declined. Instead,

---

[4] Fluor then updated this figure: to 31.5. Dkt. 693, Court Exhibit 3.

Fluor was required to produce only total payments from Fluor, and only for what Fluor (in its unilateral and un-reviewed discretion) chose to characterize as work related to this lawsuit. So, if the paid witness "consulted" or "advised" Fluor on other allegedly unrelated matters, earning hundreds of thousands of dollars during the same period in which they were testifying in Fluor's defense, Relators and the jury were deprived of this information.[5] Indeed, given Fluor's apparently longstanding practice of paying witnesses, it is plausible that Fluor was paying witnesses during the Government's investigation into Relators' allegations. If so, the jury should have heard all that evidence, as it bears not only on witness credibility, but also on Fluor's scienter. Relators made this argument at trial. V.12 at 3733:19–34:1; *see also id.* at 3707:5–22, 3712:13–13:12.

The cumulative effect of the Court's rulings regarding the witness payments include that the jury was instructed by the Court that such payments were proper, that Fluor did not limit or control the witnesses' testimony, and that the agreements had no bearing on candor. The jury should have heard the full truth of what the witness agreements required, and critically, how the paid witnesses understood the agreements and what they could (and could not) say, in order to meaningfully assess their biases and credibility. Just as a jury in a criminal case should hear all facts related to the Government's payments to cooperating witnesses. In the end, the full scope of compensation paid to witnesses was never revealed to the jury. Because of these errors, Relators did not receive a fair trial.

*     *     *

For all the reasons set forth above, the Court should grant a new trial on liability on the award fee and excess staffing fraud claims.

## VIII.   A NEW TRIAL ON DAMAGES AND PENALTIES SHOULD BE GRANTED AS TO

---

[5] In this way, Fluor and its paid witnesses were permitted to hide information that experts are routinely required to provide, and probed about. If a party's expert served as an expert for that party (or their counsel) in other cases, those opinions and the payments for them are routinely probed through cross-examination, because they go to bias and motives. The same is all the more true for fact witnesses.

**THE PROPERTY FRAUD CLAIM**

The Court should also order a new trial on damages and penalties related to the property fraud claim. Damages are a common severable issue for new trials. *Boshea v. Compass Mktg., Inc.*, 2024 WL 4732773, at *16 (D. Md. Nov. 8, 2024) (collecting cases).

First, the verdict form presented to the jury did not ask the jury to report the number of times Fluor violated the False Claims Act.[6] This was a mistake. It is well-established that a finding of liability invokes the penalties provision of the False Claims Act and that the United States is entitled to a civil penalty for each FCA violation. *See ACLU v. Holder*, 673 F.3d 245, 249 (4th Cir. 2011). Typically, the counting of FCA violations remains within the jury's purview. *See United States v. BlueWave Healthcare Consultants, Inc.*, No. 9:11-CV-1593-RMG, 2017 WL 11621328, at *1 (D.S.C. Nov. 20, 2017) (quoting *United States ex rel. Miller v. Bill Harbert Intern. Const., Inc.*, No. 95-1231, 2007 WL 851868, at *2 (D.D.C. 2007) for the proposition that "the jury's job in this case will be to determine the number of violations and fix the amount of damages, if any. The application of statutory penalties and trebling of damages are mechanical actions for the Court alone.").[7]

These penalties, of course, remain on the table for those who violate § 3729(a)(1)(G). The statute explicitly provides as follows: "Subject to paragraph (2), any person who ... knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty ... ." 31 U.S.C. §

---

[6] The parties became privy to the Court's proposed verdict form the morning of March 10, 2026. By the afternoon Court session, Relators raised the concern about the missing LTDD count. The Court denied Relators' request to alter the verdict form.

[7] Although Relators' seek a new trial at which the jury should be asked to tally the number of FCA violations, Relators would consent to the Court finding this number. *See infra* § VII.

27

3729(a)(1)(G). Moreover, the Fourth Circuit was clear in *United States ex rel. Wheeler v. Acadia Healthcare Co., Inc.*, 127 F.4th 472 (4th Cir. 2025),

> A company may be held liable for a reverse false claim if it: (1) "knowingly makes, uses, or causes to be made or used, a false record or statement material to an *obligation to pay* or transmit money or property to the Government;" or (2) "knowingly conceals or knowingly and improperly avoids or decreases an *obligation to pay* or transmit money or property to the Government."

*Id.* at 495 (quoting 31 U.S.C. § 3729(a)(1)(G)) (emphases in *Wheeler*).

Fluor argued violations of 3729(a)(1)(G) warrant fewer penalties because all violations of an "obligation" is necessarily systemic and thus could only be counted once. The Fourth Circuit takes a very different view: systemic violations warrant high penalties. *See U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 389 (4th Cir. 2015) (affirming penalty that was multiples of damages because the defendant's "conduct 'involved repeated actions[.]'") (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003)); *see also State Farm*, 538 U.S. at 419.

Of course, Fluor cited no authority that would permit section (G) to be treated any differently than the rest of § 3729(a)(1). *See* Ex. 24 (3/9/26 Email from E. Rosenwald). Instead, Fluor tries to distinguish section (G) from section (B), explaining (B) uses the language, "makes, uses." *Id.* at ¶ 2. Fluor must have overlooked that section (G) explicitly imposes liability on someone who "knowingly **makes, uses,** or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government." § 3729(a)(1)(G) (emphasis added).  LTDDs are quintessential false records or statements material to an obligation to pay or transmit property to the government.

The multiple cases Relator cited in open court assumed the applicability of these penalties. For example, in discussing that § 3729 (a)(1)(G) imposes liability, the Eighth Circuit presupposes that § 3729 (a)(1)(G) violations result in civil penalties per claim.

Subsection (a)(1)(G) is one of seven substantive provisions imposing liability for

fraud against the government. . . The portion of subsection (a)(1)(G) at issue prohibits persons from knowingly concealing an obligation to pay money to the government. To conceal is to fail to disclose. The Restatement § 160 treats concealment as equivalent to a misrepresentation. Likewise, at common law, fraud encompassed material nondisclosures by those with a duty to disclose. It is evident that the language at issue here encompasses fraudulent conduct to which Rule 9(b)'s pleading requirements apply. Our understanding comports with the punitive nature of liability that the FCA imposes. Without fraud, punitive damages—a mandatory penalty of up to $10,000 for each claim and treble damages—would seem an unreasonable levy against individuals guilty only of "knowingly" receiving an overpayment from the government fisc.

*Olson v. Fairview Health Servs. of Minn.*, 831 F.3d 1063, 1073–74 (8th Cir. 2016) (citations omitted).

Fluor's final argument was that "Given the potential disparity between the magnitude of each per-claim penalty as compared to individual instances of allegedly lost materials, Relators' requested modification to the verdict form would also raise potential Eighth Amendment excessive-fines issues," citing *Drakeford*, 792 F.3d at 387, for the proposition that "FCA penalties are subject to Eighth Amendment constraints." Ex. 24 at ¶ 2. The fact that a statute remains beholden to the constitution is Law 101, but it has never been a reason to ignore the law in the first instance. Fluor is welcome to actually make an Eighth Amendment argument as to penalties in the event it obtains standing to do so, though it will likely lose it as defendants who try it tend to do. *See, e.g., Drakeford*, 792 F.3d at 388–89 (rejecting excessive fines argument and affirming aggregate civil penalties of more than $119 million where single damages were $39.3 million).

Consistent with the jury's damages award, the jury could have found that all LTDDs that Fluor submitted in relation to LOGCAP IV constituted violations of the False Claims Act, *i.e.*, 6,739 separate violations. Ex. 25 (PX 1365) (Fluor's internal tracking of LTDDs, which when filtered for LOGCAP IV with duplicates removed reveals 6,739 unique LTDDs). The jury found that the "amount of obligation avoided or decreased" by Fluor Corporation and Fluor Intercontinental, Inc., was $15,000,000 each. Dkt. 775 at 16–17. It follows that if Fluor had even $15,000,000 in

29

unjustified losses that the jury would find Fluor not operating in accordance with FAR 52.245-1.

Each LTDD was provided "in accordance with FAR 52.245-1." *E.g.,* Ex. 26 (PX 901-8) at 12; V.12

at 3635:19-3638:15 (request for relief of responsibility per FAR 52.245-1 appears on every LTDD);

*see also id.* at 3631:12-3633:21 (LTDD process same for property and materials LTDDs); V.1 at

129:24-132:17 (describing standard LTDD process and Government review). This representation

conveyed that Fluor maintained a functional property management system and that its "property

management practices" were not "inadequate." *See* Ex. 27 (DX274) at FAR 52.245-1(h)(1)(iii).

There is therefore sufficient evidence for the jury to find  that all LTDDs constituted false

statements subject to the fines and penalties of the False Claims Act, § 3729(a)(1)(G).[8] *U.S. ex rel.*

*Bunk v. Birkart Globistics GmbH & Co.*, No. 1:02CV1168, 2011 WL 5005313, at \*6–7 (E.D. Va.

Oct. 19, 2011) (discussing whether the jury had sufficient evidence to find a particular number of

False Claims Act violations); *see e.g., cf. U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp.

2d 719, 723, 741 (N.D. Ill. 2007) (explaining, "If this Court were to ignore" testimony from the

plaintiff's expert that the defendants submitted at least 18,130 false claims based on his tally of

enrollment forms that contained at least one woman aged 17 to 44 for the relevant time period, and

the jury's verdict rendering the same count, evidence indicating that the defendants submitted over

33,000 enrollment forms in the relevant time period "supports a finding that all of these enrollment

forms were false claims as they sought inflated capitation payments," since "capitation rates were

---

[8] A corporation is liable for a reverse false claim if it "[1] knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or [2] knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." § 3729(a)(1)(G). Although it was erroneous for the Court to frame its instruction and verdict form around the second clause of this provision, the jury could still have found Fluor liable pursuant to either clause. See Ex. 28 (3/8/26 Email from A. Wolfson) at instr. #10 (at page 7 of attachment) (Relators' objections to the Court's proposed instruction for "Reverse False Claims" adding "either made, used or caused to be made or used a false record or statement material to that obligation, or" to item (b) and "false record or statement" to item (c)).

based on Defendants' promise that they would not discriminate" against pregnant individuals, even when only an example of an enrollment form was admitted in evidence).

Second, not only could there be an opportunity for the jury to count claims for penalty purposes, any ambiguity on the verdict form could also be cleared up. For example, the Court had two separate lines for damages—one for Fluor Corporation and another for Fluor Intercontinental, Inc., and the jury awarded $15 million against each. But there should have been only one line, because the damages are not severable as between the two Defendants, who are jointly and severally liable upon having been both found liable. Put another way, the Court correctly asked the jury on the verdict form to state whether they separately and independently found Fluor Intercontinental and Fluor Corporation each liable. There should have then been one line for damages, to be awarded against whichever Defendant (or both) were found liable. Here, the jury has awarded $15 million against each Defendant, but the Court has entered judgment for only $15 million (rather than $30 million) in single damages.

To clear up any confusion, and address the absence of penalties on the verdict form, a new trial on damages on Relators' property fraud claim is warranted.

## IX.    IN THE ALTERNATIVE, IF NO NEW TRIAL ON LIABILITY OR DAMAGES IS GRANTED, FLUOR REMAINS LIABLE FOR $164,129,000

### A.    Fluor is Liable to the United States for Treble Damages

The FCA provides for the automatic trebling of damages. 31 U.S.C. § 3729(a)(1) ("any person who" violates the FCA "is liable to the United States Government for…3 times the amount of damages which the Government sustains because of the act of that person."); *Cook Cnty. v. U.S. ex rel. Chandler*, 538 U.S. 119, 122 (2003) ("If the [FCA] claim succeeds, the defendant is liable to the Government for ... treble damages"); *Yates v. Pinellas Hematology & Oncology*, 21 F.4th 1288, 1314 (11th Cir. 2021) (Treble damages is "mandated by the FCA."); *U.S. ex rel. Int'l Bhd. of*

31

*Elec. Workers No. 98 v. Farfield Co.*, 5 F.4th 315, 336 (3d Cir. 2021). The Court should treble damages here to $90 million, which is three times the $30 million damages awarded by the jury.

### B.     The Court Should Award an Additional $74,129,000 in Civil Penalties

Entities that violate the FCA are liable to the United States for a civil penalty for each individual violation of the statute. 31 U.S.C. § 3729(a)(1); *see ACLU,*, 673 F.3d at 249 ("A person who violates the FCA is liable to the United States for a civil penalty"). As with trebled damages, the imposition of a civil penalty for each violation is mandatory. *Id.; Chandler*, 538 U.S. at 122 ("If the [FCA] claim succeeds, the defendant is liable to the Government for a civil penalty … for each violation[.]"); *Yates,* 21 F.4th at 1297 ("The FCA mandated the imposition of … statutory penalties."). Here, the record is clear that Fluor violated the FCA over 5,000 times with regards to property management, including through submitting 6,739 false Loss, Theft, Damaged, or Destroyed report ("LTDD") reports to the United States government. *See supra* § VI. For the reasons discussed below, the Court should award a penalty of $11,000 for each LTDD for a total civil penalty of $74,129,000 ($11,000 x 6,739).

### 1.     Fluor is Liable for 6,739 Violations of the False Claims Act

It cannot be rationally disputed that each LTDD serves as a distinct and discrete record, statement, and/or claim. Nor is it disputed that Fluor submitted 6,739 LTDDs in connection with LOGCAP IV, with 5,883 of these LTDDs submitted after the Property Management System Audit ("PMSA") at Phoenix on February 11, 2011, and 5,025 of these LTDDs submitted after the CAP completion on August 12, 2011. Ex. 25 (PX 1365) (Fluor's internal tracking of LTDDs, which when filtered for LOGCAP IV with duplicates removed reveals 6,739 unique LTDDs, 5,883 of which were submitted after February 11, 2011, and 5,025 submitted after August 12, 2011). As discussed *supra* at § VI, all LLTDDs contained a statement attesting to compliance with the property clause, implied disclosure of all known losses, and, by communicating such compliance

32

and commendable performance, served to induce the government's approval of Fluor's property management system. *See e.g.,* Ex. 29 (PX 901-1); Ex. 30 (PX 901-2); Ex. 31 (PX 901-3).

### 2. The Court Should Impose a $11,000 Penalty for Each Violation.

The False Claims Act imposes a mandatory statutory penalty per violation, and the Court has discretion in setting the penalty within the mandatory statutory range per false claim. *U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 501 F. Supp. 2d 51, 56 (D.D.C. 2007) (awarding maximum civil penalties equal to the upper limit of the range then in effect). For the years during which Fluor submitted LTDDs to the government—2010 and 2014—the range of statutorily mandated civil penalties was $5,500 to $11,000 per individual false claim. 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9) (The federal statutory minimum and maximum were $5,500 and $11,000, respectively, per violation between September 29, 1999, and November 2, 2015).

To assess the appropriate penalty within the statutory range, courts consider the totality of the circumstances, including the egregiousness of the conduct, the gravity of the offense, fairness, defendants' scienter, the damages suffered by the United States, and "the nature of these penalties as deterrents to future conduct." *Miller*, 501 F. Supp. 2d at 57 (awarding maximum civil penalties equal to the upper limit of the range then in effect); *see United States ex rel. Streck v. Takeda PharAm., Inc.*, 2023 WL 3320281, at *4 (N.D. Ill. May 9, 2023) (citing *Tyson*, 488 F. Supp. 2d at 741). Crucially, the Fourth Circuit also considers whether the "conduct 'involved repeated actions[.]'" *Drakeford*, 792 F.3d at 389 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003)); *see also State Farm*, 538 U.S. at 419 ("We have instructed courts to determine the reprehensibility of a defendant by considering whether [among other factors] the conduct involved repeated actions or was an isolated incident[.]"). "Substantial penalties also serve as a powerful mechanism to dissuade such a massive course of fraudulent conduct." *Drakeford*, 792 F.3d 364, 389 (affirming civil penalties for each submission of 21,730 false claims).

For the reasons below, Relator submits that a penalty of $11,000 per false claim is justified by the record in this case. This would result in an aggregate civil penalty of $74,129,000 (6,739 violations (amount of LTDDs) x $11,000).[3]

First, the seriousness of Fluor's misconduct justify imposition of the maximum statutory penalty. Knowing that compliance negatively affected its profits, Fluor averted its responsibilities on many levels. *U.S. ex rel. Morsell v. Gen Dig., Inc.*, 712 F. Supp. 3d 14, 27–28 (D.D.C. 2024) (maximum penalties warranted where "misconduct was serious and vast in scope"). Fluor also went to great lengths to conceal its misconduct from the government. *Miller*, 501 F. Supp. 2d at 56 ("intricate steps taken to cover up this scheme" justify maximum penalty). The systemic noncompliance plus the systemic concealment efforts justifies the imposition of the maximum civil penalty. That the government made these overpayments based on misrepresentations that Fluor was succeeding in its charge to tend to servicemembers' safety and well-being makes it worse. *See U.S. v. Dynamics Visions*, 2022 WL 612709, at *6 (D.D.C. Mar. 2, 2022).

Along these lines, the maximum civil penalty ($11,000 per false claim) is required for deterrence purposes. *See Morsell*, 712 F. Supp. 3d at 29 (considering the "deterrent value" of penalties and awarding the maximum civil penalty); *Miller*, 501 F. Supp. 2d at 57; *Drakeford*, 792 F.3d at 389. Fluor Corporation and its subsidiaries together form a massive corporate conglomerate with a market capitalization of between $7.28 billion to $8.70 billion over the course of this trial.[9] That such a dominant industry figure purposely and fraudulently caused the government to overpay weighs in favor of a high penalty. *See S.E.C. v. Lipson*, 129 F. Supp. 2d 1148, 1159 (N.D. Ill. 2001)

---

[9] *See* "Fluor Market Cap 2017-2025 | FLR," Macrotrends, https://www.macrotrends.net/stocks/charts/FLR/fluor/market-cap#google_vignette, last accessed 8 April 2026, (showing Fluor's market cap as $8.70 billion as of February 20, 2026, and $7.28 billion as of March 10, 2026, and figures within this range between January 28, and March 10, 2026).

(in securities fraud case, imposing maximum penalty where defendant's "net worth of over $100 million is large in comparison to the penalty imposed").

Third, the LTDDs themselves contained multiple misrepresentations, including certification of compliance with the property clause, implied certification of disclosure of all known losses, and the fraudulent inducement of property system approval. *See e.g.*, Ex. 26 (PX 901-8). Courts have found multiple lies in a submission justify the maximum penalty. *See Dynamics Visions,* 2022 WL 612709, at *6 (maximum penalty per claim was warranted in part because each invoice contained several false acts."); *U.S. v. Speqtrum, Inc.*, 2016 WL 5349196, at *4 (D.D.C. Sept. 23, 2016) (same).

Finally, an award of $74,129,000 in penalties is warranted as consistent with the statute and comparable to the penalties—and their ratio to damages—awarded in other FCA cases. *See e.g.*, *Drakeford*, 792 F.3d at 389 (affirming aggregate civil penalties exceeding $119 million where damages were $39.3 million); *Yates*, 21 F.4th at 1316 (affirming civil penalties of $1,177,000 despite only $755.54 in single damages); *Morsell*, 712 F. Supp. 3d at 25, 33 (awarding $5.37 million in single damages and $36.8 million in civil penalties); *Tyson*, 488 F. Supp. 2d at 745 (N.D. Ill. 2007) (FCA case upholding "ratio of the total judgment ($334 million) to actual damages ($48 million) [of] approximately 6.9:1" and collecting cases with higher such ratios). To be sure, at its core, the False Claims Act "imposes significant penalties on those who defraud the Government." *Universal Health Servs., Inc. ex rel. Escobar v. United States*, 579 U.S. 176, 180 (2016).

## CONCLUSION

For these reasons, Relators respectfully request that the Court order a new trial on liability and damages, as set forth above, or in the alternative request that the Court amend judgment to account for treble damages and penalties in the total amount of $164,129,000, separate and in addition to the award of post-judgment interest, attorneys' fees and costs.

35

Respectfully submitted,

/s/ Andrew Hand
Andrew Hand

Richard Harpootlian (Fed. ID No. 1730)
Andrew Hand (Fed. ID No. 12176)
RICHARD A. HARPOOTLIAN P.A.
1410 Laurel Street
Post Office Box 1090
Columbia, SC 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810
rah@harpootlianlaw.com

Jonathan Loevy
Michael Kanovitz
Daniel Twetten
Anand Swaminathan
Frank Newell
Anna Dover
Gwen Parker
Heather Sticht
Dominique Gilbert
Alexandra Wolfson
Aadi Tolappa
**LOEVY & LOEVY**
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
Telephone: (312) 243-5900
Facsimile: (312) 243-5902
anand@loevy.com
*Attorneys for Relators*
*Charles R. Shepherd*
*and Danny V. Rude*

Frank L. Eppes (Fed. ID No. 1003)
EPPES & PLUMBLEE, PA
PO Box 10066
Greenville, SC 29603
Telephone: (864) 235-2600
Facsimile: (864) 235-4600
feppes@eppesandplumblee.com

36

*Attorney for Relator Robert Scott Dillard*

Judah N. VanSyckel
SALUDA LAW, LLC
137 E. Butler Street
Lexington, SC 29072
Telephone: (803) 939-6927
Facsimile: (803) 902-8004
judah@saludalaw.com

*Attorney for Relator Rickey Mackey*