# EXHIBIT 1

December 31, 2016 Memo: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield

# EXHIBIT
# 1

**PLAINTIFFS' TRIAL EXHIBIT 1038**
**Page 1 of 67**

**AR 15-6 Memo Final Signed**

Approved for Release

SECRET//NOFORN



**DEPARTMENT OF THE ARMY**
HEADQUARTERS, 7TH INFANTRY DIVISION
BOX 339500, MAIL STOP 59
JOINT BASE LEWIS-MCCHORD, WA 98433-9500

AFZC-CG                                                          31 December 2016

MEMORANDUM FOR Commander, United States Forces – Afghanistan, Kabul, Afghanistan, APO, AE 09356

SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

1. (U//FOUO) The purpose of this memorandum and its enclosures is to enumerate relevant facts, findings, and recommendations pertaining to the circumstances and events surrounding the suicide vest attack that occurred on Bagram Airfield on 12 November 2016.  Based upon the appointment orders dated 25 November 2016, the undersigned and nine other personnel from 7th Infantry Division deployed to Afghanistan and – with the addition of two in-country personnel with theater expertise in force protection and contracting – conducted an administrative investigation from 07 December 2016 to 30 December 2016 in accordance with Chapter 5 of Army Regulation 15-6.  The scope of the investigation included six formal site visits and 53 formal interviews reduced to sworn statements utilizing Department of the Army Form 2823, among other informal inquiries and background research, to weigh considerations pertinent to force protection, intelligence, contracting, and combat operations.

2. (U//FOUO) The suicide attack on Bagram Airfield on 12 November 2016 resulted in the death of six personnel – three U.S. Soldiers, two civilian Fluor employees, and the suicide bomber (a Fluor subcontractor employee) – and the wounding of sixteen U.S. Army Soldiers and one Polish Soldier.  At 0538 hours, several hundred personnel residing on the base were preparing for a Veteran's Day five kilometer run, many of them already assembling in the vicinity of the landmark known as the "Disney Clamshell" on Disney Avenue for a 0615 hours start time.  The explosion, initiated by a local national employed on the base for over five years and that passed a counterintelligence screening earlier this year, occurred approximately 300 meters southwest of the start point and less than 300 meters northeast of the base headquarters.  Though the ultimate target for the attack remains indeterminable, the group of Soldiers and Fluor employees unwittingly induced the assailant to detonate his suicide vest, likely preventing a far greater tragedy at the Disney Clamshell.

3. (U//FOUO) Close to 2,000 personnel secure Bagram Airfield, the largest international military base in Afghanistan.  Though upwards of 15,000 personnel operate from this base – many of them armed as well – the majority of occupants contribute to Base Life Support and sustainment operations or enable operations beyond the Bagram Ground Defense Area.  The 1st Cavalry Division Commander, who also serves as 1) the Deputy Commanding General (Support) for United States Forces-Afghanistan, 2) the Commander of the United States National Security Element, 3) the Commander of Bagram Airfield, and 4) the Commander of Joint Task Force 1, has both local and theater-wide responsibilities.  While his staff oversees Bagram Airfield

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

security, the day-to-day security inside and outside of the Bagram Ground Defense Area is principally orchestrated by 1st Squadron, 3rd Cavalry Regiment's "Task Force Tiger." Also under the Commander of Bagram Airfield, the Area Support Group – which has responsibility for base life support on Bagram Airfield and six other major Forward Operating Bases throughout Afghanistan – manages the installation's emergency services.

4.  (U//FOUO) The leadership at Bagram Airfield orchestrates an assortment of multinational security providers and dozens of military units and contracted agencies that operate on the installation.  Initiatives that began at Bagram Airfield prior to the 12 November 2016 attack and accelerated thereafter have already mitigated many of the force protection gaps and seams that enabled the assailant to conduct the attack.  Yet, the inherent risks associated with operating in the midst of force protection threats coupled with evolving capabilities remains, requiring further analysis and the inculcation of lessons learned from this particular attack.

5.  (U//FOUO) Beyond pursuing understanding of the contributing conditions that enabled the attack, the scope of this investigation includes analysis on the actions taken by the chain of command to prevent future attacks.  The responses that follow answer the specific questions within the appointment memorandum to present facts and commensurate findings and recommendations pertinent to security operations at Bagram Airfield.  Specifically, they highlight the presence or absence of 1) published standards, 2) the resources and individual and collective training required, and 3) the engaged and disciplined leadership empowered to attain those standards.  Inspired by the sacrifice of those lost or forever impacted by the attack on 12 November 2016, this investigation seeks to provide value to the ongoing efforts in Afghanistan, with hopes that it can contribute to the understanding required to keep Service member and civilians as safe as possible.

6.  (U//FOUO) The investigation determined that the primary contributing factor to the 12 November 2016 attack was Fluor's complacency and its lack of reasonable supervision of its personnel.  These conditions enabled the suicide bomber to construct and employ a suicide vest inside the Bagram Airfield perimeter.

7.  (U//FOUO) There are eight major findings within the investigation that enabled the primary contributing factor to present risk that was not sufficiently mitigated before the attack:

    a. (U//FOUO) Local National access and supervision was not properly enforced;

    b. (U//FOUO) Unity of effort, unity of command, and interoperability challenges were compounded by multi-national and contracted security providers;

    c. (U//FOUO) The Bagram Airfield security forces' span of control is too broad and lacks adequate forces;

2

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 4 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

d. (U//FOUO) Counterintelligence shortages impaired Coalition Forces' capability to screen Local National employees and to identify Nayeb's threat indicators;

e. (U//FOUO) Complexity of intelligence and force protection mission command and interoperability of networks, architecture, and analytical tools impaired intelligence fusion;

f. (U//FOUO) Disjointed antiterrorism and force protection efforts increased susceptibility to attacks;

g. (U//FOUO) Contracting Officer's Representatives were not aligned by location, duties, or experience; and

h. (U//FOUO) Commanders and supervisors of Contracting Officer's Representatives were not appropriately engaged in contract formation, administration, and oversight.

8.  (U//FOUO) Based upon these key findings, the below recommendations may best apply lessons learned from the 12 November 2016 attack to neutralize future force protection threats:

(b)(5)

3

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(5)

9.  (U//FOUO) In summary, the investigation finds that the current leadership at Bagram Airfield, has pushed since assuming command on 13 September 2016 to reverse a pervasive "culture of complacency" and indiscipline – specifically within the civilian portions of the base – that permeated the forward operating base.  Addressing the key findings delineated above consistent with the corresponding key recommendations will prevent another local national subcontractor employee - with poorly vetted access and unreasonable supervision - from operating with impunity and conducting a similar attack on Bagram Airfield.

4

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 6 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

10. (S//NF) (8a) Identify the names, ages, country of origin, and status/employer of those killed in action (KIA) and wounded in action (WIA) from the 12 November 2016 incident.

  a. (S//NF) Identify the names, ages, country of origin, and status/employer of those killed in action (KIA).

    (1) (U//FOUO) Sergeant First Class Brown, Allan Eric; 46 years old; Headquarters and Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

    (2) (U//FOUO) Staff Sergeant Perry, John William; 30 years old; Headquarters and Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

    (3) (U//FOUO) Private First Class Iubelt, Tyler Ray; 20 years old; Headquarters and Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

    (4) (U//FOUO)        (b)(6)        U.S. Fluor Government Group International, Inc.

    (5) (U//FOUO)        (b)(6)        U.S. Fluor Government Group International, Inc.

  b. (S//NF) Identify the names, ages, country of origin, and status/employer of those wounded in action (WIA).

    (1) (U//FOUO)        (b)(3), (b)(6)        Headquarters and Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

    (2) (U//FOUO)        (b)(3), (b)(6)        Headquarters and Headquarters Battalion, 1st Cavalry Division; U.S. Army

    (3) (U//FOUO)        (b)(3), (b)(6)        412th Contracting Support Brigade; U.S. Army

    (4) (U//FOUO)        (b)(3), (b)(6)        Headquarters and Headquarters Battalion, 1st Cavalry Division; U.S. Army

    (5) (U//FOUO)        (b)(3), (b)(6)        years old; Headquarters and Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

5

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(6) (U//FOUO)                    (b)(3), (b)(6)                    36 years old;
Headquarters and Headquarters Battalion, 1st Cavalry Division; U.S. Army

(7) (U//FOUO)                    (b)(3), (b)(6)                    Detachment 19, 3rd
Medical Command Deployment Support; U.S. Army Reserve

(8) (U//FOUO)                    (b)(3), (b)(6)                    Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

(9) (U//FOUO)                    (b)(3), (b)(6)                    607th Contracting Team;
412th Contracting Support Brigade; U.S. Army

(10) (U//FOUO)                    (b)(3), (b)(6)                    901st Contracting
Battalion; 418th Contracting Support Brigade; U.S. Army

(11) (U//FOUO)                    (b)(3), (b)(6)                    Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

(12) (U//FOUO)                    (b)(3), (b)(6)                    Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

(13) (U//FOUO)                    (b)(3), (b)(6)                    Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

(14) (U//FOUO)                    (b)(3), (b)(6)                    Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

(15) (U//FOUO)                    (b)(3), (b)(6)                    Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

(16) (U//FOUO)                    (b)(3), (b)(6)                    Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

(17) (U//FOUO)                    (b)(3), (b)(6)                    Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

(18) (U//FOUO)                    (b)(6)

6

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

c. (U//FOUO) Line of duty actions are complete and all service members were found in the line of duty (Exhibits 1E, 1F).

11. (S//NF) **(8b)** Identify any/all Local Nationals (LNs) involved in the incident. Were any LNs connected to the Taliban or any other group(s)? Is so, describe the connection.

a. (S//NF) Identify any/all Local Nationals (LNs) involved in the incident.

(1) (U//FOUO) The only evidence of Local National involvement in the incident concerns the suicide bomber, Ahmad Nayeb (variant: Qari Nayab, Ahmad Naib Hafzi, Hafezi Nieb, Abdul Zuhoor), herein referred to as Nayeb, matched using DNA evidence (Exhibits 2Q, 3P, 4P, 4W, and 4AQ).

(2) (U//FOUO) At this time, no evidence suggests other Bagram Airfield Local National, including Nayeb's cousins, were co-conspirators. Nayeb had familial ties to three cousins who worked on base (Exhibits 2Q, 4AF, 4CV, and 5A).      (b)(6)      was a cousin of Nayeb and was employed on Bagram Airfield as a day shift worker at the Morale, Welfare, and Recreation Center (Exhibits 4AA, 4AF, 4CV, and 5A).      (b)(6)      was a cousin of Nayeb and was employed on Bagram Airfield as a night shift worker at the Warrior Gym (Exhibits 4AA, 4AF, 4CV, and 5B at 16).      (b)(6)      was a cousin of Nayeb and was employed on Bagram Airfield as a Dining Facility worker (Exhibits 4AA, 4AF, 4CV, and 5A).

(3) (S//NF)                              (b)(1)1.4d








                              (b)(1)1.4d




                    (b)(1)1.4d                    (Exhibits 4CJ, 4BY, 4AK, and 4AL).

b. (S//NF) Were any LNs connected to the Taliban or any other group(s)? Is so, describe the connection.

7

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(1) (S//NF)                                          (b)(1)1.4c


                                        (b)(1)1.4c



                    (b)(1)1.4c                          (Exhibits 4BW, 4BZ, 4CA, 4CC,
4CD, 4CG, 4CH, 4CQ, 4CM, 4CR, and 4CV).

(2) (S//NF)                            (b)(1)1.4c


                        (b)(1)1.4c



12. (S//NF) **(8c)** Describe the Local Nationals' connection(s) to any US/Coalition Forces (CF). Were they employed on Bagram Airfield? If so, by whom and for what position? When were they hired? What were the work days/hours of the involved Local Nationals on Bagram Airfield? Were the Local Nationals hired and supervised by Fluor Corporation or a subcontractor? Were there any failings by Fluor Corporation or another company in the hiring or continued employment of the Local Nationals involved in this incident? You will make recommendations as appropriate given your findings, on the hiring and supervision of Local Nationals by Fluor Corporation or involved companies.

a. (S//NF)                          (b)(1)1.4a, (b)(1)1.4c
(S//NF)                              (b)(1)1.4a, (b)(1)1.4c




                        (b)(1)1.4a, (b)(1)1.4c







8

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

b. (S//NF) Were they employed on Bagram Airfield?  If so, by whom and for what position? When were they hired?  What were the work days/hours of the involved Local Nationals on Bagram Airfield?

(1) (U//FOUO) Nayeb was employed by Alliance Project Services, Inc.  (APS), a subcontractor to Fluor, on Bagram Airfield in the Non-Tactical Vehicle Yard.  At the time of the bombing, he was working the 1800-0600 shift and was responsible for managing the hazardous material in the HAZMAT section of the Non-Tactical Vehicle Yard, which Fluor supervises (Exhibits 5D at 8, 5D at 2).

(2) (U//FOUO) On 01 April 2011, Nayeb entered the Provincial Reconstruction Team – Parwan (Republic Of Korea) Vocational Training Center on Bagram Airfield as a construction trainee (Exhibit 5H).  Nayeb was a transitioning Taliban member who went through reintegration as part of the Afghanistan Peace and Reintegration Program efforts funded by the Commander's Emergency Response Program pursuant to the FY2010 National Defense Authorization Act (Exhibits 5K at 331, 5AB).  Nayeb was sponsored by Task Force Red Bulls in a memorandum dated 25 March 2011, which accompanied his request for a Bagram Airfield access badge (Exhibit 5H).

(3) (S//NF)                                    (b)(1)1.4a, (b)(1)1.4c


                                  (b)(1)1.4a, (b)(1)1.4c


          (b)(1)1.4a, (b)(1)1.4c                (Exhibits 5D, 5A, and 5H).

(4) (U//FOUO) During his five years of employment, Nayeb worked varying shifts under numerous and diverse Fluor supervisors – shift changes are not uncommon among Local National employees.  His first day of work in the Fluor Non-Tactical Vehicle Yard was 11 December 2011, initially on night shift (Exhibits 5D, 5O).  Nayeb briefly worked the day shift from 24 July 2012 until 14 November 2012, then changed back to the night shift (Exhibit 5O). Nayeb stayed on the night shift until 28 April 2014, then changed to day shift for almost one full year, transitioning back to night shift on 14 April 2015 (Exhibit 5O).  Nayeb then worked the night shift until 05 June 2016, when he transferred to the day shift from 05 June 2016 until 06 August 2016 (Exhibit 5O).  From 06 August 2016 until 12 November 2016, Nayeb worked the night shift (Exhibit 5O).

9

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 11 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

c. (S//NF) Were the Local Nationals hired and supervised by Fluor Corporation or a subcontractor?

(1) (U//FOUO) Nayeb was hired by Alliance Project Services, Inc. a subcontractor of Fluor (Exhibits 5D, 5F, 5C).  Alliance Project Services, Inc. is a U.S. veteran owned business in Alexandria, Virginia, which specializes in hiring host nation personnel in a labor broker capacity.  Although Alliance Project Services, Inc. was responsible for administration of Nayeb (payroll, time and attendance, etc.), Nayeb's work performance was supervised by Fluor while he was employed at the Bagram Airfield Non-Tactical Vehicle Yard.  The paragraphs below will show that Fluor did not reasonably supervise Nayeb at the work facility, nor reasonably supervise the transport of Nayeb or other employees between the Entry Control Point and the work facility.

(2) (U//FOUO) Fluor is the prime contractor for LOGCAP IV (Task Order 005), which encompasses services and base life support for the eastern and northern portions of Afghanistan.  In support of the Afghanistan First Policy – a U.S. Government policy encouraging Afghan employment (Exhibit 5I) – Local Nationals are hired by Fluor through a subcontract with Alliance Project Services, Inc. which specializes in labor broker services (Exhibits 5D at 6, 5C at 4, 5E para 01.07).  As the prime contractor with the U.S. Government, and as the contractor with oversight of the Bagram Airfield Non-Tactical Vehicle Yard, Fluor is responsible for all of its employees, subcontractors, and subcontractor employee actions (Exhibit 5E para 01.07).  Specific to the Non-Tactical Vehicle Yard, Fluor states that "site supervision was accomplished by Fluor Other Country Nationals and Fluor U.S. National supervisors and foremen in accordance with the base access control policy" (Exhibit 5D).  This supervisory responsibility is also clearly stated in the Performance Work Statement, paragraphs 01.07a and 01.07b, dated 01 April 2013:

(a) (U//FOUO) 01.07a.  "[Fluor] is responsible for ensuring all personnel supporting [LOGCAP IV 005] comply with the standards of conduct, and all terms/conditions set forth in [the] PWS and the Basic Contract.  [Fluor] shall provide the necessary supervision for personnel required to perform this contract" (5E para 01.07).

(b) (U//FOUO) 01.07b.  "[Fluor] shall hire HN personnel and Subcontractors to the maximum extent possible in performance of this contract when such recruitment practices meet legal requirements.  [Fluor] is responsible for oversight of such personnel or Subcontractors to ensure compliance with all terms of the Basic Contract and this PWS." (5E para 01.07).

(3) (U//FOUO) Interviews with employees of the Non-Tactical Vehicle Yard conducted by Counterintelligence Agents from Task Force Odin and Task Force Crimson following the suicide blast illustrate that Fluor employees (Other Country Nationals, U.S. Nationals, and

10

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 12 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

specific Local Nationals) were responsible for the supervision of Local National employees (Exhibits 5A, 5B).

(4) (U//FOUO) There were at least three areas where Fluor did not reasonably supervise its employees, to include Nayeb, at the Non-Tactical Vehicle Yard.  The lack of reasonable supervision includes, but is not limited to:  1) lack of direct supervision over the HAZMAT area, 2) lack of supervising employee performance, and 3) failure to supervise use of tools by employees.

(a) (U//FOUO) The Non-Tactical Vehicle Yard where Nayeb worked consisted of a Light Non-Tactical Vehicle work center, a Heavy Non-Tactical Vehicle work center, and a HAZMAT work center (Exhibit 5A at 67).  All three areas are disassociated sites occupying a larger work area known as the Non-Tactical Vehicle Yard.  Both the Heavy and Light Non-Tactical Vehicle work centers are enclosed "clamshell" tents to provide protection from the elements and are separated by approximately 75 feet (Exhibit 5A at 67).  The HAZMAT work center is a row of containers placed adjacent to one another and built up with carpentry which adds a stable walking area, some overhead cover, and two work areas with minimal lighting or visibility from other work sites (Exhibit 5A at 67).  The HAZMAT area is toward the south side of the Non-Tactical Vehicle Yard – approximately 75 feet from the Heavy Non-Tactical Vehicle center and Light Non-Tactical Vehicle center – and otherwise outside and exposed to the elements and approximately 200 feet from the Non-Tactical Vehicle Yard office (Exhibit 5A at 67).

(b) (U//FOUO) As the only HAZMAT employee on night shift, Nayeb worked at the HAZMAT work center alone and with sporadic supervision (Exhibit 5B at 30-31).  There was also confusion by Fluor supervisors as to who was responsible for Nayeb and the HAZMAT work center (Exhibit 5B at 29).          (b)(6)          was the Fluor Other Country National Heavy Non-Tactical Vehicle Lead Senior Mechanic for the night shift on 12 November 2016, and when questioned about Nayeb informed Counterintelligence personnel that he had little interaction with Nayeb and insisted that "the light vehicle maintenance bay employees were responsible for ensuring Nayeb was supervised and employed" (Exhibit 5B at 27-29).  When interviewed by Counterintelligence Agents,     (b)(6)     recognized Nayeb as the HAZMAT worker but could not recall his name (Exhibit 5B, para 2.18).

(c) (U//FOUO) When HAZMAT responsibilities were reduced, or when Non-Tactical Vehicle maintenance operations were high, Nayeb would occasionally help out in either the Heavy Non-Tactical Vehicle Yard or Light Non-Tactical Vehicle Yard as workload dictated (Exhibit 5C, page 15).     (b)(3), (b)(6)     was the Fluor Other Country National Light Non-Tactical Vehicle Lead Senior Mechanic for the night shift on 12 November 2016, and – when questioned about Nayeb – informed Counterintelligence Agents that he "was only accountable for local

11

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 13 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

national employees when they worked for him in the light vehicle bay" (Exhibit 5B at 27-29).  Rexhep Rexhepi, the Fluor Other Country National Non-Tactical Vehicle Yard General Foreman, reported to Counterintelligence Agents that once Nayeb's work at HAZMAT was complete, he would work in the light vehicle bay (Exhibit 5B at 27-29).  At a later interview, Rexhep Rexhepi stated that      (b)(6)      the Heavy Non-Tactical Vehicle Lead, was responsible for Nayeb.

        (d) (U//FOUO) The statements of Fluor employees obtained by Counterintelligence Agents, coupled with the statements provided by Fluor, reveals a poor understanding by Fluor supervisors as to who was responsible for Nayeb's supervision (Exhibits 5A, 5B at 28).  This ambiguity on supervisory responsibility demonstrates an unreasonable complacency by Fluor to ensure Local National employees were properly supervised at all times, as required by their contract and non-contractual, generally recognized supervisor responsibility.  This lack of reasonable supervision facilitated Nayeb's ability to freely acquire most of the components necessary for the construction of the suicide vest and the freedom of movement to complete its construction (Exhibit 1B, 5B at 28).

        (e) (U//FOUO) According to Alliance Project Services, Inc.  Performance and Disciplinary Policy and the LOGCAP IV Afghanistan HCN Labor Support Statement of Work, sleeping while at work or unsatisfactory job performance are "cause for disciplinary action up to and including termination" (Exhibit 5F, Exhibit 5G).     (b)(3), (b)(6)     Fluor Other Country National Light Non-Tactical Vehicle Lead Senior Mechanic, states that he had caught Nayeb sleeping in the HAZMAT area in a sleeping bag (Exhibit 5B, pages 27-29).  In addition, on separate occasions, he caught Nayeb reading the Quran during work hours (Exhibit 5B, pages 27-29).  Interviews collected by Counterintelligence Agents show that Nayeb was often not present at the HAZMAT area when workers would go there to drop off oils (Exhibit 5A, para 2.62).     (b)(6)     a Local National who worked in the Light Non-Tactical Vehicle Yard, stated that "it was normal for [Nayeb] not to be in the work area" (Exhibit 5A, para 2.65).  No formal counseling or disciplinary action can be found for Nayeb despite reported instances of sleeping at work and absences without authority.  This failure to enforce a work-related standard of performance and the unjustified retention of Nayeb amounts to a lack of reasonable supervision on behalf of Fluor.

        (f) (U//FOUO) Following the suicide bombing, Counterintelligence Agents collected the tool room logs from the Non-Tactical Vehicle Yard.  Those logs revealed that between 10 August 2016 and 10 November 2016, Nayeb checked out multiple tools not associated with his duty as the HAZMAT employee, to include checking out a multimeter nine times for up to six hours at a time (a multimeter is a tool used to measure voltage, current, and resistance) (Exhibit 5A at 49-50, at 129-213).  Fluor employees confirmed that there were no tools identified as

12

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

restricted use, or controlled use, by force protection or base policy (Exhibit 5C).  Fluor employees also provided that any employee was able to check out any tool, regardless of where that employee worked.  However, interviews of Non-Tactical Vehicle Yard personnel suggest that only certain individuals could check out specific tools within the Non-Tactical Vehicle Yard (Exhibit 5A para 2.49, 2.56, 2.57, 2.62, 2.66).

        (g) (U//FOUO) An interview of Other Country National    (b)(6)    stated that "HAZMAT workers would only check out tools if one of the maintenance guys requested help" and that the HAZMAT worker would tell him the name of the mechanic that needed the tool (Exhibit 5A para 2.56).    (b)(6)    further stated that "HAZMAT workers do not require any tools in the performance of their job" (Exhibit 5A para 2.56).    (b)(3), (b)(6)    a Fluor U.S. National employee stated in an interview with Counterintelligence Agents that "he did not think it was normal for the HAZMAT worker to sign out tools" (Exhibit 5A para 2.57).  Another Fluor employee, Local National    (b)(6)    stated to Counterintelligence Agents that "only the person who needed the tool could sign the tool in or out from the tool room" (Exhibit 5A para 2.62).  A further Fluor employee, Local National    (b)(6)    stated that Nayeb "did not require the use of any special tools to complete his HAZMAT job" (Exhibit 5A para 2.66).  Fluor Local National    (b)(6)    who ran the Non-Tactical Vehicle Yard tool room at night, asked Nayeb why he needed a multimeter tool during work, to which Nayeb replied that he needed it because he was fixing a radio on one occasion and hair clippers on another occasion (Exhibit 5A para 2.49).  This apathy demonstrates that there was general knowledge of who was properly able to check out tools associated with job performance, but that the standard was poorly enforced.  It also demonstrates Nayeb was not gainfully employed without the issue being raised to a supervisor's attention.  Lastly, it illustrates a work culture of minimal supervision.  This evidence supports complacency and a lack of reasonable supervision by Fluor supervisors over Nayeb and other Local Nationals at the Non-Tactical Vehicle Yard work facility that enabled Nayeb's nefarious plan.

        (h) (U//FOUO) Fluor was also deficient in their performance of executing and supervising escort duties during the transportation of employees, to include Nayeb, between the Entry Control Point and the Non-Tactical Vehicle Yard.  The lack of reasonable supervision is evidenced by, but is not limited to, a 1) lack of accountability over employees getting on the bus at the end of each shift, and a 2) lack of positive control while escorting Local National employees to and from the Entry Control Point.  As the contractor responsible for the Non-Tactical Vehicle Yard, Fluor is responsible to provide "transportation and supervision" necessary for its employees to accomplish their work (Exhibit 5E paras 03.03 and 05.00).  This includes the supervision and transportation of Local Nationals to and from the work facility.  Various Fluor Non-Tactical Vehicle Yard employees – U.S. Civilians, Other Country Nationals, and Local Nationals – served as escorts for Local Nationals who worked in the Non-Tactical Vehicle Yard

13

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(Exhibits 5B at 28, 5D at 5). These Fluor escorts were responsible for supervising the transport of Local Nationals from the Entry Control Point to the Non-Tactical Vehicle Yard, and from the Non-Tactical Vehicle Yard back to the Entry Control Point, at shift change (Exhibit 5C). The Bagram Airfield Badging and Screening Policy requires that escorts remain in close proximity and remain in constant view of the individuals they are escorting (Exhibits 2AB, 5J).

(i) (U//FOUO) The mechanism Fluor used to ensure that Local National employees were on the bus at the end of each shift consisted of a sign in/sign out sheet filled out by the night shift Local National Team Lead,     (b)(6)     (Exhibit 5A para 2.47). In lieu of a physical or visual inspection to ensure every Local National employee was on the bus, he would attest to the same by observing that all the employees had signed out on the sheet (Exhibit 5A para 2.47). The bus would then move to the Entry Control Point without additional supervisory accountability. The Fluor U.S. National and Other Country National supervisors relied upon the Local Nationals to ensure everyone was accounted for and actually on the bus at the end of shift (Exhibit 5C at 7). On 11 November 2016, Nayeb informed     (b)(6)     – his Local National co-worker – that he would miss the bus on 12 November 2016 because of a HAZMAT class requirement, despite having taken the class on 02 October 2016 and not requiring the class for another year (Exhibits 5A at 3 at 215, 5D at 17) and evidence supports that Nayeb never got on the bus (Exhibits 5A at 3, 17, 27, 37 42, 43 47, 51, 55, 58, 80 and 5B at 31).

(j) (U//FOUO) Fluor Other Country National escorts did not know who they were responsible for escorting, as evidenced by both     (b)(6)     an Other Country National escort on the Heavy Non-Tactical Vehicle night shift, and     (b)(6)     an Other Country National escort for the Light Non-Tactical Vehicle night shift, admitting that they did not know the names of those they escorted (Exhibits 5A paras 2.25 and 2.26, 5B). Two Local National employees,     (b)(6)     and     (b)(6)     provided that if a night shift worker missed a ride to Entry Control Point 1 at the end of shift, a day shift escort would take them at a later time after the shift change (Exhibit 5A paras 2.52 and 2.54).     (b)(6)     a Local National working in the Light Non-Tactical Vehicle Yard and authorized unescorted access and escort privileges (yellow badge), provided a specific example when he shared that there were two Heavy Alliance Project Services, Inc. Local Nationals –     (b)(6)     and     (b)(6)     – left behind by the vehicle that transports Heavy Non-Tactical Vehicle Yard employees to the Entry Control Point on the morning of 12 November 2016 (Exhibit 5A para 2.45). Both men,     (b)(6)     and     (b)(6)     got on the light bus instead, unbeknownst to     (b)(6)     (Exhibit 5A para 2.45). Separate statements from     (b)(6)     and by     (b)(6)     both from the Fluor Non-Tactical Vehicle Yard, confirm that the Fluor Non-Tactical Vehicle Yard changed escorts out every week (Exhibit 5A para 2.47 and Exhibit 5C).

14

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 16 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(k) (U//FOUO) The preponderance of evidence shows a lack of reasonable supervision by Fluor while escorting Local Nationals to and from the Non-Tactical Vehicle Yard. Fluor's systemic lack of reasonable supervision enabled Nayeb to go undetected from 0445 until 0538 on 12 November 2016, which coincides with the average walking time of 53 minutes from the Non-Tactical Vehicle Yard to the blast site (Exhibits 2Q, 4CE and Naismith's Rule).

d. (S//NF) Were there any failings by Fluor Corporation or another company in the hiring or continued employment of the Local Nationals involved in this incident?

(1) (U//FOUO) There were no failings by Fluor in the hiring of local nationals. Fluor complied with the Afghan First Program and the Afghan Peace and Reintegration Program in the hiring of Nayeb through a subcontracted labor broker, Alliance Project Services, Inc. (Exhibit 5D at 4). Fluor performed the Biometrics Automated Toolset Services in March 2011, when Fluor subcontractor employee, (b)(6) nput Nayeb into the database along with the Reintegration Memorandum identifying Nayeb's previous Taliban affiliation (Exhibit 5P Line 5399 of PERSTAT Tab). The Biometrics Automated Toolset Services entry form has the Fluor employee's signature for processing (Exhibit 5H).

(2) (U//FOUO) There is evidence to support failings by Fluor in the continued employment of Nayeb. See previous analysis concerning Fluor's lack of supervision of employee performance and unreasonable employee retention of Nayeb. Fluor did not provide any information concerning disciplinary action taken against Nayeb. In fact, Nayeb received a promotion from Skilled Laborer II to Skilled Laborer III on 05 July 2016 after known poor performance (Exhibit 4AN).

e. (S//NF) Make recommendations as appropriate given your findings, on the hiring and supervision of Local Nationals by Fluor Corporation or involved companies.

_____

(b)(5)

_____

15

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(5)

(3) (U//FOUO)                              (b)(5)

(b)(5)

(4)                              (b)(5)

(b)(5)

(5) (U//FOUO)                              (b)(5)

(b)(5)

(b)(5)                              (Exhibit
5W).

(6) (U//FOUO)                              (b)(5)

(b)(5)

(7) (U//FOUO)                              (b)(5)
(b)(5)                              (b)(5)

16

SECRET//NOFORN

USARCENT FOIA FA-17-0184

Pages 23 through 24 redacted for the following reasons:
- - - - - - - - - - - - - - - - - - - - - - - - - - -
(b)(5)

Approved for Release

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(5)

13. (S//NF) **(8d)** Did U.S. or Coalition Forces have any intelligence of value or indicators
regarding the planning and execution of this incident before it occurred?  If so, what information
was known and by whom?  Did this incident identify any flaws in communication, tracking of
individuals, situational awareness, etc., between intelligence analysis, dissemination, and those
responsible for force protection on Bagram Airfield?

a. (S//NF) Did U.S. or Coalition Forces have any intelligence of value or indicators regarding
the planning and execution of this incident before it occurred?

(1) (S//NF)                                    (b)(1)1.4a

(b)(1)1.4a

(b)(1)1.4a     (Exhibits 4B and 4CP).

(2) (S//NF)                            (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c                        (Exhibits 4U, 4BF,
4BG, 4BH, 4BI, 4BJ, 4BK, 4BL, 4BM, 4BN, 4BO, 4BP, 4BQ, 4BS, 4BT, 4BU, and 4BX).

(3) (S//NF)                            (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

19

SECRET//NOFORN

USARCENT FOIA FA-17-0184

~~SECRET//NOFORN~~

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c                (Exhibits 4B, 4C, 4E, and 4F).(b)(1)1.4a

(b)(1)1.4a, (b)(1)1.4c                                                    ,

(b)(1)1.4a, (b)(1)1.4c     (Exhibits 4B, 4C, 4E, and 4F).

(4) (~~S//NF~~)                          (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(Exhibits 4BX and 4CE).

(5) (~~S//NF~~)                          (b)(1)1.4a, (b)(1)1.4c
(b)(1)1.4a, (b)(1)1.4c     (Exhibits 4B, 4D, 4E, 4F, 4G, 4H, 4J, 4M, and 4O).     (b)(1)1.4a, (b)(1)1.4c
(b)(1)1.4a, (b)(1)1.4c                     (Exhibits 4E, 4G, 4B, 4J and 4O)(b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c          (Exhibits 4E, 4F, 4G, and 4BV)(b)(1)1.4a, (b)(1)1.4c
(b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c     (Exhibit 4AX).          (b)(1)1.4a, (b)(1)1.4c
(b)(1)1.4a

(Exhibits 4B, 4E, 4G, and 4CS).

b. (~~S//NF~~) If so, what information was known and by whom?

(1) (~~S//NF~~)               (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(2) (~~S//REL TO USA, FVEY~~)          (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

20

~~SECRET//NOFORN~~

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a                       (Exhibits 4CB, 4CR and 4CV).

(3) (S//NF)                                  (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(4) (S//NF)                                  (b)(1)1.4a, (b)(1)1.4c
(b)(1)1.4a, (b)(1)1.4c      to 12 November 2016:

21

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 22 of 67

Pages 28 through 32 redacted for the following reasons:
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
(b)(1)1.4a, (b)(1)1.4c

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(10) (S//NF)                                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

_____

_____

_____

_____

(b)(5)

_____

_____

_____

27

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 24 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

_____

(b)(5)

14. (S//NF) (8e)                                  (b)(1)1.4a


                                                 (b)(1)1.4a


   a. (S//NF)                                    (b)(1)1.4a
                                    (b)(1)1.4a
         (b)(1)1.4a               (Exhibits 4Q, 4U, and 4AF).

   b. (S//NF)                          (b)(1)1.4a, (b)(1)1.4c
              (b)(1)1.4a, (b)(1)1.4c              (Exhibits 4Q and 4AB).

   c. (S//NF)                          (b)(1)1.4a, (b)(1)1.4c
            (b)(1)1.4a, (b)(1)1.4c            (Exhibits 4Q and 4AB).

   d. (S//NF) Did the incident highlight any issues or problems with BATS?

      (1) (U//FOUO) Yes. Issues with the Biometric Automated Toolset System included human error, technology limitations and software design, and a lack of familiarity with the system. Most issues or problems with the Biometric Automated Toolset System are a result of human error. These issues or problems can arise from a lack of training (Exhibits 4I and 4U) lack of attention to detail to ensure proper registration with the biometric system (Exhibits 4I, 4U, and 4AB), and lack of awareness of the system and its capabilities.

         (a) (S//NF)                      (b)(1)1.4a, (b)(1)1.4c




                                   (b)(1)1.4a, (b)(1)1.4c

28

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 25 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c

(b) (S//NF)                              (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(2) (S//NF                              (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(3) (S//NF)                             (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

29

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 26 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c

(4) (S//NF)                          (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

e. (S//NF) Make recommendations, as appropriate given your findings, with regard to the base's use of BATS.

(b)(5)

(2) (S//NF)                          (b)(1)1.4a, (b)(1)1.4c, (b)(5)

(b)(1)1.4a, (b)(1)1.4c, (b)(5)

30

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 27 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(3) (U//FOUO) Commanders require the most complete view of their operational environment. Recommend base commanders review the data and information provided by Task Force Biometrics upon assumption of mission (Exhibits 4I and 4Q). Additionally, a biometrics expert assigned to the commander's staff will enable the application of all capabilities for the command and their staff responsible for force protection and base defense. Force protection, targeting, and all source analysts need to register and employ the Biometric Identity Intelligence Resource in the execution of their duties to help fill the identity intelligence gap that currently exists (Exhibit 4AD). Access to identity intelligence should not be a cumbersome process for non-intelligence analysts. Once they understand their area of operations, commanders should customize the Biometric Automated Toolset System reports and information relevant to their battlespace that best feeds their operations. In addition to customized reports focused on their battlespace, recommend the following reports be pre-programmed and automated across Afghanistan:

(a) (U//FOUO) Biometric Enabled Watchlist Exit: Any time a Biometric Enabled Watchlist level 1-5 is biometrically toggled off an installation (Entry Control Point quality assurance)

(b) (U//FOUO) BEWL Entry: Any time a Biometric Enabled Watchlist level 1 or 2 is biometrically toggled on an installation (Immediate force protection threat)

(c) (U//FOUO) Squatter Report: A daily report with Local Nationals that have remained on post longer than 24 hours (Force protection situational awareness)

(d) (U//FOUO) Enrollment Violations: A daily report with Local Nationals that have been toggled off post with less than a 10-2-1-1 profile (Biometrics situational awareness)

(e) (U//FOUO) Local National population: A monthly report that shows Local Nationals that checked into post at least 15 days that month (Counterintelligence screening situational awareness)

(f) (U//FOUO) Local National population: A weekly report that shows Local Nationals that haven't checked into post in the past seven days (Force protection threat situational awareness)

(4) (U//FOUO) There are discretionary fields that, if made mandatory, would address some of the accountability issues. Recommend simply adding the employer name, sponsor information, and duty location would help facilitate accountability of the Local National

31

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 28 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

population. Requiring employer-provided Local National emergency contact number would assist cellular phone intelligence exploitation efforts (Exhibits 4I, 4Q, and 4AG).

(5) (U//FOUO) Finally, Task Force Biometrics and Counterintelligence assets require a more proactive force protection posture. Recommend a policy change to allow 48 hours of pre-screening lead-time before a contractor brings a new hire on base. The 48 hour lead-time would allow the counterintelligence and biometrics team to search applicable databases for derogatory information in support of the Force Protection Screening Cell background search. An increase in resources for Task Force Biometrics would also allow them to reengage some of the initiative-based analysis they conducted prior to their drawdown (Exhibits 4Q and 4AG). These techniques could help provide another layer of active defense to mitigate threats that are largely unimpeded in the Bagram Ground Defense Area.

15. (S//NF) (8f)                                                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

a. (U//FOUO) Did any Local Nationals have security clearances? If so, at what access and what date was the clearance granted? Did they have any verifiable, derogatory information in their investigation if applicable; or past? Nayeb did not have a security clearance (Exhibit 4G). The current policy standard limiting security clearances to a very select subsection of Local Nationals (e.g. dual-citizenship linguists) does not require adjustment (Exhibits 4G and 4CW).

b. (S//NF)                                                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(1) (U//FOUO) Effective screening and vetting of Local Nationals and Other Country Nationals is of increasing importance. A tapered force protection capability as Coalition Forces drawdown occurs may place Coalition Forces at a higher risk for insider threat. Stringently enforced screening and vetting processes with Local Nationals and Other Country Nationals are vital in mitigating these threats. Although Bagram Airfield has improved its screening and vetting process, a number of critical vulnerabilities remain. Vetting is a post-entry reliability

32

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

determination and an important layer of the force protection plan. Yet the Commander, Bagram Airfield, needs additional personnel qualified to screen and vet Local National and Other Country Nationals to ensure full compliance with established procedures and conduct proper oversight (Exhibits 2AB, 4AR, 4AT, 4AU, 4AV, 4AX, 4AY, 4BA, and 4AO). Recommend review of potential sourcing option to meet Bagram Airfield's requirement.

(2) (U//FOUO) Fluor and United States security personnel overlooked a single indicator during the vetting process. Nayeb's Biometric Automated Toolset System profile included an uploaded copy of his registration dossier (Exhibits 4U and 4CF). This registration dossier contained a scanned memorandum that detailed his acceptance into the Afghanistan Peace and Reintegration Program and his prior association as a Taliban insurgent. The Fluor Force Protection Screening Cell received and uploaded this memo without making a subsequent administrative note in his record or notifying a counterintelligence element for advisement. If known or discovered, United States security personnel would exploit this background information in subsequent interviews (Exhibits 4AR, 4AT, and 4AX). The force protection screening and counterintelligence support team screening integrates questions that cover previous insurgent ties, and would leverage this information into more targeted questions (Exhibits 4L and 4R). The reintegration memo and data was available for discovery by all parties who reviewed the Biometric Identity Intelligence Resource file (4AD). While Nayeb's answers to the 24 March 2016 Counterintelligence Support Team screening appear trained and coached, additional background information would enable targeted questioning by counterintelligence agents to properly assess the risk (Exhibits 4R, 4U, 4AT, 4AX, and 4BA). This missed indicator represents a lost opportunity to mitigate the threat posed by Nayeb. The value and significance of the overlooked reintegration memo may have proved vital in the post-entry reliability determination. Recommend the list of reintegrated Taliban and other insurgent members to be recovered and compared to current Local National workers within Afghanistan through the Biometrics Automated Toolset System. United States Forces - Afghanistan should nominate these individuals for Biometric Enhanced Watchlist level 6 and other appropriate identifying information in the Biometrics Automated Toolset System and the Biometric Identity Intelligence Resource (Exhibits 4AC and 4AW). These members should face additional scrutiny and targeted screening procedures for continued access. Counterintelligence Support Team screeners must be trained and disciplined to ensure they review every file uploaded into a Biometric Identity Intelligence Resource profile during their preparation for each screening. Additionally, screeners must meet the Task Force Biometrics standard that requires them to upload and individually categorize documents that fall outside a normal registration packet (Exhibit 4Q).

(3) (U//FOUO) Beyond the miss-categorized memorandum that was attached to Nayeb's Biometrics Automated Toolset System registration file, there was a significant delay at Bagram

33

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 30 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

Airfield (Bagram Airfield) from Nayeb's date of employment until his first Counterintelligence Support Team screening (Exhibits 4AI and 4AJ). Prior to 12 November 2016 there was no requirement to screen Local Nationals outside four defined categories: 1) linguists and cultural advisors, 2) armed security guards or gate processing personnel, 3) those who have recurring access, escorted or unescorted, to headquarters, computer networks or communications units, facilities, or buildings, and 4) those determined by the local supported command (Exhibit 4AT). While there was no requirement, every base except Bagram Airfield was able to conduct annual Counterintelligence Support Team screenings on their Local National population (Exhibits 4L and 4R). The five-year delay highlights an imbalance in the Counterintelligence Support Team personnel allocation across the Afghanistan and created risk for Bagram Airfield (Exhibit 4AP). This risk was not present at any other installation in Afghanistan. This imbalance, coupled with the lack of a requirement to conduct Counterintelligence Support Team screenings, led to the five-year delay before Nayeb was screened (Exhibits 4AI, 4AJ, and 4AT).

(4) (S//NF)                                        (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

34

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

| Base | Local Nationals | Other Country Nationals | Current CIST Personnel | Required CIST Personnel |
|---|---|---|---|---|
| AP Lightning | | | | |
| Arena | | | | |
| Bagram Airfield | | | | |
| Dwyer | | | | |
| Fenty | | | | |
| Gamberi | | (b)(1)1.4a, (b)(1)1.4c | | |
| HKIA | | | | |
| KAF | | | | |
| Mes/Marmal | | | | |
| New Kabul Compound | | | | |
| RS HQ | | | | |
| Shorab | | | | |

(S//NF) Figure 3:  Counterintelligence Support Team Coverage

(5) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(6) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(7) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

35

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 32 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c

(8) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

16. (U//FOUO) (8g) Describe in general the force protection measures on Bagram Airfield.  In
your opinion, are those measures sufficient?  If not, you will make recommendations, as
appropriate given your findings, to improve force protection for the forces on the base.

a. (U//FOUO) Describe in general the force protection measures on Bagram Airfield.

(1) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(2) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

36

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 33 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c

(3) (S//NF)                              (b)(1)1.4a, (b)(1)1.4b, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(4) (S//NF)                              (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(5) (S//NF)                              (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

37

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 34 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4g

(6) (S//NF)                          (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

(7) (S//NF)                          (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

(8) (S//NF)                          (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

(9) (S//NF)                          (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

38

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 35 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4g

b. (U//FOUO) In your opinion, are those measures sufficient?

(1) (S//NF)                     (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

(2) (S//NF)                     (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(3) (S//NF)                     (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(4) (S//NF)                     (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g
(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

39

SECRET//NOFORN

Approved for Release

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

c. (U//FOUO) If not, you will make recommendations, as appropriate given your findings, to improve force protection for the forces on the base.

(1) (S//NF)                                        (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(2) (S//NF)                                        (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

40

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 37 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c

(3) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(4) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(5) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(6) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g
(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

41

SECRET//NOFORN

USARCENT FOIA FA-17-0184

Approved for Release

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

of action.

17. (U//FOUO) **(8h)** What is Bagram Airfield's base access policy? When was the last review of
that policy? You will make recommendations, as appropriate given your findings, regarding that
base access policy.

   a. (U//FOUO) What is Bagram Airfield's base access policy? When was the last review of
that policy?

      (1) (U//FOUO) Bagram Airfield's base access policy is codified in the "Badge,
Screening, and Access Standard Operating Procedures," last revised on 02 December 2016
(Exhibit 2AB). This Standard Operating Procedure supersedes the 17 February 2015 Bagram
Airfield "Badge and Screening Policy" in effect during the 12 November 2016 attack. The
policy identifies entrance onto Bagram Airfield and establishes procedures for controlling access
and privileges for Local Nationals, Other Country Nationals, Common Access Card holders, and
Coalition Forces. This policy also outlines the procedures for barring personnel and enhancing
force protection during military operations. The Directorate of Emergency Services, under the
authority of the U.S. Forces-Afghanistan Area Support Group Commander, executes this policy
(Exhibits 2AB, at 1 and 2BC). All personnel requesting access to Bagram Airfield will submit a
badge application, Form 103 (Bagram Airfield Badge Request Form), Form 86 (Visitor
Request), proper identification and medical documentation (Exhibit 2AB, at 2). The Force
Protection Screening Cell screens and vets all personnel (Local Nationals and Other Country
Nationals) desiring access to Bagram Airfield and enters applicants into the Biometric
Automated Toolset System (Exhibit 2AB, at 3).

      (2) (U//FOUO) The Bagram Airfield Ground Defense Area forces are responsible for
physical inspections of personnel and vehicles entering and exiting Bagram Airfield. All Local
Nationals and Other Country Nationals entering Bagram Airfield on foot, that are in possession
of a Bagram Airfield badge, will enter through Entry Control Point 1 and undergo personnel and
property searches as well as biometrics verification (Exhibit 2AB). Furthermore, they will hand-
carry a Form 86, Letter of Authorization and/or Letter of Justification authorizing their entry and

42

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

hand-carried items (Exhibit 2AB).  Authorized Local Nationals and Other Country Nationals
arriving at Bagram Airfield via vehicle will enter Entry Control Point 3.  As with Entry Control
Point 1, all Local Nationals and Other Country Nationals must submit the required
documentation, undergo personal and vehicle searches, and enrollment into the Biometric
Automated Toolset System database.  Escorts are required for all Local Nationals entering the
installation to and from the Entry Control Points.  Final approval authority for base access is the
Area Support Group Commander or designee (Exhibit 2AB, at 3).  Entry Control Point 10 is for
U.S. and coalition tactical vehicles only and the Bagram Ground Defense Area Commander is
responsible for security protocol at this Entry Control Point (Exhibit 2AB, at 7).  The post-attack
revision of the Bagram Airfield base access policy (December 2016) made several changes to
mitigate vulnerabilities, principally:

        (a) (U//FOUO) The December 2016 policy states that "All personnel, not in uniform, are
required to maintain and display either a Common Access Card, Bagram Airfield Access Badge
or Resolute Support theater badge" (Exhibit 2AB, at 9).  The previous version did not include
military when out of uniform, and only applied to civilians (Exhibit 2AA, at 9).

        (b) (U//FOUO) The revised policy states all personnel on Bagram Airfield are subject to
be challenged and asked for Identification or Badge at any time (Exhibit 2AB, at 10); the 2015
policy did not include this language.

        (c) (U//FOUO) The 2016 policy eliminated Yellow Badges.  This is significant as the
2015 policy allowed Local Nationals to possess Yellow Badges, authorizing them unescorted
access and the authority to escort up to ten other Local National personnel and five vehicles
(Exhibit 2AA, at 12).

        (d) (U//FOUO) The new policy includes convoy escort requirements for Green Badge
Holders (Resident, non-U.S personnel), to include number of escorts required as well as lead and
trail vehicle requirements if escorting more than one Local National vehicle entering Entry
Control Point 3 (Exhibit 2AB, at 12, 15); the 2015 policy was vague and did not specify number
of escorts required for convoys (Exhibit 2AA, at 15).

        (e) (U//FOUO) The new policy changed Green Badge expiration and renewal timelines
from 12 months to six months to ensure more frequent Force Protection Screening (Exhibit 2AB,
at 13).

        (f) (U//FOUO) The new policy reiterated conditions and restrictions levied upon Red
Badge Holders.  Additionally, this 2016 revision eliminated the exemption that allowed Local
Nationals to operate unescorted within their workplace (Exhibits 2AA, at 11 and 2AB, at 11)

43

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 40 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

    b. Make recommendations, as appropriate given your findings, regarding that base access policy.

      (1) (U//FOUO) Nayeb was authorized entry to Bagram Airfield as a Red Badge holder (Exhibit 2Q).  Neither the 2015 Bagram Airfield Badging and Access Policy in place on 12 November 2016, nor the December 2016 revised policy, would have prevented the attacker's access to Bagram Airfield (Exhibits 2AA and 2AB).  Recommend re-screening all Local National personnel employed on Bagram Airfield to verify security status and re-issue appropriate color badge based on assessed risk to force protection.  This process is currently underway but is expected to take four to six months to complete.

      (2) (S//NF)                      (b)(1)1.4a, (b)(1)1.4c

                          (b)(1)1.4a, (b)(1)1.4c

      (3) (S//NF)                      (b)(1)1.4a, (b)(1)1.4c

                          (b)(1)1.4a, (b)(1)1.4c

      (4) (U//FOUO) The 2016 policy no longer contains a reference prohibiting Local Nationals from possessing maps and documents while on Bagram Airfield.  Recommend adding statements similar to the 2015 policy that prohibits Local Nationals from possessing maps and documents except Afghan National Defense Security Forces with justification (Exhibit 2AA, at 17).

44

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(5) (U//FOUO) Recommend requiring Counterintelligence and Preliminary Credibility Assessment Screening System vetting annually for all contractors with weapons privileges.  The 2016 policy states "all contractors will be required to pass a Counterintelligence screening and a Preliminary Credibility Assessment Screening System examination prior to weapons privileges being authorized on Bagram Airfield" (Exhibits 2AB, 4CO, 4CQ, 4AU, 4AV).  This indicates that contractors are only required to be screened once in order to be able to carry weapons. Considering the number of contract guards that failed vetting since the 12 November 2016 attack, incorporate annual screenings to reduce vulnerability and risk.

(6) (S//NF)                                (b)(1)1.4a




                                (b)(1)1.4a




(7) (U//FOUO) Recommend Command Operations Centers at each Entry Control Point initiate 24-Hour Scan Reports.  The 2016 policy requires a daily 24-hour Scan Report checked to ensure all Local Nationals who scanned on the installation scanned off the installation over a 24-hour period (Exhibit 2AB, paragraph 20.a).  However, the current requirement does not indicate who is responsible for running this report.  While numerous agencies may access the biometrics report, it is unclear who has the responsibility for ensuring all Local Nationals actually departed.

(8) (U//FOUO) Recommend Task Force Biometrics initiate the 30-day Inactivity Report. Task Force Biometrics can provide results to the Combined Joint Operations Center for review to further reduce vulnerabilities.  The 2016 policy directs the generation of a daily 30-day Inactivity Report in order to identify Local National workers who did not utilize their Bagram Airfield access badge for entry or exit within the past 30 days (Exhibit 2B, paragraph 20.b).  However, this paragraph does not specifically task a particular organization nor is there a system of checks and balances to ensure the report is accomplished.

45

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(9) (S//NF)                                              (b)(1)1.4a



(b)(1)1.4a



(10) (S//NF)                                     (b)(1)1.4a, (b)(1)1.4g



(b)(1)1.4a, (b)(1)1.4g



18. (S//NF) **(8i)** In general, describe Bagram Airfields entry and exit procedures for Local Nationals.  Are Local Nationals searched upon entry onto Bagram Airfield?  What are the procedures, if any, to search Local Nationals coming onto Bagram Airfield?  How many s-vests entered Bagram Airfield via Local Nationals, and by what method(s) did they accomplish this?  You will make suggestions, as appropriate given your findings, regarding the procedures for the entry/exiting the base.

    a. (S//NF) In general, describe Bagram Airfields entry and exit procedures for Local Nationals.

    (1) (U//FOUO) Bagram Airfield's base access policy is codified in the "Badge, Screening, and Access Standard Operating Procedures," last revised on 02 December 2016 (Exhibit 2AB).  This Standard Operating Procedure supersedes the 17 February 2015 Bagram Airfield "Badge and Screening Policy", in effect during the 12 November 2016 attack.  The

46

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 43 of 67

Approved for Release

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

policy identifies entrance onto Bagram Airfield and establishes procedures for controlling access and privileges for Local Nationals, Other Country Nationals, Common Access Card holders, and Coalition Forces. This policy also outlines the procedures for barring personnel and enhancing force protection during military operations. The Directorate of Emergency Services, under the authority of the U.S. Forces-Afghanistan Area Support Group Commander, executes this policy (Exhibits 2AB, at 1 and 2BC). All personnel requesting access to Bagram Airfield will submit a badge application, Form 103 (Bagram Airfield Badge Request Form), Form 86 (Visitor Request), proper identification and medical documentation (Exhibit 2AB, at 2). The Force Protection Screening Cell screens and vets all personnel (Local National and Other Country National) desiring access to Bagram Airfield and enters applicants into the Biometric Automated Toolset System (Exhibit 2AB, at 3).

(2) (U//FOUO) Local nationals entering Bagram Airfield by foot will use Entry Control Point 1 and require personnel and property searches, biometric screening, and all proper documentation (Exhibit 2AB). Local Nationals will process through eight security layers and five physical searches. In sequence, the stations are as follows:

(a) (S//NF)

(b) (S//NF)

(c) (S//NF)

(d) (S//NF)

(e) (S//NF)                    (b)(1)1.4a, (b)(1)1.4g

(f) (S//NF)

(g) (S//NF)

(h) (S//NF)

(3) (U//FOUO) Local Nationals exiting Bagram Airfield by foot will exit using Entry Control Point 1 and are subject to personal and property searches in reverse order (Exhibits 2AB and 2O). Adherence to this standard is corroborated by Task Force Tiger, the Reed Inc. Site Manager, and the U.S. Marine Corps advisors operating the Entry Control Point (Exhibits 2B, 2C, 2J, and 2N).

47

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(4) (S//NF)                                                      (b)(1)1.4a




(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g




(a) (S//NF)

(b) (S//NF)
search

(c) (S//NF)
search

(d) (S//NF)

(e) (S//NF)                                          (b)(1)1.4a

(f) (S//NF)

(g) (S//NF)

(h) (S//NF)

(i) (S//NF)

(5) (U//FOUO) (Exhibits 2AB and 2P, Diagram of Entry Control Point 3).  Local
Nationals exiting Bagram Airfield via vehicle will exit using Entry Control Point 3 and are
subject to personal and vehicle search followed by Z-Backscatter X-Ray scanner before exiting.
Adherence to this standard is corroborated by Task Force Tiger, the Reed, Inc.  Site Manager,
and the U.S. Marine Corps advisors operating the Entry Control Point (Exhibits 2B, 2C, 2J, and
2N).

b. (S//NF) Are Local Nationals searched upon entry onto Bagram Airfield?  What are the
procedures, if any, to search Local Nationals coming onto Bagram Airfield? How many suicide

48

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

vests entered Bagram Airfield via Local Nationals, and by what method did they accomplish this?

(1) (U//FOUO) All Local National employees are searched upon entry onto Bagram Airfield (Bagram Airfield) through Entry Control Point 1 and Entry Control Point 3 (Exhibits 2B, 2C, and 2AB). Local Nationals entering Bagram Airfield by foot will enter through Entry Control Point 1 and are rotated through eight security stations with physical searches being conducted at five (5) stations as described in Entry Control Point 1 entering and exiting procedures (Exhibits 2B, 2C, 2N, 2AB, and 2O). Similar to Entry Control Point 1, Local National drivers and vehicles entering Bagram Airfield through Entry Control Point 3 are rotated through nine security stations with physical searches being conducted at three stations as described in Entry Control Point 3 Entering and Exiting procedures (Exhibits 2B, 2C, 2N, 2AB and 2P). In addition to the standards laid out in the Standard Operating Procedure, the 12 November 2016 attack led to the addition of coalition forces at each Entry Control Point search station to provide oversight of Local National Reed Inc. employees and to conduct secondary searches (Exhibit 2B, 2C, 2G, 2H, 2J, 2L, and 2N).

(2) (S//NF) The evidence supports the suicide vest was assembled on Bagram Airfield by Nayeb at his workplace inside the non-tactical vehicle yard and not preassembled prior to entering the installation (Exhibit 2Q). Counterintelligence source reporting indicates Nayeb likely smuggled small quantities of homemade explosive onto Bagram Airfield over approximately four months (Exhibits 4CK, 4CI, 5N, and 5A). Nayeb reportedly smuggled homemade explosives onto Bagram Airfield utilizing a smokeless tobacco style bag or can which he then concealed in another container (Exhibits 5N and 5A). The string used to assemble the vest was a forensic match to string found at Nayeb's worksite (Exhibit 2Q). Similar components of the suicide vest used as projectiles (bolts and nuts) were also found at Nayeb's work facility (Exhibit 2Q). In addition, the switch used to trigger the suicide vest was similar to switches that were readily available and unaccounted for in a trash container at Nayeb's work facility (Exhibit 2Q). There is no evidence at this time that reveals additional vests were constructed on or entered Bagram Airfield (Exhibit 2Q).

c. (S//NF) You will make suggestions, as appropriate given your findings, regarding the procedures for the entry/exiting the base.

(1) (S//NF)                                    (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g


(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g


49

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 46 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(2) (S//NF)                              (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

19. (S//NF) (8j) Did this incident uncover any vulnerabilities as it relates to accountability in general, of Local Nationals entering and exiting the base? Are security forces properly maintaining accountability of the entry and exit of Local Nationals? You will make recommendations, as appropriate given your findings, to the procedures or equipment regarding the entry and exit of Local Nationals onto Bagram Airfield.

a. (S//NF) Did this incident uncover any vulnerabilities as it relates to accountability in general, of Local Nationals entering and exiting the base? Are security forces properly maintaining accountability of the entry and exit of Local Nationals?

(1) (S//NF)                              (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

50

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4g

(2) (U//FOUO) In addition to Local Nationals authorized to perform escort duties, Local Nationals also held key access control positions at all Entry Control Points (Exhibit 2AX).  The Local Nationals manned all of the various search stations and often times were supervised by other Local National supervisory personnel (Exhibits 2B, 2C, 2N, 2AQ, 2AX).  Furthermore, the Local National guards at several locations within the Entry Control Points were armed and operated with minimal oversight by coalition personnel (Exhibit 2B).  Georgian Soldiers now supervise all but the outermost checkpoints within the Entry Control Points, however several Local Nationals are still authorized to carry weapons (Exhibits 2B, 2C and 2N).

(3) (S//NF)                              (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

(4) (S//NF)                              (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

51

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 48 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

      (5) (S//NF)                (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

      (6) (S//NF)                (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

      (7) (S//NF)                (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

52

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 49 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4g

b. (S//NF) Make recommendations, as appropriate given your findings, to the procedures or equipment regarding the entry and exit of Local Nationals onto Bagram Airfield.

(1) (S//NF                                     (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

(2) (S//NF)                                     (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

(3) (S//NF)                                     (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

53

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 50 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

    (4) (S//NF)                   (b)(1)1.4a, (b)(1)1.4g

                               (b)(1)1.4a, (b)(1)1.4g

    (5) (S//NF)                   (b)(1)1.4a, (b)(1)1.4g

                               (b)(1)1.4a, (b)(1)1.4g

    (6) (S//NF)                   (b)(1)1.4a, (b)(1)1.4g

                               (b)(1)1.4a, (b)(1)1.4g

54

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 51 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4g

20. (U//FOUO) (8k) What steps did the command take immediately following the incident?

a. (U//FOUO) Immediately prior to the explosion, over 200 personnel were gathering at the run start site at an area referred to as the "Disney Clamshell." The Commander and (b)(3), (b)(6) (b)(3), (b)(6) for Bagram Airfield had departed their quarters at 0530 en route to the run site, where the commander was scheduled to make the opening remarks (Exhibit 3P). The Resolute Support Sustainment Brigade (b)(3), (b)(6) and over a dozen Soldiers, having realized they could not conduct planned combatives certification inside the clamshell due to the run, walked past the Bagram Airfield (b)(3), (b)(6) and (b)(3), (b)(6) and moments later were within meters of the explosion (Exhibit 3M). The Area Support Group (b)(3), (b)(6) had just signed in on the roster and initially thought the explosion sound emanated from the loudspeakers playing music for the Morale, Welfare, and Recreation event. After a hush fell over the assembled group, leaders began orchestrating efforts to clear the area and to begin treating the wounded (Exhibit 2L).

b. (U//FOUO) Among the first uninjured on scene were the Bagram Airfield Commander and (b)(3), (b)(6) the Area Support Group (b)(3), (b)(6) and (b)(3), (b)(6) as well as the Romanian Military Police element initially staged for the event. The Bagram Airfield (b)(3), (b)(6) instructed those on scene to "secure the blast site and ensure no threats were in the area, conduct first aid and CASEVAC, sound the alarm for a ground attack, place the entire base on full alert with everyone in [Personal Protective Equipment] and locked down except personnel involved in security and first responder operations, and to gain 100% personnel accountability" (Exhibit 3P). The Area Support Group (b)(3), (b)(6) worked with the Romanian Military Police element to establish the Incident Command, which the Base Provost Marshal assumed upon arrival soon thereafter (Exhibits 2L and 2I). The Bagram Airfield and Area Support Group (b)(3), (b)(6) conducted a visual sweep of the surrounding area to look for secondary devices based upon a known tactic for local threat actors (Exhibit 2L). And (b)(3), (b)(6) a Senior Medical Operations Noncommissioned Officer preparing for the run, and his medic began serving as first responders and treating the wounded, many of whom were piled on top of each other upon their arrival (Exhibits 2L, 3M, and 6H).

c. (U//FOUO) Due to the number and severity of the wounded, leadership onsite began identifying personnel and non-standard evacuation vehicles for transport to the Craig Joint Theater Hospital approximately 800 meters away from the blast site. Meanwhile, the Area Support Group (b)(3), (b)(6) and (b)(3), (b)(6) relocated to the Area Support Group Headquarters to activate the Emergency Operations Center – from which they coordinated

55

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

follow-on actions by first responders still moving towards the site or transporting personnel to the hospital. The Combined Joint Operations Center, approximately 300 meters away from the blast site, directed the Persistent Threat Detection System towards the scene of the incident and received reports from the Emergency Operations Center (primarily via phone) and the Incident Commander (via Light Mobile Radio) (Exhibits 3G and 3H), relaying reports to the Resolute Support Headquarters in Kabul.

d. (U//FOUO) The ___(b)(3), (b)(6)___ of Bagram Airfield issued guidance to and through the Combined Joint Operations Center to assume mission command (Exhibits 3P, 3J). Beyond the confirmed explosion and known casualties – initially seven reported to the Craig Joint Theater Hospital (Exhibits 6A and 3X) – the headquarters received reports of additional potential force protection threats (Exhibits 3E, 3G, 3H, 3I, 3J, 3L, 3P, 3X). Perimeter guards reported unmanned aerial systems sightings at 0632, among other sightings; a suspicious brown box and crowd massing at Entry Control Point 1 at 0613 and 0635, respectively; small arms fire at 0630 and 0652; and unconfirmed explosions at 1014 and 1157 (Exhibits 3E and 3X).

e. (S//NF)                                   (b)(1)1.4a, (b)(1)1.4g




(b)(1)1.4a, (b)(1)1.4g




f. (S//NF) As those outside of the immediate area continued to wait in the bunkers and casualties underwent treatment at the hospital, the Combined Joint Operations Center began orchestrating efforts to manage the local national population still on the base (Exhibits 3G, 3H, 3I, 3J, 3T, 3X).                (b)(1)1.4a, (b)(1)1.4d, (b)(1)1.4g


(b)(1)1.4a, (b)(1)1.4d, (b)(1)1.4g



56

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 53 of 67

**SECRET//NOFORN**

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4d, (b)(1)1.4g

g. (U//FOUO) Were those steps appropriate given the circumstances?

(1) (U//FOUO) In light of the circumstances – an unexpected form of inside-the-wire attack followed by sporadic reporting from around the base potentially indicating a complex attack – the chain of command's actions following the incident helped contain and mitigate the effects of the attack.  Despite the limited visibility (zero illumination at the time of the attack) (Exhibit 3Y), and the initial uncertainty on what caused the explosion, the Combined Joint Operations Center and leaders on the ground made sound decisions and directed appropriate actions.  The hospital was notified within two minutes of the blast, a Military Police patrol was on site within three minutes, and rotary wing assets were mobilized within seven minutes (Exhibits 3E and 3X).  Further, the establishment of Incident Command quickly progressed from an ad hoc assortment of leaders and first responders to the Area Support Group Provost Marshal, and medics and others onsite orchestrated first aid and movement of casualties to the hospital in a sequence conducive to life-saving treatment (Exhibits 3E, 3X, 6A, 6B, 6C, and 6H).

(2) (S//NF)                                    (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

(3) (U//FOUO) In the days and weeks that followed, the command took a number of actions to understand the event and to prevent similar insider attacks.  The institution of a base-

57

**SECRET//NOFORN**

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

wide Operations, Intelligence, and Investigation Update – which has now become an Operations
and Intelligence Update – assembled the right leaders to maximize crosstalk and shared
understanding. Through those sessions, the command identified dozens of initiatives that would
improve perimeter security, address insider threat risks, and better coalesce the community of
practice (Exhibit 3A and 3K). Through concerted command presence, the Bagram Airfield
Commander's leadership has reduced the risk of a similar attack. His "New Normal", with lines
of effort to address 1) Contractors Policies and Practices; 2) Improvement of Layered Security;
and 3) Integrated Base Response roles and responsibilities (Exhibit 3P) has begun addressing the
culture of complacency that may have allowed the community to miss discernible indicators of
or potential for high profile attacks.

h. (U//FOUO) Are there any suggested improvements to the command's handling of such an
incident in the future?

(1) (U//FOUO) To an extent, the response to this attack benefitted from proximity to key
leaders and headquarters. The immediate availability of both the Division     (b)(3), (b)(5)     and the
Area Support Group     (b)(3), (b)(6)     minimized the time required for key leaders to acquire
situational understanding. Further, the presence of Romanian Military Police at the run start site
placed them on scene within three minutes of the blast (Exhibits 2L and 3E). Favorable weather,
albeit with no illumination, allowed persistent intelligence, surveillance, and reconnaissance
assets to acquire over watch of the blast site. And the presence of a medical team on site – albeit
no Field Litter Ambulance for this particular event (Exhibits 6A and 6H) – expedited first
responder treatment and medical evacuation via non-standard means (Exhibits 6A, 6B, 6C, and
6H). Further, the incident occurring on an installation with a Role III hospital with robust trauma
capability only 800 meters down the main thoroughfare minimized the time between the point of
injury and surgical-level care (Exhibit 6B).

(2) (U//FOUO) Most suggested improvements regarding the command's response to the
incident pertain to actions prior to the incident itself. First, for events like the run scheduled for
that morning, recommend commands execute Special Event Vulnerability Risk Assessments –
required for events involving 300 or more people – prior to execution of large events. As per
DoDI 2000.16 (Exhibit 2BE) and the Bagram Airfield Antiterrorism Plan (Exhibit 2V), this
assessment would identify potential threats and risks and then identify and rehearse key actions
required by first responders and unit leaders. Had such an assessment occurred prior to 12
November 2016, emergency management leaders and responders would identify and coordinate
the requirement for an on-site ambulance and the location of the nearest Casualty Collection
Point and associated medical supplies (two Casualty Collection Points are within 200 meters of
the blast site.) Rehearsing contingencies may also have led the medics to more appropriately
tailor their aid bags towards potential threat streams, rather than explicitly for run injuries

58

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 55 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(Exhibit 6H). Finally, rehearsals would have more clearly delineated the mission command plan and the appropriate posture consistent with Anti-Terrorism and Force Protection doctrine.

(3) (U//FOUO) Second, recommend further consideration of the "Big Voice" battle drills and the Base Defense SOP might improve shared understanding and improve responsiveness throughout the base. At present, calls exist for indirect fire, an attack on the perimeter, mass casualty (as determined at the Craig Joint Theater Hospital), and active shooter (Exhibit 2U). In this instance, the "Cavalry Charge" call led personnel to seek shelter and may have expedited Task Force Tiger's mobilization and response to an external threat, but it also left the vast majority of base personnel under cover for an extended period of time. This compounded challenges with accountability both for coalition and local national personnel (Exhibits 2L and 3L). See PIR 8n for further analysis of "Big Voice" recommendations.

(4) (S//NF) Third, recommend                           (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

(5) (S//NF) Fourth,                           (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

59

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 56 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(6) (S//NF) Fifth,                                    (b)(1)1.4a, (b)(1)1.4d, (b)(1)1.4g


(b)(1)1.4a, (b)(1)1.4d, (b)(1)1.4g


21. (U//FOUO) **(81)** What steps did PMO take following the incident? Were those steps appropriate given the circumstances? Are there any suggested improvements to PMO's handling of such an incident in the future?

a. (S//NF) What steps did PMO take following the incident? At approximately 0538, Bagram Airfield Provost Marshal Office responded to a person-borne improvised explosive device explosion in the vicinity of the Bagram Airfield Disney Post Exchange. The Bagram Airfield Provost Marshal's Office dispatched Emergency Medical Service to the scene at 0540 as additional Military Police patrols arrived to assist with lifesaving procedures, attempt to establish an initial cordon, and conduct safety sweeps (Exhibit 2AC).    (b)(1)1.4a

(b)(1)1.4a

60

SECRET//NOFORN

USARCENT FOIA FA-17-0184

**PLAINTIFFS' TRIAL EXHIBIT 1038**
**Page 57 of 67**

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(1)1.4a

b. (U//FOUO) Were those steps appropriate given the circumstances? Yes, the PMO steps were appropriate and complied with Army Field Manual 3-39, "*Military Police Operations*", and Bagram Airfield standards identified in the First Responders Operation Working Group Standard Operating Procedure (Exhibit 2AH, 2G). Field Manual 3-39, "*Military Police Operations*", Chap. 3-105, establishes guidelines for Military Police responses to terrorist attacks. These emergency response actions incorporate measures to treat casualties, apprehend perpetrators, preserve evidence, minimize property damage, restore operations, and expedite the criminal investigation and collection of lessons from terrorist incidents (Exhibit 2G). The Bagram Airfield Provost Marshal's Office Military Police were one of the first responders to arrive at the scene and immediately began to conduct lifesaving procedures on the wounded. Emergency Medical Services, Military Police patrols, Military Working Dogs and Explosive Ordinance Disposal worked to establish the initial cordon and search for secondary devices. Although there was confusion early in the response, the actions of the Provost Marshal's Office were in line with Army Field Manual 3-39 and Bagram Airfield's First Responders Working Group.

c. (U//FOUO) Are there any suggested improvements to PMO's handling of such an incident in the future?

(1) (U//FOUO) Recommend rehearsing the incident response plans and establishing a concrete incident command reporting chain. Conduct these events as described in the Bagram Airfield Base Defense Plan, dated 15 December 2015 (Exhibit 2U). Include Tactical Exercises Without Troops (TEWTs) or tabletop exercises, in order to synchronize communication and improve unity of effort during incident response through incident command. Despite the language of the Bagram Airfield Base Defense Plan (Exhibit 2U), the incident response was not synchronized between first responders. An initial Incident Command was attempted to be established by the first arriving patrol however, the responding units of Emergency Management Services, Fire, and Explosive Ordinance Disposal did not report to an identified incident commander who could then direct additional assets where needed. The uncoordinated arrival of additional personnel to the scene for causality evacuation, secondary explosive device sweeps, and other activities allowed multiple people to walk and drive through the crime scene and

61

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 58 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

possibly distort evidence. For instance, the ⟨(b)(3), (b)(6)⟩ mentioned, "I don't want to sound coarse, but when the fire trucks showed up, they were driving right down the road and me and the CG were pushing them off so they didn't run over body parts and stuff like that" (Exhibit 2L). A clearly defined and standardized incident command, in accordance with the National Incident Management System, will enhance first response and crime scene coordination, preventing such instances from occurring (Exhibit 2AJ). Communication was also an issue at the scene of the incident with multiple agencies and coalition forces responding. Highlighting the communication challenges, ⟨(b)(3), (b)(6)⟩ stated there needs to be, "better communication with security forces patrolling the roads on Bagram Airfield. If you are going to have security forces patrolling our streets on Bagram at any hour of the day, they should have communication with either Task Force MED or USFOR-A and they have got to speak English." (Exhibit 6H). A lack of rehearsals, synchronized communication efforts, and clear leadership roles contributed to an inability to understand the situation from responding assets and coalition security forces. Incident Response Plan rehearsals could have alleviated some confusion and provided alternatives to language and communication barriers experienced on 12 November 2016.

(2) (S//NF) Recommend conducting Bagram Airfield-wide emergency management rehearsals to ensure all responding assets are familiar with processes and procedures as described in the Bagram Airfield Base Defense Plan (Exhibit 2U).     (b)(1)1.4a

(b)(1)1.4a

62

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 59 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan


(b)(1)1.4a


22. (U//FOUO) **(8m)** What steps did Task Force MED take following the incident? Were those steps appropriate given the circumstances? Are there any suggested improvements to Task Force MED's handling of such an incident in the future?

a. (U//FOUO) What steps did Task Force MED take following the incident?

(1) (U//FOUO) On 12 0538 November 2016, a suicide bomber detonated near the Base Exchange along Disney Drive on Bagram Air Field (Exhibit 1B). The emergency room received notification of the blast and alerted the Trauma Czar and the         (b)(3), (b)(6)         of Clinical Services on duty that seven patients were inbound to Craig Joint Theater Hospital at which time an "Extended Trauma" was ordered (Exhibit 6A). An Extended Trauma requires all surgeons and nurses to report to Craig Joint Theater Hospital but does not initiate a full hospital recall (Exhibits 6A, 6B, 6C, 6F). The first seven patients arrived within minutes of the blast by vehicles of opportunity and ambulance in an order that was consistent with the severity of their injuries (Exhibits 6A, 6B). As the patients arrived they were transported into the trauma bay and given lifesaving care (Exhibits 6A, 6B). At 0615 it became apparent to the hospital staff that more than seven patients were going to require care. The         (b)(3), (b)(6)         of Craig Joint Theater Hospital    (b)(3), (b)(6)   ordered an internal MASCAL, which brings all Craig Joint Theater Hospital staff to the hospital (Exhibits 6A, 6C).

(2) (U//FOUO) Patients were moved from the Trauma Bay to the Operating Room for surgery in accordance with the severity of their injuries (Exhibit 6B). On 12 November 2016, the operating room teams performed 43 procedures on nine patients, running up to four cases simultaneously in three operating rooms for over twelve hours (Exhibits 6A, 6B, 6E). A total of 19 patients received medical care on 12 November 2016 (Exhibit 6E).

(3) (U//FOUO) Once the patients were stabilized and out of surgery, Craig Joint Theater Hospital staff prepared them for evacuation from theater via a Critical Care Air Transport (Exhibit 6A, 6B, 6c). The Critical Care Air Transport flight left for Landstuhl Regional Medical Center at approximately 0730 on 13 November 2016 with six intubated patients cared for by three Critical Care Air Transport teams (Exhibit 6A, 6B, 6C).

(4) (U//FOUO) Task Force MED conducted four MASCAL rehearsals between 01 October and 12 November 2016 (Exhibits 6A, 6B, 6C). These rehearsals included all appropriate hospital staff as well as medical providers external to Craig Joint Theater Hospital (Exhibits 6A, 6B, 6C). As a result of these rehearsals, Task Force MED was well prepared for

63

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

the events of 12 November 2016 and was able to integrate medical professionals from external agencies who arrived to assist (Exhibits 6A, 6B, 6C).

b. (U//FOUO) Were those steps appropriate given the circumstances? Yes. The steps taken by Task Force MED on 12 November 2016 were appropriate given the circumstance and are to be commended. The actions of Task Force MED saved the lives of the critically wounded who arrived to Craig Joint Theater Hospital. Every patient who arrived at Craig Joint Theater Hospital alive was stabilized and evacuated from theater alive (Exhibit 6B).

c. (U//FOUO) Are there any suggested improvements to Task Force MED's handling of such an incident in the future?

(1) (U//FOUO) Task Force MED conducted an extensive after action review with all members of the medical community on Bagram Airfield immediately following the incident (Exhibits 6A, 6B, 6C). In the after action review they captured specific areas where they could improve their operations (Exhibit 6E).

(2) (S//NF)                                     (b)(1)1.4a




                                     (b)(1)1.4a




23. (U//FOUO) (8n) Is the knowledge and training on Bagram Airfield regarding the "Big Voice" sufficient? Further, is the knowledge and training sufficient, detailing the actions individuals on Bagram Airfield should take regarding different proposed incidents?

a. (S//NF)                                     (b)(1)1.4a

                                     (b)(1)1.4a



64

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a

b. (S//NF) Training regarding individual actions upon "Big Voice" alarms is insufficient.
Additionally, communication procedures to initiate a "Big Voice" alert are not well understood.
Specific findings:

(1) (S//NF) The first "Big Voice" alarm did not sound until 23 minutes following the
detonation of a suicide vest on 12 November 2016 (Exhibit 2F, 2I, 2L, 2M).

(2) (S//NF) All new personnel at Bagram Airfield view an instructional video at the
passenger terminal upon arrival regarding "Big Voice" warnings and individual responsibilities
(Exhibit 2AZ).

(3) (S//NF) A personal response action card is available to personnel that covers
individual actions to incidents such as active shooter, bomb threats, shelter-in-place, and indirect
fire (Exhibit 2AV).

(4) (S//NF) While indirect fire individual actions are understood due to the frequency of
such attacks, no documented Bagram Airfield-wide training or rehearsals were conducted over
the past six months to exercise responses to other types of warnings or attacks (Exhibit 2AZ, 2J,
2K).

(5) (S//NF) Little to no coordination occurs between the Combined Joint Operations
Center "Big Voice" controllers or military personnel and the Area Support Group Emergency
Management Officer, resulting in a lack of mission command and unity of effort (Exhibit 2AZ,
2K, 2L).

c. (U//FOUO) Are there any suggested improvements to enhance knowledge of actions to
take for each type of incident?

65

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 62 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(1) (S//NF)                                                    (b)(1)1.4a

(2) (S//NF)                                                    (b)(1)1.4a

(b)(1)1.4a

66

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 63 of 67

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(1)1.4a

(3) (S//NF)

(b)(1)1.4a

(b)(1)1.4a

(4) (S//NF)

(b)(1)1.4a

(b)(1)1.4a

24. (U//FOUO) **(8o and 8p)** You may identify and describe any other processes, procedures, systems, and/or equipment that could have contributed to or influenced this incident. You will make suggested improvements, if any, regarding the same. Address any other matters pertaining to this incident that you deem relevant.

a. (S//NF)

(b)(1)1.4a

(b)(1)1.4a

67

SECRET//NOFORN

USARCENT FOIA FA-17-0184

**PLAINTIFFS' TRIAL EXHIBIT 1038**
**Page 64 of 67**

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(1)1.4a

b. (S//NF)                                    (b)(1)1.4a

(b)(1)1.4a

c. (S//NF)                                    (b)(1)1.4a

(b)(1)1.4a

d. (S//NF)                                    (b)(1)1.4a

(b)(1)1.4a

68

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(1)1.4a

e. (S//NF)                                    (b)(1)1.4a

(b)(1)1.4a

f. (S//NF)                                    (b)(1)1.4a

(b)(1)1.4a

69

SECRET//NOFORN

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

25. (U//FOUO) The point of contact for this memorandum is the undersigned at     (b)(6) or thomas.s.james3.mil@mail.mil.

(b)(6)

THOMAS S. JAMES, JR.
Major General, USA
Investigating Officer

Approved for Release

70

SECRET//NOFORN

USARCENT FOIA FA-17-0184

PLAINTIFFS' TRIAL EXHIBIT 1038
Page 67 of 67