# EXHIBIT 17

Richardson Report

Renee Richardson

Expert Report

*United States ex rel. Shepherd, et al. v. Fluor*, No: 6:13-cv-2428-JD

July 31, 2025



## Table of Contents

I.    BACKGROUND AND QUALIFICATIONS ........................................................................ 1

II.   RETENTION AND ASSIGNMENT ................................................................. 4

III.  SUMMARY OF OPINIONS ................................................................. 5

IV.   OPINIONS ................................................................. 10

    A.   LOGCAP Contract Overview and Background ................................................................. 10

        1.   LOGCAP and Task Order 5 Background ................................................................. 10

        2.   Fluid Base Operations ................................................................. 12

        3.   Logistics Challenges ................................................................. 13

    B.   Award Fee ................................................................. 14

        1.   Cost Plus Award Fee Contract Type ................................................................. 14

        2.   Award Fee Plan ................................................................. 15

        3.   Award Fee Administration ................................................................. 17

        4.   Conversion from CPAF to CPFF ................................................................. 27

    C.   Property and Materials Management ................................................................. 29

        1.   Contract Requirements ................................................................. 29

        2.   FAR 52.245-1 Requirements Regarding Sharing Findings from Internal Self-Assessments ................................................................. 32

        3.   Other Property-Related Opinions ................................................................. 33

    D.   Business Systems Disapproval ................................................................. 34

    E.   Service Orders ................................................................. 35

    F.   Personnel Levels ................................................................. 38

APPENDIX A – Resume

APPENDIX B – Materials Considered

## I.     BACKGROUND AND QUALIFICATIONS

I graduated from the Air Force Academy in 1988 and went on to serve as a commissioned officer in the Air Force for over 29 years, retiring as a Colonel. After retiring, I spent two years serving as a civil servant member of the Senior Executive Service (SES) working for the Air Force. I have been working as a senior acquisition Subject Matter Expert (SME) with industry for the past six years.

I spent my first seven years in the Air Force serving in various leadership roles as an Intelligence Officer. In 1995, I was selected to participate in the highly-competitive program called "Education with Industry." Under this program, I spent a year working directly for Lockheed Martin in diverse positions. I gained in-depth industry knowledge and improved my business acumen and expertise regarding companies that contract with the Department of Defense (DoD) (how they operate, profit margins, overhead, etc.). Through this program, I cross-trained into the AF Acquisition Corps.

I was then stationed at Brooks Air Force Base (AFB) where I earned my unlimited Contracting Officer warrant (in less than a year).[1] I worked in Research and Development and later in Base Operating Support (BOS) providing key services and commodities for the base. At the end of my tour at Brooks AFB, the AF moved me to Lakenheath AFB in the United Kingdom. I served as the Contracting Squadron Deputy Commander and gained extensive experience in U.S. DoD contracting and the laws and nuances of providing acquisition support overseas to DoD units.

While stationed at Lakenheath AFB, I deployed to the Republic of Kosovo (Oct 2000-Apr 2001), in the aftermath of the Kosovo War to support the United Nations (U.N.) multi-national forces establishing the country of Kosovo. I earned my U.N. Unlimited Contracting Officer Warrant and served as the Deputy Theater Head of Contracts in direct support of the United Nations Mission in Kosovo (UNMIK). I oversaw all acquisitions across the Theater (Kosovo, Macedonia, Greece, and Albania) awarded by the multinational force. This experience provided me with a foundation in overseas contracting under an authority other than the USAF and supporting Nation Building in a war-torn region.

I then attended Air Command and Staff College where I spent a year furthering my professional studies. Upon graduation, the AF sent me to Duke University where I studied and earned my master's degree in International Relations.

My next duty station was Peterson AFB, Colorado as the Chief of AF Space Command's (AFSPC) Acquisition Policy Division. I oversaw billions of dollars of contracting all over the world supporting 26,000 personnel. I was considered the senior contracting SME for all eight

---

[1] For a contracting officer, a "warrant" is the officer's authority to contractually bind the Government. Typically, warrants are tied to monetary thresholds that limit an individual contracting officer's ability to bind the Government to actions at or below that threshold. An unlimited warrant meant that I had no such monetary limitation.

1

**Plaintiffs' Trial Exhibit 817**
**Page 3 of 68**

Space Command Bases. In this role, in addition to overseeing contract actions, I also taught, coached, and mentored the Space Command Acquisition/contracting workforce. One of my major responsibilities in this position was overseeing the massive Thule Air Base (Greenland) BOS Cost-Plus-Award-Fee contract (CPAF). This contract required the contractor to provide critical base operations and maintenance services to run the entire remote Outside the Continental United States (OCONUS) base. Because of its complexity and importance to Space Command, I was substantially involved in administering the contract, including Award Fee Board administration.

While at Headquarters Space Command, the AF deployed me to Iraq. I was hand-selected as the Chief of the Specialized Contract Division in Iraq supporting Operation IRAQI FREEDOM (May 2006 – Oct 2006). In this position I was responsible for awarding and overseeing all high-interest contract actions and those worth over $1M. There, I earned my U.S. Army Unlimited Contracting Officer warrant (the Army was designated as the Lead Service for contracting in Iraq). I awarded and oversaw all types of contracts to support the joint forces in Iraq (including Firm Fixed Price, CPAF and Cost-Plus-Fixed Fee Contracts). My team awarded over $11B in contracts in a 6-month period. Additionally, I coordinated and synchronized the efforts of the Army's Logistics Civil Augmentation Program (LOGCAP) and the AF's Contract Augmentation Program (AFCAP).

Shortly after my return from Iraq, the AF selected me to serve as the Commander of one of the AF's largest, most challenging contracting squadrons, Air Education and Training Command Specialized Contracting Squadron. In this role, I led approximately 100 professionals in awarding and overseeing thousands of complex contracts worth over $19B. Specifically, I oversaw the CPAF Vance Air Base BOS contract which provided "soup-to-nuts" services to the base (in 1960, Vance AFB became the first AF Government-owned, Contractor-operated Base to offset operational personnel needs). I also led the contracting for the AFCAP contract. One of my focus areas on AFCAP was to replace cost-type task orders with Firm Fixed Price (FFP) task orders in Iraq and other combat and contingency locations as the operational risks and proven contractor performance allowed.

In 2010, as a Colonel, the AF sent me to Kuwait to serve as the Defense Contract Management Agency (DCMA) Middle East Commander. I was responsible for leading the team of 126 multifunctional (Quality, Property, Contracting, Program Management, Attorneys, etc.) professionals overseeing $7.6B in DoD contracts throughout the Middle East supporting 13 U.S. Central Command (USCENTCOM) countries. I led oversight of a diverse portfolio including: Foreign Military Sales (FMS), depot-level maintenance (C-130s, AWACS, F-15s), prepositioned stock maintenance (26,000 tanks/APCs), and $5B in critical life support programs including multiple LOGCAP and AFCAP task orders supporting 120,000 troops across 17 Southwest Asia Bases. For a period of time, I managed DCMA's supervision of LOGCAP services in Iraq. I also oversaw transportation of equipment to support Operation NEW DAWN, the DoD's largest logistic operation since WWII. This effort retrograded military equipment from Iraq to Afghanistan. I

2

**Plaintiffs' Trial Exhibit 817
Page 4 of 68**

served as the senior arbitrator as massive loads of equipment were transferred from one contractor to the next (as the equipment left Iraq, was modified and fixed as needed, and was shipped to Afghanistan).

After my command in the Middle East, I was chosen to serve as the Senior Contracting Official (SCO) for Pacific Air Forces (PACAF), responsible for a $10B dollar portfolio supporting 46,000 personnel across the Pacific Theater from 2010 through 2015. As the SCO, I reviewed every contracting action over $10 million to ensure the propriety and reasonableness of the action before it was permitted to go forward. I stood-up and led the board of joint contracting leaders to synchronize deployments and efforts in contingency response to support deployments and humanitarian responses. I was also responsible for organizing and leading the premier joint contracting exercise twice with over 1,000 attendees. These exercises highlighted the effective use of joint contracting (Operational Contract Support, OCS) in contingencies. I was responsible for integrating LOGCAP and AFCAP in the exercise for the first time.

In 2016, I was then selected to serve as DCMA Chief of Staff. I led day-to-day operations of the agency's 11,000 multi-functional civilian and military personnel responsible for executing worldwide contract management at more than 700 geographically-dispersed locations. I retired from the Air Force in 2017.

Throughout my career serving in uniform, in addition to day-to-day operations, I provided significant support to multiple Award Fee Boards. My Award Fee Board duties included: setting the Boards up, training the Board members, serving as a Board member, providing inputs to the Boards, and chairing Award Fee Boards. I was involved in Award Fee Boards in the following jobs:

- AF Space Command Policy Chief (specifically for the massive CPAF contract supporting Thule Air Base).

- Air Education and Training Command Specialized Squadron Commander (specifically for multiple contracts including the AF's AFCAP Contract and the Vance AFB BOS contract).

- DCMA Middle East Commander (specifically for the LOGCAP IV contract and the Egypt BOS Support contract). For LOGCAP IV, I set up the Boards, trained Board members, served as a Board member, and provided inputs to the Boards between August 2010 and August 2012. Dyncorp was the LOGCAP contractor.

After retirement from Active Duty, I was selected to serve as a member of the SES as the Executive Director of Air Force Installation Contracting Agency. In this capacity, I assisted the Commander, leading over 750 personnel responsible for $9B in annual obligations and a total contract portfolio of $55B. I oversaw worldwide installation contracting across the Air Force, supporting 8 Major Commands and their 77 units. I led the enterprise-wide implementation of effective contracting support to contingencies. I also served as the SCO. As the SCO, I reviewed

3

**Plaintiffs' Trial Exhibit 817**
**Page 5 of 68**

every contracting action over $100 million to ensure the propriety and reasonableness of the action before it was permitted to go forward.

In 2019, I left the military and began consulting with companies to help them navigate through the regulations and laws to compete for government contracts. Additionally, once the contracts are awarded, I provide consulting services and advice through administration of the contract and in close-out. I also serve as a SME for acquisition matters. I have made multiple presentations at National Contract Management Association (NCMA) conferences on topics including leadership and managing acquisition teams.

While I was active duty, I did two presentations for the Army on services contracting and I led the largest contingency contracting exercise in the history of the DoD.

My formal education began at the Air Force Academy. I graduated with a Bachelor of Science Degree in 1988. I earned the following master's degrees throughout my career:

- Master of Science Degree in Psychology, Angelo State University, TX (1994)
- Master of Arts Degree in Acquisition and Procurement, Webster University, TX (1998)
- Master of Military Operational Art and Science Degree, Air University, AL (2001)
- Master of Arts Degree International Relations, Duke University, NC (2004)

I also attended Squadron Officers' School (Captain), Air Command and Staff College (Major) and Air War College (Lieutenant Colonel).

I earned the Defense Superior Service Medal (DSS), the Defense Meritorious Service Medal (DMSM) with one oak leaf cluster, the Meritorious Service Medal (MSM) with three oak leaf clusters, the AF Commendation Medal (AFCM), the AF Achievement Medal (AFAM) with one oak leaf cluster, the Kosovo Campaign Medal, the Iraq Freedom Campaign Medal, the Global War on Terrorism Service Medal, the Military Outstanding Volunteer Service Medal and the NATO Medal.

## II.    RETENTION AND ASSIGNMENT

I have been retained by Arnold & Porter Kaye Scholer LLP to analyze and opine on Relators' allegations against Fluor in this case, in view of my extensive experience with government contracting and administration. I have also been asked to respond to the opinions rendered by John Lyle, Michael Rudolph, and James Sherman.

In rendering my opinions, I have applied my experience, training, and expertise, as I would have when dealing with similar matters while in the Government and as I currently do in my work for private sector clients. I employed the same methodologies as I would as a contracting officer when managing and overseeing a government contract. I reviewed the facts and circumstances; analyzed the contract requirements; considered Government direction and feedback provided to

4

the contractor; took into account the mission and realities of the operating environment; and assessed evidence regarding the contractor's performance.

A copy of my CV is attached to this report as Appendix A. I was compensated at the rate of $225 per hour from retention through March 2025 and from April 2025 to the present, I have been compensated at the rate of $300 per hour all work associated with this matter, in addition to reimbursement for reasonable out-of-pocket expenses, including travel. To date, I have spent 440 hours on this matter and charged approximately $110,000 for my work.

During the previous four years, I have not testified as an expert at trial or by deposition.

### III.    SUMMARY OF OPINIONS

- Award Fee

  - The purpose of the LOGCAP IV Award Fee Boards was to award fee for areas in which Fluor exceeded minimum contractual requirements.

  - Fluor's self-assessment was an executive summary that was to include information identifying Fluor's performance above what was minimally required by the contract. Fluor was not required to identify areas in which it performed at or below the minimum contract requirements. In addition to being dictated by the contract, this opinion is consistent with contemporaneous directions given to Fluor and internal Government documents.

  - The direction for a contractor to provide information that "might be reasonably expected to assist" the Award Fee Board reflected a subjective and flexible standard, which was intended to give Fluor discretion about what to include in its self-assessment and slide presentation.

  - As long as Fluor's performance was above "average", which as defined in the contract equates to a "D" grade, Fluor was eligible for an award fee. The Government then added points for areas where Fluor was exceeding requirements; there is no contractual mechanism to deduct from the award fee for areas in which Fluor encountered challenges. Consistent with this approach, there is no evidence that the Task Order 5 Award Fee Boards subtracted from or decremented Fluor's award fee scores based on any failure by Fluor to meet a contractual requirement.

  - Award fees are intended to incentivize, not punish, the contractor. The Government utilizes other contractual mechanisms to manage a contractor that is failing to meet contractual requirements.

5

**Plaintiffs' Trial Exhibit 817
Page 7 of 68**

o  The reason performance challenges were discussed in the Task Order 5 AFEB was to provide areas for Fluor to improve moving forward; those areas did not negatively affect Fluor's award fee.

o  The Government does not rely heavily on a contractor's self-assessment or its slide presentation, as it understands those submissions will always contain some level of "puffery." Award Fee Boards therefore rely primarily on information provided by Government professionals with direct knowledge of Fluor's performance and expertise in contract oversight, including DCMA, DCAA, and the customer. As I would expect, there is considerable evidence that the Task Order 5 AFEBs performed their own independent assessments of Fluor's performance.

o  There are no objective criteria for Award Fee Board members to apply in assigning an award fee score. It many respects, it is similar to how gymnastic competitions are scored in that judges routinely reach very different scores with the same information.

o  There is no way to reliably determine whether or how different information presented to the Award Fee Boards would have affected Fluor's award fee.

o  I do not believe there is any factual basis for Mr. Lyle's conclusion that Fluor would have received zero award fee.

o  Property and materials management did not represent a critical area for the Government and is unlikely to have played a significant role in Fluor's award fee score.

o  If Fluor was not meeting minimum standards, Fluor would have failed the mission and the Government briefings to the Award Fee Boards would so indicate. I do not see any references to mission failure or any similar significant deficiencies in the Government's briefings in this case.

o  Fluor should not be criticized for wanting to profit from its work under LOGCAP IV. Fluor is a for-profit company and the Government expects its contractors will seek to make a profit. It is in the Government's interest that experienced, capable companies like Fluor benefit financially from government contracts; otherwise, there is a risk they will not be willing to perform important work.

6

**Plaintiffs' Trial Exhibit 817**
**Page 8 of 68**

o  In order for the Government to have converted Task Order 5 from Cost Plus Award Fee to Cost Plus Fixed Fee, it would have had to determine that the burden and cost of award fee administration were no longer warranted in view of Fluor's satisfactory performance.

o  I have seen no evidence that Fluor's prior award fee scores had any material effect on the fixed fee the Government negotiated with Fluor.

- Property and Materials Management

o  The Task Order 5 PWS provided that "[t]he Contractor shall submit a property control plan IAW Technical Exhibit F. All property shall be inventoried IAW the Contractor's Government approved property control plan and Federal Acquisition Regulation (FAR) Part 45." Fluor provided its Government Property Control System as its plan and the Government approved it. The Government requires a plan to make sure the contractor understands the requirement and is prepared to meet it; the contractor is not contractually required to follow every detail in that plan as long as it provides the services required by the contract. That was true here.

o  On a services contract like LOGCAP IV, the Government's primary concern is that the contractor provides the service. The Government generally leaves it to the contractor to determine how to perform the various services called for in the contract.

o  At most, the only contractual requirement based on PWS 1.08 was that Fluor conduct inventories in accordance with the first three paragraphs of the Physical Verification Inventories section in the GPCS. The GPCS did not require Fluor to conduct any particular type of periodic and physical inventories, and provided Fluor the discretion to satisfy this requirement by conducting any type of periodic and physical inventory.

o  The LOGCAP IV contract also incorporated by reference first the 2007 and then the 2012 versions of FAR 52.245-1. This FAR Clause was consistent with Fluor's GPCS and only required a contractor subject to the clause to conduct inventories periodically. Accordingly, Fluor was not contractually obligated to conduct any particular method of inventories, including 10% monthly inventories. Further, inventories are only a means to an end, not an end in themselves. Counting materials helps ensure a contractor has an adequate supply on hand to provide required services. As noted, the record indicates that Fluor adequately responded to mission critical requirements.

7

o   I understand that Mr. William Walter has concluded Fluor's Maximo data shows that Fluor conducted counts of 99% or greater of its material lines of inventory in each of the full fiscal years for which Maximo data is available. This data indicates that Fluor was routinely inventorying materials thereby meeting its contractual requirements, regardless of inventory method.

o   Under FAR 52.245-1, Fluor had discretion to determine what was a significant finding or result that would be made available to the Government Property Administrator. I would have expected that, if Fluor determined that a finding or result from an internal assessment or review was going to negatively impact combat operations, that Fluor would have reported that finding in accordance with its business judgment. Findings short of such a negative impact are entirely within the discretion of the contractor to make available or not

o   FAR 52.245-1 required Fluor to make its significant findings available. It does not specify how such findings were to be made available. I do not read the language to require Fluor to "push" all (or any) reviews or audits to the Government.

o   Fluor was not contractually required to provide each and every internal audit or assessment to the Government, nor would the Government expect Fluor to do so.

o   I do not believe there is any factual basis for Mr. Lyle's and Mr. Rudolph's opinions that Fluor's property and materials management "deficiencies" unreasonably increased costs to the Government.

o   It is in the Government's interest for a contractor to have approved business systems and it is a very serious step, reserved for extreme circumstances, when a business system is disapproved. And even if steps are initiated to disapprove a business system, it is an iterative process with opportunities for the contractor to remedy issues. Finally, if in the very rare case that a contractor's business system is disapproved, the contractor will have multiple opportunities to restore approval of that system.

• Service Orders

o   Based on the evidence I have reviewed, Fluor was adequately responding to service orders. Had there been any widespread issues with Fluor's service order performance as Relators' experts suggest, I would expect to see voluminous complaints from the customer and DCMA. I have not seen any such evidence.

8

**Plaintiffs' Trial Exhibit 817**
**Page 10 of 68**

o I disagree with Mr. Lyle's conclusions regarding Fluor's definition of "response time" for Priority 2 and Priority 3 service orders. The "Fluor procedures" he references are not contractual requirements and I would not expect the Government to devote the time and resources to dig into and assess Fluor's internal procedures provided the work is being performed, which all the evidence indicates it was. Additionally, Fluor was contractually required to have a quality system and the evidence reflects that Fluor did in fact have a robust quality system; the Government would have relied on that as well.

o I do not believe there is any factual basis for Mr. Lyle's and Mr. Rudolph's statements that Fluor's response and repair times in Maximo were not realistic.

- Personnel Levels

  o Fluor was contractually required to have personnel necessary to support a 25% surge with no additional compensation. Any prudent contractor would have taken this requirement into account in preparing its estimates for personnel requirements.

  o The evidence reflects that Fluor successfully responded to unexpected requirements throughout the contract. This would have been impossible if Fluor had minimally staffed to steady-state requirements.

  o The Government closely scrutinizes a contractor's personnel levels at every phase of a contract, from proposal, to deployment, and post-deployment. The evidence reflects that the Government did just that here. That includes scrutiny of management and administration (M&A) direct labor.

  o A contractor's estimates are of limited importance on a cost-reimbursement contract, even more so here where definitization frequently occurred after the period of performance, when the Government had actual cost data for that period, along with assessments from DCMA and DCAA regarding Fluor's personnel levels.

9

**Plaintiffs' Trial Exhibit 817**
**Page 11 of 68**

IV.    **OPINIONS**

A.    **LOGCAP Contract Overview and Background**

1.    LOGCAP and Task Order 5 Background

LOGCAP PURPOSE. When the President directs the military to undertake a mission which exceeds what the military structure can accomplish, the military relies on contracts, like LOGCAP, to augment the force. LOGCAP contracts are, by design, large manpower augmentation contracts.

LOGCAP IV, CONTRACT W5P1J-07-D-0008. Fluor was one of three awardees under this overarching LOGCAP IV contract. DynCorp International and Kellogg, Brown, and Root (KBR) were the other two awardees. Under this contract, the Government competed geographically-aligned task orders with all three awardees to support contingency operations.

TASK ORDER 0005. Fluor competed for and won Task Order 5 to provide life support and services for the thousands of military and civilian personnel deployed to Northern Afghanistan during combat operations. The supported military presence was deployed to "Forward Operating Bases" (FOBs), similar to self-contained cities with all the required services (lodging, food, laundry, security, etc.) and infrastructure (airfields, roads, hospitals, dining facilities, billets, etc.). These FOBs were located in "bandit country" and were secured by fences, concertina wire, armed guards, and other lethal and non-lethal defenses.

Task Order 5 included a phenomenally broad suite of services that Fluor's 22,000 employees were responsible to perform. These services included: Camp Construction, Facilities Management, Roads and Grounds, Chemical Latrines, Hazardous Material/Waste, Pest Management Services, Laundry Service Operations, Food Service Operations, Morale, Welfare, and Recreation (MWR), Water Production, Billeting, Sewage and Waste Management, Shuttle Bus Services, Fire Fighting Services, Project Planning, Postal Services, Banking Services, Mortuary Affairs, Supply Support Activity, Ammunition Supply, Fuel Supply, Transportation Operations, Airfield Operations, Theater Movement Control, Container and Cargo Management, Retrograde, Base Closure.[2] In total Fluor was responsible for performing over 1,600 Performance Work Statement (PWS) Services and the services supported more than 11,000 buildings/facilities, hundreds of thousands of warfighters over the period of performance.[3] The services were performed all over Northern Afghanistan, at one point to more than 70 FOBs.[4] To support these vital services, Fluor managed 25,000 lines of property, constituting a total of one billion dollars of material and equipment over the course of the contract.[5]

This was not a simple supply contract or a base operating contract. In other words, Fluor was charged with far more than supplying the military with assets and materials or providing

---

[2] Feb. 20, 2009 Task Order 05 PWS, FLUOR-SR_0007844995.
[3] Aug. 20, 2010 Fluor AFEB Speaker Notes, FLUOR-SR_0007018172 at -174.
[4] Apr. 15, 2019 SAC [DKT 121], para. 16.
[5] Aug. 20, 2010 Fluor AFEB Speaker Notes, FLUOR-SR_0007018172 at -174.

10

**Plaintiffs' Trial Exhibit 817**
**Page 12 of 68**

services at established installations. Task Order 5 was unique in that the contractor partnered with the military to literally *accomplish* the North Atlantic Treaty Organization's (NATO) International Security Assistance Forces (ISAF) mission. While this contract was for vital support services in a combat zone, it was much more. For instance, in PWS Paragraph 08.09, the Contractor was required to "use its best efforts to hire HN [Host Nation] personnel and subcontractors...."[6] Fluor's performance in this area accomplished the DoD's "Afghan First" initiative in support of the ISAF's Counterinsurgency mission (by infusing money into the economy, teaching marketable skills, and mentoring Afghanistan citizens on ethically conducting business, in essence, "winning the hearts and minds" of the population).[7] Fluor was also responsible for conducting battle damage assessments and making repairs to facilities damaged by enemy attacks.[8] Finally, Fluor enabled agile combat operations by opening and closing bases in a timely manner, synchronized with the ISAF's directives.[9] Providing the necessary services called for in the PWS was extraordinarily difficult in a combat environment. As Mr. Whitcomb describes in his deposition, Fluor ultimately had 27 employees killed in action and hundreds of wounded employees due to enemy action.[10]

TRANSITION. Based on my experience as DCMA Middle East Commander in Kuwait, when I oversaw the transition from KBR to Dyncorp, the most challenging phase of a service task order of this magnitude and complexity is usually transition. During transition, the new contractor generally hires most of the labor force from the incumbent contractor (in this case, Fluor hired 87% of the expatriate workforce and 100% of the local workforce).[11] Based on hiring the incumbent workforce and taking on the incumbent's system, the new contractor generally also inherits most of the previous contractor's problems. The transition to Task Order 5 was no different in this respect. For instance, some of the former KBR employees Fluor hired on Task Order 5 were not current on their annual medical physicals; some were five years without a physical (an annual requirement).[12] During transition, Fluor had to identify performance gaps from the previous contractor and mitigate those gaps while continuing to fully perform the contract. In the case of the medical shortfalls, Fluor was required to "catch-up" on the requirements.[13]

On a contract like this, as the new contractor transitions and begins full performance, the new contractor ordinarily improves contract performance. However, Fluor was at a significant disadvantage from the day it began performing Task Order 5. The H-7 clause of the base contract required the Government to provide a list of government-owned property for which Fluor was

---

[6] Feb. 20, 2009 Task Order 05 PWS, FLUOR-SR_0007844995 at -027.
[7] Aug. 3, 2012 AFEB Fluor Self-Assessment, USA Bates 0001513; Feb. 6, 2012 Fluor AFEB Script, FLUOR-SR_0003455220.
[8] *See, e.g.*, 7/16/2010 to 6/30/2011 LOGCAP IV Task Order 05 Final CPAR, FLUOR-SR_0011617072; 7/1/2011 to 6/30/2012 LOGCAP IV Task Order 05 Interim CPAR, FLUOR-SR_0011661760; 7/1/2016 to 6/30/2017 LOGCAP IV Task Order 05 Interim CPAR, FLUOR-SR_0006534491.
[9] Feb. 20, 2009 Task Order 0005 PWS, FLUOR-SR_0007844995 at -026.
[10] Whitcomb Dep. 21:19-20.
[11] Aug. 20, 2010 Fluor AFEB Speaker Notes, FLUOR-SR_0007018172 at -174.
[12] Aug. 25, 2010 AFEB Recorder Notes, USA Bates 0000222 at -225.
[13] *Id.*

11

Plaintiffs' Trial Exhibit 817
Page 13 of 68

taking responsibility at the beginning of Task Order 5.[14] My understanding is that the Government never provided this listing, leaving Fluor with tremendous uncertainty about what government property had been transferred and forcing Fluor to bring all of those items to record based on inadequate information.

Transition was initially estimated to be completed in 100 days; but as the Government PNM states: "Due to the magnitude of efforts required to transition the Afghanistan North Area of Operations, a 100-day transition as awarded was unfeasible."[15] In modification P0003, the Government extended the transition period over eight months beyond the 100 days, from an end date of 15 October 2009 to 30 June 2010.[16] I understand there was a disconnect in general between the requirements the Government proposed (based on "notional scenarios") and the actual operating conditions Fluor faced.[17] In such circumstances, I would fully expect the incoming contractor to face challenges in the course of transition.

### 2. Fluid Base Operations

Based on my knowledge of the mission, the Northern Afghanistan Area of Operations for which Fluor was responsible for providing wide-ranging support was extremely challenging due to endemic combat operations. Friendly forces were located on FOBs, which were self-contained "cities" secured by armed guards, barriers, and concertina wire. Hostile forces in neighboring areas were extremely active—attacking and killing friendly forces, disrupting limited transportation—and often damaging critical infrastructure. Such attacks would include, but are not limited to: vehicle-born improvised explosive devices, mortar and sniper fire, and ground incursions. Attacks on the FOBs required Fluor to deploy and quickly make repairs, while simultaneously figuring out how to continue to provide full service to the troops. Assaults on equipment, supplies, and personnel being transported in the theater required Fluor to improvise due to delivery delays. Friendly force strategy required movement of assets, employment of locals, and force protection measures.

The overall number of FOBs and personnel across the theater was unpredictable and even more volatile was the number of troops deployed to each FOB (who needed lodging, meals, showers, etc.). The Government often directed Fluor to activate and close FOBs with extremely short timelines. For Operational Security reasons and based on security classification of troop movement and combat operations, Fluor may not have visibility of Government plans until the last minute, hence the short timelines. This dangerous, changing environment required Fluor to basically "open" and "close" (and then sometimes "reopen") cities and provide all the required services to support the (ever-changing) FOB population as the military directed (and the enemy impelled). As Fluor deactivated FOBs, it was required to shift supplies, equipment, and labor to

---

[14] LOGCAP IV, FLUOR-SR_0011080668 at -695.
[15] Mar. 5, 2013 Army PNM, DCAA-SR0000263590 at -591.
[16] Task Order 05 Modification 03, FLUOR-SR_0010100213.
[17] Mar. 5, 2013 Army PNM, DCAA-SR0000263590 at -593 to -594.

12

**Plaintiffs' Trial Exhibit 817**
**Page 14 of 68**

other FOBs or out of the theater as quickly as practicable. These dynamic operations required Fluor to employ leaders and managers who could make lightning-quick, sound decisions based on competing priorities and to posture the workforce to be able to quickly shift resources, surge, and improvise.

In the Contractor Performance Assessment Reports (CPARs), the Government highlighted hundreds of examples of Fluor moving resources in response to changing Theater conditions. I provide the following as a small sample reflecting the flexibility and agility Fluor was required to provide on this contract.

- "On September 24, 2010, the retail fuel point at FOB Salerno was hit by Indirect Fire causing a fire in the fuel storage area, jeopardizing 140K gallons of JP-8 fuel….Upon release, [Fluor] firefighters exposed themselves to indirect fire to combat the fire, saving 100K gallons of JP-8 and preventing a lapse in Class III Retail Operations."[18]

- "On a separate occasion at FOB Blessing, Fluor expedited repairs to the DFAC following enemy fire to avoid a lapse in service."[19]

- "During the Koran burning event and related shutdown at Bagram, Fluor provided a quick solution for accumulated wastewater by executing a short notice build of 5 water lagoons and increasing ECOLOG truck runs within the wire."[20]

- "Following the decision by the Deputy Combatant Commander, USFOR-A to heavily restrict the total of Local Nationals (LNs) across the theater, Fluor was able to invoke the parameters of Essential Services Contingency Action Plan (ESCAP) and continue all critical services across theater despite the elimination of over 1,400 employees."[21]

### 3. Logistics Challenges

Fluor encountered unimaginable challenges in theater. The Afghanistan economy could not provide for even a nominal portion of the supplies, equipment, and labor required to operate the FOBs. Getting labor, supplies, and equipment into the enclaves required substantial planning, coordination, money, and time. The local threat required Fluor to primarily rely on expatriates and Third-Country Nationals (TCNs) to provide most of the required labor.[22] However, the contract at the outset also required Fluor to increase the number of LNs employed on the contract.[23] At one point, Fluor hired and transported 24,000 personnel to perform the contract; one-third of them were Afghan nationals, one-third were U.S. citizens, and one-third were TCNs.[24] The Afghan

---

[18] 7/16/2010 to 6/30/2011 LOGCAP IV Task Order 05 Final CPAR, FLUOR-SR_0011617072.
[19] Id.
[20] 7/1/2011 to 6/30/2012 LOGCAP IV Task Order 05 Interim CPAR, FLUOR-SR_0011661760.
[21] 7/1/2016 to 6/30/2017 LOGCAP IV Task Order 05 Interim CPAR, FLUOR-SR_0006534491.
[22] Aug. 20, 2010 Fluor AFEB Speaker Notes, FLUOR-SR_0007018172 at -174.
[23] Feb. 20, 2009 Task Order 0005 PWS, FLUOR-SR_0007844995 at -027.
[24] Whitcomb Dep. 20:14-25.

13

Plaintiffs' Trial Exhibit 817
Page 15 of 68

infrastructure was sparse, rudimentary, and dangerous. Warlords controlled passage on the meager number of roads. Deadly attacks on convoys were common. These challenges drove substantial lead-times for supplies and equipment. Additionally, the processes to deploy employees to the theater (Contractors Authorized to Accompany the Force—CAAF) were equally challenging. Fluor had to conduct background checks, input the employee's information into a contractor database-Synchronized Pre-Deployment and Operational Tracker (SPOT), wait for Government approval, conduct health and dental examinations, and provide vaccinations and training (for instance on the kidnapping protocols and evasion and escape techniques).[25] Then the contractor could *start* to coordinate transportation into the Theater. Mr. Ron Riley, in his deposition, described the lengthy procedure required to get staff into theater. "(1) it's hard to hire people wanting to come to a wartime environment; (2) there are requirements which are imposed by the government which delays personnel in getting into theater, i.e., you know, medical, fit for duty, things of that nature."[26] The average timeline to get an employee into Afghanistan was 90-120 days, with certain skilled trades taking even longer.[27]

### B.    Award Fee

#### 1.    Cost Plus Award Fee Contract Type

There are several relevant provisions of the Federal Acquisition Regulation (FAR) related to CPAF-type contracts, including the following:

FAR 16.305: A cost-plus-award-fee contract is a cost-reimbursement contract that provides for a fee consisting of (a) a base amount (which may be zero) fixed at inception of the contract and (b) an award amount, based upon a judgmental evaluation by the Government, sufficient to provide motivation for excellence in contract performance.

FAR 16.401(e):

(1) *Application.* An award-fee contract is suitable for use when-

(i) The work to be performed is such that it is neither feasible nor effective to devise predetermined objective incentive targets applicable to cost, schedule, and technical performance;

---

[25] On July 28, 2025, I spoke with Fluor employee Justin Jones who explained this process to me. Mr. Jones who explained the difficulties in hiring, training, and retaining employees, especially when those employees are working in a war zone like Afghanistan for an unknown period of time. This is especially true for specialty skilled tradesman, who I understand may have been able to obtain higher paying jobs in the United States, even when accounting for uplifts. There were many factors that impacted the time it took to hire new employees and get them into theater, including background checks, the need to pass a rigorous fit for duty exam, required trainings, and obtaining common access cards. *See also* FLUOR-SR_0008785227.

[26] Riley Dep. 42:1-5.

[27] This information was provided to me by Justin Jones during our July 28, 2025 conversation.

**Plaintiffs' Trial Exhibit 817**
**Page 16 of 68**

(ii) The likelihood of meeting acquisition objectives will be enhanced by using a contract that effectively motivates the contractor toward exceptional performance and provides the Government with the flexibility to evaluate both actual performance and the conditions under which it was achieved; and

(iii) Any additional administrative effort and cost required to monitor and evaluate performance are justified by the expected benefits as documented by a risk and cost benefit analysis to be included in the Determination and Findings referenced in 16.401 (e)(5)(iii). [Emphasis added]

(2) *Award-fee amount*. The amount of award fee earned shall be commensurate with the contractor's overall cost, schedule, and technical performance as measured against contract requirements in accordance with the criteria stated in the award-fee plan. Award fee shall not be earned if the contractor's overall cost, schedule, and technical performance in the aggregate is below satisfactory. The basis for all award-fee determinations shall be documented in the contract file to include, at a minimum, a determination that overall cost, schedule and technical performance in the aggregate is or is not at a satisfactory level. This determination and the methodology for determining the award fee are unilateral decisions made solely at the discretion of the Government. [Emphasis added]

    2.    Award Fee Plan

As described in FAR 16.401(e)(3), the Government must develop and utilize an Award Fee Plan to manage the award fee process. It must describe how the Government intends to determine a "fair" award fee for the contractor and direct the contractor on areas to focus on for the next award fee period. The award fee starts at $0 and is increased based on the Award Fee Board's assessment of how well the contractor exceeded minimal contractual requirements (that is, as noted in FAR 16.401(e)(2), the contractor's performance in the aggregate was satisfactory or better). There is no means to take away award fee if the contractor fails to meet specific areas of performance requirements, provided that the contractor's overall performance is at least satisfactory.

LOGCAP IV was awarded on 27 June 2007[28]; Task Order 5 was awarded on 16 July 2009.[29]

The Government provided the following table related to the award fee determination[30]:

---

[28] LOGCAP IV, FLUOR-SR_0011080668.
[29] Task Order 05, FLUOR-SR_0008004287.
[30] Apr. 3, 2007 LOGCAP Award Fee Plan, USA Bates 0001495 at -502 to -503.

15

**Plaintiffs' Trial Exhibit 817**
**Page 17 of 68**

| Performance Standard | Numerical Rating (Score) | Percent of Award Fee To Be Earned | Performance Standard Defined |
|---|---|---|---|
| Excellent | 100 | 100% | Performance is of the highest quality that could be achieved by a contractor under the contract. There are no areas of material deficiencies or performance problems encountered during the evaluation period. |
|  | 99 | 98% |  |
|  | 98 | 96% |  |
|  | 97 | 94% |  |
|  | 96 | 92% |  |
|  | 95 | 90% |  |
|  | 94 | 88% |  |
|  | 93 | 86% |  |
|  | 92 | 84% |  |
|  | 91 | 82% |  |
| Very Good | 90 | 80% | Performance is of high quality and approaching the best that could be performed by a Contractor. Work completed greatly exceeds an average performance level. A few minor problems are experienced during the evaluation period without impacting the overall level of performance. |
|  | 89 | 76% |  |
|  | 88 | 72% |  |
|  | 87 | 68% |  |
|  | 86 | 64% |  |
|  | 85 | 60% |  |
|  | 84 | 56% |  |
|  | 83 | 52% |  |
|  | 82 | 48% |  |
|  | 81 | 44% |  |
| Good | 80 | 40% | Contractor exceeds some contract requirements in a manner demonstrating commitment to the program. Work completed is much better than minimum required performance. Areas of deficiency and minor problems are more than offset by areas of good performance. |
|  | 79 | 36% |  |
|  | 78 | 32% |  |
|  | 77 | 28% |  |
|  | 76 | 24% |  |
|  | 75 | 20% |  |
|  | 74 | 16% |  |
|  | 73 | 12% |  |
|  | 72 | 8% |  |
|  | 71 | 4% |  |
| Average | 0-70 | 0% | Contractor's performance is the minimum required level to meet needs. Areas of good performance are offset by deficiencies and problems, which reduces performance to a level that is minimally acceptable under the contract. |

The second column is the "score" the Award Fee Board assigns for the contractor's aggregate performance during the Award Fee Period. The third column is the percentage of the Award Fee Pool that the contractor is given.

**Plaintiffs' Trial Exhibit 817**
**Page 18 of 68**

### 3.     Award Fee Administration

Meeting minimal contractual requirements is the expectation under any form of contract. The purpose of including an award fee on a contract is to incentivize a contractor to exceed these requirements. The Award Fee Plan for LOGCAP IV, dated 03 April 2007, states, "The primary objective of this process is for the Government/contractor team to recognize the impact overall corporate performance has on successful contract execution as well as the importance of exceptional performance on a single task order in support of Combatant Commander requirements."[31] This language demonstrates the intent for there to be a partnership between the Government and the contractor. Accordingly, while the Award Fee Plan provided for semi-annual Award Fee Boards, it also required ongoing dialogue between Fluor and the Government and interim sessions for the Government to provide feedback to Fluor regarding its performance. More specifically, the Plan required the Government to conduct monthly performance reviews evaluating Fluor's performance throughout the Award Fee period.[32] The Plan also mandated Interim Evaluation reports to provide a half-way assessment and to identify "watch items" for Fluor to focus on moving forward.[33] These monthly and interim reviews then rolled up to a semi-annual evaluation of overall task order performance.[34] The Plan also recommended that the Government provide informal feedback throughout the period.[35]

It is critical to understanding award fees under LOGCAP IV, Task Order 5 to contextualize what "exceeding minimum requirements" means. The Award Fee clause at H-35 in the base contract and H-3 in Task Order 5 provides the following: "Award Fee . . . is a fee amount that is earned by the contractor for performance above that minimally required by the contract/T.O."[36] [Emphasis added]. As explained further below, the Award Fee matrix demonstrates that a contractor should receive award fee for "good" performance or above. In other words, any and all performance above "average" receives an award fee. And "average" performance is further defined as "the minimum required level to meet needs. Areas of good performance are offset by deficiencies and problems, which reduces performance to a level that is minimally acceptable under the contract." In other words, "average" in this context means that the contractor's performance is more "bad" than "good" such that the contractor is barely meeting requirements. Anything above "barely making it" would qualify for award fee. And, as further explained, award fee does not turn on whether or not the contractor's performance in any particular area (e.g.,

---

[31] *Id.* at -497.

[32] *Id.*

[33] *Id.* at -498.

[34] *Id.* at -497.

[35] *Id.* I am not sure whether the Government complied with these requirements in the Award Fee Plan to the letter. For example, I am aware that the Government and Fluor met for monthly Performance Evaluation Boards (PEB), but I am not sure if the Government provided Interim Evaluation reports unless the PEBs are considered such reports. If the Government deviated from its Award Fee Plan, I would not be surprised. As discussed above, a plan is a just a plan, and deviations are likely during contract performance depending on the circumstances.

[36] LOGCAP IV, FLUOR-SR_0011080668 at -702; Task Order 05, FLUOR-SR_0008004287 at -295.

17

**Plaintiffs' Trial Exhibit 817**
**Page 19 of 68**

property management) is average or below but whether the contractor's performance on the contact as a whole is above average, that is, above the bare minimum.

The Plan goes on to state that "the contractor begins each evaluation period with 0% of the available award fee and works up to the evaluated fee for each evaluation period."[37] The contract further provides that "[t]he contractor shall submit a self-assessment to the PCO within five working days prior to the end of the evaluation period. This written assessment of the contractors performance throughout the evaluation period should contain any information that may be reasonably expected to assist the AFEB in evaluating the contractors performance."[38]

Taken together, the contract required Fluor to provide a self-assessment and include any information that might be reasonably expected to assist the AFEB in identifying Fluor's performance above what was minimally required by the contract. The phrase "might be reasonably expected to assist" reflected a very subjective and flexible standard, which, based on over 30 years of writing contracts standards, I believe was intended to give contractor discretion about what to include. It is my opinion that, in exercising this discretion, the contractor was only required to provide information regarding areas in which it felt it had exceeded contract requirements. This is consistent with Fluor's corporative representative testimony in this case, as well as the testimony of other Fluor witnesses.[39]

My opinion that Fluor was only required to provide information regarding areas where it exceeded contract requirements is also consistent with the directions that Fluor received from the Government on Task Order 5. Each letter the Government sent to Fluor announcing the Award Fee Board included the direction: "Your written assessment must identify your performance above the minimum performance standards of the contract."[40] Similarly, Brigadier General (BG) Feldman, who chaired the first Task Order 5 AFEB, told Fluor's senior project leadership that he wanted to see "the good news stories about how [Fluor] went above and beyond the contract" and "how [Fluor] affected the soldier on the ground - personally."[41] I am not aware of any evidence that the Government directed Fluor to provide information regarding areas where it did not meet minimum performance requirements, nor would I expect to see such a direction.[42]

My opinion that Fluor was only required to provide information regarding the ways in which it was exceeding the contract requirements is also consistent with internal Government

---

[37] LOGCAP IV, H-35(c)(2) Award Fee Clause, FLUOR-SR_0011080668 at -702.

[38] Task Order 05, H-3(d)(7) Award Fee Clause, FLUOR-SR_0008004287 at -297.

[39] Fluor Rule 30(b)(6) Dep. 193:12-194:14; Combs Dep. 78:6-79:19.

[40] *See, e.g.,* Letters from the Army to Fluor providing notice of upcoming AFEBs, USA Bates 0000631 (Jan. 12, 2010); USA Bates 0000072 (Aug. 20, 2010); USA Bates 0000423 (Dec. 15, 2010); USA Bates 0001119 (June 27, 2011); USA Bates 0001511 (June 7, 2012).

[41] Jan. 5, 2011 Email from Blandin to Combs re AFEB Direction, FLUOR-SR_0006863954.

[42] If at any point the Government decided it wanted this type of information reported, it could have unilaterally added a contractual requirement to that effect. It never did, which is consistent with my years of experience regarding the purpose and conduct of Award Fee Boards.

18

**Plaintiffs' Trial Exhibit 817**
**Page 20 of 68**

documents I have reviewed in this case. For example, the Rock Island briefings to the Award Fee Board members stated that one of the purposes was to "[t]o gain a complete and accurate understanding of Fluor's performance **above acceptable contract requirements**."[43] Those briefings further stated that the "AFEB Objective" was "[t]o motivate the contractor to strive for excellence. Award fee is meant to provide that motivation in form of a pool of dollars that can be earned based upon the Government's evaluation of the contractor's performance, **above** the minimum contract requirements."[44] And finally, the "Procedures" section of the briefing stated that the Award Fee Board would "[o]nly measure[] performance **above** contract requirements."[45] The bold and underlining appears in the Government's original briefing.

For these reasons, there was no requirement or expectation for Fluor to highlight areas where it failed to meet contractual requirements. I disagree with Mr. Lyle's conclusion to the contrary. Nonetheless, I note that Fluor often voluntarily provided areas in which it was challenged and its corrective action plans, which Tommy Marks acknowledged at his deposition.[46]

Relatedly, I also disagree with Mr. Lyle that the Award Fee Board would or could "deduct" from Fluor's score for areas of unsatisfactory performance. There was no contractual mechanism to deduct from the award fee. As discussed above, the Government is only looking for areas in which the contractor exceeded the minimum contract requirements. You can think of it as assessing the areas where the contractor performed above a D (in the aggregate) on a scale from A to F.[47] The Government then adds points for the areas where the Contractor is exceeding contract requirements. There is no mechanism to allow the Government to "deduct" fee for areas where the contractor performed below a D; those areas just do not factor into the award fee determination as long as the contractor's <u>overall</u> performance is at a D or above. Put another way, if the contractor, in the aggregate, reaches a D, its score can only go up, not down. This is consistent with the Government direction that the award fee starts at 0% and is increased for performance exceeding contractual minimum standards.[48]

As noted, this principle is also consistent with the award fee adjectival ratings, which end at AVERAGE. There are no ratings below AVERAGE. This also means that a contractor could get an F in one area of performance, such as property management, but at the same time receive high enough marks in other areas and still be entitled to an award fee. To carry the analogy forward, what matters in the end is the grade point average as a whole, not the individual marks in particular

---

[43] Feb. 20, 2012 Army AFEB Presentation, USA Bates 0000935 at -936.
[44] *Id.* at -937.
[45] *Id.* at -938.
[46] Marks Dep. 24:15-25:8; *see also* Combs Dep. 175:8-14.
[47] In ordinary parlance, a "C" grade is commonly characterized as average. *See* What Does a C Grade in Math Really Mean, https://www.mathnasium.com/math-centers/parker/news/what-does-a-c-grade-in-math-really-mean. However, the term "average" is contractually defined in Task Order 5 and has a different, specific meaning in the context of award fee evaluations. I interpret the contractual definition of "average," which expressly states that the bad outweighs the good, to equate to a "D" grade.
[48] LOGCAP IV, H-35(c)(2) Award Fee Clause, FLUOR-SR_0011080668 at -702.

19

**Plaintiffs' Trial Exhibit 817**
**Page 21 of 68**

classes. For these reasons, I respectfully disagree with Mr. Marks' testimony, to a point. Mr. Marks was asked: "And so if they failed a PMSA, that was something that mattered to the board in terms of what kind of award fee to award. Is that fair?" Mr. Marks responded: "If they did not meet the standard, not meeting the standard affects the award fee."[49] I agree that if, in the aggregate, Fluor was not meeting minimum contractual requirements, it was not entitled to award fee. But I disagree that a deficiency in one area would affect the award fee, once Fluor cleared the threshold requirement of performing at a D in the aggregate. To the extent the Board discussed specific areas of weakness, the record reflects that the Board did so in order to identify areas of improvement for future periods of performance.[50] For instance, after the AFEB held for the first period of performance, the Award Fee Determining Official provided feedback for improvement stating, "to ensure the obtainment of excellence and seek out other opportunities to exceed the minimum contractual requirements."[51] There is no indication that the Board subtracted or decremented Fluor's award fee based on Fluor's failure to meet some requirements.

Along the same lines, award fees are not intended to punish the contractor. The Government uses other contractual mechanisms to decrement a contractor for failing to meet contractual performance (different levels of Corrective Action Requests (CARs), CPARS reports, etc.). It can even begin proceedings to terminate for default a contractor for failing to meet contract requirements. Of course, there is no indication here that the Government ever began those proceedings against Fluor, or even considered doing so.

Turning to Fluor's self-assessment and the role it played in award fee decision making, the self-assessment is an opportunity for the contractor to present a summary of its performance of specific criteria over the period of review. As described by Mr. Marks, the contractor's self-assessment is an "executive summary" of its performance that is presented at the AFEB.[52] Ms. Combs testified that Fluor's self-assessments were consistent with that description and contained a "high-level" summary of data that Fluor used to manage the project.[53] I also disagree with Mr. Lyle when he suggests that Fluor was required to report its Loss, Theft, Damaged, and Destruction ("LTDD") reports or work order data in a particular way. Lyle at 25 (suggesting Fluor concealed LTDD information based on the way it reported them), 42-43 (suggesting Fluor concealed work order information because it reported only on closed work orders rather than all work orders). Fluor had discretion to determine whether and if so how to report LTDD and work order information in its AFEB submissions.

---

[49] Marks Dep. 38:11-16.
[50] Oct. 12, 2011 Award Fee Decision Letter (encouraging Fluor to analyze the concerns raised, develop necessary CAPs, and "implement corrective measures in an effort to meet or exceed the minimum contract requirements in those respective areas"), USA Bates 0001166; Jun. 12, 2012 Award Fee Decision Letter (stating the same), USA Bates 0000961; October 2, 2012 Award Fee Decision Letter (stating the same), USA Bates 0001473.
[51] Dec. 29, 2010 Award Fee Decision Letter, USA Bates 0000282.
[52] Marks Dep. 238:21-22. Mr. Marks also testified that a contractor's true self-assessment acknowledges the good and the bad. *Id.* 24:2-7.
[53] Combs Dep. 69:10-22.

**Plaintiffs' Trial Exhibit 817**
**Page 22 of 68**

Based on my experience participating in Award Fee Boards, the Government also understands that a contractor's self-assessment and slide deck will always contain some "puffery." Mr. Marks acknowledged at his deposition that "the contractor's trying to get the hundred percent" and "they've got an opportunity to present their own case on why they should get that and that's the expectation of the contract."[54] The expectation is that the contractor will tout its strengths just as an employee would in writing a self-evaluation for his or her employer.[55]

Because the Government understands that the contractor's self-assessment and presentation will paint its performance in the most positive light, Board members rely on numerous other inputs, in particular, information provided by a variety of Government professionals with direct knowledge of Fluor's performance and expertise in contract oversight.

In the documents I have reviewed, I have seen evidence of instances in which Fluor and the Government presented different information regarding a particular area of Fluor's performance, indicating that the Government was performing its own independent assessment. There is also evidence that the AFDO letter placed significant weight on the Government's information. For example, in its slide deck from the second AFEB, Fluor reported high percentages of compliance with response and repair times for service orders.[56] The AFDO decision letter from the same period did not include response and repair times as a strength but noted, as one of its weaknesses, that Fluor had to re-submit a number of work orders and service orders before they were properly tracked.[57] This is consistent with my experience that Board Members generally disregard contractor input not aligned with the Government input and weigh Government inputs much more heavily than the contractor's inputs. This is evident throughout the Award Fee Board documentation. For instance, Colonel Holt, DCMA Afghanistan Commander (who subsequently was promoted to Maj General as SAF/AQC) states, "we are seeing the numbers different between

---

[54] Marks. Dep. 23:17-23. Fluor should also not be criticized for wanting to make a profit, as Mr. Lyle suggests. The Government understands and expects that all contractors, including Fluor, are for-profit companies that, by definition, seek to earn profits for their shareholders in performing work.[54] It is important to the country that companies have a financial incentive to contract with the Government to ensure that we have a well-functioning defense industrial base. That is particularly true in the context of a contingency contract to support a mission of this size, scope, complexity, and duration. The Government relies on a small number of companies to perform this sort of work and it is important to provide an incentive to ensure that these capable companies are able and willing to perform the work. Further, if contractors were expected to perform at or near a loss, this could result in dramatic underbidding that could lead to mission failure because the performance costs could then greatly exceed what the contractor proposed. While this may be less of a concern with cost reimbursable contracts, the principle still holds as a contractor might dramatically under-estimate the resources it would require to perform the work, or equally problematic, provide only minimal staff and resources necessary for performance. I would expect contractors that take this approach to struggle to provide a minimum level of service, particularly in a contingency environment.

[55] As a previous Contracting Officer, I would also not expect the contractor to report internal risk assessments, such as those included in its Business Risk Management Framework ("BRMF") reports, as Lyle alleges. Lyle Report at 25-26. According to Sandy Combs testimony, BRMFs were populated using a software program where Fluor would input data, along with other factors, in order to populate a potential dollar value risk. Combs. Dep. 59:23-60:25. There was also no requirement that Fluor BRMFs, or other risk type assessments, be disclosed at AFEBs.

[56] Feb. 10, 2011 Fluor AFEB Slide Deck, USA Bates 0000437 at -451.

[57] Apr. 12, 2011 Award Fee Decision Letter, USA Bates 0000585.

21

**Plaintiffs' Trial Exhibit 817**
**Page 23 of 68**

the contractors and ours and I don't know why. The take-away is the response time. You didn't meet the response time in every situation, but you have made the repair time."[58]

The Government's candid, and sometimes critical, assessment of Fluor's performance is consistent with the rigorous oversight I would have expected it to exercise. During the award fee period, the Government oversight team (DCMA Quality Assurance Specialists, DCMA Property Specialists, customers, the Contracting Officer, the Contracting Officer Representatives, etc.) conducted thousands of audits, inspections, performance reviews, etc. The Government had a robust oversight process employing a substantial number of experts. In one six-month period of performance, the Government conducted 2,680 QAR audits and 929 Contracting Officer Representative (COR) audits[59]; extrapolating for the performance period (assuming generally the same rate), approximately 57,000 QAR and COR audits would have been completed.[60] In addition, I have been asked to assume that over a seven-year time period, the Government conducted more than 60 PMSAs. This is also evidence of robust Government oversight of Fluor's performance, specifically of Fluor's property management. In my experience, prior to the Award Fee Board, the Government would compile these inputs into multiple independent assessment briefings (with no page/time limit) which included audit results, performance assessments, strengths, mission impact, cost control information, and other metrics.

Moreover, based on my experience, if Fluor was not meeting minimum standards in the aggregate, Fluor would have failed the mission and the Government briefings to the Board would indicate these failures. I have seen no such evidence in this case. The AFEB receives briefings from the military supported customers. The customers are receiving the services from the contractor and know how the contractor is performing. In my experience, customers figure out the right people in DCMA, such as DCMA QARs, to whom they would complain about the contractor's unsatisfactory services to get the Government's attention to in turn drive improvements in the contractor's performance. For example, if the contractor is not adequately responding to service orders related to life, health, and safety issues, the customer will make this known to the DCMA, which in turn would make the AFEB aware (or the customer could directly do so during the AFEB).[61] Finally, based on the criticality of this contract, had Fluor not been meeting minimum standards, it would have resulted in significant mission degradation or failure and I would have expected the Army to terminate Fluor for default. The record does not reflect any

---

[58] Feb.10, 2011 AFEB Recorder Notes. USA Bates 0000478 at -484. These Army notes further confirm that the Government tracked response and repair times separately from Fluor. In other words, the Government did not rely on Fluor's own data exclusively but checked their own records and data. This is consistent with my experience generally that the Government does not simply "take the contractor's word for it" in conducting AFEBs.

[59] March 21, 2011 Guaraldi email to Wingate, USA Bates 0000512, attaching DCMA AFEB Script, USA Bates 0000513 at -514.

[60] And, even if for whatever reason the Government's audit rate slowed later in performance (which is not typical in my experience), there would nevertheless still have been tens of thousands of audits and reviews.

[61] See, e.g., Riley Dep. 348:23-349:25.

22

**Plaintiffs' Trial Exhibit 817
Page 24 of 68**

evidence that the Government ever considered terminating the contract, or that there would have been any reason for it to do so, given Fluor's meeting contract requirements.

I will turn now to how the Boards were conducted and Mr. Lyle's opinion that Fluor should have received zero award fee. The self-assessment of how Fluor exceeded contractual minimums (10-page limit) and an accompanying briefing (30-slide limit) was due to the Government within five working days before the Award Fee Board.[62] Based on my experience, and the fact that the assessment and briefing were due to the Board five days before, the Government spends the period before the Board analyzing and fact-checking the contractor's self-assessment and briefing.

The Award Fee Board started with a joint session[63]. Government attendance at the joint session was robust and included approximately 30 representatives (including the Board) from all organizations responsible for contract oversight.[64] Included were: Rock Island (Army Sustainment Command ASC) senior leaders, DCMA, USFOR-A, DCAA, Legal, and Serco. The Award Fee Board was composed of approximately a dozen hand-selected, Government senior acquisition experts and other senior Government leaders.[65] Finally, Fluor was also permitted to attend the joint session, but was limited to ten attendees.[66] Fluor began the Board by presenting its self-assessment briefing of how it believed it had exceeded contractual minimums. The Board members were able to ask questions throughout and the records I have reviewed reflect that did, in fact, do that. The Government provided multiple independent assessment briefings (with no page/time limit), which included audit results, performance assessments, strengths, mission impact, cost control information, and other metrics.[67] The Government and the Board presented feedback to Fluor on areas they wanted Fluor to focus on in the next Award Fee Period. These areas may have been where Fluor was failing to meet minimum requirements (weaknesses) or where they were meeting minimums but based on the mission, the Government needed Fluor to better its performance.[68]

After all the briefings were completed, the Award Fee Board then convened to assess if and where Fluor exceeded minimal requirements and at what level (a score). In my experience, consistent with the Award Fee Plan in this case, an Award Fee board starts at "0" and identifies areas the Contractor exceeded performance to increase the award fee the Contractor should receive. This score is not broken into defined percentages (for instance 5% for firefighting, 10%

---

[62] Apr. 3, 2007 Award Fee Plan, USA Bates 0001495 at -504.
[63] *See* Feb. 10, 2011 AFEB Recorder Notes, USA Bates 0000478.
[64] Aug. 25, 2010 AFEB Sign-In Sheet, USA Bates 0000137.
[65] *E.g.*, DoD Memo re Appointing Voting Members, USA Bates 0000468.
[66] Dec. 15, 2010 DoD Notification Letter, USA Bates 0000423.
[67] *E.g.*, Aug. 25, 2010 DCAA AFEB Presentation, USA Bates 0000075; Aug. 25, 2011 DCAA AFEB Presentation, USA Bates 0001236 at -257 to -278; Aug. 25, 2011 RC North AFEB Customer Briefing, USA Bates 0001236 at -319 to -323; Aug. 25, 2011 RC Northeast AFEB Customer Briefing, USA Bates 0001236 at -311 to -317; Feb. 20, 2012 DCAA AFEB Presentation, USA Bates 0000743; Feb. 20, 2012 RC North AFEB Customer Briefing, USA Bates 0000772; Feb. 20, 2012 RC Northeast AFEB Customer Briefing, USA Bates 0000762; Aug. 3, 2012 DCMA AFEB Presentation, USA Bates 0001441.
[68] Marks Dep. 37:5-38:24.

23

for food services, etc.) but into broad overall categories (that is, cost control 20%, technical performance 40%, project management 20%, and cost/schedule management 20%).[69]

This scoring is a reflection of how subjective the Award Fee process is, a fact that Mr. Lyle does not seem to take into account. There were no objective criteria, contractual or otherwise, for the AFEB members to apply in assigning Fluor an award fee. It is similar to how sports that are "judged," such as gymnastic competitions, are scored. In gymnastics for example, skill, complexity, and execution are components, but judges routinely reach wildly different scores because the athlete's performance is, in many respects, in the eye of the beholder.[70] When I served on Award Fee Boards, I would consider areas where the contractor performed above minimum contract requirements, the environment, and how important those areas were for the mission. I would look at the scale of adjectival ratings, try to match the contractor's strengths in important areas for the mission, and make my own personal judgment of an appropriate score. Other Board members might view the information entirely differently and place emphasis on different issues. For example, I was once the chairperson on an AFEB for a BOS contract in Egypt with a member who told me that he would give the contractor the maximum score because the contractor baked warm chocolate chip cookies he liked. We discussed that these cookies were not a contractual requirement but the board member continued to give the contractor high scores.  It is not clear whether, and to what extent, the chocolate chip cookies continued to influence that board member's score but these were still included in the evaluation.

The fact that different Board members bring different perspectives is precisely why boards have multiple members. Having multiple members also allows the chairman to exercise discretion to exclude outliers. For example, BG Felix Gedney of the United Kingdom participated in the final AFEB and gave Fluor the lowest scores of all the members.[71] BG Gedney even gave Fluor a 0 for cost control noting his belief in his comments that Fluor was doing "too good of a job," possibly indicating, in his subjective opinion, that the services must be too costly.[72] The AFEB calculated Fluor's scores including and excluding Gedney's inputs, and the AFDO's final score was the result excluding BG Gedney's scores.[73] In addition, BG Gedney's 0 score for cost control is the only 0 that was ever given by a board member and all of his scores were disregarded by the AFDO. BG Gedney appears to have give the 0 because he thought Fluor was performing too far above minimum standards.[74] It appears from the records that BG Gedney's scores were excluded as

---

[69] *E.g.*, Oct. 12, 2011 Award Fee Decision Letter, USA Bates 0001166; Apr. 3, 2007 Award Fee Plan, USA Bates 0001495 at -507.

[70] Also like gymnastics scoring, performing easier skills well will generally achieve a lower score than performing more difficult skills well. In my experience, AFEB members will also typically give a higher score for areas that they consider important for the mission for which the Contractor's performance is above the minimum requirement.

[71] Report Chart (undated), USA BATES 0001479.

[72] Aug. 3, 2012 AFEB Notes, USA BATES 0001667 at -670.

[73] Oct. 2, 2012 Award Fee Decision Letter (awarding Fluor an overall rating of 81), USA Bates 0001473; Score Report Chart, USA Bates 0001479.

[74] Aug. 3, 2012 AFEB Notes, USA BATES 0001667 at -670

24

**Plaintiffs' Trial Exhibit 817**
**Page 26 of 68**

unduly "harsh," though I did not find any examples where board members' scores were excluded because they were unduly positive.

There is no way to explain, especially after the fact, how a particular board member reached his or her score; even the brief, available shorthand notes do not paint anything close to a complete picture. Each score is subjective and left to the individual.[75] Based on the records, in every AFEB, each board member received the same information, on the same four topics, and awarded different scores. If it is not possible to gauge why a Board member gave a particular score in a particular area based on the information actually provided in the AFEBs, then it is pure speculation to guess what an AFEB would have done had the information been different. Accordingly, only guesswork would lead to the conclusion that, had the AFEBs at issue received information consistent with Relators' allegations, the score would have been zero. This is particularly true with respect to property administration, which was not assigned to one of the four criteria, and was briefed by different organizations under different criteria.[76] My opinion is consistent with Mr. Marks' testimony that he cannot say how the score would have been different had Fluor's performance been worse.[77] Indeed, I note that Mr. Marks was never asked to provide the conclusion that Mr. Lyle has reached. The sole award fee witness did not testify that Fluor would have received a zero award fee score based on the information Relators' counsel provided him.

Once the Board comes up with a score, it submits this information as a recommendation to a senior government official (the AFDO) who then determines the score given to the contractor and the associated amount of fee the contractor will receive.[78] In reaching the decision, in my experience, the AFDO may or may not follow the AFEB recommendation if his own subjective evaluation differs from that of the AFEB. At the end of the process, the contractor receives a letter that informs the contractor of its score and the corresponding award fee it has earned while also providing feedback on where the Government assessed that the contractor exceeded minimal contractual requirements and identifying areas for improvement. In my experience, these letters too are merely summaries and the comments are not organized in any particular area of importance (except potentially the initial paragraph). Accordingly, the fact that there may be a stray comment about property management in an award fee letter does not mean that the award fee determination was based on property management. There is simply no way to assign any particular weight to such statements (which represent only a line or two in a several-page letter).

Because of the dollars involved and the criticality of this mission there was significant oversight of the Boards. The AFDO would submit his or her determination to the Head of

[75] Marks Dep. 214:1-215:21.
[76] E.g., Feb. 20, 2012 Briefings, USA Bates 0000713 at -739 (Fluor put property management under Cost Control; FLUOR-SR_0006817165 at -166 (DCMA put property management in Cost & Schedule Management; USA Bates 0000743 at -747 to -749 (DCAA put property management in Project Management).
[77] Marks Dep. 283:21-284:2.
[78] E.g., AFEB Chairman Memorandum to AFDO re Award Fee Recommendation Report, USA Bates 0000258 (Nov. 2010); USA Bates 0001147 (undated); USA Bates 0000944 (Mar. 2012); USA Bates 0000562 (Mar. 2011).

25

Contracting Activity (HCA), who would perform a reasonableness check to ensure that the AFDO's determination was reasonable based on the record and the assessment criteria.[79] When I served as the SCO in a role similar to the HCA in this instance, I was responsible for similar assessments to ensure the reasonableness of the determination.

Only after the AFDO makes a determination that is approved by the HCA and issues Fluor a score with a resulting award fee number, does Fluor submit an invoice for the award fee amount. In other words, Fluor does not invoice for award fee until after the AFDO's determination is made and finalized.

In light of the above, for multiple reasons, I disagree with Mr. Lyle's conclusions that, had different information been presented to the AFEBs, Fluor's ratings would have corresponded to a rating of "Unsatisfactory" making Fluor ineligible for an award fee. First, Mr. Lyle seems to ignore the plain language of the award fee criteria that makes clear that the Government was assessing Fluor's "overall" performance "in the aggregate." As discussed above, Fluor only needed to perform above a D in the aggregate to merit an award fee. There is no evidence to indicate, nor does Mr. Lyle identify any evidence, that Fluor failed to successfully perform on the LOGCAP mission as a whole in each AFEB period. Second, Mr. Lyle places great weight on certain particular issues, assuming the Government would have weighed his concerns similarly. He asserts that Fluor "engaged in deception in terms of concealing information from the government and award fee boards about how it was performing" and then discusses Fluor's property management, LTDDs, service order response and repair times, and allegedly excessive labor and property and material costs.[80] I disagree with Mr. Lyle's conclusions about these alleged "themes," but, more importantly, these areas were but a small percentage of the overall scope of Fluor's services under Task Order 5. They also did not represent the most critical areas to the Government, in my experience, which would have included water, fuel, DFACs, power generation, firefighting, and so on.[81] Third, the record reflects the Government was aware of many of the issues that Mr. Lyle raises and took appropriate measures to remedy the shortfalls.[82] In my opinion, even if Fluor was having performance issues that the Government was not fully aware of in these areas, this would not justify a conclusion that Fluor's performance in the aggregate was unsatisfactory. In addition, no one could say what, if any, impact these purported deficiencies would have had on Fluor's award fee scores given the subjective nature of AFEB determinations. Therefore, it is my opinion that it

---

[79] *E.g.*, Independent Review and HCA Certifications of Award Fee Determinations, USA Bates 0000952; USA Bates 0001171; USA Bates 0000588.

[80] Lyle Report at 20-30.

[81] As discussed above, I recognize that responding to service order requests in a timely fashion, particularly those related to life, health, and safety, is an area of importance to the customer. Yet, as also discussed, there is no evidence that the Government itself shared the Relators' view that Fluor was not meeting its service order obligations.

[82] *E.g.*, Feb. 10, 2011 AFEB Recorder Notes (identifying significant concerns with three failed PMSAs in a row), USA Bates 0000478 at -493; Fluor AFEB Self-Assessment: Evaluation Period 3, USA Bates 0001657 (discussing 2010 PMSA CAP).

**Plaintiffs' Trial Exhibit 817**
**Page 28 of 68**

is impossible to second guess the AFEB scores Fluor received and therefore impossible to conclude that Fluor's scores would have been lower.

Finally, I note that Relators' suggestion that Fluor somehow concealed property and materials management challenges from the AFEB is not supported by the record. Colonel Holt noted this during the 10 Feb 2011 Award Fee Board, "I don't believe the contractor's numbers on LTDDs but they don't have accountability of property." At the same Board, LTC Lee noted "Poor accountability, so LTDD may be skewed."[83] However, Fluor still received an award fee.[84]

### 4.    Conversion from CPAF to CPFF

On 5 March 2013, the Government converted Task Order 5 to a Cost Plus Fixed Fee Contract (CPFF) with a single negotiated fixed fee of 5.87%.[85] This conversion occurred as part of negotiations concerning a "complete re-baselining" of Task Order 5, to include negotiation of a retroactive award fee to be applied to prior periods of performance, negotiation of a fixed fee for OY2 and all future years, and definitization of prior periods of performance.

In my experience, for the Government to convert to a CPFF, it had to first determine that the burden (which included deployment of personnel to a warzone to participate in the Boards) and cost of the award fee administration was no longer warranted, given Fluor's satisfactory performance, in particular its responsiveness to the Government's evolving priorities. In other words, the Government no longer needed the carrot of an award fee to incentivize Fluor's performance, so it concluded it was in the Government's best interest to convert the contract to a fixed fee and avoid the costs and burden of the AFEBs. Once the contract was converted to CPFF, Fluor would receive the fixed fee unless its performance was so poor that it was terminated for default.

With respect to the negotiation of award fee percentages for prior periods of performance, the Government PNM describes its negotiating position: "[f]or POPs prior to OY2, the award fee scores and associated percentages earned were combined with the base fee to determine an applied fee percentage. This method was utilized to simplify the negotiation process. It resulted in an OY1 fee percentage of 4.46%, and an FOC percentage of 4.21%. Due to the inherent complexity of the Transition/IOC POPs, the PARC agreed to a fee adjustment of 4.85%, including both base and award fee earned."[86] The PNM thus reflects that while the Government considered prior award fee percentages, senior contracting personnel negotiated an increase to the fee Fluor earned for several of these prior periods of performance. As discussed further below, even this was only one piece of much broader negotiations.

---

[83] Feb. 10, 2011 AFEB Recorder Notes, USA Bates 0000478 at -498.
[84] Apr. 12, 2011 Award Fee Decision Letter, USA Bates 0000585.
[85] Task Order 05 Modification 60, FLUOR-SR_0005223428 at -430.
[86] The PARC is the Principal Assistant Responsible for Contracting, who here, was the Executive Director for Army Contracting Command, Rock Island (ACC-RI). The PARC was responsible for functional contractual oversight of the organization of which the PCO was a part.

27

To calculate the fixed fee for OY 2 and going forward, "[t]he Government utilized four different methodologies to establish a pre-objective fixed fee range of 5.4% - 5.87% for OY2 [Option Year 2]." In my experience, the Government typically uses Weighted Guidelines when assessing profit margins.[87] Here, the Government's Weighted Guidelines calculation yielded a 5.4% fixed fee.[88] But the Government did not end the analysis here. It went on to perform other calculations, including looking to other contracts that the Government apparently believed were comparable. In my opinion, the record indicates that the Army may have been searching for a way to justify a higher, more fair fee percentage. At a minimum, the PNM indicates that the prior award fees were just one source of information considered and it is unclear if they played any role in the Government's agreement to a 5.87% fixed fee. In addition, the PNM states that the 5.87% fixed fee "was negotiated and settled at the PARC level."[89]

Based on the PNM, I disagree with Mr. Lyle's conclusions about the impact that Fluor's prior award fee scores had on the fixed fee.[90] While Fluor's prior award fees were discussed, the Government considered many other factors to arrive at what it considered a fair and reasonable fixed fee going forward. I also disagree that you can draw any conclusions from the PNM about the impact that prior award fee percentages had on the negotiated fee percentages for Transition through OY1. During the type of multifaceted negotiations that occurred here, different objectives are traded off to reach an agreement. The fee percentages on which the parties ultimately agreed reflect the back-and-forth of negotiations to reach a final settlement. Furthermore, the fee negotiations occurred together with negotiations regarding definitization of prior periods of performance. As the Government PNM states, the goal of the negotiations was to resolve all of these issues: "[t]he primary intent of this negotiation was to settle on a fair and reasonable not to exceed cost for purposes of cost control as well as applying fee."[91] Witnesses have described this as a complete re-baseline negotiation.[92]

Accordingly, in my view, it is impossible to conclude what impact, if any, the prior award fees had on any portion of the negotiated settlement. Further, there is no way to reliably determine that had the award fee scores been different, the outcome of the re-baseline negotiations would have been different, for all of the reasons discussed in the award fee section of my report. The outcome reflects a negotiated settlement that both parties were willing to agree to, nothing more.

I also disagree with Mr. Lyle's assertion that DCMA reported "significant overruns" by Fluor during the first AFEB, which he claims are "indicative of a failure to understand the scope

---

[87] Weighted Guidelines are a Government tool that uses various factors to determine a fair and reasonable profit on a Government contract.
[88] Mar. 5, 2013 Army PNM, DCAA-SR0000263590 at -599.
[89] Mar. 5, 2013 Army PNM, DCAA-SR0000263590 at -607, 610.
[90] Lyle Report at 69-70.
[91] Mar. 5, 2013 Army PNM, DCAA-SR0000263590 at 609.
[92] Fluor Rule 30(b)(6) Dep. 633:2-13.

28

**Plaintiffs' Trial Exhibit 817**
**Page 30 of 68**

and complexity of the requirement and implications were not reported to the government."[93] One of the significant purposes of the definitization and re-baseline was to definitize the additional costs that Fluor had incurred because the scope of the mission was significantly larger than what Fluor had been contracted to perform. As previously noted, the Government's assumptions provided to Fluor pre-transition were based on "notional scenarios" that were nothing like the "conditions on the ground."[94] The camp sizes, number of facilities, number of services, population, etc. far exceeded the assumptions under which the Task Order was awarded. This change in the scope of the contract led to costs that had not been previously definitized or foreseen. These additional costs were not "cost overrun[s]" but were instead incurred in fulfilling expanded contractual requirements in unexpected conditions.[95]

In its PNM, the Army explicitly concedes this point. For example, the PNM describes how the 100 day transition was unachievable, many services needed to be adjusted due to the contingency environment and meeting the warfighters' needs, and the Government could not provide accurate headcounts at the FOBs. "[I]t became apparent that the notional band assumptions were, in many cases, inconsistent with the reality of conditions on the ground."[96] While DCMA at the time of these early AFEBs referred to "cost overruns," the Army later concluded these were no such thing when they subsequently definitized these costs and retroactively raised the award fee percentage. In fact, Fluor was performing at risk for the benefit of the warfighter.

Finally, there is also no evidence in the record that Fluor made misrepresentations, which the Government then relied on, during the negotiation of the 5.87% Fixed Fee.

### C.     Property and Materials Management

#### 1.     Contract Requirements

The contract uses a performance work statement (PWS), which provides requirements and minimal quality standards in some cases. It does not tell Fluor how to meet those standards. PWS 01.08 on Property Control states: "The Contractor shall submit a property control plan IAW Technical Exhibit F. All property shall be inventoried IAW the Contractor's Government approved property control plan and Federal Acquisition Regulation (FAR) Part 45."[97] This PWS provision contemplates that Fluor will have a system to manage government property, which is consistent with FAR 52.245-1(f) (2007 & 2012), which was incorporated by reference into the LOGCAP IV contract,[98] and requires contractors to "establish and implement property management plans,

---

[93] Lyle Report at 32.
[94] Combs Dep. 95:15-17.
[95] Id. 95:15-96:7
[96] Mar. 5, 2013 Army PNM, DCAA-SR0000263590.
[97] Feb. 20, 2009 Task Order 05 PWS, FLUOR-SR_0007844995 at -998.
[98] DCMA-FLUOR2201839 (Modification 03 to the LOGCAP IV contract incorporating the 2007 clause); FLUOR-SR_0011930763 (Modification 20 to the LOGCAP IV contract incorporating the 2012 clause).

29

systems, and procedures at the contract, program, site or entity level to enable the following outcomes . . . ."

In my experience, because the Government cares most about outcomes, not the way those outcomes are achieved, the Government did not specify the precise means Fluor would use to manage property. For example, the PWS does not require Fluor to use a certain system such as Maximo or direct exactly what Fluor must do to control property, such as conducting monthly 10% inventories. The PWS provided the requirements and Fluor responded with its plan to meet contractual requirements. The Government approved the plan. The reason the Government will ask that the contractor prepare a plan is to make sure the contractor understands the requirement and has a reasonable plan to meet it. But it is just a plan; the contractor is not contractually required to follow every detail in that plan as long as the service is performed. Fluor was required to gain Government approval only if it wanted to significantly deviate from the plan. None of this means that the details of the plan itself became specific contractual requirements even if the Government approved the plan.

The PWS included almost nothing about property management, which, in my opinion, underscores the relative priority of this service as compared to others. The PWS requirements cited above is tied to the promulgation of Technical Exhibit F, which presumably would inform Fluor what the requirements of the property control plan would be. However, at the time the PWS was first issued in Feb. 2009, there was no Technical Exhibit F, which itself did not appear until September 2010.[99] Even then, it did not contain guidance on what should be in Fluor's property control plan.[100] In fact, Technical Exhibit F said nothing about the subject. In my view, this oversight casts doubt on whether Fluor had any contractual requirement relating to property management. However, Fluor took it on itself to self-define the property control system in the absence of Government direction.[101]

I understand that Fluor decided that its Government Property Control System (GPCS) would represent its property control plan. The GPCS was periodically provided to the GPA for review and approval.[102] Having perused the GPCS, I note that very little of the document relates to conducting inventories. As noted, the PWS requires: "All property shall be inventoried IAW the Contractor's Government approved property control plan and Federal Acquisition Regulation (FAR) Part 45." PWS 1.08.[103] In turn, the GPCS has a Physical Verification Inventories section, only the first three paragraphs of which discuss the manner and means for conducting

---

[99] Fluor Rule 30 (b)(6) Dep. 593:20-595:14.

[100] Fluor Rule 30(b)(6) Dep. 595:20-596:12; Technical Exhibit F, FLUOR-SR_0007876401.

[101] Fluor Rule 30(b)(6) Dep. 596:9-597:9.

[102] Fluor Rule 30(b)(6) Dep. 43:6-49.1; 597:2-14; Sep. 19, 2011 Orashan Letter Approval of Fluor's GPCS, RELATORS 010133; Feb. 26, 2015 Rash email to Loomis forwarding McNamara GPCS approval, FLUOR-SR_0009283831.

[103] FAR Part 45 does not impose any obligations on contractors whatsoever. It specifies how the Government should manage contractors' management of property.

30

**Plaintiffs' Trial Exhibit 817**
**Page 32 of 68**

inventories.[104] Therefore, I believe that the contractual requirement was for Fluor to follow the first three paragraphs of the Physical Verification Inventories section.[105]

These paragraphs required Fluor to conduct periodic and physical inventories, e.g., daily random spot checks, monthly, quarterly, or 10% cyclic counts throughout the year.[106] The GPCS did not require Fluor to conduct any particular type of periodic and physical inventories, and provided Fluor the discretion to satisfy this requirement by conducting various types at various times. Fluor also testified that that the question as to which part of the GPCS met the requirement of PWS § 01.08 never came up in the course of LOGCAP IV Task Order 5 contract performance and has been raised only in this lawsuit.[107] I am not at all surprised by this statement, as, in my experience, on a contract like LOGCAP, the Government does not wade into the details as to how and under what circumstances a contractor conducts inventories.

As noted above, the LOGCAP IV contract also incorporated by reference first the 2007 and then the 2012 versions of FAR 52.245-1. This FAR clause was consistent with Fluor's GPCS and requirement for physical inventories only required a contractor subject to the clause to conduct inventories periodically. FAR 52.245-1(f)(iv) (2007 & 2012). Accordingly, Fluor was not contractually obligated to conduct periodic inventories of any particular type or frequency, including 10% monthly inventories. When I was the DCMA Commander Middle East in Kuwait, we would check to see if the contractors were conducting inventories, often using a 10% monthly inventory as a benchmark, notwithstanding the fact that this was not a contractual requirement. Many of the contractors did not meet this benchmark every month and we typically did not write them up for not meeting their plans. What we were focused on instead was whether the contractors were conducting inventories at all, including inventories by exception, so that by the end of the year they would have inventoried most everything at least once. While Fluor was not contractually obligated to inventory every line of material by the end of the year,[108] I understand that Mr. William Walter has concluded that Fluor's Maximo data shows inventories of 99% or greater of its material lines of inventory in each of the full fiscal years for which Maximo data is available. Accordingly, the evidence demonstrates that Fluor satisfied its obligation under the FAR to conduct periodic inventories.

In addition, I disagree with Mr. Lyle that Fluor's deployment of pre-PMSA teams to prepare for PMSAs was improper or indicative of a "cultural flaw" or "unethical behavior."[109] As discussed below, here, the Government knew that Fluor had a pre-PMSA team that would do self-assessments and help the site prepare for the PMSAs because Fluor gave the pre-PMSA reports to the Government. This is consistent with my experience, which is that all contractors prepare for

---

[104] Sep. 1, 2011 GPCS FLUOR-SR_0011564682 at -691 to -692.
[105] See also Fluor Rule 30(b)(6) Dep. 599-603.
[106] Sep.1, 2011 GPCS 9-10, FLUOR-SR_0011564682.
[107] Fluor Rule 30(b)(6) Dep. 600:10-601:10.
[108] See Sep. 1, 2011 GPCS FLUOR-SR_0011564682 at -691 to -692.
[109] Lyle Report at 79-80.

31

**Plaintiffs' Trial Exhibit 817**
**Page 33 of 68**

PMSAs and other forms of inspections to the Government's benefit. PMSAs were not intended to be a "pop quiz," and it would frankly be concerning if a contractor did not prepare for a test it knew it was coming.

2.     FAR 52.245-1 Requirements Regarding Sharing Findings from Internal Self-Assessments

FAR 52.245-1 states that the "Contractor shall establish and maintain procedures necessary to assess its property management system effectiveness and shall perform periodic internal reviews and audits. Significant findings and/or results of such reviews and audits pertaining to Government property shall be made available to the Property Administrator." FAR 52.245-1(f)(3) (2007); FAR 52.245-1(b)(4) (2012).

As DCMA Commander and CO, I administered contracts that incorporated this FAR clause. On such contracts, I was obligated to ensure the contractor had an adequate system to protect government property. Among other things, I measured adequacy by looking at results of Government audits and reviews of the contractor's property management system, which typically were conducted by Property Administrators. As a rule, I did not rely on self-assessments by contractors and I certainly do not read the requirement as an affirmative obligation to provide any self-assessments, much less all of them.

FAR 52.245-1 required Fluor to make its significant findings available; it does not specify how such findings were to be made available. I do not read the language to "push" all (or any) reviews or audits to the Government. Had that been the requirement, it would have been simple enough for the FAR drafters to define it or for the PWS and Technical Exhibit F to include all property self-assessments on the Contract Data Requirements List.

As for "significant findings or results," here too the clause leaves their identification to the contractor's discretion. Like award fee evaluations, one person's "significant" findings could not be "significant" to another. Based on my experience, I would consider "significant" and expect to be notified of a finding or result from an internal assessment or review that negatively impacted combat operations.[110] I am aware of no such finding in this case.

My view is consistent with Paragraph 1.3 of the LOGCAP IV contract, which emphasizes the importance of mission critical services:

> the requirements to be executed under this LOGCAP contract are often mission critical services for the U.S. military. It is therefore of the utmost importance that performance be both effective and efficient. Poor execution, management, or cost control can impact U.S. military's ability to execute its national defense objectives. Such critical performance by the contractor necessarily requires a significant confidence, faith, and trust the contractor will protect the interests of the U.S.

---

[110] Riley Dep. 142:9-144:21

32

Plaintiffs' Trial Exhibit 817
Page 34 of 68

military in the performance of this contract, as well as protecting its own interests. The contractor's responsibilities under this contract should be viewed in this vein.[111]

I disagree with Relators' experts to the extent they suggest that conducting periodic physical inventories rose to the level of a mission critical service or impacted the military's ability to execute its national defense objectives.

In addition, Mr. Lyle and Mr. Rudolph fault Fluor for not providing all types of internal assessments it was conducting.[112] They focus heavily on the functional assessment reports prepared by Fluor's Training and Assessment (TAT) team.[113] But several of the PMSA reports issued by the DCMA PAs actually reference functional assessment reports,[114] which indicates that the PAs, including the Prime PA Maria McNamara, were aware that Fluor was conducting such functional assessments. The reports were therefore available for the asking had the DCMA considered them sufficiently important to pull. Instead, it appears that either the Government considered the PPMSAs sufficient for their purposes or they requested and received the other internal assessments.

I also note that the record of internal inspections also provide substantial evidence that Fluor was acting in good faith and attempting to determine the root causes of its challenges with property management and correct those issues. And the significant record of internal audits, inspections, and reports is a strong indicator that Fluor was not attempting to hide anything. If Fluor was attempting to conceal poor performance from the Government, the last thing Fluor would want to do is to document such performance through tomes of internal communications identifying shortfalls. Relators' experts themselves reference a long list of these internal communications, audits, inspections, and reports throughout the entire period, which highlights the robust, multi-faceted oversight Fluor management put in place in the combat zone to assess, identify root causes, remedy, and alleviate future occurrences of challenges.[115] And, if Fluor's intention was to conceal property management deficiencies, I question why it would routinely provide PPMSA reports to the Government which themselves documented them.

### 3.    Other Property-Related Opinions

Mr. Lyle and Mr. Rudolph both claim that Fluor's property and material "deficiencies" resulted in increased costs to the Government when Fluor ordered materials that were already on

---

[111] LOGCAP IV, FLUOR-SR_0011080668 at -681.

[112] Lyle Report at 34-35, 49-50, 60, 75-76; Rudolph Report at 47-48, 53-55.

[113] E.g., Lyle Report at 29 n. 36; Rudolph Report at 54 n. 118.

[114] See, e.g., April 20, 2013 Sabalu-Harrison PMSA, FLUOR-SR_0008018442 at -446; July 24, 2012 Spann PMSA FLUOR-SR_0006287040 at -045.

[115] Lyle Report at 24, 29, 35-36, 59, 77; Rudolph Report at 42, 44-67, 71-72, 75. Among the internal assessments cited by Lyle and Rudolph are Fluor Internal Audit reports prepared by its Internal Audit function. In my entire career I do not think I've ever seen a contractor's Internal Audit report. These are typically considered proprietary.

33

hand.[116] First, the contract does not require Fluor to "cross-level" property or materials. They do not cite to any evidence that quantifies the extent of this so-called "over ordering" nor do they show that Fluor did not effectively manage its inventory as a whole. In my experience, it is prudent for a contractor (or the military for that matter) to have sufficient supplies on hand to ensure that, in the event of a disruption of its supply lines caused by conflict or other contingencies, that it would not be caught short. Furthermore, so-called "over ordering" at any given time does not necessarily mean items were not later consumed on the contract or put to other good use. I cannot draw any conclusions from the internal Fluor documents Mr. Lyle and Mr. Rudolph cite to support their opinions without context. I have no way of knowing the basis behind these internal documents, or what happened before or after, and therefore cannot jump to the same conclusions that Mr. Lyle and Mr. Rudolph do in their respective reports.

Finally, I note that just as the Government failed to provide Fluor with a list of property transferred to Fluor's custody at Transition, the Government also failed to provide an accurate list of material being transferred from Iraq to Afghanistan. I had personal involvement in the transfer of this material. There was a rush to transfer property out of Iraq. As a result, all sorts of items were thrown haphazardly into CONEXs and shipped to Afghanistan. There was no rhyme or reason to what went into the containers. While I do not fault the Government given the exigencies at the time and the political environment, its failure to provide Fluor with an accurate list of the property being transferred to Fluor added substantially to the burden to Fluor to get accountability of the property.

### D.    Business Systems Disapproval

In my extensive Government experience, I have never had a contractor who had a business system approval revoked. Disapproval of any business system is a significant event that negatively impacts both the Government and the contractor. System disapproval results in additional Government oversight and burdens. So it is actually in the Government's interest to work with the contractor to, if possible, avoid a system disapproval. The former Property Administrators' testimony in this case supports my opinion.[117]

Theoretically speaking, the Contractor may be liable for loss of Government property furnished or acquired under this contract when the loss "is the result of willful misconduct of lack of good faith on the part of the Contractor's managerial personnel." FAR 52.245-1(h)(1)(ii) (2012). The FAR defines "Contractor's managerial personnel" as "the Contractor's directors, officers, managers, superintendents, or equivalent representatives who have supervision or direction of— (1) All or substantially all of the Contractor's business; (2) All or substantially all of the Contractor's operation at any one plant or separate location; or (3) A separate and complete major industrial operation." FAR 52.245-1(a)(3) (2012). I have never had to interpret this part of the

---

[116] Lyle Report at 28-29; Rudolph Report at 17.
[117] McNamara Day 2 Dep. 97:4-98:9.

34

**Plaintiffs' Trial Exhibit 817**
**Page 36 of 68**

clause and assess who may qualify as a contractor's "managerial personnel." Based on my review of the clause, at most the Fluor Country Manager in Afghanistan may have qualified as "Contractor's managerial personnel." FAR 52.245-1(a) (2012). This is because the clause contemplates that only a very senior employee would qualify. This makes sense. It would be unreasonable for the Government to hold Fluor as a company responsible for the willful misconduct or lack of good faith of an individual who, for example, was responsible for a single department or a single site. I say that "at most" the Country Manager because I am not sure that even this person is sufficiently senior enough within the organization for the entire company to be held responsible based on his conduct. I also note that "willful misconduct or bad faith" is also a very high standard that requires significant, deliberate misconduct and not negligence or even gross negligence.

FAR 45.105(b) and DCMA Instruction 131 lay out the formal process by which a contractor's property management system could be disapproved. In my opinion, a Letter of Concern such as the one sent by Storme Guaraldi to Fluor in December 2010 is not the appropriate way to initiate this formal process. In addition, this letter does not state as required by FAR 45.105(b) that Fluor's property management system did not comply with contractual requirements. It only states that "DCMA is concerned about LOGCAP IV TO 0005 systemic problems associated with Fluor's ability to maintain the right type and number of resources in place to accurately receive, inventory, maintain equipment and materials throughout Task Order 0005."[118] The letter itself simply indicates that, in future, DCMA may consider revoking approval of the property system if sufficient improvement is not made. I believe it was meant to be an "attention grabber" to demonstrate the Government's concern, but has no other contractual significance in the way that a corrective action request or a "show cause" letter might.

### E.     Service Orders

The PWS contains the following definitions:

- Emergency Service Order: "Emergency repairs are situations that affect life, health, safety and FP [Force Protection]. Situations which present an immediate danger to the occupants will be immediately reported to the ACO for direction. Situations that present imminent danger shall be halted, ceased, or blocked as necessary until remedial action is taken."

- Urgent Service Order: "Urgent repairs are non-life threatening."

- Routine Service Order does not have a definition.[119]

Technical Exhibit H contains the Performance Requirements. These were modified throughout the life of the contract as described below.

---

[118] Dec. 17, 2010 Guaraldi Letter of Concern to Fluor, FLUOR-SR_0012055225
[119] Feb. 20, 2009 Task Order 05 PWS, FLUOR-SR_0007844995 at -005.

35

**Plaintiffs' Trial Exhibit 817**
**Page 37 of 68**

At the time Task Order 5 was awarded, the following standards applied:

- Emergency Service Orders must be responded to within 2 hours 100% of the time and the ACO must be notified within a 2 hour time period if repairs cannot be accomplished.

- Urgent Service Orders must be responded to within 24 hours 100% of the time and repairs shall be completed within 72 hours 75% of the time.

- Routine Service orders must be responded to within 72 hours 100% of the time and repairs shall be completed within 14 days 75% of the time.[120]

With Modification BG, dated 05 January 2017,[121] the standards were revised to the following: "Ensure all inspections; maintenance and repairs are accomplished on schedule at least 75% of the time."

- Emergency Service Orders must be responded to within 2 hours 100% of the time and the ACO must be notified within a 2 hour time period if repairs cannot be accomplished.

- Urgent Service Orders must be responded to within 24 hours 75% of the time and repairs shall be completed within 7 days 75% of the time.

- Routine Service orders must be responded to within 72 hours 75% of the time and repairs shall be completed within 28 days 75% of the time.

In my experience, the contractual requirements discussed above are fairly standard for Government BOS contracts. The contractual definitions of each of the types of Service Orders are vague and require the contractor to exercise judgment to determine how to classify each service request. For instance, if a door lock to a housing unit was broken, it could be argued that it is an Emergency Service Order, based on the lack of security. It could also be classified as an Urgent Service Order or even a Routine Service Order. Here too there is subjective judgment involved. Of course, the person making the complaint is going to want to push it up the priority list so it is fixed sooner. However, the contractor (here, Fluor) was tasked with classifying all Service Orders and evaluating their relative priority levels. In accomplishing this task, Fluor would have had a more fully informed view about how similar service orders were treated in the past and what other work needed to be accomplished. The soldiers on the ground could always engage with the COR or DCMA if they believed that their service request was misclassified. In my experience, the COR or DCMA would engage with the contractor to ensure that the classification was reasonable and appropriate. I have not seen any evidence in the case record that there was any widespread misclassification of service orders by Fluor.

---

[120] Task Order 05 (instructing that Fluor fulfill all requirements outlined in the Feb. 20, 2009 PWS), FLUOR-SR_0008004287; Feb. 20, 2009 Task Order 0005 PWS, FLUOR-SR_0007844995 -at 041 to -042.
[121] Task Order 05 Modification BG, FLUOR-SR_0005223949.

36

**Plaintiffs' Trial Exhibit 817**
**Page 38 of 68**

To evaluate Relators' allegations that Fluor improperly inflated their response and repair times for service orders, it is important to place Fluor's service order work in context. Unlike some of the other tasks Fluor performed under Task Order 5 (such as property and materials management), Fluor's repair and maintenance work was customer-facing. In many instances, customers called in the problems that required repairs or even personally went to the service desk with requests. These were issues that directly affected that individual making the complaint and were deemed important enough for the individual to raise a concern. My opinion is that Relators' assertion that Fluor consistently failed to reasonably address required repairs without the government's knowledge is not credible. In my experience, the customer will not tolerate contractor failures to reasonably respond to service order requests and will raise these concerns with the COR, DCMA, the contractor, or anyone who would listen. DCMA, in turn, will ensure that the contractor addresses the requests appropriately. Therefore, if Relators were correct that Fluor did not reasonably respond to service orders, I would expect to see substantial evidence of that in the record, such as, for example, emails reflecting complaints from dissatisfied customers. However, I have seen no such evidence. I have seen isolated instances where concerns were raised about Fluor's response, which is to be expected in this environment, but I have seen no evidence of widespread failure to appropriately respond to service requests.

With respect to emergency (Priority 1) service orders in particular, Relators' allegations are even less credible. Promptly addressing and remedying dangerous conditions was one of Fluor's most important responsibilities under LOGCAP IV. It was also a very high visibility area for the Government. In January 2008, on a similar LOGCAP Task Order in Iraq, a soldier was electrocuted.[122] Based on my own experience, this incident led to substantially increased scrutiny of contractors under LOGCAP, especially as they tackled correcting facilities which presented immediate danger to the occupants. In light of this heightened scrutiny, in my view, it is not credible that Fluor failed to remedy higher level service orders and somehow hid that failure from the government. If dangerous conditions had been rampant across theater, I would anticipate seeing substantial evidence of this in the record. I have seen no evidence of this in the documents I have reviewed.

I also understand that Relators and their experts have raised concerns about Fluor's approach to the "response time" for service orders. Mr. Lyle criticizes Fluor for "simply ma[king] up" a definition of response time for Priority 2 and Priority 3 service orders that "contradicted the definitions in Fluor's procedures." I disagree with Mr. Lyle's criticism for several reasons. First, the "Fluor procedures" Mr. Lyle refers to were internal Fluor documents developed early in the project setting forth a plan for how Fluor at that time intended to execute the project.[123] These documents did not set forth contractual requirements and Fluor had discretion to deviate from them

---

[122] *Multiple Failures Lead to Iraq Electrocution, Pentagon Says,* CNN, https://www.cnn.com/2009/US/07/27/military.electrocutions/
[123] Fluor 30(b)(6) Dep. 427:3-428:14, 440:13-441:1.

37

as needed as the project progressed.[124] Second, in my view, Fluor's approach to response time was reasonable under the circumstances. I understand that for Priority 2 and Priority 3 service orders, Fluor treated the response time as the time the tradesperson began to perform work related to the service order; in some cases, this may have occurred before the tradesperson actually set foot on the location where the repair was required.[125] This is reasonable and efficient; for service requests that occurred frequently and for which the method of repair was understood in advance, it would not make sense for a tradesperson to first go to the site and then go get the materials. That likely would unnecessarily delay the repairs. Third, Fluor's approach to response time does not violate any contractual requirement. The contract does not define response time, which meant the contractor had to exercise judgment in determining how to calculate it. The lack of a response time definition in the contract also indicates to me that Fluor's internal processes for completing repair work were not particularly important to the Government. If they had been, the Government would have contractually directed a particular method or would have inquired of Fluor about its approach and informed Fluor whether its approach was acceptable. I have not seen any evidence in the record that this occurred. That is consistent with my expectation that what the Government cared about was making sure the service requests were reasonably and appropriately addressed in a timely fashion. As long as Fluor did that, I would not expect the Government to be particularly concerned with Fluor's internal processes for accomplishing those repairs.[126]

In addition, Mr. Lyle and Mr. Rudolph both express the view that Fluor's response and repair times in Maximo were not realistic. I do not believe they have any factual basis to make these statements. I would expect that DCMA personnel in theater were closely monitoring Fluor's service order work, including response and repair times. Those personnel were familiar with the work to be performed, the facilities, where those facilities were located relative to other facilities, and how to get to those locations. Had Fluor's numbers been "too good," as Mr. Lyle and Mr. Rudolph suggest, I would have expected DCMA to have raised questions and required Fluor to provide an explanation. Again, I have seen no evidence that DCMA had any such concerns. In fact, DCMA reported very similar response and repair times in AFEBs. I am confident DCMA would not have done so had they believed the data to be suspect in any way.

### F.    Personnel Levels

In accordance with the PWS:

> As identified in Section H, Clause H-4 of the RFP/TO, the Contractor's estimated cost base for the purpose of calculating fee <u>will only be modified</u> under the following circumstances: [Emphasis added]

---

[124] *Id.* 426:2-14.

[125] *Id.* 407:11-411:19.

[126] For the same reason, I do not believe it would have been material to the government whether Fluor "stopped the clock" when service orders were placed into waiting for material status. The government cared about whether the work was performed and had visibility into whether that in fact occurred.

38

**Plaintiffs' Trial Exhibit 817**
**Page 40 of 68**

i. Increases or decreases in the population of the Band which exceed +/-25% of the Band Population Base (see Clause H-5 (3) for pricing mechanism).

    a. The Band Population Base will be established at contract award by summing the FOB Band headcount for the number of FOBs awarded in the Band. For example, if there are 15 FOBs awarded in Band 4 the Band Population Base is established at 15,000.

    b. On the last day of each month the average population for the Band will be calculated by summing the average population of the FOBs within the Band. The population numbers used in this calculation will be reported by the Deputy Program Director for Afghanistan. The population numbers will be reported to the Contractor via PCO letter.

    c. <u>Population fluctuations within the +/- 25% window will be considered normal day to day operations and a change will not be considered to have occurred.</u> [Emphasis added]

    d. In the event the monthly average Band Population exceeds the +/- 25% of the Band Population Base, the Band Population Base will be set to the most recent monthly average. A change to the Supported population having been established, the parties will renegotiate the estimated cost base and negotiate an equitable adjustment to the base fee and award fee pool for the task order by multiplying the fee percentages awarded under the task order to the new estimated cost base.[127]

In other words, if the FOB population was 50,000 at the beginning of a month, Fluor was responsible for providing comprehensive life support for between 37,500 and 62,500 without any change to the estimated costs or fee. Additionally, Fluor was required to immediately provide comprehensive life support for any size of FOB increase or decrease in population-level with little to no notice.[128] In my experience, the Government puts a model like this in place to ensure contingency services are provided uninterrupted in a fluid combat zone. This model would have required any contractor to ensure there was adequate manpower in place to service significant population level increases. The lengthy time it took to hire and deploy employees (as discussed earlier) is also a significant consideration; Fluor had to have adequate staff in place to provide life support to the larger population number (i.e., 62,500 or more) even though the population could drop to 37,500.

Additionally, Fluor was responsible for providing critical services in the face of constant operational constraints and contingencies (such as repairing bomb-damaged fuel bladders, providing full service to the dining facilities even though the Deputy Combatant Commander,

---

[127] Task Order 05, FLUOR-SR_0008004287 at -207 to -298.
[128] *See* Feb. 20, 2009 Task Order 0005 PWS, FLUOR-SR_0007844995 at -997, -003, -027

39

**Plaintiffs' Trial Exhibit 817
Page 41 of 68**

USFOR-A, had directed Fluor to maximize the number of Afghanis on the contract and then restricted those Afghanis from entering the base, etc.).[129] For Fluor to successfully react to combat conditions, Fluor must maintain a workforce large and flexible enough to successfully perform routine tasks in addition to reacting to unplanned contingencies.[130]

Moreover, the Government had control and oversight of staffing, including stringent Government checks on how many employees Fluor was permitted to deploy. The Government required Fluor to request and justify each individual deployment.[131] In my experience, the Government closely evaluates contractor requests for additional personnel against the contract and mission needs. The Government then individually approves, or, as appropriate, disapproves, each request. In my experience, the Government does not rubber-stamp contractor requests to deploy additional personnel to theater. In other words, no one deploys to the theater without the Government's analysis and approval. I have no reason to believe the process worked any differently on Task Order 5.

Additionally, there is substantial Government scrutiny and oversight of contractor personnel levels after the personnel are deployed. For example, DCMA and DCAA perform audits of the numbers of individuals deployed and their jobs. The Government conducts audits to ensure the contractor has the "right" number of FTEs and is not charging for personnel not working on or not needed for the contract. DCAA conducts floor checks, during which DCAA professionals observe work, review timekeeping procedures, interview contractor personnel, and trace labor charges to contract requirements. DCMA, QAs, and CORs also surveil the labor force. Based on my review of the record in this case, the Government conducted all of the above oversight on Task Order 5. The Government's review included a check on whether Fluor had an "unreasonable" number of personnel based on that day's requirement plus potential contingencies Fluor might have to respond to. For example, in the first Award Fee Board, DCAA stated: "We conclude that Fluor <u>does not have an unreasonable number of personnel</u> located at FOB Shank. Fluor is <u>prepared for the necessary expansion projects and has the staff available to meet any short schedules required to provide support services for the increase of troops and personnel.</u>"[132][Emphasis added] This example illustrates the fact that the operating environment added unplanned labor requirements on Fluor and the Government expected Fluor to maintain staffing levels to be able to immediately respond, despite the fact that it took an average of 90-120 days to get new person into theater.

As I would expect, the Government recognized that there is a direct relationship between staffing and Fluor's ability to perform the mission. Therefore, although the Government closely scrutinized Fluor's staffing, even when the AFEB criticized what it saw as Fluor's failure to

---

[129] 7/1/2016 to 6/30/2017 LOGCAP IV Task Order 05 Interim CPAR, FLUOR-SR_0006534482 at -483.
[130] LOGCAP IV, FLUOR-SR_0011080668 -at 683.
[131] LOGCAP IV, FLUOR-SR_0011080668 at -741; Fluor 30(b)(6) Dep. 303:12-18; I spoke with Fluor employee Justin Jones who confirmed this requirement.
[132] Aug. 25, 2010 DCAA AFEB Presentation, USA Bates 0000075 at -082.

40

implement adequate cost avoidance measures, it recommended "that Fluor find ways to reduce labor costs <u>without jeopardizing technical performance</u>."[133] In my experience, understaffing could have led to contract failure and mission failure.

The documentation I have reviewed in this case is full of examples of Fluor successfully responding to unexpected requirements in the contingency environment. For instance, in the 07/01/2016—06/30/2017 CPARS input, the Government stated that, as a result of maintaining a proper level of manning, Fluor quickly reacted to unplanned, increased workload—a feat which would have been impossible if they were only minimally manned to steady-state requirements.[134] The record also reflects that Fluor demonstrated prudent judgment with respect to its level of manning in-theater. For instance, in the 07/01/2015 – 06/30/2016 CPARS input, the Government states that as the Government looked to draw down the number of contractors in the AOR, Fluor identified and implemented measures to decrease their deployment footprint. Under the Management section, the Government states, "During this rating period, Fluor's management demonstrated support of MG Bannister's 'Firm Investment' Contract Optimization Program by reducing excess contractor headcount throughout the rating period, thereby saving contract funds."[135] The Government assessed, "Fluor was cooperative and proactive in the development of Phase III drawdown objectives and strategies for reduction of contractor footprint, as well as providing input regarding services that could potentially be converted to fixed price."[136]

With respect to Mr. Sherman's criticism of Fluor's staffing levels during drawdowns, he does not consider what was occurring across Theater. The retrograde mission required a vast amount of contracted support to redeploy the troops and equipment en-masse. For instance, Fluor supported troops moving from smaller FOBs to larger FOBs (meals, beds, laundry, etc.).[137] Fluor also had to disposition equipment and material.[138] Once it was determined that the equipment and material would be redeployed, Fluor had to pack it up and arrange shipment. Fluor also had "clean-up duty" on the FOBs before the U.S. departed.[139] If Fluor failed to appropriately close FOBs, contraband could have been captured by the enemy. All of these demobilization tasks required a large contractor footprint to perform the mission.

Mr. Sherman criticizes Fluor's estimating for management and administration (M&A) personnel, including Fluor's development of bases of estimate (BOEs) for M&A labor. In my experience, contractors estimate the number and cost of M&A personnel in a variety of different ways. I am not aware of any industry standard methodology for estimating M&A. Moreover, the Government has its own data and its own estimators. In my experience, the Government will

---

[133] Oct. 2, 2012 AFDO Decision Letter, USA Bates 0001473 at – 476.
[134] 7/1/2016-6/30/2017 LOGCAP IV Task Order 05 Interim CPAR, USA Bates 0006534482, at -483 to -484.
[135] 7/1/2015-6/30/2016 LOGCAP IV Task Order 05 Final CPAR, FLUOR-SR_0006534501 at -503.
[136] Id.
[137] See Feb. 20, 2009 Task Order 0005 PWS, FLUOR-SR_0007844995 at -009, 0012, -060
[138] Feb. 20, 2009 Task Order 05 PWS, FLUOR-SR_0007844995 at -026.
[139] Id.

41

perform its own assessment and compare it against the contractor's proposal to evaluate the estimates. The Government's estimate is typically referred to as an Independent Government Cost Estimate (IGCE). The Government will conduct fact-finding during negotiations to understand how the contractor has developed its estimates and whether its figures are reasonable. As part of this process, the Government can, and in my experience does, ask for any information that it deems relevant to its ability to evaluate the contractor's estimates. Consistent with my experience, I have not seen any evidence that the Government accepted, without question, any of Fluor's estimates for Task Order 5. Instead, the record shows the Government consistently scrutinized Fluor's estimates and applied significant decrements in areas where it did not agree with Fluor's numbers, including M&A. Examples of this can be found in the PNM.[140]

Furthermore, in all cost-reimbursement-type contracts, the contractor's estimates are of limited importance because the contractor is only reimbursed for its reasonable, allowable, and allocable costs. In the performance of this specific contract, the Government relied on those estimates even less. Based on evolving Government requirements, many times negotiations between Fluor and the Government occurred after Fluor had completed a period of performance during which it performed at risk. At that point, the Government had actual cost information from the period of performance to augment the basis for its negotiations. In other words, the Government knew how much it actually cost Fluor to perform and how many personnel Fluor actually had working on the contract.[141] The Government was able to use those numbers to evaluate the reasonableness of Fluor's earlier estimates, to the extent the Government looked at the estimates at all.[142] The Government also had the benefit of input from DCAA and DCMA regarding their ongoing oversight of contractor performance, including personnel levels.

In short, Fluor was contractually required to maintain a "ready" contingency staff which included an agile workforce in numbers which exceeded the minimum required to meet immediate contractual requirements. The Government audited the labor throughout the life of the contract and repeatedly praised Fluor for successfully responding to unexpected contingencies and for cost-effectively managing the number of deployed personnel. I disagree with Mr. Sherman that there is any basis to conclude that Fluor was overstaffed.

---

[140] Mar. 5, 2013 Army PNM, DCAA-SR0000263590 at -595 to -596.

[141] Mar. 5, 2013 Army PNM, DCAA-SR0000263590 at -601 to -605.

[142] Mar. 5, 2013 Army PNM, DCAA-SR0000263590 at -606 to -608.

42

**Plaintiffs' Trial Exhibit 817**
**Page 44 of 68**

_Renee Richardson_

Renee Richardson

Date: July 31, 2025

APPENDIX A

Renee M. Richardson

**RESUME**
**RENEE M. RICHARDSON**

**PERSONAL INFORMATION:**

| | |
|---|---|
| FULL NAME: | Renee Michelle Richardson |
| HOME ADDRESS: | 3503 Pleasant Hill Road |
| | Lynn Haven, FL 32444 |
| PHONE: | (808) 202-3755 (Day/Evening) |
| HOME EMAIL: | rmrichardson808@gmail.com |
| PLACE OF BIRTH: | Dearborn, MI 48121 |
| CITIZENSHIP: | USA |
| SECURITY CLEARANCE: | SCI-DCID 6/4 (28 Jun 2013) |
| FEDERAL CIVILIAN | SES, Tier 1 (Resigned 25 Sep 2019) |
| RETIRED MILITARY: | USAF/Colonel/Dec 17/100% Disabled Vet |
| DATE OF PROMOTION: | 1 Dec 16 |

**EDUCATION:**

MASTER OF ARTS, Political Science/International Relations—2004
Duke University, Durham, NC 27708

MASTER OF SCIENCE, Military Operational Art—2001
Air Command and Staff College, Montgomery, AL 36122

MASTER OF ARTS, Acquisition and Procurement—1998
Webster University, San Antonio, TX 78213

MASTER OF SCIENCE, Psychology—1994
Angelo State University, San Angelo, TX 76909

BACHELOR OF SCIENCE, Human Factors Engineering—1988
US Air Force Academy, Colorado Springs, CO 80840

**OVERVIEW:**
I am a passionate team-builder and strategic leader, adept in coaching multifunctional teams to creatively solve acquisition challenges using all FAR and non-FAR based contract and agreement types. I have demonstrated the ability to build coalitions inside and outside traditional partnerships and am a staunch believer in continuous process improvement. I have established a legacy of robust workforce development programs for a variety of career fields. I proactively mentor and challenge the workforce to deliver optimal results—beyond what they themselves could have envisioned. Under my leadership, teams embrace and make the mission happen to deliver readiness and lethality for our nation.

Page 1

Renee M. Richardson

**WORK EXPERIENCE:**

DECEMBER 2019 – Present
**SENIOR PROCUREMENT CONSULTANT**

Serves as an executive-level advisor to industry pursuing work with the US Government. Provides strategic perspectives and recommendations to facilitate effective acquisition approaches. Serves as a high-level coach to guide teams in navigating the US Government acquisition system. Manages entire acquisition process including responding to market research, bid decisions, proposal development, writing, editing, pricing and White/Red Teaming, debriefing preparation, protest decisions and support, pursuing subcontracting opportunities, and administration and close-out of contracts.

OCTOBER 2017 – SEPTEMBER 2019
**EXECUTIVE DIRECTOR (1102; SES Tier 1)**, Air Force Installation Contracting Center
Wright-Patterson AFB, 45433
Supervisor: Brig Gen Alice Trevino; 937-257-3517; Contact: Yes
Hours: 50+ per Week

**Duties and Accomplishments:** Directly led a globally-dispersed team of over 750 professionals responsible for Air Force operational contracting. I was responsible for oversight of financial management, attorney support, information technology, strategic communications/public relations, personnel management, policy, and administration to support the entire enterprise. In addition, I served as the General Contracting Authority and Head of Contracting Activity oversight for over 3,000 acquisition professionals with a portfolio valued over $10B annually. I served as the clearance approval authority for actions valued up to $1B, warrant authority for unlimited contracting warrants. Key advisor for global integration of joint contracting assets and the economic power of in contingencies and globally. Provided primary support by developing collaborative relationships to institutionalize Category Management—moving from transactional tactical spending to strategically maximizing spend via demand management, innovative contracting solutions, policy and industry best practices. Teamed with the Army, The Ohio State University, industry, etc. to mature Category Management across the Department. Responsible for $28B contracting support to the Defense Technical Information Center (DTIC) supporting the DoD Research and Development (R&D) efforts across the Department. Responsible for direct contracting support to the AF Civil Engineering Center (AFCEC) including: $10B AF Contract Augmentation Program (AFCAP) and the AF Civil Engineer Center's Research and Development (R&D) program.

**Results:** I drove the institutionalization of innovation across AF operational contracting, resulting in a total validated savings of $1.5B over 3 years. I successfully guided the $28B DTIC source selection, second largest source selection in the DoD at the time—resulting in an extremely responsive R&D capability for the DoD. I successfully led the effort to transition from single bids on large efforts to leveraging competition to provide choices to the warfighters. I also led the transition of contract writing systems from seven legacy contract writing tools to Contracting Information Technology (CON-IT)—vastly increasing the focus on communication with the

Page 2

**Plaintiffs' Trial Exhibit 817**
**Page 47 of 68**

Renee M. Richardson

field. Under my leadership, we matured Category Management across the DoD—96% of AF spend is now overseen by Category Managers. We shared processes and tools with the Army which is now implementing Category Management. I led the integration of streamlined, innovative contracting authorities—enabling us to react to warfighter needs 'at the speed of relevance." I flawlessly led the team to provide robust contracting response to Hurricane Michael to quickly reconstitute Tyndall AFB, including safeguarding an F-22 trapped in a damaged hangar. I spearheaded successful award of AF-wide hospital cleaning contract worth $287M—providing sanitary cleaning for 50+ hospitals and clinics. I led stand-up of a Contracting Sub-Developmental Team to strategically develop the AF's 4,200 GS11- GS13 Civil Servant Contracting professionals through mentoring relationships and vectoring.

SEPTEMBER 2016 – SEPTEMBER 2017

**CHIEF OF STAFF (1102; COLONEL)**, Defense Contract Management Agency (DCMA)
Fort Lee, Virginia 23801
Supervisor: Wendy Masiello, Lt Gen, 703-344-6635; Contact: Yes
Hours: 50+ per Week

**Duties and Accomplishments:** Served in Brig Gen position. Orchestrated day-to-day activities of 12,000 geographically-dispersed, multi-functional personal. Directly oversaw over 150 professionals, 12 divisions and a budget exceeding $78M. I was responsible for day-to-day operations of DCMA Headquarters including Facilities, IT, Public Affairs, Strategic Planning, and Continuous Process Improvement. I strategically aligned the organizational battle rhythm to overcome geographic dispersion challenges and focus on development and implementation of a resilient and agile strategic plan. I led response to internal and external inquiries and drove teaming with external partners such as RAND and Defense Contract Audit Agency (DCAA).

**Results:** I identified a significant disconnect in execution of Information Technology acquisitions. Under my leadership, the team performed complex analyses, determined root causes and developed and implemented a get-well plan. I teamed with the RAND Corporation and DCAA to put safeguards in place to ensure the safety and integrity of the network systems and the efficacy of internal contracting activities. I led the reorganization of the Chief of Staff Directorate driving more responsive and lean operations.

AUGUST 2012 – AUGUST 2016
**SENIOR CONTRACTING OFFICIAL (1102; COLONEL)**, Pacific Air Forces (PACAF)
Joint Base Pearl Harbor-Hickam (JBPH-H), HI 96853
Supervisor: Cameron Holt, Brig Gen, (937) 257-3259; Contact: Yes
Hours: 50+ per Week

**Duties and Accomplishments:** Served as the General Contracting Authority and Head of Contracting Activity oversight for 7 geographically-dispersed offices across the Pacific. Led 85-member multifunction, geographically-separated workforce, overseeing acquisition efforts of 420 personnel providing support for 46,000 personnel. Principle business advisor to Pacific Air Forces (PACAF) Commander, responsible for award of 7,000 contract actions worth $700M annually
Page 3

**Plaintiffs' Trial Exhibit 817**
**Page 48 of 68**

APPENDIX A

### Renee M. Richardson

for entire Pacific Region including Alaska, Korea, Guam and Japan. I served as the clearance approval authority for all actions $2M-$1B; warrant authority for all contracting warrants. Served as US Pacific Command Senior Contract Official (SCO), key business advisor responsible to integrate joint contracting assets and our nation's economic power across 36 Pacific states. Served as Operational Contract Support Joint Exercise (OCSJX)-14 Air Force Director, led integration of Air Force procedures and 170 personnel into DoD's premier Operational Contract Support (OCS) exercise. Served as OCSJX-15 Director, led 140 joint planners to execute exercise for 1,000 participants and 100 senior leaders. Responsible for oversight of AF construction programs in the Pacific region including sustainment, restoration and modernization across in Alaska, Hawaii, Guam, and Japan.

**Results:** Expertly led execution of $4B PACAF portfolio—aligned spend to PACAF strategy, emplaced policies and processes to accomplish mission and reduce costs. Slashed annual commodity and services spend by 14%; saved $439M over the fiscal planning cycle. Skillfully spearheaded source selection for operation of 17 austere missile defense sites: Increased competition resulted in $183M savings. Earned AF Program Executive Office for Services designation as "best in the AF" for stellar and innovative oversight and management of PACAF service contract portfolio. As the US Pacific Command SCO, led 80+ DoD contracting organizations across the Pacific to ensure unity of effort. As OCSJX-15 Director, drove integration of OCS considerations into war planning across the DoD. I fully integrated new IT systems into the exercise, doubled the size of it and incorporated two locations (FT Bliss, Tx and Schofield Barracks, Hi). I led the full integration of financial managers, attorneys, and requiring activities such as 8th Theater Sustainment Command (8th TSC) and PACOM war planners.

AUGUST 2010 – AUGUST 2012
**COMMANDER, DEFENSE CONTRACT MANAGEMENT AGENCY-MIDDLE EAST (DCMA-ME) (1102; COLONEL)**, DCMA-ME, Kuwait City, Kuwait
Supervisor: Robert Gilbeau, RDML, Location Unknown; Contact: Yes
Hours: 50+ per Week

**Duties and Accomplishments:** Led 126 multifunctional professionals overseeing vital contract support for 13 Central Command countries worth $7.6B. Oversaw all functions under my command including attorney support, financial management, facilities, housing, personnel, quality assurance, property, contracting, and program managers. Led administration of diverse portfolio including: Foreign Military Sales (FMS), depot-level maintenance (C-130s, AWACS, F-15s), prepositioned stock maintenance (26,000 tanks/APCs), and critical life support efforts including multiple Logistics Civil Augmentation Program (LOGCAP) and AF Contract Augmentation Program (AFCAP) task orders supporting 120,000 troops across 17 Southwest Asia camps.

**Results:** Flawlessly piloted key facets (transportation, equipment transfer, life support) of Operation NEW DAWN, DoD's largest logistic operation since WWII. Oversaw $220M Supply Support operations and maintenance contract, salvaged $1.3B in equipment.

Page 4

**Plaintiffs' Trial Exhibit 817**
**Page 49 of 68**

APPENDIX A

Renee M. Richardson

JUNE 2007 – JULY 2010
**COMMANDER, AIR EDUCATION AND TRAINING CONTRACTING SQUADRON
(1102; COLONEL)**, Randolph AFB, TX 78150;
Supervisor: Thomas Robinson, SES, (937) 255-3741; Contact: Yes
Hours: 50+ per week

**Duties and Accomplishments:** Led a 115 geographically-dispersed multifunctional civilian and military personnel work force. Contract Clearance Approval Authority for all actions valued up to $25M. Directed portfolio of vital Base Operating Support and mission acquisitions worth $19B. Led Foreign Military Sales portfolio including Basic Ordering Agreements (BOAs) with Lockheed Martin, Boeing, etc. I led source selections for Air Force-wide: contracted security forces for 46 Air Force Bases ($396M) and award–winning national advertising contract ($372M). Piloted AF's $4B construction contract; led $10B AFCAP contract and the AF's Civil Engineering R&D program.

**Results:** Saved over $460M. Employed "lean" processes: increased obligations, drove annual actions from 2,450 to 1,804--35% decrease. Led AF's #1 performance in service acquisitions. earned first AF Program Executive Office for Services delegation for programs up to $500M. Won FY09 AF "Outstanding Large Contracting Unit" Award.

Responsible for $10B AF Contract Augmentation Program (AFCAP). Responded to multiple contingencies and Iraq/Afghanistan projects including:

-   Manas, Kyrgyzstan life support/power production.
-   Al Dahfra. UAE support.
-   Hurricane Katrina support and relief.

Responsible for AF's Sustainment, Restoration and Modernization Acquisition Task Order Contract (SATOC) accomplished multiple projects from building renovations, runways, fuel tanks, taxiway repairs. demolition, wind turbines, etc. Sample projects:

-   Replace/upgrade runways at Andrews AFB (supporting AF One)-$92M.
-   Repair taxiways/aprons (Eareckson Air Station, AK)-$17M.
-   Repair McConnell AFB Runways/Taxiways (Wichita, KS)-$67M.

MAY 2006 – OCTOBER 2006

**CHIEF, SPECIALIZED CONTRACTING DIVISION, (1102; LT COL)**, Principal Assistant Responsible for Contracting (PARC). Joint Contracting Command Iraq/Afghanistan (JCCI/A) Multi-National Forces-Iraq, Camp Victory, Iraq;
Supervisor: General Darryl Scott; Contact (Yes)
Hours: Approx. 100 per week

**Duties and Accomplishments:** Led an eight-person team procuring and managing the highest priority requirements in the Iraq theater with a portfolio valued at $5B. Held Unlimited Army Contracting Officer Warrant.

Page 5

**Plaintiffs' Trial Exhibit 817
Page 50 of 68**

APPENDIX A

### Renee M. Richardson

**Results:** Restructured $386M drinking water production contract, saved over $19M and kept 28K convoy trucks off deadly Iraqi roads. Led Iraqi revitalization: targeted $26M to fledgling economy, bolstered democratic government survivability. Drove tough negotiations: increased competition on theater's most complex contracts, saved $154M.

Previous Assignments:
Aug05 – Jun07, Chief, Policy & Clearance Branch, AF Space Command, Peterson AFB, CO
Aug02 – Aug05, Student, Duke University, Durham, NC
Aug01 – Aug02, Student, Air Command and Staff College, Maxwell AFB, AL
Oct00 – Apr01, Deputy Theatre Head of Contracts/Skopje Regional Allied Contracting Officer, Pristina, Kosovo and Skopje, Former Yugoslav Republic of Macedonia
Jun99 – Jul01, Deputy Commander, 48th Contracting Squadron, RAF Lakenheath, UK
Sep98 – Jun99, Director of Business Operations, Brooks AFB, Texas
Sep97 – Aug98, Chief, Crew Systems R&D Contracting Branch, Brooks AFB, TX
Aug96 – Sep97, Contracts Manager, Crew Systems R&D Branch, Brooks AFB, TX
Jul95 – Aug96, Student, Education with Industry (EWI), Lockheed Martin, Orlando, FL
Aug88 – Jul95, Air Force Intelligence Officer (Offutt AFB, NE and Goodfellow AFB, TX)

**OTHER QUALIFICATIONS:**
TRAINING:    U.S. Air Force, Air War College, 2006 (correspondence)
             U.S. Air Force, Air Command and Staff College, 2002 (11 months)

CERTIFICATION: Acquisition Professional Development Program: Level III (Contracting)

AWARDS:            Defense Superior Service Medal
                   Defense Meritorious Service Medal with one oak leaf cluster
                   Meritorious Service Medal with four oak leaf clusters

**REFERENCES:**
Lt Gen Wendy Masiello, USAF, Retired
Cell: (703)344-6635

Maj Gen Cameron Holt, USAF, Retired
Cell: (781)315-1780

MG Paul Pardew, USA, Retired
Cell: (256)585-8024

Page 6

**Plaintiffs' Trial Exhibit 817**
**Page 51 of 68**

**APPENDIX B**

## Materials Considered

**Docket Entries**

- Second Amended Complaint (DKT 121 – April 15, 2019)

**Expert Reports**

- Gary Gaukler Report, signed 6/13/2025
- Jim Sherman Report, signed 6/13/2025
- John Lyle Report, signed 6/13/2025
- Michael Rudolph Report, signed 6/13/2025

**Declarations**

- Asmir Mujacic Declaration, RELATORS 00249616
- Chey Cummings Declaration, RELATORS 00248713
- Chris Hartnett Declaration, RELATORS 00248717
- Chris O'Connor Declaration, RELATORS 00248721
- Clarence Thomas Declaration, RELATORS 00249604
- David Erp Declaration, RELATORS 00248772
- David Erp Declaration, FLUOR-SR_0012356134
- Fredric Coburn Declaration, RELATORS 00249598
- Glenda Sarayno Declaration, RELATORS 00248808
- Heather O'Connor Declaration, RELATORS 00248727
- Joshua Waggy Declaration, RELATORS 00249602
- Katy Yang Declaration, RELATORS 00249594
- Leon Wright Declaration, RELATORS 00249584
- Lori Patino Declaration, RELATORS 00249587
- Michael Fontenot Declaration, RELATORS 00248777
- Nancy Hegarty Declaration, RELATORS 00248738
- Robert Bunyea Declaration, RELATORS 00249590
- Robert Bunyea Declaration, FLUOR-SR_0012356122
- Roger Frazier Declaration, RELATORS 00249611
- Roger Frazier Declaration, FLUOR-SR_0012356129
- Stephen Hoke Declaration, RELATORS 00248745

**Deposition Transcripts**

- Fluor 30(b)(6) Transcript
- Maria McNamara Day 2 Transcript
- Ronald Riley Transcript
- Sandy Combs Transcript

APPENDIX B

- Steve Whitcomb Transcript
- Tommy Marks Day 1 and 2 Transcripts

**Exhibits**

- Defendant Exhibit 95
- Defendant Exhibit 96
- Defendant Exhibit 97
- Defendant Exhibit 98
- Defendant Exhibit 99
- Defendant Exhibit 100
- Defendant Exhibit 101
- Defendant Exhibit 214
- Defendant Exhibit 215
- Defendant Exhibit 216
- Defendant Exhibit 217
- Defendant Exhibit 218
- Defendant Exhibit 219
- Defendant Exhibit 220
- Defendant Exhibit 221
- Defendant Exhibit 222
- Defendant Exhibit 223
- Plaintiff Exhibit 7
- Plaintiff Exhibit 371
- Plaintiff Exhibit 372
- Plaintiff Exhibit 373
- Plaintiff Exhibit 374
- Plaintiff Exhibit 375
- Plaintiff Exhibit 376
- Plaintiff Exhibit 377
- Plaintiff Exhibit 378
- Plaintiff Exhibit 379
- Plaintiff Exhibit 380
- Plaintiff Exhibit 381
- Plaintiff Exhibit 382
- Plaintiff Exhibit 383
- Plaintiff Exhibit 384
- Plaintiff Exhibit 385
- Plaintiff Exhibit 386

APPENDIX B

- Plaintiff Exhibit 387
- Plaintiff Exhibit 388
- Plaintiff Exhibit 389
- Plaintiff Exhibit 390
- Plaintiff Exhibit 391
- Plaintiff Exhibit 454
- Plaintiff Exhibit 455
- Plaintiff Exhibit 456
- Plaintiff Exhibit 457
- Plaintiff Exhibit 458
- Plaintiff Exhibit 459
- Plaintiff Exhibit 460
- Plaintiff Exhibit 461
- Plaintiff Exhibit 462
- Plaintiff Exhibit 463
- Plaintiff Exhibit 464
- Plaintiff Exhibit 465
- Plaintiff Exhibit 466
- Plaintiff Exhibit 467
- Plaintiff Exhibit 468
- Plaintiff Exhibit 469
- Plaintiff Exhibit 470
- Plaintiff Exhibit 471
- Plaintiff Exhibit 472
- Plaintiff Exhibit 473
- Plaintiff Exhibit 474
- Plaintiff Exhibit 539
- Plaintiff Exhibit 540
- Plaintiff Exhibit 541
- Plaintiff Exhibit 542
- Plaintiff Exhibit 543
- Plaintiff Exhibit 544
- Plaintiff Exhibit 545
- Plaintiff Exhibit 546
- Plaintiff Exhibit 547
- Plaintiff Exhibit 548
- Plaintiff Exhibit 549
- Plaintiff Exhibit 550

APPENDIX B

- Plaintiff Exhibit 551
- Plaintiff Exhibit 552
- Plaintiff Exhibit 635
- Plaintiff Exhibit 638
- Plaintiff Exhibit 639
- Plaintiff Exhibit 640
- Plaintiff Exhibit 641
- Plaintiff Exhibit 642
- Plaintiff Exhibit 643
- Plaintiff Exhibit 644
- Plaintiff Exhibit 645
- Plaintiff Exhibit 646
- Plaintiff Exhibit 647
- Plaintiff Exhibit 648
- Plaintiff Exhibit 649
- Plaintiff Exhibit 650
- Plaintiff Exhibit 651
- Plaintiff Exhibit 652
- Plaintiff Exhibit 653
- Plaintiff Exhibit 654
- Plaintiff Exhibit 655
- Plaintiff Exhibit 656
- Plaintiff Exhibit 657
- Plaintiff Exhibit 658
- Plaintiff Exhibit 659
- Plaintiff Exhibit 660
- Plaintiff Exhibit 661
- Plaintiff Exhibit 662
- Plaintiff Exhibit 663
- Plaintiff Exhibit 664
- Plaintiff Exhibit 665
- Plaintiff Exhibit 666
- Plaintiff Exhibit 667
- Plaintiff Exhibit 668
- Plaintiff Exhibit 669
- Plaintiff Exhibit 670
- Plaintiff Exhibit 671
- Plaintiff Exhibit 672

APPENDIX B

- Plaintiff Exhibit 673
- Plaintiff Exhibit 675
- Plaintiff Exhibit 676
- Plaintiff Exhibit 677
- Plaintiff Exhibit 678
- Plaintiff Exhibit 679
- Plaintiff Exhibit 680
- Plaintiff Exhibit 681
- Plaintiff Exhibit 682
- Plaintiff Exhibit 683
- Plaintiff Exhibit 684
- Plaintiff Exhibit 685
- Plaintiff Exhibit 686
- Plaintiff Exhibit 687
- Plaintiff Exhibit 688

**Other Bates Stamped Documents**

- DCAA-SR0000263590
- DCAA-SR0000443146
- DCAA-SR0000468731
- DCMA-FLUOR1292764
- DCMA-FLUOR1292789
- DCMA-FLUOR1292804
- DCMA-FLUOR1327894
- DCMA-FLUOR1395718
- DCMA-FLUOR1693415
- DCMA-FLUOR2201839
- DCMA-FLUOR2250418
- FLUOR_SR_0012146445
- FLUOR-SR_0000047344
- FLUOR-SR_0000047347
- FLUOR-SR_0000047375
- FLUOR-SR_0000047376
- FLUOR-SR_0000047385
- FLUOR-SR_0000047406
- FLUOR-SR_0000047458
- FLUOR-SR_0000047478
- FLUOR-SR_0000047480

**APPENDIX B**

- FLUOR-SR_0000162269
- FLUOR-SR_0000162270
- FLUOR-SR_0000169617
- FLUOR-SR_0000195583
- FLUOR-SR_0000417740
- FLUOR-SR_0000801565
- FLUOR-SR_0000812783
- FLUOR-SR_0002234509
- FLUOR-SR_0002261429
- FLUOR-SR_0002261432
- FLUOR-SR_0002261434
- FLUOR-SR_0002261436
- FLUOR-SR_0002261438
- FLUOR-SR_0002261440
- FLUOR-SR_0002261442
- FLUOR-SR_0002261444
- FLUOR-SR_0002261446
- FLUOR-SR_0003455220
- FLUOR-SR_0003606932
- FLUOR-SR_0004799242
- FLUOR-SR_0005222613
- FLUOR-SR_0005222621
- FLUOR-SR_0005222642
- FLUOR-SR_0005222788
- FLUOR-SR_0005222802
- FLUOR-SR_0005222807
- FLUOR-SR_0005222811
- FLUOR-SR_0005222825
- FLUOR-SR_0005222837
- FLUOR-SR_0005222838
- FLUOR-SR_0005222841
- FLUOR-SR_0005222846
- FLUOR-SR_0005222849
- FLUOR-SR_0005222856
- FLUOR-SR_0005222862
- FLUOR-SR_0005222868
- FLUOR-SR_0005222874
- FLUOR-SR_0005222882

APPENDIX B

- FLUOR-SR_0005222889
- FLUOR-SR_0005222895
- FLUOR-SR_0005222903
- FLUOR-SR_0005222909
- FLUOR-SR_0005222914
- FLUOR-SR_0005222921
- FLUOR-SR_0005222928
- FLUOR-SR_0005222935
- FLUOR-SR_0005222941
- FLUOR-SR_0005222955
- FLUOR-SR_0005222962
- FLUOR-SR_0005222970
- FLUOR-SR_0005222978
- FLUOR-SR_0005222985
- FLUOR-SR_0005222991
- FLUOR-SR_0005223002
- FLUOR-SR_0005223018
- FLUOR-SR_0005223043
- FLUOR-SR_0005223051
- FLUOR-SR_0005223058
- FLUOR-SR_0005223117
- FLUOR-SR_0005223142
- FLUOR-SR_0005223148
- FLUOR-SR_0005223158
- FLUOR-SR_0005223160
- FLUOR-SR_0005223169
- FLUOR-SR_0005223230
- FLUOR-SR_0005223369
- FLUOR-SR_0005223388
- FLUOR-SR_0005223394
- FLUOR-SR_0005223397
- FLUOR-SR_0005223410
- FLUOR-SR_0005223428
- FLUOR-SR_0005223444
- FLUOR-SR_0005223450
- FLUOR-SR_0005223457
- FLUOR-SR_0005223463
- FLUOR-SR_0005223470

APPENDIX B

- FLUOR-SR_0005223486
- FLUOR-SR_0005223516
- FLUOR-SR_0005223522
- FLUOR-SR_0005223543
- FLUOR-SR_0005223556
- FLUOR-SR_0005223562
- FLUOR-SR_0005223575
- FLUOR-SR_0005223584
- FLUOR-SR_0005223596
- FLUOR-SR_0005223603
- FLUOR-SR_0005223608
- FLUOR-SR_0005223614
- FLUOR-SR_0005223621
- FLUOR-SR_0005223633
- FLUOR-SR_0005223638
- FLUOR-SR_0005223652
- FLUOR-SR_0005223666
- FLUOR-SR_0005223688
- FLUOR-SR_0005223699
- FLUOR-SR_0005223737
- FLUOR-SR_0005223744
- FLUOR-SR_0005223785
- FLUOR-SR_0005223949
- FLUOR-SR_0005224037
- FLUOR-SR_0005224043
- FLUOR-SR_0005224083
- FLUOR-SR_0005224196
- FLUOR-SR_0005224225
- FLUOR-SR_0005224230
- FLUOR-SR_0005224459
- FLUOR-SR_0005224490
- FLUOR-SR_0005224508
- FLUOR-SR_0005224551
- FLUOR-SR_0005224924
- FLUOR-SR_0006001209
- FLUOR-SR_0006007847
- FLUOR-SR_0006016820
- FLUOR-SR_0006096113

APPENDIX B

- FLUOR-SR_0006175507
- FLUOR-SR_0006208262
- FLUOR-SR_0006286756
- FLUOR-SR_0006287040
- FLUOR-SR_0006287224
- FLUOR-SR_0006287232
- FLUOR-SR_0006288172
- FLUOR-SR_0006288269
- FLUOR-SR_0006529470
- FLUOR-SR_0006529968
- FLUOR-SR_0006534450
- FLUOR-SR_0006534455
- FLUOR-SR_0006534459
- FLUOR-SR_0006534463
- FLUOR-SR_0006534467
- FLUOR-SR_0006534472
- FLUOR-SR_0006534477
- FLUOR-SR_0006534482
- FLUOR-SR_0006534491
- FLUOR-SR_0006534501
- FLUOR-SR_0006534506
- FLUOR-SR_0006538081
- FLUOR-SR_0006538090
- FLUOR-SR_0006751544
- FLUOR-SR_0006751556
- FLUOR-SR_0006751565
- FLUOR-SR_0006814386
- FLUOR-SR_0006817165
- FLUOR-SR_0006863954
- FLUOR-SR_0007018172
- FLUOR-SR_0007037510
- FLUOR-SR_0007037511
- FLUOR-SR_0007037515
- FLUOR-SR_0007037517
- FLUOR-SR_0007091043
- FLUOR-SR_0007844995
- FLUOR-SR_0007867023
- FLUOR-SR_0007867740

APPENDIX B

- FLUOR-SR_0007876401
- FLUOR-SR_0007878925
- FLUOR-SR_0007878944
- FLUOR-SR_0007997000
- FLUOR-SR_0008004246
- FLUOR-SR_0008004287
- FLUOR-SR_0008018442
- FLUOR-SR_0008064795
- FLUOR-SR_0008077376
- FLUOR-SR_0008140400
- FLUOR-SR_0008440958
- FLUOR-SR_0008705544
- FLUOR-SR_0008785226
- FLUOR-SR_0008785227
- FLUOR-SR_0008785231
- FLUOR-SR_0008785235
- FLUOR-SR_0008800550
- FLUOR-SR_0008800555
- FLUOR-SR_0008800560
- FLUOR-SR_0008800566
- FLUOR-SR_0008800594
- FLUOR-SR_0008800605
- FLUOR-SR_0008800612
- FLUOR-SR_0008800619
- FLUOR-SR_0008800623
- FLUOR-SR_0008800630
- FLUOR-SR_0008800636
- FLUOR-SR_0008800642
- FLUOR-SR_0008814749
- FLUOR-SR_0008871261
- FLUOR-SR_0008873233
- FLUOR-SR_0009283831
- FLUOR-SR_0009283833
- FLUOR-SR_0009283836
- FLUOR-SR_0009283839
- FLUOR-SR_0009284279
- FLUOR-SR_0009402774
- FLUOR-SR_0009552978

**APPENDIX B**

- FLUOR-SR_0009604082
- FLUOR-SR_0009632522
- FLUOR-SR_0009824240
- FLUOR-SR_0009883582
- FLUOR-SR_0009886268
- FLUOR-SR_0009886295
- FLUOR-SR_0009886297
- FLUOR-SR_0010046877
- FLUOR-SR_0010098070
- FLUOR-SR_0010100204
- FLUOR-SR_0010100209
- FLUOR-SR_0010100213
- FLUOR-SR_0010100912
- FLUOR-SR_0010100963
- FLUOR-SR_0010117674
- FLUOR-SR_0010123276
- FLUOR-SR_0010123286
- FLUOR-SR_0010128122
- FLUOR-SR_0010135836
- FLUOR-SR_0010172877
- FLUOR-SR_0010172878
- FLUOR-SR_0010172887
- FLUOR-SR_0010192715
- FLUOR-SR_0010238300
- FLUOR-SR_0010846293
- FLUOR-SR_0010846299
- FLUOR-SR_0011055500
- FLUOR-SR_0011055502
- FLUOR-SR_0011055517
- FLUOR-SR_0011055518
- FLUOR-SR_0011080668
- FLUOR-SR_0011080814
- FLUOR-SR_0011080929
- FLUOR-SR_0011081024
- FLUOR-SR_0011081028
- FLUOR-SR_0011081068
- FLUOR-SR_0011083379
- FLUOR-SR_0011083483

APPENDIX B

- FLUOR-SR_0011083524
- FLUOR-SR_0011083549
- FLUOR-SR_0011093523
- FLUOR-SR_0011110613
- FLUOR-SR_0011289004
- FLUOR-SR_0011301314
- FLUOR-SR_0011304173
- FLUOR-SR_0011310215
- FLUOR-SR_0011312502
- FLUOR-SR_0011313210
- FLUOR-SR_0011369579
- FLUOR-SR_0011369583
- FLUOR-SR_0011384204
- FLUOR-SR_0011398700
- FLUOR-SR_0011425192
- FLUOR-SR_0011425373
- FLUOR-SR_0011548332
- FLUOR-SR_0011549857
- FLUOR-SR_0011549860
- FLUOR-SR_0011564682
- FLUOR-SR_0011574912
- FLUOR-SR_0011574931
- FLUOR-SR_0011613828
- FLUOR-SR_0011617072
- FLUOR-SR_0011659972
- FLUOR-SR_0011660066
- FLUOR-SR_0011661760
- FLUOR-SR_0011697821
- FLUOR-SR_0011912949
- FLUOR-SR_0011930763
- FLUOR-SR_0011937061
- FLUOR-SR_0011937067
- FLUOR-SR_0011937071
- FLUOR-SR_0011937094
- FLUOR-SR_0011937153
- FLUOR-SR_0011947562
- FLUOR-SR_0011967131
- FLUOR-SR_0011973035

APPENDIX B

- FLUOR-SR_0011988808
- FLUOR-SR_0011991285
- FLUOR-SR_0012002057
- FLUOR-SR_0012010152
- FLUOR-SR_0012055225
- FLUOR-SR_0012055227
- FLUOR-SR_0012058162
- FLUOR-SR_0012067137
- FLUOR-SR_0012091832
- FLUOR-SR_0012093239
- FLUOR-SR_0012119611
- FLUOR-SR_0012134151
- FLUOR-SR_0012163012
- FLUOR-SR_0012163398
- FLUOR-SR_0012177723
- FLUOR-SR_0012216559
- FLUOR-SR_0012295202
- FLUOR-SR_0012295232
- FLUOR-SR_0012354089
- RELATORS_010133
- USA Bates 0000017
- USA Bates 0000068
- USA Bates 0000070
- USA Bates 0000072
- USA Bates 0000074
- USA Bates 0000075
- USA Bates 0000085
- USA Bates 0000104
- USA Bates 0000137
- USA Bates 0000139
- USA Bates 0000140
- USA Bates 0000151
- USA Bates 0000163
- USA Bates 0000164
- USA Bates 0000174
- USA Bates 0000185
- USA Bates 0000186
- USA Bates 0000197

**APPENDIX B**

- USA Bates 0000208
- USA Bates 0000209
- USA Bates 0000220
- USA Bates 0000221
- USA Bates 0000222
- USA Bates 0000250
- USA Bates 0000251
- USA Bates 0000257
- USA Bates 0000258
- USA Bates 0000261
- USA Bates 0000267
- USA Bates 0000268
- USA Bates 0000269
- USA Bates 0000271
- USA Bates 0000274
- USA Bates 0000276
- USA Bates 0000282
- USA Bates 0000299
- USA Bates 0000301
- USA Bates 0000302
- USA Bates 0000313
- USA Bates 0000327
- USA Bates 0000339
- USA Bates 0000350
- USA Bates 0000361
- USA Bates 0000371
- USA Bates 0000390
- USA Bates 0000394
- USA Bates 0000404
- USA Bates 0000421
- USA Bates 0000423
- USA Bates 0000425
- USA Bates 0000428
- USA Bates 0000429
- USA Bates 0000437
- USA Bates 0000467
- USA Bates 0000468
- USA Bates 0000471

**APPENDIX B**

- USA Bates 0000475
- USA Bates 0000478
- USA Bates 0000500
- USA Bates 0000512
- USA Bates 0000513
- USA Bates 0000533
- USA Bates 0000535
- USA Bates 0000561
- USA Bates 0000562
- USA Bates 0000563
- USA Bates 0000575
- USA Bates 0000582
- USA Bates 0000583
- USA Bates 0000585
- USA Bates 0000588
- USA Bates 0000590
- USA Bates 0000601
- USA Bates 0000627
- USA Bates 0000631
- USA Bates 0000633
- USA Bates 0000634
- USA Bates 0000635
- USA Bates 0000636
- USA Bates 0000637
- USA Bates 0000646
- USA Bates 0000649
- USA Bates 0000650
- USA Bates 0000660
- USA Bates 0000689
- USA Bates 0000690
- USA Bates 0000692
- USA Bates 0000713
- USA Bates 0000743
- USA Bates 0000762
- USA Bates 0000772
- USA Bates 0000783
- USA Bates 0000784
- USA Bates 0000788

**APPENDIX B**

- USA Bates 0000790
- USA Bates 0000913
- USA Bates 0000914
- USA Bates 0000917
- USA Bates 0000932
- USA Bates 0000935
- USA Bates 0000944
- USA Bates 0000952
- USA Bates 0000954
- USA Bates 0000955
- USA Bates 0000961
- USA Bates 0000972
- USA Bates 0000975
- USA Bates 0000996
- USA Bates 0001008
- USA Bates 0001017
- USA Bates 0001029
- USA Bates 0001038
- USA Bates 0001054
- USA Bates 0001063
- USA Bates 0001070
- USA Bates 0001095
- USA Bates 0001096
- USA Bates 0001097
- USA Bates 0001118
- USA Bates 0001119
- USA Bates 0001121
- USA Bates 0001130
- USA Bates 0001147
- USA Bates 0001155
- USA Bates 0001166
- USA Bates 0001171
- USA Bates 0001173
- USA Bates 0001183
- USA Bates 0001191
- USA Bates 0001210
- USA Bates 0001220
- USA Bates 0001233

**APPENDIX B**

- USA Bates 0001234
- USA Bates 0001235
- USA Bates 0001236
- USA Bates 0001353
- USA Bates 0001413
- USA Bates 0001441
- USA Bates 0001473
- USA Bates 0001478
- USA Bates 0001479
- USA Bates 0001480
- USA Bates 0001483
- USA Bates 0001485
- USA Bates 0001495
- USA Bates 0001511
- USA Bates 0001513
- USA Bates 0001523
- USA Bates 0001531
- USA Bates 0001657
- USA Bates 0001667