# EXHIBIT 18

## Walter Report

Forvis Mazars, LLP
1410 Spring Hill Road, Suite 500
Tysons, VA 22102
703.970.0400
FORVISMAZARS.US



# EXPERT REPORT OF BILL WALTER

## *United States ex rel. Shepherd, et al. v. Fluor*

## No: 6:13-cv-2428-JD



**PLAINTIFF'S EXHIBIT**

**2**

**Sutherland  10/24/2025**

**Plaintiffs' Trial Exhibit 821**
**Page 1 of 68**

## **Contents**

I.   Qualifications ................................................................................................................. 1

II.  Summary of Opinions ..................................................................................................... 2

III. General Background ....................................................................................................... 2

IV.  Compensation and Appendices ...................................................................................... 3

V.   Physical Inventory Opinions ......................................................................................... 3

   A.   Maximo Reports Generated ....................................................................................... 3

   B.   Results ......................................................................................................................... 5

VI.  Negative Adjustment Opinions ..................................................................................... 6

   A.   The Nix Analysis ........................................................................................................ 7

      1.   Conflict of Interest ............................................................................................... 7

      2.   Review Methodology and Conclusions ................................................................ 8

   B.   Negative Adjustments Should Not be Confused with Physical Losses ........................... 10

   C.   Types of Administrative Adjustments ....................................................................... 13

      1.   Data Entry Error ................................................................................................. 14

      2.   Item Code Number Change ................................................................................ 14

      3.   Unit of Measure ("UOM")/Unit of Issue ........................................................... 15

      4.   IPO ..................................................................................................................... 17

   D.   Adjustments for Materials Issued on Work Orders .................................................. 19

VII. Staffing Opinions ......................................................................................................... 21

   A.   Introduction and Overview ....................................................................................... 21

   B.   Review of Mr. Sherman's Opinions Regarding Fluor's M&A Staffing .................... 22

   C.   Review of Mr. Sherman's Opinions Regarding Direct Labor "Mark-Up" ............... 28

   D.   Review of Mr. Sherman's Opinions Regarding Service Order Work Performed Around the Holidays ........................................................................................................... 29

ii

**Plaintiffs' Trial Exhibit 821**
**Page 2 of 68**

## I.     Qualifications

I am a Certified Public Accountant (CPA) and have practiced from 1984 until the present in the accounting profession specifically as it relates to entities providing products and services under contracts and subcontracts with the federal government.  I am a member of the American Institute of Certified Public Accountants (AICPA) as well as the Virginia Society of Certified Public Accountants (VSCPA).  I am also a member of the American Bar Association Public Contract Law Section and other groups directly associated with government contracting requirements.

I began my career as an auditor for the Defense Contract Audit Agency (DCAA) as a field auditor in the northern Virginia area.  As a DCAA auditor, I was introduced to the rules, regulations and standards associated with federal contracts and subcontracts.  I performed comprehensive cost analysis and compliance reviews of the books and records of contractors providing a wide array of products and services to the Department of Defense (DoD).

After DCAA, I went to work for a CPA firm to help companies understand complex rules and regulations, including the Federal Acquisition Regulation (FAR), the Defense FAR Supplement (DFARS) and the Cost Accounting Standards (CAS), including FAR Part 31 (Cost Principles), FAR Part 42 (Contract Administration and Audit Services), and FAR 52.216-7 (Allowable Cost and Payment Clause).  Since that time, I have consulted for companies both new to government contracts and those that have been in the market for many decades.  I worked for KBR in various capacities from 2003 through 2010, ending as the Senior Vice President for Government Compliance.  For a time I was also the Senior Vice President for Finance, essentially serving as the chief financial officer for the government services division of the company.  My responsibilities at KBR required me to visit project sites, including numerous trips to Iraq and Afghanistan.

In my experience as a consultant and with KBR, I have worked with estimating, cost, and pricing issues for many industries, including contingency contracting.  I have also been heavily involved in fact-finding and negotiations with the Government regarding Undefinitized Contract Actions (UCAs) and definitization on multi-billion dollar cost-reimbursement task orders, including for Logistics Civil Augmentation Program (LOGCAP) contracts.  In my experience as a DCAA auditor, at KBR, and as a consultant, I have seen the internal workings on the Government side with regard to negotiations and cost analysis.   I use this experience to advise clients that face similar issues with government contract oversight activities.

Over my 40-year career, I have been recognized as an expert in government contracting by federal judicial entities including U.S. District Courts, the Armed Service Board of Contract Appeals (ASBCA), and the Civilian Board of Contract Appeals (CBCA).  Several of my prior expert opinions included conducting numerical analyses from datasets.  I have described some of my prior testimony in my attached resume, including all expert testimony in the past five years.

Each year, I spend a significant amount of time training individuals from the Government and private industry on the requirements of federal contracting.  Many of these courses are taught through the Public Contracting Institute in coordination with George Mason University.  I began teaching federal procurement topics very early in my career through The George Washington

1

University and the Educational Services Institute. I also lead training through the AICPA, VSCPA and other forums on topics associated with cost accounting and federal procurement requirements.

I currently lead the Government Contract Consulting practice for the public accounting firm, Forvis Mazars.

## II.     Summary of Opinions

- **Physical Inventory Opinions:** For Fiscal Years 2011 to 2014, Maximo records show that nearly 100% of lines of material had at least one physical count adjustment (PCOUNTADJ) performed with more PCOUNTADJs than there were lines of inventory. This data indicates that nearly 100% of lines of material was physically inventoried in those years, with some lines being counted multiple times per year.

- **Negative Adjustments Opinions:** I conducted several reviews relating to negative adjustments in Maximo to assess whether negative adjustments necessarily reflect physical losses of inventory and concluded: (1) a former Fluor employee, Jeffrey Nix, was acting under a disabling conflict of interest when he conducted a review of negative adjustments, that this review was limited in scope and cannot be extrapolated beyond the small sample reviewed, and that the review results do not necessarily reflect physical losses; and (2) a review of the top 20% of negative adjustments by line cost value for Fiscal Years 2011–14 demonstrated that all of the adjustments in that sample were administrative. I also reviewed examples where material appears to have been consumed on work orders without having been issued out of Maximo and instead were negatively adjusted from the system.

- **Staffing Opinions:** I have reviewed the expert report of James Sherman and I do not believe there is any factual basis for his opinion that Fluor charged the Government for excessive personnel costs or earned profit on direct labor beyond the contractually-mandated fixed fee.

## III.     General Background

I am personally familiar with Maximo from my time with KBR. I understand that Maximo is an IBM enterprise asset management software package that can be used for work order management and inventory tracking. While I understand that Fluor witnesses referred to Maximo as a "system of record" for property management, the software is not an accounting system and is not used nor is suitable as a system of record for financial reporting. I understand Fluor did not use Maximo for accounting or financial reporting but instead used SAP for these purposes.

I understand that Fluor used Maximo for managing work orders and tracking inventories, and that transactional data within Maximo was manually entered by Fluor employees at numerous stages in the work order and inventory management processes, at various sites and storerooms throughout the LOGCAP IV theater of operations in Northern Afghanistan. My analyses that follow rely on Maximo data, although I understand that, due to the above-described manual data entry, human error was common and could affect any particular transaction included in my analyses. I note too that Relators' experts, including Dr. Gaukler, also relied on Maximo data to draw conclusions.

2

While I am generally familiar with the Maximo system, I am not myself an expert in database management and SQL queries. As a result, I relied on Fluor employee Walter Sutherland to develop SQL scripts and to run reports from Maximo to obtain the data that I relied upon in forming my opinions. I had several meetings (both in-person and virtually) with Mr. Sutherland that collectively lasted about 32 hours combined. I have relied upon the accuracy of the reports generated, though the opinions in this report are mine alone. I was assisted at times by staff at Forvis Mazars (primarily Kaidan Smith). I also conferred with Fluor employees Darryl Flowers (who has extensive knowledge of Fluor's use of Maximo) and Justin Jones (himself a Maximo user in Northern Afghanistan). Messrs. Flowers and Jones provided background and insight into the Maximo data and the system's use by Fluor in Northern Afghanistan, particularly relating to physical inventories.

In addition, I relied on my expertise in auditing, estimating, and conducting data analysis, including in statistical sampling, and my knowledge of accounting principles and ethics in reaching opinions included in this report.

## IV.    **Compensation and Appendices**

My compensation rate for the analysis that follows was $715 per hour before May 31, 2025, and then $740 per hour after June 1, 2025. Forvis Mazars has billed $23,732 for approximately 40 hours I have spent on this effort from my retention in this matter through June 30, 2025. I will be prepared at deposition to provide updated information regarding time and effort billed subsequent to June 30, 2025. I estimate, however, that I have spent approximately 100 hours in July 2025 preparing my report.

Appendices A through E describe the queries Mr. Sutherland designed to gather data from Maximo.

Appendix F contains my resume and a list of prior expert engagements from the last five years.

Appendix G lists data and other information I considered in forming my opinions.

Appendix H contains detailed audit histories of certain transactions referenced in my report.

## V.    **Physical Inventory Opinions**

### A.    **Maximo Reports Generated**

Counsel for Fluor asked me to assess whether, for each existing line of material in a fiscal year, Maximo data shows that a PCOUNTADJ was performed in the preceding 12 months. I conducted this analysis for Fiscal Years 2011–14.

My understanding is that in Northern Afghanistan, after a physical count was conducted, an employee would enter a value into the physical count (PCOUNT) data field in Maximo. That action causes the system to generate a PCOUNTADJ. If at the time the new PCOUNT value is entered, it matches the PCOUNT balance previously recorded, the PCOUNTADJ will be zero. If the value is higher or lower than the then-existing PCOUNT value, the system will generate a positive or negative PCOUNTADJ reflecting the difference between the pre-existing PCOUNT

3

and the new PCOUNT. Accordingly, given the PCOUNT's use in conducting physical inventories, it can be used as a proxy for determining whether, and when, a line of inventory was counted.

To use a hypothetical example, if a line of inventory had a pre-existing PCOUNT of 10 items, and an inventory showed a physical count of 12 items, when the new physical count of 12 is entered into the system, Maximo will generate a PCOUNTADJ of +2 and corresponding adjust the PCOUNT to 12. The same, of course, would apply for a zero or a negative PCOUNTADJ. For example, if an inventory resulted in a count reflecting a physical balance that matched the Maximo PCOUNT, the system generates a PCOUNTADJ of zero even though the PCOUNT balance has not changed.

The PCOUNTADJ adjusts only the PCOUNT value. It does not in itself adjust the current balance (CURBAL) value for that line of inventory in the system. The CURBAL is reconciled to the new PCOUNT through a reconciliation balance adjustment (RECBALADJ). For example, if the Maximo CURBAL for an item is 10, and the old and new PCOUNT values also are 10, the system will generate a PCOUNTADJ of zero and, when reconciled, a RECBALADJ of zero.

A RECBALADJ will only be positive or negative if necessary to adjust the CURBAL to match a new PCOUNT value. For example, if the CURBAL for an item is 10, and the prior PCOUNT is 10 but the new PCOUNT is 12, the system will generate a PCOUNTADJ of +2 and, when reconciled, a RECBALADJ of +2. However, it is not the case that a positive or negative PCOUNTADJ will necessarily result is a positive or negative RECBALADJ adjusting the CURBAL. To illustrate, in the above example, assume instead the CURBAL is 12, and the new PCOUNT is also 12 (two more than the last PCOUNT of 10). In this instance, there will be a PCOUNTADJ of +2 and a RECBALADJ of zero, when the PCOUNT and the CURBAL are reconciled.

I also note that, in certain instances, Maximo has the capability for a user to enter additional information into a "memo field" to explain the reason for an adjustment. For example, when a user enters a new PCOUNT value, there is an option for the user to enter data in the memo field which then will be tied to the corresponding PCOUNTADJ. By contrast, a RECBALADJ has no associated memo field.

The RECBALADJ field did not play a role in this opinion but does feature in my negative adjustment analysis.

I understand that PCOUNTADJs can be generated for reasons other than physical inventories; however, in the vast majority of instances, PCOUNTADJs reflect physical inventories.

Because I understand that new PCOUNT values are entered after a physical inventory, I looked to see whether a PCOUNTADJ, regardless of value, was recorded on each line of material in each location and each storeroom in each fiscal year (which runs from October 1 to September 30).[1] The reason for this analysis is to see whether, in fact, Fluor was conducting physical inventories

---

[1] For purposes of this analysis, I considered only materials and not assets (i.e., durable equipment that is not consumed and used and is tracked by a separate, unique "property book" number).

**Plaintiffs' Trial Exhibit 821**
**Page 6 of 68**

of materials in Northern Afghanistan in the relevant period.  I understand that Fluor's plan was to conduct a 100% inventory of each line of material in each storeroom at each location at least once per fiscal year.

### B.     Results

Through the SQL query identified in Appendix A, I checked the data for the above period to see whether there was at least one PCOUNTADJ in each line of inventory in each storeroom and bin location in Maximo.  For this analysis, I relied on queries generated by Mr. Sutherland which identified the last PCOUNTADJ for any given line of material with a positive balance at the end of each fiscal year.  *See* App'x A.  I understand that the queries also included any INSERT transactions on bin creation in Maximo because that sets a physical count date without a corresponding PCOUNTADJ transaction.  This assumes correctly that when bins are created they are inventoried at the time of creation.  I then excluded from my analysis locations that had been closed in the prior fiscal year (an issue limited to D16 Bostick and D17 Kalagush in FY 2013).  This exclusion is explained in detail in Appendices A and B.  The method of inventory is not relevant to this analysis.  For example, I understand Fluor conducted inventories by exception, spot checks, cyclic 10% inventories,[2] and, in 2011 and 2013, separate specifically-directed counts of 100% of its materials inventory,[3] any of which would result in a PCOUNTADJ transaction in the line counted.

As noted below, the Maximo data reflects that Fluor conducted physical inventories of materials on a consistent basis.  On average, over the four year period, Fluor conducted physical inventories of 99.36% of its lines of material inventory.

The results by year are broken out below:

- FY 2011: **98.75%**

- FY 2012: **99.67%**

- FY 2013: **99.75%**

- FY 2014: **99.98%**

I further reviewed the total number of physical count adjustments and INSERT transactions per fiscal year compared to the total lines of material inventory that had positive balances at the end of each fiscal year to see whether there were a greater number of physical counts than lines of inventory.  *See* App'x B.  This would indicate that some lines were counted more than once per year.  The results are displayed below:

---

[2] MMP Rev. 4, FLUOR-SR_0006096113.
[3] *See* Dec. 13, 2010 CAP, FLUOR-SR_0000047347, at -363; June 14, 2014 After Action Review, Bagram 100% Initiative, FLUOR-SR_0006761073.

**Plaintiffs' Trial Exhibit 821**
**Page 7 of 68**

| Fiscal Year | Total PCOUNTADJ Transactions | Total Lines of Inventory | Ratio |
|---|---|---|---|
| 2011 | 452,961 | 313,090 | 1:4 : 1 |
| 2012 | 554,505 | 326,354 | 1.7 : 1 |
| 2013 | 249,718 | 138,817 | 1.8 : 1 |
| 2014 | 85,799 | 53,407 | 1.6 : 1 |
| Total | 1,342,983 | 831,668 | 1.6 : 1 |

On average, there was a ratio of 1.6 PCOUNTADJs per line of inventory over the four year period.

In the course of performing my analysis, I came across instances where single lines of inventory had multiple PCOUNTADJ transactions over the course of a fiscal year. In many of these same instances, I found references in "memo" fields to inventories, showing that these lines were inventoried not once but multiple times. This finding would be fully consistent with cyclic 10% inventory counts (which would result in some lines being counted more than once) as well as spot checks, separate 100% inventories, and inventories by exception.

## VI.     Negative Adjustment Opinions

I have been asked to assume that negative adjustments is a significant issue in this case and have been asked to assess whether negative adjustments necessarily reflect physical losses.

By way of background, I understand that, at one time, Fluor's material management plan (MMP) required "losses" discovered through physical inventories to be reported on loss, theft, damage, or destruction (LTDD) reports.[4] In addition, a former Fluor compliance employee, Jeffrey Nix, performed a limited analysis of negative adjustments without corresponding explanations in the Maximo "memo" field. However, I understand that in a lawsuit that Mr. Nix was building against Fluor at the time he conducted his review, Mr. Nix relied on his review to allege that there were significant physical losses of material in Northern Afghanistan. I also understand that Relator's expert Michael Rudolph opines that Fluor should not have received relief of responsibility for any LTDDs submitted and ascribed a value of $63 to 70 million to those LTDDs, Rudolph Report 74, which too seems to confuse negative adjustments with physical losses.

As a result, I have engaged in several reviews to evaluate whether in fact negative adjustments necessarily signify physical losses and to evaluate Mr. Nix's review. The results of my findings are below.

---

[4] MMP Rev. 4, FLUOR-SR_0006096113, at -180. I note that the Defense Contract Management Agency (DCMA) Government Property Administrator (GPA) later determined that Fluor was incorrectly using LTDDs to report negative adjustments and issued a corrective action request (CAR) to Fluor for the practice. The GPA concluded that Fluor should never have been using LTDDs for negative adjustments resulting from physical inventories in the first place. FLUOR-SR_0010046877.

Plaintiffs' Trial Exhibit 821
Page 8 of 68

### A.     The Nix Analysis

I reviewed an attribute sampling study (which I define below) performed by Mr. Nix on Maximo negative adjustment transactions using RECBALADJ transactions.[5]  The study shows only that—for a limited sample—there were negative adjustments in Maximo for which the "memo" field was blank and there was no evidence from the records reviewed that the adjustment was reported on a LTDD.

At the time that he designed and conducted this review, Mr. Nix was already planning to bring a lawsuit against Fluor where he stood to benefit financially if he were to prevail.[6]  In the complaint that he subsequently filed, he relied on his study to suggest that its limited results could be extrapolated to the universe of negative adjustment transactions in Maximo as a whole and that his conclusions were suggestive of large physical losses of material.[7]  However, as discussed below, his attribute sampling study results cannot be extrapolated to a larger number of transactions. And, his disabling conflict of interest appears to have led him to draw improper conclusions from his study, conclusions the Relators have adopted.

### 1.     Conflict of Interest

As a CPA, I am well familiar with the American Institute of Certified Public Accountants (AICPA) Code of Professional Conduct.  The AICPA requires CPAs to maintain independence and be free from bias.[8]  The AICPA Code defines "independence of mind" as "the state of mind that permits a member to perform an attest service without being affected by influences that compromise professional judgment."[9]  Audits, reviews, and compilations are all forms of "attest" services, all of which require independence.[10]

The requirement for independence extends beyond CPAs.  Forensic auditors and compliance professionals also must maintain independence and steer clear of conflicts of interest.  The Institute of Certified Forensic Accountants requires "objectivity" from its members "exercised when members make judgments, based upon all the available evidence, not depending on, or influenced by, personal opinions or prejudices, or by inappropriate pressure or influence."[11]  Its members "should not concurrently engage in any business occupation or other activity which impairs or might be perceived to impair their ability to carry out their public service role with integrity and objectivity.  They should advise their employers of all outside interests of a pecuniary nature and any non-pecuniary interests which are relevant to the employment responsibilities of the member."[12]  Similarly, the Association of Certified Fraud Examiners' Code of Professional

---

[5] I understand that, while Mr. Nix voluntarily dismissed his complaint, he nonetheless retains a financial interest in the pending case through an undisclosed "sharing agreement" with the Relators.  Nix Dep. Tr. 24:4–25:13.
Relators' Second Amended complaint relies on Mr. Nix's report as does  Relators' expert Michael Rudolph.  Second Am. Compl. ¶¶ 170–84; Rudolph Report 65–66.

[6] Nix Dep. Tr. 23:16–25; 363:6–17; 488:1–23.

[7] Nix Compl. ¶¶ 69–78.

[8] AICPA Code of Professional Conduct § 1.200.001, *available at* https://pub.aicpa.org/codeofconduct/ethicsresources/et-cod.pdf.

[9] *Id.* § 0.400.23.

[10] *Id.* § 0.300.050.

[11] ICFA Code of Ethics § A.2.1, *available at* https://forensicasia.org/code-of-ethics/.

[12] *Id.* § A.2.3.

**Plaintiffs' Trial Exhibit 821**
**Page 9 of 68**

Standards requires examiners to "conduct themselves with integrity" and, prior to accepting an assignment, to "investigate for actual, potential, or perceived conflicts of interests" which must be "disclos[ed] to potentially affected clients or to their employers."[13]

Similar standards apply to compliance professionals, like Mr. Nix. The Society of Corporate Compliance and Ethics' Code of Professional Ethics for Compliance and Ethics Professionals (CEPs) requires CEPs to "serve their employing organizations with the highest sense of integrity, exercise unprejudiced and unbiased judgment on their behalf, and promote effective compliance and ethics programs."[14] Further, CEPs "shall take care to avoid any actual, potential or perceived conflicts between the interests of the employing organization and either the CEP's own interests or the interests of individuals or organizations outside the employing organization with whom the CEP has a relationship. CEPs must disclose and ethically handle conflicts of interest and must remove significant conflicts whenever possible."[15]

Having served both as an auditor and a compliance professional and having worked with auditors, compliance professionals, and accountants over my four decades of experience, the avoidance of conflicts of interest in conducting audits, examinations, and reviews of any kind is a non-negotiable, bedrock principle of practice. Absent independence, any work product generated is suspect. The bias created by a lack of independence, especially when the conflict of interest has not been disclosed, calls into question any work product prepared or conclusions drawn by the conflicted individual.

It is self-evident that Mr. Nix violated these basic principles in conducting his review. As reflected in his deposition, without the knowledge of Fluor (or for that matter his co-workers in compliance), Mr. Nix began building a lawsuit against Fluor while he was working in compliance and prior to accepting the assignment in question. When designing and conducting his attribute sampling study, he was not independent. He admitted that "the worse [his] review results in terms of noncompliance, the better [his] case." Nix Dep. Tr. 362:18–63:5.[16] He also conceded that he began working on the review in February 2013 and less than a month later (and long before the review's completion) he "planned to make this review – the negative adjustment review part of [his] False Claims Act case." Id. 365:16–24. He further admitted sending his plan for the review to his personal email for "purposes of building [his] False Claims Act case." Nix Dep. Tr. 361:9–23. Mr. Nix's subsequently filed False Claims Act complaint relies heavily on his study, described as a "compliance review." Nix Compl. ¶¶ 64–78. And, as noted, the Relators in this case adopted Mr. Nix's conclusions. Second Am. Compl. ¶¶ 170–84.

2.    <u>Review Methodology and Conclusions</u>

Mr. Nix made fundamental errors in his analysis. First, he neither designed nor conducted his review such that its results could be appropriately extrapolated in the manner described in his

---

[13] ACFE Code of Professional Standards § III.A.1, *available at* https://www.acfe.com/~/-/media/E805D87A1E144558BF27A7F4B0B8317B.ashx.

[14] Code of Ethics for Compliance and Ethics Professionals, Principle II, *available at* https://assets.corporatecompliance.org/Portals/1/PDF/Resources/SCCECodeOfEthics_English.pdf.

[15] *Id*. at 7.

[16] After an objection from his counsel, Mr. Nix redefined the question and answered it. "So are you asking me if the worse the compliance review is, does that make my case look better?" . . . "Yes." *Id*. 362:25–63:5.

8

complaint (or Relators'). Second, he (and Relators) falsely equate the conclusions of his study with a physical loss of materials where his review showed nothing of the kind. Mr. Nix appears to conclude that his attribute sampling results demonstrate the physical loss of material. For example, he claims that the universe of negative adjustments from which he drew his sample totaled $386 million in materials, and because of the lack of an "audit trail" or LTDD, "this represents $360 million in missing and unaccounted-for Government materials." Nix Compl. ¶¶ 77–78. He then further extrapolates to the universe of LOGCAP IV making the wildly unsupported claim that over a billion dollars of materials were lost. *Id*. ¶ 78.

Mr. Nix's compliance review relating to negative adjustments, though not so described in his report, is what is called an attribute sampling study. This technique is also referred to by the DCAA as acceptance sampling. DCAA Contract Audit Manual (DCAM) § 4-602.7. This methodology is appropriate for binary testing (that is, "yes or no") of a particular attribute used as an internal control. For example, assume that a company's accounting system requires signature approval for invoice payment. An attribute sample study could be used to test whether in a given population (here, invoices), signatures appear or do not appear approving payment.

Mr. Nix sampled attributes to determine whether, for negative inventory adjustments, there was either:

a) objective evidence that adequate documentation was created to justify the adjustment (that is, evidence it was administrative); or

b) the adjustment was captured in a LTDD report.

Feb. 11, 2014 MMG Negative Adjustment and LTDD Compliance Review – Final Report, FLUOR-SR_0006806821 (Nix Report), at -826–27. He generated a random sample for each of the fiscal years reflected in the period of review (January 1, 2010 to February 1, 2013), identifying 59 negative adjustments in each year. In these samples, he tested for (a) and (b), and if he found either in the sampled transaction, he indicated that item as "yes" and the remainder as "no." In so doing, he calculated "error rates" by percentage of "yes" vs. "no" in his sample by year. *Id*. He reports generating the random samples using *EZ-Quant* without specifying the confidence interval used, but I assume for purposes of this report that the sample size for attribute testing was appropriate for that purpose.[17]

To determine whether or not a sample was a "yes," Mr. Nix reports looking to Maximo's "memo" field for a description or requesting "objective evidence" from the Materials Management Group that the adjustment was administrative. For LTDD testing, he also looked for "objective evidence"

---

[17] Typically, in order to conduct a proper attribute sample, one has to select the confidence level, the tolerable deviation rate, and the expected deviation rate. *See, e.g.*, HUD OIG, HUD Consolidated Audit Guide, App'x A, Attribute Sampling (2011), *available at* https://www.hudoig.gov/sites/default/files/documents/audit-guides/appendix.pdf. The DCAA methodology for acceptance sampling assumes a 90% confidence level and requires selecting from three tolerable error levels (low, medium, high). DCAM 4-602.7(i)–(j). I understand that *EZ Quant* allows a user to specify the confidence and the tolerable exception rate. Assuming Mr. Nix used these parameters to develop his sample, his report does not specify the parameters he used.

9

that a LTDD report was created for the transaction.  It is not clear from his report how he determined whether there was "objective evidence" to meet either of these criteria.[18]

Attribute sampling is a fairly simple form of testing used to identify potential internal control weaknesses.  In my experience, it is only the first step or a "jumping off point" to determine risk associated with an internal control and whether further analysis is warranted.  The next step would be to determine what the "no" signifies.  Mr. Nix appears to assume that the lack of a Maximo "memo" or other so-called "objective evidence" of an administrative adjustment means that the adjustment was not administrative.  This is a leap of logic.  Root cause analysis would be required to determine what the "no's" actually signify—e.g., whether they are reflective of physical loss of material as opposed to a simple lack of documentation (as I commonly experienced during my time on LOGCAP and in other contingency contracts).  If a causation analysis suggested that the negative adjustments did actually represent physical losses, variable sampling—and not attribute sampling—could be used to estimate how much material was "lost."  Without variable sampling, however, no such valid estimate could be made.

Judging by his report, Mr. Nix appears to recognize the limitations of attribute sampling.  The report's conclusions are framed in terms of "process and procedures" that are "not adequately controlled."  Nix Report at -822.  Nowhere in Mr. Nix's report does he conclude that the sampled items reflect actual physical loss of materials; nor does Mr. Nix attempt, as he did in his complaint, to extrapolate to the universe of property transactions the value of such supposed "losses."  If anything, the report shows only that Fluor's Material Management Group in Northern Afghanistan did not consistently follow internal controls with respect to documentation.

Drawing any broader conclusions as to what the transactions reflect in terms of physical loss and any attempt to quantify such loss would require a more comprehensive evaluation using variable sampling techniques.  *See* DCAM § 4-602.8.  Variable sampling can be used to quantify a value in a universe of items or transactions based on a sample.  In addition to a detailed analysis of each sample item, techniques such as stratified sampling (that is, dividing and analyzing the population into strata and then drawing samples from each of those strata as appropriate) can be used in appropriate circumstances to achieve a quantifiable result.

Notwithstanding his complaint, Mr. Nix did not purport to conduct any such analysis nor is it clear that he would have had the knowledge, competence, or independence to do so.[19]

### B.    Negative Adjustments Should Not be Confused with Physical Losses

I am also skeptical that the negative adjustments referenced in Mr. Nix's report necessarily represent physical losses.  From my own experience in both Iraq and Afghanistan with KBR, I am familiar with the operating environment and tempo in those theaters.  I know, for example, that the Forward Operating Bases (FOBs) on which contractors operate are tightly controlled by the

---

[18] Curiously, Mr. Nix chose only to look at negative adjustments and LTDDs and not to consider positive adjustments.  This is perhaps explainable by Mr. Nix's conflict and his personal interest in purporting to show negative adjustments reflect lost property.  I note that when Fluor did its own comprehensive review of adjustments, reported to the Government in March 2013, it considered both positive and negative adjustments.  Jan. 2014 Background Paper on Fluor Inventory Adjustments, Attachment 1, FLUOR-SR_0009515023, at -032 to -033.

[19] I note that Mr. Nix began this review when he had been in the compliance department only a few months.

military. There is extensive security both on entering and exiting the facilities, including searches of vehicles and personnel. Accordingly, I would find it highly implausible, if not impossible, for significant amounts of material to disappear through theft or to be simply "lost" on base. Further, given the stress caused by the hostile environment and the frequent turnover of personnel, data entry and paperwork errors in my experience are commonplace in virtually every aspect of LOGCAP operations. Accordingly, I would fully expect there to be similar issues relating to Maximo. Millions of dollars of material simply do not vanish into the desert. As multiple witnesses testified,[20] "losses" are far more likely to be explained by administrative error or the consumption of material outside of Maximo than by the physical loss or theft of material.

While my analysis focuses on negative adjustments, the principle is equally or better illustrated with respect to positive adjustments or "gains." I am aware that commonly, after inventories, positive adjustments are made to CURBAL. It is impossible for these materials to have magically appeared out of thin air. The "gains" instead are the result of the normal administration of material inventory or human error in the difficult operating environment of LOGCAP.

As I know from my experience in contingency contracting and from conversations with Fluor personnel, there are many examples of what are loosely termed "administrative adjustments." In general, they reflect data input errors or process changes in Maximo that result in adjustments (negative or positive) without a corresponding physical loss or gain of material. Common types of such administrative adjustments include, but are not limited to, issues with unit of measure, item code changes, and manual data entry mistakes (commonly referred to as "fat finger" errors).

Recognizing this fact, I set out to identify the root cause of the highest-dollar negative adjustment transactions in Maximo for FY 2011–14 to see if I could determine if they were administrative. To do this, I used the results of the queries set out in greater detail in Appendices C, D, and E, and I reviewed the top 20% of negative adjustments by "line cost" for each fiscal year.[21]

I manually reviewed every negative adjustment transaction in the top 20%—I did not select a sample. I chose not to conduct a variable sample for the universe as a whole because of the lack of homogeneity among transactions. A significant manual effort would have been required to evaluate each transaction and determine the root cause of the negative adjustment, over a decade after the fact. It was not feasible to review the thousands of negative transactions one-by-one in the time available, and I cannot, unlike Mr. Nix, simply conclude a lack of documentation equals a physical loss. I chose instead to look at the most significant transactions by dollar value.

There were 17 such transactions over the four years; for ease of reference, the following chart categorizes the item code, an item description, the line cost value of the negative transaction, and the type of administrative error:

---

[20] Shane Ramirez Dep. 428:11–14; Juan Jones Dep. 489:18–491:22, 511:13–512:9; Tony Montalvo Dep. 469:23–473:12.

[21] "Line cost" for an inventory adjustment is the average cost of the items adjusted multiplied by the quantity adjusted. In the data set generated by Mr. Sutherland, I understand that Ms. Smith filtered the dataset to include only the RECBALADJ and CURBALADJ transactions and then identified the top 20% of negative adjustments from this set by line cost value in each fiscal year.

11

| FY | Item | Item Description | Quantity | Average Cost | Line Cost | Root Cause |
|---|---|---|---|---|---|---|
| FY11 | 91G2590000055 | MOTOR, WIPER, GM P/N 88958144, OR APPROVED EQUAL | (266,886) | $178.52 | ($47,644,489) | Data Entry Error |
| FY12 | 92G6145000895 | WIRE, 10 AWG MTW, RED, 500 FT, ROL OF 500 FT, CAROL P/N 76832.18.03, OR APPROVED EQUAL | (249,500) | $130 | ($32,435,000) | UOM |
| FY12 | 92G5995000149 | CABLE, 10/2 WITH GROUND, NON-METALIC, SOLID, ROL OF 250 FT, COLEMAN CABLE M/N G55568-04-03, OR APPROVED EQUAL | (34,326) | $816 | ($28,039,392) | UOM |
| FY13 | 92G8540000035 | TOWEL, PAPER, SINGLE FOLD, BOX, BX OF 4000 EA | (1,667,583) | $21.74 | ($36,253,254) | UOM |
| FY14 | 91G6145001084 | WIRE, ELECTRICAL, STRANDED, WHITE, 8 AWG, FEDERAL COMMERCIAL P/N A-A-59544, OR APPROVED EQUAL | (13,972) | $207.01 | ($2,892,344) | UOM |
| FY14 | 91G6240000225 | LAMP, FLUORESCENT, WHITE, 34 W, 48 IN, PHILLIPS ELECTRONICS P/N 24470-7, OR APPROVED EQUAL | (21,496) | $38.88 | ($835,764) | Item Code Number Change |
| FY14 | 92G5340000074 | STRAP, CONDUIT, EMT, 1 HOLE, 3/4 IN, BAG OF 50 EA, THOMAS AND BETTS P/N TS 102, OR APPROVED EQUAL | (28,616) | $21.27 | ($608,662) | UOM |
| FY14 | 91G5925000506 | BREAKER, CIRCUIT, PANELBOARD, 3 POLE, 600 V, 400 A, SQUARE D P/N LA36400, OR APPROVED EQUAL | (291) | $1884.34 | ($548,343) | IPO |
| FY14 | 92G6145000285 | WIRE, RED, STRANDED, 10 AWG, THHN, 600 V, ROL OF 500 FT, REFERENCE GRAINGER P/N 4W009 | (1,497,000) | $0.25 | ($374,250) | UOM |
| FY14 | 91G4730013016 | CLAMP, 4 5INX8IN, CASCADE P/N 2/CR1-5, 60-8 | (2,380) | $157 | ($373,660) | UOM |
| FY14 | 91G6145001022 | WIRE, ELECTRICAL, 500 FT, COLONIAL WIRE AND CABLE OF NEW JERSEY INC P/N THHN-10-RED, OR APPROVED EQUAL | (3,992) | $90.16 | ($359,919) | UOM |

12

**Plaintiffs' Trial Exhibit 821**
**Page 14 of 68**

| | | | | | | |
|---|---|---|---|---|---|---|
| FY14 | 92G7360000084 | FLATWARE SET, BX OF 400 EA, ARSLON PLASTIK P/N AP-3 | (7,813) | $46.06 | ($359,867) | Item Code Number Change |
| FY14 | 91G4130001055 | CONTROLLER, MICRO-LINK3, CARRIER P/N 12-00579-00, OR APPROVED EQUAL | (163) | $1,787.35 | ($291,338) | Item Code Number Change |
| FY14 | 91G7350000053 | PLATE, PAPER, PLASTIC COATED, 3 COMPARTMENT,  10-1/4 IN | (3,947) | $73.54 | ($290,262) | Item Code Number Change |
| FY14 | 91G7350000042 | CUP, MOISTURE RESISTANT, DIEPOSABLE, 12 OZ | (2,318) | $122.20 | ($283,260) | Item Code Number Change |
| FY14 | 91G6210000185 | LIGHTING, FLOURESCENT, 10 UNIT KIT, FOR ALASKAN STRUCTURES M/N AK-EL-S10-50WFLHSBCC01 | (126) | $2,108.21 | ($265,634) | IPO |
| FY14 | 92G2530005092 | CASE, 4 LIGHT SET, CAS OF 4 EA, TEMPER P/N 31-MC-502S, OR APPROVED EQUAL | (171) | $1,541.36 | ($263,573) | UOM |

| Category | Count |
|---|---|
| Data Entry Error | 1 |
| Item Code Number Change | 5 |
| UOM | 9 |
| IPO | 2 |
| **Total** | **17** |

The negative adjustments associated with these transactions were readily explained through administrative error.  However, if these negative transactions were viewed in a vacuum, without a corresponding "deep dive," one might easily confuse them with physical loss.  For example, the highest single adjustment by dollar value was the "loss" of nearly $48 million of General Motors wiper motors (i.e., the motors that power windshield wipers on a vehicle).  At the time of the transaction, the Maximo average cost for that item was $178.52 per motor and the quantity negatively adjusted was 266,886.  Standing alone, that figure is shocking.  I asked myself—*Why would Fluor have a quarter of a million wiper motors at a single site, let alone lose them all?* Clearly, there was another explanation—and as explained below, a more detailed review showed this adjustment to be the result of a data entry error.

## C.     Types of Administrative Adjustments

I found it useful to divide the negative adjustment transactions I reviewed into categories.  I conducted a manual review of the audit histories of the transactions at issue and identified

13

reasonable explanations for the adjustments. An explanation and example of each category is listed below; a more detailed summary of each transaction I reviewed appears in Appendix G.

### 1. Data Entry Error

Data entry errors may occur when an item is manually adjusted in Maximo, for example, after a physical inventory, through human error (a "fat finger").

As noted above, the wiper motor example presents a classic case of a data entry error. The following table lists the transactions associated with this item (91G2590000055: MOTOR, WIPER, GM P/N 88958144, OR APPROVED EQUAL) from the Inventory Transaction ("INVTRANS") table:

| invb Item Number | Transaction eaudittransid | invb Current Balan | invb Physical Cour | invb eauditty | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 91G2590000055 | 24699592 | 2 | 2 | U | 2/15/2011 9:29:30 | PCOUNTADJ | 0 | 178.52 | 0 | | |
| 91G2590000055 | 24699592 | 2 | 2 | U | 2/15/2011 9:29:30 | RECBALADJ | 0 | 178.52 | 0 | | |
| 91G2590000055 | 25041070 | 2 | 266888 | U | 2/22/2011 7:21:09 | PCOUNTADJ | 266886 | 178.52 | 47644488.7 | | |
| 91G2590000055 | 25040182 | 266888 | 266888 | U | 2/22/2011 7:26:43 | RECBALADJ | 266886 | 178.52 | 47644488.7 | | |
| 91G2590000055 | 25082429 | 266888 | 2 | U | 2/23/2011 5:46:57 | PCOUNTADJ | -266886 | 178.52 | -47644489 | | |
| 91G2590000055 | 25082431 | 2 | 2 | U | 2/23/2011 5:47:45 | RECBALADJ | -266886 | 178.52 | -47644489 | | |
| 91G2590000055 | 43855387 | 2 | 2 | U | 9/20/2011 6:58:13 | RECBALADJ | 0 | 178.52 | 0 | | |
| 91G2590000055 | 43855387 | 2 | 2 | U | 9/20/2011 6:58:13 | PCOUNTADJ | 0 | 178.52 | 0 | | |
| 91G2590000055 | 70641174 | 2 | 2 | U | 4/21/2012 3:30:59 | PCOUNTADJ | 0 | 178.52 | 0 | INV 10 Cycle | 10% Monthly Inventory Adjustment |
| 91G2590000055 | 70640667 | 2 | 2 | U | 4/21/2012 3:40:33 | RECBALADJ | 0 | 178.52 | 0 | | |
| 91G2590000055 | 75291896 | 2 | 2 | U | 6/19/2012 6:22:22 | PCOUNTADJ | 0 | 178.52 | 0 | INV100 | 10%INVENTORY ADJUSTMENT |
| 91G2590000055 | 75291897 | 2 | 2 | U | 6/19/2012 6:22:36 | RECBALADJ | 0 | 178.52 | 0 | | |
| 91G2590000055 | 76987813 | 2 | 2 | U | 7/12/2012 3:50:38 | PCOUNTADJ | 0 | 178.52 | 0 | Inv100 | 100%Inventory adjustment |
| 91G2590000055 | 76987815 | 2 | 2 | U | 7/12/2012 3:50:55 | RECBALADJ | 0 | 178.52 | 0 | | |
| 91G2590000055 | 78734563 | 2 | 2 | U | 8/5/2012 8:18:25 | PCOUNTADJ | 0 | 178.52 | 0 | INV 10 Cycle | 10% Monthly Inventory Adjustment |
| 91G2590000055 | 78734457 | 2 | 2 | U | 8/5/2012 8:20:41 | RECBALADJ | 0 | 178.52 | 0 | | |

The data from the INVTRANS table shows that the item was inventoried on February 15, 2011 (as reflected by the PCOUNTADJ and RECBALADJ on that date) showing that there were two wiper motors in stock at the Non-Tactical Vehicle Storeroom at FOB Phoenix. However, on February 22, 2011, another PCOUNTADJ and RECBALADJ increased the PCOUNT balance and CURBAL from two to 266,888—adding 266,886 wiper motors to the bin at that storeroom with a "line cost" adjustment of about $47.6 million. This "fat finger" error was then corrected through negative PCOUNTADJ and RECBALADJ transactions on February 23, 2011, the very next day, returning the current balance to two, where it remained until August 2012. I further note the audit history indicates this item was counted four more times in inventories in 2012 alone.

Had Mr. Nix reviewed this transaction as a part of sample, he likely would not have considered the audit history or underlying cause; per his methodology, he would have focused alone on the lack of an explanation in the corresponding memo field. Indeed, he might have faulted Fluor for not having submitted a LTDD report for the more than 200,000 "lost" motors. Of course, these motors were never "lost" or "found" but simply were the result of a data entry error.

### 2. Item Code Number Change

Items in inventory have associated item codes within Maximo. Based on my discussions with Fluor personnel, I understand that, on occasion, it was necessary to update or revise item codes. For example, there were efforts to change "91G" item codes to "92G" codes related to unit of measure issues described below. There were also instances when items codes for "like" items were consolidated or item codes were simply changed.

14

**Plaintiffs' Trial Exhibit 821**
**Page 16 of 68**

I understand that Fluor inventory personnel processed these updates in Maximo by deleting the balance for the former item code through a negative adjustment. They then added the balance back through a corresponding positive adjustment in the new item code. There are also instances where there were discrepancies between the item code for what was ordered versus the item code for what was received. These item code discrepancies would then have to be manually corrected. None of these negative adjustments, however, reflects a physical loss of material.

I include below an example of a change in 92G item codes for boxes of plastic flatware (i.e., utensils used in dining facilities (DFACs)). On August 25, 2014 at Bagram Air Base in the DFAC storeroom, there were thirteen lines of inventory for plastic flatware that were adjusted to make the item code change. I have included one example of these transactions below for illustrative purposes. It shows that the change was made by deleting a 92G balance from one item code (92G7360000084) and inserting the 92G balance under another code (92G7360000072):

| invb Bin | invb Item Number | Transaction eaudittrans id | invb Current Balanc | invb Physical Count | invb eaudittype | invb eaudittimestamp | invb eaudittransid | Transaction Type | Quantity | AvgCost at time of Transacti | Line Cost | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DF107AAAA | 92G7360000084 | 117789861 | 960 | 0 | U | 8/25/2014 0:23:18 | 117789861 | PCOUNTADJ | -960 | 46.06 | -44217.6 | AA-92G7360000084 REPLACED BY 92G7360000072 |
| DF107AAAA | 92G7360000084 | 117790580 | 0 | 0 | U | 8/25/2014 0:23:38 | 117790580 | RECBALADJ | -960 | 46.06 | -44217.6 | |
| DF107AAAA | 92G7360000084 | | 0 | 0 | D | 8/25/2014 0:24:51 | 117790585 | | | 46.06 | | |
| DF107AAAA | 92G7360000072 | | 0 | 0 | I | 8/25/2014 0:28:10 | 117790594 | | | 28.79 | | |
| DF107AAAA | 92G7360000072 | 117790600 | 0 | 960 | U | 8/25/2014 0:31:59 | 117790600 | PCOUNTADJ | 960 | 28.79 | 27638.4 | AA-92G7360000084 REPLACED BY 92G7360000072 |
| DF107AAAA | 92G7360000072 | 117790602 | 960 | 960 | U | 8/25/2014 0:32:17 | 117790602 | RECBALADJ | 960 | 28.79 | 27638.4 | |

As we can see, the former 92G item code is adjusted out, reflected in Maximo as a negative adjustment of 960 boxes of flatware in this bin. These were not "lost." The flatware was simply transferred to a new replacement item code, as indicated in the memo field. Had the memo field been left blank, these adjustments could have been confused with physical losses, particularly because they were changed to new item codes which are not automatically linked with the former item codes. In other words, without the "memo," it would be difficult to determine what happened to the so-called "lost" boxes of flatware but in no means should one simply assume they were physically lost.

### 3.    Unit of Measure ("UOM")/Unit of Issue

UOM adjustments result from correcting errors associated with differences in units of measure. Items are often purchased in different units than issued out. In the example set out below, cable was purchased by 250 foot rolls but issued by the foot. This can cause confusion as to how the item should be inventoried (by roll versus foot) and require adjustments to correct. Similar types of errors could apply to items purchased by the case and issued in smaller quantities (e.g., paper towels). These types of errors can show dramatic, false swings in the monetary value of inventory.

I know from my experience with KBR and from my discussions with Fluor personnel that after an item is purchased, the monetary value calculated in Maximo has little to no practical significance for field employees. There are many reasons for this: among others, items may be purchased at different dollar values at different points in time and averaged out in the bin where they are received. Moreover, the dollar value calculated in Maximo for materials is not tied to SAP, the books of account used for billing or reporting costs. Practically, in my experience, materials employees relied on the quantity of materials issued, received, or transferred, and rarely (if ever) looked at their dollar value.

15

In the following example, cable was received in inventory by the roll; however, there was an error created when the cable was instead issued out of inventory by the foot:

| invb Item Number | Transaction eaudittransid | invb Current Balan | invb Physical Cour | invb eaudittyp | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 92G5995000149 | 62603205 | 133 | 133 | I | 1/9/2012 5:11:52 | TRANSFER | 133 | 816 | 108528 | | |
| 92G5995000149 | 63630438 | 133 | 138 | U | 1/22/2012 0:34:23 | PCOUNTADJ | 5 | 816 | 4080 | | INV RANDOM    Random Spot Check Adjustment |
| 92G5995000149 | 63646247 | 138 | 138 | U | 1/22/2012 4:50:25 | RECBALADJ | 5 | 816 | 4080 | | |
| 92G5995000149 | 63652992 | 138 | 34500 | U | 1/22/2012 6:17:16 | PCOUNTADJ | 34362 | 816 | 28039392 | | INV RANDOM    Random Spot Check Adjustment |
| 92G5995000149 | 63652648 | 34500 | 34500 | U | 1/22/2012 6:21:17 | RECBALADJ | 34362 | 816 | 28039392 | | |
| 92G5995000149 | 63804222 | 34500 | 138 | U | 1/24/2012 4:50:50 | PCOUNTADJ | -34362 | 816 | -28039392 | | entered by mistake, conversion from rol to ft |
| 92G5995000149 | 63804225 | 138 | 138 | U | 1/24/2012 4:51:24 | RECBALADJ | -34362 | 816 | -28039392 | | |
| 92G5995000149 | 63804235 | 138 | 34500 | U | 1/24/2012 4:53:30 | PCOUNTADJ | 34362 | 816 | 28039392 | | unit conversion from ROL to FT |
| 92G5995000149 | 63828367 | 34500 | 34500 | U | 1/24/2012 21:30:55 | RECBALADJ | 34362 | 816 | 28039392 | | |
| 92G5995000149 | 64934777 | 34500 | 34500 | U | 2/8/2012 10:23:29 | PCOUNTADJ | 0 | 816 | 0 | | |
| 92G5995000149 | 64934777 | 34500 | 34500 | U | 2/8/2012 10:23:29 | RECBALADJ | 0 | 816 | 0 | | |
| 92G5995000149 | 67860659 | 0 | 34500 | U | 3/13/2012 23:21:19 | TRANSFER | -34500 | 816 | 28152000 | | |
| 92G5995000149 | | 0 | 34500 | D | 3/18/2012 2:39:11 | | | 816 | | | |

The above table shows that, during a random spot check—a type of physical inventory—at FOB Fenty on January 22, 2012, in the electrician storeroom at D7, a RECBALADJ inserted 34,362 units of cable (92G5995000149) raising the prior inventory from 138 to 34,500. The administrative error here is that the inventory was recorded by the roll, but during the spot check, an employee mistakenly conducted the inventory by the foot. As a result, the employee recorded the 138 rolls of cable instead as 34,500 "rolls" (138 rolls x 250 feet per roll = 34,500 "rolls").

A few days later, on January 24, 2012, a Fluor employee apparently recognized the conversion error and undid it, subtracting 34,362 units of cable. The error was documented in the memo field; I note that had the memo field not been populated, this adjustment could have been confused with a significant physical loss. However, a few minutes later, a user undid the correction. This underscores the many challenges that existed related to UOM issues alone.

The UOM administrative error was exacerbated because Maximo is not used as the book of record for inventory cost. The conversion dramatically increased the "value" of the cable rolls from $4,080 (at $816 per roll) to approx. $28 million. If inventory was conducted by the foot and not the roll, then too the cost should be recorded by the foot and not the roll (here from $816 a roll to $3.26 per foot ($816/250)). It appears that the cost was not corrected which continued the inventory value at $28 million. This type of error in my experience would result from the fact that employees conducting inventories in the field are focused on the inventory unit and not the cost per unit, which is automatically generated by Maximo. Of course, cable does not cost $816 per foot, but a casual observer looking at the history after the fact could misinterpret the Maximo data. It also underscores why Fluor never used Maximo as its financial accounting system.

A similar story regarding UOM issues is presented by the following examples of boxes of paper towels:

16

Plaintiffs' Trial Exhibit 821
Page 18 of 68

| invb Item Number | Transaction eaudittransid | invb Current Balan | invb Physical Cour | invb eaudittype | invb eaudittimestam | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 92G8540000035 | | 576000 | 576000 | I | 9/4/2013 15:56:23 | | | 21.74 | | | |
| 92G8540000035 | 104221663 | 575856 | 576000 | U | 9/4/2013 15:57:01 | RETURN | -144 | 21.74 | -3062.88 | D32-1008055 | |
| 92G8540000035 | 104221664 | 575856 | 0 | U | 9/4/2013 16:06:36 | PCOUNTADJ | -576000 | 21.74 | -12522240 | | backout of material for MRR update UOM error in entering material |
| 92G8540000035 | 104221665 | 0 | 0 | U | 9/4/2013 16:06:48 | RECBALADJ | -575856 | 21.74 | -12519109 | | |
| 92G8540000035 | | 0 | 0 | D | 9/7/2013 9:10:10 | | | 21.74 | | | |

| invb Item Number | Transaction eaudittransid | invb Current Balan | invb Physical Cour | invb eaudittype | invb eaudittimestam | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 92G8540000035 | | 576000 | 576000 | I | 9/4/2013 15:56:23 | | | 21.74 | | | |
| 92G8540000035 | 104221663 | 575856 | 576000 | U | 9/4/2013 15:57:01 | RETURN | -144 | 21.74 | -3062.88 | D32-1008055 | |
| 92G8540000035 | 104221664 | 575856 | 0 | U | 9/4/2013 16:06:36 | PCOUNTADJ | -576000 | 21.74 | -12522240 | | backout of material for MRR update UOM error in entering material |
| 92G8540000035 | 104221665 | 0 | 0 | U | 9/4/2013 16:06:48 | RECBALADJ | -575856 | 21.74 | -12519109 | | |
| 92G8540000035 | | 0 | 0 | D | 9/7/2013 9:10:10 | | | 21.74 | | | |

On September 4, 2013, at the cleaning storeroom at FOB Ghazni, paper towels (92G8540000035) were entered into two different bins, with quantities of 576,000 boxes of paper towels in one bin and 1,092,000 boxes in the second. This error resulted again from UOM issues confusing boxes of paper towels with 4,000 individual paper towels per box. The 576,000 units of paper towels in the first example represented 144 boxes (576,000/4,000), and in the second, 273 boxes (1,092,000/4,000). These errors were corrected through PCOUNTADJ and RECBALADJ transactions the same day with a notation in the "memo" field that there was a UOM error when entering the material into inventory. In a now familiar refrain, without the notation, the negative transactions could have been confused as $36 million in losses.

### 4.     IPO

In the 17 transactions I reviewed, there were two negative adjustment transactions relating to open internal purchase orders ("IPOs"). Documentation shows that in these instances, negative adjustments were used to adjust balances for inventory that was never physically received at the site in order to administratively close the IPOs.

I understand that when a site requests an item in inventory from another site (and potentially when it orders an item not in inventory in Afghanistan), an internal purchase request ("IPR") is created in Maximo resulting in an associated IPO. That IPO would be closed in Maximo upon physical receipt of the items at the requesting site. However, where the requesting site only partially receives or never receives the requested items, in order to close the IPO in Maximo, the items in Transfer Out ("TROUT") status would be received at the requesting site, and in a second step, the quantities not physically received would be adjusted out. As a result, items not physically received would be shown in Maximo as received. The removal of these un-received items through negative adjustments are a form of an administrative adjustment and do not represent an actual physical loss.

In the sample, there are two instances of such adjustments, described below.

The first involves fluorescent light sets used in Alaska Structures (a brand of prefabricated building). In this example, on February 17, 2010, Spann initiated four IPRs to Bagram for light sets (91G6210000185). FLUOR-SR_0007357003 at -003, -007, -011, -015. However, those light sets were never received at Spann. Inventory Discrepancy Reports were created to demonstrate the items were not physically received. *Id.* at -006, -010, -014, -018. As a result, on October 18, 2013, the items were received in Maximo closing the IPO and the balances were negatively adjusted out thereafter, notwithstanding the fact the items were never received at Spann.

17

Plaintiffs' Trial Exhibit 821
Page 19 of 68

| invb Bin | invb Item Number | Transaction eaudittranzid | invb Current Balan | invb Physical Cour | invb eaudittyp | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IDR1000033 | 91G6210000185 | 105710149 | 30 | 30 | I | 9/30/2013 8:43:11 | TRANSFER | 30 | 2108.21 | 63246.3 | D52-1000033-PO | |
| IDR1000033 | 91G6210000185 | 106442664 | 30 | 0 | U | 10/18/2013 0:01:49 | PCOUNTADJ | -30 | 2108.21 | -63246.3 | | FLC13-520068 |
| IDR1000033 | 91G6210000185 | 106442665 | 0 | 0 | U | 10/18/2013 0:02:02 | RECBALADJ | -30 | 2108.21 | -63246.3 | | |
| IDR1000033 | 91G6210000185 | | 0 | 0 | D | 10/18/2013 0:02:24 | | | 2108.21 | | | |

| invb Bin | invb Item Number | Transaction eaudittranzid | invb Current Balan | invb Physical Cour | invb eaudittyp | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IDR1000035 | 91G6210000185 | 105710170 | 30 | 30 | I | 9/30/2013 9:03:20 | TRANSFER | 30 | 2108.21 | 63246.3 | D52-1000035-PO | |
| IDR1000035 | 91G6210000185 | 106442664 | 30 | 0 | U | 10/18/2013 0:01:49 | PCOUNTADJ | -30 | 2108.21 | -63246.3 | | FLC13-520068 |
| IDR1000035 | 91G6210000185 | 106442665 | 0 | 0 | U | 10/18/2013 0:02:02 | RECBALADJ | -30 | 2108.21 | -63246.3 | | |
| IDR1000035 | 91G6210000185 | | 0 | 0 | D | 10/18/2013 0:02:24 | | | 2108.21 | | | |

| invb Bin | invb Item Number | Transaction eaudittranzid | invb Current Balan | invb Physical Cour | invb eaudittyp | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IDR1000036 | 91G6210000185 | 105714316 | 33 | 33 | I | 9/30/2013 9:29:35 | TRANSFER | 33 | 2108.21 | 69570.93 | D52-1000036-PO | |
| IDR1000036 | 91G6210000185 | 106442664 | 33 | 0 | U | 10/18/2013 0:01:49 | PCOUNTADJ | -33 | 2108.21 | -69570.93 | | FLC13-520068 |
| IDR1000036 | 91G6210000185 | 106442665 | 0 | 0 | U | 10/18/2013 0:02:02 | RECBALADJ | -33 | 2108.21 | -69570.93 | | |
| IDR1000036 | 91G6210000185 | | 0 | 0 | D | 10/18/2013 0:02:24 | | | 2108.21 | | | |

| invb Bin | invb Item Number | Transaction eaudittranzid | invb Current Balan | invb Physical Cour | invb eaudittyp | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IDR1000037 | 91G6210000185 | 105714363 | 33 | 33 | I | 9/30/2013 10:08:04 | TRANSFER | 33 | 2108.21 | 69570.93 | D52-1000037-PO | |
| IDR1000037 | 91G6210000185 | 106442664 | 33 | 0 | U | 10/18/2013 0:01:49 | PCOUNTADJ | -33 | 2108.21 | -69570.93 | | FLC13-520068 |
| IDR1000037 | 91G6210000185 | 106442665 | 0 | 0 | U | 10/18/2013 0:02:02 | RECBALADJ | -33 | 2108.21 | -69570.93 | | |
| IDR1000037 | 91G6210000185 | | 0 | 0 | D | 10/18/2013 0:02:24 | | | 2108.21 | | | |

Further, Fluor notified the Government of a potential LTDD (FLC13-520068); however, that LTDD was subsequently cancelled.[22]  As noted above, I understand that from the adoption of MMP Revision 4 (Sept. 12, 2011) until the adoption of MMB 15 (Jan. 30, 2014), Fluor policy was to report unexplained negative adjustments as physical "losses" on LTDD reports.  I further understand that, at Government direction, Fluor changed this practice consistent with FAR 52.245-1(f)(vii)(C)(1) after it received a CAR from Prime GPA Maria McNamara on January 27, 2014 for submitting LTDD reports for adjustments.  FLUOR-SR_0010046877.  The change (and the factual circumstances of this particular transaction) demonstrates that LTDDs were properly reserved only for the physical loss, theft, damage, or destruction of property.  In any event, the submission of the LTDD did not necessarily mean property physically was lost, nor do the Maximo transactions support that conclusion.

Similarly, Bagram initiated an IPR for circuit breakers (91G5925000506) that generated an IPO in March 2013 to be fulfilled by FOB Warrior.[23]  In this instance, the IPO was closed on March 6,

---

[22] March 28, 2014 MFR re Cancellation of LTDD's per MMB-0015, FLUOR-SR_0006452717.
[23] FLUOR-SR_0011682309, at -312 (tracking delivery truck traveling from Warrior to Bagram in March 2013).

18

Plaintiffs' Trial Exhibit 821
Page 20 of 68

2014, although the circuit breakers were not physically received at Bagram.[24]   There is documentation in Maximo that indicates the truck carrying the items in question was re-routed.[25] I understand from Fluor personnel that re-routing was commonly directed by the military (and I further note that the transportation mission was not Fluor's).  Since the circuit breakers were not received, Maximo inventory needed to be adjusted through an administrative adjustment.  The circuit breakers were negatively adjusted in Maximo about a week after the "receipt."  Here, too, the negative adjustment does not demonstrate a physical loss.

| invb Item Number | Transaction eaudittransid | invb Current Balance | invbalances Physical Count | invb eaudittype | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transaction | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 91G5925000506 | 112099050 | 291 | 291 | I | 3/7/2014 1:58:15 | TRANSFER | 291 | 1884.34 | 548342.94 | D01-130053 | |
| 91G5925000506 | 112431387 | 291 | 0 | U | 3/16/2014 2:23:12 | PCOUNTADJ | -291 | 1884.34 | -548342.94 | IPO RCV DIS | Internal PO Discrepancy Adjustment |
| 91G5925000506 | 112430704 | 0 | 0 | U | 3/16/2014 2:26:21 | RECBALADJ | -291 | 1884.34 | -548342.94 | | |
| 91G5925000506 | | 0 | 0 | D | 3/17/2014 3:35:15 | | | 1884.34 | | | |

### D.     Adjustments for Materials Issued on Work Orders

In addition to the categories identified through my review of the top adjustments by line cost, I reviewed some instances where materials were consumed in performing work under LOGCAP; however, the material was not contemporaneously issued to work orders in Maximo.

Witnesses have testified that even unexplained negative adjustments do not necessarily constitute physical losses.  Instead, due to paperwork or data entry errors, items legitimately consumed in performing work under LOGCAP were not properly issued to work orders contemporaneously. For example, I understand that there were instances where the trades would take materials directly from the receiving pad or delivery trucks to perform work before the items were processed in Maximo.  Relator Mackey says as much in in a June 2012 Materials Management Conference slide deck, FLUOR-SR_0011589553, at -595, analogizing the situation to the film *Saving Private Ryan*.

There are instances in Maximo where a negative adjustment was later used to remove consumed items from active inventory balances.  During my review, I found some memo fields describing these types of adjustments; in those cases, the work order had been closed, and so the user could not issue the material to that work order.  Instead, negative adjustments were made to remove the consumed items from inventory.  Once again, such negative adjustments do not demonstrate a physical loss.

I have provided some illustrative examples below.  In selecting these examples, I necessarily relied on entries in "memo" fields tying the adjustments to work orders.[26]  I note, as did Mr. Nix, that

---

[24] FLUOR-SR_0011682315.

[25] FLUOR-SR_0001325275 (Accident/Incident Statement that "On 06MAR14, Shank Materials provided a copy of TMR Pre-Alert ACC6071 and a Memo . . . stating it was received at Retro Sort Yard and the TMR material never arrived at Bagram RDC for processing."); FLUOR-SR_0011682309, at -310 ("IPR#D01-130053- Everything has been received from TMR#ACD8137,ACE3755 & ACE3758.All the TROUTed lines ( Red color ) are pending from ACC6071 & it's never made at BAF Materials"); FLUOR-SR_0011682315 (Mar. 6, 2014 Report indicating that shipment from Warrior was "not received at Bagram RDC" and indicating that "Memo provided showing TMR ACC6071 was received at Retro").

[26] In this instance, I reviewed identified examples of negative adjustments where the "memo" identified the items had been consumed on work orders.  It would not be feasible to have conducted a sampling analysis because, as

19

there are significant numbers of negative adjustments, particularly in early years, that do not have information in the "memo" fields or for which the information is sparse.  I would fully expect that based on the witness testimony and my own experience working in LOGCAP that such data entry issues were commonplace and that in the universe of negative adjustment transactions without "memos" filled out, were it possible to tie these to work orders, I would expect to find numerous similar instance where items were consumed without being issued out of Maximo.

| Date | Item Number | Item Description | Transaction Type | Qty. | Line Cost | Memo |
|------|-------------|-----------------|------------------|------|-----------|------|
| 11-25-2011 | 91G5340000523 | COLLAR, TAP-IN, ALUMINIUM, 150 MM, P3 DUCTAL P/N 21CR15, OR APPROVED EQUAL | PCOUNTADJ | -7 | -590.8 | ITEM ORDERED FOR WO#8108222 DELIVERED TO HVAC WITHOUT PROVIDING ISSUE TICKET. ITEM ADJUSTED IN SYSTEM DUE TO NOT ISSUED THRU SYSTEM. |
| 11-25-2011 | 91G5340000523 | COLLAR, TAP-IN, ALUMINIUM, 150 MM, P3 DUCTAL P/N 21CR15, OR APPROVED EQUAL | RECBALADJ | -7 | -590.8 | NULL |
| 4-20-2012 | 91G2950000184 | TURBOCHARGER, FG WILSON P/N 997-118, OR APPROVED EQUAL | PCOUNTADJ | -1 | -2006.97 | 1 EA ISSUE UNDER BY THIS WO#9588487 |
| 4-20-2012 | 91G2950000184 | TURBOCHARGER, FG WILSON P/N 997-118, OR APPROVED EQUAL | RECBALADJ | -1 | -2006.97 | NULL |
| 6-08-2012 | 91G7920000129 | PAD, SCOURING, GRIDDLE SCREEN, 5-1/2 IN X 4 IN | PCOUNTADJ | -58 | -2388.44 | 100% inventory physical count,, in this case this item has been issue without any paper work |
| 6-08-2012 | 91G7920000129 | PAD, SCOURING, GRIDDLE SCREEN, 5-1/2 IN X 4 IN | RECBALADJ | -58 | -2388.44 | NULL |
| 7-08-2012 | 91G6240000280 | LAMP, FLUORESCENT, T-8, 48 IN X 32 W, GENERAL ELECTRIC COMPANY P/N F32T8/SP30/ECO, | PCOUNTADJ | -201 | -301.5 | ITEMS RECIVED MANUALY AND ISSUED ON WO# |

---

explained above, without a notation in the "memo" field, it would be extraordinarily to tie a negative adjustment to a work order.

20

| | | | | | | |
|---|---|---|---|---|---|---|
| | | OR APPROVED EQUAL | | | | |
| 7-08-2012 | 91G6240000280 | LAMP, FLUORESCENT, T-8, 48 IN X 32 W, GENERAL ELECTRIC COMPANY P/N F32T8/SP30/ECO, OR APPROVED EQUAL | RECBALADJ | -201 | -301.5 | NULL |
| 8-20-2012 | 91G5975001796 | COUPLING, ELECTRICAL CONDUIT, 0.5 IN, BELL ELECTRICAL SUPPLY INC P/N 2922, OR APPROVED EQUAL | PCOUNTADJ | -679 | -639.26 | PHYSICALLY CAN'T LOCATE THE ITEMS,PREVIOUSLY RECEIVED AND ISSUED WITHOUT PAPER WORK |
| 8-20-2012 | 91G5975001796 | COUPLING, ELECTRICAL CONDUIT, 0.5 IN, BELL ELECTRICAL SUPPLY INC P/N 2922, OR APPROVED EQUAL | RECBALADJ | -679 | -638.26 | NULL |
| 10-29-2013 | 91G4510001718/0006 | ACCESSORIES, TOILET TANK | PCOUNTADJ | -1 | 0 | ADMINISTRATIVE ADJUSTMENT: ITEM WAS USED ON WORK ORDER 9851187 BUT WAS NOT ISSUED AT THE TIME OF THE JOB. WORK ORDER IS NOW IN CLOSED STATUS. |
| 10-29-2013 | 91G4510001718/0006 | ACCESSORIES, TOILET TANK | RECBALADJ | -1 | 0 | NULL |

## VII.    Staffing Opinions

### A.    Introduction and Overview

Counsel for Fluor asked me to analyze and respond to Mr. Sherman's report, including his opinions that Fluor was "overstaffed" and charged the Government for excessive direct labor costs under Task Order 5.  For the reasons discussed below, I disagree with Mr. Sherman's conclusions.  There is no factual basis for Mr. Sherman's conclusion that Fluor overcharged the Government for direct labor costs.

21

**Plaintiffs' Trial Exhibit 821**
**Page 23 of 68**

As an initial matter, I understand that Fluor is a sophisticated government contractor with approved business systems that adhere to CAS and other applicable regulations imposed by the FAR and the DFARS. Among the six government-approved business systems is Fluor's Estimating System, which necessarily undergoes a detailed audit by the DCAA as part of the approval process. There are additional audits and reviews by the DCMA and DCAA of estimating systems, including a review of cost estimates submitted by a contractor as part of the proposal process, as described below.

In evaluating any cost estimate provided by a government contractor, including in proposals and bases of estimate (BOEs), it is also important to understand that estimating is a flexible, judgmental exercise. Although there are some industry standards for different aspects of estimating, there are no hard and fast rules. Per the DoD Cost Estimating Guide (version 1.0), "cost estimating is a unique skill set that combines the best of science and art into a single role. The work relies on sound mathematical and analytical skills, while also requiring critical thinking, communication, and nuance."[27] The nature and detail of any estimate necessarily depends on the context. Estimates are made using the best available information, which may change throughout the course of performance, or assumptions that do not prove out. In my experience, estimating is particularly challenging in a contingency environment, when expectations and requirements are constantly changing and may not be fully understood—either by the contractor or the Government—when the contractor submits estimates.

Furthermore, there is robust government oversight and scrutiny of a contractor's estimates, including for direct labor. In my experience, the Government does not accept a contractor's estimate on its face, certainly not for a contract of the magnitude of LOGCAP. The contracting officer is responsible under FAR Part 15 for determining that a proposed cost is fair and reasonable before the Government can award a contract. For any contract action over $2 million, where the contracting officer requests a cost estimate, the contracting officer is then required to perform cost analysis.[28] In my experience, a contracting officer's evaluation of a cost proposal is context dependent and frequently, as was true in LOGCAP, the Government relies on its own cadre of experts to determine whether the proposed cost is fair and reasonable. These experts include government personnel with accounting and estimating experience, such as cost analysts within the contracting agency, DCAA, and DCMA, as well as outside experts like Serco.

As I discuss below, based on my review of the record in this case, the contracting officer for Task Order 5, with the assistance of such experts, conducted substantial independent analysis of direct labor costs.

### B.    Review of Mr. Sherman's Opinions Regarding Fluor's M&A Staffing

Turning to the question of estimating for management and administration (M&A) personnel specifically, I disagree with Mr. Sherman's opinions for a number of reasons.

---

[27] Dep't of Defense Cost Estimating Guide, at 2 (Dec. 2020), *available at* https://www.govinfo.gov/content/pkg/GOVPUB-D-PURL-gpo156710/pdf/GOVPUB-D-PURL-gpo156710.pdf.
[28] FAR 15.404-1(a)(3).

22

*First*, Mr. Sherman does not seem to understand how Fluor (or any contractor performing a cost-reimbursement contract) bills for direct labor, appearing to confuse cost estimates with incurred costs and actual billings.

Mr. Sherman opines that Fluor's M&A worksheets (which, as discussed below, were actually internal Fluor planning tools that may or may not have been used in proposals submitted to the Government) were "25% higher than a reasonable amount" and therefore "Fluor charged the government for as much as [25% of its direct labor costs for a period of performance] in labor that was not actually provided." Sherman Report 9.  There is no basis for this conclusion because Fluor did not bill the Government based on estimated costs or any other BOE.  Instead, Fluor invoiced the Government based on actual labor costs, which reflected the actual hours worked by its personnel.

To conclude that Fluor billed for labor that was not actually provided, Mr. Sherman would have had to review an entirely different data set, including timesheets, and then make a person-by-person, week-by-week determination as to whether the individual actually worked the hours recorded on timesheets.  Even timesheets alone would not be determinative.  For example, both contractors and the DCAA routinely conduct "floor checks" to interview employees about their work, observe the work, and compare the work to hours recorded on time records.  Without conducting such an analysis, there is simply no reliable way, not to a reasonable degree of certainty, whether labor hours were inflated or "overbilled."  Regardless of Fluor's estimates, as long as the personnel were performing work supporting Task Order 5, their time was properly charged to the Government.[29]  I understand Mr. Sherman did not review timesheets nor did he engage in any other analysis of actual hours worked, and therefore has no basis to support his conclusions.

Further, the Government monitors cost on a regular basis throughout performance to determine whether costs are reasonable and allowable, including oversight by DCAA, review of cost reports, and management tools such as Earned Value Management.  These reviews extend to all elements of cost, including direct labor.

*Second*, Fluor's estimates are not helpful in evaluating staffing levels for an additional reason: Fluor did not hire all positions listed on its BOEs.  As noted above, the BOE is prepared for the purpose of developing a cost estimate to support a proposal and it reflects an initial estimate based on the information available at the time.  The BOE is an input used to develop an Authorized Position List (APL), which Fluor used to track its staffing requirements throughout the year.[30]  Based on my review of deposition testimony in this case, *see* Howard Dep. Tr. 213:2–5, 235:13–21; Fluor 30(b)(6) Dep. Tr. 652:9–19, I understand that Fluor was unable to fill every position on

---

[29] I also note that this is not simply a question of what the Government is charged.  Under a cost-reimbursement contract, the contractor only bills the Government for what it paid the employee for hours the employee worked (plus applicable burdens).  In other words, an employee is only paid for the hours worked and recorded on timesheets, and the contractor only bills the Government what it pays the employee for the same hours (plus applicable burdens).

[30] As discussed below, where I refer to "BOE" in this paragraph, I am not referring to the worksheets created by Scott Roesler, but the estimates formally developed by Fluor that were provided to the Government in its cost proposals.  See, for example:  DCAA-SR0000315333 (Apr. 14, 2014 BOE for Option Year 4); FLUOR-SR_0006206125 (Combined M&A Proposal for Option Year 4).

23

the APL, particularly in the early years of performance. Therefore, even if one were to indulge Mr. Sherman's opinion that Fluor overestimated its personnel by 25%, to evaluate how many supposedly "excessive" positions were actually filled, it would be necessary to compare the APL against the actual personnel hired and deployed and how long the employee remained in theater.[31] Mr. Sherman conducts no such analysis.

In addition, I understand that Fluor was required to request Government approval to deploy each employee, including a justification for the deployment. This was accomplished through the letter of authorization (LOA) process. Fluor could not hire and deploy anyone without the Government's review and approval. I further understand that the Government did not "rubber-stamp" LOAs and would sometimes deny them. *See* Howard Dep. Tr. 213:2–5, 235:13–21; Fluor 30(b)(6) Dep. Tr. 652:9–19. That is consistent with my experience: Government representatives that administer and manage the contract have significant say in staffing levels during performance and, based on conditions at the time (e.g., planned drawdowns or surges), may deny contractor requests for additional personnel or may insist on filling unstaffed positions.

***Third***, I disagree with Mr. Sherman's opinion that the documents that he refers to as "internal basis of estimate" [sic] overestimated Fluor's labor requirements by 25%. I understand that these documents (which I call worksheets for ease of reference) were used by functional groups in the field to provide raw information to Project Controls for the purpose of assisting Fluor personnel in Greenville, South Carolina, the headquarters of the Fluor Government Group, in preparing a refined direct labor estimate. I further understand that Project Controls only used the worksheets as one tool to develop workload drivers for the functional areas and not necessarily for the full-time equivalent (FTE) calculations reflected in the worksheets.[32] Howard Dep. Tr. 176:17–177:8; Roesler Dep. Tr. 235:13–238:4. I further understand that there is no evidence that the worksheets were actually used in a BOE submitted to the Government, Roesler Dep. Tr. 264:8–12; Howard Dep. Tr. 118:8–16, until Option Year (OY) 3. Howard Dep. Tr. 185:24–190:15; FLUOR-SR_0008512908; FLUOR-SR_0008512912.

Even if worksheets were used in some way to help calculate FTEs for Fluor's proposals before OY 3, I believe the general approach reflected in those documents is reasonable. Preston Howard, who held senior positions on Task Order 5, including Project Controls Manager and Deputy Country Manager, testified that, early in the project, Fluor had a limited ability to develop M&A staffing estimates using detailed workload drivers. Howard Dep. Tr. 119:19–121:18, 303:10–16. As discussed below, the early worksheets are consistent with this testimony.

The early worksheets include an assumption of six hours per day attributable to specifically identified "workload drivers" and an assumption of three hours of "General Admin" time. In my experience, in a contingency environment, it is difficult to anticipate requirements with precision, particularly at the outset. I understand the six hours in the worksheet represented work to meet

---

[31] In virtually every contingency contract I have been affiliated with, including LOGCAP, the Government is not concerned with "over-hiring" but ensuring that the contractor fully staffs to the requirements. In my experience, only during the tail end of an event does the Government begin to focus on demobilization and appropriately downsizing the contractor work force.

[32] FTEs are shorthand for the number of employees proposed to be deployed. Essentially, they represent the number of persons proposed to be hired to perform the work required, after taking into account concepts such as non-productive time and rest and relaxation (described below).

24

requirements reasonably known or anticipated.[33]   Howard Dep. Tr. 300:7–21, 301:9–15.   The remaining three hours were to account for requirements that were unknown or not specifically identifiable at the time the estimate was prepared.  Howard Dep. Tr. 303:18–304:18; Roesler Dep. Tr. 358:15–360:7; FLUOR-SR_0008512912, at -913.   It is reasonable to use this type of methodology to account for the number of M&A personnel needed to perform work, especially for tasks that cannot be precisely anticipated and quantified.

I further understand that as Fluor gained more experience on the project, it was able to identify with more specificity the M&A work requirements, which in turn were used to refine its cost estimates.  Howard Dep. Tr. 303:10–305:9.  The three-hour catch-all "General Admin" time was no longer used in the worksheets by OY 3, *id.*, which is consistent with my expectation that a contractor should be able to provide more detailed estimates as it gains experience on the project.

There are also periods of time when employees will be unavailable to work.  For example, personnel throughout the year rotate in and out of theater using their paid time off (known as "Rest and Relaxation" or "R&R").  Similarly, even when an employee is in theater, they will not be working 100% of the time during the workday, but that time is still properly recorded by the employee and charged to the Government.  In other words, the employee is still paid for such time.  For example, an employee will take short paid work breaks, including to use the restroom or smoke or to simply take a walk, that must be accounted for.  Any cost estimate for personnel needs to take this time into account in order to ensure that there are sufficient FTEs to perform the necessary work.  Otherwise, the contractor would have insufficient staff.

Fluor's worksheets included three hours for "R&R," which appears to function as a surrogate for paid time the employee is not working, both as a result of paid time off and for other personal time taken during a workday.  To better explain the concept, I break down the "R&R" catch-all into time spent on paid time off versus personal time taken during the workday.

At Fluor, I understand from a review of the records, FLUOR-SR_0011546938, that an employee was entitled to a total of 432 hours of paid time off annually (36 days at 12 hours per day), added to which were a travel/transit allowance of 216 hours (18 days at 12 hours per day), resulting in a total of 648 hours (54 days at 12 hours per day).  To allocate this time on a per-day basis, Fluor assumed a total number of per-employee hours at 365 days/12 hours per day of 4,380 hours before subtracting the total of 648 hours of paid time off and travel/transit time combined.  After subtraction, the total available work hours per employee is 3,732 over the course of a year.  Divided by 365, that figure yields 10.22 hours per day of work time.  The difference, accounting only for paid time off and travel/transit time, is 1.78 hours per day (or 15% of the 12-hour workday).[34]

The worksheets provide for three hours of "R&R," which appears to include both the foregoing paid time off/transit time and other paid personal time during the workday that must be considered.  Subtracting 1.78 hours from the three hour "R&R" per-day catch-all yields 1.22 hours.  This means

---

[33] Some functional areas modified these assumptions so that greater than six hours were attributable to specific workload drivers and less than three hours were attribute to General Admin. *See, e.g.*, FLUOR-SR_0008714046 (Jan. 27, 2012 Operations BOE Planning Document, estimating 8 hours per day of workload drivers).

[34] The above analysis is for Tier 1 and 2 employees.  Performing the same analysis for Tiers 3 to 5 (less senior employees) yields a slightly different figure of 13% paid time off/travel-transit time per work day or 1.6 hours per day.  This difference is immaterial to my analysis.

25

that Fluor M&A employees are assumed to spend 72 minutes a day on personal time. This 72 minutes of paid personal time (appearing to capture workday breaks over the course of a 12-hour workday) is reasonable, particularly in the high-stress environment of Northern Afghanistan.

I note that the DoD Work Estimating Desk Guide similarly accounts for "personal time" to include coffee and smoking breaks, restroom visits, and rest. *See* DCAA-SR_0000055711, at -776 (EPS Estimate Building Blocks of Time).[35]

Moreover, this daily 3-hour "R&R" assumption was communicated to the Government no later than 2013 as part of the OY 3 definitization process.[36] I am not aware of any evidence that the Government questioned its reasonableness.

***Fourth***, as discussed above, the Government does not blindly accept a contractor's estimates. It closely scrutinizes the numbers and the contractor's methodology, performing its own independent analysis. The information I have reviewed indicates that the Government followed this same approach in evaluating Fluor's M&A estimates on Task Order 5. In fact, it appears that the Government placed little, if any, weight on Fluor's BOEs, at least through OY 2 when the contract was completely re-baselined. Rather, the Government clearly states throughout its March 5, 2013 Pre/Post Negotiation Memorandum (PNM), DCAA-SR0000263590, that it relied on a variety of independent evaluation techniques to definitize.[37]

Fluor's initial pre-definitized proposal for Task Order 5 was based on a "notional scenario," that is, general assumptions provided by the Government that did not adequately reflect the realities on the ground. As stated in the PNM, "[t]hrough the transition process it was identified that a number of conditions on the ground were different from the notional band pricing." *Id*. at -593. "Due to the contingency environment, during the [full operational capability] period, there continued to be a myriad of workload and service adjustments to the TO." *Id*. As a result, Fluor and the Government negotiated a full re-baselining of the contract, including labor. The Government's PNM details the methods it used to evaluate various proposals submitted by Fluor for re-baselining costs. I have included some illustrative examples:

- For OY 1, Fluor proposed estimated costs, not based on BOEs but on actual costs incurred adjusted with a burn rate from the prior period of performance (Full Operating Capability). *Id.* at -595. The Government evaluated Fluor's proposal using a variety of techniques, including comparing the definitization proposal to Fluor's initial BOE submitted as part of

---

[35] I further note that there are alternative methodologies to estimate time spent on personal time, paid time off, and transit/travel time. For trades, Fluor accounted for time spent "not on task" during the workday (to include personal time) through a productivity factor, as Fluor testified in its deposition. Fluor 30(b)(6) Dep. Tr. 654:1–655:12; *see also* FLUOR-SR_0011546939. Fluor then calculated paid time off/travel/transit separately. Fluor 30(b)(6) Dep. Tr. 279:8–16; FLUOR-SR_0011546938. For M&A employees, Fluor did not use a productivity factor with a separate paid time off/travel/transit calculation.

[36] FLUOR-SR_0009624115 (2013-05-24 Email from Karen Jack); FLUOR-SR_0011890883 (2013-05-24 Email from Karen Jack to Brian Knutson); FLUOR-SR_0011890886 (AMRDEC status document indicating "D000 – M and A Combined – BOE(20 Afghanistan.xlsx" was uploaded to AMRDEC).

[37] Based on the PNM, I understand that through these negotiations, Fluor and the Government definitized periods of performance from OY 2 back to transition.

26

its original Task Order 5 proposal and then accounting for the magnitude of scope changes. *Id.*

- The Government did a similar analysis for M&A estimated costs, including labor. Fluor subsequently submitted an OY 1 M&A fee justification with backup, *id.* at -595–96, which did not include the worksheets. FLUOR-SR_0009606252.

- The Government also performed a "point in time" analysis using a single month of actual costs (December 2011) and extrapolating those costs to the entire OY 1 period of performance, which too necessarily does not involve the worksheets.[38] *See* PNM at -595– 96.

- The PNM also notes that the Government utilized additional techniques for OY 1: "[T]hroughout OY 1 Fluor's cost report and identified variances were being analyzed for purposes of cost control and contract management. Throughout the negotiation process these analyses were also utilized as an evaluation technique." *Id*. at -596. In other words, the Government relied not on estimates, but the actual cost reports that were submitted in real time and were monitored and analyzed contemporaneously by the Government.

- For OY 2, per the PNM, Fluor submitted a proposal using actual hours, not estimates, *id*. at -597, which the Government used various techniques to evaluate. *Id.* In the end, the Government reviewed the initial, competitively-bid proposal and made upward adjustments based on the scope increase. *Id.* at -604. The PNM reflects that the Government closely scrutinized M&A and removed $26M in labor costs from the definitized estimate of cost for positions that the Government did not believe were reasonable (and represented costs Fluor had already incurred). The Government also applied a 10% decrement to remaining M&A costs. *Id.* at -605.

There is no evidence the Government relied on Fluor BOEs between the initial proposal and OY 3. I note that the worksheets themselves were created as part of planning for OY 1 after the contract was awarded and was in performance; accordingly, it would have been impossible for them to have been used by Fluor, much less the Government, before then. Roesler Dep. Tr. 232:5–234:9; FLUOR-SR_0010302100 (October 2010 email attaching "a draft format for determining staffing"). Accordingly, I am unable to conclude that the worksheets played any part in the Government's evaluation of the re-baselining effort (which went back to transition and other periods when worksheets did not exist). Later, in response to a Government request relating to OY 3, Fluor submitted a BOE explaining its methodology based on a later iteration of the worksheets. To the extent then that Fluor proposed staffing costs based on the worksheets for OY 3, Fluor disclosed this approach to the Government.[39]

---

[38] Notably, the Government's "point in time" approach reflects that it relied on "the law of averages" to determine a reasonable personnel level for entire periods of performance. The Government acknowledged that this "inevitably created situations where levels of effort might have been negotiated higher or lower than actual performance requirements throughout the POP." PNM at -596. In other words, the Government was willing to use a *single* month to declare an average that was then applied against the year as a whole, even for months where the work performed (e.g., labor hours) was higher than the "average" month or where the work was lower than the average.

[39] *See supra* n.36.

27

**Plaintiffs' Trial Exhibit 821**
**Page 29 of 68**

Based on the foregoing, taken primarily from the Government's own PNM, I do not believe that the Government relied on Fluor's BOEs to definitize each period of performance, at least through OY 2. To the extent the Government relied on any of Fluor's BOEs in negotiating OY 3, Fluor disclosed its staffing assumptions to the Government for M&A, including nine hours calculated through workload drivers and three hours of "R&R" per day. Based on this record, I do not believe that Mr. Sherman can reasonably conclude that the Government ever relied on a Fluor BOE without knowledge of the assumptions on which it was based.

### C.     Review of Mr. Sherman's Opinions Regarding Direct Labor "Mark-Up"

Mr. Sherman opines that Fluor "marked-up its labor costs to the government so that for every labor dollar Fluor spent, it received about 6.9 percent in additional profit margin from the government." Sherman Report 14–15. Mr. Sherman concludes that "this profit is separate and apart from the 5.87 percent fixed fee profit that Fluor received on Task Order 5." *Id.* at 15. To support this conclusion, Mr. Sherman cites a document titled "FY14 Operating Plan," FLUOR-SR_0010328136.

I have reviewed this document, and Mr. Sherman's conclusions are in error. First and foremost, FAR 52.216-7 limits Fluor to be reimbursed for its actual costs for labor and mark-ups, figures that are closely scrutinized and audited by the DCAA (including during audits of public vouchers and through incurred cost audits). Through these audits, the Government reviews the contractor's documentation of actual incurred costs and not a summary planning spreadsheet that provides no context whatsoever (and I note which no witness explained).

In addition, Mr. Sherman appears to mis-read the document. The two calculations do not reflect, as he assumes, the simple difference between revenue (on the top half of the first page of the document) and cost (on the bottom half) that equals profit.

Instead, what the document reflects, based on my experience and calculations described below, is an attempt to capture the difference between planned project-controlled costs using a provisional overhead rate applied to direct labor (bottom half) compared to the projected total project revenue applying a forecasted final overhead rate applied to direct labor plus the other elements of cost, burdens, and fee (top half).

To better explain what follows, I describe a few principles relating to government contract cost accounting. A provisional billing rate (PRB) is used for interim billing of contract costs until the following fiscal year when the indirect rates are trued up to actual rates, as required by FAR 52.216-7. Unlike General & Administrative (G&A) rates and Facilities Cost of Capital (FCCOM), project overhead (expressed as an indirect rate) is only applied to direct labor. Further, G&A and FCCOM are allocations of corporate, non-project related costs to project costs, expressed as a percentage of all costs. A contractor on a cost-reimbursement contract is entitled to reimbursement of its allowable costs, including direct costs, overhead rates applied to labor, and G&A and FCCOM rates applied to all of the foregoing costs.[40] Fee is a fixed amount and is not a

---

[40] These are methods specified by the FAR Cost Principles and the Cost Accounting Standards, and Fluor's own methodologies for calculating these rates would be disclosed to the Government on an annual basis (and subsequently audited by DCAA). The FAR's Allowable Cost and Payment Clause specifies how these rates translate into actual billings.

28

percentage of cost (as a cost-plus-percentage of cost contract is illegal). Instead, fixed fee is provisionally billed as a percentage of cost but the final fixed fee amounts are determined by definitization. The 5.87% fee reflected in the document is a predetermined fixed fee percentage that will ultimately be applied to the final definitized estimate of cost.

As to the document, the bottom half on the first page reflects what appears to be the project's projection in its operating plan for FY 2014 of project-controlled costs plus the applicable overhead PRB applied to direct labor. It does not reflect G&A or FCCOM, presumably because neither is project-specific cost. Because it appears to attempt to capture project cost alone, it also does not include fee. The figures reflected in the various labor categories are calculated using an overhead PRB (included in the upper left hand corner of the document) which explains why these figures differ from the dollar amounts for the various direct labor categories in the top half (which apply a projected final overhead rate or "OH"). The reason that the projected direct costs for subcontracts and materials are the same in the top and bottom halves is because overhead is not applied to subcontracts and materials at any rate, provisional or final.

The top half appears to be the project's attempt to capture what it anticipates will be the final revenue generated from the project for costs incurred in FY 2014 to which projected final overhead, G&A, and FCCOM rates are applied. Finally, fee is estimated at 5.87% of the foregoing costs (appearing to assume only 97% of those costs will be fee bearing).

I was able to make this determination by performing calculations using the PRB and OH percentages in the upper left hand corner of the document. There are different PRB and OH rates for each category of direct labor in the schedule. The PRB is applied in the bottom half and the OH in the top. The best way to explain this difference is through an example. Taking the line labeled "CONUS Labor (GH/GL)" in the amount of $19,235,023 (representing a burdened cost) in the bottom half and dividing it by (1 + the PRB rate of 38.95%) (i.e., 1.3895) results in $13,843,125.60 of unburdened direct labor cost. Applying this direct labor figure for the same line and multiplying it by the OH rate (1 + the OH rate of 49.78%) (i.e., 1.4978) results in $20,734,233 of burdened direct labor cost using the projected OH rate. The $20,734,233 figure corresponds to the "CONUS Labor (GH/GL)" line in the top half.

This difference between the PRB burdened labor cost and the OH burdened labor cost does not reflect profit as Mr. Sherman wrongly assumes. The sole profit reflected is in the Fixed Fee calculation in the top half (which nonetheless too is an estimate as fixed fee will be determined at a set amount at definitization).

**D.     Review of Mr. Sherman's Opinions Regarding Service Order Work Performed Around the Holidays**

With respect to Mr. Sherman's opinion regarding staffing based on work performed around the holidays, there are any number of explanations for the results other than his conclusion that Fluor was overstaffed. For example, if there were fewer employees in theater at points in November and December, Fluor could have cross-leveled personnel from other departments or FOBs as necessary to complete work. When I worked in a senior position for KBR, and made a trip to theater in Iraq in the holiday season, I was asked to help sort mail to make up for staff who were out of theater and the spike in holiday mail. Moreover, employees not on leave may be called upon to work

29

additional hours beyond the typical 12-hour workday. Given my experience with KBR, the exigencies of LOGCAP often required employees to work longer than 12 hour days. Based on testimony and my personal experience, managers also control who would go out on leave and when, thereby managing R&R schedules to ensure no interruption in services. Howard Dep. Tr. 250:11–255:12. Particularly for short periods of time, it would be entirely possible to meet demand with a smaller workforce in theater. Mr. Sherman's opinion does not take into account any of these likely scenarios or other potential alternative explanations for his purported "overstaffing" conclusions.

Respectfully presented,

Bill Walter, CPA
July 31, 2025

30

### Appendix A:  Physical Inventory Query 1 – Counted in Fiscal Year

**SQL Query – High Level Summary**

Performed analysis of the Physical Inventories for each Fiscal Year 2011, 2012, 2013 and 2014 to determine the percentage of material lines that were counted within each Fiscal Year.

The SQL query returns all lines of materials (both 91G and 92G), excluding Assets (rotating items), as of each Fiscal Year close (September 30).  All lines of materials with a positive balance are included along with the last Physical Count Adjustment transaction information (PCOUNTADJ).  The transaction date from the last PCOUNTADJ transaction is used to determine whether the line was counted in the last 12 months. Material lines created within the last 12 months with no Physical Count Adjustment are also identified as being counted due to the Physical Count Date being set in Maximo when the inventory balance record is created.

The results of the query are broken into three sections which have been exported to a spreadsheet titled 'Physical Inventories Analysis_Counted in Last 12 Months_Per FY.xlsx':

- Detailed Results (details for every line of materials)
- Summary of Total Lines and Lines Counted / Not Counted by Site
- Summary of Total Lines and Lines Counted / Not Counted by RDC

The SQL query is saved as a .sql file titled 'Physical Inventories Analysis_Counted in Last 12 Months_Per FY.sql.'

**Important Notes Pertaining to SQL Logic**

- Use of invtrans table opposed to the a_invtrans table

  o The Maximo invtrans table captures every inventory adjustment transaction performed within Maximo.  The a_invtrans audit table captures the insert transaction of every inventory adjustment transaction along with updates made to transactions.  Inventory adjustment transactions cannot be updated via the front end of Maximo and must be updated via a SQL script that is documented by a Service Request (SR).  The invtrans table contains the inventory adjustment transaction data necessary for this analysis.

- SRs that created a data condition in the a_invbalances audit table which required additional logic:

  o SR10468 – Converted the 91G item codes to 92G item codes.

    ▪ When this transition occurred, it caused a scenario where the same invbalancesid in the a_invbalances table had both a 91G and 92G item code associated to it.  This condition is not possible under normal circumstances and was created by the SR10468 conversion script.

1

**Plaintiffs' Trial Exhibit 821**
**Page 33 of 68**

- It was necessary to update the logic in the query that creates the **#results** temp table which captures the current inventory balances as of the @FYDate (FY End Date) variable. The item number was removed from the logic so the data condition caused by SR10468 did not skew the results. The grouping is performed on the invbalancesid to capture the last a_invbalances record prior to Fiscal Year End for each invbalancesid record. This logic takes the 91G to 92G conversion into account and ensures the correct record is returned in the final results with no duplicates.

  o SR10036 – Created a data condition where multiple a_invbalance records for a single invbalancesid have the exact same eaudittimestamp to the millisecond.

  - This condition required the use of the max fgg_id to ensure a one-to-one join and no duplicates in the final report output. This SR created multiple a_invbalance records with the exact same eaudittimestamp. This does not occur under normal circumstances and created a condition where the max audit record prior to the Fiscal Year End Date could not be determined.

  - It was necessary to update the logic in the query that creates **#results** temp table which captures the current inventory balances as of the @FYDate (FY End Date) variable. The fgg_id field is a unique identifier set each time a record is created in the audit table. Under this condition the max fgg_id was used in conjunction with the max eaudittimestamp to determine the max audit record prior to the Fiscal Year End Date.

  o Both SR10468 and SR10036 use the same logic in the creation of the **#results** temp table creation to capture the current inventory balances as of the @FYDate (FY End Date) variable. In these cases the item number was removed from the logic to correct the grouping (required for the SR10468 data condition) and include the max fgg_id in conjunction with the max eaudittimestamp to determine the max audit record prior to the Fiscal Year End Date.

- Exclusion of sites 005 D16 and D17 from Fiscal Year 2013 results:

  o Sites 005 D16 and 005 D17 closed in Fiscal Year 2012.[41]

  o Inventory records for these sites still existed in the Maximo system during Fiscal Year 2013.

  o Physical Counts would not be performed on these sites in Fiscal Year 2013 as the sites were closed. For this reason these sites were excluded from the Fiscal Year 2013 results.

---

[41] *See* FLUOR-SR_0009135282 (July 4, 2012 Project Planning Request FLR-12-0005-CJ12-6021 to De-scope FOB Bostick, CJ12, by November 15, 2012); FLUOR-SR_0008753839 (Sep. 23, 2012 Project Estimate re: FLR-12-0005-CJ11-6012 to De-scope FOB Kalagush, CJ11, by November 5, 2012).

2

**Plaintiffs' Trial Exhibit 821**
**Page 34 of 68**

**Appendix B:  Physical Inventory Query 2 – Total PCOUNTADJ Per Fiscal Year**

**SQL Query - High Level Summary**

The SQL query performs analysis of the Physical Inventories for each Fiscal Year 2011, 2012, 2013 and 2014 to identify the total number of Physical Count Adjustments (PCOUNTADJ transactions) that occurred within the Fiscal Year along with the Inventory Balance records created within the Fiscal Year that had no subsequent PCOUNTADJ transaction.

The SQL query returns all lines of materials (both 91G and 92G), excluding Assets (rotating items), as of each Fiscal Year close (September 30).  All lines of materials with a positive balance are included along with all Physical Count Adjustment transactions (PCOUNTADJ) that were performed in the Fiscal Year.  Material lines created within the last 12 months with no subsequent Physical Count Adjustment are also included in the query results due to the Physical Count Date being set in Maximo when the inventory balance record is created.

The results of the query are broken into two sections which have been exported to a spreadsheet titled 'Physical Inventories Analysis_Total PCOUNTADJ_Per FY.xlsx':

- FYxxxx Total & Count per Item
  - FY PCOUNTADJ Count - Displays the total PCOUNTADJ transactions that were performed in the Fiscal Year for each line of materials
  - FY Inventory Creation Count - Identifies if the material line was created in the Fiscal Year with no subsequent PCOUNTADJ transaction
  - No Count in FY – Identifies if the material line was created in a previous Fiscal Year and no PCOUNTADJ transactions occurred in the Fiscal Year
  - FY PCOUNTADJ / Bin Creation Total – Total count of all PCOUNTADJ transactions and material lines that were created in the Fiscal Year with no subsequent PCOUNTADJ transaction
- FYxxxx Data – Displays the detailed results returned by the SQL query for the Fiscal Year

The SQL query is saved as a .sql file titled 'Physical Inventories Analysis_Total PCOUNTADJ_Per FY.sql.'

**Important Notes Pertaining to SQL Logic**

- Use of invtrans table opposed to the a_invtrans table:

  - The Maximo invtrans table captures every inventory adjustment transaction performed within Maximo.  The a_invtrans audit table captures the insert transaction of every inventory adjustment transaction along with updates made to transactions.  Inventory adjustment transactions cannot be updated via the front end of Maximo and must be updated via a SQL script that is documented by a Service Request (SR).  The invtrans table contains the inventory adjustment transaction data necessary for this analysis.

1

- SRs that created a data condition in the a_invbalances audit table which required additional logic:

  o SR10468 – Converted the 91G item codes to 92G item codes.

    ▪ When this transition occurred it caused a scenario where the same invbalancesid in the a_invbalances table had a 91G and 92G item code associated to it. This condition is not possible under normal circumstances and was created by the SR10468 conversion script.

    ▪ It was necessary to update the logic in the query that creates the **#results** temp table which captures the current inventory balances as of the @FYDate (FY End Date) variable. The item number was removed from the logic so the data condition caused by SR10468 did not skew the results. The grouping is performed on the invbalancesid to capture the last a_invbalances record prior to Fiscal Year End for each invbalancesid record. This logic takes the 91G to 92G conversion into account and ensures the correct record is returned in the final results with no duplicates.

  o SR10036 – Created a data condition where multiple a_invbalance records for a single invbalancesid have the exact same eaudittimestamp to the millisecond.

    ▪ This condition required the use of the max fgg_id to ensure a one-to-one join and no duplicates in the final report output. This SR created multiple a_invbalance records with the exact same eaudittimestamp. This does not occur under normal circumstances and created a condition where the max audit record prior to the Fiscal Year End Date could not be determined.

    ▪ It was necessary to update the logic in the query that creates **#results** temp table which captures the current inventory balances as of the @FYDate (FY End Date) variable. The fgg_id field is a unique identifier set each time a record is created in the audit table. Under this condition the max fgg_id was used in conjunction with the max eaudittimestamp to determine the max audit record prior to the Fiscal Year End Date.

  o Both SR10468 and SR10036 use the same logic in the creation of the **#results** temp table creation to capture the current inventory balances as of the @FYDate (FY End Date) variable. In these cases the item number was removed from the logic to correct the grouping (required for the SR10468 data condition) and include the max fgg_id in conjunction with the max eaudittimestamp to determine the max audit record prior to the Fiscal Year End Date.

- Exclusion of sites 005 D16 and D17 from Fiscal Year 2013 results:

2

**Plaintiffs' Trial Exhibit 821**
**Page 36 of 68**

o   Sites 005 D16 and 005 D17 closed in Fiscal Year 2012.[42]

o   Inventory records for these sites still existed in the Maximo system during Fiscal Year 2013.

o   Physical Counts would not be performed on these sites in Fiscal Year 2013 as the sites were closed.  For this reason these sites were excluded from the Fiscal Year 2013 results.

---

[42] *See* FLUOR-SR_0009135282 (July 4, 2012 Project Planning Request FLR-12-0005-CJ12-6021 to De-scope FOB Bostick, CJ12, by November 15, 2012); FLUOR-SR_0008753839 (Sep. 23, 2012 Project Estimate re: FLR-12-0005-CJ11-6012 to De-scope FOB Kalagush, CJ11, by November 5, 2012).

3

**Appendix C:  Negative Adjustments Query 1 – Adjustments Universe**

**SQL Query – High Level Summary**

The inventory balance records (a_invbalances) in the Maximo database are updated via multiple transaction types:

- Issue and Return Transactions

- Transfer, Receipt and Return Transactions

- Inventory Adjustment Transactions

When any of these transactions occur in Maximo, the system generates audit records in various audit tables.  Maximo's use of multiple tables requires the creation of a SQL query to pull the transaction audit history together from the various tables.

To facilitate analysis of inventory balance audit transactions, the SQL query generates the inventory balance audit (a_invbalances table) history that includes the associated transaction audit history transactions from the following tables:

- a_matrectrans - ISSUE and RETURN (Issue transaction returns) Transactions

- a_matusetrans - TRANSFER, RECEIPT and RETURN (Transfer and Receipt transaction returns) Transactions

- a_invtrans - Inventory Adjustment transactions (PCOUNTADJ, RECBALADJ, CURBALADJ etc.)

The results generated by the query return all inventory balance audits along with the transactions information that caused the audit.  The query generates the full inventory transaction audit dataset for dates 10/1/2010 through 9/30/2014.  The SQL query that generates this dataset saved as a .sql file titled 'Negative Adjustments Analysis – Adjustments Universe.sql'.

**Important Notes Pertaining to SQL Logic**

- Only used records in the analysis on or after 11/1/2010 due to SR07811.

  o Description of SR07811:

    ▪ SR07811 documented the creation of the following Maximo audit tables:

      - a_invtrans  -  Inventory Transaction audit table

      - a_wpitem  -  Work Order Planned Material audit table

      - a_wplabor  -  Work Order Planned Labor audit table

1

**Plaintiffs' Trial Exhibit 821**
**Page 38 of 68**

- The Maximo audit tables were created in Maximo Production on 11/1/2010.

o Reason for starting analysis on 11/1/2010 after the creation of the audit tables by SR07811:

- The script that created the audit tables inserted historical inventory transactions from the invtrans table that occurred prior to November 1, 2010 into the new a_invtrans audit table.

- The eaudittransid is the identifier that ties a record together by linking transactions between various audit tables. SR07811 inserted records prior to November 1, 2010 into the new a_invtrans audit table with the same eaudittransid. For the inserted records, the eaudittransid therefore did not associate to their respective inventory balance audit table (a_invbalance) records. This relationship is necessary to provide the full audit history for the data prior to November 1, 2010.

- Due to these issues, it was not possible to programmatically provide a full history for all records prior to November 1, 2010, the point at which the a_invtrans table auditing was turned on. It is still possible to view the audit histories for the transactions prior to November 1, 2010, but it would have to be done on a case-by-case basis.

o Audit History for records impacted by an SR:

- Inventory Transaction audit (a_invtrans) entries where the eauditusername starts with 'SR' are brought into the final query using specific logic necessary to account for data conditions created by SRs. These audit entries were created by approved Service Requests (SR) and were created in the a_invtrans table as CURBALADJ transactions.

- Audit entries from the a_matrectrans and a_matusetrans tables that begin with 'SR' were excluded from the results. These audit entries were created by approved Service Requests (SR).

- The 'Transaction Type' column in the final report displays the SR number for any inventory balance (a_invbalance) audit record that was updated as the result of an SR. Additional queries can be written on an as-needed basis to review additional audit history for records affected by an SR.

2

**Appendix D:  Negative Adjustments Query 2 – Pertinent Audit Histories**

**SQL Query – High Level Summary**

The inventory balance records (a_invbalances) in the Maximo database are updated via multiple transaction types:

- Issue and Return Transactions

- Transfer, Receipt and Return Transactions

- Inventory Adjustment Transactions

When any of these transactions occur in Maximo, the system generates audit records in various audit tables.  Maximo's use of multiple tables requires the creation of a SQL query to pull the transaction audit history together from the various tables.

The SQL query generates a report that returns the audit history for all transactions that are related to a specific transaction id (eaudittransid) or group of transaction ids (eaudittransid).  The query uses the transaction id (eaudittransid) entered to identify all inventory balances audit table (a_invbalances) record(s) that are associated to the item number identified by the transaction(s).  The following are the tables that contain the transaction audit records:

- a_matrectrans - ISSUE and RETURN (Issue transaction returns) Transactions

- a_matusetrans - TRANSFER, RECEIPT and RETURN (Transfer and Receipt transaction returns) Transactions

- a_invtrans - Inventory Adjustment transactions (PCOUNTADJ, RECBALADJ, CURBALADJ etc.)

The query generates a report that displays the full audit history pertaining to the inventory balance record identified by the Transaction Ids (across all sites/storerooms/bins) provided.  The overall purpose of this query is to facilitate causative analysis for specific transactions.  The report is saved in an excel file titled 'Negative Adjustments Analysis – Pertinent Audit History.xlsx'. [43]

The SQL query is saved as a .sql file titled 'Negative Adjustments Analysis - Pertinent Audit History.sql'.

**Important Notes Pertaining to SQL Logic**

- Only used records in the analysis on or after 11/1/2010 due to SR07811.

---

[43] The result set includes the histories for the Transaction IDs provided by Ms. Smith.  The audit history for one item code in the result set (91G6240000225) referenced an updated item code (92G6240000884) whose history was not otherwise included in the result set.  The Transaction ID for the next update transaction of the replacement code (11219317) was added to the result set.

1

- o Description of SR07811:

  - ■ SR07811 documented the creation of the following Maximo audit tables:

    - a_invtrans  -  Inventory Transaction audit table

    - a_wpitem  -  Work Order Planned Material audit table

    - a_wplabor  -  Work Order Planned Labor audit table

  - ■ The Maximo audit tables were created in Maximo Production on 11/1/2010.

- o Reason for starting analysis on 11/1/2010 after the creation of the audit tables by SR07811:

  - ■ The script that created the audit tables inserted historical inventory transactions from the invtrans table that occurred prior to November 1, 2010 into the new a_invtrans audit table.

  - ■ The eaudittransid is the identifier that ties a record together by linking transactions between various audit tables. SR07811 inserted records prior to November 1, 2010 into the new a_invtrans audit table with the same eaudittransid. For the inserted records, the eaudittransid therefore did not associate to their respective inventory balance audit table (a_invbalance) records. This relationship is necessary to provide the full audit history for the data prior to November 1, 2010.

  - ■ Due to these issues, it was not possible to programmatically provide a full history for all records prior to November 1, 2010, the point at which the a_invtrans table auditing was turned on. It is still possible to view the audit histories for the transactions prior to November 1, 2010, but it would have to be done on a case-by-case basis.

2

**Plaintiffs' Trial Exhibit 821**
**Page 41 of 68**

## Appendix E:  Attachment Identification Procedure

The following outlines the procedure used to identify attachments stored in the Maximo database and find them on the produced drive which contains the Maximo databases and attachments.

**Procedure:**

- Open the .sql file titled 'Maximo Attachment Search.sql' which is used to query the doclinks and docinfo tables in the Maximo database to identify the attachments.

- Execute one of the following queries contained in the .sql file depending on the search being performed:

    o **Keyword Search:**  Searches all Maximo attachment records (doclinks and docinfo) with a document name, description or file name (urlname) that contains the keyword(s) entered.

    o **Inventory Attachments Search:**  Use to identify all attachments associated to an Item's Inventory records when the Item Number is known.

    o **PO Attachments Search:**  Use to identify all attachments associated to a PO record when the PO Number is known.

    o **LTDD Attachments Search:**  Use to identify all attachments associated to an LTDD record when the LTDD Number is known.

    o **Work Order Attachments Search:**  Use to identify all attachments associated to a Work Order record when the Work Order Number is known.

- All queries listed above return a 'urlname' column.  This column contains the file name of the attachment.

- Extract the file name of the attachment from the 'urlname' column of the results.

- Access the produced drive which contains the Maximo database backups as well as all Maximo attachments.

- Navigate to the directory on the drive that contains the attachment files and perform a search for the file name.

1

<u>**Appendix F:  Curriculum Vitae**</u>

**WILLIAM R. (BILL) WALTER**

**PROFESSIONAL EXPERIENCE**

<u>**FORVIS MAZARS, LLP, Managing Director, Government Contract Consulting Practice**</u>

**2010-Present**

*Managing Director in charge of the Government Contract Consulting practice for the firm.  Current activities involve the development of policies and procedures, training, defending audit allegations of noncompliance with rules and regulations and assisting companies with compliance with FAR and CAS requirements.  Provide support on strategic issues such as indirect cost rates and providing a sounding board to support challenges faced in government contracting matters.  Provides expert contract accounting support for litigation matters as an expert witness in state and federal courts including the Court of Claims and the Armed Services Board of Contract Appeals.*

<u>**KBR, Inc. – Arlington, Virginia**</u>

| | |
|---|---|
| **Senior Vice President, Government Compliance** | **2006 – 2010** |
| **Senior Vice President, Finance** | **2005 - 2006** |
| **Vice-President, Finance** | **2004 – 2005** |
| **Director, Government Compliance** | **2003 – 2004** |

*Over a seven-year period with KBR, led the Government Compliance program for the $7B Government & Infrastructure business group.  Provided leadership and guidance to Project Managers and functional leadership across all Government programs to include procurement, project controls, accounting and IT for the division.  Testified before Congress and the Wartime Commission on Contracting in Iraq and Afghanistan on contracting issues.*

<u>**Government Contract Consulting, Northern Virginia**</u>

| | |
|---|---|
| **Goodman & Company** | **2001 – 2003** |
| **T.A. Carlson & Company** | **1986 – 2001** |

*Provided advice and consulting services to companies regarding compliance with the unique requirements associated with contracting with the Federal Government. Businesses ranged in size from Fortune 100 to sole proprietors.  Activities involved the development of policies and procedures, training, defending allegations of defective pricing and noncompliance with FAR and CAS requirements.  Also provided cost accounting expertise in support of litigation matters from bid protests, prime and subcontractor disputes and False Claim Act allegations.*

1

**Plaintiffs' Trial Exhibit 821**
**Page 43 of 68**

**Defense Contract Audit Agency – Fairfax Branch Office, Virginia**

**Auditor**                                                                          **1984 – 1986**

*In a "mobile" office audited numerous companies in the Northern Virginia for all contract accounting needs from cost proposals, incurred cost audits, defective pricing reviews and system audits.  While with DCAA provided training in the region on statistical sampling and EDP audit requirements.  Took advantage of all training opportunities presented during tenure with the agency.*

## EDUCATION & CREDENTIALS

**The Pennsylvania State University – University Park, PA**                **1983**
*Bachelor of Science, Accounting*

**Certified Public Accountant (CPA) – Commonwealth of Virginia - #10114**

**Government Contracts Programs - Faculty Member/Instructor/Advisor**

- The George Washington University/Educational Services Institute   1995 – 2003
- George Mason University/Public Contracting Institute              2010 - Present

## PROFESSIONAL ASSOCIATIONS

American Institute of CPAs - #01609306

American Bar Association, Public Contract Law Section - #01810089

Virginia Society of CPAs - #10114

Professional Services Council – #121076

National Defense Industrial Association, Contract Finance Committee - #1111514

National Contract Management Association - #674828

## PUBLICATIONS

2018 – Present, *DHG GovCon Report* and *DHG Govcon Digest*

2018 August, *DHG Advisory Bulletin,* Contracting Purchasing System Reviews: What are They and What's New?

2018 January, *DHG Advisory Bulletin,* When Uncle Sam Locks the Door and You Can't Get In - What to Do to Survive a Government Shutdown

2017, August, *DHG Advisory Bulletin,* SCA Contractors – DoL Updates Health & Welfare Fringe Benefits Rates

2017, April, *DHG Advisory Bulletin,* How will Defense Contracting Audit Reform Evolve?

## TRAINING/WEBINARS

2017 -Present, *DHG's Issues in Focus*

2017 – Present, *Government Contractor Update*, Virginia Society of CPAs

2

**Plaintiffs' Trial Exhibit 821**
**Page 44 of 68**

2018 – Present, _Master's Series in Government Contracting_, _Pricing Equitable Adjustments and Cost Accounting,_ George Mason University

2020 – Present – _Cost Accounting Deep Dive_, George Mason University

2020 - Present – _Pricing and Pricing Fundamentals_, George Mason University

2020 - Present – _DHG's CMMC Trailblazer Series_

2021 – _DFun with the DFARS_, Public Contracting Institute

2022 – _CAS: The Series_,  Public Contracting Institute

3

**Plaintiffs' Trial Exhibit 821**
**Page 45 of 68**

**LISTING OF TRIAL TESTIMONY/DEPOSITIONS (Prior 5 Years)**

2018, United States ex rel. Conyers v. Kellogg Brown & Root, Inc., No 12-4095 (C.D. Ill.), engaged by Arnold & Porter

2019, OMNISEC International Investigations, Inc et.al. v. Slavica Stone et.al., CL-2018-6368, engaged by GreenbergTraurig in Virginia, Fairfax County Circuit.

2019, Iron Bow Technologies v. Agile Defense, Inc. CL-2018-09119, engaged by Venable in Virginia, Fairfax County Circuit.

2019, Analytical Services, Inc. vs. Kord Technologies, et.al., Civil Action No. CV-2017-117-CMC, Engaged by Bradley

2019, BRC Uluslararasi Taahhut ve Ticaret AS vs. Montage, Inc., Case Number: 01-18-0004-1916 before the American Arbitration Association, Engaged by Bradley

2020, Transcore, LP v. Richmond Metropolitan Transportation Authority, engaged by Miles & Stockbridge in the US District Court for the Eastern District of Virginia, Richmond, Case No. 3:19-cv-820-REP2020,

2020, Moxie Holdings et.al. vs. PAE Holding Corporation et.al., Case No. CL-18-3721 in the Circuit Court of Arlington County, VA, Engaged by Holland & Knight, settled

2020, Old Dominion Electric Cooperative vs. White Oak Power Constructors, et al., Civil Action No. 3:17-cv-00355-JAG Before the United States District Court Eastern District of Virginia, Engaged by Miles & Stockbridge

2021, CoventBridge USA vs. NCI Information Systems, Inc. and AdvanceMed Corporation – American Arbitration Association Case Number 01-20-0014-9912, Engaged by David, Brody & Dondershine LLP

2021, USA ex rel. Robert Reddell and Robert Hendrix vs. Dyncorp International LLC and Damco USA, Inc, Civil Action No. 1:14-cv-0086-mac; US District Court for the Eastern District of Texas, Beaumont Division, Engaged by Blank Rome

2021, Satterfield & Pontikes Construction, Inc., ASBCA 59980, 62301, 62714, Engaged by Bradley

2021, CTA I, LLC v. Dept. of Veteran Affairs – ADR through CBCA 5826, 6861, 6897 and 7049, Engaged by Manfredonia Law Offices, LLC

2021, A. Harold & Associates vs. Solers Research Group, Inc. – Circuit Court of the Fourth Judicial Circuit, Duval County, Florida, Case No: 2020-VA-006375, Engaged by Taylor, Day, Grimm & Boyd

2022, FKTC vs. KBR – Case before the American Arbitration Association, Engaged by KBR

2023, Nolij Consulting, LLC vs. Optimal Strategix Group, Inc. in the Third Circuit Court for Fairfax, Virginia – Case No.:2022-13297, Engaged by Williams Mullen

2023, Framaco International, Inc., CBCA 6697-ADR, et al, engaged by Bradley

2024, US ex rel Hassan Foreman v. AECOM et al, Civil Action No. 16-cv-1960 (LSS), Engaged by Heckler Fink

2024, DRT Strategies, Inc. vs Spatial Front, Inc., American Arbitration Association, Case #01-23-0005-5844, engaged by PilieroMazza

**Appendix G:  Materials Reviewed**

**Docket Entries**

- Second Amended Complaint (DKT 121 – April 15, 2019)
- Jeffrey Nix Complaint (D.S.C. 13-cv-01528 dckt 000001_000 filed 2013-06-05)

**Expert Reports**

- Dov Zakheim Report, signed 6/13/2025
- Gary Gaukler Report, signed 6/13/2025
- Jim Sherman Report, signed 6/13/2025
- John Lyle Report, signed 6/13/2025
- Michael Rudolph Report, signed 6/13/2025

**Deposition Transcripts**

- Fluor 30(b)(6) Day 1 and 2 Transcripts
- Jeffrey Nix Transcript
- Justin Jones Transcript
- Preston Howard Transcript
- Shane Ramirez Transcript
- Scott Roesler Transcript
- Tony Montalvo Transcript

**Bates Stamped Documents**

- DCAA-SR_0000055711
- DCAA-SR0000263590
- DCAA-SR0000315333
- FLUOR_SR_0006932976
- FLUOR-SR_0000047347
- FLUOR-SR_0000178966
- FLUOR-SR_0000178967
- FLUOR-SR_0000178971
- FLUOR-SR_0000178972
- FLUOR-SR_0001065629
- FLUOR-SR_0001325275
- FLUOR-SR_0005223428
- FLUOR-SR_0006096113
- FLUOR-SR_0006206125
- FLUOR-SR_0006452717

1

**Plaintiffs' Trial Exhibit 821**
**Page 47 of 68**

- FLUOR-SR_0006761073
- FLUOR-SR_0006806821
- FLUOR-SR_0006932975
- FLUOR-SR_0006932977
- FLUOR-SR_0006932978
- FLUOR-SR_0007357003
- FLUOR-SR_0008512908
- FLUOR-SR_0008512912
- FLUOR-SR_0008714046
- FLUOR-SR_0008753839
- FLUOR-SR_0009135282
- FLUOR-SR_0009515022
- FLUOR-SR_0009515023
- FLUOR-SR_0009606252
- FLUOR-SR_0009624115
- FLUOR-SR_0009624118
- FLUOR-SR_0009883582
- FLUOR-SR_0010046877
- FLUOR-SR_0010302100
- FLUOR-SR_0010302113
- FLUOR-SR_0010328136
- FLUOR-SR_0010543503
- FLUOR-SR_0010543505
- FLUOR-SR_0011546938
- FLUOR-SR_0011546939
- FLUOR-SR_0011589553
- FLUOR-SR_0011682309
- FLUOR-SR_0011682315
- FLUOR-SR_0011890883
- FLUOR-SR_0011890886
- RELATORS_076330

2

**Plaintiffs' Trial Exhibit 821**
**Page 48 of 68**

**Appendix H:  Adjustments Analysis - Detailed Audit History**

**Contents**

I.     **FY 2011** ....................................................................................................................... **1**

  A.  Item # 91G2590000055 .................................................................................................. 1

II.    **FY 2012** ....................................................................................................................... **2**

  A.  Item # 92G6145000895 .................................................................................................. 2

  B.  Item # 92G5995000149 .................................................................................................. 3

III.   **FY 2013** ....................................................................................................................... **5**

  A.  Item # 92G8540000035 .................................................................................................. 5

IV.    **FY 2014** ....................................................................................................................... **6**

  A.  Item # 91G6145001084 .................................................................................................. 6

  B.  Item # 91G6240000225 .................................................................................................. 7

  C.  Item # 92G5340000074 .................................................................................................. 8

  D.  Item # 91G5925000506 .................................................................................................. 9

  E.  Item # 92G6145000285 ................................................................................................ 10

  F.  Item # 91G4730013016 ................................................................................................ 11

  G.  Item # 91G6145001022 ................................................................................................ 12

  H.  Item # 92G7360000084 ................................................................................................ 13

  I.  Item # 91G4130001055 ................................................................................................ 14

  J.  Item # 91G7350000053 ................................................................................................ 15

  K.  Item # 91G7350000042 ................................................................................................ 16

  L.  Item # 91G6210000185 ................................................................................................ 17

  M.  Item # 92G2530005092 ................................................................................................ 19

i

**Plaintiffs' Trial Exhibit 821**
**Page 49 of 68**

## I.    FY 2011

### A.    Item # 91G2590000055

- Transaction ID:  25082431
- RDC/Storeroom:  Phoenix, D48NTV
- Item Description:  MOTOR, WIPER, GM P/N 88958144, OR APPROVED EQUAL
- Line Cost:  ($47,644,489)
- Root Cause:  Data Entry Error
- Key History:
  - On February 15, 2011, the item was inventoried, showing two wiper motors in stock.
  - On February 22, 2011, a PCOUNTADJ and RECBALADJ increased the physical count and current balance to 266,888 (adding in 266,886 units with a positive line cost adjustment of $47,644,488.72).
  - The next day, on February 23, 2011, 266,886 wiper motors were removed through PCOUNTADJ/RECBALADJ, returning the current balance to two.  This is the transaction which was flagged for my review.
  - The current balance and physical count balance remained at two until August 2012.
  - Context suggests this was an error which was immediately rectified.

| invb Item Number | Transaction eaudittransid | invb Current Balan | invb Physical Cour | invb eaudittymn | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 91G2590000055 | 24699592 | 2 | 2 | U | 2/15/2011 9:29:30 | PCOUNTADJ | 0 | 178.52 | 0 | | |
| 91G2590000055 | 24699592 | 2 | 2 | U | 2/15/2011 9:29:30 | RECBALADJ | 0 | 178.52 | 0 | | |
| 91G2590000055 | 25041070 | 2 | 266888 | U | 2/22/2011 7:21:09 | PCOUNTADJ | 266886 | 178.52 | 47644488.7 | | |
| 91G2590000055 | 25040182 | 266888 | 266888 | U | 2/22/2011 7:26:43 | RECBALADJ | 266886 | 178.52 | 47644488.7 | | |
| 91G2590000055 | 25082429 | 266888 | 2 | U | 2/23/2011 5:46:57 | PCOUNTADJ | -266886 | 178.52 | -47644489 | | |
| 91G2590000055 | 25082431 | 2 | 2 | U | 2/23/2011 5:47:45 | RECBALADJ | -266886 | 178.52 | -47644489 | | |
| 91G2590000055 | 43855387 | 2 | 2 | U | 9/20/2011 6:58:13 | RECBALADJ | 0 | 178.52 | 0 | | |
| 91G2590000055 | 43855387 | 2 | 2 | U | 9/20/2011 6:58:13 | PCOUNTADJ | 0 | 178.52 | 0 | | |
| 91G2590000055 | 70641174 | 2 | 2 | U | 4/21/2012 3:30:59 | PCOUNTADJ | 0 | 178.52 | 0 | INV 10 Cycle | 10% Monthly Inventory Adjustment |
| 91G2590000055 | 70640667 | 2 | 2 | U | 4/21/2012 3:40:33 | RECBALADJ | 0 | 178.52 | 0 | | |
| 91G2590000055 | 75291896 | 2 | 2 | U | 6/19/2012 6:22:22 | PCOUNTADJ | 0 | 178.52 | 0 | INV100 | 10%INVENTORY ADJUSTMENT |
| 91G2590000055 | 75291897 | 2 | 2 | U | 6/19/2012 6:22:36 | RECBALADJ | 0 | 178.52 | 0 | | |
| 91G2590000055 | 76987813 | 2 | 2 | U | 7/12/2012 3:50:38 | PCOUNTADJ | 0 | 178.52 | 0 | Inv100 | 100%Inventory adjustment |
| 91G2590000055 | 76987815 | 2 | 2 | U | 7/12/2012 3:50:55 | RECBALADJ | 0 | 178.52 | 0 | | |
| 91G2590000055 | 78734563 | 2 | 2 | U | 8/5/2012 8:18:25 | PCOUNTADJ | 0 | 178.52 | 0 | INV 10 Cycle | 10% Monthly Inventory Adjustment |
| 91G2590000055 | 78734457 | 2 | 2 | U | 8/5/2012 8:20:41 | RECBALADJ | 0 | 178.52 | 0 | | |

1

**Plaintiffs' Trial Exhibit 821**
**Page 50 of 68**

## II. FY 2012

### A. Item # 92G6145000895

- Transaction: 76811684
- RDC/Storeroom: Fenty, D07ELEC
- Item Description: WIRE, 10 AWG MTW, RED, 500 FT, ROL OF 500 FT, CAROL P/N 76832.18.03, OR APPROVED EQUAL
- Transaction Type: RECBALADJ
- Line Cost: ($32,435,000)
- Root Cause: UOM
- Key History:
  - On December 15, 2011, 500 rolls were entered into Maximo, as 250,000 units (feet), pursuant to a purchase order.
  - On December 29, 2011, the 500 feet were transferred another bin, presumably to fill the purchase order, and Maximo database had 249,500 remaining ft. on record.
  - On July 9, 2012, the remaining amount was adjusted out.  A Causative Research Transaction Register from Dec. 3, 2013 identified the adjustment as fixing a UOM issue.[1]
  - Context suggests that the purchase order had requested 500 ft. of wire, but the wire was entered into Maximo as 500 rolls for a total of 250,000 ft.  After the 500 ft. that had been purchased was issued to the work order, the remaining balance did not actually exist, so had to be administratively adjusted out.

| invb Item Number | Transaction eaudittranid | invb Current Balan | invb Physical Cour | invb eaudittype | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 92G6145000895 | 60089679 | 250000 | 250000 | I | 12/15/2011 23:05:51 | TRANSFER | 250000 | 0 | 0 | D07-104153 | |
| 92G6145000895 | 61642779 | 249500 | 250000 | U | 12/29/2011 23:44:24 | TRANSFER | -500 | 0 | 0 | | |
| 92G6145000895 | 76811006 | 249500 | 0 | U | 7/9/2012 20:28:16 | PCOUNTADJ | -250000 | 130 | -32500000 | | INV 100    100% Inventory Adjustment |
| 92G6145000895 | 76811684 | 0 | 0 | U | 7/9/2012 22:53:25 | RECBALADJ | -249500 | 130 | -32435000 | | |
| 92G6145000895 | | 0 | 0 | D | 7/11/2012 8:41:50 | | | 130 | | | |

---

[1] RELATORS_076330 (Dec. 3, 2013 "Fenty Causative Research Transaction Register," AO Fenty Transaction Register, Row 2667).

2

**B.    Item # 92G5995000149**

- Transaction:  63804225
- RDC/Storeroom:  Fenty, D07ELEC
- Item Description:  CABLE, 10/2 WITH GROUND, NON-METALIC, SOLID, ROL OF 250 FT, COLEMAN CABLE M/N G55568-04-03, OR APPROVED EQUAL
- Transaction Type:  RECBALADJ
- Line Cost: ($28,039,392)
- Root Cause:  UOM
- Key History:
  - On January 22, 2012, the current balance was adjusted from 138 to 34,500.  34,500 is the result of multiplying 138 by 250.  There are 250 feet in a roll of the cable.
  - On January 24, 2012, the current balance was adjusted back down to 138, undoing the prior transaction.  The memo field indicates that the earlier transaction was "entered by mistake."
  - The average cost was not simultaneously updated, so the line of inventory continued to be processed as costing $816/foot.

3

**Plaintiffs' Trial Exhibit 821**
**Page 52 of 68**

| invb Item Number | Transaction eaudittranid | invb Current Balan | invb Physical Cour | invb eaudittype | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 92G5995000149 | 62603205 | 133 | 133 | I | 1/9/2012 5:11:52 | TRANSFER | 133 | 816 | 108528 | | |
| 92G5995000149 | 63630438 | 133 | 138 | U | 1/22/2012 0:34:23 | PCOUNTADJ | 5 | 816 | 4080 | | INV RANDOM    Random Spot Check Adjustment |
| 92G5995000149 | 63646247 | 138 | 138 | U | 1/22/2012 4:50:25 | RECBALADJ | 5 | 816 | 4080 | | |
| 92G5995000149 | 63652992 | 138 | 34500 | U | 1/22/2012 6:17:16 | PCOUNTADJ | 34362 | 816 | 28039392 | | INV RANDOM    Random Spot Check Adjustment |
| 92G5995000149 | 63652648 | 34500 | 34500 | U | 1/22/2012 6:21:17 | RECBALADJ | 34362 | 816 | 28039392 | | |
| 92G5995000149 | 63804222 | 34500 | 138 | U | 1/24/2012 4:50:50 | PCOUNTADJ | -34362 | 816 | -28039392 | | entered by mistake, conversion from rol to ft |
| 92G5995000149 | 63804225 | 138 | 138 | U | 1/24/2012 4:51:24 | RECBALADJ | -34362 | 816 | -28039392 | | |
| 92G5995000149 | 63804235 | 138 | 34500 | U | 1/24/2012 4:53:30 | PCOUNTADJ | 34362 | 816 | 28039392 | | unit conversion from ROL to FT |
| 92G5995000149 | 63828367 | 34500 | 34500 | U | 1/24/2012 21:30:55 | RECBALADJ | 34362 | 816 | 28039392 | | |
| 92G5995000149 | 64934777 | 34500 | 34500 | U | 2/8/2012 10:23:29 | PCOUNTADJ | 0 | 816 | 0 | | |
| 92G5995000149 | 64934777 | 34500 | 34500 | U | 2/8/2012 10:23:29 | RECBALADJ | 0 | 816 | 0 | | |
| 92G5995000149 | 67860659 | 0 | 34500 | U | 3/13/2012 23:21:19 | TRANSFER | -34500 | 816 | 28152000 | | |
| 92G5995000149 | | 0 | 34500 | D | 3/18/2012 2:39:11 | | | 816 | | | |

4

**Plaintiffs' Trial Exhibit 821**
**Page 53 of 68**

### III.   FY 2013

### A.   Item # 92G8540000035

- Transaction:  104221665
- RDC/Storeroom:  Ghazni, D32CLEN
- Item Description:  TOWEL, PAPER, SINGLE FOLD, BOX, BX OF 4000 EA
- Transaction Type:  RECBALADJ
- Line Cost:  ($36,253,254)
- Root Cause:  UOM
- Key History:
  - On September 4, 2013, in two bins, units were inserted, returned, and adjusted out; memo fields read: "backout of material for MRR update UOM error in entering material."
  - The sum total of the resulting negative adjustment was $36,253,254.

| invb Item Number | Transaction eaudittransid | invb Current Balan | invb Physical Cour | invb eaudittype | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 92G8540000035 | | 576000 | 576000 | I | 9/4/2013 15:56:23 | | | 21.74 | | | |
| 92G8540000035 | 104221663 | 575856 | 576000 | U | 9/4/2013 15:57:01 | RETURN | -144 | 21.74 | -3062.88 | D32-1008055 | |
| 92G8540000035 | 104221664 | 575856 | 0 | U | 9/4/2013 16:06:36 | PCOUNTADJ | -576000 | 21.74 | -12522240 | | backout of material for MRR update UOM error in entering material |
| 92G8540000035 | 104221665 | 0 | 0 | U | 9/4/2013 16:06:48 | RECBALADJ | -575856 | 21.74 | -12519109 | | |
| 92G8540000035 | | 0 | 0 | D | 9/7/2013 9:10:10 | | | 21.74 | | | |

| invb Item Number | Transaction eaudittransid | invb Current Balan | invb Physical Cour | invb eaudittype | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 92G8540000035 | | 576000 | 576000 | I | 9/4/2013 15:56:23 | | | 21.74 | | | |
| 92G8540000035 | 104221663 | 575856 | 576000 | U | 9/4/2013 15:57:01 | RETURN | -144 | 21.74 | -3062.88 | D32-1008055 | |
| 92G8540000035 | 104221664 | 575856 | 0 | U | 9/4/2013 16:06:36 | PCOUNTADJ | -576000 | 21.74 | -12522240 | | backout of material for MRR update UOM error in entering material |
| 92G8540000035 | 104221665 | 0 | 0 | U | 9/4/2013 16:06:48 | RECBALADJ | -575856 | 21.74 | -12519109 | | |
| 92G8540000035 | | 0 | 0 | D | 9/7/2013 9:10:10 | | | 21.74 | | | |

5

## IV.   FY 2014

### A.   Item # 91G6145001084

- Transaction: 110948527
- RDC/Storeroom: Bagram, D01ELEC
- Item Description: WIRE, ELECTRICAL, STRANDED, WHITE, 8 AWG, FEDERAL COMMERCIAL P/N A-A-59544, OR APPROVED EQUAL
- Transaction Type: RECBALADJ
- Line Cost: ($2,892,344)
- Root Cause: UOM
- Key History:
  - On February 3, 2014, 14,000 units were transferred into the bin.
  - The following day, on February 4, 2014, the inventory balance was adjusted from 14,000 to 28. 14,000 is the result of multiplying 28 by 500.
  - The accompanying memo for the PCOUNTADJ indicated that this was an administrative adjustment converting the units from feet to eaches (from 14,000 feet to 28 eaches, of 500 feet each).

| invb Item Number | Transaction eaudittransid | invb Current Balan | invb Physical Coun | invb eaudittype | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 91G6145001084 | 110913548 | 14000 | 14000 | I | 2/3/2014 7:43:25 | TRANSFER | 14000 | 207.01 | 2898140 | | TRANSFER TO CORRECT LOCATION- TURN IN CASE 9 |
| 91G6145001084 | 110948526 | 14000 | 28 | U | 2/4/2014 23:14:20 | PCOUNTADJ | -13972 | 207.01 | -2892343.7 | | ADMINISTRATIVE ADJUSTMENT FROM FT TO EA D01-14034-009 |
| 91G6145001084 | 110948527 | 28 | 28 | U | 2/4/2014 23:14:34 | RECBALADJ | -13972 | 207.01 | -2892343.7 | | |
| 91G6145001084 | 111627238 | 0 | 28 | U | 2/22/2014 2:40:41 | TRANSFER | -28 | 207.01 | 5796.28 | | PCARSS CASE 9 |
| 91G6145001084 | | 0 | 28 | D | 3/17/2014 2:52:38 | | | 207.01 | | | |

6

**B.    Item # 91G6240000225**

- Transaction:  112191457
- RDC/Storeroom:  Bagram, D01ELEC
- Item Description:  LAMP, FLUORESCENT, WHITE, 34 W, 48 IN, PHILLIPS ELECTRONICS P/N 24470-7, OR APPROVED EQUALL
- Transaction Type:  RECBALADJ
- Line Cost:  ($835,764)
- Root Cause:  Item Code Number Change
- Key History:
  - On March 9, 2014, two lines of inventory were adjusted with the same Transaction ID.  Memo fields for both lines read: "AA-91G6240000225 REPLACED BY 92G6240000884."
  - In each case, the balance in the old code was adjusted out, and a corresponding amount was adjusted into the new item code.  One example is provided below.
  - The sum total of the negative adjustments was -$835,764.

| invb Bin | invb Item Number | Transaction eaudittrans id | invb Current Balanc | invb Physical Count | invb eaudittype | invb eaudittimestamp | invb eaudittransid | Transaction Type | Quantity | AvgCost at time of Transacti | Line Cost | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EL088BAAA | 91G6240000225 | 112180019 | 46 | 510 | U | 3/9/2014 1:18:27 | 112180019 | TRANSFER | 6 | 38.88 | 233.28 | bin to bin |
| EL088BAAA | 91G6240000225 | 112191456 | 46 | 0 | U | 3/9/2014 8:31:23 | 112191456 | PCOUNTADJ | -510 | 38.88 | -19828.8 | AA-91G6240000225 REPLACED BY 92G6240000884 |
| EL088BAAA | 91G6240000225 | 112191457 | 0 | 0 | U | 3/9/2014 8:31:38 | 112191457 | RECBALADJ | -46 | 38.88 | -1788.48 | |
| EL088BAAA | 92G6240000884 | | 0 | 0 | I | 3/9/2014 8:35:53 | 112193176 | | | 47.55 | | |
| EL088BAAA | 92G6240000884 | 112193177 | 0 | 46 | U | 3/9/2014 8:36:30 | 112193177 | PCOUNTADJ | 46 | 47.55 | 2187.3 | AA-91G6240000225 REPLACED BY 92G6240000884 |
| EL088BAAA | 92G6240000884 | 112193179 | 46 | 46 | U | 3/9/2014 8:36:49 | 112193179 | RECBALADJ | 46 | 47.55 | 2187.3 | |

7

**Plaintiffs' Trial Exhibit 821**
**Page 56 of 68**

**C.     Item # 92G5340000074**

- Transaction:  112098050
- RDC/Storeroom:  Bagram, D01ELEC
- Item Description:  STRAP, CONDUIT, EMT, 1 HOLE, 3/4 IN, BAG OF 50 EA, THOMAS AND BETTS P/N TS 102, OR APPROVED EQUAL
- Transaction Type:  RECBALADJ
- Line Cost:  ($608,662)
- Root Cause:  UOM
- Key History:
    - On February 1, 2014, first 29,346 and then 695 units were transferred into the bin.  Only the 29,346 unit transfer updated the PCOUNTADJ, because that was the "Insert" transaction, but the inventory held a total of 30,041 units (29,346 + 695).
    - On March 7, 2014, a PCOUNTADJ/RECBALADJ was performed, updating the balance to 1,424.  The memo indicated that this was because the units were converted from eaches to packs.

| invb Item Number | Transaction eaudittransid | invb Current Balan | invb Physical Cour | invb eaudittype | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 92G5340000074 | 110838486 | 29346 | 29346 | I | 2/1/2014 1:28:05 | TRANSFER | 29346 | 21.34 | 626243.64 | | TRANSFER TO NEW BIN |
| 92G5340000074 | 110838489 | 30041 | 29346 | U | 2/1/2014 1:29:56 | TRANSFER | 695 | 21.34 | 14831.3 | | TRANSFER TO NEW BIN |
| 92G5340000074 | 110991545 | 30040 | 29346 | U | 2/5/2014 8:33:23 | ISSUE | -1 | 21.34 | 21.34 | | |
| 92G5340000074 | 112098048 | 30040 | 1424 | U | 3/7/2014 1:22:20 | PCOUNTADJ | -27922 | 21.27 | -593900.94 | | AA⬚ Convert unit of measure from EA to PAC |
| 92G5340000074 | 112098050 | 1424 | 1424 | U | 3/7/2014 1:22:44 | RECBALADJ | -28616 | 21.27 | -608662.32 | | |
| 92G5340000074 | 112151652 | 1424 | 1424 | U | 3/8/2014 6:23:08 | PCOUNTADJ | 0 | 21.27 | 0 | INV 100 | 100% Inventory Adjustment |
| 92G5340000074 | 112151654 | 1424 | 1424 | U | 3/8/2014 6:23:29 | RECBALADJ | 0 | 21.27 | 0 | | |

8

**Plaintiffs' Trial Exhibit 821**
**Page 57 of 68**

D.    **Item # 91G5925000506**

- Transaction: 112430704
- RDC/Storeroom: Bagram, D01COXS
- Item Description: BREAKER, CIRCUIT, PANELBOARD, 3 POLE, 600 V, 400 A, SQUARE D P/N LA36400, OR APPROVED EQUAL
- Transaction Type: RECBALADJ
- Line Cost: ($548,343)
- Root Cause: IPO Issues
- Key History:
  - On March 7, 2014, 291 units were transferred in, referencing PO D01-130053.
  - An attachment to PO D01-130053 shows that a year earlier, Bagram initiated an IPR for circuit breakers to be fulfilled by FOB Warrior.[2] The truck carrying the items in question was rerouted.[3]
  - On March 16, 2014, the balance was adjusted out. The memo field for the PCOUNTADJ line reads: "IPO RCV DIS Internal PO Discrepancy Adjustment."

| invb Item Number | Transaction eaudittransid | invb Current Balan | invb Physical Coun | invb eaudittype | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 91G5925000506 | 112099050 | 291 | 291 | I | 3/7/2014 1:58:15 | TRANSFER | 291 | 1884.34 | 548342.94 | D01-130053 | |
| 91G5925000506 | 112431387 | 291 | 0 | U | 3/16/2014 2:23:12 | PCOUNTADJ | -291 | 1884.34 | -548342.94 | IPO RCV DIS | Internal PO Discrepancy Adjustment |
| 91G5925000506 | 112430704 | 0 | 0 | U | 3/16/2014 2:26:21 | RECBALADJ | -291 | 1884.34 | -548342.94 | | |
| 91G5925000506 | | 0 | 0 | D | 3/17/2014 3:35:15 | | | 1884.34 | | | |

---

[2] FLUOR-SR_0011682309, at -312 (tracking delivery truck traveling from Warrior to Bagram in March 2013).

[3] FLUOR-SR_0001325275 (Accident/Incident Statement that "On 06MAR14, Shank Materials provided a copy of TMR Pre-Alert ACC6071 and a Memo . . . stating it was received at Retro Sort Yard and the TMR material never arrived at Bagram RDC for processing."); FLUOR-SR_0011682309, at -310 ("IPR#D01-130053- Everything has been received from TMR#ACD8137,ACE3755 & ACE3758.All the TROUTed lines ( Red color ) are pending from ACC6071 & it's never made at BAF Materials"); FLUOR-SR_0011682315 (Mar. 6, 2014 Report indicating that shipment from Warrior was "not received at Bagram RDC" and indicating that "Memo provided showing TMR ACC6071 was received at Retro").

9

**Plaintiffs' Trial Exhibit 821**
**Page 58 of 68**

**E.**    **Item # 92G6145000285**

- Transaction:  112110645
- RDC/Storeroom:  Bagram, D01ELEC
- Item Description:  WIRE, RED, STRANDED, 10 AWG, THHN, 600 V, ROL OF 500 FT, REFERENCE GRAINGER P/N 4W009
- Transaction Type:  RECBALADJ
- Line Cost:  ($374,250)
- Root Cause:  UOM
- Key History:
  - On Jan. 19, 2013, there are two receipts of 750,000 each for two different purchase orders, for a total of 1.5 million units.
  - On March 7, 2014, the amount is adjusted down by a factor of 500, with a memo field indicating that the adjustment was correcting a UOM error (i.e., from 1.5 million feet to 3000 rolls, at 500 feet each).

| invb Item Number | Transaction eaudittransid | invb Current Balan | invb Physical Coun | invb eaudittype | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 92G6145000285 | 90947229 | 750000 | 750000 | I | 1/19/2013 11:14:52 | RECEIPT | 750000 | 0 | 255 | D01-105218 | |
| 92G6145000285 | 90948003 | 1500000 | 750000 | U | 1/19/2013 11:15:08 | RECEIPT | 750000 | 0 | 255 | D01-105219 | |
| 92G6145000285 | 112110642 | 1500000 | 3000 | U | 3/7/2014 7:51:25 | PCOUNTADJ | -747000 | 0.25 | -186750 | | AA-ADMINISTRATIVE INVENTORY ADJUSTMENT MRR UOM ERROR(00308105) |
| 92G6145000285 | 112110645 | 3000 | 3000 | U | 3/7/2014 7:51:51 | RECBALADJ | -1497000 | 0.25 | -374250 | | |
| 92G6145000285 | 112150251 | 3000 | 3000 | U | 3/8/2014 5:37:47 | PCOUNTADJ | 0 | 0.25 | 0 | INV 100 | 100% Inventory Adjustment |
| 92G6145000285 | 112150252 | 3000 | 3000 | U | 3/8/2014 5:38:16 | RECBALADJ | 0 | 0.25 | 0 | | |

10

**Plaintiffs' Trial Exhibit 821**
**Page 59 of 68**

**F.    Item # 91G4730013016**

- Transaction: 106069569
- RDC/Storeroom: Fenty, D07PLUM
- Item Description: CLAMP, 4 5INX8IN, CASCADE P/N 2/CR1-5, 60-8
- Transaction Type: RECBALADJ
- Line Cost: ($373,660)
- Root Cause: UOM
- Key History:
  - The transaction references an memorandum attachment, which explains the history of the transaction.[4]
  - Earlier, Shank sent an IPR to Fenty, requesting 2,450 eaches of clamps. Shank received 70, but believed it was missing 2,380. Shank initiated an Inventory Discrepancy Report ("IDR") for the remaining 2,380.
  - Fenty and Shank management later determined that there was a UOM issue at Shank. Shank thought it had received the shipment in eaches, rather than boxes. Shank had in fact received the 2,450 eaches it had requested (in the form of 70 boxes).
  - The inventory management teams determined that the remaining balance in Maximo had in fact been sent to Shank and consumed on the work order.
  - The 2,380 balance was sent to an IDR bin on August 27, 2013, and adjusted out on October 8, 2013, referencing the memo which explained the discrepancy.

| invb Bin | invb Item Number | Transaction eaudittranaid | invb Current Balan | invb Physical Cour | invb eaudittyno | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IDR-09101 | 91G4730013016 | 103799142 | 2380 | 2380 | I | 8/27/2013 10:12:37 | TRANSFER | 2380 | 157 | 373660 | | RETURN TO ORIGINAL IDR LOCATION - IDR-09101 |
| IDR-09101 | 91G4730013016 | 106069568 | 2380 | 0 | U | 10/8/2013 11:24:57 | PCOUNTADJ | -2380 | 157 | -373660 | | Administrative Adjustment UOI Discrepancy , see attached Memo IAR D07- 1006 |
| IDR-09101 | 91G4730013016 | 106069569 | 0 | 0 | U | 10/8/2013 11:25:10 | RECBALADJ | -2380 | 157 | -373660 | | |
| IDR-09101 | 91G4730013016 | | 0 | 0 | D | 10/8/2013 11:27:50 | | | 157 | | | |

---

[4] FLUOR-SR_0010543505 (File titled "Email Traffic_IAR D07-1006130813.pdf"); FLUOR-SR_0010543503 (File titled "IAR D07 1006130813.pdf").

11

**Plaintiffs' Trial Exhibit 821**
**Page 60 of 68**

**G.     Item # 91G6145001022**

- Transaction:  110948533
- RDC/Storeroom:  Bagram, D01ELEC
- Item Description:  WIRE, ELECTRICAL, 500 FT, COLONIAL WIRE AND CABLE OF NEW JERSEY INC P/N THHN-10-RED, OR APPROVED EQUAL
- Transaction Type:  RECBALADJ
- Line Cost:  ($359,919)
- Root Cause:  UOM
- Key History:
  - On February 4, 2014, the 4,000 units in the current balance were adjusted down to 8.  4,000 is the result of multiplying 8 by 500—i.e., from 4,000 feet to 8 rolls.
  - The memo field for the PCOUNTADJ transaction indicated that the adjustment was due to converting the unit from feet to eaches.

| invb Item Number | Transaction eaudittransid | invb Current Balan | invb Physical Coun | invb eaudittyp | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 91G6145001022 | 110911610 | 4000 | 4000 | I | 2/3/2014 7:27:14 | TRANSFER | 4000 | 90.16 | 360640 | | TRANSFER TO CORRECT LOCATION- TURN IN CASE 9 |
| 91G6145001022 | 110948532 | 4000 | 8 | U | 2/4/2014 23:18:02 | PCOUNTADJ | -3992 | 90.16 | -359918.72 | | ADMINISTRATIVE ADJUSTMENT FROM FT TO EA D01-14034-009 |
| 91G6145001022 | 110948533 | 8 | 8 | U | 2/4/2014 23:18:13 | RECBALADJ | -3992 | 90.16 | -359918.72 | | |
| 91G6145001022 | 111627236 | 0 | 8 | U | 2/22/2014 2:39:08 | TRANSFER | -8 | 90.16 | 721.28 | | PCARSS CASE 9 |
| 91G6145001022 | | 0 | 8 | D | 3/17/2014 2:49:48 | | | 90.16 | | | |

12

**Plaintiffs' Trial Exhibit 821**
**Page 61 of 68**

**H.     Item # 92G7360000084**

- Transaction: 117790580
- Commodity: Food Preparation and Serving Equipment
- Item Description: FLATWARE SET, BX OF 400 EA, ARSLON PLASTIK P/N AP-3
- Transaction Type: RECBALADJ
- Line Cost: ($359,867)
- Root Cause: Item Code Number Change
- Key History:
  - On August 25, 2014, 13 lines of inventory were adjusted with the same Transaction ID. The memo fields for all the lines read: "AA-92G7360000084 REPLACED BY 92G7360000072."
  - In each case, the balance in the old code was adjusted out, and a corresponding amount was adjusted into the new item code. One example is provided below.
  - The sum total of the negative adjustments was -$359,867.

| invb Bin | invb Item Number | Transaction eaudittrans id | invb Current Balanc | invb Physical Count | invb eaudittype | invb eudittimestamp | invb eaudittransid | Transaction Type | Quantity | AvgCost at time of Transacti | Line Cost | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DF107AAAA | 92G7360000084 | 117789861 | 960 | 0 | U | 8/25/2014 0:23:18 | 117789861 | PCOUNTADJ | -960 | 46.06 | -44217.6 | AA-92G7360000084 REPLACED BY 92G7360000072 |
| DF107AAAA | 92G7360000084 | 117790580 | 0 | 0 | U | 8/25/2014 0:23:38 | 117790580 | RECBALADJ | -960 | 46.06 | -44217.6 | |
| DF107AAAA | 92G7360000084 | | 0 | 0 | D | 8/25/2014 0:24:51 | 117790585 | | | 46.06 | | |
| DF107AAAA | 92G7360000072 | | 0 | 0 | I | 8/25/2014 0:28:10 | 117790594 | | | 28.79 | | |
| DF107AAAA | 92G7360000072 | 117790600 | 0 | 960 | U | 8/25/2014 0:31:59 | 117790600 | PCOUNTADJ | 960 | 28.79 | 27638.4 | AA-92G7360000084 REPLACED BY 92G7360000072 |
| DF107AAAA | 92G7360000072 | 117790602 | 960 | 960 | U | 8/25/2014 0:32:17 | 117790602 | RECBALADJ | 960 | 28.79 | 27638.4 | |

13

**Plaintiffs' Trial Exhibit 821**
**Page 62 of 68**

I.    **Item # 91G4130001055**

- Transaction:  109458274
- Commodity:  Refrigeration, Air Conditioning, and Air Circulating Equipment
- Item Description:  CONTROLLER, MICRO-LINK3, CARRIER P/N 12-00579-00, OR APPROVED EQUAL
- Transaction Type:  RECBALADJ
- Line Cost:  ($291,338)
- Root Cause:  Item Code Number Change
- Key History:
    - On December 27, 2013, the lines of inventory were adjusted out of three different bins under the same Transaction ID.
    - Memo fields for all PCOUNTADJ lines read:  "ADMINISTRATIVE ADJUSTMENT IC 91G4130001055 REPLACED BY  91G4130000845."
    - In each case, the balance in the old code was adjusted out, and a corresponding amount was adjusted into the new item code.  One example is provided below.
    - The sum total of the negative adjustments was -$291,338.

| invb Bin | invb Item Number | Transaction eaudittrans id | invb Current Balanc | invb Physical Count | invb eaudittype | invb eaudittimestamp | invb eaudittransid | Transaction Type | Quantity | AvgCost at time of Transacti | Line Cost | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A008BAAL | 91G4130001055 | 109458273 | 39 | 0 | U | 12/27/2013 6:27:09 | 109458273 | PCOUNTADJ | -41 | 1787.35 | -73281.35 | ADMINISTRATIVE ADJUSTMENT IC 91G4130001055 REPLACED BY 91G4130000845 |
| A008BAAL | 91G4130001055 | 109458274 | 0 | 0 | U | 12/27/2013 6:27:22 | 109458274 | RECBALADJ | -39 | 1787.35 | -69706.65 | |
| A008BAAL | 91G4130001055 | | 0 | 0 | D | 12/27/2013 6:27:36 | 109458276 | | | 1787.35 | | |
| A008BAAL | 91G4130000845 | | 0 | 0 | I | 12/27/2013 6:33:12 | 109458309 | | | 1738.54 | | |
| A008BAAL | 91G4130000845 | 109458311 | 0 | 39 | U | 12/27/2013 6:33:30 | 109458311 | PCOUNTADJ | 39 | 1738.54 | 67803.06 | ADMINISTRATIVE ADJUSTMENT IC 91G4130001055 REPLACED BY 91G4130000845 |
| A008BAAL | 91G4130000845 | 109458314 | 39 | 39 | U | 12/27/2013 6:33:44 | 109458314 | RECBALADJ | 39 | 1738.54 | 67803.06 | |

14

**Plaintiffs' Trial Exhibit 821**
**Page 63 of 68**

**J.     Item # 91G7350000053**

- Transaction:  105841909
- Commodity:  Food Preparation and Serving Equipment
- Item Description:  PLATE, PAPER, PLASTIC COATED, 3 COMPARTMENT,  10-1/4 IN
- Transaction Type:  RECBALADJ
- Line Cost:  ($290,262)
- Root Cause:  Item Code Number Change
- Key History:
  - On October 3, 2013, 13 lines were adjusted out of different bins.
  - The memo fields for all the associated PCOUNTADJ transactions read:  "ADMINISTRATIVE ADJUSTMENT IC 91G7350000053 REPLACED BY 92G7350000110."
  - In each case, the balance in the old code was adjusted out, and a corresponding amount was adjusted into the new item code.  One example is provided below.
  - The sum total of the negative adjustments was -$290,262.

| invb Bin | invb Item Number | Transaction eaudittrans id | invb Current Balanc | invb Physical Count | invb eaudittype | invb eaudittimestamp | invb eaudittransid | Transaction Type | Quantity | AvgCost at time of Transacti | Line Cost | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EF10AAAA | 91G7350000053 | 105841908 | 244 | 0 | U | 10/3/2013 10:15:21 | 105841908 | PCOUNTADJ | -247 | 73.54 | -18164.38 | ADMINISTRATIVE ADJUSTMENT IC 91G7350000053 REPLACED BY 92G7350000110 |
| EF10AAAA | 91G7350000053 | 105841909 | 0 | 0 | U | 10/3/2013 10:15:44 | 105841909 | RECBALADJ | -244 | 73.54 | -17943.76 | |
| EF10AAAA | 92G7350000110 | | 0 | 0 | I | 10/3/2013 10:17:19 | 105841910 | | | 82.86 | | |
| EF10AAAA | 92G7350000110 | 105841924 | 0 | 244 | U | 10/3/2013 10:23:46 | 105841924 | PCOUNTADJ | 244 | 82.86 | 20217.84 | ADMINISTRATIVE ADJUSTMENT IC 91G7350000053 REPLACED BY 92G7350000110 |
| EF10AAAA | 92G7350000110 | 105841925 | 244 | 244 | U | 10/3/2013 10:24:01 | 105841925 | RECBALADJ | 244 | 82.86 | 20217.84 | |

**K.     Item # 91G7350000042**

- Transaction:  117876508
- Commodity:  Food Preparation and Serving Equipment
- Item Description:  CUP, MOISTURE RESISTANT, DIEPOSABLE, 12 OZ
- Transaction Type:  RECBALADJ
- Line Cost:  ($283,260)
- Root Cause:  Item Code Number Change
- Key History:
  - On August 28, 2014, 13 lines are adjusted out of different bins.
  - Memo fields for all PCOUNTADJ transactions read:  "AA-91G7350000042 REPLACED BY 92G7350000042."
  - In each case, the balance in the old code was adjusted out, and a corresponding amount was adjusted into the new item code.  One example is provided below.
  - The sum total of the negative adjustments was -$283,260.

| invb Bin | invb Item Number | Transaction eaudittrans id | invb Current Balanc | invb Physical Count | invb eaudittype | invb eaudittimestamp | invb eaudittransid | Transaction Type | Quantity | AvgCost at time of Transacti | Line Cost | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DFAC73AAAA | 91G7350000042 | 117876507 | 276 | 0 | U | 8/28/2014 6:56:27 | 117876507 | PCOUNTADJ | -276 | 122.2 | -33727.2 | AA-91G7350000042 REPLACED BY 92G7350000042 |
| DFAC73AAAA | 91G7350000042 | 117876508 | 0 | 0 | U | 8/28/2014 6:57:00 | 117876508 | RECBALADJ | -276 | 122.2 | -33727.2 | |
| DFAC73AAAA | 91G7350000042 | | 0 | 0 | D | 8/28/2014 6:57:50 | 117876509 | | | 122.2 | | |
| DFAC73AAAA | 92G7350000042 | | 0 | 0 | I | 8/28/2014 7:00:27 | 117876511 | | | 91.57 | | |
| DFAC73AAAA | 92G7350000042 | 117876513 | 0 | 276 | U | 8/28/2014 7:02:42 | 117876513 | PCOUNTADJ | 276 | 91.57 | 25273.32 | AA-91G7350000042 REPLACED BY 92G7350000042 |
| DFAC73AAAA | 92G7350000042 | 117876514 | 276 | 276 | U | 8/28/2014 7:03:07 | 117876514 | RECBALADJ | 276 | 91.57 | 25273.32 | |

16

**Plaintiffs' Trial Exhibit 821**
**Page 65 of 68**

**L.    Item # 91G6210000185**

- Transaction: 106442665
- RDC/Storeroom:  Marmal, D52RECV
- Item Description: LIGHTING, FLOURESCENT, 10 UNIT KIT, FOR ALASKAN STRUCTURES M/N AK-EL-S10-50WFLHSBCC01
- Transaction Type:  RECBALADJ
- Line Cost:  ($265,634)
- Root Cause:  IPO
- Key History:
  - As indicated in the Maximo database attachments, on February 17, 2010, Spann initiated four IPRs to Bagram for light sets.[5]  those light sets were never received at Spann.  Inventory Discrepancy Reports were created to demonstrate the items were not physically received.[6]
  - On October 18, 2013, the items were received in Maximo in four IPR bins (one for each IPO), in order to close the IPO.
  - The four balances were adjusted out in one transaction (with the same transaction ID), for a total negative adjustment of $265,634.
  - Fluor notified the Government of a potential LTDD (FLC13-520068); however, that LTDD was subsequently cancelled.[7]

| invb Bin | invb Item Number | Transaction eaudittransid | invb Current Balan | invb Physical Cour | invb eaudittype | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IDR1000033 | 91G6210000185 | 105710149 | 30 | 30 | I | 9/30/2013 8:43:11 | TRANSFER | 30 | 2108.21 | 63246.3 | D52-1000033-PO | |
| IDR1000033 | 91G6210000185 | 106442664 | 30 | 0 | U | 10/18/2013 0:01:49 | PCOUNTADJ | -30 | 2108.21 | -63246.3 | | FLC13-520068 |
| IDR1000033 | 91G6210000185 | 106442665 | 0 | 0 | U | 10/18/2013 0:02:02 | RECBALADJ | -30 | 2108.21 | -63246.3 | | |
| IDR1000033 | 91G6210000185 | | 0 | 0 | D | 10/18/2013 0:02:24 | | | 2108.21 | | | |

---

[5] FLUOR-SR_0007357003 at -003, -007, -011, -015.

[6] *Id.* at -006, -010, -014, -018.

[7] March 28, 2014 MFR re Cancellation of LTDD's per MMB-0015, FLUOR-SR_0006452717.

17

**Plaintiffs' Trial Exhibit 821**
**Page 66 of 68**

| invb Bin | invb Item Number | Transaction eaudittransid | invb Current Balan | invb Physical Cour | invb eaudittype | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IDR1000035 | 91G6210000185 | 105710170 | 30 | 30 | I | 9/30/2013 9:03:20 | TRANSFER | 30 | 2108.21 | 63246.3 | D52-1000035-PO | |
| IDR1000035 | 91G6210000185 | 106442664 | 30 | 0 | U | 10/18/2013 0:01:49 | PCOUNTADJ | -30 | 2108.21 | -63246.3 | | FLC13-520068 |
| IDR1000035 | 91G6210000185 | 106442665 | 0 | 0 | U | 10/18/2013 0:02:02 | RECBALADJ | -30 | 2108.21 | -63246.3 | | |
| IDR1000035 | 91G6210000185 | | | 0 | 0 | D | 10/18/2013 0:02:24 | | | 2108.21 | | | |

| invb Bin | invb Item Number | Transaction eaudittransid | invb Current Balan | invb Physical Cour | invb eaudittype | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IDR1000036 | 91G6210000185 | 105714316 | 33 | 33 | I | 9/30/2013 9:29:35 | TRANSFER | 33 | 2108.21 | 69570.93 | D52-1000036-PO | |
| IDR1000036 | 91G6210000185 | 106442664 | 33 | 0 | U | 10/18/2013 0:01:49 | PCOUNTADJ | -33 | 2108.21 | -69570.93 | | FLC13-520068 |
| IDR1000036 | 91G6210000185 | 106442665 | 0 | 0 | U | 10/18/2013 0:02:02 | RECBALADJ | -33 | 2108.21 | -69570.93 | | |
| IDR1000036 | 91G6210000185 | | 0 | 0 | D | 10/18/2013 0:02:24 | | | 2108.21 | | | |

| invb Bin | invb Item Number | Transaction eaudittransid | invb Current Balan | invb Physical Cour | invb eaudittype | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IDR1000037 | 91G6210000185 | 105714363 | 33 | 33 | I | 9/30/2013 10:08:04 | TRANSFER | 33 | 2108.21 | 69570.93 | D52-1000037-PO | |
| IDR1000037 | 91G6210000185 | 106442664 | 33 | 0 | U | 10/18/2013 0:01:49 | PCOUNTADJ | -33 | 2108.21 | -69570.93 | | FLC13-520068 |
| IDR1000037 | 91G6210000185 | 106442665 | 0 | 0 | U | 10/18/2013 0:02:02 | RECBALADJ | -33 | 2108.21 | -69570.93 | | |
| IDR1000037 | 91G6210000185 | | 0 | 0 | D | 10/18/2013 0:02:24 | | | 2108.21 | | | |

18

**Plaintiffs' Trial Exhibit 821**
**Page 67 of 68**

**M.     Item # 92G2530005092**

- Transaction:  115178242
- Commodity: Vehicular Equipment Components
- Item Description:  CASE, 4 LIGHT SET, CAS OF 4 EA, TEMPER P/N 31-MC-502S, OR APPROVED EQUAL
- Transaction Type:  RECBALADJ
- Line Cost:  ($263,573)
- Root Cause:  UOM
- Key History:
    - On May 9, 2013, there was a total current balance of 228 units.  The items are in cases of 4, per the item description.
    - On July 24, 2013, 57 units were issued out, leaving a balance of 171.  228 is 57 units multiplied by 4 lights per unit.  This suggests that the balance was issued out on cases, rather than unit of measure of eaches.  If the issue would have been at the eaches level, the current balance would have been 0.
    - On June 5, 2014, the remaining 171 balance was adjusted out.  The memo field indicated that this was an administrative correction for the 171 balance.

| invb Item Number | Transaction eaudittranaid | invb Current Balan | invb Physical Cour | invb eaudittyp | invb eaudittimestamp | Transaction Type | Quantity | AvgCost at time of Transact | Line Cost | PO Number | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 92G2530005092 | 98161160 | 180 | 180 | I | 5/9/2013 1:49:01 | TRANSFER | 180 | 1541.36 | 277444.8 | | Disposition of Excess: DIS3055-D33002- |
| 92G2530005092 | 98161162 | 228 | 180 | U | 5/9/2013 1:49:45 | TRANSFER | 48 | 1541.36 | 73985.28 | | Disposition of Excess: DIS3055-D33002- |
| 92G2530005092 | 102269969 | 171 | 180 | U | 7/24/2013 8:00:14 | ISSUE | -57 | 1541.36 | 87857.52 | | Support Excess Turn-in Process |
| 92G2530005092 | 115178241 | 171 | 0 | U | 6/5/2014 3:56:45 | PCOUNTADJ | -180 | 1541.36 | -277444.8 | | AA - Error when Issued (Double Entry)- Administrative correction for 171ea. Email attached |
| 92G2530005092 | 115178242 | 0 | 0 | U | 6/5/2014 3:57:05 | RECBALADJ | -171 | 1541.36 | -263572.56 | | |
| 92G2530005092 | | 0 | 0 | D | 6/5/2014 4:03:01 | | | 1541.36 | | | |

19

**Plaintiffs' Trial Exhibit 821**
**Page 68 of 68**