**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

|  |  |
|---|---|
| United States of America, *ex rel.* Charles R. Shepherd, Danny V. Rude, Robert Scott Dillard, And Rickey Mackey<br><br>Plaintiff-Relators,<br><br>v.<br><br>Fluor Corporation, Inc., and Fluor Intercontinental, Inc.,<br><br>Defendants. | Case Number: 6:13-02428-JD<br><br>Honorable Joseph Dawson, III<br><br>JURY TRIAL DEMANDED |

## <u>RELATORS' MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES</u>

Jon Loevy
Mike Kanovitz
Daniel Twetten
Anand Swaminathan
Frank Newell
Anna Dover
Gwen Parker
Heather Sticht
Dominique Gilbert
Alexandra Wolfson
Aadi Tolappa
**LOEVY & LOEVY**
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
Telephone: (312) 243-5900
Facsimile: (312) 243-5902
dan@loevy.com
anand@loevy.com

Frank L. Eppes
**EPPES & PLUMBLEE, PA**
PO Box 10066
Greenville, SC 29603
Telephone: (864) 235-2600
Facsimile: (864) 235-4600
feppes@eppesandplumblee.com

Judah N. VanSyckel
**Saluda Law, LLC**
137 E. Butler Street
Lexington, SC 29072
Telephone: (803) 939-6927
Facsimile: (803) 902-8004
judah@saludalaw.com

Richard Harpootlian
**RICHARD A. HARPOOTLIAN P.A.**
1410 Laurel Street – P.O. Box 1090
Columbia, SC 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810
rah@harpootlianlaw.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

RELEVANT BACKGROUND ................................................................................................... 5

LEGAL STANDARDS ............................................................................................................. 9

ARGUMENT ....................................................................................................................... 12

I.     The approximately 110,000 hours invested to prevail in this matter over the course of 13 years of hard-fought litigation were reasonable given the complexities of the case and the resource-consuming strategies undertaken by Fluor in defending it ..................... 12

       A.     The hours that Loevy + Loevy devoted to this matter were reasonable. .............. 12

       B.     Relators' awarded hours should not be reduced for "partial success" .................. 14

       C.     Relators' counsel are even more reasonable in light of their billing judgment .... 17

       D.     Relators' hours are reasonable compared to those billed by Fluor's counsel ....... 18

II.    Relators Counsel's Requested Hourly Rates Are Reasonable ......................................... 18

       A.     Relators' Counsel ................................................................................................. 18

       B.     The hourly rates sought are reasonable and justified .......................................... 23

III.   Relators Counsel's Requested Costs Are Reasonable .................................................... 28

IV.    Relators' South Carolina Local Counsel's Hours, Rates, and Costs Are Reasonable ...... 30

Conclusion ....................................................................................................................... 31

i

## TABLE OF AUTHORITIES

### CASES

*Barber v. Kimbrell's, Inc.*,
  577 F.2d 216 (4th Cir. 1978) ........................................................................ 25, 26

*Blum v. Stenson*,
  465 U.S. 886 (1984) ..................................................................................... 10, 11, 23

*Chrapliwy v. Uniroyal, Inc.,*
  670 F.2d 760 (C.A.Ind., 1982) ........................................................................ 24

*Courthouse News Serv. v. Schaefer*,
  484 F. Supp. 3d 273 (E.D. Va. 2020) ............................................................. 23

*Daly v. Hill*,
  790 F.2d 1071 (4th Cir. 1986) ........................................................................ 28

*Farfaras v. Citizens Bank & Trust*,
  433 F.3d 558 (7th Cir. 2006) .......................................................................... 18

*Goodlaxson v. Mayor & City Council of Baltimore*,
  776 F. Supp. 3d 311 (D. Md. 2025) ................................................................ 29

*Graves v. Plaza Medical Cntr.., Corp.*,
  2018 WL 3699325 (S.D. Fla. 2018) ................................................................ 16

*Hassan v. Lyons Logistics, LLC*,
  No. 1:21-CV-00266, 2022 WL 989726 (E.D. Va. Jan. 13, 2022) ........................... 22

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983) ......................................................................................... 10, 15

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
  586 F. Supp. 2d 732 (S.D. Tex. 2008) ............................................................. 22

*In re Gen. Motors Corp.*,
  110 F.3d 1003 (4th Cir. 1997) ........................................................................ 26

*In re Nat'l Football League Players' Concussion Inj. Litig.*,
  No. 2:12-MD-02323-AB, 2024 WL 3843058 (E.D. Pa. May 28, 2024) ................ 22

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
  535 F. Supp. 2d 249 (D.N.H. 2007) ................................................................ 22

*Jones v. Southpeak Interactive Corp. of Delaware*,
  777 F.3d 658 (4th Cir. 2015) .......................................................................... 15

*McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*,
  423 F.3d 1256, 1259 (11th Cir. 2005) ................................................................................ 9

*Missouri v. Jenkins*,
  491 U.S. 274 (1989) ............................................................................................................. 11

*Molina Healthcare v. Prose*,
  No. 21-1145 (U.S. 2022) ...................................................................................................... 2

*Moreno v. City of Sacramento*,
  534 F.3d 1106 (9th Cir. 2008) ............................................................................................ 11

*Morris v. Bland*, No. 5:12- CV-3177-RMG,
  2015 WL 12910631 (D.S.C. Jan. 15, 2015) ...................................................................... 23

*Nat'l Wildlife Fed'n v. Hanson,*
  859 F.2d 313 (4th Cir. 1988) ........................................................................................ 23, 24

*Nigh v. Koons Buick Pontiac GMC, Inc.*,
  478 F.3d 183 (4th Cir. 2007) .............................................................................................. 15

*Norman v. Hous. Auth. of Montgomery*,
  836 F.2d 1292 (11th Cir. 1988) .......................................................................................... 11

*Perdue v. Kenny A. ex rel. Winn*,
  559 U.S. 542 (2010) ...................................................................................................... 10, 11

*Philips Med. Sys. (Cleveland), Inc. v. Buan*,
  No. 19-CV-2648, 2023 WL 4533336, (N.D. Ill. July 13, 2023) ....................................... 22

*Rehab. Ass'n of Va., Inc. v. Metcalf*,
  8 F. Supp. 2d 520 (E.D. Va. 1998) ..................................................................................... 28

*Robinson v. Equifax Info. Services, LLC*,
  560 F.3d 235 (4th Cir. 2009) .............................................................................................. 24

*Rum Creek Coal Sales, Inc. v. Caperton*,
  31 F.3d 169 (4th Cir. 1994) ................................................................................................ 23

*Spell v. McDaniel*,
  852 F.2d 762 (4th Cir. 1988) .............................................................................................. 28

*U.S., ex rel. Abbott-Burdick v. Univ. Med. Assocs.*,
  No. 2:96-1676-12, 2002 WL 34236885 (D.S.C. May 23, 2002) ....................................... 24

*U.S., ex rel. Abbott-Burdick v. Univ. Med. Assocs.*,
  No. 2:96-1676-12, 2002 WL 34236885 (D.S.C. May 23, 2002) .................................. 23, 25

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
   352 F.3d 908 (4th Cir. 2003) ................................................................................................ 28

*Westgate Myrtle Beach, LLC v. Holiday Hosp. Franchising, Inc.*,
   No. 4:08-cv-03590-JMC, 2011 WL 13248437 (D.S.C. June 2, 2011) .................................... 26

## OTHER AUTHORITIES

H. Rep. No. 99-660, (1986) ......................................................................................................... 9

House Report, 132 Cong. Rec.
   H9382_03, 1986 WL 786917 (Cong.Rec.) ............................................................................ 12

S. Rep. No. 111-10 , 2009 U.S.C.C.A.N. ..................................................................................... 9

S. Rep. No. 99-345, 1986 U.S.C.C.A.N. 5266 ....................................................................... 9, 10

## RULES

31 U.S.C. § 3730(d)(2) ................................................................................................. 2, 4, 10, 30

iv

**INTRODUCTION**

On March 11, 2026, the jury in this matter returned a verdict in favor of Relators and against each of the two Defendants, Fluor Corp. and Fluor Intercontinental, Inc., for $15 million in single damages before automatic trebling. Dkt. 775 at 16–17. This was a historic result: to Relators' knowledge, no jury in the 160-year history of the False Claims Act had ever previously found against a contractor performing in a war zone.

The verdict was the culmination of more than 13 years of hard-fought litigation, by a team of more than 25 lawyers, investing nearly 110,000 hours of attorney time and millions of dollars in out-of-pocket costs, all with no guarantee of success. Far from it. This non-intervened case, with its wartime setting on military bases across a massive theater half-way around the world, is one of the riskiest and most difficult imaginable from an *ex ante* perspective. Besides its complexity (factual, legal and logistic), the case was also incredibly hard fought by a very well-heeled defendant,, represented vigorously by one of the premier False Claims Act law firms in the U.S. It was as heavily-contested as any civil litigation in Federal court, as this Court is well aware.

Relators counsel began investigating this matter in 2012 and filed it in 2013. From 2013-2018, Relators' counsel worked side by side with the Department of Justice to investigate and develop the matter, including retaining an expert and analyzing Fluor's massive MAXIMO database. Once the Department of Justice's decided not to intervene, Relators' counsel were confronted with a difficult choice:  let the government's claims lapse for lack of prosecution (allowing Relators' counsel to move on to other lucrative cases), or pick up the mantle and invest massively their firm's resources to try to achieve a recovery for the taxpayers.

The risks and opportunity costs to the firm were enormous. Less than 10 percent of non-intervened cases succeed. *See* Brief of the Chamber of Commerce of the United States of

America as Amicus Curiae at 15, *Molina Healthcare v. Prose*, No. 21-1145 (U.S. 2022). These long odds are not lost on sophisticated, repeat player defendants like Fluor. Many, like Fluor here, adopt a strategy of never settling in order to discourage legitimate private enforcement by forcing would-be relators counsel to bear the burden of all the costs for all of the years it will take. Few if any firms have both the ability and the conviction to perform this massive lift.

A vital inducement influencing relators' counsels' willingness to go the distance was the ability to be compensated for the fees and cost needed to get the recovery should they be fortunate enough to guide the case to a victory. The same calculation has weighed, and will weigh in the future, on every law firm considering contingency representation to pursue the United States' claims. Congress understood the immensely challenging economics of declined cases and so it enacted 31 U.S.C. § 3730(d)(2) to incentivize private enforcement. The provision gives a right to recover fees and costs, if (and only if) relator's lawyers undertake the risks of representation and are good enough to win for the taxpayers. Congress's fee-shifting provision also forces defendants to bear the costs of forestalling legitimate results, as Fluor did in this case for over 13 years, despite knowing the evidence of fraud that the jury finally heard at trial.

Relators' counsels' performance and results have amply justified their fee.

First, victory required Relators to overcome each of a long series of obstacles, beginning with Fluor's original motion to dismiss. Then, for more than five years, Relators engaged in massive discovery efforts. This included obtaining more than 14,500,000 pages of documents from Fluor, the Army, and other Government agencies; reviewing and analyzing those documents; conducting and defending almost 50 depositions across the United States and around the world, followed by a massive amount of expert discovery, whose expert reports collectively consumed many hundreds of (often highly technical) pages.

2

In parallel, as the Court will undoubtedly recall, Relators litigated what was essentially an entire separate case based on Fluor's arguments that Jeffrey Nix "stole" Fluor's privileged materials and that Relators then used that information in a manner that required Relators' counsel to be disqualified or even for the case to be dismissed. Resolving that issue required Relators to depose Fluor witnesses, develop supporting declarations, and engage in hundreds of pages of briefing, all under Fluor's threats of dismissal and disqualification (and a total loss of Relators' counsel's investment) as a sanction.

Upon the close of discovery, Fluor moved for summary judgment on all of Relators' claims. Relators rigorously briefed the summary judgment arguments and provided this Court more than 200 exhibits demonstrating that Relators' claims should go to trial. The Court agreed and denied Fluor's motion for summary judgment in its entirety.

Relators' counsel then prepared the case for trial, including all of the pre-trial work that Congress and this Court would expect: identifying more than 1,000 trial exhibits, preparing and responding to motions in limine, and preparing jury instructions, all while also preparing witnesses to testify and developing examinations and arguments.

Relators' counsel then tried this case over seven weeks. Ultimately, the jury found in Relators' favor and against Fluor regarding Fluor's false claims related to Government property.

Each of these steps required massive amounts of work by highly skilled attorneys with specialized knowledge and experience, as well as enormous financial commitment. Relators' counsel paid all of these attorneys for more than 13 years, plus additional millions more in out-of-pocket case costs – all at serious risk of not collecting a penny in compensation.

And there is no doubt that Relators were met with equally skilled (and better-resourced) counsel for Fluor. Fluor was primarily represented by Arnold & Porter, one of the largest and

3

most sophisticated law firms in the world. Undoubtedly, Fluor received world-class legal representation and spared no expense in defending this case. By all appearances, Fluor's counsel billed even more hours, and at substantially higher rates. Relators secured comparable quality of representation for their claims on behalf of the government, and their lawyers matched Arnold & Porter effort for effort. It would defeat the remedial purpose of the False Claims Act in general and its fee-shifting provisions in particular to deny Relators' counsel the right to be fully compensated for their work – just as Arnold & Porter was, and continues to be, even in defeat.

Moreover, Relators made at least three good-faith efforts to settle this matter. First, in 2018, following the Government's decision to not intervene, Relators attempted to settle the matter. Then, in December 2023, after substantial document discovery had been completed but before depositions and expert discovery began, Relators made another overture at settlement discussions. In December 2025, after summary judgment briefing but before trial, Relators made yet another settlement demand to Fluor. In each instance, Fluor refused to negotiate, and to this day has not offered a single penny to settle this matter. Declaration of Anand Swaminathan ("Swaminathan Dec.") at ¶15.

Instead, as this Court has witnessed, Fluor chose to litigate this case as aggressively as possible. It was Fluor's right to refuse to settle and force relators to go to the mat at every turn. But those choices are not without consequence. Per Congress's plan, Fluor is responsible to pay Relators' counsel for the fees and costs invested pursuant to 31 U.S.C. § 3730(d)(2).[1]

---

[1] One likely reason Fluor has declined to offer any money is that it apparently hoped to recover all of its attorneys' fees (estimated to be at least $100 million) from the U.S. Army if it prevailed as a "cost" of its performance of the LOGCAP contract. The prospect of winning on appeal (however remote) and recovering all of these fees is perhaps why Fluor still refuses, even after a judgment has been entered, to offer a dime to resolve this matter. But having made this bet, and lost, Fluor can hardly begrudge Relators' counsel the right to recover comparable fees.

4

**RELEVANT BACKGROUND**

Relators Charles Shepherd and Danny Rude, represented by Loevy + Loevy, filed this case on February 22, 2013, in the United States District Court for the Northern District of Illinois. Dkt. 1-2. At the time, Fluor was 4 years into a 10-year contract that paid Fluor more than $10 billion to provide logistical support to the United States Army in Afghanistan.

On September 9, 2013, this matter was transferred to the United States District Court for the District of South Carolina, Greenville Division. Dkt. 1-1.

From 2013 through September 2018, this matter remained under seal while the Department of Justice investigated Relators' allegations. While the case was under seal, it was being investigated and litigated actively by the Department of Justice and the United States Attorneys' Office for the District of South Carolina – all with active assistance from Relators' counsel. Swaminathan Dec. at ¶13.  Relators' counsel met with the Government in person in Washington, D.C., and South Carolina on more than ten occasions. *Id.* Relators' counsel also spent hundreds of hours working with a MAXIMO database expert to support the Government's investigation, coordinating numerous MAXIMO projects at the Government's requests. *Id.* Relators' counsel also reviewed thousands of documents produced by Fluor under the coordination of the Government's counsel. *Id.*

During the period in which the complaint was under seal, Relators Mackey and Dillard each filed False Claims Act lawsuits alleging that Fluor defrauded the Government on LOGCAP IV. Mackey filed his lawsuit on May 10, 2016, Case No. 2016-cv-1521, Mackey Dkt. 1, and Dillard filed his lawsuit on August 25, 2016. Case No. 2016-cv-2948, Dillard Dkt. 1. Two other individuals, Jeffrey Nix and David Payne, brought False Claims Act lawsuits while the

complaint was under seal, and then subsequently voluntarily dismissed their qui tam claims. Case No. 2013-cv-1528, Nix Dkt. 1, 99; Case No. 2018-cv-1000, Payne Dkt. 1, 71.

During the Government's investigation, each of Shepherd, Rude, Nix, Payne, Dillard, and Mackey were party to a joint-prosecution agreement. Pursuant to that agreement, counsel for each Relator worked cooperatively to develop and support the Government's investigation.

On October 1, 2018, the United States filed a notice of non-intervention but permitted Relators to move forward with the case. Dkt. 77. Relators Shepherd, Rude, Mackey, and Dillard thereafter filed a second amended complaint, which remained the operative complaint in this matter through trial. Dkt. 121.[2]

From the time this matter was unsealed, counsel for all Relators agreed that one law firm should be primarily responsible for litigating this matter so that it could be litigated both expertly and efficiently. Because Loevy + Loevy's clients (Rude and Shepherd) filed first and Loevy + Loevy had substantial experience litigating declined False Claims Act matters and the financial wherewithal to commit millions of dollars to the matter, Loevy + Loevy became lead counsel for all Relators.  Declaration of Michael Kanovitz ("Kanovitz Dec.") ¶18.

Highly complex, contested, and protracted litigation ensued. On May 30, 2019, Fluor both moved to dismiss the second amended complaint and sought immediate expedited discovery regarding Fluor's contention that Nix "stole" privileged information that was then used in this matter. Dkts. 126-127. This Court held a hearing on those motions on November 19, 2019. Dkt.

---

[2] Relator Payne thereafter chose to dismiss his False Claims Act case.  Case No. 2018-cv-1000 Dkt. 24 in Payne case. Similarly, Relator Nix chose to dismiss his False Claims Act case. Case No. 2013-cv-1528, Dkt. 99 in Nix case.

171. On February 28, 2020, this Court denied Fluor's motion to dismiss the False Claims Act claims, granting it only as to certain contract claims. Dkt. 176

Fact discovery commenced and continued through March 2025. The parties identified more than 200 witnesses in their initial Rule 26 disclosures. Relators obtained more than 14,500,000 million pages of documents from Fluor, the United States Army, other Government agencies, and third-parties. The parties conducted around 50 depositions, many of which spanned two days. Those depositions occurred around the world, including in Dubai, London, Chicago, Washington, D.C., Houston, Orlando, and Los Angeles. This work in discovery comprises the majority of the fees and costs that Relators seek in this motion.

Discovery and briefing extended to Fluor's assertion that Nix "stole" privileged information and Fluor's attempt to knock out the case by disqualification of Relators' counsel and/or dismissal. Dkts. 260, 274, 279, 281, 296, 311-313, 315, 325, 328, 330, 334, 338, and 345. On May 2, 2023, the Court held a hearing on the issue. Dkt. 361. The parties thereafter submitted post-hearing briefs. Dkts. 367, 370, 373. On June 23, 2023, this Court largely denied Fluor's requests regarding the Nix privilege issue, instead ordering Relators to provide limited additional clarifying responses, which Relators then did. Dkt. 379.

In addition, in December 2023, Fluor raised a new argument that the False Claims Act is unconstitutional. Dkt. 396. The parties thereafter briefed this issue thoroughly. Dkts. 411, 462, 469, 470. The Court ultimately rejected Fluor's argument. Dkt. 600.

Following the close of fact discovery, the parties engaged in extensive expert discovery. Relators disclosed five expert reports (totaling 415 pages), and Fluor disclosed six (totaling an additional 346 pages). The parties then completed depositions of each expert during 2025.

On October 20, 2025, Fluor moved for summary judgment on all of Relators' claims. Dkt. 507. Following extensive and high-quality briefing by Relators' counsel in opposition, this Court denied Fluor's motion in its entirety on January 14, 2026. Dkt. 600.

Jury selection occurred on January 21, 2026. Dkt. 634. Trial commenced on January 28, 2026, and the jury returned its verdict on March 11, 2026. Dkts. 657, 775. The testimony at trial demonstrated the complexity of this case, as Relators and Fluor presented detailed evidence of Fluor's property management system, the Government's oversight of that system, Fluor's disclosures (and non-disclosures) to the Government regarding that system and losses of Government property. There was also evidence regarding Fluor's labor billing and Fluor's award fee requests and presentations, and Relator Rude's retaliation claim.

After a full day of closing arguments summarizing a seven-week trial, the jury found in Relators' favor and against each of Fluor Corporation and Fluor Intercontinental, Inc., on Relators' property management theory. Jurors awarded $15 million in single damages against each Defendant, to be trebled. Dkt. 775.

Throughout this matter, Relators attempted to reach a reasonable settlement. Fluor refused each time. Around late 2018-early 2019, Relators' counsel engaged Fluor counsel to discuss settling the matter before the parties began incurring millions of dollars in attorney fees. Fluor declined. In December 2023, after much document discovery had been completed and the Court had rejected Fluor's attempt to dismiss the case on the basis that Relators used Fluor's privileged information, Relators again tried to settle the case. Again, Fluor declined to engage in any settlement discussions. Finally, in December 2025, the parties engaged in court-ordered mediation. Relators once again made an opening demand and expressed a willingness to negotiate. Again, Fluor flatly refused to make any offer. In 13 years of litigation, Fluor never

once offered a penny to settle the case, necessitating resolution by the most expensive and resource-consuming method possible: jury trial on the merits. Swaminathan Decl. ¶15.

**LEGAL STANDARDS**

"The False Claims Act is the primary law on which the federal government relies to recover losses caused by fraud." *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005). In 1986, Congress queried "why fraud in Government programs is so pervasive yet seldom detected and rarely prosecuted." S. Rep. No. 99-345, at 4, 1986 U.S.C.C.A.N. 5266. It found "serious roadblocks to obtaining information as well as weaknesses in both investigative and litigative tools." *Id*. In Congress's view, "the most serious problem plaguing effective enforcement is a lack of resources on the part of Federal enforcement agencies." *Id*., at 7. "Allegations that perhaps could develop into very significant cases are often left unaddressed at the outset due to a judgment that devoting scarce resources to a questionable case may not be efficient." *Id*. Congress was concerned that "large, profitable corporations" that became "the subject of a fraud investigation" were able "to devote many times the manpower and resources available to the Government," resulting in a "resource mismatch." *Id.* at 8. Accordingly, Congress wanted to enlist the private bar to aid the taxpayers by balancing out the disequilibrium in resources.

Congress amended the Act to make it "the Government's primary litigative tool for combating fraud" "in modern times." S. Rep. No. 99-345, at 2; *see also* H. Rep. No. 99-660, at 18 (1986) (Act "used as the primary vehicle by the Government for recouping losses suffered through fraud"); S. Rep. No. 111-10, at 10, 2009 U.S.C.C.A.N. 430, 437 (reinvigorated Act declared "[o]ne of the most successful tools for combating waste and abuse in Government spending"). Primary among the amendments were reinforcement of the *qui tam* provisions.

9

"[O]nly a coordinated effort of both the Government and the citizenry will decrease this wave of defrauding public funds." S. Rep. No. 99-345, at 2. For the Act to function, however, relators must secure experienced representation. Congress acknowledged and appreciated this when it amended the Act in 1986, concluding the "unavailability of attorneys fees" in the prior versions of the law "inhibits and precludes many private individuals, as well as their attorneys, from bringing fraud suits." *Id*., at 29. The fee provision in §3730(d)(2) effectuates the Act's purposes by attracting attorneys capable of navigating claims through the complex legal and factual waters of False Claims Act litigation when the government declines to use its own scarce resources in False Claims Act litigation.

Determination of the fee and cost award in this case is guided by the clear wording of 3730(d)(2) and black-letter law. Under federal fees law, statutory attorneys' fees and costs are determined by the adjusted lodestar methodology. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Blum v. Stenson*, 465 U.S. 886 (1984). Under the adjusted lodestar method, courts follow a two-step inquiry. First, they determine the "lodestar," defined as the number of hours reasonably expended in the litigation multiplied by the reasonable hourly rates of the various timekeepers. This lodestar calculation is presumed to represent a "reasonable fee." This lodestar method is used to provide "an objective basis on which to make an initial estimate of the value of a lawyer's services." *Hensley*, 461 U.S. at 433. It "produces an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case;" and it "cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551-552 (2010).

Underlying this rule is the concept that courts ordinarily should defer to the fee claimant's judgment as to the reasonableness of, and necessity for, the work involved, counsel who, after all, are investing their time at the risk of getting nothing, and therefore presumably do their best to allocate their own resources efficiently. *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) ("By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case"); *Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1306 (11th Cir. 1988) ("The measure of reasonable hours is determined by the profession's judgment of the time that may be conscionably billed and not the least time in which it might theoretically have been done").

As for applicable rates, two key concepts apply here. First, under Supreme Court authorities, to compensate for delay in payment (here, more than 13 years without payment), statutory attorneys fees should be calculated using hourly rates current to the year of recovery. *Perdue*, 559 U.S. at 555; *Missouri v. Jenkins*, 491 U.S. 274, 284 (1989).

Second, counsel's reasonable hourly rates must reflect the market treatment for experienced attorneys with specialized skills necessary to litigate this *qui tam* case. *See Blum*, 465 U.S. at 890 (special qualifications justifies higher rates based upon market treatment). Such specialized skills and experience are essential to *qui tam* cases.

Finally, as Congress was keenly aware, to represent a reasonable rate, fees paid to counsel working on a contingent basis must reflect market treatment for contingent risk, a risk that the False Claims Act defense lawyers do not face.

> [A] true marketplace rate in a False Claims Act case would be what competent counsel's expectations of an hourly rate would be at the time of the filing of the case understanding that payment will be made only after success is achieved, and only after the defendant is given the opportunity to challenge the amount requested, and where the judge or an appellate court may reduce the amount

required, and where payment may not come until this process is concluded. **In such cases, that rate would be substantially greater than a rate where payment was guaranteed on a monthly basis regardless of whether the case was won or lost.**

House Report, 132 Cong. Rec. H9382_03, 1986 WL 786917 (Cong.Rec.) (emphasis added).

## ARGUMENT

**I.**      **The approximately 110,000 hours invested to prevail in this matter over the course of 13 years of hard-fought litigation were reasonable given the complexities of the case and the resource-consuming strategies undertaken by Fluor in defending it.**

     **A.**      **The hours that Loevy + Loevy devoted to this matter were reasonable.**

The core of this case was Relators' assertion that Fluor's property management system was broken and that Fluor lied to the Government about that system and Fluor's losses of Government property. Proving these claims resulted in highly complex, extremely protracted litigation. The case required massive amounts of attorney time[3] to develop and pursue to verdict.

In total, Loevy + Loevy devoted 109,974 hours in this matter, as detailed in the time reports in Group Exhibit 1 that Relators will provide in unredacted form to this Court for *in camera* consideration. That time can be roughly broken into three phases of the case: under-seal investigation; discovery and motion practice; and trial preparation and trial:

---

[3] Relators will provide to the Court a thumb drive with detailed, unredacted time records as Group Exhibit 1. Relators will also provide to Fluor those time records with appropriate redactions to account for attorney work-product and attorney-client privileged information.

12

| Phase | Hours | Date |
|---|---|---|
| Preparing complaint and under-seal investigation | 4,899 | 2/29/12 - 9/30/18 |
| Motions to dismiss, fact discovery, expert discovery, motions for summary judgment | 94,471.25 | 10/1/18 - 11/30/25 |
| Trial preparation and trial | 10,603.75 | 12/1/25 - current |

Group Ex. 2, Declarations, *See* Declaration of Daniel M. Twetten ("Twetten Dec.") ¶ 27.

Although this matter was filed in 2013, the relevant period of fraud continued through 2017, requiring Relators' counsel to investigate and litigate how Fluor's property management system functioned from 2009 to 2017 in a war zone in Afghanistan. Among other things, Relators' counsel was required to evaluate and understand how Fluor purchased property, how it managed and inventoried property, how it accounted for property in its MAXIMO and MATMAN databases, and how it reported property losses to the Government. In addition, Relators' counsel was required to understand the relationship between Fluor and the Government across this period of time, including all communications between Fluor and the Government.

All of this work required Relators' counsel to obtain and review tens of millions of pages of emails, audits, reports, communications, memos, and other documents. In addition to the overwhelming volume of documents at issue, Relators received a copy of Fluor's massive MAXIMO database and were required to analyze terabytes worth of data.

The inherent complexity of these documents and data is reflected in the fact that the parties collectively disclosed 11 expert witnesses to explain these issues to a jury.

The parties also collectively disclosed more than 200 potential fact witnesses. These witnesses were scattered around the globe. Eventually, the parties conducted around 50 fact

depositions. In addition, Relators' counsel interviewed dozens of additional potential witnesses and produced more than 20 third-party declarations supporting their allegations.

In addition to the highly complex and sprawling facts of this case, the case presented a series of novel legal issues, including: what constituted a "claim" under the Act; the interplay of the FAR requirements for property management and relief of responsibility; what statements were material to the Government and why; whether Fluor possessed the requisite scienter under the Act; the nature and scope of Fluor's contractual requirements; a long-running series of privilege issues; and complex briefing regarding motions to dismiss, motions for summary judgment, *Daubert* motions, motions *in limine*, and other pre-trial motions. Leaving no stone unturned, Fluor even challenged the constitutionality of the Act itself.

Ultimately, all of this effort resulted in a historic jury verdict. The jury found in favor of Relators and against Fluor on the § 3729 claim as to government property fraud. As stated, that verdict was the first time in the history of the False Claims Act that a military contractor was found to have violated the False Claims Act for fraud in an active war theater. Every hour that Relators' counsel invested into the case was reasonable to prove fraud in such circumstances to hold Fluor accountable.

In addition, even though the Relators other than Shepherd and Rude were represented by other counsel, all counsel agreed that Loevy + Loevy would take the lead in litigating this matter. Group Ex. 2, *See* Kanovitz Dec. ¶ 18. That way, Relators were not duplicating efforts and the firm most willing to bear the risks would accept them.

**B.      Relators' awarded hours should not be reduced for "partial success"**

Fluor may argue that Relators prevailed only on one theory, such that Relators' counsel supposedly should not recover all of their hours.

14

Such an argument, should it be raised, must be rejected. Relators won the primary claim in the case, and thus prevailed for purposes of the law. *Hensley v. Eckerhart,* 461 U.S. 424, 435 (1983) ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.") The other claims would have been gravy, but they were ancillary and counsel should not be penalized for setting their sights aggressively on behalf of the United States. *Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 676 (4th Cir. 2015) ("[A] court should not reduce a fee award simply because the plaintiff failed to prevail on every contention raised in the lawsuit." (cleaned up)). Where, as here, Relators obtained an outstanding and unprecedented result, it does not matter under the law that they asked for more on more claims. *Nigh v. Koons Buick Pontiac GMC, Inc.*, 478 F.3d 183, 190 (4th Cir. 2007) ("[W]e do not reflexively reduce fee awards whenever damages fail to meet a plaintiff's expectations in proportion to the damages' shortfall.").

Moreover, "cases [where] the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories . . . cannot be viewed as a series of discrete claims." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). In *Hensley,* the court "reject[ed] 'a mathematical approach comparing the total number of issues in the case with those actually prevailed upon[,]'", since "[s]uch a ratio provides little aid in determining what is a reasonable fee in light of all the relevant factors." *Id.* at n. 11 (quoting the record). The Supreme Court explained that it is not necessarily significant that a prevailing plaintiff did not receive all the relief requested. *Id.* ("For example, a plaintiff who failed to recover damages but obtained injunctive relief, or vice versa, may recover a fee award based on all hours reasonably expended if the relief obtained justified that expenditure of attorney time.").

15

The question for this Court, then, is whether it was reasonable for Relators' counsel to expend the time it did pursuing this case. The answer is plainly yes, especially given that this Court's decision to permit the theories to go to the jury, thereby denying Fluor's summary judgment motion before trial and Fluor's successive Rule 50 motions at trial.[4]

Further, the different issues in the case involved a common core of facts, and thus all of the work would have been performed regardless. All of Relators' theories involved the same people during the same time period: the materials management function at Fluor from 2008-2017. The witnesses who managed the Government's property (like Tony Montalvo) also developed Fluor's award fee presentations, for example. Further, Relators' evidence in support of its award fee theory was largely the evidence of Fluor's property management failures, such as Fluor's actual loss rates being much higher than what was reported. And Relators' retaliation claims were bound-up with the property theory because the protected activity of Mr. Shepherd and Mr. Rude was related to concerns about service order reporting that was used to cover up issues related to property management. Further, Relators' labor fraud theory was presented at trial through witnesses who also testified about Fluor's property management problems and concerns, including Scott Dillard, Scott Roesler, Preston Howard, and Danny Rude.

In the event that this Court disagrees with Relators' counsel, and concludes that it may be appropriate to reduce Relators' counsel's hour based on the theories on which Relators did not

---

[4]Even if the Court were to view Relators' level of success as limited, their success in unchartered areas is significant enough to balance out this concern. That a "Relator... obtained relief of significant import to the FCA realm" is reason enough to award full attorney's fees. *See, e.g., Graves v. Plaza Medical Cntr.., Corp.*, 2018 WL 3699325 (S.D. Fla. 2018), recommendation adopted, 2018 WL 3697475 (S.D. Fla. 2018) ("reject[ing] Defendants' contention that the fee award should be reduced based on Relator's limited degree of success" when "Relator's case is one of the first Medicare Part C cases to advance beyond summary judgment").

prevail, Relators' counsel conducted a review of their time entries to identify time related to Relators' award fee and labor fraud theories and Mr. Shepherd's and Mr. Rude's retaliation claims. Relators' counsel has time entries relating to those theories totaling 11,950 hours. Group Ex. 2, *See* Twetten Dec. ¶ 23. This total is an overstatement of the amount of time that Relators' counsel devoted to these theories because in most instances those time entries are part of an attorney's aggregate billing for a particular day, but this is nonetheless a reasonable way to identify such hours. These time entries represent 10.86 percent of the total hours devoted to this matter (109,974 hours), so any reduction of Relators' lodestar to account for partial success should be at most 10.86 percent – an almost certainly less than that for all of the reasons identified above.

**C.     Relators' counsel are even more reasonable in light of their billing judgment**

Even though all of Relators' counsel's time in this matter was reasonably spent and there is no basis under the law to reduce Relators' counsel's hours based on partial success or any other factor, Relators' counsel nonetheless are exercising their billing judgment and voluntarily reducing the hours for which they seek recovery.

Specifically, Relators' counsel are not seeking to recover *anything* for the many thousands of hours of paralegal time devoted to this matter over the past 13 years. Instead, Relators' counsel are treating those hours as part of the overhead in this matter, which helped the attorneys be more effective and efficient. In addition, Relators are not seeking to recover for the hours of one of the attorneys who led the case for a time (Vince Field). Mr. Field worked thousands of hours on this matter, but was terminated from the firm for issues unrelated to this litigation, and subsequently faced discipline from the bar. Under those circumstances, Relators' counsel does not believe this Court should award fees for Mr. Field's hours even though they

17

were reasonable and substantial. Finally, Relators' counsel are not seeking to recover any time for Arthur Loevy, the firm's most senior member until his recent death.

### D.     Relators' hours are reasonable compared to those billed by Fluor's counsel

Perhaps the most useful comparator for assessing the reasonableness of the number of hours billed by Relators' counsel is the total number billed by Fluor's attorneys for the same litigation. In response to pre-filing requests, Fluor has respectfully declined to divulge the total number of hours its attorneys' billed. Relators acknowledge that there is no rule expressly requiring Fluor to share this information. But it could. Fluor will be filing a response. Relators respectfully submit that unless and until defense counsel discloses how much time it spent on the case, Fluor is on shaky ground in contesting the number of hours billed by Relators as "unreasonable." *See Farfaras v. Citizens Bank & Trust,* 433 F.3d 558, 569 (7th Cir. 2006) (explaining that .the purpose of a Local Rule requiring exchange of billing records "is to avoid exactly the type of hypocritical objections presented by the defendants.").

## II.     Relators Counsel's Requested Hourly Rates Are Reasonable

Loevy + Loevy's attorneys are some of the most successful trial lawyers in the nation. They also have particular skills and experience in False Claims Act matters.

The full summary of Loevy + Loevy's attorney hours and their requested rates is attached at Exhibit 3. The background and credentials of each attorney is set forth in the declarations at Group Exhibit 2.

### A.     Relators' Counsel

Among Relators' counsel are the four attorneys who examined witnesses and provided argument at trial:

**Jon Loevy.** Mr. Loevy is the founder and managing partner of Loevy + Loevy, a law firm he has grown to more than 70 lawyers litigating complex cases across the country. He has become one of the most successful trial lawyers in the United States, having won more than $750 million dollars in jury verdicts, including verdicts of $20 million or more at a dozen different jury trials, and more than $100 million three separate times. Loevy was recently named one of "America's Top 200 Lawyers" by Forbes magazine. In 2011, Loevy was awarded a Career Achievement award from the Chicago Law Bulletin, putting him in the select group of what was then 11 attorneys in Illinois with at least five (5) jury verdicts in Illinois courts in excess of $5 million (Loevy now has 22 such verdicts).

**Mike Kanovitz.** Mr. Kanovitz is a co-founder of Loevy + Loevy, a leading trial attorney, and an almost-30 year practitioner of False Claims Act litigation. area for almost 30 years. In addition, Mr. Kanovitz has been counsel to relators in several matters in which the Government declined to intervene but relators pursued the litigation and prevailed by settlement or judgment. *See*, *e.g.*, *United States, ex rel. McArtor v. Rolls-Royce Corp.,* Case No. 08-cv-133 (S.D. Indiana); *County of Cook, et al., ex rel. Gorman, et al. v. American International Group, Inc., et al.,* No. 12 L 2765 (Circuit Court of Cook County); *City of Chicago ex rel. McShane v. General Chemical, et al.,* Case No. 2016-L-11383 (Circuit Court Cook County, IL). In particular, Mr. Kanovitz was counsel to the relators in *McArtor*, one of the very few non-intervened cases against a defense contractor to reach a successful resolution and also was trial counsel for the plaintiff-relator in the *AIG* matter. Mr. Kanovitz graduated *cum laude* from Cornell Law School in 1994.

**Anand Swaminathan.** Mr. Swaminathan is a partner at Loevy + Loevy and a leading trial attorney who has specialized in civil rights and False Claims Act practice for more than 15

19

years. Mr. Swaminathan has represented several dozen whistleblowers. Among them, he has represented relators who successfully obtained recoveries after Government intervention in their cases. He has also successfully obtained recoveries for several relators who elected to pursue litigation after the government elected to not intervene in their matters. These include the relators in *United States, ex rel. McArtor v. Rolls-Royce Corp.*, Case No. 08-cv-133 (S.D. Indiana); *United States, ex rel. Herron v. ING*, Case No. 01:06 Civ. 1778 (S.D. Ind.); *United States ex rel. Blaum v. Triad Isotopes, et al.*, Case No. 11-cv-8098 (N.D. Ill.); and *United States ex rel. Hansen, et al.*, Case No. 1:11-cv-566 (D.N.M).]. In total, his settlements and verdicts exceed $300 million.

**Dan Twetten.** Mr. Twetten is a partner at Loevy + Loevy and has litigated False Claims Act cases on behalf of relators for 17 years. Mr. Twetten has represented dozens of relators, including relators in several matters in which the Government declined to intervene but which Loevy & Loevy pursued to a successful recovery. *See*, *e.g.*, *United States, ex rel. McArtor v. Rolls-Royce Corp.*, Case No. 08-cv-133 (S.D. Indiana); *United States ex rel. Andrews v. Accordis, Inc*., Case No. 09-cv-5093 (N.D. Ill.); *United States ex rel. Blaum v. Triad Isotopes, et al.*, Case No. 11-cv-8098 (N.D. Ill.); *United States ex rel. McGee v. IBM, et al.*, Case No. 11-cv-3482 (N.D. Ill); and *City of Chicago ex rel. McShane v. General Chemical, et al.*, Case No. 2016-L-11383 (Circuit Court Cook County, IL). By way of example, the *McArtor* matter involved claims against a large military defense contractor that were litigated for several years prior to resolution by settlement. Mr. Twetten graduated with honors from Northwestern University School of Law in 2001 and clerked for the Hon. Richard Tallman (U.S. Court of Appeals for the Ninth Circuit). He worked for Sidley Austin before joining Loevy + Loevy.

20

In addition to those four partners, Relators' counsels' team included other attorneys particularly well-suited to litigate this matter. Frank Newell, a partner at Loevy + Loevy and honors graduate of Harvard Law School, is a former Sidley Austin attorney who has represented relators in non-intervened cases for 12 years, including the *McArtor* and *McShane* matters. Anna Dover, of counsel at Loevy + Loevy, is the former co-chair of the Milberg firm's False Claims Act practice. Loevy + Loevy hired Ms. Dover specifically to work on this matter. Heather Sticht is an attorney with substantial ESI and document review experience whom Loevy + Loevy hired to oversee the massive document review required. Associate attorneys Kevin Thomas and River Scott are each Army veterans, specifically hired by Loevy + Loevy to work on this matter for their military expertise. Gwen Parker is an attorney with significant complex litigation experience whom Loevy + Loevy hired to work on this matter exclusively. After a specialized career in the federal government involving national security logistics and federal contracts, plus two federal clerkships, Dominique Gilbert supported this case through expert discovery, depositions, motion briefing, and trial. Declaration of Dominique Gilbert at ¶¶7–16. After two federal clerkships and civil rights litigation experience, Alexandra Wolfson joined the team in the throes of summary judgment and assisted with motion briefing and trial. Declaration of Alexandra Wolfson at ¶¶4–8. Aadi Tolappa joined the team after two federal clerkships and commercial litigation experience and supported this case through motion briefing and trial. Declaration of Aadi Tolappa at ¶¶7–11. Anna St. John is an experienced commercial class action litigator (and recently appointed United States District Court judge) whom Loevy + Loevy hired to work on this matter. Each attorney's experience and credentials are set forth in detail in their corresponding declarations, which are gathered in Group Exhibit 2.

Over the course of the litigation, Loevy + Loevy utilized another 26 attorneys to address the 16 million pages of documents, including review, providing analysis, and conducting follow-up research in the documents throughout the case development.[5] All of the selected attorneys were experienced in reviewing and analyzing documents, which was an essential step in this matter that required enormous amounts of time to complete. In order to properly represent their clients, Relators counsel were required to analyze and understand this vast set of information. The document review team assembled by Relators' counsel was carefully overseen and managed

---

[5] Relators' counsel directly hired (and supervised) some of these attorneys as independent contractors rather than W-2 employees. Many of these attorneys sought independent contractor work because of life circumstances like raising children or awaiting a clerkship (and despite having impressive resumes that could land them jobs at many firms). Their independent contractor status has no bearing on the right to recover reasonable rates for their time under Section 3730(d)(2). Indeed, had the firm not found qualified attorneys willing to work on the case in that capacity, the fees to pursue the case and the resulting obligation of Fluor to pay them, would only be greater. *See, e.g.*, *Hassan v. Lyons Logistics, LLC*, No. 1:21-CV-00266, 2022 WL 989726, at *2 (E.D. Va. Jan. 13, 2022) (awarding lead counsel $590 an hour in attorneys' fee and a contract attorney $450 an hour in attorneys fees when the contract attorney provided "extra support" for the response to summary judgment); *Philips Med. Sys. (Cleveland), Inc. v. Buan*, No. 19-CV-2648, 2023 WL 4533336, at *6 (N.D. Ill. July 13, 2023) (finding plaintiffs met their burden of showing that contract attorneys' hourly rates were reasonable as attorneys' fees); *In re Nat'l Football League Players' Concussion Inj. Litig.*, No. 2:12-MD-02323-AB, 2024 WL 3843058, at *2 (E.D. Pa. May 28, 2024) ("The approved hourly billing rates are: $758.35 for partners; $692.50 for 'counsel' or 'of counsel' attorneys; $486.67 for associates; $537.50 for contract attorneys; and $260.00 for paralegals."); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 783 (S.D. Tex. 2008) (awarding attorneys' fees for contract attorneys when "Lead Counsel has provided specific factual evidence that demonstrates that a number of its contract attorneys were experienced, skillful counsel, on the level of partner or senior or junior associate, and that the others were carefully supervised and mentored while engaged in legal work"); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 272 (D.N.H. 2007) ("SERS/PSERS argues that the work done by contract attorneys should be treated as an expense to be reimbursed, rather than being included in the lodestar. This objection lacks merit. The lodestar calculation is intended not to reflect the costs incurred by the firm, but to approximate how much the firm would bill a paying client. An attorney, regardless of whether she is an associate with steady employment or a contract attorney whose job ends upon completion of a particular document review project, is still an attorney. It is therefore appropriate to bill a contract attorney's time at market rates and count these time charges toward the lodestar.").

by other attorneys with substantive experience, including Mr. Newell, Ms. Sticht, Ms. Dover, and Mr. Swaminathan. Group Ex. 2, *See* Swaminathan Dec. at ¶17, Declaration of Frank Newell at ¶12, Declaration of Anna C. Dover ("Dover Dec.") at ¶6, Declaration of Heather Sticht ("Sticht Dec.") at ¶ ¶7-8. The experience and credentials of the document review attorneys are set forth in their own declarations and in Ms. Sticht's declaration.

### B.     The hourly rates sought are reasonable and justified

Under familiar lodestar principles, a court first determines an initial estimate of a reasonable attorneys' fee by "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate[,]" *Blum*, 465 U.S. at 888, a reasonable hourly rate is "the prevailing market rate," defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Id.* at 896 n. 11.

In other words, courts accept hourly rates that reflect "the customary fee for like work." *See, e.g.*, *U.S., ex rel. Abbott-Burdick v. Univ. Med. Assocs., No. 2:96-1676-12, 2002 WL 34236885*, at \*12 (D.S.C. May 23, 2002); *Morris v. Bland*, No. 5:12- CV-3177-RMG, 2015 WL 12910631, at \*2 (D.S.C. Jan. 15, 2015). In the Fourth Circuit, "[r]ates charged by attorneys in other cities [ ] may be considered when 'the complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally,' and the party choosing the attorney from elsewhere acted reasonably in making the choice." *Rum Creek Coal Sales, Inc. v. Caperton,* 31 F.3d 169, 179 (4th Cir. 1994) (quoting *Nat'l Wildlife Fed'n v. Hanson,* 859 F.2d 313, 317 (4th Cir. 1988)); *see also Courthouse News Serv. v. Schaefer*, 484 F. Supp. 3d 273, 277–79 (E.D. Va. 2020) (In the Fourth Circuit, "the reasonableness requirement of attorneys' fees is ordinarily met by compensating attorneys at the prevailing market rate in the relevant community[,]" and that rate "should be determined by evidence of what attorneys earn from

23

paying clients for similar services in similar circumstances[.]") (quoting *Robinson v. Equifax Info. Services, LLC*, 560 F.3d 235, 244 (4th Cir. 2009)) (other citations omitted).

Not all complex matters are the same; even if a firm may have handled one type of complex matter, that firm is not necessarily a fit for a complex False Claims Act case. *See U.S., ex rel. Abbott-Burdick v. Univ. Med. Assocs.*, No. 2:96-1676-12, 2002 WL 34236885 (D.S.C. May 23, 2002). In *National Wildlife*, the Fourth Circuit held that a plaintiff's firm was entitled to the prevailing rates in Washington, D.C., where the plaintiff's counsel was based. *See National Wildlife*, 859 F.2d at 318. The court considered two primary factors in determining that the plaintiff acted reasonably in paying out-of-state attorney rates: (1) "are services of like quality truly available in the locality where the services are rendered"; and (2) "did the party choosing the attorney from elsewhere act reasonably in that choice?" *National Wildlife*, 859 F.2d at 317 (citing *Chrapliwy*, 670 F.2d at 769).

Relators here acted reasonably. Were there any doubt, that reasonableness is corroborated by the fact that Fluor itself hired counsel from outside the jurisdiction to obtain the necessary expertise and muscle. If Fluor deemed it appropriate to bring in top-notch legal talent, it can hardly begrudge Relators for seeking the same advantage.

In this case, the relevant community is a handful of law firms capable of litigating a highly complex False Claims Act case to verdict, investing millions of dollars in out-of-pocket expenses, and staffing it with dozens of highly qualified attorneys for more than 100,000 hours of time over the course of 13+ years. There are very few such firms in the United States. Group Ex. 2, *See* Twetten Dec. ¶ 10; Ex. 4, Declaration of Jeremy Friedman ("Friedman Dec.") ¶¶ 19-20. Non-intervened False Claims Act cases require thousands of hours of attorney time and millions of dollars in out-of-pocket costs. Ex. 5, *See* Declaration of David Chizewer ("Chizewer

24

Dec.")¶ 4 ; Friedman Dec. ¶ 20; Twetten Dec. ¶9. Those resources are spent without any guarantee of ever recovering anything in the case. *See* Ex. 5, Chizewer Dec. at ¶ 4; Ex. 4, Friedman Dec. ¶ 27; Group Ex. 2, Twetten Dec. ¶ 9; Ex. 6, Declaration of Michael Ronickher ("Ronickher Dec.") ¶¶ 12-13.

In addition, Relators' counsel are entitled to fees at least commensurate to those that Fluor's counsel charged Fluor in this case. This follows from first principles. As Mr. Chizewer states in his declaration, False Claims Act cases are often defended by AmLaw 100 law firms like Arnold & Porter in this matter. Chizewer Dec. ¶ 2. In such cases, "the relator will need to find counsel that can match the resources and experience level of such firm, at least in order to have the same chance at success as the defendant." Id. "Under these circumstances, it is reasonable that lawyers with resources and experience to match an AM Law 100 defense firm would expect to earn the same, or greater, rate on their time as the defense lawyers earn essentially risk free on theirs." Id. ¶ 5; *see also* Ronickher Dec. ¶ 14. Whether prosecuting a complex False Claims Act case or defending it, counsel must grapple with the same "novel[] and difficult[]" questions and demonstrate the same specialized skill "to properly perform the legal services rendered." *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978). Moreover, the same "customary fee[s] for like work" and "attorneys' fees awards in similar cases" govern, regardless of whom counsel represents.

This Court's decision in *United States ex rel. Abbot-Burdick v. University Medical Associates* illustrates the point. No. 2:96-1676-12, 2002 WL 3426885 (D.S.C. May 23, 2002). In that case, this Court held that defense counsel's rates and hours worked were "very pertinent" for calculating relators' attorneys fees. *See id.* at *21 n.17. Relators' counsel there requested

25

hourly rates similar to those actually charged by defendant's counsel, which weighed in favor of finding Relators' counsel's proposed hourly rates reasonable. *Id.* at \*21.

This Court and the Fourth Circuit have applied the same standards and reached the same conclusion in other cases too. For example, in *Westgate Myrtle Beach, LLC v. Holiday Hosp. Franchising, Inc.*, this Court held that a defendant's refusal to disclose its hourly rates weighed in favor of finding the plaintiff's proposed rates reasonable. No. 4:08-cv-03590-JMC, 2011 WL 13248437, at \*3 (D.S.C. June 2, 2011). The Court's ruling presupposed that the defendant's hourly rate would be a relevant comparator when deciding the plaintiff's fee award. *See id*; *see also In re Gen. Motors Corp.*, 110 F.3d 1003, 1033 (4th Cir. 1997) (same). These cases also show that Fluor's counsel's present refusal to disclose rates or timesheets supports a finding that Relators' counsel's rates are reasonable.

A persuasive argument could be made that Relators' counsel should be entitled to even greater hourly rates than those that Fluor's counsel has charged, given the circumstances. Relators' counsel worked fully on contingency, facing financial risks and massive "opportunity costs in pressing the . . . litigation" for over thirteen years without a guarantee of recouping fees. *See Barber*, 577 F.2d at 226 n.28. Fluor's counsel got paid win or lose, billing as they went along, and thus did not face the same risks or opportunity costs. Their rates necessarily thus reflect the reduced risk to them. These factors weigh in favor of reimbursing Relators' counsel at a higher hourly rate than what Fluor's lawyers charged.

Though Arnold & Porter has not disclosed the information, as a BigLaw law firm, its customary rates are very likely more than $2,000 per hour. Even in 2022, the going rate for partners at such firms was around $1,500 per hour. *See* Friedman Dec. ¶ 17(e). Many such firms now charge $2,000 per hour for the partners like Craig Margolis and Tirzah Lollar who lead

complex litigation.[6] *See Ex. 5* Chizewer Dec. ¶ 7; Group Ex. 2, Twetten Dec. ¶ 19. Indeed, AmLaw 100 firms like Arnold & Porter charge more than $1,000 per hour for even their very youngest associates. *See* Ex. 4, Friedman Dec. ¶ 17(e).

Further, the rates sought by Relators' counsel are consistent with the rates of other national law firms that pursue non-intervened False Claims Act matters and other complex contingent fee cases on behalf of plaintiffs. As noted in the declaration of fee expert Jeremy Friedman, "[t]he rates charged and/or claimed by" Loevy + Loevy in this case "are comparable to rates charged and/or claimed by firms representing plaintiffs in contingency and non-contingency fee cases in both False Claims Act cases and other complex cases." Friedman Dec. ¶ 40. For example, in 2026, Sussman Godfrey, LLP, which represents relators in False Claims Act cases, elite litigators at Susman Godfrey are charging as much as $4,000 an hour. Friedman Dec. ¶ 17(d).

In addition, other practitioners in this area of the law have provided supporting declarations attesting to the reasonableness of Loevy + Loevy's rates. *See* Ronickher Dec. ¶¶ 15-17; Chizewer Dec. ¶. As Mr. Chizewer states, "it is worth pointing out that Jon Loevy, who played a leading role in the trial of this case, has trial credentials, experience and success that compare favorably not just to the defense lawyers in this case, but to almost any defense lawyer in the country. Down the line, Relators' counsel, generally speaking, attended elite law schools, obtained prestigious judicial clerkships and garnered professional experience and

---

[6] As stated, Relators have requested Fluor's billing records in this matter. To date, Fluor has refused to provide them. If Fluor in fact has paid its lawyers meaningfully lower rates than AmLaw 100 firms typically charge, presumably Fluor will provide its records.

accomplishments to match the defense lawyers in this case and other AM Law 50 law firms who typically represent FCA defendants in cases of this profile." Chizewer Dec. ¶ 8.

Applying the rates sought by Loevy + Loevy to the time devoted produces a total lodestar of $86,436,564. *See* Summary Chart of Hours and Rates (attached hereto as Ex. 3). In the event the Court elects to apply a 10.86 percent reduction to account for the theories on which Relators did not prevail, that would yield a total lodestar of $77,049,553.

**III.    Relators Counsel's Requested Costs Are Reasonable**

Loevy + Loevy incurred more than $5 million in out-of-pocket costs. Those costs were necessary to pursue this matter across the 13 years from filing to verdict.

In addition to attorney's fees, the False Claims Act entitles a prevailing *qui tam* relator to reimbursement of costs and "an amount for reasonable expenses which the court finds to have been necessarily incurred." 31 U.S.C. § 3730(d)(2). The Fourth Circuit analyzes the reasonableness of costs and expenses under the FCA the same way it does under other fee-shifting statutes. *See United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 924-25 (4th Cir. 2003) (citing *Daly v. Hill*, 790 F.2d 1071, 1084 (4th Cir. 1986) (analyzing fee-shifting under 42 U.S.C. § 1988)). Thus, attorneys representing prevailing *qui tam* relators are entitled to "reasonable out-of-pocket expenses incurred by the attorney which are nominally charged to a fee-paying client, in the course of providing legal services." *Spell v. McDaniel*, 852 F.2d 762, 771 (4th Cir. 1988). Those include charges for computerized legal research, photocopying, travel, postage, overnight couriers, deposition transcripts, expert witnesses, court costs, miscellaneous expenditures, and "other compensable expenses that an attorney charges her client." *Westinghouse*, 352 F.3d at 923; *see Rehab. Ass'n of Va., Inc. v. Metcalf*, 8 F. Supp. 2d 520, 530-31 (E.D. Va. 1998); *Goodlaxson v. Mayor & City Council of*

*Baltimore*, 776 F. Supp. 3d 311, 326 (D. Md. 2025). Relators seek reimbursement costs and expenses in line with those that courts in this circuit have routinely found reasonable and compensable.

Exhibit 7 details Relators' counsel's costs. In total, Loevy + Loevy incurred $5,543,997.11 in out-of-pocket costs for which they are seeking reimbursement. Group Ex. 2, *See* Twetten Dec. ¶17. The major categories of costs are expert fees, electronically-stored information ("ESI") server hosting costs, and travel costs. Each of these expenses was reasonable to incur in order to pursue this matter. These are exactly the types of costs that Fluor's counsel charged to its client. For example, Relators' counsel is aware from its communications with Fluor counsel that Fluor, like Relators, used ESI services. Group Ex. 2, *See* Dover Dec. ¶ 6, Sticht Dec. at ¶ ¶7.  ESI costs for both sides were necessary in order to host, search, and review the millions of pages of documents relevant to this matter. As for experts, this Court heard testimony at trial that Fluor paid its testifying experts about a million dollars. *See* Trial Tr. 27 at 8686:16. Expert costs for both sides were appropriate given the complexity of the legal and factual issues in this matter, as reflected by the fact that Fluor also paid for six experts to offer opinions. And travel costs were essential in order for Relators' counsel to attend depositions, court hearings, interviews, and meetings with the Government. Undoubtedly, Fluor's counsel charged Fluor for their extensive travel, as well.

The costs that Relators' counsel incurred are all reasonable and necessary, and parallel to costs that Fluor's counsel charged their own client. As with their hours, Relators' counsel are exercising their billing judgment and removing all costs associated with Mr. Field. Relators total requested costs are $5,543,997.11. Group Ex. 2, *See* Twetten Dec. ¶ 17. In addition, Relators seek to recover $104,945.92 in expert costs that Loevy + Loevy incurred but were paid directly

29

by Philips & Cohen, counsel for Mr. Nix. The detail for those expenses is provided in Mr. Nix's separately filed motion for fees and costs. In total, Loevy + Loevy respectfully asks the Court to order that Fluor pay $5,648,943.03 in costs pursuant to 31 U.S.C. § 3730(d)(2).

In the event the Court chooses to reduce Relators' awarded fees and costs to account for the theories on which Relators did not prevail, Relators have identified the costs paid to Jim Sherman and John Lyle, Relators' experts for their labor fraud and award fee theories. Those costs total $152,049.57.

## IV.     Relators' South Carolina Local Counsel's Hours, Rates, and Costs Are Reasonable

In addition to being represented by Loevy + Loevy as lead counsel, Relators were represented by local South Carolina counsel, as required by Court rule.

The law firm Richard A. Harpootlian, P.A., worked with Loevy + Loevy as local counsel. Dick Harpootlian, Chris Kenney, and Andrew Hand were the attorneys from the firm who worked on this matter, and they were supported by paralegal Holli Miller. Mr. Harpootlian has practiced in South Carolina since 1974 and has been a leading trial lawyer for decades. Ex. 8, *See* Harpootlian Dec. § 4. Mr. Kenney worked for the firm for more than 10 years, including on several False Claims Act matters. Id. § 5. Mr. Hand has practiced law for 13 years, including complex commercial litigation and conducting several trials. Id. § 6. Each of their and Ms. Miller's experience and expertise are described in detail in Mr. Harpootlian's declaration, as are the bases for their claimed hourly rates.

In addition, the time entries for Mr. Harpootlian, Mr. Kenney, Mr. Hand, and Ms. Miller are included in the material Relators are providing to this Court for *in camera* review.

In total, Richard A. Harpootlian, P.A., seeks to recover $411,400 in fees and $20,986.86 in costs.

Similarly, Judah VanSyckel worked as local counsel for Rickey Mackey in this matter. In accordance with his declaration found at Ex. 9, Mr. VanSyckel seeks $2,950 in fees.[7]

**Conclusion**

Relators' counsel undertook an enormous amount of time and resources to pursue this case, all with no guarantee of ever receiving a dime. Unlike Fluor's counsel, they faced the very real risk of losing everything they invested. Fortunately for them, however, they won. Under those circumstances, the law requires that Relators' counsel should be compensated for their hours billed at their hourly rates. The resulting lodestar sought here is almost surely less than the amount billed by Fluor's counsel, and should be approved.

Respectfully submitted,

/s/ Andrew Hand
Andrew Hand

Richard Harpootlian (Fed. ID No. 1730)
Andrew Hand (Fed. ID No. 12176)
RICHARD A. HARPOOTLIAN P.A.
1410 Laurel Street
Post Office Box 1090
Columbia, SC 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810
rah@harpootlianlaw.com

Jonathan Loevy
Michael Kanovitz
Daniel Twetten
Anand Swaminathan
Frank Newell
Anna Dover

---

[7] Frank Eppes served as local counsel for Relator Scott Dillard. Mr. Eppes was hospitalized the week of April 27, 2026, and was unable to prepare materials to file by May 4, 2026. Mr. Eppes will file a motion for leave to file his fee and costs requests as soon as possible.

31

Gwen Parker
Heather Sticht
Dominique Gilbert
Alexandra Wolfson
Aadi Tolappa
**LOEVY & LOEVY**
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
Telephone: (312) 243-5900
Facsimile: (312) 243-5902
anand@loevy.com
*Attorneys for Relators*
*Charles R. Shepherd*
*and Danny V. Rude*

Frank L. Eppes (Fed. ID No. 1003)
EPPES & PLUMBLEE, PA
PO Box 10066
Greenville, SC 29603
Telephone: (864) 235-2600
Facsimile: (864) 235-4600
feppes@eppesandplumblee.com

*Attorney for Relator Robert Scott*
*Dillard*

Judah N. VanSyckel
SALUDA LAW, LLC
137 E. Butler Street
Lexington, SC 29072
Telephone: (803) 939-6927
Facsimile: (803) 902-8004
judah@saludalaw.com

*Attorney for Relator Rickey Mackey*

32