# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### GREENVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CHARLES R. SHEPHERD; DANNY V. RUDE; ROBERT SCOTT DILLARD; and RICKEY MACKEY,<br><br>    Plaintiff-Relators,<br><br>  v.<br><br>FLUOR CORPORATION; FLUOR INTERCONTINENTAL, INC.,<br><br>    Defendants. | Civil Action No. 6:13-cv-02428-JD<br>Hon. Joseph Dawson, III |

## FLUOR'S MEMORANDUM OF LAW IN OPPOSITION TO RELATORS' MOTION FOR A NEW TRIAL, OR, IN THE ALTERNATIVE, TO AMEND JUDGMENT

Mark C. Moore (Fed. ID No. 4956)
Michael A. Parente (Fed. ID No. 13358)
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 540-2146
Facsimile: (803) 727-1458
MMoore@maynardnexsen.com

Konstantine P. Diamaduros (Fed. ID No. 12368)
MAYNARD NEXSEN PC
104 South Main Street, Suite 900 (29601)
Post Office Drawer 10648
Greenville, SC 29603-0648
Telephone: (864) 370-2211
Facsimile: (864) 282-1177
KDiamaduros@maynardnexsen.com

Craig D. Margolis (admitted *pro hac vice*)
Tirzah S. Lollar (admitted *pro hac vice*)
Christian D. Sheehan (admitted *pro hac vice*)
Elizabeth A. Carney (admitted *pro hac vice*)
Katelyn M. Deibler (admitted *pro hac vice*)
Elliot S. Rosenwald (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, Northwest
Washington, DC 20001-3743
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
craig.margolis@arnoldporter.com

Rachel K. Higgins (admitted *pro hac vice*)
Sahrula Kubie (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Counsel for Defendants Fluor Corporation and Fluor Intercontinental, Inc.*

May 8, 2026

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD........................................................................................................... 1

DISCUSSION ...................................................................................................................... 2

I.      The Court Properly Excluded Evidence Related to the Bagram Suicide Bombing............ 2

        A.      Irrelevant, Inflammatory Evidence About the Bombing Was Subject to
                Exclusion Under Rule 403 ........................................................................ 2

        B.      Fluor Did Not Open the Door to Bombing-Related Evidence.............................. 6

II.     The Court Correctly Recognized Fluor's Privilege Regarding the Materials
        Management Investigation........................................................................................ 9

        A.      The MMI is Privileged............................................................................. 9

        B.      Fluor Did Not Waive Privilege Over the MMI........................................... 11

III.    The Court's Rulings Regarding Mr. Methot Were Proper ................................................. 12

IV.     The Court Set Reasonable Limitations on Expert Cross-Examination............................. 14

V.      The Court Appropriately Declined to Permit a Rebuttal Case ........................................ 17

VI.     Relators Fail to Identify Any Erroneously Admitted Testimony Regarding
        Staffing........................................................................................................... 19

VII.    The Court's Decisions Regarding Fluor's Witness Agreements Were Correct ............... 20

        A.      Relators Misconstrue the Agreements ................................................... 20

        B.      The Agreements Were Proper................................................................... 21

        C.      The Court Permitted Appropriate Cross-Examination ......................................... 23

VIII.   Relators' Objection to the Verdict Form on Penalties is Untimely and Unfounded ........ 25

        A.      Relators' Challenge is Untimely............................................................. 25

        B.      Relators' Property Fraud Theory Supports Only a Single Penalty....................... 26

        C.      The Penalties Relators Seek Present Multiple Constitutional Problems .............. 30

IX.     Relators' Request to Amend the Judgment is Procedurally Improper and Fails on the Merits ................................................................................................................. 31

CONCLUSION.................................................................................................................. 34

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Prince George's County*,
737 F.2d 1299 (4th Cir. 1984) ...........................................................................................18

*Altria Client Servs. LLC v. R.J. Reynolds Vapor Co.*,
650 F. Supp. 3d 375 (M.D.N.C. 2023) ..................................................................................2

*Am. Canoe Ass'n v. Murphy Farms, Inc.*,
326 F.3d 505 (4th Cir. 2003) ...........................................................................................19

*Bahr v. NCL (Bahamas) Ltd.*,
No. 19-cv-22973, 2021 WL 4845789 (S.D. Fla. Oct. 18, 2021) ............................................17

*Blue Cross & Blue Shield of S.C. v. W.R. Grace & Co.*,
781 F. Supp. 420 (D.S.C. 1991)..........................................................................................16

*Boley v. Armor Correctional Health Servs., Inc.*,
No. 2:21-cv-197, 2023 WL 2800135 (E.D. Va. Apr. 5, 2023) ..............................................17

*Calderon v. GEICO Gen. Ins. Co.*,
754 F.3d 201 (4th Cir. 2012) ...........................................................................................31

*City of Myrtle Beach v. United Nat' Ins. Co.*,
No. 4:08-cv-1183-TLW-SVH, 2010 WL 3420044 (D.S.C. Aug. 27, 2010) ...........................11

*City of Richmond v. Madison Mgmt. Grp., Inc.*,
918 F.2d 438 (4th Cir. 1990) .......................................................................................32, 33

*Clayton v. Nationwide Mut. Ins. Co.*,
260 F. Supp. 3d 514 (D.S.C. 2017)......................................................................................19

*Clear Touch Interactive, Inc. v. Ockers Co.*,
171 F.4th 715 (4th Cir. 2026) ...........................................................................................2

*Coryn Group II, LLC v. O.C. Seacrets, Inc.*
*No.* WDQ-08-2764, 2011 WL 862729 (D. Md. Mar. 10, 2011)...........................................17

*Delaware v. Van Arsdall*,
475 U.S. 673 (1986)...................................................................................................23, 24

*E.E.O.C. v. Consol Energy, Inc.*,
860 F.3d 131 (4th Cir. 2017) ......................................................................................1, 2, 5

*Fayetteville Invs. v. Com. Builders, Inc.*,
    936 F.2d 1462 (4th Cir. 1991) ...............................................................................2, 31

*Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*,
    412 F.3d 745 (7th Cir. 2005) ........................................................................................16

*Gibbons v. Gibbs*,
    167 F.4th 131 (4th Cir. 2026) .......................................................................................15

*Graham v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
    No. 0:16-cv-01153-MBS, 2017 WL 116798 (D.S.C. Jan. 12, 2017) ......................................11

*Hege v. Aegon USA, LLC*,
    No. 8:10-cv-1578-GRA, 2011 WL 1791883 (D.S.C. May 10, 2011) ......................................11

*Hencely v. Fluor Corp.*,
    146 S. Ct. 1086 (2026).................................................................................................2, 5

*Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*,
    962 F.3d 1204 (10th Cir. 2020) ....................................................................................26

*Hosp. Bldg. Co. v. Trs. Of Rex Hosp.*,
    791 F.2d 288 (4th Cir. 1986) ........................................................................................17

*Huskey v. Ethicon, Inc.*,
    29 F. Supp. 3d 691 (S.D. W. Va. 2014) ..........................................................................16

*In re Aqueous Film-Forming Prods. Liab. Litig.*,
    No. 2:18-mn-2873-RMG, 2023 WL 3517923 (D.S.C. May 2, 2023) ....................................16

*In re Celotex Corp.*,
    124 F.3d 619 (4th Cir. 1997) ........................................................................................26

*In re Fluor Intercontinental, Inc.*,
    803 F. App'x 697 (4th Cir. 2020) .............................................................................10, 28

*In re Target Corp. Customer Data Breach Sec. Breach Litig.*,
    No. 14-cv-2522, 2015 WL 6777384 (D. Minn. Oct. 23, 2015)..............................................11

*In re Tudor Assocs., Ltd., II*,
    20 F.3d 115 (4th Cir. 1994) ..........................................................................................13

*In re Under Seal*,
    749 F.3d 276 (4th Cir. 2015) ........................................................................................25

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    No. 2:18-md-2836, 2023 WL 4156858 (E.D. Va. Apr. 5, 2023)............................................13

*Jensen v. EXC, Inc.*,
  82 F.4th 835 (9th Cir. 2023) ................................................................16

*Kelly v. Equifax, Inc.*,
  No. 8:12-cv-03095-MGL, 2013 WL 5954799 (D.S.C. Nov. 7, 2013) ......................................9

*Maldondo v. Solara Med. Supplies*,
  No. 20-cv-12198, 2021 WL 8323636 (D. Mass. June 2, 2021)................................................11

*Med-Therapy Rehab. Servs., Inc. v. Diversicare Corp. of Am.*,
  Nos. 93-1176, 93-1210, 1994 WL 34745 (4th Cir. 1994) (per curiam) ..................................33

*Mullen v. Princess Anne Volunteer Fire Co.*,
  853 F.2d 1130 (4th Cir. 1988) ...............................................................5

*New Hampshire v. Maine*,
  532 U.S. 742 (2001)................................................................33

*Noel v. Artson*,
  641 F.3d 580 (4th Cir. 2011) ................................................................5

*Old Chief v. United States*,
  519 U.S. 172 (1997)................................................................3

*Prasad v. MML Invs. Servs., Inc.*,
  No. 04-cv-380, 2004 WL 1151735 (S.D.N.Y. May 24, 2004) ................................................21

*Pugh v. Louisville Ladder, Inc.*,
  361 F. App'x 448 (4th Cir. 2010) ................................................................17

*Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*,
  32 F.3d 851 (3d Cir. 1994)................................................................11

*S.E.C. v. Jarkesy*,
  603 U.S. 109 (2024)................................................................29

*SD3, LLC v. Black & Decker (U.S.), Inc.*,
  No. 1:14-cv-00191, 2016 WL 4722001 (E.D. Va. July 29, 2016)............................................11

*Snoznik v. Jeld-Wen, Inc.*,
  No. 1:09-cv-42, 2010 WL 1924483 (W.D.N.C. May 12, 2010)................................................14

*Souffrant v. Iseman*,
  No. 18-cv-388-SHH, 2020 WL 980186 (D.S.C. Feb. 28, 2020) .............................................19

*Stanko v. Stirling*,
  No. 1:19-cv-03257, 2022 WL 22887110 (D.S.C. May 23, 2022) ...........................................12

*State Farm Mut. Auto Ins. Co. v. Campbell*,
  538 U.S. 408 (2003)..................................................................................................30

*Tull v. United States*,
  481 U.S. 412 (1987)..................................................................................................29

*U.S. ex rel. Davis v. U.S. Training Ctr. Inc.*,
  498 F. App'x 308 (4th Cir. 2012) ................................................................................3

*U.S. ex rel. Drakeford v. Tuomey*,
  792 F.3d 364 (4th Cir. 2015) ...............................................................................27, 30

*U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*,
  912 F.3d 731 (4th Cir. 2019) ................................................................................25, 26

*U.S. ex rel. Palmer v. Tata Consultancy Servs., Ltd.*,
  784 F. Supp. 3d 927 (E.D. Tex. 2025)........................................................................27

*U.S. Just. Found. v. Response Unlimited, Inc.*,
  No. 5:25-cv-00074, 2026 WL 498890 (W.D. Va. Feb. 23, 2026)...........................18

*United States v. A&S Council Oil Co.*,
  947 F.2d 1128 (4th Cir. 1991) ....................................................................................16

*United States v. Ambers*,
  85 F.3d 173 (4th Cir. 1996) ........................................................................................23

*United States v. Anty*
  203 F.3d 305 (4th Cir. 2000) ......................................................................................24

*United States v. Bainbridge Mgmt., L.P.*,
  No. 01-cr-496, 2002 WL 31006135 (N.D. Ill. Sept. 5, 2002).....................................3

*United States v. Blizzard*,
  27 F.3d 100 (4th Cir. 1994) ........................................................................................26

*United States v. Bornstein*,
  423 U.S. 303 (1976).....................................................................................................26

*United States v. Boyd*,
  No. 24-cr-00935-JD, 2025 WL 46464208 (D.S.C. Oct. 14, 2025).............................3

*United States v. Brewer*,
  1 F.3d 1430 (4th Cir. 1993) ........................................................................................25

*United States v. Cadden*,
  No. 14-cr-10363, 2018 WL 2108243 (D. Mass. May 7, 2018) ...................................3

*United States v. Duke Energy Corp.*,
  208 F.R.D. 553 (M.D.N.C. 2002) ....................................................................................12

*United States v. Ferguson*,
  140 F.4th 538 (4th Cir. 2025) .........................................................................................19

*United States v. Greenwood*
  796 F.2d 49 (4th Cir. 1976) ............................................................................................24

*United States v. Hawkins*,
  No. 23-4130, 2024 WL 3083418 (4th Cir. June 21, 2024)..............................................24

*United States v. Hopkins*
  197 F. App'x 235 (4th Cir. 2006) ....................................................................................23

*United States v. Jackson*,
  327 F.3d 273 (4th Cir. 2003) .............................................................................................7

*United States v. Jones*,
  696 F.2d 1069 (4th Cir. 1982) ........................................................................................11

*United States v. Kiza*,
  855 F.3d 596 (4th Cir. 2017) ..........................................................................................23

*United States v. Libby*,
  467 F. Supp. 2d 1 (D.D.C. 2006) ......................................................................................6

*United States v. McDonald*,
  166 F. 4th 440 (4th Cir. 2026) ..........................................................................................7

*United States v. Miller*,
  61 F.4th 426 (4th Cir. 2023) .............................................................................................3

*United States v. Odeh*,
  No. 13-cr-20772, 2014 WL 5473042 (E.D. Mich. Oct. 27, 2014) ...................................3

*United States v. Scheetz*,
  293 F.3d 175 (4th Cir. 2002) ..........................................................................................23

*United States v. Smith*,
  373 F.3d 561 (4th Cir. 2004) ..........................................................................................26

*United States v. Smith*,
  451 F.3d 209 (4th Cir. 2006) ..........................................................................................23

*United States v. Vaghari*,
  735 F. Supp. 2d 197 (E.D. Pa. 2010) ................................................................................3

*United States v. Williams,*
    445 F.3d 724 (4th Cir. 2006) .................................................................................5

*Vodusek v. Bayliner Marine Corp.,*
    71 F.3d 148 (4th Cir. 1995) .................................................................................15

*Ward v. AutoZoners, LLC,*
    958 F.3d 254 (4th Cir. 2020) ................................................................................2

**Constitutional Provisions and Statutes**

U.S. Const.
    amend. V .........................................................................................................30
    amend. VII ................................................................................................29, 32
    amend. VIII .....................................................................................................30

18 U.S.C.
    § 201(c)(2) ......................................................................................................21
    § 201(d) ...........................................................................................................22

31 U.S.C.
    § 3729(a)(1) ..........................................................................................29, 30, 33
    § 3729(a)(1)(G) ..........................................................................................26, 27

**Rules and Regulations**

28 C.F.R. 85.3(a)(9) ................................................................................................30, 33

FAR 52.245-1 .............................................................................................................27

Fed. R. Civ. P.
    50(b) ..........................................................................................................30, 33
    51(b)(2) ............................................................................................................24
    51(c)(2) ............................................................................................................25
    51(d) .................................................................................................................25
    59(a) ...................................................................................................................1
    59(e) ...............................................................................................................2, 31
    60(b) ...................................................................................................................2

Fed. R. Evid.
    401 .....................................................................................................................2
    403 ...............................................................................................2, 3, 6, 13, 19
    602 ...................................................................................................................13
    611 ...................................................................................................................13
    705 ..............................................................................................................15, 16
L. R. Civ.
    7.05 ..................................................................................................................19
    37.01(A) ..............................................................................................................9

– ix –

**<u>Other Authorities</u>**

ABA Formal Op. 96-402 .................................................................................................21

*Jury Awards $45 Million in Whistleblower Case That Exposed Massive Fraud by
Military Contractor in Afghanistan*, Loevy + Loevy (Mar. 14, 2026),
https://www.loevy.com/big-wins/jury-sides-with-whistleblowers-in-fluor-trial/
[https://perma.cc/QEC5-WX39] ................................................................................1

S.C. Bar Ethics Advisory Op. 97-42.............................................................................21

Fluor Corporation and Fluor Intercontinental, Inc. (collectively, "Fluor") submit this memorandum of law in opposition to Relators' Motion for a New Trial, or, in the Alternative, to Amend Judgment (Dkt. 785).

## INTRODUCTION

Relators' counsel publicly described the jury's verdict in this case as "a just conclusion."[1] Yet, Relators in their motion say the opposite, asking for a new trial based on a hodgepodge of arguments the Court already thoughtfully considered and rejected, most of which rehash complaints about the Court's discretionary evidentiary and trial-management decisions. Each of the questioned rulings was correct and well within the Court's broad discretion. Moreover, several of Relators' arguments are either waived, procedurally improper, or not supported with citations to the record. And, even if Relators could identify stray rulings from this lengthy trial that could have gone a different way, they come nowhere close to meeting Rule 59(a)'s demanding bar—a "grievous" error that "rendered the entire trial unfair." Finally, there is no basis for Relators' request to amend the judgment to impose damages and penalties that fly in the face of Relators' prior arguments, do not reflect the jury's verdict, and which in any event would not be constitutionally permitted. The Court should deny Relators' motion in its entirety.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 59(a), the Court "may grant a new trial only if the verdict: (1) is against the clear weight of the evidence; (2) is based upon false evidence; or (3) will result in a miscarriage of justice." *E.E.O.C. v. Consol Energy, Inc.*, 860 F.3d 131, 145 (4th Cir.

---

[1] *Jury Awards $45 Million in Whistleblower Case That Exposed Massive Fraud by Military Contractor in Afghanistan*, Loevy + Loevy (Mar. 14, 2026), https://www.loevy.com/big-wins/jury-sides-with-whistleblowers-in-fluor-trial/ [https://perma.cc/QEC5-WX39] (statement by Anand Swaminathan).

2017).  "When, as here, a new trial is sought based on purported evidentiary errors by the district court, a verdict may be set aside only if an error is so grievous as to have rendered the entire trial unfair."  *Id.*  The Fourth Circuit has never held in a civil case that such unfairness can arise from an accumulation of smaller errors; rather, it "ha[s] generally only applied the cumulative-error doctrine in criminal cases."  *Ward v. AutoZoners, LLC*, 958 F.3d 254, 273 (4th Cir. 2020); *accord Altria Client Servs. LLC v. R.J. Reynolds Vapor Co.*, 650 F. Supp. 3d 375, 411–12 (M.D.N.C. 2023).

A court may grant a motion to amend a judgment under Rule 59(e) only "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice."  *Clear Touch Interactive, Inc. v. Ockers Co.*, 171 F.4th 715, 728 (4th Cir. 2026). A motion under Rule 60(b) additionally requires a showing of "lack of unfair prejudice to the opposing party, and exceptional circumstances."  *Id.*  Rules 59(e) and 60(b) may not be used to attack a non-final judgment.  *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1469–70 (4th Cir. 1991).

## **DISCUSSION**

### I.    **The Court Properly Excluded Evidence Related to the Bagram Suicide Bombing**

#### A.    **Irrelevant, Inflammatory Evidence About the Bombing Was Subject to Exclusion Under Rule 403**

While the Court denied Fluor's motion in limine categorically to bar evidence relating to the Bagram suicide bombing, it exercised its discretion to exclude such evidence during the trial itself based on obvious Rule 401 and 403 concerns.  Dkt. 650 at 6–7.[2]  Throughout trial, Relators

---

[2] A full description of the underlying facts is unnecessary here.  Suffice it to say that in November 2016 a former member of the Taliban who was working as a laborer at Bagram under Fluor's LOGCAP contract (and who was hired based on the Army's security screening of the individual and its "Afghan First" program directing Fluor to maximize the employment of local nationals) denotated an explosive vest killing and injuring military and civilian personnel.  Fluor's

– 2 –

did not identify a proper purpose for offering such evidence, and the Court therefore declined to allow them to introduce it.

The Court's rulings on this issue were correct and certainly not an abuse of discretion. Under Rule 403, courts may "exclude relevant evidence if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice." The rule's purpose is to exclude evidence that might "lure the factfinder into declaring [liability] on a ground different from proof specific to the [asserted cause of action]." *United States v. Miller*, 61 F.4th 426, 429 (4th Cir. 2023) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)) (emphasis deleted). As this Court recognized in a case Relators cite, evidence depicting "violence" and "inflammatory remarks" is ripe for exclusion under Rule 403. *United States v. Boyd*, No. 24-cr-00935-JD, 2025 WL 46464208, at *3 (D.S.C. Oct. 14, 2025). Indeed, courts commonly exclude references to violence, terrorism, or death in cases that concern only nonviolent conduct. *E.g., U.S. ex rel. Davis v. U.S. Training Ctr. Inc.*, 498 F. App'x 308, 317 (4th Cir. 2012) (in FCA case, excluding evidence that defendant's employee made "death threat" to government employee who was reviewing allegedly fraudulent bills).[3] It is hard to imagine evidence more likely to prejudice a jury than

---

responsibility for the incident is hotly contested and is being litigated separately in a series of personal injury suits in this District (including several before this Court). *See Hencely v. Fluor Corp.*, 146 S. Ct. 1086 (2026) (holding these lawsuits can proceed). In a redacted investigation report, the Army lay blame at Fluor for insufficient supervision of the employee and his access to tools that were unnecessary for him to perform his job. Nowhere does this report criticize Fluor for inadequate property management more generally nor do the statements in the report track Relators' allegations in this case. *See generally* Dkt. 588 at 2–7 (Fluor's motion in limine providing further factual background).

[3] *See also, e.g., United States v. Odeh*, No. 13-cr-20772, 2014 WL 5473042, at *9–10 (E.D. Mich. Oct. 27, 2014) (in prosecution for failing to disclose on citizenship application a prior conviction related to a bombing, Rule 403 barred connecting prior crime to terrorism, because that would be "highly prejudicial and create a danger of improperly influencing the jury's verdict"); *United States v. Vaghari*, 735 F. Supp. 2d 197, 205–06 (E.D. Pa. 2010) (precluding sanctions expert from referencing terrorism when testifying in non-terrorism-related sanctions-evasion case); *United States v. Cadden*, No. 14-cr-10363, 2018 WL 2108243, at *5 (D. Mass. May 7, 2018) (excluding

seeking to tar a defendant with responsibility for a Taliban-inspired suicide bombing on an American military base that killed U.S. servicemembers.[4]

Moreover, evidence related to the bombing was simply irrelevant to Relators' claims, particularly given Relators' concession that their property theory extends only to 2014, while the bombing occurred in late 2016. *See* Dkt. 785-1 ("Br.") at 33 (stating date range to which the jury's liability finding applies is "2010 [to] 2014"). Relators argue that the Army's heavily redacted report "plainly supported [their] allegation that Fluor failed to account for the Government's property and materials." Br. 5–6. But the report does nothing of the sort. Contrary to Relators' assertion, it does not state that the bomber "acquire[d]" the bombmaking materials "from Fluor facilities," *see id.*, but instead reaches no conclusions about whether the bomber acquired those materials from somewhere on the base or instead smuggled them into his worksite. *See* Pls.' Ex. 1038 at 46. And as the evidence at trial clearly established, the Army (not Fluor) was in charge of base security, *e.g.,* Dkt. 738 at 6266:14–16 (testimony of Steven Whitcomb); Dkt. 661 at 566:23–568:2 (testimony of David Payne), and decided how and where materials were stored, Dkt. 737 at 5911:2–5912:13 (testimony of Minka Hill); Dkt. 661 at 559:7–21 (testimony of Mr. Payne). Moreover, the Army report does not, as Relators assert, make "findings regarding materials management." Br. 6. One of Relators' bombing-related exhibits details six contractual provisions

---

evidence of patients' deaths in prosecution for healthcare fraud); *United States v. Bainbridge Mgmt., L.P.*, No. 01-cr-496, 2002 WL 31006135, at \*2 (N.D. Ill. Sept. 5, 2002) (similar).

[4] Relators' assertion that the bombing might generate sympathy for Fluor because several Fluor employees were also killed rings utterly hollow in light of Relators' repeated attempts to portray Fluor as a company that cared more about "profits" than "people." *E.g.,* Dkt. 729 at 5220:2–9 (Relator Dillard testifying that "Fluor is a soulless corporation"); Dkt. 716 at 4928:4–23 (Court sustaining Fluor's objection when Relators' counsel asked a witness whether Fluor's conduct constituted "putting profits over people").

Fluor allegedly "failed to comply with," *none* of which relates to property management. *See* Pls.' Ex. 1036.[5]

Even if the bombing could have had some tangential relevance, it is, at best, "weakly probative of a minor point." *United States v. Williams*, 445 F.3d 724, 731 (4th Cir. 2006). Because the jury found in their favor regarding Fluor's liability for lost property (erroneously, in Fluor's view), Relators request for a new trial on their property theory is limited to damages, that is, the quantum of property actually lost. *See* Br. 1; Dkt. 770 at 27. The tragic suicide bombing involved miniscule amounts of low-dollar consumables (some "string," a "switch," and a few "bolts and nuts" used in the vest). *See* Pls.' Ex. 1038 at 46. Accordingly, the cost of these materials (assuming Fluor's liability for them) would not move the needle on damages in any meaningful way. This lays bare Relators' true purpose for seeking to admit the evidence—to "excite the jury to make a decision on the basis of a factor unrelated to the issues properly before it." *Noel v. Artson*, 641 F.3d 580, 592 (4th Cir. 2011) (quoting *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1134 (4th Cir. 1988)). Relators thus cannot have been "grievous[ly]" prejudiced by the absence of this evidence. *Consol Energy*, 860 F.3d at 145.[6]

---

[5] Importantly, the investigative report is redacted, and the government has consistently opposed Fluor's attempts to obtain it in unredacted form. Indeed, after the denial of its bombing motion in limine, Fluor promptly subpoenaed the unredacted report from the Army as a prophylaxis should Relators have been permitted to introduce evidence relating to the incident. The government moved to quash the subpoena arguing, among other things, that the unredacted report remains classified. Dkt. 701 at 1, 3, 8–9. This issue and the related "state secrets doctrine" will be litigated in the *Hencely* case (as well as the cases before this Court). *See* Br. for U.S. as *Amicus Curiae* at 21 n.1, *Hencely v. Fluor Corp.*, No. 24-294 (U.S. filed Sept. 22, 2025).

[6] Relators also bizarrely argue that the absence of bombing-related evidence "likely influenced [the jury's] decision to reject [Relators'] award fee [theory]." Br. 9. The uncontroverted evidence was that the Army converted the contract to a fixed fee years before the bombing, *see* Defs.' Ex. 452, meaning, of course, that earlier award fee decisions could not have been influenced by that future event. Any jury argument from Relators connecting the bombing to the award fee (had the bombing been introduced) would have been improper.

As a fallback, Relators posit that they would have used the bombing to show that "the Army nearly terminated TO5" and "may well . . . have done the same had it discovered those deficiencies earlier." Br. 9. But this speculative argument raises any number of questions. First, as noted, the Army's investigative report does not accuse Fluor of improper property management. Second, when the Army had full knowledge of the incident following its investigation in 2016, it *did not* terminate the contract (nor, for that matter, did it disapprove Fluor's property system). Third, Relators never seriously pursued the theory that Fluor's claims to the Army were false *because* Fluor's contract with the Army would have been terminated. Indeed, had they done so, presumably they would have challenged *all* of Fluor's claims for reimbursement of its cost, and not those limited to consumable property, award and fixed fees, and certain categories and amounts of labor. This is but another stalking horse for Relators' true purpose for wanting the bombing in evidence.

Such evidence also would have "wast[ed] time" in this already lengthy trial. *See* Fed. R. Evid. 403. District courts have broad discretion to manage trials, including to exclude complicated evidence about tangential points. *Cf. United States v. Libby*, 467 F. Supp. 2d 1, 15 (D.D.C. 2006) (where government official was charged with making false statements to FBI, Rule 403 barred him from testifying about terrorist incidents he claimed caused him to be distracted when he gave false statements, because it would be a "waste of time and diversion of the jury's attention away from the actual issues in th[e] case"). Any discussion of the bombing would have required both extensive litigation outside the presence of the jury with respect to the host of issues raised, as well as extensive time in front of the jury to properly contextualize it.

## B.    Fluor Did Not Open the Door to Bombing-Related Evidence

Relators also assert Fluor "opened the door" to bombing evidence by "eliciting testimony that Fluor cared about safety because it had lost personnel to war, did not have safety issues, never

experienced mission failure, and never heard the Army complain about its services." Br. 8. But Relators cannot establish that this testimony—which the Court carefully policed—opened the door, and even if they could, Relators cannot show that introduction of the Army's report would have been "proportional and directly responsive" to this testimony. *See United States v. McDonald*, 166 F. 4th 440, 450 (4th Cir. 2026); *see also United States v. Jackson*, 327 F.3d 273, 293 (4th Cir. 2003) (evidence must be "reasonably tailored to rebut the original evidence").

None of Relators' four cited testimony excerpts opened the door. As an initial matter, the Court made clear that Fluor should not reference an absence of "mission failure" generally but allowed evidence about Fluor's performance in specific, relevant areas. Relators admitted that Fluor hewed to this line. *See* Dkt. 708 at 2331:6–16 (Relators' counsel "commend[ing]" Fluor's counsel for "not implying no mission failure," and stating that Relators accordingly "haven't gone anywhere near the bomb[ing]"); Dkt. 711 at 4295:6–24 (Relators' counsel objecting to question that referenced witness's earlier testimony regarding "mission failure," but not objecting when subsequent questions narrowed to specific services).

Relators now attempt to walk back these concessions by first citing Relator Rude's testimony, but Fluor's cross-examination centered on whether the government raised concerns about Fluor not mitigating Priority 1 service orders, such as sparking wires, in facilities across theater. *See* Br. 8 (citing Dkt. 679 at 2486:11–2496:8). Those questions were appropriate impeachment of Rude's assertion that Fluor was not properly mitigating such service orders. Similarly, Fluor's award fee expert Renee Richardson testified that she was not aware of a time where Fluor did not feed the troops, provide clean laundry, or ensure that there was functioning air conditioning or heating, all of which are directly relevant to the contract's award fee criteria requiring the Army to assess Fluor's performance as a whole across the task order. *Id.* (citing Dkt.

755 at 7567:24–7568:16). That testimony—which Relators presented no evidence to rebut—in no way invites testimony about a terrorist attack years after the contract was converted to fixed fee. Relators' remaining two excerpts show that Fluor asked two witnesses a total of *three questions* about Fluor's general approach to safety. *See id.* (citing Dkt. 716 at 4971:16–4973:4; Dkt. 738 at 6196:6–6203:16). The Court permitted two of those questions during Preston Howard's testimony to respond to *Relators'* insinuation that if Fluor engaged in overstaffing "that would be putting profits over people." *See* Dkt. 716 at 4928:21 (Relators' question); *id.* at 4972:3–4973:2 (Court permitting limited questioning on safety to respond to Relators' earlier question). Likewise, Fluor asked Steven Whitcomb *one* question about safety protocols in general. Dkt. 738 at 6196:6–6198:13.[7] None of this testimony comes close to opening the door, nor does general testimony about the inherent dangers of working in a warzone. *See* Br. 7.

***

Relators claim they should have been allowed to introduce evidence of a terrorist bombing to establish a false claims case. The Court properly determined otherwise. And because Fluor did not elicit any testimony suggesting that a suicide bombing never occurred, the Court properly held Fluor never opened the door. These evidentiary rulings were well within the Court's considerable discretion.

---

[7] In response to this question, Mr. Whitcomb began discussing a hypothetical rocket strike and how that could lead to the death of Fluor employees. Dkt. 738 at 6197:21–25. Fluor did not elicit this testimony, and, as the Court commented, "general officers . . . [are] going to talk about what they want to talk about." Dkt. 738 at 6201:10–11. In any event, the Court struck Mr. Whitcomb's remark at Relators' request. *Id.* at 6202:13–17.

II.    **The Court Correctly Recognized Fluor's Privilege Regarding the Materials Management Investigation**

Relators also seek a new trial because the Court excluded evidence of Fluor's Materials Management Investigation ("MMI").  Br. 9–12.  Because the MMI is subject to privileges Fluor did not waive, the Court properly excluded such evidence.

A.    **The MMI is Privileged**

The following is a brief recitation of the arguments already made and addressed by the Court on this topic during the trial.  First and foremost, Relators failed to timely raise any questions about the MMI and whether Fluor improperly withheld evidence in discovery.  This Court's Local Rules required Relators to move to compel "within twenty-one (21) days after receipt of the discovery response to which the motion to compel is directed or, where no response has been received, within twenty-one (21) days after the response was due."  L. R. Civ. 37.01(A).[8]  The rule is strictly construed.  *E.g.,* Dkt. 483 at 9–10 (denying as untimely Fluor's motion to compel challenging Relators' privilege assertions); *see also Kelly v. Equifax, Inc.*, No. 8:12-cv-03095-MGL, 2013 WL 5954799, at *3 (D.S.C. Nov. 7, 2013) (twenty-four days untimely).  Discovery in this case spanned from 2020 to 2025, and Fluor provided multiple privilege logs in 2022 and 2023. Relators did not challenge Fluor's privilege assertions over the MMI until February 12, 2026— years after Fluor first asserted privilege over the MMI.  This is alone grounds for Relators' claim to be denied.

On the merits, Relators' argument fails because Fluor never waived privilege over, nor put at issue, the MMI.  Relators continue to conflate the MMI and Fluor's 2013 Inventory Adjustment

---

[8] There is an exception to this deadline where "counsel are actively engaged in attempts to resolve the discovery dispute," but it expires "thirty (30) days before the deadline for completion of discovery as set by the scheduling order" and therefore is not relevant here.  *See id.*

Analysis ("IAA"), which were separate and distinct. The IAA spanned from approximately February 2013 to December 2013 and was conducted by Fluor materials management leadership, including Tony Montalvo, Ernest Ridley, David Whelan, and Reed Wilson. The IAA results were presented to DCMA Prime Property Administrator ("PA") Maria McNamara (along with another PA named Joshua Gannon) in December 2013, and resulted in Ms. McNamara issuing a corrective action request ("CAR") advising Fluor not to submit lost, theft, damaged, and destruction ("LTDD") reports for reasonable inventory adjustments. These facts were a core part of Fluor's defense to Relators property fraud claims, and Fluor never asserted privilege over any aspect of its IAA. Indeed, Relators vigorously questioned both Mr. Montalvo and Mr. Ridley about the methodology of the review and the soundness of its conclusions. *E.g.,* Dkt. 705 at 1248:1–1254:9; Dkt. 711 at 4343:1–4347:6, 4350:5–4352:24, 4359:19–4380:1.

In contrast, the MMI was initiated by Fluor's Legal Department in or about March 2013 after Fluor received a Department of Justice ("DOJ") Civil Investigative Demand. This investigation was conducted under the supervision, and at the direction, of Fluor counsel and included a review of a wide range of issues related to Fluor's materials management practices. On June 9, 2014, Fluor made a disclosure to the Department of Defense Office of Inspector General ("DoD-IG") that reported, among other things, that Fluor had "identified some instances when individuals reported 10% cyclic inventories as having been done when the inventories were not done or were not done properly. Annual inventory reports for FY 2011 and FY 2012 provided to the Government Property Administrator (GPA) relied in part on these misreported inventories." Defs.' Ex. 591, 2014 DoD IG Disclosure at 2.[9] Fluor never relied on the MMI as part of its defense;

---

[9] This disclosure of investigative findings did not waive privilege over the underlying investigation. *See In re Fluor Intercontinental, Inc.*, 803 F. App'x 697, 701 (4th Cir. 2020).

indeed, Relators affirmatively introduced the disclosure *against* Fluor, equating it to a confession. *See* Dkt. 662 at 871:17–872:6.  Fluor was unable to meaningfully rebut the argument because of the privilege.

Relators speculate that the IAA and MMI must actually be one investigation because there was some overlap between the people who participated in each.  However, the fact that property professionals (such as Mr. Montalvo) were involved in both investigations does not render them one and the same.  *See In re Target Corp. Customer Data Breach Sec. Breach Litig.*, No. 14-cv-2522, 2015 WL 6777384, at *2 (D. Minn. Oct. 23, 2015) (privilege maintained over counsel-led investigation but not over a company's ordinary-course investigation); *Maldondo v. Solara Med. Supplies*, No. 20-cv-12198, 2021 WL 8323636, at *4–5 (D. Mass. June 2, 2021) (same).  Based on information presented during the trial (and in prior briefing relating to the MMI long before trial), the Court correctly ruled that the IAA and MMI "were initiated at different times for different purposes and under different supervisory structures."  Dkt. 710 at 3916:20–24.

### B.    Fluor Did Not Waive Privilege Over the MMI

Relators also argue that Fluor "waived privilege as to its MMI by putting the investigation at issue in its trial defense."  Br. 11.  Relators, however, do not explain *how* Fluor put its investigation at issue anywhere in their brief, which alone warrants denial of their motion on this issue. The omission is not surprising given that at-issue waiver is limited to instances where a party makes "[s]elective disclosure for tactical purposes" in an attempt "gain an advantage in litigation[.]" *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982).  In other words, where privilege is wielded as a sword rather than a shield.  The exception is narrow, and a party puts privileged information at issue only "where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney-client communication." *SD3, LLC v. Black & Decker (U.S.), Inc.*, No. 14-cv-00191, 2016 WL 4722001, at *2 (E.D. Va. July 29,

2016) (quoting *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir. 1994)).[10]

Fluor scrupulously avoided putting its investigation at issue. It did not call any of the investigators as witnesses nor did it introduce any reports or related documents from the investigation. As noted, only Relators put the investigation at issue by introducing (and repeatedly citing to) Fluor's DoD-IG disclosure. Because of the privilege, Fluor could not address the substance of the disclosure and therefore Fluor carefully avoided "at issue" waiver. Accordingly, as the Court previously held, at-issue waiver would occur only were Fluor to "affirmatively rel[y] on privileged communications, legal advice, or the substance of the MMI to support its defense before the jury." Dkt. 710 at 3917:12–14.

### III.     The Court's Rulings Regarding Mr. Methot Were Proper

Relators also argue that they are entitled to a new trial because the Court limited their cross-examination of David Methot. Br. 12. Fluor moved for limitations on Mr. Methot's testimony because he did not remember the 2014 DoD-IG disclosure or any of the events that precipitated it, and Fluor could not refresh his memory because the underlying documents are privileged. *See* Dkt. 666. Although the Court was willing to conduct *voir dire* of Mr. Methot to determine the permissible scope of questioning, Dkt. 710 at 3914:18–21, *Relators* expressed that this *voir dire*

---

[10] None the cases Relators cite say otherwise. *See Graham v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 0:16-cv-01153-MBS, 2017 WL 116798, at *4 (D.S.C. Jan. 12, 2017) (discussing South Carolina state law privilege); *City of Myrtle Beach v. United Nat'l Ins. Co.*, No. 4:08-cv-1183-TLW-SVH, 2010 WL 3420044, at *1, 5–6 (D.S.C. Aug. 27, 2010) (same); *Hege v. Aegon USA, LLC*, No. 8:10-cv-1578-GRA, 2011 WL 1791883, at *4 (D.S.C. May 10, 2011) (same); *Stanko v. Stirling*, No. 1:19-cv-03257, 2022 WL 22887110, at *2 (D.S.C. May 23, 2022) (discussing waiver of confidentiality—not privilege—where under-seal documents are made the centerpiece of a motion to amend judgment, which requires the court to give the respondent access to those documents so they can meaningfully respond); *United States v. Duke Energy Corp.*, 208 F.R.D. 553, 558 (M.D.N.C. 2002) (denying in part motion for a protective order and ordering a 30(b)(6) deposition about the defendant's defense but not requiring the deponent to "reveal the actual past confidential communications").

was unnecessary. Dkt. 729 at 5374:1–2 (Mr. Loevy informing the Court that "[Relators] don't see any reason for even a voir dire."). Based on the Court's own review of Mr. Methot's deposition transcript, the Court permitted certain testimony about Mr. Methot's role, his responsibilities, and what he recalled about the disclosure. Dkt. 729 at 5378:20–5379:20. And, because Mr. Methot recalled virtually nothing about the disclosure, the Court did not allow Relators to belabor the points or examine Mr. Methot on specific issues in the disclosure about which Mr. Methot admitted he had no memory. Dkt. 729 at 5422:11–5426:20.

Relators' strategy was to call Mr. Methot for the sole purpose of eliciting his failure of recollection and then to call him a liar. Relators sought to double down on this accusation by tying his lack of recall with the fact that he has been paid under a lawful consulting agreement with Fluor despite the lack of even a shred of evidence that the two were connected. *See* Dkt. 716 at 5100:20–5101:4 (Relators' counsel stating that "[w]e're going to ask the jury not to believe that he doesn't remember, particularly when he's billed 330 hours, consulting with Fluor about this"). Moreover, had Mr. Methot recalled the underlying bases for the disclosure, Fluor would have invoked privilege given that the disclosure was based on the MMI and Fluor is not required to have done so before the jury. *See In re Tudor Assocs., Ltd., II*, 20 F.3d 115, 120 (4th Cir. 1994); *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-md-2836, 2023 WL 4156858, at *4–5 (E.D. Va. Apr. 5, 2023).[11]

By implementing reasonable guardrails for Mr. Methot's testimony, the Court appropriately exercised its discretion under Rule 611(a) to control the mode of examining

---

[11] Indeed, this exact situation began unfolding after the Court permitted Relators' counsel to ask Mr. Methot what "the credible evidence [was] that Fluor was violating the False Claims Act." When Mr. Methot began answering the question, the Court immediately excused the jury before Fluor needed to object. Dkt. 729 at 5410:15–22. This example alone underscores that the Court's guardrails were necessary to appropriately manage Mr. Methot's testimony.

witnesses.[12]   Rule 602's requirement for a witness to have "personal knowledge of the matter[s]" about which the witness is testifying further supports the Court's limiting Mr. Methot's testimony only to those issues of which he had a present, independent recollection of at the time of his testimony.  *See Snoznik v. Jeld-Wen, Inc.*, No. 1:09-cv-42, 2010 WL 1924483, at \*16 (W.D.N.C. May 12, 2010) (to have personal knowledge, the witness must have "not only the ability to perceive or observe the events at the time that they occurred, *but also* the ability to presently recall that past perception" (emphasis added)).

Moreover, Relators do not explain how the exclusion of evidence that Mr. Methot purportedly "had taken no steps to actually verify the assertions he made in the 2014 DODIG disclosure," Br. 12, prejudiced them.  The jury found Fluor liable on Relators' property management theory, and Relators do not argue that the jury's *damages* calculation would have been impacted by hearing Mr. Methot say "I don't know" or "I don't recall" repeatedly.

## IV.     The Court Set Reasonable Limitations on Expert Cross-Examination

Relators' argument regarding expert cross-examinations misstates the record and the law. Relators claim "the Court precluded" them from "question[ing] Fluor's expert Renee Richardson about whether she considered the deposition testimony of two individuals," Rick Reuter and George Rabb, "when she formed her opinion." Br. 14.  Ms. Richardson's testimony belies that assertion:

> Q.  How about Mr. Reuter or Mr. Rabb, the country manager?  Did you put any weight on their testimony that Fluor was obligated to be transparent and disclose the good or the bad?
>
> A.  I don't think that they were a significant contributor to my opinions.

---

[12] For example, Relators' motion overlooks that the Court imposed a 30-minute time limit on Mr. Methot's direct examination under Federal Rules of Evidence 611 and 403.  *See* Dkt. 729 at 5172:14–18.

– 14 –

Q. You didn't receive those depositions, did you?

A. No.

Dkt. 755 at 7603:12–19. Ms. Richardson then gave a detailed response (again without objection) to Relators' question about "[h]ow [she] decide[d] what depositions [she] [was] going to see." *Id.* at 7603:20–7604:6. Only when Relators' counsel sought to further question Ms. Richardson concerning the *substance* of Messrs. Reuter's and Rabb's out-of-court deposition testimony did the Court intercede on Fluor's objection. *See id.* at 7604:7–7606:16. Likewise, Relators did not merely "ask [Ms.] Richardson *if* she had considered the deposition testimony of Storme Guaraldi," Br. 14 (emphasis added)—they began to describe that testimony in their question. *See* Dkt. 755 at 7694:16–17. Here too the Court sustained Fluor's objection.

The issue Relators raise regarding Fluor's expert Dr. Brad Rice is similar. Dr. Rice had already testified that he was not attempting to assign a cause for certain inventory-adjustment spikes identified by Relators' expert Dr. Gary Gaukler, only that he questioned Dr. Gaukler's basis for assigning cause. Dkt. 739 at 6691:4–12. Relators sought to probe further regarding purported "evidence of what the other assignable causes were," even through Dr. Rice had just testified that he had not considered any. *Id.* at 6691:13–14. Only then did the Court sustain Fluor's objection on the ground that "he's answered the question." *Id.* at 6691:25–6692:2.[13]

The Court's rulings were correct. The Federal Rules of Evidence permit wide latitude to cross-examine an expert about the evidence on which they *based* their opinion—not inadmissible

---

[13] Relators concede that they "agreed to move on" following the Court's ruling regarding the questioning of Tom Ruckdaschel. Br. 14. Relators thus waived this argument. *Gibbons v. Gibbs*, 167 F.4th 131, 140 (4th Cir. 2026) (challenge to ruling that party must lay a foundation was waived where party did not attempt to do so). In any event, as discussed in this section, the Court was correct to require Relators to establish that Mr. Ruckdaschel relied on documents about which Relators sought to question him.

materials on which they did not.  Under Rule 705, cross-examination may "require[] [an expert] to disclose" "the reasons *for*" the expert's opinion, even if they might otherwise be inadmissible. Fed. R. Evid. 705 (emphasis added).  To that end, a party may cross-examine an expert about otherwise-inadmissible material only "[o]nce [the expert has] testified that he had read and rejected" that material in forming his opinion.  *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 157 (4th Cir. 1995); *see also, e.g.*, *Jensen v. EXC, Inc.*, 82 F.4th 835, 848–49 (9th Cir. 2023) (bar on cross-examination using inadmissible materials "easily applied" where "opposing counsel cross-examined an expert with opinions expressed in a document that the testifying expert had not even read"); *Blue Cross & Blue Shield of S.C. v. W.R. Grace & Co.*, 781 F. Supp. 420, 427 (D.S.C. 1991) (party cross-examining an expert cannot "automatically" introduce hearsay; "[t]he expert must rely upon the evidence in question for it to be admissible").  Rule 705 is confined to "[f]ull examination of *the underpinnings of* an expert's opinion" and the "bases" for it, not materials the expert did not consider.  *United States v. A&S Council Oil Co.*, 947 F.2d 1128, 1135 (4th Cir. 1991) (emphasis added); *see also id.* at 1131 (noting that it was undisputed that the expert "had considered" the evidence at issue).

Relators have identified no authority for their position that they should have been permitted to introduce inadmissible hearsay on which Fluor's experts did not rely.  Relators' cited cases either do not deal with inadmissible material or merely permitted questioning as to *whether* an expert relied on certain materials (as the Court did here), but none permitted a questioner to read from, describe, or display inadmissible material on which the expert witness had not relied.  *E.g., Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 751 (7th Cir. 2005) (remarking, in the context of determining the proper sanctions for an expert's failure to disclose materials considered, that one basis for the rule requiring disclosure is to aid cross-

examination); *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 691, 735 (S.D. W. Va. 2014) (discussing cross-examination about certain "internal . . . reports" of the party that retained the expert, with no suggestion that such party-opponent statements would be inadmissible); *In re Aqueous Film-Forming Prods. Liab. Litig.*, No. 2:18-mn-2873-RMG, 2023 WL 3517923, at *5 (D.S.C. May 2, 2023) (remarking generally that defendant may cross-examine plaintiffs' expert to adduce whether he "failed to consider alternative sources" of plaintiffs' injuries, but not suggesting defendant could use inadmissible material to do so); *Bahr v. NCL (Bahamas) Ltd.*, No. 19-cv-22973, 2021 WL 4845789, at *10 (S.D. Fla. Oct. 18, 2021) (discussing possibility of defendant cross-examining plaintiff's expert to show that he "did not consider all of the relevant medical records," with no suggestion that such questioning would involve inadmissible material).[14]

Accordingly, the Court properly exercised its discretion to preclude Relators from using expert cross-examination as a backdoor to introduce otherwise inadmissible evidence. This is especially so because, by the time Fluor began to present its case, the Court was actively exercising its "broad discretion" to control the duration of the questioning. *See Boley v. Armor Correctional Health Servs., Inc.*, No. 2:21-cv-197, 2023 WL 2800135, at *8 (E.D. Va. Apr. 5, 2023). And, in any event, Relators do not explain how the exclusions of these few questions in a six-week trial could have rendered the verdict grievously unfair.

## V.    The Court Appropriately Declined to Permit a Rebuttal Case

The Court had "broad discretion" whether to allow Relators a rebuttal case, which it properly exercised to deny. *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 458 (4th Cir. 2010).

---

[14] Relators' reliance on *Coryn Group II, LLC v. O.C. Seacrets, Inc.* is particularly puzzling. *See* Br. 16. That case had nothing to do with what materials could be used in cross-examination but rather involved an allegation that a trademark expert had altered the evidence he showed to participants in a survey he performed as part of his analysis. *See* Civ. No. WDQ-08-2764, 2011 WL 862729, at *5–7 (D. Md . Mar. 10, 2011).

That discretion includes "limiting [the plaintiff's] rebuttal to testimony which had unfairly surprised it." *Hosp. Bldg. Co. v. Trs. Of Rex Hosp.*, 791 F.2d 288, 293–94 (4th Cir. 1986).  There was no such surprise testimony here.  Relators concede that Will Snyder's testimony regarding critical shortages related to a "topic [that] was not 'new.'"  Br. 17.  They claim, however, that Mr. Snyder was "the first witness . . . with direct first-hand knowledge of Fluor's [alleged] critical material shortages."  Br. 17–18.  Setting aside whether that could be a sufficient basis on which to grant a rebuttal case, it is just not true.  Of the five exhibits Relators sought to introduce on this topic in rebuttal, *see* Dkt. 748 at 3, four were emails involving witnesses who testified in Relators' case-in-chief.  Dkt. 750 at 5.  If Relators had any trouble identifying which of their witnesses had first-hand knowledge on this topic, they could have asked their expert Michael Rudolph to point them in the right direction, as he testified that he had seen "[m]any" "examples" of "evidence of shortages of critical items in the records [he] reviewed."  Dkt. 662 at 864:15–865:18.  In fact, Relators introduced Plaintiffs' Exhibit 1136 with Tony Montalvo (the third trial witness), which is an email in which Mr. Snyder discusses a base that was "running low or out of DFAC critical items."  *See* Dkt. 706 at 1665:7–17.

Relators' other requested area for rebuttal fares equally poorly.  Relators claim they should have been permitted to rebut Ms. Richardson's discussion of Defendants' Exhibit 801.  But DX 801 is simply a summary exhibit of evidence introduced during Relators' case-in-chief identifying the number of audits performed by DCMA, and Ms. Richardson used it to support an opinion that she discussed at length in her expert report.  *See* Dkt. 750 at 6.  A "new interpretation of . . . evidence which had always existed during the pendency of the[] lawsuit[]" is not a valid basis to award a rebuttal case.  *Allen v. Prince George's County*, 737 F.2d 1299, 1305 (4th Cir. 1984).  In any event, as Fluor has previously argued, there were several independent reasons that Relators'

proposed rebuttal evidence would have been inadmissible, an issue Relators do not even contest in their Motion. *See* Dkt. 750 at 7.

## VI.     Relators Fail to Identify Any Erroneously Admitted Testimony Regarding Staffing

Relators fail to sufficiently support their arguments regarding their various staffing theories. *See U.S. Just. Found. v. Response Unlimited, Inc.*, No. 5:25-cv-00074, 2026 WL 498890, at *12 n.9 (W.D. Va. Feb. 23, 2026) (collecting cases for the proposition that "arguments that are unsupported by pertinent authority[] are deemed waived"); L. R. Civ. 7.05 (requiring any memorandum to state "the facts that pertain to the matter before the court for ruling with reference to the location in the record"). Relators' single-sentence argument against the Court's well-reasoned grant of judgment as a matter of law on Relators' labor-estimating theory does not cite any case law regarding why such a theory would be viable (it would not be), nor any evidence Relators introduced to support it (there was none). *See* Br. 19. The remainder of this section argues that the Court erroneously admitted certain expert testimony, but contains zero citations to any trial testimony. *Id.* at 19–20.[15] Fluor and the Court "ha[ve] no obligation to fashion arguments for [Relators] or to further develop [Relators'] argument" when Relators have failed to identify the testimony to which they object. *See Clayton v. Nationwide Mut. Ins. Co.*, 260 F. Supp. 3d 514, 521 (D.S.C. 2017). This is especially true for decisions under Rule 403, *see* Br. 20, which are particularly "fact-specific." *See United States v. Ferguson*, 140 F.4th 538, 543 (4th Cir. 2025).

---

[15] Relators do not ask the Court to reconsider its *Daubert* rulings, which in any event would be subject to a strict standard Relators cannot meet. *See Souffrant v. Iseman*, No. 18-cv-388-SHH, 2020 WL 980186 (D.S.C. Feb. 28, 2020) (citing *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 513–14 (4th Cir. 2003)) ("Motions for reconsideration of interlocutory orders are appropriately granted only in narrow circumstances: (1) the discovery of new evidence, (2) an intervening development or change in the controlling law, or (3) the need to correct a clear error or prevent manifest injustice.").

## VII.    The Court's Decisions Regarding Fluor's Witness Agreements Were Correct

Relators argue that the Court should have declared Fluor's fact witness agreements improper and should have permitted greater cross-examination as to them.  The Court's rulings as to both issues were correct.

### A.    Relators Misconstrue the Agreements

Before reaching the substance of Relators' arguments, Fluor is constrained to note that Relators, yet again, misread them.  It is simply incorrect that the agreements "provided that these witnesses could only disclose facts *as approved by Fluor*."  Br. 21, 22, 23.  Rather, the agreements say that Fluor will pay compensation only "for preparing to testify, attending proceedings, and providing testimony as specifically approved by the company."  Court Ex. 1 at 2.  The only plausible reading of this provision is that it governs *which* proceedings and activities a witness can seek compensation for, not the substance of what the witness can say.  Relators do not even mention that the Court construed the agreements *not* to require approval of the substance of testimony.  Dkt. 703 at 12.

Relators are also wrong "that witnesses cannot disclose facts 'to anyone outside the Company, except with prior written authorization of the Company."  The confidentiality provision applies only to confidential "information which [the witness] obtains in connection with this Agreement," meaning information the witness did not already know.  *See* Court Ex. 1 at 2.  And it explicitly permits the use of confidential information "to perform such services"—*i.e.*, to testify.  *See id.*  If that were not enough, in bold letters immediately below the paragraph Relators quote, the agreements say that "nothing in this Agreement prohibits or restricts Witness from . . . participating in an investigation or a proceeding before any governmental agency responsible for the enforcement of any local, state or federal law."  *Id.* at 2–3.  Relators mention none of this, and do not even note that the Court has already determined that the confidentiality provision does not

"prohibit[] truthful testimony in response to lawful questioning at deposition or trial." Dkt. 703 at 17.

Relators also misrepresent several aspects of how the witness agreements came to light, and the parties' subsequent communications. *See* Br. 24–26. Relators claim that Fluor provided information "only for what Fluor (in its unilateral and un-reviewed discretion) chose to characterize as work related to this lawsuit," thereby "depriv[ing]" the jury of information such as whether "Fluor was paying witnesses during the Government's investigation into Relators' allegations." Br. 26. But Fluor provided payment information "for time spent on *any activity* by any Potential Witness pursuant to a consulting or witness agreement," without "eliminat[ing] any payments for time spent by any Potential Witness doing *any activity*." Dkt. 785-24 ¶ 5 (Feb. 20, 2026, declaration of Elliot Rosenwald) (emphases added).

### B.     The Agreements Were Proper

Courts and ethics authorities have established clear guidelines for witness agreements, all of which Fluor followed. An agreement to compensate a fact witness is proper "[a]s long as it is made clear to the witness that the payment is not being made for the substance or the efficacy of the witness's testimony, and is being made solely for the purpose of compensating the witness for the time the witness has lost." S.C. Bar Ethics Advisory Op. 97-42 at 2 (quoting ABA Formal Op. 96-402); *see also* Dkt. 671 at 2–6; Dkt. 678 at 2–3 (Fluor's prior briefing on this issue); Dkt. 703 at 6–7, 17–18 (Court's order holding agreements are not improper). Time lost includes "time spent preparing to testify or otherwise consulting on a litigation matter in addition to the time spent providing testimony in a deposition or at trial." *Prasad v. MML Invs. Servs., Inc.*, No. 04-cv-380, 2004 WL 1151735, at *5 (S.D.N.Y. May 24, 2004) (collecting cases). The agreements at issue here complied with the applicable rules by explicitly stating:

by reimbursing Witness for the value of Witness's time [] and/or any lost wages or expenses, [Fluor] is *not seeking to influence the Witness's testimony* at any proceeding, hearing, or trial, and that Witness *agrees to truthfully testify* at any such proceeding, hearing, or trial. The *reimbursement for the value of Witness's time and/or any lost wages or expenses is not, and shall not be, contingent upon the substance of the Witness's testimony* in the course of a proceeding, deposition, hearing or trial *nor shall it be contingent on the outcome* of any such proceeding, deposition, hearing or trial.

Court Ex. 1 at 2 (emphasis added).

To support their argument that "the agreements were not proper," Relators cite the anti-gratuity statute in the federal criminal code, though they purport "not to claim or accuse [Fluor] of criminal conduct." Br. 21–22 (citing 18 U.S.C. § 201(c)(2)). Conspicuously absent from their discussion is the provision's express exception for "the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any . . . trial, hearing, or proceeding." 18 U.S.C. § 201(d). Fluor's witness agreements do nothing more than what the statute allows.

Without factual or legal support, Relators also baldly assert that the agreements were improper because they "went far beyond what the professional rules allow under the auspices of 'reasonable' compensation of time," because "in multiple cases," the rates were "extremely high." Br. 22. They claim they were not permitted to develop facts regarding "whether the compensation rates for each . . . witness were reasonable," *see id.*, but that is incorrect. Relators asked several witnesses what their witness agreement rates were. *E.g.,* Dkt. 706 at 1658:15–19 (Mr. Montalvo); Dkt. 707 at 1829:2–6 (Bradley Hamm); Dkt. 711 at 4160:25–4161:5 (David Erp); Dkt. 711 at 4332:18–21 (Mr. Ridley); Dkt. 729 at 5392:2–17 (Mr. Methot). And they asked several witnesses—including several witnesses who had witness agreements—about their Fluor salaries. *E.g.,* Dkt 705 at 1046:2-6 (Mr. Montalvo); Dkt. 738 at 6313:6-21 (Mr. Whitcomb). Relators had access to all the facts they would have needed to build an argument that the rates were unreasonable; the facts simply do not support that conclusion.

– 22 –

## C.    The Court Permitted Appropriate Cross-Examination

Fluor recognizes that, even if lawful, a party's payments to a witness may be relevant to the witness's potential bias.  Accordingly, it did not oppose fair examination of witnesses about the amounts they had been paid or intended to seek from Fluor under the agreements.  Relators incorrectly claim the Court "limit[ed] Relators to only asking on cross-examination about the amounts billed by each witness."  Br. 21.  The Court permitted the parties to ask questions about the witness agreements, going so far as to provide 14 exemplars covering topics such as the fact that the agreements are not confidential, that payments are not contingent, and what documentation witnesses were required to submit to receive payment.  *See* Court Ex. 2.[16]

The scope of cross-examination demarcated by the Court's rulings was well within its discretion. The Fourth Circuit has held time and again that trial courts "ha[ve] 'wide latitude' to impose reasonable limits on cross-examination to address concerns of prejudice, confusing the jury, relevance, and repetition." *United States v. Kiza*, 855 F.3d 596, 604 (4th Cir. 2017) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)); *accord United States v. Smith*, 451 F.3d 209, 221 (4th Cir. 2006).  In the analogous context of cooperating witnesses in criminal cases, the Fourth Circuit has repeatedly upheld limitations regarding which provisions of the cooperation agreement are permissible topics of cross-examination.  *United States v. Scheetz*, 293 F.3d 175, 184–85 (4th Cir. 2002) (citing *United States v. Ambers*, 85 F.3d 173, 176–77 (4th Cir. 1996)).  The Court's limitations here were appropriately targeted to permit Relators to expose the issue of

---

[16] Relators later deride this list of questions as telling "only Fluor's side of the story (*e.g.*, the payments are not contingent on the substance of the testimony)."  Br. 21.  But *questions* don't tell a story—witnesses do.  The Court permitted Relators to ask every witness whether he was "being paid based on the substance of [his] testimony."  Court Ex. 2 (question 9).  The reason that every witness answered that question in the negative is not that the Court was telling "Fluor's side of the story."  It is that every witness understood that is exactly what the agreements say.

potential bias without confusing the jury and wasting its time.[17]  The cases Relators cite do not establish that the Court should have permitted broader cross-examination.  *See* Br. 23.  The "credibility" addressed in *United States v. Hopkins* has nothing to do with potential bias; it related to whether a witness was testifying consistently with admissions the witness made in a prior plea agreement.  197 F. App'x 235, 238 (4th Cir. 2006).  *United States v. Anty* is doubly irrelevant: it relates to *Brady* rights that are unique to criminal prosecution, and addresses only the information a defendant is entitled to receive—not what should be presented to a jury.  203 F.3d 305, 311–12 (4th Cir. 2000).  In *United States v. Greenwood*, the Fourth Circuit affirmed the limitations the trial court had placed on bias evidence, holding that "[o]nce some inquiry into bias has been permitted, a trial court has discretion to limit the cross-examination on the grounds of, *inter alia*, confusion of the issues or marginal relevance."  796 F.2d 49, 54 (4th Cir. 1976).  Indeed, even "complete exclusion of bias evidence can constitute harmless error."  *Id.* at 55 (citing *Van Arsdall*, 475 U.S. at 684).  And the Court *did* permit Relators to ask Fluor's witnesses "whether [they] hope[d] to receive some benefit in exchange for [their] testimony," as contemplated by *United States v. Hawkins*, No. 23-4130, 2024 WL 3083418, at *1 (4th Cir. June 21, 2024).[18]

---

[17] Relators further complain that witnesses with agreements testified at deposition they were not "working" for Fluor, *see* Br. 21 n.2; however, such testimony is entirely consistent with the arrangement established by the witness agreements: no one in common parlance would say that "render[ing] advisory and consultation services to [a] [c]ompany . . . from time[]to[]time" constitutes working for that company. *See id.*  In any event, if Relators thought the phrase "worked for" was ambiguous, they could have asked follow-up questions at deposition but did not.  Nor is their any basis for Relators' complaints that they "learned for the first time" about these agreements at trial. *See* Br. 20–21.  As the Court held, Relators simply failed to request them in discovery. Dkt. 703 at 8–10.

[18] Even so, *Hawkins* is inapposite because it grounded the requirement to permit such cross-examination in a criminal defendant's rights under the Confrontation Clause. *See id.*

– 24 –

The bottom line is the Court permitted Relators to question witnesses about potential bias while imposing reasonable limitations to prevent Relators from willfully misconstruing the agreements and unfairly impugning a lawful practice.

## VIII.  Relators' Objection to the Verdict Form on Penalties is Untimely and Unfounded

### A.     Relators' Challenge is Untimely

Relators complain that the verdict form did not ask the jury to calculate the number of reverse false claims violations, but they did not timely raise this objection.  After providing the parties its proposed verdict form, the Court "g[a]ve the parties an opportunity to object on the record . . . before the [jury] instructions and [closing] arguments [were] delivered."  Fed. R. Civ. P. 51(b)(2).  Accordingly, Relators were required to "object at th[at] opportunity."  Fed. R. Civ. P. 51(c)(2).  They did not do so, instead waiting several hours until they had completed their closing argument and Fluor was well into presenting its own.  *See* Dkt. 777 at 8582:6–8587:9 (raising other objections at appropriate time); *id.* at 8755:19–8756:24 (raising this objection during break in Fluor's closing argument).  Relators' objection is especially untimely because it came well after Relators discussed this very portion of the verdict form in their closing argument.  *See id.* at 8656:25–8657:18.  The untimeliness of Relators' objection is not a mere formality.  When Relators objected, Fluor was already midway through its closing argument.  Had the Court granted Relators' belated request, Fluor would have been substantially prejudiced because it would have been deprived of the opportunity to give the jury its considered view of how to perform the analysis Relators wanted them to perform.

Because Relators failed to timely object to the verdict form, the Court may review their objection only for plain error.  Fed. R. Civ. P. 51(d).  Relators' brief does not even mention the plain-error standard, let alone attempt to establish that Relators can meet it here.  *See generally U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 912 F.3d 731, 738 (4th Cir. 2019) (plain

error requires a showing that "(1) the district court erred; (2) the error is plain; (3) the error affects substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings" (quotation marks and ellipsis omitted)).  Relators have thus waived that argument.  *In re Under Seal*, 749 F.3d 276, 292 (4th Cir. 2015) (plain-error argument is waived where party who "bears the burden of showing . . . plain error . . . fail[s] to argue for plain error" (quotation marks omitted)).  The Court should reject Relators' objection to the verdict form on this basis alone.[19]

### B.    Relators' Property Fraud Theory Supports Only a Single Penalty

As to the substance, the Court correctly did not ask the jury to find the number of reverse false claims violations, which Relators now attempt to pin to the number of LTDD forms Fluor submitted to the government during contract performance (to which Relators refer as "the missing LTDD count.")  Br. 27 & n.6.  The Court instructed the jury on just one path to liability with respect to Relators' property fraud case: that Fluor concealed from the government property loss that had resulted from the willful misconduct or bad faith on the part of Fluor's "managerial personnel," as defined in the FAR. Dkt. 770 at 23.  Because the FCA's "reverse false claim" provision penalizes the wrongful *concealment or avoidance* of an obligation, liability under this

---

[19] If the Court elects to address this issue, there is no plain error.  The Court's decision was correct, as discussed *infra* 26–31.  And in any event, given the sparse case law on this question, any error cannot have been "plain."  *United States v. Brewer*, 1 F.3d 1430, 1435 (4th Cir. 1993) (any error in decision on "unsettled" question is not plain).  Relators' rights were not affected because the evidence supports the assessment of only one penalty, *see infra* 26–30, and the error does not "seriously affect[] the fairness, integrity or public reputation of judicial proceedings," *Oberg*, 912 F.3d at 738, because Relators are represented by "sophisticated" counsel "well versed in the rigors of civil litigation," they did not "in any way lack[] the opportunity to raise the issue," and they "still ha[d] the opportunity . . . to recover some of [their purported] damages." *In re Celotex Corp.*, 124 F.3d 619, 631 (4th Cir. 1997) (finding this prong unsatisfied on these grounds).

– 26 –

theory typically is based on an allegation of ongoing conduct for which there is therefore only a single violation. *See* 31 U.S.C. § 3729(a)(1)(G).

The determination of how many violations occurred must be based on the defendant's "specific conduct." *United States v. Bornstein*, 423 U.S. 303, 313 (1976). Allegations of concealment are considered single, ongoing violations. In the criminal statute of limitations context, the Fourth Circuit has squarely held that "concealing and retaining . . . government property" is a continuing offense. *United States v. Blizzard*, 27 F.3d 100, 102 (4th Cir. 1994); *see also Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1225 (10th Cir. 2020) (collecting cases). Likewise, where a defendant retained "funds voluntarily placed in the defendant's possession by the government . . . without need for affirmative acts linked to any particular receipt of funds," the offense is a single continuing one. *United States v. Smith*, 373 F.3d 561, 567–68 (4th Cir. 2004). Relators have identified no contrary authority. *Drakeford*, the primary case on which Relators rely, says nothing about "systemic" violations. *Contra* Br. 28 (citing *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 389 (4th Cir. 2015)). It was an *affirmative* false claims case where the defendant was found to have submitted 21,730 *separate* false claims for Medicare payments, 792 F.3d at 389, and is therefore distinguishable.[20]

Further, the evidence here supports only a single penalty. Relators have not explained how the number of LTDDs is relevant to the number of FCA violations under the theory that went to

---

[20] Although the first clause of 31 U.S.C. § 3729(a)(1)(G) refers to "mak[ing] [or] us[ing] . . . a false record or statement material to an obligation," *see* Br. 27, the jury was not requested to, and did not, find that Fluor violated this provision. *See* Dkt. 775 at 15 (jury verdict finding that Fluor "knowingly concealed, avoided, or improperly decreased [an] obligation"); *accord* Dkt. 770 at 25 (charging the jury only on this theory). Relators did not object to the Court's jury instructions on this point, specifically the lack of an instruction on this provision. Accordingly, even if this provision could be read to support separate per-penalty violations, it does not apply here. As discussed further above, Relators did not argue the falsity of individual LTDD forms.

the jury.[21]  An LTDD is not a claim for payment, as it neither requests nor results in payment. *Cf. U.S. ex rel. Palmer v. Tata Consultancy Servs., Ltd.*, 784 F. Supp. 3d 927, 939 (E.D. Tex. 2025) (application for visa is not a claim because it cannot result in payment of money or property from the government).  LTDDs serve to inform the government of a potential loss, theft, damage or destruction of government property.  Through LTDDs, contractors request the relief of stewardship responsibility in accordance with FAR 52.245-1.  *See, e.g.*, Defs.' Ex. 362.  "Stewardship responsibility" simply means the responsibility for recordkeeping, inventorying, and the like, which is distinct from financial responsibility.[22]

Moreover, only a handful of LTDDs are in evidence (all introduced by Fluor), most of which relate to inventory adjustments or undocumented consumption.  Defs.' Ex. 362 ($914.09 of inventory adjustments); Defs.' Ex. 369 ($866.25 of inventory adjustments); Defs.' Ex. 906 ($1,678,032.30 of undocumented consumption); Defs.' Ex. 1101 ($895.44 of inventory adjustments).  Relators put forward no evidence as to how *any* of these specific LTDDs resulted from the alleged willful misconduct or lack of good faith of Fluor's managerial personnel, let alone evidence that they reflected knowing avoidance or concealment of such misconduct.[23]  Without asserting that any of the LTDDs in evidence support a violation, Relators instead rely on counsel's

---

[21] Fluor does not address here whether or how the number of LTDDs could be relevant to a theory based on property management system ("PMS") disapproval since the Court did not instruct the jury on that theory and Relators have not objected to the absence of such an instruction.

[22] Each LTDD form expressly notes that money has not changed hands for the lost property, through insurance or any other means of covering the identified property. *Id.* ("No insurance cost or other means of covering LTDD Government Property were charged to the contract.").  Where the government grants relief of responsibility, it makes clear that such approval serves only as the contractor's "authority to adjust the contract property records accordingly for the lost item(s) listed." Defs.' Ex. 377; Defs.' Ex. 389.

[23] In addition, the LTDDs specifically seek relief of responsibility for *Fluor Intercontinental*. *See* Defs.' Ex. 362 at 1; Defs.' Ex. 369 at 1; Defs.' Ex. 1101 at 1; Pls.' Ex. 901-8 at 2. Relators do not explain how they could give rise to liability for Fluor Corporation.

– 28 –

interpretation of a Fluor-internal spreadsheet. *See* Br. 29. Relators theorize based on Plaintiffs' Exhibit 1365 that the jury could have found that Fluor committed 6,739 violations because when the spreadsheet is "filtered for LOGCAP IV with duplicates removed," it "reveals 6,739 unique LTDDs." *Id.* Counsel's interpretation of this data is entirely unsupported by the trial record. Indeed, Jeffery Nix, the only witness Relators asked about Plaintiffs' Exhibit 1365, testified that he had he had "no idea" what was in the spreadsheet, "no clue at all." Dkt. 696 at 3535:13–16. Moreover, Relators' reliance on this spreadsheet suffers from the same problem noted above for the LTDDs actually in evidence: Relators did not present evidence that any one of these LTDDs (let alone all of them collectively) related to property loss caused by the alleged willful misconduct or lack of good faith of Fluor's managerial personnel or gave rise to improper avoidance or concealment of liability for such conduct.

Instead, Relators theory appears to have been that senior Fluor managers did not rectify, or turned a "blind eye" toward, property mismanagement that resulted in property loss. They never even purported to single out particular managers having caused particular instances of property loss, nor do they do so here other than to assert that each and every one of the thousands of LTDDs Fluor submitted somehow constituted separate violations.[24]

In short, the FCA provision under which Fluor was found liable generally imposes liability for avoiding an obligation to pay the government money, which is a single, continuing offense that supports only one violation.[25] Further, even if Relators' theory could have supported multiple

---

[24] The assertion is ironic given that the crux of their theory appeared to be that Fluor did not submit *enough* LTDDs as it did not report sufficient negative inventory adjustments prior to the 2013 disclosure.

[25] As Fluor has argued elsewhere, *see* Dkt. 784-1, it respectfully submits the evidence presented at trial did not establish even a single violation. But, to the extent it did, it was one violation alone.

penalties, they presented no evidence from which a reasonable jury could have calculated the number of penalties.

### C.    The Penalties Relators Seek Present Multiple Constitutional Problems

In addition to being the correct decision on the merits, assessing a single penalty is the only constitutionally permissible outcome here based on the verdict.  Relators purport to "consent to the Court finding th[e] number" of violations.  Br. 27 n.7.  But the Seventh Amendment precludes any nonjury finding of liability for civil penalties.  *Tull v. United States*, 481 U.S. 412, 422 (1987).  Though the Court can determine the *dollar amount* of each applicable penalty within the statutory range, *see* 31 U.S.C. § 3729(a)(1), it may not make a determination of the *number* of penalties that arise from Fluor's alleged conduct.  *See S.E.C. v. Jarkesy*, 603 U.S. 109, 124 (2024) (Seventh Amendment precludes nonjury determinations of statutory penalty criteria that "condition[] the available penalty on the culpability of the defendant").

Furthermore, the astronomical number of penalties Relators seek, if allowed, would violate the Constitution's requirement of due process and prohibition on excessive fines.  *See* U.S. Const. amends. V, VIII; *Drakeford*, 792 F.3d at 387–90 (applying due process and excessive fines analysis to FCA statutory penalties).  If Relators' penalty theory were to prevail, the amount of compensatory damages would be $15,000,000, while punitive damages and penalties would total approximately $104,000,000—a ratio of more than six to one.[26]  But "an award of more than four times the amount of compensatory damages might be close to the line of constitutional

---

[26] The applicable penalty range is $5,500 to $11,000 per violation. *See* 31 U.S.C. § 3729(a)(1); 28 C.F.R. 85.3(a)(9).  Relators request that the Court impose 6,739 penalties at $11,000 each, totaling $74,129,000.  *See* Br. 32.  In addition, the trebling of damages from the jury's $15 million finding to $45 million would include $30 million of non-compensatory (*i.e.*, punitive) damages.  *See* Br. 31–32.  In total, this would result in $104,129,000 in punitive damages and penalties.

impropriety." *Drakeford*, 792 F.3d at 389 (quoting *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003)).

Relators' requested award would not pass constitutional muster.  To even get close to the constitutional line, a court must evaluate "the degree of reprehensibility of the defendant's misconduct," which includes consideration of whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id*.  Even ignoring the substantial issues with the jury's verdict identified in Fluor's Rule 50(b) motion, all of these factors weigh against a highly punitive award.  Here, any harm was entirely economic.  It arose from diligent if imperfect attempts to manage massive quantities of materials under austere conditions.  The only possible victim would have been the U.S. government, which is not "financial[ly] vulnerabl[e]."  And it was a result, at worst, of isolated reckless disregard, not an intentional plan to engage in deceit.  There is simply no basis to approach the constitutional line much less cross it.

## IX.    Relators' Request to Amend the Judgment is Procedurally Improper and Fails on the Merits

Relators do not clearly articulate the procedural basis for their request that the Court amend its March 13 judgment to (1) interpret the verdict form as finding $30,000,000 in damages rather than $15,000,000; (2) apply treble damages; and (3) apply $74,129,000 in statutory penalties. *See* Br. 2–3 (reciting legal standards only for the grant of a new trial); *id.* at 31 (identifying no rule under which request for amended judgment is made); Dkt. 785 (similar).[27]  There is none.  The

---

[27] Relators also do not specify whether they are asking the Court to enter an amended judgment after resolving the instant motions or only after resolving the issue of attorneys' fees.  Fluor

only two rules under which such a motion can be brought, 59(e) and 60(b), do not apply to non-final judgments. *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1469–70 (4th Cir. 1991). The Court's March 13 judgment (Dkt. 781) is non-final because it explicitly reserves decision on "statutory enhancements, including trebling of damages and civil penalties." *See Calderon v. GEICO Gen. Ins. Co.*, 754 F.3d 201, 204–06 (4th Cir. 2012) (judgment not final were it left certain aspects of damages calculation unresolved). Relators' request to amend the judgment should be denied on that basis alone.[28]

On the substance, Relators' arguments may be easily dispensed with, beginning with the ludicrous assertion that the jury found separate damages of $15 million against each of the Fluor defendants for a total of $30 million in damages. This assertion flies in the face of arguments Relators made both to the jury and to the public. In their closing argument, Relators told the jury multiple times that any damages awarded on a single theory against both defendants would *not* be aggregated: "It is critical you put it on both lines. ***Don't try to get cute and say I will split it in half, it only gets awarded once, they don't pay it twice.*** But you have to show each of them is responsible for the ***same number***, not paid it twice, then jointly responsible." Dkt. 777 at 8826:18–23 (emphases added). "You have to write it on both lines . . . to get both defendants. ***That doesn't mean Fluor has to pay it twice. Fluor only pays it once***, but you do want to make sure both defendants are liable." *Id.* at 8662:13–17 (emphasis added). And in their post-trial press release, Relators' counsel confirmed their understanding that the "jury . . . award[ed] $15 million in damages." *See supra* n.1. These contemporaneous statements give the lie to Relators' assertion

---

submits that the Court should not enter final judgment until all issues—including attorneys' fees—have been resolved. This will streamline the issues and avoid requiring multiple appeals.

[28] In *Fayetteville*, the Fourth Circuit permitted the trial court to convert a motion filed erroneously under Rule 59(e) into a motion for reconsideration, but did not suggest that doing so is required where the movant has failed to even suggest that as a basis for its motion.

now that the jury awarded not $15 million for which the Fluor defendants are jointly and severally liable, but a total of $30 million.

Relators' request also fails on the merits because the Fourth Circuit has squarely rejected Relators' position. In a case presenting the exact same question—how to interpret a verdict form where the jury assigned identical damages amounts to each of two defendants—the court held that "aggregation occur[s] only if the aggregated verdict is what the jury *must* have intended." *City of Richmond v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 461 (4th Cir. 1990). Otherwise, aggregation "is barred by the Seventh Amendment." *Id.* Because the court in *City of Richmond* could not "inexorably [reach] the conclusion that the jury intended an aggregated award," it reversed the district court's decision to aggregate. *Id.* This case presents an even weaker case for aggregation than did *City of Richmond*. There, the court considered it "*possible* that the jury simply inserted the amount that the [plaintiff] was damaged and *assumed* that the court would later figure out how to apportion that amount among the liable defendants." *Id.* (emphases added). Here, by contrast, it is not merely possible that the jury made such an assumption—they were specifically told that is how the verdict form worked, by none other than Relators.[29] Thus, aggregation of the damages

---

[29] Unlike in *City of Richmond*, where the court remanded for a new trial on damages because there was no clarity in either direction, here, no new trial is warranted because the jury's intention is clear in light of Relators' explanation. *Cf. Med-Therapy Rehab. Servs., Inc. v. Diversicare Corp. of Am.*, Nos. 93-1176, 93-1210, 1994 WL 34745, at *5 (4th Cir. 1994) (per curiam) (reversing district court's decision on aggregation and not requiring new trial). Moreover, in *City of Richmond*, "the parties [were] equally culpable for the ambiguity" in the interpretation of the verdict form. 918 F.2d at 462 & n.24. That is the opposite of the case here given that Relators essentially instructed the jury on the proper reading of the verdict form. Indeed, it would also violate principles of judicial estoppel and fundamental fairness to double the jury verdict; Relators assured the jury that Fluor would not be hit twice, yet that is precisely what they now ask. In other words, they cannot mislead the jury into reaching a result that it could not have contemplated based on what Relators told it. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory").

amounts would be improper.  And, for the reasons discussed in the prior section, there is no basis to amend the judgment to impose more than one penalty.  *Supra* 25–31.[30]

## **CONCLUSION**

For these reasons, the Court should deny Relators' Motion in full.

*[signature page follows]*

---

[30] Fluor does not dispute that if any liability survives Fluor's Rule 50(b) motion, the Court's final judgment should treble damages and impose one penalty of up to $11,000. *See* 31 U.S.C. § 3729(a)(1); 28 C.F.R. 85.3(a)(9).

Respectfully Submitted,

/s/ Mark C. Moore
Mark C. Moore (Fed. ID No. 4956)
Michael A. Parente (Fed. ID No. 13358)
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 540-2146
Facsimile: (803) 727-1458
MMoore@maynardnexsen.com

Konstantine P. Diamaduros (Fed. ID No. 12368)
MAYNARD NEXSEN PC
104 South Main Street, Suite 900 (29601)
Post Office Drawer 10648
Greenville, SC 29603-0648
Telephone: (864) 370-2211
Facsimile: (864) 282-1177

Craig D. Margolis (admitted *pro hac vice*)
Tirzah S. Lollar (admitted *pro hac vice*)
Christian D. Sheehan (admitted *pro hac vice*)
Elizabeth A. Carney (admitted *pro hac vice*)
Katelyn M. Deibler (admitted *pro hac vice*)
Elliot S. Rosenwald (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, Northwest
Washington, DC 20001-3743
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
craig.margolis@arnoldporter.com

Rachel K. Higgins (admitted *pro hac vice*)
Sahrula Kubie (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Counsel for Defendants Fluor Corporation and
Fluor Intercontinental, Inc.*

May 8, 2026

– 35 –