# EXHIBIT A

## Relators' Response to Fluor's Memorandum of Law In Support of Renewed Motion For Judgment as A Matter of Law

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| United States of America, *ex rel.* | ) | |
| Charles R. Shepherd; Danny V. Rude; | ) | |
| Robert Scott Dillard; Rickey Mackey, | ) | C/A No.: 6:13-cv-02428-JD |
| | ) | |
| Plaintiffs-Relators, | ) | |
| | ) | Hon. Joseph Dawson III |
| v. | ) | |
| | ) | |
| Fluor Corporation; | ) | |
| Fluor Intercontinental, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**RELATORS' RESPONSE TO FLUOR'S MEMORANDUM OF LAW IN SUPPORT OF**
<u>**RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**</u>

Jon Loevy
Mike Kanovitz
Daniel Twetten
Anand Swaminathan
Frank Newell
Anna Dover
Gwen Parker
Heather Sticht
Dominique Gilbert
Alexandra Wolfson
Aadi Tolappa
**LOEVY & LOEVY**
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
Telephone: (312) 243-5900
Facsimile: (312) 243-5902
dan@loevy.com
anand@loevy.com

Frank L. Eppes
**EPPES & PLUMBLEE, PA**
PO Box 10066
Greenville, SC 29603
Telephone: (864) 235-2600
Facsimile: (864) 235-4600
feppes@eppesandplumblee.com

Judah N. VanSyckel
**Saluda Law, LLC**
137 E. Butler Street
Lexington, SC 29072
Telephone: (803) 939-6927
Facsimile: (803) 902-8004
judah@saludalaw.com

Richard Harpootlian
**RICHARD A. HARPOOTLIAN P.A.**
1410 Laurel Street – P.O. Box 1090
Columbia, SC 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810
rah@harpootlianlaw.com

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ...................................................................................................... 1

LEGAL STANDARD................................................................................................. 2

ARGUMENT ............................................................................................................. 3

I.　The Jury Heard Substantial Evidence that Reuter, Whitcomb, Montalvo, Reeves, and Others Qualify as "Managerial Personnel"........................................................... 4

　A.　The Jury Heard Sufficient Evidence to Conclude that Fluor's Property Management System is a "Separate and Complete Major Industrial Operation," and so the Directors Overseeing Property and Materials are Managerial Personnel........................................................................................ 4

　B.　The jury heard sufficient evidence to conclude that site managers and RDC managers each have supervision or direction of "all or substantially all of the Contractor's Operations at any one plant or separate location" ............................ 7

　C.　The jury heard substantial evidence that Fluor Government Group/Fluor Corporation managers are the managerial personnel of the "Contractor".............. 9

II.　The Jury Heard Substantial Evidence that Fluor's Managerial Personnel Engaged in Willful Misconduct or Lack of Good Faith that Caused Loss of Government Property.. 11

　A.　"Willful misconduct or lack of good faith" does not require proof of purposeful, corrupt, or dishonest acts. .................................................................. 11

　B.　Fluor managerial personnel's acts and omissions constituted willful misconduct or lack of good faith that caused loss of Government property............................ 13

　　1.　The jury heard substantial evidence that Fluor lost Government property 13

　　2.　The jury heard substantial evidence that these losses resulted from willful misconduct or a lack of good faith by Fluor's managerial personnel. ........................................................................................... 16

III.　The Jury Heard Substantial Evidence that Fluor Avoided or Decreased an Obligation to the Government................................................................................................ 33

IV.　The Jury Heard Substantial Evidence that Fluor Acted Knowingly................................. 35

V.　The Jury Had Ample Evidence to Find Fluor Corporation Liable ................................... 38

A.      Fluor Waived Any Sufficiency Argument Related to Fluor Corporation's "Obligations." ........................................................................................ 38

B.      Even on the Merits, Fluor Corporation's Sufficiency Challenge Fails. ................. 41

C.      Fluor Corporation Is Liable for Causing Any Obligation to Be Avoided. ........... 43

CONCLUSION ..................................................................................................................... 44

## TABLE OF AUTHORITIES

### CASES

*Belk, Inc. v. Meyer Corp.*, U.S.,
    679 F.3d 146 (4th Cir. 2012) ........................................................................................ 6

*Carson v. Emergency MD, LLC*,
    No. 6:20-CV-01946-JD, 2024 WL 4520234, (D.S.C. Apr. 16, 2024)................................ 12, 39

*Centex Corp. v. United States*,
    395 F.3d 1283 (Fed. Cir. 2005) ...................................................................................... 11

*Centex Corp. v. United States*,
    49 Fed. Cl. 691 (2001) .................................................................................................. 11

*Century Expl. New Orleans, LLC v. United States*,
    110 Fed. Cl. 148 (2013)................................................................................................. 11

*Century Expl. New Orleans, LLC v. United States*,
    745 F.3d 1168 (Fed. Cir. 2014) ..................................................................................... 11

*Dennis v. Columbia Colleton Med. Ctr., Inc.*,
    290 F.3d 639 (4th Cir. 2002) ........................................................................................... 2

*Design Gaps, Inc. v. Distinctive Design & Constr. LLC*,
    162 F.4th 452 (4th Cir. 2025) .................................................................................. 40, 42

*Fairchild Hiller Corp.*,
    ASBCA No. 14387, 1971 WL 1284 (Nov. 30, 1971) ..................................................... 12

*Fed. Sav. & Loans Ins. Corp. v. Reeves*,
    816 F.2d 130 (4th Cir. 1987) .................................................................................. 39, 42

*Gautier v. Tams Mgmt., Inc.*,
    No. 5:20-CV-00165, 2024 WL 1399004 (S.D. W. Va. Mar. 31, 2024) .................................... 2

*Harrison v. Westinghouse Savannah River Co.*,
    176 F.3d 776 (4th Cir. 1999) ........................................................................................ 34

*Lust v. Clark Equip. Co., Inc.*,
    792 F.2d 436 (4th Cir. 1986) ........................................................................................... 2

*McKinnon v. City of Berwyn*,
    750 F.2d 1383 (7th Cir. 1984) ...................................................................................... 39

*Morgan v. Sundance, Inc.*,
    596 U.S. 411 (2022).......................................................................................................... 39

*Pacific Architects & Engineers, Inc,*
  ASBCA No. 19513, 1978 WL 2445 (Oct. 24, 1978)................................................................. 13

*Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*,
  190 F.3d 729 (6th Cir. 1999) ..................................................................................... 34

*Tidewater Fin. Co. v. Finserv Sols., Inc.*,
  4 F. App'x 201 (4th Cir. 2001) .................................................................................. 39

*U.S. ex rel. Bahrani v. Conagra, Inc.*,
  465 F.3d 1189 (10th Cir. 2006) ................................................................................. 34

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.,*
  352 F.3d 908 (4th Cir. 2003) ..................................................................................... 36

*United States ex rel Davis v. Prince*,
  No. 1:08CV1244, 2011 WL 13092085 (E.D. Va. June 23, 2011)............................................ 37

*United States ex rel. Byers v. Amedisys SC LLC*,
  No. 7:21-CV-03109-DCC, 2022 WL 4237076 (D.S.C. Sept. 14, 2022)................................... 34

*United States ex rel. Cody v. ManTech Int'l, Corp.*,
  746 F. App'x 166 (4th Cir. 2018) .............................................................................. 42

*United States ex rel. Grubea v. Risocki, Risocki & Assocs. P.C.*,
  318 F. Supp. 3d 680 (S.D.N.Y. 2018) ....................................................................... 44

*United States ex rel. Koch Indus., Inc.*,
  57 F. Supp. 2d 1122 (N.D. Okla. 1999)..................................................................... 44

*United States ex rel. Landis v. Tailwind Sports Corp.*,
  160 F. Supp. 3d 253 (D.D.C. 2016).......................................................................... 34

*United States ex rel. Landis v. Tailwind Sports Corp.*,
  51 F. Supp. 3d 9 (D.D.C. 2014)................................................................................ 44

*United States ex rel. Marcus v. Hess*,
  317 U.S. 537 (1943)................................................................................................. 34

*United States ex rel. Riedel v. Bos. Heart Diagnostics Corp.,*
  332 F. Supp. 3d 48 (D.D.C. 2018)............................................................................ 34

*United States ex rel. Sheldon v. Allergan Sales, LLC*,
  24 F.4th 340 (4th Cir. 2022) ..................................................................................... 36

*United States ex rel. Thomas v. Touchstone Behav. Health*,
  774 F. Supp. 3d 1179 (D. Ariz. 2025) ...................................................................... 44

iv

*United States ex rel. Wheeler v. Acadia Healthcare Company, Inc.*,
127 F.4th 472 (4th Cir. 2025) .......................................................................................... 34

*United States Sec. & Exch. Comm'n v. Clark*,
60 F.4th 807(4th Cir. 2023) ............................................................................................... 2

*United States v. Caremark, Inc.*,
634 F.3d 808 (5th Cir. 2011) ........................................................................................... 44

*United States v. DynCorp International*,
LLC, 253 F. Supp. 3d 89 (D.D.C. 2017) ......................................................................... 38

*United States v. Merck-Medco Managed Care, L.L.C.*,
336 F. Supp. 2d 430 (E.D. Pa. 2004) ............................................................................... 44

*United States v. Olano*,
507 U.S. 725 (1993)......................................................................................................... 40

*United States v. Pemco Aeroplex, Inc.*,
195 F.3d 1234 (11th Cir. 1999) ....................................................................................... 34

*United States v. Sci. Applications Int'l Corp.*,
626 F.3d 1257 (D.C. Cir. 2010) ....................................................................................... 37

*Vititoe v. Bridgestone Americas Tire Operations, Inc.*,
No. 2:12-CV-1844-DCN, 2018 WL 4095620 (D.S.C. Aug. 28, 2018)............................ 2

*Westmoreland v. TWC Admin. LLC*,
924 F.3d 718 (4th Cir. 2019) ...................................................................................... 3, 43

**STATUTES**

31 U.S.C § 3729............................................................................................................ 35, 43

**OTHER AUTHORITIES**

1986 U.S.C.C.A.N ............................................................................................................. 37

21 S. Williston & R. Lord, A Treatise on the Law of Contracts (4th ed. Westlaw updated May
2026) ............................................................................................................................... 42

9B Wright & Miller, Fed. Prac. & Proc. Civ. (3d ed. 2026 update)............................................ 39

American Heritage Dictionary (5th Ed. 2022)............................................................................. 13

H. Rep. No. 99-660 (June 26, 1986)............................................................................................. 37

S. Rep. No. 99-345................................................................................................................... 37

**INTRODUCTION**

Given the critical role juries play in our Constitutional system, overturning a jury verdict is not something Courts take lightly. It is reserved for the most extraordinary of circumstances—where the evidence (considered in the light most favorable to the winning party) supports only *one* reasonable verdict in favor of the losing party.

That is plainly not the case here. In suggesting otherwise, Fluor's Rule 50 motion asks the Court to do exactly what Rule 50 forbids: reweigh the evidence, credit Fluor's witnesses over Relators' witnesses, disregard reasonable inferences drawn by the jury, and adopt Fluor's preferred interpretation of disputed evidence and contract language. None of that is appropriate.

Viewing the evidence in the light most favorable to Relators, the jury heard seven weeks of testimony and reviewed extensive documentary evidence regarding Fluor's loss of Government property, Fluor's repeated failures to report those losses, and Fluor's efforts to conceal the true scope of those losses from the Government. That included testimony from Fluor executives, property managers, auditors, compliance personnel, security personnel, and Government witnesses. The jury also reviewed contemporaneous internal Fluor communications describing Fluor's property management system as, *e.g.,* "smoke and mirrors," describing inventories as "pencil whipping," and warning of "enough fraud to sink a ship." The jury ultimately found that Fluor knowingly concealed or avoided an obligation to pay the Government for lost Government property. Fluor obviously has a different opinion of what the jury should have concluded, but the evidence was more than sufficient to support this verdict.

Fluor's primary argument is that no reasonable jury could have found misconduct by Fluor's "managerial personnel." Fluor made this argument to the jury, which rejected it. For good reason. There was extensive evidence that senior Fluor managers, including Rick Reuter, Steve Whitcomb, Tony Montalvo, Jarrold Reeves, and multiple Regional Distribution Center ("RDC")

1

managers, knew that Fluor was failing to account for Government property, knew that losses were not being reported, knew that inventories were being manipulated to pass PMSAs, and nonetheless concealed the true extent of those problems from the Government.

Fluor also argues that Relators failed to prove actual property loss, failed to prove an established obligation, failed to prove concealment, and failed to prove liability as to Fluor Corporation. Each argument ignores substantial evidence supporting the verdict, and improperly asks the Court to substitute in Fluor's view of the evidence over that of the jury. At most, Fluor identifies factual disputes and competing interpretations of the evidence, which is plainly insufficient to overturn a jury verdict under Rule 50. The motion should be denied.

## LEGAL STANDARD

"The right to a trial by jury is enshrined by the Seventh Amendment. And the Federal Rules of Civil Procedure require that juries, not judges, decide cases so long as there is evidence from which a reasonable decision can be made." *United States Sec. & Exch. Comm'n v. Clark*, 60 F.4th 807, 815 (4th Cir. 2023). A court therefore "must not weigh evidence, determine witness credibility 'or substitute [the court's] judgment of the facts for that of the jury.'" *Id*. (quoting *Lust v. Clark Equip. Co., Inc.*, 792 F.2d 436, 438 (4th Cir. 1986).

Judgment as a matter of law under Rule 50(b) is therefore "a remedy to be applied sparingly and only in the most extraordinary circumstances." *Gautier v. Tams Mgmt., Inc.*, No. 5:20-CV-00165, 2024 WL 1399004 (S.D. W. Va. Mar. 31, 2024). The Court must determine only "whether a jury, viewing the evidence in the light most favorable to [the non-movant], could have properly reached the conclusion reached by this jury," and reversal is appropriate only where "a reasonable jury could only rule in favor of the movant." *Vititoe v. Bridgestone Americas Tire Operations, Inc.*, No. 2:12-CV-1844-DCN, 2018 WL 4095620 (D.S.C. Aug. 28, 2018) (quoting *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002)).

2

The Court must "assume that the testimony in favor of plaintiffs was credible, unless totally incredible on its face, and ignore evidence to rebut it." *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 722 (4th Cir. 2019). If "reasonable minds could differ," the verdict must stand. *Id*.

## ARGUMENT

The Court's jury instructions properly explained what Relators were required to prove in order to prevail on their reverse false claims theory. Relators had to establish that Fluor managerial personnel engaged in willful misconduct or lack of good faith, that Government property was lost, that the misconduct caused the loss, and that Fluor knowingly concealed or improperly avoided an obligation to pay the Government. Dkt. 770 at 22–23.

The jury heard seven weeks of testimony and reviewed extensive documentary evidence concerning Fluor's property management system, Fluor's internal audits and assessments, Fluor's PMSA preparation process, Fluor's handling of inventory discrepancies and LTDDs, and Fluor's disclosures to the Government. The jury heard from Fluor executives, RDC managers, property personnel, auditors, compliance personnel, Government witnesses, and experts. The jury also reviewed contemporaneous emails and internal documents showing that Fluor managers knew the system was failing, knew losses were not being reported, knew inventories were being manipulated to pass PMSAs, and nonetheless concealed the extent of those problems from the Government. The jury saw documents and heard testimony that, in a number of instances, Fluor managers openly and expressly characterized the conduct as "fraud," "lies through the omission of truth and facts," and other similar characterizations.

Fluor's motion largely ignores that evidence. Instead, Fluor repeatedly asks the Court to adopt Fluor's preferred interpretation of disputed FAR language, credit Fluor's witnesses over Relators' witnesses, reject reasonable inferences drawn by the jury, and substitute Fluor's view of the evidence for the jury's. Rule 50 does not permit that.

I.      **The Jury Heard Substantial Evidence that Reuter, Whitcomb, Montalvo, Reeves, and Others Qualify as "Managerial Personnel"**

Much of Fluor's motion hangs on whether the jury heard enough evidence to conclude that certain Fluor employees qualify as "managerial personnel."

As an initial matter, Fluor concedes that as the Vice President of Afghanistan Operations, Rick Reuter qualifies as Fluor's managerial personnel. See Dkt. 784-1 at 6. Fluor also concedes that Country Managers such as Steve Whitcomb also qualify. *Id.* at 7. Those concessions alone require denial of Fluor's Rule 50 motion because, as explained below, there is ample evidence from which the jury could have found that Reuter and Whitcomb knew the facts and failed to act, making Fluor responsible for the lost Government property.

That aside, there was also ample evidence for the jury to conclude that additional managers such as Tony Montalvo, Jarrold Reeves, and the RDC managers also qualify as "managerial personnel" under the Property Clause, and also acted culpably. Under the Court's instructions, Fluor employees qualify as "managerial personnel" if the jury found that they were "directors, officers, managers, superintendents, or equivalent representatives" "who have supervision or direction of (1) All or substantially all of the Contractor's business; (2) All or substantially all of the Contractor's operation at any one plant or separate location; or (3) A separate and complete major industrial operation." Dkt. 770 at 19. That test was easily satisfied for Montalvo, Reeves, and other RDC managers.

A.      **The Jury Heard Sufficient Evidence to Conclude that Fluor's Property Management System is a "Separate and Complete Major Industrial Operation," and so the Directors Overseeing Property and Materials are Managerial Personnel**

The jury heard sufficient evidence from which it could conclude that Fluor's Property Management System ("PMS") was a "separate and complete major industrial operation" as described in the Property Clause, such that PMS leaders Tony Montalvo and Jarrold Reeves are

4

therefore managerial personnel. The PMS was specifically identified as *one* of four distinct "major" business systems subject to the DFARS business system rule. *See* PX 1582 at 17. The PMS was also "major" in terms of the value of the items managed: as of September 2012, Fluor's PMS encompassed asset lines valued at $423 million and material line items valued at $439 million. DX 423 at 2-3.

Further, the PMS was regulated under a separate clause of the LOGCAP IV base contract and a property-specific Federal Acquisition Regulation (see PX 1044 at 4-12 (FAR 52.245-1, "Property Clause")), and was governed by separate, government-approved policies and procedures. See PX 537 (Government Property Control System, "GPCS"); PX 1077 (Material Management Plan). The GPCS was subject to formal approval by DCMA. *See* PX 743 at 4 (requiring Fluor to inventory all property in accordance with its "Government approved property control plan"); DX 500 at 2; DX 630 at 6 (noting Maria McNamara approved Fluor's property control procedures in 2014 after Fluor adjusted them); Tr. 1975:22-1976:2. So, too, was the Material Management Plan ("MMP"). *See* Tr. 1981:9-21 (Maria McNamara confirming Fluor was required to follow its MMP and was audited to it); Tr. 1101:17-19 (Montalvo testifying Fluor told the government its staff was required to follow the MMP); Tr. 6918:21-14 (Poniatowski conceding the GPCS says Fluor will follow its MMP).

Another meaningful signal of the "separate and complete" nature of Fluor's PMS is the fact that it had a dedicated team of Government property specialists assigned to separately audit it each year – a process that included the Prime Government Property Administrator conducting an audit of Fluor's Greenville headquarters, and each of the RDCs and other major property warehouses, and preparing an annual roll-up PMSA report. See PX 1582 at 18-19 (showing government audits of Fluor's business systems under LOGCAP IV); Tr. 2222:5-2223:16, 2223:21-

2224:5, 2225:12-18, 3043:7-12 (testimony of Maria McNamara, describing PMSA roll-up process); DX 500 at 5-7 (recapping overall PMSA process for FY2013); DX 630 at 10-12 (same for FY2014). The auditable outcomes spanned everything from receiving through disposition – essentially, tracking property from cradle to grave – and through a Maximo database dedicated to tracking that property. See DX 500 at 5 (listing outcomes applicable to the roll-up PMSA); DX 630 at 9-10 (same for FY2014 roll-up PMSA).

This evidence was more than sufficient for the jury to conclude that the PMS was a separate and complete major industrial operation. From there, the jury was free to conclude that the managers of that operation qualified as "managerial personnel" under the Property Clause.[1] That included the actions of two individuals who were the subject of much testimony at trial: Tony Montalvo and Jarrold Reeves. Fluor employed Tony Montalvo to be the dedicated executive managing Fluor's massive PMS operation. Tr. 1045:22-1046:1, 1064:9-15 (Montalvo confirming he was the head of Property and Materials); *id.* at 1088:9-21; see also PX 1547 at 9 (describing creation of executive leadership position for each business system to ensure adequate managerial oversight).

Montalvo eventually left Afghanistan to continue to manage the PMS from Greenville. Tr. 1226:5-23. After Montalvo's departure, Jarrold Reeves became the Materials Management

---

[1] Suggesting otherwise, Fluor offers several arguments about how "separate and complete major industrial operation" should be interpreted, invoking canons of statutory interpretation. Dkt. 784-1 at 9–10. But Rule 50 is not a vehicle for pressing new (and waived) legal positions after the charging conference, and Fluor is not arguing that the Court gave a faulty jury instruction on the definition. Instead, the only proper question is whether there was sufficient evidence from which a jury could reach its verdict. *Belk, Inc. v. Meyer Corp.*, U.S., 679 F.3d 146, 161 (4th Cir. 2012), as amended (May 9, 2012) ("Rule 50 is meant to preserve the judge's power to determine evidentiary sufficiency. The rule is not concerned with 'pure' questions of law that are detached from the evidence, not within the domain of the jury, and only ever properly ruled upon by the judge.")

6

Director with day-to-day oversight over operations in Afghanistan until around September 2015. Tr. 1226:15-19 (day-to-day operations handed to Reeves after Montalvo departure); 144:16-145:9 (Reeves was materials management director over all of Afghanistan in March 2013); 1416:11-1417:7 (Reeves still in charge of day-to-day operations in March 2014); 5081:2-5 (Gregg Gross replaced Reeves as materials management director in Sep 2015). Reeves had a broad swath of managers reporting to him including Theater Property Manager Rickey Mackey (Tr. 3628:6-25), Scott Dillard (both as Deputy Director of Materials Management and RDC manager) (Tr. 5025:19-5026:25), and RDC Managers such as Bradley Hamm (Tr. 1921:4-6), and David Erp (Tr. 4015:4-4016:6) and senior materials control specialist Ernest Ridley (Tr. 4234:19-24; 4550:20-4551:3).

Each RDC manager reported *not* to the site manager, but instead to Tony Montalvo and Jarrold Reeves, the leaders of the property management operation. Scott Dillard testified that when he was an RDC manager, he reported directly to Montalvo, and then to Reeves after the latter took over Montalvo's role as head of Property and Materials. Tr. 5027:18–5028:1. Montalvo and then Reeves thus directed the entire materials and property operation in Afghanistan. *See* Tr. 1045:22 - 1046:1 (Montalvo agreeing that his role as head of property and materials was the lead role for that job), 6386:20-6387:6 (Whitcomb identifying Reeves as directing the operation in theater).

> **B.    The jury heard sufficient evidence to conclude that site managers and RDC managers each have supervision or direction of "all or substantially all of the Contractor's Operations at any one plant or separate location"**

Fluor asserts that only Rick Reuter, or possibly Country Managers, are "managerial personnel" who have supervision or direction of "all or substantially all of the Contractor's Operations at any one plant or separate location." Dkt 784-1 at 5–9. Again, Fluor advances all sorts of arguments about how and why a Court should interpret that phrase. Fluor continues to miss the point. The relevant question after the verdict is whether the jury heard sufficient evidence

7

from which it could conclude that RDC Managers and Site Managers were entrusted with supervision or direction responsibilities at any one location. They certainly did.

There was sufficient evidence to establish that each RDC operated as its own plant or separate location, with the RDC Manager responsible for all supervision and direction at that RDC. Specifically, each RDC manager oversaw the company's Property Management System at one of Fluor's eight major distribution centers in Afghanistan. *See, e.g.*, PX 765 at 5 (listing RDCs as of December 2013); Tr. 3644:9–11 (RDC property and materials offices reported to the RDC manager); Tr. 4993:4–13 (RDC manager responsibilities encompassed material control, property, traffic, expediting, and some procurement); 5027:1-11 (TAT teams at RDCs reported to RDC managers); 5060:20-5061:2 (same). Each RDC managed Government property valued at $30 to $169 million as of September 2012. *See* PX 1404 at 9. Each of the eight RDCs is uniquely a creature of the property system, essentially a warehouse or yard with the only purpose being to manage Government property – receiving it, tracking it, and doling it out to 70 different sites that were in the business of providing services to the troops at that site. The eight RDCs did not house troops, and they did not perform functions other than property management. Indeed, each RDC had its own location code, and each RDC manager reported *not* to site managers – who were effectively the "customers" of the RDC's plant or warehouse – but instead to Montalvo and Reeves. *See* Tr. 5027:18–5028:1; Tr. 6387:4–22. Put simply, an RDC is no different than a single factory, and the RDC managers are the most senior managers overseeing the entire factory's operation. As such, a jury could conclude that each RDC itself was its own location and that each RDC manager was therefore managerial personnel under the Property Clause.

In addition, there is no question that every base, or site, was its own location. And every site had a site manager who was responsible for the overall operation of each base. Tr. 6193:8-16,

8

6383:15-21. Site managers also played a crucial role in inventory reporting. Each inventory summary report was reviewed and signed by "the Site Manager and Sr. Materials personnel on site." PX 1077 at 69; Tr. 506:8–12. Each site then sent the inventory documentation (including count sheets and inventory summary reports) to the RDC, so the RDC could report the results for the Area of Operation (AO). PX 1077 at 69. Site managers also received TAT assessment reports that described deficiencies in property management at the site, demonstrating their responsibility for supervision at the site and from which a jury could conclude that they would have had knowledge of the systemic property failures at their site that were presented to the jury in spades (and largely conceded by Fluor). Tr. 4125:16–4126:7 (site managers received TAT reports); *see also* Tr. 1242:19-1243:20 (Montalvo admitting ghost bin problem "got away from" Fluor).

C.     **The jury heard substantial evidence that Fluor Government Group/Fluor Corporation managers are the managerial personnel of the "Contractor"**

Fluor raises a technical argument that because Fluor Intercontinental, Inc., executed the LOGCAP contract, only Fluor Intercontinental employees can be considered managerial personnel of the "contractor." Dkt 784-1 at 5. This argument ignores the substantial (and largely undisputed) evidence that Fluor Government Group ("FGG") was the operational business unit that handled Fluor's contracts with the Government, such as the LOGCAP contract at issue here.

Tellingly, Fluor cites no authority to support its position—because there is none. There is ample evidence that FGG implemented the LOGCAP IV/TO 5 contract. The jury heard at trial how Reuter was employed by FGG but acted as the Program Director for TO 5. *See* PX 5 (Reuter's emails acknowledged that he was an employee of FGG). Likewise, Montalvo and compliance director David Methot represented that they were employees of FGG with extensive responsibilities for property management within TO 5. *See* PX 365 at (Letter from Montalvo to DCMA on behalf of "Fluor Government Group"); DX 591 (Methot represented that he was

9

employed by FGG). The jury also received evidence that FGG acted not only on behalf of Fluor Intercontinental, but that FGG was also a "business unit within Fluor Corporation responsible for U.S. Government contracting." *See, e.g.*, DX 591 at 4; *see also* Tr. at 4911:16-4912:4 (Howard testifying that he worked for FGG, which was "a business line" within Fluor Corporation), 5088:13-5089:6 (Dillard testifying same), 5403:16-25 (Methot testifying same); 6308:25-6309:12 (Whitcomb testifying that he oversaw LOGCAP as an employee of FGG); 6990:9-23; DX 630 at 4–5 (letter from DCMA to Norm Powell of "Fluor Corporation" stating that "*your* Property System is acceptable and approved," and listing various FGG employees as "Contractor Representatives" (emphasis added)); DX 700 at 1–2 (similar, this time addressing Powell as a member of FGG, naming FGG as the contractor, and listing Fluor Intercontinental's address as FGG's address); *accord* PX 720 (similar). Based on this evidence, a jury could conclude that FGG personnel were the managerial personnel for Fluor Intercontinental.

Fluor's argument is that only Fluor Intercontinental, Inc.'s employees can be managerial personnel, which would be particularly convenient for Fluor because Fluor Intercontinental, Inc. actually has zero employees. Tr. at 7859:25-7860:2 (Justin Jones testifying that he "do[es]n't know" whether Fluor Intercontinental "has any employees"). In Fluor's telling, this corporate shell game immunizes it from liability. That is not the case. The aforementioned senior managers in FGG were acting on behalf of both Fluor Corporation and Fluor Intercontinental, Inc., as expressly stated in the testimony and admitted exhibits at trial. If all a company had to do to avoid statutory FCA obligations to the Army was sign a contract in the name of an entity with no employees, the purpose of government contracting would be seriously frustrated. The jury did not have to, and did not buy that, properly finding instead through their verdict that FGG employees were in fact managerial personnel for Fluor Intercontinental. That finding was within the jury's prerogative.

10

II.     **The Jury Heard Substantial Evidence that Fluor's Managerial Personnel Engaged in Willful Misconduct or Lack of Good Faith that Caused Loss of Government Property**

The jury received significant evidence that Fluor managerial personnel's acts and omissions constituted willful misconduct or lack of good faith, and that such acts and omissions caused the loss of Government property. To be clear, the jury needs only to have had sufficient evidence to satisfy *either* of these terms (wilful misconduct *or* lack of good faith), not both.[2]

A.     **"Willful misconduct or lack of good faith" does not require proof of purposeful, corrupt, or dishonest acts.**

Perhaps because no court has directly opined on what "lack of good faith" means in the FAR context, the jury was not specifically instructed on the meaning of "willful misconduct and lack of good faith," leaving jurors free to apply a common sense understanding. The use of the term in the standard covenant of good faith and fair dealing is instructive. "All contracts, including government contracts, contain an implied covenant of good faith and fair dealing." *Centex Corp. v. United States*, 49 Fed. Cl. 691, 708 (2001). The Uniform Commercial Code defines good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing" UCC § 1-201. A party breaches the covenant of good faith when it acts "so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Century Expl. New Orleans, LLC v. United States*, 110 Fed. Cl. 148, 174 (2013), *aff'd*, 745 F.3d 1168 (Fed. Cir. 2014) (quoting *Centex*, 395 F.3d at 1304)).

---

[2] Fluor's conflation of the willful misconduct *or* lack of good faith options into a single intentional misconduct standard renders the "lack of good faith" provision redundant and/or meaningless, which courts do not do. *E.g., Fontenot v. Taser Int'l, Inc.,* 736 F.3d 318, 327 (4th Cir. 2013) ("We are guided by the principle of statutory construction that a statute should be 'construed, if possible, so that none of its provisions shall be rendered useless or redundant.'" (*quoting Porsh Bldrs, Inc. v. City of Winston–Salem,* 302 N.C. 550, 276 S.E.2d 443, 447 (1981)).

Applying a definition that was not provided to the jury, Fluor attacks the jury's verdict by arguing (for the first time in this case) that "willful misconduct or lack of good faith" requires proof that Fluor acted "purposefully, corruptly, or dishonestly." See Dkt 784-1 at 11–13. By not raising this argument in its Rule 50(a) motions, however, Fluor has waived it. *Carson v. Emergency MD, LLC*, No. 6:20-CV-01946-JD, 2024 WL 4520234, at *4 (D.S.C. Apr. 16, 2024).

Regardless, Fluor misstates the standards for both "willful misconduct" and "lack of good faith." Although no district court has directly interpreted "willful misconduct" as cited in the FAR, federal statutes typically define, and courts traditionally interpret, "willful misconduct" as merely requiring a deliberate action, taken in spite of knowledge of the likelihood of harm. 38 C.F.R. § 3.1 (federal regulation about military pensions) ("Willful misconduct means an act involving conscious wrongdoing or known prohibited action."). This accords with the traditional tort definition of "willful misconduct" as an action that involves "actual knowledge—or what the law deems to be the equivalent of actual knowledge of the peril to be apprehended, coupled with a conscious failure to avert injury." 3 Am. L. of Torts § 10:2; *see also id.* § 10:17 ("Courts have observed there is often no clear distinction between willful, wanton, or reckless conduct and gross negligence, and the two have tended to merge and take on the same meaning.").

The decisions Fluor cites do not support its invented "purposefully, corruptly, or dishonestly" standard.  For example, Fluor relies heavily on *Appeal of Fairchild Hiller Corp.*, ASBCA No. 14387, 72-1 B.C.A. (CCH) ¶ 9202 (Nov. 30, 1971), but Fluor's own chosen quotations do not support its proposed standard. As Fluor rightly quotes, *Fairchild Hiller Corp.* held that a party exhibits "willful misconduct or lack of good faith" when the party "refuse[s] deliberately to perform a plain, well-understood contractual or statutory obligation without just cause or excuse." *Id.* Such a party is "recreant to their duty," *id.*, that is, "[u]nfaithful or

12

disloyal." *See* American Heritage Dictionary (5th Ed. 2022), https://ahdictionary.com/word/ search.html?q=recreant. In other words, "willful misconduct or lack of good faith" covers not just malicious or corrupt acts, but also the knowing and unjustified failure to perform  one's duties, a conclusion the jury could easily have reached based on the ample evidence that Fluor's senior property managers shirked their duties and actively hid it from the Government. Even under Fluor's preferred standard, the jury heard more than enough evidence to satisfy it.[3]

### B. Fluor managerial personnel's acts and omissions constituted willful misconduct or lack of good faith that caused loss of Government property

#### 1. The jury heard substantial evidence that Fluor lost Government property

Fluor argues that any losses were merely "undocumented consumption" for which the Government received full economic benefits. Dkt. 784-1 at 18. Fluor pressed that argument at trial, and the jury plainly did not buy it. That was hardly an irrational or unsupported conclusion.

As an initial matter, Fluor as much as admitted to the Government in 2013 (albeit only half the story) that it had failed to report many losses (including discrepancies and inventory adjustments) for years. See Tr. 1192:13-1193:17 (Montalvo conceding Fluor failed to report losses); PX 1622 (March 20, 2013 email from Steve Rash); PX 365 (April 1, 2013 CAP); PX 1620 at 6–7 (draft Nix compliance review stating there was no evidence an LTDD was submitted for 80.5% of sampled adjustments from 2010 through 2013).

Fluor's unreported material losses clearly fit within the FAR's definition of "loss of Government property": the "unintended, unforeseen or accidental loss, damage or destruction to Government property that reduces the Government's expected economic benefits of the

---

[3] Fluor also cites *Pacific Architects & Engineers, Inc.*, for the proposition that "negligence . . . is not the standard" to establish willful misconduct or lack of good faith. *Id.* This is unhelpful. Nobody is arguing that negligence is the applicable standard.

13

property," including but not limited to "**(1) Items that cannot be found after a reasonable search;**(2) Theft; (3) Damage resulting in unexpected harm to property requiring repair to restore the item to usable condition." PX 1026 at 2 (FAR 52.245-1(a)). Fluor now insists that these material losses were just "undocumented consumption" for which the Government received full economic benefits, but points to no evidence that would have allowed the jury to conclude all the unaccounted-for materials were consumed in a way that benefitted the Government or that would explain away the voluminous evidence of actual loss, damage, and theft.

By contrast, the jury had ample evidence that Fluor's unaccounted-for materials represented real reductions in the Government's expected economic benefits from the property — *i.e.*, real losses. For example:

- Montalvo confirmed that, according to Fluor's internal reports, approximately 44% of the items Fluor could not account for were lost and **41% were stolen**. Tr. at 1079:11-22 (referring to PX 1737-3 at 32).

- The Prime GPA and Montalvo confirmed that theft was more likely when property was not accurately accounted for in Fluor's system of record. Tr. 2007:19-2008:2 (McNamara confirming that maintaining accountability of Government materials was important to prevent both theft and risk to the United States military), 1076:19-23 (Montalvo conceding theft could happen when items were not in the system of record).

- Fluor itself characterized $31.4 million of materials that Fluor could not account for after a months-long search and analysis as "actual losses" in December 2013. PX 765 at 4; *see also* Tr. 4517:15-21 (Ridley confirming that if you can't explain a negative adjustment, it's an actual loss).

- Yet other evidence showed that Fluor's 2013 analysis understated actual losses by entirely excluding inventory adjustments from 2010 and 2011. See PX 1620 at 6-7 (draft Nix compliance review stating there was no evidence an LTDD was submitted for 91.5% of sampled inventory adjustments from 2010 and 81% of sampled adjustments from 2011); Tr. 3341:7–21 (Nix explaining this finding was "quite shocking"). Importantly, the Prime GPA testified that excluding these earlier losses was improper: if Fluor knew about losses going back to 2010 that had not been addressed, they should have included that in the 2013 CAP. See Tr. 2125:15-19.

- David Payne testified that he had "conservatively" estimated that Fluor had failed to report $100 to $120 million in losses to the Government. Tr. 156:15-157:3, 157:14-23.

14

- Mike Rudolph testified that, based on the materials he reviewed, theft was a "recurring and systemic" problem at multiple sites over multiple years. Tr. 870:20-871:15.

Finally, the jury also had concrete examples of the Government losing all expected economic benefits from materials that Fluor lost, damaged, failed to secure from theft, or left exposed to the weather, such as:

- Ayanna Cassanova described a two-story-high, unorganized, and unsecured pile of materials at Bagram that was visible from the airplane, with items that were crushed or left exposed to the elements. Tr. 2963:25-2965:13. It was large enough for workers to build nests inside for taking naps. Id. at 2972:11-2973:2. The pile remained for at least a year. *Id.* at 3014:9-13.

- An August 2012 internal Fluor email, for example, described $294,549 of lumber that was stored unsecured for more than six months and that (according to the email) might have been "misappropriated by unknown individual(s)." *See* PX 1546 at 1.

- An October 2012 internal assessment found a "major system failure in materials operations at Marmal," including pallets and boxes of materials on the ground with no protection from the elements, "no completed record of Materials Physical Inventory for the whole year 2012," and "unlocked storage areas/containers." PX 40 at 5, 9, 12-13.

- Other illustrative examples of evidence of theft included:

  o An August 2013 report from a Fluor Government Group Security Manager, describing alleged theft of "copper wire along with various amounts of hand tools, and miscellaneous equipment" from Salerno. PX 1801 at 1.

  o A February 2014 Fluor Government Group Country Security report of a stolen vehicle. PX 1803 at 1.

  o A May 2014 email from Steve Whitcomb, recounting allegations that an employee of a Fluor subcontractor "was removing materials from the Fluor Materials Yard and selling it to the Afghani Bazaar Vendors located directly across the street from the RDC." PX 1800 at 1.

The above evidence provided more than adequate grounds for the jury to conclude that Fluor's material losses represented tens of millions of dollars — if not a hundred million dollars or more — of reductions in the Government's expected economic benefits from the property. The evidence the jury heard of theft, alone, is sufficient. In any event, it was hardly unreasonable for a jury to infer that if Fluor cannot account for that property, it was indeed lost

15

(consistent with the FAR definition). Fluor's argument otherwise was made to the jury, but unsuccessfully.

> **2.      The jury heard substantial evidence that these losses resulted from willful misconduct or a lack of good faith by Fluor's managerial personnel.**

The trial record includes voluminous direct and circumstantial evidence from which the jury could properly conclude that the above losses were the result of willful misconduct or lack of good faith on the part of Fluor's managerial personnel.[4]

As an initial matter, the jury heard evidence that the lack of property accountability caused losses (and excess over-ordering, which is also a loss in terms of financial cost to the Government). Tr. 773:4-21 (Rudolph testimony regarding excess and over-ordering resulting in unnecessary spending passed on to client); Tr. 2007:19-2008:2; Tr. 1076:19-23. That's the whole point of the rigorous property procedures the Government insisted upon. And the jury heard mountains of evidence that Fluor's property system was broken, and failures were rampant–a point Fluor all but conceded at trial. This alone is enough for a jury to find that the lack of property accountability known and perpetuated by Fluor's senior leaders caused losses.

The same is true when one considers each of Fluor's managerial personnel.

*Tony Montalvo*

The jury could easily find that Montalvo caused losses of Government property when, knowing full well that Fluor's property management system was broken, he failed to fix it, thereby allowing the system to keep failing. As detailed below, Montalvo knew for years that Fluor was not investigating materials discrepancies promptly (or in many cases at all), and that

---

[4] When evaluating whether managerial personnel engaged in willful misconduct or lack of good faith, it was proper for the jury to consider the conduct of other Fluor employees (who were not managerial personnel) as part of the surrounding facts and circumstances. Dkt. 770 at 19.

16

this caused actual losses because millions of dollars of property could not be found after a reasonable search. Montalvo allowed these losses to accumulate for months and years, and then eventually admitted to $31.3 million in "actual losses" in a presentation he made to the Government in late 2013. This admission, even putting aside that it was fraudulently understated by tens of millions of dollars, is alone sufficient to establish a causal relationship.

As head of Fluor's PMS, Montalvo had primary responsibility for ensuring Fluor passed PMSAs, and he was under great pressure to succeed. See PX 4 at 2 (Reuter email stating that losing Government approval of Fluor's PMS would be "devastating" for Fluor). Montalvo claimed this pressure was just a "directive" (Tr. 1104:20-24), but it was for the jury to weigh that claim given that Montalvo also testified that Fluor would become responsible for losses if it kept failing PMSAs after failing its first three PMSAs for Task Order 5 (Tr. 1089:12-1091:4) and Rick Reuter (Montalvo's boss) stated Fluor could "kiss off future proposals for quite a while" if the Government disapproved Fluor's property system. PX 3 at 1.

Montalvo was fully apprised of the problems Fluor's audit compliance team found at sites before PMSAs and the illicit methods Fluor used to pass them. *See, e.g.*,  PX 234 at 2 (February 2011 email from Montalvo stating that if Phoenix passes, it will be due to "external intervention and damage control measures"); PX 326 at 3 (Montalvo's talking points memo, confirming that Phoenix passed through external interventions); PX 238 at 1 (June 2011 email from Minka Hill describing "breakdown of the basic processes and procedures necessary to maintain material and property control and accountability" at Salerno); PX 502 at 1 (September 2011 email from Hill describing same type of breakdown at Eggers).

By late 2011, Montalvo also knew that failing to report property losses–expressly described as losses and/or LTDDs–was a systemic problem. *See* Tr. 5058:6-5059:12 (Montalvo

and Reeves aware in October 2011 that inventory adjustments not being submitted for inclusion on LTDDs); PX 5 at 1 (October 2011 email from Minka Hill stating that failure to submit material inventory adjustments for LTDD submission after inventories was a problem "throughout Theater"); PX 419 at 1, 4 (August 2011 internal assessment from Bagram, stating "no LTDD or FOI were submitted for inventory with discrepancies"); PX 1421 at 1 (June 28, 2011 email stating memo field for 95% of material inventory adjustments were blank). Montalvo also received findings that the problem persisted throughout 2012. *E.g.*, PX 417 at 10, 4 ("No LTDD or FOI's were reported to Property."); PX 1546 (lack of LTDDs reporting lumber losses).

There was ample evidence from which the jury could infer that Montalvo *intentionally* let these problems fester. Montalvo (and those reporting to him) had a clear *motive* to let false reports continue because they helped Fluor pass PMSA audits. As David Erp (Training and Assessment Team Lead) wrote to Jarrold Reeves (copying Minka Hill, Ernest Ridley, Justin Jones and others), "[w]e have went thru several PMSA's and they are passing because we do adjust the Materials Inventories but we are not reporting them." PX 24 at 1. Given how closely Montalvo worked with Reeves and Hill, the jury could properly infer this issue was fully vetted with him–especially given the other evidence of inventory adjustments being used just before audits. *See* PX 1636 (February 2013 statement by Todd Friemel, describing failure to report losses identified before the 2011 Salerno PMSA); PX 1754 (showing spikes in current balance adjustments before PMSAs, including before the 2011 Salerno PMSA); PX 1755 (showing spikes in physical count adjustments before PMSAs). Hill herself testified that Montalvo directed all adjustments should go into virtual bins or ghost bins. Tr. 5928:1-15.

18

Montalvo (and the people reporting to him) also had the *opportunity* to let this broken system persist. DCMA could not directly access Maximo. *See* Tr. 2086:11-13 (Maria McNamara lacked access), 2086:20-25 (property administrators in the field lacked access), 6049:14-20 (Minka Hill agreeing DCMA lacked access). Fluor's audit compliance lead (who served as the Government's point of contact for most PMSAs) did not volunteer information that DCMA did not directly request. Tr. 5952:1-7. And even the Prime GPA would not have known to ask about the audit logs in Maximo that might have revealed the problem. Tr. 2088:10-2089:3.

Failing to report materials adjustments to pass PMSAs was just the beginning. When it came time to come clean to the Government about all of this in 2013, Montalvo engaged in his own lies through omission. When Montalvo submitted the corrective action plan ("CAP"), he attributed the problem to "[m]anagement oversight at select RDCs" and "high turnover of materials management personnel." PX 365 at 2. There is no evidence that Montalvo disclosed (in the CAP or later disclosures) that there were systemic, longstanding causes such as the failure to require memo justifications for material adjustments in Maximo. PX 1421 at 1 (June 28, 2011 email from Almir Alicehajic stating memo field for 95% of material inventory adjustments were blank); PX 566 at 5 (March 7, 2013 email from Michael Ramirez describing lack of memo justifications); PX 574 (May 2013 email from Ernest Ridley stating, "there are still a great number of IAR's being created with no memo and we are left to guess what happened.").

After reviewing the CAP, Maria McNamara directed that Fluor's inventory reconciliation should not go back before July 2012 because–as she clearly explained when she made the decision–she believed Fluor had already reported all losses before then. DX 492 at 1. McNamara cared about losses before June 2012 and expected Fluor to tell her about them. Tr. 2124:3-11 ("Of course I cared. …The thing is that they should have already picked up that because of this

19

CAP that they were doing. How many times do you have to pay over and over and over again to do the same thing?"), 2125:15-19 (if there were losses before June 2012, the CAP should have covered them), 3200:23-3201:11, 3276:15-24. Montalvo did not correct McNamara's false belief even though Fluor's project compliance group had found the problem went back to 2010. See PX 1620 at 6-7; PX 869 ("End of Year Inventory Roll Up 2012" document, stating "End of Year Inventory results were not fully disclosed in 2010, 2011, or 2012.").

The jury also had ample evidence from which it could infer that Montalvo intentionally underreported actual losses to the Government when reporting the final results of the 2013 CAP. In late May 2013, Montalvo reviewed results from Ernest Ridley's inventory reconciliation analysis and observed that the "percent gains and losses are a mute [sic] point since we exceeded any type of ASTM or Army standard." PX 1404 at 1. Yet by December 2013, when Montalvo reported the results to DCMA, he falsely represented that Fluor's overall "actual losses" were less than 5% — within ASTM *and* Army standards. PX 765 at 4, 6-8. As Ridley testified, it was Tony Montalvo who took the raw results of the inventory reconciliation and chose how to (mis)represent the data to the Government. Tr. 4364:8-16 (Ridley did not do the math to calculate the loss rate); 4555:8-17 (Montalvo explained the data to the Government). Montalvo also determined key assumptions for Ridley's work. Tr. 4528:1-12 (Montalvo was responsible for the decision that when Fluor reported the losses to the government, they would assume nothing got stolen). Finally, Montalvo told the Government that Fluor had suspended DRMO storerooms – the so-called "ghost bins" – by April 2013 (PX 765 at 3) and had completed a full reconciliation of "all inventory adjustments" (*id.* at 2), while omitting the inconvenient fact that Fluor still had millions of dollars in "inventory that may or may not exist" in DRMO bins. PX 1071 at 3 (November 25, 2013 email from Montalvo to Reeves).

20

*Jarrold Reeves*

The jury had more than enough record evidence at trial to conclude Jarrold Reeves, too, was well aware of a litany of property and materials management problems that occurred during his tenure. Unsurprisingly, given that they are all managerial personnel, a large amount of the evidence that demonstrates Reeves' knowledge is explained in the context of Montalvo, Whitcomb, and the RDC Managers' knowledge. *See infra* § II(B)(2) (Montalvo Section) (citing disclosures to Reeves in PX 24 (Erp 2012 report that PMSAs passing because not reporting adjusted inventories)); *infra* § II(B)(2) (Whitcomb Section) (citing disclosures to Reeves in PX 574 (May 2013 "lessons learned," including need to regulate Maximo access and IARs created with no explanation for the loss)); *infra* § II(B)(2) (RDC Manager Section) (citing disclosures to Reeves in PX7 (March 2013 Juan Jones report that majority of time spent "fixing what was hidden in September 2011 PMSA)), PX 1071 (November 2013 email chiding Reeves for failing to eliminate the DRMO bins, resulting in $4.3 million in inventory that may or may not exist); PX 41, 44 (Hamm report of multiple instances of fraud at 2014 FOB Marmal PMSA)).[5]

Additional record evidence the jury considered regarding property and materials management problems of which Reeves was aware include the following:

- In October 2011, Montalvo and Reeves were aware that inventory adjustments were not being submitted for inclusion on LTDDs. Tr. 5058:6-5059:12; PX 5.

- Starting when Dillard transferred to Bagram around November 2011, he and Reeves had a very close working relationship. The two discussed systemic property and materials problems and their shared frustration that Fluor told the "government we'd fix it in 2011 with our PMSA CAP, and then it just stayed broken." Tr. 5027:18--5031:11; *see also* Tr. 5089:8-5091:5 (Dillard had daily meetings with Reeves; problems were not fixed).

---

[5] The IAR missing memo field issue identified in the May 2013 "lessons learned" Ridley shared with Reeves (PX 574) continued into March 2014 (*see* PX 379), thus demonstrating that Reeves had taken no action to combat the problem. On this point, Ridley testified no one, like Reeves, had put him in a position of influence to help solve this problem. Tr. 4554:21-25.

- Dillard and Reeves both traveled to sites, shared what they saw, and had "open and frank" conversations about what Reeves saw on his visits and reports on inventory accuracy problems that were system-wide.Tr. 5027:18--5031:11. Dillard also shared Minka Hill's assessments of the sites with Reeves, who knew that she and her team were doing "what was necessary," *i.e.*, cheating, to pass the PMSA audits. Tr. 5091:7-5094:17.

- Mackey questioned the veracity of an October 2012 end of the year inventory summary Reeves made to the Government covering October 2011-2012 that proclaimed 100% physical inventory was completed and no discrepancies were noted. DX 423; Tr. 3665: 12-3668:3. Mackey told Reeves the "numbers for losses drastically contradict" the perfect picture Reeves presented to the Government. PX 1117. Reeves never responded, and Mackey never saw evidence that Reeves ever corrected his prior misstatements.  Tr. 3668:6-3671:7. Moreover, Reeves had told Mackey not to communicate with the Government so Mackey did not inform them of these concerns. Tr. 3817:12-19.

- In October 2012, RDC Manager David Erp voiced his concern to Reeves that inventory counts at FOB Sharana were being falsified–an echo of concerns Mackey had noted with respect to the 2012 end of year summary.  Tr. 4015:4-4016: 15 (discussing PX 25).

- Even after these voiced concerns, Reeves was aware the problem of falsifying or "pencil whipping" inventories continued unabated. In March 2013, after reviewing a report of 10% inventory failures at FOB Salerno (PX 796 at 7), Reeves acknowledged the rampant pencil whipping of 10% inventories in an email to all RDC managers, "[w]e are not executing 10% to standard. Sites are pencil whipping the inventory, not reconciling the 10% in Maximo, and not reflecting the reason for the adjustment in Maximo." PX 28

- Also in early 2013, as part of his inventory adjustment analysis, Jeffrey Nix came across evidence that administrative adjustment memos from RDC managers had been backdated and which was a red flag that falsified information might be in the auditable record. Tr. 3343:15-3349:2; PX 1119. Reeves promised to "take care of it" but ultimately did nothing. Tr. 3348:9-3349:2.
- In August 2013, Mackey reported to Fluor's compliance department that Reeves had been holding on to 19 aged LTDDs from 2012 that showed a "substantial amount of loss" so they would not be included in the 2012 report to the Government. Tr. 3817:21-3820:25; PX 1500. Andrew Rutledge, a prior theater materials manager who was BCCed on the report noted that Mackey "was telling the truth and his management team does not want to hear it." PX 1500; Tr. 3821:16-3822:11. Dillard provided similar testimony about Reeves' concealment of losses on unsigned and unreported LTDDs. Tr. 5222:24-5223:7.

22

- In March 2014, the IAR missing memo field issue identified in the May 2013 "lessons learned" Ridley shared with Reeves (PX 574) was identified as a continuing problem, demonstrating this "lesson" had yet to be "learned."

- Additional instances of property and materials-related fraud that Mackey witnessed and report to Reeves included the following :

  - Fluor personnel were misusing LTDD numbers to remove items from the material record for which the government had not granted relief of responsibility. Reeves was upset at Mackey for reporting issues such as this one, but the problems continued. Tr. 3640:5-3643:15.

  - To clear Fluor's record of missing inventory, Fluor personnel claimed that items purportedly shipped in sealed containers were "lost in transit" after traveling from one site to another. There was no evidence, however, that those items were in the containers or that the containers were tampered with. Instead of requiring an inventory of the items in the shipping container at the destination site to confirm if they were actually lost in transit, Reeves ordered all inventories to cease and required personnel to rely exclusively on the packing list for the container–thus ordering the inventories to be "pencil whipped." Tr. 3661:21-3664:1.

This vast quantity of record evidence described above demonstrates Reeves' willful refusal to fix the problems, and active efforts to conceal property failures. The systemic problems Reeves discussed with Dillard persisted throughout his tenure. At no point did Reeves fix these problems or report them to the Government.  Tr. 5027:18--5031:11; Tr. 5089:8-5091:5.  In fact, the jury heard evidence that Reeves went so far as to instruct managers such as Mackey *not* to report these problems to the Government. Tr. 3817:12-19. Further, when RDC Manager Juan Jones was SameTime chatting with Bradley Hamm about "straight up LOGCAP fraud," they openly predicted (accurately, it turned out) what would happen when the serious misconduct was reported to Reeves: absolutely nothing. PX 44 at 3; Tr. 1872:1–1873:3, 1873:25-1874:3.

In sum, the jury had more than enough evidence to conclude that Reeves' refusal to ensure adherence to property procedures and to maintain accountability, and his failure to

23

promptly report these failures and attendant losses to the Government, constituted a lack of good faith or willful misconduct, or both, and led to the loss of Government property.

***Steve Whitcomb***

The plain record of admitted documents and testimony is that Steve Whitcomb was aware of all of Fluor's major property deficiencies during his tenure as country manager. Whitcomb admitted as much on the stand, characterizing himself as a "hands-on guy." Tr. at 6192:13; 6339:6-7. In fact, in no uncertain terms, he acknowledged that he was in the loop and knew the situation on the ground. *Id.* at 6342:21-24 ("Q: If there were problems in the LOGCAP contract and the way the property and materials was working, you have confidence you would have known about it? A: I do, sir."). Given these admissions, the jury could conclude that Whitcomb had full knowledge of Fluor's fraud and misconduct.

There were also specific examples of the numerous property and management issues that Whitcomb was aware of throughout his tenure. He assumed the role of Country Manager for Afghanistan in August 2012 (Tr. 6186:10-17) and was quickly informed of the true state of Fluor's materials management operations. PX 1546 at 1–2.  In a memo to Whitcomb dated February 2013, Fluor's Country Security Manager described serious "materials accounting discrepancies," including negative inventory adjustments that lacked corresponding LTDDs, internal purchase orders that had been open for more than 60 days, and materials with a total value of $13.5 million located in 44 non-standard storerooms in Maximo. PX 796 at 1-4. The memo also detailed materials management problems at RDCs, including the failure to complete 10% inventories, the use of DRMO storerooms in Maximo to "virtually conceal" material losses, and the failure to report losses from closed sites. *Id.* at 9. That same month, Justin Jones reported

24

to his colleagues in Fluor's Project Compliance group that Whitcomb wanted to know "how we pass PMSA's when internal reviews continue to find deficiencies." PX 13 at 3.

In March 2013, Whitcomb (and Reuter) received the Civil Investigative Demand. PX 1061 at 1. Soon after, Nix (also in project compliance) memorialized a meeting with Whitcomb and the Compliance Director, regarding the status of Nix's "Negative Adjustment/LTDD Compliance Review." PX 805 at 1. Whitcomb remained actively engaged in the (ultimately misleading) negative inventory adjustment review and analysis. In a May 2013 email to Jarrold Reeves (copying Montalvo), Ernest Ridley describes "lessons learned" that he was asked to submit to Whitcomb. PX 574 at 1. The lessons included: (1) Fluor needed to regulate who had the ability to create adjustments within Maximo, (2) Ridley had "heard from several TAT members that they were asked to keep there [sic] findings in house so they could clean up there [sic] own messes"; and (3) Fluor needed to have a monthly review of all inventory adjustments (not just those done as part of the 10% inventory) because "...there are still a great number of IAR's being created with no memo and we are left to guess what happened." *Id.* at 1–2.

Leaving no doubt about his knowledge of the failure to follow property procedures necessary to maintain accountability, in July 2013 Whitcomb emailed Tony Montalvo, copying Rick Reuter: "I have indications that some personnel have been deviating from established Fluor Material Management Procedures. " PX 1688 at 1.

Both Whitcomb and Reuter followed thefts of Government property closely. In August 2013, for example, a FGG Security Manager informed Whitcomb and Reuter of a theft of "copper wire along with various amounts of hand tools, and miscellaneous equipment" from Salerno. PX 1801 at 1. In February 2014, Whitcomb grilled Fluor Security after a vehicle was stolen, asking, "Who is implementing a chain and lock around steering wheel and brake?" PX

25

1803 at 1. In May 2014, Whitcomb followed up with Reuter and others about missing fuel injectors that were stolen. PX 1800 at 1. An employee of a Fluor subcontractor "was removing materials from the Fluor Materials Yard and selling it to the Afghani Bazaar Vendors located directly across the street from the RDC." *Id.* Fluor's Country Security Manager informed Whitcomb of hundreds of thousands of dollars of plywood that could not be accounted for after being left unsecured for many months, and a large volume of related inventory adjustments that had no justification recorded in Maximo. PX 1546 at 1-2.

In sum, this is ample evidence of Whitcomb's knowledge of systemic failures in Fluor's property system, and outright fraud; his refusal to ensure it stopped, instead permitting it to continue over years; and plain evidence of the loss of economic benefit to the Government from lost and stolen property. Whitcomb's entire tenure as "hands on" country manager was plagued by property management misconduct that Whitcomb was aware of yet failed to address or remedy, including not reporting these issues to the government. Instead, he was involved in the misleading inventory adjustment review that underreported losses to the government. And Whitcomb's knowledge of the concealment of these losses during PMSA audits (as demonstrated by his conversations with Compliance about how they were passing PMSAs despite internal audit reports repeatedly finding failures) and Fluor's false and misleading inventory reports and 2013 inventory adjustment disclosure deprived the government of the opportunity to deny relief of responsibility. The jury had more than sufficient basis to conclude that Whitcomb's lack of good faith or willful misconduct caused the loss of government property.

### Rick Reuter

Both Montalvo and Whitcomb reported to the Vice President of Afghanistan Operations, Rick Reuter. Tr. 1107:14-16, 6243:20-21. Whitcomb confirmed that he "expected to feed

26

[Reuter] myself, so that he [was] kept informed of what we were doing and how we were doing, and if there were any specific [] challenges or issues." Tr. 6244:6-9. Based on this testimony, a jury could conclude that the "challenges or issues" related to property were known to Reuter.

In December 2010, Eric Best (Chief Financial Officer for Fluor Government Group) emailed Reuter a draft Fluor Corporation internal audit of procurement and related material management functions for the LOGCAP IV project. Reuter responded: "The entire procurement, property and materials piece is just broken." PX 1583 at 1. Reuter was also fully aware of the property failures leading to the December 2010 CAP, and the ensuing efforts to pass PMSAs. During the lead up to the Phoenix PMSA in January 2011, Reuter made clear that they had to pass PMSAs or else. PX 3 at 1 ("…we have got to get through this PMSA. If they take the property system from us we can kiss off future proposals for quite a while."); Tr. 5000:8-24 (passing Phoenix PMSA is a "no-fail mission" for Fluor); PX 4 at 2. Montalvo's response leaves no doubt that Reuter was fully aware of how Fluor passed the ensuing PMSAs:  "smoke and mirrors;" "Sir, it's not what they are reporting, but what is absent from their reports. … These are lies through omission of the truth/facts." *Id.* at 1. Reuter's response was not that they should report this fraud to the Government; it was to wait and see if the "lies" he was informed about would prove successful. *Id.* This, alone, is sufficient to support the jury's verdict.

In August 2012, Reuter (like Whitcomb) received an email from Fluor's Country Security Manager describing hundreds of thousands of dollars of plywood that could not be accounted for after being left unsecured for many months, and a large volume of related inventory adjustments that had no justification recorded in Maximo. PX 1546 at 1-2. Reuter forwarded the email to Montalvo with the note, "WTF?" Id. at 1.

27

In June 2013, Reuter kept fully abreast of how the inventory adjustment review was progressing, and directed Montalvo to provide an update to CFO Eric Best, with Reuter copied. The jury could reasonably conclude, then, that the false and misleading inventory adjustment disclosure to the Government was a result of Reuter's lack of good faith or willful misconduct PX 804 at 2.

In July 2013, Reuter was copied on the emails from Whitcomb to Montalvo expressly stating that Fluor personnel were "deviating from established Fluor Material Management Procedures." PX 1688 at 1. And, like Whitcomb, Reuter had full knowledge that these failures were resulting in theft and additional loss of economic benefit to the Government. PX 1801 at 1; PX 1803 at 1; PX 1800 at 1.

There can be no doubt there is more than sufficient evidence for a jury to find that Reuter had full knowledge of Fluor's property failures, and the "lies" being used to pass PMSAs. They had direct evidence, supported by much more, that he actively demanded it–pass, or else, (Tr. 5000:8-24; 5050:3-14 (PMSAs are a "no-fail mission"))–and told Montalvo to wait and see if their "smoke and mirrors" would successfully dupe the Government. The jury could reasonably find this misconduct constituted a lack of good faith or willful misconduct and that the predictable theft and losses that fully materialized were the direct result of this misconduct. This is particularly so given that Reuter never came to trial (by agreement, not less) to deny any of it.

### RDC Managers

Independently, there was also voluminous direct and circumstantial evidence from which the jury could properly conclude that the losses of Government property described above were the result of willful misconduct or lack of good faith on the part of Fluor's RDC managers.

28

Again, the RDC Managers were entirely and exclusively in charge of the entire property operation at each of eight property hubs. The mountains of evidence of property failures presented at trial and largely conceded by Fluor are themselves sufficient for a jury to reasonably infer the RDC Managers' full knowledge of what was happening under their noses.

There is much evidence of not only their knowledge, but their active involvement in lying about and concealing the misconduct. A comprehensive Security investigation from February 2013, based on interviews of each RDC Manager, described exactly such conduct:

- The Salerno RDC Manager indicated that all IARs and LTDDs for shortages discovered after 10% inventories during FY2012 were performed, but a review of ISRs showed that LTDDs were not initiated in October, November and December 2011, and the GPA was not informed. In addition, a series of 10% inventory reports for the Salerno AO asserted 100% inventory accuracy, but the count sheets did not support that conclusion.
- The Fenty RDC Manager indicated 100% physical inventories were conducted for seven site closures, but there were no inventory-related LTDDs processed in FY2012 for four sites. The RDC Manager acknowledged there were shortages and overages at base closure sites, but he did not provide details as to which sites.
- The Sharana RDC Manager acknowledged not all records were completed according to MMP and functional procedures in preparation for a PMSA.
- The Ghazni RDC Manager confirmed not all 10% monthly inventories were being completed when he arrived in June 2012. IARs were completed, but the corresponding LTDDs were never submitted to Theater Property or the GPA. The RDC Manager identified the "root cause of these non-conformances to be from a  lack of control and enforcement of established MMP procedures."
- The Marmal RDC Manager stated that it appeared EOY inventory and LTDD information was previously withheld from disclosure to TPO and Security.

PX 796 at 7-10.

Jeffrey Nix encountered similar problems when he conducted a review of negative inventory adjustments. For 80.5% of the sampled transactions from 2010 to 2013, there was no documentation to support the negative adjustments in the system. PX 1620 at 5. When Nix attempted to get records from RDCs, most refused to provide anything, and the only two RDCs that did provided falsified records. PX 1620 at 8; Tr. 3354:7-3356:4 (no one who reviewed the report disagreed with the finding of falsified records).

29

The jury heard myriad other evidence of the misconduct of RDC Managers, including:

- At Salerno, there were surges of current balance adjustments before the 2011 PMSA and in physical count adjustments before the 2012 PMSA. See PX 1754 at 7; PX 1755 at 3.
- A Materials Control Supervisor, Todd Friemel, stated that Salerno adjustments were not reported on LTDDs at the direction of the RDC manager. PX 1636 at 1.
- Jarrold Reeves emailed all RDC managers stating, "Sites are pencil whipping the inventory, not reconciling the 10% in Maximo, and not reflecting the reason for the adjustment in Maximo." PX 28 at 1.
- During the preparation of Fluor's FY2012 end-of-year inventory report, David Erp (Sharana RDC Manager) warned, "some AO's (Sharana specifically) submitted less than 1% items for LTDD that were adjusted due to an inventory count process, therefore all adjustments for losses are needing to be reported." PX 25 at 1. Erp testified that he was concerned that the inventory counts had been falsified. 4015:4-4016:15.
- A few months earlier, Erp had warned, "We have went thru several PMSA's and they are passing because we do adjust the Materials Inventories but we are not reporting them." PX 4 at 1.
- Juan Jones, the Bagram RDC Manager, asked Reeves for guidance and explained, "Currently, we are not reporting any adjustments to the government.  I am not sure where this guidance came from but it contradicts the MMP and the FAR.  My fear is that no matter which process we take, we are not in compliance." PX 410 at 2.
- In March 2013, Juan Jones, Bagram RDC Manager, wrote to Reeves, "Realistically, *the majority of my time has been spent fixing what was hidden during the course of the September 2011 PMSA*, attempting to rectify LTDDs that were never reported, and dealing with POs that had never been received." PX 7 at 2. He thus openly acknowledged active concealment to pass PMSAs, and the ensuing losses.

In the aftermath of the 2014 Marmal PMSA, Bradley Hamm detailed employee complaints about fraudulent conduct by Marmal RDC Manager Todd Volk and explained, "These are all similar issues that we are still finalizing from Ghazni from when current Marmal leadership was assigned there…" PX 41 at 1; *see also* PX 44 at 2 (SameTime message from Juan Jones stating, "he did it here, at Ghazni and Warrior and now Marmal man").

Finally, there was the oft-discussed SameTime Chat between Bradley Hamm and Bagram RDC Manager Juan Jones about the actions of Marmal RDC Manager Todd Volk in the lead up to the May 2014 PMSA. Hamm wrote: "i got enough fraud documented from this trip to sink a ship,,, his guys here are ready to call the hotline as they are being directed to conduct straight up fraud;" "I have never seen so much straight up fraud in my logcap life"; "small scales

30

happen,,,,we are talking excess of excess here,,,above and beyond reasonable." PX 44 at 1-2. Hamm later reported to Jarrold Reeves that "several of Fluor employees stated that they were going to call the ethics hotline on Todd as to some of the directives they have been given recently, they are afraid that some of the issues will fall back on them and for valid reasoning." PX 41 at 1-2. Hamm explained he was forwarding the concerns because the other employees "were afraid to bring it up the chain due to Mr. Volk's new assignment with theater Material MGMT." *Id.* at 1. The specific concerns that Hamm forwarded included "Removing material out of containers which contained PMSA sample material rather then making appropriate corrections… tucking and hiding issues instead of fixing them. . . .Material that was not in system or issued out was directed to "make it disappear." *Id.*

These examples are illustrative of the large body of evidence that the RDC managers were central players in Fluor's property fraud, with full knowledge of the failures and actively involved in the fraudulent conduct used to conceal them. The jury could easily conclude that their conduct led to the tens of millions of dollars in losses that Fluor concedes, and the many tens of millions more that were never disclosed, as Relators presented at trial.

### Site Managers

Site managers were responsible for reviewing and signing off on inventory summary reports. PX 1077 at 69; Tr. 506:8–12. Sites then sent the full inventory documentation (including count sheets and inventory summary reports) to the RDC, so the RDC could report the results. PX 1077 at 69. Site managers also received TAT assessment reports that described deficiencies in property and materials management, from which a jury could conclude that they would have had knowledge of the systemic property failures. *See* Tr. 4125:16–4126:7.

31

The jury had ample evidence that sites falsified inventory summary reports. The February 2013 memo from Bryan Wilson to Steve Whitcomb stated that one site reported "100% perfect accountability for all line items" for five consecutive months – a completely implausible result. PX 796 at 7. Reeves confirmed, "Sites are pencil whipping the inventory, not reconciling the 10% in Maximo, and not reflecting the reason for the adjustment in Maximo." PX 28 at 1. Erp testified that he was concerned that inventory counts had been falsified. Tr. 4015:4-4016:15.

Given the role of site managers in approving inventory summary reports, all the evidence of wrongdoing relating to the reporting of inventories cited above also implicates site managers. *See supra* at § II(B)(2) (Montalvo Section), (Reeves Section), (RDC Managers Section) (describing failures to complete or accurately report inventories).

Evidence From Other Personnel Demonstrating Willful Misconduct or Lack of Good Faith

Moreover, the instructions permitted the jury to consider the evidence regarding acts of other employees in considering whether the managerial personnel described above acted willfully or without good faith. Dkt. 770 at 19. Based on that, there was more than enough such evidence of Fluor's systematic problems and concealment. *See, e.g.* Tr. 6040:14-6041:1 (Hill testimony that after getting samples, Fluor sometimes changed Maximo before an audit); Tr. 6066:9- 6067:6 (Hill testimony that not her job to disclose things to DCMA, only needs to disclose problems internally); Tr. 3357:12-23, Tr. 3383:11-3384:4 (Nix testimony regarding inventory adjustment reported to Whitcomb was still rigged); Tr. 342:23-355:13 (O'Connor testimony describing site managers requesting advance notice of quality inspections rendering them inaccurate); Tr. 2989:1 - 2992:13 (Cassanova testimony that issue tickets on samples were being falsified); *see also infra* § IV.

32

Furthermore, Fluor witnesses continually twisted words and denied the plain meaning of the language they used, enabling the jury to conclude that Fluor employees were simply not credible. For example, Bradley Hamm refused to acknowledge that when he said Fluor was committing fraud, he meant Fluor was committing fraud. *See* Tr. 1823:11-17 Instead, he hedged and obfuscated, inexplicably contending that fraud was slang, and "locker-room talk" was "slander." *See* Tr. 1945:13–19. He even denied that "band-aid" is used colloquially to mean an inadequate solution. *Compare* Tr. 1938:19-39:4.

Hamm was not alone in struggling to grasp the definition of commonplace terms he had himself used. Montalvo had trouble understanding the word "promise," *see* Tr. 1072:21-25, and "broken," *see* Tr. 1109:1-13. He testified under oath that he used, but did not understand, the phrase "Macchiavellian scheme." *See* Tr. 1142:5-12.[6]

In the face of all this testimony, the jury could reasonably conclude that Fluor witnesses were not credible, and their testimony not worthy of belief.

### III.     The Jury Heard Substantial Evidence that Fluor Avoided or Decreased an Obligation to the Government

Fluor rehashes an unsuccessful summary judgment argument, suggesting in passing that the jury lacked evidence to conclude that Fluor avoided or decreased an actual obligation to the Government, Dkt. 784-1 at 20-21, but its position basically collapses into the argument about whether Fluor's managerial personnel engaged in willful misconduct or lack of good faith that caused a loss of Government property. The Property Clause provides that Fluor is liable for Government property that was lost because of the willful misconduct or lack of good faith by Fluor

---

[6] Along similar lines, Mr. Snyder fought over the definitions of "bad" and "running out." *See* Tr. 7059:25-60:16, 7068:14-18 ("Q. So you were walking the auditors so they wouldn't see the trouble areas that would make you fail the audit. That is what you wrote, right? A. That is how it reads, but that is not what was being said here."), 7084:4-12.

managers, full stop. PX 1026. So long as there was sufficient evidence of loss through such misconduct, Fluor owed the Government money. And for all of the factual reasons discussed above, there is such evidence. *See supra* § II(B). This alone defeats Fluor's argument.

Fluor instead makes a purely legal argument, one without merit: that an obligation does not exist unless and until the Government affirmatively exercises enforcement discretion. As the Court already explained when rejecting this argument in Fluor's motion for summary judgment, the Fourth Circuit in *Wheeler* foreclosed it. Dkt. 600 at 25; *United States ex rel. Wheeler v. Acadia Healthcare Company, Inc.*, 127 F.4th 472, 496–97 (4th Cir. 2025) ("A contracting party's discretion to enforce an obligation does not eliminate the existence of that obligation.").[7]

In response, Fluor cites *United States ex rel. Byers v. Amedisys SC LLC*, No. 7:21-CV-03109-DCC, 2022 WL 4237076 (D.S.C. Sept. 14, 2022) as "dismissing complaint for failure to allege 'a separate obligation for requirement as required to establish a reverse false claim[.]'" In *Byers*, the Court found that "conduct alleged [in the complaint] duplicative of the allegations underlying Relators other claims," thus lacking allegations that the defendant bore any obligation to return funds other than "simply because it knew the funds were fraudulently obtained and that

---

[7] Courts widely agree. *See U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1204 (10th Cir. 2006) ("That the government may exercise discretion regarding whether to charge the authorized fee does not render an obligation 'contingent' in the context of a reverse false claim."); *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 741 (6th Cir. 1999); *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1237 (11th Cir. 1999); *Riedel*, 332 F. Supp. 3d at 82; *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 255 (D.D.C. 2016). Fluor is "not permit[ted] to avoid liability simply because its concealment was successful." Dkt. 600 at 26. And, to be sure, some government process—procedural Due Process, after all, being a constitutional requirement—does not extinguish liability for a claim under 31 U.S.C. § 3729(a)(1)(G). Even if Fluor had not lied to prevent the Government from making an informed enforcement decision, the *qui tam* provision of the FCA exists to supplement such enforcement. *See U. S. ex rel. Marcus v. Hess*, 317 U.S. 537, 542 (1943) ("The statute is a remedial one. It is intended to protect the treasury against the hungry and unscrupulous host that encompasses it on every side, and should be construed accordingly."); *cf. Harrison I*, 176 F.3d at 788.

34

the government was the source of the funds." Id. at *4. The Court thus dismissed the reverse false

claim but maintained the claims alleging violations of other provisions of § 3729(a)(1).

In contrast, here the source of Fluor's obligation is clear. The False Claims Act defines

"obligation" as:

> an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.

31 U.S.C. § 3729(b)(3); see also Dkt. 600 at 23 (this Court explaining: "The statute defines

'obligation' broadly"). Fluor's duty to pay for property lost due to managerial misconduct "ar[ose]

from" both the "contractual relationship" in LOGCAP, and the "regulation" of the Property Clause.

31 U.S.C. § 3729(b)(3). The Property Clause provides that Fluor must pay the Government for the

"Loss of Government property that is the result of willful misconduct or lack of good faith on the

part of the Contractor's managerial personnel." PX 1026. And the LOGCAP IV base contract

imposed the same obligation on Fluor by incorporating the Property Clause. PX 1044 at 4–12.

That obligation arises as soon as the loss occurs; there is nothing further that the Government must

do to create an obligation. By "conceal[ing]" or "avoid[ing] or decreas[ing]" this obligation, Fluor

violated the False Claims Act. 31 U.S.C. § 3729(a)(1)(G). In addition, each time that Fluor

submitted an LTDD that sought relief of responsibility for losses caused by managerial

misconduct, Fluor made "a false record or statement material to an obligation." *Id.*

## IV.     The Jury Heard Substantial Evidence that Fluor Acted Knowingly

Fluor again contends that there was insufficient evidence that Fluor acted knowingly. Dkt.

784-1 at 21–23. To the contrary, the jury heard significant evidence that Fluor "knowingly

conceal[ed] or knowingly and improperly avoid[ed] or decrease[d] an obligation to pay" for

Fluor's losses of Government property. 31 U.S.C. § 3729(a)(1)(G). This element is satisfied

through all of the evidence discussed above regarding Fluor management's awareness of losses that were not reported to the Government and awareness of Fluor's hiding the extent of its PMS failures. *See supra* § II(B). There was more than sufficient evidence to support the jury's verdict on this point.

As it did at trial and summary judgment, Fluor again declares that "Relators must place the requisite knowledge in a single individual." Dkt. 784-1 at 21 (citing *Harrison II*, 352 F.3); *see also* Tr. 5761:5-18; Dkt. 507-1 at 43 n. 35. The law is actually the opposite of what Fluor claims: in *Harrison II*, the Fourth Circuit explicitly stated "[w]e decline to adopt Westinghouse's 'single actor' requirement," *see id.* at 919, and "a corporation can be held liable under the FCA even if the certifying employee was unaware of the wrongful conduct of other employees, *see id.* at n.12. The Court thus rejected an argument "that a single employee must know both the wrongful conduct and the certification requirement[,]" explaining, "[i]f we established such a rule, corporations would establish segregated 'certifying' offices that did nothing more than execute government contract certifications, thereby immunizing themselves against FCA liability." *Id.* All *Harrison II* did is reject the "piecing together scraps of 'innocent' knowledge held by various corporate officials" to prove scienter, *see id.* at 918 n. 9, but here, the knowledge held by Fluor's corporate officials is by no means "innocent."

There is robust case law that relators need not prove that a single individual had actual knowledge of all of the relevant facts establishing a violation of the False Claims Act. *See, e.g., United States ex rel. Sheldon v. Allergan Sales, LLC*, 24 F.4th 340, 368 (4th Cir. 2022), remanded on other grounds, (Wynn, J., dissenting) ("The clear intent of [the 1986 FCA] amendments was to . . . 'hold responsible those corporate officers who insulate themselves from knowledge of false claims submitted by lower-level subordinates.'") (quoting S. Rep. No. 99-

345, at 7, 1986 U.S.C.C.A.N. at 5272).[8]

Applying the correct standard, the trial record sufficiently establishes that Fluor acted knowingly in the steps it took (and failed to take) that amounted to Fluor's avoidance of their obligation to the Government. Examples of this evidence are laid out above, discussing the misconduct of Fluor's managerial personnel. *See supra* at § II(B).[9]

There was further evidence from which the jury could infer that Fluor learned of problems and avoided disclosures thereof in order to decrease or avoid its obligation to the government. For example, Bradley Hamm testified to disclosing the "straight-up fraud" to his

---

[8] *See also United States ex rel Davis v. Prince*, No. 1:08CV1244, 2011 WL 13092085 (E.D. Va. June 23, 2011) ("It is intended that persons who ignore 'red flags' that the information may not be accurate or those persons who deliberately choose to remain ignorant of the process through which their company handles a claim should be held liable under the Act.") (quoting Civil False Claims, § 2.06[B], at 291 (in turn quoting H. Rep. No. 99-660 (June 26, 1986))); *see also United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1276 (D.C. Cir. 2010)) ("Under the FCA, 'collective knowledge' provides an inappropriate basis for proof of scienter . . . . On the other hand, actual knowledge possessed by individual company employees or a conclusion that the company acted recklessly based on the actions of employees or the company's systems and structure would be sufficient.").

[9] There is loads more. Minka Hill knew about "real" and "substantial" problems, which she advised her colleagues to conceal. PX 14 (email from Minka Hill "Attached is the prePMSA. I think we should keep this one internal."); Tr. 6064:4-15 (Hill testimony corroborating email); Tr. 6066:23-6067:6 (Hill testimony that when she "knew of a real problem, a substantial problem," that she "would tell Fluor internally not [to tell] the DCMA"). David Payne likewise knew of problems and concealments thereof and shared as much with his supervisors, but the problems continued and were concealed. See PX 1336 (email from Payne to his Brian Wilson "These actions were performed without informing Fluor property to initiate the loss, theft, damaged or destroyed LTDD process and appear to be in direct violation of Fluor's material management plan, MMP. These changes were made to conceal significant losses of lumber materials across several categories with the goal of prolonging disclosure and accountability for those losses.") Tr. 149:3–150:4); Tr. 150:4–23 (Payne testimony of investigating the incident and unreported losses). Montalvo, Reuter, and Whitcomb also knew about material problems and the concealments thereof. *See supra* at § II(B)(2)*; e.g.,* PX 1583 (Reuter's note that "The entire procurement, property and materials piece is just broken."); PX 4 (Montalvo emailing Reuter, "it's not what they are reporting, but what is absent from their reports."); PX 1546 (plywood incident); PX 574 (Ridley's "lessons learned" to Reeves for Whitcomb); Tr. 5058:6-5059:12 (Montalvo and Reeves aware in October 2011 that inventory adjustments not being submitted for inclusion on LTDDs).

"chain of command." Tr. 1867:22-1867:24. And once he told Reeves about "potential fraud," Hamm "didn't know what [Reeves] did or didn't do" with the information but nonetheless did not expect a call from Fluor's compliance team. Tr. 1872:1–1873:3; *see also* 1873:25-1874:3. Similarly, Dillard testified that Reeves and others learned about specific and systemic problems yet took no effective action. Tr. 5027:18--5031:11 (Fluor told the "government we'd fix it in 2011 with our PMSA CAP, and then it just stayed broken."); Tr. 5089:8-5091:5. Nix testified that no one told him his conclusions were wrong or fixed the problems he raised. Tr. 3387:12–16. These are just examples. The  jury could easily infer that Fluor's failure to pass along these concerns demonstrates an intent to mislead. *See United States v. DynCorp International*, LLC, 253 F. Supp. 3d 89 (D.D.C. 2017) (contractor's withholding of information about the unreasonableness of the costs that contractor charged the Department of State permitted a reasonable inference that contractor did so with intent that government not realize outrageousness of costs).

## V.     The Jury Had Ample Evidence to Find Fluor Corporation Liable

Finally, Fluor contends that the jury lacked evidence to find that 1) Fluor Corporation owed an obligation to the government and 2) any relevant person acted as Fluor Corporation's agent in concealing that obligation. Dkt. 784-1 at 28–29. Fluor waived the first argument by failing to raise it in its earlier motions for judgment as a matter of law. But both arguments crumble under scrutiny regardless.

### A.     Fluor Waived Any Sufficiency Argument Related to Fluor Corporation's "Obligations."

To start, Fluor has waived any argument that Fluor Corporation did not owe the government an obligation under the FCA. A party "waives its right to move to set aside a verdict for [a given] reason pursuant to Rule 50(b)" by "not mov[ing] for judgment as a matter of law on

38

[that] issue pursuant to Rule 50(a)." *Carson v. Emergency MD, LLC*, No. 6:20-CV-01946-JD, 2024 WL 4520234, at *4 (D.S.C. Apr. 16, 2024) (quoting *Tidewater Fin. Co. v. Finserv Sols., Inc.*, 4 F. App'x 201, 204 (4th Cir. 2001)). There are two important reasons for this rule. First, overriding a jury's verdict on grounds not previously raised would violate the prevailing party's Seventh Amendment right to a jury trial. *See Fed. Sav. & Loans Ins. Corp. v. Reeves*, 816 F.2d 130, 138 (4th Cir. 1987); 9B Wright & Miller, Fed. Prac. & Proc. Civ. § 2522 (3d ed. 2026 update). And second, the opposing party must have "enough notice of the alleged error to permit an attempt to cure it" before the court sends the case to the jury. *Reeves*, 816 F.2d at 138; *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1388 (7th Cir. 1984) (Posner, J.).

Fluor failed entirely to raise the issue of Fluor Corporation's "obligations" in its earlier Rule 50(a) motions. Fluor's initial Rule 50(a) motion, which it filed after Relators rested their case, did not even distinguish between Fluor Corporation and Fluor Intercontinental, let alone argue that Fluor Corporation did not owe an "obligation" to the government. *See generally* Dkt. 725-1. Fluor filed a second Rule 50(a) motion after the close of evidence and argued that "Fluor Corporation is [e]ntitled to JMOL on [a]ll [c]laims." *See* Dkt. 752-1 at 30. Yet Fluor focused entirely on parent-subsidiary liability and piercing the corporate veil, without even a whisper that Fluor Corporation owed the government no "obligation" as defined in the FCA. *Id.* at 30-31. The first time Fluor raised the issue was in its present motion to override the jury's verdict in Relators' favor. *See* Dkt. 784-1 at 28. Fluor's silence in its earlier Rule 50(a) motions amounts to waiver. *See Carson*, 2024 WL 4520234, at *4; *Tidewater Fin. Co.*, 4 F. App'x at 204.

Fluor's actions outside its Rule 50 motions provide even more reasons to find waiver. Courts treat the "intentional relinquishment or abandonment of a known right" as a waiver of that right. *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022) (quoting *United States v. Olano*,

39

507 U.S. 725, 733 (1993)). And courts infer a party has waived a right if the party constructively knew it had the right, but took actions inconsistent with asserting it. *Design Gaps, Inc. v. Distinctive Design & Constr. LLC*, 162 F.4th 452, 481 (4th Cir. 2025). Here, there is ample evidence that Fluor knew it could (and might eventually) argue that Fluor Corporation did not owe the government an obligation, but chose not to raise that argument. For example, before trial, Fluor tendered separate verdict forms for Fluor Intercontinental and Fluor Corporation. *See* Fluor Intercontinental's Proposed Verdict Form (attached as Exhibit 1); Fluor Corp.'s Proposed Verdict Form (attached as Exhibit 2). In these forms, Fluor proposed asking the jury specifically whether Relators had proven that Fluor Corporation "knowingly and improperly avoided an obligation to pay the government for lost property." *See* Ex. 2 at 3. Likewise, in its revised proposed jury instructions, which Fluor tendered a day before filing its second Rule 50(a) motion, Fluor suggested instructing the jury that, to find Fluor Corporation liable, it had to determine that Fluor Corporation independently owed the government an obligation. *See* Dkt. 760-2, Fluor's Mar. 5, 2026, Proposed Jury Instr. Despite repeatedly indicating that it knew Fluor Corporation's "obligations" were at issue, Fluor chose not to mention that issue in its Rule 50(a) motions, and instead chose to wait until after the jury's verdict to raise its sufficiency challenge. The Court must infer that in doing so, Fluor intentionally relinquished the right to challenge the sufficiency of the evidence on this ground. The Court cannot save Fluor from the consequences of its own decisions.[10]

---

[10] Though Relators need not demonstrate why Fluor chose to waive its arguments, it is not difficult to imagine a strategic reason. Fluor may, for example, have decided that it stood a better chance of convincing the jury not to hold Fluor Corporation liable by not calling Relators' attention to Fluor Corporation's obligations to the government. It may have decided that doing so would tip its hand and give Relators a chance to shore up any supposed gaps. Fluor's about-face after being found liable represents the exact gamesmanship that Rule 50's waiver rules are meant to protect against. *See Reeves*, 816 F.2d at 138.

**B.**        **Even on the Merits, Fluor Corporation's Sufficiency Challenge Fails.**

Despite its waiver, Fluor now argues that there is no evidence Fluor Corporation owed the government an "obligation" as the FCA defines that term, and no evidence that any relevant person acted as Fluor Corporation's agent. *See* Dkt. 784-1 at 28-29. These arguments fail because there was evidence that individuals in Fluor Government Group, acting on Fluor Corporation's behalf as its agents, assumed obligations to pay the government for lost property.

To start, there was ample evidence that various key actors in this case acted as Fluor Corporation's agents. As noted, the jury saw (undisputed) evidence that FGG was a business division within Fluor Corporation. DX591 at 4. So the jury could reasonably have concluded that individuals like Jarrold Reeves, Rick Reuter, Tony Montalvo, and Minka Hill, who held themselves out as members of FGG in emails and written documents, were in fact Fluor Corporation's employees or agents. *See, e.g.*, PX 5 (Reeves signing email as "Government Group"); PX 3 (Reuter signing emails as "V.P. Afghanistan Operations Fluor Government Group"); PX 365 at (Letter from Montalvo to DCMA on behalf of "Fluor Government Group"); PX6 (Rogers); PX 7 (Juan Jones); PX1622 (Rash); PX16 (Nix); PX 238 (Minka Hill); PX 665 (Dillard); PX 542 (Riley); PX46 (Gunter); PX1500 (Rutledge); DX 591 (Methot); PX 1062 (Wells); PX 2 (Rabb); PX 380 (Ridley). For another, the jury could reasonably have found that individuals who used "FluorCorp" email addresses were employees or agents of Fluor Corporation. *See, e.g.*, PX 3 (Reuter, Gunter, and Montalvo all using "FluorCorp" email addresses); PX 5 (same for Reeves and Minka Hill).

Second, there was plenty of evidence that Fluor Corporation assumed Fluor Intercontinental's obligations under LOGCAP IV and Task Order 5. A contract binds a nonsignatory whose conduct indicates that it intends to assume contractual obligations. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009); 21 Williston on Contracts § 57:19 (4th ed.

41

2026 update).[11] The jury considered plenty of evidence that Fluor Corporation's agents in FGG, acting on Fluor Corporation's behalf, intentionally assumed Fluor Intercontinental's obligations under LOGCAP IV and Task Order 5. *See, e.g.*, PX 1077 at 82–83 ("FGG has a contractual obligation to adhere to . . . the applicable contract clauses as they relate to stewardship and management of Government property in the possession of contractors."). Indeed, as discussed above, evidence showed that individuals in FGG performed LOGCAP IV and Task Order 5.[12] *See, e.g.*, DX 591 at 4 (Methot worked for FGG, a "business unit within Fluor Corporation responsible for U.S. Government contracting," and also acted "on behalf of Fluor Intercontinental"); DX 630 at 4–5 (letter from DCMA to Norm Powell of "Fluor Corporation" stating that "*your* Property System is acceptable and approved," attaching a report addressed to Fluor Intercontinental, and listing FGG employees as "Contractor Representatives" (emphasis added)); DX 700 at 1–2 (now addressing Powell as a member of FGG, naming FGG as the contractor, and listing Fluor Intercontinental's address as FGG's address); *accord* PX 720 (similar). Thus, the jury had a legally sufficient evidentiary basis to conclude that Fluor Corporation assumed Fluor Intercontinental's obligations to the government by executing LOGCAP IV and Task Order 5 on its behalf. In other words, the jury had a basis to find that Fluor Corporation's obligations were at least coterminous with Fluor Intercontinental's.

---

[11] Relators note that "when reviewing a motion for judgment as a matter of law," the court must "apply the law as it should be, rather than the law as it was read to the jury." *United States ex rel. Cody v. ManTech Int'l, Corp.*, 746 F. App'x 166, 179-80 (4th Cir. 2018). That is because the focus at this stage is on the legal sufficiency of the jury's verdict, not on why it actually reached its decision. *See id.*

[12] Fluor does not argue that verdicts against Fluor Corporation and Fluor Intercontinental are inconsistent. And even in its earlier Rule 50(a) motions, Fluor never argued that Fluor Corporation and Fluor Intercontinental could not *both* be held liable for actions taken by individuals in FGG. So Fluor has waived all arguments to that end. *See Reeves*, 816 F.2d at 138; *Design Gaps*, 162 F.4th at 481.

Fluor's arguments to the contrary are unresponsive. First, Fluor suggests that "[a]t most, Relators got a handful of witnesses to testify that, in hindsight, they believe (erroneously) that they were employed by Fluor Corporation." Dkt. 784-1 at 39. For one thing, even if the Court were to disregard these witnesses' testimony about who employed them, as noted above, Relators still presented substantial evidence that Fluor Corporation assumed obligations through its agents' actions. For another, Fluor asks the Court to draw inferences in exactly the wrong direction. In this posture, the Court must credit testimony in Relators' favor unless it is "incredible on its face." *Westmoreland*, 924 F.3d at 722 (quoting *Duke*, 928 F.2d at 1419). Fluor's characterization of its own employees' sworn testimony as "erroneous" falls far short of that.

In a footnote, Fluor next argues that FGG's actions do not bind Fluor Corporation because FGG is "not a legal entity." Dkt. 784-1 at 29 n.15. This is a strawman. The jury's verdict did not rely on finding that FGG is a legal entity, or that FGG itself worked as Fluor Corporation's agent. Rather, the jury could reasonably have concluded that FGG is a specialized team of Fluor employees who act as agents for Fluor Corporation and Fluor Intercontinental, just as, for example, universities divide their employees into departments or law firms divide their lawyers into practice groups. In sum, the jury had sufficient grounds to find Fluor Corporation liable for violating 31 U.S.C. § 3729(a)(1)(G).

### C.     Fluor Corporation Is Liable for Causing Any Obligation to Be Avoided.

The jury's verdict can be independently supported by the fact that Fluor Corporation can be liable for causing *any* obligation to the Government to be avoided. That is because the FCA imposes liability on "*any person*" who "knowingly makes, uses, or causes to be made or used, a false record or statement material to *an obligation* to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases *an obligation*" to pay or transmit property to the government. 31 U.S.C. § 3729(a)(1)(G) (emphasis

43

added). The statute does not limit liability to those who conceal "their own" obligations. Accordingly, courts have routinely held that § 3729(a)(1)(G) applies when a defendant impairs an obligation that someone else owes the government. *See, e.g.*, *United States v. Caremark, Inc.*, 634 F.3d 808, 817 (5th Cir. 2011); *United States ex rel. Thomas v. Touchstone Behav. Health*, 774 F. Supp. 3d 1179, 1193 (D. Ariz. 2025); *United States ex rel. Grubea v. Risocki, Risocki & Assocs., P.C.*, 318 F. Supp. 3d 680, 703 (S.D.N.Y. 2018); *United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 60 (D.D.C. 2014); *United States v. Merck-Medco Managed Care, L.L.C.*, 336 F. Supp. 2d 430, 444 (E.D. Pa. 2004); *United States ex rel. Koch Indus., Inc.*, 57 F. Supp. 2d 1122, 1128 (N.D. Okla. 1999). Fluor cites no caselaw holding otherwise. Here, the jury could have found Fluor Corporation liable even *without* determining that it independently owed the government an obligation, so Fluor's sufficiency challenge is a nonstarter.

## CONCLUSION

Fluor's Motion reargues evidence that the parties already presented to the jury. That evidence was substantial and carefully considered by a jury that paid close attention to this case for seven weeks. The jury ruled against Fluor and in favor of Relators based on the significant evidence it evaluated. The Court should deny Fluor's Motion.

May 8, 2026                                         Respectfully submitted,

                                                    /s/ Andrew Hand
                                                    Andrew Hand

                                                    Richard Harpootlian (Fed. ID No. 1730)
                                                    Andrew Hand (Fed. ID No. 12176)
                                                    RICHARD A. HARPOOTLIAN P.A.
                                                    1410 Laurel Street
                                                    Post Office Box 1090
                                                    Columbia, SC 29202
                                                    Telephone: (803) 252-4848
                                                    Facsimile: (803) 252-4810
                                                    rah@harpootlianlaw.com

Jonathan Loevy
Michael Kanovitz
Daniel Twetten
Anand Swaminathan
Frank Newell
Anna Dover
Gwen Parker
Heather Sticht
Dominique Gilbert
Alexandra Wolfson
Aadi Tolappa
**LOEVY & LOEVY**
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
Telephone: (312) 243-5900
Facsimile: (312) 243-5902
anand@loevy.com
*Attorneys for Relators*
*Charles R. Shepherd*
*and Danny V. Rude*

Frank L. Eppes (Fed. ID No. 1003)
EPPES & PLUMBLEE, PA
PO Box 10066
Greenville, SC 29603
Telephone: (864) 235-2600
Facsimile: (864) 235-4600
feppes@eppesandplumblee.com

*Attorney for Relator Robert Scott*
*Dillard*

Judah N. VanSyckel
SALUDA LAW, LLC
137 E. Butler Street
Lexington, SC 29072
Telephone: (803) 939-6927
Facsimile: (803) 902-8004
judah@saludalaw.com

*Attorney for Relator Rickey Mackey*

45

# EXHIBIT 1

Fluor Intercontinental's Proposed Verdict Form

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

UNITED STATES OF AMERICA *ex rel.*
CHARLES R. SHEPHERD; DANNY V.
RUDE; ROBERT SCOTT DILLARD; and
RICKEY MACKEY,

                 Plaintiffs,

v.

FLUOR CORPORATION; FLUOR
INTERCONTINENTAL, INC.,

                 Defendants.

Civil Action No. 6:13-cv-02428-JD
Hon. Joseph Dawson, III

**FLUOR'S PROPOSED SPECIAL VERDICT FORM (FLUOR INTERCONTINENTAL, INC.)[1]**

      We the jury, being duly impaneled and sworn, find as follows:

**I.**      **Award Fee Theory**

      ***(Please refer to Jury Instructions 12-20, 36)***

      **A.**      **Award Fee Period 1 (July 7, 2009 – June 30, 2010)**

      1.      Have Relators proven by a preponderance of the evidence that Fluor fraudulently induced an award fee?

      _____ Yes      _____ No

      2.      What award fee would Fluor have received but-for Fluor's false or fraudulent statements?

      _____

---

[1] Fluor received the Court's summary judgment decision this morning and notes that there remain outstanding questions relating to legal issues presented in these instructions. Fluor reserves the right to supplement and/or revise this proposed verdict form before the charging conference depending on the evidence and the Court's further guidance.

**B.** **Award Fee Period 2 (July 1, 2010 – December 31, 2010)**

3.  Have Relators proven by a preponderance of the evidence that Fluor fraudulently induced an award fee?

_____ Yes          _____ No

4.  What award fee would Fluor have received but-for Fluor's false or fraudulent statements?

_____

**C.** **Award Fee Period 3 (Jan. 1, 2011 – June 30, 2011)**

5.  Have Relators proven by a preponderance of the evidence that Fluor fraudulently induced an award fee?

_____ Yes          _____ No

6.  What award fee would Fluor have received but-for Fluor's false or fraudulent statements?

_____

**D.** **Award Fee Period 4 (July 1, 2011 – December 31, 2011)**

7.  Have Relators proven by a preponderance of the evidence that Fluor fraudulently induced an award fee?

_____ Yes          _____ No

8.  What award fee would Fluor have received but-for Fluor's false or fraudulent statements?

_____

**E.** **Award Fee Period 5 (Jan. 1, 2012 – June 30, 2012)**

9.  Have Relators proven by a preponderance of the evidence that Fluor fraudulently induced an award fee?

_____ Yes          _____ No

10.  What award fee would Fluor have received but-for Fluor's false or fraudulent statements?

_____

## II.     Property Management Theory

### (Please refer to Jury Instructions 21-31, 36)

11.     Have Relators proven by a preponderance of the evidence that Fluor knowingly and improperly avoided an obligation to pay the government for lost property?

_____ Yes          _____ No

*If you answered "Yes" to Question 11, you must indicate on which theory your finding is based by answering Questions 12-14.*

12.     Have Relators proven by a preponderance of the evidence that the government would have disapproved Fluor's Property Management System?

_____ Yes          _____ No

13.     Have Relators proven by a preponderance of the evidence that Fluor's managerial personnel engaged in willful misconduct or lack of good faith?

_____ Yes          _____ No

14.     If you answered "Yes" to Question 13, identify the Fluor manager or managers on which your finding is based.

_____

15.     State the amount of money that Fluor was obligated to pay but did not.

_____

## III.     Overbilling for Labor Theory

### (Please refer to Jury Instructions 32-36)

16.     Have Relators proven by a preponderance of the evidence that Fluor knowingly submitted a false or fraudulent claim for labor hours for M&A employees?

_____ Yes          _____ No

17.     Identify the number of false or fraudulent claims.

_____

18.     State the damages the government sustained.

_____

3

**IV.    False Claims Act Retaliation**

*(Please refer to Jury Instructions 37-49)*

19.    Has Relator Shepherd proven that Fluor retaliated against him?

_____ Yes          _____ No

20.    State the damages Relator Shepherd sustained.

_____

21.    Has Relator Rude proven that Fluor retaliated against him?

_____ Yes          _____ No

22.    State the damages Relator Rude sustained.

_____

*[signature page follows]*

4

Respectfully submitted,

/s/ Mark C. Moore
Mark C. Moore (Fed. ID No. 4956)
Michael A. Parente (Fed. ID No. 13358)
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 540-2146
Facsimile: (803) 727-1458
MMoore@maynardnexsen.com

Konstantine P. Diamaduros (Fed. ID No. 12368)
MAYNARD NEXSEN PC
104 South Main Street, Suite 900 (29601)
Post Office Drawer 10648
Greenville, SC 29603-0648
Telephone: (864) 370-2211
Facsimile: (864) 282-1177
KDiamaduros@maynardnexsen.com

Craig D. Margolis (admitted *pro hac vice*)
Tirzah S. Lollar (admitted *pro hac vice*)
Christian D. Sheehan (admitted *pro hac vice*)
Elizabeth A. Carney (*admitted pro hac vice*)
Katelyn M. Deibler (*admitted pro hac vice*)
Elliot S. Rosenwald (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, Northwest Washington, DC 20001-3743
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
craig.margolis@arnoldporter.com

Rachel K. Higgins (admitted *pro hac vice*)
Sahrula Kubie (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

January 14, 2026
Columbia, South Carolina

*Counsel for Defendants Fluor Corporation and Fluor Intercontinental, Inc.*

5

# EXHIBIT 2

Fluor Corp.'s Proposed Verdict Form

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

UNITED STATES OF AMERICA *ex rel.*
CHARLES R. SHEPHERD; DANNY V.
RUDE; ROBERT SCOTT DILLARD; and
RICKEY MACKEY,

           Plaintiffs,

v.

FLUOR CORPORATION; FLUOR
INTERCONTINENTAL, INC.,

           Defendants.

Civil Action No. 6:13-cv-02428-JD
Hon. Joseph Dawson, III

**FLUOR'S PROPOSED SPECIAL VERDICT FORM (FLUOR CORPORATION)[1]**

    We the jury, being duly impaneled and sworn, find as follows:

**I.**    **Award Fee Theory**

    ***(Please refer to Jury Instructions 12-20, 36)***

    **A.**    **Award Fee Period 1 (July 7, 2009 – June 30, 2010)**

    1.    Have Relators proven by a preponderance of the evidence that Fluor fraudulently induced an award fee?

        _____ Yes        _____ No

    2.    What award fee would Fluor have received but-for Fluor's false or fraudulent statements?

        _____

---

[1] Fluor received the Court's summary judgment decision this morning and notes that there remain outstanding questions relating to legal issues presented in these instructions. Fluor reserves the right to supplement and/or revise this proposed verdict form before the charging conference depending on the evidence and the Court's further guidance.

**B.**     **Award Fee Period 2 (July 1, 2010 – December 31, 2010)**

3.     Have Relators proven by a preponderance of the evidence that Fluor fraudulently induced an award fee?

_____ Yes          _____ No

4.     What award fee would Fluor have received but-for Fluor's false or fraudulent statements?

_____

**C.**     **Award Fee Period 3 (Jan. 1, 2011 – June 30, 2011)**

5.     Have Relators proven by a preponderance of the evidence that Fluor fraudulently induced an award fee?

_____ Yes          _____ No

6.     What award fee would Fluor have received but-for Fluor's false or fraudulent statements?

_____

**D.**     **Award Fee Period 4 (July 1, 2011 – December 31, 2011)**

7.     Have Relators proven by a preponderance of the evidence that Fluor fraudulently induced an award fee?

_____ Yes          _____ No

8.     What award fee would Fluor have received but-for Fluor's false or fraudulent statements?

_____

**E.**     **Award Fee Period 5 (Jan. 1, 2012 – June 30, 2012)**

9.     Have Relators proven by a preponderance of the evidence that Fluor fraudulently induced an award fee?

_____ Yes          _____ No

10.     What award fee would Fluor have received but-for Fluor's false or fraudulent statements?

_____

**II.**    **Property Management Theory**

           ***(Please refer to Jury Instructions 21-31, 36)***

11.    Have Relators proven by a preponderance of the evidence that Fluor knowingly and improperly avoided an obligation to pay the government for lost property?

        _____ Yes          _____ No

*If you answered "Yes" to Question 11, you must indicate on which theory your finding is based by answering Questions 12-14.*

12.    Have Relators proven by a preponderance of the evidence that the government would have disapproved Fluor's Property Management System?

        _____ Yes          _____ No

13.    Have Relators proven by a preponderance of the evidence that Fluor's managerial personnel engaged in willful misconduct or lack of good faith?

        _____ Yes          _____ No

14.    If you answered "Yes" to Question 13, identify the Fluor manager or managers on which your finding is based.

    _____

15.    State the amount of money that Fluor was obligated to pay but did not.

    _____

**III.**    **Overbilling for Labor Theory**

           ***(Please refer to Jury Instructions 32-36)***

16.    Have Relators proven by a preponderance of the evidence that Fluor knowingly submitted a false or fraudulent claim for labor hours for M&A employees?

        _____ Yes        _____ No

17.    Identify the number of false or fraudulent claims.

    _____

18.    State the damages the government sustained.

    _____

3

**IV.**     <u>**False Claims Act Retaliation**</u>

*(Please refer to Jury Instructions 37-49)*

19.     Has Relator Shepherd proven that Fluor retaliated against him?

_____ Yes          _____ No

20.     State the damages Relator Shepherd sustained.

_____

21.     Has Relator Rude proven that Fluor retaliated against him?

_____ Yes          _____ No

22.     State the damages Relator Rude sustained.

_____

*[signature page follows]*

4

Respectfully submitted,

/s/ Mark C. Moore
Mark C. Moore (Fed. ID No. 4956)
Michael A. Parente (Fed. ID No. 13358)
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 540-2146
Facsimile: (803) 727-1458
MMoore@maynardnexsen.com

Konstantine P. Diamaduros (Fed. ID No. 12368)
MAYNARD NEXSEN PC
104 South Main Street, Suite 900 (29601)
Post Office Drawer 10648
Greenville, SC 29603-0648
Telephone: (864) 370-2211
Facsimile: (864) 282-1177
KDiamaduros@maynardnexsen.com

Craig D. Margolis (admitted *pro hac vice*)
Tirzah S. Lollar (admitted *pro hac vice*)
Christian D. Sheehan (admitted *pro hac vice*)
Elizabeth A. Carney (*admitted pro hac vice*)
Katelyn M. Deibler (*admitted pro hac vice*)
Elliot S. Rosenwald (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, Northwest Washington, DC 20001-3743
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
craig.margolis@arnoldporter.com

Rachel K. Higgins (admitted *pro hac vice*)
Sahrula Kubie (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

January 14, 2026
Columbia, South Carolina

*Counsel for Defendants Fluor Corporation and Fluor Intercontinental, Inc.*

5